**No. 26-2759**

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

ANDREW CORZO, ET AL.,
*Plaintiffs-Appellees*,

*v.*

CORNELL UNIVERSITY, ET AL.,
*Defendants-Appellants*.

Interlocutory Appeal Pursuant to Federal Rule of Civil Procedure 23(f) from the United States District Court for the Northern District of Illinois, No. 1:22-cv-00125-MFK Before the Honorable Matthew F. Kennelly

## BRIEF FOR DEFENDANTS-APPELLANTS

DAVID GRINGER
ALAN SCHOENFELD
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
david.gringer@wilmerhale.com
alan.schoenfeld@wilmerhale.com

SETH P. WAXMAN
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
seth.waxman@wilmerhale.com

*Attorneys for Defendant-Appellant the Trustees of the University of Pennsylvania*

October 5, 2026

NORMAN ARMSTRONG
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800
norman.armstrong@cooley.com

*Attorney for Defendant-Appellant Cornell University*

BRITT M. MILLER
DANIEL T. FENSKE
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
dfenske@mayerbrown.com

*Attorneys for Defendant-Appellant Georgetown University*

ERIC MAHR
JAN RYBNICEK
FRESHFIELDS US LLP
700 13th Street NW
Washington, DC 20005
(202) 777-4500
eric.mahr@freshfields.com
jan.rybnicek@freshfields.com

*Attorneys for Defendant-Appellant Massachusetts Institute of Technology*

ZAKI ANWAR
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
zaki.anwar@wilmerhale.com

EDWARD W. FELDMAN
MILLER SHAKMAN LEVINE &
FELDMAN LLP
30 W. Monroe Street
Suite 1900
Chicago, IL 60603
(312) 759-7213
efeldman@millershakman.com

*Attorneys for Defendant-Appellant the Trustees of the University of Pennsylvania*

ROBERT A. VAN KIRK
SARAH F. KIRKPATRICK
MATTHEW D. HEINS
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000
rvankirk@wc.com
skirkpatrick@wc.com
mheins@wc.com

*Attorneys for Defendant-Appellant University of Notre Dame*

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-

Short Caption: Andrew Corzo, et al. v. Cornell University, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Trustees of the University of Pennsylvania

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Wilmer Cutler Pickering Hale & Dorr LLP; Miller Shakman Levine & Feldman LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Seth P. Waxman Date: 6/15/2026

Attorney's Printed Name: Seth P. Waxman

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: Wilmer Cutler Pickering Hale & Dorr LLP

2100 Pennsylvania Avenue NW, Washington DC 20037

Phone Number: 202-663-6800 Fax Number: 202-663-6363

E-Mail Address: seth.waxman@wilmerhale.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-

Short Caption: Andrew Corzo, et al. v. Cornell University, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Trustees of the University of Pennsylvania

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Wilmer Cutler Pickering Hale & Dorr LLP; Miller Shakman Levine & Feldman LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ David Gringer Date: 6/15/2026

Attorney's Printed Name: David Gringer

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: Wilmer Cutler Pickering Hale & Dorr LLP

7 World Trade Center, 250 Greenwich Street, New York, NY 10007

Phone Number: 212-230-8864 Fax Number: 212-230-8888

E-Mail Address: david.gringer@wilmerhale.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-

Short Caption: Andrew Corzo, et al. v. Cornell University, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Trustees of the University of Pennsylvania

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Wilmer Cutler Pickering Hale & Dorr LLP; Miller Shakman Levine & Feldman LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Alan Schoenfeld Date: 6/15/2026

Attorney's Printed Name: Alan Schoenfeld

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: Wilmer Cutler Pickering Hale & Dorr LLP

7 World Trade Center, 250 Greenwich Street, New York, NY 10007

Phone Number: 212-937-7294 Fax Number: 212-230-8888

E-Mail Address: alan.schoenfeld@wilmerhale.com

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2759

Short Caption: Andrew Corzo, et al. v. Cornell University, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Trustees of the University of Pennsylvania

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Wilmer Cutler Pickering Hale and Dorr LLP; Miller Shakman Levine & Feldman LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Zaki Anwar Date: September 23, 2026

Attorney's Printed Name: Zaki Anwar

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: Wilmer Cutler Pickering Hale and Dorr LLP

60 State Street, Boston, MA 02109

Phone Number: 617-526-6000 Fax Number: 617-526-5000

E-Mail Address: zaki.anwar@wilmerhale.com

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-

Short Caption: Andrew Corzo, et al. v. Cornell University, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Trustees of the University of Pennsylvania

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Wilmer Cutler Pickering Hale and Dorr LLP, and Miller Shakman Levine & Feldman LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: */s/ Edward W. Feldman* Date: June 15, 2026

Attorney's Printed Name: Edward W. Feldman, and Daniel M. Feeney

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☒

Address: 30 West Monroe Street, Suite 1900

Chicago, IL 60603

Phone Number: 312-263-3700 Fax Number: 312-263-3270

E-Mail Address: efeldman@millershakman.com , and dfeeney@millershakman.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-

Short Caption: Andrew Corzo, et. al. v. Cornell University, et. al., No. 1:22-cv-00125-MFK (N.D. Ill.)

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Cornell University

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Cooley LLP, Kirkland & Ellis, and King & Spalding

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

None

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Norman Armstrong Date: June 15, 2026

Attorney's Printed Name: Norman Armstrong

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: 1299 Pennsylvania Avenue NW, STE 700

Washington, DC 20221

Phone Number: (202) 728-7120 Fax Number: (202) 842-7899

E-Mail Address: narmstrong@cooley.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-

Short Caption: Andrew Corzo, et al. v. Cornell University, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Georgetown University

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Mayer Brown LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Britt M. Miller Date: June 15, 2026

Attorney's Printed Name: Britt M. Miller

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: 71 South Wacker Drive

Chicago, Illinois 60606

Phone Number: (312) 701-8663 Fax Number: (312) 706-8763

E-Mail Address: bmiller@mayerbrown.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-

Short Caption: Andrew Corzo, et al. v. Cornell University, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Georgetown University

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Mayer Brown LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Daniel T. Fenske Date: June 15, 2026

Attorney's Printed Name: Daniel T. Fenske

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 71 South Wacker Drive

Chicago, Illinois 60606

Phone Number: (312) 701 8926 Fax Number: (312) 706 9380

E-Mail Address: dfenske@mayerbrown.com

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-

Short Caption: Andrew Corzo, et al v. Cornell University, et al

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Massachusetts Institute of Technology

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Freshfields US LLP

Goldman Ismail Tomaselli Brennan & Baum

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: */s/ Eric Mahr* Date: June 15, 2026

Attorney's Printed Name: Eric Mahr

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** [X] **No** [ ]

Address: 700 13th St. NW, 10th Fl., Washington, DC, 20004

Phone Number: (202) 777-4500 Fax Number: (202)777-4555

E-Mail Address: eric.mahr@freshfields.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-

Short Caption: Andrew Corzo, et al v. Cornell University, et al

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Massachusetts Institute of Technology

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Freshfields US LLP
Goldman Ismail Tomaselli Brennan & Baum

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and
N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

---

Attorney's Signature: */s/ Jan Rybnicek* Date: June 15, 2026

Attorney's Printed Name: Jan Rybnicek

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** X

Address: 700 13th St. NW, 10th Fl., Washington, DC, 20004

Phone Number: (202) 777-4500 Fax Number: (202)777-4555

E-Mail Address: jan.rybnicek@freshfields.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-

Short Caption: Andrew Corzo, et al. v. Cornell University, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

University of Notre Dame

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Williams & Connolly LLP; Michael Best & Friedrich LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: [signature] Date: June 12, 2026

Attorney's Printed Name: Robert A. Van Kirk

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: Williams & Connolly LLP, 680 Maine Avenue SW, Washington, D.C. 20024

Phone Number: 202-434-5000 Fax Number:

E-Mail Address: rvankirk@wc.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-

Short Caption: Andrew Corzo, et al. v. Cornell University, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

University of Notre Dame

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Williams & Connolly LLP; Michael Best & Friedrich LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: [signature] Date: June 12, 2026

Attorney's Printed Name: Sarah F. Kirkpatrick

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: Williams & Connolly LLP, 680 Maine Avenue SW, Washington, D.C. 20024

Phone Number: 202-434-5000 Fax Number:

E-Mail Address: skirkpatrick@wc.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-

Short Caption: Andrew Corzo, et al. v. Cornell University, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

University of Notre Dame

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Williams & Connolly LLP; Michael Best & Friedrich LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: [signature] Date: June 12, 2026

Attorney's Printed Name: Matthew D. Heins

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: Williams & Connolly LLP, 680 Maine Avenue SW, Washington, D.C. 20024

Phone Number: 202-434-5000 Fax Number:

E-Mail Address: mheins@wc.com

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ iv

INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 6

STATEMENT OF ISSUES ........ 7

STATEMENT OF THE CASE ........ 7

A. Factual Background ........ 7

1. Financial aid in higher education ........ 7

2. The challenged conduct ........ 9

B. Procedural History ........ 14

1. Plaintiffs' allegations ........ 14

2. *Daubert* proceedings ........ 21

3. Class certification proceedings ........ 23

SUMMARY OF ARGUMENT ........ 25

STANDARD OF REVIEW ........ 30

ARGUMENT ........ 30

I. PLAINTIFFS' EXPERT OPINION PURPORTING TO ESTABLISH COMMON IMPACT IS NOT THE RESULT OF ANY RELIABLE METHODOLOGY ........ 31

A. Singer's Regression Model Does Not Analyze Price And Cannot Show An Overcharge ........ 32

B. Singer's Model Assumes Uniform Conduct Despite Incontrovertible Evidence Showing Varied Conduct ........ 35

1. Singer's regression model artificially assumed uniformity where none existed ........ 36

a. The model omitted meaningful differences in conduct among Defendants and over time ........ 38

b. The model failed to account for students who benefited from the challenged conduct ........ 46

2. Singer's "in-sample" prediction analysis compounds these flaws ........ 49

a. Singer's "in-sample" prediction analysis guaranteed a finding of individual harm ........ 49

b. The "in-sample" prediction method is inherently biased and unreliable ........ 52

3. Singer's "Yale" model says nothing about non-Yale class members and contradicts the record ........ 56

4. Singer's "price structure" analysis depends on the model's (false) imposition of uniformity ........ 58

C. Singer's Model Opportunistically Excluded Data ........ 59

II. THE DISTRICT COURT CONTRAVENED *ARANDELL* BY FAILING TO INVESTIGATE THE REALISM OF PLAINTIFFS' EXPERT OPINION ........ 65

A. Defendants' Countervailing Evidence Triggered A Duty For The District Court To Investigate The Realism Of Singer's Model ..... 66

B. The District Court Abdicated Its Duty To Investigate The Realism Of Singer's Model And Make Requisite Factual Findings ..... 70

CONCLUSION ..... 76

CERTIFICATE OF COMPLIANCE

APPENDIX VOLUME 1

CIRCUIT RULE 30(d) CERTIFICATE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*American Honda Motor Company v. Allen*,
600 F.3d 813 (7th Cir. 2010) .......... 28, 31, 56, 64

*Arandell Corporation v. Xcel Energy, Inc.*,
2022 WL 2314717 (W.D. Wis. June 28, 2022) .......... 72

*Arandell Corporation v. Xcel Energy Inc.*,
149 F.4th 883 (7th Cir. 2025) .......... *passim*

*Barber v. United Airlines, Inc.*,
17 F. App'x 433 (7th Cir. 2001) .......... 63

*Bell Atlantic Corporation v. AT&T Corporation*,
339 F.3d 294 (5th Cir. 2003) .......... 63

*Blades v. Monsanto Company*, 400 F.3d 562 (8th Cir. 2005) .......... 48, 64

*Bustamante v. KIND, LLC*, 100 F.4th 419 (2d Cir. 2024) .......... 34, 35

*City of Rockford v. Mallinckrodt ARD, Inc.*,
2024 WL 1363544 (N.D. Ill. Mar. 29, 2024) .......... 28

*Clark v. Takata Corporation*, 192 F.3d 750 (7th Cir. 1999) .......... 37

*Comcast Corporation v. Behrend,* 569 U.S. 27 (2013) .......... 3, 29, 66, 67

*Concord Boat Corporation v. Brunswick Corporation*,
207 F.3d 1039 (8th Cir. 2000) .......... 57

*Conrad v. Jimmy John's Franchise, LLC*,
2021 WL 718320 (S.D. Ill. Feb. 24, 2021) .......... 15

*Copeland v. Energizer Holdings, Inc.*,
2026 WL 2913693 (N.D. Cal. Sept. 28, 2026) .......... 15

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) .......... *passim*

*Elcock v. Kmart Corporation*, 233 F.3d 734 (3d Cir. 2000) ............... 36, 57

*Ellis v. Costco Wholesale Corporation*,
657 F.3d 970 (9th Cir. 2011) ............................................................ 70

*Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corporation*, 99 F.4th 770 (5th Cir. 2024) ...................................... 31

*Gopalratnam v. Hewlett-Packard Company*,
877 F.3d 771 (7th Cir. 2017) ............................................... 25, 31, 32

*Hanover Shoe, Inc. v. United Shoe Machinery Corporation*,
392 U.S. 481 (1968) ........................................................................ 26, 32

*In re Deepwater Horizon BELO Cases*,
119 F.4th 937 (11th Cir. 2024) .................................................. 34, 61

*In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 2022 WL 11809467 (S.D.N.Y. Oct. 20, 2022) ............... 15

*In re Google Play Store Antitrust Litigation*,
2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) ................................. 15

*In re Hydrogen Peroxide*, 552 F.3d 305 (3d Cir. 2008) .......... 70, 72, 73, 74

*In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices & Products Liability Litigation (No. II) MDL 2502*,
892 F.3d 624 (4th Cir. 2018) ........................................................ 58, 59

*In re Rail Freight Fuel Surcharge Antitrust Litigation-MDL No. 1869*, 725 F.3d 244 (D.C. Cir. 2013) ............................................

*In re TMI Litigation*, 193 F.3d 613 (3d Cir. 1999) .................................. 61

*In re TMI Litigation*, 199 F.3d 158 (3d Cir. 2000) .................................. 61

*Jamie S. v. Milwaukee Public Schools*,
668 F.3d 481 (7th Cir. 2012) ...................................................... 29, 30

*Kamakahi v. American Society for Reproductive Medicine*,
305 F.R.D. 164 (N.D. Cal. 2015) ..................................................... 15

*Menasha Corporation v. News America Marketing In-Store, Inc.*, 354 F.3d 661 (7th Cir. 2004) ........................................................ 50

*Messner v. Northshore University HealthSystem*, 669 F.3d 802 (7th Cir. 2012) ........................................................ 72

*Miami Products & Chemical Company v. Olin Corporation*, 2023 WL 8946114 (W.D.N.Y. Dec. 28, 2023)................................. 58

*Myers v. Illinois Central Railroad Company*, 629 F.3d 639 (7th Cir. 2010) .................................................. 31, 32

*Norris v. Baxter Healthcare Corporation*, 397 F.3d 878 (10th Cir. 2005) ................................................ 51, 52

*North Brevard County Hospital District v. C.R. Bard, Inc.*, 710 F. Supp. 3d 1090 (D. Utah 2023) ........................................... 67

*Owens v. Auxilium Pharmaceuticals, Inc.*, 895 F.3d 971 (7th Cir. 2018) .................................................. 36, 57

*Parko v. Shell Oil Company*, 739 F.3d 1083 (7th Cir. 2014) .................. 70

*Porter v. Whitehall Laboratories, Inc.*, 9 F.3d 607 (7th Cir. 1993) ...................................................... 50, 51

*Reed v. Advocate Health Care*, 268 F.R.D. 573 (N.D. Ill. 2009)........ 48, 63

*Rhode Island Office of General Treasurer ex rel. Employees Retirement System v. Boeing Company*, 182 F.4th 422 (4th Cir. 2026)....................................................... 75

*Rusoff v. Happy Group, Inc.*, 2026 WL 2387098 (9th Cir. Aug. 17, 2026) ................................... 64

*Sardis v. Overhead Door Corporation*, 10 F.4th 268 (4th Cir. 2021)............................................................................................ 34

*Target Market Publishing, Inc. v. ADVO, Inc.*, 136 F.3d 1139 (7th Cir. 1998) ...................................................... 48

*Van v. Ford Motor Company*, 332 F.R.D. 249 (N.D. Ill. 2019) ............... 56

*West v. Prudential Securities, Inc.*, 282 F.3d 935 (7th Cir. 2002) .......... 69, 75

*Winters v. Fru-Con Inc.*, 498 F.3d 734 (7th Cir. 2007) .......... 37

*Zenith Electronics Corporation v. WH-TV Broadcasting Corporation,* 395 F.3d 416 (7th Cir. 2005) .......... 51

**DOCKETED CASES**

*Cornell University v. Corzo*, No. 26-8014 (7th Cir.) .......... 24, 51, 54

**STATUTES AND RULES**

15 U.S.C. §1 note .......... 1

28 U.S.C.
§1292 .......... 6
§1331 .......... 6
§1337 .......... 6

Federal Rule of Civil Procedure 23 .......... *passim*

Federal Rule of Evidence 702 .......... 5, 24, 74

**OTHER AUTHORITIES**

Gupta, Nikhil & Matthias Lux, *Surfacing the Hidden Assumptions of the In-Sample Prediction Model*, Antitrust Source (Oct. 2025), https://tinyurl.com/4c95ppw7 .......... 55

Ramsey, Daniel & Celeste Saravia, *Evaluating the In-Sample Prediction Approach to Assessing Class-Wide Impact for Class Certification*, J. Competition L. & Econ. 1 (2026), https://doi.org/10.1093/joclec/nhag020 .......... 51, 52,

Rubinfeld, Daniel L., *Reference Guide on Multiple Regression*, in Federal Judicial Center*, Reference Manual on Scientific Evidence* 303 (3d ed. 2011), https://www.fjc.gov/sites/default/files/materials/21/SciMan3D01.pdf .......... 53

## INTRODUCTION

The district court manifestly erred in certifying an antitrust class spanning 20 years, comprising more than 220,000 people and seeking damages that stretch into the billions. Plaintiffs brought this class action against 17 universities, former members of the 568 Group ("the Group"), a consortium of private universities that worked together to develop a set of general principles to make financial aid fairer and more accessible for students. A749 (Order on Cross-Motions for Summary Judgment at 3).[1] Plaintiffs are a class of former students who received tens or even hundreds of thousands of dollars in financial aid.

The district court certified the class based solely on the flawed work of Plaintiffs' expert, Dr. Hal Singer. It did so even though Defendants' experts (and the undisputed record) showed that Singer's analysis: (1) assumed the impact it purported to be testing for; (2) analyzed the effect of a conspiracy that differs from both the record evidence and Plaintiffs' own theory of the case; (3) employed a discredited "in-sample"

[1] The Group was named after Section 568 of the Improving America's Schools Act of 1994, which provided an antitrust exemption for need-blind institutions to discuss common principles of need analysis. *See* 15 U.S.C. §1 note. Application of the 568 exemption is not at issue in this appeal. A781-783 (Order on Cross-Motions for Summary Judgment at 39-41).

prediction methodology that yielded the conclusion that nearly every class member had been harmed in the exact same amount of $1,202 per year and inexplicably found that the thousands of students who paid nothing to attend college were somehow "overcharged"; (4) produced wild year-to-year swings in individual class members' purported overcharges (and undercharges) without any alleged change in the challenged conduct; and (5) excluded reams of data whenever using it would generate results inconsistent with his theory.

The district court's certification decision violated *Arandell Corporation v. Xcel Energy Inc.*, 149 F.4th 883 (7th Cir. 2025), because both the threshold premise of reliability and the analysis underlying the court's predominance determination were fundamentally flawed. *First,* the irredeemable flaws in Singer's analysis rendered his testimony fundamentally unreliable. *Second*, when those same flaws are examined alongside the strong record evidence and expert testimony to the contrary, the district court could not reasonably conclude that there was sufficient evidence to demonstrate predominant common proof of antitrust impact.

Although Singer's model assumed uniform conduct by each Defendant, Defendants conclusively demonstrated otherwise through record evidence and rebuttal experts: schools in the Group had different financial aid policies, and each school's policies changed over time. These varied policies and approaches in turn meant that the actual prices students were offered varied widely among schools in the Group, even for the same student. By assuming uniform conduct, Singer ensured that his analysis would "find" not just an overcharge but (miraculously) a single, consistent overcharge for almost every student in the class. Had Singer removed this unsupported assumption of uniform conduct from his model, it would not have found a single, common overcharge—and for many of the Defendants, it would have found no overcharge at all.

Defendants also demonstrated that Plaintiffs' damages model is inconsistent with their current theory of liability. *See Comcast Corporation v. Behrend*, 569 U.S. 27 (2013). Plaintiffs' theory now disclaims any shared formula and hinges on an "overarching" conspiracy centered on schools' calculations of how much a student's family could reasonably be expected to pay—Expected Family

Contribution ("EFC"), a calculation made by colleges and universities around the country. Yet Singer's model assumes that the conduct (and thus the fact of overcharge) was the same across Defendants—a methodology that is generally defensible only where the challenged conduct involves price fixing. That is not all: Instead of focusing on EFC—the asserted object of the conspiracy—Singer's model analyzes a metric he invented for this lawsuit, which he calls "Effective Institutional Price" ("EIP"). EIP is the cost of attendance less need-based grant aid from the university. Almost no one paid EIP. It is a manufactured metric that fails to take account of several sources of aid, including scholarships or aid from federal or state governments, work-study, subsidized loans, and merit-based scholarships.

Moreover, EIP is (by definition) a function of both cost of attendance (a school's sticker price) and financial aid packaging (the relative mix of grants, loans, and other sources of funding that constitute a student's financial aid award). But Plaintiffs have never alleged a conspiracy over cost of attendance, and any claim of a packaging conspiracy is overwhelmingly contradicted by the record. The mismatches between Singer's model and the theory of liability advanced by Plaintiffs (and

accepted for class treatment by the district court) are yet another reason why class certification must be denied.

Regardless of how the district court resolved the challenge to Singer's testimony under Rule 702, the district court had a responsibility to analyze how realistic Singer's expert model was and to make factual findings because Defendants presented compelling admissible evidence indicating that Plaintiffs were incapable of demonstrating antitrust impact through common proof. To certify a class, the court would have had to find that all schools participated in the alleged conspiracy (in the same way and throughout the alleged 20 years) such that the alleged conspiracy could have resulted in common impact.

The court never did so (and could not do so). In its single-page, perfunctory treatment of common impact, A29 (First Order on Plaintiffs' Mot. for Class Cert. at 18), the court disregarded the fundamental flaws in Singer's analysis despite this Court's clear instruction in *Arandell* that, as part of the "rigorous analysis" Rule 23 requires, a court must weigh competing expert analyses and resolve threshold factual issues and expert disputes. 149 F.4th at 894-895.

Failing even to acknowledge the evidence from Defendants' experts, the district court did precisely what *Arandell* prohibits: it granted certification based solely on its (incorrect) decision that Plaintiffs' damages and injury model survived *Daubert*.

Because of the irremediable flaws with Singer's model, this Court should reverse with instructions that class certification be denied.

## JURISDICTIONAL STATEMENT

The district court has subject-matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1337 because Plaintiffs-Appellees in this class action assert claims under Section 1 of the Sherman Act, 15 U.S.C. §1.

This Court has jurisdiction under 28 U.S.C. §1292(e) and Federal Rule of Civil Procedure 23(f). The district court granted class certification on June 1, 2026. A1-11 (Second Order on Plaintiffs' Mot. for Class Cert.); *see also* A12-73 (First Order on Plaintiffs' Mot. for Class Cert.). Defendants-Appellants timely filed a petition for review of the district court's class-certification order under Rule 23(f). This Court granted the petition on August 24, 2026.

## STATEMENT OF ISSUES

Whether the district court's class-certification order violated *Arandell Corporation v. Xcel Energy Inc.*, 149 F.4th 883 (7th Cir. 2025), because:

I. Plaintiffs' expert opinion purporting to establish common impact is not the result of any reliable methodology.

II. The court failed to analyze the "realism" of Plaintiffs' expert opinion considering Defendants' contrary admissible evidence.

## STATEMENT OF THE CASE

### A. Factual Background

#### 1. Financial aid in higher education

Defendants are nonprofit universities committed to ensuring that the cost of attendance does not prevent qualified students from attending the school of their choice. A924, 950 (Long Rebuttal ¶¶11, 79). Defendants therefore are among only a few dozen universities nationwide that admit applicants without regard to financial need and meet the full demonstrated need of every student who enrolls. A945-946, A948-949, A962-963. The total amount of aid Defendants provided increased substantially between 2003 and 2021: in inflation-adjusted terms, the average aid per student approximately doubled for first-year

undergraduate students. A602-604 (Hill Rebuttal ¶¶80-81, figs. 7-8). Meeting that commitment typically begins with estimating an "Expected Family Contribution" for each student, based on school-specific formulas and policies. A952-953 (Long Rebuttal ¶¶82-83 & n.164). The EFC represents a school's assessment of what a family can afford to pay toward the estimated cost of attendance, which includes tuition, room, board, and other expenses. The student's need is calculated based on the difference between the school's cost of attendance ("COA") and the student's EFC; how the school meets that need depends on the school's approach to "packaging" aid awards. *Id.*

The processes behind determining EFC and assembling the resulting financial aid package are separate judgments each Defendant makes for itself. A960-961, 974-975 (Long Rebuttal ¶¶94-95, 163 & fig. 6). Every Defendant chose its own approach to analyzing a student's EFC and resulting need, with some Defendants adapting the College Board's Institutional Methodology (which itself is customizable) and others using their own school-specific approaches. *See* A928-930, 974-975, 977-978 (Long Rebuttal ¶¶24, 163, 168); A1108-1109 (Stiroh Rebuttal ¶151). Defendants therefore calculated wildly different EFCs,

with an average variance of over $15,000 for students admitted to multiple Defendants, and nearly $25,000 for those admitted to five or more Defendants. A611-612 (Hill Rebuttal ¶102). And Defendants adopted varying approaches to aid packaging. Financial aid packages are determined individually and can include federal or state grants or loans, institutional grants or loans, outside scholarships, and work-study. A1089 (Stiroh Rebuttal ¶50). Notably, Defendants treated loans differently throughout their membership in the Group. Some Defendants adopted no-loan or low-loan policies during the class period, keyed to annual family income, and some abandoned loans entirely. A692-693 (Tilton Dep. 121:18-122:10); A310-313 (Financial Aid Initiatives Timeline); A960-961 (Long Rebuttal ¶¶94-96, fig. 6).

Students admitted to multiple schools in the Group therefore faced materially different net prices at each school. A618-619 (Hill Rebuttal ¶120 & figs. 20-21). "Defendants offered different net prices for all cross-admitted students," and more than two-thirds of cross-admits had net prices that differed by over 15%. *Id.* Students with nearly identical assessed need paid substantially different amounts: for example, for class members with EFCs near the median of $18,690 in the 2018-2019

academic year, net prices ranged from $5,330 to $61,462. A1105-1106 (Stiroh Rebuttal ¶142, fig. 5.6).

### 2. The challenged conduct

Plaintiffs initially alleged a price-fixing case against 17 of the approximately three dozen members of the "568 Group." A212-A216 (Second Amended Complaint ("SAC") ¶1). The complaint alleged that Defendants "have participated in a price-fixing cartel that is designed to reduce or eliminate financial aid as a locus of competition, and that in fact has artificially inflated the net price of attendance for students receiving financial aid." A140 ¶1. The alleged mechanism was the "Consensus Methodology Guidelines" ("CM Guidelines"), a set of 17 principles and topics focusing on how to more accurately calculate a family's EFC. A971-973 (Long Rebuttal ¶¶145-146). Plaintiffs charged that the CM Guidelines were used to establish "a common formula for determining an applicant's ability to pay." A141 (Complaint ¶3); *see* A212-213, A219 (SAC ¶¶1, 5, 115); A201-202, A206 (Amended Complaint ¶¶1, 5, 115).

That theory did not survive discovery. A759 (Order on Cross-Motions for Summary Judgment at 17). Singer conceded that the

Group never developed a "formula that [schools] should use," A717 (Singer Dep. 20:2-10), and that its members "calculated different EFCs for the same student," A719 (Singer Dep. 27:21-24). Plaintiffs were thus forced to pivot to an "overarching conspiracy" resting on a "set of princip[le]s" applied in "broad strokes," without shared inputs, caps, or formulas. A716-717, A724 (Singer Dep. 19:19-20:1; 95:1-17). Now, the alleged agreement is "(a) to apply [six] core principles in awarding aid … (b) to use the College Board's standard IM [Institutional Methodology] (or 'Base IM') as the foundation for developing a 'Consensus Methodology,' (c) to use agreed-upon guidelines for applying 'professional judgment' in modifying the EFCs …, and (d) to share information with each other regarding their annual calculations of financial aid." Dkt.757 at 7 (Plaintiffs' Class Cert. Mot.).

Plaintiffs focus primarily upon six "core principles." Dkt.757 at 7 (Plaintiffs' Class Cert. Mot.); A656 (568 Group CM Guidelines, Dec. 2016). But those principles are endorsed by all institutions practicing need-based aid, not just Group members. They also are open-ended by design, implementable in myriad ways, and too vague to have any

objectively measurable impact. *See* A976-981 (Long Rebuttal ¶¶166-173); A1108-1110 (Stiroh Rebuttal ¶¶150-152).

The first principle provides that "parents and students have the primary responsibility to contribute to educational expenses before an institution awards financial aid." A676-677 (Singer Second Am. Rep. ¶149). The second provides that "[f]amilies should contribute to educational expenses according to their ability" and that "[t]hose with similar financial profiles should contribute similar amounts." *Id.* The third principle asks schools to "evaluate both income and assets as part of the assessment of parents' and applicants' ability to pay." *Id.* The fourth and fifth principles encourage transparency with applicants "about the policies and practices ... applie[d] when measuring a family's ability to pay." *Id.* The final principle provides that "'professional judgment' by financial aid officers in assessing a family's ability to pay should recognize unique or extenuating financial circumstances in individual cases" rather than "systematically treating ... [g]roups of students differently in order to advance institutional objectives." *Id.*

In addition, Plaintiffs contend that the alleged conspiracy involved agreeing to the CM Guidelines, which themselves addressed only 17

elements of the many dozens typically found in a comprehensive need analysis methodology, and many of those 17 elements were not actionable recommendations. A971-972, 976-977 (Long Rebuttal ¶¶145, 166-167). The CM Guidelines did not address aid packaging or other forms of aid like merit aid. A1000 (Long Rebuttal ¶208).

Even the actionable recommendations were not adopted uniformly. A1108 (Stiroh Rebuttal ¶150). Every school applied its own financial aid methodology to assess each applicant's individual financial need. A1108-1109 (¶151). Some schools applied variations of existing methodologies, such as the College Board's "Base IM," while others used their own school-specific approaches. *See* A928-930, 974-975, 977-978 (Long Rebuttal ¶¶24, 163, 168); A1108 (Stiroh Rebuttal ¶150). To the extent schools also customized their methodologies by following recommendations in the CM Guidelines, no two schools in the Group adopted the same subset of recommendations. *See* A984-987 (Long Rebuttal ¶¶178-179, fig. 8). Of students admitted to more than one Defendant school, *over 99% received different EFCs*. A610-611 (Hill Rebuttal ¶¶100-101, fig. 14).

Over the Group's 20 years of existence, both the inflation-adjusted total amount of aid provided by Defendants and the average aid per first-year student at least doubled, while average net prices (cost of attendance less grant and scholarship aid) fell. A602-604 (Hill Rebuttal ¶¶80-81, figs. 7-8); A941-944, 954-956 (Long Rebuttal ¶¶49-50, 86, figs. 4-5). At Penn, for example, the average net cost to freshmen receiving financial aid fell 23.2% in constant dollars from fiscal years 2005-2020, even as the school's sticker price cost of attendance rose. A708-709 (Undergraduate Students Access & Affordability Presentation).

### B. Procedural History

#### 1. Plaintiffs' allegations

Plaintiffs' proposed class includes undergraduates who received any institutional need-based aid during their school's membership in the Group, while carving out the students who received the most (students who received a full ride for all four years). A215-216 (SAC ¶11); A11. It encompasses more than 220,000 students and roughly 780,000 individual student aid determinations across 17 schools and two decades, a period over which Defendants distributed around $50 billion in aid. *See* Dkt.757 at 36 (Plaintiffs' Class Cert. Mot.); A684 (Singer

Second Am. Rep. tbl. 10); A603 (Hill Rebuttal fig. 7). The parties conducted extensive discovery—more than 100 depositions and millions of pages of documents—followed by expert reports and depositions.

Plaintiffs' assertion of common injury rested entirely on one expert witness: Hal Singer. *See* Dkt.757 at 3 (Plaintiffs' Class Cert. Mot.). Singer's regression and overcharge opinions have been found unreliable or criticized in many cases. *See, e.g.*, *Conrad v. Jimmy John's Franchise*, *LLC*, 2021 WL 718320, at *16 (S.D. Ill. Feb. 24, 2021); *Copeland v. Energizer Holdings, Inc.*, 2026 WL 2913693, at *11 (N.D. Cal. Sept. 28, 2026); *In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *9 (N.D. Cal. Aug. 28, 2023); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2022 WL 11809467, at *2 (S.D.N.Y. Oct. 20, 2022); *Kamakahi v. American Soc'y for Reprod. Med.*, 305 F.R.D. 164, 179-182 (N.D. Cal. 2015).

Here, Singer purported to establish injury through a two-step approach. At Step 1, he conducted a regression analysis to estimate the average amount by which the challenged conduct purportedly inflated prices across the class. At Step 2, to translate that alleged classwide injury into harm suffered by any individual student, Singer employed a

method called "in-sample prediction," which purports to compare the price his model predicts each student would have paid absent the challenged conduct (the "but-for price") against the price that student actually paid. A685-686 (Singer Second Am. Rep. ¶¶255-256).

At neither step did Singer measure the price students actually paid. He built his regression analysis around a metric he invented for this lawsuit—what he called the "Effective Institutional Price," or EIP. A685-686 (Singer Second Am. Rep. ¶¶255-256); A262 (Singer Dep. 282:18-22). Singer defined EIP as the cost of attendance less only need-based grant aid from the university; it disregards government aid, merit aid, outside scholarships, work-study, and subsidized loans, thus producing a result higher than what most students actually paid. A262-263, A265-266, A268-269 (Singer Dep. 282:18-283:13, 289:25-290:3, 292:23-293:8); A740 (Singer Second Am. Rep. ¶3). Singer acknowledged that his model assumed the universities' conduct was "uniform ... across all schools [and] all time periods." A252 (Singer Dep. 253:17-25). From that premise, he derived an average EIP overcharge of $1,202. A302-304 (Singer Rebuttal ¶150 tbl. 6, col. 6). But even Singer acknowledged that less than half of the $1,202 EIP overcharge

was attributable to an alleged inflation of EFC—*i.e.*, the focus of the challenged conduct. A339 (Singer Suppl. Rebuttal ¶57).

Defendants answered with three experts: Drs. Stiroh, Hill, and Long. Dkt.788 at vii-ix (Defendants' Opp. to Plaintiffs' Class Cert. Mot., Table of Referenced Witnesses). Their central criticism was structural. By using a single conduct variable, spanning every school and every year of membership, Singer *assumed* all Defendants behaved alike throughout the class period and therefore uniformly injured the putative class. A316 (Stiroh Surrebuttal ¶18); A1111-1112 (Stiroh Rebuttal ¶¶164-165); A230 (Hill Rebuttal ¶233). But, as the evidence pervasively showed, Group members were not required to follow the CM Guidelines; members' use of the Guidelines differed widely in practice; and even application of the Guidelines would not have had a uniformly adverse impact. A984-987 (Long Rebuttal ¶¶178-180 & fig. 8); A735-738 (Long Rebuttal Errata).

For example, while the standard approach to need analysis was to take a family's home equity into account when determining need, the CM Guidelines recommended capping consideration of home equity at 1.2 times parental income, decreasing EFC for families that owned a

home. Only four Defendants applied that specific home equity cap; some others chose lower caps, and still others chose not to consider home equity at all. A1018-1020 (Long Rebuttal ¶¶184-187). Many schools' approaches also changed over time. *Id.*; *see also, e.g.*, A847, A855, A890, A903, A908 (Long Rebuttal Appendix D, tbls. D.1, D.3, D.11, D.14-D.15). Schools also differed in how they treated families with siblings in college: only two followed every sibling recommendation in the CM Guidelines. A993-994 (Long Rebuttal ¶190). Some Defendants used other methodologies to "decrease a student's EFC relative to the CM Guidelines' recommended treatment"—for example, Cornell counted siblings in graduate or professional school as siblings in college for EFC purposes; Notre Dame applied allowances against income for K-12 tuition expenses like those paid for children to attend parochial school; and MIT reduced the parent contribution by half if the student and sibling both attended MIT. A994 (Long Rebuttal ¶191); A897 (Long Rebuttal Appendix D, tbl. D.13).

By assuming uniformity in Defendants' conduct (and thus class members' injuries), Singer's model not only ignored the unrefuted evidence but also failed to reflect the reality that the challenged conduct

left many class members better off. Several of the CM Guidelines' recommendations were more generous than the Base IM that schools may have otherwise used, such as the treatment of student assets as parent assets and use of a lower home equity cap. A1098 (Stiroh Rebuttal ¶117). For instance, Yale was capping home equity at 3 times income before joining the Group, adopted the CM Guidelines' recommended cap of 1.2 times income while a member, and reverted to its original cap 3 times income after leaving the Group. A1099-1100 (Stiroh Rebuttal ¶122). That is, Yale became more generous to families with significant home equity while in the Group but was less so both before joining and after leaving. Application of the Guidelines thus "did not [as alleged] uniformly increase EFC calculations, and for some proposed Class members, even decreased them relative to a plausible but-for world." *Id.*

When Singer's model was modified to match reality (where financial aid practices varied by school), it produced statistically significant *undercharges*—meaning students benefited from the challenged conduct—across many schools and years, and produced no statistically significant overcharge *at all* for seven schools, including Appellants

Notre Dame, Penn, and Georgetown. A320-322 (Stiroh Surrebuttal ¶32 & figs. S4.2-S4.3).

Defendants' experts also showed that Singer's model generated results that could not be explained by any theory of the alleged conspiracy. Singer's model found that students on full rides were somehow overcharged by roughly $1,000 a year on average. A825 (Daubert Hrg. Tr. 99:14-20). It also fluctuated wildly year-to-year for individual students with no explanation—for example, a Notre Dame student appeared undercharged by $30,000 and $25,000 in their first two years and overcharged by $28,000 and $32,000 in their last two, though neither the school's policies nor the student's finances changed and the student's later financial aid awards were larger than their earlier awards. A818 (Daubert Hrg. Tr. 71:12-23); A834 (Daubert Presentation Slide). That issue was endemic to the model: Twenty-six percent of the proposed class had at least one year with an undercharge exceeding $5,000 and at least one year with an overcharge exceeding $5,000. A319 (Stiroh Surrebuttal ¶25).

Further, Singer's regression rested on selective data. He excluded students whose grant aid exceeded 95% of cost of attendance. A703-704

(Singer Second Am. Rep. ¶246 & n.342). He excluded every Group member not named as a Defendant, though membership allegedly defines the challenged conduct, A680 (Singer Second Am. Rep. ¶227). He removed data from the University of Chicago after 2015, which moved his results by more than 70%. A298-299 (Singer Rebuttal ¶¶112-113). Singer offered no economic justification for any of these decisions. He admitted that he did not know there were nearly a dozen non-Defendant members of the Group, A237-238 (Singer Dep. 33:6-34:6). And he conceded that he dropped the later Chicago data because including it "substantially biases [his] conduct coefficient downwards," A299 (Singer Rebuttal ¶113) and kept the earlier data because it "gives the model an opportunity to find an effect." A245 (Singer Dep. 131:11-12). These choices introduced selection bias that all but guaranteed finding an overcharge.

### 2. *Daubert* proceedings

Defendants moved to exclude Singer. Dkt.754. Defendants argued that EIP is an artificial metric that does not measure the amount students actually paid, *id.* at 5-6; that Singer's impact regression presumes uniformity, *id.* at 12-15; that his in-sample prediction cannot

establish common impact, *id.* at 15-19; and that Singer's data selection drove the result, *id.* at 6-10.

The court set a *Daubert* hearing and strictly policed its parameters. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The object of the hearing was "to determine whether, and the extent to which, Dr. Singer's challenged opinions meet the requirements of *Daubert*." A705. It would not be "the equivalent of a trial on the merits or a mini-trial regarding the degree of persuasiveness of Singer's challenged opinions vis-a-vis the opinions of the defendants' experts." *Id.* And it was limited to four hours in duration, with strict time requirements around direct and redirect examination of Singer, one defense rebuttal expert, and closing argument—precluding Defendants from presenting the testimony of rebuttal experts Stiroh and Long. *Id.* Predominance was never at issue.

The court denied Defendants' motion to exclude Singer's testimony. A127. The court emphasized that it was not scrutinizing the "quality of the expert's data and conclusions." A81. It recognized that Defendants had raised "several fair points that may limit or undermine the probative value of Singer's impact regression," but assigned them to

"the weight to be given to the analysis, not a basis for its exclusion." A94. The court concluded the same as to Defendants' challenges to Singer's in-sample prediction, reiterating that "issues regarding the data used and the conclusions reached ... are appropriately addressed by cross-examination and presentation of contrary evidence, not by exclusion of Singer's analysis." A100.

**3. Class certification proceedings**

Defendants twice requested a hearing on class certification, but the court denied both requests. *See* A786-787 (Hrg. Tr. 10:6-11:5 (Mar. 20, 2025)); A1122 (Hrg. Tr. 7:6-25 (July 28, 2025)).

The court issued its class-certification order over a year later, finding that Plaintiffs had satisfied "all of the requirements for class certification," save for adequacy of class counsel, which was resolved in a later order that is outside the scope of this appeal. A13 (First Order on Plaintiffs' Mot. for Class Cert. at 2); A11 (Second Order on Plaintiffs' Mot. for Class Cert. at 11). The court found that Plaintiffs satisfied the requirements of Rule 23(b)(3), noting that many of Plaintiffs' predominance arguments rested primarily on Singer's testimony and regression analysis. The court dispensed with Defendants' thorough

critiques of Singer's analysis by cross-reference to its earlier *Daubert* ruling, stating that "[f]or the reasons discussed in [its] ruling on defendants' motion to exclude Singer's testimony, these contentions are unavailing." A31. The critiques presented by Defendants' experts went unmentioned. *Id.* No facts were found. The district court did not cite *Arandell* a single time, despite both parties submitting supplemental briefs on the case. Dkt.945; Dkt.949. Indeed, the court spent only four pages in its 62-page opinion addressing whether Plaintiffs satisfied predominance.

Defendants timely filed a petition for review under Rule 23(f). No. 26-8014 (7th Cir.), Dkt.1. This Court granted Defendants' petition for permission to appeal on the issue of "whether the district court adequately analyzed expert testimony related to the question of common proof of antitrust impact" under *Arandell Corporation v. Xcel Energy Inc.*, 149 F.4th 883 (7th Cir. 2025), noting that the scope of review "may include the merits of the district court's analysis under

Federal Rule of Evidence 702." No. 26-8014 (7th Cir.), Dkt.26 (order granting Rule 23(f) petition).[2]

## SUMMARY OF ARGUMENT

The district court certified a 220,000-member antitrust class, spanning decades, and seeking billions in damages on the testimony of a single expert. Singer's opinion was the only evidence Plaintiffs offered to show that antitrust impact could be established with common proof, and that opinion fails twice over: it is inadmissible and, even if it crosses the threshold of admissibility, it is insufficient to demonstrate common proof of antitrust impact. Reversal is warranted under *Arandell* on either ground.

A. *Arandell* rests on the premise that where a plaintiff seeks to establish predominance through an expert model purporting to demonstrate common impact, that model must, at minimum, be admissible. *See* 149 F.4th at 894. The district court erred in admitting Singer's testimony because his methodology was thoroughly unreliable. A district court must act as a gatekeeper, even at class certification,

[2] Defendants preserve for further review the other issues raised in their Rule 23(f) Petition. No. 26-8014 (7th Cir.), Dkt.1 (Defendants' 23(f) Petition) at 14.

admitting expert testimony only where the methodology is reliable and relevant. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778-779 (7th Cir. 2017). Singer's analysis fails those requirements in at least four respects.

*First*, Singer's regression predicted an irrelevant variable. Rather than measuring the price students actually paid, it measured EIP—a metric invented for this litigation that is higher than what almost every student paid because it omits government grants, outside scholarships, merit aid, work-study, and subsidized loans. An overcharge model that never measures what students were charged is irrelevant because an antitrust overcharge is "measured by the difference between the *price paid* and what the market or fair price would have been." *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 489 (1968).

*Second*, Singer's model assumed the common impact for which it purported to test. His model reduced two decades of varied financial-aid-related conduct at 17 schools to a single on/off conduct variable, producing a single uniform overcharge for every student by assuming every Defendant behaved in the same way—an assumption Singer conceded was "necessary" to his result, but that the record refutes.

*Third*, Singer's finding of common impact rests on an "in-sample prediction" method that the economics literature has discredited. Singer's model forced each student's residuals (*i.e.*, price variation caused by other, unexplored sources and not by the challenged conduct) to sum to zero—which meant that any student whose years in school fell entirely within a Defendant's membership in the Group would always show a net "harm" equal to Singer's average overcharge multiplied by that student's number of years in school. This explains why 85% of class members emerged with precisely the same net overcharge—$1,202 per year—the exact classwide average—despite Singer's model finding wildly varying over- and undercharges by year for the same students. Singer's in-sample prediction guaranteed a finding of individual harm, even where students paid nothing at all or benefited from the challenged conduct.

*Fourth,* Singer excluded reams of data that undercut his desired result. His model excluded the students (including class members) who received the most aid (causing the schools to appear less generous) and students at all Group members not named as defendants even though membership allegedly defines the challenged conduct, and he excluded

nearly a decade of data from the University of Chicago that would have disproven his conclusion.

The district court recognized these flaws but wrote each off as going to "weight," A87, A89, A93-94, A102, A105, effectively abdicating its gatekeeping role. Because Singer's opinion was Plaintiffs' only evidence of common impact, "Plaintiffs are left with too little to satisfy Rule 23(b)(3)'s predominance prong." *See American Honda Motor Co. v. Allen*, 600 F.3d 813, 819 (7th Cir. 2010) (per curiam); *City of Rockford v. Mallinckrodt ARD, Inc.*, 2024 WL 1363544, at *10 (N.D. Ill. Mar. 29, 2024).

B. Even if Singer's testimony were admissible, those same flaws necessitated a meaningful and realistic investigation of Singer's opinion, under the "rigorous" standard of review imposed by Rule 23. *See Arandell Corporation v. Xcel Energy Inc.*, 149 F.4th 883 (7th Cir. 2025). Where a defendant offers admissible evidence that, if credited, would show that individual questions predominate, the court "must 'investigate[] the realism' of the expert evidence 'in light of the defendants' counterarguments.'" *Id.* at 894. Defendants did exactly that, showing through rebuttal experts and record evidence that

Defendants did not act uniformly via the challenged conduct and thus their conduct did not uniformly harm class members—and in many cases benefited them. The court also failed to grapple with the mismatch between Singer's model and Plaintiffs' theory of liability. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). Plaintiffs concede there was no common "formula," and the district court held at summary judgment that this was not a price-fixing case; yet Singer's model assumed a uniform, price-fixing-style overcharge, in which all Defendants participated in the challenged conduct in a uniform manner. And while Plaintiffs' alleged conspiracy focuses on EFC, Singer's model instead analyzes a metric that does not reflect either EFC or what students actually paid to attend school.

The district court engaged with none of this. Its order never mentioned Defendants' experts and disposed of their arguments in a few sentences resting entirely on the *Daubert* ruling (itself wrongly decided). That is precisely the "shortcut" *Arandell* forbids. 149 F.4th at 895. Because Singer's model is both inadmissible and insufficient, and because its defects are irremediable, the Court should reverse with instructions that class certification be denied.

## STANDARD OF REVIEW

This Court reviews class-certification decisions for an "abuse of discretion, but legal determinations made in support of the decision are reviewed de novo." *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 493 (7th Cir. 2012).

## ARGUMENT

In certifying the class, the district court reasoned that "Dr. Singer's testimony is sufficiently reliable and is admissible, and thus the contention that class certification is unwarranted because his testimony is unreliable does not carry the day." A31. That conclusion contravenes *Arandell* because both the premise and the analysis of the court's predominance determination were fundamentally flawed. *First*, the court erred in finding Dr. Singer's methodology reliable enough to be admissible. *See Arandell*, 149 F.4th at 894. *Second*, even assuming admissibility, the court erred by treating it as perforce satisfying Rule 23's separate requirement that predominance be established by a preponderance of the evidence. *Id.*

## I. PLAINTIFFS' EXPERT OPINION PURPORTING TO ESTABLISH COMMON IMPACT IS NOT THE RESULT OF ANY RELIABLE METHODOLOGY

*Arandell* rests on the premise that where a plaintiff seeks to establish predominance through an expert model purporting to demonstrate common impact, that model must, at minimum, be admissible. "[W]hen an expert's report or testimony is critical to class certification ... a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion." *American Honda Motor Co. v. Allen*, 600 F.3d 813, 815-816 (7th Cir. 2010) (per curiam); *see also Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 99 F.4th 770, 774 (5th Cir. 2024) ("Class actions may only be certified 'based on adequate admissible evidence to justify class certification.'"). In determining admissibility, a district court must "act as an evidentiary gatekeeper, ensuring an expert's testimony rests on a reliable foundation and is relevant to the task at hand." *Gopalratnam*, 877 F.3d at 778. The district court erred in admitting Singer's expert testimony because his testimony measured an irrelevant metric, assumed the common impact

it was supposed to test, employed a discredited in-sample prediction method, and excluded data that undercut the desired result.

### A. Singer's Regression Model Does Not Analyze Price And Cannot Show An Overcharge

For expert testimony to be admissible, the testimony must actually "assist the trier of fact to understand the evidence or to determine a fact in issue." *Gopalratnam*, 877 F.3d at 779 (quoting *Myers v. Illinois Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)). But Singer's model failed to measure the impact of the challenged conduct on the price class members *actually paid* to attend their chosen school. Instead, he measured an irrelevant and biased metric that he invented for this litigation to create the illusion of impact where none existed. This alone rendered his model irrelevant and unreliable.

Plaintiffs rely on Singer to calculate the aggregate, average, and individualized "overcharge" attributable to the challenged conduct. But an "overcharge" in an antitrust case is "measured by the difference between the *price paid* and what the market or fair price would have been." *Hanover Shoe Inc.*, 392 U.S. at 489 (emphasis added).

Singer did not measure the "price paid" by students or the "fair price" they would have paid absent the challenged conduct. Instead,

Singer purported to analyze the challenged conduct's impact on EIP—a metric he made up and alone defined as the "cost of attendance remaining after subtracting any [university-provided] need-based financial grant or scholarship aid." A740 (Singer Second Am. Rep. ¶3). It is undisputed, however, that a significant portion of the class received other forms of aid that substantially reduced their actual cost of attendance below Singer's EIP, including merit-based scholarships, work-study, subsidized loans, and scholarships or aid from federal or state governments, nonprofits, and other sources. It is likewise undisputed that schools took account of those other forms of aid in making their own aid decisions. Singer intentionally omitted these forms of assistance from his metric. *See* A263, A265-266, A268-269 (Singer Dep. 283:9-13, 289:25-290:3, 292:23-293:1); *see also* A740, A742 (Singer Second Am. Rep. ¶¶3, 6). Any increase in these forms of aid would lead to a corresponding decrease in university grant aid, which Singer would then paradoxically interpret as a price increase, even though the student's cost went down or stayed the same.

In fact, EIP was almost always higher than the "net price" the student paid. *See* A741-743 (Singer Second Am. Rep. ¶¶5-7). For

example, if a student paid $28,000 after receiving $7,000 in Pell Grants, Singer's regression would have calculated that student's EIP to be $35,000, even though the student paid only $28,000. A264 (Singer Dep. 288:10-22). To take a real-world example: a student who attended the University of Chicago in 2004 and received $39,256 in need-based aid, $14,539 in merit-based aid, and $9,807 in aid from other sources paid only $5,336 to attend school, but Singer's model calculated an EIP of $29,683. A815 (Daubert Hrg. Tr. 48:1-18). Only by inflating that student's cost of attendance by nearly $24,500 was Singer able to conclude that the student was overcharged by a small fraction of that figure.

The district court failed to reckon with this fundamental shortcoming, characterizing Singer's reliance on EIP as nothing more than a choice to "use a particular dependent variable rather than another," a choice that goes "to the probative weight of the analysis rather than its admissibility." A87 (citation omitted). But this flaw does not merely go to "weight": it renders Singer's testimony irrelevant because without measuring what students were "charged" in the first place, the model cannot reasonably establish an overcharge injury,

much less classwide injury. *See In re Deepwater Horizon BELO Cases*, 119 F.4th 937, 947 (11th Cir. 2024) (affirming exclusion of expert who relied on studies focused "on acute rather than chronic conditions" in a case about the latter); *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 289, 295-296 (4th Cir. 2021) (finding expert testimony relying on inapplicable industry standard to be irrelevant); *Bustamante v. KIND, LLC*, 100 F.4th 419, 431-432 (2d Cir. 2024) (affirming exclusion where expert applied "a framework he developed" rather than operative legal standard). If experts could simply invent their own inflated measure of "price," every antitrust case would always find impact, even where, as here, none existed.

### B. Singer's Model Assumes Uniform Conduct Despite Incontrovertible Evidence Showing Varied Conduct

Singer's "two-step approach" to measuring harm and establishing common antitrust impact fails at both steps. At step one, Singer relied on a "dummy" variable that counterfactually assumed uniform conduct across schools and over time, did not reflect the conspiracy Plaintiffs themselves allege, and produced only a classwide average that cannot be reasonably imputed to individual class members. At step two, Singer's in-sample prediction mechanically and artificially distributed

step one's "average" across the class, generating nonsensical outputs in the process.

### 1. Singer's regression model artificially assumed uniformity where none existed

Singer's first-step regression model produced Plaintiffs' desired result—a consistent annual overcharge of $1,202 per class member—but only by *assuming* that each Defendant engaged in the challenged conduct in exactly the same way. A287 (Singer Rebuttal ¶74); A725 (Singer Dep. 117:8-18); A252 (Singer Dep. 253:17-25). Singer conceded that this assumption of uniformity necessarily would "produce a single, common overcharge." A287 (Singer Rebuttal ¶74).

But the undisputed record squarely contradicts that assumption. The evidence showed that schools did not uniformly adhere to the Group's recommendations, that they adopted radically different approaches to financial aid packaging resulting in dramatically different amounts of financial aid received by class members with similar financial circumstances, and that the components of the challenged conduct changed over time. Contradicting the record in this manner requires exclusion of "the testimony itself." *See, e.g.*, *Owens v.*

*Auxilium Pharms., Inc.*, 895 F.3d 971, 973 (7th Cir. 2018); *Elcock v. Kmart Corp.*, 233 F.3d 734, 756 (3d Cir. 2000).

Singer could have designed his regression to account for this real-world variation. But as Defendants' experts demonstrated, doing so would demonstrate the absence of a common impact. *See* A321-323 (Stiroh Surrebuttal figs. S4.2, S4.3, S4.4). When Singer's model was corrected to allow the conduct to vary by school, it produced statistically significant undercharges across many schools and years, and *no statistically significant overcharge at all* for seven schools, including Notre Dame, Penn, and Georgetown, A320-322 (Stiroh Surrebuttal ¶32 & figs. S4.2-S4.3). By constructing a model forcing uniformity, Singer built his analysis on the very hypothesis he set out to test: that Defendants acted in a uniform manner that produced a common effect on the class. Expert testimony that engages in such circular reasoning must be excluded. *See Winters v. Fru-Con Inc.*, 498 F.3d 734, 743 (7th Cir. 2007) (expert may not "start[] his analysis based upon ... the very question that he was called upon to resolve)" (quoting *Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999))).

#### *a. The model omitted meaningful differences in conduct among Defendants and over time*

Defendants' financial aid practices varied across schools and over time. Both in their approaches to need analysis (the determination of each student's EFC) and to "packaging" (the mix of grants, loans, and other aid offered to each student), Defendants applied bespoke strategies that resulted in dramatically different EFCs and prices for individual students admitted to multiple Defendant schools. Singer's single-variable regression was impermissibly designed to mask that variation and thus contradicted the uncontroverted record.

*First*, despite Plaintiffs' initial claim that Defendants standardized their need analysis—and set a price "floor"—through a supposed "formula" set forth in the CM Guidelines, *see* A674-675, 679 (Singer Second Am. Rep. ¶¶126, 160), the record is clear there was no formula and Defendants did *not* consistently implement the CM Guidelines during their membership in the Group or otherwise establish a price floor. Defendants also changed how each calculated EFC at varying points over the 20-year class period. A839-919 (Long Rebuttal Appendix D). Indeed, the average student admitted to multiple Defendant schools received widely divergent aid offers from each school,

belying any uniform conduct or common impact. A609-613, A617-619 (Hill Rebuttal ¶120 & figs. 13-15, 20-21). Students admitted to multiple Defendants had an average spread in their EFCs of at least $15,399. A611-612 (Hill Rebuttal ¶102). The EFCs of 56% of these "cross-admits" varied by 20% or more across Defendants. A609-611 (Hill Rebuttal ¶¶99, 101, figs. 13-14) (also noting student whose EFC varied from $43,177 to $69,156). Plaintiffs failed to identify even a single student whom different Defendants charged the same net price. Moreover, by the 2021-2022 school year, Defendants awarded roughly 25% of all institutional grant aid to students who paid *nothing* to attend, rendering Plaintiffs' hypothesized "price floor" nonsensical. A700-701 (Hill Rebuttal ¶85 & fig. 11).

Undisputed evidence regarding the challenged conduct and Defendants' actual behavior during the relevant period underscores the point. Many of the CM Guidelines' recommendations were nothing more than suggested considerations that schools could implement in numerous different ways. A971-972, 981-996 (Long Rebuttal ¶¶145, 174-198); A1108-1109 (Stiroh Rebuttal ¶¶150-152). For example, the Guidelines urged application of professional judgment for self-employed

families but offered no specifics about how to do so. A669 (568 Group CM Guidelines, Dec. 2016). Similarly, the Guidelines recommended that schools collect income information from each custodial parent, noncustodial parent, and their spouses, but made no recommendation about how (or even whether) to weigh that information once collected. A660 (568 Group CM Guidelines, Dec. 2016). Other examples of incomplete and open-ended guidelines abound. *See, e.g.,* A667 (568 Group CM Guidelines, Dec. 2016) ("Treatment of non-recurring income is to be handled on a case-by-case basis.").

Even for the handful of actionable recommendations, "[d]efendants who adopted those recommendations did not do so uniformly." A1108-1110 (Stiroh Rebuttal ¶¶150-152 & nn.355, 356); A987-988 (Long Rebuttal ¶181) ("568 Group members commonly reported 'deviat[ing]' from the CM Guidelines"); A839-919 (Long Rebuttal Appendix D) (documenting whether and how each Defendant implemented each recommendation). As Defendants' expert documented in painstaking detail—and Singer did not refute—no Defendant adopted every actionable recommendation. A982-987 (Long Rebuttal ¶¶176-180 & fig. 8); A735-738 (Long Rebuttal Errata); A839-919(Long Rebuttal Appendix

D). The Guidelines themselves were also updated and revised throughout the relevant period, often suggesting new approaches that would benefit students. *See* A678 (Singer Second Am. Rep. ¶156); A247 (Singer Dep. 184:11-19) (conceding "that there were refinements to the CM over time"). Defendants' expert Dr. Long prepared the following chart showing how Defendants deviated from the CM Guidelines over time, A737 (Long Rebuttal Errata, fig. 8):

**Corrected Figure 8**
**Each Defendant Separately Determined How Its Need Analysis Methodology Treated Elements for Which the CM Guidelines Provided Actionable Recommendations[1]**

| | CM Guidelines' Elements | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Defendant** | **Cost of Living Variances** | **Family and Student Assets** | **Home Equity** | **Imputing the Value of Liquid Assets** | **K-12 Tuition Expenses** | **Medical Expenses** | **Number of Siblings in College** | **Rental Property/Other Real Estate** |
| Brown | | | | | ✓ | | | ✓ |
| Caltech | ✓ | | | | | | | ✓ |
| Chicago | | | | ✓ | | | | ✓ |
| Columbia | ✓ | | ✓ | ✓ | * | * | ✓ | ✓ |
| Cornell | ✓ | | | | ✓ | | | |
| Dartmouth | | | | ✓ | | | ✓ | |
| Duke | ✓ | ✓ | ✓ | | ✓ | | | |
| Emory | ✓ | | | | | | | |
| Georgetown | ✓ | | ✓ | | | | | ✓ |
| Johns Hopkins | ✓ | * | ✓ | ✓ | ✓ | * | * | |
| MIT | ✓ | | | | | | | ✓ |
| Northwestern | ✓ | * | | * | * | * | * | ✓ |
| Notre Dame | | | | | | | | ✓ |
| Penn | ✓ | | | ✓ | ✓ | | | |
| Rice | ✓ | | | | | ✓ | | |
| Vanderbilt | ✓ | | | | | | | * |
| Yale | ✓ | | | ✓ | | ✓ | | |
| **Number of Schools** | | | | | | | | |
| Consistent with CM | 13 | 1 | 4 | 6 | 5 | 2 | 2 | 8 |
| Inconsistent with CM | 4 | 14 | 13 | 10 | 10 | 12 | 13 | 8 |
| Contradiction/ Insufficient Information | 0 | 2 | 0 | 1 | 2 | 3 | 2 | 1 |

**Notes:**
[1] ✓ indicates that the Defendant's treatment of a specific need analysis element was consistent with all components of the CM Guidelines' recommended treatment in all years for that Defendant's respective Class Period, to the extent this information is available.
[2] * indicates that either: (1) there was insufficient information available about the Defendant's treatment of the specific need analysis element to determine whether it was consistent with the CM Guidelines' recommended treatment for any year I analyzed; or (2) the available information about the Defendant's treatment of the specific need analysis element was conflicting for all years for that Defendant's respective Class Period, such that it was not possible to determine whether it was consistent with the CM Guidelines' recommended treatment in any year.
[3] A blank indicates that the Defendant's treatment of a specific need analysis element was demonstrably inconsistent with at least one component of the CM Guidelines' recommended treatment in at least one year for that Defendant's respective Class Period.

Take again the example of home equity. In 2003, the original CM Guidelines recommended capping consideration of a family's home equity at 2.4 times income. A few years later, updated Guidelines began recommending a lower cap of 1.2 times income, benefiting most students whose families owned a home. Only a few schools followed either recommendation. Some were more generous and did not consider home equity (e.g., MIT after 2016); others counted the full value of a family's home but exercised professional judgment to remove it from consideration on a case-by-case basis (Notre Dame, Northwestern); and others applied an income-based cap that was higher or lower than the CM Guidelines recommendation (e.g., Penn, Rice, Brown, Emory). *See* A847, A876, A890, A894, A898, A903, A908, A911 (Long Rebuttal Appendix D, tbls. D.1, D.8, D.11-16); A966-967 (Long Rebuttal ¶124).

Similarly, starting in 2016, the Guidelines recommended that schools reduce a student's expected parental contribution by fixed percentages based on that student's number of siblings in college at the time. Only two Defendants followed. A993-994 (Long Rebuttal ¶190). Every other school acted differently. A982-987, A993-995 (Long Rebuttal ¶¶176-180, 190-193, fig. 8); A735-738 (Long Rebuttal Errata).

Both Cornell and Georgetown accounted for siblings in graduate or professional school, contrary to the Guidelines' recommendation, A994 (Long Rebuttal ¶191); *see* A865, A884 (Long Rebuttal Appendix D, tbls. D.5, D.9); and MIT and Penn at various points during the class period lowered the parental contribution for each sibling in college more than the Guidelines recommended, A994 (Long Rebuttal ¶191); *see* A892, A905 (Long Rebuttal Appendix D, tbls. D.11, D.14). These deviations *benefited* class members at those schools.

Schools also differed in their approach to "cost-of-living" adjustments. The Guidelines recommended that schools make allowances for families living in high-cost areas, resulting in more generous and more equitable aid packages for students in those areas. *See* A615-617 (568 Group CM Guidelines, Dec. 2016). Four Defendants opted against this allowance, and although the others made cost-of-living adjustments, A986-987 (Long Rebuttal ¶179 & fig. 8); A735-738 (Long Rebuttal Errata), they did so in different ways at different times, A1017-1018 (Long Rebuttal ¶183 & n.371).

*Second*, Defendants diverged widely in their approaches to financial aid packaging, a factor that significantly affects the prices students

actually paid. Consider, for example, two students with EFCs of $20,000 at two schools with a $50,000 cost of attendance. If School A offers $30,000 in grants (which do not need to be repaid), and School B offers $30,000 in loans (which do), then the student at School A will pay $30,000 less than the student at School B, despite the students' identical EFCs.

At various times while members of the Group, several Defendants adopted no-loan or low-loan policies. A1103-1104 (Stiroh Rebuttal ¶140); A960 (Long Rebuttal fig. 6); *see also* A1026 (Long Rebuttal fig. 9). Georgetown began replacing loans with grants for many low-income students in 2004. A623-624 (Hill Rebuttal ¶132 & n.184). Penn and Columbia eliminated loans for families earning less than $50,000 in 2006. A311 (Financial Aid Initiatives Timeline). Columbia eliminated loans for *all* financial aid recipients in 2008, and Penn and Vanderbilt did so in 2009, A960 (Long Rebuttal fig. 6), while they were members of the Group, A239-240 (Singer Dep. 48:11-49:2). Northwestern and MIT came next, adopting no-loan policies while in the Group in 2016 and 2017. A960 (Long Rebuttal fig. 6). It makes no sense to claim that a student who attended a school with no loans faced the same uniform

overcharge as a student at a school that packaged loans, and yet Singer did exactly that.

Indeed, Singer himself acknowledged that it would have been "foolish" for Defendants to conspire on EFC while allowing members of the "cartel" to "cheat" by replacing loans with grants. A722-723 (Singer Dep. 92:3-93:12). Thus, absent proof of a packaging conspiracy, there is no case. Lacking any evidence of what he conceded was an essential element to find common impact, Singer simply assumed a conspiracy on packaging. But the divergence in packaging practices eviscerates Singer's unfounded assumption.

#### *b. The model failed to account for students who benefited from the challenged conduct*

Finally, Singer's model does not reflect the undisputed fact that the CM Guidelines' recommendations made many class members better off. Instead, he attributes a $1,202 overcharge to nearly the entire class, regardless of their circumstances. Three examples demonstrate the point.

*First*, the Guidelines' cost-of-living recommendation undeniably reduced EFCs—and thus prices—for students from high-cost areas. *See supra*, at p.43. The effect of this adjustment was significant. For

example, two students admitted to Cornell for 2015-2016 each had an EFC of $3,350 under the College Board's Base IM. A1099 (Stiroh Rebuttal ¶120). But because one lived in New York and the other in Northern California, Cornell's choice to use the CM Guidelines' recommended cost-of-living adjustment resulted in EFCs of $1,975 and $1,850, respectively. *Id.* (Stiroh Rebuttal ¶120). Both students paid less because of the conduct Plaintiffs challenge, yet Singer's model implausibly assigns to each an overcharge of $1,202.

*Second*, the CM Guidelines' home-equity cap recommendation benefited house-rich, income-constrained families who might have suffered under other approaches. *See supra*, at p.41. The Guidelines recommended capping consideration of home equity at 1.2 times family income beginning in 2005. A1099 (Stiroh Rebuttal ¶121). Any student "whose famil[y's] home equity exceeds 1.2 times family income would therefore benefit" from this recommendation. *Id.*

*Third*, Plaintiffs assert that part of the conspiracy was an agreement to adhere to "principles" that cannot have uniformly harmed a class defined by receipt of need-based aid. *See supra*, at pp.11-12. The principles listed in the Guidelines include the tenet that financial aid

should primarily be awarded based on need, and that students in like financial circumstances should be treated similarly. This stands in contrast to merit aid, which, by definition, "requires schools to select certain students over their peers on the basis of academic merit, athletic merit, or other qualities valued by schools." A1094-1095 (Stiroh Rebuttal ¶92). In a but-for world tilted toward merit, aid dollars would be "spread across fewer 'worthy' applicants," shifting aid "from a family with more need to a family with less need." A1095 (Stiroh Rebuttal ¶93).

These are not marginal cases—they are endemic to the conduct Plaintiffs allege. Yet Singer's model makes no effort to identify or otherwise account for them, rendering his finding of a uniform overcharge utterly implausible.

* * *

Singer's regression intentionally ignored the differences in Defendants' conduct and the resulting lack of common injury across the class. His model considered only whether a school was a member of the Group in a given year—and if so, it "found" that class members were harmed by an average of $1,202. Singer's "use of averages, when

applied to these facts, unacceptably masks the significant variation" in Defendants' conduct and thus any purported effect on class members. *Reed v. Advocate Health Care*, 268 F.R.D. 573, 592 (N.D. Ill. 2009); *see also Blades v. Monsanto Co.*, 400 F.3d 562, 573 (8th Cir. 2005) (affirming denial of class certification because evidence showing an increase in the "average price of GM seeds [did] not make the case" that "adherence extended to hundreds of list prices"). This is textbook *ipse dixit* that should have been excluded. *See Target Mkt. Publ'g, Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1144 (7th Cir. 1998).

### 2. Singer's "in-sample" prediction analysis compounds these flaws

#### *a. Singer's "in-sample" prediction analysis guaranteed a finding of individual harm*

Singer's second step purported to translate his average EIP "overcharge" into individual harm using "in-sample prediction." By Singer's own explanation, the in-sample prediction was dependent on the output of the first-step regression, A305-306 (Singer Rebuttal ¶227), and so it suffered from the same flaws. But the in-sample prediction was also independently unreliable because it mechanically distributed

the single classwide average across the class rather than measuring any student's actual injury.

Singer's in-sample prediction step thus guaranteed a finding of harm. It forced each student's residuals (*i.e.*, price variation caused by other, unexplained sources and not the challenged conduct) to sum to zero, which meant that any student whose years in school fell entirely within a Defendant's membership would always show a net "harm" equal to Singer's average overcharge ($1,202) multiplied by that student's number of years in school. A259-260 (Singer Dep. 273:16-274:16); A325-330 (Stiroh Rebuttal Appendix 1); A697-698 (Stiroh Surrebuttal ¶21). That was a mathematical inevitability, not an empirical finding.

This explains why 85% of all class members emerged with a net overcharge of precisely $1,202 per year—the exact classwide average—"regardless of the individual characteristics of the student," the school attended, or the year of matriculation. A254-255 (Singer Dep. 261:18-262:25); A696-698 (Stiroh Surrebuttal ¶¶19-21). All 921 class members who attended Cornell from 2010 to 2013 were found to have been harmed by the identical per-year amount, even though the total need-

based aid those students received ranged from $8,615 to $285,398. A695-696 (Stiroh Surrebuttal ¶17). At Dartmouth and Emory, where the model included only one year of data per student, every class member was found to have been harmed by exactly $1,202. A697 (Stiroh Surrebuttal ¶20, fig. S3.5). Again, that was a mathematical necessity of Singer's rigged model, not an empirical finding. A method rigged to return the same answer for every student before examining any student's circumstances does not "test" for impact; it imposes it. *See Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 665 (7th Cir. 2004) (an expert may not "assume[] what is to be established").

Singer's in-sample prediction also generated wild results that cannot be reconciled with the factual record or common sense. Again, for a student who attended Notre Dame from 2015 to 2018, Singer's model reported year-to-year swings of roughly $30,000 and $25,000 in *undercharges* followed by $28,000 and $32,000 in *overcharges*. *See supra*, at p.20. Examples of these swings abound. Singer found that 26% of the proposed class had at least one year with an undercharge exceeding $5,000 and at least one year with an overcharge exceeding $5,000. A319 (Stiroh Surrebuttal ¶25).

When confronted with an example, Singer conceded that his model "just could not have predicted" the student's actual price and that "[t]he regression can't explain" the result. A256-259 (Singer Dep. 270:9-273:6). "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process" and must be excluded. *See Zenith Elecs. Corp. v. WH-TV Broad. Corp.,* 395 F.3d 416, 419 (7th Cir. 2005).

***b. The "in-sample" prediction method is inherently biased and unreliable***

The flaws with Singer's in-sample prediction are not unique to this case, but instead inherent to the methodology. In-sample prediction has been widely criticized by economists, including the dean of antitrust scholars, Herbert Hovenkamp, as unreliable and unsound. *See, e.g.*, Econometrics Amicus Br. 6, 20-22, No. 26-8014 (7th Cir.), Dkt.15 (filed in support of Defendants' Rule 23(f) petition); Ramsey & Saravia, *Evaluating the In-Sample Prediction Approach to Assessing Class-Wide Impact for Class Certification*, J. Competition L. & Econ. 1 (2026). Because the in-sample prediction method has "not gained acceptance in the relevant scientific community," the district court should have excluded Singer's testimony. *Norris v. Baxter Healthcare Corp.*, 397

F.3d 878, 887 (10th Cir. 2005); *accord Porter v. Whitehall Lab'ys, Inc.*, 9 F.3d 607, 614 (7th Cir. 1993).

*First,* the in-sample prediction method has a false-positive error rate that "can approach 100 percent." Ramsey & Saravia, *supra*, at 4, 6, 16. That drastically exceeds the typically acceptable false-positive error rate of "5 percent or less" for "[c]ommon econometric and statistical approaches." *Id.* at 16.

The reason is structural. The in-sample prediction method relies on a regression, which draws a best-fit line (prediction) through the data. But the actual price will almost never land exactly on that best-fit line. If the distribution of residuals is symmetrical, approximately half of the transactions will fall above the best-fit line (a positive residual), and the remainder will fall below (a negative residual). Ramsey & Saravia, *supra*, at 16-17.

Because the in-sample prediction method treats *any* positive residual as evidence of harm in a price-fixing case, the method will flag approximately half of all transactions as "overcharge[d]" even if the conspiracy had no effect on them. Ramsey & Saravia, *supra*, at 16-17. And when class members typically have many transactions (like here,

where students typically had a transaction each year they were in college), the probability that *at least one* will produce a positive residual increases with each additional transaction and can approach certainty as the number of transactions increases (here, the probability was 93.75%). *Id.* at 17-18.

*Second,* the in-sample prediction method is not a consistent estimator of transaction-specific overcharges. An "estimator" is a method for calculating a quantity that cannot be observed directly—here, the amount of overcharge attributable to the challenged conduct. *See* Rubinfeld, *Reference Guide on Multiple Regression*, in Federal Jud. Ctr., *Reference Manual on Scientific Evidence* 303, 353 (3d ed. 2011). "[V]irtually all economists agree" that, at a minimum, an estimator should be "consistent," Ramsey & Saravia, *supra*, at 6, 12-13 & n.38, meaning that, as it is given more data, an estimator will "converge" to the true value of the property it is estimating. If an estimator is not consistent, its results "will not converge to the true value, no matter how large the data" and therefore it cannot "reliably determine the harm incurred by individual transactions or class members." *Id.* at 3, 6, 12-13. Singer's in-sample prediction method is not consistent, and

therefore not reliable, because factors having nothing to do with the challenged conduct persist within its measurement "no matter how large the data set" grows. Ramsey & Saravia, *supra*, at 15. No regression can explain any student's price completely, and the unexplained portion is called the regression "residual." For example, suppose a student actually paid $30,000 a year, while Singer's model predicts he would have paid $27,000 a year without the challenged conduct. Of that $3,000 difference, $1,202 is Singer's average overcharge and the remaining $1,798 is the unexplained regression "residual."

Singer's in-sample prediction method adds the regression "residual" to his average overcharge and claims that the entire $3,000 is the individual's overcharge. *See* A697 (Stiroh Surrebuttal ¶21). But again, that residual is the portion that the regression *cannot* explain; it is partially or entirely determined by factors entirely unrelated to the challenged conduct—for example, a change in the student's family circumstances, an increase in non-institutional aid, the exercise of professional judgment by a financial aid officer, or even a rounding error. Econometrics Amicus Br. 16, No. 26-8014 (7th Cir.), Dkt.15.

Because Singer's model inherently contains factors unrelated to the challenged conduct—which persist regardless of data size—Singer's analysis never converges on the true overcharge for any individual student. This inability demonstrates "the *fundamental impossibility* of the in-sample prediction method to measure the impact of the challenged conduct on a given transaction" (emphasis in original). *See* Gupta & Lux, *Surfacing the Hidden Assumptions of the In-Sample Prediction Model*, Antitrust Source 1, 5-6, 9 (Oct. 2025).

#### 3. Singer's "Yale" model says nothing about non-Yale class members and contradicts the record

After Defendants' experts demonstrated that Singer's primary model could not show that individual students were harmed, Singer offered a late "Yale Model" purporting to find that 93% of students who attended Yale both before and after Yale left the Group in 2008 were overcharged during those years in which Yale was in the Group. A340-341 (Singer Suppl. Rebuttal ¶72); A729-730 (Singer Dep. 47:7-48:10); A809 (Daubert Hrg. Tr. 27:2-4). The "Yale Model" also fails, for two reasons.

*First*, the Yale Model is nothing more than the same discredited in-sample prediction method applied to one school around a single point in time. A340-341 (Singer Suppl. Rebuttal ¶72); Dkt.754 at 15-19;

Dkt.806 at 10-12; Dkt.788 at 36-39. Had Singer performed the identical exercise for several other Defendants—a "Penn Model," a "Notre Dame Model," or a "Georgetown Model"—it would have shown no harm at all. *See* A320-322 (Stiroh Surrebuttal ¶32 & n.75 & fig. S4.3). A model that addresses only Yale cannot establish common impact across 16 other schools over two decades. *See American Honda Motor*, 600 F.3d at 817; *Van v. Ford Motor Co.*, 332 F.R.D. 249, 269-270 (N.D. Ill. 2019) (excluding expert testimony that "improperly draws generalizations about the putative class based on an unrepresentative sample"); Dkt.806 at 10-12.

*Second*, the Yale Model again contradicts the record. Yale adopted financial-aid policies that were more generous to students while it was a member of the Group and became less generous after it left—the opposite of what Singer's Yale Model purports to show. After departing the Group, Yale *decreased* its scholarship budget by roughly $12 million. A714 (Oct. 2, 2012 email from Caesar Storlazzi to J. Lloyd Suttle and Bhakti Nagalla). One hundred eighty-two Yale students received full rides only after Yale rejoined the Group in 2018—these same students received only partial aid in 2017 when Yale was outside

the Group. A688 (Hill Surrebuttal ¶44 & n.49); Dkt.806 at 4. And Yale decreased its consideration of home equity while in the Group: Before joining, Yale capped home equity at 3 times income; it then adopted the CM's recommended cap of 1.2 times income while a member but reverted to 3 times income after leaving. A1099-1100 (Stiroh Rebuttal ¶122). Twenty-nine percent of students admitted to Yale had home equity exceeding the CM-recommended cap—each would have received a lower EFC under the challenged conduct than in Singer's but-for world. *Id.* (Stiroh Rebuttal ¶122 & n.287). A model that attributes harm to membership, when the record shows membership coincided with greater generosity, is unrealistic even for the single school it examines. *See Owens*, 895 F.3d at 973; *Kmart*, 233 F.3d at 756; *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000).

#### 4. Singer's "price structure" analysis depends on the model's (false) imposition of uniformity

As an alternative to his in-sample prediction method at Step 2, Singer offered a "price structure analysis" to demonstrate individualized harm, but it fares no better. The price structure analysis utilized regressions and other methods to measure whether prices paid

by class members tend to move in tandem; Singer claimed that this proves that any overcharge was suffered across the class. But Singer conceded that no second-step technique "by itself ... [could] constitute [] proof of common impact." A508-509 (Singer Dep. 315:8-316:22); Dkt.806 at 8. For good reason: showing that prices move together says nothing about whether any price was inflated in the first place. A1116 (Stiroh Rebuttal ¶204); *see Miami Prods. & Chem. Co. v. Olin Corp.*, 2023 WL 8946114, at *19 (W.D.N.Y. Dec. 28, 2023) (a "pricing structure cannot demonstrate classwide antitrust injury" where it "'would exist in the absence of the [alleged] cartel'"); Dkt.788 at 39-41. Like the rest of Singer's analysis, the price-structure evidence assumed the uniformity it was supposed to prove.

### C. Singer's Model Opportunistically Excluded Data

Singer compounded the flaws in his unreliable methodology by excluding inconvenient data. These opportunistic omissions were significant and pervasive: Singer canvassed the record to find numbers that produced an overcharge when fed into his model and discarded the rest. Because Singer failed to bridge the gap between the data he used and the categorical conclusion he reached, the court should have

excluded his testimony. *See In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II) MDL 2502*, 892 F.3d 624, 634 (4th Cir. 2018) ("Result-driven analysis, or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion.").

*First*, Singer excluded instances in which a student received institutional grant aid covering more than 95% of the cost of attendance in a given year—excluding over 58,000 observations, 7.5 percent of the total data available. A702-703 (Singer Second Am. Rep. ¶246 & n.342); A684 (Singer Second Am. Rep. tbl. 10). Over the class period, both the number of students receiving full rides and the amount those students received increased. A700-701 (Hill Rebuttal ¶85 & fig. 11). Because these are the students who received the most generous aid packages, removing them materially skewed his results in Plaintiffs' favor. A227-228, A230 (Hill Rebuttal ¶¶81, 234 & n.106).

Singer's only explanation for these exclusions was the assertion that these students "are not members of the class." A250 (Singer Dep. 201:19-24). That too was wrong: although students who received a full ride for *all* of their years in school are not part of the proposed class,

A836 (Order Granting Notice to the Class 1 n.2), Singer excluded each observation in which a student received aid covering *more than 95%* of the cost of attendance *for that year*, A703-704 (Singer Second Am. Rep. ¶246 & n.342); *see also* A743 (Singer Second Am. Rep. ¶8); A1006 (Singer Decl. ¶1).

Regardless, Singer's rationale does not provide a valid basis for exclusion of this data from his model. These students had their financial aid determined pursuant to the same principles that applied to other class members. Assessing the impact of the conspiracy, as Singer purports to do, thus required including these students. And when Singer eventually revised his model after the fact to include students on full rides, his model nonsensically concluded that such students who paid absolutely nothing had been *overcharged* by an average of roughly $1,000 a year, demonstrating its fundamental unreliability. A825 (Daubert Hrg. Tr. 99:14-20).

*Second*, Singer excluded data from non-defendant Group members. A234 (Singer Dep. 29:17-25). He did so even though he claimed that the "price effects" are "most reliably measured" by considering all such schools. A287-288 (Singer Rebuttal ¶75). This exclusion is telling given

that Singer argued "the key feature of the Challenged Conduct ... that bound Defendants together" was "[m]embership in the 568 Group," and therefore "exposure to the Challenged Conduct ... did not vary by school or year." A289-291 (Singer Rebuttal ¶¶93, 95). If that were true, all Group members—including non-defendants—would necessarily be relevant to measuring the effect of the challenged conduct on prices. On Singer's own theory, omitting non-defendant Group members results in an unrepresentative sample, reflecting selection bias. *See In re Deepwater Horizon BELO Cases*, 119 F.4th at 947 (affirming exclusion of expert who relied on study that "suffered from clear 'selection bias,' which [expert] 'acknowledged' but 'failed to address'"); *In re TMI Litig.*, 193 F.3d 613, 708 (3d Cir. 1999) (affirming district court's exclusion of expert because "[t]here is no way to insure that participants [selected by the expert] were not selected or excluded in a manner that would bias the study," meaning that "[t]he groups [the expert] studied ... had a built-in bias so that a finding of increased cancer incidence was inevitable."), *amended*, 199 F.3d 158 (3d Cir. 2000). Plaintiffs had every opportunity over years of fact discovery to obtain this data, and much of it is publicly available, but they inexplicably chose to ignore it. A933

(Long Rebuttal ¶41 & n.71); A606-607 (Hill Rebuttal ¶90). Nor can Plaintiffs respond that Singer made a considered, reasonable choice to exclude non-Defendant members: Singer did not even *know* the Group was larger than just the named Defendants until being told so by Defendants' counsel at his deposition. A234 (Singer Dep. 29:7-13).

*Third*, Singer omitted all data from the years 2016-2023 from the University of Chicago because it "substantially biase[d] [his] conduct coefficient downwards." A299 (Singer Rebuttal ¶113). That is, he disregarded the data because it eviscerated his claimed effect. Singer claimed that this data was "unreliable" "due to database inconsistencies" resulting from a change in the University of Chicago's financial aid database that made it difficult to identify the amount of institutional need-based grant aid. A298-299 (Singer Rebuttal ¶112). That "difficulty" of course could readily have been eliminated in discovery. And the same issue did not stop Singer from using Rice University's data, which had the same change. A702-703 (Singer Second Am. Rep. ¶246 & n.341).

Singer also asserted that the University of Chicago's post-2015 data "misreport[s] higher real [EIPs]." A298-299 (Singer Rebuttal ¶112).

But this claimed "inconsistency" was simply data that disproved Singer's theory. The data showed a substantial increase in EIP between 2015 and 2016 and then again between 2021 and 2022, with the former coinciding with when the University of Chicago left the Group. A297-298 (Singer Rebuttal fig. 1). Once again assuming what he was supposed to prove, Singer declared that since Chicago had left the Group, this could not possibly be true. A298-299 (Singer Rebuttal ¶¶112-113). Singer's exclusion of data that would have substantially reduced his average overcharge estimate underscores the unreliability of his methodology. "[S]uch a selective use of facts fails to satisfy the scientific method" and "thus fails to 'assist the trier of fact.'" *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001).

* * *

Where "[the] fact of damage cannot be established for every class member through proof common to the class," class certification must be denied. *Reed*, 268 F.R.D. at 582; *see also Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003). Plaintiffs rely solely on Singer's expert testimony to demonstrate common antitrust impact. Singer's testimony was inadmissible because his model was riddled with

methodological flaws that rendered his testimony irrelevant and unreliable. As a result, class certification must be denied. *See American Honda Motor*, 600 F.3d at 818-819 (denying class certification on Rule 23(f) review because "the testimony proffered here is not merely shaky: it is unreliable" and "[w]ithout [the] testimony, Plaintiffs are left with too little to satisfy Rule 23(b)(3)'s predominance prong"); *Rusoff v. Happy Grp., Inc.*, 2026 WL 2387098, at *6-7 (9th Cir. Aug. 17, 2026) (affirming denial of class certification on Rule 23(f) review after finding that "the district court correctly excluded [the injury expert's] opinions as unreliable" and that, without the expert opinion, "plaintiffs did not show that common questions of deception predominate"); *Blades*, 400 F.3d at 572 (affirming denial of class certification where "plaintiffs' expert did not show that the fact of injury could be proven for the class as a whole with common evidence").

## II. THE DISTRICT COURT CONTRAVENED *ARANDELL* BY FAILING TO INVESTIGATE THE REALISM OF PLAINTIFFS' EXPERT OPINION

Even if the district court had not erred in admitting Singer's testimony, the court nevertheless completely failed to conduct Rule 23's separate analysis, which must investigate the extent to which Singer's opinion aligned (or not) with reality. In particular, the court failed to

meaningfully investigate Singer's expert testimony in light of Defendants' countervailing evidence showing that any anticompetitive effect upon class members was distinctly not uniform. Instead, the district court did exactly what *Arandell* prohibits: it granted certification based *solely* on its decision that Singer's damages model survived *Daubert*.

### A. Defendants' Countervailing Evidence Triggered A Duty For The District Court To Investigate The Realism Of Singer's Model

Defendants put forth expert testimony and record factual evidence that "if credited, would mean individual questions would predominate over common questions." *Arandell*, 149 F.4th at 894.

*First,* Defendants and their experts demonstrated that Singer's model did not suffice as the "common evidence" demonstrating that "all class members were in fact injured by the alleged conspiracy." *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 252 (D.C. Cir. 2013). As explained (at 36-49), Singer's model showed common impact only because it assumed uniform conduct across all Defendants despite unrebutted evidence that the conduct varied by school and across years. And Singer conceded that the challenged

conduct amounted to no more than a set of principles that operated in broad strokes. But his analysis assumed the opposite, leading him to calculate an average annual overcharge of $1,202. Singer's flawed in-sample prediction then led him to conclude that for 85% of individual class members—spread over 17 universities and 20 years—each individual student's annual alleged overcharges (and undercharges) averaged to precisely $1,202 per year.

*Second*, Defendants demonstrated an inescapable contradiction between Singer's model and the only liability theory Plaintiffs now pursue, in direct conflict with *Comcast*. "[A] model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable" to the "theory of antitrust impact" put forth by Plaintiffs and "accepted for class-action treatment by the District Court." *Comcast*, 569 U.S. at 35; *see also id.* at 38 ("The first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*." (emphasis in original)). Singer's damages model "assume[d]" the challenged conduct was "uniform ... across all schools [and] all time periods." A725 (Singer Dep. 117:8-18); A252 (Singer Dep. 253:17-25). But Plaintiffs now

concede the Group never developed a single "formula that [schools] should use." A717 (Singer Dep. 20:2-10). And the district court held at summary judgment that there was no price-fixing,[3] rendering Singer's uniform overcharge both unrealistic and inconsistent with Plaintiffs' ultimate theory of the case. *See North Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc.*, 710 F. Supp. 3d 1090, 1111 (D. Utah 2023) ("The distinction [plaintiff] fails to reckon with is that its average overcharge methodology is generally only acceptable in the price-fixing context."). "[A]t the class certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation.'" *Comcast*, 569 U.S. at 35. But Singer's model relied on a disavowed and unsupported theory of the case, in violation of *Comcast*.

Nor is that the only mismatch Defendants identified. Plaintiffs' liability case was predicated on the allegation that Defendants conspired through the Group to apply principles that drive the

---

[3] A760-761 ("The agreement here is one on general standards—short of a formula[.]"); *see also* A31 (First Order on Plaintiffs' Mot. for Class Cert. at 20 n.3) ("[T]he *per se* rule does not apply because the claimed conspiracy did not directly fix prices as such.").

calculation of students' EFC, A213, A219-220 (SAC ¶¶4, 117), whereas Singer analyzed something quite different—his invented metric of EIP, which (unlike EFC) is a function of the school's cost of attendance and the proportion of financial need that is covered by school grants alone. A740, A742 (Singer Second Am. Rep. ¶¶3, 6). For this reason, EIP can readily increase while EFC stays constant.




For example, if a student's EFC was the same in two academic years but their need was covered by a school grant one year and a federal grant the next, their EIP went up while the price they actually paid did not. Measuring an increase in EIP over time—as Singer purported to

do—demonstrated nothing about whether EFC (the object of the alleged conspiracy) was also increasing.

Indeed, Singer found that only $515 of the $1,202 EIP overcharge was attributable to an alleged inflation of EFC. A339 (Singer Suppl. Rebuttal ¶57). The remainder, he claimed, was attributable to increases in universities' overall cost of attendance and to shifts in "packaging," from grants to loans. *Id.* But again, Plaintiffs do not allege a conspiracy to increase overall cost of attendance, and any claim of coordination in packaging is contradicted by the record, which demonstrates that schools diverged sharply in their approaches to packaging financial aid. *See supra*, at pp.43-45.

### B. The District Court Abdicated Its Duty To Investigate The Realism Of Singer's Model And Make Requisite Factual Findings

Defendants' evidence raised "material disputes bearing on class certification." *Arandell*, 149 F.4th at 893 (citing *West v. Prudential Sec., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002)). Where "defendants have offered admissible evidence that, if credited, would mean individual questions would predominate over common questions"—as they certainly did here—"then the district court must 'investigate[] the

realism' of the expert evidence 'in light of the defendants' counterarguments,' and take evidence to that end." *Id*. at 894 (quoting *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1086 (7th Cir. 2014)); *accord*, *e.g.*, *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (vacating class certification because "[i]nstead of judging the persuasiveness of the evidence presented, the district court seemed to end its analysis of the plaintiffs' evidence after determining such evidence was merely admissible"); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 323 (3d Cir. 2008), *as amended* ("[O]pinion testimony should not be uncritically accepted as establishing a Rule 23 requirement merely because the court holds the testimony should not be excluded, under *Daubert* or any other reason.").

Defendants' evidence imposed a duty on the district court to "expressly address or make findings about the defense arguments that the plaintiffs' [expert] models were inadequate so as to defeat predominance." *Arandell*, 149 F.4th at 891. To have sustained Singer's analysis as it did, in light of the admissible evidence to the contrary, the court would have had to find, among other things: (1) the scope of the alleged conspiracy; (2) that all Defendants were part of the alleged

conspiracy and participated in the same way across students and years; (3) that the alleged conspiracy could have resulted in common impact; (4) that Singer's model tested for uniformity instead of arbitrarily imposing it; (5) that Singer's model was consistent with Plaintiffs' liability theory, which disclaims price fixing and centers on EFC, not EIP; and (6) that Singer's model's selective inclusion and exclusion of data did not undermine its ability to demonstrate common impact—all by a preponderance of the evidence.

The court did none of this. Its class-certification order does not even mention Defendants' experts and barely addresses Defendants' arguments. Instead, the court stated: "For the reasons discussed in the Court's ruling on defendants' motion to exclude Singer's testimony, these contentions are unavailing." A31. The court thus rested its class-certification decision entirely on its *Daubert* ruling, concluding that "Dr. Singer's testimony is sufficiently reliable and is admissible, and thus the contention that class certification is unwarranted because his testimony is unreliable does not carry the day." *Id.* That approach is flatly inconsistent with *Arandell*'s holding that "just because expert

evidence is admissible does not mean that it will justify class certification." 149 F.4th at 894.

In fact, the district court committed the exact same error as the lower court did in *Arandell*, when it found sufficient that "[P]laintiffs ha[d] articulated a facially credible basis for a jury to determine their conspiracy claims at a class level" and that "defendants remain[ed] free to challenge plaintiff's theory." *Arandell Corp. v. Xcel Energy, Inc.*, 2022 WL 2314717, at *10 (W.D. Wis. June 28, 2022), *vacated*, 149 F.4th 883 (7th Cir. 2025). And class certification was easier to achieve in *Arandell* than here because of the nature of the product at issue. *Arandell* involved natural gas, which is a "fungible commodity," where "[o]ne molecule is indistinguishable from another." 149 F.4th at 887. This case, by contrast, involves a non-fungible "product" and no price-fixing. The pricing decisions of each Defendant, for each student, for each year were bespoke. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 816 (7th Cir. 2012) (antitrust impact is "relatively simple" to show for a "generic, undifferentiated commodity"); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 307-308 (vacating

certification in case involving chemicals sold in different concentrations and grades that were "not economic substitutes for each other").

Further, the court's *Daubert* opinion cannot backfill the failings in its class-certification analysis because that opinion *disclaimed* conducting the analysis *Arandell* requires. The court's *Daubert* opinion expressly refrained from considering arguments that went to the "weight to be given to [Singer's] analysis," A94. The court acknowledged that "defendants bring up several fair points that may limit or undermine the probative value of Singer's impact regression," but noted "that is a matter regarding the weight to be given to the analysis, not a basis for its exclusion." A94. It similarly noted that "whether Singer used the wrong data, or even incorrect or incomplete data, goes to the weight to be afforded to his model." A89. And even though the court left "issues regarding the data used and the conclusions reached from the in-sample regression" to be "addressed by ... [the] presentation of contrary evidence" at later stages of litigation, the court never revisited the deficiencies in Singer's model at class certification. A100.

"Rule 23's 'rigorous analysis' requirement for class certification is not the same as the test for admissibility" under Rule 702 and *Daubert*. *Arandell*, 149 F.4th at 894. Unlike at the *Daubert* stage, "weighing" expert testimony is "not only permissible [at the class certification stage]; it may be integral to the rigorous analysis Rule 23 demands," as it was here. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 323. Because "there is no shortcut that might let the district court avoid full engagement with the ... experts and their many and detailed point-counterpoint debates," the court's grant of class certification cannot stand. *Arandell*, 149 F.4th at 895.

* * *

Given the irremediable errors in Singer's model, and the fundamental mismatch between the model and Plaintiffs' liability theory, vacating and remanding for further proceedings would be futile. The record is sufficiently developed for this Court to determine whether class certification is appropriate. For the reasons explained, the Court should reverse with instructions to deny class certification. *See, e.g.*, *Comcast*, 569 U.S. at 34, 38 (holding that "class action was improperly certified" because "under the proper standard of evaluating

certification, respondents' model falls far short of establishing that damages are capable of measurement on a class-wide basis"); *Rhode Island Office of Gen. Treasurer ex rel. Emps. Ret. Sys. v. Boeing Co.*, 182 F.4th 422, 448 (4th Cir. 2026) (reversing district court's class certification, noting that plaintiffs "cannot show their liability theory is consistent with the damages methodology"); *West*, 282 F.3d at 938-940 (reversing the district court's grant of class certification and finding that "a remand is unnecessary" "[b]ecause the record here does not demonstrate [causation]").

## CONCLUSION

The Court should reverse the district court's grant of class certification with instructions that class certification be denied.

Dated: October 5, 2026

Respectfully submitted.

*/s/ Seth P. Waxman*
SETH P. WAXMAN
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000

DAVID GRINGER
ALAN SCHOENFELD
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 Word Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
david.gringer@wilmerhale.com
alan.schoenfeld@wilmerhale.com

ZAKI ANWAR
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
zaki.anwar@wilmerhale.com

EDWARD W. FELDMAN
MILLER SHAKMAN LEVINE &
FELDMAN LLP
30 W. Monroe Street
Suite 1900
Chicago, IL 60603
(312) 759-7213
efeldman@millershakman.com

*Attorneys for Defendant-Appellant the Trustees of the University of Pennsylvania*

NORMAN ARMSTRONG
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800
norman.armstrong@cooley.com

*Attorney for Defendant-Appellant Cornell University*

BRITT M. MILLER
DANIEL T. FENSKE
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
dfenske@mayerbrown.com

*Attorneys for Defendant-Appellant Georgetown University*

ERIC MAHR
JAN RYBNICEK
FRESHFIELDS US LLP
700 13th Street NW
Washington, DC 20005
(202) 777-4500
eric.mahr@freshfields.com
jan.rybnicek@freshfields.com

*Attorneys for Defendant-Appellant Massachusetts Institute of Technology*

ROBERT A. VAN KIRK
SARAH F. KIRKPATRICK
MATTHEW D. HEINS
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000
rvankirk@wc.com
skirkpatrick@wc.com
mheins@wc.com

*Attorneys for Defendant-Appellant University of Notre Dame*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Seventh Circuit Rule 32(c) because it contains 13,968 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements and type-style requirements of Federal Rule of Appellate Procedure 32(a), as amended by Seventh Circuit Rule 32(b), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

/s/ *Seth P. Waxman*
SETH P. WAXMAN

October 5, 2026

# APPENDIX

No. 26-2759

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

ANDREW CORZO, ET AL.,

*Plaintiffs-Appellees*,

*v.*

CORNELL UNIVERSITY, ET AL.,

*Defendants-Appellants*.

Interlocutory Appeal Pursuant to Federal Rule of Civil Procedure 23(f) from the United States District Court for the Northern District of Illinois, No. 1:22-cv-00125-MFK Before the Honorable Matthew F. Kennelly

**APPENDIX FOR DEFENDANTS-APPELLANTS BRIEF**
**VOLUME 1**
**(A1 – A127)**


DAVID GRINGER
ALAN SCHOENFELD
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 Word Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
david.gringer@wilmerhale.com
alan.schoenfeld@wilmerhale.com

SETH P. WAXMAN
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
seth.waxman@wilmerhale.com

*Attorneys for Defendant-Appellant the Trustees of the University of Pennsylvania*


October 5, 2026

Additional Counsel on Inside Cover

NORMAN ARMSTRONG
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800
norman.armstrong@cooley.com

*Attorney for Defendant-Appellant Cornell University*

BRITT M. MILLER
DANIEL T. FENSKE
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
dfenske@mayerbrown.com

*Attorneys for Defendant-Appellant Georgetown University*

ERIC MAHR
JAN RYBNICEK
FRESHFIELDS US LLP
700 13th Street NW
Washington, DC 20005
(202) 777-4500
eric.mahr@freshfields.com
jan.rybnicek@freshfields.com

*Attorneys for Defendant-Appellant Massachusetts Institute of Technology*

ZAKI ANWAR
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
zaki.anwar@wilmerhale.com

EDWARD W. FELDMAN
MILLER SHAKMAN LEVINE &
FELDMAN LLP
30 W. Monroe Street
Suite 1900
Chicago, IL 60603
(312) 759-7213
efeldman@millershakman.com

*Attorneys for Defendant-Appellant the Trustees of the University of Pennsylvania*

ROBERT A. VAN KIRK
SARAH F. KIRKPATRICK
MATTHEW D. HEINS
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000
rvankirk@wc.com
skirkpatrick@wc.com
mheins@wc.com

*Attorneys for Defendant-Appellant University of Notre Dame*

# APPENDIX TABLE OF CONTENTS

Page

## VOLUME 1
## (BOUND WITH BRIEF)

Order on Motion for Class Certification (June 1, 2026), Dkt. 1275 .......... A1

Memorandum Opinion and Order on Motion for Class Certification (Mar. 31, 2026), Dkt. 1241 .......... A12

Memorandum Opinion and Order on Motions to Exclude Expert Testimony (Sept. 29, 2025), Dkt. 1160 .......... A74

## VOLUME 2
## (SEPARATELY BOUND)

District Court Docket, No. 1:22-cv-00125 (N.D. Ill.) .......... A128

Complaint (Jan. 9, 2022), Dkt. 1 .......... A139

Amended Complaint (Feb. 15, 2022), Dkt. 106 .......... A200

Memorandum Opinion and Order on Motion to Dismiss (Aug. 15, 2022), Dkt. 185 .......... A207

Second Amended Complaint (Feb. 6, 2023), Dkt. 308 .......... A211

Plaintiffs' Motion for Class Certification Exhibit 17: Email from Patricia McWade to Ted Bracken (dated Apr. 15, 2014), Dkt. 753-17 (Redacted) .......... A222

Plaintiffs' Motion for Class Certification Exhibit 18: Email from Cynthia Barnhart to Elizabeth Hicks (dated Aug. 27, 2014), Dkt. 753-18 (Excerpts) .......... A223

Plaintiffs' Motion for Class Certification Exhibit 24: Email from Donald Bishop to Lou Nanni, Joseph Gelchion, and Robert Mundy (dated Mar. 6, 2012), Dkt. 753-24 .......... A224

Rebuttal Expert Report of Nicholas Hill, dated Aug. 7, 2024 (filed Dec. 16, 2024), Dkt. 755-4 (Excerpts) ............................... A226

Deposition of Hal J. Singer, dated Nov. 27, 2024 (filed Dec. 16, 2024), Dkt. 755-11 (Excerpts) ........................................................A233

Amended Expert Report of Hal J. Singer, dated May 28, 2024 (filed Dec. 16, 2024), Dkt. 755-12 (Excerpts) ............................ A272

Rebuttal Expert Report of Hal J. Singer, dated Oct 7, 2024 (filed Dec. 16, 2024), Dkt. 755-18 (Excerpts) ............................ A279

Defendants' Motion to Exclude Expert Testimony, Exhibit 20: *Peer School Financial Aid Initiatives Timeline* (filed Dec. 16, 2024), Dkt. 755-22 ...........................................................................A310

Surrebuttal Expert Report of Lauren J. Stiroh, dated Nov. 1, 2024 (filed Dec. 16, 2024), Dkt. 755-27 (Excerpts) ................................A314

Rebuttal Expert Report of Lauren J. Stiroh, Appendix 1, dated Aug. 7, 2024 (filed Dec. 16, 2024), Dkt. 755-29 (Excerpts) ............................................................... A324

Rebuttal Expert Report of Hal J. Singer, dated Oct. 7, 2024 (filed Dec. 17, 2024), Dkt. 756-34 (Excerpts) ............................ A331

Expert Report of George Bulman, dated May 14, 2024 (filed Dec. 17, 2024), Dkt. 756-36 (Excerpts) ...............................A336

Supplemental Rebuttal Expert Report of Hal J. Singer, dated Nov. 8, 2024 (filed Dec. 17, 2024), Dkt. 756-38 (Excerpts) ............................................................... A338

Rebuttal Expert Report of Bridget Terry Long, dated Aug. 7, 2024 (filed Dec. 17, 2024), Dkt. 756-39 (Excerpts) (Redacted) ..............A342

Rebuttal Expert Report of Bridget Terry Long, Appendix D, dated Aug. 7, 2024 (filed Dec. 20, 2024), Dkt. 765-1 (Excerpts) (Redacted)............................................... A426

Deposition of Hal J. Singer, dated Nov. 27, 2024 (filed Feb. 1, 2025), Dkt. 789-2 (Excerpts) ....... A507

Rebuttal Expert Report of Bridget Terry Long, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 789-3 (Excerpts) (Redacted) ....... A510

Rebuttal Expert Report of Nicholas Hill, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 789-4 (Excerpts) ....... A598

Rebuttal Expert Report of Lauren J. Stiroh, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 789-16 (Excerpts) (Redacted) ....... A625

Plaintiffs' Motion for Class Certification, Exhibit 19: *The 568 Group Consensus Methodology Policy Guidelines* (Dec. 2016) (filed Feb. 1, 2025), Dkt. 789-20 ....... A655

Second Amended Expert Report of Hal J. Singer, dated June 10, 2024 (filed Feb. 1, 2025), Dkt. 789-25 (Excerpts) ....... A673

Surrebuttal Expert Report of Nicholas Hill, dated Nov. 1, 2024 (filed Feb. 1, 2025), Dkt. 789-32 (Excerpts) ....... A687

Plaintiffs' Motion for Class Certification, Exhibit 41: *Report of Common Standard Subcommittee to 568 Presidents' Working Group* (filed Feb. 1, 2025), Dkt. 789-42 (Excerpts) ....... A689

Deposition of James Tilton, dated May 15, 2023 (filed Feb. 1, 2025), Dkt. 789-49 (Excerpts) ....... A691

Surrebuttal Expert Report of Lauren J. Stiroh, dated Nov. 1, 2024 (filed Feb. 1, 2025), Dkt. 789-51 (Excerpts) ....... A694

Rebuttal Expert Report of Nicholas Hill, dated Aug. 7, 2024 (filed Feb. 27, 2025), Dkt. 802-7 (Excerpts) ....... A699

Second Amended Expert Report of Hal J. Singer, dated June 10, 2024 (filed Feb. 28, 2025), Dkt. 805-2 (Excerpts) ....... A702

Minute Docket Entry for Hearing on Motions to Exclude
Expert Testimony (Apr. 3, 2025), Dkt. 835 ................................ A705

Defendants' Motion for Summary Judgment, Exhibit 85:
*Penn Undergraduate Student Accessibility and Affordability*, dated Feb. 27, 2020, (filed May 7, 2020), Dkt. 864-4 (Excerpts) ................................ A707

Defendants' Motion for Summary Judgment, Exhibit 90:
*House Judiciary Committee Report on Need-Based Educational Aid Act of 2001*, H.R. Rep. No. 107-32, 1st Sess. (2001), Dkt. 864-9 (Excerpts)................................ A710

Defendants' Motion for Summary Judgment, Exhibit 120:
Email from Caesar Storlazzi to J. Lloyd Suttle and Rhakti Nagella, dated Oct. 2, 2012 (filed May 7, 2025), Dkt. 864-39 ................................ A714

Deposition of Hal J. Singer, dated Nov. 27, 2024
(filed May 8, 2025), Dkt. 865-30 (Excerpts) ................................ A715

Deposition of Caesar Storlazzi, dated July 27, 2023
(filed May 8, 2025), Dkt. 865-31 (Excerpts) ................................ A726

Deposition of Hal J. Singer, dated Nov. 27, 2024
(filed May 29, 2025), Dkt. 874-5 (Excerpts) ................................ A728

Errata to Expert Report of Bridget Terry Long, updated
Aug. 12, 2024 (filed June 27, 2025), Dkt. 889-3 (Excerpts)...... A735

Second Amended Expert Report of Hal J. Singer,
dated June 10, 2024 (filed June 27, 2025), Dkt. 889-17 (Excerpts) ................................ A739

Plaintiffs' Opposition to Summary Judgment, Exhibit 107:
*Memorandum of Understanding the 568 Presidents' Group*, dated Jan. 5, 2004 (filed Sept. 12, 2025, Dkt. 1025-6 ................................ A744

Memorandum Opinion and Order on Cross-Motions for Summary Judgment (Jan. 12, 2026), Dkt. 1210 (Excerpts) ...................... A747

Transcript of Proceedings of Status Conference (Mar. 20, 2025), Dkt. 1261 (Excerpts)........................................................... A784

Transcript of Proceedings on Motions to Exclude Expert Testimony (Apr. 14, 2025), Dkt. 1263 (Excerpts) ..................... A788

Hearing on Motions to Exclude Expert Testimony (Apr. 14, 2025): Defendants' Hearing Presentation ................ A833

Order Granting Plaintiffs' Motion to Provide Agreed Forms of Notice to the Certified Litigation Class (June 12, 2026), Dkt. 1282 (Excerpts)........................................................... A835

Transcript of Proceedings on Class Counsel Approval (May 26, 2026, 2:30pm) (Excerpts).......................................... A837

**VOLUME 3**
**SEALED**
**(SEPARATELY BOUND)**

Rebuttal Expert Report of Bridget Terry Long, Appendix D, dated Aug. 7, 2024 (filed Dec. 16, 2024) Dkt. 754-3 (Excerpts) [unredacted version of A426-506] ............................ A839

Plaintiffs' Motion for Class Certification Exhibit 17: Email from Patricia McWade to Ted Bracken (dated Apr. 15, 2014), Dkt. 757-12 [unredacted version of A222] ......................................................................... A920

Rebuttal Expert Report of Bridget Terry Long, dated Aug. 7, 2024 (filed Dec. 17, 2024), Dkt. 757-52 (Excerpts) [unredacted version of A342-425] ..........................................................A921

Declaration of Hal J. Singer (Jan. 25, 2025), Dkt. 785-2................. A1005

Rebuttal Expert Report of Bridget Terry Long, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 788-3 (Excerpts) [unredacted version of A510-597]...................................................................A1009

Rebuttal Expert Report of Lauren J. Stiroh, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 788-16 (Excerpts) [unredacted version of A625-654] ....................................................A1088

Second Amended Expert Report of Hal J. Singer (May 7, 2025), Dkt. 854-7 (Excerpts) ....................................................A1118

Transcript of Proceedings on Settlement Approval (July 28, 2025, 2:50pm), Dkt. 1345 (Excerpts)............................A1121

**Index of Excerpted Transcript Pages Included in Appendix**



| Proceeding | Excerpted Transcript Pages | Appendix Page |
|---|---|---|
| Transcript of Proceedings of Status Conference (Mar. 20, 2025), Dkt. 1261 | pp.9-11 | A785-787 |
| Transcript of Proceedings on Motions to Exclude Expert Testimony (May 15, 2026), Dkt. 1263 | pp.7-31, 47-48, 69-73, 75-76, 87, 98-100, 113-115, 130-131, 150 | A789-832 |
| Transcript of Proceedings on Settlement Approval (July 28, 2025, 2:50pm), Dkt. 1345 (SEALED) | p.7 | A1122 |
| Transcript of Proceedings on Class Counsel Approval (May 26, 2026, 2:30pm) | p.9 | A838 |

# Index of Excerpted Deposition Transcript Pages Included in Appendix

| Depositions | Excerpted Transcript Pages | Appendix Page |
|---|---|---|
| Hal J. Singer Deposition (Nov. 27, 2024), Dkt. 755-11 | pp.29, 31-34, 48-49, 127-132, 184, 189-190, 201, 252-254, 261-262, 270-274, 281-283, 288-293, 295-296 | A234-271 |
| Hal J. Singer Deposition (Nov. 27, 2024), Dkt. 789-2 | pp.315-316 | A508-509 |
| Hal J. Singer Deposition (Nov. 27, 2024), Dkt. 865-30 | pp.19-21, 27, 59, 82, 92-93, 95, 117 | A716-725 |
| Hal J. Singer Deposition (Nov. 27, 2024), Dkt. 874-5 | ECF pp.3-8 | A729-734 |
| Caesar Storlazzi Deposition (July 27, 2023), Dkt. 865-31 | p.38 | A727 |
| James Tilton Deposition (May 15, 2023), Dkt. 789-49 | pp.121-122 | A692-693 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ANDREW CORZO, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 22 C 125** |
| | ) | |
| **BROWN UNIVERSITY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER ON MOTION FOR CLASS CERTIFICATION**

MATTHEW F. KENNELLY, District Judge:

The plaintiffs in this antitrust suit have moved for class certification. In a decision issued a little over two months ago, the Court found "that plaintiffs have satisfied all of the requirements for class certification, save one: adequacy of counsel." *See Corzo v. Brown Univ.*, No. 22 C 125, 2026 WL 881598, at *1 (N.D. Ill. Mar. 31, 2026).

On that point, the Court found that the proposed class counsel—three law firms—had made or participated, at least tacitly, in misrepresentations to the Court regarding the fee arrangements of one of the three firms with a litigation funder. The firm whose fee arrangements had been misrepresented—Gilbert Litigators and Counselors (GLC)—withdrew from consideration as class counsel. The Court "deferred final ruling on the motion for class certification while affording plaintiffs an opportunity to bring in new, and adequate, proposed lead class counsel." *Id.*

Plaintiffs have now proposed appointment of Steven Molo and MoloLamken LLP as lead class counsel, with two of the original three law firms representing plaintiffs, Freedman Normand Friedland LLP (FNF) and Berger Montague PC (Berger), remaining

in the case as co-counsel for the class, but not in a lead role. The remaining defendants who have not settled—the University of Notre Dame, the University of Pennsylvania, Cornell University, and Georgetown University—oppose this and contend that class certification should be denied.

Familiarity with the Court's March 31 decision—which ran to sixty-two pages—is assumed. The Court will, however, directly quote here the section of the decision most relevant to the matter now before the Court:

> It is a separate question . . . whether [counsels'] misstatements *actually* influenced the Court. The Court acknowledges that it is assessing this with hindsight. But the Court concludes that counsels' misstatements regarding the purportedly contingent nature of GLC's work and its purportedly unreimbursed expense outlays did not actually impact the award of fees and expenses in connection with the settlements. GLC was not the only firm prosecuting the case. The work of FNF and Berger *was* fully contingent; they have represented that they do not have litigation financing arrangements that compensate them for attorney and other professional time. As for GLC, though it had been paid a very large sum for its time on the case, at the time of the settlements its work was still *partially* contingent: the hourly fee reimbursement was for 40 percent of its lodestar, and it was capped at $14 million. This meant that the overall percentage for which GLC had been paid started to drop once it had put more than $35 million in time into the case. Considered globally, class counsel's fees still were overwhelmingly contingent. In addition, the Court has no basis to believe that awareness of Gilbert's arrangement would have affected the percentage of the award. This is the one place where the fact that Gilbert was in a "joint venture" with the funder *was* relevant: the funder would recover its advances off the top of the fee award to GLC. Thus knowledge that GLC had been paid (as Gilbert put it, advanced) $14 million would not have impacted the Court's decision to award a one-third fee.
>
> The same is true regarding the false representations concerning reimbursement for GLC's expense outlays. There is no scenario where this, by itself or together with the fact that Gilbert's work was not actually performed on a fully contingent basis, would have altered the Court's decision to approve the one-third fee award and the award of expenses proposed by counsel. To put a finer point on it, the fact that Gilbert bore only a limited risk would not have impacted the Court's decision to approve payment in full for class counsel's litigation expenses, or the one-third fee.

This does not mean that counsels' misrepresentations regarding Gilbert's arrangements do not matter. They do. The issue here boils down to candor. Gilbert's affidavits were affirmatively misleading. And at a minimum, the other two lead counsel, Cramer and Normand, helped pull the wool over the Court's eyes. Gilbert made affirmative misstatements; Cramer and Normand could have corrected or tried to correct them but did not. Further, they did not disavow Gilbert's misstatements and, worse, affirmatively adopted them as part of the joint filings. And even though, as the Court has discussed, these representations had no *actual* effect on its decision, Gilbert, Cramer, and Normand all plainly understood that it *could* affect the fee awards.

That much is clear. What is less clear is what the Court should do about it. For defendants, it's simple: do not certify the class. But it is not that simple. For one thing, although the Court has not yet certified a class as to the litigating defendants, it's not as if a class doesn't exist. One does: a settlement class has been certified, and over 74,000 class members have submitted claims to the $220 million fund (net of fees) created on their behalf. In other words, *there is an existing class*, certified for settlement purposes, that effectively mirrors the class that plaintiffs have moved to certify with regard to the claims against the litigating defendants. This is not the typical situation where, when class certification is considered, the putative class is an anonymous group of arguably uninterested persons who are not actually before the Court. Rather, the class is already here. This may not matter in terms of the specific requirements for class certification. But it does matter from a practical, commonsense standpoint.

The defendants express concern about prejudice to the class as well. They point out that the false statements about the purportedly contingent nature of GLC's work are linked to the excess-billing issues noted by Bach-y-Rita and the hourly-rate issues involving GLC. Specifically, defendants argue, this was all part of an effort to get more for counsel at the expense of the class. The Court cannot disagree with that. But the solution proposed by defendants gives *them* a windfall and penalizes the alleged victims. Denial of certification is, of course, the usual result if class counsel are inadequate. But again, the overwhelming majority of those situations involve still-anonymous groups of people who have not actually chosen to bring claims to court. That is not the situation here: over 74,000 class members have actually asserted claims. Denial of class certification would reward the defendants at the expense of those the defendants contend were harmed by counsels' improper actions.

The Court turns to the law regarding attorney misconduct and Rule 23(a). The Seventh Circuit has stated that "[w]hen class counsel have demonstrated a lack of integrity, a court can have no confidence that they will act as conscientious fiduciaries of the class." *Creative Montessori Learning Centers v. Ashford Gear LLC,* 662 F.3d 913, 918 (7th Cir. 2011); *see also, e.g., Eubank v. Pella Corp.*, 753 F.3d 718, 724 (7th Cir. 2014) (quoting *Ashford Gear*). The Seventh Circuit has explained this concern as follows:

> [U]nethical conduct by class counsel implicates class certification because class counsel serves as a fiduciary for the unnamed plaintiffs. Class actions present strong incentives for counsel to sell out the class by agreeing with the defendant to recommend that the judge approve a settlement involving a meager recovery for the class but generous compensation for the lawyers. Thus, when class counsel have demonstrated a lack of integrity through misconduct and unethical action, a court can have no confidence that they will act as conscientious fiduciaries of the class.

*Reliable Money Ord., Inc. v. McKnight Sales Co.*, 704 F.3d 489, 495 (7th Cir. 2013) (cleaned up).

Given this concern, it is *not* the rule that misconduct by class counsel defeats class certification, period. As the court stated in *Reliable Money Order*,

> Not any ethical breach justifies the grave option of denying class certification. [M]isconduct that prejudices the class or creates a direct conflict between counsel and the class requires such denial . . . . [And] even "serious" or "major" ethical violations—not prejudicial to the class—can require denial of class certification. . . . That does not mean, however, that an ethical violation always requires denial of certification . . . . A "slight" or "harmless" breach of ethics will not impugn the adequacy of class counsel. . . . This conclusion makes sense: the ABA Model Rules, the Illinois Rules, and the Wisconsin Rules all warn that "the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons." Thus, unless the violation prejudices one of the parties or undermines the court's ability to resolve the case justly, state bar authorities—not a court—should enforce the rules and sanction the attorney.

*Id.* (citations omitted). The court stated the governing rule as follows: "[U]nethical conduct, not necessarily prejudicial to the class, nevertheless raises a ‘serious doubt’ about the adequacy of class counsel when the misconduct jeopardizes the court's ability to reach a just and proper outcome in the case." *Id.*

Conflicts between counsel and an actual or putative class are more or less inherent in the relationship. The class—to the extent it is engaged in the matter, which generally is not the case—wants fair compensation for the wrongs it suffered. Counsel have an interest in being paid for their time. Thus, as the Seventh Circuit recognized, counsel have an incentive to sell the class short in return for getting paid.

But nothing about this case leads the Court to believe that counsel have sold the class short thus far in connection with either litigation or settlement.

Counsel have ably prosecuted the case to date. The class's claims have survived summary judgment, and the case is set for trial. And counsel have achieved from twelve of the seventeen defendants very large settlements that have gained $220 million in compensation for the class, net of fees.

Going forward, it is unlikely that counsels' lack of candor with the Court would impact their zealous prosecution of the case from a litigation standpoint. And regarding settlement, any opportunities for the class to be sold short from here on in are likely quite limited. The prospect of settlement with the five remaining defendants appears to be remote. Based on discussions the Court has had with the parties, including a settlement conference involving plaintiffs' counsel and the remaining defendants, plaintiffs' counsel have insisted on settlement payments higher than those from the defendants who settled earlier on, and defendants have made it clear that they are unwilling to pay anything close to what earlier settling defendants did. This posture may, of course, change on one side or both. But settlement—and thus the opportunity for an attempted "sellout" by counsel—appears relatively unlikely at this point.

That said, the breach here was a significant one. The ability of a court to trust counsel matters, particularly when counsel represents a class. Here counsel have impaired that trust in a significant way. And there is no way to predict with certainty that this will not matter going forward. If nothing else, there is a risk that current class counsel may pull their punches to avoid a perceived risk of antagonizing the Court.

On the other side of the ledger, however, removal of all the current attorneys poses a very high risk of impairing the prosecution of the case going forward. The current lawyers have spent years preparing and developing the case; they are familiar with its strengths and weaknesses; and they have developed a strategy that has enabled them to achieve significant settlements and ready the case for trial. The putative class risks being seriously harmed if current counsel are removed completely.

Weighing these competing concerns is not easy. Given counsels' candor problem, the Court concludes that there is at least significant doubt that current class counsel, even with GLC out of the mix, are adequate within the meaning of Rule 23(a). But the level of doubt is insufficient to require their removal entirely. Instead the Court concludes that the appropriate measure—both to protect the class and avoid unfairly prejudicing it—is to require bringing in new lead counsel outside the current group. If this is done, and the new counsel is shown to be adequate, then the Court will grant the motion for class certification and appoint the new counsel as the lead, with FNF and Berger as co-counsel. If new and adequate lead counsel is not brought in, then the balance will tip the other way, and the Court will deny the motion for class certification.

> The Court therefore defers entry of a ruling on the motion for class certification. Plaintiffs are given 21 days, to file a submission proposing new lead class counsel.

*Corzo*, 2026 WL 881598, at *26-28.

To summarize certain salient points, the Court:

- emphasized that counsel had demonstrated a lack of candor vis-à-vis the Court;
- found that counsels' misstatements had no actual impact on the Court's decisions regarding attorney's fee and expense awards;
- expressed concern about penalizing the putative class for counsel's conduct by denying class certification outright;
- concluded that there was no basis to find that counsels' conduct had prejudiced the class in the litigation thus far;
- found it "unlikely that counsels' lack of candor with the Court would impact their zealous prosecution of the case from a litigation standpoint" and that it was unlikely that counsels' actions would lead them to "sell out" the class in settlement;
- found there was "a risk that current class counsel may pull their punches to avoid a perceived risk of antagonizing the Court" but that this had to be balanced with the proposition that "removal of all the current attorneys poses a very high risk of impairing the prosecution of the case going forward" and thus unfairly prejudicing the class; and
- found there was "at least significant doubt" that current class counsel were adequate but that "the level of doubt is insufficient to require their removal entirely," counseling instead, to avoid unfairly prejudicing the class, in favor of

attempting to "bring[ ] in new lead counsel outside the current group" and then determine if the proposed new lead counsel were shown to be adequate.

To put a bit of a finer point on it, the Court found that the then-proposed class counsel, including FNF and Berger, had committed misconduct, but importantly, that this misconduct *had not* prejudiced the class. And the Court did not find that the misconduct created an actual conflict between FNF and Berger on the one hand and the class on the other. For these reasons, defendants' reference to the principle—also discussed by the Court in its earlier opinion—that "misconduct *that prejudices the class or creates a direct conflict between counsel and the class* requires [ ] denial" of class certification, *Reliable Money Order, Inc. v. McKnight Sales Co.*, 704, F.3d 489, 498 (7th Cir. 2015) (emphasis added), simply does not carry the day here. *See* Defs.' Brief in Resp. to Pls.' Submission Regarding New Lead Counsel (dkt. 1269) at 2.

Instead, the Court found only a potential for a conflict between the remaining counsel and the class, and a hypothetical one at that: a concern that counsel might be overly cautious to avoid antagonizing the Court going forward. On this, the Court's conclusion, not said expressly but implicit in its order, was that if new lead class counsel were brought in, this would sufficiently address the potential for a conflict involving the existing counsel "pulling [their] punches," and the even more hypothetical possibility of counsel pushing for a less-than-adequate settlement with the remaining defendants.

The proposed new lead class counsel, Steven Molo and the law firm MoloLamken LLP, are unquestionably adequate as class counsel within the meaning of Rule 23(a). Indeed, the defendants do not argue otherwise. Nor could they do so viably. Mr. Molo and the MoloLamken firm are highly experienced and skilled in

complex litigation, including class representation; they have a stellar reputation of long standing; and they will be operating purely on a contingent fee basis, meaning that the firm's financial incentive is to maximize recovery for the class.

Instead, the defendants' arguments involve the fact that the Court gave plaintiffs and the remaining counsel an opportunity to correct the potential flaws the Court saw in the previous class counsel configuration; the fact that FNF and Berger were involved in selecting the new lead counsel; and the lack of involvement up front by the named plaintiffs in the selection process. *See* Defs.' Brief at 1 (listing these three points). The Court addresses each of these points in turn.

First, there is no logical reason why a proposal for appointment of class counsel should be "one and done," as defendants effectively contend. That is not the case for class *representatives*: when the designated representative is dismissed for reasons specific to him, another representative may be substituted; the case is not automatically dismissed. *See Matz v. Household Int'l Tax Reduction Inv. Plan*, 774 F.3d 1141, 1145 (7th Cir. 2014) ("Ordinarily when a class representative is dismissed on grounds applicable to him but not to all other members of the class, the suit is not dismissed but rather another member of the class is substituted as class representative."). The Court sees no good reason why the same should not be true for counsel, at least in the circumstances present here. *See E. Maine Baptist Church v. Regions Bank*, No. 4:05-CV-962, 2007 WL 3022220, at *8 (E.D. Mo. Oct. 12, 2007). *See generally* Manual for Complex Litig., Fourth, § 21.272 (Fed. Jud. Ctr. 2004) ("If no application would provide adequate representation, the judge may refuse to certify the class. *If the class appears otherwise certifiable, however, refusal to certify solely on a finding of inadequate*

*representation is very problematic*." (emphasis added)); 1 Newberg & Rubenstein on Class Actions § 3.87 at 721-22 & nn. 6, 7 (6th ed. 2022). This is particularly so given the basis upon which the Court acted in this case: largely the *potential* for a concern about problems that could arise in the future, as opposed to a current inadequacy that actually impacted FNF and Berger's vigorous representation of the class.

On the second and third points raised by defendants, the Court is not persuaded that Berger and FNF's involvement in identifying, screening, and selecting additional counsel has tainted the new proposed lead counsel or that the process was flawed because the named plaintiffs were not directly involved.[1] Realism has to play a role here: one cannot rationally expect the named plaintiffs, even if they may be considerably more sophisticated than the usual class representative, to be able to identify, solicit, and screen proposed lead counsel for a putative antitrust class action of the magnitude of this case, particularly given the stage of the litigation. And nothing about the process suggests that FNF and/or Berger sought lead counsel would bend to their will or otherwise act in a subordinate manner.

If the concern involves the independence of Mr. Molo and MoloLamken, the Court is satisfied that they understand that their duty runs to the class, not to the other attorneys representing the class. Along the same lines, the Court does not see a problem in the fact that existing counsel necessarily will be involved in the process of getting MoloLamken up to speed on a case that has been litigated vigorously for four

[1] On a related note, defendants complain that certain plaintiffs were instructed not to answer certain questions during their recent supplemental depositions. *See* Defs.' Brief at 8. But defendants chose not to seek relief from the Court or even to bring this to the Court's attention at the time. They have forfeited any issue that might arise from this point.

years. Specifically, the Court is not persuaded that the preparation process will result in MoloLamken being subordinate to or dependent upon the other firms going forward. In this regard, the Court itself, during its time in practice, was involved in a number of engagements where the law firm with which it practiced was brought in just before trial to take the case to its conclusion, typically with the ongoing involvement (albeit in a subordinate role) of the attorneys who had been handling the case up to that point. When a new attorney or law firm comes in as, effectively, lead trial counsel in a lawsuit that is at an advanced stage, that doesn't make the new attorneys subordinate to or dependent on those who have been in the case since the outset. In this situation, the lawyers involved understand that the trial attorneys are being brought in to take over the trial of the case and that this requires serving in a lead and independent role even though other attorneys have been involved from the outset. Skilled trial attorneys are able to serve in this capacity without being beholden to or unduly influenced by the attorneys who brought the case to the ten yard line. It appears from plaintiffs' submission that MoloLamken has had this sort of experience as well. This makes the firm well suited to take over as lead counsel, act independently, and have final decision-making authority, which is what the Court intends by designating MoloLamken as lead class counsel.

The Court also notes, in this regard, defendants' apparent contention that designating Molo Lamken as "lead" counsel for the case is a term with no actual meaning. The Court disagrees. *See, e.g.*, Manual for Complex Litigation, *supra*, § 10.221; *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 09 C 3690, 2013 WL 6050431, at *6 (N.D. Ill. Nov. 15, 2013) (Dow, J.). And though not in the text of Rule

23, this role is also well known, in a different but similar context, in multidistrict litigation and in litigation under the Private Securities Litigation Reform Act.

**Conclusion**

For the reasons stated in the Court's March 31, 2026 Memorandum Opinion and Order and in the present Order, the Court grants plaintiffs' motion for class certification. The Court certifies a class consisting of all persons who have during the "class period" (a) enrolled in one or more of defendants' full-time undergraduate programs, (b) received at least some need-based financial aid from one or more defendants, and (c) whose tuition, fees, room, or board to attend one or more of defendants' full-time undergraduate programs was not fully covered by the combination of any types of grant or merit aid in any undergraduate year. (The term "class period" is defined with particularity in various submissions, *see, e.g.*, dkt. 755-12 ¶ 9 (Hal Singer amended report), and should of course be included in the class notice.) The remaining named plaintiffs are appointed as class representatives and should be identified in the class notice. Steven Molo and MoloLamken LLC are appointed as lead counsel for the class, and Freedman Norman Friedland LLP and Berger Montague PC are appointed as co-counsel for the class. The parties are directed to confer regarding an appropriate form of notice and are to submit an agreed notice, or competing proposals if they cannot agree in good faith, by June 10, 2026. A telephonic status hearing is set for June 12, 2026 at 9:15 a.m., using call-in number 650-479-3207, access code 2305-915-8729.

Date: June 1, 2026

MATTHEW F. KENNELLY
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLANDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated,** | ) | |
| **Plaintiffs,** | ) | |
| **vs.** | ) | **Case No. 22 C 00125** |
| **BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,** | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Plaintiffs Andrew Corzo, Sia Henry, Michael Maerlander, Alexander Leo-Guerra, Brandon Piyevsky, Benjamin Shumate, Brittany Tatiana Weaver, and Cameron Williams have moved to certify a class of persons similarly situated in their claims against

defendants, a group of private universities. The defendants include Brown University (Brown), California Institute of Technology (CalTech), University of Chicago (Chicago), the Trustees of Columbia University in the City of New York (Columbia), Cornell University (Cornell), the Trustees of Dartmouth College (Dartmouth), Duke University (Duke), Emory University (Emory), Georgetown University (Georgetown), the Johns Hopkins University (Johns Hopkins), Massachusetts Institute of Technology (MIT), Northwestern University (Northwestern), University of Notre Dame Du Lac (Notre Dame), the Trustees of the University of Pennsylvania (Penn), William Marsh Rice University (Rice), Vanderbilt University (Vanderbilt), and Yale University (Yale). Plaintiffs allege that defendants participated in a horizontal price-fixing scheme in violation of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

For the reasons outlined below, the Court finds that plaintiffs have satisfied all of the requirements for class certification, save one: adequacy of counsel. The Court defers final ruling on the motion for class certification while affording plaintiffs an opportunity to bring in new, and adequate, proposed lead class counsel.

**Background**

The background of this case has been taken from the parties' briefs and the complaint.

## A. Factual background

According to plaintiffs, defendants—all "elite, private universities"—were each "members of the '568 Presidents Group' at some point between January 1, 1998, and November 4, 2022." Pls.' Mem. in Supp. of Mot. for Class Certification at 5. The Group derived its name from Section 568 of the Improving America's Schools Act of 1994,

which permitted "institutions of higher education" like defendants "to award [students admitted on a need-blind basis] financial aid only on the basis of demonstrated financial need for such aid" and "to use common principles of analysis for determining the need of such students for financial aid if the agreement to use such principles does not restrict financial aid officers at such institutions in their exercising independent professional judgment with respect to individual applicants for such financial aid." 15 U.S.C. § 1 note. "[I]nstitutions of higher education" are exempted from antitrust laws under section 568 if "all students admitted are admitted on a need-blind basis." *Id.* Section 568 defines "on a need-blind basis" as "without regard to the financial circumstances of the student involved or the student's family." *Id.* In other words, the Act permits institutions of higher education to use common principles when determining how much financial aid to offer a student—and thus, according to plaintiffs, limit competition among themselves—but avoid a federal antitrust violation so long as the institutions adhere to section 568's requirements.

According to plaintiffs, the 568 Group operated the alleged price-fixing conspiracy by requiring each participant in the Group to adhere to an "Overarching Agreement," which plaintiffs allege included the following:

> (a) to apply several core principles in awarding aid, which included the agreement to make need-based aid the primary form of financial aid and to base it on student and family "ability to pay," (b) to use the College Board's standard IM (or "Base IM") as the foundation for developing a "Consensus Methodology," (c) to use agreed-upon guidelines for applying "professional judgment" in modifying the [Expected Family Contributions] that the Consensus Methodology generated, and (d) to share information with each other regarding their annual calculations of financial aid.

Pls.' Mem. in Supp. of Mot. for Class Certification at 7. Plaintiffs contend that the defendants, in this way, "engaged in a long-running, overarching conspiracy on

the principles and methods for calculating institutional financial aid and for sharing critical pricing-related information—rather than aggressively completing to attract students." *Id*. at 1 (footnote omitted). They further contend that despite defendants' purported reliance on the section 568 exemption, "the classwide evidence shows that the [exemption] did not apply—because, contrary to its terms, Defendants *did* consider the 'financial circumstances' of applicants and their families in admission." *Id.* at 4.

**B. Litigation history**

On January 9, 2022, plaintiffs filed suit against the defendants, alleging that each "participated and are participating in a price-fixing cartel that is designed to reduce or eliminate financial aid as a locus of competition, and that in fact has artificially inflated the net price of attendance for students receiving financial aid." Second Am. Compl. ¶ 1. They have sued for actual damages or restitution. *Id.* at 70.

Defendants moved to dismiss the complaint, a motion the Court denied in August 2022. *See Carbone v. Brown Univ.*, 621 F. Supp. 3d 878, 894 (N.D. Ill. 2022). Discovery is now complete, and the Court has denied defendants' motion for summary judgment, as well as a motion for summary judgment by plaintiffs on one of defendants' affirmative defenses. *See Corzo v. Brown Univ.*, No. 22 C 125, 2026 WL 91424 (N.D. Ill. Jan. 12, 2026). The plaintiffs have moved for class certification under Federal Rule of Civil Procedure 23(a) and 23(b)(3).[1]

---

[1] Plaintiffs initially sought class certification under Rule 23(b)(2) as well, but according to their motion for class certification, "the alleged conspiracy disbanded in the fall of 2022, mooting the need for injunctive relief." Pls.' Mem. in Supp. of Mot. for Class Certification at 1 n.1.

**C. The motion for class certification**

Plaintiffs seek certification of the following proposed Class:

> All persons who have during the Class Period (a) enrolled in one or more Defendants' full-time undergraduate programs, (b) received at least some need-based financial aid from one or more Defendants, and (c) whose tuition, fees, room, or board to attend one or more Defendants' full-time undergraduate programs was not fully covered by the combination of any types of grant or merit aid in any undergraduate year.

Pls.' Mem. in Supp. of Mot. for Class Certification at 1. This proposed Class is limited to individuals who "first enrolled in one of Defendants' full-time undergraduate programs" during the time periods outlined below. *See* Second Am. Compl. ¶ 223. The following individuals are excluded from the proposed Class:

> Any Officers and/or Trustees of Defendants, or any current or former employees holding any of the following positions: Assistant or Associate Vice Presidents or Vice Provosts, Executive Directors, or Directors of Defendants' Financial Aid and Admission[s] offices, or any Deans or Vice Deans, or any employees in Defendants' in-house legal offices; and [a]ny person who was not a U.S. citizen or permanent resident at the time such person attended a full-time undergraduate program and received at least some need-based financial aid from one or more Defendants.

Pls.' Mem. in Supp. of Mot. for Class Certification at 1 n.3; *see also* Second Am. Compl. ¶ 224. The proposed Class also excludes "the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person." Second Am. Compl. ¶ 224.

Plaintiffs propose to define the Class period as follows:

> (a) For Brown, Dartmouth, and Emory—from fall term 2004 through June 30, 2023. (b) For Chicago—from fall term 2003 through June 30, 2014. (c) For Columbia, Cornell, Duke, Georgetown, MIT, Northwestern, Notre Dame, and Rice—from fall term 2003 through June 30, 2023. (d) For Penn—from fall term 2003 through June 30, 2019. (e) For Vanderbilt—from fall term 2003 through June 30, 2020. (f) For Yale—from fall term 2003 through June 30, 2007, and from fall term 2018 through June 30, 2023. (g) For CalTech—from fall term 2020 through June 30, 2023. (h)

For Johns Hopkins—from fall term 2022 through June 30, 2023.

Singer Am. Rep. ¶ 9. This is intended to reflect the specific periods when each defendant is claimed to have been a member of the 568 Group.

Plaintiffs seek the appointment of Andrew Corzo, Sia Henry, Alexander Leo-Guerra, Michael Maerlander, Brandon Piyevsky, Brittany Tatiana Weaver, and Cameron Williams as class representatives under Rule 23(a)(4). Plaintiffs seek the appointment of law firms Freedman Normand Friedland LLP, Gilbert Litigators & Counselors, PC, and Berger Montague PC as co-lead class counsel under Rules 23(a)(4) and 23(g).

**Discussion**

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure. Under Rule 23, a plaintiff must show that the proposed class satisfies all four requirements of Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In addition, plaintiffs must also satisfy the requirements of one of three alternatives under Rule 23(b). Plaintiffs must establish each of Rule 23(a) and Rule 23(b)'s requirements by a preponderance of the evidence. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

A court's assessment of the requirement for class certification under Rule 23 must be "rigorous" and may "entail some overlap with the merits" of plaintiffs' case, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011), but consideration of the merits for class certification purposes must "be limited to those aspects of the merits that affect

the decisions essential under Rule 23." *Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010); *see also Messner*, 669 F.3d at 823 (finding that "an argument that some class members' claims will fail on the merits if and when damages are decided" is "a fact generally irrelevant to the district court's decision on class certification"). "Rule 23 allows certification of classes that are fated to lose as well as classes that are sure to win" and therefore "[t]he chance, even the certainty, that a class will lose on the merits does not prevent its certification." *Schleicher*, 618 F.3d at 686–87.

**A. Rule 23(a)**

As outlined earlier, plaintiffs seeking class certification must establish the four requirements of Rule 23(a), commonly referred to as (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy. Plaintiffs bear the burden of showing that each element is met and must establish each requirement by a preponderance of the evidence. *Messner*, 669 F.3d at 811.

Plaintiffs contend that in their brief filed in opposition to the motion for class certification, "[d]efendants do not contest any of the requirements under Rule 23(a)." Pls.' Reply Mem. in Supp. of Mot. for Class Certification at 1. Parsing defendants' opposition brief, it does appear that all of defendants' arguments opposing class certification attack plaintiffs' ability to establish the requirements of Rule 23(b)(3). For example, defendants' brief asserts that "[p]laintiffs cannot establish antitrust impact of this [alleged conspiracy] through common proof and so cannot satisfy Rule 23(b)(3)'s predominance requirement." Defs.' Mem. in Opp. to Pls.' Mot. for Class Certification at 1. Defendants also contend that "the putative class includes too many uninjured members" and therefore "the 'need to identify those *individuals*' would '*predominate* and

render an adjudication unmanageable.'" *Id.* at 52 (emphases added) (quoting *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53–54 (1st Cir. 2018)). As yet another example, defendants argue that "*[i]ndividualized* issues separately *predominate* because the class includes students whose parents (or other third parties) paid for their education" which, according to defendants, means that these students "suffered no injury." *Id.* at 53 (emphases added).

Though defendants' challenges implicated whether plaintiffs' claims are sufficiently common for class certification, the specific language defendants used sounds more in Rule 23(b)(3) than Rule 23(a). *See* Fed. R. Civ. P. 23(b)(3) (requiring that "questions of law or fact common to class members *predominate* over any questions affecting only *individual members*") (emphases added). The Court conducted both a visual and an electronic search within defendants' opposition brief for "23(a)" and found no mention of it. *See generally* Defs.' Mem. in Opp. to Pls.' Mot. for Class Certification. The Court finds that defendants have waived any opposition to plaintiffs' contention that they satisfy the requirements of Rule 23(a), except for the adequacy of class counsel, which defendants challenged in later briefing, and which the Court addresses below. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."); *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013) ("[Plaintiffs] also failed to respond to the City's arguments against these claims in their reply to the City's motion to dismiss. Because they did not provide the district court with any basis to decide their claims, and did not respond to the City's arguments, these claims are waived."); *see also Williams v. Bd. of Educ. of City of Chi.*, 982 F.3d 495, 507 n.30 (7th Cir. 2020) (finding that a failure

to raise an argument in the initial brief results in waiver of that argument).

Despite defendants' waiver , the Court will address in the following sections each element of Rule 23(a) based on the record before it. The exception is the adequacy of counsel aspect of the Rule 23(a) adequacy analysis. The Court will hold that to the end of this opinion for reasons that will become apparent.

**1. Numerosity**

"The key numerosity inquiry under Rule 23(a)(1) is not the number of class members alone but the practicability of joinder." *Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 777 (7th Cir. 2021). Accordingly, plaintiffs must show "that it is extremely difficult or inconvenient to join all members of the class" based on "the nature of the action, the size of the individual claims, and the location of the members of the class or the property that is the subject matter of the dispute." *Id.* (quoting 7A C. Wright & A. Miller, *Federal Practice & Procedure* § 1762 (3d ed. 2011)). Though courts have emphasized that there is no magic number for establishing numerosity, the Seventh Circuit has "recognized that 'a forty-member class is often regarded as sufficient to meet the numerosity requirement.'" *Id.* (quoting *Orr v. Shicker*, 953 F.3d 490, 498 (7th Cir. 2020)); *see also Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017).

Plaintiffs contend that numerosity is easily met here. According to plaintiffs, their economic expert, Dr. Singer, "calculates from the Defendants' own data that the proposed Class includes 224,840 current and former students" based on his initial expert report dated May 14, 2024. Pls.' Mem. in Supp. of Mot. for Class Certification at 36; *id.*, Ex. 108 ¶ 259. This proposed class number appears to have shifted marginally

downward based on Dr. Singer's amended expert report, dated May 28, 2024, which indicates that the "Class Members in Sample" total 224,744. Singer Am. Rep. ¶ 259.

One way or another, plaintiffs have put forth sufficient evidence to establish numerosity. A class exceeding 224,000 individual members, scattered throughout the country (and, given the decades-long alleged conspiracy, perhaps around the globe) reflects that joinder would be impractical.

**2. Commonality**

To satisfy the commonality requirement under Rule 23(a)(2), plaintiffs' claims "must 'depend on a common contention' and '[t]hat common contention . . . must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Ross v. Gossett*, 33 F.4th 433, 437 (7th Cir. 2022) (quoting *Wal-Mart*, 564 U.S. at 350). Put differently, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (quoting Richard Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). For the purposes of Rule 23(a)(2), "even a single common question" will suffice to satisfy this requirement. *Id.* at 359 (cleaned up) (quoting Richard Nagareda, *The Preexistence Principle and the Structure of the Class Action*, 103 Colum. L. Rev. 149, 176 n.110 (2003)).

Plaintiffs contend that "[c]ommonality is 'readily met' in antitrust cases" like this one "because proof of the alleged conspiracy focuses on the defendants' standardized

conduct." Pls.' Mem. in Supp. of Mot. for Class Certification at 36 (first quoting *Chicken Grower*, 2024 WL 2117359, at *7, then quoting *Moehrl v. Nat'l Ass'n of Realtors*, No. 19 C 1610, 2023 WL 2683199, at *11 (N.D. Ill. Mar. 29, 2023)). According to plaintiffs, common questions in this action "include 'whether Defendants illegally conspired to restrict supply and increase the price' and 'the nature of the conspiracy, whether the conspiracy caused the price increase, and what is the appropriate measure of damages.'" *Id.* (quoting *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2022 WL 1720468, at *5 (N.D. Ill. May 27, 2022) (hereinafter *Broiler Chicken*)). Plaintiffs further contend that another "common question is whether the 568 Exemption applies, which implicates . . . Defendants' wealth favoritism," because "[w]here any school's wealth favoritism precludes the application of the 568 Exemption for all Defendants . . . this case has the 'capacity' to generate a 'common *answer*' on whether the 568 Exemption applies." *Id.* at 37 (quoting *Wal-Mart*, 564 U.S. at 350); *see also Carbone*, 621 F. Supp. 3d at 887–88 ("[T]he fact that at least one member of the conspiracy is plausibly alleged not to be, or not to have been, need-blind means that the plaintiffs have plausibly alleged that none of the schools are protected under the 568 Exemption.").

The Court finds that plaintiffs have met Rule 23(a)(2)'s commonality requirement. As the plaintiffs point out, even a single common question is enough to meet this standard. Here, at a minimum, the common question of whether the defendants engaged in the alleged conspiracy "is capable of classwide resolution," and the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims." *Wal-Mart*, 564 U.S. at 350. If the defendants did not engage in a conspiracy, then the entirety of plaintiffs' suit will be resolved. Similarly, a showing that

none of the defendants ran afoul of the 568 Exemption may resolve this litigation. Accordingly, plaintiffs have met Rule 23(a)(2)'s requirement that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).

**3. Typicality**

Under Rule 23(a)(3), a "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and [is] based on the same legal theory." *Lacy v. Cook County*, 897 F.3d 847, 866 (7th Cir. 2018) (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)). The typicality requirement "is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large." *Id.* (cleaned up) (quoting *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006)). "In the antitrust context, typicality will be established by plaintiffs and all class members alleging the same antitrust violation by the defendants." *Moehrl*, 2023 WL 2683199, at *12 (internal quotation marks and citation omitted).

Plaintiffs contend that the proposed class representatives meet the typicality requirement because the "proposed Class Representatives received need-based financial aid from one or more Defendants, and they allege they paid artificially inflated net prices as a result of the alleged conspiracy." Pls.' Mem. in Supp. of Mot. for Class Certification at 37. And in response to a limitations defense interposed by defendants, plaintiffs also invoke the "'discovery rule,' which poses the question of whether 'a reasonably diligent person would not have been able to discover the injury until a date within the limitations period.'" *Id.* (quoting *Carbone*, 621 F. Supp. 3d at 892). Plaintiffs argue that applicability of the discovery rule encompasses both the named

representatives and the putative class members, and therefore "whether the discovery rule is satisfied will 'turn on common evidence or patterns of evidence.'" *Id.* at 38 (quoting *Schofield v. Delta Air Lines, Inc.*, No. 18-CV-00382-EMC, 2019 WL 955288, at *4 (N.D. Cal. Feb. 27, 2019)).

The Court finds that plaintiffs' proposed class representatives satisfy Rule 23(a)(3)'s typicality requirement. Though the defendants are alleged to have participated in the conspiracy during varying time periods, the challenged conduct underlying the conspiracy is more or less uniform across the various defendants. In other words, the claims of the class representatives turn on evidence that is in common with that of the class as a whole. Further, "all class members, including the named representatives, will likely face the same challenge with respect to the statute of limitations defense." *Schofield*, 2019 WL 955288, at *4. In short, the named class representatives face the same challenges and rely on the same evidence as the putative class members; their claims arise from the same alleged course of conduct and rely on the same legal theory as the claims of the putative class members. The Court therefore finds that the proposed class representatives satisfy Rule 23(a)(3)'s typicality requirement.

**4. Adequacy**

Finally, plaintiffs must meet Rule 23(a)(4)'s adequacy requirements. "Adequacy is a two-part test: (i) the class representatives must not have claims in conflict with other class members, and (ii) the class representatives and proposed class counsel must be able to litigate the case vigorously and competently on behalf of named and absent class members alike." *Broiler Chicken*, 2022 WL 1720468, at *3 (citing *Kohen v.*

*Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 679 (7th Cir. 2009)).

Regarding the first part of the adequacy test, plaintiffs contend that the now-$320 million in settlements[2] that have resulted from their prosecution of the case thus far shows that the "interests of Plaintiffs and absent Class members are aligned." Pls.' Mem. in Supp. of Mot. for Class Certification at 38; *cf. Chicken Growers*, 2024 WL 2117359, at *10 (finding that "successfully securing settlements on behalf of the class" makes arguments that class representatives are not adequate representatives of the class as a whole "particularly unpersuasive").

The Court finds that the proposed class representatives do not have any claims in conflict with the absent class members. For starters, defendants do not identify any evidence indicating any conflicts that may undermine adequacy of representation. And nothing else in the history of this litigation would lead one to believe that any such conflict of interest exists. Thus far, the named plaintiffs have diligently litigated this case, resulting in numerous settlements. Plaintiffs have shown that they adequately represent the interests of the absent class members.

The second part of the adequacy test involves the adequacy of class counsel. As indicated earlier, defendants' original class certification response brief did not address this factor. It later became contested, however, after information came to light regarding alleged ethical breaches by the proposed class counsel. This led to several hearings and extensive additional briefing. The Court will hold off on discussion of this point until later in this opinion.

[2] The first ten settlements reached as of July 2024, as referenced in the plaintiffs' opening brief, totaled $248 million. The overall total is now higher, approximately $320 million, following approval of two additional settlements in 2025.

In sum, the Court finds that plaintiffs have established the requirements of Rule 23(a), save for adequacy of counsel. The Court proceeds to consider whether plaintiffs meet the requirements of Rule 23(b)(3).

**C. Rule 23(b)(3)**

Plaintiffs here seek to certify their proposed class under Rule 23(b)(3), which requires showing (1) "that the questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013). Rule 23(b)(3) does not "require a plaintiff seeking class certification to prove that each element of [his or her] claim is susceptible to class wide proof." *Id.* at 469 (cleaned up). Nor does it require the absence of individual questions. The plain language of Rule 23(b)(3) clearly contemplates that such individual questions may, and likely will, be present, but the rule permits certification so long as common questions predominate. *See* Fed. R. Civ. P. 23(b)(3) (requiring that "questions of law or fact common to the class predominate over questions affecting *only individual members*") (emphasis added). For instance, "it is well established that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)." *Messner*, 669 F.3d at 815.

Rule 23(b)(3) contains a non-exhaustive list of factors that courts should consider when determining whether predominance and superiority are met:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in a particular forum; and (D) the likely difficulties in managing a class action.

*Id.*

"Predominance is satisfied when common questions represent a significant aspect of a case and . . . can be resolved for all members of a class in a single adjudication." *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 925 (7th Cir. 2016). "There is no mathematical or mechanical test for evaluating predominance." *Messner*, 669 F.3d at 814 (citing 7A C. Wright & A. Miller, *Federal Practice & Procedure* § 1778 (3d ed. 2011)). Instead, the inquiry under Rule 23(b)(3) "'trains on the legal or factual questions that qualify each class member's case as a genuine controversy,' with the purpose being to determine whether a proposed class is 'sufficiently cohesive to warrant adjudication by representation.'" *Id.* (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). Though similar to Rule 23(a)'s commonality and typicality requirements, "the predominance criterion is far more demanding." *Amchem Prods., Inc.*, 521 U.S. at 623–24. Predominance is shown when "common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Messner*, 669 F.3d at 815 (cleaned up). Courts have found that common questions may predominate if "a 'common nucleus of operative facts and issues' underlies the claims brought by the proposed class." *Id.* (quoting *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006)). If establishing a prima facie showing on a given question requires members of a proposed class to present evidence that varies from member to member, then it is an individual question, but "[i]f the same

evidence will suffice for each member to make a prima facie showing, then it becomes a common question." *Id.* (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)).

**1. Predominance of common questions**

Plaintiffs contend that predominance is "readily met" in cases alleging "violations of antitrust law," *Amchem*, 521 U.S. at 625, and they cite seven specific common issues of law and fact that they claim predominate over individual issues. First, plaintiffs argue that "this type of alleged conspiracy is the prototypical example of an issue where common questions predominate," *Broiler Chicken*, 2022 WL 1720468, at *7, because "whether a conspiracy exists is a common question that is thought to predominate over the other issues in the case." 7A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 1781 (3d ed. 2020) (collecting cases). According to plaintiffs, "the more Defendants contend that there was no conspiracy or that its scope was narrow, the more the issue is framed as 'central to this litigation.'" Pls.' Mem. in Supp. of Mot. for Class Certification at 39 (quoting *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1206 (N.D. Cal. 2013)).

Second, plaintiffs contend that whether defendants may invoke the 568 Exemption is a common question that is susceptible to classwide proof. If any one defendant fails to satisfy the 568 Exemption, plaintiffs argue, then none of them can. Alternatively, if all defendants satisfy the Exemption, then plaintiffs will ultimately lose, as the alleged conspiracy would not violate antitrust law. Thus answering this common question, plaintiffs say, may resolve the litigation, and as such it represents a significant aspect of the case.

Third, plaintiffs argue that whether the "*per se*" rule or the "Rule of Reason" is the proper mode of analysis for the antitrust claim is also a common question. Plaintiffs contend that they rely on classwide evidence to show that defendants' conduct was *per se* anticompetitive, and alternatively if the Rule of Reason applies, it will apply for all defendants. (The Court notes that it has since determined, on summary judgment, that the *per se* rule does not apply. *See Corzo*, 2026 WL 91424, at *19.)

Fourth, plaintiffs purport to rely on common evidence of defendants' collective market power. The plaintiffs' evidence on this point is primarily the testimony of Dr. Singer, who will use common evidence to address whether defendants had the market power to permit them to artificially raise prices.

Fifth, issues of antitrust impact are common questions relying on common evidence for the entire class. As with collective market power, plaintiffs rely on Dr. Singer's regression analysis to show common impact. Though defendants contend that Singer's regression analysis is flawed because it assumes common conduct across defendants, the Court has previously found the proffered testimony admissible. Singer's two-step method showing common impact addresses a central issue in this litigation, and it applies to all defendants and all Class members.

Sixth, plaintiffs contend that damages present a common issue capable of classwide proof. At the class-certification stage, "any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation." *Comcast v. Behrend*, 569 U.S. 27, 35 (2013) (citation and quotation marks omitted). Accordingly, "a model purporting to serve as evidence of damages in [a] class action must measure only those damages

attributable to that theory." *Id.* If a model does not attribute damages based on plaintiffs' theory of antitrust conspiracy, then "it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* Damages calculations, however, "need not be exact." *Id.* "[P]laintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of their damages." *Kleen Prods. LLC*, 831 F.3d at 929; *see also id.* ("[A]t the class certification stage, plaintiffs are not obliged to drill down and estimate each individual class members' damages."). At this point, a showing that aggregated damages are susceptible to classwide proof is sufficient to satisfy Rule 23(b)(3)'s predominance requirement.

Seventh, and finally, plaintiffs argue that whether or not their claims are time-barred is a common issue. If the claims are untimely, it will resolve the litigation. The evidence and analysis regarding application of the discovery rule and tolling doctrines apply to the class as a whole.

The Court finds that plaintiffs have established that common questions predominate over individual issues of law and fact. Plaintiffs' claims largely depend on Dr. Singer's testimony and other common evidence supporting the claim of a conspiracy, and accordingly the case is likely to rise or fall depending upon the probative weight given to that evidence.

In opposing class certification, defendants assert many issues similar to those they raised in their motion seeking to exclude Dr. Singer. For instance, defendants contend that individualized issues predominate regarding antitrust impact because defendants did not adhere to the same core principles at all times throughout the Class

period. Further, defendants argue that differences in packaging decisions for financial aid are individualized across defendant-schools, and therefore class members would have been impacted differently. And defendants repeat their arguments that Singer's regression analysis is flawed and therefore cannot support a finding of common impact. For the reasons discussed in the Court's ruling on defendants' motion to exclude Singer's testimony, these contentions are unavailing. Dr. Singer's testimony is sufficiently reliable and is admissible, and thus the contention that class certification is unwarranted because his testimony is unreliable does not carry the day.[3]

For these reasons, the Court concludes that common issues predominate over individual issues.

**2. Superiority of a class action**

A court's assessment of whether a class action is a superior method "is comparative: the court must assess efficiency with an eye toward 'other available methods.'" *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 664 (7th Cir. 2015) (quoting Fed. R. Civ. P. 23(b)(3)). As previously stated, Rule 23(b)(3) includes a non-exhaustive list of factors that courts may consider to determine whether a class action is superior to other available methods. *See* Fed. R. Civ. P. 23(b)(3).

Plaintiffs contend that these factors all indicate that a class action is the superior

---

[3] In a supplemental brief filed just recently, ostensibly on the adequacy of counsel issue discussed later, defendants contend that class certification should be denied, among other reasons, because in ruling on summary judgment the Court supposedly "held that there was no price-fixing conspiracy." Dkt. 1239 at 3 (citing Dkt. 1210 at 18-19). Putting aside the fact that class certification denial is not supposed to be based on claimed lack of merit of the underlying claims, that's a considerable overstatement of the Court's conclusion that the *per se* rule does not apply because the claimed conspiracy did not directly fix prices as such.

method of adjudicating their claims, and defendants do not articulate in their response to plaintiffs' class certification motion an argument to the contrary. *See generally* Defs.' Mem. in Opp. to Pls.' Mot. for Class Certification. Considering the factors listed under Rule 23(b)(3), the proposed class includes thousands of members across the country, and all their claims are materially the same. The Court has already successfully managed this case for several years, including through several class settlements with particular defendants. The Court concludes that a class action is superior to other available methods for adjudicating the claims of the members of the class.

The Court therefore finds that plaintiffs have shown, by a preponderance of the evidence, that they satisfy the requirements of Rule 23(b)(3). This leaves only the issue of adequacy of class counsel under Rule 23(a), which the Court addresses in the following section.

**D. Adequacy of class counsel**

Defendants challenge the adequacy of proposed class counsel. They contend that counsel have engaged in misconduct that prejudiced the class. The Court first summarizes the pertinent facts and then considers the parties' arguments.

**1. First round of class settlements**

The plaintiffs have achieved class-wide settlements with twelve of the seventeen defendants in this case, who collectively have agreed to pay about $319 million to the class and class counsel. The first round of settlement approvals came in the summer of 2024, pursuant to motions filed by plaintiffs' counsel in April of that year. In that round, the plaintiffs sought approval for settlements with ten defendants totaling $284 million.

In a separately-filed motion and memorandum seeking approval of attorney's

fees, plaintiffs' counsel requested fees totaling one-third of the overall settlement amount—a little under $95 million—and expenses of about $3.5 million. The joint memorandum in support of the requested award of fees and costs was signed by the three lead attorneys, Eric Cramer of Berger Montague (Berger), Robert Gilbert of Gilbert Litigators and Counselors (GLC), and Edward Normand of Freedman Normand Friedland (FNF).

As just indicated, counsel sought fees based on a percentage of the settlement amount. Counsel argued—accurately—that the percentage-of-recovery method is, in this district and circuit, the favored method of calculating fees in common-fund cases like this one. Dkt. 679 at 15-16 (citing *Gaskill v. Gordon*, 160 F.3d 361, 362 (7th Cir. 1988), and *In re Dairy Farmers of Am., Inc.*, 80 F. Supp. 3d 838, 844 (N.D. Ill. 2015) (Dow, J.)). Counsels' memorandum discussed at length the Seventh Circuit's decision in *In re Synthroid Marketing Litigation*, 264 F.3d 712, 718 (7th Cir. 2001), in particular the proposition that in common-fund cases, "courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time," adjusting the market rate to account for the risk of nonpayment that a firm agrees to bear, the quality of its performance, the amount of work necessary to resolve the litigation, and the stakes of the case. Dkt. 679 at 16-17 (citing *Synthroid*, 264 F.3d at 718, 721). Counsel also cited numerous cases for the proposition that percentages from 33 to 40 percent represent the norm in similar antitrust class action litigation. *Id.* at 18-19 & nn. 12, 13, 14.

Class counsel argued that a one-third fee "is reasonable considering the risk of nonpayment," the quality of the work done, the amount of work done, and the stakes

involved. *Id.* at 20. On the first factor, the memorandum referenced "[t]he substantial risk that Settlement Class Counsel assumed in prosecuting this case," and it quoted *Silverman v. Motorola Solutions, Inc.*, 738 F.3d 956, 958 (7th Cir. 2013), for the proposition that "[c]ontingent fees compensate lawyers for the risk of nonpayment. The greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel." Dkt. 679 at 20, 21. As will be seen, however, one of the three firms did not actually risk "walking away empty handed." Counsel also discussed the other *Synthroid* factors. This included, as noted earlier, a statement that the three firms had collectively devoted over 91,313 hours to the case, and a representation they had committed this time as well as significant out of pocket expenses "with no guarantee of recovery." Dkt. 679 at 22 (footnote omitted).

Counsel also offered a "lodestar" calculation (hours times hourly rate) for purposes of a reasonableness cross-check. *See, e.g., Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011). On this point, counsel represented that their firms the total hours of professional time "amount[s] to a collective lodestar of $70,150,911.00 based on historical market rates." Dkt. 679 at 4. (The motion defined "historical" rates as the rates as of the time the work was performed, as distinguished from those in effect at the time of the fee petition. *See id.* at n.4.) Counsel stated that based on the lodestar cross-check, the requested one-third award "would result in a modest lodestar multiplier of 1.35 . . ., which is well below multipliers awarded in comparable antitrust and other class actions." *Id.* at 4, 24 (citing cases noting that multipliers between 1 and 4 have been approved, and particular decisions approving multipliers of 2.04 and 1.11). Counsels' memorandum also emphasized, however,

Seventh Circuit pronouncements that "consideration of a lodestar check is not an issue of required methodology" and that "we have never ordered the district judge to ensure that the lodestar result mimics that of the percentage approach." *Id.* at 23 (footnote omitted) (quoting *Williams*, 658 F.3d at 636, and *Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998)).

Each of the three primary plaintiffs' lawyers submitted a separate affidavit regarding his firm's work, including the time spent, hourly rates for the attorneys involved, and the amount of out-of-pocket expenses. Cramer's affidavit stated that "My firm's work on this case was performed on a wholly contingent basis" and that his firm's total lodestar was about $17 million, representing 22,351 attorney and paralegal hours at hourly rates ranging from $240 (for a legal assistant) to $1,390 (for Cramer in 2024). Dkt. 679-2 ¶ 3 & Ex. A. Gilbert's affidavit stated his firm's "work on this case was performed on a contingent basis," Dkt. 679-3 ¶ 4, and that the firm's lodestar was a little over $31 million, representing 36,232 hours at hourly rates from $240 (for a paralegal) to $1,495 (for Gilbert in 2024). *Id.* ¶ 2 & Ex. A. Normand's affidavit stated that his firm "performed its work in this Action on a contingent basis," Dkt. 679-4 ¶ 6, and that the firm's lodestar was $21 million, representing 32,730 hours at hourly rates from $100 (for investigators) and $345 (for paralegals) to $1,250 (for Normand and Devin Freedman) in 2023-24. *Id.*, Ex. A. The three affiants also represented that their respective firms had expended a little over $856,000 "in unreimbursed costs and expenses" (Cramer), dkt. 679-2 ¶ 4; $1,007,669 "in costs and expenses" (Gilbert), dkt. 679-3 ¶ 4; and a little under $997,000 "in unreimbursed costs and expenses" (Normand), dkt. 679-4 ¶ 7.

The Court approved the class settlements with the ten defendants, including the

requested one-third fee award. *See* Dkt. 726. In determining whether to approve the fee award, the Court reviewed the representations in the attorneys' affidavits regarding the time spent and the claimed hourly rates. But that was not the Court's focus: based on Seventh Circuit caselaw, the Court relied principally on the reasonableness of the percentages sought, and the comparisons to percentages awarded in other similar litigation. That said, the Court did reference the collective firms' total lodestar as a crosscheck. But the Court did not delve into the breakdown among the three firms. In fact, the Court cannot say that it took notice of the differences among the hours claimed by each firm (roughly 36,000 for GLC, 32,000 for FNF, and 22,000 for Berger). Had the Court noticed this, it would have chalked up the difference to how tasks had been doled out among the three firms.

The order that the Court signed approving the settlements and fee and expense awards had been prepared and submitted by moving counsel, and to the best of the Court's recollection it did not modify the draft. The order stated in paragraph 27 that "Settlement Class Counsel undertook this case *on a wholly contingent basis* and ran *a substantial risk of no recovery whatsoever*." Dkt. 726 ¶ 27 (emphasis added). This was not accurate with respect to GLC, as will be seen. The order also referenced the "lodestar cross-check" and the 1.35 fees-to-lodestar ratio. *Id.*

**2. The second round of class settlements**

The second and, to date, last round of class settlements involved two defendants, Johns Hopkins and Cal Tech. These settlements totaled $35,250,000, bringing the overall total to $319,250,000. Plaintiffs' counsel submitted the materials in support of these settlements in April 2025. The motion and supporting memorandum—

signed by all three lead attorneys—represented that counsels' collective lodestar was $95.5 million, which was said to represent 127,557 hours of attorney and other professional time. Dkt. 830 at 4. The motion again sought a fee award of one-third of the $35.25 million settlement total, in other words, $11.75 million. Counsel stated that adding this to the fee amount previously approved, and comparing it with the overall settlement totals, "would result in a modest lodestar multiplier of just over 1.1 or lower" for the entire period of the litigation through the date the new settlements were preliminarily concluded. *Id*. at 4, 12.

Counsels' motion also stated that class counsel had incurred a total of $2,441,739 in "unreimbursed litigation expenses" through February 2025. This, as will be seen, was not accurate with respect to expenses incurred by GLC. Counsels' joint memorandum represented that "Settlement Class Counsel undertook the risks inherent to this complex case on contingency, knowing it could take years to prosecute and millions of dollars and tens of thousands of attorney hours to properly resource—*with no guarantee of any return* for those material investments." *Id.* at 3 (emphasis added). Again, the "no guarantee" reference was not accurate with respect to GLC.

In support of the proposed award of fees and expenses, the same three lead attorneys also submitted a joint affidavit, Dkt. 830-1, which incorporated the affidavits submitted in connection with the earlier settlements. *Id.* ¶ 2. With respect to GLC, the joint affidavit represented that GLC "has expended a total of $1,044.295 in *unreimbursed* costs and expenses . . . ." *Id.* ¶ 42 (emphasis added). This was not accurate.

The three lead plaintiffs' attorneys, Cramer, Gilbert, and Normand, also submitted

separate affidavits supporting the fees and expenses sought for the Johns Hopkins/Cal Tech settlements, as they had with the first round of settlement approvals. Cramer's affidavit stated, as had his earlier affidavit, that "[m]y firm's work on this case was performed on a wholly contingent basis." Dkt. 830-2 ¶ 5. Cramer stated that his firm's total lodestar from inception was a little over $21 million, about $5.6 million of which postdated his April 2024 affidavit. *Id.* As before, the highest hourly rate referenced was $1,390, for Cramer himself. *Id.*, Ex. A. Normand's affidavit stated that "[m]y firm's work on this case was performed on a wholly contingent basis," Dkt. 830-3 ¶ 5; the word "wholly" had not been included in the parallel representation in Normand's April 2024 affidavit. Normand stated that his firm's total lodestar from inception was a little over $35 million, of which a little over $19 million postdated the April 2024 submission. *Id.* The highest hourly rate disclosed was $1,250, for Normand himself. *Id.*, Ex. A. Gilbert's affidavit stated that "[m]y firm's work on this case was performed on a *wholly* contingent basis." Dkt. 830-4 ¶ 5 (emphasis added). The word "wholly" had not been included in Gilbert's April 2024 affidavit, though the Court did not notice this shift at the time. Gilbert represented that his firm's total lodestar was a little over $39 million, of which just under $12 million postdated the April 2024 submission. The highest hourly rate referenced, as before, was $1,495, for both Gilbert and Elpidio Villarreal. *Id.*, Ex. A.

Regarding litigation expenses, Cramer represented that his firm had been reimbursed for a little over $856,000 and had a little under $334,000 in unreimbursed expenses. Dkt. 830-2 ¶ 6. Normand represented that his firm had a little under $674,000 in expense outlays, all unreimbursed. Dkt. 830-3 ¶ 6. Gilbert represented that "[m]y firm has expended a total of $1,044,295.00 in unreimbursed costs and

expenses" from inception and stated, "[t]hese costs were incurred on behalf of the Settlement Class by my firm *and have not been reimbursed*." Dkt. 830-4 ¶ 6 (emphasis added). The latter representation was not accurate.

The draft order provided by all three counsel along with the motion for approval of the Johns Hopkins/Cal Tech settlements included a sentence stating: "Settlement Class Counsel undertook this case on a wholly contingent basis and ran a substantial risk of no recovery whatsoever." Dkt. 843-13 ¶ 27. Again, this was not true with respect to GLC, as will be seen.

**3. Allegations by an FNF associate; the June 23, 2025 hearing**

Matters began to go awry for plaintiffs' counsel a little before the scheduled June 20, 2025 final approval hearing for the Johns Hopkins/Cal Tech settlements. On June 19, 2025, the day before the hearing, Peter Bach-y-Rita, an associate with FNF who had appeared in the case, wrote to the Court. Bach-y-Rita claimed that he was "the attorney who conceived, developed, and originated" this case. Dkt. 878 at 1. He wrote to advise the Court of what he contended were "potential violations of the ethical rules (in particular, Rule 1.5(f) of the Illinois Rules of Professional Conduct)." *Id.* He said he had tried without success to resolve his concerns with his colleagues and co-counsel in advance of the hearing. He advised that plaintiffs' counsel had asked him to refrain from raising this issue in connection with the June 20 hearing and had indicated that they would ask the Court to defer a decision on their fee application.

Later the same day, lead class counsel filed a response. The response noted that Bach-y-Rita "is involved in an employment and compensation dispute" with the Freeman firm that was in arbitration after mediation had failed just a few days earlier, on

June 16. Dkt. 879 at 2. Lead class counsel stated that the claimed ethical issue, as asserted by Bach-y-Rita's lawyer in a communication on June 17, was that "Class Counsel lacked written consent from the eight Named Plaintiffs for the fee division among the three Class Counsel firms litigating this case . . . ." *Id.* Lead counsel argued, citing caselaw, that Rule of Professional Conduct 1.5(f) (regarding division of fees among counsel) does not apply in class actions and that in any event, the issue was moot because, after Bach-y-Rita's lawyer raised the issue, class counsel had obtained written consent to their agreement regarding division of fees. *Id.* at 2-3. Less than a half hour after the filing of this response, still on June 19, Bach-y-Rita filed a further letter in reply, explaining why he believed that class counsel's solution was inadequate and also contending that (earlier) he had been retaliated against for raising the potential rules violation, by his firm "purporting to cut me out of my agreed-upon share of the attorneys' fees entirely." Dkt. 880 at 1.

The final approval hearing ended up taking place on June 23 rather than June 20 due to a technical glitch. *See* Dkt. 881. At the hearing, the Court had an extended discussion with Bach-y-Rita regarding the inter-firm allocation issue he had raised, including why—as one of the attorneys of record—he had not raised it with the Court at the time of the earlier settlement approvals. The Court also asked if Bach-y-Rita was objecting to the Cal Tech settlement.[4] He affirmatively stated, twice, that he was not. June 23, 2025 Tr. at 11, 12. Nor did any class members or counsel for any of the other parties.

---

[4] Final approval of the Johns Hopkins settlement had to be held over by about a month for unrelated reasons. *See* Dkt. 882.

The Court orally approved the Cal Tech settlement, including the proposed fee award, and later entered a written approval order. Dkt. 884. The Court notes that the settlement approval order did not include anything, nor had the Court been asked to include anything, regarding how fees would be split among class counsels' firms. This was also true of the 2024 settlement approval order; it just awarded an overall percentage fee of one-third.

Still during the June 23 hearing, one of the lead class counsel (Cramer) asked to respond to Bach-y-Rita's contentions. That prompted a further response by Bach-y-Rita, and some back-and-forth with the Court. Toward the end of the hearing, Bach-y-Rita advanced a new allegation: "the root ethical violation here that [RPC] 1.5 was used to cover up was essentially – was a fraud on the Court, was a submission of inflated billing records. And I have the documentation that establishes that that likely happened." *Id.* at 21. The Court advised Bach-y-Rita that if he wanted to bring additional matters to the Court's attention, he should make an appropriate filing. *Id.* at 22-23.

**4. The July 11, 2025 hearing and its immediate aftermath**

Bach-y-Rita did not make a further filing at that point. But on July 1, the non-settling defendants filed what they entitled a "motion for *limited discovery* into plaintiffs' counsel's allegations of misconduct and related briefing," Dkt. 908 at 1 (emphasis added), contending this was relevant regarding the already-pending motion for class certification with respect to claims against the non-settling defendants. The request was not actually all that "limited": defendants asked to take 5 depositions of plaintiffs' counsel and serve 10 document requests and 5 interrogatories. In support of the

motion, defendants relied on Bach-y-Rita's letter and his contention at the June 23 hearing regarding inflated billing records.

The Court ordered plaintiffs to respond to defendants' motion and held a further hearing on July 11. After hearing argument on that date, the Court addressed whether the requested discovery was warranted. The Court first stated that the alleged division-of-fees-among-counsel issue did not, in its view, impact class certification or the adequacy of counsel, nor would it have any impact on the class. July 11, 2025 Tr. at 16-17, 18.

On the claim of inflated billing records, the Court noted that under Seventh Circuit caselaw, attorney misconduct impacts class certification "only if the misconduct prejudices the class or if it jeopardizes the integrity [of] the judicial process in the sense of jeopardizing the Court's ability to reach a just and proper outcome." *Id.* at 17. The Court briefly reviewed the history of the fee applications in the case, saying that fees had been awarded based on a percentage, not based on time spent. *Id.* at 18. On the lodestar crosscheck point, the Court said the following:

> Yes, there is a [lodestar] cross-check. That's the lingo that's used. That's the last of several factors, probably the least important of [them], and it's not even required by the Seventh Circuit. But . . . [t]here's no question it was offered in this case. . . . I'm just going to tell you I didn't look at a single one of the billing records [sic][5] because that's not what cross-check means. But it was referenced, and there's a reference which I would call pretty close to a passing reference in the . . . two orders of approval . . . which refer to this.
>
> But yes, it was considered. Was it significant? No. Would the settlement have been approved even without the reference to the [lodestar] cross-checks? Yes. And that's true for both of them. But it was submitted.
>
> . . .

[5] Actually no "billing records" had been submitted, but only the totals referenced in counsels' submissions.

> So I think within [ ] legally strict and circumscribed limits, which I'm going to tell you right now, I want to know more information about this. I'm not granting your motion for discovery . . . . There's no reason to do any [of] that. Mr. Bach-y-Rita is one of the approved class counsel in the case. He has a fiduciary duty to the class, and he's under an obligation [of] candor to me. . . . I'm going to direct him in very short order to file . . . a statement of his contentions regarding inflated billing records, overbilling, whatever the lingo is. . . .
>
> And then I'm going to see what that is, and I'm going to figure out whether there's any discovery that out to be . . . allowed once I get that. . . .

*Id.* at 18-20.

The Court's order following the hearing stated, in relevant part, as follows:

> Class counsel Peter Bach-y-Rita is directed to file under seal by no later than 12:00 PM Central Time on 7/21/2025 a statement that details his contentions regarding submission of false or inflated billing records to the Court in this case. Mr. Bach-y-Rita may attach (also under seal) supporting documentation but should take care not to include any material on which a claim of attorney-client or work product privilege could be asserted. . . . A further hearing on defendants' motion for discovery is set for 7/28/2025 at 10:00 AM.

Dkt. 912.

Bach-y-Rita filed an affidavit on July 21, 2025. In the affidavit, he stated that in or around October 2023, in anticipation of the first round of settlement approvals, his colleagues at FNF had reviewed the reported hours and lodestar from GLC and "repeatedly expressed their incredulity of [sic] GLC's reported hours, rates, and lodestar, as well as the numerous reasons for their incredulity and their thoughts regarding what actions they may need to take as a result." Dkt. 913 ¶ 7. Bach-y-Rita said that though he "had limited involvement in, and limited visibility into" the discussions that followed this (presumably given his status as an associate), he had "repeatedly raised my concerns regarding the firm's ethical obligations with my FNF colleagues who were more directly involved in such discussions, including Mr. Normand." *Id.* ¶ 9. Bach-y-

Rita said that in response, they had not provided him with "information to allay my concerns" but instead had restricted his work on the case and purported to "cut me out of my agreed-upon share of the fee award." *Id.*

On July 28, 2025, the Court held a video hearing as scheduled but was advised that Bach-y-Rita, via his personal counsel, had declined to participate. The Court continued the matter and entered an order stating, in relevant part, as follows:

> The Court sets the matter--specifically the dispute over discovery arising from Mr. Bach-y-Rita's apparent allegation of a fraud upon the Court--for an in-person hearing on 8/8/2025 at 10:30 AM. Mr. Bach-y-Rita, who is one of the attorneys of record for the plaintiffs and the putative class in this case, is hereby ordered to attend in person. . . . Mr. Bach-y-Rita is to be prepared to testify regarding any contention on his part that false or inflated billing records were submitted to the Court. He is also to bring with him any supporting evidence (as referenced in his sealed submission).

Dkt. 921.

**5. The August 8, 2025 hearing**

**a. Bach-y-Rita's testimony**

At the hearing on August 8, Bach-y-Rita provided records, and the Court questioned him under oath. The Court summarizes certain salient points here. When asked if he believed any of the time submitted to the Court under the GLC umbrella was false "either because they put in hours that weren't actually worked or they inflate[d] the hours or there's an inaccurate description of what was done" or on some other basis, Bach-y-Rita initially said, "I believe it to be the case," based on discussions before the time was actually submitted. Aug. 8, 2025 Tr. at 12. When asked why he had not raised this when the submission was made to the Court—a submission on which Bach-y-Rita's name appeared as counsel—he said it was because he was waiting to see how a "reallocation" of fees, suggested as a way to deal with the Gilbert hours, worked out.

*Id.* at 14. "So the decision to reallocate was instead of raising ethical concerns. So what I decided I would do was – because I didn't feel that I knew that there had been ethical violations." *Id.* at 15. When he later saw that the reallocation had not been disclosed to the named plaintiffs, Bach-y-Rita said, he decided to raise the issue. *Id.* (The Court notes that the named plaintiffs later consented to the inter-firm allocation, though it's not likely the law actually required their consent.)

When asked the basis for his belief that GLC's time was inflated, Bach-y-Rita referred to email correspondence among lead counsel, which he produced at the hearing (some of it in redacted form at the insistence of Gilbert, who cited work product issues regarding the redacted material). Specifically, he referred to an October 2023 email from attorney Normand analyzing "reasons why the [Gilbert] [lode]star might be high and the reasons why FNF felt uncomfortable with the [Gilbert] [lode]star." *Id.* at 19. When asked again by the Court to describe directly the basis for his concerns, Bach-y-Rita referenced Normand's assessment regarding too many partner-level hours claimed by GLC; redundancy; and high hourly rates.

**b. The October 2023 emails**

The Court next summarizes, briefly, the lengthy emails among lead class counsel in October 2023 that Bach-y-Rita produced at the hearing. The first was an October 3, 2023 email from Normand to Cramer and Velvel Freedman (of FNF), but not to Gilbert, evidently summarizing earlier discussions and containing proposed talking points for a discussion with Gilbert. The main talking point was, "We find the GLC hours billed implausible. It's simply too many hours in too short a time, and the comparison to the FNF hours makes no sense. But that's probably not true. The hours billed are about

50% more than FNF, and they include a lot of pre-filing work. The real problem, per below, is the level of senior work and redundancy." Concern was expressed regarding whether the Court would approve GLC's hours or whether submitting those hours as-is would "decrease [the] likelihood of a full contingency recovery for the group"—the primary problems with GLC's time being "Senior people doing junior work. All the time." and "Many senior people apparently doing many of the same things at the same time." Normand suggested several solutions to propose to Gilbert, including, "GLC should agree to take a haircut" on its lodestar submission and various proposals for going forward, involving GLC cutting back on its billing and/or reallocating work away from GLC.

There evidently ensued a discussion among lead class counsel, including Gilbert, which in turn led to a lengthy response email from Gilbert dated October 13, 2023. Gilbert expressed "disappoint[ment]" and responded to the points made by the other attorneys. He defended at length the accuracy and appropriateness of the hours spent by GLC attorneys, attributing it in part to the departure or non-involvement of certain attorneys with FNF (which required GLC to take on a greater share of the work), and he indicated that the proposal to try to equalize billing as between GLC and FNF would lead to inefficiency and redundancy. Gilbert—evidently perceiving this, at least in part, as an issue regarding how fees would be divided—said he would make his own proposal to increase the lodestars of the other firms.

After a further exchange, Normand raised an issue with the claimed hourly rates of some of the attorneys under the GLC umbrella; said the claimed GLC lodestar "will operate to hurt all three firms" because the overall lodestar would be viewed by the

Court as unreasonable (and for other reasons); and stated that "FNF and [Berger] will not submit any papers supporting the GLC umbrella lodestar . . ., and may need to express our concerns about it, consistent with our ethical obligations." Normand's email also made reference to assertions by Gilbert—in support of GLC's billings—to "the payments that GLC's funder has made based on the GLC umbrella lodestar to date." Normand further stated that "the fact that you are being paid hourly on this case may help to explain why GLC has billed double the hours of the firms that are not being paid hourly, and which do not have the incentive of doing work that duplicates efforts." Later in the email, Normand stated that he understood that Gilbert was prepared to justify the "disproportionate lodestar to date" but said, "we disagree with that story." Normand's bottom-line proposal was to reallocate work to rebalance the firms' respective lodestars, allocating more work to FNF and BMPC and less to GLC.

Gilbert's response email, dated October 23, 2023, again defended at length the amount of attorney time claimed by GLC. He repeated that attorneys from FNF whose participation in the litigation had been expected had not participated; he stated that the allocation of work among firms had been repeatedly discussed and agreed to; and he pointed out that the relative lodestar proportions had been known to all three firms for over a year, without any criticism or attempt to modify it. He also defended the quality of the work done by GLC and the level of involvement of more senior lawyers. Gilbert also made the case that GLC's lodestar was reasonable, as were the billing rates claimed by the GLC attorneys. In this regard, Gilbert cited his litigation funder's approval of these rates. Gilbert did, however, express willingness to accommodate the other firms' request to undertake a greater proportion of the work going forward.

**c. Bach-y-Rita's testimony, continued**

The Court now returns to Bach-y-Rita's testimony at the August 8, 2025 hearing. Nearer the end of his testimony, Bach-y-Rita volunteered the following: "Your Honor raised the idea at the previous hearing [sic] of hours that were simply made up. I don't have any reason to think that – or I did not – that's not something that was ever raised in that way. Like, there's the idea that the hours are too much, but made-up hours, there's nothing in here that goes to that." *Id.* at 27. Asked about this again, directly, by the Court later in the hearing, Bach-y-Rita said, "I'd rather think that probably did not happen"—"that" being a reference to time claimed that had not actually been spent. *Id.* at 31.

**d. Arguments at the hearing**

After the conclusion of Bach-y-Rita's testimony, defense counsel summarized the testimony as follows: Bach-y-Rita's "allegation of fraud is based on suspicions that the work was intentionally generated to generate a high number that would allow Mr. Gilbert to claim a higher allocation." *Id.* To put it another way, as counsel summarized, "[t]he idea is that they put bodies on this case in order to generate time that would be used in that allocation [among plaintiffs' counsel] so that [GLC] could take a larger percentage." *Id.* at 33. Defense counsel emphasized that the time claimed by GLC had been submitted to the Court, "and the Court did rely on it as a check on the thing," *id.*, "check" being a reference to the lodestar cross-check. Defense counsel repeated the defendants' request for additional discovery.

The tenor of at least part of defense counsel's comments—particularly his comment regarding attorney Gilbert's billings—indicated to the Court that at least some

of what had been alleged (regarding excessive hours) had been apparent to defense counsel at an earlier time. The Court asked why defense counsel had not raised this point earlier, for example in connection with the earlier settlement approvals. *Id.* at 41. Defense counsel initially stated, "The fee request for us, for the non-settling defendants, we don't have a dog in that fight." *Id.* at 42. When pressed, in particular regarding the obligation of counsel to disclose their awareness what they were now contending was a fraud on the court, defense counsel essentially said that although the defense understood there would be "a fight [among plaintiffs' counsel] on allocation among themselves," it did not have enough evidence of a fraud on the Court to raise that issue at the time. *Id.* at 43. The Court pushed back to some extent but at this point does not intend to dwell on this issue further, so it will refrain from summarizing that discussion.

In response, plaintiffs' attorney Cramer stated that, after further discussion and exchanges of information that followed the October 2023 correspondence, the other lead plaintiffs' attorneys had become comfortable with the time claimed by the Gilbert firm. Cramer's comments included:

> As to Mr. Gilbert's 3,000 hours, that sounds like a lot of time and it is. That's because that's all Mr. Gilbert did during that time. He had no other cases. And, sadly, he had no other life during that period. I felt for his health during that period he was working so hard. There was some discussion here. Well, we don't have enough information. There's only top line summaries. We need the detail. Well, the top line summaries are all Mr. Bach-y-Rita saw. . . .
>
> . . .
>
> [B]etween October 2023 and April 2024 when the fee petition as submitted, our firms had multiple meetings . . . where we figured out, oh, well, the reason why Gilbert and Mr. Raymar and Mr. Villareal and all the other people associated with Gilbert Litigators were doing X, Y, and Z was because they were working on this. And they were working on that, and they were working on this. . . . [B]ecause we were each involved in our own small corners of the case, large corners of the case, we didn't necessarily know what each other was working on.

> And so we had – you saw a reaction in October 2023. Oh, that seems high.
>
> But Mr. Bach-y-Rita wasn't privy to what happened after[,] where we worked it out. Where we not just worked out how we're going to allocate fees amongst each other, we worked out and understood why the work was done, why so much work was done, and who did it.

*Id.* at 48-49.

#### e. The Court's ruling on the request for more discovery

On defendants' request for discovery, the Court commented that—with respect to the issue of excessive hours—the requested discovery was unlikely to be productive. The Court stated: "[O]ne small part of my issue with all of the discovery that the defendants had wanted to do on this is . . . you'd just be running around in circles because how are you ever going to prove that somebody didn't actually do the work that they [said they] did?" *Id.* at 52. Ultimately, the Court concluded that "[t]he request for discovery that was made by the defendants goes significantly beyond anything . . . that I might consider reasonable, given the circumstances. So that request is overruled." *Id.* at 62-63.

The Court did, however, direct production to defendants of the emails Bach-y-Rita had produced at the hearing. The Court also gave leave to file supplemental briefs "regarding any impact on the motion for class certification of the evidence adduced at the hearing, the inter-attorney correspondence, and the surrounding issues." Dkt. 944.

### 6. The September 4, 2025 hearing and the supplemental briefs

Defendants filed a supplemental brief that primarily addressed the issues of overbilling and hourly rates but also identified an issue arising from the references in counsels' emails to GLC's litigation funding arrangement. On this point, defendants referenced plaintiffs' counsels' representation in the earlier fee petitions that "the fee

award they sought was fair and reasonable given the extraordinary risk of litigating on a contingency fee." Dkt. 947 at 7 (internal quotation marks omitted). Defendants argued that "for GLC, the representation was false, and FNF and [Berger] knew it . . . [and] signed on anyway." *Id.* On the hourly rate issue, defendants attached material outside the existing record, consisting of fee submissions in other cases in which lower hourly rates were used.

In response, plaintiffs evidently took this as an invitation to further expand the record themselves. Their response attached a series of further affidavits from lead class counsel explaining how the inter-attorney disputes over time, rates, and allocation had been worked out. They also attached an affidavit from a law professor who is a noted expert in class action and complex litigation, providing an opinion that largely focused on these same points.

The Court viewed these submissions, collectively, as expanding the record far beyond what was warranted under the circumstances, and plaintiffs' affidavits in particular (even more particularly the expert's affidavit) as potentially opening the door to full-blown satellite discovery even beyond what defendants previously had requested. By this point, the Court concluded, the record on the hours/hourly rates/allocation issues was sufficiently developed, and additional discovery on those points was unwarranted and disproportionate. The Court therefore struck the parties' supplemental submissions and, ultimately, ordered further oral argument and more focused supplemental briefing. *See* Dkt. 954, 956, 960.

Defendants' arguments at a hearing held on September 4, 2025 mostly addressed the attorney time and hourly rate issues, but they also focused on issues

relating to GLC's litigation financing. Defendants argued that given what had been said about the financing in the October 2023 emails, the representations made to the Court by plaintiffs' counsel to support their fee requests (relating to contingency and risk) were false, a further basis to deny class certification.

In response, plaintiffs' counsel Normand emphasized "the excellence of the results" obtained by class counsel—$320 million in settlements—and noted that "when the defendants oppose the adequacy of class counsel, they are not acting in the best interest of the class" but instead were furthering their own interest in defeating class certification. Sept. 4, 2025 Tr. at 23-24. Normand argued that under governing caselaw, "ethical issues of the sort that get raised on class cert are relevant for purposes of adequacy only when they prejudice the class, result in a direct conflict within counsel and the class, [or] jeopardize the Court's ability to reach a just and proper outcome." *Id.* at 24. None of the defendants' accusations, Normand contended, rose to that level. Normand elaborated on this at some length, focusing—as defendants' counsel had—on the time and hourly rate issues. On the litigation funding issue raised by defendants, Normand stated that on the "issue of whether and to what extent the GLC firm was operating on a contingent basis, which is the expression they used. They were on a contingent basis. I mean, Mr. Gilbert can address this now and in a declaration, but this is a common representation when plaintiffs' lawyers have some funding where, as a whole, the funder and the lawyers are taking a risk. It is contingent. And that's what happened here." *Id.* at 30-31.

The Court directed production of the GLC litigation funding agreements for *in camera* inspection and thereafter directed their production to defendants on an

attorney's eyes only basis, with one minor redaction. *See* Dkt. 960, 1086. The Court also ordered further supplemental briefing. *Id.* In their ensuing briefs, defendants continued to address the attorney time and hourly rate issues. They also placed greater emphasis on their contentions that plaintiffs' counsel had made misrepresentations regarding the purportedly contingent nature of Gilbert's fee arrangement. They contended that counsels' conduct and representations prejudiced the class, showed counsel were inadequate as class counsel, and should defeat class certification. Defendants' further submission after production of the GLC litigation funding documents further emphasized their contentions that counsel had made false statements to the detriment of the class. *See* Dkt. 1021, 1146.

The post-hearing submissions by plaintiffs' counsel argued that the attorney billing rates were supported via the record and otherwise and that the time spent was reasonable and justifiable. *See* Dkt. 1077, 1175. Regarding whether GLC's fee arrangement was contingent, counsel argued, among other things, that

> Defendant's focus on GLC's "contingency" and "risk" is also meritless. GLC incurred extraordinary risk and "with no guarantee of recovery," because litigation funding is not a "recovery." Defendants also ignore that a funder is part of the firm's undertaking. Defendants' misinterpretation of "contingent" and "risk" would require every firm seeking fees from a common fund to detail its funding or lending, however general or specific. There is no such rule in this District, and no caselaw regarding how such firm economics implicate fee awards. Instead, as this Court recognized, "the proposition that a plaintiffs' law firm in this kind of case would get litigation funding is old hat," and "fee awards in antitrust cases in this circuit are almost always one-third."

*Id.* at 8 (footnotes and record citations omitted). Plaintiffs' counsel further emphasized these points in their memorandum filed after the production of the GLC agreements. *See* Dkt. 1175. They also argued that the claim that GLC worked on a "contingent" basis was accurate because "no client or class member is obligated to pay fees unless

there is a recovery," which they said "reflects the conventional usage of 'contingent fees that clients pay lawyers.'" *Id.* at 1. Plaintiffs' counsel further argued that even considering GLC's fee arrangement, GLC had "incurred substantial risk," as only a portion of its fees were funded. *Id.* at 4.

**7. The litigation funding issue**

As indicated earlier, Gilbert produced, initially for *in camera* review and later for defense counsel at the Court's direction, GLC's agreements with litigation funders. The Court will discuss the terms at a high level.[6] The first agreement, dated in January 2022, provided for payment to GLC of 50 percent of its hourly billings with a payment cap of about $5.9 million, and its litigation expenses. Later agreements (the first dated October 13, 2023 and the last in January 2025) modified this in stages, ultimately providing for payment to GLC of 40 percent of its hourly billings up to, ultimately, $14 million, and for its litigation expenses.

By the time of the first fee motion in April 2024, GLC's reimbursed fees had surpassed the then-existing cap of $8 million. Specifically, GLC's claimed lodestar at that point was $31 million, which at 40 percent would have translated to about $12.5 million.

**8. The March 11, 2026 hearing**

The Court held a further hearing on March 11, 2026, largely for the purpose of questioning the three lead plaintiffs' attorneys regarding the references in the earlier filings to the purportedly contingent nature of GLC's work on the case.

[6] None of what the Court references here is legitimately kept out of the public record, so the Court will not do so.

Cramer and Normand advised that, unlike GLC, their firms did not have funding arrangements under which some part of their fees was funded as the litigation progressed. Mar. 11, 2026 Tr. at 11-12. Both stated that they viewed their fee arrangements as "contingent," by which they meant they would not be paid by anyone unless there was a settlement or judgment (though Normand stated that this "describes what our agreement with our clients was"). *Id.* at 13, 14.

The Court asked Gilbert what he meant by the representation in his April 2024 affidavit that "GLC's work on this case was performed on a contingent basis." *Id.* at 14. Gilbert responded: "That if there would be a recovery that the clients would not have to pay anything, and we would be paid when there's a recovery. The clients would not have to pay anything." *Id.* at 14-15. The Court pointed out that Gilbert's affidavit had said nothing about the clients but rather simply stated that "*work* is being performed on a contingent basis." The Court asked, "Isn't that something that would be reasonably understood by a reader that you weren't getting paid at all unless you prevailed in the case or got a settlement?" *Id.* at 15. Gilbert replied, "it doesn't mean what your Honor said." *Id.* He resisted the Court's suggestion that given GLC's litigation funding deal—under which GLC would get paid up to $14M—it would be more accurate to describe the arrangement as "partly contingent." *Id.* at 16. He stated, "My understanding is that it's accurately – it's a fully contingent basis and also get [sic] litigation finance as reflect[ing] my state of mind, going back to the very outset of the case, in the client retention letter." *Id.* at 18.

The Court pointed out that Gilbert's affidavit didn't say his firm wasn't getting paid by the clients but simply that "GLC's work was performed on a contingent basis," and

asked again, "How can you say that your work was performed on a contingent basis when you were getting paid up to $14 million for your work?" Gilbert replied, "We understood that in this district, it's perfectly proper to say that it's a contingent basis and to have funding and that there's never been a case or law that we need to disclose if it's a contingent [sic] that there's funding." *Id.* The Court asked the basis for Gilbert's stated "understanding," and Gilbert said simply, "There's no case or rule or law in this circuit or this district that suggests that in the contingent case someone needs to indicate their finances." *Id.* at 18-19.

The Court next turned to counsels' joint memorandum submitted in connection with the first round of settlement approvals, dkt. 679, and specifically the representation in that memorandum that "[s]ettlement class counsel also filed this case on contingency, knowing it could take years to prosecute the millions of dollars and tens of thousands of attorney hours to properly resource, thus assuming the very risk of nonpayment." Mar. 11, 2026 Tr. at 21. The Court asked Cramer and Normand, "As to Mr. Gilbert, at least, there was not a risk of non-payment was there?" *Id.* at 22. Cramer replied that from what he knows how, Gilbert "was not funded at anything close to a hundred percent of his lodestar. . . . And I think in that sentence, at least what I meant, was non-payment in the case, by the class from the case, not from an outside funder." *Id.* Normand concurred. *Id.* When the Court asked "don't you think that that would communicate to a listener that there was no payment at all forthcoming unless there was a recovery in the case?," Normand said, "that's not what I understood it to mean when I read it." *Id.* at 22. He stated that "in retrospect, it could have" been made clearer. *Id.* at 23.

Court next asked Gilbert about the statement in his March 2025 affidavit that "My

firm's work on this case was performed on a *wholly* contingent basis." Dkt. 830-4 (emphasis added). Asked what he meant by "wholly contingent," Gilbert stated: "Well, I signed previous [statements] that said contingent. I said [in this] one that's wholly contingent. I meant exactly what I thought about right from the beginning of the case when I say to the client, the agreement is entered into on a fully contingent basis. I understood that to be what the meaning of contingency was." *Id.* at 24. The Court pointed out, again, that Gilbert's affidavit made no reference to his agreement with the clients but rather said that his firm's "work on the case was performed on a wholly contingent basis, when, in fact, you had gotten paid or were going to get paid $14 million. How is that wholly contingent? It's not wholly contingent, is it?" *Id.* In response, Gilbert referred to the joint enterprise with the litigation funder. The Court noted that Gilbert's filing had said nothing about a litigation funder or his agreement with the clients and asked "Do you not see how [your statement] would communicate to a reader that what was happening was that you weren't getting paid anything unless you made a recovery?" *Id.* at 25. Gilbert said, "I can see now how your Honor would be concerned about that. I can see that now. So I apologize for that." *Id.*

The Court asked lastly about Gilbert's expense reimbursement arrangement with the litigation funder. He stated that the expenses "were being paid as we go on approximately a monthly basis." *Id.* at 27-28. The Court then quoted Gilbert's statement in the same affidavit that "These costs were incurred on behalf of the settlement class by my firm and have not been reimbursed" and asked Gilbert, "Was that true?" Gilbert replied, "Not reimbursed by the client. That's [the] meaning of that." *Id.* at 28. When the Court pointed out that the affidavit included no such qualifier,

Gilbert again referenced the "joint enterprise" with the litigation funder: "I had been given an advance, I guess, is one way of looking at it, that, as part of a joint enterprise with the funder, I would have to pay back at a multiple." *Id.* at 28-29. He said, "The reality of our situation, when we owe a substantial debt to a funder, it's hard to think of it as we've been reimbursed by the funder." *Id.* at 29. When the Court suggested that any reasonable reader would understand Gilbert's affidavit statement to convey that "you laid out $1,044,000 and you hadn't gotten a dime of it back," *id.* at 29, Gilbert disagreed, stated that he viewed the statement as candid, and said "I don't think of us as having been paid for that, and I don't see that as a fair, necessarily, with all respect, characterization, your honor." *Id.* at 30.

The Court then heard argument from both sides. In oral comments, Cramer stated, "I . . . regret that some of the language in some of the documents that were filed in support of the fee petition were not as transparent as they could have been" and appeared to acknowledge that the statements, which he claimed were largely borrowed from filings in other cases, "did not account for the funding agreement that Mr. Gilbert had." *Id.* at 33. He stated that 'in hindsight, I would say that we should have been clearer regarding that, and I apologize to the Court for that." *Id.* Normand noted that the Court was "understandably frustrated with the ambiguity of some of the language. I understand that. There's no, from my perspective, intentional wrongdoing. These were negligent mistakes of omission, I think you could say." *Id.* at 34. Both Cramer and Normand emphasized the results obtained by the class thus far and contended that there was no misconduct of the sort "that would call into question the ability to represent the class as loyal to the class." *Id.*; *see also id.* at 33. Gilbert made some separate

points regarding hours and hourly rates and said, on the issue at hand, "I apologize to the extent there was some inference, understanding, from words that were used that was not intended, certainly not intended and never understood that there was any requirement in this district to view this as a joint enterprise between the law firm and its sponsors [sic]." *Id.* at 36-37. Defendants' counsel emphasized their arguments that counsel had made knowing misrepresentations that prejudiced the class.

**9. The motion to amend**

Following the March 2026 hearing, plaintiffs filed a motion to amend their motion for class certification. Specifically, plaintiffs stated that they "now seek the appointment of only Freedman Normand Friedland LLP ('FNF') and Berger Montague PC ('BMPC') as Class Counsel for the proposed litigation Class in this case," and not Gilbert Litigators and Counselors. Dkt. 1236 at 2. They argued that this would adequately and appropriately address the concerns noted by the Court at the March 11 hearing. Gilbert filed a supplement to the motion asking to keep GLC on in a supporting role to FNF and BMPC but offering to have GLC "withdraw altogether" "if the Court believes [GLC] cannot adequately represent the interests of the Class under the leadership of BMPC and FNF (without Mr. Gilbert's involvement) . . . ." Dkt. 1237 at 3.

In response, defendants argued that plaintiffs' motion "does not solve their problem. BMPC and FNF made the same misrepresentations as GLC and thus share responsibility for misleading the Court on this and related overbilling issues by GLC, which they did for their own benefit and to the detriment of the proposed class." Dkt. 1239 at 2. Defendants also noted that FNF and Berger might be contractually obligated to share any further fee awards with GLC, which they contended would improperly

permit GLC to profit even if removed from the case.

The Court grants the motion to amend, including the proposal by GLC to withdraw from representation of the class. But for the reasons described below, the Court does not believe that this is sufficient to remedy the problem caused by counsels' inappropriate conduct. Nor, however, does the Court agree with defendants' contention that the Court should simply deny class certification and proceed on an individual basis.

**10. The Court's assessment of the fee split and excessive hours issues**

The Court ultimately did not order further discovery from the law firms regarding the fee split and excessive hours issues. Thus the record does not include contemporaneous records describing exactly how the dispute was resolved. The other lead plaintiffs' counsel have represented that, following extended discussions, they became comfortable with the amount claimed by GLC and also worked out the division of labor among the three firms going forward.

The Court declined defendants' request for extended discovery largely because it was likely to be a dead end on these points, and on proportionality grounds. It is overwhelmingly unlikely that further discovery ever could have established that an attorney who claimed X hours on a particular date for a particular set of tasks did not actually spend that time. Nor would discovery likely have provided any additional meaningful insight into the issue of inappropriate allocation of work among upper and lower-level attorneys. Among other things, we already know Gilbert's view on this; it is expressed in his October 23, 2023 email. Furthermore, it is already obvious from the face of the attorney's fee motions that GLC's hours and claimed lodestar were significantly higher than those of the other two firms: GLCs lodestar was about fifty

percent higher than FNF's and nearly double that of Berger. And it is also obvious from the face of the papers that the average hourly rate for the GLC work was higher than for the other firms, meaning that more of the time had been claimed by more senior attorneys.[7]

Just as importantly, the Court can confidently say (as it did at the July 11, 2025 hearing) that the claimed overinvolvement of more senior GLC attorneys and the allegedly inflated hourly rates, though material in an objective sense, did not *actually* make a difference in the Court's fee rulings regarding the two groups of settlements. Some simple math illustrates this. For the first group of 10 settlements, totaling $285 million in payments, plaintiffs' counsel sought a little under $95 million in fees. They represented that the total lodestar was a little over $70 million, meaning that on the "lodestar crosscheck" the multiplier was a bit over 1.3. The $70 million was broken down approximately as follows: $31 million for GLC; $21 million for FNF, and $17 million for Berger Montague. *Even if (to account for hours and rates) one were to cut the GLC number in half, to $15.5 million, the lodestar crosscheck multiplier still would be under 1.8* (at a total lodestar of $54 million), which is comfortably within the range of typical approvals. The Court would have approved a one-third fee even if those had been the lodestar numbers. Again, the Seventh Circuit has made clear that the

---

[7] Regarding the hourly rate issue, there do appear to be disparities between the rates provided for some GLC attorneys for this case and amounts they sought in other litigation. But it is not apparent that the market hourly rates for the other matters are similar to those for complex antitrust matters like this one. And the range of rates for the GLC attorneys (from lowest to highest) is roughly the same as the range for Berger and FNF. On a separate point, the question of whether GLC was an actual preexisting "law firm" or instead served as an umbrella for not-previously-affiliated lawyers—another point identified by defendants—is of little consequence in the Court's view.

standard is the market rate, and the relevant caselaw establishes that the market rate in a common fund case of this type is a percentage, not hours-times-rate. The discovery sought by defendants would not have altered these facts.[8]

The Court also notes that defendants have not been in anything approaching an information vacuum here. They were given the detailed correspondence among the plaintiffs' firms from October 2023; Bach-y-Rita testified; and the three lead plaintiffs' counsel were questioned extensively by the Court at the March 2026 hearing. They have had plenty of information that enabled them to advance their contentions on the adequacy of counsel issue, and what they got was proportional to the issues under consideration.

**k. The candor issue**

The real concern here is not overinvolvement of senior attorneys, inappropriate allocation of work, or even hourly rates. In the Court's view, the most significant issue—which did not emerge right away—arises from litigation funding arrangement, in particular the representations to the Court claiming that GLC's work was done on a "contingent" or "wholly contingent" basis and that its expense outlays were "unreimbursed."

Before discussing this issue, the Court wishes to make clear that the problem does not involve the fact that Gilbert had litigation financing or the particular terms of the financing. The Court has nothing at all against litigation financing. Just as liability

[8] The Court acknowledges that, as defendants contend, there is a logical link between this issue and the hours/hourly rate issue, as both were part of counsels' argument that they should be awarded a one-third fee. The Court will address this point below. But this logical link does not make the hours/hourly rate issue independently significant.

insurance (in part a form of litigation financing) allows an alleged tortfeasor to present a defense, plaintiff-side litigation financing allows parties with potentially viable legal claims to pursue them where they otherwise could not. There are, to be sure, problems that arise from certain types of funding arrangements, but those problems are not at issue here. There is no question that the plaintiff class in this case has potentially viable claims that the litigation has enabled the class to pursue—achieving nearly $320 million in settlements.[9]

Likewise, the issue here does not involve any view on the Court's part that there was, or should be, an affirmative obligation to disclose GLC"s litigation financing. The current Federal Rules do not require it; nor do this District's local rules; and the undersigned judge has not imposed such a requirement on an individualized basis.

Rather, the issue here involves candor. Plaintiffs' counsel were not required to tell the Court or defendants about GLC's litigation financing. But making untruthful and misleading statements about it is a different matter. And that is what happened here.

The Court starts with Gilbert. He represented, in his April 2024 affidavit, that "GLC's work on this case was performed on a contingent basis." Dkt. 679-3 ¶ 4. That was not accurate. By that time, payment of $8 million for 40 percent of GLC's time was *guaranteed* and likely already had happened. And even though GLC had exceeded that cap by the time of the April 2024 affidavit, that meant only that GLC's work was *partly*

[9] The repeated rhetorical flourish by defense counsel that the record shows this is litigation "by lawyers, for lawyers" is unpersuasive. The Court's reaction to the first part of that is, so what: all non-*pro se* lawsuits are "by lawyers." The pejorative connotation of the second part is defeated by the class settlements, which have returned over $220 million *for the class members* exclusive of fees, which by any reasonable measure is a wildly successful outcome.

performed on a contingent basis. Gilbert's affidavit, however, included no such qualifier; it said the firm's work was performed on a "contingent" basis, period. Even if this was not completely untrue—in that the work was *partly* performed on a contingent basis—it was at least misleading without a qualifier.

And in any event, in Gilbert's March 2025 affidavit, he effectively doubled down: he represented that "[m]y firm's work on this case was performed on a *wholly* contingent basis." Dkt. 830-4 ¶ 5 (emphasis added). It most certainly was not. By then GLC had been paid $14 million, which it would have to pay back only in the event of a recovery. It is, of course, true that GLC would be paying the funder back from the settlement-related fee and expense award, but Gilbert's sworn representations to the Court expressly concerned *the period when the work "was performed."* Words matter, and context matters. The statements by Gilbert would have misled any reasonable reader to believe that, at the time GLC's work was performed, it risked total nonpayment for its work. The truth is that it didn't. If the case had been dismissed that day, Gilbert would have walked away with the funder's millions in hand.

And it didn't stop there. Gilbert represented in his March 2025 affidavit that GLC had over $1 million "in unreimbursed costs and expenses" and repeated that "[t]hese costs . . . *have not been reimbursed*." *Id.* ¶ 6 (emphasis added). That was not true: the litigation funding agreements guaranteed payment of 100 percent of GLC's expenses. GLC almost certainly had already been reimbursed for these outlays by the time Gilbert signed the affidavits. But even if that had not happened just yet, it would have been quite misleading to call "unreimbursed" expense outlays for which GLC was guaranteed to be repaid.

Up to this point the focus has been on Gilbert. That does not mean that the other attorneys or firms can walk away unscathed. The October 2023 emails reflect that by then, Cramer and Normand were aware of Gilbert's litigation financing arrangement—including the fee payments (in fact, it appears that at the relevant time, they may have believed that GLC was getting 100 percent of its hourly fees paid). Indeed, Cramer and Normand confirmed at the March 2026 hearing that they were aware that Gilbert was receiving payment for his firm's hourly fees. Despite this knowledge, they filed with the Court submissions that included the false statements by Gilbert just discussed, without disavowing them or even calling the Court's attention to the point. And in both the March 2024 and April 2025 submissions, which both Cramer and Normand signed, the attorneys all represented that counsel had worked on the case "with no guarantee of recovery," which they knew was not accurate with regard to GLC. Their joint (with Gilbert) April 2025 affidavit incorporated the earlier submissions, which included Gilbert's statements that his firm's work had been performed on a contingent basis, which was likewise not accurate as stated. And they submitted draft settlement approval orders that called upon the Court to find that counsel "undertook this case on a wholly contingent basis and ran a substantial risk of no recovery whatsoever"—which unquestionably was untrue with respect to GLC—knowing full well that the Court did not know any better.

The Court suspects that if Cramer or Normand had told Gilbert—as they had earlier regarding the hours/rates issue—that they would not be party to a submission that included a statement that GLC's work had been performed on a "contingent" or "wholly contingent" basis—which is what they should have done—the Court would have

been told the straight story and would not have been forced onto this extended detour. But none of that happened.

It is worthy of note that Cramer and Normand did not simply choose to remain silent in the face of Gilbert's misstatements; they *affirmatively adopted* them. This is not simply a matter of being less than "fully transparent," as counsel suggested at the March 2026 hearing.

Counsels' primary contention is that what they really meant was that recovery by what they refer to as the GLC/litigation financer joint venture was indeed contingent. But even if that is true in the abstract, it totally ignores what the affidavits and other submissions *actually said*. They made no reference to litigation financing. a joint venture, or anything of the kind. Rather, Gilbert repeatedly said that "*GLC's work on this case* was performed on a contingent basis," or, even worse, "on a wholly contingent basis." GLC did not perform its work on a contingent basis. It had an arrangement on which it was guaranteed up to $14 million for its time and all of its out of pocket expenses, and it didn't have to pay this back to anyone except in the event of a recovery via settlement or judgment. Yes, the litigation funder was 100 percent at risk, but Gilbert's affidavits, and all three counsel's submissions, referred to GLC, not the litigation funder or any sort of a joint venture. Again, words matter, and context matters. What these words communicated in context to any reasonable reader—and certainly to the Court—was that if GLC did not win or get a settlement it was not getting paid, period. That was false.

The next question concerns the significance of the misstatements. There is no doubt that Gilbert made his statements about the "contingent" and "wholly contingent"

nature of GLC's work to persuade the Court that GLC risked, in the words of the April 2024 submission (quoting *Silverman*) "walking away empty handed." That is what any reasonable judicial reader would have understood Gilbert's statements to mean. And that, in turn, is what any reasonable lawyer in the position of Gilbert, Cramer, and Normand would understand. From an objective standpoint, the misstatements were material: they were capable of influencing the intended decisionmaker, namely the Court. The statements that GLC's work was performed on a contingent or wholly contingent basis, and the statement in March 2025 that GLC's expense outlays of over $1 million were unreimbursed—which similarly was false—were made in the context of a discussion of the risk taken on by class counsel. Under governing caselaw, the degree of risk was an important consideration in determining a reasonable fee. All three lead counsel most certainly knew this.

It is a separate question, however, whether these misstatements *actually* influenced the Court. The Court acknowledges that it is assessing this with hindsight. But the Court concludes that counsels' misstatements regarding the purportedly contingent nature of GLC's work and its purportedly unreimbursed expense outlays did not actually impact the award of fees and expenses in connection with the settlements. GLC was not the only firm prosecuting the case. The work of FNF and Berger *was* fully contingent; they have represented that they do not have litigation financing arrangements that compensate them for attorney and other professional time. As for GLC, though it had been paid a very large sum for its time on the case, at the time of the settlements its work was still *partially* contingent: the hourly fee reimbursement was for 40 percent of its lodestar, and it was capped at $14 million. This meant that the

overall percentage for which GLC had been paid started to drop once it had put more than $35 million in time into the case. Considered globally, class counsel's fees still were overwhelmingly contingent. In addition, the Court has no basis to believe that awareness of Gilbert's arrangement would have affected the percentage of the award. This is the one place where the fact that Gilbert was in a "joint venture" with the funder *was* relevant: the funder would recover its advances off the top of the fee award to GLC. Thus knowledge that GLC had been paid (as Gilbert put it, advanced) $14 million would not have impacted the Court's decision to award a one-third fee.

The same is true regarding the false representations concerning reimbursement for GLC's expense outlays. There is no scenario where this, by itself or together with the fact that Gilbert's work was not actually performed on a fully contingent basis, would have altered the Court's decision to approve the one-third fee award and the award of expenses proposed by counsel. To put a finer point on it, the fact that Gilbert bore only a limited risk would not have impacted the Court's decision to approve payment in full for class counsel's litigation expenses, or the one-third fee.

This does not mean that counsels' misrepresentations regarding Gilbert's arrangements do not matter. They do. The issue here boils down to candor. Gilbert's affidavits were affirmatively misleading. And at a minimum, the other two lead counsel, Cramer and Normand, helped pull the wool over the Court's eyes. Gilbert made affirmative misstatements; Cramer and Normand could have corrected or tried to correct them but did not. Further, they did not disavow Gilbert's misstatements and, worse, affirmatively adopted them as part of the joint filings. And even though, as the Court has discussed, these representations had no *actual* effect on its decision, Gilbert,

Cramer, and Normand all plainly understood that it *could* affect the fee awards.

That much is clear. What is less clear is what the Court should do about it. For defendants, it's simple: do not certify the class. But it is not that simple. For one thing, although the Court has not yet certified a class as to the litigating defendants, it's not as if a class doesn't exist. One does: a settlement class has been certified, and over 74,000 class members have submitted claims to the $220 million fund (net of fees) created on their behalf. In other words, *there is an existing class*, certified for settlement purposes, that effectively mirrors the class that plaintiffs have moved to certify with regard to the claims against the litigating defendants. This is not the typical situation where, when class certification is considered, the putative class is an anonymous group of arguably uninterested persons who are not actually before the Court. Rather, the class is already here. This may not matter in terms of the specific requirements for class certification. But it does matter from a practical, commonsense standpoint.

The defendants express concern about prejudice to the class as well. They point out that the false statements about the purportedly contingent nature of GLC's work are linked to the excess-billing issues noted by Bach-y-Rita and the hourly-rate issues involving GLC. Specifically, defendants argue, this was all part of an effort to get more for counsel at the expense of the class. The Court cannot disagree with that. But the solution proposed by defendants gives *them* a windfall and penalizes the alleged victims. Denial of certification is, of course, the usual result if class counsel are inadequate. But again, the overwhelming majority of those situations involve still-anonymous groups of people who have not actually chosen to bring claims to court. That is not the situation here: over 74,000 class members have actually asserted

claims. Denial of class certification would reward the defendants at the expense of those the defendants contend were harmed by counsels' improper actions.

The Court turns to the law regarding attorney misconduct and Rule 23(a). The Seventh Circuit has stated that "[w]hen class counsel have demonstrated a lack of integrity, a court can have no confidence that they will act as conscientious fiduciaries of the class." *Creative Montessori Learning Centers v. Ashford Gear LLC,* 662 F.3d 913, 918 (7th Cir. 2011); *see also, e.g., Eubank v. Pella Corp.*, 753 F.3d 718, 724 (7th Cir. 2014) (quoting *Ashford Gear*). The Seventh Circuit has explained this concern as follows:

> [U]nethical conduct by class counsel implicates class certification because class counsel serves as a fiduciary for the unnamed plaintiffs. Class actions present strong incentives for counsel to sell out the class by agreeing with the defendant to recommend that the judge approve a settlement involving a meager recovery for the class but generous compensation for the lawyers. Thus, when class counsel have demonstrated a lack of integrity through misconduct and unethical action, a court can have no confidence that they will act as conscientious fiduciaries of the class.

*Reliable Money Ord., Inc. v. McKnight Sales Co.*, 704 F.3d 489, 495 (7th Cir. 2013) (cleaned up).

Given this concern, it is *not* the rule that misconduct by class counsel defeats class certification, period. As the court stated in *Reliable Money Order*,

> Not any ethical breach justifies the grave option of denying class certification. [M]isconduct that prejudices the class or creates a direct conflict between counsel and the class requires such denial . . . . [And] even “serious” or “major” ethical violations—not prejudicial to the class—can require denial of class certification. . . . That does not mean, however, that an ethical violation always requires denial of certification . . . . A "slight" or "“harmless" breach of ethics will not impugn the adequacy of class counsel. . . . This conclusion makes sense: the ABA Model Rules, the Illinois Rules, and the Wisconsin Rules all warn that "the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons." Thus, unless the violation prejudices one of the parties or undermines the court's ability to resolve the case justly, state bar

authorities—not a court—should enforce the rules and sanction the attorney. *Id.* (citations omitted). The court stated the governing rule as follows: "[U]nethical conduct, not necessarily prejudicial to the class, nevertheless raises a 'serious doubt' about the adequacy of class counsel when the misconduct jeopardizes the court's ability to reach a just and proper outcome in the case." *Id.*

Conflicts between counsel and an actual or putative class are more or less inherent in the relationship. The class—to the extent it is engaged in the matter, which generally is not the case—wants fair compensation for the wrongs it suffered. Counsel have an interest in being paid for their time. Thus, as the Seventh Circuit recognized, counsel have an incentive to sell the class short in return for getting paid.

But nothing about this case leads the Court to believe that counsel have sold the class short thus far in connection with either litigation or settlement. Counsel have ably prosecuted the case to date. The class's claims have survived summary judgment, and the case is set for trial. And counsel have achieved from twelve of the seventeen defendants very large settlements that have gained $220 million in compensation for the class, net of fees.

Going forward, it is unlikely that counsels' lack of candor with the Court would impact their zealous prosecution of the case from a litigation standpoint. And regarding settlement, any opportunities for the class to be sold short from here on in are likely quite limited. The prospect of settlement with the five remaining defendants appears to be remote. Based on discussions the Court has had with the parties, including a settlement conference involving plaintiffs' counsel and the remaining defendants, plaintiffs' counsel have insisted on settlement payments higher than those from the

defendants who settled earlier on, and defendants have made it clear that they are unwilling to pay anything close to what earlier settling defendants did. This posture may, of course, change on one side or both. But settlement—and thus the opportunity for an attempted "sellout" by counsel—appears relatively unlikely at this point.

That said, the breach here was a significant one. The ability of a court to trust counsel matters, particularly when counsel represents a class. Here counsel have impaired that trust in a significant way. And there is no way to predict with certainty that this will not matter going forward. If nothing else, there is a risk that current class counsel may pull their punches to avoid a perceived risk of antagonizing the Court.

On the other side of the ledger, however, removal of all the current attorneys poses a very high risk of impairing the prosecution of the case going forward. The current lawyers have spent years preparing and developing the case; they are familiar with its strengths and weaknesses; and they have developed a strategy that has enabled them to achieve significant settlements and ready the case for trial. The putative class risks being seriously harmed if current counsel are removed completely.

Weighing these competing concerns is not easy. Given counsels' candor problem, the Court concludes that there is at least significant doubt that current class counsel, even with GLC out of the mix, are adequate within the meaning of Rule 23(a). But the level of doubt is insufficient to require their removal entirely. Instead the Court concludes that the appropriate measure—both to protect the class and avoid unfairly prejudicing it—is to require bringing in new lead counsel outside the current group. If this is done, and the new counsel is shown to be adequate, then the Court will grant the motion for class certification and appoint the new counsel as the lead, with FNF and

Berger as co-counsel. If new and adequate lead counsel is not brought in, then the balance will tip the other way, and the Court will deny the motion for class certification.

The Court therefore defers entry of a ruling on the motion for class certification. Plaintiffs are given 21 days, to file a submission proposing new lead class counsel.

**Conclusion**

In sum, the Court grants plaintiffs' motion to amend their motion for class certification and withdraws from consideration as class counsel the attorneys associated with Gilbert Litigators and Counselors [dkt. 1236, 1237]. The Court enters and continues plaintiffs' motion for class certification [dkt. 757] and gives plaintiffs 21 days, to April 21, 2026, to file a motion proposing new lead class counsel. The case is set for an in-person status hearing on April 28, 2026 at 9:30 a.m.

MATTHEW F. KENNELLY
United States District Judge

Date: March 31, 2026

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLANDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated,** | ) |
| **Plaintiffs,** | ) |
| **vs.** | ) **Case No. 22 C 125** |
| **BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,** | ) |
| **Defendants.** | ) |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Plaintiffs Andrew Corzo, Sia Henry, Michael Maerlander, Alexander Leo-Guerra, Brandon Piyevsky, Benjamin Shumate, Brittany Tatiana Weaver, and Cameron Williams have moved to certify a class of persons similarly situated on their claims against

defendants, a group of private universities. The defendants include Brown University (Brown), California Institute of Technology (CalTech), University of Chicago (Chicago), the Trustees of Columbia University in the City of New York (Columbia), Cornell University (Cornell), the Trustees of Dartmouth College (Dartmouth), Duke University (Duke), Emory University (Emory), Georgetown University (Georgetown), the Johns Hopkins University (Johns Hopkins), Massachusetts Institute of Technology (MIT), Northwestern University (Northwestern), University of Notre Dame Du Lac (Notre Dame), the Trustees of the University of Pennsylvania (Penn), William Marsh Rice University (Rice), Vanderbilt University (Vanderbilt), and Yale University (Yale). Plaintiffs allege that defendants participated in a horizontal price-fixing scheme in violation of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

A key disputed issue regarding plaintiffs' motion involves testimony from their expert, Dr. Hal Singer. In conjunction with their opposition to class certification, defendants have moved to exclude much of Dr. Singer's proposed testimony, as well as the proposed testimony of two other expert witnesses, Dr. George Bulman and Elizabeth Mora. For their part, plaintiffs have moved to exclude the testimony of two of defendants' experts, Dr. Bridget Terry Long and Peter Ammon. The Court has deferred ruling on plaintiffs' motion for class certification pending further briefing regarding the adequacy of class counsel. The testimony of at least some of the parties' experts is, however, also pertinent to the defendants' pending motion for summary judgment. For this reason, and because the parties' motions regarding the experts are ripe for ruling, the Court has determined to go ahead and address those motions.

## Background

The background of this case has been taken from the parties' briefs and the complaint.

### A. Factual background

According to plaintiffs, defendants—all "elite, private universities"—were each "members of the '568 Presidents Group' at some point between January 1, 1998, and November 4, 2022." Pls.' Mem. in Supp. of Mot. for Class Certification at 5. The Group derived its name from Section 568 of the Improving America's Schools Act of 1994, which permitted "institutions of higher education" like defendants "to award [students admitted on a need-blind basis] financial aid only on the basis of demonstrated financial need for such aid" and "to use common principles of analysis for determining the need of such students for financial aid if the agreement to use such principles does not restrict financial aid officers at such institutions in their exercising independent professional judgment with respect to individual applicants for such financial aid." 15 U.S.C. § 1 note. "[I]nstitutions of higher education" are exempted from antitrust laws under section 568 if "all students admitted are admitted on a need-blind basis." *Id.* Section 568 defined "on a need-blind basis" as "without regard to the financial circumstances of the student involved or the student's family." *Id.* In other words, the Act permits institutions of higher education to use common principles when determining how much financial aid to offer a student—and thus, according to plaintiffs, limit competition among themselves—but avoid a federal antitrust violation so long as the institutions adhere to section 568's requirements.

According to plaintiffs, the 568 Group operated the alleged price-fixing

conspiracy by requiring each participant in the Group to adhere to an "Overarching Agreement," which plaintiffs allege included the following:

> (a) to apply several core principles in awarding aid, which included the agreement to make need-based aid the primary form of financial aid and to base it on student and family "ability to pay," (b) to use the College Board's standard IM (or "Base IM") as the foundation for developing a "Consensus Methodology," (c) to use agreed-upon guidelines for applying "professional judgment" in modifying the [Expected Family Contributions] that the Consensus Methodology generated, and (d) to share information with each other regarding their annual calculations of financial aid.

Pls.' Mem. in Supp. of Mot. for Class Certification at 7.

**B. Litigation history**

On January 9, 2022, plaintiffs filed suit against the defendants, alleging that each "participated and are participating in a price-fixing cartel that is designed to reduce or eliminate financial aid as a locus of competition, and that in fact has artificially inflated the net price of attendance for students receiving financial aid." Second Am. Compl. ¶ 1. They have sued for actual damages or restitution. *Id.* at 70.

Defendants moved to dismiss the complaint, a motion the Court denied in August 2022. *See Carbone v. Brown Univ.*, 621 F. Supp. 3d 878, 894 (N.D. Ill. 2022). Discovery is now complete or virtually so. The plaintiffs have moved for class certification under Federal Rule of Civil Procedure 23(a) and 23(b)(3).[1] In addition, the remaining defendants have moved for summary judgment on various grounds.

**C. Plaintiffs' motion for class certification**

Though the Court is not ruling on plaintiffs' motion for class certification in this

[1] Plaintiffs initially sought class certification under Rule 23(b)(2) as well, but according to plaintiffs' motion for class certification, "the alleged conspiracy disbanded in the fall of 2022, mooting the need for injunctive relief." Pls.' Mem. in Supp. of Mot. for Class Certification at 1 n.1.

opinion, a brief description of the motion is needed to provide appropriate background for the expert-related motions that the Court is addressing.

Plaintiffs seek certification of the following proposed Class:

> All persons who have during the Class Period (a) enrolled in one or more Defendants' full-time undergraduate programs, (b) received at least some need-based financial aid from one or more Defendants, and (c) whose tuition, fees, room, or board to attend one or more Defendants' full-time undergraduate programs was not fully covered by the combination of any types of grant or merit aid in any undergraduate year.

Pls.' Mem. in Supp. of Mot. for Class Certification at 1. This proposed Class is limited to individuals who "first enrolled in one of Defendants' full-time undergraduate programs" during the time periods outlined below. *See* Second Am. Compl. ¶ 223. The following individuals are excluded from the proposed Class:

> Any Officers and/or Trustees of Defendants, or any current or former employees holding any of the following positions: Assistant or Associate Vice Presidents or Vice Provosts, Executive Directors, or Directors of Defendants' Financial Aid and Admission[s] offices, or any Deans or Vice Deans, or any employees in Defendants' in-house legal offices; and [a]ny person who was not a U.S. citizen or permanent resident at the time such person attended a full-time undergraduate program and received at least some need-based financial aid from one or more Defendants.

Pls.' Mem. in Supp. of Mot. for Class Certification at 1 n.3; *see also* Second Am. Compl. ¶ 224. The proposed Class also excludes "the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person." Second Am. Compl. ¶ 224.

Plaintiffs propose to define the Class period as follows:

> (a) For Brown, Dartmouth, and Emory—from fall term 2004 through June 30, 2023. (b) For Chicago—from fall term 2003 through June 30, 2014. (c) For Columbia, Cornell, Duke, Georgetown, MIT, Northwestern, Notre Dame, and Rice—from fall term 2003 through June 30, 2023. (d) For Penn—from fall term 2003 through June 30, 2019. (e) For Vanderbilt—from fall term 2003 through June 30, 2020. (f) For Yale—from fall term 2003

> through June 30, 2007, and from fall term 2018 through June 30, 2023. (g) For CalTech—from fall term 2020 through June 30, 2023. (h) For Johns Hopkins—from fall term 2022 through June 30, 2023.

Singer Am. Rep. ¶ 9. This Class period is meant to reflect the specific periods when each defendant is claimed to have been a member of the 568 Group.

**Discussion**

The Seventh Circuit has held that "[w]hen an expert's report or testimony is 'critical to class certification,' . . . a district court must make a conclusive [*Daubert*] ruling on any challenge to that expert's qualifications or submissions before it may rule on a motion for class certification." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012) (quoting *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010)). In addition, as the Court has noted, the testimony of at least some of the parties' experts is pertinent to the pending motion(s) for summary judgment. The Court begins by addressing defendants' motion to exclude the testimony of Dr. Hal Singer, which appears to be bear on both class certification and summary judgment.

## A. Motion to exclude Dr. Singer

Federal Rule of Evidence 702 governs the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. More generally, the rule requires the trial judge to act as a gatekeeper and "ensure that any and all expert testimony or evidence admitted 'is not only relevant, but reliable.'" *Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 806 (7th

Cir. 2013) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)). Though *Daubert* interpreted an earlier version of Rule 702, "it remains the gold standard for evaluating the reliability of expert testimony and is essentially codified in the current version of Rule 702." *Id.*

As indicated in the language cited above, the twin concerns of *Daubert* and Rule 702 are relevance and reliability. *See Daubert*, 509 U.S. at 594–95 ("[Rule 702's] overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission."). Relevance, as set forth in the language of Rule 702, follows the standard of Rule 401. *Compare* Fed. R. Evid. 702(a) (requiring a court to determine that testimony will help the trier of fact "to understand the evidence or to determine a fact in issue") *with* Fed. R. Evid. 401 (evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action").

"Reliability, however, is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower*, 732 F.3d at 806. The Seventh Circuit has repeatedly stated that "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Id.* (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)); *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) ("Rule 702's requirement that the district judge determine that the expert used reliable methods does

not ordinarily extend to the reliability of the conclusions those methods produce—that is, whether the conclusions are unimpeachable."). A court inappropriately usurps the role of the jury "if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed." *Manpower*, 732 F.3d at 806.

That said, "conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The Court must therefore scrutinize an expert's methodology by considering, among other factors, "(1) whether the theory has been or is capable of being tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential rate of error; and (4) the theory's level of acceptance within the relevant community." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011) (citing *Daubert*, 509 U.S. at 593–94). Put differently, a court must assess whether an expert "utilize[d] the methods of the relevant discipline" to reach opinions that are "reasoned and founded on data." *Id.* The Supreme Court has made clear that district courts have flexibility in determining whether the methodology employed is reliable under Rule 702. *See Daubert*, 509 U.S. at 594.

In seeking class certification and opposing summary judgment, plaintiffs rely on the proposed testimony of Dr. Hal Singer, an expert in economics and econometrics. In particular, plaintiffs retained Dr. Singer to address four main issues:

> (1) whether Defendants collectively had sufficient market power to inflate their Effective Institutional Prices (EIPs) above competitive levels through collusion; (2) whether the Challenged Conduct ("CC") was consistent with conspiracy and inconsistent with unfettered competition and unilateral conduct; (3) whether the CC inflated EIPs to the vast majority of Class members; and (4) whether damages to the Class as a whole could be

computed with standard economic methods.

Pls.' Mem. in Opp. to Defs.' Mot. to Exclude at 1–2. Dr. Singer authored three expert reports addressing these four issues and addressing critiques from defendants' own experts. Plaintiffs also included a Declaration from Dr. Singer in response to defendants' motion to exclude his testimony.[2]

Defendants do not challenge Dr. Singer's qualifications but instead contend that his conclusions are unreliable. The thrust of defendants' argument boils down to three main points: (1) Dr. Singer's regression analysis, upon which he bases the bulk of his conclusions, is methodologically unreliable; (2) Dr. Singer offers certain opinions that are outside the scope of his claimed expertise; and (3) Dr. Singer's market definition is flawed because he uses the wrong methodology and his conclusions are unsupported by the data. In short, defendants contend that Dr. Singer's opinions are "junk science, beyond the scope of his expertise, or both." Defs.' Mem. in Supp. of Mot. to Exclude at 5.

**1. Dr. Singer's regression analysis**

Defendants contend that Dr. Singer's opinions are the result of pre-determined outcomes derived from a faulty regression. According to defendants, Dr. Singer's regression model was designed to force the results described below. Defendants highlight four specific issues with the regression analysis, which they contend

[2] Defendants have moved to strike Singer's declaration as untimely. *See* Defs.' Am. Reply in Supp. of Mot. to Exclude at 4. The Court will address these arguments later in this opinion.

"epitomizes junk science."[3] *Id.* at 3.

Dr. Singer was retained to assess whether the alleged conspiracy existed and, if so, whether it caused classwide antitrust impact. To make this determination, Singer employed a two-step method. He claims the data shows, first, that class members paid artificially inflated prices and, second, that substantially all class members were impacted by this price inflation. At a general level, this two-step method has been "broadly accepted" as a reliable means to show antitrust impact across a class. *See, e.g.*, *In re Broiler Chicken Grower Antitrust Litig. (No. II)*, No. 6:20-md-02977-RJS-CMR, 2024 WL 2117359, at *29 (E.D. Okla. May 8, 2024) (hereinafter *Chicken Grower*) (relying on Dr. Singer's "broadly accepted two-step method" to certify a Rule 23(b)(3) class); *In re Restasis Antitrust Litig.*, 335 F.R.D. 1, 15 (E.D.N.Y. 2020) (finding that the expert relied on the "commonly accepted two-step method to prove classwide injury-in-fact"). At a high level, Singer's model first measures the effect, if any, of the challenged conduct by comparing the price that Class members actually paid "against a benchmark that involved pricing during periods where Defendants were not formally part of the 568 Group." Singer Am. Rep. ¶ 227. Having found that the challenged conduct did result in inflated prices, Singer next runs an in-sample regression to determine whether this price inflation impacted members across the Class. *See id.* ¶¶ 252–255. Singer describes this as a "before-after methodology" and contends that "this standard empirical approach enjoys frequent application in both research and litigation." *Id.* ¶ 227.

Because defendants challenge many aspects of Singer's regression, it is worth

---

[3] Throughout their motion, defendants repeatedly refer to the regressions of Drs. Singer and Bulman as junk science. The frequency with which defendants use this term does not make their argument more convincing.

discussing the model in some detail. In Step 1, Dr. Singer uses an "impact regression . . . to determine whether the [challenged conduct] caused Class members to pay artificially inflated Effective Institutional Price (EIP)." Pls.' Mem. in Opp. to Defs.' Mot. to Exclude at 8. EIP is a different metric from net price, which has a statutory definition:

> The term "net price" means the average yearly price actually charged to first-time, full-time undergraduate students receiving student aid at an institution of higher education after deducting such aid, which shall be determined by calculating the difference between the institution's cost of attendance for the year for which the determination is made and the quotient of the total amount of need-based grant aid and merit-based grant aid, from Federal, State, and institutional sources, provided to such students enrolled in the institution for such year, and the total number of such students receiving such need-based grant aid or merit-based grant aid for such year.

20 U.S.C. § 1015a(a)(3).[4] Singer's EIP, on the other hand, is "the cost of attendance minus institutional need-based grants and scholarships." Singer Am. Rep. ¶ 7. According to Singer, "[s]ubtracting third-party grants and scholarships from the Effective Institutional Price would yield the net price" as defined by the Department of Education. *Id.* Singer says that he utilizes EIP rather than net price "because it is the effective price that Defendants charge, after deducting the institutional aid they provide (but without considering grant aid that federal and state governments, and other third-party sources, may provide)." *Id.*

---

[4] This statutory definition is codified in a section titled "Transparency in college tuition for consumers." *See* 20 U.S.C. § 1015a. The statutory definition is meant to ensure that the net price listed on the "College Navigator website" operated by the Department of Education is calculated using a uniform standard for the purposes of tuition transparency for prospective students. *See, e.g.*, *id.* § 1015a(b) ("In making the calculations regarding . . . net price, . . . with respect to a public institution of higher education, the Secretary shall calculate the . . . net price . . . at such institution in the manner described in subsection (a) . . . .").

The results of Singer's Step 1 impact regression show that participation in the 568 Group "artificially inflated [EIP] by $1,485 on average per Class Member-academic year as a result of the Challenged Conduct." *Id.* ¶ 249; *see id.* Table 11. After adjusting his impact regression to account for a number of defendants' rebuttal experts' proposed "data-processing adjustments," Dr. Singer found an "artificial overcharge of $1,202 per Class Member and academic year." Singer Rebuttal Rep. ¶¶ 72, 150; *see id.* Table 6. This second impact regression, upon which plaintiffs primarily rely, utilizes data from 701,220 observations. *See id.* Table 6.

Step 2 of Singer's two-step method utilizes the findings from Step 1 to "demonstrate how the generalized price effect captured in [Singer's] regressions impacted all or almost all Class Members." Singer Am. Rep. ¶ 217. At Step 2, Singer uses both qualitative and quantitative evidence and conducts several analyses to determine whether the impact indicated from Step 1 was felt classwide. These analyses include a "common shock" analysis and a series of regression analyses utilizing the qualitative data. Singer also deploys one quantitative method: "a standard statistical methodology called 'in-sample prediction,'" which he contends "is capable of identifying individual class members who may have escaped injury in the presence of generalized (inflationary) price effects." Pls.' Mem. in Opp. to Defs.' Mot. to Exclude at 10 (citing Singer Am. Rep. ¶¶ 255–261). According to plaintiffs, Singer's in-sample prediction corroborates the findings of Step 1 and shows that the alleged conspiracy resulted in common impact across the class.

Defendants contend that Dr. Singer's regression models are the result of manipulations of data and flawed methodologies. They dispute Singer's use of EIP as

the dependent variable in his impact regression formula and the manner in which he selected and cleaned his data, and they challenge specific data that he excludes or includes to reach his results. Defendants also contend that Singer's impact regression *imposes* common impact. Specifically, defendants challenge Singer's decision to utilize a single variable for the challenged conduct. They contend that, by using a single conduct variable, Singer's analysis assumes that all defendants participated in the alleged scheme in the same manner simply by being members of the 568 Group. According to defendants, this assumption results in a regression that forces a showing that students paid a higher EIP and were thus impacted by the challenged conduct. Defendants further challenge Singer's in-sample regression, arguing that it similarly "imposes" a finding of impact and is based on an unreliable methodology and therefore must be excluded.

**a. Singer's use of EIP**

First, defendants contend that Singer's regression model is irrelevant to the issue of antitrust injury because it measures EIP, which they contend is an invented metric and not the actual net price students paid during the Class period. Defendants argue that EIP is almost always higher than net price because it omits numerous sources of financial aid. According to defendants, EIP is not relevant to the issue of whether students paid an overcharge because overcharge is "measured by the difference between the price paid and what the market or fair price would have been." Defs.' Mem. in Supp. of Mot. to Exclude at 6 (quoting *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 489 (1968)). Defendants thus contend that using EIP does not reflect the *actual* price students paid because it does not reflect the full scope of

financial aid from federal and state governments or other third parties. And because it does not reflect the actual price paid, defendants say, EIP cannot be used to support a conclusion that students were overcharged due to the challenged conduct.

The Court does not find these arguments persuasive. First of all, the alleged conspiracy involves coordination by the defendants to reduce competition by setting a cap on how much need-based financial aid a school could offer based on a student's family income and assets. The allegation, in other words, is that defendants specifically limited one category of financial aid to prevent "bidding wars" among themselves. Pls.' Mem. in Supp. of Mot. for Class Certification at 7. Given the nature of the alleged conspiracy, it is beside the point whether an individual student, or even every student admitted, obtained additional funds from sources other than need-based financial aid from a university.

Singer explains why he opted to use EIP rather than net price, and the Court finds his explanation logical. Singer was retained to test whether a specific category of funding was manipulated by defendants, consistent with plaintiffs' allegations regarding the nature of the claimed conspiracy. Consistent with this, he constructed a regression analysis that elected to use a particular dependent variable rather than another—that is, EIP instead of net price. "[T]he selection of the variables to include in a regression analysis is normally a question that goes to the probative weight of the analysis rather than its admissibility." *Manpower*, 732 F.3d at 808. Should defendants wish to raise their issues regarding EIP, the proper place to do so is on cross-examination. Whether Singer selected the "best data set to use" when opting to measure EIP instead of net price "is a question for the jury, not the judge." *Id.* at 809.

**b. Singer's selection of data**

Second, defendants challenge the data that Singer included in and excluded from his regression. According to defendants, Singer selected only the data that produced an overcharge when fed into his model and disregarded the rest. They contend that Singer's regression is unreliable due to selection bias. *See Joiner*, 522 U.S. at 146 ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Defendants raise four specific issues regarding Singer's dataset. First, Singer "excludes students whose institutional grant aid covered more than 95% of the cost of attendance," who Singer refers to as full-ride students. Defs.' Mem. in Supp. of Mot. to Exclude at 6. According to defendants, this results in an exclusion of "more than 83,000 observations across more than 40,000 students." *Id.* Next, "Singer excludes data from non-defendant 568 Group members." *Id.* at 8. Third, "Singer omits 2016-2023 data from the University of Chicago." *Id.* at 9. Finally, defendants say, "Singer includes fundamentally unreliable data." *Id.* at 11. Specifically, Singer utilizes data from the 2024–2025 academic year as evidence of a "clean" benchmark period after the 568 Group had disbanded and the alleged conspiracy ended. Defendants contend, however, that this data is "incomplete" because it only contains "estimates of students' non-final early decision and early application [financial aid] awards." *Id.* Singer also uses data from the 2023–2024 academic year, another allegedly "clean" benchmark period, which defendants challenge as incomplete because "six defendants report no paid financial aid awards at all; Caltech reports only about ¼ as many institutional aid awards as in 2022; and Duke reports more than 90% fewer institutional grants offered

than in 2022." *Id.*

Defendants' arguments, at base, amount to contentions that Singer used the wrong data for his regression. But whether Singer used the wrong data, or even incorrect or incomplete data, goes to the weight to be afforded to his model. *See Manpower*, 732 F.3d at 809 ("Whether [the expert] selected the best data set to use, however, is a question for the jury, not the judge. Assuming a rational connection between the data and the opinion—as there was here—an expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility."). This is not grounds for exclusion under *Daubert* and Rule 702; the Supreme Court, the Seventh Circuit, and numerous other courts have repeatedly emphasized this point. *See id.* at 808 ("[T]he Supreme Court and this Circuit have confirmed on a number of occasions that the selection of the variables to include in a regression analysis is normally a question that goes to the probative weight of the analysis rather than to its admissibility."); *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (per curiam) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility."); *In re Allstate Corp. Secs. Litig.*, No. 16 C 10510, 2022 WL 842737, at *9 (N.D. Ill. Jan. 10, 2022) ("[D]isagreements over which time period to use or how to weight individual states reflect a classic dispute among the experts over the choice of inputs, which is inappropriate to resolve at this *Daubert* juncture."); *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 WL 5767415, at *12 (E.D. Pa. July 29, 2015) ("Even if the data relied on by the expert is imperfect, and more (or different) data might have resulted in a better or more accurate estimate in the absolute sense, it is not the district court's role under *Daubert* to

evaluate the correctness of facts underlying an expert's testimony." (cleaned up)). Accordingly, defendants' assertion that Singer's regression does not include all of the purportedly relevant data, or even that it omits large chunks of data, does not provide a viable basis under *Daubert* for exclusion of his opinions.

That said, defendants are correct that Singer does not have carte blanche to make decisions about what data to utilize for his regression analysis. An expert, for instance, may not "rely on data that has no quantitative or qualitative connection to the methodology employed." *Manpower*, 732 F.3d at 808. In addition, the text of Rule 702 requires a court to determine that an expert's "testimony is based on sufficient facts or data," and thus a court must assess whether "the expert considered sufficient data to employ the methodology." *Id.* (first quoting Fed. R. Evid. 702(b), then quoting *Stollings*, 725 F.3d at 766). And "an expert must employ 'those kinds of facts or data' on which experts in the field would reasonably rely." *Id.* (quoting Fed. R. Evid. 703).

The Court concludes that none of the points defendants raise regarding Dr. Singer's data set make his regression unreliable under *Daubert* and Rule 702 such that it should be excluded. Nothing that defendants point to indicates an impermissibly biased selection of data. As a starting principle, Singer may select the data that he concludes is appropriate so long as other experts in the economics and econometrics field would do the same. That is the case here.

For instance, concern that Singer omitted "more than 83,000 observations" of full-ride student data does not automatically mean that Singer's model is unreliable. *See id.* at 807 ("[T]he selection of data inputs to employ in a model is a questions separate from the reliability of the methodology reflected in the model itself."). Singer

defends his choice to exclude full-ride students by emphasizing that his assignment was to measure any potential effect of the challenged conduct on members of the proposed Class, which expressly excludes students "whose tuition, fees, room, or board to attend one or more of Defendants' full-time undergraduate programs *was not fully covered* by the combination of any types of grants or merit aid in *any undergraduate year*." *See* Singer Am. Rep. ¶ 8. Defendants point out that Singer omitted data from students who received "only" 95% of their tuition in aid, noting that these students are not "full-ride" students in the literal sense, as they had to make up the 5% not covered by grants or other financial aid. But again, Singer explains that he excluded these students for a valid reason: "the available data indicates the average COA for full-time *on campus* students per school per year. But many students live off-campus which tends to be cheaper, and thus incurs [sic] a lower COA than the available data would indicate." Pls.' Mem. in Opp. to Defs.' Mot. to Exclude at 19 n.37. Put differently, Singer's decision to classify students receiving 95% financial aid as full-ride, and then to exclude these students from his sample, was part of his data-cleaning process (more on this below). In order to properly assess impact on plaintiffs' proposed class, Singer contends that it is necessary to construct a regression that utilizes data from potential class members only. Plaintiffs argue that Singer accordingly used his knowledge and understanding of how available data may not adequately convey the nuances of a student's financial obligations (i.e., that COA differs between on-campus and off-campus students in ways not reflected in the data) to justify removing these 95%-funded students from his sample. Further, omitting 83,000 observations may mean that an expert's opinions are not based on sufficient facts or data, but such a determination is context-specific. Here,

Singer's regression model contains over 700,000 observations, even without the additional 83,000 observations from full-ride students. *See* Singer Rebuttal Rep., Table 6. This is a sufficient dataset to run his regression.[5]

The Court is also unpersuaded that Dr. Singer's exclusion of certain post-2015 data from University of Chicago renders his regression unreliable. Singer explains that Chicago changed database software in 2016, and as a result roughly forty percent of the observations in the post-2015 data do not distinguish university aid from third-party aid. *See id.* ¶ 110. Singer contends that he reviewed the post-2015 data and "found that Chicago did not maintain consistency in how it recorded data" when switching software. *Id.* As a result, Singer opted to exclude this post-2015 data as part of his data-cleaning process. Data cleaning is a standard process; it is listed as one of the "Ten Commandments of Applied Econometrics" in the late economist Peter Kennedy's textbook, *A Guide to Econometrics*. *See* Peter Kennedy, *A Guide to Econometrics* 362–64 (6th ed. 2008). "Data cleaning looks for inconsistencies in the data—are any observations impossible, unrealistic, or suspicious?" *Id.* at 364. According to Singer, that is precisely what he did: reviewed the data from University of Chicago, found that the post-2015 data presented "implausible" "inconsistenc[ies]," and determined to exclude it. Singer Rebuttal Rep. ¶ 111; *see also id.* ¶¶ 110–113, Fig. 1. The Court finds that there is a rational and reasonable basis for Singer's decision to exclude this post-2015 University of Chicago data. Defendants' arguments that this data makes Singer's opinions less probative are appropriately addressed to the jury via cross examination

[5] Defendants' challenges regarding the exclusion of data from non-defendant members of the 568 Group are unpersuasive for similar reasons.

and presentation of contrary evidence, not by excluding his opinions.

Finally, defendants' contention that Singer included incomplete data from the 2023–2024 and 2024–2025 academic years amounts to an argument about the weight a factfinder should assign to his regression. The Court's task here is focused on determining whether there is "a rational connection between the data and the opinion," *Manpower*, 732 F.3d at 809, such that Singer's opinion "is [not] connected to existing data only by [his] *ipse dixit*." *Joiner*, 522 U.S. at 146. There appears to be no question that the data from these years that Singer included is relevant; the question is whether he should have excluded it because it is incomplete. But whether Singer relied on incomplete, "faulty information is a matter to be explored on cross-examination." *Manpower*, 732 F.3d at 809.

**c. Singer's impact regression**

Defendants also argue that Dr. Singer's impact regression from Step 1 of his model imposes a finding of common impact by "assuming that each defendant engaged in the challenged conduct in the exact same way, without change, over the entire period he analyzed." Defs.' Mem. in Supp. of Mot. to Exclude at 12. Singer's impact regression measures the effect of the challenged conduct on EIP by "us[ing] a single conduct variable across all Defendants and academic years" to "produce a single, common overcharge." Singer Rebuttal Rep. ¶ 74. Defendants contend that this is a flawed analysis because it assumes each defendant adhered to the challenged conduct by virtue of membership in the 568 Group. This assumption, according to defendants, is "implausible because the challenged conduct differed between defendants and changed over time." Defs.' Mem. in Supp. of Mot. to Exclude at 12.

The Court is not persuaded by defendants' arguments that the differences in conduct among defendants or across time render Singer's impact regression unreliable and therefore inadmissible. The fact that different schools changed how they packaged aid over time does not really influence Singer's impact regression. Nor does defendants' argument that schools differed in how they applied the CM Guidelines and thus how they are claimed to have engaged in the challenged conduct. Singer was assigned to test whether the conspiracy that plaintiffs allege could have existed. The fact that he utilized a single, uniform conduct variable to test for a conspiracy appears to the Court to be plausible and reasonable. In a given conspiracy, though all members must be shown to have adopted the conspiracy's goals, that does not mean that for a conspiracy to exist, all of them have to do the same thing to carry out those goals. In other words, not every school needed to package aid in exactly the same way, or adhere to precisely the same CM Guidelines, to have agreed to the conspiracy and engaged in at least some of the challenged conduct.

In this regard, Singer's model does not impose a finding of common impact. Rather it tests for one, using variables that are rationally connected to what Singer was testing for. Though defendants bring up several fair points that may limit or undermine the probative value of Singer's impact regression, that is a matter regarding the weight to be given to the analysis, not a basis for its exclusion.

**d. Singer's in-sample regression**

Defendants' final argument against Singer's regression analysis targets his in-sample regression from Step 2 of his model. Defendants contend that the in-sample regression is flawed in part because it relies on the results from Singer's impact

regression. The Court has already addressed the reliability and admissibility of Singer's impact regression from Step 1, and thus for the reasons the Court has described defendants' argument that the in-sample regression is faulty because of its reliance on the impact regression is unavailing.

Defendants also argue that the in-sample regression is flawed and should be excluded for reasons independent of the results of Step 1. They contend that Singer's in-sample regression "shows wildly varying results between years for many students," yet his analysis nevertheless indicates that these students suffered "an identical average annual overcharge for them and nearly every other class member." *Id.* at 16. According to defendants, this and results like it indicate that the model is unreliable and "mathematically rigged to artificially show harm." *Id.* at 17. Defendants attribute this flaw to "a critical methodological error." *Id.* at 18. According to defendants:

> Singer's regression calculates the difference between a class member's actual EIP and the hypothetical "but-for" EIP. The "but-for" EIP has two components: (1) the uniform effect the model attributes to the challenged conduct and (2) the regression's "residual," which represents unexplained price variation. But by incorporating student fixed effects, Singer mathematically ensures that the residuals for each student's observation will sum to zero. This technical constraint leads to a predetermined outcome: students with observations entirely during the defendant-schools' 568 Group membership will *always* show a net harm equal to Singer's average EIP overcharge multiplied by the number of observations for that students.

*Id.* Put differently, defendants contend that Singer's in-sample regression is designed to always reflect a $1,202 overcharge from the impact regression. Because this $1,202 overcharge occurs each year, a student whose enrollment in a defendant school overlaps entirely with the defendant's membership in the 568 Group will show a net harm of $4,808—$1,202 multiplied by four years of attendance.

Defendants further contend that, when questioned about these results during his deposition, Dr. Singer "concede[d] his regression model is unreliable." *Id.* at 17. Defendants highlight a particular instance of a student who attended Cornell; Singer's in-sample regression shows that the challenged conduct harmed the student "by $1,282 in year one, harmed this student by $4,030 in year two, and *benefited* this student by $9,487 in year three, only to have again harmed the student in year four by $8,983, for a total overcharge of $4,808 over four years." *Id.* at 16–17. When asked about these results, and specifically the in-sample model showing a $9,487 undercharge, Singer responded that his model "just could not have predicted that this student would" have a lower EIP for the third year and that, ultimately, "[t]he regression can't explain why it was so low." *Id.* at 17 (citing Singer Dep. 270:9–273:6). Singer's inability to explain these allegedly implausible results, defendants contend, warrants exclusion of the in-sample regression under *Daubert* and Rule 702.

The Court is not persuaded by defendants' arguments. After a thorough review of Singer's in-sample regression and his reasons justifying it, including during the *Daubert* hearing (during which Singer testified), the Court is persuaded that his methodology was reliable and does not force a result, as defendants contend. Regarding the example of the Cornell student referenced above, as well as other students that defendants highlighted during the *Daubert* hearing, it is unsurprising that a sample as large as the one Singer used for the in-sample regression would yield some unexpected results. Singer's in-sample regression analysis includes data from 224,744 Class members. *See* Singer Am. Rep., Table 12. In simplest terms, a "[r]egression analysis permits the comparison between an outcome (called the dependent variable)

and one or more factors (called independent variables) that may be related to that outcome." *Manpower*, 732 F.3d at 808; *see also* Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, in *Reference Manual on Scientific Evidence* 333–36 (3d ed. 2011). According to Professor Daniel Rubinfeld, "[m]ultiple regression analysis . . . is a method in which a regression line is used to relate the average of one variable—the dependent variable—to the values of other explanatory variables." Rubinfeld, *supra*, at 334. A regression analysis can "predict the value of one variable using the values of others" as indicated by a "regression line," which is "the best-fitting straight line through a set of points in a scatterplot." *Id.* at 334–35. In other words, a regression will always have instances where some datapoints are below the regression line, and some are above. And in a sample as large as the one Dr. Singer used for his in-sample regression, it is unsurprising that there would be instances in the data that are far above or far below the regression line.

In response to defendants' critiques, Singer conducted another in-sample regression. As an initial matter, defendants contend that Singer's declaration containing this new in-sample regression should be stricken as untimely according to Federal Rule of Civil Procedure 26(a)(2), which sets forth requirements for disclosure of expert testimony. Defendants say that this declaration was filed after the close of expert discovery and "address[es] criticisms defendants' expert made months" prior. Defs.' Am. Reply in Supp. of Mot. to Exclude at 4. They contend that this deprives them of a meaningful opportunity to respond, and they argue that this prejudice "cannot be cured without imposing undue costs or case delays." *Id.* The defendants therefore contend that exclusion of the declaration is "automatic and mandatory" under Rule 37(c)(1). *Id.*

at 5 (quoting *Karum Holdings LLC v. Lowe's Cos.*, 895 F.3d 944, 951 (7th Cir. 2018)). Under that rule, plaintiffs may rely on Singer's so-called untimely declaration only if their "failure" to adhere to the discovery deadline "was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Defendants contend that plaintiffs can make neither showing.

The Seventh Circuit has instructed courts to consider the following factors when determining whether to exclude testimony under Rule 37: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2000).

The Court overrules defendants' request to exclude Singer's declaration under Rule 37. In particular, the Court is unpersuaded that the defendants have been harmed by the timing of the declaration or face prejudice or surprise. In particular, they have had a full and fair opportunity to address the in-sample regression offered by Singer in this declaration in writing as well as orally, in connection with the *Daubert* hearing. And the other enumerated factors do not support exclusion under Rule 37 (among other things, there is no indication of bad faith or willfulness). Therefore, the Court declines to exclude Singer's declaration.

Returning to defendants' arguments regarding Singer's in-sample regression, they contend that "students *with observations entirely during the defendant-schools' 568 Group membership* will *always* show a net harm equal to Singer's average EIP overcharge multiplied by the number of observations for that student." Defs.' Mem. in Supp. of Mot. to Exclude at 18 (first emphasis added). Singer therefore ran an in-

sample regression using only "Class members who attended Yale during the period overlapping when it was in and when it was out of the 568 Group." Pls.' Mem. in Opp. to Defs.' Mot. to Exclude at 14. In other words, Singer's so-called Yale Model addresses defendants' concerns by using data from students whose observations are *not* entirely during the defendant-schools' 568 Group membership. These students are dubbed "straddlers" because their attendance straddles the defendant schools' membership in the 568 Group and, accordingly, the analysis should include data from periods when Yale was allegedly participating in the alleged conspiracy and periods when it was not.

Singer's Yale Model indicates that "81 percent of these transactions[6] were impacted—that is, 81 percent of this subset of transactions occurring prior to Yale having left the 568 Group in 2008 show higher actual Effective Institutional Prices than the predicted but-for prices." Singer Suppl. Rebuttal Rep. ¶ 72. Defendants' rebuttal expert, Dr. Stiroh, claims that in a "hypothetical scenario where the overcharge is zero, half of the *transactions* would show up as being harmed (i.e., having a higher actual price than the but-for predicted price)." *Id.* ¶ 71. This makes sense, given the explanation of how a regression line operates. If the in-sample regression showed no harm from the challenged conduct, then a "best-fitting line" drawn through the middle of the scattered transactions would be 50/50 because any overcharges would be balanced out by corresponding undercharges. The Yale Model shows that 81 percent of transactions resulted in harm, meaning that 81 percent of the data points were above

[6] Singer defines a "transaction" as "an observation in the data—that is, a specific Class Member-academic year instance." Singer Suppl. Rebuttal Rep. ¶ 71.

the regression line. This tends to support the proposition that Singer's other in-sample models were not forcing a result but rather were reflecting a common impact.

Put differently, Singer addressed defendants' concerns by running the Yale Model. This model continues to show a high level of common impact, which tends to support the proposition that his other in-sample regressions are reliable. Otherwise, the results would diminish upon changing the regression to account for defendants' contention regarding straddlers. Singer's Yale Model does show an impact—though admittedly less than the impact shown from his other in-sample regressions. Still, the Court is persuaded that Singer's methodology is reliable. Other experts have used this methodology in antitrust cases, and the econometrics literature reflects that this is an acceptable model for calculating antitrust impact. Further, the numerous in-sample regressions that Singer ran support his conclusion that the impact from the challenged conduct was shared across the class even after incorporating critiques from defendants' experts. As with the other challenges to Singer's regression analysis, issues regarding the data used and the conclusions reached from the in-sample regression are appropriately addressed by cross-examination and presentation of contrary evidence, not by exclusion of Singer's analysis.

In sum, none of the defendants' arguments regarding Dr Singer's regression analysis persuades the Court that it is unreliable and should be excluded under *Daubert* and Rule 702.

**2. Dr. Singer's opinions allegedly outside the scope of his expertise**

Defendants next contend that Dr. Singer attempts to offer opinions outside the scope of his economic expertise by "(1) restating cherry-picked evidence without any

methodology; and (2) musing about defendants' intent." Defs.' Mem. in Supp. of Mot. to Exclude at 20. Specifically, defendants challenge the opinions contained in Part II of Singer's amended report, in which he opines that "the record evidence cited herein" supports the allegation that "Defendants engaged in the alleged conspiracy to suppress the institutional grant aid and to artificially inflate Effective Institutional Price, and inconsistent with unfettered competition and unilateral conduct." Singer Am. Rep. ¶ 124. Defendants contend that these opinions are "impermissible assertions about defendants' intent" or are "high-level conclusions with no accompanying scientific methodology." Defs.' Mem. in Supp. of Mot. to Exclude at 21.

Defendants first argue that Dr. Singer simply collected and summarized evidence favorable to plaintiffs' theory of conspiracy and ignored documents contradicting that theory. *See* Singer Dep. 329:6–9 (when asked whether Singer looked for documents "that contradict [his] opinions," he replied that he did not "go look[ing] for them"). Defendants assert that for this reason, Singer's opinions that defendants' actions regarding financial aid packaging are inconsistent with unfettered competition and unilateral conduct must be excluded. *See Smith v. Ill. Dep't of Transp.*, 936 F.3d 554, 558–59 (7th Cir. 2019) (excluding an expert who "omitted a substantial set of facts from his analysis, and instead relied only on what appears to be plaintiff-curated records"). The Court reads this aspect of defendants' motion to be limited to challenging the qualitative evidence Singer relied upon, as opposed to the quantitative evidence.

Defendants further contend that Singer's opinions regarding how the challenged conduct may have affected financial aid packaging should be excluded because his analysis in this regard relies on this allegedly cherry-picked and biased reading of the

record and not on a reliable methodology. In particular, defendants argue that the qualitive evidence Singer relied on consists only of "cherry-picked deposition statements from Notre Dame's Director of Financial Aid, a consulting expert, and a College Board representative." Defs.' Mem. in Supp. of Mot. to Exclude at 22 (citing Singer Am. Rep. ¶¶ 188–191). According to defendants, Singer "ignored the copious evidence showing that there was no agreement on packaging." *Id.* Finally, defendants contend that Singer's findings regarding financial aid packaging are "contradicted by the record." *Id.* at 23.

The Court is unpersuaded that Dr. Singer impermissibly "cherry-picked" record evidence such that his opinions are, as a result, unreliable and subject to exclusion under Rule 702. As an initial matter, defendants' argument that Singer did not review significant portions of the factual record appropriately goes to the weight to be afforded to his opinions, not their admissibility. *See Manpower*, 732 F.3d at 808 (finding that "the selection of variables . . . is normally a question that goes to the probative weight of the analysis rather than to its admissibility"). Dr. Singer is not required to select what defendants consider to be the "best" record data to consider when reaching his conclusions, and a court should not "assess the quality of the data inputs" lest it risk invading the province of the jury. *Id.* at 806–07. Instead, a court assesses only whether there is "a rational connection between the data and the opinion." *Id.* at 809. Here, Singer's findings, as outlined in his expert report, are rationally connected to the data upon which he relies.

Defendants also contend that Dr. Singer seeks to offer opinions regarding defendants' state of mind. For example, defendants point out statements in Singer's

expert report in which he addresses defendants' perceptions of themselves, their intent with respect to the 568 Group and Consensus Methodology, and what various defendants may have concluded or the practices they may have adhered to. *See* Defs.' Mem. in Supp. of Mot. to Exclude, App'x (listing paragraphs where defendants allege Singer offered impermissible state-of-mind testimony). Defendants argue that expert opinions regarding intent must be excluded under Rule 702. *See United States v. Schultz*, No. 14 CR 467-3, 2016 WL 7409911, at *3 (N.D. Ill. Dec. 22, 2016) (collecting cases).

To the extent that Singer actually does opine on any given defendant's state of mind, the Court agrees that such opinions would be outside the scope of testimony that is permissible under Rule 702. That said, impermissible state-of-mind opinions can easily be excised without impacting Dr. Singer's overall conclusions. At this phase, the Court finds that defendants have not shown that Dr. Singer's ultimate conclusions should be excluded. Determining the specific parameters for and limitations upon Singer's testimony on these points is best addressed during the pretrial phase.

**3. Dr. Singer's market definition**

Finally, defendants challenge the reliability of the methodology Singer employed for his proposed market definition. Singer defines the relevant market as "Elite Private Universities whose undergraduate programs consistently ranked in the [U.S. News and World Report] Top 25 during the Class Period." Singer Am. Rep. ¶ 72. According to defendants, this market definition "is contradicted by the economic literature Singer cites and his own revealed-preferences analysis, does not find support in his so-called *Brown Shoe* factor analysis, and 'ignores' 'significant competition' where 'competition exists.'"

Defs.' Mem. in Supp. of Mot. to Exclude at 23 (quoting *In re IBM Peripheral EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 978 (N.D. Cal. 1979)). Because Singer reaches "illogical conclusions, drawn from an unreliable methodology," defendants contend, his opinion regarding the definition of the relevant market must be excluded. *Id.*

The Court is not persuaded that any of the deficiencies alleged by defendants warrant excluding Dr. Singer's opinion regarding the relevant market definition. As plaintiffs correctly point out, defendants' arguments on this point are largely directed towards Dr. Singer's conclusions. But challenges related to what evidence Singer relied upon (or disregarded) to reach his conclusions, or arguments that Singer's conclusions are contrary to the results of his studies, are more appropriate for cross-examination and presentation of contrary evidence; they do not justify exclusion under Rule 702. *See Manpower*, 732 F.3d at 809 ("[A]n expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility.").

Singer contends in his report that he is able to demonstrate defendants' collective market power through both direct and indirect evidence. As direct evidence, Singer points to his impact regression. Singer asserts that he was able to show through his impact regression analysis that defendants "artificially inflated the Effective Institutional Price during the Class Period to an economically and statistically significant degree," which would not have been possible "unless [defendants] collectively held market power over Class Members in the first place." Singer Am. Rep. ¶ 63. In his report, Singer cites to multiple scholarly articles supporting the proposition that "[e]conomists can demonstrate market power directly via evidence that Defendants raised prices over

competition levels or excluded rivals." *Id.* ¶ 62; *see, e.g.*, Aaron S. Edlin & Daniel J. Rubinfeld, *Exclusive or Efficient Pricing? The Big Deal Bundling of Academic Journals*, 72 Antitrust L.J. 119, 126 (2004) ("[I]f power [over price] can be shown directly, there is no need for market definition: the value of market definition is in cases where power cannot be shown directly and must be inferred from sufficiently high market share in a relevant market."). The Court has already concluded that Singer's impact regression model is reliable and thus admissible; the challenges that defendants assert against this model involve the weight to be given to particular evidence and are not an appropriate basis for exclusion.

Singer's report also addresses indirect evidence of market power. Singer utilizes the factors laid out in *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), to show the existence of the relevant market. These factors focus on "practical indicia" of market boundaries and include "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* at 325. In assessing the *Brown Shoe* factors, Singer conducted the following additional analyses:

> (1) [A] "peer analysis" quantifying the extent to which [elite private universities] perceived their undergraduate services as a separate market; (2) an analysis showing students were willing to travel longer distances (demonstrating product differentiation); and (3) a study of students' "revealed preferences," evaluating whether (and finding that) students "admitted to an institution in the relevant market consider and prefer other institutions in the relevant market more than institutions not in the relevant market."

Pls.' Mem. in Opp. to Defs.' Mot. to Exclude at 23 (internal citations omitted). Singer also uses a hypothetical monopolist test (HMT), "which evaluates a relevant market as

the smallest grouping of firms that would need to be combined through merger or collusion to sustain price increases substantially above the competitive levels for a significant amount of time." Singer Am. Rep. ¶ 64.

The Court finds that these methods of showing market power through indirect proof are the types of tests that experts in the field would employ, and that Singer applied these methods reliably. Courts have "routinely rel[ied] on the *Brown Shoe* factors to define the relevant product market," *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 118 (D.D.C. 2016), and "[a]ll factors need not be satisfied for the Court to conclude that [the plaintiff] has identified a relevant market." *FTC v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 355 (S.D.N.Y. 2024). The peer analysis, distances-travelled analysis, and revealed-preferences analysis that buoy Singer's *Brown Shoe* analysis all rely on publicly available data or data supplied by defendants. And though Singer employed a modified version of the HMT, he explains in his report why he made the modifications. *See* Singer Am. Rep. ¶¶ 79–81. Based on these explanations, the Court finds that Singer's use of the modified HMT does not deviate from the traditional HMT in a way that makes his=- findings unreliable. And again, the soundness of the conclusions reached from the HMT is appropriately addressed on cross-examination or by presentation of contrary evidence, not by exclusion.

To recap: the Court is not persuaded by defendants' arguments for exclusion of all or parts of Dr. Singer's opinions and analysis. After a thorough review of his report, multiple briefs, and an evidentiary hearing, the Court is persuaded that Singer has employed reliable methodologies in a reliable fashion to reach the conclusions in his report. Whether he used the "best" available data is an issue for another day. The

Court denies defendants' motion to exclude Dr. Singer.

**B. Remaining motions to exclude**

Defendants have also moved to exclude the testimony of Dr. George Bulman and Elizabeth Mora. Plaintiffs have moved to exclude the testimony of Dr. Bridget Terry Long and Peter Ammon. As previously stated, the twin concerns under *Daubert* and Federal Rule of Evidence 702 are relevance and reliability. *See Daubert*, 509 U.S. at 594–95. The Supreme Court in *Daubert* also makes clear that Federal Rule of Evidence 403 is applicable to expert testimony, and thus a court should exclude expert testimony "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Id.* at 595 (quoting Fed. R. Evid. 403).

The Court will first address defendants' motion to exclude Dr. Bulman and Ms. Mora before proceeding to address plaintiffs' motions regarding Dr. Long and Mr. Ammon.

**1. Defendants' motion to exclude**

**a. Dr. Bulman**

Defendants contend that Dr. Bulman offers the following three opinions, all of which defendants seek to exclude: "(1) defendants experienced substantial endowment growth; (2) defendants spent less on financial aid out of their endowment returns once the Class Period began; and (3) defendants could have spent more on financial aid." Defs.' Mem. in Supp. of Mot. to Exclude at 28. According to defendants, Dr. Bulman's second opinion should be excluded because his analysis utilizes an unreliable methodology, and Dr. Bulman's first and third opinions should be excluded "because

they are irrelevant factual summaries that would confuse the jury; they are not expert opinions." *Id.*

**i. Dr. Bulman's second opinion**

Defendants raise two main issues regarding Dr. Bulman's methodology. First, Bulman's regression examines the relationship between excess returns from defendants' endowments and financial aid. In his report, Bulman defines excess returns as returns that "exceed the target spending rate from the endowment and inflation." Bulman Rep. ¶ 33. But defendants argue that Dr. Bulman's regression actually shows a relationship between financial aid and endowment levels *generally*. According to defendants, Dr. Bulman never states that excess returns directly affect financial aid. Instead, he opines that "institutions with high investment returns could use their enhanced wealth to reduce their list price or offer more generous institutional aid to attract students," *id.* ¶ 32, and that "excess returns might increase student aid . . . through greater endowment levels," Bulman Rebuttal Rep. ¶ 62. But endowment levels, defendants contend, are not the same metric as excess returns, and therefore Bulman's regression is disconnected from the conclusions offered in his expert report. Defendants also contend that Bulman's methodology for his expert report in this action conflicts with his own research from 2022, which "uses an instrumental variable strategy to measure how endowment levels—not 'excess returns'—affect financial aid." Defs.' Mem. in Supp. of Mot. to Exclude at 29. According to defendants, "[t]he unexplained inconsistency between Bulman's professional work and his paid testimony undermines the reliability of his opinion and creates the kind of 'junky' analysis that *Daubert* forbids." *Id.* at 30.

Plaintiffs counter defendants' challenge to Dr. Bulman's opinion regarding endowment growth by contending that all of defendants' issues with this opinion are disputes for the jury to address and are not proper bases for exclusion under *Daubert* and Rule 702. Plaintiffs contend that Bulman's work in 2022 "answered a different question using different data" and that defendants take Bulman's statements from his deposition out of context. Pls.' Mem. in Opp. to Defs.' Mot. to Exclude at 30.

The Court finds that Bulman has applied a reliable methodology and that it is not contradicted by his prior work. A good deal of what defendants argue amounts to issues with Bulman's regression specifications and the specific data that he determined to use as variables. But as explained earlier when addressing the motion to exclude Dr. Singer's testimony, issues over the appropriate data inputs are matters for the jury to assess, not a basis for exclusion. Bulman explains why he did not apply the same methodology used in his 2022 paper, and the Court is not persuaded that these explanations are mere pretense. Bulman's methodology is reliable and therefore his opinions are not inadmissible on this basis.

**ii. Dr. Bulman's first and third opinions**

Defendants argue that Dr. Bulman's opinions concerning defendants' endowment growth and spending potential regarding financial aid should be excluded because "[n]either of these opinions is based on any specialized knowledge or expertise." Defs.' Mem. in Supp. of Mot. to Exclude at 31.

Dr. Bulman's opinion regarding endowment growth is that "[d]efendants experienced substantial investment returns and endowment growth" based on "some basic available data regarding the size and growth of defendants' endowments, and

their investment returns on these endowments over the past three decades," adjusted for inflation. Bulman Rep. ¶¶ 9(a), 23–31. Defendants contend that "[a]ny layperson would understand from the underlying data that defendants' investment returns have grown over time" and thus that this opinion is not based on any specialized knowledge, as required under Rule 702. Defs.' Mem. in Supp. of Mot. to Exclude at 31; *see also* Fed. R. Evid. 702(a) ("[T]he expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue . . . ."). Defendants further contend that this opinion is irrelevant because "defendants' historical endowment levels and investment return rates have no relation to any of the six components of the 'challenged conduct,'" and thus this opinion will not assist the trier of fact in determining a fact in issue. Defs.' Mem. in Supp. of Mot. to Exclude at 31. Finally, defendants argue that Dr. Bulman's opinion regarding "substantial" endowment growth will confuse the jury because such an opinion "invites the jury to disregard the issue of liability and base its decision solely on defendants' resources." *Id.* at 32.

Plaintiffs contend that Dr. Bulman's analysis regarding endowment growth "involved far more than summarizing facts for a few hours like the cases [defendants] cite" and is not something a layperson could have done. Pls.' Mem. in Opp. to Defs.' Mot. to Exclude at 32–33. According to plaintiffs, "Dr. Bulman constructed a 32-year history of institutional endowment levels, returns, composition, and spending which involved reviewing and weaving together several data sources, including surveys, IRS filings, and institutional annual reports all with differing reporting standards." *Id.* at 32.

Defendants raise near-identical challenges to Dr. Bulman's opinion regarding

defendants' capacity to spend more on financial aid due to the endowment growth. Defendants assert that Dr. Bulman "readily admits that he has no experience in managing a college or university endowment" and that he did not "review depositions where plaintiffs asked defendants' employees about endowments." *Id.* Accordingly, defendants contend that Dr. Bulman's opinion does not come from any specialized knowledge, is irrelevant to issues in the case, and risks confusing the jury.

The Court concludes that Dr. Bulman may permissibly offer the challenged testimony. The nature and extent of defendants' endowment growth involves more than simply tallying up numbers; Dr. Bulman had to sort through years of data and organize and clean it so that it would be understandable to a layperson. Bulman utilizes his knowledge and experience to extrapolate from different data sources to reach the conclusions presented in his report. Bulman's report indicates that he will not take the stand to merely recite and summarize facts; he will use his expertise in economics and econometrics to discuss defendants' endowments. This testimony will assist the jury, as this case involves complex theories of economics and pulling together huge swaths of data over extended periods of time.

For these reasons, the Court finds that Dr. Bulman is qualified to proffer the challenged testimony and that he employs reliable methods to reach the conclusions contained in his report. The Court therefore denies defendants' motion to preclude his testimony.

**b. Elizabeth Mora**

Defendants also move to exclude the testimony of Elizabeth Mora "in full," which specifically includes her opinions concerning how "defendants are 'akin' to for-profit

businesses, how and why they offer financial aid, how they compete with one another, and how they can and do manage revenues and endowments." Defs.' Mem. in Supp. of Mot. to Exclude at 32. Defendants contend that Ms. Mora is unqualified to offer these opinions due to a lack of experience and insufficient analysis of the record and that her opinions are irrelevant.

**i. Whether defendants are akin to for-profit businesses**

Defendants first seek to exclude Mora's testimony that defendants are akin to for-profit businesses, arguing both that this is irrelevant and that Mora is unqualified to offer the testimony. Defendants specifically assert that Ms. Mora has "zero expertise" "in the study of the corporate form and governance," "no relevant educational background," and "no relevant work experience." *Id.* at 33. They further contend that Ms. Mora "cannot point to any literature relying on the attributes she says identify a company as akin to a for-profit," and thus "her method of highlighting attributes . . . consisted of randomly picking those that 'seem[ed] to [her] to be the most obvious.'" *Id.* at 33–34 (quoting Mora Dep. at 91:8–16). Mora's opinion regarding these attributes is made more unreliable, defendants contend, because "[t]his opinion also depends on Mora knowing which attributes defendants possess." *Id.* at 34. Defendants assert that the extent of Mora's knowledge regarding whether defendants possess attributes that would make them akin to for-profit businesses is based on "a vague recollection of a handful of 'ad hoc' conversations she had more than 15 years ago." *Id.* According to defendants, Mora did not conduct an individualized analysis of each defendant and "instead surmis[ed] that the present defendants are 'like Harvard[]' . . . based on a review of 12 record documents and 2 deposition transcripts." *Id.*

Plaintiffs respond to this by arguing that Ms. Mora is qualified to offer this opinion based on her work experience. *See United States v. Parkhurst*, 865 F.3d 509, 516 (7th Cir. 2017); *Jordan v. City of Chicago*, No. 08 C 6902, 2012 WL 254243, at *3 (N.D. Ill. Jan. 27, 2012) ("An expert may be qualified to render opinions based on experience alone."). Specifically, plaintiffs contend that Mora's "work experience across university (including in endowment-related roles and as Harvard's Chief Financial Officer), non-profit, and for-profit institutional leadership qualifies her to opine on the comparative organizational attributes of Defendant universities and for-profit enterprises." Pls.' Mem. in Opp. to Defs.' Mot. to Exclude at 34. Plaintiffs also argue that this opinion will help the jury to understand defendants' motivations regarding their endowments by illustrating how defendants may behave like a for-profit enterprise as Mora contends Harvard does.

The Court is persuaded that Ms. Mora is qualified to offer opinions regarding whether defendants are akin to for-profit businesses. Mora has worked extensively in both the non-profit and for-profit sectors, as well as, through her time at Harvard, gaining insight into how elite, private universities operate. Further, her testimony will assist the jury by helping it to understand the business side of how a private university with a large endowment may operate. Mora's report indicates that her knowledge comes from her work experience and review of defendants' "operational data." *Id.* (citing Mora Rep., App'x D).

Regarding Ms. Mora's qualifications, her work experience includes eleven years at Harvard University from 1997 to 2008. During this period, she served as Chief Financial Officer from 2006 through 2008; her responsibilities in that role included

managing Harvard's "budgets, reporting, audits, internal audits, sponsored research, interdepartmental money transfers, and school assessments." Mora Rep. ¶ 11. In this role, Mora also served as Harvard's "liaison to and sat on the board of directors of the Harvard Management Company (HMC), which managed the endowments of the University and its various schools." *Id.* ¶ 12. In addition to her inward-facing responsibilities, Mora attended forums where representatives of the defendants were frequently also in attendance. These forums met "two or three times a year to discuss recent events and compare campaigns, endowment-related issues (such as endowment growth and earnings performance), research funding, [and] capital expansion." *Id.* ¶ 17.

Ms. Mora also reviewed material provided by the defendants, outlined in her report in Appendix D. *See id.*, App'x D. This material includes annual reports and endowment reports from defendants for the 2022 fiscal year. Though this is only a single year's worth of data, the Court has already discussed, earlier in this decision, that arguments regarding the quality of the data relied upon are for the jury in assessing the credibility and weight of the testimony, not for the Court. *See Manpower*, 732 F.3d at 806 ("Reliability, however, is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology."). That aside, the cited materials are also not the only knowledge that Mora relies upon to draw her conclusion that defendants operate in a manner akin to for-profit businesses. She has years of experience, including attending forums with defendants to discuss endowment-related issues. This is not an instance where an expert is relying on data so insufficient that it lacks reliability. *See id.* at 808 ("Rule 702's requirement that expert opinions be supported by 'sufficient facts or data' means 'that the expert considered

sufficient data to employ the methodology' . . . ." (quoting *Stollings*, 725 F.3d at 766)). The Court's role here is to determine whether there is "a rational connection between the data and the opinion," *id.* at 809, and here, there is.

Though defendants are correct that Ms. Mora only worked at Harvard for a limited time some years ago, and that she reviewed a limited number of documents, this affects the weight to be given to her testimony, not its admissibility. Plaintiffs are correct that challenging Mora's opinion on this basis is properly done on cross-examination.

**ii. The purposes of financial aid**

Defendants next contend that Ms. Mora's testimony regarding how and why the defendants offer financial aid is irrelevant and unreliable due to her lack of relevant experience. Defendants specifically contend that Mora bases this opinion on anecdotal evidence and that "she has neither studied why defendants or others award financial aid, nor reviewed evidence or literature" as a basis for this particular opinion. Defs.' Mem. in Supp. of Mot. to Exclude at 35.

Plaintiffs argue that this testimony is relevant to determining whether to apply the *per se* or Rule of Reason analysis to the antitrust claims in this case. They also repeat their contention that Mora is qualified to proffer this opinion due to her work experience and review of certain documents regarding defendants' operational practices.

Again, the Court finds defendants' arguments unpersuasive. Simply because Ms. Mora derived this opinion from experience, which includes both her own work and attending forums alongside representatives of the defendants while at Harvard, does not make her unqualified to offer it. Further, the suit centers on how and why defendants offer the specific financial aid packages they do. Arguments that opinions

on these topics would not aid the jury in determining whether defendants would be motivated to engage in the alleged conspiracy and how they might (or might not) utilize their endowments when offering aid are unavailing.

**iii. Flexibility in using endowments and competition**

Finally, defendants argue that Ms. Mora is unqualified to offer the opinion that "defendants have 'flexibility' to manage and spend 'revenues and endowment earnings' and 'compete with each other' in certain ways," due to both a lack of experience and insufficient methodology. *Id.* (quoting Mora Rep. ¶ 5). According to defendants, Mora's "opinions about defendants' budgets and endowments rely almost entirely on 'ad hoc' conversations" and that in reaching her "opinion on defendants' various revenue streams, . . . Mora 'did not undertake an analysis for the 17 Defendants' of the availability, size, or flexibility of any revenue stream for any defendant." *Id.* (quoting Mora Dep. at 161:10–163:11, 164:15–165:4). In other words, defendants contend that Mora lacks the experience to offer these opinions and did not utilize reliable information or "methodology," which may have compounded her lack of experience. *Id.*

Plaintiffs again assert that Ms. Mora's work experience does qualify her to offer these opinions and that she did utilize "Defendant-specific data," including "endowment reports and annual reports, . . . as well as revenues and organizational characteristics." Pls.' Mem. in Opp. to Defs.' Mot. to Exclude at 35. Defendants counter this assertion by arguing that this amounts to a review of "operational data," which does not address the availability, size, or flexibility of endowments, including any restrictions on endowment funds. Defs.' Reply in Supp. of Mot. to Exclude at 20.

At this juncture, the Court is not persuaded that Ms. Mora's testimony regarding

endowments and competition is unreliable such that she should be excluded under *Daubert* and Rule 702. It is of little import whether Mora utilizes a specific "methodology" to formulate her opinions on these points; "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ("An expert's testimony is not unreliable simply because it is founded on his experience rather than on data . . . .").

While working at Harvard, Mora compared "Harvard to MIT and other elite, private universities, on metrics such as endowment dollar per student and revenue-generating activities." Pls.' Mem. in Opp. to Defs.' Mot. to Exclude at 35 (citing Mora Rep. ¶¶ 54, 58–68). In addition to this experience, Mora has reviewed defendant-specific data, as described above. This is a sufficient basis of experience and knowledge to enable Mora to appropriately testify about potential flexibility in endowment spending and competition among institutions like defendants.

As discussed above, Mora's qualifications have been thoroughly vetted. The Court concludes that she is within her relevant experience and knowledge-base to offer the opinions and conclusions provided in her report. Therefore, the Court denies defendants' motion to exclude relating to her testimony.

To summarize: the Court is persuaded that plaintiffs have established that each challenged expert is qualified to offer the testimony contained in their respective expert

reports. Further, the Court finds that the methods employed by these experts to reach their proffered conclusions are reliable and of the sort that other experts in their field would utilize. The Court therefore denies defendants' motions to exclude relating to Dr. Singer, Dr. Bulman, and Ms. Mora.

**2. Plaintiffs' motions to exclude**

Plaintiffs have filed two separate motions to exclude defendants' expert witnesses. The Court will address each in turn.

**a. Dr. Long**

Plaintiffs first move to exclude specific testimony proffered by Dr. Bridget Terry Long under *Daubert* and Rules 702, 402, and 403. For the following reasons, the Court concludes that none of plaintiffs' arguments warrant excluding the challenged testimony.

Dr. Long holds a Ph.D. in economics and is a professor of education and economics at the Harvard Graduate School of Education. Defendants offer Dr. Long to testify regarding a range of topics. Plaintiffs do not challenge Dr. Long's qualifications and seek only to exclude her testimony regarding "three purported benefits of the 568 Group: increased 'access' to higher education for low-income students, increased 'equity' in financial aid, and increased socioeconomic diversity at Defendants' universities." Pls.' Mem. in Supp. of Mot. to Exclude Dr. Long at 1.

Plaintiffs assert that Dr. Long's testimony "regarding these purported benefits would not assist the jury and is therefore inadmissible under Rules 702, 402, and 403" for three reasons. *Id.* First, plaintiffs contend that federal antitrust law permits defendants only to "justify their horizontal agreement restraining price competition by demonstrating that the restraints furthered some end that enhanced competition." *Id.*;

*see Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978) ("[T]he purpose of the analysis [under the Sherman Act] is to form a judgment about the competitive significance of a restraint; it is not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of an industry."). Because the proffered benefits of increased access, equity, and socioeconomic diversity do not enhance competition between or among defendants, plaintiffs argue, Dr. Long's testimony on these subjects involves "the kind of 'social objectives beyond enhancing competition' that the Supreme Court has 'regularly' characterized as irrelevant to antitrust analysis." Pls.' Mem. in Supp. of Mot. to Exclude Dr. Long at 1. And irrelevant evidence is inadmissible under Rules 702 and 402. *See* Fed. R. Evid. 702 (permitting experts to testify so long as their opinions "will help the trier of fact to understand the evidence or to determine a fact in issue"); *id.* 402 ("Irrelevant evidence is not admissible.").

The Court is not persuaded that Dr. Long's testimony is irrelevant, irrespective of which method of antitrust analysis (*per se* or Rule of Reason) the Court ultimately concludes is appropriate. Dr. Long explains that students have myriad reasons why they may wish to attend one school over another, and these reasons include certain values that the schools claim to embody. Accordingly, then, Dr. Long contends that the social objectives can, and do, promote competition by making schools attractive to a certain type of student.

Second, plaintiffs contend that these so-called social objectives are further irrelevant because Dr. Long "admits that Defendants' horizontal agreement is unnecessary to achieve increased access, equity, and socioeconomic diversity." Pls.'

Mem. in Supp. of Mot. to Exclude Dr. Long at 2. According to plaintiffs, then, "those benefits cannot serve to justify the challenged conduct." *Id.* Put differently, any procompetitive benefits that Dr. Long contends may be derived from defendants' social objectives could also be obtained without the "horizontal agreement." Therefore, plaintiffs argue, the horizontal agreement itself does not actually produce these social benefits and in turn does not have a procompetitive justification.

Though plaintiffs have a viable point here, the Court declines to conclude at this juncture that Dr. Long's testimony is impermissible. As the Court has explained, Dr. Long does identify at least a plausible relationship between the social objectives defendants claim to promote and procompetitive benefits. In other words, the Court finds relevant Dr. Long's contention that defendants' social objectives make their schools more attractive to certain students who may want a more socioeconomically diverse student body. Specific limitations upon Dr. Long's testimony along the lines of plaintiffs' motion can be addressed during the pretrial phase should developments indicate that her challenged testimony is, in fact, irrelevant to any material issue.

Finally, plaintiffs argue that Dr. Long's challenged testimony is ambiguous and equivocal and thus will not help the trier of fact determine a material issue. Plaintiffs contend that this warrants exclusion under Rule 702 and under Rule 403, because the testimony has little or no probative value but "would necessitate time-consuming, complex, and confusing mini-trials on issues that are collateral to, and would distract from, the merits." *Id.* at 17 n.8; *see* Fed. R. Evid. 403 (permitting a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue

delay, wasting time, or needlessly presenting cumulative evidence").

The Court does not agree that Dr. Long's opinions regarding the benefits of increased access and socioeconomic diversity are so speculative or equivocal that they are appropriately excluded.

Plaintiffs take issue with Dr. Long's concession that it was "unclear whether or not there would have been improvement to the same degree" absent the 568 Group. Pls.' Mem. in Supp. of Mot. to Exclude Dr. Long at 16 (quoting Long Dep. at 103:13–105:10). They also emphasize that Long does not respond to specific questions with a "yes" or a "no," which they contend make her opinions equivocal. But as defendants point out in their opposition brief, plaintiffs' own experts "frequently addressed 'yes-or-no' deposition questions with caveated and context-providing answers." Defs.' Mem. in Opp. to Pls.' Mot. to Exclude Dr. Long at 20; *see also id.* at 20 n.2 (collecting instances in Dr. Singer's, Dr. Bulman's, and Ms. Mora's depositions where they allegedly gave "caveated and context-providing answers" to yes-or-no questions).

The Court pauses here to note that each side has extensively challenged the manner in which their opponents' experts answer questions on what amounts to cross-examination. The Court's job at this juncture, however, is to assess whether an expert's testimony is relevant and reliable based on qualifications and reliability; the Court does not determine the weight that should be given to such testimony, which is a function of the jury. The Court is confident of two things: first, that it will be able to exercise its authority during trial to strike or preclude non-responsive answers, and second, that the jury will be fully capable of assessing whether an expert's caveated and long-winded answers make his or her testimony less persuasive.

Reviewing the specific statements at issue regarding Dr. Long, the Court does not find her explanations so equivocal such that they will confuse the jury or result in undue delay or waste of time.

In sum, the Court is not persuaded by any of plaintiffs' arguments regarding the challenged testimony of Dr. Long. Accordingly, the Court denies their motion to exclude regarding Dr. Long.

**b. Peter Ammon**

Plaintiffs have also moved to exclude the testimony of Peter Ammon under *Daubert* and Rule 702. Mr. Ammon is the Chief Investment Officer (CIO) at Penn. Plaintiffs say that Ammon has been retained to rebut the opinions offered in Dr. Bulman's report with regard to Penn but that he is not qualified to offer these opinions. According to plaintiffs, Mr. Ammon lacks the requisite education, "training, experience, or expertise to render competent opinions on Dr. Bulman's analyses." Pls.' Mem. in Supp. of Mot. to Exclude Peter Ammon at 3. Plaintiffs further argue that "Penn proffered Mr. Ammon's opinions after the close of fact discovery and in rebuttal to the timely disclosed report and analyses of Plaintiffs' economic expert Prof. George Bulman, Ph.D." *Id.* at 1.

Though plaintiffs move to exclude Ammon under Rule 702 and *Daubert*, see *id.* at 1, they also raise an issue regarding the timing and nature of Ammon's disclosure under Federal Rule of Civil Procedure 26(a)(2)(C). Plaintiffs contend that the nature of Ammon's testimony, in which he seeks to rebut certain conclusions drawn by Dr. Bulman, makes him a retained, as opposed to a non-retained, expert witness. Under Rule 26(a)(2)(B), any expert witness who is "retained or specially employed to provide

expert testimony" must prepare and sign a "written report." Fed. R. Civ. P. 26(a)(2)(B). To comply with the Rule's requirements, this written report must contain certain specified information. *See id.* 26(a)(2)(B)(i)–(vi). For any other opinion witness, the proffering party must disclose simply "the subject matter on which the witness is expected to present evidence" and "a summary of facts and opinions to which the witness is expected to testify." *Id.* 26(a)(2)(C).

The Court finds that Ammon is qualified to offer the opinions contained in his disclosure, and that he is not properly categorized as a retained expert as plaintiffs contend. Reviewing Ammon's disclosure, all of the opinions he offers appear to be based on knowledge and information he obtained while in the ordinary course of his employment as Penn's CIO and not as a result of his reviewing Dr. Bulman's report or otherwise in response to the present suit. *See Beaton v. SpeedyPC Software*, 338 F.R.D. 232, 236 (N.D. Ill. 2021) ("[A] 'hybrid fact/expert witness' [under Rule 26(a)(2)(C)] may not offer opinions based on 'information they learned solely through . . . litigation' but is instead limited to the facts personally known by the witness." (quoting *Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 370–71 (7th Cir. 2017))). It is well established that an expert may be qualified by experience, and that is precisely what Ammon relies upon to base his proffered testimony.

#### i. ***Daubert* and Rule 702**

Beginning with Ammon's qualifications, he has served as Penn's CIO since 2013. Prior to his employment at Penn, Ammon worked at the Yale University Investments Office. He holds an MBA from Yale University. Ammon attests that in his capacity as CIO, he has "personal knowledge of Penn's endowment investment returns" due to his

"extensive experience managing the investment of Penn's endowment funds." Ammon Rule 26(a)(2)(C) Disclosure ¶ 3. Ammon currently leads Penn's Office of Investments, which "has been delegated authority to recommend investment strategy (including strategic asset allocation), select and appoint investment managers, directly manage assets, and take any other actions necessary to carry out those responsibilities." *Id.* He has held this leadership role for the last ten years. All of this experience has provided Ammon with "specialized technical knowledge of the composition and performance of Penn's endowment investment portfolio; the strategic considerations, institutional priorities, and financial factors that guide and constrain Penn's investment decisions; and the market conditions in which Penn operates." *Id.* ¶ 5.

Looking to Ammon's disclosure, he intends to offer opinions "regarding inaccurate and misleading statements in the Bulman Report." *Id.* ¶ 7. All of these opinions appear to be derived from Ammon's experience serving as Penn's Chief Investment Officer. Simply because Ammon seeks to rebut certain statements in Bulman's report does not mean his knowledge is derived from that report. Rather, Ammon's disclosure indicates that he will testify that the data used and conclusions reached in Bulman's report do not comport with the reality of Penn's endowment and policies as Ammon understands them after more than a decade of working at Penn. For instance, Ammon intends to "testify that Dr. Bulman inaccurately analyzes the availability of endowment funds for use for financial aid." *Id.* ¶ 7(a). But he does not seek to do so by challenging Bulman's regression model itself. Instead, Ammon will testify based on his independent knowledge and understanding about the "restrictions" that "govern[]" use of endowment returns as "set forth in the gift agreement at the time

the funds were donated to [Penn]." *Id.* Therefore, Ammon's rebuttal opinion does not take issue with Bulman's opinions based on any specialized understanding of economics, but rather on Ammon's own knowledge regarding how Penn's endowment funds operate. Bulman's conclusions thus will not be challenged based on "statistical expertise." Pls.' Mem. in Supp. of Mot. to Exclude Ammon at 3. Rather, Bulman's conclusion will be challenged based on the contention that his report uses inaccurate data, a rebuttal conclusion that Ammon is qualified by experience to offer.

Ammon also intends to testify that, "contrary to the implication in Dr. Bulman's report, Penn dramatically increased endowment spending in support of undergraduate financial aid from 2003 to 2019." Ammon Rule 26(a)(2)(C) Disclosure ¶ 7(c). Clearly, Ammon's knowledge regarding Penn's increased endowment spending was not derived from reading Dr. Bulman's report, nor does it require any specialized expertise beyond his own work experience at Penn.

Ammon's disclosure does affirmatively indicate that he will critique Bulman's regression analysis. But such critiques do not require a specialized expertise in economics, nor is Ammon unqualified to offer the critiques contained in his disclosure simply because he does not have a Ph.D. in economics. Ammon's disclosure states that he plans to testify that Bulman's regression analysis is "undermined by Penn's demonstrated commitment to supporting financial aid even during periods of weak endowment returns." *Id.* ¶ 7(e). This quite obviously is not the same as critiquing the methodology or data that Bulman utilized in his regression. Rather, the only specialized knowledge that Ammon requires to offer this opinion is his knowledge regarding Penn's financial aid spending during periods of weak endowment returns—knowledge that he

has gained from his experience working for Penn.

The closest that Ammon arguably gets to criticizing Bulman's regression itself is his intended testimony that "Bulman's calculation of Defendants' 'excess investment returns' relies on an average endowment spend rate that is not reflective of Penn's actual spending rate from financial aid endowment units." *Id.* ¶ 7(f). But here again, Ammon's knowledge that such a calculation is not reflective of Penn's actual spending rate does not come from Bulman's report itself; it comes from Ammon's experience as Penn's CIO.

**ii. Rule 26(a)(2)(B)**

The Court's conclusion does not change even if Ammon's proposed testimony does fall under the heading of a retained expert who is subject to the requirements of Rule 26(a)(2)(B). Ammon's disclosure contains all of the requirements of a retained expert report enumerated under Rule 26(a)(2)(B). It contains "a complete statement of all opinions [Ammon] will express and the basis and reasons for them"; it references "the facts or data considered by [Ammon] in forming them"; it includes "any exhibits that will be used to summarize or support" Ammon's opinions; and it provides Ammon's "qualifications" to offer such opinions. Fed. R. Civ. P. 26(a)(2)(B)(i)–(iv); *see also* Ammon Rule 26(a)(2)(C) Disclosure. The only required information not provided in the disclosure is "a list of other cases in which, during the previous 4 years, [Ammon] testified as an expert at trial or by deposition" and "a statement of the compensation to be paid for the study and testimony in the case." Fed. R. Civ. P. 26(a)(2)(B)(v)–(vi). Any such omission, however, is harmless, as it can easily be elicited via deposition or cross-examination.

For these reasons, plaintiffs' arguments to exclude Ammon are unavailing; the Court denies their motion to exclude his testimony.

**Conclusion**

In conclusion, the Court denies plaintiffs' motions to exclude Dr. Long and Mr. Ammon [dkt. nos. 750, 751] and also denies defendants' motion to exclude Dr. Singer, Dr. Bulman, and Ms. Mora [dkt. 755].

MATTHEW F. KENNELLY
United States District Judge

Date: September 29, 2025

**CIRCUIT RULE 30(d) CERTIFICATION**

All materials required by Circuit Rules 30(a) and (b) are included in Defendants-Appellants' Appendix.

/s/ *Seth P. Waxman*
SETH P. WAXMAN

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of October, 2026, I filed the foregoing using the CM/ECF system, which effected service on all registered counsel.

/s/ *Seth P. Waxman*
SETH P. WAXMAN