No. 26-2759

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

ANDREW CORZO, ET AL.,

*Plaintiffs-Appellees*,

*v.*

CORNELL UNIVERSITY, ET AL.,

*Defendants-Appellants*.

Interlocutory Appeal Pursuant to Federal Rule of Civil Procedure 23(f) from the United States District Court for the Northern District of Illinois, No. 1:22-cv-00125-MFK Before the Honorable Matthew F. Kennelly

**APPENDIX FOR DEFENDANTS-APPELLANTS BRIEF**
**VOLUME 2, PARTS 1 & 2**
**(A128 – A266)**

DAVID GRINGER
ALAN SCHOENFELD
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 Word Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
david.gringer@wilmerhale.com
alan.schoenfeld@wilmerhale.com

SETH P. WAXMAN
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
seth.waxman@wilmerhale.com

*Attorneys for Defendant-Appellant the Trustees of the University of Pennsylvania*

October 5, 2026

Additional Counsel on Inside Cover

NORMAN ARMSTRONG
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800
norman.armstrong@cooley.com

*Attorney for Defendant-Appellant Cornell University*

BRITT M. MILLER
DANIEL T. FENSKE
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
dfenske@mayerbrown.com

*Attorneys for Defendant-Appellant Georgetown University*

ERIC MAHR
JAN RYBNICEK
FRESHFIELDS US LLP
700 13th Street NW
Washington, DC 20005
(202) 777-4500
eric.mahr@freshfields.com
jan.rybnicek@freshfields.com

*Attorneys for Defendant-Appellant Massachusetts Institute of Technology*

ZAKI ANWAR
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
zaki.anwar@wilmerhale.com

EDWARD W. FELDMAN
MILLER SHAKMAN LEVINE & FELDMAN LLP
30 W. Monroe Street
Suite 1900
Chicago, IL 60603
(312) 759-7213
efeldman@millershakman.com

*Attorneys for Defendant-Appellant the Trustees of the University of Pennsylvania*

ROBERT A. VAN KIRK
SARAH F. KIRKPATRICK
MATTHEW D. HEINS
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000
rvankirk@wc.com
skirkpatrick@wc.com
mheins@wc.com

*Attorneys for Defendant-Appellant University of Notre Dame*

## APPENDIX TABLE OF CONTENTS

Page

### VOLUME 1
### (BOUND WITH BRIEF)


Order on Motion for Class Certification (June 1, 2026), Dkt. 1275 ........ A1

Memorandum Opinion and Order on Motion for Class Certification (Mar. 31, 2026), Dkt. 1241 ........ A12

Memorandum Opinion and Order on Motions to Exclude Expert Testimony (Sept. 29, 2025), Dkt. 1160 ........ A74


### VOLUME 2
### (SEPARATELY BOUND)


District Court Docket, No. 1:22-cv-00125 (N.D. Ill.) ........ A128

Complaint (Jan. 9, 2022), Dkt. 1 ........ A139

Amended Complaint (Feb. 15, 2022), Dkt. 106 ........ A200

Memorandum Opinion and Order on Motion to Dismiss (Aug. 15, 2022), Dkt. 185 ........ A207

Second Amended Complaint (Feb. 6, 2023), Dkt. 308 ........ A211

Plaintiffs' Motion for Class Certification Exhibit 17: Email from Patricia McWade to Ted Bracken (dated Apr. 15, 2014), Dkt. 753-17 (Redacted) ........ A222

Plaintiffs' Motion for Class Certification Exhibit 18: Email from Cynthia Barnhart to Elizabeth Hicks (dated Aug. 27, 2014), Dkt. 753-18 (Excerpts) ........ A223

Plaintiffs' Motion for Class Certification Exhibit 24: Email from Donald Bishop to Lou Nanni, Joseph Gelchion, and Robert Mundy (dated Mar. 6, 2012), Dkt. 753-24 ........ A224

Rebuttal Expert Report of Nicholas Hill, dated Aug. 7, 2024 (filed Dec. 16, 2024), Dkt. 755-4 (Excerpts) .............................. A226

Deposition of Hal J. Singer, dated Nov. 27, 2024 (filed Dec. 16, 2024), Dkt. 755-11 (Excerpts) ....................................................A233

Amended Expert Report of Hal J. Singer, dated May 28, 2024 (filed Dec. 16, 2024), Dkt. 755-12 (Excerpts) ............................ A272

Rebuttal Expert Report of Hal J. Singer, dated Oct 7, 2024 (filed Dec. 16, 2024), Dkt. 755-18 (Excerpts) ............................ A279

Defendants' Motion to Exclude Expert Testimony, Exhibit 20: *Peer School Financial Aid Initiatives Timeline* (filed Dec. 16, 2024), Dkt. 755-22 ......................................................................A310

Surrebuttal Expert Report of Lauren J. Stiroh, dated Nov. 1, 2024 (filed Dec. 16, 2024), Dkt. 755-27 (Excerpts) ................................A314

Rebuttal Expert Report of Lauren J. Stiroh, Appendix 1, dated Aug. 7, 2024 (filed Dec. 16, 2024), Dkt. 755-29 (Excerpts) ............................................................. A324

Rebuttal Expert Report of Hal J. Singer, dated Oct. 7, 2024 (filed Dec. 17, 2024), Dkt. 756-34 (Excerpts) ............................ A331

Expert Report of George Bulman, dated May 14, 2024 (filed Dec. 17, 2024), Dkt. 756-36 (Excerpts) ...............................A336

Supplemental Rebuttal Expert Report of Hal J. Singer, dated Nov. 8, 2024 (filed Dec. 17, 2024), Dkt. 756-38 (Excerpts) ............................................................. A338

Rebuttal Expert Report of Bridget Terry Long, dated Aug. 7, 2024 (filed Dec. 17, 2024), Dkt. 756-39 (Excerpts) (Redacted) ..............A342

Rebuttal Expert Report of Bridget Terry Long, Appendix D, dated Aug. 7, 2024 (filed Dec. 20, 2024), Dkt. 765-1 (Excerpts) (Redacted)............................................... A426

Deposition of Hal J. Singer, dated Nov. 27, 2024 (filed Feb. 1, 2025), Dkt. 789-2 (Excerpts) .......... A507

Rebuttal Expert Report of Bridget Terry Long, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 789-3 (Excerpts) (Redacted) .......... A510

Rebuttal Expert Report of Nicholas Hill, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 789-4 (Excerpts) .......... A598

Rebuttal Expert Report of Lauren J. Stiroh, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 789-16 (Excerpts) (Redacted) .......... A625

Plaintiffs' Motion for Class Certification, Exhibit 19: *The 568 Group Consensus Methodology Policy Guidelines* (Dec. 2016) (filed Feb. 1, 2025), Dkt. 789-20 .......... A655

Second Amended Expert Report of Hal J. Singer, dated June 10, 2024 (filed Feb. 1, 2025), Dkt. 789-25 (Excerpts) .......... A673

Surrebuttal Expert Report of Nicholas Hill, dated Nov. 1, 2024 (filed Feb. 1, 2025), Dkt. 789-32 (Excerpts) .......... A687

Plaintiffs' Motion for Class Certification, Exhibit 41: *Report of Common Standard Subcommittee to 568 Presidents' Working Group* (filed Feb. 1, 2025), Dkt. 789-42 (Excerpts) .......... A689

Deposition of James Tilton, dated May 15, 2023 (filed Feb. 1, 2025), Dkt. 789-49 (Excerpts) .......... A691

Surrebuttal Expert Report of Lauren J. Stiroh, dated Nov. 1, 2024 (filed Feb. 1, 2025), Dkt. 789-51 (Excerpts) .......... A694

Rebuttal Expert Report of Nicholas Hill, dated Aug. 7, 2024 (filed Feb. 27, 2025), Dkt. 802-7 (Excerpts) .......... A699

Second Amended Expert Report of Hal J. Singer, dated June 10, 2024 (filed Feb. 28, 2025), Dkt. 805-2 (Excerpts) .......... A702

Minute Docket Entry for Hearing on Motions to Exclude
Expert Testimony (Apr. 3, 2025), Dkt. 835 ............................... A705

Defendants' Motion for Summary Judgment, Exhibit 85:
*Penn Undergraduate Student Accessibility and Affordability*, dated Feb. 27, 2020, (filed May 7, 2020),
Dkt. 864-4 (Excerpts) ............................................................. A707

Defendants' Motion for Summary Judgment, Exhibit 90:
*House Judiciary Committee Report on Need-Based Educational Aid Act of 2001*, H.R. Rep. No. 107-32,
1st Sess. (2001), Dkt. 864-9 (Excerpts)..................................... A710

Defendants' Motion for Summary Judgment, Exhibit 120:
Email from Caesar Storlazzi to J. Lloyd Suttle and Rhakti Nagella, dated Oct. 2, 2012 (filed May 7, 2025),
Dkt. 864-39 ............................................................................. A714

Deposition of Hal J. Singer, dated Nov. 27, 2024
(filed May 8, 2025), Dkt. 865-30 (Excerpts) .............................. A715

Deposition of Caesar Storlazzi, dated July 27, 2023
(filed May 8, 2025), Dkt. 865-31 (Excerpts) .............................. A726

Deposition of Hal J. Singer, dated Nov. 27, 2024
(filed May 29, 2025), Dkt. 874-5 (Excerpts) .............................. A728

Errata to Expert Report of Bridget Terry Long, updated
Aug. 12, 2024 (filed June 27, 2025), Dkt. 889-3 (Excerpts)...... A735

Second Amended Expert Report of Hal J. Singer,
dated June 10, 2024 (filed June 27, 2025),
Dkt. 889-17 (Excerpts) ............................................................ A739

Plaintiffs' Opposition to Summary Judgment, Exhibit 107:
*Memorandum of Understanding the 568 Presidents' Group*, dated Jan. 5, 2004 (filed Sept. 12, 2025,
Dkt. 1025-6 ............................................................................. A744

Memorandum Opinion and Order on Cross-Motions for Summary Judgment (Jan. 12, 2026), Dkt. 1210 (Excerpts) ...................... A747

Transcript of Proceedings of Status Conference (Mar. 20, 2025), Dkt. 1261 (Excerpts)................................................................. A784

Transcript of Proceedings on Motions to Exclude Expert Testimony (Apr. 14, 2025), Dkt. 1263 (Excerpts) ..................... A788

Hearing on Motions to Exclude Expert Testimony (Apr. 14, 2025): Defendants' Hearing Presentation ................ A833

Order Granting Plaintiffs' Motion to Provide Agreed Forms of Notice to the Certified Litigation Class (June 12, 2026), Dkt. 1282 (Excerpts)................................................................. A835

Transcript of Proceedings on Class Counsel Approval (May 26, 2026, 2:30pm) (Excerpts) .......................................... A837

**VOLUME 3**
**SEALED**
**(SEPARATELY BOUND)**

Rebuttal Expert Report of Bridget Terry Long, Appendix D, dated Aug. 7, 2024 (filed Dec. 16, 2024) Dkt. 754-3 (Excerpts) [unredacted version of A426-506] ............................ A839

Plaintiffs' Motion for Class Certification Exhibit 17: Email from Patricia McWade to Ted Bracken (dated Apr. 15, 2014), Dkt. 757-12 [unredacted version of A222] ........................................................................ A920

Rebuttal Expert Report of Bridget Terry Long, dated Aug. 7, 2024 (filed Dec. 17, 2024), Dkt. 757-52 (Excerpts) [unredacted version of A342-425] ..................................................................A921

Declaration of Hal J. Singer (Jan. 25, 2025), Dkt. 785-2................. A1005

Rebuttal Expert Report of Bridget Terry Long, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 788-3 (Excerpts) [unredacted version of A510-597]...........................................................................A1009

Rebuttal Expert Report of Lauren J. Stiroh, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 788-16 (Excerpts) [unredacted version of A625-654] ....................A1088

Second Amended Expert Report of Hal J. Singer (May 7, 2025), Dkt. 854-7 (Excerpts) ....................A1118

Transcript of Proceedings on Settlement Approval (July 28, 2025, 2:50pm), Dkt. 1345 (Excerpts) ....................A1121

## Index of Excerpted Transcript Pages Included in Appendix



| Proceeding | Excerpted Transcript Pages | Appendix Page |
|---|---|---|
| Transcript of Proceedings of Status Conference (Mar. 20, 2025), Dkt. 1261 | pp.9-11 | A785-787 |
| Transcript of Proceedings on Motions to Exclude Expert Testimony (May 15, 2026), Dkt. 1263 | pp.7-31, 47-48, 69-73, 75-76, 87, 98-100, 113-115, 130-131, 150 | A789-832 |
| Transcript of Proceedings on Settlement Approval (July 28, 2025, 2:50pm), Dkt. 1345 (SEALED) | p.7 | A1122 |
| Transcript of Proceedings on Class Counsel Approval (May 26, 2026, 2:30pm) | p.9 | A838 |

## Index of Excerpted Deposition Transcript Pages Included in Appendix



| Depositions | Excerpted Transcript Pages | Appendix Page |
|---|---|---|
| Hal J. Singer Deposition (Nov. 27, 2024), Dkt. 755-11 | pp.29, 31-34, 48-49, 127-132, 184, 189-190, 201, 252-254, 261-262, 270-274, 281-283, 288-293, 295-296 | A234-271 |
| Hal J. Singer Deposition (Nov. 27, 2024), Dkt. 789-2 | pp.315-316 | A508-509 |
| Hal J. Singer Deposition (Nov. 27, 2024), Dkt. 865-30 | pp.19-21, 27, 59, 82, 92-93, 95, 117 | A716-725 |
| Hal J. Singer Deposition (Nov. 27, 2024), Dkt. 874-5 | ECF pp.3-8 | A729-734 |
| Caesar Storlazzi Deposition (July 27, 2023), Dkt. 865-31 | p.38 | A727 |
| James Tilton Deposition (May 15, 2023), Dkt. 789-49 | pp.121-122 | A692-693 |

**United States District Court**
**Northern District of Illinois (Chicago)**
**CIVIL DOCKET FOR CASE #: 1:22-cv-00125**

Henry et al v. Brown University et al
Assigned to: Honorable Matthew F. Kennelly
Case in other court: 26-01275
Cause: 15:1 Antitrust Litigation

Date Filed: 01/09/2022
Jury Demand: Both
Nature of Suit: 410 Anti-Trust
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 01/09/2022 | 1 | COMPLAINT filed by Michael Maerlander, Sia Henry, Brandon Piyevsky, Kara Saffrin, Brittany Tatiana Weaver; Jury Demand. Filing fee $ 402, receipt number 0752-19036663.(Roche, Kyle) (Entered: 01/09/2022) |
| 02/15/2022 | 106 | AMENDED complaint by Michael Maerlander, Sia Henry, Brandon Piyevsky, Kara Saffrin, Brittany Tatiana Weaver, Alexander Leo-Guerra, Savannah Rose Eklund, Frank Carbone, Andrew Corzo against Brown University, California Institute of Technology, Cornell University, Duke University, Emory University, Georgetown University, Massachusetts Institute of Technology, Northwestern University, The Trustees of Columbia University in the City of New York, The Trustees of the University of Pennsylvania, Trustees of Dartmouth College, University of Chicago, University of Notre Dame du Lac, Vanderbilt University, William Marsh Rice University, Yale University, The Johns Hopkins University (Roche, Kyle) (Entered: 02/15/2022) |
| 08/15/2022 | 185 | MEMORANDUM OPINION AND ORDER signed by the Honorable Matthew F. Kennelly on 8/15/2022: For the reasons stated in the accompanying Memorandum Opinion and Order, the Court denies the defendants' motions to dismiss [dkt. nos. 145, 146 & 148]. The defendants are directed to answer the amended complaint by no later than September 9, 2022. The parties are directed to promptly confer regarding a discovery and pretrial schedule, and they are to file by August 26, 2022 a joint status report with an agreed proposal, or alternative proposals if they cannot agree. The case is set for a telephonic status hearing on September 2, 2022 at 9:10 a.m., using call-in number 888-684-8852, access code 746-1053. The Court reserves the right to vacate the hearing if it determines a hearing is not needed. (mk) (Entered: 08/15/2022) |
| 02/06/2023 | 308 | *SECOND* AMENDED complaint by Cameron Williams, Alexander Leo-Guerra, Michael Maerlander, Sia Henry, Benjamin Shumate, |

| | | |
|---|---|---|
| | | Brandon Piyevsky, Andrew Corzo, Brittany Tatiana Weaver against Brown University, California Institute of Technology, Cornell University, Duke University, Emory University, Georgetown University, Massachusetts Institute of Technology, Northwestern University, The Johns Hopkins University, The Trustees of Columbia University in the City of New York, The Trustees of the University of Pennsylvania, Trustees of Dartmouth College, University of Chicago, University of Notre Dame du Lac, Vanderbilt University, William Marsh Rice University, Yale University (Normand, Edward) (Entered: 02/06/2023) |
| 12/16/2024 | 753 | DECLARATION of Edward Normand regarding motion for miscellaneous relief, 751 , motion for miscellaneous relief, 750 , motion for miscellaneous relief, 752 (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45, # 46 Exhibit 46, # 47 Exhibit 47, # 48 Exhibit 48, # 49 Exhibit 49, # 50 Exhibit 50, # 51 Exhibit 51, # 52 Exhibit 52, # 53 Exhibit 53, # 54 Exhibit 54, # 55 Exhibit 55, # 56 Exhibit 56, # 57 Exhibit 57, # 58 Exhibit 58, # 59 Exhibit 59, # 60 Exhibit 60, # 61 Sealed Exhibit 61, # 62 Exhibit 62, # 63 Sealed Exhibit 63, # 64 Exhibit 64, # 65 Exhibit 65, # 66 Exhibit 66, # 67 Exhibit 67, # 68 Exhibit 68, # 69 Exhibit 69, # 70 Exhibit 70, # 71 Sealed Exhibit 71, # 72 Exhibit 72, # 73 Exhibit 73, # 74 Exhibit 74, # 75 Exhibit 75)(Normand, Edward) Docket Text Modified by Clerk's Office. (Entered: 12/16/2024) |
| 12/16/2024 | 754 | SEALED DOCUMENT by Defendant The Trustees of the University of Pennsylvania *Defendants' Motion to Exclude Expert Testimony and Opinions of Hal Singer, George Bulman, and Elizabeth Mora* (Attachments: # 1 Appendix, # 2 Declaration of David Gringer in Support, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13, # 16 Exhibit 14, # 17 Exhibit 15, # 18 Exhibit 16, # 19 Exhibit 17, # 20 Exhibit 18, # 21 Exhibit 19, # 22 Exhibit 20, # 23 Exhibit 21, # 24 Exhibit 22, # 25 Exhibit 23, # 26 Exhibit 24, # 27 Exhibit 25, # 28 Exhibit 26, # 29 Exhibit 27, # 30 Exhibit 28, # 31 Exhibit 29, # 32 Exhibit 30, # 33 Exhibit 31, # 34 Exhibit 32, # 35 Exhibit 33, # 36 |

| | | |
|---|---|---|
| | | Exhibit 34, # 37 Exhibit 35, # 38 Exhibit 36, # 39 Exhibit 37, # 40 Exhibit 38, # 41 Exhibit 39, # 42 Exhibit 40, # 43 Exhibit 41, # 44 Exhibit 42)(Gringer, David) (Entered: 12/16/2024) |
| 12/16/2024 | 755 | MOTION by Defendant The Trustees of the University of Pennsylvania Defendants' Motion to Exclude Expert Testimony and Opinions of Hal Singer, George Bulman, and Elizabeth Mora<br><br>(Attachments: # 1 Appendix, # 2 Declaration of David Gringer in Support, # 3 Sealed Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13, # 16 Exhibit 14, # 17 Exhibit 15, # 18 Exhibit 16, # 19 Exhibit 17, # 20 Exhibit 18, # 21 Exhibit 19, # 22 Exhibit 20, # 23 Exhibit 21, # 24 Exhibit 22, # 25 Exhibit 23, # 26 Exhibit 24, # 27 Exhibit 25, # 28 Exhibit 26, # 29 Exhibit 27, # 30 Exhibit 28, # 31 Exhibit 29, # 32 Exhibit 30, # 33 Exhibit 31, # 34 Exhibit 32, # 35 Exhibit 33, # 36 Exhibit 34, # 37 Exhibit 35, # 38 Exhibit 36, # 39 Exhibit 37, # 40 Exhibit 38, # 41 Exhibit 39, # 42 Exhibit 40, # 43 Exhibit 41, # 44 Exhibit 42)(Gringer, David) Docket Text Modified by Clerk's Office. (Entered: 12/17/2024) |
| 12/17/2024 | 756 | EXHIBIT by Plaintiffs Sia Henry, Michael Maerlander, Alexander Leo-Guerra, Andrew Corzo, Brittany Tatiana Weaver, Benjamin Shumate, Cameron Williams regarding declaration,,,,,, 753 (Attachments: # 1 Exhibit 77, # 2 Exhibit 78, # 3 Exhibit 79, # 4 Exhibit 80, # 5 Exhibit 81, # 6 Exhibit 82, # 7 Exhibit 83, # 8 Exhibit 84, # 9 Exhibit 85, # 10 Exhibit 86, # 11 Exhibit 87, # 12 Exhibit 88, # 13 Exhibit 89, # 14 Exhibit 90, # 15 Exhibit 91, # 16 Exhibit 92, # 17 Exhibit 93, # 18 Exhibit 94, # 19 Exhibit 95, # 20 Exhibit 96, # 21 Exhibit 97, # 22 Exhibit 98, # 23 Exhibit 99, # 24 Exhibit 100, # 25 Exhibit 101, # 26 Exhibit 102, # 27 Exhibit 103, # 28 Exhibit 104, # 29 Exhibit 105, # 30 Exhibit 106, # 31 Exhibit 107, # 32 Sealed Exhibit 108, # 33 Exhibit 109, # 34 Exhibit 110, # 35 Exhibit 111, # 36 Exhibit 112, # 37 Exhibit 113, # 38 Exhibit 114, # 39 Exhibit 115, # 40 Exhibit 116, # 41 Exhibit 117, # 42 Exhibit 118, # 43 Exhibit 119, # 44 Exhibit 120, # 45 Exhibit 122, # 46 Exhibit 123)(Normand, Edward) Docket Text Modified by Clerk's Office. (Entered: 12/17/2024) |
| 12/17/2024 | 757 | SEALED MOTION by Plaintiffs Sia Henry, Michael Maerlander, Alexander Leo-Guerra, Andrew Corzo, Brandon Piyevsky, Brittany Tatiana Weaver, Benjamin Shumate, Cameron Williams FOR CLASS CERTIFICATION (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 6, # 6 Exhibit 8, # 7 Exhibit 9, # 8 Exhibit 11, # 9 Exhibit 12, # 10 Exhibit 13, # 11 Exhibit 14, # 12 Exhibit 17, # 13 Exhibit 19, # 14 Exhibit 22, # 15 Exhibit 23, # 16 Exhibit 28, # 17 Exhibit 29, # 18 Exhibit 30, # 19 Exhibit 31, # 20 |

| | | |
|---|---|---|
| | | Exhibit 32, # 21 Exhibit 36, # 22 Exhibit 37, # 23 Exhibit 47, # 24 Exhibit 49, # 25 Exhibit 50, # 26 Exhibit 51, # 27 Exhibit 53, # 28 Exhibit 54, # 29 Exhibit 55, # 30 Exhibit 56, # 31 Exhibit 59, # 32 Exhibit 60, # 33 Exhibit 61, # 34 Exhibit 64, # 35 Exhibit 65, # 36 Exhibit 67, # 37 Exhibit 69, # 38 Exhibit 71, # 39 Exhibit 74, # 40 Exhibit 85, # 41 Exhibit 86, # 42 Exhibit 87, # 43 Exhibit 88, # 44 Exhibit 94, # 45 Exhibit 97, # 46 Exhibit 100, # 47 Exhibit 101, # 48 Exhibit 108, # 49 Exhibit 110, # 50 Exhibit 111, # 51 Exhibit 114, # 52 Exhibit 115, # 53 Exhibit 119, # 54 Exhibit 120, # 55 Exhibit 121)(Normand, Edward) (Entered: 12/17/2024) |
| 12/20/2024 | 765 | MOTION by Defendant The Trustees of the University of Pennsylvania to seal *Portions of Exhibit 1 to Their Daubert Motion* 755<br><br>(Attachments: # 1 Exhibit 1)(Gringer, David) (Entered: 12/20/2024) |
| 01/24/2025 | 785 | SEALED MEMORANDUM by Plaintiffs Sia Henry, Michael Maerlander, Alexander Leo-Guerra, Andrew Corzo, Brandon Piyevsky, Brittany Tatiana Weaver, Cameron Williams (Attachments: # 1 Declaration of Eric Cramer, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12)(Cramer, Eric) Modified on 1/27/2025 (td, ). (Entered: 01/24/2025) |
| 01/31/2025 | 788 | SEALED RESPONSE by The Trustees of the University of Pennsylvania to SEALED MOTION by Plaintiffs Sia Henry, Michael Maerlander, Alexander Leo-Guerra, Andrew Corzo, Brandon Piyevsky, Brittany Tatiana Weaver, Benjamin Shumate, Cameron Williams *FOR CLASS CERTIFICATION* 757 (Attachments: # 1 Declaration of David Gringer in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28, # 30 Exhibit 29, # 31 Exhibit 30, # 32 Exhibit 31, # 33 Exhibit 32, # 34 Exhibit 33, # 35 Exhibit 34, # 36 Exhibit 35, # 37 Exhibit 36, # 38 Exhibit 37, # 39 Exhibit 38, # 40 Exhibit 39, # 41 Exhibit 40, # 42 Exhibit 41, # 43 Exhibit 42, # 44 Exhibit 43, # 45 Exhibit 44, # 46 Exhibit 45, # 47 Exhibit 46, # 48 Exhibit 47, # 49 Exhibit 48, # 50 Exhibit 49, # 51 Exhibit 50, # 52 Exhibit 51, # 53 Exhibit 52, # 54 Exhibit 53, # 55 Exhibit 54, # 56 Exhibit 55, # 57 Exhibit 56, # 58 Exhibit 57, # 59 Exhibit 58, # 60 Exhibit 59, # 61 Exhibit 60, # 62 Exhibit 61, # 63 Exhibit 62, # 64 Exhibit 63, # 65 Exhibit 64, # 66 |

| | | |
|---|---|---|
| | | Exhibit 65, # 67 Exhibit 66, # 68 Exhibit 67, # 69 Exhibit 68)(Gringer, David) (Entered: 01/31/2025) |
| 02/01/2025 | 789 | RESPONSE by The Trustees of the University of Pennsylvania in Opposition to SEALED MOTION by Plaintiffs Sia Henry, Michael Maerlander, Alexander Leo-Guerra, Andrew Corzo, Brandon Piyevsky, Brittany Tatiana Weaver, Benjamin Shumate, Cameron Williams FOR CLASS CERTIFICATION 757 (Attachments: # 1 Declaration of David Gringer in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28, # 30 Exhibit 29, # 31 Exhibit 30, # 32 Exhibit 31, # 33 Exhibit 32, # 34 Exhibit 33, # 35 Exhibit 34, # 36 Exhibit 35, # 37 Exhibit 36, # 38 Exhibit 37, # 39 Exhibit 38, # 40 Exhibit 39, # 41 Exhibit 40, # 42 Exhibit 41, # 43 Exhibit 42, # 44 Exhibit 43, # 45 Exhibit 44, # 46 Exhibit 45, # 47 Exhibit 46, # 48 Exhibit 47, # 49 Exhibit 48, # 50 Exhibit 49, # 51 Exhibit 50, # 52 Exhibit 51, # 53 Exhibit 52, # 54 Exhibit 53, # 55 Exhibit 54, # 56 Exhibit 55, # 57 Exhibit 56, # 58 Exhibit 57, # 59 Exhibit 58, # 60 Exhibit 59, # 61 Exhibit 60, # 62 Exhibit 61, # 63 Exhibit 62, # 64 Exhibit 63, # 65 Exhibit 64, # 66 Exhibit 65, # 67 Exhibit 66, # 68 Exhibit 67, # 69 Exhibit 68)(Gringer, David) (Entered: 02/01/2025) |
| 02/27/2025 | 802 | MOTION by Defendants Cornell University, Georgetown University, Massachusetts Institute of Technology, The Trustees of the University of Pennsylvania, University of Notre Dame du Lac for leave to file Amended Reply in Support of Defendants' Motion to Exclude Expert Testimony and Opinions of Hal Singer, George Bulman, and Elizabeth Mora<br><br>(Attachments: # 1 Exhibit A - Amended Reply in Support of Defendants' Motion to Exclude Expert Testimony and Opinions of Hal Singer, George Bulman, and Elizabeth Mora, # 2 Declaration of David Gringer in Support, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13, # 16 Exhibit 14, # 17 Exhibit 15, # 18 Exhibit 16, # 19 Exhibit 17, # 20 Exhibit 18, # 21 Exhibit 19, # 22 Exhibit 20)(Miller, Britt) (Entered: 02/27/2025) |
| 02/28/2025 | 805 | REPLY by Defendants Cornell University, Georgetown University, Massachusetts Institute of Technology, The Trustees of the University of Pennsylvania, University of Notre Dame du Lac to motion for |

| | | |
|---|---|---|
| | | miscellaneous relief,,,, 755 *(Amended Reply in Support of Defendants' Motion to Exclude Expert Testimony and Opinions of Hal Singer, George Bulman, and Elizabeth Mora)* (Attachments: # 1 Declaration of David Gringer in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20)(Miller, Britt) (Entered: 02/28/2025) |
| 02/28/2025 | 806 | SEALED REPLY by Cornell University, Georgetown University, Massachusetts Institute of Technology, The Trustees of the University of Pennsylvania, University of Notre Dame du Lac to MOTION by Defendant The Trustees of the University of Pennsylvania Defendants' Motion to Exclude Expert Testimony and Opinions of Hal Singer, George Bulman, and Elizabeth Mora<br><br>755 *(Amended Reply in Support of Defendants' Motion to Exclude Expert Testimony and Opinions of Hal Singer, George Bulman, and Elizabeth Mora)* (Attachments: # 1 Declaration of David Gringer in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20)(Miller, Britt) (Entered: 02/28/2025) |
| 04/03/2025 | 835 | MINUTE entry before the Honorable Matthew F. Kennelly: Docket entry 834 included a date error and is corrected to read as follows (change shown in **bold type**). The Court has reviewed the parties' proposals regarding the Daubert hearing on the motion to exclude opinions of plaintiffs' expert Dr. Singer. The purpose of the hearing is to determine whether, and the extent to which, Dr. Singer's challenged opinions meet the requirements of Daubert and Federal Rule of Evidence 702 and are therefore admissible. The hearing is not the equivalent of a trial on the merits or a mini-trial regarding the degree of persuasiveness of Dr. Singer's challenged opinions vis-a-vis the opinions of the defendants' experts. In addition, the parties should assume that the Court has read and studied the pertinent written materials that have been submitted, which of course include the defendants' examination of Dr. Singer during his deposition and their rebuttal experts' reports and related materials. The hearing will begin promptly at 12:45 PM on **4/14/2025** as previously ordered and will continue to approximately 4:45-5:00 PM. (a) Because plaintiffs bear the burden of establishing admissibility, they will go first and last in questioning Dr. Singer, and they will have the opportunity to recall Dr. Singer briefly after defendants' rebuttal expert testifies. (b) Each side is |

| | | |
|---|---|---|
| | | allocated 50 minutes of time for Dr. Singer's opening examination. Plaintiffs may divide their time as they wish between direct and redirect examination. (c) If defendants wish to call a rebuttal expert, they will go first and last in questioning that expert. Each side is allocated 25 minutes of time with the defendants' rebuttal expert. Defendants may divide this time as they wish between direct and redirect examination. (d) If plaintiffs wish to recall Dr. Singer for further testimony after the defendants' rebuttal expert has testified, the Court will allocate 10 minutes per side for that. (e) Each side is allocated no more than 15 minutes for argument at the conclusion of the testimony. (f) The Court reserves the right to reduce these time limits either collectively or individually before or during the hearing. (mk) (Entered: 04/03/2025) |
| 05/07/2025 | 854 | SEALED DOCUMENT by Defendants Cornell University, Georgetown University, Massachusetts Institute of Technology, The Trustees of the University of Pennsylvania, University of Notre Dame du Lac (Declaration of Daniel T. Fenske in Support of Motion for Summary Judgment and Exhibits 1-80) (Attachments: # 1 Exhibit 1, # 2 Exhibit 1.1, # 3 Exhibit 2, # 4 Exhibit 2.1, # 5 Exhibit 3, # 6 Exhibit 3.1, # 7 Exhibit 4, # 8 Exhibit 5, # 9 Exhibit 6, # 10 Exhibit 7, # 11 Exhibit 8, # 12 Exhibit 9, # 13 Exhibit 10, # 14 Exhibit 11, # 15 Exhibit 12, # 16 Exhibit 13, # 17 Exhibit 14, # 18 Exhibit 15, # 19 Exhibit 16, # 20 Exhibit 17, # 21 Exhibit 18, # 22 Exhibit 19, # 23 Exhibit 20, # 24 Exhibit 21, # 25 Exhibit 22, # 26 Exhibit 23, # 27 Exhibit 24, # 28 Exhibit 25, # 29 Exhibit 26, # 30 Exhibit 27, # 31 Exhibit 28, # 32 Exhibit 29, # 33 Exhibit 30, # 34 Exhibit 31, # 35 Exhibit 32, # 36 Exhibit 33, # 37 Exhibit 34, # 38 Exhibit 35, # 39 Exhibit 36, # 40 Exhibit 37, # 41 Exhibit 38, # 42 Exhibit 39, # 43 Exhibit 40, # 44 Exhibit 41, # 45 Exhibit 42, # 46 Exhibit 43, # 47 Exhibit 44, # 48 Exhibit 45, # 49 Exhibit 46, # 50 Exhibit 47, # 51 Exhibit 48, # 52 Exhibit 49, # 53 Exhibit 50, # 54 Exhibit 51, # 55 Exhibit 52, # 56 Exhibit 53, # 57 Exhibit 54, # 58 Exhibit 55, # 59 Exhibit 56, # 60 Exhibit 57, # 61 Exhibit 58, # 62 Exhibit 59, # 63 Exhibit 60, # 64 Exhibit 61, # 65 Exhibit 62, # 66 Exhibit 63, # 67 Exhibit 64, # 68 Exhibit 65, # 69 Exhibit 66, # 70 Exhibit 67, # 71 Exhibit 68, # 72 Exhibit 69, # 73 Exhibit 70, # 74 Exhibit 71, # 75 Exhibit 72, # 76 Exhibit 73, # 77 Exhibit 74, # 78 Exhibit 75, # 79 Exhibit 76, # 80 Exhibit 77, # 81 Exhibit 78, # 82 Exhibit 79, # 83 Exhibit 80)(Fenske, Daniel) (Entered: 05/07/2025) |
| 05/07/2025 | 864 | EXHIBIT by Defendants Cornell University, Georgetown University, Massachusetts Institute of Technology, The Trustees of the University of Pennsylvania, University of Notre Dame du Lac *(Redacted Exhibits 81-160 to Declaration of Daniel T. Fenske)* regarding declaration,,,,,, 863 (Attachments: # 1 Exhibit 82, # 2 Exhibit 83, # 3 Exhibit 84, # 4 Exhibit 85, # 5 Exhibit 86, # 6 Exhibit 87, # 7 Exhibit 88, # 8 Exhibit 89, # 9 Exhibit 90, # 10 Exhibit 91, # 11 Exhibit 92, # 12 Exhibit 93, # |

| | | |
|---|---|---|
| | | 13 Exhibit 94, # 14 Exhibit 95, # 15 Exhibit 96, # 16 Exhibit 97, # 17 Exhibit 98, # 18 Exhibit 99, # 19 Exhibit 100, # 20 Exhibit 101, # 21 Exhibit 102, # 22 Exhibit 103, # 23 Exhibit 104, # 24 Exhibit 105, # 25 Exhibit 106, # 26 Exhibit 107, # 27 Exhibit 108, # 28 Exhibit 109, # 29 Exhibit 110, # 30 Exhibit 111, # 31 Exhibit 112, # 32 Exhibit 113, # 33 Exhibit 114, # 34 Exhibit 115, # 35 Exhibit 116, # 36 Exhibit 117, # 37 Exhibit 118, # 38 Exhibit 119, # 39 Exhibit 120, # 40 Exhibit 121, # 41 Exhibit 122, # 42 Exhibit 123, # 43 Exhibit 124, # 44 Exhibit 125, # 45 Exhibit 126, # 46 Exhibit 127, # 47 Exhibit 128, # 48 Exhibit 129, # 49 Exhibit 130, # 50 Exhibit 131, # 51 Exhibit 132, # 52 Exhibit 133, # 53 Exhibit 134, # 54 Exhibit 135, # 55 Exhibit 136, # 56 Exhibit 137, # 57 Exhibit 138, # 58 Exhibit 139, # 59 Exhibit 140, # 60 Exhibit 141, # 61 Exhibit 142, # 62 Exhibit 143, # 63 Exhibit 144, # 64 Exhibit 145, # 65 Exhibit 146, # 66 Exhibit 147, # 67 Exhibit 148, # 68 Exhibit 149, # 69 Exhibit 150, # 70 Exhibit 151, # 71 Exhibit 152, # 72 Exhibit 153, # 73 Exhibit 154, # 74 Exhibit 155, # 75 Exhibit 156, # 76 Exhibit 157, # 77 Exhibit 158, # 78 Exhibit 159, # 79 Exhibit 160)(Fenske, Daniel) (Entered: 05/08/2025) |
| 05/08/2025 | 865 | EXHIBIT by Defendants Cornell University, Georgetown University, Massachusetts Institute of Technology, The Trustees of the University of Pennsylvania, University of Notre Dame du Lac *(Redacted Exhibits 161-240 to Declaration of Daniel T. Fenske)* regarding declaration,,,,,, 863 (Attachments: # 1 Exhibit 162, # 2 Exhibit 163, # 3 Exhibit 164, # 4 Exhibit 165, # 5 Exhibit 166, # 6 Exhibit 167, # 7 Exhibit 168, # 8 Exhibit 169, # 9 Exhibit 170, # 10 Exhibit 171, # 11 Exhibit 172, # 12 Exhibit 173, # 13 Exhibit 174, # 14 Exhibit 175, # 15 Exhibit 176, # 16 Exhibit 177, # 17 Exhibit 178, # 18 Exhibit 179, # 19 Exhibit 180, # 20 Exhibit 181, # 21 Exhibit 182, # 22 Exhibit 183, # 23 Exhibit 184, # 24 Exhibit 185, # 25 Exhibit 186, # 26 Exhibit 187, # 27 Exhibit 188, # 28 Exhibit 189, # 29 Exhibit 190, # 30 Exhibit 191, # 31 Exhibit 192, # 32 Exhibit 193, # 33 Exhibit 194, # 34 Exhibit 195, # 35 Exhibit 196, # 36 Exhibit 197, # 37 Exhibit 198, # 38 Exhibit 199, # 39 Exhibit 200, # 40 Exhibit 201, # 41 Exhibit 202, # 42 Exhibit 203, # 43 Exhibit 204, # 44 Exhibit 205, # 45 Exhibit 206, # 46 Exhibit 207, # 47 Exhibit 208, # 48 Exhibit 209, # 49 Exhibit 210, # 50 Exhibit 211, # 51 Exhibit 212, # 52 Exhibit 213, # 53 Exhibit 214, # 54 Exhibit 215, # 55 Exhibit 216, # 56 Exhibit 217, # 57 Exhibit 218, # 58 Exhibit 219, # 59 Exhibit 220, # 60 Exhibit 221, # 61 Exhibit 222, # 62 Exhibit 223, # 63 Exhibit 224, # 64 Exhibit 225, # 65 Exhibit 226, # 66 Exhibit 227, # 67 Exhibit 228, # 68 Exhibit 229, # 69 Exhibit 230, # 70 Exhibit 231, # 71 Exhibit 232, # 72 Exhibit 233, # 73 Exhibit 234, # 74 Exhibit 235, # 75 Exhibit 236, # 76 Exhibit 237, # 77 Exhibit 238, # 78 Exhibit 239, # 79 Exhibit 240)(Fenske, Daniel) (Entered: 05/08/2025) |
| 05/29/2025 | 874 | NOTICE OF FILING PUBLIC VERSIONS OF DOCUMENTS PREVIOUSLY FILED UNDER SEAL by Andrew Corzo, Sia Henry, |

| | | |
|---|---|---|
| | | Alexander Leo-Guerra, Michael Maerlander, Brandon Piyevsky, Benjamin Shumate, Brittany Tatiana Weaver, Cameron Williams (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26)(Normand, Edward) (Entered: 05/29/2025) |
| 06/27/2025 | 889 | DECLARATION of David Gringer regarding Response 887 , response in opposition to motion, 886 , Rule 56 statement 888 (Attachments: # 1 Exhibit 1, # 2 Exhibit 1.1, # 3 Exhibit 1.2, # 4 Exhibit 2, # 5 Exhibit 2.1, # 6 Exhibit 3, # 7 Exhibit 4, # 8 Exhibit 5, # 9 Exhibit 6, # 10 Exhibit 7, # 11 Exhibit 8, # 12 Exhibit 9, # 13 Exhibit 10, # 14 Exhibit 11, # 15 Exhibit 12, # 16 Exhibit 13, # 17 Exhibit 14, # 18 Exhibit 15, # 19 Exhibit 16, # 20 Exhibit 17, # 21 Exhibit 18, # 22 Exhibit 19, # 23 Exhibit 20, # 24 Exhibit 21, # 25 Exhibit 22, # 26 Exhibit 23, # 27 Exhibit 24, # 28 Exhibit 25, # 29 Exhibit 26)(Gringer, David) (Entered: 06/27/2025) |
| 08/12/2025 | 945 | PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY by Andrew Corzo, Sia Henry, Alexander Leo-Guerra, Michael Maerlander, Brandon Piyevsky, Benjamin Shumate, Brittany Tatiana Weaver, Cameron Williams (Attachments: # 1 Exhibit A)(Normand, Edward) (Entered: 08/12/2025) |
| 08/25/2025 | 949 | RESPONSE by Defendant The Trustees of the University of Pennsylvania to other, 945 *Notice of Supplemental Authority* (Gringer, David) (Entered: 08/25/2025) |
| 09/12/2025 | 1025 | NOTICE by Andrew Corzo, Sia Henry, Alexander Leo-Guerra, Michael Maerlander, Brandon Piyevsky, Benjamin Shumate, Brittany Tatiana Weaver, Cameron Williams re Response 896 *OF FILING CORRECTED AND PUBLIC COPIES OF DOCUMENTS* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 17, # 4 Exhibit 40, # 5 Exhibit 46, # 6 Exhibit 107, # 7 Exhibit 117, # 8 Exhibit 122, # 9 Exhibit 129, # 10 Exhibit 203, # 11 Exhibit 204, # 12 Exhibit 206, # 13 Exhibit 237, # 14 Exhibit 271, # 15 Exhibit 275, # 16 Exhibit 282, # 17 Exhibit 314, # 18 Exhibit 367, # 19 Exhibit 369, # 20 Exhibit 377)(Normand, Edward) (Entered: 09/12/2025) |
| 09/29/2025 | 1160 | MEMORANDUM OPINION AND ORDER signed by the Honorable Matthew F. Kennelly on 9/29/2025: For the reasons stated in the accompanying Memorandum Opinion and Order, the Court denies plaintiffs' motions to exclude Dr. Long and Mr. Ammon [dkt. nos. 750, |

| | | |
|---|---|---|
| | | 751] and also denies defendants' motion to exclude Dr. Singer, Dr. Bulman, and Ms. Mora [dkt. 755]. (mk) (Entered: 09/29/2025) |
| 01/12/2026 | 1210 | MEMORANDUM OPINION AND ORDER signed by the Honorable Matthew F. Kennelly on 1/12/2026: For the reasons stated above, the Court denies the universities' motion for summary judgment in its entirety [dkt. 848] and the students' motion for partial summary judgment on UPenn's withdrawal defense [dkt. 850]. (mk) (Entered: 01/12/2026) |
| 03/31/2026 | 1241 | MEMORANDUM OPINION AND ORDER signed by the Honorable Matthew F. Kennelly on 3/31/2026: For the reasons stated in the accompanying Memorandum Opinion and Order, the Court grants plaintiffs' motion to amend their motion for class certification and withdraws from consideration as class counsel the attorneys associated with Gilbert Litigators and Counselors [dkt. 1236, 1237]. The Court enters and continues plaintiffs' motion for class certification [dkt. 757] and gives plaintiffs 21 days, to April 21, 2026, to file a motion proposing new lead class counsel. The case is set for an in-person status hearing on April 28, 2026 at 9:30 a.m. (mk) (Entered: 03/31/2026) |
| 05/15/2026 | 1261 | TRANSCRIPT OF PROCEEDINGS held on March 20, 2025 before the Honorable Matthew F. Kennelly. Order Number: 51430, 51433, 51434, 51440. Court Reporter Contact Information: Carolyn Cox, carolyn_cox@ilnd.uscourts.gov.<br><br>IMPORTANT: The transcript may be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through the Court Reporter/Transcriber or PACER. For further information on the redaction process, see the Court's web site at www.ilnd.uscourts.gov under Quick Links select Policy Regarding the Availability of Transcripts of Court Proceedings.<br><br>Redaction Request due 6/5/2026. Redacted Transcript Deadline set for 6/15/2026. Release of Transcript Restriction set for 8/13/2026. (Cox, Carolyn) (Entered: 05/15/2026) |
| 05/15/2026 | 1263 | TRANSCRIPT OF PROCEEDINGS held on April 14, 2025 before the Honorable Matthew F. Kennelly. Order Number: 48951, 48948, 48945, 48935, 51648. Court Reporter Contact Information: Carolyn Cox, carolyn_cox@ilnd.uscourts.gov.<br><br>IMPORTANT: The transcript may be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may |

| | | |
|---|---|---|
| | | be obtained through the Court Reporter/Transcriber or PACER. For further information on the redaction process, see the Court's web site at www.ilnd.uscourts.gov under Quick Links select Policy Regarding the Availability of Transcripts of Court Proceedings.<br><br>Redaction Request due 6/5/2026. Redacted Transcript Deadline set for 6/15/2026. Release of Transcript Restriction set for 8/13/2026. (Cox, Carolyn) (Entered: 05/15/2026) |
| 06/01/2026 | 1275 | ORDER ON MOTION FOR CLASS CERTIFICATION, signed by the Honorable Matthew F. Kennelly on 6/1/2026: For the reasons stated in the Court's March 31, 2026 Memorandum Opinion and Order and in the present Order, the Court grants plaintiffs' motion for class certification. The Court certifies a class consisting of all persons who have during the "class period" (a) enrolled in one or more of defendants' full-time undergraduate programs, (b) received at least some need-based financial aid from one or more defendants, and (c) whose tuition, fees, room, or board to attend one or more of defendants' full-time undergraduate programs was not fully covered by the combination of any types of grant or merit aid in any undergraduate year. (The term "class period" is defined with particularity in various submissions, see, e.g., dkt. 755-12 par. 9 (Hal Singer amended report), and should of course be included in the class notice.) The remaining named plaintiffs are appointed as class representatives and should be identified in the class notice. Steven Molo and MoloLamken LLC are appointed as lead counsel for the class, and Freedman Norman Friedland LLP and Berger Montague PC are appointed as co-counsel for the class. The parties are directed to confer regarding an appropriate form of notice and are to submit an agreed notice, or competing proposals if they cannot agree in good faith, by June 10, 2026. A telephonic status hearing is set for June 12, 2026 at 9:15 a.m., using call-in number 650-479-3207, access code 2305-915-8729. (mk) (Entered: 06/01/2026) |
| 06/12/2026 | 1282 | ORDER Granting Plaintiff's Motion to Provide Agreed Forms of Notice to the Certified Litigation Class: Signed by the Honorable Matthew F. Kennelly on 6/12/2026. Mailed notice. (mma, ) (Entered: 06/12/2026) |
| 09/30/2026 | 1345 | SEALED TRANSCRIPT OF PROCEEDINGS held on July 28, 2025 before the Honorable Matthew F. Kennelly. UNDER SEAL MOTION. Court Reporter Contact Information: Carolyn Cox, carolyn_cox@ilnd.uscourts.gov. (Cox, Carolyn) (Entered: 09/30/2026) |

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SIA HENRY, MICHAEL MAERLANDER, BRANDON PIYEVSKY, KARA SAFFRIN, and BRITTANY TATIANA WEAVER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,<br><br>Defendants. | Case No.:<br><br>**JURY TRIAL DEMANDED** |

**<u>CLASS ACTION COMPLAINT</u>**

Plaintiffs, Sia Henry, Michael Maerlander, Brandon Piyevsky, Kara Saffrin, and Brittany Tatiana Weaver, individually and on behalf of all others similarly situated, bring this class action under Section 1 of the Sherman Act against Brown University ("Brown"), California Institute of Technology ("CalTech"), University of Chicago ("Chicago"), The Trustees of Columbia University in the City of New York ("Columbia"), Cornell University ("Cornell"), Trustees of Dartmouth College ("Dartmouth"), Duke University ("Duke"), Emory University ("Emory"), Georgetown University ("Georgetown"), Massachusetts Institute of Technology ("MIT"), Northwestern University ("Northwestern"), University of Notre Dame du Lac ("Notre Dame"), The Trustees of the University of Pennsylvania ("Penn"), William Marsh Rice University ("Rice"), Vanderbilt University ("Vanderbilt"), and Yale University ("Yale") (collectively, "Defendants").

## I.

## INTRODUCTION

1. Defendants are private, national universities that have long been in the top 25 of the *U.S. News & World Report* rankings for such schools. These elite institutions occupy a place of privilege and importance in American society. And yet these same Defendants, by their own admission, have participated in a price-fixing cartel that is designed to reduce or eliminate financial aid as a locus of competition, and that in fact has artificially inflated the net price of attendance for students receiving financial aid. Defendants participate in the cartel claiming the protection of Section 568 of the Improving America's Schools Act of 1994 (the "568 Exemption"). This exemption from the antitrust laws, which otherwise prohibit conspiracies among competitors, applies to two or more institutions of higher education at which "*all* students admitted are admitted on a need-blind basis." Section 568 defines "on a need-blind basis" to mean "without regard to the financial circumstances of the student involved or the student's family." 15 U.S.C. § 1 Note.

2. Defendants have not been entitled to the 568 Exemption. Under a true need-blind admissions system, all students would be admitted without regard to the financial circumstances of the student or student's family. Far from following this practice, at least nine Defendants for many years have favored wealthy applicants in the admissions process. These nine Defendants have thus made admissions decisions *with regard to* the financial circumstances of students and their families, thereby disfavoring students who need financial aid. All Defendants, in turn, have conspired to reduce the amount of financial aid they provide to admitted students. This conspiracy, which has existed (with slightly varying membership) for many years, thus falls outside the exemption from the antitrust laws.

3. Defendants are members of the so-called "568 Presidents Group," in which the members have agreed on "a set of common standards for determining the family's ability to pay for college," which the members describe as the "Consensus Approach." Based on the Consensus Approach, in approximately 2003 the 568 Presidents Group (the "568 Cartel") devised the Consensus Methodology, which is a common formula for determining an applicant's ability to pay. Under the Consensus Methodology, an applicant's ability to pay is a substantial determinant of the net price, which is the institution's gross tuition plus fees for room and board, less institutional grant aid, charged to the applicant for attendance.

4. In collectively adopting this methodology, and regularly meeting to implement it jointly, the 568 Cartel has explicitly aimed to reduce or eliminate price competition among its members. As a result of this conspiracy, the net price of attendance for financial-aid recipients at Defendants' schools has been artificially inflated. In short, due to the conduct challenged herein, over almost two decades, Defendants have overcharged over 170,000 financial-aid recipients by at least hundreds of millions of dollars, in violation of Section 1 of the Sherman Act.

5. Defendants' longstanding conspiracy would be immune from the antitrust laws only if they have all been complying with the 568 Exemption. In fact, however, at least nine Defendants (Columbia, Dartmouth, Duke, Georgetown, MIT, Northwestern, Notre Dame, Penn, and Vanderbilt) have been members of the 568 Cartel and have not qualified for the 568 Exemption throughout the Class Periods (defined below).

6. Instead, these nine Defendants have considered the financial circumstances of students and their families in admissions—for example, by maintaining admissions systems that favor the children of wealthy past or potential future donors. At least some of these nine Defendants also take into account applicants' financial circumstances through a largely secretive practice known as "enrollment management." And at least some of these nine Defendants have also considered applicants' need for financial aid by preferencing students who will not need financial aid in deciding on waitlist admissions.

7. The other seven Defendants (Brown, CalTech, Chicago, Cornell, Emory, Rice, and Yale) have been members of the 568 Cartel during at least parts of the last two decades. These seven Defendants may or may not have adhered to need-blind admissions policies, but they nonetheless conspired with the other Defendants. The 568 Exemption thus does not apply to them either. In addition, although such knowledge is unnecessary to show their liability, these seven Defendants knew or should have known that the other nine Defendants were not following need-blind admissions policies.

8. In critical respects, elite, private universities like Defendants are gatekeepers to the American Dream. Defendants' misconduct is therefore particularly egregious because it has narrowed a critical pathway to upward mobility that admission to their institutions represents. The burden of the 568 Cartel's overcharges falls in particular on low- and middle-income families

struggling to afford the cost of a university education and to achieve success for their children. In addition, unlike prior admissions scandals, such as Varsity Blues,[1] the 568 Cartel's systematic suppression of financial aid is the official policy of its participants.

9. The 568 Cartel has thus caused substantial injury damages to Plaintiffs and the other members of the proposed Class (defined below). Plaintiffs bring this lawsuit to end Defendants' conspiratorial conduct and to prevent future students from suffering the injury the ongoing conspiracy has inflicted. In addition, Plaintiffs do so under circumstances in which a reasonable person, like each of the Plaintiffs, would have been unaware of the harm resulting from Defendants' use of the Consensus Methodology.

10. Plaintiffs also seek to compensate the proposed Class of all U.S. citizens or permanent residents, and purchasers of tuition, room, or board on their behalf, who have (a) enrolled in one or more of the Defendants' full-time undergraduate programs, (b) received need-based financial aid from one or more Defendants, (c) paid to one of more Defendants tuition, room, or board not fully covered by such financial aid, and (d) first enrolled in one of the Defendants' full-time undergraduate programs during the relevant times (defined below) since 2003.

11. Parents, legal guardians, and other family members commonly pay or help to pay the cost of a student's tuition, room, and board. The proposed Class therefore includes both students and those who pay or commit to pay on behalf of students.

[1] "Varsity Blues" is law enforcement's code name for the investigation and prosecution of the college admissions bribery scandal, which involved allegations that certain universities gave admissions preference to the children of wealthy parents in exchange for bribes.

## II.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331, 1332(d)(2), and 1337.

13. This Court has personal jurisdiction over each Defendant on multiple bases, including that each Defendant has (1) transacted business in the United States and in this District, including by recruiting, and advertising for, students residing in this District; (2) transacted business with Class Members throughout the United States, including those residing in this District; and (3) committed substantial acts in furtherance of an unlawful scheme in the United States, including in this District. Each Defendant has recruited, accepted, enrolled, and charged artificially high net prices of attendance to, and thus injured, individuals residing within this District. In addition, Defendants have held at least one meeting of the 568 Cartel in Rosemont, Illinois, which is within this District.

14. Venue is proper in this District under 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b), (c), and (d), because each Defendant transacted business, was found, had agents, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

15. During the Class Periods, Defendants' conduct has had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States and in this District. Defendants' conduct affects admitted students around the country, including through transactions with parties residing in different states. Defendants do business across state lines.

## III.

## THE PARTIES

### A. Plaintiffs

16. Plaintiff Sia Henry attended Duke as a full-time undergraduate student from the fall of 2007 until she graduated in the spring of 2011. For each of these four years, she paid to Duke some of the costs of tuition, room, and board. She received need-based financial aid from Duke in at least two of her four years of attendance. Since graduating from Duke, and subsequently from Harvard Law School, Ms. Henry has dedicated her career to advocacy on behalf of prisoners, most recently as a Senior Program Specialist at Impact Justice. She resides in Atlanta, Georgia.

17. Plaintiff Michael Maerlander attended Vanderbilt as a full-time undergraduate student from the fall of 2015 until he graduated in the spring of 2019. For each of these four years, he received need-based financial aid from Vanderbilt and paid for some of the costs of tuition, room, and board. He resides in New York, New York.

18. Plaintiff Brandon Piyevsky attended Northwestern as a full-time undergraduate student from the fall of 2013 until he graduated in the spring of 2017. For each of these four years, he received need-based financial aid from Northwestern and paid for some of the costs of tuition, room, and board. He resides in Toledo, Ohio.

19. Plaintiff Kara Saffrin attended Northwestern as a full-time undergraduate student from the fall of 2014 until she graduated in the spring of 2018. For each of these four years, she received need-based financial aid from Northwestern and paid for some of the costs of tuition, room, and board. She resides in Chicago, Illinois.

20. Plaintiff Brittany Tatiana Weaver attended Vanderbilt as a full-time undergraduate student from 2003 until she graduated in 2007. For each of these four years, she received need-

based financial aid from Vanderbilt and paid for some of the costs of tuition, room, and board. She resides in Farmington Hills, Michigan.

**B. Defendants**

21. Defendants are private, national universities that have been members of the 568 Cartel (most since 2003, and some not continuously) sand have been continuously ranked in the top 25 of the *U.S. News & World Report* rankings for national universities since 2003.

22. Each Defendant acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein. All Defendants are jointly and severally liable for the acts of all members of the 568 Cartel.

23. At least nine Defendants were continuously members of the 568 Cartel from 1998, implemented the Consensus Methodology from 2003 (or 2004, in the case of Dartmouth) through at least 2019, and practiced admissions policies that were not need-blind and thus were not covered by the 568 Exemption.

24. The remaining Defendants were official members of the 568 Cartel for different time periods and may or may not have followed a need-blind admissions policy, but nonetheless conspired with the other Defendants (and knew or should have known that the other Defendants were not following need-blind admissions policies).

**Brown**

25. Defendant Brown University is a private, non-profit institution with its principal place of business in Providence, Rhode Island.

26. Brown was established by a charter, approved by the Rhode Island legislature, as "College of Rhode Island" in 1764. The school was the third college in New England and seventh in America. The school's name was changed to Brown in 1804. Brown is a member of the Ivy League, a consortium of eight elite universities.

27. Brown's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $204,200; 19% of undergraduates come from the top 1% of the country's income distribution, and 70% come from the top 20%; and only 4.1% come from the bottom 20% of the income distribution.[2]

28. Brown has an endowment of approximately $6.9 billion.[3]

**California Institute of Technology**

29. Defendant California Institute of Technology is a private, non-profit institution with its principal place of business in Pasadena, California.

30. CalTech is one of the nation's leading research universities.

31. CalTech's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $146,300; 3% of undergraduates come from the top 1% of the country's income distribution, and 69% come from the top 20%; and only 2.9% come from the bottom 20% of the income distribution.[4]

32. CalTech has an endowment of approximately $3 billion.

**Chicago**

33. Defendant University of Chicago is a private, non-profit institution with its principal place of business in Chicago, Illinois.

---

[2] *Economic Diversity and Student Outcomes at Brown University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/brown-university.

[3] Michael Nitezel, *Elite University Endowments Soar as Higher Ed Divide Grows*, FORBES (Oct. 15, 2021), https://www.forbes.com/sites/michaeltnietzel/2021/10/15/elite-university-endowments-soar-to-record-highs/?sh=724aa8932d5f.

[4] *Economic Diversity and Student Outcomes at the University of California Institute of Technology*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/california-institute-of-technology.

34. Chicago was founded in 1890 by the American Baptist Education Society and oil magnate John D. Rockefeller, who later described the school as "the best investment I ever made."

35. Chicago's undergraduate study body is generally wealthy and privileged. The median family income of undergraduates is $134,500; 10% of undergraduates come from the top 1% of the country's income distribution, and 58% come from the top 20%; and only 5.5% come from the bottom 20% of the income distribution.[5]

36. Chicago has an endowment of almost $12 billion.

**Columbia**

37. Defendant Trustees of Columbia University in the City of New York is a private, non-profit institution with its principal place of business in New York, New York.

38. Columbia was established as King's College by royal charter of King George II of Great Britain in 1754. It was renamed Columbia College in 1784. In 1896, the campus was moved to its current location in Morningside Heights and renamed Columbia University. According to its website, "Columbia University is one of the world's most important centers of research." Columbia is a member of the Ivy League.

39. Columbia's undergraduate student body, with the exception of its School of General Studies, discussed below, is generally wealthy and privileged. The median family income of undergraduates is $150,900; 13% of undergraduates come from the top 1% of the country's income distribution, and 62% come from the top 20%; and only 5.1% come from the bottom 20% of the income distribution.[6]

---

5 *Economic Diversity and Student Outcomes at the University of Chicago*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/university-of-chicago.

6 *Economic Diversity and Student Outcomes at Columbia University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/columbia-university.

40. Columbia has an endowment of approximately $14 billion.

**Cornell**

41. Defendant Cornell is a private, non-profit institution with its principal place of business in Ithaca, New York.

42. Cornell was founded in 1865, as a private though land-grant institution of New York State. According to its website, Cornell has been described as "the first *truly* American university because of its founders' revolutionary egalitarian and practical vision of higher education." (Emphasis in original.) Cornell is a member of the Ivy League.

43. Cornell's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $151,600; 10% of undergraduates come from the top 1% of the country's income distribution, and 64% come from the top 20%; and only 3.8% come from the bottom 20% of the income distribution.[7]

44. Cornell's endowment is approximately $10 billion.

**Dartmouth**

45. Defendant Trustees of Dartmouth College is a private, non-profit institution with its principal place of business in Hanover, New Hampshire.

46. According to Dartmouth's website: "Founded in 1769, Dartmouth is a member of the Ivy League and consistently ranks among the world's greatest academic institutions." Dartmouth's website also claims that "Dartmouth College educates the most promising students."

47. Dartmouth's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $200,400; 21% of undergraduates come from the top

---

[7] *Economic Diversity and Student Outcomes at Cornell University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/cornell-university.

1% of the country's income distribution, and 69% come from the top 20%; and only 2.6% come from the bottom 20% of the income distribution.[8]

48. Dartmouth has an endowment of approximately $8.5 billion.

**Duke**

49. Defendant Duke University is a private, non-profit institution with its principal place of business in Durham, North Carolina.

50. Duke's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $186,700; 19% of undergraduates come from the top 1% of the country's income distribution, and 69% come from the top 20%; and only 3.9% come from the bottom 20% of the income distribution.[9]

51. Duke has an endowment of approximately $12.7 billion.

**Emory**

52. Defendant Emory University is a private, non-profit institution with its principal place of business in Atlanta, Georgia.

53. Emory was established by charter of the Georgia legislature in 1836.

54. Emory's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $139,800; 15% of undergraduates come from the top 1% of the country's income distribution, and 58% come from the top 20%; and only 6% come from the bottom 20% of the income distribution.[10]

---

[8] *Economic Diversity and Student Outcomes at Dartmouth College*, N.Y. TIMES https://www.nytimes.com/interactive/projects/college-mobility/dartmouth-college.

[9] *Economic Diversity and Student Outcomes at Duke University* N.Y. TIMES https://www.nytimes.com/interactive/projects/college-mobility/duke-university.

[10] *Economic Diversity and Student Outcomes at Emory University* N.Y. TIMES https://www.nytimes.com/interactive/projects/college-mobility/emory-university.

55. Emory has an endowment of approximately $9 billion.

**Georgetown**

56. Defendant Georgetown University is a private, non-profit institution with its principal place of business in Washington, District of Columbia.

57. According to its website: "Georgetown University is the oldest Catholic and Jesuit institution of higher learning in the United States."

58. Georgetown's undergraduate student body is generally wealthy and privileged. The median family income of undergraduate students is $229,100; 21% of undergraduates come from the top 1% of the country's income distribution, and 74% come from the top 20%; and only 3.1% come from the bottom 20% of the income distribution.[11]

59. Georgetown has an endowment of approximately $2.6 billion.

**Massachusetts Institute of Technology**

60. Defendant Massachusetts Institute of Technology is a private, non-profit institution with its principal place of business in Cambridge, Massachusetts.

61. MIT is regularly ranked in the top five in international rankings of the world's best research universities.

62. MIT's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $137,400; 5.7% of undergraduates come from the top 1% of the income distribution, and 61% come from the top 20%; and only 6.2% come from the bottom 20% of the income distribution.[12]

---

[11] *Economic Diversity and Students Outcomes at Georgetown University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/georgetown-university.

[12] *Economic Diversity and Student Outcomes at Massachusetts Institute of Technology*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/massachusetts-institute-of-technology.

63. MIT has an endowment of approximately $27.4 billion.

**Northwestern**

64. Defendant Northwestern University is a private, non-profit institution with its principal place of business in Evanston, Illinois. Northwestern was founded in 1853.

65. Northwestern's undergraduate student body is generally wealthy and privileged. The median family income of Northwestern's undergraduates is $171,200; 14% of undergraduates come from the top 1% of the income distribution, and 66% come from the top 20%; and only 3.7% come from the bottom 20% of the income distribution.[13]

66. Northwestern has an endowment of approximately $11 billion.

**University of Notre Dame du Lac**

67. Defendant University of Notre Dame du Lac is a private, non-profit institution with its principal place of business in South Bend, Indiana.

68. Notre Dame was founded in 1842. According to its website, Notre Dame is "[o]ne of America's leading undergraduate teaching institutions."

69. Notre Dame's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $191,400; 15% of undergraduates come from the top 1% of the income distribution, and 75% come from the top 20%; and only 1.6% come from the bottom 20% of the income distribution.[14]

70. Notre Dame has an endowment of approximately $12 billion.

---

[13] *Economic Diversity and Student Outcomes at Northwestern University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/northwestern-university.

[14] *Economic Diversity and Student Outcomes at Notre Dame*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/notre-dame.

**University of Pennsylvania**

71. Defendant Trustees of the University of Pennsylvania is a private, non-profit institution with its principal place of business in Philadelphia, Pennsylvania.

72. Penn was founded in 1740 by Benjamin Franklin. As of 2014, Penn had 25 undergraduate alumni that were billionaires, more than any other university in the world.[15] Penn is a member of the Ivy League.

73. Penn's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $195,500; 19% of undergraduates come from the top 1% of the income distribution, and 71% come from the top 20%; and only 3.3% come from the bottom 20% of the income distribution.[16]

74. Penn has an endowment of approximately $20.5 billion.

**Rice**

75. Defendant William Marsh Rice University is a private, non-profit institution with its principal place of business in Houston, Texas.

76. Rice was founded in 1891 by Houston businessman William Marsh Rice.

77. Rice's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $160,800; 9.8% of undergraduates come from the top 1% of the income distribution, and 64% come from the top 20%; and only 4.9% come from the bottom 20% of the income distribution.[17]

---

15 Emily Jane Fox, *Top 20 Colleges with Most Billionaire Alumni*, CNN (Sept. 17, 2014), https://money.cnn.com/2014/09/16/luxury/top-colleges-with-billionaire-undergraduates/.

16 *Economic Diversity and Student Outcomes at the University of Pennsylvania*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/university-of-pennsylvania.

17 *Economic Diversity and Student Outcomes at Rice University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/rice-university.

78. Rice's total endowment is approximately $8 billion.

**Vanderbilt**

79. Defendant Vanderbilt University is a private, non-profit institution with its principal place of business in Nashville, Tennessee.

80. Vanderbilt was founded in 1873 and named in honor of Cornelius Vanderbilt, who donated a founding gift. According to Vanderbilt's website, "the university's prominent alumni base includes Nobel Prize winners, members of Congress, governors, ambassadors, judges, admirals, CEOs, university presidents, physicians and attorneys, as well as professional sports figures playing in the NFL, NBA, Major League Baseball, the PGA and LPGA."

81. Vanderbilt's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $204,500; 23% of undergraduates come from the top 1% of the income distribution, and 70% come from the top 20%; and only 1.9% come from the bottom 20% of the income distribution.[18]

82. Vanderbilt has an endowment of approximately $10 billion.

**Yale**

83. Defendant Yale University is a private, non-profit institution with its principal place of business in New Haven, Connecticut.

84. Originally chartered by the legislature of Connecticut as the Collegiate School in 1701 in multiple locations, the school was moved to New Haven in 1716 and renamed Yale in 1718, after a wealthy British merchant and philanthropist, Elihu Yale. It is the third-oldest university in the United States. Yale is a member of the Ivy League.

---

[18] *Economic Diversity and Student Outcomes at Vanderbilt University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/vanderbilt-university.

85. Yale's undergraduate study body is generally wealthy and privileged. The median family income of undergraduates is $192,600; 19% of undergraduates come from the top 1% of the income distribution, and 69% come from the top 20%; and only 2.1% come from the bottom 20% of the income distribution.[19]

86. Yale's endowment of approximately $42 billion is the second highest of any university in the United States.

**IV.**

**MEMBERSHIP IN THE 568 CARTEL**

87. The 568 Cartel was formed in 1998. Columbia, Cornell, Duke, Georgetown, MIT, Northwestern, and Notre Dame have been members of the 568 Cartel since 1998 and first implemented the Consensus Methodology in 2003.

88. Dartmouth joined the 568 Cartel in 1998 and implemented the Consensus Methodology in 2004.

89. Penn and Vanderbilt joined the 568 Cartel in 1998, implemented the Consensus Methodology in 2003, and evidently withdrew from the Cartel in 2020.

90. Yale joined the 568 Cartel in 1998, implemented the Consensus Methodology in 2003, and evidently withdrew from the Cartel at the end of 2007. Yale has been a member of the 568 Cartel from 2018 to the present.

91. Rice joined the 568 Cartel in 1998, implemented the Consensus Methodology in 2003, and evidently withdrew from the Cartel in 2009. Rice has been a member of the 568 Cartel from 2017 to the present.

---

[19] *Economic Diversity and Student Outcomes at Yale University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/yale-university.

92. Brown joined the 568 Cartel in 1998, implemented the Consensus Methodology in 2004, and evidently withdrew from the Cartel in 2012.

93. Emory joined the 568 Cartel in 1998, implemented the Consensus Methodology in 2003, and evidently withdrew from the Cartel in 2012.

94. Chicago joined the 568 Cartel in 1998, implemented the Consensus Methodology in 2003, and evidently withdrew from the Cartel in 2014.

95. CalTech joined the 568 Cartel in 2019 and implemented the Consensus Methodology the same year.

## V.

## DEFENDANTS' VIOLATION OF THE FEDERAL ANTITRUST LAWS

### A. Defendants Have Colluded on Their Financial-Aid Practices

96. Defendants are competitors in enrolling highly selective undergraduate student bodies and providing an undergraduate education. People throughout the United States (and the world) apply for admission to Defendants' undergraduate programs.

97. Each Defendant annually sends out thousands of solicitations and mailings and receives thousands of admission applications that cross state lines, including thousands of applications from Class Members. Out-of-state students, including thousands of Class Members, make up a substantial percentage of each Defendant's undergraduate population.

98. Each Defendant annually receives millions of dollars that flow across state lines in tuition payments, grants, donations, and athletic ticket sales and sponsorships. Each Defendant markets its undergraduate programs and tickets for athletic events to the public across state lines.

99. The Defendants have engaged, throughout the Class Periods, in a continuing conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act. This violation is likely to continue unless the relief sought herein is granted.

100. This conspiracy consists of an agreement, understanding, and concert of action among Defendants, the substantial terms of which are to restrain price competition relating to their provision of financial aid for students, and thereby to increase the net price of attending these institutions ("the net price of attendance").

101. The 568 Cartel generally meets in person as a group at least twice each year. In October 2017, for example, the 568 Cartel held one of its official biannual meetings at the Hilton Rosemont, in Rosemont, Illinois, near O'Hare International Airport. On information and belief, 568 Cartel members communicate with each other about matters related to the conspiracy through other means as well, such as telephone calls, video calls, emails, and messaging.

102. Defendants maintain a website for purpose of representing the 568 Cartel and its purposes to the public. The website of the 568 Presidents Group states: "This site serves as a resource . . . for visitors seeking to learn more about the Group."[20] The website explains that the "568 Presidents Group is an affiliation of colleges and universities, all of which must admit students on a need-blind basis." An FAQ section on the website adds: "It is referred to as a 'Presidents' group because it was formed by a group of 28 college and university presidents from need-blind schools in 1998." The website also contains the form of a certificate of compliance whereby a member of the group can certify that "its admission and financial aid practices currently comply with the rules of Section 568 regarding 'need-blind admission practices.'" These statements on the website mislead the public by representing that the 568 Cartel members' practices are compliant with Section 568. The truth, as alleged further below, is the opposite.

103. The 568 Cartel fixes prices through a formula that is based on a "set of common standards for determining the family's ability to pay for college." The 568 Cartel calls this formula

---

[20] 568 PRESIDENTS GROUP, http://www.568group.org/home/.

the "Consensus Methodology." This methodology assesses the income and assets of a given financial-aid applicant and their family to determine the applicant's ability to pay and thus the financial contribution that the applicant and their family is expected to make. The applicant's assessed ability to pay therefore is a key determinant in the net price of attendance. To the extent the 568 Cartel uses these standards and methodology to set a formula for setting prices only for a student's freshman year, these prices substantially determine the prices for that student's subsequent years at the same institution.

104. Members of the 568 Cartel began meeting sometime after the enactment of Section 568 in 1994. The 568 Cartel was officially formed in 1998.

105. Penn and Vanderbilt evidently withdrew from the 568 Cartel around June 2020; since then, their names have not been included in the list of member institutions on the Cartel website. But the determinants of the net price of attending Penn and Vanderbilt, during the Class Periods and for all currently enrolled students (other than incoming freshmen in 2021), were established while those institutions were participating in the conspiracy alleged here.

106. The net price of attendance for all currently enrolled students (other than incoming freshman in 2021) were fixed between the institution and the student while Penn and Vanderbilt were in the 568 Cartel.

107. As of July 2001, Dartmouth had not joined the 568 Cartel. According to Dartmouth's then-Dean of Admissions and Financial Aid, Karl Furstenberg, as of 2001 Dartmouth had a "need analysis methodology that [was] perhaps more enlightened, more generous and more flexible than" that of the 568 Cartel, and Dartmouth was "actually doing more than this new

methodology would allow."[21] Not long after Mr. Furstenberg made these statements, however, Dartmouth decided to join the 568 Cartel and implemented the Consensus Methodology soon after the 2003-04 academic year.

108. The 568 Cartel monitors and enforces its combination and conspiracy in several ways, according to the Cartel's website, including (but not limited to) such steps as (a) requiring each participating institution to submit a "Certificate of Compliance," (b) requiring university professionals at each institution to receive "training . . . in the application of the Methodology," (c) imposing a "common calendar for the collection of data from families," and (d) conducting an annual or biannual meeting every year since 2007.

## VI.

## DEFENDANTS' ANTICOMPETITIVE CONDUCT HAS RAISED NET PRICES

109. As higher-education insiders—including employees and officers of the institutions in the 568 Cartel—have acknowledged, the Cartel limits competition in financial-aid offers from supposedly competing schools, driving down aid packages and thereby driving up the net price of attendance for aid-eligible students.

110. Yale evidently withdrew from the 568 Cartel in 2008, for example, and did so because it determined that membership in the Cartel had restricted the amount of financial aid that Yale could provide to students. That is, Yale's decision to increase financial-aid awards to eligible students prompted it to withdraw. In withdrawing, Yale stated that its "new, more generous aid

[21] Shevani Jaisingh, *28 Colleges Alter Financial Aid Packages*, THE DARTMOUTH (July 17, 2001), https://www.thedartmouth.com/article/2001/07/28-colleges-alter-fin-aid-packages.

policy in [to become effective in] January [2009] means the University can no longer follow the consensus methodology."[22]

111. Yale's then-Director of Student Financial Services, Caesar Storlazzi, concluded: "By leaving the 568 Group, Yale is now free to give families more aid than they would have gotten under the consensus methodology."[23] Storlazzi stated that what is "not good" about the Cartel's approach is that it has "one needs-analysis formula that everyone has to sign on to."[24] The connection between Yale's withdrawal and the effect on net prices was explicit: "In other words, the percentage of a family's income and assets that Yale takes as a parental contribution is now lower than the percentage taken by 568 schools."[25] (Yale evidently rejoined the Cartel in 2018, without fanfare.)

112. Other universities have similarly declined to participate in the 568 Cartel because it would limit the financial aid they could provide. Harvard's then-Director of Financial Aid, Sally Donahue, said in 2008 that Harvard never joined the 568 Cartel because its financial-aid formula would have yielded financial-aid packages that were smaller than what Harvard wanted to award.[26] In 2015, one anonymous university president who refused to participate in the 568 Cartel described it as "an insider's game" that belonged to a "bygone era." Observing that some schools had left the 568 Cartel to offer more financial aid, this anonymous president opined that "the notion of a collective that would constrain money is counter to public policy."[27]

---

[22] Caitlin Roman, *University Leaves Financial Aid Group*, YALE DAILY NEWS (Sept. 26, 2008), https://yaledailynews.com/blog/2008/09/26/university-leaves-financial-aid-group/.

[23] *Id*.

[24] *Id*.

[25] *Id*.

[26] *Id*.

[27] The Education Conservancy, *Financial Aid: Examining the Thinking Behind the Policy* (June 2015), https://www.educationconservancy.org/PresidentialThinking.pdf.

113. Indeed, the website of the 568 Presidents Group states in relevant part: "The Consensus Approach . . . seeks to reduce much of the variance in need analysis results that has been experienced in recent years." The website goes on to state that the "participating institutions believe that the Consensus Approach, when applied in a consistent manner, serves to diminish or eliminate . . . divergent results."

114. The phrases "reduce much of the variance," "consistent manner," and "diminish or eliminate divergent results," in the opaque world of higher-education pricing, are code words meaning that the purpose of the 568 Cartel is to reduce or eliminate competition between Cartel members over offers of financial aid to prospective students. And elimination of competition over financial-aid offers is simply a means of coalescing around a uniform *and lower* level of aid to all prospective students. The result of the 568 Cartel is thus not only to reduce the amount of total aid offered by each school, but also to reduce the total amount of aid offered to each prospective student at each Defendant school.

115. In addition, under antitrust principles, the fact that members of the 568 Cartel must agree on a common methodology for determining financial aid is itself evidence that the Cartel reduced such aid. Competitors would not reach such agreement, because they would be incentivized to increase aid and reduce net prices of attendance to attract students. In this case, that would mean the awarding of more financial aid and reduction of net prices of attendance for all students in the proposed Class.

116. The 568 Exemption allowed the 568 Cartel members to eliminate incentives to compete if all of the members admitted all students on a need-blind basis. Plaintiffs show herein, however, that by their own actions, Defendants did not satisfy this provision and thus were not

entitled to the exemption. Accordingly, Defendants are liable for the reduced aid and artificially high net prices of attendance for Class Members that resulted from their agreement.

117. Absent collusion, Defendants would compete on price for the students that they have decided to admit because these are the students that the admissions department has decided would satisfy the goals of the admissions process—among other things, to generate a diverse student body of high academic performers and student-athletes. Defendants view enrolling such students as critical to maintaining their prestige and influence and continuing to attract donations.

118. Given that a large percentage of families cannot afford an elite university education for their children without financial assistance, the 568 Cartel has enabled Defendants to maintain artificially inflated net prices of attendance, through artificially reduced financial aid, without losing admitted students to competitor schools.

119. In short, Defendants' anticompetitive activities have produced overcharges in the net prices of attendance for all Class Members.

## VII.

## ALLEGATIONS RELATED TO DEFENDANTS' AFFIRMATIVE DEFENSES

### A. Most and Possibly All Defendants Do Not Employ "Need-Blind" Admissions Policies

120. During the Class Periods, at least nine Defendants—Columbia, Dartmouth, Duke, Georgetown, MIT, Northwestern, Notre Dame, Penn, and Vanderbilt—have failed to conduct their admissions practices on a need-blind basis because all of them made admissions decisions taking into account the financial circumstances of applicants and their families, through policies and practices that favored the wealthy, including but not limited to those described below.

121. The other seven Defendants (Brown, CalTech, Chicago, Cornell, Emory, Rice, and Yale) may or may not have followed a need-blind admissions policy throughout the Class Periods,

but during at least some portion of the Class Periods, they conspired with the other Defendants to reduce financial aid and increase the net price of attendance for their students.

122. Section 568 defines "on a need-blind basis" to mean "without regard to the financial circumstances of the student involved or the student's family."

123. An admissions practice can be described as "need-aware," as some admissions offices have used the phrase, if the institution considers an applicant's inability to afford the full price of tuition, room, and board as a factor weighing against acceptance in at least some admissions decisions.

124. The language of Section 568, as well as its legislative history, makes clear that to qualify for the exemption, a school must follow need-blind admissions with respect to all applicants, including those on the waitlist. Section 568 is modeled on the settlement reached between MIT and the Department of Justice in a case against the predecessor to the 568 Cartel, which operated for decades until the early 1990s. It was known as the Overlap Group. The MIT settlement defined "need-blind admissions" to mean "admit[ting] all United States citizens to its undergraduate programs without regard to family financial circumstances, *other than admitted from a wait list.*" (Emphasis added.) In enacting Section 568, Congress generally followed the terms of MIT's settlement, but it *omitted* the exception for waitlisted students.

125. Penn and Vanderbilt have considered the financial need of waitlisted applicants, despite Section 568's requirement that "all students admitted" be admitted on a need-blind basis.

126. A former Penn admissions officer, Karen Crowley, conceded in 2009 that although it is "not an official practice," admissions officers give preference to "full-paying student[s]" on the waitlist over those who need financial aid, especially when "endowments are down and cost-cutting is essential." "If a full-paying student says he'll definitely come, letting him in can be a

relief."[28] On information and belief, Crowley's concession was reflective of Penn's own admissions practices.

127. In May 2021, college admissions consultant and former Associate Dean of Admissions at Penn until June 2008, Sara Harberson, acknowledged: "When I worked as the associate dean of admissions at the University of Pennsylvania, a need-blind institution, the office was not forthright about the fact that needing financial aid kept a student from being considered or admitted from the waitlist. Many need-blind universities are not open about their policies when it comes to whom they admit off the waitlist."[29]

128. Vanderbilt has admitted being need-aware with respect to waitlisted applicants through statements by its admissions officers. Vanderbilt has stated on its website, for example, that it "reserve[s] the right to be need aware when admitting waitlisted students."[30] This concession was posted on April 13, 2018, by Kim Struglinski, who joined the Vanderbilt office of undergraduate admissions in 2015 and thus was a Vanderbilt employee at the time of the statement.

129. Vanderbilt has conceded it is need-aware for waitlisted applicants on other occasions. In 2013, a Vanderbilt employee named Carolyn Pippen stated that "we do reserve the right to be need-aware when admitting waitlisted students."[31] And in 2014, a Vanderbilt employee

---

[28] Kathleen Kingsbury, *Dirty Secrets of College Waitlists*, THE DAILY BEAST (Mar. 30, 2009, updated July 14, 2017), https://www.thedailybeast.com/dirty-secrets-of-college-waitlists.

[29] Sara Harberson, *How Colleges Play the Waitlist Game*, COURIER TIMES (May 17, 2021), https://www.buckscountycouriertimes.com/story/opinion/2021/05/17/op-ed-how-colleges-play-waitlist-game-students-detriment/5071470001/.

[30] Kim Struglinski, *Waitlist FAQ 2018*, VANDERBILT UNIVERSITY UNDERGRADUATE ADMISSIONS (Apr. 13, 2018), https://admissions.vanderbilt.edu/vandybloggers/2018/04/waitlist-faqs-2018/.

[31] Carolyn Pippen, *I'm On the Wait List – Now What*, VANDERBILT UNIVERSITY UNDERGRADUATE ADMISSIONS (Apr. 12, 2013), https://admissions.vanderbilt.edu/vandybloggers/2013/04/im-on-the-wait-list-now-what-2/.

named Jay Watson addressed whether Vanderbilt would be need-aware for waitlisted students that year: "We do reserve the right to be need aware when admitting students from the wait list."[32]

130. Accordingly, in failing to conduct need-blind admissions as to waitlisted applicants, Penn and Vanderbilt do not qualify for the 568 Exemption.

131. Columbia engages in need-aware admissions practices that relate to applicants to its School of General Studies, which is an undergraduate program of Columbia. The School of General Studies is under the governance of Columbia's President, Provost, Trustees, and Faculty of Arts and Sciences, just like Columbia College and equivalent to the School of Engineering and Applied Science.[33] This governance structure contrasts with Barnard College, which is independent of, but affiliated with, Columbia.[34]

132. Columbia's School of General Studies offers an undergraduate degree program for "nontraditional students" who have had a break of one or more year in their studies and for dual- or joint-degree students, who split their time as students between Columbia and other institutions, such as Sciences Po in Paris and Trinity College Dublin.[35] Students in the School of General Studies take the same courses with the same faculty and undertake the same majors as other undergraduates at Columbia. They receive a diploma from Columbia like other undergraduates.

---

32 Jay Watson, *Vanderbilt Admissions AMA*, VANDERBILT UNIVERSITY UNDERGRADUATE ADMISSIONS (Mar. 31, 2014), https://admissions.vanderbilt.edu/vandybloggers/2014/03/vanderbilt-admissions-ama/.

33 *Compare* COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CHARTERS AND STATUTES (2017), art. XXII (Faculty of General Studies), *with* art. XI (Columbia College), art. XIV (Faculty of Engineering and Applied Science).

34 *See id.*, art. XXIII.

35 Columbia School of General Studies, *Dual and Joint Degree Programs*, https://gs.columbia.edu/content/dual-and-joint-degree-programs.

133. According to Columbia's website, the School of General Studies comprises more than 2,500 undergraduate students, which is approximately 30% of Columbia's undergraduate student population.[36] In addition, 68% of undergraduates enrolled in the School of General Studies take classes on a full-time basis.[37]

134. Columbia concedes that "General Studies admissions are not need-blind."[38] In fact, Columbia has used General Studies to generate revenue that supports other university initiatives, like campus expansions and new scientific research centers. Columbia's Faculty of Arts & Sciences pays a nine-figure "common-cost tax" to the university.[39] But General Studies recruits and enrolls a less wealthy, more socioeconomically diverse student body than Columbia's other undergraduate programs.[40] The burden of supporting Columbia's preservation of prestige and financial accumulation therefore falls on those who can least afford it.

135. Accordingly, in failing to conduct need-blind admissions as to applicants for the School of General Studies, Columbia does not qualify for the 568 Exemption.

136. In sum, throughout the relevant Class Periods, Penn and Vanderbilt have considered the financial need of waitlisted students, and Columbia has considered the financial need of

---

36 Columbia University, *Fall Headcount Enrollment by School, 2010-2019* (Jan. 13, 2020), https://opir.columbia.edu/sites/default/files/content/Statistical%20Abstract/opir_enrollment_history.pdf.

37 Columbia School of General Studies, *Statistics and Facts*, https://gs.columbia.edu/content/statistics-and-facts.

38 Eli Lee, *Public Health Professor Lisa Rosen-Metsch Appointed Dean of General Studies*, COLUMBIA SPECTATOR (Nov. 14, 2017), https://www.columbiaspectator.com/news/2017/11/14/public-health-professor-lisa-rosen-metsch-appointed-dean-of-general-studies/.

39 Michael Ouimette, *Unfunded Mandate: Columbia College, Arts and Sciences, and the Bollinger Era*, COLUMBIA SPECTATOR (May 5, 2016), https://www.columbiaspectator.com/lead/2016/05/05/unfunded-mandate-columbia-college-arts-and-sciences-and-bollinger-era/.

40 Jessica Spitz, *At a crossroads; The future of GS*, COLUMBIA SPECTATOR (Apr. 20, 2017), https://www.columbiaspectator.com/news/2017/04/20/at-a-crossroads-the-future-of-gs/ ("[T]he population skews older and many are juggling jobs, raising families, and often do not have parents to rely on for tuition money.").

students applying to the School of General Studies, in deciding whether to admit such students to attend their undergraduate programs on a full-time basis. The presence of these institutions in the 568 Cartel therefore extinguishes the 568 Exemption for all its members.

**B. Certain Defendants' Enrollment Management Practices Are Not "Need-Blind"**

137. Dartmouth and Notre Dame engage in need-aware admissions through "enrollment management." This is "the systematic integration of the functions of admissions, the relationship between tuition and fees (pricing) and financial aid, and student retention, along with the use of research to inform institutional policies and practices."[41] It is a "managerial paradigm" that brings together admissions and other institutional functions "into a comprehensive institutional approach designed to enable college and university administrators to exert greater influence over the factors that shape their enrollments."[42]

138. One of the key purposes of enrollment management is to limit the number of financial-aid-eligible applicants who are admitted to the institution to achieve financial and budgetary objectives. The effect of these practices is to disadvantage applicants based on their need for institutional financial aid.

139. Econometric modeling is central to enrollment management. As explained by Stephen Brooks, a higher-education consultant whose client list includes Columbia and Penn,[43] models draw on standard elements of college applications—academic ability, geography, demographics, interests, whether the student has requested aid, and more—to assess an applicant's

[41] Don Hossler, *Origins of Strategic Enrollment Management*, in HANDBOOK OF STRATEGIC ENROLLMENT MANAGEMENT 5 (Don Hossler and Bob Bontrager, eds., 2014).

[42] *Id*. at 4, 7-8.

[43] *Our Clients*, SHBrooks, https://www.shbrooks.com/clients.

likelihood of enrolling if offered admission.[44] These yield models, in turn, permit schools to forecast the revenue and cost implications of their admissions and financial-aid decisions.[45]

140. One anonymous enrollment manager has said: "Good luck getting any institution to tell you exactly how they handle ability to pay as a driver in their admit decision. . . . What they will say is 'We're need blind.' That's bullshit. They would never tell you exactly how they do it, but they do it all the time."[46]

141. Indeed, these institutions know their practices are legally problematic, and thus they maintain a shroud of secrecy over them. For instance, author Jeff Selingo asked two dozen colleges or universities for access to their admissions practices. Nearly all refused, some because they were "worried about exposing how they shaped their class based on the financial need of applicants."[47] Selingo also wrote: "Even at need-blind schools, admission eventually can come down to money. Those colleges control how much they spend on financial aid by recruiting heavily in rich high schools and admitting in early decision a significant proportion of students who tend to be wealthier. And even when schools are need-blind, admissions officers still see the zip codes and the occupations of parents when reviewing applications."[48]

---

[44] Stephen H. Brooks, *Using Campus-Based Financial Aid Strategically*, in HANDBOOK OF STRATEGIC ENROLLMENT MANAGEMENT 223-26 (Don Hossler and Bob Bontrager, eds., 2014); Stephen H. Brooks, *Econometric Modeling of Enrollment Behavior*, 26 J. Student Fin. Aid 7, 9-10 (1996).

[45] Brooks, *Using Campus-Based Financial Aid Strategically*, at 226; Brooks, *Econometric Modeling of Enrollment Behavior*, at 16-17.

[46] Matthew Quirk, *The Best Class Money Can Buy*, THE ATLANTIC (Nov. 2005) https://www.theatlantic.com/magazine/archive/2005/11/the-best-class-money-can-buy/304307/.

[47] Jeffrey Selingo, WHO GETS IN AND WHY: A YEAR INSIDE COLLEGE ADMISSIONS 13 (2020).

[48] *Id.* at 212.

142. Notre Dame also employs an "enrollment management model."[49] Announcing in 2010 the hire of its associate vice-president for undergraduate enrollment, Don Bishop, Notre Dame praised his "innovative marketing and financial aid strategies" in prior enrollment-management jobs.[50] Announcing a new dean of admissions in 2019, Notre Dame touted her status as "a featured presenter at national enrollment management conferences and events."[51] In addition, Notre Dame has a partnership with a software company that develops data-visualization tools, touting "improved scenario analyses on all data associated with an applicant or prospective enrollee."[52] Notre Dame is thus using data analysis to shape need-aware admissions decisions.

143. In 2015, Dartmouth created the position of Vice Provost for Enrollment Management, announcing that it would permit the university "to use a wealth of newly available data to identify and recruit prospective students."[53] In 2016, Dartmouth announced its hiring of Lee Coffin from Tufts University, a need-aware school.[54] At Tufts, Coffin operated under strict

---

49 Jordan Cockrum and Natalie Weber, *Notre Dame, SMC communities evaluate opportunities, efforts for low socioeconomic students*, THE OBSERVER (Apr. 30, 2018), https://ndsmcobserver.com /2018/04/efforts-low-socioeconomic-students/.

50 Dennis Brown, *Notre Dame alumnus Bishop appointed associate VP for undergraduate enrollment*, NOTRE DAME NEWS (Sept. 15, 2010), https://news.nd.edu/news/notre-dame-alumnus-bishop-appointed-associate-vp-for-undergraduate-enrollment/.

51 Joyce Lance, *Christy Pratt appointed director of admissions*, NOTRE DAME NEWS (July 1, 2019), https://news.nd.edu/news/christy-pratt-appointed-director-of-admissions/.

52 Leila Meyer, *U Notre Dame, SynGlyphX Partner on Enrollment Data Visualization Tool*, CAMPUS TECH. (Jan. 13, 2016), https://campustechnology.com/articles/2016/01/13/u-notre-dame-synglyphx-partner-on-enrollment-data-visualization-tool.aspx?admgarea=news.

53 Dartmouth University, Office of Communication, *Search Has Begun for Undergraduate Admissions Leader* (Oct. 29, 2015), https://news.dartmouth.edu/news/2015/10/search-has-begun-undergraduate-admissions-leader.

54 Bill Platt, *Lee Coffin to Lead Enrollment, Admissions, and Financial Aid*, DARTMOUTH NEWS (Feb. 4, 2016), https://news.dartmouth.edu/news/2016/02/lee-coffin-lead-enrollment-admissions-and-financial-aid.

budgetary limits.[55] He shaped the cohort of admitted students to bring revenues and costs in line. His admissions office sent tentative acceptances to the financial-aid office, which modeled the revenue and cost implications so that the admissions office would meet the university's budgetary goals. As Coffin has acknowledged, "Shifting things at the end . . . happens every year."[56]

144. Dartmouth's and Notre Dame's use of enrollment management thus involves the resolution of admissions decisions *with* regard to the financial circumstances of the applicant or their family, in that such management (i) identifies relatively wealthy students, for the benefits (direct and indirect) that the school expects from their admission, and (ii) identifies relatively less wealthy students in order to limit the total amount of financial aid—and then acts upon that information to meet budgetary goals.

### C. Many Defendants Consider Family Financial Circumstances in Giving Preference to the Children of Wealthy Past or Potential Donors, and Thus Do Not Adhere to a Need-Blind Admissions Policy

145. Many Defendants consider applicants' "financial circumstances" through admissions preferences given to the children of wealthy past or potential donors, such that their chances of admission increase significantly. Such Defendants understand that these applicants—commonly known as "development cases" or "development admits"—have no need for financial aid and that their admission could generate a substantial financial return for the university.

146. Consequently, the development offices of such Defendants analyze and monitor these applicants and coordinate with the university presidents or admissions offices during the

[55] Carly Olson, *Crunching the Numbers*, TUFTS OBSERVER (Apr. 25, 2016), https://tuftsobserver.org /crunching-the-numbers/("My responsibility as Dean is that I can't spend more dollars than Tufts has. They give me a checkbook every year and they say spend all of it, but don't spend more than that."); *see also id.* ("This year, Coffin said admissions had $19.7 million and 1,325 spots to consider when making their decisions.").

[56] *Id.*

admissions cycle. In short, awarding special treatment to the children of wealthy prior and potential donors necessarily means some less privileged applicants are not admitted on account of their financial circumstances to make room for the wealthy.

147. Many Defendants also consider large donations, and even financial capacity in the absence of any donation history, as plus factors for admission. Assessing potential donations of an applicant's family necessarily involves considering the income, assets, and other financial circumstances of that family. Similarly, considering a family's past donations, pursuant to the agreement of the 568 Cartel, constitutes the consideration of family financial circumstances.

148. In considering the wealth and donation history of certain students and their families, moreover, such Defendants implicitly consider less privileged applicants' lack thereof. Because of the limited number of spots available in any given class, the advantage given to one group entails a disadvantage imposed on the other. Privileging the wealthy and disadvantaging the financially needy are inextricably linked; they are two sides of the same coin.

149. In addition, such Defendants are committed to maintaining admissions as a zero-sum game, by limiting growth in the number of undergraduate seats to maximize perceptions of exclusivity and prestige. Defendants' presidents and senior admissions and development officers know that the other Defendants routinely favor children from wealthy families and thereby fail to admit all students without regard to their financial circumstances or that of their families.

150. Dartmouth's former dean of admissions, Maria Laskaris, said in 2019: "The ultra-rich have an additional advantage in their ability to donate large sums of money to universities, which can boost their kids' chances of acceptance." According to Laskaris, admissions officers are

"made aware of" this factor because "colleges are always in fundraising mode."[57] At Dartmouth, development officers meet with admissions staff to review a list created by the development office. Each year, up to 50 applicants may be considered through this special process, most of whom are admitted, accounting for 4-5% of Dartmouth's student body.[58]

151. An email exchange exposed by the Sony hack in 2014 illustrates Dartmouth's efforts to evaluate and court wealthy potential donors.[59] Michael Lynton, CEO of Sony Pictures Entertainment, intended to visit Dartmouth with his daughter, a prospective student. Michael Lynton is not an alumnus of Dartmouth, and public records have not shown that Lynton had previously donated to Dartmouth. On the eve of his visit, Lynton received a solicitous email from Jeff Sassorossi, a 1975 Dartmouth graduate and then Dartmouth's "Director, Special Projects & Reporting." Sassorossi explained that his role at Dartmouth was "to serve as the liaison between the Advancement (Alumni Relations and Development) and Admissions. As such, I work with families as they go through the admissions process at Dartmouth." Sassorossi offered Lynton and his daughter a personal tour of the campus. Sassorossi's email also indicated that Lynton was being recruited to Dartmouth by Leon Black, a billionaire private equity investor, major Dartmouth benefactor, and former trustee.[60]

---

57 Jill Tucker, *In the College Admissions Game, Even the Legal Kind, Money Has Always Mattered*, SAN FRANCISCO CHRON. (Mar. 12, 2019), https://www.sfchronicle.com/bayarea/article/In-the-college-admissions-game-even-the-legal-13683518.php.

58 Joseph Asch, *Donor Admissions: How It Works Now*, DARTBLOG (Sept. 29, 2014), http://www.dartblog.com/data/2014/09/011686.php.

59 *See* Joseph Asch, *VIP Donor Preferences Cont'd*, DARTBLOG (Feb. 4, 2016), http://www.dartblog.com/data/2016/02/012467.php; Email from Jeff T. Sassorossi to Michael Lynton, Re: Dartmouth College Visit (Mar. 28. 2014), https://wikileaks.org/sony/emails/emailid/132718.

60 *See* Peter Lattman, *Apollo's Leon Black Donates $48 Million to Dartmouth*, N.Y. TIMES DEALBOOK (Mar. 29, 2012), https://dealbook.nytimes.com/2012/03/29/apollos-leon-black-donates-48-million-to-dartmouth; Office of Communications, Dartmouth University, *Dartmouth Board Elects Three New Charter Trustees*, DARTMOUTH NEWS (June 13, 2011) (announcing Black was stepping down after

152. Despite these entreaties, Lynton's daughter enrolled at Brown, which got the $1 million donation from Lynton instead of Dartmouth.[61] The opinion editor for the *Brown Daily Herald* described Lynton's gift to Brown as "a $1 million check to Brown with more strings attached than the Los Angeles Philharmonic. Anyone with a pulse can trace the probable outcome of this 'philanthropy'—a prospective student connected to Lynton gets accepted to Brown!"[62]

153. According to journalist Daniel Golden's book, *The Price of Admission*, Duke "enrolled thousands of privileged but underqualified applicants with no prior ties to the university in the expectation of parental payback."[63] According to Golden, Duke "accepted at least one hundred nonalumni children each year due to family wealth."[64] In some years, between 3-5% of Duke's student body consists of students "who would have been turned away without pressure from the development office."[65]

154. While serving as president of Duke, Richard Brodhead admitted that "it would be naïve to say that any university should pay no attention to a family's ability to help the university," explaining that a family's ability to donate to Duke was a "plus factor" in admissions."[66] Jean Scott, a former director of undergraduate admissions at Duke, estimated that "a couple of hundred" applicants a year received special attention as children of prospective donors. Scott admitted that

---

two terms as trustee), https://news.dartmouth.edu/news/2011/06/dartmouth-board-elects-three-new-charter-trustees.

61 Chad Simon, *Simon '16: Pimp My University*, BROWN DAILY HERALD (Oct. 21, 2015), https://www.browndailyherald.com/2015/10/21/simon-16-pimp-my-university/.

62 *Id*.

63 Daniel Golden, THE PRICE OF ADMISSION 54 (2006).

64 *Id*.

65 *Id*. at 57.

66 Geoffrey Mock, *Brodhead Discusses Early Admissions, Developmental Admits*, DUKE TODAY (Sept. 22, 2006), https://today.duke.edu/2006/09/admit.html.

there "were certainly students who got in because they were a high priority" for fundraising. Scott also said that there "was more of this [fundraising-related] input at Duke than at any other institution I ever worked for."[67]

155. The longstanding dean of admissions for Georgetown, Charles Deacon, was asked by a reporter: "What about children of alumni and *potential* donors?" (Emphasis added.) In response, Dean Deacon candidly admitted: "On the fundraising side, we also have a small number of 'development *potential'* candidates. If Bill Gates wants his kid to come to Georgetown, we'd be more than happy to have him come and talk to us." (Emphasis added.) Dean Deacon continued to point out that "not all those special cases end up being people who give a lot of money. We have children of Supreme Court justices, senators, and so on apply. We may give extra consideration to them because of the opportunities that may bring."[68]

156. In short, Georgetown admits a range of students based on their families' wealth, prestige, and influence. Some of these students are given "extra consideration" based on their parents' influence or political power, without any expectation of a financial contribution. On the other hand, some *are* given "extra consideration" on the basis of their "development potential"—namely, the ability of the family to make a financial contribution to the institution, and the likelihood that it will do so.

157. Indeed, Dean Deacon has also candidly admitted that Georgetown favors past donors, as well as potential donors, and has even admitted that Georgetown calibrates the extent of the admissions advantage to the size of the donation: "If you were very close to the edge and

---

[67] Daniel Golden, *How Lowering the Bar Helps Colleges Prosper*, WALL ST. J. (Sept. 9, 2006), https://www.wsj.com/articles/SB115774251817757837.

[68] Alvin P. Sanoff, *Getting In To Top Schools*, WASHINGTONIAN (Oct. 1, 2007), https://www.washingtonian.com/2007/10/01/getting-in-to-top-schools/.

the family's given to the annual fund every year or something, that might be enough of a tip to get you in. If you're a little farther from the edge, but the family has built Regents Hall, that might tip a little farther."[69]

158. The former director of selection at MIT, McGreggor Crowley, admitted in March 2019: "In truth, for every office of admissions there is a development office that builds a university's endowment through donations from alumni and wealthy individuals. And every year, regardless of what a college or university says publicly, a number of children of wealthy donors and alumni get a nod in their direction while other applicants are rejected."[70] In an interview with NBC News, Crowley admitted that "as for the children of prominent campus donors, . . . a college's development office might reach out to the dean of admissions to say, 'Hey, just so you know, Lisa's dad has been very generous to us in the past, or something.'" NBC News reported that according to Crowley: "Usually, that kind of information [about a family's financial contribution] is relayed to the most senior officials in an admissions office."[71]

159. At Northwestern, a separate admissions process exists for the wealthy and well connected. On April 24, 2019, *The Daily Northwestern* published an article with the headline: "Northwestern President Schapiro Says He Reads Applications of Some Legacy, Donor Students." As revealed in the article, in the 2018-19 admissions cycle, Schapiro personally reviewed the applications of about 550 students, including applications associated with wealthy donors. A

---

[69] Suzanne Monyak, *Legacy Status Tips Admission*, THE HOYA (Mar. 20, 2015), https://thehoya.com/legacy-status-tips-admission-scales/.

[70] McGreggor Crowley, *Confessions of a Former MIT Admissions Director*, BOSTON GLOBE (Mar. 13, 2019), https://www.bostonglobe.com/opinion/editorials/2019/03/13/confessions-former-admissions-director/qPQppf0AhpJIbIJ8mZ6q9L/story.html.

[71] Daniel Arkin, *The College Admissions Scandal is Just the Extreme Version of a System that Already Favors the Wealthy*, NBC, https://www.nbcnews.com/news/us-news/college-cheating-scandal-two-ex-admissions-officers-explain-behind-scenes-n983796.

Northwestern spokeswoman has further admitted that President Schapiro was "frequently involved in dealing with principal donors to the University."[72]

160. One of the student reporters who broke the story about Northwestern's two-track admissions system later stated in a podcast interview: "[President Schapiro] also told us that he tries to work with the Dean of Admissions Christopher Watson, as much as he can. He brought up an example that if they both disagreed on an applicant that they try to work it out."[73] President Schapiro is the boss at Northwestern, and the Dean of Admissions reports to him. The head of the university is using his discretion to make or influence numerous admissions decisions. Schapiro's involvement in admissions decisions for applicants associated with wealthy donors was not public until revealed by reporting in 2019.

161. Penn also tracks past and potential donors, rewarding past donors and enticing potential donors by admitting their children. A former Associate Dean of Admissions, Sara Harberson, has described the university's use of "tags" to track applicants that are "a high priority for the institution." Penn tags the applications of "children of donors or potential donors," among others, giving those applicants "the proverbial golden ticket."[74] The university has "spots reserved"

---

72 Alan Perez and Gabby Birenbaum, *Northwestern President Schapiro Says He Reads Applications of Some Legacy, Donor Students*, THE DAILY NORTHWESTERN (Apr. 24, 2019), https://dailynorthwestern.com/2019/04/24/campus/northwestern-president-schapiro-says-he-reads-applications-of-some-legacy-donor-students/?print=true.

73 Cassidy Jackson and Heena Srivastava, *The Weekly: University President Morton Schapiro Reveals Role in Admissions Process*, THE DAILY NORTHWESTERN (May 3, 2019), https://dailynorthwestern.com/2019/05/03/multimedia/audio/the-weekly-university-president-morton-schapiro-reveals-role-in-admissions-process/.

74 Sarah Harberson, *The Truth about 'Holistic" College Admissions*, LOS ANGELES TIMES (June 9, 2015), https://www.latimes.com/opinion/op-ed/la-oe-harberson-asian-american-admission-rates-20150609-story.html.

for these "development cases," whose "parents have already given significant money to the institution, or plan to."[75]

162. The director of admissions at Notre Dame for 36 years until his retirement in July 2019, Bob Mundy, made appearances at alumni gatherings during his tenure in office. Mundy's biography at these appearances stated: "In his current position as Director of Admissions Operations, he oversees the 35 members of staff, and recruitment efforts that have included as many as 40,000 annual inquiries and a record-setting 16,500 applications for the 2011 class. Ultimately, the office is responsible for 'delivering' a freshmen class of approximately 2,000 students, while also satisfying the needs of various constituencies: i.e. alumni, athletics, *the Development Office*, etc." (Emphasis added.)

163. The associate vice provost for undergraduate enrollment at Notre Dame, Don Bishop, acknowledged the significant influence that donations play in the Notre Dame admissions process. Indeed, he admitted that if someone gave $15 million, then their children would be given "some special interest" during the Notre Dame admissions process.[76]

164. A past president of Vanderbilt, E. Gordon Gee, stated in 2019 that any president under "truth serum" would concede that donor connections make a difference in admissions.[77]

165. Defendants may independently choose to favor the children of the wealthy if they like, thereby disfavoring every other applicant. But if they make that choice, they cannot lawfully

---

[75] Vice News, *How Broken the College Admissions Process Is*, YOUTUBE (Mar. 13, 2019) (Harberson quoted at 5:20), https://www.youtube.com/watch?v=0v5yHnWCiLE&feature=emb_logo.

[76] Daniel Golden, *How Wealthy Families Manipulate Admissions at Elite Universities*, TOWN & COUNTRY (Nov. 21, 2016), https://www.townandcountrymag.com/society/money-and-power/news/a8718/daniel-golden-college-admission/.

[77] Jack Stripling, *It's an Aristocracy: What the Admissions-Bribery Scandal Has Exposed About Class on Campus*, THE CHRONICLE OF HIGHER EDUCATION (Apr. 17, 2019), https://www.chronicle.com/article/its-an-aristocracy-what-the-admissions-bribery-scandal-has-exposed-about-class-on-campus/?cid2=gen_login_refresh&cid=gen_sign_in.

conspire on financial-aid policies. The law does not allow them to do both. Defendants must choose between continuing their wealth favoritism and need-aware admissions practices, on the one hand, and participation in the lucrative 568 Cartel, on the other.

### D. The Section 568 Exemption Applies Only to a Group of Schools That All Employ "Need-Blind" Admissions Policies Within the Term's Statutory Meaning

166. The 568 Exemption, as noted, precludes any school invoking it from taking account of "the financial circumstances" of a student or their family in making admissions decisions. Under the well-established rules of statutory construction, any contrary interpretation of the text of the 568 Exemption would be impermissible speculation as to Congress's intent—in particular where any antitrust exemption is construed narrowly (with what courts have described as "beady eyes and green eyeshades"). Just as fundamental, the evidence of the purpose and overarching goal of the 568 Exemption, as reflected in its legislative history, compels this interpretation of the plain meaning of "need-blind" as defined in the statute.

167. The 568 Exemption replaced what had been a general temporary antitrust exemption. The 1994 legislative history of the enactment of Section 568 explains in relevant part: "This provision extends for an additional three years the temporary antitrust exemption for certain collegiate financial aid award analysis, which was originally enacted with the Higher Education Amendments of 1992 as a two-year exemption." H.R. Conf. Rep. 103-761, 911-12, 1994 U.S.C.C.A.N. 2901, 3242-43. This report explained that, as noted above, Section 568 is modeled on the MIT-DOJ settlement: "The temporary exemption has also been revised in light of the 'standards of conduct' adopted as part of the settlement of the antitrust action between the Department of Justice and Massachusetts Institute of Technology in the case of *United States v. Brown University, et al.*, Civ. Action No. 91-3274 (E.D. Pa.), on December 22, 1993." *Id.*

168. The referenced "standards of conduct" provided in relevant part: "Non-profit institutions of higher education may participate in the cooperative financial aid arrangements set forth below ('Participating Schools'), provided that they practice need-blind admissions; that is, admit all United States citizens to its undergraduate programs without regard to family financial circumstances, other than admitted from a wait list." *Letter from MIT lawyer Thane D. Scott about Overlap settlement*, http://tech.mit.edu/Bulletins/overlp-ts.html. This legislative history thus makes clear that Section 568's language tracks the language in the "standards of conduct" precluding admissions *with* regard to "family financial circumstances."

169. This legislative history further states that the 568 Exemption "applies only to institutions of higher education that admit students on a need-blind basis. The definition of 'on a need-blind basis' in subsection (c)(6) is based on language in the 'standards of conduct' adopted in the MIT settlement. However, there is one conspicuous difference between the statutory language and the MIT standards of conduct: the statute deletes the phrase 'other than admitted from a wait list.' *See also United States v. Brown University*, 5 F.3d 658 (1993)." H.R. Conf. Rep. 103-761, 911-12, 1994 U.S.C.C.A.N. 2901, 3242-43. This conference report further states:

> The managers have decided against elaborating on the need-blind admissions standard in the statutory text. As should be obvious, however, evidence of a practice among admissions personnel at an institution of higher education of examining, discussing, or otherwise considering information relating to a student's financial circumstances that is derived from such student's financial aid application form, *or from any other document or record obtained for the purpose of ascertaining such financial circumstances*, before the decision is made regarding the student's admission will substantially increase the institution's burden of demonstrating that the school's admissions policy is truly need-blind.

*Id*. (emphasis added). The report then specifies: "Prudence would counsel that schools wishing to make use of this provision *insulate their admissions, process and admissions personnel as*

*completely as possible from such student financial aid information, until after the admissions process is complete*." *Id*. (emphasis added). Consistent with the statute, no exception is made for applicants on the institution's waitlists.

170. This aspect of the legislative history thus reflects Congress's intent that a "truly need-blind" admissions policy would not permit a school invoking the 568 Exemption to use the information that the 568 Cartel has used and continues to use to consider the financial circumstances of an applicant's family for admissions purposes—including (i) the common application (which asks questions about the parents' occupation for the purpose, at least in part, of ascertaining the financial circumstances of the applicant and their family); (ii) emails between development and admissions, as well as any "tags" that admissions uses to flag development prospects, obtained for the purpose of ascertaining the financial circumstances of the applicant and their family; (iii) any documents that admissions receives identifying one or both parents as donors, or regarding donation history, or identifying one or both parents as alumni; and (iv) the information integral to enrollment management.

171. The 2001 legislative history to the renewal of the 568 Exemption further confirms the following congressional goal and purpose: "No student who is otherwise qualified ought to be denied the opportunity to go to one of the nation's most prestigious schools because of the financial situation of his or her family." Report to Accompany H.R. 768, House of the Judiciary, *Need-Based Educational Aid Act of 2001* (Apr. 3, 2001). An admissions policy that admits certain students based on their wealth, in a zero-sum admissions arrangement, necessarily denies admission to at least some students "because of the financial situation of his or her family."

172. In a separate part of the 2001 legislative history, Senator Barney Frank, one of the sponsors of the legislation, referenced that it arose out of litigation regarding the Overlap Group

(discussed above), and a practice in which "these schools strive to achieve what they call a needs-based admission policy," and "what it meant was that they strove to admit young men and women *based on their ability to do the work of that school*." Statement of Barnie Frank, Need-Based Educational Aid Act of 2001, 147 Cong. Rec. H1360-02, 2001 WL 321629 (Apr. 3, 2001) (emphasis added). An admissions policy that admits certain students based on their wealth as a relevant factor does not admit those students "based on their ability to do the work of that school."

173. In sum, the scope of the 568 Exemption is rooted in the plain language of the statutory text, and in the statute's legislative history, which shows that the statute's plain text furthers the statute's purposes.

## VIII.

## PLAINTIFFS' DELAYED DISCOVERY OF THEIR INJURIES UNDER, AND DEFENDANTS' CONTINUING VIOLATIONS OF, THE ANTITRUST LAWS

174. Defendants' violations of the Sherman Act occurred each time Defendants engaged in conduct, further to the 568 Cartel, that harmed Plaintiffs and other Class Members. In the context of Defendants' price-fixing conspiracy, such conduct and violations occurred each time Defendants have met to fine-tune their Cartel agreement and upon each transaction with any Class Member at an artificially inflated net price of attendance.

175. Defendants have engaged in continuing violations of the Sherman Act. The 568 Cartel has met at least annually since 2003 to discuss and fine-tune their Cartel agreement, and the Class Members have paid artificially high net prices to attend Defendants' schools since that time as a result of the conduct alleged herein.[78]

---

[78] In terms of formal membership, as noted above, Brown and Emory evidently left the 568 Cartel permanently in 2012; Chicago evidently left it in 2014; and Penn and Vanderbilt evidently left it in 2020. Some institutions have attended meetings of the 568 Cartel and exchanged information with the Cartel without being formal members, including certain institutions that never formally joined. (Plaintiffs reserve the right to name such institutions as defendants based on discovery in this case.)

176. The Class Members' claims accrued when they discovered they had been injured and who caused their injury. Plaintiffs discovered these facts only within the last two years.

177. Until that time, a person exercising reasonable diligence could not have discovered (a) the extent to which Defendants had failed to admit all successful applicants without regard to the financial circumstances of the student or the student's family, in violation of the 568 Exemption, or (b) that Defendants' use of the Consensus Methodology has disadvantaged and in fact caused financial injury to the Class Members.

178. A person exercising reasonable diligence could not have discovered the violations and injury at issue in part because Defendants have made incomplete and misleading statements that impeded discovery of those violations and the resulting injury.

179. Defendant have publicly stated and advertised, incompletely and misleadingly, that they admit students on a need-blind basis; and Defendants have claimed to be need-blind on hundreds of internet, marketing, and admissions materials and brochures.

180. Defendants and the other members of the 568 Cartel have maintained a website for the Cartel. The first words printed on the homepage of this website have been: "What is the 568 Presidents Group? 568 Presidents Group is an affiliation of colleges and universities, all of which must admit students on a need-blind basis." Under an FAQ on the same website, the 568 Cartel has made the following misleading claim: "It is referred to as a 'Presidents' group because it was formed by a group of 28 college and university presidents from need-blind schools in 1998."

181. Defendants that have not followed a need-blind admissions policy have made similarly incomplete and misleading statements, including on websites, during the Class Periods. Such Defendants have further misrepresented, as shown below, that they are "need-blind," within the meaning of that term under Section 568.

182. The website for Columbia has stated and continues to state: "Admission to Columbia is need-blind for US Citizens and Eligible Noncitizens, meaning the Office of Undergraduate Admissions considers your application without regard to your financial need." Whether or not Columbia considers each application without regard to the student's financial need, this notion of need-blindness is not consistent with the statutory definition that prohibits Columbia (so long as it participates in the 568 Cartel) from considering either financial need or financial wealth. Columbia's redefinition of "need-blind" is not consistent with the statute. A university's promise to disregard financial need is meaningless if the institution privileges wealth.

183. Other Defendants that have not followed a need-blind admissions policy have also engaged in definitional contortions. Dartmouth's website, for example, has contained and continues to contain a glossary of admissions-related terms. As redefined by Dartmouth, an admissions decision is "need-blind" so long as it is not made with "knowledge of an applicant's financial need." If Dartmouth does make admissions decisions without knowledge of an applicant's financial need, this is nevertheless insufficient for compliance with Section 568, which requires that *all* students be admitted without regard to the financial circumstances of the students or their families. Under Section 568, Dartmouth is not allowed to make admissions decisions with knowledge and on the basis that, an applicant has financial need, or does not have financial need, or is rich, or any other financial circumstance.

184. Duke's website has also employed and continues to employ its own definitions, claiming that its "admissions policy is 'need-blind,' which means that applicants are accepted based on their merit, regardless of their ability to pay for college." Duke's redefinition does not mention whether *all* students "are accepted based on their merit, regardless of" their ability to donate money to Duke. In reality, not all students are admitted to Duke on the basis of merit at all.

185. MIT's website also has provided and continues to provide a glossary of admissions-related terms. As redefined by MIT, "need-blind" means that "[p]rospective students are not disadvantaged in the undergraduate admissions process because of their financial need." MIT's redefinition is contrary to the statutory meaning of "need-blind basis" and constitutes an admission that MIT considers the financial circumstances of certain applicants.

186. Northwestern's website has claimed and continues to claim that it "has a need-blind admissions policy for U.S. citizens and permanent residents; this means that financial aid is not a factor in determining admission. Applicants are encouraged to apply for financial aid." Northwestern's redefinition of "need-blind basis" is also contrary to the statutory definition and constitutes a further admission that Northwestern fails to conduct admissions without regard to the financial circumstances of all applicants and their families.

187. Penn's website has claimed and continues to claim another misleading definition of "need-blind": "Our need-blind policy means that your ability to pay is not considered in your admission decision." This is misleading because under Section 568, exempt institutions are prohibited from considering the financial circumstances of any applicant or any applicant's family, not just an applicant's "ability to pay."

188. The foregoing redefinitions of "need-blind" for purposes of Section 568 obfuscate that Defendants failing to follow need-blind admissions policies have made admissions decisions with regard to the financial circumstances of all applicants and their families.

189. In reality, the 568 Cartel was not, and has never been, composed of "need-blind schools" as that term is defined by the statute. The 568 Cartel's inaccurate public claim to being composed of "need-blind schools" had the effect of misleading a reasonably diligent person investigating whether the 568 Cartel's conduct gave rise to a cause of action.

190. The website for the 568 Cartel has contained and continues to contain the form of a certificate of compliance whereby a member of the Cartel can certify that "its admission and financial aid practices currently comply with the rules of Section 568 regarding 'need-blind admission practices.'" Publicly posting this form of certification misleads any reasonably diligent person who inquires into whether members of the 568 Cartel are need-blind.

191. The website for the 568 Cartel has stated and continues to state: "This site serves as a resource both for the 568 Presidents Group member institutions wanting to keep up to date on the Group's activities, *as well as for visitors seeking to learn more about the Group*." (Emphasis added.) The 568 Cartel thus continues inaccurately to advertise on its website that all Cartel members are "need-blind" within the meaning of Section 568.

192. The 568 Cartel has publicly asserted that its activities were carried out for altruistic purposes. The website for the 568 Cartel, for example, has stated and continues to state that the purpose of the conspiracy is to agree on a financial-aid system that is "fair" and that the Consensus Methodology was adopted after consideration of ways to "improve the financial aid system so as to better serve the needs of families in their efforts to pay for college."

193. Such assertions are false but would be viewed as credible by a reasonably diligent person investigating the 568 Cartel's conduct. Actors sympathetic to the 568 Cartel have likewise published statements and conclusions that would have persuaded a reasonably diligent person investigating the Cartel's conduct that they had not suffered financial harm.

194. Defendants further engaged in conduct that hindered a reasonably diligent person's ability to discover the violations and injury at issue by consistently omitting, in public statements purporting to describe the reasons for net tuition price increases, any reference to price fixing or the use of the Consensus Methodology as bearing on increased net prices of attendance. Whether

or not such statements have accurately described *some* of the reasons for net tuition price increases, these statements have not acknowledged the effects of the use of the Consensus Methodology.

195. In targeting Class Members through the institution's alumni magazine, for example, Dartmouth claimed in 2015 that rising tuition prices could be explained because "[j]ust as lattes cost more these days, so do markers and whiteboards and keeping the lights on. Healthcare costs and salaries are rising too—and hiring at the College has shot up more than enrollment."[79] The feature article also listed "[l]ess sizeable but still significant drivers of cost includ[ing] compliance with a range of government regulations imposed to address issues such as crime, gender equity and accessibility, which have totaled millions of dollars." The article quoted Dartmouth's president Phil Hanlon as saying that these factors, although supposedly "not as much as financial aid" have "'been a driver for the last eight to 10 years.'"[80]

196. A Georgetown spokesperson explained away the institution's substantial tuition increases by suggesting that "the growing cost 'reflects the reality that many of our operating expenses continue to increase at rates higher than inflation.'"[81]

197. In 2008, an MIT news release incorrectly claimed: "During the past decade, the net tuition for undergraduates--what students and families pay after financial aid--has, on average, dropped by more than 15 percent when adjusted for inflation."[82] Such statements suggest to a reasonable person that MIT had lowered net prices of attendance over time. If MIT's statement

---

79 C.J. Hughes, *Why is Dartmouth So Expensive*, DARTMOUTH ALUMNI MAGAZINE, May-June 2015, https://dartmouthalumnimagazine.com/articles/why-dartmouth-so-expensive.

80 *Id.*

81 Connie Parham, *GU Hikes Undergraduate Tuition 5.5 Percent*, THE HOYA (Feb. 22, 2008), https://thehoya.com/gu-hikes-undergraduate-tuition-5-5-percent/.

82 *MIT to be Tuition-Free for Families Earning less than $75,000 a Year*, MIT NEWS (Mar. 7, 2008), https://news.mit.edu/2008/tuition-0307.

were true, moreover, the net price of attendance would have "dropped" even more if MIT had not participated in the 568 Cartel.

198. In 2009, John Affleck-Graves, then-executive vice president of Notre Dame, identified only food costs when asked to explain the institution's 4.4 percent increase in tuition: "We are aware of the pressure families are under, and we wanted to be as conservative as we could be, . . . the difficultly for us this year is that we have seen an increase in a lot of our costs, like food . . . . And then we are faced with a difficult choice because we don't want to decrease the opportunities we provide for the students, like study abroad and research opportunities."[83]

199. In 2017, Amy Gutmann, President of Penn, told *The Daily Pennsylvanian* that "as tuition goes up financial aid goes up even more."[84] If this statement is true, it is also true that but for Penn's participation in the 568 Cartel, financial aid would have gone up even more—and that President Gutmann did not speak to that fact.

## IX.

## CLASS ACTION ALLEGATIONS

200. The proposed Class, under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), comprises all U.S. citizens or permanent residents, and purchasers of tuition, room, or board on their behalf, who have (a) enrolled in one or more of the Defendants' full-time undergraduate programs, (b) received need-based financial aid from one or more Defendants, (c) paid to one of more Defendants tuition, room, or board not fully covered by such financial aid,

---

[83] Madeline Buckley, *University Increases Tuition for 2009*, THE OBSERVER (Mar. 4, 2009), https://ndsmcobserver.com/2009/03/university-increases-tuition-for-2009/.

[84] *Amy Gutmann's Interview with The Daily Pennsylvanian*, THE DAILY PENNSYLVANIAN (Mar. 2, 2017), https://www.thedp.com/article/2017/03/amy-gutmann-penn-transcript-interview.

and (d) first enrolled in one of the Defendants' full-time undergraduate programs during these time periods (the "Class Periods"):

- Brown—from 2004 through 2012.
- CalTech—from 2019 to the present.
- Chicago—from 2003 through 2014.
- Columbia—from 2003 to the present.
- Cornell—from 2003 to the present.
- Duke—from 2003 to the present.
- Dartmouth—from 2004 to the present.
- Emory—from 2004 through 2012.
- Georgetown—from 2003 to the present.
- MIT—from 2003 to the present.
- Northwestern—from 2003 to the present.
- Notre Dame—from 2003 to the present.
- Penn—from 2003 to the present.
- Rice—from 2003 through 2009, and from 2017 to the present.
- Vanderbilt—from 2003 through 2019.
- Yale—from 2003 through 2007, and from 2018 to the present.

201. The Class excludes purchasers of tuition, room, and board the full cost of which was covered with institutional aid provided by such Defendant(s). Class Members also exclude Defendants and their officers, directors, management, employees, subsidiaries, or affiliates; and the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

202. Plaintiffs reserve the right to amend the Class definition, including with respect to the relevant time periods of membership in the 568 Cartel, based on discovery in this action.

203. The Class Members are readily ascertainable and identifiable because records of the relevant transactions should exist, because the Class Members' identities are known to Defendants, and because the members may be notified of the pendency of this action by forms of notice customarily used in class actions.

204. The Class Members are so numerous that joinder of all of them is impracticable; the number is unknown to Plaintiffs but, on information and belief, is over 170,000.

205. There are questions of law and fact common to the Class Members, including, but not limited to, the following:

a. The scope and operation of the 568 Exemption;

b. Whether Defendants' admissions practices fall under the 568 Exemption;

c. Whether Defendants conspired as alleged herein;

d. Whether the conspiracy harmed competition as alleged herein;

e. Whether the conspiracy caused antitrust injury as alleged herein;

f. The appropriate Class-wide measure of damages; and

g. The common method for determining the damages of individual Class Members.

206. All or substantially all Class Members were injured by Defendants' unlawful conduct. A common formula exists that allows for determination of damages of individual Class Members and for excluding from recovery any individuals who may not have been damaged.

207. Plaintiffs' claims are typical of the claims of the Class Members. Plaintiffs and the other Class Members were damaged by the same common course of conduct by Defendants.

208. Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs' interests are aligned with, and not adverse to, those of the other Class Members.

209. Plaintiffs will continue to fully and adequately protect the interests of the Class Members. Plaintiffs have retained counsel competent and experienced in the prosecution of antitrust class action litigation, and with the necessary financial resources, to represent themselves and the Class.

210. Defendants have acted on grounds that apply generally to the Class, so that final injunctive relief is appropriate respecting the Class as a whole.

211. Questions of law or fact that are common to the Class Members predominate over any questions affecting only individual Class Members.

212. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual Class Members would impose heavy burdens on the Court and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. In contrast, a class action would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the vast majority of the Class Members to seek redress for the violations of law alleged herein.

## X.

## ANTITRUST INJURY

213. Plaintiffs and the other Class Members have suffered antitrust injury due to Defendants' illegal conduct. They have suffered injury of the type that the antitrust laws were intended to prevent and that flows from that which makes Defendants' acts unlawful.

214. Defendants have conspired to reduce or eliminate price competition among 568 Cartel members on provision of financial-aid packages to Class Members, thereby depriving Plaintiffs and the other Class Members of a competitive marketplace.

215. As a result of Defendants' conspiracy to fix prices, Plaintiffs and the other Class Members were injured in the form of receiving artificially suppressed financial aid and paying artificially inflated net prices of attendance.

216. Plaintiffs and the other Class Members are naturally motivated to enforce the antitrust laws because they paid artificially inflated prices. There are no other persons who were more directly injured from, or more motivated to seek redress for, Defendants' misconduct than Plaintiffs and the other Class Members.

217. Absent Defendants' conspiracy, Defendants would have competed more aggressively to attract Plaintiffs and the other Class Members to their undergraduate programs, by offering all Class Members more generous financial aid and charging lower net prices of attendance than under Defendants' conspiracy.

218. If Defendants had competed with respect to financial aid, Plaintiffs and the other Class Members would have received more money in financial aid and paid lower net prices of attendance, as opposed to the artificially inflated net prices that Plaintiffs and the other Class Members paid due to Defendants' conspiracy.

219. Defendants' conspiracy is an illegal horizontal agreement to fix prices. By setting prices, through agreed-upon formulas, Defendants' price fixing directly and proximately caused antitrust injury to Plaintiffs and the other Class Members, who received less money in financial aid, and paid higher net prices of attendance, than they would have if Defendants had competed rather than conspired to fix prices.

## XI.

## THE RELEVANT MARKET

220. Defendants' price fixing is *per se* anticompetitive, obviating any market definition, including based on the direct evidence of anticompetitive effects. Defendants' conduct is also illegal under any rule of reasons or "quick look" analysis that may apply.

221. Plaintiffs thus further allege a relevant market, for undergraduate education at private national universities with an average ranking of 25 or higher in the *U.S. News & World Report* rankings from 2003 through 2021 (the most recent year in which Class Members applied to any of the Defendants). This is the Market for Elite, Private Universities.

222. This market does not include liberal arts colleges, which offer distinct products and are generally more like each other than elite, private universities. Reflecting industry recognition of these discrete classifications, both *U.S. News & World Report* and the *Carnegie Classifications* classify national universities and liberal arts colleges separately, given that liberal arts colleges are generally regarded as having different characteristics and services, including a smaller student body, smaller and less competitive athletic programs, fewer graduate programs, and less emphasis on research. In contrast, private, national universities tout themselves as offering such distinct services that the liberal arts colleges do not.

223. The Market for Elite, Private Universities has a rational relation to the interchangeability of use or cross-elasticity of demand with respect to the universities in the market. That is, within this market, sufficient cross-elasticity of demand exists such that a sufficient number of admitted students to two or more of these universities would respond to a small but significant increase in the net price by one university in the market by choosing to attend a lower-priced university in the same market that would make the price increase unremunerative.

224. The Market for Elite, Private Universities also has a rational relation to the cross-elasticity of demand with respect to elite, private liberal arts colleges. That is, the cross-elasticity between elite, private universities and elite liberal arts colleges in the United States is low, such that a hypothetical monopolist in the Market for Elite, Private Universities could impose a small but significant non-transitory increase in price ("SSNIP") without losing so many students to elite liberal arts colleges as to render the SSNIP unremunerative.

225. Admission to elite, private liberal arts colleges is generally less selective than admission to elite, private, national universities. According to *U.S. News & World Report,* the average admission rate of the top 10 national universities is approximately 7%, whereas the average admission rate of the top 10 liberal arts colleges is approximately 14%.

226. A further factor differentiating private universities and liberal arts colleges is the yield rate—that is, the rate at which admissions offers are accepted. Among the private universities ranked in the top 25 by *U.S. News & World Report*, there is a strong correlation between the institution's rank and yield rate. Among the liberal arts colleges, this correlation is much weaker (if it exists at all). The yield rate of both Harvard and Stanford, for example, is usually greater than 80%, whereas the yield rate for the most highly rated private liberal arts colleges—Williams, Amherst, and Swarthmore—is usually approximately 40%.

227. The Market for Elite, Private Universities does not include public universities. A handful of public universities have national rankings and selectivity comparable to that of the elite, private universities. Competition between public universities and elite, private institutions, however, is limited in the national market for students seeking financial aid, including the Class Members. The University of California-Los Angeles ("UCLA") and the University of California-Berkeley ("UC Berkeley"), for example, do not provide need-based financial assistance to out-of-

state applicants. The University of Michigan-Ann Arbor ("Michigan") has an official policy of prioritizing financial aid for residents. The University of Virginia ("UVA") is required by law to matriculate at least two-thirds of its undergraduate student body from its pool of in-state applicants and charges a high average net price to out-of-state students to cross-subsidize in-state students, a pricing policy that is driven by political pressure that private institutions do not face.

228. Indeed, public universities and private universities make pricing decisions based on very different factors, with public institutions being subject to political pressures, state laws, and dependence on expropriations from state treasuries. Compared to elite, private universities, public universities such as UCLA, UC Berkeley, UVA, and Michigan have different pricing models and largely compete for different students. (Cornell includes four contract colleges, whose students comprise less than half of the university's undergraduates, that charge lower tuition on in-state residents. Plaintiffs expect discovery to confirm that this fact does not exclude Cornell from the relevant market, including because Cornell does not largely compete for different students than the other universities in the relevant market.)

229. Schools in the Market for Elite, Private Universities compete with each other. Defendants are tightly packed in their average *U.S. News & World Report* rankings over the last 19 years (3.1, 5.1, 5.9, 6.4, 7.3, 8.0, 8.0, 10.7, 11.5, 14.8, 14.8, 16.7, 16.7, 18.1, 19.7, and 22.3).

230. Defendants have considerable market power, which they have exercised to increase the net price of attendance and to injure Plaintiffs and the other Class Members through the conduct alleged herein. Since 2003, Defendants have controlled, on average, approximately 74% of the number of undergraduate slots in the Market for Elite, Private Universities.

231. Competition in the Market for Elite, Private Universities is constrained by extremely strong brand preferences among consumers and high barriers to entry. Competition is

further constrained by the fact that such institutions limit the supply of available seats, which has the effect of generating scarcity and enhancing their prestige. Competition in the Market for Elite, Private Universities is further constrained by the fact that applicants cannot readily substitute one institution for another because an applicant's choice is limited to those universities to which he or she is admitted in a highly selective process.

232. The 568 Cartel does not have any pro-competitive impacts. Accordingly, if the rule of reason were to apply, it is not necessary to demonstrate reasonable and less restrictive alternatives are available. Unlike the Overlap Group, the 568 Cartel does not agree to allocate aid solely based on demonstrated financial need. Indeed, unlike the Overlap Group, several members of the 568 Cartel offer athletic scholarships and compete to have nationally ranked athletic teams every year.

233. Defendants have substantial endowments and the proven capacity to earn rates of return on those endowments that well exceed the minimum 5% distribution requirement of the tax laws. Defendants thus have ample resources to meet the financial needs of their students without reducing their endowments (if that were even imperative) and without colluding on a formula that results in artificially reduced financial aid, and that would in fact provide substantially more financial aid, and charge lower net prices of attendance, but for the 568 Cartel.

234. In addition, a reasonable and less restrictive alternative is for each member of the 568 Cartel to implement a fair formula unilaterally, as other elite, private universities have done, without entering into a conspiracy that overcharges students. In addition, no pro-competitive impact that Defendants may proffer justifies the significant overcharge caused by the conspiracy. If even relevant to any analysis under the rule of reason, moreover, there is no legitimate or significant procompetitive justification in Defendants' non-compliance with Section 568 or in

combining such non-compliance with the collective application of the Consensus Methodology to artificially reduce financial aid.

235. Colluding on common aid methodology under the 568 Cartel is not reasonably necessary to achieve the objective of awarding financial aid to admitted students. Instead, there are substantially less restrictive alternatives for helping to fund need-based financial aid—namely, and as noted, using a portion of the annual investment gains on Defendants' endowments.

## XII.

## CLAIM FOR RELIEF

### FIRST CAUSE OF ACTION
### Sherman Act Section 1

236. Plaintiffs incorporate the preceding paragraphs.

237. At a time currently unknown to Plaintiffs, but at least as early as 2003, and continuing through the present, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize and reduce the amount of financial aid paid to Class Members, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

238. In formulating and carrying out their agreement and conspiracy, Defendants did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others: Using an agreed upon formula or method for fixing, lowering, and stabilizing the amount of financial aid they offered and fixing, increasing, and stabilizing the net price of attendance.

239. The 568 Cartel has monitored and enforced its combination and conspiracy in several ways, according to the Cartel's website, including (but not limited to) such steps as (a) requiring each participation institution to submit a "Certificate of Compliance," (b) requiring university professionals at each institution to receive "training . . . in the application of the

Methodology," (c) imposing a "common calendar for the collection of data from families," and (d) conducting an annual or biannual meeting every year since 2007.

240. This conspiracy has had the following effects, among others: The net price of attendance has been fixed, increased, maintained, and stabilized at artificially high, non-competitive levels for all Class Members.

241. Plaintiffs and the other Class Members have been injured and will continue to be injured in their businesses and property by paying more for attendance at Defendants than they would have paid and will pay but for the combination and conspiracy.

242. Defendants are not entitled to the affirmative defense that they are exempt from the antitrust laws, because they do not satisfy the requirement that all students are admitted on a need-blind basis, for the reasons set forth above.

243. Defendants' price-fixing is a *per se* violation of the Sherman Act; or, in the alternative, is a violation of the Sherman Act under the Rule of Reason or "quick look" analysis.

244. Defendants' conduct has directly and proximately caused antitrust injury to Plaintiffs and the other Class Members. The artificially inflated net price of attendance that Plaintiffs and the other Class Members have paid to Defendants flows directly from Defendants' price fixing and is the type of damage that the antitrust laws were designed to prevent.

245. Plaintiffs and the other Class Members are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

## XIII.

## REQUESTED RELIEF

Plaintiffs request the following relief:

(a) That the Court determine that this action may be maintained as a class action under Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and direct that notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to Class Members;

(b) That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the law;

(c) That the Court hold Defendants jointly and severally liable for the injuries caused by each one of them and award Plaintiffs and the other Class Members actual damages and/or restitution in an amount to be determined at trial, such amount to be trebled as permitted by law;

(d) That the Court award Plaintiffs and the other Class Members pre- and post-judgment interest on any recovery;

(e) That the Court award Plaintiffs their costs of suit, including reasonable attorneys' fees and expenses;

(f) That the Court award Plaintiffs a permanent injunction, under Section 16 of the Clayton Act, enjoining Defendants from continuing to illegally conspire regarding their pricing and financial-aid policies; and

(g) That the Court award such other relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury of all claims so triable in this lawsuit.

/s/ Robert D. Gilbert
Robert D. Gilbert
Elpidio Villarreal
**GILBERT LITIGATORS & COUNSELORS, P.C.**
11 Broadway, Suite 615
New York, NY 10004
Telephone: 646-448-5269
rgilbert@gilbertlitigators.com
pdvillarreal@gilbertlitigators.com

/s/ Kyle W. Roche
Kyle W. Roche
Edward Normand
Eric Rosen
Peter Bach-y-Rita
**ROCHE FREEDMAN LLP**
99 Park Avenue, 19th Floor
New York, NY 10016
Tel: (646) 350-0527
kyle@rochefreedman.com
tnormand@rochefreedman.com
erosen@rochefreedman.com
pbachyrita@rochefreedman.com

/s/ Eric L. Cramer
Eric L. Cramer*
Caitlin Coslett*
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Phone: (215) 875-3000
ecramer@bm.net
ccoslett@bm.net

/s/ Elizabeth A. Fegan
Elizabeth A. Fegan
**FEGAN SCOTT LLC**
150 S. Wacker Dr., 24th floor
Chicago, IL 60606
Tel: (312) 741-1019
beth@feganscott.com

Robert E. Litan*
Daniel J. Walker*
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20006
Phone: (202) 559-9745
rlitan@bm.net
dwalker@bm.net

**Pro hac vice* to be filed

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| FRANK CARBONE, ANDREW CORZO, SAVANNAH ROSE EKLUND, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, KARA SAFFRIN, and BRITTANY TATIANA WEAVER, individually and on behalf of all others similarly situated, | **Case No. 1:22-cv-00125** |
| Plaintiffs, | **Hon. Matthew F. Kennelly** |
| v. | |
| BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY, | **JURY TRIAL DEMANDED** |
| Defendants. | |

**AMENDED CLASS ACTION COMPLAINT**

Plaintiffs, Frank Carbone, Andrew Corzo, Savannah Rose Eklund, Sia Henry, Alexander Leo-Guerra, Michael Maerlender, Brandon Piyevsky, Kara Saffrin, and Brittany Tatiana Weaver, individually and on behalf of all others similarly situated, bring this class action under Section 1 of the Sherman Act against Brown University ("Brown"), California Institute of Technology ("CalTech"), University of Chicago ("Chicago"), The Trustees of Columbia University in the City of New York ("Columbia"), Cornell University ("Cornell"), Trustees of Dartmouth College ("Dartmouth"), Duke University ("Duke"), Emory University ("Emory"), The Johns Hopkins University ("Johns Hopkins"), Georgetown University ("Georgetown"), Massachusetts Institute of Technology ("MIT"), Northwestern University ("Northwestern"), University of Notre Dame du Lac ("Notre Dame"), The Trustees of the University of Pennsylvania ("Penn"), William Marsh Rice University ("Rice"), Vanderbilt University ("Vanderbilt"), and Yale University ("Yale") (collectively, "Defendants").

## I.

## INTRODUCTION

1. Defendants are private, national universities that have long been in the top 25 of the *U.S. News & World Report* rankings for such schools. These elite institutions occupy a place of privilege and importance in American society. And yet these same Defendants, by their own admission, have participated and are participating in a price-fixing cartel that is designed to reduce or eliminate financial aid as a locus of competition, and that in fact has artificially inflated the net price of attendance for students receiving financial aid.

2. Defendants have participated in this cartel while claiming the protection of Section 568 of the Improving America's Schools Act of 1994 (the "568 Exemption"). This exemption from the antitrust laws, laws which otherwise prohibit conspiracies among competitors relating to price, offers antitrust immunity only to two or more institutions of higher education at which "*all* students

admitted are admitted on a need-blind basis." (Emphasis added.) Section 568 defines "on a need-blind basis" to mean "without regard to the financial circumstances of the student involved or the student's family." 15 U.S.C. § 1 note.

3. Defendants are not entitled to the 568 Exemption. Under a legally compliant need-blind admissions system, all students must be admitted without regard to their or their families' financial circumstances. Far from adhering to this statutory requirement, all Defendants have considered the financial circumstances of students or their families in deciding whether to admit students.

4. Defendants have thus made admissions decisions *with regard to* the financial circumstances of students and their families, thereby disfavoring students who need financial aid. All Defendants, in turn, have conspired to reduce the amount of financial aid they provide to admitted students. This conspiracy, which has existed (with only slightly varying membership) for many years, thus falls outside any potentially applicable antitrust exemption.

5. Defendants are and have been members of the so-called "568 Presidents Group," in which the members have agreed on "a set of common standards for determining the family's ability to pay for college," which the members describe as the "Consensus Approach." Based on the Consensus Approach, in approximately 2003, the 568 Presidents Group (the "568 Cartel") devised the Consensus Methodology, which is a common formula for determining an applicant's ability to pay. Under the Consensus Methodology, an applicant's ability to pay is a substantial determinant of the net price, which is the institution's gross tuition plus fees for room and board, less institutional grant aid, charged to the applicant for attendance.

6. Since its inception, the goal of the 568 Cartel has been, in the words of the Cartel members, to determine "whether it is possible to reach agreement on common standards for

determining financial need at the institutional level." Defendants in fact so determined and so agreed. Defendants have met—and continue to meet—to devise, agree upon, and collectively implement common principles and a uniform method for analyzing, offering, and providing financial aid to admitted students.

7. In collectively sharing confidential data and information about admissions and financial aid, adopting this methodology, and regularly meeting to implement this methodology jointly, the 568 Cartel has intended to reduce or eliminate, and in fact succeeded in reducing or eliminating, price competition among its members. As a result, the net price of attendance for financial-aid recipients at Defendants' schools—included among the members of the proposed Class here—has been artificially inflated. In short, due to the conduct challenged herein, over almost two decades, Defendants have overcharged over 200,000 financial-aid recipients by at least hundreds of millions of dollars collectively, in violation of Section 1 of the Sherman Act.

8. This longstanding conspiracy would be immune from the antitrust laws only if all the conspirators have been complying with the 568 Exemption. In fact, all Defendants have been members of the 568 Cartel, and none has qualified for the 568 Exemption. Instead, all Defendants have considered the financial circumstances of students and their families in deciding whether to admit waitlisted and transfer students; at least several Defendants maintain admissions systems that favor the children of wealthy past or potential future donors; at least several Defendants preference wealthy applicants through the largely secretive process known as "enrollment management"; and Columbia considers the financial circumstances of students and families in making admission decisions for its School of General Studies.

9. In critical respects, elite, private universities like Defendants are gatekeepers to the American Dream. Defendants' misconduct is particularly egregious because it has narrowed a

critical pathway to upward mobility that admission to their institutions represents. The burden of the 568 Cartel's overcharges falls especially on low- and middle-income families struggling to afford the cost of a university education and to achieve success for their children. In addition, unlike prior admissions scandals, such as Varsity Blues,[1] the 568 Cartel's systematic suppression of financial aid, resulting in the artificial inflation of the net price of attendance, is the official policy of its participants. As Defendants have succinctly admitted, the purpose of their Cartel has been—in these specific terms—to "discuss *and agree upon* common principles of analysis for determining the financial need of undergraduate financial aid applicants."

10. The 568 Cartel has thus caused substantial injury to Plaintiffs and the other members of the proposed Class (defined below). Plaintiffs bring this lawsuit to end Defendants' conspiratorial conduct and to prevent future students from suffering the injury the ongoing conspiracy has inflicted. Plaintiffs do so without having known until recently that they had been injured in violation of the 568 Exemption, and under circumstances in which a reasonable person would have been unaware of the harm resulting from Defendants' use of the Consensus Methodology in violation of the 568 Exemption.

11. Plaintiffs also seek compensation for themselves and a proposed Class of all U.S. citizens or permanent residents, and purchasers of tuition, room, or board on their behalf, who have (a) enrolled in one or more of Defendants' full-time undergraduate programs, (b) received need-based financial aid from one or more Defendants, (c) paid to one of more Defendants tuition, room, or board not fully covered by such financial aid, and (d) first enrolled in one of Defendants' full-time undergraduate programs during the relevant times (defined below) from January 1, 2003 until

[1] "Varsity Blues" is law enforcement's code name for the investigation and prosecution of the college admissions bribery scandal, which involved allegations that certain universities gave admissions preference to the children of wealthy parents in exchange for bribes.

the effects of Defendants' continuing conduct ceases. Members of this "Class" shall be called "Class Members."

12. Parents, legal guardians, and other family members commonly pay or help to pay the cost of a student's tuition, room, and board. The proposed Class therefore includes both students and those who pay or commit to pay on behalf of students.

## II.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331, 1332(d)(2), and 1337.

14. This Court has personal jurisdiction over each Defendant on multiple bases, including that each Defendant has: (1) transacted business in the United States and in this District, including by recruiting, and advertising for, students residing in this District; (2) transacted business with Class Members throughout the United States, including those residing in this District; and (3) committed substantial acts in furtherance of an unlawful scheme in the United States, including in this District. Each Defendant has recruited, accepted, enrolled, and charged artificially high net prices of attendance to, and thus injured, individuals residing within this District. In addition, Defendants have held at least one meeting of the 568 Cartel in Rosemont, Illinois, which is within this District.

15. Venue is proper in this District under 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b), (c), and (d), because each Defendant transacted business, was found, had agents, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

formed by a group of 28 college and university presidents from need-blind schools in 1998." The website also contains the form of a certificate of compliance whereby a member of the group can certify that "its admission and financial aid practices currently comply with the rules of Section 568 regarding 'need-blind admission practices.'" These statements on the website mislead the public by representing that the 568 Cartel members' practices are compliant with Section 568. The truth, as alleged further below, is the opposite.

115. The 568 Cartel fixes prices through a formula that is based on a "set of common standards for determining the family's ability to pay for college." The 568 Cartel calls this formula the "Consensus Methodology." Defendants admit on their own website that the "purposes" of the 568 Cartel include, collectively, to "Discuss and agree upon common principles of analysis for determining the financial need of undergraduate financial aid applicants"; to "Build, maintain, and revise, as appropriate, a Consensus Approach need analysis methodology that is consistent with these principles"; and to "Explore ways of developing a data exchange program."

116. Defendants further concede that the "Consensus Methodology" would, in their own words, contain "certain key components, including: 1) common elements of need analysis . . .; 2) a common calendar for the collection of data from families; 3) a means of training aid professionals in the application of the Methodology; and 4) an oversight 568 Group to review and modify the methodology as needed over time."

117. Critical components of the 568 Cartel have therefore been the development of a "data exchange program" and the agreement to share information about admissions and financial-aid methodology, and then to meet regularly to discuss this data and information, to enable the Cartel members to agree to use a common methodology for determining financial-aid awards for the purposes of coordinating financial-aid awards among Cartel members. The common

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **FRANK CARBONE, ANDREW CORZO, SAVANNAH ROSE EKLUND, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLANDER, BRANDON PIYEVSKY, KARA SAFFRIN, and BRITTANY TATIANA WEAVER, individually and on behalf of all others similarly situated,** | ) | |
| **Plaintiffs,** | ) | |
| **vs.** | ) | **Case No. 22 C 125** |
| **BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,** | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Frank Carbone, Andrew Corzo, Savannah Rose Eklund, Sia Henry, Alexander Leo-Guerra, Michael Maerlander, Brandon Piyevsky, Kara Saffrin, and Brittany Tatiana

Weaver, on behalf of themselves and all others similarly situated, have sued seventeen private universities for antitrust violations under section 1 of the Sherman Act. The defendants include Brown University (Brown), California Institute of Technology (CalTech), University of Chicago (Chicago), the Trustees of Columbia University in the City of New York (Columbia), Cornell University (Cornell), Trustees of Dartmouth College (Dartmouth), Duke University (Duke), Emory University (Emory), Georgetown University (Georgetown), the Johns Hopkins University (Johns Hopkins), Massachusetts Institute of Technology (MIT), Northwestern University (Northwestern), University of Notre Dame Du Lac (Notre Dame), the Trustees of the University of Pennsylvania (Penn), William Marsh Rice University (Rice), Vanderbilt University (Vanderbilt), and Yale University (Yale).

This opinion concerns three motions to dismiss filed by the defendants: (1) a motion joined by all of the defendants; (2) a motion by Brown, Chicago, Emory, and Johns Hopkins; and (3) a motion by Yale. For the reasons below, the Court denies the defendants' motions.

**Background**

The defendants are private universities that have been consistently ranked by the *U.S. News & World Report* as among the top twenty-five of such schools in the nation. On January 9, 2022, the plaintiffs filed suit against the defendants, who they allege have "participated and are participating in a price-fixing cartel that is designed to reduce or eliminate financial aid as a locus of competition, and that in fact has artificially inflated the net price of attendance for students receiving financial aid." Am. Compl. ¶ 1. The plaintiffs seek class certification under Federal Rules of Civil Procedure 23(a),

**C. Yale's motion**

Yale has also filed a separate motion to dismiss, contending that the claims against it should be dismissed because the plaintiffs concede that Yale does not use the disputed Consensus Methodology in determining a student's need for financial aid. The Court disagrees. The amended complaint alleges that "Yale claims not to have participated in the 568 Cartel from 2008 until 2018" and that it implemented a new financial aid policy in early 2009. Am. Compl. ¶ 123. Contrary to Yale's contentions, these allegations do not amount to a concession that Yale does not use the CM. In fact, the plaintiffs allege that Yale is currently a member of the 568 Group and that all members of the 568 Group are required to adopt the CM. *See id.* ¶ 124 (alleging that "Yale understood that active members of the 568 Cartel were required to agree to and impose the Consensus Methodology").

In addition, even if the amended complaint was understood to allege that Yale stopped using the CM in 2008, it can still be held liable for the acts of its alleged coconspirators. *Marion Healthcare*, 952 F.3d at 839. The amended complaint alleges that Yale joined the 568 Group in 1998. Yale contends that the plaintiffs concede that Yale withdrew from the conspiracy in 2008, but this is inaccurate. As with Brown, Chicago, and Emory, the amended complaint states that Yale *claims* to have withdrawn from the conspiracy, but it does not concede that Yale actually withdrew. The Court thus denies Yale's motion to dismiss.

**Conclusion**

For the foregoing reasons, the Court denies the defendants' motions to dismiss [dkt. nos. 145, 146 & 148]. The defendants are directed to answer the amended

complaint by no later than September 9, 2022. The parties are directed to promptly confer regarding a discovery and pretrial schedule, and they are to file by August 26, 2022 a joint status report with an agreed proposal, or alternative proposals if they cannot agree. The case is set for a telephonic status hearing on September 2, 2022 at 9:10 a.m., using call-in number 888-684-8852, access code 746-1053. The Court reserves the right to vacate the hearing if it determines a hearing is not needed.

MATTHEW F. KENNELLY
United States District Judge

Date: August 15, 2022

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated, | **Case No. 1:22-cv-00125** |
| Plaintiffs, | |
| v. | **Hon. Matthew F. Kennelly** |
| BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY, | **JURY TRIAL DEMANDED** |
| Defendants. | |

**SECOND AMENDED AND SUPPLEMENTAL
CLASS ACTION COMPLAINT**

Plaintiffs, Andrew Corzo, Sia Henry, Alexander Leo-Guerra, Michael Maerlender, Brandon Piyevsky, Benjamin Shumate, Brittany Tatiana Weaver, and Cameron Williams, individually and on behalf of all others similarly situated, bring this class action under Section 1 of the Sherman Act against Brown University ("Brown"), California Institute of Technology ("CalTech"), University of Chicago ("Chicago"), The Trustees of Columbia University in the City of New York ("Columbia"), Cornell University ("Cornell"), Trustees of Dartmouth College ("Dartmouth"), Duke University ("Duke"), Emory University ("Emory"), The Johns Hopkins University ("Johns Hopkins"), Georgetown University ("Georgetown"), Massachusetts Institute of Technology ("MIT"), Northwestern University ("Northwestern"), University of Notre Dame du Lac ("Notre Dame"), The Trustees of the University of Pennsylvania ("Penn"), William Marsh Rice University ("Rice"), Vanderbilt University ("Vanderbilt"), and Yale University ("Yale") (collectively, "Defendants").

## I.

## INTRODUCTION

1. Defendants are private, national universities that have long been in the top 25 of the *U.S. News & World Report* rankings for such schools. These elite institutions occupy a place of privilege and importance in American society. And yet these same Defendants, by their own admission, have participated and are participating in a price-fixing cartel that is designed to reduce or eliminate financial aid as a locus of competition, and that in fact has artificially inflated the net price of attendance for students receiving financial aid.

2. Defendants have participated in this cartel while claiming the protection of Section 568 of the Improving America's Schools Act of 1994 (the "568 Exemption"). This exemption from the antitrust laws, laws which otherwise prohibit conspiracies among competitors relating to price, offered antitrust immunity only to two or more institutions of higher education at which "*all*

students admitted are admitted on a need-blind basis." (Emphasis added.) Section 568 defines "on a need-blind basis" to mean "without regard to the financial circumstances of the student involved or the student's family." 15 U.S.C. § 1 note. The 568 Exemption expired at midnight on September 30, 2022.

3. Defendants were not entitled to the 568 Exemption. Under a legally compliant need-blind admissions system, all students must be admitted without regard to their or their families' financial circumstances. Far from adhering to this statutory requirement when the 568 Exemption existed, all Defendants have considered the financial circumstances of students or their families in deciding whether to admit students.

4. Defendants have thus made admissions decisions *with regard to* the financial circumstances of students and their families, thereby disfavoring students who need financial aid. All Defendants, in turn, have conspired to reduce the amount of financial aid they provide to admitted students. This conspiracy, which has existed (with only slightly varying membership) for many years, thus falls outside any potentially applicable antitrust exemption.

5. Defendants are and have been members of the so-called "568 Presidents Group," in which the members have agreed on "a set of common standards for determining the family's ability to pay for college," which the members describe as the "Consensus Approach." Based on the Consensus Approach, in approximately 2003, the 568 Presidents Group (the "568 Cartel") devised the Consensus Methodology, which is a common formula for determining an applicant's ability to pay. Under the Consensus Methodology, an applicant's ability to pay is a substantial determinant of the net price, which is the institution's gross tuition plus fees for room and board, less institutional grant aid, charged to the applicant for attendance.

6. Since its inception, the goal of the 568 Cartel has been, in the words of the Cartel members, to determine "whether it is possible to reach agreement on common standards for determining financial need at the institutional level." Defendants in fact so determined and so agreed. Defendants have met—and may continue to meet—to devise, agree upon, and collectively implement common principles and a uniform method for analyzing, offering, and providing financial aid to admitted students.

7. In collectively sharing confidential data and information about admissions and financial aid, adopting this methodology, and regularly meeting to implement this methodology jointly, the 568 Cartel has intended to reduce or eliminate, and in fact succeeded in reducing or eliminating, price competition among its members. As a result, the net price of attendance for financial-aid recipients at Defendants' schools—included among the members of the proposed Class here—has been artificially inflated. In short, due to the conduct challenged herein, over almost two decades, Defendants have overcharged over 200,000 financial-aid recipients by billions of dollars collectively, in violation of Section 1 of the Sherman Act.

8. This longstanding conspiracy would have been immune from the antitrust laws when the 568 Exemption existed only if all the conspirators had been complying with the Exemption. In fact, all Defendants have been members of the 568 Cartel, and thus conspirators, and none qualified for the 568 Exemption. Instead, all Defendants have considered the financial circumstances of students and their families in deciding whether to admit waitlisted and transfer students; Defendants have maintained admissions systems that favor the children of wealthy past or potential future donors; at least several Defendants have given preference to wealthy applicants through the largely secretive process known as "enrollment management"; and Columbia has

considered the financial circumstances of students and families in making admission decisions for its School of General Studies.

9. In critical respects, elite, private universities like Defendants are gatekeepers to the American Dream. Defendants' misconduct is particularly egregious because it has narrowed a critical pathway to upward mobility that admission to their institutions represents. The burden of the 568 Cartel's overcharges falls especially on low- and middle-income families struggling to afford the cost of a university education and to achieve success for their children. In addition, unlike prior admissions scandals, such as Varsity Blues,[1] the 568 Cartel's systematic suppression of financial aid, resulting in the artificial inflation of the net price of attendance, has been the official policy of its participants. As Defendants have succinctly admitted, the purpose of their Cartel has been—in these specific terms—to "discuss *and agree upon* common principles of analysis for determining the financial need of undergraduate financial aid applicants."

10. The 568 Cartel has thus caused substantial injury to Plaintiffs and the other members of the proposed Class (defined below). Plaintiffs bring this lawsuit to prevent Defendants' conspiratorial conduct and to prevent future students from suffering the injury the ongoing conspiracy has inflicted. Plaintiffs do so without having known until recently that they had been injured in violation of the 568 Exemption, and under circumstances in which a reasonable person would have been unaware of the harm resulting from Defendants' use of the Consensus Methodology in violation of the 568 Exemption.

11. Plaintiffs also seek compensation for themselves and a proposed Class of all U.S. citizens or permanent residents, who have (a) enrolled in one or more of Defendants' full-time

---

[1] "Varsity Blues" is law enforcement's code name for the investigation and prosecution of the college admissions bribery scandal, which involved allegations that certain universities gave admissions preference to the children of wealthy parents in exchange for bribes.

undergraduate programs, (b) received need-based financial aid from one or more Defendants, (c) directly purchased from one of more Defendants education, room, or board not fully covered by such financial aid, and (d) first enrolled in one of Defendants' full-time undergraduate programs during the relevant times (defined below) from January 1, 2003 until the effects of Defendants' continuing conduct ceases. Members of this "Class" shall be called "Class Members."

## II.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331, 1332(d)(2), and 1337.

13. This Court has personal jurisdiction over each Defendant on multiple bases, including that each Defendant has (1) transacted business in the United States and in this District, including by recruiting, and advertising for, students residing in this District; (2) transacted business with Class Members throughout the United States, including those residing in this District; and (3) committed substantial acts in furtherance of an unlawful scheme in the United States, including in this District. Each Defendant has recruited, accepted, enrolled, and charged artificially high net prices of attendance to, and thus injured, individuals residing within this District. In addition, Defendants have held at least one meeting of the 568 Cartel in Rosemont, Illinois, which is within this District.

14. Venue is proper in this District under 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b), (c), and (d), because each Defendant transacted business, was found, had agents, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

102. Johns Hopkins joined the 568 Cartel in 2021, has taken overt steps in furtherance of the conspiracy alleged herein (including meeting with Defendants and discussing the Consensus Methodology with them), and first implemented the Consensus Methodology with respect to Early Decision applicants in 2021.

103. Rice joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

104. Penn joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

105. Vanderbilt joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

106. Yale joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

107. Certain Defendants claim to have stopped participating in the 568 Cartel at various points in time since 2003, but Plaintiffs are unaware of any evidence that any Defendant disavowed and repudiated the conspiracy and its goals. Accordingly, no Defendant withdrew from the conspiracy. Accordingly, since 2003 and through the present, the determinants of the net price of attending Defendants' schools have been established through the conspiracy.

## V.

## DEFENDANTS' VIOLATION OF THE FEDERAL ANTITRUST LAWS

### A. Defendants Have Colluded on Their Financial-Aid Practices

108. Defendants are purported competitors in enrolling highly selective undergraduate student bodies and providing an undergraduate education. People throughout the United States apply for admission to Defendants' undergraduate programs.

109. Each Defendant annually sends out thousands of solicitations and mailings and receives thousands of admission applications that cross state lines, including thousands of applications from Class Members. Out-of-state students, including thousands of Class Members, make up a substantial percentage of each Defendant's undergraduate population.

110. Each Defendant annually receives millions of dollars that flow across state lines in tuition payments, grants, donations, and athletic ticket sales and sponsorships. Each Defendant markets its undergraduate programs and tickets for athletic events to the public across state lines.

111. Defendants have engaged in a continuing conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act. This conspiracy, to the extent it continues, is likely to continue unless the relief sought herein is granted.

112. This conspiracy has consisted of an agreement, understanding, and concert of action among Defendants, and each of them, the substantial terms of which are to restrain price competition relating to their provision of financial aid for students, and thereby to increase the net price of attending these institutions ("the net price of attendance").

113. The 568 Cartel generally meets in person as a group at least twice each year. In October 2017, for example, the 568 Cartel held one of its official biannual meetings at the Hilton Rosemont, in Rosemont, Illinois, near O'Hare International Airport. On information and belief, 568 Cartel members communicate with each other about matters related to the conspiracy through other means as well, such as telephone calls, video calls, emails, and messaging.

114. Until the fall of 2022, Defendants maintained a public-facing website for purpose of representing the 568 Cartel and its purposes to the public. The website stated: "This site serves as a resource . . . for visitors seeking to learn more about the Group."[22] The website explained that

---

[22] 568 PRESIDENTS GROUP, http://www.568group.org/home/.

the "568 Presidents Group is an affiliation of colleges and universities, all of which must admit students on a need-blind basis." An FAQ section on the website added: "It is referred to as a 'Presidents' group because it was formed by a group of 28 college and university presidents from need-blind schools in 1998." The website also contained the form of a certificate of compliance whereby a member of the group could certify that "its admission and financial aid practices currently comply with the rules of Section 568 regarding 'need-blind admission practices.'" These statements on the website misled the public by representing that the 568 Cartel members' practices were compliant with Section 568. The truth, as alleged further below, is the opposite.

115. The 568 Cartel has fixed prices through a formula that is based on a "set of common standards for determining the family's ability to pay for college." The 568 Cartel calls this formula the "Consensus Methodology." Defendants admitted on their own website that the "purposes" of the 568 Cartel include, collectively, to "Discuss and agree upon common principles of analysis for determining the financial need of undergraduate financial aid applicants"; to "Build, maintain, and revise, as appropriate, a Consensus Approach need analysis methodology that is consistent with these principles"; and to "Explore ways of developing a data exchange program."

116. Defendants further conceded that the "Consensus Methodology" would, in their own words, contain "certain key components, including: 1) common elements of need analysis . . .; 2) a common calendar for the collection of data from families; 3) a means of training aid professionals in the application of the Methodology; and 4) an oversight 568 Group to review and modify the methodology as needed over time."

117. Critical components of the 568 Cartel have therefore been the development of a "data exchange program" and the agreement to share information about admissions and financial-aid methodology, and then to meet regularly to discuss this data and information, to enable the

Cartel members to agree to use a common methodology for determining financial-aid awards for the purposes of coordinating financial-aid awards among Cartel members. The common methodology assesses the income and assets of given financial-aid applicants and their families to determine the applicants' ability to pay and thus the financial contribution that the applicant is expected to make.

118. The applicants' assessed ability to pay therefore is a key determinant in the net price of attendance. The 568 Cartel has used the shared, competitively sensitive information about enrollment, costs, and other data relating to Defendants' available resources for financial aid to arrive at a common and agreed formula for setting ability to pay, which results in artificially inflated net prices of attendance.

119. Members of the 568 Cartel began meeting sometime after the enactment of Section 568 in 1994. The 568 Cartel was officially formed in 1998.

120. As of July 2001, Dartmouth had not joined the 568 Cartel. According to Dartmouth's then-Dean of Admissions and Financial Aid, Karl Furstenberg, as of 2001 Dartmouth had a "need analysis methodology that [was] perhaps more enlightened, more generous and more flexible than" that of the 568 Cartel, and Dartmouth was "actually doing more than this new methodology would allow."[23] Not long after Mr. Furstenberg made these statements, however, Dartmouth decided to join the 568 Cartel, implemented the Consensus Methodology, and took other steps in furtherance of the conspiracy as alleged herein.

121. The 568 Cartel has monitored and enforced its combination and conspiracy in several ways, according to the Cartel's website, including (but not limited to) such steps as (a)

---

[23] Shevani Jaisingh, *28 Colleges Alter Financial Aid Packages*, THE DARTMOUTH (July 17, 2001), https://www.thedartmouth.com/article/2001/07/28-colleges-alter-fin-aid-packages.

requiring each participating institution to submit a "Certificate of Compliance," (b) requiring university professionals at each institution to receive "training . . . in the application of the Methodology," (c) imposing a "common calendar for the collection of data from families," and (d) conducting an annual or biannual meeting every year since 2007.

122. At midnight on September 30, 2022, the 568 Exemption expired. The 568 Cartel website is now blank except for the following message: "The 568 Presidents Group (and all of its Committees) has been formally dissolved, effective November 4, 2022. Thank you."

## VI.

## DEFENDANTS' ANTICOMPETITIVE CONDUCT HAS RAISED NET PRICES

123. As higher-education insiders—including employees and officers of the institutions in the 568 Cartel—have acknowledged, the Cartel has limited competition in financial-aid offers from supposedly competing schools, driving down aid packages and thereby driving up the net price of attendance for aid-eligible students.

124. Yale claims not to have participated in the 568 Cartel from 2008 until 2018. Yale claims it left the Cartel because it determined that membership in the Cartel had restricted the amount of financial aid that Yale could provide to students. That is, Yale's decision to increase financial-aid awards to eligible students prompted it to want to no longer participate. In so doing, referring to a new policy to be implemented in early 2009, Yale stated that its "new, more generous aid policy in January means the University can no longer follow the consensus methodology."[24]

125. Yale's then-Director of Student Financial Services, Caesar Storlazzi, concluded: "By leaving the 568 Group, Yale is now free to give families more aid than they would have gotten

[24] Caitlin Roman, *University Leaves Financial Aid Group*, YALE DAILY NEWS (Sept. 26, 2008), https://yaledailynews.com/blog/2008/09/26/university-leaves-financial-aid-group/.

EXHIBIT
McWade-11 12.8.23 mlg
exhibitsticker.com

**Date:** Tuesday, April 15 2014 01:09 PM
**Subject:** Re: 568 Talking points paper
**From:** Patricia McWade <mcwadep@georgetown.edu>
**To:** Ted Bracken <ted.bracken@yahoo.com>;

I think it was made clear to those wanting to participate in 568 that they could NOT use an EFC that was lower than what is calculated using the CA, unless they had documented the case using "professional judgment". That was why HYP felt the need to leave the group; they wanted to offer more "need-based" scholarship aid. Maybe this is not the document to explain that nuance but it is a reality.

On Tue, Apr 15, 2014 at 12:57 PM, Ted Bracken <ted.bracken@yahoo.com> wrote:

I think this is a improvement on what were were trying to say, Pat.

Begin forwarded message:

**From:** Kristine E Dillon <[redacted]@MIT.EDU>
**Subject: RE: 568 Talking points paper**
**Date:** April 15, 2014 at 12:51:29 PM EDT
**To:** Ted Bracken <ted.bracken@yahoo.com>
**Cc:** Megan Arleth <marleth@mit.edu>

Ted--

Sorry to be slow with my comments. I was traveling last week and editing documents was not possible.

-----Original Message-----
From: Ted Bracken [mailto:ted.bracken@yahoo.com]
Sent: Tuesday, April 15, 2014 12:31 PM
To: Bruce C Layton; Megan Arleth; Scott Fleming; Patricia McWade; Chris Simmons; [redacted]
Cc: Kristine E Dillon
Subject: 568 Talking points paper

All,

Attached is the latest draft of the 'talking points' piece that has now had the benefit of several improvements suggested by the group.

Let me know how I can be of further help.

Ted

EXHIBIT
Exhibit 2 ID 4/23/24 LF
exhibitsticker.com

**Date:** Wednesday, August 27 2014 09:19 AM
**Subject:** Re: 568 Presidents' Group Exemption Renewal Efforts
**From:** Cynthia Barnhart
**To:** Elizabeth M Hicks <emhicks@mit.edu>;
**CC:** Dennis M Freeman <freeman@mit.edu>; Philip H. Lippel <phlippel@mit.edu>; Leslie C Bridson <lbridson@mit.edu>;
**Attachments:** smime.p7m

---

Thanks Betsy! Could you respond directly to the email below and let Karla know?

Thanks again,
Cindy

CYNTHIA BARNHART
Chancellor
Ford Professor of Engineering
MIT, Room 10-200, 77 Massachusetts Avenue
Cambridge, MA 02139
barnhart@mit.edu
617 253-3815

On Aug 26, 2014, at 11:21 AM, Elizabeth M Hicks <emhicks@mit.edu> wrote:

Dear Cindy,

After talking to Philip Lippel as well as the MIT financial aid staff, I recommend that we support the renewal of Section 568. However, we may want to make it clear that we believe that the 568 Group is entering its final transition stage and will have served its purpose after this next 5-7 year extension.

Currently, there are twenty-four 568 member institutions, of which four are Ivy's (Columbia Cornell, Dartmouth and Penn) and nine others COFHE institutions (Amherst, Duke, Georgetown, MIT, Northwestern, Swarthmore, University of Chicago, Wellesley and Williams) and eleven other non-COFHE institutions. Leslie Bridson, our Director of Financial Aid, serves on the Technical Committee. The Group provides MIT financial aid staff with professional development opportunities for jointly discussing and agreeing on principles of need analysis. I do worry that the eleven non-COFHE institutions have institutional resource issues that can lead the group away from establishing sound need analysis principles. An institution can be a part of the 568 Group and be more stringent in how it defines financial need, but not more generous. Harvard, Princeton, Stanford and Yale departed from the 568 Group when they decided not only to be more generous but to be more transparent about the financial aid a family would receive.

I expect that in the future there will be other professional development opportunities for MIT financial aid staff, but we are not there yet. As part of the transition, a cost of $10,000 to fund this renewal, along with our annual 568 Group dues, are reasonable costs to assume for the benefit we derive.

If you have any other questions about the 568 Group, please let me know.

Best,

Betsy

**Date:** Tuesday, March 6 2012 03:10 PM
**Subject:** outcomes of our sessions last week
**From:** Donald Bishop <Donald.C.Bishop.40@nd.edu>
**To:** Lou Nanni <lnanni@nd.edu>; Joseph Gelchion <Joseph.Gelchion.2@nd.edu>; Robert Mundy <Robert.M.Mundy.1@nd.edu>;
**CC:** Donald Bishop <Donald.C.Bishop.40@nd.edu>;

Exhibit
12
Witness: Rev. Edward A. Malloy, C.S.C.
9/7/2023
Michelle Keegan, RMR, CRR, CSR

I have now reviewed the data.

Clearly we had more higher ranked applicants this year. Most of the increase is in the AP area.

We have the following outcomes of admits by UR rating:

| | 2012 | 2011 | |
|---|---|---|---|
| A | 43 | 34 | +9 |
| AP | 32 | 20 | +12 |
| B | 42 | 52 | -10 |
| BM | 46 | 70 | -24 |
| | 163 | 176 | -13 |
| SAT-one-test | 1388 | 1398 | |

(the decline of 10 points on the SAT for UR admits means our enrolled class profile will be one-point lower this year due to the lower profile of these students—compared to the decisions we made last year)

Admits at the academic rating of:

| Academic Rating | 2012 | 2011 | |
|---|---|---|---|
| 1-8 | 69 | 99 | -30 |
| 9-12 | 56 | 57 | -1 |
| 13-18 | 38 | 20 | +18 |

Most of our non-special interest admits have an academic rating of 1-6. If you add alumni status to the mix many alumni children with a 7 or 8 academic rating gain admission (about 90%).

Students with a 13-18 rating are massive allowances to the power of the family connections and funding history. The gain of 21 A and AP admits and the gain of 18 very low ranked admits (13-18 academic ratings) means we allowed their high gifting or potential gifting to influence our choices more this year than last year—because they simply were more higher ranked and larger donors.

In one respect we can congratulate university relations on these added donors. However, many of them are AP's so it will be important this summer and each summer to review the actual history of giving by these AP's as their relationship with Notre dame matures.

Overall I feel the decisions we made were in reasonable accordance with what we did last year.

The lower number of B Minus and B's were due to our elevation of the giving to reach these ratings.

The sad part of the year is the drop of 30 UR kids in the academic rating of 1-8. That was a big decline.

Sure hope the wealthy next year raise a few more smart kids!

Don

Don Bishop
Associate Vice President for Undergraduate Enrollment
University of Notre Dame

574-631-7505

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLANDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERONE WILLIAMS, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHN HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,<br><br>*Defendants.* | Case No. 22-cv-00125 |

**EXPERT REPORT OF NICHOLAS HILL**

**7 August 2024**

ATTORNEYS' EYES ONLY – SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

**Figure 7: Average total institutional grant aid awarded per Defendant over time (dollars in 2024 prices)**




Sources: IPEDS; Federal Reserve Bank of St. Louis CPI data (as produced by Dr. Singer).
Notes:
[1] Institutional grant aid awarded per Defendant calculated as the average amount of institutional grant aid awarded to full-time, first-time degree-seeking undergraduates per Defendant (total institutional aid awarded to full-time, first-time, degree-seeking undergraduates / 17 Defendants).
[2] Aid awarded refers to grant or scholarship aid awarded to the student. Aid awarded may differ from aid dispersed to a student. For example, aid awarded may differ if a student leaves a school mid-year before the entire award amount is dispersed. "IPEDS 2023–2024 Student Financial aid survey instructions," Integrated Postsecondary Education Data System, accessed June 30, 2024, https://surveys.nces.ed.gov/ipeds/public/survey-materials/instructions?instructionid=30016.
[3] As previously discussed, the 2003–2004 academic year is the first academic year the consensus methodology guidelines could have potentially affected aid packages.

(81) Another way to quantify the amount of institutional aid awarded by a school is to calculate the average amount of institutional aid received per full-time, first-time, degree-seeking undergraduate student. I use the average institutional aid per student, as opposed to the average institutional aid per student who received aid, as a more complete measure for the total amount of institutional aid provided.[106] Figure 8 summarizes the average amount of aid received per full-time, first-time, degree-

[106] To see this, consider two otherwise identical schools A and B with a cost of attendance of $10,000. School A provides institutional aid for 50 percent of the cost of attendance for 50 percent of students. School B provides institutional aid for 50 percent of the cost of attendance for 50 percent of students and institutional aid for 10 percent of the cost of attendance for the rest of 50 percent of students. In this case, School B provides more financial aid to students overall. The average institutional aid per student is calculated at $2,500 for School A and $3,000 for School B, whereas the average institutional aid per student who received an award is calculated at $5,000 for School A and $3,000 for School B, which is inconsistent with the fact that School B provides more institutional aid. Such a situation may occur for a school like MIT, which "provided a $5,000 Covid-era grant to all enrolled undergraduate students" during the pandemic. Office of the Vice Chancellor, "MIT keeps a firm commitment to undergraduate student support for 2021–2022," MIT News, March 26, 2021, https://news.mit.edu/2021/mit-keeps-firm-commitment-undergraduate-student-support-0326.

seeking undergraduate student by year at the Defendants. The figure shows that inflation-adjusted average institutional aid awarded by the Defendants per undergraduate student has risen both over time and since the introduction of the consensus methodology guidelines.[107]

**Figure 8: Average institutional grant aid awarded to full-time, first-time, degree-seeking undergraduates by the Defendants (dollars in 2024 prices)**




Sources: IPEDS; Federal Reserve Bank of St. Louis CPI data (as produced by Dr. Singer).
Notes:
[1] Average institutional grant aid calculated as the average amount of institutional grant aid awarded per full-time, first-time, degree-seeking undergraduate (total institutional grant aid awarded to full-time, first-time, degree-seeking undergraduates / total full-time, first-time degree-seeking undergraduates).
[2] The 2003–2004 academic year is the first academic year the consensus methodology guidelines could have potentially affected aid packages.

(82) A third way to quantify the amount of financial aid awarded by the Defendants is to measure the proportion of students awarded aid. Figure 9 depicts the percentage of full-time, first-time, degree-seeking undergraduates who received aid at the Defendants over time. It shows that while this percentage varies significantly from year to year, it has increased overall since the introduction of the

[107] The figure includes all the Defendants in all years, which includes periods when a Defendant was not part of the 568 Group. In Appendix C.1, I show the same chart limiting the chart to those six Defendants that were continuously part of the 568 Group (until its disbandment) since before the consensus methodology guidelines were introduced (Columbia, Cornell, Georgetown, MIT, Northwestern, Notre Dame). That chart looks very similar and also shows that average institutional aid, adjusted for inflation, awarded by those Defendants per undergraduate student has risen both over time and since the introduction of the consensus methodology guidelines.

Defendants agreeing to a common financial aid methodology or the challenged conduct standardizing expected family contributions.

**Figure 14: Percentage of cross-admitted students who received different expected family contributions from the Defendants, 1998–1999 to 2022–2023 academic years**




Sources: Corrected combined Defendant data; IPEDS; Cornell cost of attendance data; Federal Reserve Bank of St. Louis CPI data (as produced by Dr. Singer).
Notes:
[1] Data are limited to students who were admitted to two or more Defendants with non-missing and non-zero school-specific expected family contr butions.
[2] Data are restricted to the academic years during the conduct period for which each Defendant was a member of the 568 Group.
[3] Applicants for whom all expected family contributions exceed the cost of attendance are excluded from the analysis. I rely on IPEDS cost of attendance data to make this restriction, with the exception of Cornell. For Cornell, I rely on produced average cost of attendance data (CORNELL_LIT0000436889) that distinguishes between Cornell's endowed and contract colleges for New York residents.[133] *See* Section 3.3 for how cost of attendance is defined.

(102) Figure 15 depicts the average spread in expected family contribution for students who were admitted to two, three, four, and five or more Defendants. It shows that students who were admitted to two

133 Some Cornell students pay lower tuition rates (*e.g.*, New York State residents matriculating at Cornell's contract colleges who pay in-state rates) that are not captured by IPEDS, which only reports the highest tuition rates (i.e., the tuition rates applicable to all students matriculating at Cornell's endowed colleges and students who are not New York State residents but matriculate at Cornell's New York State statutory colleges, or contract colleges). Before 2003, Cornell reported for purposes of IPEDS data separate metrics for its tuition (and thereby, cost of attendance) for its contract colleges. After 2003, a single metric is reported which overestimates the cost of attendance for New York State residents matriculating at Cornell's contract colleges, *see* my backup materials for a comparison of these metrics.

damages) holds for 29 percent of school-academic year combinations during the alleged conduct period.[366]

(233) These problems arise due to an econometric issue with Dr. Singer's model. The problem results from the combination of several factors, including the facts that (1) Dr. Singer's models 4–6 use a single dummy variable to identify the effect of the challenged conduct and (2) schools enter and exit the challenged conduct at different times.[367] This results in affected students serving as a control for other affected students.[368]

## 8.5. Dr. Singer has failed to account for selection bias introduced by the fact that the alleged conduct is associated with a changing fraction of students on full rides

(234) Dr. Singer's overcharge modeling is plagued by multiple forms of bias in the selection of his sample. Specifically, before estimating his regression model Dr. Singer limits his sample to students (1) whose grant aid covered less than 95 percent of the school-academic year specific cost of attendance and (2) who received a positive amount of institutional need-based grant aid.[369] Both sources of selection bias can result in an estimate of positive overcharges due to the alleged conduct when every individual class member was either unharmed or benefitted from the actions of 568 Group.[370]

(235) To illustrate this issue, I present two examples. The first demonstrates the issue with Dr. Singer excluding students whose grant aid covered more than 95 percent of the cost of attendance. The second demonstrates the issue with Dr. Singer excluding students who do not receive any form of grant aid. I will abstract from Dr. Singer's exact overcharge models for the sake of simplicity and consider the general form of Dr. Singer's "before-after" modeling.

(236) My first example is illustrated in Figure 42. Suppose there are two students, Student A and Student B, both of whom attend the same School S, for two years. School S is not a member of the 568 Group in the first year but joins prior to the second year. Now suppose that Student A has an effective

366 *See* my backup materials. I calculate analogous percentages for all regressions in Dr. Singer's Table 11 regressions.

367 In my analysis in Section 4.2, I mitigate the econometric difficulties highlighted in this section. I do so by using a methodology designed to overcome them.

368 Recall that Dr. Singer's models 4–6 identify the effect of the challenged conduct by comparing the financial aid granted to students whose schools changed 568 Group membership status to the financial aid granted to students whose schools did not change 568 Group membership status. This control group includes both students whose schools were in (and remained in) the 568 Group and students whose schools were not in (and remained out of) the 568 Group. It also compares students in different time periods to one another. These comparisons lead to counter-intuitive findings such as the ones described above.

369 Singer Report, ¶ 246.

370 *See, e.g.*, Joshua D. Angrist and Jörn-Steffen Pischke, *Mostly Harmless Econometrics: An Empiricist's Companion* (Princeton University Press, 2009), § 2.1.

institutional price of $30,000 in both years. Student B has an effective institutional price of $10,000 for the first year, and $0 for the second (i.e., student B receives a full ride the second year). Dr. Singer's "before-after" modeling would calculate an average effective institutional price of $20,000 for the "before" period (the average of Student A's $30,000 effective institutional price and Student B's $10,000 effective institutional price in the first year). Dr. Singer's approach would calculate an average effective institutional price of $30,000 for the conduct period (Student A's effective institutional price is $30,000 and Student B's price is excluded from the Dr. Singer's "before-after" as Student B received a full ride). As a result, Dr. Singer's approach would estimate an *increase* in the effective institutional price by $10,000 ($20,000 during the "before" period vs. $30,000 during the conduct period) due to the alleged conduct when neither Student A nor Student B's effective institutional price increased due to the alleged conduct—indeed, Student B's price decreased. This is an obvious modeling error, since Student A pays the same amount each year, while Student B pays less the second year.

**Figure 42: Example illustrating sample selection issues from full ride students in Dr. Singer's overcharge modeling**

| | Year 1 price (pre-conduct period) | In Dr. Singer's calculation? | Year 2 price (conduct period) | In Dr. Singer's calculation? | Difference |
|---|---|---|---|---|---|
| Student A | $30,000 | Yes | $30,000 | Yes | $0 |
| Student B | $10,000 | Yes | $0 | No | -$10,000 |
| **True average** | $20,000 | | $15,000 | | **-$5,000** |
| **Dr. Singer's average** | $20,000 | | $30,000 | | **$10,000** |

Note: Details of this example can be found in the text above.

(237) My second example is illustrated in Figure 43. Suppose there are two other students (Student C and Student D) who attended the same School S in the same two-year period as my previous example. In this example, the effective institutional price faced by Student C is $10,000 for both the first and second year (the "before" year and the conduct year). Suppose further that Student D received no aid in the first year and therefore paid the full cost of attendance of $50,000. Additionally, Student D received some aid in the second year and had an effective institutional price of $30,000. Dr. Singer's before-after model would compute an average effective institutional price of $10,000 in the first year (Student D's first year price is dropped from the analysis, as they did not receive any grant aid and the only price used in the first year is Student C's effective institutional price). Dr. Singer's model would compute an average effective institutional price of $20,000 in the conduct year (the average of Student C and Student D's prices of $10,000 and $30,000 in the second year, respectively). Dr. Singer's before-after approach would find a $10,000 increase in the effective institutional price for class members due to the conduct—the average effective institutional price increased from $10,000 in the "before" period to $20,000 in the conduct period. However, neither Student C nor Student D's effective institutional price increased from before the conduct to the conduct period, and Dr. Singer would erroneously conclude that the alleged conduct increased the effective institutional price of class members.

**Figure 43: Example illustrating sample selection issues from students receiving any aid in Dr. Singer's overcharge modeling**

| | Year 1 price (pre-conduct period) | In Dr. Singer's calculation? | Year 2 price (conduct period) | In Dr. Singer's calculation? | Difference |
|---|---|---|---|---|---|
| Student C | $10,000 | Yes | $10,000 | Yes | $0 |
| Student D | $50,000 | No | $30,000 | Yes | -$20,000 |
| **True average** | $30,000 | | $20,000 | | **-$10,000** |
| **Dr. Singer's average** | $10,000 | | $20,000 | | **$10,000** |

Note: Details of this example can be found in the text above.

(238) The previous two examples illustrate the selection issues in Dr. Singer's general "before-after" model that prevent one from interpreting his model estimates as reflective of the effect of the alleged conduct on the prices class members paid to the Defendants.

## 8.6. Damages

(239) After correcting for errors in Dr. Singer's model and corresponding damages calculations, there is no credible evidence that the class members were harmed by the alleged conduct. Hence, I conclude that Dr. Singer's report provides no credible evidence of anticompetitive harm as a result of the alleged conduct.

# EXCERPTS FROM TRANSCRIPT OF HAL J. SINGER DEPOSITION (NOV. 27, 2024), DKT. 755-11

**Pages 29, 31-34, 48-49, 127-132, 184, 189-190, 201, 252-254, 261-262, 270-274, 281-283, 288-293, 295-296**

**In the Matter Of:**

CORTZO V. BROWN UNIVERSITY

1:22-cv-00125

---

**HAL J. SINGER, PH.D.**

*November 27, 2024*

---

*Confidential*

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

allegedly run afoul of the criteria for getting the exemption.

Under which they would come up with common formula, a common set of principals for arriving at student aid packages.

Q. Do you know if there were members of the 568 Group who are not defendants in this case?

A. I can't think of any members. I mean it's possible, but I can't think of members sitting here that aren't also defendants.

Q. You ran regression models in this case?

A. Yes.

Q. None of your regression models analyzed data from any school that was a member of the 568 Group that is not a defendant in this case; correct?

MR. CRAMER: Objection to form.

THE WITNESS: I think that's correct. The only way that I could get data is if granular student level data, was if the school was a defendant in this case.

there's data out there for someone who never belonged, then they would always be coded a zero, in which case it would be hard, at least for the technique that I applied to assess the impact of the cartel.

Q. Well, I think I was asking you something slightly different than you answered, but maybe not.

But I'll just -- I want to be clear. If you wanted to assess whether the challenged conduct had an impact on EIPs or EFCs, do you think it's important to analyze the data for all the members of the alleged cartel?

MR. CRAMER: Objection to form. Asked and answered. Incomplete hypothetical.

THE WITNESS: I believe that I have assessed all the members in the sense those who are actively participating during the scope of this class period. I don't think that we've omitted anyone.

If you're asking me to assume that there's a hypothetical member out there who's data I didn't get, I'm just not aware that there was a member who's data I didn't

get.

BY MR. GRINGER:

Q. I'm asking you for then to just assume that there are members of the 568 Group whose data is not included in your regression.

Given that, so assume there is that data out there, in assessing whether the challenged conduct had an impact on EIPs and/or EFCs, isn't it important to consider the data from all the group members, not just a subset?

MR. CRAMER: Incomplete hypothetical. Objection to form. Asked and answered.

THE WITNESS: I don't think that it's critical. If you're asking me as an economist, would I like to see more data, I think economists are never going to turn down that invitation. But I don't think it's critical.

If I thought I was missing some important component of the activity of the members of the cartel here, but I don't think I am. I think I've seen all the important

members.
BY MR. GRINGER:
Q. So, you analyzed that data from Swarthmore College in your regressions?
A. No.
Q. Do you know Swarthmore College was a member of the 568 Group?
A. Sitting here, I can't tell you if they were, but I don't think that they would have, you know, made certain criteria that plaintiffs have required to be a defendant in the case.
Q. Do you know if Wesleyan was a member of the 568 Group?
A. They may have attended a meeting, but I don't know if they were a member.
Q. Do you know if Pomona College was a member of the 568 Group?
A. I haven't seen any documents or evidence on Pomona College.
Pomona did you say?
Q. Yeah, Pomona.
A. Yeah.
Q. You don't know one way or the

other if they were a member?
A. If I don't get to see their documents or data, it's hard for me to say.
If the plaintiffs haven't named them as a defendant, my strong surmise is there's something different about Pomona.
Q. Is it your strong surmise that maybe it would be inconvenient for the proposed market definition to look at Pomona College?
MR. CRAMER: Objection to form.
THE WITNESS: Would it -- I mean are you asking me is that the reason why be they didn't name Pomona as a defendant?
BY MR. GRINGER:
Q. You said you surmised asking. Is that the reason?
MR. CRAMER: Objection form. Asked and answered.
THE WITNESS: I don't have an opinion on that.
BY MR. GRINGER:
Q. You don't know whether Pomona college was a member of the 568 Group; correct?

fact, that if we got to, you know, 81 percent of those transactions, you know, suffered impact and of course it's even higher when you consider at least once it would go into the 90s if you considered, you know, the students at Yale who lived through that experience would have suffered impact, I think it's 93 percent.

So, that was the regression analysis that I had in mind.

Q. Is it your understanding that Penn was the only school to adopt a no-loan policy while it was a member of the 568 Group?

A. No. There was one other -- there was one other one, at least one other one who did it concurrent with Penn. And I think both of those were done in reaction to Yale.

It starts with a C and I think it may have been Cornell.

Q. Columbia?

A. Oh, you know, you try -- there's so many facts here and I just -- I'm trying to remember. For some reason my brain is

telling me it was Penn plus someone who started with a C. It could be Columbia, yes.

Q. And just tell me the schools you believe adopted a no-loan policy after leaving the 568 Group?

MR. CRAMER: Asked and answered.

THE WITNESS: Okay. Yeah, let's see how good my memory is compared to seven minutes ago.

I think I answered Yale, Emory, Chicago, Rice, Brown went to no loan. Those are the ones that I'm just doing by memory. But I would -- I would probably rather go with what I put in my reports than memory, but that's the best my memory can do.

BY MR. GRINGER:

Q. When Yale rejoined the 568 Group, it continued to have a no-loan policy; correct?

A. I don't have that concrete. I think that's consistent with my understanding, but I don't have the histories of each school completely memorized.

Q. In your view, is leaving the 568 Group the same thing as no longer engaging in

$10,000 jump in the EIPs in the first year and that's a bigger jump than we had ever seen leading up to that. And then we see another jump that I think is on the order of $20,000.

And so, we are very skeptical about what's going on with the post 2016 data.

I have all other sorts of thoughts on it, too, but I don't want to keep talking. You go ahead.

Q. I appreciate that. Thank you.

You're making the assumption that the data until 2016 when the database changed is accurate; correct?

A. I am making an assumption that it is accurate and I am -- but most importantly, and I think this is I'm going to tee up this dispute, we have variation in the conduct, in the pre '16 period; right?

So, whatever infirmities that pre '16 data might have, what's nice is that we can -- we can see how it changes with respect to a change in the conduct.

The problem, you know, Dr. Hill

proposed during his deposition, that we should instead only include 2016 post 2016.

And the problem with that, I don't know if he's aware or not, but it's just a run of zeros. There's no variation in the conduct during that period.

So, if you limit the data that way, you're, by design or by accident, depriving the model of being able to ascertain any effect of the challenged conduct.

And if that one was done in isolation, I would say okay, maybe it was an oversight.

But there's a theme that emerges in Dr. Hill's criticisms, in that they are almost all appear to be motivated as a way to deprive the regression of the data that it would need to find an effect.

We can go through the Chicago example where he chooses post 2016, the killing 2023, which is one of the only years that we have for many of these schools that they weren't in the conduct. He wants it gone from the regression. You know, the

staggered DID deprives it of the Yale experience after they leave. The cluster standard errors we talked about, depriving the classification of errors. Putting in the COVID period through 2024, which of course coincides with the very few clean period observations we have as away to conflate the model and to inject confusion as to what is causing it, between COVID and the conduct.

Finally the year fixed effects as opposed to my time is another way to inject collinearity with the conduct and therefore make it harder for the regression to find an effect.

I feel like the theme that's emerging from Dr. Hill is that not how to design the best model, but how can I derive the model? How can I, Dr. Hill, deprive the model by making these choices to ever find an effect.

I realize it's very convenient for the defendants to not find an effect, but that can't be the load star. The load star can't be let me suggest changes that deprive the model. We have to give the model the

data. We have to give it a chance to find these effects.

Q. I appreciate all that context. My question was really just are you making the assumption that the data until 2016 when the database changed is accurate? You answered that and then went on, I think, you know, and I don't want to fight with you too hard on this. You're an expert. I understand this. But am going to move to strike everything after the word accurate in this answer.

MR. CRAMER: We'll oppose that motion.

MR. GRINGER: It was a little lengthy, I think all things considered.

BY MR. GRINGER:

Q. You don't actually know which data set with regard to Chicago is the accurate data set; correct?

MR. CRAMER: Objection to form.

THE WITNESS: I know that the two can't be put side by side; right?

What I -- and also, when you say accurate, we don't want to hold up the data.

There's no such thing as a pristine database. Every database is going to have a certain amount of infirmities.

What I think is more attractive about the pre 2016 is that you at least have variation in the conduct. You at least have the opportunity to see, do prices change when the conduct goes in and out; right?

So, if we're forced to chose between pre 2016 and post 2016, to me it's a very easy choice. One gives the model an opportunity to find an effect. It doesn't guarantee an effect but it gives the model an opportunity to find one, if one exists.

Dr. Hill's choice precludes the model from finding an effect.

If you just have a run of zeros, we can't find an effect. You've basically eliminated Chicago's contribution, right, to informing the conduct variable.

Q. How is that any less outcome determinative than what you just criticized Dr. Hill for doing?

A. Because there's no guarantee of an outcome. There's no guarantee of an

outcome just because you have zeros and ones.

We could run the regression and find that there was no effect; right?

But at least you have some period of zeros and some period of ones to test. You have data that you're feeding the model; right?

If we take Dr. Hill's approach, which is throw out 2023, you know, just look at Chicago post 2016; right? We're taking away some of the very small sources of variation in the database where you have clean periods, right, or where you have a change in the conduct.

If my methodology is let's exploit the changes, and his fixes are just remove the possibility of studying changes, right, then the likelihood of finding an effect is going to vanish.

Q. You're the one who removed the 2016 to 2022 Chicago data; correct?

A. I removed the 2016 because it can't be compared. When you see the $10,000 jump when they change databases and then you see another jump of $20,000, something is

not to adopt a policy like a higher minimum wage policy in which each state is making independent decisions.

This is whether or not to be a member of a cartel and the cartel formed in 2002 and it ran to 2023.

So the exposure to the treatment, exposure to the cartel, the cartel was a constant. It didn't vary across schools and didn't vary across years.

Q. Did the consensus methodology vary across years?

A. I think that there were refinements to the CM over time.

But that doesn't change how I would design the zero one decision to just one conspiracy. There's not a series of independent serially stacked up conspiracies here.

Q. Okay. And if we go to your rebuttal report, Singer-2 at Footnote 218, really starting at 216 through 218 which is on Page 62.

And you also quote in the text.

A. Yes. I'm here.

The treatment is the exposure to the conduct, which is a 20-year long price fixing conspiracy; right?

And within a year, within a given year, again, these firms aren't making, you know, decisions about whether or not the conduct -- the cartel exists. The cartel exists regardless of whether or not one person defects in a given year. The cartel is the cartel.

Q. How does your model adjust for staggered entry and exit into the 568 Group?

A. My model, so, I don't do a staggered diff and diff or DID the way that Dr. Hill does.

So my model treats you as a one or a zero, depending on whether or not you were alleged to have participated in the cartel in that year; right?

In contrast, for the staggered different difference, as Dr. Hill acknowledges in his report, if you have someone like Yale, who starts off say outside of the conduct, comes in and then leaves, right, he has to eliminate Yale's post 2008

experience from his model, right. Under staggered treatment you use the post 2008 Yale experience, which I got to tell you is probably one of the most important experiences we can investigate in the entirety of the data set.

Dr. Hill's technique eviscerates it. It eliminates Yale post 2008.

So, if I -- if you understand kind of the hand that you're dealt, where you can find variation in the data and you recognize the downside of the staggered DID, you would hopefully quickly come to the conclusion that this is too important. This data that he's eliminating from the regression is just too important to get rid of.

And yet he does. So for me, I, you know, we considered it and we decided to treat, you know, in and out of the conduct as one in zero regardless of whether or not you had been there. If you were there and you left, you know, you get -- you continue to stay in the database and you continue to inform the conduct coefficient.

financial aid. We didn't want to include those who had free rides.

Q. Because those are not in the class?

A. Correct.

Q. Weren't students who received a full ride subject to the same challenged conduct as the potential class members?

A. Sure.

Q. So, why should the definition of the class determine whether or not -- let me ask you this: You would agree with me that the people, the students who got 95 percent or more of the cost of attendance are the individuals for whom defendants were most generous towards with their financial aid; correct?

A. Sure.

Q. So, in your regression models, you exclude observations from the very individuals from whom defendants were most generous to; correct?

A. Yes. Because they are not members of the class.

So, what we want to do is build

THE WITNESS: I wouldn't put it that way. It's not requiring it. Because it could find no effect.

The way that you put the question, it almost sounds as if there has to be an effect.

BY MR. GRINGER:

Q. No.

A. It's just testing for a single uniform effect.

Q. So, just so -- because I'm screwing up.

Your EIP regression model is testing for a single uniform effect. Is that correct?

A. It's testing for a single uniform effect because one of the nature of the challenged conduct which you and I don't get to write, but two, we don't have an a priori basis in the record for why the effect would vary from one year to the next.

The mere fact that one of 17 schools peeled out, you know, in the middle of a period would not materially alter the efficacy of the alleged cartel. I mean

either the cartel is inflating prices or it's not. And when one of 17 goes out or two of 17 goes out in a given year, that doesn't give you an a priori reason in economics to believe that the cartel would all of a sudden unravel and the effects would go to zero. Right?

You would need substantial defection in order to achieve an unraveling of the cartel. We never get anywhere close to that.

That's the quibble that I'm having with Dr. Stiroh. You need an a priori reason to test for break. If you don't have an a priori reason, you have one conduct coefficient. It's just that simple.

Q. And in your EIP regression model tests for the alleged impact of the challenged conduct to be constant across the individual schools; right?

MR. CRAMER: Objection. Form.

THE WITNESS: Well, it's estimating the effect of one uniform coefficient across all schools across all time periods.

Again, I said that when we go and use our in-sample prediction techniques, we generate differential effects, right, by defendant in that table. We get differential effects.

Q. What are institution fixed effects?

A. An institution fixed effect is a dummy variable that will control for the identity of the institution when making the prediction of what the EIP or the EFC was in any given year.

Q. Do you use institution fixed effects in your regression models?

A. I think that we have some combination of institution student fixed effects. We can go back and look in the summary tables where we show the regression coefficients. We define how we've constructed the student fixed effects.

Q. I will concede you do that.

A. Okay.

Q. My question was just a stand-alone institution fixed effect.

A. I think that if you added those

can be vastly different, in fact, it could even be zero in a given year.

The prediction for a given year is not constrained in any way.

Q. Not only that, the prediction can be and often is negative; correct?

A. You could have -- you could have a, when you say negative, I want to make sure that the predicted price comes in above the actual price. That could happen; right?

Even with, we should give a name for these people, the never -- we should come up with a name, this is different than the singletons. These are people who only purchase while their school is a member of the cartel. The -- I don't know what you want to call it.

Q. If you think of something, get back to us.

So, would it be and what we just -- that average effect across the number of years is true regardless of the individual characteristics of the student; correct?

A. The average across the four years will be the same, right.

And so, you know, you know my response to this. I think I these -- these class members, the ones that are unfortunate enough to have actually matriculated four years under the cartel, that is, their school was a member of the cartel, each of the four years I think these are the most vulnerable students, the most likely to be injured given the generalized effect that we already know.

So, we're faced with this issue of should we remove them from the test, which Dr. Stiroh never does, but that's her implication, but I strongly would reject taking them out because my inclination is to give the fact finder my best estimate of the share of the class members who are injured under a given standard.

But having said that, we said fine, if you want to do a test purely on students who don't fall under the singleton category or about the only cartel, we'll come up with a name for them, they are only purchasing while they are sellers in the cartel. I've got another test, that's the Yale test and that's in Singer-3.

(Whereupon, Deposition Exhibit Singer-9, Surrebuttal Expert Report of Lauren J. Stiroh, Ph.D., was marked for identification.)

\- - -

BY MR. GRINGER:

Q. If you could turn to Page 14, Singer-9, 3.86.

This is an actual Cornell student in your data, Dr. Singer.

And this student ostensively is overcharged by $1,282 in year one, $4,030 in year two, undercharged by $9,487 in year three and was harmed by $8,983 in year four.

What could explain the switch from a $4,030 overcharge in year two to a $9,487 undercharge in year three?

A. Yeah. It's easy. He got -- this student, I don't know if it's a man or a woman, but if you look at the actual EIP in Column D, they got a remarkably low EIP. And it's so low that I priced the regression. The regression can't explain why it was so low.

So, when I go to predict what

this person would have paid, my prediction is above the actual EIP in that third year. My prediction, the best prediction I can make, given all the characteristics of that student, is that that student's EIP in year three would have been 17,226.

But in fact, they got this remarkably low EIP of 7,739.

So, I cannot show injury under this method in year three.

Q. What could explain the switch from the $4,030 overcharge in year two to the $9,487 undercharge in year three?

MR. CRAMER: Asked and answered. He just answered that question.

THE WITNESS: I mean I can do it again.

I think maybe you're asking now why didn't that happen in the previous year?

MR. GRINGER: Okay.

THE WITNESS: I can answer it -- let me just say it. It's okay.

Look at the price in the previous year. I mean you're going to see a pattern.

Here the price shot up from their initial EIP, their initial EIP was 14,000. Do you see that?

It goes up to 19,000 in year two. And the regression predicts, the prediction model, right, my best-fitting model, model six, right, is that this student would have paid in year two an EIP of 15,501; right?

And, therefore, they suffered an overcharge of $4,000; right?

But I don't want you to look at the 4,000 and the minus 9,000 and think there's some infirmity with the prediction.

The model just could not have predicted that this student would have gone from 14 to 19 to 7,000 in an EIP.

These are the examples I'm talking about before where these very large discounts manifest. The model could not have predicted them and the model will consider the student to be uninjured in those years.

Despite the fact that whatever shock gave that low price, likely that same shock would have occurred in the but-for

world, but we're not crediting the student for that. We're just going to assume that that shock was associated entirely with the conduct; right?

We're going to take that out and the model, the model can't predict it; right?

BY MR. GRINGER:

Q. Do you have any idea what Cornell did in year three for this student that was better for the student?

A. We'd have to go into the individual database to look to see what happened.

But I have to accept that those are the actual EIPs according to the data.

Q. Even with these data swings from 14 to 19 to 7 to 25, this student's total overcharge just happened to equal exactly $4,808. That doesn't strike you as a coincidence?

A. It is not a coincidence. It is happening because of the student fixed effects that we're using. This would not happen had we not used student fixed effects.

This is a -- this is an artifact

of two things, I'm telling you. The use of the student fixed effects, which I think is the best model that we can use.

When you look at the R squared, among other factors, but if you look at the R squares as we move across the bottom of the row, we get much, much better predictive power with the student fixed effects than we do without, right.

I want to come up with the best prediction model possible.

This is entirely an artifact of the use of fixed effects, student fixed effects combined with students who were unfortunate to have just matriculated while their school was part of the cartel.

Q. Do you dispute that 26 percent of proposed class members were, according to your methodology, overcharged by more than $5,000 in at least one year and undercharged by more than $5,000 in at least one other year?

MR. CRAMER: Objection to form.

THE WITNESS: I've never seen or heard that stat before. You're asking me to

the best model.
And method, you know, specification six is my preferred model.
I continue to use student fixed effects even when I do the Yale regression. I continue to do student fixed effects. But just for those students who experience the switch by Yale in the 2008 period.
Q. Okay. Do you still have Singer-9 in front of you?
A. Yes.
Q. Page earlier, footnote 53. Do you dispute Dr. Stiroh's finding that when you apply your harmed-on-net analysis to your EIP specification, that uses only school fixed effects rather than school and student fixed effects that only half of proposed class members are flagged as harmed?
A. Do I dispute it? I don't know what the answer is. I can't dispute it.
Q. Is the only difference between model three and model six in your EIP regression analysis the inclusion of student fixed effects?
A. I believe so.

Q. Okay.
A. And I could -- I just happen to have the page here.
Q. Please.
A. Let me just confirm.
Q. Please confirm.
A. Yes. That's the only difference.
Q. Now we've been talking all about EIPs. And you've built a regression model to analyze the challenged conducts impact on EIPs; correct?
A. Correct.
Q. And you define EIP as the cost of attendance minus institutional grant aid; correct?
A. Correct.
Q. EIP is a measure you came up with; correct?
A. It is a measure I came up with, but it's based off of a much more commonly known net price measure.
The reason, as I explained in my report, I didn't want to use net price is that net price subtracts out aid from other

sources.

And I felt like including that into the dependent variable would create a source of confusion and would confound what we're looking for.

And I'm fairly confident that Dr. Hill uses the same measure of pricing that I do as well.

Q. Your EIP metric does not include work study awards; correct?

A. I don't think the base version of my EIP model uses work study. It's subtracting out institutional grant aid.

Q. Why does your definition of EIP not include work study awards?

A. Because the theory of harm here is that the defendants coordinated in their decisions of how much to offer in terms of grant aid.

So, if we included other measures of aid that were outside of what I think the scope of the challenged conduct is, I don't think there's a theory of harm that says that this inflated work study or deflated work study. Now they may have gone

MR. CRAMER: There are a lot of class members in here.

MR. GRINGER: Could you stop it?

MR. CRAMER: It was a joke.

MR. GRINGER: First of all, i did receive financial aid from Penn which is more than certain people and their children can say. Okay?

BY MR. GRINGER:

Q. So, you don't know, and we can come back to that, Dr. Singer.

But just so the record is clear, if a student received $50,000 in grant aid and the $2,000 work study award and the cost of attendance was $80,000, the student would pay to the school $28,000; correct?

MR. CRAMER: Asked and answered.

THE WITNESS: That sounds right.

BY MR. GRINGER:

Q. But you would treat the EIP as $30,000; correct?

A. Correct.

Q. So you're personally inflating your measure of the EIP inflates what every single potential class member actually paid

to their institution; correct?
MR. CRAMER: Objection to form.
THE WITNESS: No. That's way too much of a stretch. Did you mean to say every single? Maybe -- I think maybe what you meant to say was for those who got work study assistance.
BY MR. GRINGER:
Q. That's fair. Your measure of EIP inflates for every student who received work study assistance what they actually paid to a defendant?
A. It -- I'm going to push back gently on that it inflates.
I'm trying to capture out of pocket no strings attached. I think that I've come up with the best measure of that.
You know, I note that none of your experts have said that Dr. Singer should include work study as -- in his EIP. This is the first time I'm hearing this critique. But having heard it now for the first time, I think that my measure is still superior. I like mine better.
Q. EIP also does not include

subsidized loans; correct?
A. It does not include subsidized loans.
Q. You don't think the opportunity to obtain a subsidized loan is a benefit offered to students?
A. Oh, no, not if it's coming in lieu of an unconditional grant. You'd always prefer a grant over a loan. My goodness. These students, I know you think they should be thankful, but they don't like coming out of college in debt up to their eyeballs.
Q. Let me ask you: You're assuming that the choice is between a subsidized loan and more grant money. If the choice is between a subsidized loan and nothing, a student prefers a subsidized loan; correct?
A. If that's the choice, I don't think that that -- I don't think that that is the outcome, though, in the but-for world. I think that what's happening is that the defendants were able to drive a harder bargain and push more loans than they otherwise would have been able to.
Q. Okay. And what percentage of

**No. 26-2759**

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

ANDREW CORZO, ET AL.,

*Plaintiffs-Appellees*,

*v.*

CORNELL UNIVERSITY, ET AL.,

*Defendants-Appellants*.

Interlocutory Appeal Pursuant to Federal Rule of Civil Procedure 23(f) from the United States District Court for the Northern District of Illinois, No. 1:22-cv-00125-MFK Before the Honorable Matthew F. Kennelly

**APPENDIX FOR DEFENDANTS-APPELLANTS BRIEF**
**VOLUME 2, PART 3**
**(A267 – A508)**

DAVID GRINGER
ALAN SCHOENFELD
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 Word Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
david.gringer@wilmerhale.com
alan.schoenfeld@wilmerhale.com

SETH P. WAXMAN
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
seth.waxman@wilmerhale.com

*Attorneys for Defendant-Appellant the Trustees of the University of Pennsylvania*

October 5, 2026

Additional Counsel on Inside Cover

NORMAN ARMSTRONG
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800
norman.armstrong@cooley.com

*Attorney for Defendant-Appellant Cornell University*

BRITT M. MILLER
DANIEL T. FENSKE
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
dfenske@mayerbrown.com

*Attorneys for Defendant-Appellant Georgetown University*

ERIC MAHR
JAN RYBNICEK
FRESHFIELDS US LLP
700 13th Street NW
Washington, DC 20005
(202) 777-4500
eric.mahr@freshfields.com
jan.rybnicek@freshfields.com

*Attorneys for Defendant-Appellant Massachusetts Institute of Technology*

ZAKI ANWAR
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
zaki.anwar@wilmerhale.com

EDWARD W. FELDMAN
MILLER SHAKMAN LEVINE & FELDMAN LLP
30 W. Monroe Street
Suite 1900
Chicago, IL 60603
(312) 759-7213
efeldman@millershakman.com

*Attorneys for Defendant-Appellant the Trustees of the University of Pennsylvania*

ROBERT A. VAN KIRK
SARAH F. KIRKPATRICK
MATTHEW D. HEINS
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000
rvankirk@wc.com
skirkpatrick@wc.com
mheins@wc.com

*Attorneys for Defendant-Appellant University of Notre Dame*

# APPENDIX TABLE OF CONTENTS

Page

## VOLUME 1
## (BOUND WITH BRIEF)


Order on Motion for Class Certification (June 1, 2026), Dkt. 1275 .......... A1

Memorandum Opinion and Order on Motion for Class Certification (Mar. 31, 2026), Dkt. 1241 .......... A12

Memorandum Opinion and Order on Motions to Exclude Expert Testimony (Sept. 29, 2025), Dkt. 1160 .......... A74


## VOLUME 2
## (SEPARATELY BOUND)


District Court Docket, No. 1:22-cv-00125 (N.D. Ill.) .......... A128

Complaint (Jan. 9, 2022), Dkt. 1 .......... A139

Amended Complaint (Feb. 15, 2022), Dkt. 106 .......... A200

Memorandum Opinion and Order on Motion to Dismiss (Aug. 15, 2022), Dkt. 185 .......... A207

Second Amended Complaint (Feb. 6, 2023), Dkt. 308 .......... A211

Plaintiffs' Motion for Class Certification Exhibit 17: Email from Patricia McWade to Ted Bracken (dated Apr. 15, 2014), Dkt. 753-17 (Redacted) .......... A222

Plaintiffs' Motion for Class Certification Exhibit 18: Email from Cynthia Barnhart to Elizabeth Hicks (dated Aug. 27, 2014), Dkt. 753-18 (Excerpts) .......... A223

Plaintiffs' Motion for Class Certification Exhibit 24: Email from Donald Bishop to Lou Nanni, Joseph Gelchion, and Robert Mundy (dated Mar. 6, 2012), Dkt. 753-24 .......... A224

Rebuttal Expert Report of Nicholas Hill, dated Aug. 7, 2024 (filed Dec. 16, 2024), Dkt. 755-4 (Excerpts) .............................. A226

Deposition of Hal J. Singer, dated Nov. 27, 2024 (filed Dec. 16, 2024), Dkt. 755-11 (Excerpts) .......................................................A233

Amended Expert Report of Hal J. Singer, dated May 28, 2024 (filed Dec. 16, 2024), Dkt. 755-12 (Excerpts) ............................ A272

Rebuttal Expert Report of Hal J. Singer, dated Oct 7, 2024 (filed Dec. 16, 2024), Dkt. 755-18 (Excerpts) ............................ A279

Defendants' Motion to Exclude Expert Testimony, Exhibit 20: *Peer School Financial Aid Initiatives Timeline* (filed Dec. 16, 2024), Dkt. 755-22 ....................................................................A310

Surrebuttal Expert Report of Lauren J. Stiroh, dated Nov. 1, 2024 (filed Dec. 16, 2024), Dkt. 755-27 (Excerpts) ................................A314

Rebuttal Expert Report of Lauren J. Stiroh, Appendix 1, dated Aug. 7, 2024 (filed Dec. 16, 2024), Dkt. 755-29 (Excerpts) ............................................................... A324

Rebuttal Expert Report of Hal J. Singer, dated Oct. 7, 2024 (filed Dec. 17, 2024), Dkt. 756-34 (Excerpts) ............................ A331

Expert Report of George Bulman, dated May 14, 2024 (filed Dec. 17, 2024), Dkt. 756-36 (Excerpts) ...............................A336

Supplemental Rebuttal Expert Report of Hal J. Singer, dated Nov. 8, 2024 (filed Dec. 17, 2024), Dkt. 756-38 (Excerpts) ............................................................... A338

Rebuttal Expert Report of Bridget Terry Long, dated Aug. 7, 2024 (filed Dec. 17, 2024), Dkt. 756-39 (Excerpts) (Redacted) ..............A342

Rebuttal Expert Report of Bridget Terry Long, Appendix D, dated Aug. 7, 2024 (filed Dec. 20, 2024), Dkt. 765-1 (Excerpts) (Redacted)............................................... A426

Deposition of Hal J. Singer, dated Nov. 27, 2024 (filed Feb. 1, 2025), Dkt. 789-2 (Excerpts) .......... A507

Rebuttal Expert Report of Bridget Terry Long, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 789-3 (Excerpts) (Redacted) .......... A510

Rebuttal Expert Report of Nicholas Hill, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 789-4 (Excerpts) .......... A598

Rebuttal Expert Report of Lauren J. Stiroh, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 789-16 (Excerpts) (Redacted) .......... A625

Plaintiffs' Motion for Class Certification, Exhibit 19: *The 568 Group Consensus Methodology Policy Guidelines* (Dec. 2016) (filed Feb. 1, 2025), Dkt. 789-20 .......... A655

Second Amended Expert Report of Hal J. Singer, dated June 10, 2024 (filed Feb. 1, 2025), Dkt. 789-25 (Excerpts) .......... A673

Surrebuttal Expert Report of Nicholas Hill, dated Nov. 1, 2024 (filed Feb. 1, 2025), Dkt. 789-32 (Excerpts) .......... A687

Plaintiffs' Motion for Class Certification, Exhibit 41: *Report of Common Standard Subcommittee to 568 Presidents' Working Group* (filed Feb. 1, 2025), Dkt. 789-42 (Excerpts) .......... A689

Deposition of James Tilton, dated May 15, 2023 (filed Feb. 1, 2025), Dkt. 789-49 (Excerpts) .......... A691

Surrebuttal Expert Report of Lauren J. Stiroh, dated Nov. 1, 2024 (filed Feb. 1, 2025), Dkt. 789-51 (Excerpts) .......... A694

Rebuttal Expert Report of Nicholas Hill, dated Aug. 7, 2024 (filed Feb. 27, 2025), Dkt. 802-7 (Excerpts) .......... A699

Second Amended Expert Report of Hal J. Singer, dated June 10, 2024 (filed Feb. 28, 2025), Dkt. 805-2 (Excerpts) .......... A702

Minute Docket Entry for Hearing on Motions to Exclude
Expert Testimony (Apr. 3, 2025), Dkt. 835 .............................. A705

Defendants' Motion for Summary Judgment, Exhibit 85:
*Penn Undergraduate Student Accessibility and Affordability*, dated Feb. 27, 2020, (filed May 7, 2020),
Dkt. 864-4 (Excerpts) .............................................................. A707

Defendants' Motion for Summary Judgment, Exhibit 90:
*House Judiciary Committee Report on Need-Based Educational Aid Act of 2001*, H.R. Rep. No. 107-32,
1st Sess. (2001), Dkt. 864-9 (Excerpts)...................................... A710

Defendants' Motion for Summary Judgment, Exhibit 120:
Email from Caesar Storlazzi to J. Lloyd Suttle and Rhakti Nagella, dated Oct. 2, 2012 (filed May 7, 2025),
Dkt. 864-39 ............................................................................. A714

Deposition of Hal J. Singer, dated Nov. 27, 2024
(filed May 8, 2025), Dkt. 865-30 (Excerpts) .............................. A715

Deposition of Caesar Storlazzi, dated July 27, 2023
(filed May 8, 2025), Dkt. 865-31 (Excerpts) .............................. A726

Deposition of Hal J. Singer, dated Nov. 27, 2024
(filed May 29, 2025), Dkt. 874-5 (Excerpts) .............................. A728

Errata to Expert Report of Bridget Terry Long, updated
Aug. 12, 2024 (filed June 27, 2025), Dkt. 889-3 (Excerpts)...... A735

Second Amended Expert Report of Hal J. Singer,
dated June 10, 2024 (filed June 27, 2025),
Dkt. 889-17 (Excerpts) ............................................................ A739

Plaintiffs' Opposition to Summary Judgment, Exhibit 107:
*Memorandum of Understanding the 568 Presidents' Group*, dated Jan. 5, 2004 (filed Sept. 12, 2025,
Dkt. 1025-6 ............................................................................. A744

Memorandum Opinion and Order on Cross-Motions for Summary Judgment (Jan. 12, 2026), Dkt. 1210 (Excerpts) ...................... A747

Transcript of Proceedings of Status Conference (Mar. 20, 2025), Dkt. 1261 (Excerpts)................................................................ A784

Transcript of Proceedings on Motions to Exclude Expert Testimony (Apr. 14, 2025), Dkt. 1263 (Excerpts) ..................... A788

Hearing on Motions to Exclude Expert Testimony (Apr. 14, 2025): Defendants' Hearing Presentation ................ A833

Order Granting Plaintiffs' Motion to Provide Agreed Forms of Notice to the Certified Litigation Class (June 12, 2026), Dkt. 1282 (Excerpts)................................................................ A835

Transcript of Proceedings on Class Counsel Approval (May 26, 2026, 2:30pm) (Excerpts)........................................... A837

**VOLUME 3**
**SEALED**
**(SEPARATELY BOUND)**

Rebuttal Expert Report of Bridget Terry Long, Appendix D, dated Aug. 7, 2024 (filed Dec. 16, 2024) Dkt. 754-3 (Excerpts) [unredacted version of A426-506] ............................ A839

Plaintiffs' Motion for Class Certification Exhibit 17: Email from Patricia McWade to Ted Bracken (dated Apr. 15, 2014), Dkt. 757-12 [unredacted version of A222] ......................................................................... A920

Rebuttal Expert Report of Bridget Terry Long, dated Aug. 7, 2024 (filed Dec. 17, 2024), Dkt. 757-52 (Excerpts) [unredacted version of A342-425] ..........................................................A921

Declaration of Hal J. Singer (Jan. 25, 2025), Dkt. 785-2................. A1005

Rebuttal Expert Report of Bridget Terry Long, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 788-3 (Excerpts) [unredacted version of A510-597].......................................................................A1009

Rebuttal Expert Report of Lauren J. Stiroh, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 788-16 (Excerpts) [unredacted version of A625-654] ........................................................A1088

Second Amended Expert Report of Hal J. Singer (May 7, 2025), Dkt. 854-7 (Excerpts) ........................................................A1118

Transcript of Proceedings on Settlement Approval (July 28, 2025, 2:50pm), Dkt. 1345 (Excerpts) ............................A1121

## Index of Excerpted Transcript Pages Included in Appendix



| Proceeding | Excerpted Transcript Pages | Appendix Page |
|---|---|---|
| Transcript of Proceedings of Status Conference (Mar. 20, 2025), Dkt. 1261 | pp.9-11 | A785-787 |
| Transcript of Proceedings on Motions to Exclude Expert Testimony (May 15, 2026), Dkt. 1263 | pp.7-31, 47-48, 69-73, 75-76, 87, 98-100, 113-115, 130-131, 150 | A789-832 |
| Transcript of Proceedings on Settlement Approval (July 28, 2025, 2:50pm), Dkt. 1345 (SEALED) | p.7 | A1122 |
| Transcript of Proceedings on Class Counsel Approval (May 26, 2026, 2:30pm) | p.9 | A838 |

# Index of Excerpted Deposition Transcript Pages Included in Appendix

| Depositions | Excerpted Transcript Pages | Appendix Page |
|---|---|---|
| Hal J. Singer Deposition (Nov. 27, 2024), Dkt. 755-11 | pp.29, 31-34, 48-49, 127-132, 184, 189-190, 201, 252-254, 261-262, 270-274, 281-283, 288-293, 295-296 | A234-271 |
| Hal J. Singer Deposition (Nov. 27, 2024), Dkt. 789-2 | pp.315-316 | A508-509 |
| Hal J. Singer Deposition (Nov. 27, 2024), Dkt. 865-30 | pp.19-21, 27, 59, 82, 92-93, 95, 117 | A716-725 |
| Hal J. Singer Deposition (Nov. 27, 2024), Dkt. 874-5 | ECF pp.3-8 | A729-734 |
| Caesar Storlazzi Deposition (July 27, 2023), Dkt. 865-31 | p.38 | A727 |
| James Tilton Deposition (May 15, 2023), Dkt. 789-49 | pp.121-122 | A692-693 |

aid -- you've reviewed many documents in this case or at least many documents are cited in your reports; correct?
A. Correct.
Q. How many of those documents referenced your concept of EIP?
A. Well, I don't know if there is a -- if there's a document that defines EIP as I've defined it.
I've cited published, you know, economics studies and other statutory language over a net price. And mine is a derivative of a net price and I've now told you that I don't want to include scholarships and funding from other sources in my price measure because that would conflate and confound the effect of the alleged conspiracy.
Q. You didn't -- are there any benefits to a family who receives a subsidized loan as part of their financial aid package?
MR. CRAMER: Objection to form.
THE WITNESS: I would say it depends on relative to what? If it was -- if

it came about because of a conspiracy to suppress grant aid, then they would be unequivocally worse off.

BY MR. GRINGER:

Q. What if it -- just putting aside no -- I'm not looking compared to what. Is there any benefit to a family if being able to obtain a subsidized loan as part of their financial aid package?

MR. CRAMER: Asked and answered.

THE WITNESS: You could construct a fact pattern under which a subsidized loan is better than having to borrow at prevailing commercial rates.

BY MR. GRINGER:

Q. Many student loans are forgiven. Are you aware of that?

A. I understand it can happen, yes.

Q. Did you go back and recalculate EIP for potential class members though had their student loan forgiven?

A. No.

Q. You don't consider a Pell grant and other federal grants in your EIP calculation; correct?

A. Correct.
Q. Why not?
A. For the reason I told you. If it's coming from third parties, then it's going to conflate the measure of our dependent variable in particular, it's going to inject components that are not under the control of the defendant institutions.
Q. But nonetheless, any outside scholarship or Pell grant a student might receive, might have lowered the net price that they paid to attend a defendant institution; correct?
A. It may have lowered it relative to the actual world but relative to the but-for world. It can't compensate for the injury that the class members suffered as a result of this cartel.
Q. Why not?
A. Oh, because that's easy. Because they would have continued to get, presumably they would have gotten the same funding from third parties in the but-for world.
The only thing that would change

into consideration when they are making their grant aid decisions.

Q. But do you have an actual understanding of what happens?

A. I don't think I have a good enough understanding to explain it to you right now.

I would submit that at least in our student fixed effect models, if those Pell grants are constant over time, they would be controlled for with the student fixed effects.

Q. Do you know if Pell grants are constant over time?

A. I don't know that if every case they are constant.

Q. Do you know if in any case they are constant?

A. No, but I think a reasonable surmise is that if you got a grant such as a Pell grant, that the amount would be the same in every year that you're in the database.

Q. Do you know of any higher education institution that uses EIP?

A. Well, they are all using it

implicitly, right, because they are all trying to figure out how to bridge the gap between the list price and the various payers. I didn't say that well. But they are trying to figure out how the various payers can get up to the list price and one component would be the EFC. Another component would be the loans. The third component would be the grant aid.

And so, you know, that formula incorporates and embeds what I've defined as the EIP.

So they are all implicitly using it.

Q. What about explicitly? Do you know of any school that explicitly uses the EIP?

A. I don't know if they write out EIP as a separate formula and model it the way that I have.

Q. We talked earlier today about the principle of horizontal equity.

A. Uh-huh.

Q. One possibility is that schools that adhere to that principle make more

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, MICHAEL MAERLANDER, ALEXANDER LEO-GUERRA, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,<br><br>*Defendants.* | Case No. 1:22-cv-00125<br><br>*Class Action*<br><br>**AMENDED EXPERT REPORT OF HAL J. SINGER, PH.D.**<br><br>May 28, 2024 |

This report cites and quotes material that Defendants designated as Confidential or AEO under the Second Amended Confidentiality Order (ECF No. 608)

members were expected to commit that the CM would be the "lowest" contribution expected of a family.[128] According to documents, Defendants did not want "competitive pressure"[129] and wanted to "avoid bidding wars."[130] The objective was to "reduce the variance in need analysis results across institutions through consistent application of these common standards."[131]

127. The second element, relating to the sharing of competitively sensitive information, concerned the 568 Group's effort to understand how they were approaching and awarding institutional grant aid from year to year. This is consistent with, as a practical matter, an enforcement mechanism—if Defendants saw that some of them were not applying the CM and Core Principles so as to result in similar practices and policies, as reflected in the shared data, then they would see there was no point or utility in adhering to the Challenged Conduct.

128. It would have been important, as an economic matter, for Defendants to have agreement not just on the Core Principles, but also on at least many components of an IM, because otherwise the schools could all apply the principles while applying different methodologies generating different results. This was true because, as Dr. Baum acknowledges, at least most of the "precise number[s]" in the Base IM, with respect to percentages, "could be modified to some extent

---

128. DARTMOUTH_000035937 (an internal Dartmouth June 2004 memorandum summarizing a recent 568 Group meeting and explaining that to participate in the 568 Group, you did not have to agree to use the Consensus Methodology entirely, but institutions had to commit that the CA would be the "**lowest**" contribution that would be expected of a family) (emphasis in original); *see also* MIDDLEBURY01293 (document entitled "Summary of Presidents' Section 568 Group Meetings" authored by a former Chair of the Technical Committee stating "[i]t has been understood that some 568 member institutions, for budgetary or other reasons, might decide not to fully implement all of the specific agreements, but not so as to result in lower expected contributions than the agreements."); Emory_568Lit_0000577 (568 Technical Committee making changes to income bands optional, "consistent with [its] policy of making across-the-board revisions only if PCs are increased").

129. MITLIT-000078586 at -78591.

130. DARTMOUTH_0000359527.

131. GTWNU_0000012456.

TABLE 13: IN-SAMPLE ANALYSIS
EFFECTIVE INSTITUTIONAL PRICE OVERCHARGE PERCENTAGE BY DEFENDANT

| Defendant | Effective Institutional Price Overcharge (%) |
|---|---|
| Brown | 6.4% |
| Caltech | 1.0% |
| Chicago | 3.4% |
| Columbia | 9.2% |
| Cornell | 6.6% |
| Dartmouth | 6.3% |
| Duke | 3.9% |
| Emory | 4.4% |
| Georgetown | 5.3% |
| Johns Hopkins | 7.8% |
| MIT | 9.8% |
| Northwestern | 4.2% |
| Notre Dame | 3.0% |
| Penn | 4.3% |
| Rice | 8.5% |
| Vanderbilt | 6.3% |
| Yale | 8.5% |

*Notes*: Percentage values correspond to the average Effective Institutional Price overcharge across Class Members and academic years in the sample during the Class Period.

### 2. Price Structure Analysis

262. Another standard method of proving Common Impact is a two-pronged, class-wide approach that has been accepted in antitrust litigation, including in *High-Tech Employee Antitrust* and in *Arizona Travel Nurses*.[358] Although those cases are compensation cases, the same principles apply in the evaluation of common movements within any pricing variable.[359] The first prong

358. I was the plaintiffs' economic expert in *Arizona Travel Nurses*. The district court accepted my methodology for proving antitrust impact in *Johnson v. Arizona Hospital & Healthcare Ass'n*, No. CV 07-1292-PHX-SRB, 2009 WL 5031334 (D. Ariz. 2009). The same "two-step" methodology utilized in *Johnson* was accepted by the court in *In re High-Tech Employees Antitrust Litigation*, 985 F. Supp. 2d 1167, 1206 (N.D. Cal. 2013), *Order Granting Plaintiffs' Supplemental Motion For Class Certification* ("Plaintiffs noted that Dr. Leamer's approach followed a roadmap widely accepted in antitrust class actions that uses evidence of general price effects plus evidence of a price structure to conclude that common evidence is capable of showing widespread harm to the class."). *See also, e.g.*, *Johnson v. Arizona* (finding predominance where conduct was alleged to suppress bill rates for nurses generally and evidence was presented that bill rates were correlated with nurse pay rates).

359. Hal Singer & Kevin Caves, *Analyzing High-Tech Employee: The Dos and Don'ts of Proving (and Disproving) Classwide Antitrust Impact in Wage Suppression Cases*, THE ANTITRUST SOURCE (Feb. 2015), at 5.

least five percent year-over-year in the actual world.[360] I then analyze whether the average Effective Institutional Price for each income decile also decreased, therefore implying that a shock to the average results in a shock to each income level in the Class.

265. Specifically, I calculate 490 income deciles across all Defendants in years when such a common shock occurred (i.e., when one Defendant's Effective Institutional Price decreased by at least five percent from the previous year). Of these, I find that, in 420 of the income deciles (over 85 percent), the average Effective Institutional Price in that decile decreases as the average overall Effective Institutional Price at the given Defendant institution decreases.[361] This result indicates that when the Effective Institutional Price falls at a Defendant institution, the decline impacts Class Members at all income levels.

266. The second step I describe above provides further evidence of a price structure. To do this, I run regressions analyzing how changes in average Effective Institutional Prices paid by other Class Members correlate with the Effective Institutional Price paid by each Class Member. I first regress each Class Member's Effective Institutional Price on their "Peers' Average Effective Institutional Prices." This regression analyzes whether changes in the average Effective Institutional Price paid by other Class Members at the same Defendant institution in the same academic year are associated with the individual Effective Institutional Prices paid by a Class Member to their particular Defendant. *Second,* I test "Other Defendants' Average Effective Institutional Prices," or whether the average Effective Institutional Price paid by Class Members at other Defendants' institutions during the same academic year are associated with the price paid by an individual Class Member at a given Defendant institution. In each regression, I include the same control variables as

360. As with my other analyses, both Effective Institutional Price and adjusted gross income are converted to 2024 dollars. Hence, my analysis looks at changes in *real* Effective Institutional Prices year-over-year.

361. *See* my workpapers for details.

those used in my regressions in Part III.A.2, including student fixed effects. Both approaches yield results consistent with the existence of such a price structure and inconsistent with its absence. In other words, I would not expect to obtain such results in the absence of a price structure.

267. Table 14 shows results of my price structure regressions. Column (1) presents results when regressing an individual Class Member's Effective Institutional Price on the average Effective Institutional Price paid by all other Class Members that attended the same Defendant institution during the same academic year (*i.e.*, Peers' Average Effective Institutional Price). The coefficient on Peers' Average Effective Institutional Price is 0.91, meaning that a one-dollar increase in the average Effective Institutional Price charged to other Class Members at the same Defendant institution is associated with a $0.91 increase in the Effective Institutional Price charged to an individual Class Member attending the same institution. Column (2) presents results when regressing an individual Class Member's Effective Institutional Price on the average Effective Institutional Price charged to other Class Members at other Defendant institutions during the same academic year (*i.e.*, Other Defendants' Average Effective Institutional Price). The coefficient on Other Defendants' Average Effective Institutional Price is 0.68, meaning that a one-dollar increase in the average Effective Institutional Price charged to other Class Members at other Defendant institutions is associated with a $0.68 increase in the Effective Institutional Price charged to an individual Class Member. Both coefficients described above are highly statistically significant at a one percent significance level. These results are consistent with common movements in Defendants' Effective Institutional Prices, and therefore provide class-wide evidence of a common pricing structure.

TABLE 14: PRICE STRUCTURE REGRESSIONS

| | Dependent Variable: *Effective Institutional Price* | |
|---|---|---|
| | (1) | (2) |
| **Peers' Average Effective Institutional Price** | **0.91*** ** | |
| | **(0.000)** | |
| **Other Defendants' Average Effective Institutional Price** | | **0.68*** ** |
| | | **(0.000)** |
| Adj. Gross Income | 1.01*** | 1.03*** |
| | (0.000) | (0.000) |
| Net Worth | 0.37*** | 0.35*** |
| | (0.000) | (0.000) |
| Number in College | -4,705.75*** | -4,687.25*** |
| | (0.000) | (0.000) |
| Year in College | -230.34*** | -539.33*** |
| | (0.000) | (0.000) |
| Student's Gift Aid from Other Sources | 0.24*** | 0.25*** |
| | (0.000) | (0.000) |
| Lagged Excess Endowment Investment Returns | 2,095.67*** | 3,322.46*** |
| | (0.000) | (0.000) |
| Inst. Tuition Rev per FTE Undergraduate (1-year lag) | -0.00 | 0.03*** |
| | (0.492) | (0.000) |
| % of FY-FTE Undergrads Receiving Financial Aid | -103.08*** | -23.44*** |
| | (0.000) | (0.000) |
| Unemployment (1-year lag) | -133.13*** | -187.38*** |
| | (0.000) | (0.000) |
| COVID | -91.84 | 737.49*** |
| | (0.285) | (0.000) |
| Trend | 2,235.03*** | 2,404.68*** |
| | (0.000) | (0.000) |
| Real GDP | -0.36*** | -0.33*** |
| | (0.000) | (0.000) |
| Observations | 726,773 | 726,773 |
| R-Squared | 0.84 | 0.84 |
| Includes Institution*Student Fixed Effects? | Y | Y |
| Number of Fixed Effects | 287,159 | 287,159 |

*Notes*: Robust p-values in parentheses; ***p<0.01, **p<0.05, *p<0.1. Adjusted Gross Income and Net Worth reported in thousands.

268. In summary, my regression analysis in Section III.A.2 demonstrates evidence of a general Effective Institutional Price overcharge to Class Members. The evidence above reveals that Effective Institutional Prices (1) move together across peers attending the same Defendant

institution, and (2) move together across Defendants. This evidence shows that the price overcharge due to the Challenged Conduct was not confined to a subset of Class Members, but instead would have been broadly shared across all Class Members at all Defendants institutions.

#### *b. Qualitative Evidence of Defendants' Goals of Horizontal and Vertical Equity Are Consistent with an Effective Institutional Price Structure*

269. In some institutions, a social objective or policy goal in need-based aid, as noted above, is so-called "horizontal equity" across students—that is, families of similar socioeconomic status and size should receive similar aid.[362] Such institutions utilize "need analysis" to determine students' financial aid.[363] Inputs to the need analysis include student and family level data contained in students' FAFSA and CSS Profile applications, which are submitted to universities electronically from the Department of Education and the College Board. Institutions use these inputs to ensure that students in families with similar income, assets, and family structure are evaluated as having a similar ability to pay, and therefore receive similar financial aid packages.

### C. Discovery of Anticompetitive Effects

270. In my opinion, a reasonable person would not have known that the Overarching Agreement had caused or was causing the economic impact I describe in Parts II and III. I base this opinion both on my own econometric work in this case and on evidence in the record.

---

362. Ross Rubenstein, Ph.D., *The institution Finance Perspective on Equity*, COGNIA (Fall 2016), https://source.cognia.org/issue-article/school-finance-perspective-equity/.

363. *Principles of Need Analysis*, CALTECH, https://www.finaid.caltech.edu/howitworks/principles#:~:text=There%20should%20be%20horizontal%20equity,expected%20to%20make%20similar%20contributions (last visited Mar. 2024), at 4 ("There should be horizontal equity (also referred to as equity across the board) in the distribution of limited financial aid resources. That is, families in similar circumstances with similar resources should be expected to make similar contributions."); *Need Analysis*, NAICU, https://www.naicu.edu/policy-advocacy/issue-brief-index/student-aid/needanalysis#:~:text=In%20the%20early%201950s%2C%20John,for%20students%20with%20financial%20needs (last visited Mar. 2024).

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, MICHAEL MAERLANDER, ALEXANDER LEO-GUERRA, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,<br><br>*Defendants*. | Case No. 1:22-cv-00125<br><br>*Class Action*<br><br>**REBUTTAL EXPERT REPORT OF HAL J. SINGER, PH.D.**<br><br>October 7, 2024 |

This report cites and quotes material that Defendants designated as Confidential or AEO under the Second Amended Confidentiality Order (ECF No. 608)

## II. THE CHALLENGED CONDUCT

33. In my Initial Report, I described the general features of the Challenged Conduct.[102] I explained that the Challenged Conduct is an alleged Overarching Agreement comprised of consensus on six elements, including: (1) six core principles of awarding institutional aid, (2) the primacy of awarding need based aid, (3) the use of the Institutional Methodology ("IM") as the basis for developing and using the Consensus Methodology ("CM"), (4) the development and use of the CM itself, (5) a manual for exercising Professional Judgment that was to applied to exceptional circumstances, and (6) the sharing of competitively sensitive information ("CSI").[103] I then analyzed, through an economic lens, whether the Challenged Conduct is consistent with the allegations of conspiracy and inconsistent with unilateral conduct and unfettered competition in setting Effective Institutional Prices.[104] I presented quantitative evidence—namely, my overcharge regression results—which are consistent with *all* Defendants having engaged in the Challenged Conduct to artificially suppress institutional grant aid (and thereby artificially inflate Effective Institutional Prices).[105] I also presented quantitative evidence consistent with *each* Defendant having participated in the Challenged Conduct to artificially inflate Effective Institutional Prices.[106] This evidence consisted of applying in-sample prediction to each Defendant after having run my primary regression overcharge model; this analysis showed that each Defendant had artificially inflated its Effective Institutional Prices during periods in which it had participated in the Challenged Conduct above where such prices would have been in the absence of the Challenged Conduct. This statistical finding

102. Singer Report §II.A.
103. *Id.* ¶148.
104. *Id.* §II.D.
105. *Id.* §II.B.
106. *Id.* §II.C.

demonstrates that each Defendant's prices are consistent with it having participated in the Challenged Conduct, and inconsistent with it having competed in an unfettered way.

34. Defendants' Experts dispute element (4) of the Challenged Conduct, the consensus on use of the CM for determining EFCs, but they do not dispute the execution of the five other elements. Defendants' Experts did not contest my economic assessment of the qualitative evidence pertaining to any of the other elements of the Challenged Conduct, including the exchange of competitively sensitive information on prices, the organizational elements that effectuated supracompetitive pricing, and inducements to support collusion, such as through regular meetings and surveys.[107] Defendants' Experts assert that the five uncontested elements of the Challenged Conduct were not anticompetitive because they were merely the result of industry standards, and, because of this, Defendants would have engaged in the same actions absent an Overarching Agreement.

35. I explain the flaws in Defendants' Experts' arguments below. Namely, I provide both qualitative and quantitative evidence that is consistent with Defendants having used a common formula for EFCs, in direct contrast to Defendants' Experts' arguments, and also with the Challenged Conduct having otherwise inflated Effective Institutional Prices. I explain that the economics of cartels is inconsistent with Defendants' Experts' theory that Defendants would have engaged in the same conduct absent an Overarching Agreement.

36. It bears noting that I presented Plaintiffs' theory of the case for purposes of exposition and for purposes of assessing whether, *conditional on the existence of the Challenged Conduct*, said conduct is consistent with the alleged overarching conspiracy and inconsistent with competition when viewed through an economic lens, as well as whether the economic facts are consistent with each Defendant's participation in the Challenged Conduct. Put differently, my assignment is predicated

107. Singer Report §II.D.2.

TABLE 1: EFC REGRESSION RESULTS

| | Dependent Variable: *Real EFC* | | | | | |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| | *No Student Fixed Effects* | | | *Includes Student Fixed Effects* | | |
| **Conduct** | **699.78*** ** | **453.71*** ** | **753.08*** ** | **459.21*** ** | **560.73*** ** | **514.94*** ** |
| | **(0.000)** | **(0.000)** | **(0.000)** | **(0.000)** | **(0.000)** | **(0.000)** |
| Adj. Gross Income | 89.38*** | 89.08*** | 88.88*** | 51.46*** | 51.42*** | 51.50*** |
| | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) |
| Net Worth | 2.87*** | 2.84*** | 2.82*** | 0.77*** | 0.77*** | 0.77*** |
| | (0.000) | (0.000) | (0.000) | (0.002) | (0.002) | (0.002) |
| Number in College | -4,279.04*** | -4,224.73*** | -4,221.93*** | -6,627.13*** | -6,630.58*** | -6,629.32*** |
| | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) |
| Year in College | -1,375.72*** | -1,423.53*** | -1,450.95*** | -66.42*** | -67.38*** | 815.94*** |
| | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) |
| Student's Gift Aid from Other Sources | -0.61*** | -0.60*** | -0.59*** | -0.09*** | -0.09*** | -0.09*** |
| | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) |
| Lagged Excess Endowment Investment Returns | | 2,057.41*** | -1,550.80*** | | 1,264.32*** | 733.52*** |
| | | (0.000) | (0.000) | | (0.000) | (0.007) |
| Inst. Tuition Rev per FTE Undergraduate (1-year lag) | | 0.09*** | -0.01*** | | -0.01*** | -0.02*** |
| | | (0.000) | (0.000) | | (0.000) | (0.000) |
| % of FY-FTE Undergrads Receiving Financial Aid | | -21.50*** | 1.96 | | -21.68*** | -8.77** |
| | | (0.000) | (0.757) | | (0.000) | (0.018) |
| Unemployment (1-year lag) | | | -79.66*** | | | -89.51*** |
| | | | (0.000) | | | (0.000) |
| COVID | | | 741.01*** | | | -85.00 |
| | | | (0.000) | | | (0.429) |
| Trend | | | 34.78 | | | -1,229.23*** |
| | | | (0.300) | | | (0.000) |
| Real GDP | | | 0.87*** | | | 1.00*** |
| | | | (0.000) | | | (0.000) |
| Observations | 690,236 | 690,236 | 690,236 | 690,236 | 690,236 | 690,236 |
| R-Squared | 0.23 | 0.23 | 0.23 | 0.90 | 0.90 | 0.90 |
| Includes Institution Fixed Effects? | Y | Y | Y | Y | Y | Y |
| Includes Institution*Student Fixed Effects? | N | N | N | Y | Y | Y |
| Number of Fixed Effects | 17 | 17 | 17 | 256,661 | 256,661 | 256,661 |

*Notes*: Robust p-values in parentheses; ***p<0.01, **p<0.05, *p<0.1. Adjusted Gross Income and Net Worth reported in thousands. All dollar denominated variables are in real dollars. These regressions are equivalent to the regressions that I provided in Table 11 of my Initial Report, but using revised data adjusted to incorporate all of Dr. Hill's data-processing adjustments marked as "Accepted" = "Y" outlined in Table 5.

45. Next, to evaluate how the Challenged Conduct impacts the difference in the EFCs offered to cross-admitted students at various Defendants, I analyze the EFCs for cross-admitted students, comparing the two EFCs offered by each Defendant. I evaluate how the range in EFC values is affected by the Challenged Conduct. Compared to Defendants' Experts' analyses, my analysis evaluates how the Challenged Conduct affects the range of EFC values, rather than naively requiring that EFCs match perfectly during the Challenged Conduct to show an effect. I control for the student's average income and net worth (the average of the values as assessed by the two schools), the number in college (also averaged between the two schools), the number of Defendants that admitted the given

student, the difference in U.S. News & World Report rankings for the Defendants that admitted the student, the real GDP, the lagged unemployment rate, a flag for COVID-19, and a trend variable. These mirror the controls used in my EFC regression in Table 1, minus any control variables that do not inform the range in EFC, such as year in college, because cross-admits should be new applicants to both Defendants. I also added the count of Defendants that admitted the student and the range of the rankings of the admitted schools, as these can inform the relative desirability of the institutions and the quality of the applicant, because an applicant who is admitted to more than two Defendants may be a stronger applicant than one who was only admitted to two Defendants.

TABLE 2: RANGE IN EFCS FOR CROSS-ADMITTED STUDENTS

| | Dependent Variable: *Real EFC Range* | |
|---|---|---|
| | (1) | (2) |
| **Conduct** | **-2,954.98*****<br>**(0.000)** | **-1,718.24*****<br>**(0.000)** |
| Average Real Income | | 86.32***<br>(0.000) |
| Average Real Net Worth | | 2.86<br>(0.269) |
| Average Number in College | | -5,037.25***<br>(0.000) |
| Unemployment (1-year lag) | | -219.73***<br>(0.000) |
| Admitted Defendant Count | | -773.79***<br>(0.000) |
| Ranking Range | | 55.25*<br>(0.055) |
| COVID | | -2,003.30***<br>(0.000) |
| Trend | | 580.00***<br>(0.000) |
| Real GDP | | -668.66*<br>(0.072) |
| Observations | 116,704 | 116,461 |
| R-Squared | 0.001 | 0.116 |

*Notes*: Robust p-values indicated as follows: ***p<0.01, **p<0.05, *p<0.1. Real GDP is measured in millions of dollars. Average income and average assets are measured in real dollars.

46. Table 2 shows that the absolute difference between the EFCs is lower when both Defendants for the cross-admitted student are in the 568 Group than when one or both Defendants are not. These results are economically and statistically significant for both specifications. I repeat this analysis using the Effective Institutional Price and find similar results.[127] The results from the Effective Institutional Price cross-admit regression are shown in Table 3 below. Together, these cross-admit regression results indicate that the EFC and the resulting Effective Institutional Price are closer together when the Challenged Conduct is in effect than when the Challenged Conduct is not. The cross-admit regression results demonstrate the chilling effect on competition of Defendants' participation in the 568 Group and contradict Defendants' Experts' ill-founded critique that the lack of identical EFC awards rules out anticompetitive effects.

127. In both the EFC cross-admit regression and Effective Institutional Price cross-admit regression, the R-squared values are low. Economists generally advise against putting too much emphasis on R-squared values. *See*, *e.g.*, WOOLDRIDGE at 39 ("Students who are first learning econometrics tend to put too much weight on the size of the R-squared in evaluating regression equations. For now, be aware that using R-squared as the main gauge of success for an econometric analysis can lead to trouble.").

TABLE 3: RANGE IN EFFECTIVE INSTITUTIONAL PRICES FOR CROSS-ADMITTED STUDENTS

| | Dependent Variable: *Real Effective Institutional Price Range* | |
|---|---|---|
| | (1) | (2) |
| **Conduct** | **-6,711.40*****<br>**(0.000)** | **-4,735.54*****<br>**(0.000)** |
| Average Real Income | | -28.66***<br>(0.000) |
| Average Real Net Worth | | -0.47<br>(0.248) |
| Number in College | | 1,435.14***<br>(0.000) |
| Unemployment (1-year lag) | | 263.09***<br>(0.000) |
| Admitted Defendant Count | | 280.41***<br>(0.000) |
| Ranking Range | | 423.58***<br>(0.000) |
| COVID | | 500.38<br>(0.123) |
| Trend | | 512.98***<br>(0.000) |
| Real GDP | | 134.65<br>(0.473) |
| Observations | 110,491 | 110,275 |
| R-Squared | 0.020 | 0.089 |

*Notes*: Robust p-values indicated as follows: ***p<0.01, **p<0.05, *p<0.1. Real GDP is measured in millions of dollars. Average income and average assets are measured in real dollars.

## B. Defendants' Experts Misleadingly Argue That Defendants' Actions Are Consistent with The Rest of The Higher Education Industry

47. In my Initial Report, I provided record evidence describing Defendants' purpose in establishing the CM as being one to achieve "a consistent formula of need analysis."[128] This evidence consisted of documents showing that Defendants did not want "competitive pressure"[129] and wanted to "avoid bidding wars."[130] I also provided evidence that Defendants had engaged in the sharing of

128. Singer Report ¶126 (citing VANDERBILT-00000528 at -529 (statement from 568 Group Technical Committee Chair to 568 Group Members about renewing the 568 exemption)).
129. *Id.* (citing MITLIT-000078586 at -591).
130. *Id.* (citing DARTMOUTH_0000359527).

in a but-for world. In fact, in my Initial Report, I cited qualitative evidence explaining that the Challenged Conduct likely would have altered the Base IM through (a) Defendants making recommendations about and suggesting changes to the Base IM itself, and (b) having Group members serve on the College Board and its relevant committees tasked with making changes to the Base IM.[174] Hence, Base IM EFCs would not be representative of what EFCs would have been absent the Challenged Conduct, and Dr. Stiroh's comparison of Defendants' EFCs to Base IM EFCs is therefore invalid.

63. Dr. Stiroh states that "Dr. Singer's economic modeling cannot provide a prediction of the expected changes that any individual school would have made to its EFC calculations absent the Challenged Conduct."[175] In Part II.A above, I respond to Dr. Stiroh's claim by empirically testing what Defendants' EFCs would have looked like absent the Challenged Conduct. Dr. Stiroh's hypothesis is that the Challenged Conduct did not result in an artificial inflation in EFCs. I reject her hypothesis—Defendants' EFCs were artificially inflated by approximately $515 per Class Member-academic year, and this result is both economically and statistically significant. This quantitative evidence is consistent with the expected economic effect of the Challenged Conduct on EFCs based on the qualitative evidence, and it is inconsistent with Dr. Stiroh's claim that EFCs were not affected by the Challenged Conduct.

64. Dr. Stiroh asserts that there is no clear economic linkage between higher EFCs and higher Effective Institutional Prices, because Defendants would have competed on packaging.[176] Put

---

174. *Id.* ¶159. PENN568-LIT-00029001 ("My recollection is that the tables were developed by a FASSAC subcommittee which included some 568 cross-representation."); AMHE-00012771 at -783 ("Strong feeders for FASSAC have been identified as: . . . The 568 Group."); COFHE-02-00011341 at -343 ("The GAO also discovered that many of the 568 Group recommendations for methodological revisions that better serve students and parents had been adopted by the College Board as well as by individual institutions.").
175. Stiroh Report ¶109.
176. *Id.* ¶¶138-143.

Challenged Conduct. Record evidence suggests that Defendants that ceased to participate often did not fully withdraw from the 568 Group, thereby suggesting that their Effective Institutional Prices were likely still artificially inflated during non-participation periods. For instance, many Defendants had still engaged in the information-exchange element of the Challenged Conduct even during non-participatory years.[187] Third, economists have found that there is often a lag in timing between when a cartel ends and when market prices return to competitive levels, and this price reduction lag is greater the longer the cartel was in place.[188] Given that the Challenged Conduct spans nearly two decades, one would expect that post-2022 prices are likely still at least partially inflated as a result of the alleged conspiracy—thereby rendering my overcharge calculations conservative.

***a. Dr. Stiroh's Critique of My Use of a Common Overcharge Is Unfounded***

74. To measure the effect of the Challenged Conduct on Effective Institutional Prices, I use a standard approach that involves regressing real Effective Institutional Prices on a dummy variable that captures when a Defendant had or had not participated in the Challenged Conduct. Because my regressions use a single conduct variable across all Defendants and academic years, these regressions each produce a single, common overcharge. Dr. Stiroh critiques my use of a common overcharge, suggesting that I should instead estimate Defendant-specific and time-period-specific overcharges. Below, I describe the numerous flaws in her arguments.

75. The fundamental issue with Dr. Stiroh's argument is that one should use all of Defendants' reliable data in an econometric model for the specific purpose of providing a reliable

---

187. There were two primary sources of information exchange. One involved the 568 surveys, meetings, and communications. The other was the COFHE meetings. Many Defendants who came in and out of 568 remained in COFHE the entire time. Singer Report ¶¶165-166.

188. Joseph E. Harrington, Jr., *Post-Cartel Pricing During Litigation*, 52(4) THE JOURNAL OF INDUSTRIAL ECONOMICS 517-533, 517 (2004) ("Standard methods in the U.S. for calculating antitrust damages in price-fixing cases are shown to create a strategic incentive for firms to price above the non-collusive price after the cartel has been dissolved. This results in an overestimate of the but for price and an underestimate of the level of damages. The extent of this upward bias in the but for price is greater, the longer the cartel was in place and the more concentrated the industry.").

measure of the overcharges, if any, attributable to the Challenged Conduct. The price effects of supply and demand factors influencing Effective Institutional Prices in the market are most reliably measured by a model across as much of the market as possible. Each student enrollment-payment transaction in each academic year plays some role in reliably measuring market-price effects for every other transaction. Dr. Stiroh attempts to estimate my regressions separately by Defendant, but this fails to provide reliable estimates of market-price effects, and therefore of the separate price effects of the Challenged Conduct, for the simple reason that she excludes significant portions of the available, relevant data from other Defendants. Dr. Hill obtains similar unsound, economically nonsensical results when he dismisses post-Class Period data, as I show in Part III.A.2.e. By limiting the data to narrow slices, Defendants' Experts exclude essential information that informs market effects on Effective Institutional Prices.

76. Similarly, my model provides the most reliable estimate of overcharges by including a single indicator for the Challenged Conduct across the whole Class Period. Defendants' Experts' choices to chop up the Challenged Conduct indicator into time segments, as Dr. Stiroh does, or to artificially mute any effect from the Challenged Conduct by including highly collinear dummy variables, as Dr. Hill does, increases the likelihood that market and conspiracy price effects are conflated, rendering their various estimates unreliable and unsound.[189]

---

189. *See* Part III.A.2.d. Dr. Hill tests (1) incorporating time fixed effects, and (2) separate dummy variables for each year after the onset of COVID-19 into my regressions. Hill Report §8.3. Both of these erroneous adjustments would be expected to artificially dampen any effect of the Challenged Conduct on Effective Institutional Prices. Many Defendants provided data that only contain one year to two years in which the Defendant did not participate in the conspiracy (i.e., 2023 and 2024). Because the data I use are annual, a dummy variable for 2023 would absorb most of the conduct effect due to its high collinearity with the conduct variable, which is what Dr. Hill does when he adds time fixed effects or COVID-19 dummy variables for every year after the onset of COVID-19.

92. Instead of the Huber-White standard errors, Dr. Hill contends that I should have used "clustered" (or "cluster-robust") standard errors. Specifically, he explains:

> To correct Dr. Singer's erroneous standard errors, I replace his Huber-White robust standard errors with two-way clustered standard errors and re-estimate his model. The two-way clustered standard errors allow for correlation for a given student across years and for correlation among different students attending the same school during the same year by clustering on (1) student and (2) school by year. These clustered standard errors can measure the precision of an estimated coefficient more accurately than Dr. Singer's standard errors.[214]

The application of clustered standard errors consists of two steps. A researcher must decide (1) whether or not to cluster in the first place, i.e., whether the error structure exhibits relationship within and/or between certain groups, and (2) the appropriate level of clustering. Dr. Hill argues that clustering is warranted and that the clustering should occur at the student and by school/year levels, hence his use of two-way clustered standard errors. Dr. Hill relies, however, on two faulty arguments to support his position that my use of Huber White standard errors is unreasonable. I address each in turn.

93. Dr. Hill first mischaracterizes the nature of the Challenged Conduct, implying that each Defendant decided whether or not to join the 568 Group independently each year, akin to each institution annually tossing a coin to decide membership for the year. If Dr. Hill's view truly reflected reality, then the probability of observing a school such as Northwestern or Duke as a member every year would be infinitesimally small, approximately equal to $0.5^t$, where t equals the number of years during the relevant period in which these schools participated in the conspiracy. Dr. Hill claims:

> First, Dr. Singer's standard errors assume that all common factors that impact the Effective Institutional Price of all students at a school in the same year are explicitly controlled for in his regressions. This assumption is not credible because it assumes that there are no school-level decisions or exogenous shocks that vary over time and affect multiple students in the same school-year combination. The Challenged Conduct is one such factor that varies by school and year.

214. Hill Report ¶189.

Dr. Hill's claim runs counter to the evidence. Membership in the 568 Group represents the key feature of the Challenged Conduct and reflects the common thread that bound Defendants together both in a given year and across years. In other words, the treatment effect did not occur at the level of clustering that Dr. Hill chooses, but rather across those levels. Dr. Hill erroneously redefines the scope of the Challenged Conduct to correspond to his clustering choice. As MacKinnon et al. explain, "Thus it never makes sense to cluster at a level finer than the one at which treatment is assigned."[215]

94. Abadie et al. address the very misconceptions that motivate Dr. Hill's claim that I should have used clustered standard errors rather than Huber-White.[216] The first two issues that Abadie et al. raise speak directly to Dr. Hill's misreading of the literature:

> We use our framework to highlight three common misconceptions surrounding clustering adjustments. The first misconception is that the need for clustering hinges on the presence of a nonzero correlation between residuals for units belonging to the same cluster. We show that the presence of such correlation does not imply the need to use cluster adjustments. The second misconception is that there is no harm in using clustering adjustments when they are not required, with the implication that if clustering the standard errors makes a difference, one should cluster.[217]

95. The guidance from Abadie at al. has direct implications for the empirical investigation of the effect of the Challenged Conduct. The authors make a critical point, which supports my decision not to employ clustered standard errors in this case:

> the sampling process and the treatment assignment mechanism solely determine the correct level of clustering; the presence of cluster-level unobserved components of the outcome variable becomes irrelevant for the choice of clustering level.[218]

---

215. James G. MacKinnon, Morten Ørregaard Nielsen, and Matthew D. Webb, *Cluster-robust inference: A guide to empirical practice*, 232(2) JOURNAL OF ECONOMETRICS 272-299, 278 (2023) [hereafter MacKinnon et al. (2023)].

216. Alberto Abadie, Guido Imbens, Susan Athey, and Jeffery Wooldridge, *When Should You Adjust Standard Errors for Clustering?*, 138(1) QUARTERLY JOURNAL OF ECONOMICS 1-35 (2023) [hereafter Abadie et al. (2023)].

217. Abadie et al. (2023) at 3.

218. *Id*. *See also id*. at 32 ("If assignment is perfectly clustered so that units that belong to the same cluster have the same treatment assignment, there is no improvement from using the CCV [cluster causal variance] variance and the TSCB [two-stage cluster bootstrap] variance estimator is not applicable.").

In other words, the sole determinant of whether one should cluster or not depends on the level of the treatment assignment. In this case, the treatment assignment (exposure to the Challenged Conduct) did not vary by school or year. Dr. Hill's approach seeks to manufacture variation where none exists. The point of the Challenged Conduct was to impose a common financial aid approach, and to reduce variability among schools.[219] Contrary to Defendants' own admissions to this effect, Dr. Hill posits the exact opposite—namely, that membership in the 568 Group varied across schools and years. Dr. Hill cites to MacKinnon et al., who explain that "When the regressor of interest is a treatment dummy, and the level at which treatment is assigned is known, then it generally makes sense to cluster at that level." I agree. But because the treatment assignment occurred across schools and years, it does not make sense to adopt the by-school-and-year clustering that Dr. Hill proposes.

96. In addition, the decision of whether or not to cluster, as Abadie et al. explain, depends on "the sampling process"—that is, how we obtained the data, what those data represent, and what role the data play in a researcher's analysis. I understand that these data represent the full available complement of data for the population of students for each Defendant in the relevant period. I do not seek to extrapolate from these Defendants to other schools not found in the data.

97. In a discussion of Abadie et al.'s paper on the World Bank blog, lead economist David McKenzie explains that "Instead, under the sampling perspective, what matters for clustering is how the sample was selected and whether there are clusters in the population of interest that are not represented in the sample."[220] Abadie et al. further note that, "when the number of clusters in the sample is a nonnegligible fraction of the number of clusters in the population, conventional clustered

---

219. *See, e.g.*, *Memorandum of Understanding*.

220. David McKenzie, *When should you cluster standard errors? New wisdom from the econometrics oracle*, WORLD BANK BLOG (Oct. 16, 2017), https://blogs.worldbank.org/en/impactevaluations/when-should-you-cluster-standard-errors-new-wisdom-econometrics-oracle ("Their advice [Abadie et al. (2023)]: whether or not clustering makes a difference to the standard errors should not be the basis for deciding whether or not to cluster. They note there is a misconception that if clustering matters, one should cluster.").

| Overall Issue # | Defendant Affected | Adjustment Description | Accept? | Description of Adjustment Effect/Relevance | Summary of Effect |
|---|---|---|---|---|---|
| 57 | All | Dr. Hill adjusts my code to incorporate IPEDS 1997 institutional tuition revenues (which enter my regressions in the lagged 1998 institutional tuition revenues control variable). | Y | This has no material effect on my results. *See* Part III.A.2.c.ii. | Trivial |
| 58 | All | Dr. Hill adjusts my coding of the year in college variable, which he claims is inconsistently coded. | Y | Using Hill's year in college increases the conduct coefficient by 4 dollars. | Trivial |
| 59 | All | Dr. Hill splits my continuous versions of the control variables for year in college and number in college into separate dummy variables. | N | *See* Part III.A.2.c.ii. | N/A |
| 60 | All | Dr. Hill alters how negative and zero values enter my logarithmic regressions by coding these variables as zero and entering a dummy variable for when they are missing. | N | *See* Part III.A.2.c.ii. | N/A |

#### i. Dr. Hill's "Corrections" to My Data Processing Do Not Materially Alter My Findings

104. Dr. Hill critiques my processing of Defendants' structured data. He outlines numerous purported flaws in my data processing in Section 8.2.1 of his report, plus many more in his backup production. Below, I provide details as to the cause and the significance of a number of these purported flaws. After adjusting my data to incorporate the points that Dr. Hill raises and with which I agree, and to exclude the points that Dr. Hill raises with which I disagree, I find that his adjustments do not materially alter my findings, and that my regression models continue to show that the Challenged Conduct resulted in an economically and statistically significant artificial increase in Effective Institutional Prices.

105. Many of the "data processing" critiques raised by Dr. Hill stem from the inherent challenges associated with interpreting Defendants' data, particularly given its volume and complexity. Many Defendants did not provide sufficient information to interpret many of their data fields, and so my team had to make certain assumptions regarding how to process Defendants' data. These assumptions were reasonable given the limited nature of the disclosures relating to the data, and any adjustments that Dr. Hill made due to these assumptions has little material impact, as shown in Table 5 above.

106. Moreover, certain data-processing issues raised by Dr. Hill contradict Defendants' data or responses provided by Defendants. For instance, Dr. Hill claims that Brown's aid year variable refers to the spring semester, rather than the fall semester, and that Brown's data should therefore be coded based on their aid year minus one.[231] This means that Brown's data starts in the 1997 academic year, one year prior to the agreed-upon beginning date for the production of Defendants' structured data. Additionally, over the course of correspondence that my team had with Brown (through Counsel), Brown had never specified that the aid year variable should correspond to the spring semester, even though my team had asked questions pertaining to this variable.[232] Similarly, Dr. Hill claims that I improperly dropped Brown observations that had aid year values equal to "NULL," and that these observations should have instead been coded based on other observations within their datasets.[233] My team had asked this exact question as to how to treat these "NULL" observations in January 2024. Brown had responded: "We do not believe that any available data is missing," and

231. Hill Report ¶193; Point 1; Bullet 2. Over the course of question-and-answer correspondence between my team and Brown (through Counsel), Brown had never specified that the "aid_year" variable corresponds to the spring of the academic year.

232. For example, *see* Brown's Responses to Questions re: Structured Data (Jan. 26, 2024), 7 (Q: "Is there a reason why there are only ~3,000-4,000 observations per year from 1998 – 2006, and ~14,000 from 2007?" To this, Brown responded "…Although we cannot pinpoint a precise explanation…the available 1998-2006 data…". Brown specifically mentioned "1998-2006" when referencing the data we asked about, and did not correct it to say "1997").

233. Hill Report ¶193; Point 2; Bullet 3.

stated they would review the problem further.[234] Although my team never received an answer to this question, at a July 31, 2024 meeting with Bates White and NERA, Brown instructed Bates White as to how to interpret these "NULL" values.[235]

107. Dr. Hill claims that I improperly classified some of Northwestern's federal awards as being institutional.[236] Yet Northwestern's data had specified these awards as being institutionally sourced, in contrast to Dr. Hill's claim.[237] Similarly, Dr. Hill claims that I improperly categorized some Northwestern awards that are institutional athletic scholarships as being outside scholarships.[238] Yet the data to which Dr. Hill is referring contains observations where the award type is equal to "A" (athletic) and the source type is equal to "O" (other), contrary to his claim.[239] Dr. Hill asserts that I incorrectly classified some Yale awards that are merit-based as being need-based.[240] This contradicts Yale's website, which states that "Yale does not award merit-based scholarships."[241]

---

234. *See* Brown's Responses to Questions re: Structured Data (Jan. 26, 2024), at 5. (Q: "Why are ~25% of observations for the "aid_year" field equal to "NULL"? Can you provide the missing years?" To this, Brown responded: "We do not believe that any available data is missing. Brown has not been able to determine the reason for the missing "AID_YEAR" data.").

235. Hill Workpapers, "Summary of data processing updates.xlsx".

236. Hill Report ¶193; Point 3; Bullet 2.

237. Dr. Hill claims that I miscategorized some Pell Grant and "Fed ACG" awards in Northwestern's data as being from an institutional private source. *See* Hill Workpapers, "Summary of data processing updates.xlsx". It bears noting that Northwestern's data was incorrect in its classification of these awards that Dr. Hill identifies. I use the variable "source" in Northwestern's data to classify award sources, and I classified awards with "source" = "I" as institutional. The awards that Dr. Hill is highlighting have a "source" = "I", inconsistent with Dr. Hill's description. Nevertheless, I accept Dr. Hill's adjustment of my classification for these observations, and I find that it has a very modest impact on my results (this adjustment affects less than 0.3 percent of all Northwestern observations).

238. *See* Hill Workpapers, "Summary of data processing updates.xlsx".

239. The data that Dr. Hill is referring to contains observations where the award type is equal to "A" (athletic) and the source type is equal to "O" (other), yet the category is "NU Athletic scholarships". There is a clear discrepancy between the source type column and the category column. It is therefore not clear whether Dr. Hill's adjustment to classify these as institutional athletic scholarships is correct, or whether my classification of these awards as other grants is correct. Because these observations have no meaningful impact on the results (Dr. Hill's adjustment only affects 0.8 percent of observations), I accept Dr. Hill's adjustment under the assumption that the category variable is more accurate for these observations, although there is no strong basis to this assumption.

240. *See* Hill Workpapers, "Summary of data processing updates.xlsx".

241. *Financial Aid: Merit-Based Scholarship*, YALE, https://finaid.yale.edu/award-letter/financial-aid-terminology/merit-based-scholarships (last visited Oct. 2024).

108. Some of the data-processing issues that Dr. Hill raises arise from the fact that Defendants had not yet produced the data necessary for my analyses, but later produced the data. For example, Dr. Hill uses a Penn crosswalk for classifying awards, but I did not have access to said crosswalk.[242] Nonetheless, in my revised estimates, I take account of these data that had previously not been available.

109. Other data-processing issues that Dr. Hill raises have no practical impact on either the data or my findings, but nonetheless I take account of them in my revised estimates. For instance, Dr. Hill claims that, for Emory and Brown, I drop all instances of a student in a year where the student shows up in multiple observations for the same year (i.e., duplicate observations). Dr. Hill claims this is improper because I should have at least preserved one instance of the duplicate student in the year, rather than dropping *all* instances.[243] As Dr. Hill states in his report, this adjustment drops a trivial 15 students for Brown. And, contrary to what Dr. Hill states in his report, this adjustment has *no* effect for Emory because it pertains only to admissions data, which does not have any impact on any of my analyses. As further examples, Dr. Hill claims that I did not properly include state awards in my "other gift aid" control variable for Georgetown.[244] State grants account for zero percent of grants at Georgetown and therefore have no material impact on my results.[245] Dr. Hill claims that I incorrectly omitted yellow-ribbon and veteran-benefit awards in my processing of MIT data.[246] His

242. *See* Hill Workpapers, "Summary of data processing updates.xlsx" (referencing PENN568_STRUCTURED-00000216).

243. Hill Report ¶193; Point 2; Bullet 4.

244. *Id*. ¶193; Point 3; Bullet 3.

245. *See* my workpapers for details.

246. Hill Report ¶193; Point 2. Dr. Hill claims that I incorrectly omitted yellow ribbon and veteran benefit awards in my processing of MIT data. Hill Workpapers, "Summary of data processing updates.xlsx". Dr. Hill appears to assume that the values "VATUTN", "YELRBN", "VASTIP", and "YELMCH" for the variable "fund_name" represent these purported award types. He offers no explanation or documentation to support his assumption that these values of "fund_name" should be included.

adjustment has no impact on my results—the yellow-ribbon and veteran-benefit awards that he flags are equal to zero for approximately 99.9 percent of all observations.

110. One of the important changes that Dr. Hill makes to my data processing with which I disagree pertains to the University of Chicago's data. Chicago produced financial aid data from two database systems. Chicago stored its 1998-2015 financial aid data in a PowerFAIDS database and stored its 2016-2023 financial aid data in a PeopleSoft database.[247] Because of this change in database systems over time, my team had reviewed and analyzed the consistency of these two databases to determine whether both databases recorded the variables used for my analyses consistently across time. Upon this review, my team found that Chicago did not maintain consistency in how it recorded data in PeopleSoft relative to how it recorded these data in PowerFAIDS. Specifically, Chicago's 2016-2023 PeopleSoft data does not allow one to isolate institutional need-based grant aid due to issues in identifying the source of the financial aid (e.g., institutional aid, Federal aid, etc.) and in

247. PowerFAIDS is "a comprehensive software solution automating financial aid processes" produced by the College Board. *PowerFAIDS,* COLLEGE BOARD, https://powerfaids.collegeboard.org/media/pdf/powerfaids-financial-aid-management.pdf (last visited Sept. 2024). The software offers a range of functionalities, including the ability to produced need analyses, manage federal funds, and award and simulate student aid awards. *See What PowerFAIDS Helps You Do*, COLLEGE BOARD, https://powerfaids.collegeboard.org/about-powerfaids/what-powerfaids-helps-you-do (last visited Sept. 2024). PeopleSoft Campus Solutions is a similar software produced by Oracle. It "automates federal and institutional financial aid processing for a more efficient operation. It provides flexibility and helps you manage financial aid activity for applicants and students." *Campus Solutions 9.2: Financial Aid,* ORACLE, https://docs.oracle.com/cd/F33383_01/psft/pdf/cs92lsfa-b072020.pdf (last visited Sept. 2024), 39. The PeopleSoft database allows an institution to: "Receive and track financial aid applications. Design cost of attendance assessment by defining budget categories, items, and formulas. Manage need analysis, packaging, disbursement, and loan processing. Process origination and disbursement for FFELP, Direct Loan, and Pell Grant programs. Calculate federal Pell awards. Use award plans to automatically package students. Match financial aid sources to eligible students. Modify financial aid notification letters. Maintain federal compliance with annual regulatory updates for ISIR, Pell, Direct Loan, FISAP, and other federal updates. Post financial aid to student accounts. Provide students with self-service access to view, accept, and decline awards. Manage student work-study programs." *Id.* at 39.

distinguishing need-based from merit aid types.[248]

111. In Figure 1, I demonstrate this inconsistency in Chicago's databases by plotting Chicago's average real Effective Institutional Price from 1998 to 2022. These data come directly from Dr. Hill's backup. The vertical dashed line shows when Chicago had switched from a PowerFAIDS to a PeopleSoft database system. As shown, there is a significant increase in Chicago's average real Effective Institutional Price from approximately $47,000 per academic year to $57,000 per academic year when Chicago switched its database system—amounting to a $10,000 increase year-over-year. A change in real Effective Institutional Prices such as that shown in Figure 1 is attributed to the change in database systems. Figure 1 also shows a substantial increase in real Effective Institutional Prices from approximately $56,000 to over $76,000 between the 2021 and 2022 academic years—an $19,000 increase in real Effective Institutional Prices, which are *after* accounting for inflation. This spike in real Effective Institutional Prices in a single year is implausible and likely reflects another inconsistency in Chicago's database.

248. Dr. Hill highlights that I did not use Chicago's 2016-2023 data. Hill Report ¶193 (at point 2, bullet 1).. I did not use Chicago's 2016-2023 data due to problems identifying institutional grant aid and problems with identifying other, non-institutional grant aid. Chicago had produced two datasets containing awards for the period 2016-2023: "UCHICAGO_STRUCTURED_1000000025_ATTORNEYS_EYES_ONLY_PS_STDNT_AWARDS" and "UCHICAGO_STRUCTURED_1000000026_ATTORNEYS_EYES_ONLY_PS_STDNT_AWD_PER_DATA_TABLE." UCHICAGO_STRUCTURED_1000000025 provides a field named "fin_aid_type" which has values "G", "S", "W", "L", "T", "V", and "" (missing). "G" and "S" refer to grants and scholarships, respectively, but these terms do not denote whether the award is need-based or merit-based. Therefore, one cannot distinguish need-based awards from merit-based awards using this field. Further, none of the variables in UCHICAGO_STRUCTURED_1000000025 allow one to expressly identify the source of the funding, which I require in order to distinguish institutional from non-institutional awards. After reviewing Dr. Hill's backup, I find that he uses the field "award_msg_cd" to distinguish institutional from other sources of awards. This is not a valid solution. Dr. Hill drops 38 percent of award observations that have a missing value for this field. The other dataset for 2016-2023 awards that Chicago produced was UCHICAGO_STRUCTURED_1000000026, which has fields specifying total institutional awards, total institutional need-based awards, total federal awards, and total federal need-based awards. The issue with these data is that they do not allow one to separate out institutional need-based *gift aid* awards from institutional need-based *loan* awards.

FIGURE 1: CHANGE IN AVERAGE REAL EFFECTIVE INSTITUTIONAL PRICES WHEN SWITCHING FROM CHICAGO'S PRE-2016 PFAIDS DATA TO 2016-2022 PEOPLESOFT DATA




*Notes*: I create this figure using Hill's backup production of Chicago's data.

112. These substantial, mismeasured increases in real Effective Institutional Prices, which are observed over the entire 2016-2023 period due to database inconsistencies, render Chicago's 2016-2023 data unreliable for use in my analyses.[249] To see why, consider the time periods over which Chicago participated in the 568 Group. Chicago began to participate in the 568 Group starting in 2003, and then no longer participated from 2015 onwards. As shown in Figure 1, inconsistencies in Chicago's database systems result in real Effective Institutional Prices being improperly recorded by higher amounts from 2016-2023—exactly during those years that Chicago had ceased to

249. This discernible change in Chicago's real Effective Institutional Prices attributable to its change in database is different from what economists refer to as "classical measurement error." Rather, this measurement error is a systemic consequence of the change in database system. *See*, *e.g.*, Daniel L. Millimet and Christopher F. Parmeter, *Accounting for Skewed or One-Sided Measurement Error in the Dependent Variable*, IZA INSTITUTE OF LABOR ECONOMICS, Discussion Paper No. 12576 (Aug. 2019), 1 ("While classical measurement error in the dependent variable in a linear regression framework results only in a loss of precision, non-classical measurement error can lead to estimates which are biased and inference which lacks power.").

participate in the Challenged Conduct. In rudimentary terms, my regression model compares a Defendant's real Effective Institutional Prices during years in which the Defendant had participated in the 568 Group to years that they did not participate, as well as to other Defendants' real Effective Institutional Prices during years that those other Defendants did not participate. This means that the regression attributes the misreported higher real Effective Institutional Prices to periods that a Defendant did not participate in the Challenged Conduct.

113. As a result of this misattribution of higher real effective prices to non-participatory periods, the inclusion of the 2016-2023 Chicago data substantially biases my conduct coefficient downwards. To show this, I make a single adjustment to Dr. Hill's data provided in his backup by excluding Chicago's 2016-2023 data, and I run the same regression that he runs to generate his Figure 33.[250] I find that the conduct coefficient from Dr. Hill's model 6 (which corresponds to my primary overcharge model) increases from $441 to $750 once I exclude Chicago's 2016-2023 data, a 70 percent increase in the conduct coefficient relative to what Dr. Hill obtains.

114. Dr. Hill makes another significant change to my processing of Duke's data that he does not note anywhere in his report, which I reject in computing my revised regressions. For context, Duke produced financial aid awards data that includes different award variables, such as variables for "offered" amounts, variables for "accepted" amounts, and variables for "paid" amounts. Upon review of these data, my team discovered that the total "paid" amount did not match the total "accept" amount for 87 percent of observations in these awards data, and that the total "accepted" amounts were over $13,000 greater than the total "paid" amounts on average. Because the "paid" amounts

250. Dr. Hill's Figure 33 shows the cumulative effect of applying his data-processing adjustments, control-variable construction adjustments, and standard-error adjustments to my regression models. The comparison that I provide here is for the Model 6 of that figure, which corresponds to what I refer to as my primary overcharge model, which includes all of the control variables outlined in my Initial Report, as well as student-Defendant fixed effects. Dr. Hill reports the numeric values used in his Figure 33 in Appendix H.2 of his report (at Figure 79).

appeared incomplete, my team used the "accepted" amounts for purposes of measuring Duke's financial aid. Dr. Hill alters my code instead to use "paid" amounts, and he provides no basis for doing so, nor does he explain anywhere in his report that he made this change.

115. This alteration to my code is wrong. To illustrate, I review named plaintiff Sia Henry's financial aid records in Duke's data, and I compare her total "paid" and "accepted" amounts to her actual financial aid awards that are referenced in Dr. Stiroh's report and which come from Henry's Supplemental Responses and Objections to Defendants' First Set of Interrogatories. Dr. Stiroh notes that Sia Henry had been awarded $9,300 for the 2007 academic year, $14,200 for the 2008 academic year, $40,455 for the 2009 academic year, and $30,579 for the 2010 academic year.[251] In Duke's financial aid data, I find exact matches to Sia Henry's total aid awards when using the "accepted" award amounts, consistent with the "accepted" award amount being the *actual* award. The "paid" award amounts do not match for *any* year of Sia Henry's data, and these "paid" award amounts vary substantially from the actual amounts Henry received. For instance, Sia Henry's "paid" total award for 2007 academic year is $0 (instead of $9,300), for the 2008 academic year is $0 (instead of $14,200), for the 2009 academic year is $34,800 (instead of $40,455), and for the 2010 academic year is $23,579 (instead of $30,579).[252] I therefore find that Dr. Hill's adjustment to use "paid" amounts instead of "accepted" amounts for Duke to be improper.

116. I adjust Dr. Hill's code to use Duke's accepted amount instead of their paid amount, and I find that correcting for this error further increases the conduct coefficient in Dr. Hill's regressions. As noted above, making a single change to Dr. Hill's methodology by excluding Chicago's 2016-2023 data results in the conduct coefficient increasing from $441 to $750. Correcting

251. Stiroh Report ¶18. Plaintiff Sia Henry's Supplemental Responses and Objections to Defendants' First Set of Interrogatories, *Henry v. Brown University*, Case No. 1:22-cv-00125 (N.D. Ill. Jun. 27, 2023) at 4-5.

252. *See* my workpapers. Sia Henry can be identified in the structured data as UID_0000404135288.

Dr. Hill's code to use the proper financial aid award variables in Duke's data results in the conduct coefficient increasing from $750 to $930, a 24 percent increase in the conduct coefficient relative to when using the improper Duke awards variables.

117. Dr. Hill recodes the Challenged Conduct dummy variable for Rice and for Duke, which fundamentally alters the conduct variable and thereby changes the overcharge calculation. In my Initial Report, I defined Rice as having participated in the Challenged Conduct from 2003 to 2022. Dr. Hill adjusts my Class Period definition by coding Rice as having not participated in the Challenged Conduct from 2012 to 2014.[253] He also adjusts my Class Period definition by coding Rice and Duke as having not participated in 2022, contrary to my definition, which assigned both Defendants as having participated during the 2022 academic year. While Dr. Hill includes this Class Period change in his section pertaining to "data processing" critiques, a change such as this is not what one would refer to as an error in "data processing." This is a legal issue as to how one is to interpret the record evidence. Counsel has instructed me to accept Dr. Hill's adjusted Class Period definition to be consistent with the record evidence that he cites.

118. Note that the changes that I make here only pertain to Dr. Hill's data-processing adjustments. In the next section, I make further corrections to Dr. Hill's adjustments pertaining to my control-variable construction, and I find that doing so further increases his conduct coefficient to a level similar to that which I showed in my Initial Report.

253. Treating Rice as having participated from 2012-2014 is conservative considering that there is record evidence that Rice left the 568 Group largely because it did not want to pay membership dues, not because of any ideological difference or limitations placed by the 568 Group. Rice continued to meet with 568 Group schools during COFHE and CNAR meetings during this period as well. *See, e.g.*, RICE_LIT0000007623; RICE_LIT0000007155; RICE_LIT0000033957; RICE_LIT0000067255.

#### v. My Updated Regressions Continue to Show a Positive and Statistically Significant Effect of the Challenged Conduct on Effective Institutional Prices Paid by Class Members

149. As explained above, I accept a number of Dr. Hill's adjustments to my data processing, and I accept a few adjustments that he makes to my control variable construction. Each adjustment that I accept is outlined in Table 5 above with a value of "Y" in the "Accept?" column. As described in Part III.A.2.c.i, many of these adjustments were the result of contradictions between Defendants' data and/or responses compared to Dr. Hill's interpretation of these data, or due to Defendants not having produced sufficient data prior to my Initial Report submission. The adjustments that Dr. Hill makes and that I accept are either due to (1) a clarification from Defendants as to the interpretation of their data; (2) additional data that should be incorporated into my analyses; or (3) corrections to minor errors in my code.

150. I find that the cumulative effect of making these adjustments is modest. In Table 6, I provide my updated regression results.[302] The updated conduct coefficient in my primary model in

302. In my workpapers, I provide revised versions of the Effective Institutional Price and institutional grant aid regression tables I provided in my Initial Report, which use the revised data adjusted to incorporate all of Dr. Hill's data processing adjustments marked as "Accepted" = "Y" outlined in Table 5. I note that columns 1-2 of my institutional grant aid regression tables no longer consistently show a negative conduct using these updated data. I also note that columns 1-3 of my Effective Institutional Price regression tables using a logarithmic functional form no longer show positive conduct coefficients. These results only pertain to my Defendant-only fixed effects regressions, but not my Defendant-student fixed effects regressions, which still produce conduct coefficients consistent with the Challenged Conduct resulting in an artificial overcharge in Effective Institutional Prices and an artificial underpayment in institutional grant aid. As I explained in my Initial Report, my primary model includes student fixed effects because these account for time-invariant, student-specific factors that might otherwise confound the relationship between the dependent variable and the conduct variable. *See* Singer Report ¶245. These results are consistent with such a concern and support my decision to rely on a specification using Defendant-student fixed effects as my primary model for determining common impact and damages. I also explain this point in Part III.A.2.g, *infra*. I also specifically use my column 6 regression, as opposed to columns 4-5 (which also include student fixed effects), because the column 6 regression not only includes student-Defendant fixed effects, but also incorporates all of the student, institution, and macroeconomic control variables detailed in my Initial Report, and thereby is most robust to any potential omitted variable bias. It also bears noting that my institutional grant aid and logarithmic Effective Institutional Price regressions are distinct from my primary model.

column 6 shows that a Defendant's participation in the Challenged Conduct results in a $1,202 artificial increase to their Effective Institutional Prices. My conduct coefficient decreases in light of the myriad adjustments that Dr. Hill proffers and that I accept, from 1,497 to 1,202; the conduct coefficient remains positive and statistically significant at a one percent significance level across all six specifications of my regression. These results are consistent with the Challenged Conduct having artificially inflated Class Members' Effective Institutional Prices relative to a but-for world absent the Challenged Conduct.[303]

---

Additionally, my Effective Institutional Price regression using a levels specification more closely matches the data-generating process than the logarithmic specification. The formulaic approach that Defendants use in their needs analysis reflects a levels relationship between independent variables and the EFC. For example, an additional family member in college generally reduces a student's FM EFC by a dollar amount, not a percentage. *See, e.g.*, *The EFC Formula, 2014-2015*, U.S. DEPARTMENT OF EDUCATION, FEDERAL STUDENT AID, https://fsapartners.ed.gov/sites/default/files/attachments/efcformulaguide/091913EFCFormulaGuide1415.pdf (last visited Oct. 2024) (showing an additional $4,820 income protection allowance for a family or four versus a family of five, with one in college); *id*. at 10 (showing a student's income assessed at 0.5 and assets assessed at 0.2).

303. In my reply workpapers, I provide the other alternative regressions that I had included in the appendices of my Initial Report. Alternative versions of my primary regression model show that the Challenged Conduct resulted in an artificial inflation in Effective Institutional Prices and an artificial suppression of institutional grant aid.

TABLE 6: UPDATED EFFECTIVE INSTITUTIONAL PRICE REGRESSION RESULTS

| | Dependent Variable: *Real Effective Institutional Price* | | | | | |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| | *No Student Fixed Effects* | | | *Includes Student Fixed Effects* | | |
| **Conduct** | **523.21***** | **524.46***** | **945.17***** | **996.44***** | **1,241.21***** | **1,201.94***** |
| | **(0.000)** | **(0.000)** | **(0.000)** | **(0.000)** | **(0.000)** | **(0.000)** |
| Adj. Gross Income | 54.54*** | 54.37*** | 54.35*** | 31.00*** | 30.84*** | 30.67*** |
| | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) |
| Net Worth | 1.61*** | 1.59*** | 1.58*** | 0.30*** | 0.29*** | 0.28*** |
| | (0.000) | (0.000) | (0.000) | (0.001) | (0.001) | (0.001) |
| Number in College | -2,845.42*** | -2,817.33*** | -2,823.26*** | -5,782.52*** | -5,770.70*** | -5,763.23*** |
| | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) |
| Year in College | 582.08*** | 551.29*** | 558.47*** | 1,483.39*** | 1,313.33*** | -987.41*** |
| | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) |
| Student's Gift Aid from Other Sources | -0.08*** | -0.08*** | -0.08*** | 0.33*** | 0.33*** | 0.32*** |
| | (0.002) | (0.003) | (0.003) | (0.000) | (0.000) | (0.000) |
| Lagged Excess Endowment Investment Returns | | 462.88*** | -262.17** | | 1,096.76*** | 1,083.26*** |
| | | (0.000) | (0.038) | | (0.000) | (0.000) |
| Inst. Tuition Rev per FTE Undergraduate (1-year lag) | | 0.05*** | 0.02*** | | 0.11*** | 0.05*** |
| | | (0.000) | (0.000) | | (0.000) | (0.000) |
| % of FY-FTE Undergrads Receiving Financial Aid | | -89.69*** | -78.41*** | | -24.59*** | -32.89*** |
| | | (0.000) | (0.000) | | (0.000) | (0.000) |
| Unemployment (1-year lag) | | | -197.44*** | | | -120.30*** |
| | | | (0.000) | | | (0.000) |
| COVID | | | 4,644.11*** | | | 3,358.89*** |
| | | | (0.000) | | | (0.000) |
| Trend | | | -152.23*** | | | 2,128.17*** |
| | | | (0.000) | | | (0.000) |
| Real GDP | | | 0.47*** | | | 0.54*** |
| | | | (0.000) | | | (0.000) |
| Observations | 701,220 | 701,220 | 701,220 | 701,220 | 701,220 | 701,220 |
| R-Squared | 0.19 | 0.19 | 0.19 | 0.87 | 0.87 | 0.87 |
| Includes Institution Fixed Effects? | Y | Y | Y | Y | Y | Y |
| Includes Institution*Student Fixed Effects? | N | N | N | Y | Y | Y |
| Number of Fixed Effects | 17 | 17 | 17 | 257,769 | 257,769 | 257,769 |

*Notes*: Robust p-values in parentheses; ***p<0.01, **p<0.05, *p<0.1. Adjusted Gross Income and Net Worth reported in thousands. These regressions are equivalent to the regressions that I provided in Table 11 of my Initial Report, but using revised data adjusted to incorporate all of Dr. Hill's data-processing adjustments marked as "Accepted" = "Y" outlined in Table 5.

#### *d. I Employ Standard Econometric Methods to Measure the Effect of the Challenged Conduct on Effective Institutional Prices on a Classwide Basis*

151. In Section 8.3 of his rebuttal report, Dr. Hill levies various misplaced criticisms regarding my choices of control variables to include in my econometric model. His arguments are irrelevant at and in direct conflict with the econometric literature. I address each in turn.

##### i. Dr. Hill Incorrectly Defines Omitted Variable Bias, Contradicting the Literature and Undermining His Critiques

152. Dr. Hill's critiques regarding my control variables focus on his claim that my results suffer from omitted variable bias. His arguments are inapposite, most importantly because *Dr. Hill*

in basic econometrics; to dispute the validity of its application, as Dr. Stiroh does, is contrary to standard economic principles.[387]

226. Dr. Stiroh claims that my in-sample prediction "is fundamentally flawed and econometrically invalid."[388] Her argument is erroneous because (1) it ignores the reality of the data and the first step of the in-sample prediction method, and (2) it is predicated on presenting a basic statistical characteristic of regression predictions as a flaw: that approximately 50 percent of observations in a regression model will be above the regression (or in-sample prediction) line, and 50 percent of observations will be below the regression line. As I demonstrate below, the in-sample prediction method is functioning correctly and provides reliable support of classwide impact.

227. My in-sample prediction analysis is based on a two-step process. First, I calculate the generalized overcharge of Effective Institutional Prices resulting from the Challenged Conduct. Second, I use in-sample prediction to measure how the generalized overcharge impacts each Class Member's Effective Institutional Prices. This approach to in-sample prediction is based upon the Federal Judicial Center's *Reference Manual on Multiple Regression*,[389] and it has been cited in several

387. *See* WOOLDRIDGE at 190 ("Sometimes, it is useful to examine individual observations to see whether the actual value of the dependent variable is above or below the predicted value; that is, to examine the residuals for the individual observations. . . . Residual analysis also plays a role in legal decisions."). *See also* Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, 3 REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 303–357, 308 (2011) [hereafter REFERENCE MANUAL].

388. Stiroh Report ¶197.

389. REFERENCE MANUAL at 308.

recent antitrust cases wherein economists have used this same in-sample prediction to demonstrate Common Impact.[390] The in-sample prediction method can be summarized as follows:[391]

> **Step 1: Specify a regression model to estimate *general* overpayments across Class members.** The coefficient on the variable of interest represents the *general* or aggregate overpayment to Defendants from Class Members during the Class Period. If the general overpayment is economically and statistically significant, proceed to step two.
>
> **Step 2: Compute the "but-for" price for each observation in the data.** This is done by using the overcharge regression to calculate estimated Effective Institutional Prices associated with each Defendant-Class Member-academic year *but-for* the Challenged Conduct. This is done by using standard regression prediction methods, after manually setting the effect of the variable of interest (i.e., the conduct variable) to zero. This simulates the price but-for the Challenged Conduct to each Class Member, based on a common econometric model.
>
> **Step 3: Compare the actual price paid to the "but-for" price.** The difference between the actual and "but-for" price is the overpayment estimate for each Class Member-academic year.

228. Dr. Stiroh's criticisms are fatally flawed because she ignores Step 1. If it were the case that Effective Institutional Prices were not artificially suppressed by the conduct, then the analysis would end there. There would be no aggregate overpayment to assess on a per-student basis. In that case, the in-sample method would not be advisable, and thus should not be used, as all it will do is demonstrate statistical noise.

229. Instead, contrary to standard practice, Dr. Stiroh begins at Step 2 with an assumed zero general artificial overcharge.[392] Under this scenario, she claims that my in-sample prediction would be expected to show 93.75 percent of Class Members impacted based on random chance

---

390. *In Re Broiler Chicken Growing Antitrust Litigation (No. II)*, 6:20-MD-02977-RJS-CMR (E.D. Ok May 8, 2024) (Memorandum Decision and Order Granting Plaintiffs' Motion for Class Certification and Denying Defendant's Motion to Exclude) [hereafter *In Re Broiler Chicken Grower* Class Certification] at 40 ("The in-sample prediction method is a standard technique used to test whether the impact of an antitrust conspiracy is widespread."); *id*. at n. 242 (citing *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods*, LLC, 31 F.4th 651, 672 (9th Cir. 2022); *In re Capacitors Antitrust Litig. (No. III)*, Case No. 17-md-02801, 2018 WL 5980139, at *7–9 (N.D. Cal. Nov. 14, 2018); *In re Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 217 (E.D. Pa. 2017); *In re Korean Ramen Antitrust Litig.*, Case No. 13-cv-04115, 2017 WL 235052, at *6 (N.D. Cal. Jan. 19, 2017); *In re Broiler Chicken*, Case No. 16-cv-8637, 2022 WL 1720468, at *10, *13 (N.D. Ill. May 27, 2022).

391. *See* n. 389, *supra*.

392. *Id*. ¶198.

her flawed Defendant-specific regressions—Caltech, Columbia, and Vanderbilt—her in-sample analysis finds significantly lower Class Member impact percentages (22 percent to 79 percent of Class Members impacted at least once). These results are consistent with the validity of my methodology in measuring Class Member impact—students subject to the Challenged Conduct are highly likely to have been impacted; students not subject to the Challenged Conduct are not likely to have been impacted.

#### b. *Dr. Stiroh's Critiques of My Price Structure Regression Methodology Are Without Merit*

239. Along with in-sample prediction, I also presented two price structure analyses in my Initial Report as evidence of widespread impact to Class Members.[399] *First*, I conducted a "common shock" analysis. This involved flagging instances in which a Defendant's average Effective Institutional Price decreased by at least five percent year-over-year in the actual world, and then analyzing whether each student income decile at said Defendant university also experienced a decrease in average Effective Institutional Prices.[400] I found that over 85 percent of income decline groups subject to the common shock also experienced a decrease in their average Effective Institutional Price.[401] *Second*, I ran price structure regressions, which involve regressing a Class Member's Effective Institutional Prices on the average Effective Institutional Prices paid by *other* Class Members.[402] I found that a Class Member's Effective Institutional Prices are highly correlated with Effective Institutional Prices paid by other Class Members.[403] As explained in my Initial Report, price structure regressions are a common and standard method for proving Common Impact in

399. Singer Report §III.B.2.
400. *Id*. ¶264.
401. *Id*. ¶265. In my reply workpapers, I provide revised results of this common shock analysis using the revised regression data that is adjusted to incorporate all of Dr. Hill's data-processing adjustments marked as "Accepted" = "Y" outlined in Table 5. I find that 90 percent of income decile groups subject to the common shock also experienced a decrease in their average Effective Institutional Price.
402. *Id*. ¶266.
403. *Id*. ¶267; *id*. Table 14.

Institutional Price is not relevant to this analysis—that is what my in-sample prediction and price structure regressions are for.

242. Dr. Stiroh also argues that what I define as common shocks do not inform whether Class Members would pay lower prices in a but-for world.[407] I disagree. I define a common shock as being a five percent reduction in a Defendant's average Effective Institutional Price. Contrary to Dr. Stiroh's claim, this is one of the most directly informative scenarios for determining whether Class Members would pay lower Effective Institutional Prices in a but-for world. A removal of the Challenged Conduct would be expected to result in a non-trivial reduction (i.e., "shock") in Effective Institutional Prices as shown by my overcharge regressions. My common-shock analysis analyzes this same scenario using instances where there was a common and non-trivial Effective Institutional Price reduction.

243. Dr. Stiroh asserts that my price structure regressions, which showed that changes in Effective Institutional Prices are highly correlated, provide no insight as to whether all or nearly all Class Members were impacted.[408] Dr. Stiroh illustrates a hypothetical example where market-wide factors cause prices for all customers to increase by two percent over time, but prices for only a subset of customers increase by ten percent due to an additional overcharge.[409] She asserts that my methodology is insufficient to establish impact because it would report a price correlation between both groups, even though only one group was subject to an overcharge.[410]

244. Dr. Stiroh's example ignores how my price structure regressions function. I included

---

407. *Id*. ¶205.

408. *Id*. ¶203. In my reply workpapers, I provide revised results of my price structure regressions using the revised regression data that is adjusted to incorporate all of Dr. Hill's data-processing adjustments marked as "Accepted" = "Y" outlined in Table 5. I continue to find a high degree of correlation between a Class Member's Effective Institutional Price and the average Effective Institutional Prices of their peers, consistent with a pricing structure.

409. *Id*. ¶204.

410. *Id*. ¶204.

percent of cross-admitted students.[539] He then argues that the average EFC spread among cross-admitted students is between $15,400 and $26,600 depending on the number of Defendant schools which admitted the student.[540] Dr. Hill discusses these points as if he expected that the EFCs should match perfectly for all students across all Defendants. Variations in EFCs are to be expected, however, and do not provide evidence inconsistent with the alleged conspiracy.

304. Variation of EFCs across Defendants, even for the same student, is to be expected. There is no requirement for the EFCs to be the same across all cross-admitted students for the alleged conspiracy to be effective. What matters is whether the Challenged Conduct restricted competition such that it reduced the variance in EFCs for cross-admitted students and whether there is a common set of factors, which translates into harm across all or almost all Class Members. I demonstrate this impact with my cross-admit regression analysis in TABLE 2 and TABLE 3 above, by showing that the EFCs and the resulting Effective Institutional Prices are closer together when Defendants are in the 568 Group compared to when they are not. Furthermore, my EFC regressions in Table 1 show that the Challenged Conduct is associated with a statistically significant overall increase in EFC values.

305. Additionally, Dr. Hill's test of the EFC spread for cross-admitted students emphasizes the percentage of students whose EFCs vary. He does not show, however, the distribution of these variations. Looking at the absolute value, just under 30 percent of cross-admitted students had EFCs that were within $2,500, 69.1 percent had EFCs within $10,000, and 91.9 percent had EFCs within $30,000 of each other.[541]

539. Hill Report ¶101, Figure 14.
540. *Id.* ¶102, Figure 15.
541. *See* my workpapers for details.

## Peer School Financial Aid: Initiatives

1. February 1998: **Princeton** announces elimination or reduction of loan based on family income and elimination of home equity in the need analysis for low income families.

2. March 1998: **Brown** announces loan reduction based on family income.

3. March 1998: **MIT** announces substantial reduction of loan for both typical and low-income students.

4. March 1998: **Penn** announces loan elimination for certain students selected by admissions (Trustees Scholars and Mayors Scholars).

5. Fall 1998: **Cornell** Tradition grants increased by $1,000.

6. September 1998: **Harvard** announces $2,000 reduction in self help for all students.

7. October 1998: **Dartmouth** announces elimination or reduction of loan based on family income.

8. Spring 1998: **MIT** reduces self help and increases scholarships by $1,000 for Pell Grant recipients.

9. Spring 1999: **Stanford** earmarks $500,000 to target low-income students and Presidential Scholars.

10. Spring 1999: **Penn** announces loan elimination for an increased number of students selected by admissions (adding Leadership scholars to the pre-existing Trustees and Mayors Scholars).

11. January 2001: **Princeton** announces elimination of all loans. Reduces percentage of student assets from 35% to 5%. Eliminates home equity and gives $140,000 allowance against assets for renters.

12. February 2001: **Harvard** announces $2,000 reduction in self help.

13. March 2001: **MIT** announces $2,000 reduction in self help.

14. April 2001: **Dartmouth** announces $1,225-$1,500 loan reduction.

15. September 2001: **Yale** announces self help reduction (to $3,900).

16. Spring 2002: **Brown** announces elimination of work study from first-year packages.

17. February 2004: **Harvard** announces elimination of Parent Contribution for families earning less than $45,000 per year, as well as reduction of PC for families earning between $45,000 and $60,000 per year.

18. March 2005: **Yale** announces elimination of Parent Contribution for families earning less than $45,000 per year. Reduction of PC for families earning between $45,000 and $60,000

per year.

19. Spring 2005: **Brown** announces additional funding for (no loan) Frank Scholars Program.

20. Spring 2006: **MIT** announces Pell Grant Initiative which further reduces self help for low income students.

21. March 2006: **Penn** announces loan elimination for students from families earning less than $50,000 per year.

22. March 2006: **Stanford** announces elimination of Parent Contribution for families earning less than $45,000 per year. Reduction of PC for families earning between $45,000 and $60,000 per year.

23. March 2006: **Harvard** announces elimination of Parent Contribution for families earning less than $60,000 per year.

24. September 2006: **Columbia** announces they will eliminate loans for families with incomes less than $50,000.

25. February 2007: **Stanford** announces they will reduce loan expectations from $3,500 to $2,000. Announced they would cap home equity at 1.5 times income.

26. March 2007: **Penn** announces that they will eliminate loans for families with incomes less than $60,000.

27. May 2007: **University of Chicago** announces that they will eliminate loans for families with incomes less than $60,000 and for families with incomes between $60,000 and $75,000 the loan amounts will be cut in half.

28. July 2007: **Amherst** announces the elimination of all loans from financial aid packages for all students.

29. Fall 2007: **Haverford** announces that all incoming students will receive a package without loans and that they will be reducing the loan expectation for continuing students.

30. November 1, 2007: **Williams** announces they will eliminate loans from financial aid packages for all students.

31. November 5, 2007: **Wesleyan** announces they will eliminate loans for families with incomes less than $40,000. For families with incomes above $40,000 the loan expectation will be reduced by 35%.

32. December 8, 2007: **Duke** announces $0 PC for families with incomes less than $60,000 per year. No loans for families with incomes below $40,000, lower loan levels for students with family incomes between $40,000 and $100,000 per year, families with incomes over $100,000 will have their loans capped at $5,000 per year.

33. December 10, 2007: **Harvard** announces three initiatives. "Zero to 10%:" Families with incomes between $120,000 and $180,000 per year will have a parent contribution equal to pay 10% of their income, and decline steadily for families with incomes less than $120,000 until a zero contribution for $60,000 is reached. No loans for all students. Eliminate home equity from need analysis.

34. December 12, 2007: **Pomona** announces they will eliminate loans from financial aid packages for all students.

35. December 13, 2007: **Swarthmore** announces they will eliminate loans from financial aid packages for all students.

36. December 17, 2007: **Penn** announces that for the 2008-2009 academic year they will eliminate loans for all students with incomes less than $100,000, and a 10% reduction in loans for families with incomes above $100,000. For the 2009-2010 academic year they will eliminate loans for all students.

37. December 19, 2007: **Tufts** announces they will eliminate loans for families with incomes less than $40,000 per year.

38. January 14, 2008: **Yale** announces they will eliminate loans from financial aid packages for all students and reducing self help expectation from $4,400 to $2,500. Families with incomes less than $60,000 will have a $0 parent contribution. For families with incomes from $60,000 to $120,000 families will have a parent contribution between 1-10% of their total income. For families with incomes from $120,000 to $200,000 families will have a parent contribution averaged at 10% of their total income. In addition, they will ignore the first $200,000 of the family's assets.

39. January 18, 2008: **Bowdoin** announces they will eliminate loans from financial aid packages for all students.

40. January 19, 2008: **Colby** announces they will eliminate loans from financial aid packages for all students.

41. January 22, 2008: **Dartmouth** announces they will eliminate loans from financial aid packages for all students. Families with incomes less than $75,000 will have a $0 parent contribution. Need Blind for all students, including foreign students. No summer savings expectation for students in their junior year.

42. January 31, 2008: **Cornell** announces they will eliminate loans for students with family incomes less than $75,000 in a two year process. For 2008-2009 loans will be eliminated for families under $60,000, and for 2009-2010 this will be extended to families with incomes less than $75,000. For families with incomes up to $120,000 the annual loan amount will be capped at $3,000.

43. January 31, 2008: **Northwestern** announces they will eliminate loans for their neediest students and will be based on parent contribution rather than family income, but 80% of recipients will come from families with incomes less than $55,000. For the remaining students the total four year borrowing will be capped at $20,000.

44. February 7, 2008: **Wellesley** announces that they will eliminate loans for families with incomes less than $60,000. For students with incomes between $60,000 and $100,000 the four-year loan debt will be capped at $8,600. For the remaining students the four-year loan debt will be capped at $12,825.

45. February 20, 2008: **Stanford** announces that they will eliminate loans from financial aid packages for all students. Families with incomes less than $60,000 will have a $0 parent contribution. For families with incomes between $60,000 to $100,000 they will have free tuition, but may have a contribution towards room and board (PC cap at 10% of income). Other enhancements for all students at all income levels, but does not say what and how much.

46. February 21, 2008: **Washington University** announces that they will eliminate loans for families with incomes less than $60,000.

47. February 23, 2008: **Brown** announces that they will eliminate loans for families with incomes less than $100,000. For families with incomes from $100,000 to $125,000 the four year loan debt will be $12,000. Families with incomes from $125,000 to $150,000 the four year loan debt will be $16,000, and families with incomes above $150,000 the four year loan debt will be $20,000. In addition, families with incomes below $60,000 will have a $0 parent contribution.

48. March 7, 2008: **MIT** announces they will eliminate loans for families with incomes less than $75,000. Families with incomes below $75,000 will receive free tuition. Families with incomes below $100,000 they will not use home equity as part of PC calculation. Reduce work study requirement for all students.

49. March 11, 2008: **Columbia** announces no loans for all financial aid students. $0 PC for families with incomes under $60,000, and PC reductions for families with incomes between $60,000 and $100,000.

50. March 11, 2008: **Vassar** announces no loans for families with incomes below $60,000.

51. March 17, 2008: **Claremont-McKenna** announces they will eliminate loans from financial aid packages for all students.

**ATTORNEYS' EYES ONLY – SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS individually and on behalf of all others similarly situated,

*Plaintiffs*,

v.

BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,

*Defendants.*

Case No. 22-cv-00125

# SURREBUTTAL EXPERT REPORT OF LAUREN J. STIROH, PH.D.

**November 1, 2024**

have benefitted. Moreover, even if EFC calculations were closer together, the data Dr. Singer uses for this regression show that, on average, EFCs still differed by an average of $14,476 when both Defendant schools were in the 568 Group.[32]

### B. Dr. Singer's New "Harmed on Net" Analysis Reveals That His In-Sample Prediction Methodology Is Fatally Flawed

15. Dr. Singer presents a new result using what he describes as a "harmed on net" methodology to purportedly demonstrate common impact.[33] This methodology is tied to Dr. Singer's in-sample prediction analysis, in which he purports to be able to measure a specific overcharge for each individual proposed Class member – academic year observation.[34] In Dr. Singer's "harmed on net" analysis, he sums these purported individual overcharges for each proposed Class member across all of their academic years in the Class Period to purportedly obtain a measure of "net harm" for each proposed Class member.[35] He claims that the results of this analysis demonstrate common impact and that his results are not mechanical, *i.e.*, are not the result of his model being mathematically rigged to deliver only one possible outcome.[36] However, Dr. Singer's new analysis only demonstrates that his methodology is fundamentally incapable of assessing whether individual proposed Class members were harmed by the Challenged Conduct.

16. Dr. Singer's new analysis does not address the fundamental flaw with his approach that I pointed out in the Stiroh Initial Report – that the statistical analysis employed by Dr. Singer imposes, rather than tests for, common impact.[37] His new methodology is inextricably linked to his flawed overcharge regression and thus suffers from the same flaws. For instance, as I demonstrate below, Dr. Singer's methodology cannot identify unharmed proposed Class members. Dr. Singer's new "harmed on net" analysis and the results he obtains from it confirm this.

17. That Dr. Singer imposes, rather than tests for, common impact is illustrated by the fact that his methodology mechanically returns a finding that *every* proposed Class member who only attended a Defendant school during the period when their school was a member of the 568 Group was "harmed on net" by exactly his generalized overcharge estimate of

---

[32] For context, the average yearly real EFC for each Defendant during its Conduct Period ranges from $23,637 at Yale to $34,452 at Rice. Similarly, EIPs differed by $17,939 on average when both Defendant schools were in the 568 Group. Hill turnover materials (Student school-pairs dataset); Singer reply turnover materials (EFC Regression Data); Singer Reply Report, Table 2.

[33] Singer Reply Report, ¶¶ 234-235.

[34] Expert Report of Hal J. Singer, Ph.D. (Errata II Updated), *Henry, et al. v. Brown University, et al.*, Case No. 1:22-cv-00125, United States District Court, Northern District of Illinois, Eastern Division, June 10, 2024 ("Singer Amended Report"), ¶ 255; Singer Reply Report, ¶¶ 224-225.

[35] Singer Reply Report, ¶ 234.

[36] Singer Reply Report, ¶ 235.

[37] Stiroh Initial Report, ¶ 164.

$1,202 multiplied by the number of years of data for the proposed Class member.[38] For example, there are 921 proposed Class members who attended Cornell from 2010 through 2013, all years in which Cornell was a member of the 568 Group.[39] Dr. Singer's methodology mechanically returns a finding that all 921 of these students were "harmed on net" by exactly $1,202 (his generalized overcharge estimate) times four.[40] Thus, Dr. Singer's analysis of "harmed on net" is not a finding of class-wide harm but rather a mechanical outcome of his model.[41] All students are assigned an identical overcharge regardless of individual characteristics. This is wholly implausible given that actual total need-based aid varied for these students from $8,615 to $285,398.[42]

18. Almost 85 percent of all proposed Class member/school combinations have been assigned an identical overcharge of $1,202 per year of attendance by Dr. Singer's methodology.[43] That is because that same 85 percent of the proposed Class member/school combinations only have observations at Defendant schools while those schools were in the 568 Group and no observations in Dr. Singer's benchmark periods.[44] This result is completely disconnected from the economics of the situation. For these 85 percent of student/school combinations to be injured by exactly the same amount, Defendants would have all had to make the same modifications to their needs analyses and packaging decisions, and these modifications, regardless of each student's idiosyncratic financial and personal circumstances, must have affected EFC calculations, aid packaging, and EIPs completely identically. As discussed in Sections IV and V of the Stiroh Initial Report, this is implausible.

19. As demonstrated in **Figure S3.4** below, for every single one of these proposed Class members that Dr. Singer says is "impacted," Dr. Singer's "harmed on net" methodology finds that the proposed Class member was overcharged on net by exactly $1,202 times the number of years they appear in the data.[45] To the extent that any individual proposed Class members were not impacted by the Challenged Conduct, Dr. Singer's methodology is mathematically incapable of identifying them, as I detail below.

---

[38] Such students do not have data observations that fall into the periods Dr. Singer defines as the benchmark periods for his overcharge analysis. While the results of Dr. Singer's analysis for such students clearly illustrate an issue with Dr. Singer's methodology, it remains that this methodology does not return meaningful results for proposed Class members with benchmark observations, either, for the reasons I explain in the Stiroh Initial Report. Singer Amended Report, ¶¶ 217, 281; Singer Reply Report, ¶¶ 57, 71, 211, 227, Table 6; Stiroh Initial Report, ¶¶ 197-202, Appendix 1.

[39] These are students who began at Cornell in 2010 and left in 2013 and have no other observations outside of those four years. Singer reply turnover materials (Singer Updated Regression Data).

[40] *See* Singer reply turnover materials (Singer Updated Regression Data).

[41] *See* **Figure 3.6**.

[42] Singer reply turnover materials (Singer Updated Regression Data).

[43] Singer reply turnover materials (Singer Updated Regression Data).

[44] Singer reply turnover materials (Singer Updated Regression Data).

[45] There are 35 proposed Class members for whom Dr. Singer predicts would have paid negative EIPs in the but-for world in at least one year. Dr. Singer drops these observations from his "harmed on net" analysis. Other than these 35 proposed Class members, every proposed Class member without benchmark observations is flagged by Dr. Singer as "impacted" according to both his "impacted at least once" criteria and his "harmed on net" criteria. Singer reply turnover materials (Singer Updated Regression Data).

**Figure S3.4: "Net Overcharges" for Proposed Class Members Without Benchmark Observations According to Dr. Singer's New "Harmed on Net" Methodology[46]**

| Years Attended School | Class Members | Class Members "Impacted" | Class Members "Impacted" by Exactly $1,202 times Years Attended School |
|---|---|---|---|
| | (Count) | | |
| (a) | (b) | (c) | (d) |
| 1 | 45,030 | 45,030 | 45,030 |
| 2 | 24,568 | 24,561 | 24,561 |
| 3 | 27,486 | 27,468 | 27,468 |
| 4 | 71,136 | 71,126 | 71,126 |

20. The fundamental shortcomings of Dr. Singer's methodology for demonstrating common impact are also illustrated by his purported findings for proposed Class members at Dartmouth and Emory. Dartmouth and Emory only produced data that cover each student's first academic year. For proposed Class members at Dartmouth and Emory with one observation in the data, Dr. Singer's methodology "finds" that every single one of these proposed Class members was impacted by the Challenged Conduct and, moreover, that all were "harmed on net" by exactly the same amount as his generalized overcharge estimate.[47] Dr. Singer's methodology is incapable of identifying any proposed Class members at Dartmouth and Emory who were not impacted by the Challenged Conduct.

**Figure S3.5: Results of Dr. Singer's "Harmed on Net" Methodology for Proposed Class Members With One Observation at Dartmouth or Emory[48]**

| Defendant | Class Members | Class Members "Impacted" | Class Members "Impacted" by Exactly $1,202 | Percent "Impacted" | Percent "Impacted" by Exactly $1,202 |
|---|---|---|---|---|---|
| | | (Count) | | (Percent) | |
| (a) | (b) | (c) | (d) | (e) | (f) |
| Dartmouth | 7,724 | 7,724 | 7,724 | 100 % | 100 % |
| Emory | 5,550 | 5,550 | 5,550 | 100 | 100 |

21. In fact, the findings presented above are not surprising given that they are a mathematical result of Dr. Singer's methodology and model. As I discussed in Appendix 1 of the Stiroh Initial Report, Dr. Singer's purported "overcharge" for each observation is equal to the sum of the residual from his regression model and the generalized overcharge estimate.[49] Through the inclusion of student-school fixed effects and the mathematics of

---

46 In this figure, "Years Attended School" refers to the number of years for which there are data for each proposed Class member/school combination. Singer reply turnover materials (Singer Updated Regression Data).

47 There are two proposed Class members at Dartmouth and three proposed Class members at Emory who appear in multiple years in the data. Dr. Singer's methodology flags all five as impacted and finds that all five were "harmed on net" by exactly $2,404. *See* Singer reply turnover materials (Singer Updated Regression Data).

48 Singer reply turnover materials (Singer Updated Regression Data).

49 Stiroh Initial Report, Appendix 1.

fixed effects in a linear regression, Dr. Singer's model imposes that the sum of residuals for each student's observations is equal to zero.[50] This has two implications.

i. Every proposed Class member for whom there are only observations in the Conduct Period is mathematically guaranteed to have at least one observation flagged as "impacted" because for the residuals to sum to zero, at least one individual residual must be positive and at least one must be negative. Over 85 percent of proposed Class member/school combinations fall into this category.[51] By construction, if any of these proposed Class members were not impacted by the Challenged Conduct, Dr. Singer's model is mathematically incapable of identifying these proposed Class members.

ii. For all of these proposed Class members, Dr. Singer purports to find that they are "harmed on net" by exactly his overcharge coefficient estimate times the number of years the proposed Class member appears in the data.

22. **Figure S3.6** presents an example from the data that demonstrates how Dr. Singer's model and methodology mathematically guarantees his conclusion (*i.e.*, it is mechanical). The figure presents findings from Dr. Singer's methodology for a student who attended Cornell from 2018 through 2021, all years in which Cornell was a member of the 568 Group. Column (d) presents the actual EIPs paid by the student in each year while column (f) presents Dr. Singer's predictions of what the student would have paid but for the Challenged Conduct. Column (g) presents the estimated residual for each observation from Dr. Singer's main regression specification, which is the difference between the actual EIP paid by the student and the fitted value that comes from Dr. Singer's full regression model, including his conduct coefficient.[52] Column (i) presents Dr. Singer's estimate of overcharge for each individual observation for this student, which is simply equal to the sum of the estimated residual from column (g) and his generalized overcharge estimate recorded in column (h).

23. In his "harmed on net" analysis, Dr. Singer sums the four values in column (i) to obtain a "net harm" estimate of $4,808, which is equal to four times $1,202. Because the observation-specific overcharge estimates in column (i) are themselves obtained by summing up the values from column (g) and column (h), the sum of the values from column (i) will be mathematically identical to the sum of all the values in columns (g) and (h). By construction, the estimated residuals in column (g) will sum to zero.[53] As such, Dr. Singer's methodology imposes that such a proposed Class member (*i.e.* one

50 William H. Greene, *Econometric Analysis* (8th Edition) (New York: Pearson, 2018) ("Greene (2018)"), p. 33.

51 Singer reply turnover materials (Singer Updated Regression Data).

52 The fitted value for each observation from Dr. Singer's regression model can be expressed as the but-for EIP plus his generalized overcharge estimate. Jeffrey M. Wooldridge, Introductory Econometrics: A Modern Approach (7th Edition) (Boston: Cengage, 2020), pp. 27-28.

53 This is a consequence of the model Dr. Singer has chosen to employ in this context, which includes student and school fixed effects. Greene (2018), p. 33. Note that when applying Dr. Singer's "harmed on net" analysis to his EIP specification that uses only school fixed effects, rather than school and student fixed effects (*i.e.*, specification (3) instead of specification (6)), only 50 percent of proposed Class members are flagged as "harmed". Singer reply turnover materials (Singer Updated Regression Data); Singer Reply Report, Table 6.

with observations in only the Conduct Period) is "impacted" and is "harmed on net" by precisely his generalized overcharge estimate times the number of years the proposed Class member appears in the data.[54] Because this framework is set up to guarantee only one outcome, it cannot establish common impact.

24. The wide range of overcharges for the same student across years in column (i) of **Figure S3.6** also illustrates that this methodology is flawed. According to Dr. Singer's methodology, this student was purportedly harmed by more than $4,000 in the 2019 academic year, benefitted from the alleged conspiracy by over $9,000 in the 2020 academic year, and was harmed by almost $9,000 in the 2021 academic year. And yet, under Dr. Singer's model this student was still allegedly harmed in total by exactly the generalized overcharge estimate times the four years for which they were allegedly part of the proposed Class.

**Figure S3.6: Example of Outcomes from Dr. Singer's Supposed In-Sample Prediction and "Harmed on Net" Methodology[55]**

| UID | School | Academic Year | Actual EIP | Fitted EIP | "But-For" EIP | Residual | Generalized Overcharge Estimate | Observation-Specific Overcharge |
|---|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f)<br>(e) - (h) | (g)<br>(d) - (e) | (h) | (i)<br>(g) + (h) |
| UID_0000000004463 | Cornell | 2018 | $ 14,130 | $ 14,050 | $ 12,848 | 80 | $ 1,202 | $ 1,282 |
| UID_0000000004463 | Cornell | 2019 | 19,531 | 16,703 | 15,501 | 2,828 | 1,202 | 4,030 |
| UID_0000000004463 | Cornell | 2020 | 7,739 | 18,428 | 17,226 | -10,689 | 1,202 | -9,487 |
| UID_0000000004463 | Cornell | 2021 | 25,322 | 17,541 | 16,339 | 7,781 | 1,202 | 8,983 |
| | | | | | **Total:** | **0** | **4,808** | **4,808** |

25. This is not a one-off example. While it is to be expected that positive and negative residuals would offset each other, it stands out that in some years, Dr. Singer's estimated residuals are many times bigger than his estimated annual overcharge. For example, 26 percent of proposed Class members were overcharged by more than $5,000 in at least one year and undercharged by more than $5,000 in at least one other year, *i.e.*, both a single year overcharge and undercharge of more than the total amount by which any Class member is estimated to be injured if they attended a school for four years, all of which were during the Conduct Period.[56] The fact that Dr. Singer's model shows such swings in overcharges year to year—with the same student supposedly being harmed by the conspiracy in one year by thousands of dollars only to benefit from it the next by thousands of dollars, with no apparent change to the nature of the conspiracy—shows the unreliability of his methodology.

54 The "net harmed" amount for this student and all students that have four observations in the class period and none in the benchmark equals $4,808, or $1,202×4, as shown in **Figure S3.4**.

55 Singer reply turnover materials (Singer Updated Regression Data).

56 Singer reply turnover materials (Singer Updated Regression Data).

EIP specifications.[73] These Defendant schools account for approximately 49 percent of Dr. Singer's Class observations.[74]

32. Similarly, Dr. Singer's model with institution and student fixed effects, after allowing the estimated effect of the Challenged Conduct to vary by Defendant school, does not demonstrate harm to Class members that attended Defendant schools Brown, Caltech, Columbia, Georgetown, Notre Dame, Penn, and Vanderbilt, in the specification that Dr. Singer uses for his damages calculation.[75] These Defendant schools account for approximately 47 percent of Dr. Singer's Class observations.[76] The numbers presented in **Figure S4.2** and **Figure S4.3** are similar to those in Figures 7.2 and 7.3 from the Stiroh Initial Report and any changes do not alter my overall opinions.

---

73 This is shown by a negative, or statistically insignificant, conduct coefficient in **Figure S4.2**.

74 Class observation refers to the number of unique student, school and academic year observations in the revised data that were produced by Dr. Singer and purportedly used for his own analyses, without any modifications. *See* Singer reply turnover materials (Singer Updated Regression Data).

75 This is shown by a negative, or a statistically insignificant, conduct coefficient in column (d) of **Figure S4.3**.

In addition to the Defendant schools listed above, Dr. Singer's student and institution fixed effects specifications do not demonstrate harm to proposed Class members that attended Johns Hopkins in at least one of Dr. Singer's other EIP and log EIP specifications.

76 Class observation refers to the number of unique student, school and academic year observations in the revised data that were produced by Dr. Singer and purportedly used for his own analyses, without any modifications. *See* Singer reply turnover materials (Singer Updated Regression Data).

These Defendant schools account for approximately 48 percent of Dr. Singer's Class observations when Johns Hopkins is included.

ATTORNEYS' EYES ONLY – SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

## Figure S4.2: School Specific Regression Conduct Coefficients, Including School Fixed Effects[77]

| | Level | | | Log | | |
|---|---|---|---|---|---|---|
| **Defendant** | **Base Regression** | **Base Regression and Institutional Level Control Variables** | **Base Regression, Institutional Level, and Macroeconomic Control Variables** | **Base Regression** | **Base Regression and Institutional Level Control Variables** | **Base Regression, Institutional Level, and Macroeconomic Control Variables** |
| **(a)** | **(b)** | **(c)** | **(d)** | **(e)** | **(f)** | **(g)** |
| Brown | -1,283 *** | -193 | 448 ** | -0.017 *** | -0.013 ** | -0.025 *** |
| Caltech | 64 | 457 | -1,390 * | -0.042 * | -0.045 * | -0.029 |
| Chicago | 2,591 *** | 2,056 *** | 2,545 *** | 0.024 *** | 0.014 *** | 0.098 *** |
| Columbia | -3,236 *** | -5,935 *** | -4,454 *** | -0.166 *** | -0.126 *** | -0.089 *** |
| Cornell | 2,618 *** | 3,093 *** | 3,308 *** | 0.163 *** | 0.170 *** | 0.110 *** |
| Dartmouth | -1,116 *** | -1,532 *** | -1,229 *** | -0.146 *** | -0.133 *** | -0.071 *** |
| Duke | 4,960 *** | 4,820 *** | 5,093 *** | 0.060 *** | 0.078 *** | 0.098 *** |
| Emory | 1,993 *** | 2,988 *** | 3,442 *** | 0.083 *** | 0.094 *** | 0.052 *** |
| Georgetown | -5,773 *** | -5,152 *** | -5,075 *** | -0.166 *** | -0.159 *** | -0.229 *** |
| Johns Hopkins | -4,365 *** | -5,415 *** | -4,757 *** | -0.165 *** | -0.159 *** | -0.138 *** |
| MIT | 5,486 *** | 6,122 *** | 6,144 *** | 0.212 *** | 0.186 *** | 0.141 *** |
| Northwestern | 1,995 *** | 1,708 *** | 2,196 *** | 0.009 ** | 0.037 *** | 0.075 *** |
| Notre Dame | 2,453 *** | 2,873 *** | 3,175 *** | -0.012 | -0.019 | -0.092 *** |
| Penn | -1,524 *** | -1,315 *** | -424 *** | -0.118 *** | -0.127 *** | -0.083 *** |
| Rice | 1,731 *** | 2,100 *** | 1,771 *** | 0.083 *** | 0.098 *** | 0.077 *** |
| Vanderbilt | -497 * | -450 * | -305 | 0.024 *** | 0.004 | -0.039 *** |
| Yale | 2,808 *** | 2,791 *** | 2,071 *** | 0.069 *** | 0.101 *** | 0.053 *** |

[77] Asterisks indicate statistical significance at different significance levels: *** <0.01 means statistical significance at the one percent level; ** <0.05 at the five percent level; and *<0.10 at the 10 percent level. The dependent variables used are EIP and log EIP, respectively. *See* Singer reply turnover materials (Singer Updated Regression Data).

Columns (b) through (d) report the Defendant-specific conduct coefficients, using EIP specifications (1) through (3) of Dr. Singer's model, respectively (*see* Singer Reply Report, Table 6). Columns (e) through (g) report the Defendant-specific conduct coefficients, using log EIP specifications (1) through (3) of Dr. Singer's model, respectively. *See* Singer Amended Report, Appendix 4 Table 2.

**ATTORNEYS' EYES ONLY – SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)**

## Figure S4.3: School Specific Regression Conduct Coefficients, Including School and Student Fixed Effects[78]

| | Level | | | Log | | |
|---|---|---|---|---|---|---|
| Defendant | Base Regression | Base Regression and Institutional Level Control Variables | Base Regression, Institutional Level, and Macroeconomic Control Variables | Base Regression | Base Regression and Institutional Level Control Variables | Base Regression, Institutional Level, and Macroeconomic Control Variables |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) |
| Brown | -386 | -119 | -8 | -0.026 *** | -0.009 | -0.007 |
| Caltech | 352 | 1,306 | -1,293 | 0.013 | 0.057 ** | -0.014 |
| Chicago | 356 ** | 500 *** | 634 *** | 0.010 ** | 0.010 ** | 0.012 *** |
| Columbia | -204 | -266 | 40 | 0.007 | 0.003 | 0.004 |
| Cornell | 4,380 *** | 4,072 *** | 3,834 *** | 0.109 *** | 0.102 *** | 0.095 *** |
| Dartmouth | N/A | N/A | N/A | N/A | N/A | N/A |
| Duke | 3,458 *** | 3,878 *** | 3,506 *** | 0.070 *** | 0.078 *** | 0.068 *** |
| Emory | N/A | N/A | N/A | N/A | N/A | N/A |
| Georgetown | -29 | -37 | -513 | -0.007 | -0.004 | -0.016 |
| Johns Hopkins | 1,099 *** | -101 | 1,040 *** | 0.043 *** | 0.021 ** | 0.039 *** |
| MIT | 5,312 *** | 4,642 *** | 4,656 *** | 0.165 *** | 0.148 *** | 0.147 *** |
| Northwestern | 1,411 *** | 1,610 *** | 1,839 *** | 0.032 *** | 0.027 *** | 0.029 *** |
| Notre Dame | -1,062 | -1,626 | -1,272 | -0.023 | -0.047 | -0.034 |
| Penn | -1,490 *** | -290 * | 24 | -0.054 *** | -0.026 *** | -0.016 *** |
| Rice | 1,605 *** | 1,570 *** | 1,380 *** | 0.060 *** | 0.060 *** | 0.055 *** |
| Vanderbilt | 514 * | 693 ** | -727 ** | 0.029 *** | 0.036 *** | -0.001 |
| Yale | 2,467 *** | 2,509 *** | 2,320 *** | 0.088 *** | 0.080 *** | 0.074 *** |

33. **Figures S4.4** presents updated results of Figure 7.4 from the Stiroh Initial Report using Dr. Singer's revised data. A negative or statistically insignificant period-specific conduct coefficient shows that Dr. Singer's regression model does not estimate an increase in EIP during the Class Period for proposed Class members who attended Defendant schools within that specific time period.[79] In Dr. Singer's institution fixed effects specifications, 2008–2014 has a negative or insignificant conduct coefficient in all of Dr. Singer's EIP and log EIP specifications. These years account for 41 percent of Dr. Singer's Class observations.[80] In Dr. Singer's institution and student fixed effects specifications, the measured effect of the Challenged Conduct is negative or insignificant across all of his

78 Asterisks indicate statistical significance at different significance levels: *** <0.01 means statistical significance at the one percent level; ** <0.05 at the five percent level; and *<0.10 at the 10 percent level. The dependent variables used are EIP and log EIP, respectively. *See* Singer reply turnover materials (Singer Updated Regression Data).

Columns (b) through (d) report the Defendant-specific conduct coefficients, using EIP specifications (4) through (6) of Dr. Singer's model, respectively (*see* Singer Reply Report, Table 6). Columns (e) through (g) report the Defendant-specific conduct coefficients, using log EIP specifications (4) through (6) of Dr. Singer's model, respectively. *See* Singer Amended Report, Appendix 4 Table 2.

79 Stiroh Initial Report, ¶ 180.

80 Class observation refers to the number of unique student, school and academic year observations in the revised data that were produced by Dr. Singer and purportedly used for his own analyses, without any modifications. *See* Singer reply turnover materials (Singer Updated Regression Data).

EIP and log EIP specifications for 2008–2014 and 2015–2019.[81] These years account for 68 percent of Dr. Singer's Class observations.[82]

### Figure S4.4: Regression Conduct Coefficients Using Dr. Singer's Model and Allowing the Conduct Coefficients to Vary Over Time[83]

| | Linear | | | Log | | |
|---|---|---|---|---|---|---|
| Time Period | Base Regression | Base Regression and Institutional Level Control Variables | Base Regression, Institutional Level, and Macroeconomic Control Variables | Base Regression | Base Regression and Institutional Level Control Variables | Base Regression, Institutional Level, and Macroeconomic Control Variables |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) |
| **Includes Institution Fixed Effects** | | | | | | |
| 2003-2007 | 337 *** | 379 *** | 444 *** | 0.030 *** | 0.015 *** | -0.015 *** |
| 2008-2014 | -666 *** | -574 *** | -101 | -0.047 *** | -0.044 *** | -0.032 *** |
| 2015-2019 | 1,840 *** | 1,746 *** | 2,289 *** | -0.005 ** | 0.016 *** | 0.048 *** |
| 2020-2022 | 2,684 *** | 2,700 *** | 1,415 *** | -0.013 *** | 0.022 *** | 0.030 *** |
| **Includes Institution and Student Fixed Effects** | | | | | | |
| 2003-2007 | 1,675 *** | 1,857 *** | 1,931 *** | 0.047 *** | 0.045 *** | 0.041 *** |
| 2008-2014 | -1,037 *** | -932 *** | -780 *** | -0.035 *** | -0.026 *** | -0.021 *** |
| 2015-2019 | -1,592 *** | -629 *** | -114 | -0.041 *** | -0.016 *** | -0.001 |
| 2020-2022 | 2,967 *** | 2,786 *** | 2,071 *** | 0.087 *** | 0.082 *** | 0.065 *** |

34. **Figure S4.5** presents updated results from Figure 7.6 of the Stiroh Initial Report using Dr. Singer's revised data. Modifying Dr. Singer's benchmark classification to reflect the Complaint's allegation that the Challenged Conduct was in place through at least February 2023 (including for Defendants who formally left the 568 Group) yields a result where the conduct coefficient is negative in all of Dr. Singer's institution fixed effects EIP and log EIP specifications, and decreases in all of Dr. Singer's institution and student fixed effects EIP and log EIP specifications.[84] This result is similar to that of Figure 7.6 in the Stiroh Initial Report and any changes do not alter my overall opinion.

---

81 The measured effect of the Challenged Conduct was also negative or insignificant across all of Dr. Singer's EIP and log EIP specifications with institution and student fixed effects for 2008–2014 and 2015–2019 prior to Dr. Singer updating his data, as shown in Figure 7.4 of the Stiroh Initial Report.

82 Class observation refers to the number of unique student, school and academic year observations in the revised data that were produced by Dr. Singer and purportedly used for his own analyses, without any modifications. *See* Singer reply turnover materials (Singer Updated Regression Data).

83 Asterisks indicate statistical significance at different significance levels: *** <0.01 means statistical significance at the one percent level; ** <0.05 at the five percent level; and *<0.10 at the 10 percent level. The dependent variables used are EIP and log EIP, respectively. Years refer to academic years; for example, 2003 corresponds to academic year 2003–2004. *See* Singer reply turnover materials (Singer Updated Regression Data).

The figure reports the coefficients for each Conduct Period from my sensitivity analyses of Dr. Singer's regression model. The institution fixed effects rows in columns (b) – (d) (and (e) – (g)) relate to Dr. Singer's EIP (log EIP) specifications (1) – (3), respectively. The institution and student fixed effects rows in columns (b) – (d) (and (e) – (g)) relate to Dr. Singer's EIP (and log EIP) specifications (4) – (6), respectively. *See* Singer Reply Report, Table 6 and Appendix 4, Table 2.

84 I use the same methodology to modify Dr. Singer's benchmark classification as I do in my initial report. *See* Stiroh Initial Report. footnote 413. In this specification, there are no available benchmark data for Brown, Cornell, Emory, Georgetown, MIT, Notre Dame, or Rice. Therefore, Dr. Singer's model, using the Complaint benchmark classification, does not estimate the impact of the Challenged Conduct at these Defendant schools.

**ATTORNEYS' EYES ONLY – SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS individually and on behalf of all others similarly situated,

*Plaintiffs*,

v.

BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,

*Defendants.*

Case No. 22-cv-00125

# EXPERT REPORT OF LAUREN J. STIROH, PH.D.

**August 7, 2024**

# Appendix 1

1. Dr. Singer uses his flawed regression model to perform an analysis that he argues can demonstrate common impact. Even ignoring the flaws and shortcomings of his underlying regression model which makes the model inappropriate even to estimate average impact, Dr. Singer's in-sample analysis is incapable of demonstrating that nearly all Class members paid an inflated price. Dr. Singer can only reach the conclusion that substantially all proposed Class members were impacted by incorrectly using the statistical predictions from his regression model. As I explain, this analysis is not consistent with economic theory because it conflates unexplained variation in EIPs with the impact, if any, of the Challenged Conduct. Dr. Singer purports to use an "in-sample" prediction methodology to establish class-wide impact.[1] Dr. Singer claims that this methodology allows him to identify specific individual student-school-year observations that were impacted by the Challenged Conduct.[2] As I demonstrate below, this methodology is fundamentally flawed. A regression model, such as the one employed by Dr. Singer, is only an approximation of the relationships between the explanatory variables included in the model and the outcome variable, and Dr. Singer's model does not fully explain the EIP paid by each proposed Class member in each year.[3] By claiming that he can use his average overcharge regression results to precisely identify which student-school-year observations were impacted, Dr. Singer ignores the inherent variation in his regression and conflates the variation in outcomes unexplained by his model with the estimated average impact from his analysis.

2. As previously discussed, Dr. Singer uses a regression model to estimate the statistical relationship between EIPs and other variables included in his model. Dr. Singer's supposed standard analysis to demonstrate class-wide impact starts with the results of his regression model.[4] Dr. Singer's econometric model can be expressed by the following equation, where $EIP_{ist}$ represents the EIP paid by student *i* at school *s* in time *t*.[5]

$$EIP_{ist} = \alpha + \beta Conduct_{st} + \Sigma_X Controls_{ist}^X + \varepsilon_{ist}$$

3. After running a regression model, fitted values of the dependent variable (in this case $\widehat{EIP_{ist}}$) can be obtained as the linear combination of the estimated coefficients ($\hat{\alpha}$, $\hat{\beta}$, and the estimated coefficients on the control variables) and the values of the independent variables for the particular student-school-year observation.

---

1 Singer Amended Report, ¶ 255.

2 Singer Amended Report, ¶¶ 256, 258.

3 William H. Greene, *Econometric Analysis* (6th Edition) (Pearson/Prentice Hall, 2007), p. 9 ("The term $\varepsilon$ is a random **disturbance**, so named because it 'disturbs' an otherwise stable relationship. The disturbance arises for several reasons, primarily because we cannot hope to capture every influence on an economic variable in a model, no matter how elaborate.") (emphasis in original).

4 Singer Amended Report, ¶ 255 ("This econometric method uses the output of my regression analyses to compare the Effective Institutional Price that students paid to what they would have paid 'but-for' the Challenged Conduct.").

5 Singer Amended Report, ¶ 238.

$$\widehat{EIP_{ist}} = \hat{\alpha} + \hat{\beta}Conduct_{ist} + \Sigma_X \widehat{Controls_{ist}^X} \quad (fitted\ EIP)$$

4. By subtracting the fitted value of EIP ($\widehat{EIP_{ist}}$) from the actual, observed EIP for each particular student-school-year observation ($EIP_{ist}$), you obtain the regression residual ($r_{ist}$).[6] This residual informs how far off the actual value for a particular observation is from the value predicted by the estimated regression model. While multiple regression models are constructed so that these residuals are, on average, equal to zero, this does not mean that the residual is zero for all observations.[7]

$$EIP_{ist} - \widehat{EIP_{ist}} = r_{ist} \quad (residual)$$

5. Dr. Singer's in-sample methodology relies upon comparing actual, observed EIPs with EIPs he asserts would have prevailed in the but-for world absent the Challenged Conduct. To obtain these predicted but-for EIPs (represented as $\widehat{EIP_{ist}^{bf}}$), Dr. Singer uses all of the estimated coefficients from his model except the conduct coefficient to predict a price for each student-school-year observation. These estimated coefficients represent the average estimated relationship between the control variables and prices across all observations in the regression model (*i.e.*, not the effect of the control variables on EIPs at the individual level).[8]

$$\widehat{EIP_{ist}^{bf}} = \hat{\alpha} + \Sigma_X \widehat{Controls_{ist}^X} \quad (predicted\ but - for\ EIP)$$

6. Dr. Singer then takes the difference between actual prices and what his model predicts would be but-for prices for each observation (this difference is depicted in the expression below). He concludes by claiming that any positive difference between these two values is evidence that a particular student-school-year observation was impacted by the alleged conspiracy.[9]

$$EIP_{ist} - \widehat{EIP_{ist}^{bf}}$$

7. The fundamental flaw of Dr. Singer's approach is that, even assuming his regression is well-specified and that he has estimated properly the average effect of the conduct and all of the additional control variables included in his model, the student-school-year level differences he examines to "identify" common impact conflate both the residual values of his regression ($r_{ist}$) and the average effect, if any, of the conduct ($\hat{\beta}$). Through simple algebra and by the definitions of the regression components used in Dr. Singer's methodology, I show that the difference Dr. Singer analyzes ($EIP_{ist} - \widehat{EIP_{ist}^{bf}}$) can

---

[6] Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach* (7th Edition) (Boston: Cengage, 2020) ("Wooldridge (2020)"), pp. 27-28, 32-33, 74.

[7] Wooldridge (2020), p. 74 ("Normally, the actual value for $y_i$ for any observation *i* will not equal the predicted value, $\hat{y}_i$: OLS minimizes the *average* squared prediction error, which says nothing about the prediction error for any particular observation.").

[8] Wooldridge (2020), p. 72.

[9] Singer Amended Report, ¶ 258.

**ATTORNEYS' EYES ONLY – SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)**

equivalently be expressed as the sum of the residual for each individual observation from Dr. Singer's regression and the average estimated conduct parameter ($r_{ist} + \hat{\beta}Conduct_{ist}$).

$$EIP_{ist} - \widehat{EIP}_{ist}^{bf} = EIP_{ist} - \left[\widehat{EIP}_{ist} - \hat{\beta}Conduct_{ist}\right]$$

$$= r_{ist} + \hat{\beta}Conduct_{ist}$$

8. The issue with Dr. Singer's methodology is that any variation in outcomes unexplained by the regression model is conflated with the average effect, if any, from the conduct. Indeed, in a well-specified linear regression model, roughly half the fitted values of a variable will be above the observed values and half will be below.[10] Assuming that all proposed Class members attended Defendant schools for four years (and all four years were in the participation periods), then even if the estimated effect of the conduct were zero, using the "in-sample prediction methodology" suggested by Dr. Singer in this hypothetical setting would be expected to flag 93.75 percent of proposed Class members as being "impacted."[11] Such a flawed method is simply incapable of providing any direction as to whether average impact, even if properly estimated, was class-wide.

9. Another way to illustrate the error with Dr. Singer's methodology is to review the estimated residuals from his regression model, their size and variation, and their connection with Dr. Singer's approach of flagging individual observations as impacted or not impacted. The estimated residual for each student-school-year observation is obtained from taking the difference of actual EIP ($EIP_{ist}$) and the fitted EIP ($\widehat{EIP}_{ist}$) from Dr. Singer's regression model including the average, estimated conduct coefficient. In **Figure A.1** below, I present a scatterplot of residuals from observations of students at Cornell in academic year 2022-2023.[12] Dr. Singer's methodology mechanically flags any observation for which the estimated residual is above -1,496.58 (the negative of his estimated conduct coefficient) as being "impacted." **Figure A.2** demonstrates this fact. Using Dr. Singer's turnover materials, I confirm that the exact observations flagged by Dr. Singer as "impacted" are simply the observations with estimated residuals greater than -1,496.58.

---

10 Wooldridge (2020), p. 74; Penn State Eberly College of Science Department of Statistics, "4.2 - Residuals vs. Fits Plot," available at https://online.stat.psu.edu/stat462/node/117.

11 Assuming that the actual EIP for each student-school-year had a 50 percent chance of being higher than the predicted, but-for EIP in a setting with zero overcharge and that each proposed Class member had four observations, there is a $1\text{-}.5^4 =$ 93.75 percent chance that at least one of a proposed Class member's actual EIPs would be above their predicted, but-for EIP.

12 This example is chosen for illustrative purposes and other school/year combinations show the same general pattern.

**ATTORNEYS' EYES ONLY – SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)**

**Figure A.1: Residuals Estimated by Dr. Singer's Model for Proposed Class Member-Year Observations Enrolled at Cornell in 2022-2023[13]**




**Figure A.2: Proposed Class Member-Year Observations Flagged as Impacted by Dr. Singer Compared with Those with a Residual Greater than -1,496.58[14]**

| Criteria | Class Member-Year Observations | Percent of Total Observations |
|---|---|---|
| | --------(Count)-------- | ----(Percent)----- |
| (a) | (b) | (c) |
| Flagged as Impacted in Dr. Singer's Turnover | 367,709 | 65 % |
| Residual Greater than -1,496.58 | 367,709 | 65 |

10. To the extent that individual variation in injury from the Challenged Conduct is present, it is subsumed into the residuals obtained through Dr. Singer's methodology. Suppose for the sake of argument that Dr. Singer has correctly estimated the average impact of the Challenged Conduct. Because Dr. Singer has hardwired a uniform, average impact into the regression model he uses as the basis for his analysis, if there are individualized, specific deviations from this average, these differences get baked into the estimated

13 Singer turnover materials (Defendants FA Regression Data).

14 Singer Amended Report, Table 11; Singer turnover materials (Defendants FA Regression Data).

**ATTORNEYS' EYES ONLY – SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)**

residuals. More generally, it is not possible to know what precisely is driving the unexplained variation leftover in a regression model. Dr. Singer's full model predicts EIPs that deviate substantially from EIPs actually paid. **Figure A.3** provides counts and percentages of observations with estimated residuals from Dr. Singer's model above various thresholds. Again, these estimated residuals are obtained from Dr. Singer's regression model which incorporates an average coefficient for impact (*i.e.*, these represent any remaining unexplained variation in price not accounted for in the model as specified). For example, for 34 percent of observations, Dr. Singer's model estimates a residual that is greater than the value of his asserted, average overcharge.

**Figure A.3: Proposed Class Member-Year Observations With Residuals of Varying Magnitudes[15]**

| Criteria | Class Member-Year Observations | Percent of Total Observations |
|---|---|---|
| | --------(Count)-------- | ----(Percent)----- |
| (a) | (b) | (c) |
| Residual Greater than 0 | 246,954 | 43 % |
| Residual Greater than 1,496.58 | 191,502 | 34 |
| Residual Greater than 10,000 | 50,291 | 9 |

11. Dr. Singer purports to use the estimated coefficients from his model to predict a but-for price for each student-school-year observation if the estimated conduct coefficient were set to zero, and claims that any proposed Class Member who had an observed EIP higher than the predicted but-for price in any academic year during the Conduct period was harmed by the Challenged Conduct. However, this approach ignores the inherent uncertainty in statistical estimation. Each of the coefficients in Dr. Singer's regression analysis are estimated with error, and so too are the resulting predictions of price using those coefficients. Analysts typically account for this known lack of precision in forecasting by building confidence intervals (*i.e.*, a plus-minus range) around an estimate. Dr. Singer ignores this known uncertainty in his predicted but-for EIP estimates and his opinions regarding the number of class members identified as impacted.[16] Putting aside the issues with Dr. Singer's methodology discussed above and elsewhere in my report, a proposed Class member whose actual EIP falls within a standard prediction interval around the estimated EIP for that proposed Class member should not be counted as impacted even in Dr. Singer's methodology, because some variation around a mean is expected. Without accounting for this known uncertainty and lack of precision in statistical estimation, Dr. Singer overstates the share of the class that he opines is harmed by the Challenged Conduct even if his model were otherwise capable of estimating

[15] Singer Amended Report, Table 11; Singer turnover materials (Defendants FA Regression Data).

[16] This uncertainty is known as "prediction error" (*see, e.g.*, Wooldridge (2020), pp. 201-204). The standard error of the predicted price can be used to obtain a 95 percent confidence interval for each of the purported but-for price estimates. A 95 percent confidence interval is the range of values for which there is a 95 percent chance that the true value of the point estimate is within that range, assuming Dr. Singer's regression model is correctly specified.

impact from the Challenged Conduct, which it is not for the reasons described in my report.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ANDREW CORZO, SIA HENRY, MICHAEL MAERLANDER, ALEXANDER LEO-GUERRA, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated,

*Plaintiffs*,

v.

BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,

*Defendants*.

Case No. 1:22-cv-00125

*Class Action*

**REBUTTAL EXPERT REPORT OF HAL J. SINGER, PH.D.**

October 7, 2024

This report cites and quotes material that Defendants designated as Confidential or AEO under the Second Amended Confidentiality Order (ECF No. 608)

PRIVILEGED AND CONFIDENTIAL
PREPARED FOR COUNSEL

### 2. Econometric Evidence Confirms That the Generalized Effective Institutional Price Overcharges Were Paid by All or Nearly All Class Members

224. In my Initial Report, I empirically demonstrated that the artificial overcharge in Effective Institutional Prices resulting from the Challenged Conduct can be shown to have impacted all or nearly all Class Members during the Class Period. I do this using two sets of analyses. *First*, I presented an in-sample prediction analysis, which showed that 97 percent of Class Members are predicted to have been impacted via paying artificially inflated Effective Institutional Prices than they would have absent the Challenged Conduct.[384] *Second*, I presented price structure analyses, which showed that a Class Member's Effective Institutional Prices are highly correlated with the Effective Institutional Prices paid by other Class Members.[385] The latter analyses show that a generalized effect across a set of schools or within a school, as my regression modelling has shown, would likely be experienced across students within each school given that their prices are correlated with each other, and so if the average moves down, I would expect nearly all prices to move down with the average. Below, I highlight Dr. Stiroh's critiques of both sets of analyses, and I explain the flaws in her reasoning.

#### *a. Dr. Stiroh's Critiques of my In-Sample Prediction Methodology are Without Merit*

225. In my Initial Report, I used in-sample prediction to demonstrate that all or nearly all Class members were negatively impacted by the Challenged Conduct.[386] My methodology is rooted

384. Singer Report §III.B.1.
385. *Id*. §III.B.2.a.
386. Singer Report §III.B.1.

in basic econometrics; to dispute the validity of its application, as Dr. Stiroh does, is contrary to standard economic principles.[387]

226. Dr. Stiroh claims that my in-sample prediction "is fundamentally flawed and econometrically invalid."[388] Her argument is erroneous because (1) it ignores the reality of the data and the first step of the in-sample prediction method, and (2) it is predicated on presenting a basic statistical characteristic of regression predictions as a flaw: that approximately 50 percent of observations in a regression model will be above the regression (or in-sample prediction) line, and 50 percent of observations will be below the regression line. As I demonstrate below, the in-sample prediction method is functioning correctly and provides reliable support of classwide impact.

227. My in-sample prediction analysis is based on a two-step process. First, I calculate the generalized overcharge of Effective Institutional Prices resulting from the Challenged Conduct. Second, I use in-sample prediction to measure how the generalized overcharge impacts each Class Member's Effective Institutional Prices. This approach to in-sample prediction is based upon the Federal Judicial Center's *Reference Manual on Multiple Regression*,[389] and it has been cited in several

387. *See* WOOLDRIDGE at 190 ("Sometimes, it is useful to examine individual observations to see whether the actual value of the dependent variable is above or below the predicted value; that is, to examine the residuals for the individual observations. . . . Residual analysis also plays a role in legal decisions."). *See also* Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, 3 REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 303–357, 308 (2011) [hereafter REFERENCE MANUAL].

388. Stiroh Report ¶197.

389. REFERENCE MANUAL at 308.

232. Furthermore, my in-sample prediction analysis conservatively assumes that the unexplained variation may allow Class Members to escape overcharges when, in reality, there is no reason to conclude that variation would have been different in the but-for world. In this sense, the model underestimates impact: If my regression could predict with perfect accuracy the Effective Institutional Price every Class Member would pay during every academic year, then any overcharge would show 100 percent impact. By attributing the unexplained error to the ability of a Class Member to escape injury, the model assesses if there exists a large number or segment of students that consistently paid lower Effective Institutional Prices than what the regression model would predict. In this case, the model shows that virtually all Class Members paid artificially inflated Effective Institutional Prices.

233. In addition, my in-sample analysis assumes that any student who actually paid less than the predicted but-for Effective Institutional Price did so because they benefitted from the Challenged Conduct. In reality, the reason why they show as having paid less than the predicted but-for Effective Institutional Price is for the reason explained above—my model does not perfectly explain every factor influencing Effective Institutional Prices. There is no basis for assuming other factors not accounted for by my model would differ in the actual versus the but-for world. In other words, any student who shows up as having paid less than the predicted but-for Effective Institutional Price would likely have paid *even less* without the Challenged Conduct. All of the factors that Dr. Stiroh points out as having a differential impact on students—professional judgment, packaging special circumstances, etc.—would all be expected to have occurred in the same way in both in the actual and the but-for world.

234. I highlight the flaw in Dr. Stiroh's argument by demonstrating that Class Members were impacted on a "harmed on net" standard. To be impacted "on net," a Class Member would have

had to have been overcharged when summing across all of his or her academic years during the Class Period. That is, if I sum but-for total Effective Institutional Prices over all transactions for each Class Member and compare it to the sum of their actual Effective Institutional Prices, net harm occurs when the Class Member would have paid less *on net* (across all academic years during the Class Period) absent the Challenged Conduct. Finding impact under this methodology requires a more general overpayment, and thus it is less likely that its results would be due to statistical chance, as Dr. Stiroh asserts. Put another way, Dr. Stiroh claims that my in-sample prediction methodology could be flawed due to a scenario where a student has a fifty-fifty chance of being impacted by paying a higher Effective Institutional Price. If this were the case, then any predicted overcharges per student would be expected to be cancelled out by predicted undercharges, since actual values would show up equally on both sides of the regression line, and this would render the sum of a student's predicted overcharges across all academic years in the Class Period to zero. If one finds a high proportion of students suffering from positive overcharges across all academic years subject to the Challenged Conduct, such a result is less likely the result of statistical noise.

235. Using this "harmed on net" methodology, I find that 95 percent of Class Members overpaid via artificially inflated Effective Institutional Prices across all academic years they were subject to the Challenged Conduct. This result runs counter to Dr. Stiroh's assertion that my results are "mechanical."[395]

236. Dr. Stiroh claims that because I had improperly assigned the academic years for Duke, Northwestern, and Vanderbilt in my Initial Report, prior to Dr. Hill's adjustment to these Defendants' data, my in-sample prediction improperly finds higher rates of impact for these Defendants than the

395. *Id*. ¶201.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ANDREW CORZO, SIA HENRY, MICHAEL MAERLANDER, ALEXANDER LEO-GUERRA, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated,

*Plaintiffs*,

v.

BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,

*Defendants*.

Case No. 1:22-cv-00125

*Class Action*

**EXPERT REPORT OF GEORGE BULMAN, PH.D.**

May 14, 2024

**This Report references material designated by Defendants as Confidential or AEO under the Second Amended Confidentiality Order (ECF No. 576).**

Table 3: Endowment Growth 2003 to 2022

| Institution | Endowments (in millions) | | Endowment Growth | |
|---|---|---|---|---|
| | 2003 | 2022 | Unadjusted | Adjusted |
| Brown University | 1,461 | 6,141 | 320% | 147% |
| California Institute of Technology | 1,145 | 3,635 | 217% | 86% |
| Columbia University | 4,350 | 13,280 | 205% | 79% |
| Cornell University | 2,855 | 9,838 | 245% | 102% |
| Dartmouth College | 2,121 | 8,066 | 280% | 123% |
| Duke University | 3,017 | 12,116 | 302% | 136% |
| Emory University | 4,020 | 9,998 | 149% | 46% |
| Georgetown University | 591 | 3,210 | 443% | 219% |
| Johns Hopkins University | 1,715 | 8,244 | 381% | 182% |
| Massachusetts Institute of Technology | 5,134 | 24,740 | 382% | 183% |
| Northwestern University | 3,051 | 14,121 | 363% | 171% |
| Rice University | 2,938 | 7,814 | 166% | 56% |
| University of Chicago | 3,222 | 9,915 | 208% | 80% |
| University of Notre Dame | 2,573 | 16,729 | 550% | 281% |
| University of Pennsylvania | 3,547 | 20,724 | 484% | 243% |
| Vanderbilt University | 2,019 | 10,206 | 405% | 196% |
| Yale University | 11,035 | 41,383 | 275% | 120% |
| Average Growth | | | 316% | 144% |

**Notes:** This table presents end-of-fiscal-year endowment levels in 2003 and 2022 in millions of dollars. Endowment values are not adjusted for inflation. Adjusted growth in the last column is based on the Commonfund Higher Education Price Index.

27. As a result of robust endowment growth between 1991 and 2022, the average endowment of Defendants was 14.4 times larger in 2022 than in 1991, and 5.5 times larger after adjusting for higher-education inflation. Relative to 1991, real growth in Defendants' endowments ranged from 165% to over 900%. Overall, endowments have grown substantially in real terms, driven by extended periods of sustained growth during the 1990s, 2000s, and 2010s.

28. Defendants' endowment dollars per-student also have grown over time. Table 4 presents endowment per undergraduate student (FTE) in 1991, 2003, 2020, and 2022, all adjusted to 2022 dollars using the HEPI. Average real endowment per undergraduate grew from less than

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ANDREW CORZO, SIA HENRY, MICHAEL MAERLANDER, ALEXANDER LEO-GUERRA, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated,

*Plaintiffs*,

v.

BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,

*Defendants*.

Case No. 1:22-cv-00125

*Class Action*

**SUPPLEMENTAL REBUTTAL EXPERT REPORT OF HAL J. SINGER, PH.D.**

November 8, 2024

This report cites and quotes material that Defendants designated as Confidential or AEO under the Second Amended Confidentiality Order (ECF No. 608)

"give Emory far greater flexibility in the packaging of financial aid."[102] The same logic of the Challenged Conduct would lead to restrictions on packaging; if Defendants could compete under the alleged cartel using a non-price-fixed element, then one of the main points of the alleged cartel (suppressing competition over aid/price and reducing variability across schools) would be undermined.

57. Synthesizing the results from my Effective Institutional Price regressions and EFC conduct regressions together, I find that these results combined provide quantitative evidence that the Challenged Conduct had affected packaging. I calculate that the Challenged Conduct resulted in an artificial overcharge in EFCs of roughly $515, and an artificial overcharge in Effective Institutional Prices of $1,202.[103] This differential between the conduct coefficients of my Effective Institutional Price and EFC conduct regressions can be thought of as measuring the effect of the Challenged Conduct on (1) packaging via a shift from institutional grant aid to loans or (2) list prices via information sharing or both.

58. Dr. Stiroh presents a packaging analysis in Figure S3.7 of her sur-rebuttal report, showing that total grants cover all estimated financial need, calculated as the cost of attendance minus EFC, for more than ten percent of Class Members.[104] She claims that for these Class Member observations, "packaging in the but-for world could not be better than packaging in the actual world."[105] I do not dispute Dr. Stiroh's claim that *some* Class Members may not have been impacted *via* packaging. But this analysis is uninformative as to whether these Class Members were impacted

---

102. Singer Rebuttal Report ¶40; *id*. at n. 118 (citing Emory_568Lit_0006213). *See also* Emory_568Lit_0006214 (in purportedly leaving the 568 Group, in 2012, Emory officials lamented that the Group "generates a restrictive environment for packaging financial aid at a time when college and universities need to be more flexible and responsive[.]").
103. *See* Singer Rebuttal Report Table 1 Column 6; *id*. Table 6 Column 6.
104. *See* Stiroh Surrebuttal Report ¶27.
105. *Id*. ¶27.

once.[124]

71. Because this analysis only includes Yale Class Members that show up in the data both before-and-after Yale chose to leave the 568 Group in 2008, it therefore is directly in response to the in-sample critiques Dr. Stiroh raises in her sur-rebuttal report. The Yale Class Members that I include in this analysis only show up both inside and outside of the Class Period, and therefore, by definition, these Class Members must show up in the data more than once. Dr. Stiroh takes issue with Class Members who either only show up in the Class Period or who only show up in the data once—this analysis excludes both of these groups. Additionally, note that Dr. Stiroh claims that "The fundamental issue with Dr. Singer's methodology is that any variation in outcomes unexplained by the regression model is conflated with the average effect, if any from the conduct. Indeed, in a well specified linear regression model, roughly half of the fitted values for a variable will be above the observed values and half will be below."[125] Dr. Stiroh admits that under a hypothetical scenario where the overcharge is zero, half of the *transactions* would show up as being harmed (i.e., having a higher actual price than the but-for predicted price). By transaction, I am referring to an observation in the data—that is, a specific Class Member-academic year instance. If one were to find that the share of *transactions* harmed is materially greater than 50 percent, this would be indicative that my method demonstrates that the overall effect of the Challenged Conduct on Effective Institutional Prices outweighs individual variation.

72. I apply my in-sample prediction to the subset of Yale Class Member transactions discussed—that is, Class Members who show up in Yale's data before-and-after Yale had left the 568 Group in 2008. I first run my primary Effective Institutional Price regression (from my prior reports), and I then run my in-sample prediction method on the Yale 2008 before-and-after subset

124. *Id.*
125. Stiroh Report ¶198.

of Class Members. My in-sample prediction method involves comparing each of these Class Member's actual Effective Institutional Prices with their predicted but-for Effective Institutional Prices, and counting up how many transactions show up with an actual Effective Institutional Price greater than the but-for Effective Institutional Price. I calculate that 81 percent of these transactions were impacted—that is, 81 percent of this subset of transactions occurring prior to Yale having left the 568 Group in 2008 show higher actual Effective Institutional Prices than the predicted but-for prices. This 81 percent result is *significantly* higher than the 50 percent benchmark that would be expected under a zero overcharge, and it therefore indicates that my model is identifying far more than noise, especially in light of the conservative nature of this analysis.

73. This test is highly conservative for multiple reasons. As stated above, in-sample prediction is a conservative methodology generally because it simply assumes that all reductions in price not picked up by the variables in my model are due to the Challenged Conduct. Moreover, as stated above, it would take time for the impacts of leaving the alleged cartel to fully express themselves in pricing, and yet this analysis necessarily compares a student's actual and but-for pricing during the period immediately before and after Yale's claimed departure from the 568 Group. Further, I do not measure impact by calculating the share of Class Members *ever* impacted at least once in this analysis, but I instead as the share of transactions that were impacted, which is more conservative.[126] In reality, if a Class Member attends a Defendant institution for multiple years, the probability of obtaining an actual Effective Institutional Price greater than the predicted but-for Effective Institutional Price increases due to the fact that they are exposed to the Challenged Conduct

126. In my Initial Report, and in my Rebuttal Report backup, I computed the percent of Class Members that were ever impacted, which is calculated by counting whether a Class Member had paid a higher actual Effective Institutional Price than their but-for predicted Effective Institutional Price in any academic year in which they were subject to the Challenged Conduct. I calculated that over 96 percent of Class Members were impacted at least once. *See* Singer Rebuttal Report Workpapers; Singer Report Table 12.

ATTORNEYS' EYES ONLY - SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,<br><br>Defendants. | **Case No. 1:22-cv-00125**<br><br>**Hon. Matthew F. Kennelly** |

**EXPERT REPORT OF BRIDGET TERRY LONG, PH.D.**
**AUGUST 7, 2024**

including major awards from the U.S. Department of Education, National Science Foundation ("NSF"), and the Bill & Melinda Gates Foundation.

5. As Dean of HGSE from 2018 to 2024, I applied much of my scholarly expertise about higher education in my leadership role. I managed the school's financial resources, faculty, and staff, and led our fundraising efforts. I also stewarded important initiatives such as the development and launch of our redesigned master's in education degree program, the pivot to remote education during academic year 2020-2021, and the introduction of HGSE's first online master's degree. I expanded HGSE's external engagement with working educators, school administrators, parents, and policymakers. I also dramatically increased HGSE's financial aid for master's students by raising nearly $84 million in gifts over two years and leading our efforts to develop communication and outreach plans to increase applications and enrollment among low-income students.[1] I previously served as HGSE's Academic Dean (2012 to 2017) and Faculty Director of the Research Doctoral Program (2010 to 2013).

6. As Dean, I also participated regularly in Harvard University leadership meetings, helped to influence university decision-making and policy, and worked closely with members of the senior leadership team, including the President, Provost, Executive Vice President, and Chief Financial Officer, as well as the Deans of other schools and members of the Harvard

[1] I use the term "low-income students" throughout this report to refer to students with limited income and assets as determined by higher education institutions when awarding financial aid. This is consistent with how I use the term "low-income students" in my academic research. Defendants use a wide range of terminology, including "low-income students," to describe these students. *See, for example*, "First Generation & Low-Income Student Support," Cornell University, available at https://scl.cornell.edu/FGLI, accessed July 8, 2024 ("Students with low-income status have little or no expected parent contribution as part of their financial aid package, are Pell Grant recipients, or have had their academic experience limited due to socioeconomic status."); "About Penn First Plus," University of Pennsylvania, available at https://pennfirstplus.upenn.edu/about-penn-first-plus/, accessed July 8, 2024 (Penn notes the "subjectivity in this space" and that many terms, such as "lower-income," "limited-income," and "modestly resourced" are used.).

Corporation. As part of my other University service, I was a member of the Harvard University Task Force on the Future of Teaching and Learning, the HarvardX Research Committee, and the Committee to Establish Metrics for the Cost of Higher Education. Throughout my time as a faculty member at Harvard, I have also worked closely with admissions professionals at Harvard College and advised Harvard leadership about admissions and financial aid issues. For example, I advised Lawrence Summers during his time as President of Harvard on how the university might increase financial aid for low-income students and simplify communication to those families for greater impact. More recently, I have been working with the Harvard College Admissions Office as they consider ways they might improve their outreach efforts and admissions policies to increase access for low-income students.

7. I have over 25 years of experience teaching graduate students and higher education professionals in academic programs and professional education workshops. My courses have focused on the economics of higher education including finances, policies, and trends, college decision-making, postsecondary student access and outcomes, and higher education leadership. As a faculty instructor, I have trained hundreds of students who work in higher education administration, including a large number of admissions and financial aid professionals. My former students have gone on to be directors of admissions and taken on senior enrollment management roles at colleges and universities such as Brown, Princeton, Caltech, and the University of Pennsylvania ("Penn"). Additionally, my former students have gone on to lead projects at organizations such as the College Board and Consortium on Financing Higher Education ("COFHE"), are leading scholars at top universities, and hold leadership positions at prominent universities.

### B. Case Background

#### *1. Parties Involved*

11. Defendants in this matter are private, non-profit higher education institutions[2] and include Brown, Caltech, Chicago, Columbia, Cornell, Dartmouth, Duke, Emory, Johns Hopkins, Georgetown, MIT, Northwestern, Notre Dame, Penn, Rice, Vanderbilt, and Yale (collectively, "Defendants").[3] [redacted]

12. Defendants were members of the 568 Presidents Group ("568 Group"), named for Section 568 of the Improving America's Schools Act of 1994 ("Section 568"), along with several other need-blind private universities and liberal arts colleges.[4] Section 568 provided higher education institutions that admit students on a need-blind basis with an exemption from the antitrust laws authorizing them to: (1) agree "to award financial aid only on the basis of demonstrated financial need"; (2) use "common principles of analysis for determining financial need"; (3) use "a common aid application form"; and (4) exchange, "through an independent third party, financial information submitted by students and their families."[5]

---

2 Throughout this report, I use the terms "schools" and "higher education institutions" interchangeably.

3 Second Amended and Supplemental Class Action Complaint, *Henry, et al. v Brown University*, 1:22-cv-00125 February 6, 2023 ("Complaint"), p. 1.

4 "A Brief Summary and Analysis of Section 568," 568 Presidents Group, January 24, 2022, available at https://web.archive.org/web/20220124040057/http://www.568group.org/home/?q=node/12, accessed August 25, 2023. As of January 2022, non-Defendant 568 Group members included Amherst College, Boston College, Claremont McKenna College, Davidson College, Grinnell College, Middlebury College, Pomona College, Swarthmore College, and Williams College. "568 Presidents Group Member Institutions," January 24, 2022, available at https://web.archive.org/web/20220124040052/http://www.568group.org/home/?q=node/24, accessed July 6, 2024.

5 Need-Based Educational Aid Act of 2015, H. R. Rep. No. 114-224, pp. 2-3.

compensation based on fees charged by Analysis Group. No compensation is contingent on the nature of my findings, the testimony I give, or the outcome of this litigation.

20. A complete list of materials I relied on in connection with this report is included as **Appendix B**. My report is based on information available to me as of the date of this report. I reserve the right to update and revise my report in the event that new information relevant to my opinions is produced. My understanding is that the opinions offered in this report may have additional legal significance and by describing my assignment here, I do not intend to limit the use of my opinions in this case.

**D. Summary of Opinions**

21. Based on my expertise and analysis, I have reached the following opinions with regard to the issues addressed and opinions expressed by Ms. Mora, Dr. Singer, and Dr. Bulman.

22. Each Defendant is a mission-driven higher education institution that seeks to achieve educational excellence and social betterment, especially through the students who attend their schools. Defendants pursue this mission through their dedication to providing a rigorous and engaging education to qualified students no matter their background and irrespective of their ability to afford college. Consequently, Defendants and their peers invest immense resources to provide students with a rich set of educational experiences, prioritize creating a student body that is diverse along many dimensions, and subsidize all students' higher education costs, often at the expense of generating higher revenues. Plaintiffs' experts fail to consider the many ways in which Defendants' actions and policies, including their financial aid policies and practices, serve their missions. Contrary to Ms. Mora's claims, Defendants are not revenue-maximizing like for-profit businesses;

ATTORNEYS' EYES ONLY - SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

and contrary to Dr. Singer's claims, it is flawed to think that absent the Challenged Conduct, Defendants would have adopted financial aid philosophies, principles, or policies that were inconsistent with their broader missions.

- Each Defendant, similar to peer schools, devotes substantial financial resources to providing a high-quality educational experience for its students. These investments are costly. In fact, each Defendant's educational expenditures per student exceed the published undergraduate tuition, fees, and room and board charges, meaning that each Defendant subsidizes all of their undergraduate students' educations even if they do not receive financial aid. Further, Defendants and their peers provide additional financial support to their students in the form of institutional grant aid, substantially reducing the revenue they collect from students. In the 2021-2022 academic year alone, Defendants provided $832 million in institutional grant aid. *See* **Section II.A**.

- Although Defendants and their peers could increase their revenues by enrolling only qualified students who can afford to pay the full cost of attending their school, each Defendant instead selects qualified students across a wide range of backgrounds, talents, and interests to create a high-achieving, well-balanced freshman class each year. Defendants compose their student bodies this way because their public service missions motivate them to advance equitable access to education and social mobility. Defendants' efforts to enroll a wide range of student profiles also have beneficial educational effects, as academic research has demonstrated that a student body composed of a variety of backgrounds and experiences enhances the quality of education and improves students' educational outcomes. *See* **Section II.B**.

- As part of Defendants' individual missions to increase access and social mobility, each Defendant has developed and maintains a variety of initiatives and policies designed to work together to identify, attract, admit, matriculate, and graduate outstanding students from disadvantaged backgrounds. These initiatives and policies include efforts such as targeted recruiting and outreach programs, need-blind admissions policies, and the provision of need-based financial aid. Many of these policies reduce the potential revenues Defendants can receive from students while increasing their outlay of expenditures per student. However, these initiatives and policies are essential to each school's mission. *See* **Section II.C**.

- Each Defendant has implemented initiatives and policies to support their goals of increasing access for students, many of which are fundamental financial aid and admissions policies and practices. These investments are costly and are often at the expense of the potential for greater tuition revenue from higher-income students. These investments show that Defendants are dedicated to their missions and undermine the plausibility of any notion that Defendants would have approached these policies and practices differently absent their participating in the 568 Group. They also highlight how Defendants differ starkly from for-profit businesses. Ms. Mora's attempt to equate Defendants to for-profit businesses ignores the specific missions of each Defendant and the central role these missions play in institutional decision-making, which leads to inappropriate comparisons and thoroughly flawed opinions. *See* **Section II.D**.

23. Need-based financial aid is an important tool for increasing low- and middle-income students' access to higher education, consistent with the goals of educational equity, access, and excellence. Each Defendant uses need analysis to equitably distribute need-based financial aid to admitted students who do not otherwise have the means to attend. Due to the inherent complexity of need analysis, it is common for schools, the government, and other organizations to engage in discussions and debates focused on how to improve equity and transparency in the need analysis process. These discussions can be critical to ensuring the most aid is provided to the neediest students and that students with similar financial challenges are awarded similar amounts. The 568 Group was one such forum for developing economic expertise to improve need analysis.

- It is and has historically been widely accepted in the higher education industry that any need analysis methodology applied by a school should seek to advance the principles of vertical equity, which is to treat families in different financial circumstances differently, and horizontal equity, which is to treat families in similar financial circumstances similarly. While these principles are clear, there are not always clear answers to questions of how to accomplish these goals, given the myriad types of income, investments, assets, and expenses and the importance of a

student's family and local context. Application of these principles is often harder and more nuanced in practice than in theory. *See* **Section III.A**.

- Since the 1950s, schools, the federal government, and nonprofit organizations have sought to improve need analysis methodologies to help students by better accounting for their financial challenges, reducing confusion about the process, and easing the burden of multiple application forms. After the introduction of the Federal Methodology ("FM") and the Institutional Methodology ("IM") in the early 1990s, there were increased discussions in the financial aid community on circumstances and questions that remained unaddressed and what the best practices might be for schools. Different need analysis methodologies could lead the same student to receive very different estimates of their family's ability to pay for college, which threatened to undermine students' confidence that their levels of need were being assessed fairly and accurately by each school. Defendants and other schools who were focused on increasing access sought to bring together their economic expertise, analyses, and experiences and created the 568 Group to dedicate attention to improving understanding of best practices and options in order to bolster equity in need analysis. *See* **Sections III.B-C**.

- The 568 Group's discussions led to the development of the Consensus Methodology Guidelines ("CM Guidelines") and an accompanying document with guidance on the application of professional judgment, adapted from existing industry guidance ("PJ Guidelines"). The CM Guidelines expanded on existing guidance, particularly from the College Board, in relation to the IM. The 568 Group anticipated that the modifications in the CM Guidelines would in aggregate decrease students' expected family contributions ("EFCs") and therefore benefit students. For example, the CM Guidelines' recommendation to adjust for the cost of living resulted in decreasing EFCs for students living in high-cost areas. *See* **Section III.D**.

24. Although the 568 Group developed the CM Guidelines, each Defendant separately determined its own specific need analysis methodology, which often reflected different choices about how to approach elements of need analysis that either differed from or were not covered by the recommendations in the CM Guidelines. These individualized

approaches are inconsistent with what Dr. Singer portrays as a coordinated effort to suppress need-based institutional grant aid.

- The CM Guidelines did not provide a specific formula to determine EFCs for individual admitted students. In fact, the CM Guidelines discussed only 17 of the dozens of elements of need analysis, and even their discussion of these 17 elements was often vague and incomplete, leaving each school to make a series of decisions regarding its own need analysis methodology. *See* **Section IV.A**.

- Dr. Singer attempts to characterize each Defendant's *entire* need analysis methodology as "following" the CM Guidelines based on nothing more than a collection of high-level statements. In my professional experience, a reliable understanding of a school's baseline need analysis methodology requires a systematic review of how, in practice, the school treated individual elements of need analysis. I have performed such a review on eight elements of need analysis for which the CM Guidelines provided actionable recommendations and found that, in fact, Defendants' treatment of these elements was often inconsistent with the recommendations in the CM Guidelines. *See* **Section IV.B**.

- Contrary to Dr. Singer's assertion that Defendants sought to establish a floor for EFCs, my analysis demonstrates that Defendants' individual need analysis methodologies were inconsistent with the CM Guidelines in numerous ways, including in ways that lowered EFCs relative to the CM Guidelines, which would benefit impacted students. *See* **Section IV.C**.

- Defendants also did not consistently rely on the 568 Group's PJ Guidelines in their need analyses. Importantly, the concept of professional judgment is, by definition, rooted in the application of a financial aid officer's independent, individual judgment to a particular student's unusual or extenuating circumstances to calculate an equitable EFC for that student. *See* **Section IV.D**.

- Whether the EFC a specific Defendant calculated for a particular student would have been higher or lower absent the 568 Group is a highly individualized question. Further, a hypothetical increase in an individual student's EFC would not necessarily have decreased the student's institutional grant aid as claimed by Dr. Singer. Institutional grant aid is determined not only by EFCs, but also by each individual Defendant's

ATTORNEYS' EYES ONLY - SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

packaging policies, including the composition of the package, which Dr. Singer concedes were not discussed by the 568 Group. In fact, each Defendant took steps during the Class Period to reduce their reliance on loans and *increase* the share of financial aid they provided in the form of institutional grant aid. *See* **Section IV.E.**

25. Dr. Singer classifies several fundamental principles and practices underlying the financial aid system as Challenged Conduct. These include long-standing and widely held principles based on the fundamental values of equity, efficiency, and transparency as well as commonplace practices such as using the IM as a starting point for need analysis, using professional judgment when reviewing individual students' need analysis, and sharing basic information about financial aid practices. Each of these principles and practices are shared by many non-Defendant organizations in the higher education industry. Dr. Singer has not demonstrated that Defendants' commitment to these principles and practices was influenced by their membership in the 568 Group, rather than simply reflecting Defendants' pre-existing approaches and widespread industry standards. *See* **Section V**.

26. Dr. Singer's flawed approach extends into his proposed definition of the relevant market as consisting of the top 25 private national universities ranked by U.S. News and World Report. This definition is not an accurate reflection of how students, including Named Plaintiffs, select schools for application and matriculation, and it fails to capture important competitive dynamics in the higher education industry.

- Individual student preferences lead students to consider public universities, liberal arts colleges, and lower-ranked private national universities alongside the schools in Dr. Singer's proposed relevant market. Those individual preferences translate to different sets of potential schools for each student to consider, depending on the value they personally place on different attributes. In turn, this results in each school having large and varying competitive sets, especially when examining their competitors from the student perspective. This range of different competitive sets for

Defendants includes a number of schools outside of Dr. Singer's proposed relevant market. *See* **Sections VI.A-C**.

- The academic literature studying higher education, including my own work, regularly includes schools outside of Dr. Singer's proposed relevant market in studies of student choice and higher education competition. For example, in my own work studying how tuition prices and financial aid policies affect student access and choice, I include both public universities and liberal arts colleges in my analysis. *See* **Section VI.D**.

27. The analyses by Dr. Bulman and Ms. Mora are also flawed with respect to their assessment of endowment and budget management. Endowments provide long-term financial stability to enable schools to make important commitments and investments, and such stability has enabled Defendants' educational expenditures per student to exceed the amount collected from tuition, fees, and room and board charges.

- Endowments are made up of many individual funds that are subject to complex rules and restrictions regarding how funds can be managed and how returns can be spent. Ms. Mora asserts, without support, that a "substantial portion" of distributions from restricted endowments are not "really" restricted, yet does not analyze the individual Defendants' particular circumstances. My direct and indirect experience with these rules and restrictions is that they are often very difficult to modify in practice, including because doing so might be in conflict with legal agreements that commit the school to follow the donors' wishes and because the continued stewardship of donors by demonstrating how their funds have been spent appropriately is an important activity for schools to continue to receive future gifts. In fact, in my experience it is rare for a higher education institution to attempt to alter endowment restrictions, particularly across major spending categories (e.g., from a faculty chair to financial aid). *See* **Sections VII.A**.

- Plaintiffs' experts' focus on so-called "excess returns" to suggest that Defendants could have spent more on financial aid but for the Challenged Conduct fails to contend with the realities of institutional financing. Institutional spending decisions are long-term commitments that are made in support of a school's long-term goals and mission. The assertions by Plaintiffs' experts are based on hindsight that administrators do not have

the benefit of. Administrators cannot assume that large past returns will be repeated in the future. Allocating extra money from the endowment to financial aid in a year of unusually strong market performance risks the inability to continue to fund financial aid at that new, higher level in future years, causing volatility and uncertainty in institutional financial aid upon which students rely. *See* **Section VII.B**.

## II. EACH DEFENDANT'S FINANCIAL AID POLICIES ARE A PRODUCT OF ITS MISSION TO ADVANCE EQUITY IN AND ACCESS TO HIGHER EDUCATION

28. Dr. Singer claims that Defendants engaged in Challenged Conduct that was "inconsistent with unilateral conduct and unfettered competition,"[27] while Ms. Mora claims that Defendants "in many material respects, operate like for-profit businesses" and follow a strategy "analogous to a venture capital fund" and seek to maximize revenues or donations.[28] These claims erroneously equate Defendants, who are non-profit higher education institutions, with for-profit businesses. Dr. Singer's claim further implies that, absent Defendants' participation in the 568 Group, each Defendant would not have independently adopted many of the financial aid practices that they currently have. Dr. Singer's and Ms. Mora's opinions fail to consider Defendants' financial aid philosophies and practices not only within the broader context of higher education funding, but also within the context of each Defendant's mission. Defendants' financial aid philosophies and practices work in concert with other activities, initiatives, and policies that support their broader mission of providing a rigorous and engaging education to qualified students no matter their background and irrespective of their ability to afford college.

---

27 Singer Report, ¶ 123 ("I analyze record evidence concerning the extent to which the Challenged Conduct is consistent with the allegations of conspiracy and inconsistent with unilateral conduct and unfettered competition in setting Effective Institutional Prices.").

28 Mora Report, ¶ 73.

### *2. Defendants and Their Peers Heavily Subsidize Their Students' Educations*

41. Defendants' and their peers' investments in their students' educational experiences are costly. Despite these costs, each Defendant sets the maximum amount of revenues that it could receive from students at less than the amount it costs to educate them. This can be seen in publicly available data from the Integrated Postsecondary Education Data System ("IPEDS"), an annual survey collected by the U.S. Department of Education as a requirement of receiving federal aid.[71]

42. IPEDS data include measures of potential revenues schools may receive from undergraduate students (i.e., published tuition,[72] required fees, and on campus room and board), as well as measures of various types of student educational expenditures (i.e., instruction, academic support, student services, institutional support, and auxiliary enterprises) and research expenditures. IPEDS does not report educational expenditures on undergraduate students separately from expenditures on graduate students because schools' resources support both undergraduate and graduate students. While the extent to which each expenditure category is focused on undergraduate versus graduate students can vary by category and across schools depending on the specific school's characteristics and composition, I use average expenditures across all students (i.e., undergraduate and graduate) as a proxy for average expenditures across undergraduate students. I note that

---

[71] IPEDS gathers information from all higher education institutions that participate in federal student financial aid programs and includes measures related to institutional prices, enrollment, student financial aid, student persistence and success, and institutional resources and finances. "About IPEDS," Integrated Postsecondary Education Data System, available at https://nces.ed.gov/ipeds/about-ipeds, accessed August 1, 2024.

[72] IPEDS reports both out-of-state and in-state tuition for participating higher education institutions. For private higher education institutions, such as Defendants, these values are the same. Backup materials to this report (IPEDS, Expenditures v. Revenues).

based on my experience, for many categories this is a conservative estimate, as expenditures on academic support and student services tend to be mostly focused on undergraduate students.

43. As shown in **Figure 1**, analysis of the IPEDS data shows that for each Defendant, the maximum amount of revenues that a school could potentially receive from an undergraduate student, assuming the student pays the full published tuition, required fees, and on-campus room and board (which, as I discuss below, is more than the amount many students actually pay) is lower than the average institutional educational and research expenditures per student in the academic year 2021-2022. When excluding expenditures on research, this relationship holds for all Defendants other than Rice.

ATTORNEYS' EYES ONLY - SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

**Figure 1**
**Institutional Educational Expenditures Per Student Exceed Maximum Potential Revenues Per Student, by Defendant in 2021-2022[73]**




**Notes:**
[1] Maximum potential revenues per student at a given school is calculated as the sum of the IPEDS fields "published out-of-state tuition and fees" and "on campus room and board" at the given school. Maximum potential revenues are reported for the 2021-2022 academic year.
[2] Student educational expenditures per student at a given school is calculated as the sum of the IPEDS fields "instruction-total amount," "academic support-total amount," "student service-total amount," "institutional support-total amount," "auxiliary enterprises-total amount," and "research-total amount," when included, divided by the total number of students at the given school. Because IPEDS does not distinguish between expenditures on undergraduate versus graduate students, the total number of students at a given school is calculated as the sum of the IPEDS fields "estimated full-time equivalent undergraduate enrollment" and "estimated full-time equivalent graduate enrollment" at the given school. Student educational expenditures per student are reported for the 2022 fiscal year.
[3] Emory's Oxford College is listed separately from Emory University and is therefore excluded from this analysis.

---

[73] Backup materials to this report (IPEDS, Expenditures v. Revenues); National Center for Education Statistics, *Integrated Postsecondary Education Data System*, available at https://nces.ed.gov/ipeds/datacenter.

44. For example, **Figure 1** shows maximum potential revenues from undergraduate students at MIT during the 2021-2022 academic year were $73,978 per student.[74] By contrast, in its 2022 fiscal year,[75] the sum of MIT's student educational expenditures were $152,095 per student.[76] Including research expenditures increases MIT's 2022 fiscal year student educational expenditures to $284,012 per student.[77] This same relationship holds for all Defendants when including their research expenditures per student, meaning that *all Defendants subsidize all of their undergraduate students' educations*, regardless of whether or not the student receives any financial aid.

45. This has also been true on average across all Defendant schools since the 2003-2004 academic year, as shown in **Figure 2**. As I discuss further in **Section VII**, non-profit schools receive revenue not only from tuition and fees but also from gifts, endowment income, and government sources. These other resources allow Defendants and their peers to set the amount that they charge students in tuition, fees, and room and board lower than their production costs.[78]

---

74 Backup materials to this report (IPEDS, Expenditures v. Revenues). National Center for Education Statistics, *Integrated Postsecondary Education Data System*, available at https://nces.ed.gov/ipeds/datacenter.

75 MIT's fiscal year 2022 ran from July 1, 2021 through June 30, 2022. Shor, Glen, "Massachusetts Institute of Technology Report of the Treasurer for the Year Ended June 30, 2022," PricewaterhouseCoopers, October 7, 2022, available at https://vpf.mit.edu/sites/default/files/downloads/TreasurersReport/MITTreasurersReport2022.pdf, accessed August 1, 2024.

76 Backup materials to this report (IPEDS, Expenditures v. Revenues); National Center for Education Statistics, *Integrated Postsecondary Education Data System*, available at https://nces.ed.gov/ipeds/datacenter.

77 Backup materials to this report (IPEDS, Expenditures v. Revenues); National Center for Education Statistics, *Integrated Postsecondary Education Data System*, available at https://nces.ed.gov/ipeds/datacenter.

78 Winston (1997).

ATTORNEYS' EYES ONLY - SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

**Figure 2**
**Defendants' Average Institutional Educational Expenditures Per Student Exceed Average Maximum Potential Revenues Per Student**[79]




**Notes:**
[1] Maximum potential revenues per student at a given school is calculated as the sum of the IPEDS fields "published out-of-state tuition and fees" and "on campus room and board" at the given school. Maximum potential revenues are reported by academic year. Average maximum potential revenues per student in a given year is calculated as the sum of maximum potential revenues per student across Defendants in the given year divided by 17, the number of Defendants.
[2] Student educational expenditures per student at a given school is calculated as the sum of the IPEDS fields "instruction-total amount," "academic support-total amount," "student service-total amount," "institutional support-total amount," "auxiliary enterprises-total amount," and "research-total amount," when included, divided by the total number of students at the given school. Because IPEDS does not distinguish between expenditures on undergraduate versus graduate students, the total number of students at a given school is calculated as the sum of the IPEDS fields "estimated full-time equivalent undergraduate enrollment" and "estimated full-time equivalent graduate enrollment" at the given school. Student educational expenditures per student are reported in fiscal years. Average student

79 Backup materials to this report (IPEDS, Expenditures v. Revenues); National Center for Education Statistics, *Integrated Postsecondary Education Data System*, available at https://nces.ed.gov/ipeds/datacenter; "Consumer Price Index for All Urban Consumers: All Items in U.S. City Average," Federal Reserve Bank of St. Louis, June 2024, available at https://fred.stlouisfed.org/series/CPIAUCNS, accessed August 7, 2024.

educational expenditures per student across Defendants in a given year is calculated as the sum of average student educational expenditures per student across Defendants in the given year divided by 17, the number of Defendants.
[3] Maximum potential revenues per student and average educational expenditures per student are adjusted for inflation to 2022 dollars using the consumer price index ("CPI"). For academic years, I apply the inflation adjustment to the year of the spring semester. For example, nominal amounts in academic year 2008-2009 are treated as 2009 dollars. For fiscal years, I apply the inflation adjustment to the listed year. For example, nominal amounts in FY09 are treated as 2009 dollars.
[4] All 17 Defendants are included for the entire period, regardless of their membership in the 568 Group. Emory's Oxford College is listed separately from Emory University but does not consistently report information between 2008-2009 and 2021-2022 and is therefore excluded from this analysis.

46. In addition to setting the maximum amount of revenues that they could receive from undergraduate students less than the amount it costs to educate those students, each Defendant commits to meeting the financial need of admitted students, which is defined as the difference between a student's EFC and the school's COA with an individualized financial aid package.[80] A school's COA is the total advertised price of attending the school and includes tuition and fees, room and board, as well as individually estimated transportation costs, books, and other expected expenses.[81] The policy of meeting the difference between a student's COA and EFC is known as a full-need policy, and many Defendants have pursued such a policy prior to the Class Period.[82] Each Defendant meets

80 The backup materials to this report contain information on the Defendants' full-need policies. Backup materials to this report (Full-Need Policies); JHULIT_0000122562 ("COFHE Yellowbook for 2023-2024," Consortium on Financing Higher Education, 2023-2024) (provides information on the full-need policies for Brown, Columbia, Cornell, Dartmouth, Emory, Georgetown, Johns Hopkins, MIT, Northwestern, Rice, Chicago, Penn, Vanderbilt, and Yale); DUKE568_0033960 ("Meeting of the Resources Committee of the Board of Trustees," Duke University, February 26, 2021) (provides information on Duke's full-need policy); Deposition of Malina Chang, Director of Student Financial Aid at California Institute of Technology, *Henry, et al. v Brown University, et al.*, 1:22-cv-00125 September 13, 2023 ("Chang Deposition"), pp. 94:9-94:14 (describing Caltech's full-need policy); Deposition of John Affleck-Graves, Professor of Finance in the Department of Finance at University of Notre Dame, *Henry, et al. v Brown University, et al.*, 1:22-cv-00125 January 24, 2023 ("Affleck-Graves Deposition"), pp. 220:20-221:18 (describing Notre Dame's full-need policy).

81 Cairns, Hilary, "The Difference Between a School's Sticker Price and Net Price – And How to Estimate It," CollegeRaptor, December 21, 2022, available at https://www.collegeraptor.com/find-colleges/articles/affordability-college-cost/the-difference-between-a-schools-sticker-price-and-net-price-and-how-to-estimate-it, accessed August 20, 2023 ("The sticker price of a college is the advertised price of attending a full year. It can also be called the 'Cost of Attendance' or COA. This number includes tuition, of course, but it also includes: room and board[,] transportation costs[,] fees[,] books[, and] other expected expenses.").

82 For example, MIT adopted a full-need policy in 1867, Georgetown in 1978, Cornell in 1998, and Notre Dame in 1999-2000. "MIT Need-Based Aid Dates Back to 1867," MIT News, 1992, available at https://news.mit.edu/1992/aid-0506, accessed April 29, 2024; GTWNU_0000390613 ("Policies and Procedures

students' full need with a combination of institutional, federal, state, and private sources, and students' financial aid packages can be a combination of grants, loans, and work-study.[83] While Defendants could primarily meet students' full need with loans and work-study, which students either have to pay back or work for, analysis of IPEDS data shows that Defendants devote substantial school resources to provide institutional grant aid to further subsidize some students' education. Institutional grant aid is funded by the school and does not need to be paid back or worked for, thus directly decreasing potential revenues the school can receive from students receiving such aid.

47. Examining IPEDS data on the sources of financial aid expenditures, **Figure 3** shows that between the 2008-2009 and 2021-2022 academic years,[84] across all Defendants, the share of institutional grant aid increased from just over 80 percent of all aid given to nearly 90 percent, while the share of grant aid from federal, state, and local sources decreased over the same time period.[85] Further, **Figure 3** shows that Defendants increased the total amount of institutional grant aid given by 63 percent, from $472 million in 2008-2009 to $771 million in 2021-2022.[86] Over this time period, Cornell awarded a total of $972 million in

Manual 2023-2024," Georgetown University, 2023-2024) at 624; CORNELL_LIT0000245115 ("Undergraduate Financial Aid Task Force - Final Report," Cornell University, April 27, 2012) at 117; Affleck-Graves Deposition, 220:20-221:22.

83 "Types of Financial Aid: Loans, Grants, and Work-Study Programs," Federal Student Aid, available at https://studentaid.gov/understand-aid/types, accessed August 20, 2023.

84 IPEDS reports total financial aid dollars by source starting in the 2008-2009 academic year.

85 Backup materials to this report (IPEDS, Composition of Aid). National Center for Education Statistics, *Integrated Postsecondary Education Data System*, available at https://nces.ed.gov/ipeds/datacenter.

86 Financial aid dollars are adjusted for inflation to 2022 dollars using the CPI. For academic years, I apply the inflation adjustment to the year of the spring semester. For example, nominal amounts in academic year 2008-2009 are treated as 2009 dollars. Backup materials to this report (IPEDS, Composition of Aid); National Center for Education Statistics, *Integrated Postsecondary Education Data System*, available at https://nces.ed.gov/ipeds/datacenter; "Consumer Price Index for All Urban Consumers: All Items in U.S. City Average," Federal Reserve Bank of St. Louis, June 2024, available at https://fred.stlouisfed.org/series/CPIAUCNS, accessed August 7, 2024.

institutional grant aid, Georgetown awarded a total of $401 million, MIT awarded a total of $428 million, Notre Dame awarded a total of $677 million, and Penn awarded a total of $766 million in institutional grant aid.[87]

**Figure 3**
**Defendants Devote Substantial Resources to Providing Institutional Grant Aid[88]**




**Notes:**
[1] Financial aid amounts come from the IPEDS fields "total amount of student loans awarded to full-time first-time undergraduates," "total amount of institutional grant aid awarded to full-time first-time undergraduates," "total amount of state/local grant aid awarded to full-time first-time undergraduates," and "total amount of federal grant aid awarded

87 Financial aid dollars are adjusted for inflation to 2022 dollars using the CPI. For academic years, I apply the inflation adjustment to the year of the spring semester. For example, nominal amounts in academic year 2008-2009 are treated as 2009 dollars. Backup materials to this report (IPEDS, Composition of Aid); National Center for Education Statistics, *Integrated Postsecondary Education Data System*, available at https://nces.ed.gov/ipeds/datacenter.

88 Backup materials to this report (IPEDS, Composition of Aid); National Center for Education Statistics, *Integrated Postsecondary Education Data System*, available at https://nces.ed.gov/ipeds/datacenter; "Consumer Price Index for All Urban Consumers: All Items in U.S. City Average," Federal Reserve Bank of St. Louis, June 2024, available at https://fred.stlouisfed.org/series/CPIAUCNS, accessed August 7, 2024.

to full-time first-time undergraduates." These fields are only available for academic years 2008-2009 through 2021-2022. IPEDS does not include information on private scholarships.
[2] Financial aid dollars are adjusted for inflation to 2022 dollars using the CPI. For academic years, I apply the inflation adjustment to the year of the spring semester. For example, nominal amounts in academic year 2008-2009 are treated as 2009 dollars.
[3] All 17 Defendants are included for the entire period, regardless of their membership in the 568 Group. Emory's Oxford College is listed separately from Emory University but does not consistently report information between 2008-2009 and 2021-2022 and is therefore excluded from this analysis.

48. Increases in institutional grant aid between 2008-2009 and 2021-2022 at Defendant schools far outpaced increases in institutional student charges. For example, tuition, fees, and room and board increased by 18.0 percent at Notre Dame, but the total amount of institutional grant aid awarded grew by 67.0 percent.[89] Similarly, at Cornell, tuition, fees, and room and board increased by 17.9 percent but the total amount of institutional grant aid awarded increased by 106.1 percent.[90]

49. Ultimately, institutional grant aid awarded by Defendants has had a large impact on decreasing the price students actually pay for attendance at Defendant schools. Instead of paying a school's advertised COA, due to institutional grant aid offered by Defendants, many students actually pay a lower "net price."[91] In the 2021-2022 academic year just over

---

89 Tuition, fees, room and board, and institutional grant aid dollars are adjusted for inflation to 2022 dollars using the CPI. For academic years, I apply the inflation adjustment to the year of the spring semester. For example, nominal amounts in academic year 2008-2009 are treated as 2009 dollars. Backup materials to this report (IPEDS, Composition of Aid); National Center for Education Statistics, *Integrated Postsecondary Education Data System*, available at https://nces.ed.gov/ipeds/datacenter; "Consumer Price Index for All Urban Consumers: All Items in U.S. City Average," Federal Reserve Bank of St. Louis, June 2024, available at https://fred.stlouisfed.org/series/CPIAUCNS, accessed August 7, 2024.

90 Tuition, fees, room and board, and institutional grant aid dollars are adjusted for inflation to 2022 dollars using the CPI. For academic years, I apply the inflation adjustment to the year of the spring semester. For example, nominal amounts in academic year 2008-2009 are treated as 2009 dollars. Backup materials to this report (IPEDS, Composition of Aid); National Center for Education Statistics, *Integrated Postsecondary Education Data System*, available at https://nces.ed.gov/ipeds/datacenter; "Consumer Price Index for All Urban Consumers: All Items in U.S. City Average," Federal Reserve Bank of St. Louis, June 2024, available at https://fred.stlouisfed.org/series/CPIAUCNS, accessed August 7, 2024.

91 Cairns, "The Difference Between a School's Sticker Price and Net Price – And How to Estimate It," CollegeRaptor, December 21, 2022, available at https://www.collegeraptor.com/find-colleges/articles/affordability-college-cost/the-difference-between-a-schools-sticker-price-and-net-price-and-how-to-estimate-it, accessed August 20, 2023 ("The big difference between sticker price and net price for college is that 'net price' refers to what the student will *actually* pay to attend a given school for a semester. Students can

half of first-year students at Defendant schools received institutional grant aid, thus decreasing those students' net prices below their COAs, and decreasing potential revenues schools could receive from these students.[92]

50. As shown in **Figure 4**, despite rising COA, the average net price charged by Defendants remained relatively constant for all students receiving financial aid between 2008-2009 and 2021-2022. This is due directly to the fact that Defendants were increasing institutional grant aid over the same period, as shown in **Figure 3**. Importantly, institutional grant aid at Defendant schools covered the overwhelming share of student charges on average. For example, in 2021-2022, institutional grant aid covered 97 percent of tuition and fees and 71 percent of the average COA for a student at MIT awarded financial aid; at Georgetown, institutional grant aid covered 74 percent of tuition and fees and 54 percent of the average COA for a student awarded financial aid.[93]

arrive at this number by taking the sticker price and subtracting any aid that is expected which can include merit-based scholarships, need-based grants, or other financial aid programs from schools, state government, federal government, and organizations.").

92 Backup materials to this report (IPEDS, Composition of Aid); National Center for Education Statistics, *Integrated Postsecondary Education Data System*, available at https://nces.ed.gov/ipeds/datacenter.

93 Backup materials to this report (IPEDS, Composition of Aid); National Center for Education Statistics, *Integrated Postsecondary Education Data System*, available at https://nces.ed.gov/ipeds/datacenter.

**Figure 4**
**Defendants' Average Net Price Decreased Over Time for Aided Students[94]**




**Notes:**
[1] A school's published cost of attendance is reported in IPEDS in the field "Total Price." IPEDS calculates this field as the sum of tuition, required fees, room and board, books and supplies, and other expenses for on-campus first year students. Average cost of attendance in a given year is calculated as the sum of cost of attendance across Defendants in a given year divided by 17, the number of Defendants.
[2] Net price is reported in IPEDS in the field "Average net price for students awarded grant or scholarship aid (current year)." IPEDS calculates this field by subtracting the average amount of aid students receive from federal, state, and local government sources, as well as institutional grant and scholarship aid from cost of attendance. This field is available starting in the 2008-2009 academic year. Average net price for students awarded any grant or scholarship aid in a given year is calculated as the sum of net prices across Defendants in the given year divided by 17, the number of Defendants.
[3] Average net price for students awarded any grant or scholarship aid and average cost of attendance are adjusted for inflation to 2022 dollars using the CPI. For academic years, I apply the inflation adjustment to the year of the spring semester. For example, nominal amounts in academic year 2008-2009 are treated as 2009 dollars.

---

94 Backup materials to this report (IPEDS, Net Price); National Center for Education Statistics, *Integrated Postsecondary Education Data System*, available at https://nces.ed.gov/ipeds/datacenter; "Consumer Price Index for All Urban Consumers: All Items in U.S. City Average," Federal Reserve Bank of St. Louis, June 2024, available at https://fred.stlouisfed.org/series/CPIAUCNS, accessed August 7, 2024.

[4] All 17 Defendants are included for the entire period, regardless of their membership in the 568 Group. Emory's Oxford College is listed separately but does not consistently report information between 2008-2009 and 2021-2022 and is therefore excluded from this analysis.

51. In summary, in pursuit of their missions, Defendants and their peers expend their resources in a range of ways that reduce rather than increase their revenues. They subsidize all undergraduate students due to their educational expenditures exceeding the maximum amount of revenue they could collect from students, so that even a full-paying student does not pay for the full cost of their education. Additionally, they use school resources to fund institutional aid in order to meet financial aid commitments, further decreasing the revenues received from students. By contrast, for-profit businesses typically do not maintain activities or products that consistently cost more to provide than the revenue generated.[95]

### B. Defendants and Their Peers Focus on the Size and Composition of the Student Body in Furtherance of Their Educational Missions

52. Defendants and their peers focus incredible energy crafting a student body of appropriate size and range of characteristics. First, even with high admissions standards to ensure they admit high-achieving students capable of handling a high standard of academic rigor, Defendants and their peers admit far fewer applicants to their schools than the number of qualified students who apply. This is despite the fact that they could raise tuition prices,

---

95 Brealey et al. (2020), Chapter 1, p. 2 ("The investment decision also involves managing assets already in place and deciding when to shut down and dispose of assets when they are no longer profitable."). Winston (1997) also presents a car dealership as an example to illustrate that a business that sells its product at a price below the cost of making that product is a violation of how for-profit firms work. Winston (1997), p. 34.

ATTORNEYS' EYES ONLY - SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

such as working to support their family or care for younger siblings, in contrast with a student who lacked extracurricular activities but did not have competing familial demands.[141]

72. The holistic approach of having admissions officers consider the entirety of an application in the context of a student's circumstances is essential for admitting and enrolling a broad array of high-achieving applicants who may demonstrate their talents and accomplishments in a range of ways. Focusing on the ability of the applicant to make the most of their circumstances allows Defendants and their peers to craft a well-rounded, diverse student body, consistent with each of their educational and societal missions to increase access to education and maximize the educational experience of their students.

### *3. Need-Blind Admissions Policies Seek to Admit and Recruit Students Without Disadvantaging Those Without the Ability to Pay*

73. Need-blind admissions policies are another tool Defendants and their peers use to increase access and ensure that highly qualified applicants can afford to enroll at their schools. Need-blind admissions seek to limit bias in the admissions process by ensuring that when evaluating a candidate for admission, admissions officers do not consider the potential adverse impact the candidate's enrollment might have on the school's budget. This both reduces bias in the admissions process and can be used as a public signal to encourage applications from low-income students. A school's commitment to need-blind admissions is touted as a demonstration of the school's commitment to being accessible and equitable

---

[141] Deposition of John McLaughlin, former Vice Dean and Director of Admissions at University of Pennsylvania, *Henry, et al. v Brown University, et al.*, 1:22-cv-00125 July 12, 2023 ("McLaughlin Deposition"), 241:10-242:8; March 2024 Furda Deposition, 86:11-87:25; "High School Preparation," University of Pennsylvania Admissions, available at https://admissions.upenn.edu/how-to-apply/what-penn-looks-for/high-school-preparation, accessed May 1, 2024.

to high-achieving low-income students. As a faculty member, university administrator, and active participant in broader conversations about college access with education and community-based organizations, I have seen and heard repeatedly how explaining the use of need-blind admissions at certain schools can assuage the fears of low-income applicants who are worried about being penalized for needing financial aid. Coupled with an institutional commitment to meet a student's full need (see **Section II.A.2**), potential applicants have shown greater interest in applying to schools like Defendants and their peers given the reassurance that their ability to pay will not affect their chances of being accepted, and that there will be support available to enable them to attend the school.

74. Need-blind admissions policies were first adopted by some higher education institutions in the 1950s in an effort to ensure that "admissions decisions would be made without regard to an applicant's ability to pay" the listed COA.[142] Historically, Defendants have described their need-blind admissions policies as being aimed at increasing access, consistent with their missions. For example, an MIT press release from 1992 described its need-blind admissions policy as "eliminat[ing] from the admissions process any consideration of an applicant's ability to pay."[143] Penn explained in 1999 that it adopted need-blind admissions

---

142 Roth, Andrew, "Admission, Ethics & Financial Aid: Formulating and Applying an Ethical Framework to the Need-Blind Debate," in *The Journal of College Admission Ethics Series*, Alexandria, Virginia, National Association for College Admission Counseling, 2000, edited by Loveland, Elaina C. and Joyce Raynor, p. 70.

143 "MIT Need-Based Aid Dates Back to 1867," MIT News, 1992, available at https://news.mit.edu/1992/aid-0506, accessed April 29, 2024. This definition from the 1992 MIT news article is reiterated in MIT's deposition testimony and other Defendant testimony available in this matter. For example, Stuart Schmill, Dean of Admissions and Student Financial Services at MIT, testified that need-blind means "an applicant's ability to pay is not a factor in the admission review." Deposition of Stuart Schmill, Dean of Admissions and Student Financial Services at Massachusetts Institute of Technology, *Henry, et al. v Brown University, et al.*, 1:22-cv-00125 June 28, 2023 ("Schmill Deposition"), 29:13-16; *see also* Deposition of David Dukor-Jackson, Director of Admissions at Massachusetts Institute of Technology, *Henry, et al. v Brown University, et al.*, 1:22-cv-00125 May 9, 2022 ("Dukor-Jackson Deposition"), 67:5-21. As another example, Eric Furda, former Dean of Admissions at Penn, testified that need-blind means "not taking into consideration a family's ability to pay to inform the admission decision." November 2023 Furda Deposition, 126:4-9.

policies in 1965 and that being need-blind "meant that Penn would accept a candidate by examination of his or her high-school record, resume, and qualifying statistics without regard to the financial situation of the applicant. This would ensure a fair assessment without consideration of ability to pay college costs."[144] Georgetown has followed a need-blind admissions policy since at least 1978, under which "every student is considered for admissions solely on merit," not "ability to pay."[145]

75. Despite the recognition that need-blind admissions policies help encourage low-income students to apply and reduce bias against low-income students in the admissions process, Defendants are among the relatively few schools that choose to implement need-blind admissions policies. Of the approximately 2,300 four-year schools in the U.S.,[146] only a little more than about 100 had need-blind admissions policies as of 2022.[147] The number of schools that have need-blind admissions policies is constrained by the expectation that such schools also make a strong effort to meet the financial needs of the students they admit. As a result, the number of need-blind schools has fluctuated over time, as some schools decided to move away from need-blind policies due to financial challenges.[148]

---

[144] "Images in Flux: The 20th Century Development of the Undergraduate Experience at Penn," University of Pennsylvania, 1999, available at https://archives.upenn.edu/exhibits/penn-history/images-in-flux/part-8/, accessed July 7, 2024.

[145] GTWNU_0000327371 ("Georgetown University Staff for the 1789 Scholarship Imperative Volunteer Pilot Program," Georgetown University, May 2010) at 392.

[146] National Center for Education Statistics, *Acceptance rates; number of applications, admissions, and enrollees; and enrollees' SAT and ACT scores for degree-granting postsecondary institutions with first-year undergraduates, by control and level of institution: Academic year 2022-23*, available at https://nces.ed.gov/programs/digest/d23/tables/dt23_305.40.asp.

[147] Robinson, Ashley, "All 115 Need-Blind Colleges in the US: A Complete Guide," PrepScholar, 2020, available at https://blog.prepscholar.com/need-blind-colleges-list, accessed July 7, 2024.

[148] *See, for example*, Roth, Michael, "Sustainable Affordability," Wesleyan University, May 30, 2012, available at https://roth.blogs.wesleyan.edu/2012/05/30/sustainable-affordability/, accessed August 4, 2024; "Macalester Today Spring 2005," Macalester College, April 1, 2005, available at https://digitalcommons.macalester.edu/macalestertoday/82/, accessed August 4, 2024, p.4.

76. Notwithstanding the customary understanding of the term "need-blind admissions" in the higher education industry, I understand that Plaintiffs have argued that that the term in Section 568 means that any awareness or consideration of a student's or family's socioeconomic status during the admissions process negates a school's need-blind admissions policy.[149] That is, Plaintiffs suggest that information admissions officers may learn while performing holistic application review—including information about the student's context, background, and life experiences—is sufficient to render that school not need-blind.

77. To the contrary, based on my experience and knowledge of general industry practice, to consider an applicant "without regard to financial circumstances" is generally understood to mean that an applicant will not be disadvantaged in the admissions process due to their potential need for financial aid.[150] The deposition testimony in this case reflects the same understanding: that conducting review "without regard to financial circumstances" means without considering whether an applicant's detailed financial information (such as the information supplied in financial aid applications) indicates that they might qualify for financial aid, not without awareness of any general information that may be suggestive of socioeconomic status.[151] This is consistent with need-blind schools' external messaging

149 The 568 Exemption defines "on a need-blind basis" to mean "without regard to the financial circumstances of the student involved or the student's family." Improving America's Schools Act of 1994, § 568, 15 U.S.C. § 1.

150 *See, for example*, Shaffer, Suzanne, "Need-Blind Colleges & Need-Blind Admissions," appily, available at https://www.appily.com/guidance/articles/finding-your-college/need-blind-admission-colleges, accessed August 4, 2024 ("A college or university that claims to have a need-blind admission policy communicates that your ability to pay for your education will not be considered when offering admission. It does not mean they will meet 100% of your financial need, but they won't deny you admission because you can't afford to pay. In other words, you will be admitted or rejected solely on the merit of your application—not on your ability or inability to pay.").

151 For example, Scott Wallace-Juedes, former Director of Undergraduate Financial Aid at Yale testified need-blind means "admissions decisions are made absent information – financial information that's submitted to the financial aid office about a family's ability to contribute." Deposition of Scott Wallace-Juedes, former Director of

about their financial aid policies,[152] as well as Congress's description of financial circumstances as information "that is derived from such student's financial aid application form, or from any other document or record obtained for the purpose of ascertaining such financial circumstances."[153]

78. The use of need-blind admissions policies works hand in hand with the holistic application review process to reduce bias against low-income students in admissions, to convert low-income applicants into low-income admitted students, and to increase equity of access to education.

---

Undergraduate Financial Aid at Yale University, *Henry, et al. v Brown University, et al.*, 1:22-cv-00125 July 7, 2023 ("Wallace-Juedes Deposition"), 162:5-9. In another example, Shane Maloney, Associate Director for Federal Awards in the Office of Student Financial Aid at University of Wisconsin-Madison, testified that the university has practiced need-blind admissions for many years with the understanding that "admissions makes […] decisions independent of need information from the FAFSA." Deposition of Shane Maloney, Associate Director of Federal Awards at University of Wisconsin-Madison, *Henry, et al. v Brown University, et al.*, 1:22-cv-00125 March 26, 2024 ("Maloney Deposition"), 119:21-120:13. Similarly, Eric Furda, a former Director of Admissions at Columbia, explained that Columbia's need-blind admissions policy meant admissions "did not get information from the financial aid office while we were admitting the class to Columbia College and the School of Engineering and Applied Science." November 2023 Furda Deposition, 25:18-26:8. John DeGioia, President of Georgetown, also testified that "[t]he term on a need-blind basis means without regard to the financial circumstances of the student […] The way that has been typically understood in the higher education community is when we evaluate your potential candidacy, we don't regard your financial capacity, your ability to pay as a relevant factor in our decision to admit you." Deposition of John DeGioia, President of Georgetown University, *Henry, et al. v Brown University, et al.*, 1:22-cv-00125 February 16, 2024 ("DeGioia Deposition"), 172:18-173:4.

[152] For example, in a 1999 edition of Penn's publicly available *Almanac*, Penn's former Director of Financial Aid, Bill Schilling, explained that need-blind admissions "means that when the admissions office is evaluating students, when the selection committees are making their decisions, they are not making them based on whether the student is an aid applicant or not" and that it is the "financial aid application" that "provides information about the family's financial circumstances." "Need-Blind Admissions and the Drive to Increase Endowed Scholarships," University of Pennsylvania Almanac, 1999, available at https://almanac.upenn.edu/archive/v46/n11/fin-aid.html, accessed April 29, 2024. Similarly, since at least 2019, Harvard's website has stated that the university admits students "regardless of their financial circumstances," which means that "your financial need and your aid application will never affect your chance of being admitted to Harvard." "How Aid Works," Harvard College, available at https://college.harvard.edu/financial-aid/how-aid-works, accessed July 25, 2024.

[153] House Conference Report No. 103-761 (1994), p. 912.

### *4. Defendants and Their Peers Prioritize Need-Based Financial Aid over Merit-Based Aid*

79. Financial aid is a tool that Defendants and their peers use to increase access among qualified applicants by ensuring that admitted students can afford to attend the school of their choice. Schools may award institutional financial aid to a student based on the student's level of demonstrated financial need ("need-based aid") or based on other factors such as athletic or academic achievement ("non-need-based aid" or "merit-based aid"). While both forms of aid benefit students by reducing the price of attendance, need-based aid is more focused on distributing aid equitably among students according to their need, as dollars are allocated according to financial circumstances, with more aid offered to students with more need. Each Defendant prioritizes need-based financial aid, as do other members of the 568 Group and their peer schools, and this choice reflects each of these schools' missions of increasing access for admitted students, especially low- and middle-income students, through the use of institutional resources.

#### *a) Need-Based Financial Aid*

80. The principle that aid should be awarded on the basis of need is deeply rooted in higher education and many other social programs.[154] For example, Harvard's first financial aid scholarship was established in 1643 specifically for "the maintenance of some poor

[154] CBD000001 ("2003-2004 School Year IM Users' Guide," The College Board, 2003) at 022 ("Since the founding of postsecondary educational institutions in this country, there has existed a tradition that scholarships and other forms of financial support should be provided for students who are 'in need.'").

ATTORNEYS' EYES ONLY - SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

[scholar],"[155] while MIT established its first need-based scholarship in 1867, two years after classes began.[156]

81. The process of awarding financial aid based on a need calculation mirrors decades of federal and state policy in distributing government benefits. There is a long history of the U.S. government implementing "means-tested" programs that determine an individual's eligibility for benefits based on an assessment of their financial circumstances and needs. For example, programs like the National School Lunch Program,[157] Temporary Assistance for Needy Families ("TANF"),[158] and Supplemental Nutrition Assistance Program ("SNAP"),[159] determine benefit eligibility and amounts according to income thresholds adjusted by family size, a proxy for financial circumstances. Similarly, for over 50 years, the Pell Grant program has been the federal government's primary benefit program for low-income students attending college; award eligibility and amount is based on an evaluation of family financial information provided on the Free Application for Federal Student Aid ("FAFSA").[160] The focus on determining a family's eligibility for a benefit

---

155 "Lady Mowlson Bequeaths the First Undergraduate Scholarship," The Harvard Crimson, available at https://financialaid.hcf.harvard.edu/lady-mowlson, accessed November 30, 2023.

156 "MIT Need-Based Aid Dates Back to 1867," MIT News, 1992, available at https://news.mit.edu/1992/aid-0506, accessed April 29, 2024.

157 Long, Cynthia, "Child Nutrition Programs: Income Eligibility Guidelines," USDA Food and Nutrition Service, February 20, 2024, available at https://www.federalregister.gov/documents/2024/02/20/2024-03355/child-nutrition-programs-income-eligibility-guidelines, accessed August 1, 2024.

158 "Apply for TAFDC," Mass.gov, available at https://www.mass.gov/how-to/apply-for-tafdc, accessed July 26, 2024.

159 "SNAP Eligibility," USDA Food and Nutrition Service, available at https://www.fns.usda.gov/snap/recipient/eligibility, accessed August 5, 2024; *see also* "Massachusetts Supplemental Nutrition Assistance Program (SNAP)," SNAP, available at https://www.benefits.gov/benefit/1280, accessed July 8, 2024.

160 "How the Federal Government Distributes Aid to Students," Lumina Foundation & IHEP, available at https://www.luminafoundation.org/files/resources/form-and-formula-viewing-guide.pdf, accessed December 7, 2023, pp. 5-7; Baum, Sandy, "Exploring Ways to Enhance FAFSA Efficiency: The Federal Methodology: Is It a Good Measure of Ability to Contribute Toward Educational Expenses?," Urban Institute and The National

based on their income and other measures of financial circumstance reflect a recognition that resources—whether from the government or a school—are limited, and there is a desire to ensure that these limited resources be distributed fairly and targeted to those with the greatest financial need.

82. To award need-based financial aid, schools begin by determining each student's level of demonstrated need based on the information students and their families submit via financial aid application forms. The two most common financial aid application forms are: (1) the FAFSA, which is used to award federal financial aid and is also used by certain schools to award their own need-based institutional financial aid;[161] and (2) the College Scholarship Service PROFILE ("CSS PROFILE"), which is used by select schools to help determine additional institutional need-based aid awards.[162] Some schools may also have their own individual financial aid applications, either instead of or in addition to the FAFSA and CSS PROFILE.[163] The financial information from the student and family collected on financial aid applications is then used to calculate the student's EFC.[164]

---

Association of Student Financial Aid Administrators, August 2020, available at https://www.nasfaa.org/uploads/documents/FAFSA_Series_Pt10_Federal_Methodology.pdf, accessed August 21, 2023, p. 4.

[161] "What Is the FAFSA?," CollegeBoard, June 12, 2023, available at https://blog.collegeboard.org/what-is-the-fafsa, accessed August 21, 2023.

[162] "What Are the Different Types of Financial Aid?," BigFuture, available at https://bigfuture.collegeboard.org/pay-for-college/get-help-paying-for-college/different-types-financial-aid, accessed August 2, 2024.

[163] *See, for example*, "Applying for Financial Aid," University of Southern California, available at https://financialaid.usc.edu/graduates/prospective/applying.html, accessed August 7, 2024; "Financial Aid Forms," Boston College, available at https://www.bc.edu/bc-web/offices/student-services/financial-aid/financial-aid-forms.html, accessed August 22, 2023.

[164] "Chapter 3: Expected Family Contribution (EFC)," Federal Student Aid, available at https://fsapartners.ed.gov/knowledge-center/fsa-handbook/2023-2024/application-and-verification-guide/ch3-expected-family-contribution-efc, accessed December 11, 2023.

83. The Federal Government has a set formula for making its EFC calculation using information from the FAFSA to award federal financial aid, but, to award institutional financial aid, each school may have its own specific needs assessment methodology using information from the FAFSA, CSS PROFILE, and/or other forms, to calculate a school-specific EFC. Taking the difference between each student's EFC and the school's COA gives an individualized estimate of each students' financial need, which, as described in **Section II.A.2**, each school then addresses with a financial aid package made up of institutional and/or federal grants, loans, and work study support—and at each Defendant school, this financial aid package covers admitted students' full need.

84. As I have documented in my research, while all students are concerned about the affordability of higher education, many high-income students are able to select and attend a school irrespective of whether they receive financial aid. For low-income students, however, lack of financial aid can mean not attending any post-secondary school.[165] Need-based financial aid, by definition, targets the specific hardship that low-income students face and helps place them on a level playing field with higher-income students. Several studies have demonstrated that need-based financial aid increases enrollment and persistence among low-income students.[166]

85. To advance their missions, including improving the educational experience, broadening access to education, advancing equity and fairness, and increasing diversity, Defendants (and many other schools) therefore spend substantial time and effort attempting to ensure

---

165 Long, Bridget T., "Making College Affordable by Improving Aid Policy," *Issues in Science and Technology*, Vol. 26, 2010, p. 34. All class members attended a Defendant institution, meaning the amount of aid they were awarded was sufficient for them to attend that institution.

166 For a review of such research, see Dynarski, Susan et al., "Chapter 4 - College Costs, Financial Aid, and Student Decisions," Vol. 7, Handbook of the Economics of Education, 2023, pp. 240-244.

that need-based financial aid reaches the neediest students and does so in a manner that is equitable and fair. Through the need analysis process, schools that award need-based financial aid seek to adhere to the principle of "vertical equity," which is to treat families in different financial circumstances differently, and the principle of "horizontal equity," which is to treat families in similar financial circumstances similarly.[167]

86. Analysis of IPEDS data shows that Defendants' efforts have been successful. As shown in **Figure 5**, and as noted above in **Section II.A.2**, despite rising COA, the average net price for any student receiving aid remained constant from academic year 2008-2009 to 2021-2022. Among students receiving any form of federal aid, the average net price for students whose families were in income brackets under $75,000 was substantially lower than the overall average net price for any aided student, and in fact decreased across Defendants. For example, federally-aided students whose families were in the $48,000 to $75,000 income bracket saw the average net price decrease from $19,290 in the 2008-2009 academic year to $7,887 in the 2021-2022 academic year.[168]

---

167 Baum, Sandy, "A Primer on Economics for Financial Aid Professionals," CollegeBoard, 2004, available at https://professionals.collegeboard.org/pdf/primer-economics-financial-aid-professionals.pdf, accessed September 14, 2023, p. 8.

168 Net price is adjusted for inflation to 2022 dollars using the CPI. For academic years, I apply the inflation adjustment to the year of the spring semester. For example, nominal amounts in academic year 2008-2009 are treated as 2009 dollars. Backup materials to this report (IPEDS, Net Price); National Center for Education Statistics, *Integrated Postsecondary Education Data System*, available at https://nces.ed.gov/ipeds/datacenter; "Consumer Price Index for All Urban Consumers: All Items in U.S. City Average," Federal Reserve Bank of St. Louis, June 2024, available at https://fred.stlouisfed.org/series/CPIAUCNS, accessed August 7, 2024.

ATTORNEYS' EYES ONLY - SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

**Figure 5**
**Defendants' Average Net Price Decreased Over Time for Federally-Aided Students in Low-Income Brackets[169]**




**Notes:**
[1] A school's published cost of attendance is reported in IPEDS in the field "Total Price." IPEDS calculates this field as the sum of tuition, required fees, room and board, books and supplies, and other expenses for on-campus first year students. Average cost of attendance in a given year is calculated as the sum of cost of attendance across Defendants in a given year divided by 17, the number of Defendants.
[2] Net prices for federally-aided students for each of the income bracket shown are reported in IPEDS in the fields: "Average net price (income 0-30,000)-students awarded Title IV federal financial aid," "Average net price (income 30,001-48,000)-students awarded Title IV federal financial aid," and "Average net price (income 48,001-75,000)-students awarded Title IV federal financial aid." IPEDS calculates these fields by subtracting the average amount of aid students receive from federal, state, and local government sources, as well as institutional grant and scholarship aid from cost of attendance. These fields are available starting in the 2008-2009 academic year.
[3] Average net price and average cost of attendance are adjusted for inflation to 2022 dollars using the CPI. For academic years, I apply the inflation adjustment to the year of the spring semester. For example, nominal amounts in academic year 2008-2009 are treated as 2009 dollars.

---

[169] National Center for Education Statistics, *Integrated Postsecondary Education Data System*, available at https://nces.ed.gov/ipeds/datacenter; Backup materials to this report (IPEDS, Net Price); National Center for Education Statistics, *Integrated Postsecondary Education Data System*, available at https://nces.ed.gov/ipeds/datacenter; "Consumer Price Index for All Urban Consumers: All Items in U.S. City Average," Federal Reserve Bank of St. Louis, June 2024, available at https://fred.stlouisfed.org/series/CPIAUCNS, accessed August 7, 2024.

[4] All 17 Defendants are included for the entire period, regardless of their membership in the 568 Group. Emory's Oxford College is listed separately but does not consistently report information between 2008-2009 and 2021-2022 and is therefore excluded from this analysis.

### *b) Merit-Based Financial Aid*

87. Unlike need-based financial aid, a student's eligibility for merit-based aid does not depend on the student's financial circumstances. Only some Defendant schools offer merit-based aid. Chicago, Duke, Emory, Johns Hopkins, Northwestern, Notre Dame, Rice, and Vanderbilt offer or have offered limited merit-based aid to students, with eligibility criteria that vary based on the specific scholarship.[170] For example, Notre Dame offers merit-based scholarships to less than five percent of first-year students "based on their highly competitive academic records, demonstrated leadership, and service to their communities," each with different eligibility criteria based on a "very competitive" selection process:[171] some require the prospective student to commit to majoring in certain degrees, such as engineering, while others require the prospective student to be a resident of a specific county or country.[172] Additionally, Duke, Johns Hopkins, Georgetown, Northwestern,

[170] "Merit Scholarships," University of Chicago, available at https://collegeadmissions.uchicago.edu/financial-support/scholarships/merit-scholarships, accessed July 6, 2024; "Merit Scholarships," Duke University, available at https://ousf.duke.edu/merit-scholarships/, accessed July 6, 2024; "Grants and Scholarships," Emory University - Office of Financial Aid, available at https://studentaid.emory.edu/undergraduate/types/grants-scholarships/index.html, accessed August 5, 2024; "Merit Scholarships," Johns Hopkins University, available at https://apply.jhu.edu/tuition-aid/types-of-financial-aid/merit-scholarships/, accessed July 6, 2024; "Admitted Student FAQs," Northwestern University, available at https://undergradaid.northwestern.edu/apply-for-aid/prospective-students/admitted-student-faqs.html, accessed August 5, 2024; "Athletics Compliance Office," University of Notre Dame Department of Athletics, available at https://financialaid.nd.edu/aid-types/undergraduate-students/merit-based-scholarships/ accessed June 27, 2024; "Merit Scholarships," Rice University, available at https://financialaid.rice.edu/types-aid/merit-scholarships, accessed July 6, 2024; "Merit Scholarship Opportunities," Vanderbilt University, available at https://www.vanderbilt.edu/scholarships/faq.php, accessed June 27, 2024.

[171] "Funding Types," University of Notre Dame, available at https://admissions.nd.edu/aid-affordability/funding-types/, accessed July 26, 2024; "Notre Dame Scholars' Program," University of Notre Dame, available at https://scholars.nd.edu/, accessed August 3, 2024.

[172] "Notre Dame Scholars' Program All Awards (A-Z)," University of Notre Dame Office of the Provost, available at https://scholars.nd.edu/awards/list-of-awards/, accessed August 2, 2024.

rigorous courses at their high schools, and they may need to devote time to less rewarded activities, such as needing to work to support their families.[180]

90. In sum, prioritizing need-based aid over merit-based aid does not help Defendants and their peers increase their revenues. Defendants and their peers nevertheless do prioritize need-based aid over merit-based aid because doing so serves to distribute their finite institutional aid resources equitably in terms of need, thereby advancing their educational and societal missions.

#### *5. Efforts to Simplify Communications of Financial Aid Policies Encourage High-Achieving, Low-Income Students to Apply*

91. Another means by which some Defendants and their peers try to increase access is by simplifying communications around financial aid policies. This initiative helps increase access for low-income applicants in particular, as one of the barriers faced by these applicants is an expectation, despite need-blind admissions policies and commitments to meet full need, that they will not be able to afford to attend schools like Defendants and their peers. In practice, low-income students often pay less to attend such schools than they would to attend schools with lower published prices, due to the financial aid awards of Defendants and their peers. Given the complexity of the federal financial aid process and the fact that many low-income students lack school support or parental knowledge of how to navigate the institutional aid process, they are often unaware of how much they could

[180] Long and Riley (2007), p. 45. *See also, for example,* JHULIT_0000001992 ("Email with subject line 'Re: The Realignment/Recruitment from rural areas'," November 2, 2021) ("We have had to train staff to better understand what achievement looks like for students from under resourced backgrounds. For example, it is common for students to have to work to help support their family so you may not see the same level of involvement in clubs or organizations. But working to help your family is a significant indicator of engagement and being an active community member.").

receive in financial aid. Improving messaging around financial aid to bridge this knowledge gap improves access by encouraging applications from high-achieving low-income students who might otherwise assume they would not be able to afford to attend schools like Defendants and their peers. This has been a major part of my research, both diagnosing the problem and creating interventions and advocating for policies that would help low-income students better understand and access the financial aid they are eligible to receive.[181]

92. The data are clear that the net price for federally-aided low-income students at Defendants would be lower than many other schools that appear to have a lower COA. For example, in the 2021-2022 academic year, Georgetown's average COA was $81,515, Penn's average COA was $83,298, Vassar College's average COA was $80,830, and UVA's average in-state COA was $36,314 and its average out-of-state COA was $70,696.[182] However, a federally-aided student with a family household income between $48,000 and $75,000 would have paid an average net price of $11,409 at Georgetown and $11,544 at Penn in the 2021-2022 academic year.[183] By contrast, a federally-aided student with a family

---

181 *See, for example*, Bettinger, Eric P. et al., "The Role of Application Assistance and Information in College Decisions: Results from the H&R Block FAFSA Experiment," *The Quarterly Journal of Economics*, Vol. 127, No. 3, 2012; Avery, Christopher et al., "Digital Messaging to Improve College Enrollment and Success," *Economics of Education Review*, Vol. 84, 2021.

182 Backup materials to this report (IPEDS, Net Price); National Center for Education Statistics, *Integrated Postsecondary Education Data System*, available at https://nces.ed.gov/ipeds/datacenter. Published cost of attendance is reported in IPEDS in the field "Total Price." IPEDS calculates this field as the sum of tuition, required fees, room and board, books and supplies, and other expenses for on-campus first year students.

183 Backup materials to this report (IPEDS, Net Price); National Center for Education Statistics, *Integrated Postsecondary Education Data System*, available at https://nces.ed.gov/ipeds/datacenter. Net prices for federally-aided students with a household income between $48,000 and $75,000 are reported in IPEDS in the field: "Average net price (income 48,001-75,000)-students awarded Title IV federal financial aid." IPEDS calculates this fields by subtracting the average amount of aid students receive from federal, state, and local government sources, as well as institutional grant and scholarship aid from cost of attendance.

household income between $48,000 and $75,000 would have paid an average net price of $20,408 at Vassar College and $14,884 at UVA.[184]

93. Although many students would pay less to attend Defendant schools, many students are unaware of this given the complexity of the financial aid process. Defendants and their peers have sought to address the information gaps faced by low-income students by simplifying communications around their financial aid policies and addressing concerns specific to low-income students. For example, students often do not understand the differences in the types of financial aid (i.e., grants, which do not need to be paid back, versus loans, which need to be paid back, versus work-study, which is earned through student labor). Moreover, with little awareness about grant aid, low-income students often assume the aid they will receive will be loans. This is especially concerning in efforts to increase college access because, as I note in my research, the academic literature has documented a higher prevalence of debt aversion among low-income students.[185] In fact, a 2002 survey found that low-income students were more likely to report that student loan debt impacted their decision to pursue higher education or their choice of institution.[186] Lower levels of financial literacy also contribute to the aversion low-income students and families have to taking on any debt.[187]

---

184 Backup materials to this report (IPEDS, Net Price); National Center for Education Statistics, *Integrated Postsecondary Education Data System*, available at https://nces.ed.gov/ipeds/datacenter.

185 Long, Bridget T., "The New Financial Aid Policies: Their Impact on Access and Equity For Low-Income Students?," *Harvard Graduate School of Education*, 2010, p. 6. *See also* Long (2011).

186 Baum, Sandy and Marie O'Malley, "College on Credit: How Borrowers Perceive Their Education Debt," *Journal of Student Financial Aid*, Vol. 33, No. 3, 2003. *See also* Avery, Christopher et al., "A Revealed Preference Ranking of U.S. Colleges and Universities," *The Quarterly Journal of Economics*, Vol. 128, No. 1, 2013.

187 Anderson, Drew M. et al., "The State of Financial Knowledge in College: New Evidence from a National Survey," *RAND Corporation*, 2018, p. 2; Markle, Gail, "Crushing Debt or Savvy Strategy? Financial Literacy and Student Perceptions of their Student Loan Debt," *Journal of Student Financial Aid*, Vol. 49, No. 1, 2019, p. 1.

94. In response to the growing literature on debt aversion, as shown in **Figure 6** below, since 2008, many of the Defendants have introduced no-loan policies for all undergraduate students, which eliminate loans from financial aid packages and replace them with scholarships, grants, or work-study. These blanket policies aim to increase applications from low-income students concerned about loan debt, particularly since they are simple and easy to communicate.

**Figure 6**
**Defendants' No-Loan Policies as of 2023**[188]

| Institution | Year |
|---|---|
| Columbia | 2008 |
| Yale | 2008 |
| Penn | 2009 |
| Vanderbilt | 2009 |
| Chicago | 2015 |
| Northwestern | 2016 |
| MIT | 2017 |
| Brown | 2018 |
| Johns Hopkins | 2019 |
| Dartmouth | 2022 |
| Emory | 2022 |
| Rice | 2022 |

**Notes:**
[1] As of 2023, Caltech, Cornell, Duke, Georgetown, and Notre Dame do not have no-loan policies.
[2] Penn phased in their no-loan policy beginning September 2008 restricted to undergraduates with calculated family incomes under $100,000 and extended the policy to all undergraduate students eligible for financial aid in 2009.
[3] Chicago and Northwestern implemented their policy for incoming first-year and future undergraduate students.
[4] MIT previously established a no-loan policy for all undergraduate students before 2011 but ended their policy as of the 2011-2012 academic year. MIT reinstated their no-loan policy as of the 2017-2018 academic year.

95. Similarly, some of the Defendants have instituted income threshold policies whereby prospective students with family incomes under a certain amount (and with typical amounts of assets) will not have loans in their financial aid packages or will not have a required

188 Backup to this report (No-Loan Timeline); **Appendix C** (No-Loan Timeline).

parent contribution to the cost of their education. For example, in January 2008, Cornell announced a policy that eliminated loans for families with income less than $60,000 and assets less than $100,000.[189] In 2014, Brown eliminated parent contributions for families with total parent earnings lower than $60,000 and assets lower than $100,000, and for families with earnings lower than $60,000 but assets greater than $100,000, required "a significantly reduced parent contribution (from assets only)."[190] In practice, many of these students would not have been expected to contribute under the schools' existing institutional need analysis methodologies. These types of income threshold policies have been shown to be much more impactful on student interest and decisions due to their simplicity, in comparison to aid programs that emphasize EFC and other concepts embedded in the complex financial aid process and forms.[191]

96. The reduced use of loans in financial aid packaging has been shown to increase the matriculation of Pell Grant recipients.[192] Thus, Defendants' and their peers' efforts to simplify communications reflect their commitment to encouraging low-income students to apply, as part of each of their overarching goals of increasing access.

---

189 "Cornell Drops Need-Based Loans for Students From Families Earning Under $75,000," Cornell University, January 31, 2008, available at https://news.cornell.edu/stories/2008/01/cornell-announces-sweeping-new-financial-aid-program, accessed August 6, 2024.

190 BROWN_0000050379 ("Financial Aid Office: Undergraduate Overview," Brown University, 2014) at 379 ("Families with total parent earnings less than $60,000 and assets greater than $100,000 have a significantly reduced contribution (from assets only).").

191 Avery, Christopher et al., "Cost Should Be No Barrier: An Evaluation of the First Year of Harvard's Financial Aid Initiative," *National Bureau of Economic Research Working Paper Series*, 2006. *See also* Deposition of Sarah Donahue, former Director of Financial Aid at Harvard University, *Henry, et al. v Brown University, et al.*, 1:22-cv-00125 March 26, 2024 ("Donahue Deposition"), 30:2-10, 37:12-38:4, 116:18-117:6.

192 Bennett, Christopher "Taken for Granted? Effects of Loan-Reduction Initiatives on Student Borrowing, Admission Metrics, and Campus Diversity," *Research in Higher Education*, 2020.

114. Ultimately, Ms. Mora's opinion that Defendants "in many material respects, operate like for-profit businesses"[241] reflects a view of higher education institutions that ignores the fundamental purpose and mission of these schools in favor of shallow and meaningless comparisons.

## III. THE 568 GROUP WAS FORMED TO IMPROVE EQUITY AND TRANSPARENCY IN NEED ANALYSIS

115. As discussed in **Section II.C.4**, need-based financial aid is an important tool for fulfilling each Defendant's mission for increasing access, as without financial aid, many students would be unable to afford Defendant schools, educational opportunities would be restricted to wealthier students, and educational quality would suffer. To ensure that each school's institutional grant aid is fairly and equitably distributed to those admitted students who truly do not have the financial means to attend otherwise, each Defendant estimates students' financial need.

116. Defendants and other schools similarly focused on increasing access were some of the few schools in the U.S. that offer both need-blind admissions and a guarantee to meet full financial need. These schools recognized that the magnitude of their financial aid programs and the important commitments that they were making to increase educational equity, access, and excellence required attention and discussion dedicated to the issue of need analysis. This was especially important at the time of the 568 Group's founding due to increasing questions and debates about the most accurate way to measure need, and

2024 ; "2019 Annual Report," American Red Cross, 2019, available at https://www.redcross.org/content/dam/redcross/about-us/publications/2019-publications/Annual-Report-2019.pdf, accessed August 4, 2024.

241 Mora Report, ¶ 5.

concerns about the viability of various need analysis approaches in terms of institutional sustainability. As my analysis of documentary evidence and academic literature demonstrates, Defendants and other similarly access-focused schools created the 568 Group to discuss and develop recommendations for best practices in need analysis. These discussions and best practices improved the American financial aid system and led to guidelines around specific elements of need analysis, many of which resulted in lower EFCs for many students, therefore benefiting proposed class members.

117. There were many efforts in the higher education industry and by the federal government, nonprofit organizations, and industry groups, including the 568 Group, to continually refine need analysis methodologies as the financial circumstances of students eligible for need-based aid became increasingly varied and nuanced, and as schools and other organizations adapted to contend with these complex circumstances. These efforts centered on the goals of increasing access for students by better meeting their financial needs in a fair and equitable way.

### A. Need Analysis Systems Are Designed to Equitably Distribute Finite Need-Based Financial Aid Across Families with Varied Economic Circumstances

#### *1. Need Analysis Systems that Honor Both Vertical and Horizontal Equity for Students Are Complex and Nuanced*

118. Schools focused on increasing educational access, including Defendants, implemented need analysis systems consistent with each school's effort to allocate finite aid resources fairly, so that those with the greatest level of financial need receive the most financial aid (i.e., vertical equity), and students with similar levels of financial need receive similar

amounts of financial aid (i.e., horizontal equity).[242] While it would be convenient for schools to simply rely on common measures of a family's financial circumstances in calculating financial need such as adjusted gross income ("AGI"), which is an important measure in calculating federal tax liability, these measures fail to adequately capture the financial picture for many families with college-aged children. For instance, AGI does not incorporate the earnings of people who may have complex investments, assets, and expenses.[243] Failing to account for these financial situations and treating all families with the same income equally can lead to inequitable outcomes.

119. To demonstrate this concern, consider two students whose families report the same annual income and net worth, but one family lives in Massachusetts (which has the fourth-highest cost of living for all states) while the other lives in Mississippi (which has the fifth-lowest cost of living for all states).[244] Despite having the same income, these two families may have different financial circumstances driven by differences in the cost of living they experience. Therefore, expecting both families to contribute the same amount to their child's college education may not be an equitable outcome. Additionally, the exact family composition and other metrics might be important to an equitable calculation of financial aid. If one of these families is supporting multiple dependents, they might not be able to contribute as much of their income to college expenses as a family with fewer dependents

---

242 Baum, "A Primer on Economics for Financial Aid Professionals," CollegeBoard, 2004, available at https://professionals.collegeboard.org/pdf/primer-economics-financial-aid-professionals.pdf, accessed September 14, 2023, p. 8.

243 Baum, "A Primer on Economics for Financial Aid Professionals," CollegeBoard, 2004, available at https://professionals.collegeboard.org/pdf/primer-economics-financial-aid-professionals.pdf, accessed September 14, 2023, p. 60.

244 "Cost of Living Data Series," Missouri Economic Research and Information Center, 2024, available at https://meric.mo.gov/data/cost-living-data-series, accessed August 2, 2024.

ATTORNEYS' EYES ONLY - SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

because their essential expenses are higher. Without information on the exact spending patterns of the two families as well as on their family context, it would be difficult to determine which family truly has more need.

120. As another example, consider three families that report the same annual income, but (i) one family has simple W-2 income from the parents' full-time employment, (ii) the second family reports half its income from real estate investments that accounts for depreciation and other losses reported on tax forms, and (iii) the third family reports income from a home child-care business. The W-2 income is simple to verify, but the incomes from the other two families are more complex to assess for purposes of evaluating a family's ability to pay for college. For the second family with real estate investments, depreciation and losses lower the family's reported income on paper, but "do not necessarily reduce the family's cash flow or their ability to make financial decisions."[245] The fact that the family owns real estate properties also suggests that it may be in a stronger overall financial position than the other families. Income from a home child-care business is also not simple W-2 income, and appropriately accounting for the revenue and expenses related to such an endeavor is difficult. Such circumstances highlight the challenge to determining how much each family is able to pay for higher education given their different income sources and assets.

121. As shown by the above examples, determining how to interpret and evaluate families' myriad income sources, assets, and expenses to ensure vertical and horizontal equity is a complex task. In essence, the details of a family's income, expenses, and context, which

[245] NULIT-0000000680 ("Institutional Methodology User Guide," Northwestern University, July 15, 2021) at 690.

could include their location, living situation, and a host of other factors such as the parents' occupations and work histories, would be needed to determine how to equitably define need across students.

122. Given the complexity and multiple ways to interpret different family situations, building a fair need analysis system requires significant expertise. However, even with extensive information and expertise, financial aid offices face an enormous challenge because there is often no single "right" answer to the question of how much a family can afford to pay for their child's higher education. What one person might deem as an essential expense that cannot be reallocated to paying for college, another person might consider discretionary. Additionally, opinions can vary about whether and how to count the income of noncustodial parents and to what degree a family's home equity or other illiquid assets should be considered as part of their wealth.

123. To manage the complex process and debatable questions about what should and should not be included in a fair need analysis, schools that provide need-based financial aid typically develop a need analysis methodology and use software to process and analyze the extensive information they receive, guided by manuals or guidelines for their financial aid officers to use when reviewing students' EFCs. This process constitutes the institution's baseline need analysis approach, including how the school aims to treat different students equitably while taking into account recommendations on how to deal with the particular family circumstances such as those discussed above.

124. In addition to common practices for need analysis, financial aid officers can also apply their professional judgment throughout the need analysis process, including making adjustments to inputs to the need analysis software, as well as adjustments directly to the

software-outputted EFC. Professional judgment refers to the officers' individual discretion to address nuanced circumstances that are not otherwise or adequately accounted for in the baseline need analysis methodology.[246] Different financial aid officers can therefore estimate different EFCs for a given family, even when looking at the same financial information, if they, for example, deem it necessary to treat depreciation or losses against reported income differently or to evaluate the expenses for a home child-care business differently. Professional judgment has been an important way for schools to address unusual profiles of admitted students. Over time, however, the goal is for frequently recurring circumstances to be accounted for by the baseline rules or methods, reserving professional judgment adjustments for one-off or unique situations.

#### 2. *Need Analysis Systems Grew in Complexity as Schools Sought to Address the Needs of a Wider Range of Student Backgrounds*

125. As illustrated in the examples above, need analysis can quickly become a complex endeavor when trying to ensure vertical and horizontal equity, even among students with relatively common financial profiles. Several social and demographic shifts in the past few decades increased the range of variation in applicant backgrounds. At the same time, Defendants' and their peers' commitments to social mobility prompted them to admit increasingly diverse groups of students, further increasing the range of familial circumstances being presented to university financial aid offices. Accordingly, these

246 *See, for example*, "What is Professional Judgment?," Federal Student Aid, available at https://studentaid.gov/help-center/answers/article/what-is-professional-judgment, accessed July 7, 2024 ("When there are unusual situations or circumstances that impact your federal student aid eligibility, federal regulations give a financial aid administrator discretion or professional judgment on a case-by-case basis and with adequate documentation to make adjustments to the data elements […] that impact your Expected Family Contribution (EFC) to gain a more accurate assessment of your family's ability to contribute to your cost of education.").

ATTORNEYS' EYES ONLY - SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

existing approaches into "a coherent whole."[269] The federal government endorsed the UM in 1986, when the government modeled the Congressional Methodology after the UM to distribute all federal aid other than Pell Grants (which continued to be distributed using the separate Pell Grant Methodology).[270]

135. In the early 1990s, the federal government replaced the Pell Grant Methodology and the Congressional Methodology with the Federal Methodology ("FM"), and required schools to use the FM to distribute federal aid to students. The FM's most notable update was its removal of home equity from its EFC calculation, meaning its financial aid form, the FAFSA, would not collect this information.[271] Although home equity had previously been counted as an asset that could be borrowed against to fund college, it was removed in part because it is an illiquid asset, and the government did not want to create an expectation that families re-mortgage their houses to pay for college.[272] This decision also reflected the

[269] "How the Federal Government Distributes Aid to Students," Lumina Foundation & IHEP, available at https://www.luminafoundation.org/files/resources/form-and-formula-viewing-guide.pdf, accessed December 7, 2023, p. 6.

[270] Clotfelter, Charles T., "Financial Aid and Public Policy," in *Economic Challenges in Higher Education*, University of Chicago Press, 1991, pp. 95-96; Baum, "Exploring Ways to Enhance FAFSA Efficiency: The Federal Methodology: Is It a Good Measure of Ability to Contribute Toward Educational Expenses?," Urban Institute and The National Association of Student Financial Aid Administrators, August 2020, available at https://www.nasfaa.org/uploads/documents/FAFSA_Series_Pt10_Federal_Methodology.pdf, accessed August 21, 2023, pp. 4-5; "How the Federal Government Distributes Aid to Students," Lumina Foundation & IHEP, available at https://www.luminafoundation.org/files/resources/form-and-formula-viewing-guide.pdf, accessed December 7, 2023, p. 6.

[271] Baum, "Exploring Ways to Enhance FAFSA Efficiency: The Federal Methodology: Is It a Good Measure of Ability to Contribute Toward Educational Expenses?," Urban Institute and The National Association of Student Financial Aid Administrators, August 2020, available at https://www.nasfaa.org/uploads/documents/FAFSA_Series_Pt10_Federal_Methodology.pdf, accessed August 21, 2023, p. 5.

[272] Baum, "Exploring Ways to Enhance FAFSA Efficiency: The Federal Methodology: Is It a Good Measure of Ability to Contribute Toward Educational Expenses?," Urban Institute and The National Association of Student Financial Aid Administrators, August 2020, available at https://www.nasfaa.org/uploads/documents/FAFSA_Series_Pt10_Federal_Methodology.pdf, accessed August 21, 2023, p. 11; Baum, "A Primer on Economics for Financial Aid Professionals," CollegeBoard, 2004, available at https://professionals.collegeboard.org/pdf/primer-economics-financial-aid-professionals.pdf, accessed September 14, 2023, p. 72.

sense by some that home equity might be the main source of savings for a family, and thus should be treated more as a retirement asset than as a means of getting funds to pay for college. On the other hand, many financial aid professionals believed that by removing home equity, the FM ignored real differences in the financial stability of families who owned homes and that of families that did not.[273] Given these differing views about the treatment of home equity, this decision was controversial.

136. Recognizing that the changes introduced by the FM "would require a significantly reduced set of financial data" and due to an expressed need "for an alternative methodology to assist schools in determining need for institutional and other nonfederal funds,"[274] the College Board responded by developing an alternative need analysis methodology, the Institutional Methodology ("IM"), in 1993. The goal of the IM was to provide schools with a more complete understanding of a family's financial situation.[275] This involved collecting and evaluating more information than was required by the FM, such as home equity and financial information for all families, regardless of their income levels, so that schools

[273] Baum, "Exploring Ways to Enhance FAFSA Efficiency: The Federal Methodology: Is It a Good Measure of Ability to Contribute Toward Educational Expenses?," Urban Institute and The National Association of Student Financial Aid Administrators, August 2020, available at https://www.nasfaa.org/uploads/documents/FAFSA_Series_Pt10_Federal_Methodology.pdf, accessed August 21, 2023, p. 11.

[274] CBD000001 ("2003-2004 School Year IM Users' Guide," The College Board, 2003) at 030 ("As it became apparent that FM would require a significantly reduced set of family financial data, a need was expressed for an alternative methodology to assist institutions in determining need for institutional and other nonfederal funds.").

[275] CBD000001 ("2003-2004 School Year IM Users' Guide," The College Board, 2003) at 029-030 ("[The IM was] designed to provide a comprehensive assessment of family income and asset strength.").

could evaluate both income and assets to assess financial need.[276] The IM collected this information through a more detailed financial aid form: the CSS PROFILE.[277]

### C. The 568 Group Provided a Valuable Forum for Schools to Discuss and Improve Equity and Transparency in Need Analysis

137. The introduction of the FM and IM in quick succession, at a time when some schools were moving away from need-based financial aid due to budgetary concerns, increased the need for schools to be able to discuss the impact of these methodologies on their respective students and existing financial aid policies.[278] Building on prior efforts by schools, the federal government, and other organizations to improve need analysis methods, the 568 Group represented an institution-led effort by Defendants and their peers to reaffirm their existing commitments to the principles of need-based aid, as well as to refine common need analysis guidelines to improve transparency and equity among families, in line with their broader dedication to their long-standing missions of equitable and fair allocation of finite resources.

[276] CBD000001 ("2003-2004 School Year IM Users' Guide," The College Board, 2003) at 029-030; Baum, "A Primer on Economics for Financial Aid Professionals," CollegeBoard, 2004, available at https://professionals.collegeboard.org/pdf/primer-economics-financial-aid-professionals.pdf, accessed September 14, 2023, p. 70 ("Among those who apply for financial aid through the CSS/Financial Aid PROFILE, a significant portion of those at the low end of the income distribution have relatively high net worth, while many of those with high incomes do not have measurable assets.").

[277] CBD000001 ("2003-2004 School Year IM Users' Guide," The College Board, 2003) at 030.

[278] For example, between 1986 and 1992, the percent of tuition at private schools covered by federal financial aid declined from 22 percent to 16 percent, increasing the burden on schools and/or students. McPherson, Michael S. and Morton O. Schapiro, "Financing Undergraduate Education: Designing National Policies," *National Tax Journal*, Vol. 50, No. 3, 1997, p. 560. *See also* McPherson and Schapiro (1998), p. 17 ("But it is fair to say that the number of institutions following the 'need-blind, full-need' strategy—always a small number—has shrunk in the past decade and that most institutions have moved their financial aid operations from the direction of the [budget stretch approach] significantly toward the strategic maximization camp."); COFHE-02-00009085 ("Materials for the Next Meeting on September 13," 568 Presidents' Working Group, September 3, 1999) at 091 ("Only a few (30-40) institutions still maintain positions that are fully need-based, all need-blind, and meet full need.").

increasingly using formal retirement savings accounts, which were already protected from need analysis methodologies.[291]

143. These discussions benefited students in multiple ways and enhanced equity in need analysis processes. For example, the 2001 refinement of the IM led to schools reporting fewer appeals in the first year following implementation, suggesting that these updates led to a more equitable and efficient allocation of institutional aid that aligned with families' expectations.[292]

144. The 568 Group thus represented an institution-led effort by Defendants and some of their peers to reaffirm their existing commitments to the principles of need-based aid, as well as to refine common need analysis guidelines to improve transparency and equity among families.

### D. The 568 Group Developed Recommended Best Practices for Need Analysis that Benefited Students

145. The 568 Group focused its efforts on developing best practices for need analysis, focusing on specific elements that needed "to be addressed if fairness and equity across institutions [were] to be recognized."[293] The 568 Group's recommendations and discussions were documented in the CM Guidelines, which were circulated to members and updated over time to reflect additional discussion and information as it became available. By December 2016, the latest date for which finalized CM Guidelines were produced in this matter, the

291 Baum, "A Primer on Economics for Financial Aid Professionals," CollegeBoard, 2004, available at https://professionals.collegeboard.org/pdf/primer-economics-financial-aid-professionals.pdf, accessed September 14, 2023, pp. 83–85.

292 CBD000001 ("2003-2004 School Year IM Users' Guide," The College Board, 2003) at 031.

293 COFHE-02-00009085 ("Materials for the Next Meeting on September 13," 568 Presidents' Working Group, September 3, 1999) at 093.

CM Guidelines discussed the treatment of 17 elements used in need analysis for domestic students.[294]

146. Often, the CM Guidelines highlighted financial burdens faced by families that were not adequately accounted for by the IM. In these cases, the CM Guidelines recommended modifications to better estimate the needs of students, which acknowledged the need for more aid than what the IM suggested. As described in the CM Guidelines, "[i]n developing its policy guidelines, the 568 Group has focused on arriving at the 'right' approach to determining parental ability to pay without regard to potential cost implications. For many families, especially middle-income families, the methodology has the effect of reducing the expected family contribution."[295] The 568 Group therefore anticipated that the CM Guidelines would "reduce expected parent contributions in the aggregate."[296] Although the effect of the CM Guidelines' recommendations on a student's EFC depended on the student's and their family's individualized financial circumstances, there were several

[294] NULIT-0000000348 ("568 Presidents' Group: Consensus Methodology Policy Guidelines," 568 Presidents' Group, 2016). In addition to the CM Guidelines dated December 2016, I have also identified three final drafts dated June 2001, 2004-2005, November 2015; *see* UCHICAGO_0000183661 ("Report of The Common Standards Subcommittee to The 568 Presidents' Working Group," 568 Presidents' Working Group, June 1, 2001); NULIT-0000161662 ("Consensus Methodology Policy Guidelines Manual," The 568 Presidents' Group, 2004); DARTMOUTH_0000152041 ("The 568 Presidents' Group Consensus Methodology Policy Guidelines," The 568 Presidents' Group, November 2015); DARTMOUTH_0000091786 ("The 568 Presidents' Group Consensus Methodology Policy Guidelines," The 568 Presidents' Group, December 2016); as well as drafts dated November 2010, November 2012, January 2013, October 2014, and March 2019; *see* Emory_568Lit_0000224 ("The 568 Presidents' Group Consensus Methodology Policy Guidelines," The 568 Presidents' Group, November 2010); MIDDLEBURY003665 ("The 568 Presidents' Group Consensus Methodology Policy Guidelines," The 568 Presidents' Group, November 2012); GTWNU_0000006237 ("The 568 Presidents' Group Consensus Methodology Policy Guidelines," The 568 Presidents' Group, January 2013); GTWNU_0000141656 ("The 568 Presidents' Group Consensus Methodology Policy Guidelines," The 568 Presidents' Group, October 2014); MITLIT-000006825 ("The 568 Presidents' Group Consensus Methodology Policy Guidelines," The 568 Presidents' Group, December 2016); *see also* **Appendix D**.

[295] NULIT-0000000348 ("568 Presidents' Group: Consensus Methodology Policy Guidelines," 568 Presidents' Group, 2016) at 351.

[296] NULIT-0000000348 ("568 Presidents' Group: Consensus Methodology Policy Guidelines," 568 Presidents' Group, 2016) at 352.

ATTORNEYS' EYES ONLY - SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

recommendations in the CM Guidelines that would more commonly lower students' EFCs. Below, I describe some of the recommendations that benefited students and could lead to more financial aid, which is inconsistent with a coordinated effort to suppress institutional grant aid as alleged by Dr. Singer.

*1. Cost-of-Living Adjustments*

147. Throughout the Class Period, the IM provided families with an Income Protection Allowance ("IPA") and an Emergency Reserve Allowance ("ERA") that reduced the amount of income and assets, respectively, that could be assessed to pay for higher education.[297] Financial aid officers debated whether and how these allowances should account for differences in the cost of living in different areas of the country since at least 1995.[298] Failing to account for differences in the cost of living could lead to horizontal inequity, with families in similar economic circumstances being treated differently. However, as discussed above in **Section III.A.1**, there were numerous difficulties in implementing such an adjustment in practice, including identifying which areas of the country should receive an adjustment and developing an appropriate method to distinguish differences in cost of living from differences in standard of living associated with different areas.[299]

297 CBD000001 ("2003-2004 School Year IM Users' Guide," The College Board, 2003) at 044-045; NULIT-0000181680 ("Institutional Methodology User Guide," CollegeBoard, July 15, 2022) at 694, 697.

298 COFHE-02-00013416 ("Recent Meeting of the Group, Aid Directors at Section 568 Signatory Institutions," Consortium on Financing Higher Education, December 11, 1995) at 422.

299 NULIT-0000000348 ("568 Presidents' Group: Consensus Methodology Policy Guidelines," 568 Presidents' Group, 2016) at 355-356; COFHE-02-00013416 ("Recent Meeting of the Group, Aid Directors at Section 568 Signatory Institutions," Consortium on Financing Higher Education, December 11, 1995) at 422; Baum, "A Primer on Economics for Financial Aid Professionals," CollegeBoard, 2004, available at https://professionals.collegeboard.org/pdf/primer-economics-financial-aid-professionals.pdf, accessed September 14, 2023, pp. 66-67.

than would otherwise be calculated under the IM, which did not provide for such an allowance.[330]

## IV. EACH DEFENDANT SEPARATELY DETERMINED EFCS AND INSTITUTIONAL GRANT AID FOR ITS OWN STUDENTS, REFLECTING ITS OWN NEED ANALYSIS METHODOLOGY, APPLICATION OF PROFESSIONAL JUDGMENT, AND PACKAGING POLICY

162. Dr. Singer asserts that the 568 Group had the "goal of suppressing [need-based] institutional grant aid" and, to that end, purports to frame the 568 Group's efforts to improve need analysis as a form of price-fixing in which Defendants agreed on key aspects of their need analysis methodologies to "establish a floor for EFCs."[331] Dr. Singer alleges that Defendants accomplished this by: (1) "using the [IM] as the 'base' method for need analysis and as the starting point for calculating financial aid"; (2) "developing and implementing the [CM] as a variation of the IM for purposes of need analysis"; and (3) "using a common manual for applying 'professional judgment' to determinations of need, and treating professional judgment as the exception rather than the rule."[332]

163. As discussed in **Section III.D**, many of the recommendations in the CM Guidelines would, in fact, *decrease* EFCs relative to baseline treatment in the IM for impacted students, which is inconsistent with an attempt to suppress need-based institutional grant aid. Further, while the 568 Group made recommendations regarding the treatment of certain elements in need

---

[330] The 568 Group distributed preliminary tools to assess retirement allowances in 2019. However, the most recent CM Guidelines are from 2016. The 568 Group did not move to formally add this tool to the CM Guidelines before the 568 Group dissolved in 2022. *See* CALTECH000001583 ("Email with subject line 'Fw: Reminder - Retirement Allowance Tools'," June 4, 2019) at 583; NULIT-0000000348 ("568 Presidents' Group: Consensus Methodology Policy Guidelines," 568 Presidents' Group, 2016).

[331] Singer Report, ¶¶ 3, 126.

[332] Singer Report, ¶ 4.

analysis methodologies (as documented in the CM Guidelines) and adapted existing industry guidance on professional judgment practices (as documented in the PJ Guidelines), my analysis of documentary evidence demonstrates that each Defendant continued to independently determine and apply its own institutional need analysis methodologies.

164. It is not surprising that each Defendant developed and applied individualized methodologies, as most elements of need analysis either were not addressed at all in the CM Guidelines or were addressed incompletely through imprecise recommendations that left substantial room for schools to take varying approaches. Even when the CM Guidelines outlined a specific recommendation for the treatment of a particular element, each Defendant separately determined how to treat that element in its own need analysis methodology. Often, Defendants chose different treatments for these elements that were inconsistent with the CM Guidelines' recommendations, and these differences could either increase or decrease EFCs relative to the recommended treatment in the CM Guidelines.

165. Given the individualized ways each Defendant approached need analysis, including in ways that *decreased* EFCs relative to the CM Guidelines, Dr. Singer has not demonstrated that the Challenged Conduct created a "floor" on EFCs. Further, the Challenged Conduct and the CM Guidelines are unrelated to how each Defendant packages its financial aid offers, which is a key determining factor for the amount of need-based institutional grant aid a student is offered. In fact, Defendants *increased* the share of aid awarded through institutional grant aid during the Class Period.

### A. The CM Guidelines Did Not Limit Each Defendant's Ability to Separately Determine Its Own EFC Estimates

166. As Dr. Singer recognizes in his report, without "agreement […] on at least many components of an IM […] the schools could [...] appl[y] different methodologies generating different results."[333] Indeed, my analysis of the CM Guidelines finds that they discussed only 17 specific elements used in need analysis and provided actionable recommendations for only some of these elements. Therefore, even if Defendants' need analysis methodologies were consistent with the recommendations in the CM Guidelines for the actionable elements—which, as I discuss in **Section IV.B**, is not the case—there would necessarily be substantial independent judgment underlying Defendants' individualized need analysis methodologies and resulting EFC calculations.

167. As discussed in **Section III.D**, the 568 Group focused its attention on 17 specific elements used in need analysis that it had determined were "most often subject to local interpretation or professional judgment," suggesting that schools were dissatisfied with the then-current treatment (if any) of these nuanced elements in common need analysis methodologies, such as the IM.[334] However, recommendations on these 17 elements could not be used by themselves to calculate an EFC because need analysis requires "the examination of many dozens of elements to measure a family's ability to pay."[335] Therefore, the CM Guidelines could only be used in conjunction with a broader need analysis methodology, such as a

---

333 Singer Report, ¶ 128.

334 NULIT-0000000348 ("568 Presidents' Group: Consensus Methodology Policy Guidelines," 568 Presidents' Group, 2016) at 352; DARTMOUTH_0000082053 ("A Response to the Draft Report on the Activities of the 568 Report," 568 Presidents' Group, September 5, 2006) at 059.

335 NULIT-0000000348 ("568 Presidents' Group: Consensus Methodology Policy Guidelines," 568 Presidents' Group, 2016) at 350.

ATTORNEYS' EYES ONLY - SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

methodology based on the IM or the FM (discussed in **Section III.B**), that would inform how the school evaluated elements not discussed in the CM Guidelines.

168. Schools have substantial flexibility to modify the IM and the FM for the purpose of awarding their own institutional aid. Although use of the FM is subject to strict regulations for the purpose of awarding federally funded financial aid such as Pell Grants, schools are free to modify the FM formula for the purpose of awarding their own institutional financial aid. For example, until 2013, Johns Hopkins used a modified version of the FM, which it referred to as the "Smart FM," to award its institutional financial aid. According to Thomas McDermott, Associate Vice Provost for Financial Aid at Johns Hopkins, the Smart FM was based on the FM but differed in several ways, including its consideration of home equity and noncustodial parents.[336] Similarly, the College Board provides schools with substantial flexibility to modify the baseline IM EFC calculation "to reflect their mission and goals."[337] Schools can modify settings in their Institutional Portal that controlled various elements of the IM EFC calculation which could either increase or decrease EFCs.[338] The College Board also gives schools the flexibility to add supplemental questions to the CSS PROFILE, allowing them to obtain information about a family's financial circumstances that was not covered by the standard CSS PROFILE questions (or the FAFSA), which schools can then incorporate into their need analysis calculations.[339] Schools can then download students' financial aid data from the College Board into their own Financial Aid

336 Deposition of Thomas McDermott, Associate Vice Provost for Financial Aid at Johns Hopkins University, *Henry, et al. v Brown University, et al.*, 1:22-cv-00125 August 18, 2023 ("McDermott Deposition"), 24:17-25:9.

337 NULIT-0000181680 ("Institutional Methodology User Guide," CollegeBoard, July 15, 2022) at 721.

338 VANDERBILT-00272944 ("Profile Users Guide," CollegeBoard, October 2013) at 970, 971.

339 VANDERBILT-00272944 ("Profile Users Guide," CollegeBoard, October 2013) at 952.

Management System software, where they can further adjust the calculation of students' EFCs.[340]

169. Even for the 17 elements of need analysis discussed in the CM Guidelines, the 568 Group's recommendations were often incomplete or left room for different treatments and professional judgment. As I discuss in more detail in **Section IV.B**, my analysis of the CM Guidelines and available documentation identified only eight elements with actionable recommendations such that I could assess whether each Defendant's methodology was consistent with the CM Guidelines. For elements without actionable recommendations, each Defendant had to individually determine its own approach, which may have been informed by its interpretation of the CM Guidelines, the treatment of that element in the FM or IM, or its own school-specific priorities and needs.

170. For example, the CM Guidelines provided minimal direction on the treatment of parent-owned businesses. While the CM Guidelines noted that it was "the sense of most financial aid professionals that self-employed families generally have greater financial strength than wage earning families with the same AGI"—and that this relative strength was not adequately adjusted for by the CM Guidelines' recommended treatment of business income and losses—the 568 Group did not "attempt[]" to develop a recommendation to address this discrepancy in financial strength.[341] Instead, the CM Guidelines suggested that it *could*

---

[340] VANDERBILT-00272944 ("Profile Users Guide," CollegeBoard, October 2013) at 952.

[341] NULIT-0000000348 ("568 Presidents' Group: Consensus Methodology Policy Guidelines," 568 Presidents' Group, 2016) at 362.

be appropriate to apply professional judgment based on "reviewing tax returns for Corporation/Partnerships and Schedule C, E, and F enterprises."[342]

171. For other elements, the CM Guidelines provided a recommendation that left vast room for interpretation or variation in application. For example, in the case of divorced, separated, or single parents, the CM Guidelines recommended that schools collect information about the income and assets of all parents, including the custodial parent, the noncustodial parent, and their spouses. However, it did not provide an actionable recommendation for which parents should be expected to contribute towards a student's education or how to determine the contribution from each parent.[343] Defendants therefore took a variety of approaches to calculating EFCs for students with divorced, separated, or single parents:

- [redacted]4
- MIT generally expected a contribution from both the custodial and noncustodial parents based on a full need analysis of each parent's information.[345]
- [redacted]

[342] NULIT-0000000348 ("568 Presidents' Group: Consensus Methodology Policy Guidelines," 568 Presidents' Group, 2016) at 362.

[343] NULIT-0000000348 ("568 Presidents' Group: Consensus Methodology Policy Guidelines," 568 Presidents' Group, 2016) at 353. The 568 Group's recommended method for calculating noncustodial parent contributions, and for accounting for the income and assets of spouses, was described in the PJ Guidelines. However, as discussed in **Section IV.D** below, professional judgment was always to be applied on a case-by-case basis. In addition, the PJ Guidelines noted "that there may be problems trying to apply the […] general procedures" to each student and therefore recommended that they "be used when appropriate." NULIT-0000018769 ("568 Presidents' Group: Professional Judgment Guidelines Manual," 568 Presidents' Group, 2016) at 771-775.

[344] Backup materials to this report (Appendix D).

[345] Backup materials to this report (Appendix D).

[redacted]

- [redacted]
- Georgetown separately calculated an EFC based on the custodial household (including the custodial parent's spouse, if any) and an EFC based on the custodial and non-custodial parents, then used whichever EFC was higher.[348]

172. Similarly, the CM Guidelines provided incomplete recommendations for how to treat changes in employment (e.g., sudden unemployment). The CM Guidelines recommended that "[a]nticipated year income can be used when there has been an interruption or change in employment that has caused a significant reduction in household income."[349] However, they did not provide a recommendation for how to determine when a reduction in household income is "significant," nor did they provide specific guidance on how to calculate anticipated year income other than noting that "it should be assumed that the parent will be reemployed at a reduced rate from his or her previous salary."[350] Schools used different approaches to estimate anticipated year income, such as assuming the parent

---

346 Backup materials to this report (Appendix D); CALTECH000013902 ("Verification and Needs Analysis Manual 2020-2021," California Institute of Technology, 2020-2021) at 935-937.

347 Backup materials to this report (Appendix D); Emory_568Lit_0007286 ("Chapter 5 File Review and Verification," Emory University, 2015) at 305.

348 Backup materials to this report (Appendix D).

349 NULIT-0000000348 ("568 Presidents' Group: Consensus Methodology Policy Guidelines," 568 Presidents' Group, 2016) at 362.

350 NULIT-0000000348 ("568 Presidents' Group: Consensus Methodology Policy Guidelines," 568 Presidents' Group, 2016) at 362.

would be re-employed at 80 percent of their previous income (Penn) or 60 percent of their previous income (Cornell).[351]

173. Finally, I note that regardless of how a school's need analysis methodology treated a particular element, financial aid professionals could apply professional judgment to account for an individual student's specific circumstances. As one example, even though the CM Guidelines recommended that schools not allow losses on rental properties to reduce parental income, the corresponding PJ Guidelines acknowledged that it may sometimes be appropriate to account for such losses, such as when a rental property is unoccupied for an extended period of time while the family incurs expenses like mortgage payments, taxes, and utilities.[352] I discuss the role of professional judgment in detail in **Section IV.D**.

### B. Defendants' Need Analysis Methodologies Routinely Diverged from the Recommended Approaches in the CM Guidelines

174. Dr. Singer alleges as part of the Challenged Conduct that Defendants had an "agreement on" "developing and implementing the CM as a variation [of] the IM for purposes of need analysis."[353] Dr. Singer asserts that "Defendants regularly described themselves as following the […] CM."[354] To support this point, Dr. Singer simply cites to a handful of Defendant documents indicating that their need analysis methodologies were aligned with

---

351 Backup materials to this report (Appendix D); PENN568-LIT-00163047 ("Need Analysis," University of Pennsylvania, 2005) at 056; CORNELL_LIT0000269951 ("Financial Aid Application Review Procedures 2012-2013," Cornell University) at 969.

352 NULIT-0000000348 ("568 Presidents' Group: Consensus Methodology Policy Guidelines," 568 Presidents' Group, 2016) at 354; NULIT-0000018769 ("568 Presidents' Group: Professional Judgment Guidelines Manual," 568 Presidents' Group, 2016) at 786.

353 Singer Report, ¶ 148.

354 Singer Report, ¶ 157.

the CM or that they "applied" the CM.[355] That is, Dr. Singer attempts to characterize a school's *entire* need analysis methodology—which cannot realistically be captured in a few sentences—with little more than a collection of high-level statements. Unsurprisingly, the conclusion he purports to draw from this ad hoc approach is contradicted by my own systematic review of each Defendant's need analysis methodology, as well as the very internal 568 Group survey he cites.

175. Based on my knowledge and professional experience, understanding a school's baseline need analysis methodology (that is, the methodology they apply before the exercise of any professional judgment) requires understanding how that methodology treats specific elements in its calculation. One can achieve such an understanding by reviewing documentation such as the school's policies and software settings used to customize its EFC calculation or through conversations with individuals knowledgeable about these details. It is not sufficient or reliable to build a complete understanding of the school's need analysis methodology in any other way, much less determine whether schools were consistent with a certain methodology. Because Dr. Singer's report does not demonstrate an understanding of each Defendant's need analysis methodology, any opinions related to the potential or actual effects of Defendants' participation in the 568 Group on their need analysis methodologies are unreliable.

176. Using my academic expertise and my professional experience, as well as need analysis manuals and other documents produced in this case, deposition testimony from current and former financial aid officers, and other discovery responses, I performed an independent

355 Singer Report, ¶ 157.

and comprehensive analysis of each Defendant's consistency with the CM Guidelines. In particular, for the eight need analysis elements that had both actionable recommendations in the CM Guidelines and sufficient data across Defendants about their treatment of those elements, I analyzed whether each Defendant's treatment was consistent with the CM Guidelines' recommendations, for years for which that Defendant is included in Dr. Singer's proposed Class Period.[356] The eight elements I analyzed were: (1) cost-of-living variances; (2) family and student assets; (3) home equity; (4) imputing the value of liquid assets; (5) elementary and secondary school tuition expenses; (6) medical expenses; (7) number of siblings in college; and (8) assessment of rental property or other real estate.[357] Although these eight elements contained actionable recommendations, the CM Guidelines' recommendations were often nuanced, could include multiple distinct components, and/or changed from year to year. For example, the CM Guidelines' recommended treatment of medical expenses was to reduce income by the amount of unreimbursed medical expenses incurred in that year if they exceeded a certain percentage of income; however, the percentage of income recommended varied from year to year.[358] The CM Guidelines' recommended adjustments for multiple siblings in college contained

---

356 *See* Singer Report, ¶ 9.

357 The CM Guidelines discussed but did not provide actionable recommendations on the following elements: divorced, separated, and single parents; parental unemployment; retirement allowances; IM taxation bands; family loan debt; one-time income adjustments; special expense adjustments; and parent businesses. As discussed in **Section III.D.4**, I do not consider the CM Guidelines to have provided actionable recommendations on retirement allowances because the tools the 568 Group developed were never officially incorporated into the Guidelines. In addition, although the CM Guidelines provided actionable recommendations for the definition of income, for the majority of Defendants, produced documents and deposition testimony about their need analysis methodologies did not provide sufficient information for me to analyze whether they were consistent with the CM Guidelines' recommendations. Although I did not compare each Defendant's need analysis methodology to the CM Guidelines for these elements, I summarized each Defendant's treatment of all 17 elements included in the CM Guidelines in **Appendix D**.

358 *See, for example*, NULIT-0000161662 ("Consensus Methodology Policy Guidelines Manual," The 568 Presidents' Group, 2004) at 674; NULIT-0000000348 ("568 Presidents' Group: Consensus Methodology Policy Guidelines," 568 Presidents' Group, 2016) at 360.

numerous components, including a percentage adjustment for each incremental sibling, with specific recommendations to account for siblings in graduate or professional school, siblings in low-cost schools, and siblings receiving merit-based aid.[359]

177. In my analysis of Defendants' need analysis methodologies, I only classify a Defendant's treatment of a particular element in its need analysis methodology as consistent with the CM Guidelines if that treatment was consistent with all components of the CM Guidelines' recommendation in all years I analyzed, to the extent information was available. For example, although MIT capped home equity at the CM Guidelines' recommended rate from academic year 2008-2009 to academic year 2013-2014, MIT's baseline methodology included an exemption for families with annual income under $100,000, which was inconsistent with the CM Guidelines.[360] Similarly, Vanderbilt imputed assets based only on reported interest income while the CM Guidelines' recommendation was to impute assets using both interest and dividend income.[361] My analysis considers neither school to have been consistent with the CM Guidelines' recommendations for these respective elements.

178. **Figure 8** summarizes the extent to which each Defendant's need analysis methodology was consistent with the CM Guidelines for the eight need analysis elements I analyzed. For each school and element, I marked a Defendant with a checkmark if its approach was consistent with all components of the CM Guidelines' recommendation for that element for all available years I analyzed. In some cases, information about a Defendant's treatment

---

359 NULIT-0000000348 ("568 Presidents' Group: Consensus Methodology Policy Guidelines," 568 Presidents' Group, 2016) at 359.

360 **Appendix Table D.11**.

361 **Appendix Table D.16**.

of a particular element in its need analysis methodology was incomplete (e.g., only available for certain years or certain components of a recommendation) or inconsistent (e.g., documents and deposition testimony appear contradictory). If the information was sufficiently incomplete or inconsistent that I could not reliably determine whether the Defendant's need analysis methodology was consistent with the CM Guidelines in at least one year, I marked the Defendant with an asterisk for that element. A Defendant that is left blank was *not* consistent with at least one component of the CM Guidelines' recommendation for that element in at least one year. My complete analysis is available in **Appendix D**.

**Figure 8**
**Each Defendant Separately Determined How Its Need Analysis Methodology Treated Elements for Which the CM Guidelines Provided Actionable Recommendations[362]**

| | CM Guidelines' Elements | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Defendant** | **Cost of Living Variances** | **Family and Student Assets** | **Home Equity** | **Imputing the Value of Liquid Assets** | **K-12 Tuition Expenses** | **Medical Expenses** | **Number of Siblings in College** | **Rental Property/Other Real Estate** |
| Brown | | | | | ✓ | | | ✓ |
| Caltech | ✓ | | | | | | | ✓ |
| Chicago | | | | ✓ | | | | ✓ |
| Columbia | ✓ | | ✓ | ✓ | * | * | ✓ | ✓ |
| Cornell | ✓ | | | | ✓ | | | |
| Dartmouth | | | | ✓ | | | ✓ | |
| Duke | ✓ | ✓ | ✓ | | ✓ | | | |
| Emory | ✓ | | | | | | | |
| Georgetown | ✓ | | ✓ | | | | | ✓ |
| Johns Hopkins | ✓ | * | ✓ | ✓ | ✓ | * | * | |
| MIT | ✓ | | | | | | | ✓ |
| Northwestern | ✓ | * | | * | * | * | * | ✓ |
| Notre Dame | | | | | | | | ✓ |
| Penn | ✓ | | | ✓ | ✓ | | | |
| Rice | ✓ | | | | | ✓ | | |
| Vanderbilt | ✓ | | | | | | | * |
| Yale | ✓ | | | ✓ | | ✓ | | |
| **Number of Schools** | | | | | | | | |
| Consistent with CM | 13 | 1 | 4 | 6 | 5 | 2 | 2 | 8 |
| Inconsistent with CM | 4 | 13 | 13 | 10 | 9 | 12 | 12 | 7 |
| Contradiction/ Insufficient Information | 0 | 3 | 0 | 1 | 3 | 3 | 3 | 2 |

**Notes:**
[1] ✓ indicates that the Defendant's treatment of a specific need analysis element was consistent with all components of the CM Guidelines' recommended treatment in all years for that Defendant's respective Class Period, to the extent this information is available.
[2] * indicates that either: (1) there was insufficient information available about the Defendant's treatment of the specific need analysis element to determine whether it was consistent with the CM Guidelines' recommended treatment for any year I analyzed; or (2) the available information about the Defendant's treatment of the specific need analysis element was conflicting for all years for that Defendant's respective Class Period, such that it was not possible to determine whether it was consistent with the CM Guidelines' recommended treatment in any year.
[3] A blank indicates that the Defendant's treatment of a specific need analysis element was demonstrably inconsistent with at least one component of the CM Guidelines' recommended treatment in at least one year for that Defendant's respective Class Period.

[362] **Appendix Tables D.1-D.17.**

ATTORNEYS' EYES ONLY - SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

179. As can be seen in **Figure 8** above, I find that Defendants had divergent need analysis methodologies throughout their time as 568 Group members and regularly employed need analysis methodologies that were inconsistent with the recommendations in the CM Guidelines for the eight elements I analyzed. Specifically, no Defendant was consistent with the CM Guidelines' recommended treatment for all eight elements I analyzed for all years with available information. Defendants ranged from being consistent on one element (Emory, Notre Dame, Vanderbilt) to being consistent on a maximum of five elements (Columbia). Further, Defendants were not uniformly consistent with the CM Guidelines' recommended treatment for any of the eight elements I analyzed. On one end of the spectrum, thirteen Defendants were consistent with the CM Guidelines' recommendation to use the IM cost-of-living table, more than any other element I analyzed. On the other end of the spectrum, only one Defendant (Duke) was consistent with the CM Guidelines' recommendations regarding the treatment of family and student assets.

180. Note that marking a Defendant's need analysis methodology as consistent with the CM Guidelines for a particular element (identified with a checkmark in **Figure 8)** does not mean that it never deviated from the CM Guidelines' recommended treatment of that element for any student. In particular, my assessment does not incorporate professional judgment adjustments, which Defendants may have used to adjust the treatment of *any* element based on a specific student's needs or circumstances.

181. Dr. Singer alleges that surveys conducted by the 568 Group made clear that Defendants were "each applying most of the components of the CM."[363] However, Dr. Singer does not

[363] Singer Report, ¶ 201.

cite to any surveys to support his point. Contrary to Dr. Singer's claim, a 568 Group survey distributed by the 568 Group before a January 2015 meeting is consistent with my findings in **Figure 8** above—that individual Defendants did not consider themselves bound by the CM Guidelines. The survey asked 568 Group members for their "non-institutional, professional perspectives" about whether they agreed "in principle," "with reservations," or disagreed with the treatment of each element outlined in the CM Guidelines and whether their school deviated in practice from the CM Guidelines for those elements.[364] Consistent with my findings, Defendant and non-Defendant 568 Group members commonly reported "deviat[ing]" from the CM Guidelines "in practice."[365]

182. Further, some Defendants made public announcements regarding need analysis policies that were inconsistent with the CM Guidelines, prioritizing transparency in their ability to meet demonstrated need. For example, upon removing home equity from their need analysis formula in 2016, MIT issued a news release highlighting this policy change; the release explained that MIT was "remov[ing] consideration of home equity as a factor in awarding financial aid" while noting that "home equity had previously been considered [by MIT]."[366]

364 Columbia_00059052 ("Whither Consensus Survey," 568 Presidents' Group, January 2015) at 054-061; CORNELL_LIT0000252669 ("Results of Consensus Methodology Questionnaire," Cornell University, January 2015).

365 Out of the 19 schools that completed the questionnaire, three schools reported deviating from the recommended treatment of divorced, separated, and single parents, three schools reported deviating from the recommended treatment of cost-of-living variances, six schools reported deviating from the recommended treatment of family and student assets, two schools reported deviating from the recommended treatment of retirement allowances, two schools reported deviating from the recommended treatment of the number of siblings in college, and one school reported deviating from the recommended imputation of the value of liquid assets. See CORNELL_LIT0000252669 ("Results of Consensus Methodology Questionnaire," Cornell University, January 2015) at 679, 681-683, 685, 687.

366 "Increase of 10.4 Percent in Financial Aid Will Benefit a Wide Range of MIT Families," Massachusetts Institute of Technology News, March 4, 2016, available at https://news.mit.edu/2016/increase-financial-aid-benefit-students-families-0304., accessed August 7, 2024.

### C. Defendants' Need Analysis Methodologies Deviated from the CM Guidelines' Recommended Treatment in a Variety of Ways, Including Choices that Further Decrease EFC

183. Dr. Singer asserts that the CM Guidelines "establish a floor for EFCs," and that a school "would be allowed to deviate from the [CM] and make global changes to its financial aid awarding policies that systematically deviated from the methodology so long as any such changes increased family contributions."[367] To the contrary, my analysis finds not only that Defendants routinely deviated from the CM Guidelines, but also that individual Defendants' need analysis methodologies differed from the CM Guidelines in a variety of ways, including at times by lowering EFCs further than the recommendations in the CM Guidelines would suggest. Below, I describe the wide range of approaches Defendants adopted for three of the eight elements I analyzed in detail. I similarly found variation among the remaining five elements, described in more detail in **Appendix D**. Specifically:

- *Medical Expenses.* The CM Guidelines recommended that schools use the IM's default allowance for unreimbursed medical expenses above a certain threshold, yet individual Defendants differed on the percent of income above which medical expenses were allowed.[368]
- *Elementary and Secondary School Tuition Expenses.* The CM Guidelines recommended that schools use the IM's optional allowance for elementary and secondary school tuition expenses up to a certain maximum, yet some individual Defendants did not make an allowance for such expenses at all, while those that did make an allowance differed on the maximum amount of the allowance.[369]

---

[367] Singer Report, ¶¶ 126, 147.

[368] For example, in AY 2004, Chicago made an allowance for unreimbursed medical expenses exceeding 7.5 percent of income, while Cornell made an allowance for expenses exceeding 4 percent of income and Penn made an allowance for expenses exceeding 3.4 percent of income. (**Appendix Tables D.3, D.5, D.14**.)

[369] For example, in AY 2015, Rice did not make an allowance for elementary and secondary school tuition expenses. Vanderbilt and Dartmouth both made an allowance for such expenses, but Vanderbilt capped its allowance at

- *Imputing Liquid Assets.* The CM Guidelines recommended that schools impute the value of liquid assets that could have generated reported interest and dividend income assuming a four percent rate of return, yet individual Defendants differed on whether they imputed liquid assets based on interest income, dividend income, or the CM Guidelines' recommendation of both interest and dividend income, as well as on the rate of return they assumed to perform the imputation.[370]

- *Cost-of-Living Adjustments.* The CM Guidelines recommended that schools adjust certain allowances against income and assets to account for cost-of-living differences using tables provided by the College Board, yet individual Defendants differed on whether they made cost-of-living adjustments at all, or only made such adjustments using professional judgment.[371]

- *Assessment of Rental Property and Other Real Estate.* The CM Guidelines' recommendation for the assessment of rental property and other real estate included multiple components. While most Defendants added back rental losses and depreciation, individual Defendants varied in the way they determined the value of rental properties, with some Defendants relying on Zillow or tax assessor websites rather than the CM Guidelines' recommendation to use purchase price and a multiplier based on the year of purchase.[372]

### 1. *Home Equity*

184. As discussed in **Section III.D.2**, the CM Guidelines included a specific recommendation for the treatment of home equity as an asset. Before 2005, the CM Guidelines recommended that schools cap home value at 2.4 times total parent income, or equivalently

---

[redacted] while Dartmouth's cap [redacted]. (**Appendix Tables D.15, D.16, D.6.**)

370 For example, in AY 2009, Rice did not impute assets at all while Emory assumed different interest rates to impute assets using interest income (two percent) and dividend income (three percent). (**Appendix Tables D.15, D.8.**)

371 For example, in AY 2007, [redacted]. (**Appendix Tables D.1, D.6.**)

372 For example, in AY 2012, [redacted]. (**Appendix Tables D.7, D.5.**)

cap home equity at 2.4 times total parent income less mortgage debt. Beginning in 2005, the 568 Group instead recommended that schools directly cap home equity at 1.2 times total parent income.[373]

185. My review of each Defendant's need analysis methodology shows that only four Defendants applied a home equity cap at the level recommended in the CM Guidelines for all years they were included in Dr. Singer's Class Period and for which information on their baseline need analysis methodologies was available.[374] Other Defendants' approaches have varied over time.

186. Some Defendants' baseline methodologies treated home equity in a way that would decrease a student's EFC compared to the CM Guidelines' recommended treatment:

- Some Defendants did not include home equity in their need analysis at all in some years during Dr. Singer's Class Period, including [redacted] and MIT (since 2016).[375]
- Before MIT removed home equity from its need analysis for all families in 2016, it removed home equity from its need analysis for families with less than $100,000 in income beginning in 2008. It expanded the set of families for which it did not consider home equity to all families with less than $150,000 in income beginning in 2014.[376]

[373] DARTMOUTH_0000359371 ("Membership Dues in Support of The 568 Presidents' Group for FY 2006 and 2007," 568 Presidents' Group, November 28, 2005) at 375; COFHE-02-00002603 ("Report of the Common Standards Subcommittee to the 568 Presidents' Working Group," Consortium on Financing Higher Education, June 2001) at 612-613.

[374] The Defendants my analysis identified as acting consistent with the CM Guidelines are Columbia, Duke, Georgetown, and Johns Hopkins. See **Figure 8**.

[375] **Appendix Tables D.2, D.11**.

[376] **Appendix Table D.11**.

- In 2005, Penn capped the amount of home equity used in its need analysis at 1.1 times income. This cap would result in lower parent contributions than the CM Guidelines' recommended cap.[377]

187. Other Defendants' baseline methodologies treated home equity in a way that would tend to increase a student's EFC compared to the CM Guidelines' recommended treatment:

- Some Defendants did not cap home equity in various years during Dr. Singer's proposed Class Period, including Notre Dame and Northwestern.[378]

- Some Defendants used higher caps on home equity, ranging from 2-3 times income in various years during Dr. Singer's proposed Class Period, including Vanderbilt, Rice, Brown, and Emory. Using a higher cap on home equity would result in higher parent contributions than the CM Guidelines' recommended cap.[379]

- Some Defendants used a higher cap on home equity for families with higher income. For example, during the 2013-2014 academic year, Penn capped home equity at 1.2 times income for families with incomes below $180,000, but capped home equity at 1.7 times income for families with higher incomes.[380]

188. Most Defendants' need analysis methodologies reflected the thinking of the 568 Group, which recognized the benefit to students of limiting the extent to which home equity is considered in need analysis. Still, individual Defendants rarely defaulted to the CM Guidelines' recommendation. These choices resulted in some Defendants' need analysis

---

[377] **Appendix Table D.14**. Throughout the entire time period, Penn used a variation of the FM's methodology to assess parent assets in its own need analysis, which lowered the effect of home equity and other considered assets on Penn's calculation of EFC for some families relative to the IM. PENN568-LIT-00055002 ("Email with subject line 'Penn IM Tool update'," May 10, 2021) at 002. Specifically, Penn added a portion of discretionary net worth to available income and then calculated a single parent contribution from that, rather than separately calculating a parent contribution from income and a parent contribution from assets per the IM's methodology. *See also* **Section V.C**.

[378] **Appendix Tables D.13, D.12**.

[379] **Appendix Tables D.16, D.15, D.1, D.8**.

[380] **Appendix Table D.14**.

methodologies resulting in lower EFCs than would be expected from the CM Guidelines' recommendation, and others resulting in higher EFCs.

*2. Number of Siblings in College*

189. As of December 2016, the CM Guidelines included the following five specific recommendations for how to adjust parent contributions for students with siblings in college at the same time: (1) employ the IM's default approach for multiple siblings in college, which expects [redacted] percent of the parent contribution if the student has one sibling in college, [redacted] percent if the student has two siblings in college, and [redacted] percent if the student has three or more siblings in college; (2) do not count siblings in graduate or professional school towards the number of siblings enrolled in college (unless they are dependents with documented parent contributions for their own education); (3) do not allow the reduction in the parent contribution for a sibling in college to exceed the sum of tuition and fees if the sibling is enrolled in community college or another low-cost school; (4) do not allow the reduction in the parent contribution for a sibling in college to exceed the sum of tuition, fees, and room and board net of non-need-based scholarship if the sibling received non-need-based scholarships; and (5) do not count parents towards the number of family members in college.[381]

190. My review of each Defendant's need analysis methodology shows that only two Defendants treated siblings in college in a manner consistent with all components of the CM Guidelines' recommendation for all years they were included in Dr. Singer's Class

---

[381] NULIT-0000072193 ("Draft Professional Judgment Guidelines Manual," 568 Presidents' Group, August 26, 2015), at 215 (detailing IM treatment of multiple siblings); NULIT-0000038124 ("Consensus Methodology Policy Guidelines," 568 Presidents Group, November 2015), at 135-136.

Period for which information on their baseline need-analysis methodologies were available.[382]

191. Some Defendants' baseline methodologies treated the number of siblings in college in a way that would decrease a student's EFC relative to the CM Guidelines' recommended treatment:

- Some Defendants expected a lower percentage of the parent contribution for multiple siblings in college at the Defendant school or other similarly priced school in various years during Dr. Singer's proposed Class Period. For example, Emory expected 50 percent of the parent contribution if the student had one sibling in college and 35 percent if the student had two siblings in college if the siblings attended Emory or another similarly priced school. Similarly, MIT expected 50 percent of the parent contribution if the student and sibling both attended MIT.[383]
- Some Defendants allowed siblings in graduate or professional school to count towards the number of siblings in college in various years during Dr. Singer's proposed Class Period, including, for example, Cornell.[384]

192. Other Defendants' baseline methodologies treated the number of siblings in college in a way that would increase a student's EFC relative to the CM Guidelines' recommended treatment. Some Defendants did not allow for all siblings enrolled in college to reduce the expected parent contribution in various years during Dr. Singer's proposed Class Period. For example, Vanderbilt disallowed students enrolled in community college from being counted as a sibling in college and reducing the parent contribution.[385]

382 The Defendants my analysis identified as acting consistent with the CM Guidelines are Columbia and Dartmouth. See **Figure 8**.

383 **Appendix Tables D.8, D.11**.

384 **Appendix Table D.5.**

385 **Appendix Table D.16.**

193. Defendants' need analysis methodologies were often consistent with the CM Guidelines' general acknowledgement that the financial burden of multiple children in college should reduce the parent contribution, but were rarely consistent with all of the specific components of the CM Guidelines' recommendation on this element of need analysis. As a result of these choices, some Defendants' need analysis methodologies produced lower EFCs than would be expected from the CM Guidelines' recommendation, and others produced higher EFCs.

### 3. *Family and Student Assets*

194. Because parents are expected to have other demands on their assets, only a modest share of family assets are included in the expected parent contribution. Students, on the other hand, are expected to prioritize paying for their own education and therefore the percentage of their assets that is included in the expected student contribution is much higher—under the IM, student assets are assessed at 25 percent.[386] Prior to academic year 2015-2016, the CM Guidelines recommended that student assets be assessed as parent assets, including prepaid tuition and savings plans. Beginning in academic year 2015-2016, the CM Guidelines recommended that assets whose source is someone other than the parent (e.g., gifts from grandparents, assets for which the student is the "source of the asset," and trusts) be assessed as student assets rather than parent assets.

195. My review of each Defendant's need analysis methodology shows that only one Defendant was consistent with the CM Guidelines for the treatment of family and student assets for

---

[386] *See, for example*, Baum, "A Primer on Economics for Financial Aid Professionals," CollegeBoard, 2004, available at https://professionals.collegeboard.org/pdf/primer-economics-financial-aid-professionals.pdf, accessed September 14, 2023, p. 74.

all years during Dr. Singer's Class Period and for which information on its baseline need-analysis methodology was available.[387]

196. Some Defendants' baseline methodologies treated family and student assets in a way that would decrease a student's EFC compared to the CM Guidelines' recommended treatment, by treating more student assets as parent assets than recommended by the CM Guidelines. For example, in academic year 2022-2023, Caltech treated all student assets as parent assets.[388]

197. Other Defendants' baseline methodologies treated family and student assets in a way that would increase a student's EFC relative to the CM Guidelines' recommended treatment. Several Defendants did not treat any student assets as parent assets in any years that I analyzed with sufficient information available, including Brown and Emory.[389]

198. Again, each Defendant's treatment of family and student assets reflected substantive differences across their individual need analysis methodologies and a departure from multiple components of the CM Guidelines' recommendation, with some resulting in higher EFCs and some resulting in lower EFCs.

### D. Defendants Varied in Their Application of Professional Judgment and Did Not Consistently Rely on the 568 Group's PJ Guidelines

199. Dr. Singer alleges that Defendants "us[ed] a common manual for applying Professional Judgment" and points to a "Professional Judgment Guidelines Manual" published with

---

[387] The Defendant my analysis identified as acting consistent with the CM Guidelines is Duke. See **Figure 8**.

[388] **Appendix Table D.2**.

[389] **Appendix Tables D.1**, **D.8**.

about how will we do our own practice of financial aid."[399] Michael Hall, Executive Director of Financial Aid at Columbia, also reported that the PJ Guidelines were just "a tool for the tool box," while Columbia "internally [had its] own professional judgments beyond what's in the 568 professional judgment guide."[400]

### E. Defendants' Individualized Need Analysis Methodologies Did Not Systematically Suppress Need-Based Institutional Grant Aid

203. Dr. Singer asserts that the Challenged Conduct, including the development of the CM Guidelines and the PJ Guidelines, "concerned how to award [need-based] institutional aid" by creating a "'consistent formula of need analysis'" that "establish[ed] a floor for EFCs" calculated by Defendants and "suppress[ed] the [need-based] institutional grant aid."[401] However, as discussed in **Section III.D**, the CM Guidelines included several recommendations that reduced calculated EFCs relative to the IM's treatment, which in turn could lead to additional financial aid for students. Additionally, as discussed in **Sections IV.A-IV.C**, Defendants continued to employ different need analysis methodologies that did not treat the CM Guidelines as prescribing a floor for EFCs. Namely, several Defendants implemented policies that *decreased* calculated EFCs in comparison to the CM Guidelines' recommendations.

---

399 Deposition of Douglas Christiansen, Vice Provost for University Enrollment Affairs and Dean of Admissions and Financial Aid at Vanderbilt University, *Henry, et al. v Brown University, et al.*, 1:22-cv-00125 December 1, 2023 ("Christiansen Deposition"), 80:21–81:19 ("Q. Wouldn't a 19-page guidelines manual for professional judgment circumscribe the independence of professional judgment? […A]. It's merely a guideline; it's not what you must or must not do. It's, in their own words, guideline manual. It's a way to think about things, but it's not something that we would go through and say, Yes, yes, yes, yes. Q. Why does someone need guidelines if their professional judgment is supposed to be independent? […A.] In our case at Vanderbilt University, while the 568 may call it guidelines, this was merely one piece of many, many, many things that we continue to look at to think about how will we do our own practice of financial aid.").

400 Hall Deposition, 95:7-96:8.

401 Singer Report, ¶¶ 124-126.

ATTORNEYS' EYES ONLY - SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

204. Whether the EFC a particular Defendant calculated for a particular student would have been higher or lower absent the 568 Group is therefore a highly individualized question that depends on a number of factors, including: the individual financial circumstances of that student and their family; which (if any) elements discussed in the CM Guidelines were relevant to that student's particular financial circumstances; how that Defendant interpreted the relevant recommendations from the CM Guidelines; whether that Defendant's need analysis methodology was consistent (or not) with the relevant recommendations from the CM Guidelines; to what extent that Defendant applied professional judgment to arrive at that particular student's EFC; and, crucially, whether that Defendant would have made the same need analysis methodology choices absent the 568 Group.

205. Not only did the Challenged Conduct not systematically increase EFCs calculated by Defendants, but a student's EFC does not, in itself, determine the amount of need-based institutional grant aid they will be offered. Instead, as Dr. Singer has recognized, the amount of need-based institutional grant aid a school offers a student is determined by *both* that student's demonstrated financial need (i.e., the difference between their COA and EFC) and institutional packaging policies that govern how much of that need is met by grants, loans, and/or work-study.[402] In fact, at various points during Dr. Singer's Class Period, some Defendants had differential and/or preferential packaging policies that reduced the amount of self-help aid packaged for students based on their income or admissions ratings.[403] As a result of these policies, two students admitted to the same

[402] Singer Report, ¶ 58.

[403] For example, Columbia and Georgetown implemented preferential packaging policies, and Cornell and Dartmouth implemented differential packaging policies within the Class Period. *See, for example*, Columbia_00277674 ("COFHE Yellowbook for 2019-2020," Consortium on Financing Higher Education, 2019-

school with the same EFC could be offered different amounts of need-based institutional grant aid.

206. While a student's EFC affects the calculation of their demonstrated financial need, whether and to what extent a change in EFC affects the amount of need-based institutional grant aid they are offered depends critically on each institution's individual packaging policies.

207. Depending on the school's packaging policy, even if a student's EFC would have been lower absent the 568 Group—which Dr. Singer has not demonstrated would have occurred—they would not necessarily have received additional need-based institutional grant aid if the school met that increased need by increasing the amount of student loans or work-study included in their financial aid package instead. For example, Georgetown met students' demonstrated financial needs first with Pell Grants, then with federal Stafford loans, then with federal work-study or student employment. Only after awarding these types of aid did Georgetown award need-based institutional grant aid.[404] Therefore, even if a particular student's EFC would have been lower absent the 568 Group, the incremental need may have been met with not yet allocated federal aid. Other Defendants, including

2020) (In the 2019-2020 academic year, Columbia reported that their Scholar Program removed loan and job expectations for selected students); GTWNU_0000195239 ("COFHE Yellowbook for 2016-2017," Consortium on Financing Higher Education, 2016-2017) (In the 2016-2017 academic year, Georgetown reported that their Georgetown Scholars Program (GSP) and John Carroll program removed loan requirements for selected students); CORNELL_LIT0000213959 ("COFHE Yellowbook for 2019-2020," Consortium on Financing Higher Education, 2019-2020) (In the 2019-2020 academic year, Cornell removed loan requirements for students with family income less than or equal to $60,000); DARTMOUTH_0000177144 ("COFHE Yellowbook for 2019-2020," Consortium on Financing Higher Education, 2019-2020) (In the 2019-2020 academic year, Dartmouth removed loan requirements for students with family income less than $100,000).

[404] GTWNU_0000186083 ("Policies and Procedures Manual," Georgetown University, 2013-2014) at 157-158.

Cornell and Brown, similarly had policies of packaging institutional need-based grant aid only after packaging all other available types of aid such as federal grants and loans.[405]

208. Notably, Plaintiffs do not allege that Defendants agreed on how to package financial aid, even though the packaging process ultimately determines what portion of a student's demonstrated need is met through need-based institutional grant aid. In fact, Dr. Singer acknowledges that "[t]he question of the 'packaging of aid' was a separate matter," and record evidence—including evidence cited by Dr. Singer—shows that the 568 Group *expected* members to apply different packaging policies.[406] For example, the CM Guidelines consistently referred to "individual institutional 'packaging' decisions" and noted that schools may wish to adjust their packaging policies to help manage any budgetary pressures they faced as a result of deciding to adopt some of the 568 Group's recommendations that would tend to lower EFCs for students.[407] Similarly, a 2018 presentation by the 568 Technical Committee to the 568 Group specifically noted that the "CM does NOT address packaging policies nor does it address non-need-based financial aid such as often called merit-based aid related to academics or athletics" [emphasis in original].[408]

209. Consistent with the 568 Group's expectation, record evidence shows that Defendants adopted a wide range of packaging policies, and in fact changed these policies throughout

---

405 CORNELL_LIT0000213572 ("2022-2023 Undergraduate Need Analysis and Packaging Policies," Cornell University, 2022-2023) at 578-579; BROWN_0000050379 ("Financial Aid Office: Undergraduate Overview," Brown University, 2014) at 381.

406 Singer Report, ¶ 146.

407 *See, for example*, NULIT-0000161662 ("Consensus Methodology Policy Guidelines Manual," The 568 Presidents' Group, 2004) at 665-666; NULIT-0000000348 ("568 Presidents' Group: Consensus Methodology Policy Guidelines," 568 Presidents' Group, 2016) at 351-352.

408 DARTMOUTH_0000154245 ("Greater Good vs Institutional Needs," 568 Technical Committee, 2018) at 248.

the Class Period. For example, COFHE Yellowbook data produced in this case report the "typical" amount of self-help aid, broken down into loans and work-study, included in a student's financial aid package by school and year for COFHE members. COFHE defines "typical self-help" as "the starting or base package offered to students who are not affected by differential or preferential packaging[;] who are in the default category for differential or preferential packaging"; or who are in the "clear modal group" of a school's differential or preferential packaging policy.[409] These data show that Defendants differed in the amount they expected students to contribute through work-study, with the typical work study expectation ranging between $1,350 and $3,600.[410] Further, analysis of these data for first-year students in **Figure 9** below shows that Defendants included varying amounts of loans in their "typical" financial aid packages, with each Defendant decreasing its reliance on loans between 2010 and 2023. Because Defendants all meet the full demonstrated need of their admitted students,[411] including less loans or work-study in their typical financial aid packages means, by definition, that they therefore include *higher* amounts of need-based institutional grant aid to make up the difference. This behavior is inconsistent with Dr.

409 *See, for example*, BROWN_0000331819 ("COFHE Yellowbook for 2014-2015," Consortium on Financing Higher Education 2014-2015). COFHE defines preferential packaging as policies that lower self-help expectations based in part on admissions ratings while it defines differential packaging as policies that lower self-help expectations for lower-income students.

410 Backup materials to this report (COFHE); **Appendix C** (COFHE).

411 The backup materials to this report contain information on the Defendants' full-need policies. Backup materials to this report (Full-Need Policies); JHULIT_0000122562 ("COFHE Yellowbook for 2023-2024," Consortium on Financing Higher Education, 2023-2024) (provides information on the full-need policies for Brown, Columbia, Cornell, Dartmouth, Emory, Georgetown, Johns Hopkins, MIT, Northwestern, Rice, Chicago, Penn, Vanderbilt, and Yale); DUKE568_0033960 ("Meeting of the Resources Committee of the Board of Trustees," Duke University, February 26, 2021) (provides information on Duke's full-need policy); Chang Deposition, 94:9-94:14 (describing Caltech's full-need policy); Affleck-Graves Deposition, 220:20-221:18 (describing Notre Dame's full-need policy).

Singer's allegation that Defendants had the "goal of suppressing [need-based] institutional grant aid."[412]

**Figure 9**
**Defendants Continued to Decrease Loans in Students' Typical Financial Aid Packages[413]**

[redacted]

**Notes:**
[1] The loan share is calculated as the typical self-help loan amount for freshmen divided by the combined tuition, fees, room, and board for a given school and year, from data in COFHE Yellowbooks. COFHE defines typical self-help as the starting or base package offered to students who are not affected by differential or preferential packaging or who are in the default category for differential or preferential packaging. COFHE specifies that the total tuition, mandatory fees paid by all students, and room and board costs are the announced, official numbers reported by the given school.
[2] Columbia, Penn, Vanderbilt, and Yale are not pictured because they had no-loan policies for the entire time period pictured and therefore their loan share is zero percent. Brown, Dartmouth, Emory, and Notre Dame are not pictured due to data limitations. Notre Dame is not a COFHE member, and Brown, Dartmouth, and Emory do not have continuous COFHE Yellowbook data from 2010-2023. Caltech is not pictured prior to 2017 due to data limitations.
[3] Chicago, Northwestern, MIT, Johns Hopkins, and Rice implemented no-loan policies during the time period pictured. Chicago announced its no-loan policy for the 2015-2016 academic year. However, the COFHE data show

412 Singer Report, ¶¶ 3, 126.

413 Backup materials to this report (COFHE); **Appendix C** (COFHE).

that Chicago's loan share fell to zero percent in the 2016-2017 academic year. Northwestern announced its no-loan policy for the fall of the 2016-2017 academic year. However, the COFHE data show that Northwestern's loan share fell to zero percent in the 2017-2018 academic year. MIT ended its no-loan policy as of the 2011-2012 academic year and reinstated its no-loan policy for the 2017-2018 academic year. However, the COFHE data show that MIT's loan share fell to zero percent beginning in the 2018-2019 academic year. Johns Hopkins announced its no-loan policy for the fall semester of 2019. However, the COFHE data show that Johns Hopkins's loan share fell to zero percent for the 2020-2021 academic year. Rice announced a no-loan policy in 2021 to be applied to all students' financial aid packages beginning in the fall semester of 2022. However, the COFHE data show that Rice's loan share fell to zero percent beginning in the 2021-2022 academic year. *See* **Appendix C** (No-Loan Policies).

210. In fact, as discussed in **Section II.C.5**, many Defendants implemented no-loan policies during the Class Period. Columbia, Penn, Vanderbilt, and Yale all implemented these policies before 2010 and therefore are not included in **Figure 9**, above, while the figure shows the implementation of no-loan policies at Chicago, Northwestern, MIT, Johns Hopkins, and Rice between 2015 and 2022.[414]

211. Dr. Singer's only purported evidence that the Challenged Conduct influenced Defendants' packaging policies *at all* is a series of quotes showing that Notre Dame considered whether students would be able to repay their student loans, which he argues is consistent with what he calls the "affordability principle" of the Challenged Conduct.[415] Dr. Singer seems to imply that sensitivity to a student's ability to repay loans would somehow tend to increase the amount of loans in a student's financial aid package.[416] This makes no sense. In my experience, schools are focused on decreasing the loan burden for their students; hence the proliferation of no-loan policies. In fact, the documents Dr. Singer quotes to support this argument demonstrate that, consistent with what I would expect, Notre Dame sought to

---

[414] Backup materials to this report (COFHE); **Appendix C** (COFHE).

[415] Singer Report, ¶ 191, Section II.A.4.

[416] Singer Report, ¶ 190.

account for students' *inability* to repay loans, and therefore sought to decrease—not increase—the loan burden on students.[417]

212. Because the Challenged Conduct did not systematically increase EFCs calculated by any Defendant or influence any Defendant's packaging policies—which, in fact, became more generous throughout the Class Period—it logically would not have systematically reduced the average amount of need-based institutional grant aid Defendants awarded.

## V. THE REMAINING COMPONENTS OF DR. SINGER'S CHALLENGED CONDUCT ARE WIDELY ACCEPTED PRACTICES EXERCISED BROADLY IN THE HIGHER EDUCATION INDUSTRY

213. In addition to allegedly "developing and implementing" the CM Guidelines and PJ Guidelines, Dr. Singer defines the Challenged Conduct as including the following other components:

- "reaching agreement on [] six core principles of awarding financial aid";
- "making need-based aid the primary form of financial aid";
- "using the Institutional Methodology […] as the 'base' method for need analysis and as the starting point for calculating financial aid";
- "treating professional judgment as the exception, rather than the rule";[418] and
- "reciprocally sharing competitively sensitive information relating to principles, practices, amounts, and methods regarding the provision of financial aid."[419]

---

[417] Singer Report, ¶ 191.

[418] Dr. Singer combines both aspects of the Challenged Conduct relating to the use of professional judgment as one element of the Challenged Conduct. I discuss the aspect related to the development of the PJ Guidelines in **Section IV.D**.

[419] Singer Report, ¶ 4.

ATTORNEYS' EYES ONLY - SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,

Defendants.

**Case No. 1:22-cv-00125**

**Hon. Matthew F. Kennelly**

# EXPERT REPORT OF BRIDGET TERRY LONG, PH.D.
**AUGUST 7, 2024**

ATTORNEYS' EYES ONLY - SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

# APPENDIX D

# COMPARISON OF CM GUIDELINES AND DEFENDANTS' INDIVIDUAL NEED ANALYSIS METHODOLOGIES

# Appendix D
# Methodology for Analyzing Consistency of Defendants' Need Analysis Methodologies with CM Guidelines

1. This appendix summarizes the methodology I used to analyze Defendants' need analysis methodologies and the extent to which they were consistent with the recommendations in the CM Guidelines.

## A. ANALYSIS OF CM GUIDELINES

2. I identified four sets of CM Guidelines that appeared to be finalized, dated June 2001, 2004-05, November 2015, and December 2016. I identified several other versions of CM Guidelines; however, each appeared to be a draft due to the inclusion of track changes in the documents and/or based on the content of the emails to which they were attached. See **Figure D.i**, below, for a summary of the CM Guidelines documents I identified.

**Figure D.i**

| Date of Document | Example Bates Stamp | Draft/Final | Notes |
|---|---|---|---|
| June 2001 | UCHICAGO_0000183661 | Final | The cover email dated 7/3/2001 (UCHICAGO_0000183658) says "A copy of the final report of the subcommittee on a new 'Consensus Approach to Need Analysis' is also attached for your information and files " |
| 2004-05 (Members Only Version) | NULIT-0000161662 | Final | No cover emails or other documentation were found to suggest that this version is a draft |
| November 2010 | Emory_568Lit_0000224 | Draft | The cover email dated 11/18/2010 (Emory_568Lit_0000223) refers to this document as "Ted's draft rewrite of the manual " |
| November 2012 | MIDDLEBURY003665 | Draft | The cover email dated 10/20/2014 (MIDDLEBURY003632) notes that this version was circulated ahead of the 568 Group meeting in October 2013 and includes "possible/proposed changes to income, asset and business equity adjustments " |
| January 2013 | GTWNU_0000006237 | Draft | The cover email dated 12/28/2012 (GTWNU_0000006234) says "I am attaching a revised draft of the 568 CM Manual that was prepared by Bill Schilling in anticipation of our upcoming Workshop " |
| October 2014 | GTWNU_0000141656 | Draft | The cover email dated 8/12/2014 (GTWNU_0000141655) says "In anticipation of our conf call on Friday, I am attaching my redrafts of the Consensus Methodology Manual[ ]" |
| November 2015 | DARTMOUTH_0000152041, RICE_LIT0000007065 | Final | The cover email dated 2/10/2016 (DARTMOUTH_0000152040) says "I have attached (above) the 568 Manual with some of the technical corrections […] We have not yet posted the manual to the site (members only), as we are still looking into the password issue " The file name of the attachment indicates this version was "approved " |
| December 2016 | DARTMOUTH_0000091786, NULIT-0000000348, PENN568-LIT-00162887 | Final | The cover email (DARTMOUTH_0000091785) says "Please see attached the final versions of the Professional Judgment and Consensus Methodology Manuals " |
| April 2019 | MITLIT-000006825 | Draft | The cover email (MITLIT-000006823) says "I have done some work on the PJ and CM Manuals based on the document […] that Bernie sent us " |

3. For each of the four finalized CM Guidelines, I identified the recommended treatment (if any) for the 17 elements of need analysis discussed in the CM Guidelines. I assumed that

the recommended treatment of an element in any finalized set of CM Guidelines did not change unless a new, finalized set of CM Guidelines was published with an updated recommendation, with the exception of home equity, for which a document in the record confirmed that the recommendation changed in 2005.[1]

4. The CM Guidelines' [redacted]. **Figure D.ii** below shows these values in each academic year from 2003 to 2022.

**Figure D.ii: Institutional Methodology Option Values**

| Academic Year | [redacted] | [redacted] | Source |
|---|---|---|---|
| AY 2003 | [redacted] | [redacted] | CBD004281 at 281. |
| AY 2004 | [redacted] | [redacted] | CBD004286 at 286. |
| AY 2005 | [redacted] | [redacted] | CBD004291 at 292. |
| AY 2006 | [redacted] | [redacted] | CBD004296 at 297. |
| AY 2007 | [redacted] | [redacted] | CBD004301 at 302. |
| AY 2008 | [redacted] | [redacted] | CBD004306 at 307. |
| AY 2009 | [redacted] | [redacted] | CBD004311 at 312. |
| AY 2010 | [redacted] | [redacted] | CBD004316 at 317. |
| AY 2011 | [redacted] | [redacted] | CBD004321 at 322. |
| AY 2012 | [redacted] | [redacted] | CBD004326 at 327. |
| AY 2013 | [redacted] | [redacted] | CBD004331 at 334. |
| AY 2014 | [redacted] | [redacted] | CBD004345 at 348. |
| AY 2015 | [redacted] | [redacted] | CBD004359 at 362. |
| AY 2016 | [redacted] | [redacted] | CBD004373 at 376. |
| AY 2017 | [redacted] | [redacted] | NULIT-0000111384 at 387. |
| AY 2018 | [redacted] | [redacted] | NULIT-0000166453 at 457. |
| AY 2019 | [redacted] | [redacted] | NULIT-0000000649 at 655 |
| AY 2020 | [redacted] | [redacted] | NULIT-0000000540 at 545. |
| AY 2021 | [redacted] | [redacted] | NULIT-0000000094 at 099. |
| AY 2022 | [redacted] | [redacted] | NULIT-0000000665 at 670. |

[1] DARTMOUTH_0000359371 at 375.

## B. ANALYSIS OF DEFENDANTS' NEED ANALYSIS METHODOLOGIES

5. For each Defendant, I reviewed all documentation I could identify with respect to that Defendant's baseline need analysis methodology during the Class Period defined by Dr. Singer for information on their treatment of the 17 elements discussed by the CM Guidelines.[2] The materials I identified and reviewed included policy manuals, financial aid software settings, responses to a questionnaire from the United States Government Accountability Office, other produced documents, and deposition testimony.

6. Documentation was not always precise about the exact timing of a methodological approach. To the extent available, I included either the academic year or the most specific date (at the monthly level) available in the underlying documentation. For depositions, if no timeframe was specified, I assumed the testimony described the approach taken in the closest academic year to the date of the deposition.

7. Software settings reflect the value of the global options set by Defendants for the purpose of calculating EFCs within a particular software system (e.g., PowerFAIDS, Banner). However, I note that each school might change options locally for individual students, or might make global changes across groups of students outside of the software settings. In the absence of additional information, I have treated software settings as reflecting the Defendant's treatment of each element for the purpose of my analysis. In addition, I note that some software settings are not sufficiently precise to be informative about whether a Defendant was consistent with the CM Guidelines. For example, the produced software settings related to the treatment of family and student assets only allow two options: to treat

2 *See* Singer Report, ¶ 9. I understand that there is a dispute as to when individual Defendants entered or exited the 568 Group. In my analysis, I use the Class Period as presented by Dr. Singer, but I am not opining on the correct conduct dates. To the extent that the Class Period is updated, I may be asked to update my analysis.

all reported student assets as student assets or to treat all reported student assets as parent assets (except for trust funds).[3] Because neither option is consistent with the nuances of the CM Guidelines' recommended treatment of this element, financial aid officers would always have to make adjustments not captured by the software settings to be consistent with the recommendation in the CM Guidelines. Therefore, for this element, I did not consider software settings sufficiently informative as to whether a Defendant's approach was consistent with the CM Guidelines.

### C. ANALYSIS OF DEFENDANTS' CONSISTENCY WITH CM GUIDELINE RECOMMENDATIONS

8. As discussed in **Section IV.B**, I excluded nine elements of need analysis from my analysis because the CM Guidelines did not provide actionable recommendations for the treatment of the element, or because sufficient information was not available across Defendants to consistently analyze the treatment of the element. Specifically, I found that the CM Guidelines discussed but did not provide actionable recommendations on the following elements: divorced, separated, and single parents; parental unemployment; retirement allowances; IM taxation bands; family loan debt; one-time income adjustments; special expense adjustments; and parent businesses. In addition, although the CM Guidelines provided actionable recommendations for the definition of income, for the majority of Defendants, produced documents and deposition testimony about their need analysis methodologies did not provide sufficient information for me to analyze whether they were consistent with the CM Guidelines' recommendations. I have included the information I gathered for each Defendant related to its treatment of these elements in the backup

[3] *See, for example*, NULIT-0000000240 at 249; NULIT-0000181680 at 747.

ATTORNEYS' EYES ONLY - SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

materials to this Appendix, but I have not analyzed each Defendant's consistency with the CM Guidelines for these elements.

9. For the remaining eight elements, I compared each Defendant's treatment with the recommendation in the CM Guidelines. If the CM Guidelines' recommendation had multiple components, I considered the Defendant's consistency with each component.

10. For each element and year with available data, I classified each Defendant's need analysis methodology as follows:

- **Consistent:** A Defendant's need analysis methodology was classified as consistent with the CM Guideline recommendation if its treatment of the element was consistent with the CM Guideline for all components of the recommendation for which information was available.

- **Inconsistent:** A Defendant's need analysis methodology was classified as inconsistent with the CM Guideline recommendation if its treatment of the element was inconsistent with the CM Guideline for any component of the recommendation for which information was available. If a Defendant's treatment was consistent with some, but not all, components of the CM Guideline, it was marked as inconsistent.

- **Insufficient information:** A Defendant's need analysis methodology was classified as having insufficient information if there was not sufficient information to determine whether the Defendant was consistent with the CM Guideline recommendation for any component of the recommendation for that element. This includes cases where the information was missing and cases where multiple sources of information appeared to be contradictory.

**Appendix Table D.1**
**Comparison of CM Guidelines and Brown Methodology**
**(AY 2004-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living table. |
| | Institutional Policy | [Jan 2007] Brown did not adjust the IPA and ERA using the IM cost-of-living tables. |
| | Consistent with CM | [Jan 2007] No; Brown did not account for differences in cost of living between areas. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [Jan 2007] Brown used IM optional treatment of elementary and secondary school tuition expenses.<br><br>[AY 2014-AY 2015] Brown made an allowance for private school tuition expenses covering "all or a portion of a sibling's private school education costs." |
| | Consistent with CM | [Jan 2007] Yes.<br><br>[AY 2014-AY 2015] Insufficient information. |
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2004 -AY 2007] Brown assessed student assets at the FM student asset assessment rate of 35%.<br><br>[Jan 2007, AY 2014-AY 2015] Brown treated assets reported in the student's name as student assets and assessed them at 20%. |
| | Consistent with CM | [AY 2004-AY 2007, AY 2014-AY 2015] No; assets reported in students name are treated as student assets. |

**Appendix Table D.1**
**Comparison of CM Guidelines and Brown Methodology**
**(AY 2004-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [Jan 2007, AY 2010-AY 2011] Brown capped home equity at 3 times income minus mortgage debt.<br><br>[AY 2015-AY 2017] Brown capped home value at 3 times income.<br><br>[AY 2022] Brown did not consider home equity in its need analysis. |
| | Consistent with CM | [Jan 2007, AY 2010-AY 2011] No; home equity capped at 3 times income.<br><br>[AY 2015-AY 2017] No; home value capped at 3 times income.<br><br>[AY 2022] No; home equity not considered. |
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [Jan 2007] Brown imputed assets based on an assumed 3% rate of return. Brown imputed assets based only on interest and not on dividend income. |
| | Consistent with CM | [Jan 2007] No; Brown imputed assets at a 3% interest rate based only on interest, not on dividend income. |

**Appendix Table D.1**
**Comparison of CM Guidelines and Brown Methodology**
**(AY 2004-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [Jan 2007] Brown made an allowance for unreimbursed medical expenses exceeding 11% of the IPA.<br><br>[AY 2010-AY 2011, AY 2016-AY 2017] Brown made an allowance for unreimbursed medical expenses exceeding 99.9% of income.<br><br>[AY 2014] Brown made an allowance for unreimbursed medical expenses exceeding the standard FM allowance.<br><br>[AY 2015] Contradiction between produced documents:<br>• According to software settings, Brown made an allowance for unreimbursed medical expenses exceeding 99.9% of income.<br>• According to other produced documents, Brown made an allowance for unreimbursed medical expenses exceeding the standard FM allowance. |
| | Consistent with CM | [Jan 2007, AY 2010-AY 2011, AY 2014-2017] No; Brown used alternative income thresholds to determine the allowance. |
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [Jan 2007, AY 2014] Brown used the FM percentages to split the parent contribution for multiple siblings in college. Brown lowered the allowance if the sibling attended a low cost school. Brown did not count siblings in graduate or professional school as siblings in college except if the family provided documentation that the sibling was a dependent for aid purposes in AY 2006. Brown did not include parents for the number in college.<br><br>[AY 2010, AY 2011, 2015-2017, AY 2022] Brown used the FM percentages to split the parent contribution for multiple siblings in college. |
| | Consistent with CM | [Jan 2007, AY 2010, AY 2011, AY 2014, 2015-2017, AY 2022] No; Brown uses FM percentages to split the parent contribution. |

**Appendix Table D.1**
**Comparison of CM Guidelines and Brown Methodology**
**(AY 2004-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [Jan 2007, AY 2014, AY 2015, AY 2022] Brown added back rental depreciation and losses to income. |
| | Consistent with CM | [Jan 2007, AY 2014, AY 2015, AY 2022] Yes; based on components for which information is available. |

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.2**
**Comparison of CM Guidelines and Caltech Methodology**
**(AY 2020-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living table. |
| | Institutional Policy | [AY 2020-AY 2022] Caltech adjusted the IPA and ERA using the IM cost-of-living tables. |
| | Consistent with CM | [AY 2020-AY 2022] Yes. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2020-AY 2022] Caltech did not make an allowance for elementary and secondary school tuition expenses. |
| | Consistent with CM | [AY 2020-AY 2022] No; Caltech did not make an allowance for elementary and secondary school tuition expenses. |
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2020-AY 2021] Contradiction between deposition and produced documents:<br>• According to deposition testimony, Caltech treated all student assets as parents assets.<br>• According to software settings, Caltech did not treat student assets as family assets.<br><br>[AY 2022] Caltech treated all student assets as parents assets. |
| | Consistent with CM | [AY 2020-AY 2021] Contradiction between deposition and produced documents.<br><br>[AY 2022] No; Caltech does not treat student trust funds and assets from sources other than the parent as student assets. |
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [AY 2020-AY 2022] Caltech did not consider home equity in its need analysis. |
| | Consistent with CM | [AY 2020-AY 2022] No; Caltech did not include home equity. |

**Appendix Table D.2**
**Comparison of CM Guidelines and Caltech Methodology**
**(AY 2020-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2020] Caltech did not impute assets.<br><br>[AY 2021] Contradiction between produced documents:<br>• According to software settings, Caltech did not impute assets.<br>• According to its Needs Analysis Manual, Caltech imputed assets assuming either a 1.3% or a 2.7% rate of return, depending on the total amount of interest income, tax exempt interest, and dividend income.<br><br>[AY 2022] Caltech did not impute assets. |
| | Consistent with CM | [AY 2020-AY 2022] No; Caltech either did not impute assets or imputed assets assuming a different rate of return. |
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2020, AY 2022] Caltech used the income threshold determined by the College Board to make an allowance for unreimbursed medical expenses above that threshold.<br><br>[AY 2021] Caltech made an allowance for unreimbursed medical expenses that exceeded 5% of income. |
| | Consistent with CM | [AY 2020, AY 2022] Yes.<br><br>[AY 2021] No; Caltech made a different allowance for unreimbursed medical expenses than recommended by the College Board. |

**Appendix Table D.2**
**Comparison of CM Guidelines and Caltech Methodology**
**(AY 2020-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [AY 2020-AY 2022] Caltech used the FM percentages to split the parent contribution for multiple siblings in college. Caltech capped the allowance for siblings enrolled in community college at the total cost of attendance. |
| | Consistent with CM | [AY 2020-AY 2022] No; Caltech used the FM percentages to split the parent contribution by the number of siblings in college. |

**Appendix Table D.2**
**Comparison of CM Guidelines and Caltech Methodology**
**(AY 2020-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2020] Caltech added back rental and other real estate depreciation to income.<br><br>[AY 2021] Caltech added back rental and other real estate depreciation to income unless the amount of depreciation was less than or equal to $1,500. Caltech imputed the value of rental properties based on either the amount of depreciation or mortgage interest paid. |
| | Consistent with CM | [AY 2020-AY 2021] Yes; based on components for which information is available. |

**Note:**

[1] From AY 2020 to AY 2022, Caltech used both the FM and the IM as the starting point for its need analysis methodology for different students. I analyzed whether Caltech's need analysis methodology was consistent with the CM Guidelines when it used the IM as the starting point rather than the FM.

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.3**
**Comparison of CM Guidelines and Chicago Methodology**
**(AY 2003-AY 2013)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living table. |
| | Institutional Policy | [AY 2003-AY 2005] Chicago reported that it was not consistent with the CM Guidelines on cost-of-living variances. |
| | Consistent with CM | [AY 2003-AY 2005] No; Chicago reported that it was not consistent with the CM Guidelines. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2003-AY 2005] Contradiction between produced documents:<br>• According to its response to the GAO survey, Chicago's treatment of elementary and secondary school tuition expenses was consistent with the CM Guidelines.<br>• According to produced documents, Chicago used the IM optional treatment of elementary and secondary tuition expenses only if the parent contribution "seem[ed] excessive given a family's income."<br><br>[AY 2006-AY 2013] Chicago made an allowance for elementary and secondary school tuition expenses only if the parent contribution "seem[ed] excessive given a family's income." Chicago capped the allowance for elementary and secondary school tuition expenses at $7,900. |
| | Consistent with CM | [AY 2003-AY 2005] Contradiction between produced documents.<br><br>[AY 2006-AY 2013] No; Chicago only included an allowance for elementary and secondary tuition expenses for some families and in some years used a different cap for the allowance. |

**Appendix Table D.3**
**Comparison of CM Guidelines and Chicago Methodology**
**(AY 2003-AY 2013)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2003-AY 2005] Contradiction between produced documents:<br>• According to its response to the GAO survey, Chicago's treatment of family and student assets was consistent with the CM Guidelines.<br>• According to another produced document, Chicago treated student assets, including student trust funds, assets given to the student by their parents under $10,000, assets given to the student by other parties, pre-paid tuition plans, among others, as student assets.<br><br>[AY 2006-AY 2013] Chicago treated student assets, including student trust funds, assets given to the student by their parents under $10,000, assets given to the student by other parties, pre-paid tuition plans, among others, as student assets. Beginning AY 2009, Chicago noted that it disregarded student assets if the total value of those assets was less than $100. |
| | Consistent with CM | [AY 2003-AY 2005] Contradiction between produced documents.<br><br>[AY 2006-AY 2013] No; Chicago treated most student assets as student assets. |
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [AY 2003-AY 2004] Contradiction between produced documents:<br>• According to its response to the GAO survey, Chicago's treatment of home equity was not consistent with the CM Guidelines.<br>• According to another produced document, Chicago capped home equity at 2.4 times parent income minus mortgage debt.<br><br>[AY 2005] Chicago capped home equity at 3.0 times parent income minus mortgage debt.<br><br>[AY 2006] Chicago capped home equity at 2 times parent income.<br><br>[AY 2007-AY 2013] Chicago capped home equity at 1.2 times parent income. |
| | Consistent with CM | [AY 2003-AY 2004] Contradiction between produced documents.<br><br>[AY 2005-AY 2006] No; Chicago used a different home equity cap.<br><br>[AY 2007-AY 2013] Yes. |

**Appendix Table D.3**
**Comparison of CM Guidelines and Chicago Methodology**
**(AY 2003-AY 2013)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2003-AY 2013] Chicago imputed assets based on an assumed 4% rate of return. Chicago imputed assets based on interest and dividend income. |
| | Consistent with CM | [AY 2003-AY 2013] Yes. |
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2003-AY 2013] Chicago made an allowance for medical expenses exceeding 7.5% of total income. In AY 2012-AY 2013, Chicago did not include this allowance for students admitted under early action. |
| | Consistent with CM | [AY 2003-AY 2013] No; Chicago used a different threshold and, in some years, did not include any allowance for students admitted under early action. |

**Appendix Table D.3**
**Comparison of CM Guidelines and Chicago Methodology**
**(AY 2003-AY 2013)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [AY 2003-AY 2005] Contradiction between produced documents:<br>• According to its response in the GAO survey, Chicago's treatment of the number of siblings in college was consistent with the CM Guidelines.<br>• According to produced documents, Chicago used the IM formula to split the parent contribution for multiple siblings in college when the costs of all schools were equivalent or when taking the siblings' costs directly from the parent contribution would yield a lower contribution for the sibling attending Chicago. Chicago did not count siblings in graduate school as siblings in college.<br><br>[AY 2006-AY 2013] Chicago used the IM formula to split the parent contribution for multiple siblings in college when the costs of all schools were equivalent or when taking the siblings' costs directly from the parent contribution would yield a lower contribution for the sibling attending Chicago. Chicago did not count siblings in graduate school as siblings in college. |
| | Consistent with CM | [AY 2003-AY 2005] Contradiction between produced documents.<br><br>[AY 2006-AY 2013] No; Chicago used a different method to adjust for siblings in college when school costs were not equivalent or when taking sibling costs directly from the parent contribution would lead to a higher EFC for the sibling enrolled at Chicago. |

**Appendix Table D.3**
**Comparison of CM Guidelines and Chicago Methodology**
**(AY 2003-AY 2013)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2003-AY 2005] According to its response to the GAO survey, Chicago's treatment of business and real estate was consistent with the CM Guidelines. |
| | Consistent with CM | [AY 2003-AY 2005] Yes. |

**Note:**
[1] When possible, I relied on manuals outlining Chicago's need analysis methodology for the regular decision admissions cycle. In the absence of such manuals, I instead relied on manuals outlining Chicago's need analysis methodology for the early action admissions cycle.

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.4**
**Comparison of CM Guidelines and Columbia Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living table. |
| | Institutional Policy | [AY 2021] Columbia adjusted the IPA and ERA using the IM cost-of-living tables. |
| | Consistent with CM | [AY 2021] Yes. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2021] Columbia made an unspecified allowance for elementary and secondary school tuition expenses. |
| | Consistent with CM | No information. |
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2013] Columbia treated student assets as student assets except for assets given to the student by the parent.<br><br>[AY 2014-AY 2022] Columbia treated the first $10,000 of student assets as parent assets. Columbia treated any additional student assets as student assets. |
| | Consistent with CM | [AY 2013-AY 2022] No; Columbia applied different rules to determine which student assets to assess as student assets vs. parent assets. |
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [AY 2021] Columbia capped home equity at 1.2 times income. |
| | Consistent with CM | [AY 2021] Yes. |
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2021] Columbia imputed assets based on an assumed 4% rate of return. |
| | Consistent with CM | [AY 2021] Yes. |
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | No information. |
| | Consistent with CM | No information. |

**Appendix Table D.4**
**Comparison of CM Guidelines and Columbia Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [AY 2021] Columbia used the IM percentages to split the parent contribution for multiple siblings in college. Columbia multiplied the parent contribution by 50% for each enrolled sibling if both siblings attended Columbia. |
| | Consistent with CM | [AY 2021] Yes; based on components for which information is available. |
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2021] Columbia added back rental and other real estate depreciation and rental losses to income. |
| | Consistent with CM | [AY 2021] Yes; based on components for which information is available. |

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.5**
**Comparison of CM Guidelines and Cornell Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living-table. |
| | Institutional Policy | [AY 2004-AY 2006] Cornell adjusted for cost-of-living for families living in areas with high cost-of-living.<br><br>[AY 2021-AY 2022] Cornell adjusted the IPA and ERA using the IM cost-of-living tables. |
| | Consistent with CM[1] | [AY 2004-AY 2006] Insufficient information.<br><br>[AY 2021-AY 2022] Yes. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2004-AY 2006, AY 2012, AY 2014-AY 2020] Cornell considered private school tuition in its need analysis methodology.<br><br>[AY 2021-AY 2022] Cornell used the IM optional treatment of elementary and secondary school tuition expenses. |
| | Consistent with CM[2] | [AY 2004-AY 2006, AY 2012, AY 2014-AY 2020] Insufficient information.<br><br>[AY 2021-AY 2022] Yes. |

**Appendix Table D.5**
**Comparison of CM Guidelines and Cornell Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2004-AY 2006] Cornell treated student assets given to the student from their parents or saved from the student's own employment as parent assets. It treated assets given to the student from a third party (grandparents, godparents, or other relatives) as student assets and assessed them at 25%. In AY 2005-AY 2006, Cornell specified that it would not treat student assets as parent assets if doing so resulted in an EFC lower than the FM EFC.<br><br>[AY 2012, AY 2014-AY 2020] Cornell treated student assets where the source is either the parent or the student (including 529 plans set up by the parent or student and, in AY 2016-AY 2020, student trust funds set up by the parent) as parent assets and all other student assets (including IRAs and Keoghs) as student assets. Cornell disregarded student assets if the total value of those assets was less than a specified threshold and, in AY 2014-AY 2015, disregarded 529 plans set up by third parties.<br><br>[AY 2021-AY 2022] Contradiction between produced documents:<br>• According to one source, Cornell treated student assets where parents were the source of the asset and pre-paid tuition or savings plans as parent assets and treated student assets provided by third parties or the student, including trusts, as student assets.<br>• According to another source, Cornell treated student assets where the source is either the parent or the student and pre-paid tuition or savings plans as parent assets and treated student assets provided by third parties as student assets. |
| | Consistent with CM | [AY 2004-AY 2006, AY 2012, AY 2014-2020] No; Cornell used different rules to determine which students assets to treat as student assets and which to treat as parent assets.<br><br>[AY 2021-AY 2022] Contradiction between produced documents. |

**Appendix Table D.5**
**Comparison of CM Guidelines and Cornell Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [AY 2004-AY 2006] Cornell capped home equity at 2.4 times total income minus mortgage debt.<br><br>[Mar 2008, Oct 2008, AY 2012, AY 2014-AY 2022] Cornell capped home equity at 1.2 times income. |
| | Consistent with CM | [AY 2004, Mar 2008, Oct 2008, AY 2012, AY 2014-AY 2022] Yes.<br><br>[AY 2005-AY 2006] No; Cornell capped home equity at 2.4 times income minus mortgage debt. |

**Appendix Table D.5**
**Comparison of CM Guidelines and Cornell Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2004-AY 2006] Cornell imputed assets based on an assumed 4% rate of return. Cornell imputed assets based on interest and dividend income.<br><br>[AY 2012] Cornell imputed assets based on an assumed 3% rate of return. Cornell imputed assets based on interest and dividend income.<br><br>[AY 2014-AY 2018] Cornell imputed cash assets using interest income based on an assumed 2% rate of return. Cornell imputed the value of investments using dividend income based on an assumed 4% rate of return.<br><br>[AY 2019-AY 2022] Cornell imputed assets based on an assumed 3% rate of return. Cornell imputed assets based on interest and dividend income. |
| | Consistent with CM | [AY 2004-AY 2006] Yes.<br><br>[AY 2012, AY 2014-2022] No; Cornell assumed a different rate of return to impute parent assets. |
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2004-AY 2006] Cornell made an allowance for unreimbursed medical expenses exceeding 4% of income.<br><br>[AY 2012, AY 2014-AY 2020] Cornell considered unreimbursed medical expenses in its need analysis methodology.<br><br>[AY 2021-AY 2022] Cornell used the income threshold determined by the College Board to make an allowance for unreimbursed medical expenses above that threshold. |
| | Consistent with CM[3] | [AY 2004-AY 2006] No; Cornell used a different income threshold.<br><br>[AY 2012, AY 2014-AY 2020] Insufficient information.<br><br>[AY 2021-AY 2022] Yes. |

**Appendix Table D.5**
**Comparison of CM Guidelines and Cornell Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship |
| | Institutional Policy | [AY 2004-AY 2006] Cornell used the IM formula to split the parent contribution for multiple siblings in college. Cornell did not count siblings enrolled in graduate school as siblings in college except if the parents provided more than half of the sibling's financial support during the academic year. Cornell used a different method to adjust the parent contribution for siblings with low parent contributions.<br><br>[AY 2012, AY 2014-AY 2016] Cornell did not count siblings enrolled in graduate school as siblings in college except if the parents provided documentation of a required parent contribution. Cornell used a different method to adjust the parent contribution for siblings with low parent contributions.<br><br>[AY 2017-2020] Cornell used the IM formula to split the parent contribution for multiple siblings in college. Cornell did not count siblings enrolled in graduate school as siblings in college except if the parents provided documentation of a required parent contribution. Cornell used a different method to adjust the parent contribution for siblings with low parent contributions.<br><br>[AY 2021] Cornell used the IM formula to split the parent contribution for multiple siblings in college. Cornell counted siblings in graduate and professional school as siblings in college. It counted siblings in graduate and professional school towards the number of siblings in college. Cornell used a different method to adjust the parent contribution for siblings with low parent contributions.<br><br>[AY 2022] Cornell used the IM formula to split the parent contribution for multiple siblings in college. Cornell counted siblings in graduate and professional school and siblings with low parent contributions or attending low-cost colleges as siblings in college. |
| | Consistent with CM | [AY 2004-AY 2006, AY 2012, AY 2014-AY 2022] No; Cornell at various times used a different method to adjust the parent contribution for siblings with low parent contribution (rather than siblings attending low-cost schools) and adjusted the parent contribution for siblings in graduate and professional school regardless of whether a parent contribution was required for those students. |

**Appendix Table D.5**
**Comparison of CM Guidelines and Cornell Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2004-AY 2006] Cornell added back depreciation and rental losses to income.<br><br>[AY 2012, AY 2014-AY 2018] Cornell added back rental losses to income. Cornell used tax assessor websites or Zillow to assess the value of rental properties. If the family occupied one unit in a multifamily property they owned, Cornell treated the equity in the non-owner-occupied portion of the property as other real estate. Cornell would move real estate assets to other real estate if a family reported rental income as a business.<br><br>[AY 2019-AY 2022] Cornell added back rental losses to income. If the family occupied one unit in a multifamily property they owned, Cornell treated the equity in the non-owner-occupied portion of the property as other real estate. In AY 2021-AY 2022, Cornell would move real estate assets to other real estate if a family reported it as a business. |
| | Consistent with CM | [AY 2004-AY 2006] Yes, based on components for which information is available.<br><br>[AY 2012, AY 2014-AY 2022] No; in various years Cornell used tax assessor websites or Zillow to assess the market value of the home and did not treat rental properties as businesses even when they were the primary source of income. |

**Notes:**

[1] From AY 2004 to AY 2006, produced documents state that Cornell made cost of living adjustments but do not describe how those adjustments were made. Therefore, I did not have sufficient information to determine whether Cornell's policy was consistent with the CM Guidelines' recommendation.

[2] From AY 2004 to AY 2006, in AY 2012, and from AY 2014 to AY 2020, produced documents state that Cornell considered private school tuition in its need analysis methodology but do not describe how it was considered. Therefore, I did not have sufficient information to determine whether Cornell's policy was consistent with the CM Guidelines' recommendation.

[3] In AY 2012, and from AY 2014 to AY 2020, produced documents state that Cornell considered unreimbursed medical expenses in its need analysis methodology but do not describe how it was considered. Therefore, I did not have sufficient information to determine whether Cornell's policy was consistent with the CM Guidelines' recommendation.

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.6**
**Comparison of CM Guidelines and Dartmouth Methodology**
**(AY 2004-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living table. |
| | Institutional Policy | [AY 2006-AY 2007, AY 2010-AY 2012] Dartmouth used professional judgment to adjust for cost-of-living in Alaska, Hawaii, and Puerto Rico on appeal. Dartmouth approved other cost-of-living adjustments only by committee.<br><br>[AY 2013-AY 2016] Dartmouth approved cost-of-living adjustments by committee.<br><br>[AY 2017-AY 2022] Dartmouth adjusted the IPA and ERA using the IM cost-of-living table. |
| | Consistent with CM | [AY 2006-AY 2007, AY 2010-AY 2017] No; Dartmouth used professional judgment to make cost-of-living adjustments on appeal or only if approved by committee.<br><br>[AY 2017-AY 2021] Yes. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2006-AY 2007, AY 2010-AY 2014] Dartmouth used IM optional treatment of elementary and secondary school tuition expenses.<br><br>[AY 2015-AY 2021] Dartmouth used IM optional treatment of elementary and secondary school tuition expenses unless the expected parent contribution for the student was lower than the maximum allowance, in which case it capped the allowance at the expected parent contribution instead. |
| | Consistent with CM | [AY 2006-AY 2007, AY 2010-AY 2014] Yes.<br><br>[AY 2015-AY 2021] No; Dartmouth used a lower cap for some students. |

**Appendix Table D.6**
**Comparison of CM Guidelines and Dartmouth Methodology**
**(AY 2004-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2004] Dartmouth treated all student assets as student assets.<br><br>[AY 2006] Dartmouth assessed reported student assets at the IM student asset assessment rate of 25% unless the IM student contribution was less than the FM student contribution. Dartmouth treated college savings plans and prepaid tuition plans owned by the parent as parent assets if the beneficiary was a sibling. Dartmouth treated prepaid tuition plans owned by the parent as a resource that reduced self help if the beneficiary was the student.<br><br>[AY 2007] Dartmouth assessed reported student assets at the FM student asset assessment rate of 20% unless the IM student contribution was less than the FM student contribution. Dartmouth treated college savings plans and prepaid tuition plans owned by the parent as parent assets.<br><br>[AY 2010-AY 2013] Dartmouth assessed reported student assets at the FM student asset assessment rate of 20%. Dartmouth treated college savings plans owned by either the parent or the student as parent assets. Dartmouth treated prepaid tuition plans owned by the parent as parent assets.<br><br>[AY 2014-AY 2021] Dartmouth assessed reported student assets at the FM student asset assessment rate of 20%. Dartmouth treated qualified tuition programs owned by either the parent or the student as parent assets. Dartmouth treated UGMAs and UTMAs as student assets. |
| | Consistent with CM | [AY 2004, AY 2006-AY 2007, AY2010-AY 2021] No; Dartmouth at various times did not treat student assets as parent assets; treated college savings plans and prepaid tuition plans as student assets in some circumstances; and treated UGMAs and UTMAs as student assets regardless of the source of the gift. |

**Appendix Table D.6**

**Comparison of CM Guidelines and Dartmouth Methodology**

**(AY 2004-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [AY 2006-AY 2009] Dartmouth capped home equity at 2.4 times income minus mortgage debt.<br><br>[AY 2010-AY 2021] Dartmouth capped home equity at 1.2 times income. |
| | Consistent with CM | [AY 2006-AY 2009] No; Dartmouth capped home value at 2.4 times income.<br><br>[AY 2010-AY 2021] Yes. |
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2006-AY 2007, AY 2010-AY 2021] Dartmouth imputed assets using interest and dividend income based on an assumed 4% rate of return. |
| | Consistent with CM | [AY 2006-AY 2007, AY 2010-AY 2021] Yes. |
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2006-AY 2007, AY 2010-AY 2011, AY 2013-AY 2021] Dartmouth used the income threshold determined by the College Board to make an allowance for unreimbursed medical expenses above that threshold.<br><br>[AY 2012] Dartmouth made an allowance for unreimbursed medical expenses that exceeded 3.5% of income. |
| | Consistent with CM | [AY 2006-AY 2007, AY 2010-AY 2011, AY 2013-AY 2021] Yes.<br><br>[AY 2012] No; Dartmouth used a different income threshold. |

**Appendix Table D.6**
**Comparison of CM Guidelines and Dartmouth Methodology**
**(AY 2004-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [AY 2006-AY 2007, AY 2010-AY 2015] Dartmouth used the IM percentages to split the parent contribution for multiple siblings in college. Dartmouth did not count siblings in graduate school as siblings in college without additional documentation.<br><br>[AY 2016-AY 2021] Dartmouth used the IM percentages to split the parent contribution for multiple siblings in college. Dartmouth did not count siblings in graduate school as siblings in college. |
| | Consistent with CM | [AY 2006-AY 2007, AY 2010-AY 2021] Yes; based on components for which information is available. |

**Appendix Table D.6**
**Comparison of CM Guidelines and Dartmouth Methodology**
**(AY 2004-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2006-AY 2007, AY 2010-AY 2012] Dartmouth added back the higher of rental depreciation or losses to income. Dartmouth added back real estate losses separately for individual entities.<br><br>[AY 2013-AY 2021] Dartmouth added back the higher of rental depreciation or losses to income. Dartmouth added back real estate losses separately for individual entities. Dartmouth did not impute the value of rental properties. |
| | Consistent with CM | [AY 2006-AY 2007, AY 2010-AY 2012] Yes, based on components for which there is information.<br><br>[AY 2013-AY 2021] No; Dartmouth did not impute rental property value. |

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.7**
**Comparison of CM Guidelines and Duke Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living table. |
| | Institutional Policy | [AY 2012-AY 2013] Duke adjusted the IPA based on cost-of-living expenses in different parts of the country.<br><br>[AY 2022] Duke adjusted the IPA and ERA using the IM cost-of-living tables. |
| | Consistent with CM[1] | [AY 2012-AY 2013] Insufficient information.<br><br>[AY 2022] Yes. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2012-AY 2013, AY 2021] Duke used IM optional treatment of elementary and secondary school tuition expenses.<br><br>[AY 2022] Duke made an unspecified allowance for secondary school tuition expenses. |
| | Consistent with CM[2] | [AY 2012-AY 2013, AY 2021] Yes.<br><br>[AY 2022] Insufficient information. |
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2010] Duke treated assets saved under the student's name as parent assets.<br><br>[AY 2011-AY 2022] Contradiction between deposition testimony and produced documents:<br>• According to testimony from Janice Coleman, Duke treated assets saved under the student's name as parent assets.<br>• According to testimony from Miranda McCall, Duke treated all student assets as parent assets except for student trust funds, which it treated as student assets. Duke did not consider gifts from third parties (e.g., grandparents) in its need analysis.<br>• According to produced documents, Duke treated all student assets as parent assets except for student trust funds, which it treated as student assets. Duke treated college savings plans as parent assets. Duke treated gifts from third parties (e.g., grandparents) as trust funds. |
| | Consistent with CM | [AY 2010] Yes.<br><br>[AY 2011-AY 2022] Contradiction between deposition testimony and produced documents. |

**Appendix Table D.7**
**Comparison of CM Guidelines and Duke Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [AY 2012-AY 2013, AY 2021-AY 2022] Duke capped home equity at 1.2 times income. |
| | Consistent with CM | [AY 2012-AY 2013, AY 2021-AY 2022] Yes. |
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2012-AY 2013] Duke imputed assets using interest and dividend income based on an assumed 2.5% rate of return.<br><br>[AY 2021] Duke imputed assets using interest and/or dividend income based on an unspecified rate of return.<br><br>[AY 2022] Duke imputed assets based on an assumed rate of return that varied annually and ranged between 2% and 3.5%. |
| | Consistent with CM[3] | [AY 2012-AY 2013, AY 2022] No; Duke used a different rate of return to impute assets.<br><br>[AY 2021] Insufficient information. |
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2012-AY 2013] Duke made an allowance for unreimbursed medical expenses that exceeded 3.6% of income.<br><br>[AY 2022] Duke used the income threshold determined by the College Board to make an allowance for unreimbursed medical expenses above that threshold. |
| | Consistent with CM | [AY 2012-AY 2013] No; Duke used a different threshold.<br><br>[AY 2022] Yes. |

**Appendix Table D.7**
**Comparison of CM Guidelines and Duke Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [AY 2012-2013] Duke used the IM formula to split the parent contribution for multiple siblings in college. Duke did not count siblings enrolled in graduate or professional school, siblings receiving full merit or athletic scholarships, or siblings enrolled at military academies as siblings in college. Produced documents contain a contradiction as to whether Duke did not count any siblings in community college as siblings in college or whether it only counted siblings in community college if their COA exceeded $15,000.<br><br>[AY 2022] Duke used the IM formula to split the parent contribution for multiple siblings in college. |
| | Consistent with CM | [AY 2012-2013] No; Duke used different rules to determine which students it counted as in college.<br><br>[AY 2022] Yes, based on components for which information is available. |

**Appendix Table D.7**
**Comparison of CM Guidelines and Duke Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2012 - AY 2013] Duke added back rental losses and depreciation to income. Duke used Zillow to estimate the value of rental properties.<br><br>[Date unknown] Duke added back rental losses separately for individual entities.<br><br>[AY 2021] Duke added back rental depreciation to income. Duke treated rental properties as business assets. Duke used real estate websites to estimate the value of rental properties and other real estate.<br><br>[AY 2022] Duke did not use the purchase price and the date of purchase to impute rental property value. Duke treated all rental and real estate assets as business assets. Duke did not have a standard approach to the treatment of multi-family property. Duke did not add back real estate losses separately for individual entities. |
| | Consistent with CM | [AY 2012-AY 2013, AY 2021-AY 2022] No; Duke used a different method to assess rental property value and, at various times, Duke treated all rental properties as businesses, did not have a standard approach for treating multifamily properties, and did not zero out losses on each rental property separately. |

**Notes:**
[1] From AY 2012 to AY 2013, produced documents state that Duke made cost of living adjustments but do not describe how those adjustments were made. Therefore, I did not have sufficient information to determine whether Duke's policy was consistent with the CM Guidelines' recommendation.
[2] In AY 2022, deposition testimony states that Duke made an allowance for secondary school tuition in its need analysis methodology but does not provide sufficient information for me to determine whether Duke's policy was consistent with the CM Guidelines' recommendation.
[3] In AY 2021, produced documents state that Duke imputed the value of liquid assets but do not specify the rate of return. Therefore, I did not have sufficient information to determine whether Duke's policy was consistent with the CM Guidelines' recommendation.

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.8**
**Comparison of CM Guidelines and Emory Methodology**
**(AY 2004-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| **Cost of Living Variances** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living table. |
| | Institutional Policy | [AY 2009] Emory adjusted the IPA and ERA for high cost-of-living areas.<br><br>[AY 2015] Emory adjusted the IPA based on cost-of-living expenses in different parts of the country. |
| | Consistent with CM[1] | [AY 2009] Yes.<br><br>[AY 2015] Insufficient information. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2009, AY 2015] Emory made an allowance for private school tuition expenses capped at $6,500 for each eligible student. |
| | Consistent with CM | [AY 2009] No; Emory used a different cap. |
| **Family and Student Assets** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2009, AY 2015] Emory treated student assets as student assets. |
| | Consistent with CM[2] | [AY 2009] No; Emory did not treat student assets as parent assets.<br><br>[AY 2015] Insufficient information. |
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [2007] Emory sometimes capped home equity at 2.4 times income minus mortgage debt.<br><br>[AY 2009, AY 2015] Emory capped home equity at 2 times income if the home was purchased at least 10 years ago. |
| | Consistent with CM | [AY 2007, AY 2009, AY 2015] No; Emory used a different home equity cap and did not cap home equity for all students. |

**Appendix Table D.8**
**Comparison of CM Guidelines and Emory Methodology**
**(AY 2004-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| **Imputing the Value of Liquid Assets** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2009, AY 2015] Emory imputed assets using interest income based on an assumed 2% rate of return. Emory imputed assets using dividend income based on an assume 3% rate of return. |
| | Consistent with CM | [AY 2009, AY 2015] No; Emory assumed a different rate of return to impute assets. |
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2009] Emory used the income threshold determined by the College Board to make an allowance for unreimbursed medical expenses above that threshold.<br><br>[AY 2015] Emory made an allowance for unreimbursed medical expenses that exceeded 3.8% of income. |
| | Consistent with CM | [AY 2009] Yes.<br><br>[AY 2015] No; Emory used a different income threshold. |

**Appendix Table D.8**
**Comparison of CM Guidelines and Emory Methodology**
**(AY 2004-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| **Number of Siblings in College** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [AY 2009] Emory used the IM formula to split the parent contribution for multiple siblings in college.<br><br>[AY 2015] Emory used the IM formula to split the parent contribution for mulitple siblings in college. Emory multiplied the total parent contribution by 50% for one sibling in college and 35% for two siblings in college if the sibling attended Emory or another similarly priced institution. |
| | Consistent with CM | [AY 2009] Yes, based on components for which there is information.<br><br>[AY 2015] No; Emory used different percentages to split the parent contribution when siblings also attended Emory or similar priced schools. |

**Appendix Table D.8**
**Comparison of CM Guidelines and Emory Methodology**
**(AY 2004-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2009] Emory added back rental depreciation and losses to income. Emory imputed the value of rental properties using an unspecified multiplier.<br><br>[AY 2015] Emory added back rental depreciation to income. Emory did not add back rental losses. |
| | Consistent with CM | [AY 2009] Yes, based on components for which there is information.<br><br>[AY 2015] No; Emory did not add back rental losses. |

**Notes:**
[1] In AY 2015, produced documents state that Emory made cost of living adjustments but do not describe how those adjustments were made. Therefore, I did not have sufficient information to determine whether Emory's policy was consistent with the CM Guidelines' recommendation.
[2] I did not consider software settings to contain sufficient information to compare Emory's treatment of family and student assets to the CM Guidelines' recommendation for AY 2015.

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.9**
**Comparison of CM Guidelines and Georgetown Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living table. |
| | Institutional Policy | [AY 2016, AY 2018-AY 2022] Georgetown adjusted the IPA and EPA using the IM cost-of-living tables. |
| | Consistent with CM | [AY 2016, AY 2018-AY 2022] Yes. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2004-AY 2009] Georgetown made an allowance for tuition expenses up to $6,900 for each eligible student.<br><br>[AY 2019] Georgetown made an allowance for tuition expenses up to $11,970 for each eligible student.<br><br>[AY 2022] Georgetown made an allowance for tuition expenses up to $12,640 for each eligible student.<br><br>[AY 2011-AY 2015, AY 2017-AY 2018, AY 2020-AY 2021] Contradiction between produced documents:<br>• According to an internal contradiction in its Policy and Procedure manuals, Georgetown made a maximum allowance of either $6,900 or $8,870 from AY 2011-AY 2015, either $6,900 or $8,870 in AY 2017, and either $11,970 or $12,220 in AY 2020.<br>• According to software settings, Georgetown made an allowance for tuition expenses up to $11,750 in AY 2018, $12,220 in AY 2020, and $12,540 in AY 2021.<br>• According to its Policy and Procedure Manuals, Georgetown made an allowance for tuition expenses up to $11,970 in AY 2018 and AY 2020 and $12,640 in AY 2021. |
| | Consistent with CM | [AY 2004-AY 2009, AY 2012-AY 2015, AY 2017] No; Georgetown used a different cap for elementary and secondary school tuition expenses.<br><br>[AY 2011, AY 2018, AY 2020-AY 2021] Contradiction between produced documents.<br><br>[AY 2019, AY 2022] Yes. |

**Appendix Table D.9**
**Comparison of CM Guidelines and Georgetown Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2016] Georgetown treated student assets as family assets unless the calculated IM EFC is less than FM EFC, in which case Georgetown treated student assets as student assets.<br><br>[AY 2018-AY 2022] According to its software settings, Georgetown treated student assets as parent assets except for student trust funds, which it treated as student assets. |
| | Consistent with CM[1] | [AY 2016] No; Georgetown either treated all student assets as family assets (including trust funds) or treated all student assets as student assets, depending on whether the calculated IM EFC was less than the FM EFC.<br><br>[AY 2018-AY 2022] Insufficient information. |
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [AY 2016, AY 2018-AY 2022] Georgetown capped home equity at 1.2 times income. |
| | Consistent with CM | [AY 2016, AY 2018-AY 2022] Yes. |

**Appendix Table D.9**
**Comparison of CM Guidelines and Georgetown Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2004-AY 2009, AY 2011-AY 2015, AY 2017-AY 2018, AY 2020-AY 2022] Georgetown imputed cash assets using interest income based on an assumed 4% rate of return. Georgetown imputed the value of investments using dividend income based on an assumed 5% rate of return.<br><br>[AY 2019] According to its software settings, Georgetown imputed cash assets using interest income based on an assumed 4% rate of return. Georgetown imputed the value of investments using dividend income based on an assumed 40% rate of return.<br><br>[AY 2018, AY 2020] Contradiction between produced documents:<br>• According to its software settings, Georgetown imputed cash assets using interest income based on an assumed 4% rate of return. Georgetown imputed the value of investments using dividend income based on an assumed 40% rate of return.<br>• According to its Policy and Procedure manuals, Georgetown imputed cash assets using interest income based on an assumed 4% rate of return. Georgetown imputed the value of investments using dividend income based on an assumed 5% rate of return.<br><br>[AY 2021-AY 2022] Contradiction between produced documents:<br>• According to its software settings, Georgetown imputed cash assets using interest income based on an assumed 4% rate of return. Georgetown imputed the value of investments using dividend income based on an assumed 4% rate of return.<br>• According to its Policy and Procedure Manuals, Georgetown imputed cash assets using interest income based on an assumed 4% rate of return. Georgetown imputed the value of investments using dividend income based on an assumed 5% rate of return. |
| | Consistent with CM | [AY 2004-AY 2009, AY 2011-AY 2015, AY 2017, AY 2019] No; Georgetown assumed a different rate of return to impute the value of investments.<br><br>[AY 2018, AY 2020-AY 2022] Contradiction between produced documents. |

**Appendix Table D.9**
**Comparison of CM Guidelines and Georgetown Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2004-AY 2009] Georgetown made an allowance for unreimbursed medical expenses that exceeded 5% of income.<br><br>[AY 2011, AY 2018-AY 2019] Georgetown used the income threshold determined by the College Board to make an allowance for unreimbursed medical expenses above that threshold.<br><br>[AY 2012-AY 2015, AY 2017] Georgetown made an allowance for unreimbursed medical expenses that exceeded 3.5% of income.<br><br>[AY 2020-AY 2022] Contradiction between produced documents:<br>• According to its software settings, Georgetown used the income threshold determined by the College Board to make an allowance for unreimbursed medical expenses above that threshold. ([AY 2020] 5.0%, [AY 2021-2022] 4.3%).<br>• According to other produced documents, Georgetown made an allowance for unreimbursed medical expenses that exceeded 4.9% of income. |
| | Consistent with CM | [AY 2004-AY 2009, AY 2012-AY 2015, AY 2017] No; Georgetown used a different income threshold.<br><br>[AY 2011, AY 2018-AY 2019] Yes.<br><br>[AY 2020-AY 2022] Contradiction between produced documents. |

**Appendix Table D.9**
**Comparison of CM Guidelines and Georgetown Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [AY 2004-AY 2009, AY 2011-AY 2015, AY 2017-AY 2018, AY 2020-AY 2022] Georgetown used the IM formula to split the parent contribution for multiple siblings in college. Georgetown counted siblings enrolled in professional school (e.g., law, medicine) as siblings in college. Georgetown did not count siblings in ROTC, siblings in miliatry academies, siblings with full scholarships, siblings in community college, or siblings in graduate school as siblings in college.<br><br>[AY 2018-AY 2022] Georgetown used the IM formula to split the parent contribution for multiple siblings in college.<br><br>[AY 2004-AY 2009, AY 2011-AY 2015, AY 2017] Georgetown counted siblings enrolled in professional school (e.g., law, medicine) as siblings in college.<br><br>[AY 2018, AY 2020- AY 2022] Georgetown did not count siblings enrolled in professional school (e.g., law, medicine) as siblings in college. |
| | Consistent with CM | [AY 2004-AY 2009, AY 2011-AY 2015, AY 2017-AY 2018, AY 2020-AY 2022] No; at various times, Georgetown treated siblings in professional school (e.g., law and medicine) as siblings in college and did not treat siblings in community college as siblings in college. |

**Appendix Table D.9**
**Comparison of CM Guidelines and Georgetown Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2004-AY 2009, AY 2011-AY 2015, AY 2017-AY 2018, AY 2020-AY 2022] Georgetown added back rental losses to income.<br><br>[AY 2016] Georgetown added back rental losses and rental and real estate depreciation, net of losses, to income.<br><br>[AY 2018-AY 2022] Georgetown added back rental losses to income. |
| | Consistent with CM | [AY 2004-AY 2009, AY 2011-AY 2022] Yes, based on components for which information is available. |

**Notes:**

[1] I did not consider software settings to contain sufficient information to compare Georgetown's treatment of family and student assets to the CM Guidelines' recommendation from AY 2018 to AY 2022.

[2] I infer the academic year associated with Georgetown's software settings based on their file names.

**Sources:** Backup materials to this report (Appendix D).

ATTORNEYS' EYES ONLY - SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

**Appendix Table D.10**
**Comparison of CM Guidelines and Johns Hopkins Methodology**
**(AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living table. |
| | Institutional Policy | [AY 2022] Johns Hopkins adjusted the IPA and EPA using the IM cost-of-living tables. |
| | Consistent with CM | [AY 2022] Yes. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2022] Johns Hopkins used IM optional treatment of elementary and secondary school tuition expenses. |
| | Consistent with CM | [AY 2022] Yes. |
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2022] According to produced documents, Johns Hopkins treated all student assets as parent assets except for trust funds, which it treated as student assets. |
| | Consistent with CM[1] | [AY 2022] Insufficient information. |
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [AY 2022] Johns Hopkins capped home equity at 1.2 times income. |
| | Consistent with CM | [AY 2022] Yes. |
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2022] Johns Hopkins imputed assets based on an assumed 4% rate of return. |
| | Consistent with CM | [AY 2022] Yes. |

**Appendix Table D.10**

**Comparison of CM Guidelines and Johns Hopkins Methodology**

**(AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2022] Contradiction between deposition testimony and produced documents:<br>• According to deposition testimony, Johns Hopkins used the income threshold determined by the College Board to make an allowance for unreimbursed medical expenses above that threshold (4.3%).<br>• According to produced documents, Johns Hopkins made an allowance for unreimbursed medical expenses that exceeded 5% of income. |
| | Consistent with CM | [AY 2022] Contradiction between deposition testimony and produced documents. |
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [AY 2022] Johns Hopkins used the IM formula to split the parent contribution for multiple siblings in college. Johns Hopkins did not count siblings older than 23, siblings in graduate school, siblings attending military or service academies, or siblings attending community college as siblings in college, but did count parents towards the number of family members in college. Deposition testimony and produced documents contain a contradiction on the treatment of siblings in community college:<br>• According to deposition testimony, Johns Hopkins considered the cost of attendance for siblings attending community college in the calculation of the parent contribution.<br>• According to produced documents, Johns Hopkins made a standard allowance of $3,000 for siblings attending community college. |
| | Consistent with CM | [AY 2022] Contradiction between deposition testimony and produced documents. |

**Appendix Table D.10**

**Comparison of CM Guidelines and Johns Hopkins Methodology**

**(AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2022] Johns Hopkins added back rental and real estate losses and depreciation to income. Johns Hopkins added back rental losses separately for individual entities. Johns Hopkins treated real estate value and debt as business value and debt if a family reported rental income on Schedule E, even if rental income was not the family's primary source of income. |
| | Consistent with CM | [AY 2022] No; Johns Hopkins treated real estate value and debt as business value and debt if there is rental income on Schedule E, even if it was not the primary source of income. |

**Note:**

[1] I did not consider software settings to contain sufficient information to compare Johns Hopkins' treatment of family and student assets to the CM Guidelines' recommendation for AY 2022.

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.11**
**Comparison of CM Guidelines and MIT Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living table. |
| | Institutional Policy | [AY 2003-AY 2022] MIT adjusted the IPA and ERA using the IM cost-of-living tables. |
| | Consistent with CM | [AY 2003-AY 2022] Yes. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2003-AY 2017, AY 2021-AY 2022] MIT used the IM optional treatment of elementary and secondary school tuition expenses.<br><br>[AY 2018-AY 2020] MIT made an allowance for elementary and secondary school tuition expenses capped at $11,450. |
| | Consistent with CM | [AY 2003-AY 2011, AY 2014-AY 2017, AY 2021-AY 2022] Yes.<br><br>[AY 2012-AY 2013, AY 2018-AY 2020] No; MIT applied a different cap. |
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2003-AY 2010] MIT treated all student assets where the parent was the source of the asset, including pre-paid tuition plans, college savings plans, and parent-originated trusts, as parent assets. MIT treated student assets given by a third party as student assets.<br><br>[AY 2011-AY 2020] MIT treated student assets, except trusts, as parent assets, including any pre-paid tuition and savings plans where the parent is the owner.<br><br>[AY 2021-AY 2022] MIT treated all student assets as parent assets. |
| | Consistent with CM | [AY 2003-AY 2022] No; MIT applied different rules to determine which student assets to assess as student assets vs parent assets. |

**Appendix Table D.11**
**Comparison of CM Guidelines and MIT Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [AY 2003-AY 2006] MIT capped home equity at 2.4 times income minus mortgage debt.<br><br>[AY 2007] MIT capped home equity at 1.2 times income.<br><br>[AY 2008-AY 2013] MIT capped home equity at 1.2 times income for families with income greater than $100,000. MIT did not consider home equity in its need analysis for families with income less than $100,000.<br><br>[AY 2014-AY 2015] MIT capped home equity at 1.2 times income for families with income greater than $150,000. MIT did not consider home equity in its need analysis for families with income less than $150,000.<br><br>[AY 2016-AY 2022] MIT did not consider home equity in its need analysis. |
| | Consistent with CM | [AY 2003-AY 2004, AY 2007] Yes.<br><br>[AY 2005-AY 2006] No; MIT applied a different home equity cap.<br><br>[AY 2008-AY 2022] No; MIT excluded home equity for families with income below certain thresholds and then excluded home equity altogether. |
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2003-AY 2013] MIT imputed assets based on an assumed 4% rate of return. MIT imputed assets based on interest and dividend income.<br><br>[AY 2014- AY 2022] MIT imputed assets based on an assumed 3% rate of return. MIT imputed assets based on interest and dividend income. |
| | Consistent with CM | [AY 2003-AY 2013] Yes.<br><br>[AY 2014-AY 2022] No; MIT assumed a different rate of return to impute the value of liquid assets. |

**Appendix Table D.11**
**Comparison of CM Guidelines and MIT Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2003, AY 2009-AY 2011, AY 2014, AY 2021-AY 2022] MIT used the income threshold determined by the College Board to make an allowance for unreimbursed medical expenses above that threshold.<br><br>[AY 2004-AY 2008] MIT made an allowance for unreimbursed medical expenses that exceeded 3.4% of income.<br><br>[AY 2012-AY 2013] MIT made an allowance for unreimbursed medical expenses that exceeded 3.5% of income.<br><br>[AY 2015-AY 2020] MIT made an allowance for unreimbursed medical expenses that exceeded 3.8% of income. |
| | Consistent with CM | [AY 2003, AY 2009-AY 2011, AY 2014, AY 2021-AY 2022] Yes.<br><br>[AY 2004-AY 2008, AY 2012-AY 2013, AY 2015-AY 2020] No; MIT applied a different income threshold. |

**Appendix Table D.11**
**Comparison of CM Guidelines and MIT Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [AY 2003-AY 2022] MIT used the IM formula to split the parent contribution for multiple siblings in college. MIT did not count siblings enrolled in graduate or professional school as siblings in college unless they provided documentation of expected parent contributions. MIT used professional judgment for siblings attending low cost schools to proportionally divide the parent contribution according to the cost of each sibling's college.<br><br>[AY 2004-AY 2005] MIT used professional judgment to multiply the parent contribution by 50% for each enrolled sibling on appeal if two siblings attended MIT.<br><br>[AY 2006-AY 2009] MIT multiplied the parent contribution by 50% for each enrolled sibling if two siblings attended MIT.<br><br>[AY 2010-AY 2022] MIT multiplied the parent contribution by 50% for each enrolled sibling on appeal if two siblings attended MIT or a similarly priced private school. |
| | Consistent with CM | [AY 2003, AY 2010-AY 2014] Yes.<br><br>[AY 2004-AY 2009] No; MIT used different percentages to split the parent contribution when multiple siblings attended MIT.<br><br>[AY 2015-AY 2022] No; MIT did not cap the allowance for siblings enrolled at community colleges or low-cost schools as part of its standard treatment. |

**Appendix Table D.11**
**Comparison of CM Guidelines and MIT Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2003-AY 2008] MIT added back rental losses and rental and other real estate depreciation to income. MIT imputed the value of rental properties based on the purchase price and the date of purchase, applying the College Board's Federal Commercial Property Multiplier table.<br><br>[AY 2009] MIT added back rental losses and rental and other real estate depreciation to income. MIT added back rental losses separately for individual entities. MIT imputed the value of rental properties based on the purchase price and the date of purchase, using the College Board's Federal Commercial Property Multiplier table. If the family occupied one unit in a multifamily property they owned, MIT treated the full amount of equity under home equity.<br><br>[AY 2010-AY 2022] MIT added back rental losses and rental and other real estate depreciation to income. MIT added back rental losses separately for individual entities. MIT used purchase price and date of purchase to impute rental property value, applying different multipliers over the years. If the family occupied one unit in a multifamily property they owned, MIT treated the equity in the non-owner-occupied portion of the property as other real estate. MIT considered treating real estate as a business if rental real estate was being used as income. |
| | Consistent with CM | [AY 2003-AY 2022] Yes, based on components for which information is available. |

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.12**
**Comparison of CM Guidelines and Northwestern Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living-table. |
| | Institutional Policy | [AY 2016-AY 2017] Northwestern adjusted the IPA and ERA for parents who lived in metropolitan areas where the cost of living was higher than the national average.<br><br>[AY 2018-AY 2022] Northwestern adjusted the IPA and ERA using the IM cost-of-living tables. |
| | Consistent with CM | [AY 2016-AY 2022] Yes. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2016-AY 2022] Northwestern made an unspecified allowance for elementary and secondary school tuition expenses. |
| | Consistent with CM[1] | [AY 2016-AY 2022] Insufficient information. |
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2018-AY 2022] According to its software settings, Northwestern treated student assets as student assets. |
| | Consistent with CM[2] | [AY 2018-AY 2022] Insufficient information. |
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [AY 2018-AY 2022] Northwestern did not cap home equity. |
| | Consistent with CM | [AY 2018-AY 2022] No; Northwestern did not cap home equity. |

**Appendix Table D.12**
**Comparison of CM Guidelines and Northwestern Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2016-AY 2022] Northwestern imputed assets based on an unspecified rate of return. |
| | Consistent with CM[3] | [AY 2016-AY 2022] Insufficient information. |
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | No information. |
| | Consistent with CM | No information. |
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [AY 2022] Northwestern reduced the parent contribution by 40% for two siblings in college. Northwestern used professional judgment to protect a certain amount of parent income to pay college costs rather than applying a percent multiplier to unequal parent contribution amounts across families. |
| | Consistent with CM | No information. |

**Appendix Table D.12**
**Comparison of CM Guidelines and Northwestern Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2018-AY 2022] Northwestern added back rental losses to income. |
| | Consistent with CM | [AY 2018-AY 2022] Yes, based on components for which information is available. |

**Notes:**

[1] From AY 2016 to AY 2022, produced documents state that Northwestern made an allowance for elementary and secondary school tuition in its need analysis methodology but do not provide sufficient information for me to determine whether Northwestern's policy was consistent with the CM Guidelines' recommendation.

[2] I did not consider software settings to contain sufficient information to compare Northwestern's treatment of family and student assets to the CM Guidelines' recommendation from AY 2018 to AY 2022.

[3] From AY 2016 to AY 2022, produced documents indicate that Northwestern imputed the value of liquid assets but do not specify the rate of return. Therefore, I did not have sufficient information to determine whether Northwestern's policy was consistent with the CM Guidelines' recommendation.

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.13**
**Comparison of CM Guidelines and Notre Dame Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living-table. |
| | Institutional Policy | [AY 2003-AY 2011] Notre Dame used professional judgment to adjust the IPA and ERA using the IM cost-of-living tables.<br><br>[AY 2012-AY 2016, AY 2018-AY 2022] Notre Dame adjusted the IPA and ERA using the IM cost-of-living tables. |
| | Consistent with CM | [AY 2003-AY 2011] No; Notre Dame did not apply a cost-of-living adjustment.<br><br>[AY 2012-AY 2016, AY 2018-AY 2022] Yes. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2003-May 2005] Notre Dame used IM optional treatment of elementary and secondary school tuition expenses.<br><br>[Mar 2006, Jan 2007, AY 2008-AY 2022] Notre Dame used professional judgment to make an allowance for elementary and secondary school tuition expenses. |
| | Consistent with CM | [AY 2003-May 2005] Yes.<br><br>[March 2006, Jan 2007, AY 2008-AY 2022] No; Notre Dame did not provide an allowance for elementary and secondary school tuition expenses as part of its baseline need analysis methodology. |
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2003] Notre Dame used professional judgment to determine the treatment of student assets.<br><br>[Feb 2004-AY 2011] Notre Dame treated student assets greater than $100 as parent assets if the parents were the source of the assets.<br><br>[AY 2012-AY 2022] Notre Dame treated student assets as student assets except for trust funds established by the parent, which it treated as parent assets. |
| | Consistent with CM | [AY 2003-AY 2022] No; Notre Dame used different rules to determine which assets to treat as student assets and which to treat as parent assets. |

**Appendix Table D.13**
**Comparison of CM Guidelines and Notre Dame Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [Feb 2004-AY 2020] Notre Dame did not cap home equity in its need analysis.<br><br>[AY 2021-AY 2022] Notre Dame capped home equity at 1.2 times income. |
| | Consistent with CM | [Feb 2004-AY 2020] No; home equity not capped.<br><br>[AY 2021- AY 2022] Yes. |
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2003-Feb 2005] Notre Dame reviewed interest and dividend income relative to assets and used professional judgment in the case of discrepancies.<br><br>[AY 2006-Jan 2008] Notre Dame imputed assets based on an assumed 5% rate of return. Notre Dame imputed assets based on interest and dividend income.<br><br>[Jan 2009-AY 2011, AY 2014-AY 2016] Notre Dame imputed assets based on an assumed 4% rate of return. Notre Dame imputed assets based on interest and dividend income.<br><br>[AY 2012-AY 2013, AY 2021-AY 2022] Notre Dame imputed assets based on an assumed 3% rate of return. Notre Dame imputed assets based on interest and dividend income.<br><br>[AY 2017-AY 2020] Notre Dame did not impute assets. |
| | Consistent with CM | [AY 2006-AY 2008, AY 2012-AY 2013, AY 2018-AY 2022] No; Notre Dame either assumed a different rate of return to impute assets or did not impute assets.<br><br>[Jan 2009-AY 2011, AY 2014-AY 2016] Yes. |

**Appendix Table D.13**
**Comparison of CM Guidelines and Notre Dame Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [Jan 2004, Feb 2005, Apr 2006, Jan 2007, Jan 2008, Jan 2009, May 2010] Notre Dame made an allowance for all unreimbursed medical expenses.<br><br>[AY 2011-AY 2013, AY 2015, AY 2018, AY 2020-AY 2022] Notre Dame used the income threshold determined by the College Board to make an allowance for unreimbursed medical expenses above that threshold.<br><br>[Feb 2003, AY 2014, AY 2016-AY 2017] Notre Dame made an allowance for unreimbursed medical expenses that exceeded 4% of income (AY 2003), 3.7% of income (AY 2014), or 3.9% of income (AY 2016-AY 2017).<br><br>[AY 2019] Notre Dame made an allowance for unreimbursed medical expenses that exceeded an unknown percent of income. |
| | Consistent with CM[1] | [Feb 2003, Jan 2004, Feb 2005, Apr 2006, Jan 2007, Jan 2008, Jan 2009, May 2010, AY 2014, AY 2016-AY 2017] No; Notre Dame used a different income threshold or no income threshold at all.<br><br>[AY 2011-AY 2013, AY 2015, AY 2018, AY 2020-AY 2022] Yes.<br><br>[AY 2019] Insufficient information. |

**Appendix Table D.13**
**Comparison of CM Guidelines and Notre Dame Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [AY 2003, Feb 2004, Feb 2005, Apr 2006, Jan 2007, Jan 2008, Jan 2009, May 2010] Notre Dame did not count siblings in graduate school as siblings in college.<br><br>[AY 2011-AY 2022] Notre Dame did not count siblings in graduate school or siblings in low-cost schools as siblings in college. |
| | Consistent with CM | [AY 2003, Feb 2004, Feb 2005, Apr 2006, Jan 2007, Jan 2008, Jan 2009, May 2010, AY 2011- AY 2014] Yes, based on components for which information is available.<br><br>[AY 2015-AY 2022] No; Notre Dame treated siblings enrolled in low-cost schools differently. |

**Appendix Table D.13**
**Comparison of CM Guidelines and Notre Dame Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2003, May 2005] Notre Dame added back rental losses and depreciation to income.<br><br>[AY 2006] Notre Dame added back rental losses and depreciation to income. Notre Dame treated real estate assets as business assets if they were a family's primary source of income.<br><br>[Jan 2007-AY 2022] Notre Dame added back rental losses and depreciation to income. Notre Dame treated real estate assets as business assets if they were a family's primary source of income. Notre Dame used the College Board multipliers to impute rental property value. It used a multiplier to impute rental property value. |
| | Consistent with CM | [AY 2003, May 2005, AY 2006-AY 2022] Yes, based on components for which information is available. |

**Note:**
[1] In AY 2019, produced documents indicate that Notre Dame made an allowance for some amount of unreimbursed medical expenses; however, due to the way the document was printed, the threshold used to make that allowance is not visible. Because I am unable to confirm whether Notre Dame's threshold was consistent with the threshold determined by College Board in this year, I do not have sufficient information to determine whether Notre Dame's policy was consistent with the CM Guidelines.

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.14**
**Comparison of CM Guidelines and Penn Methodology**
**(AY 2003-AY 2018)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living-table. |
| | Institutional Policy | [AY 2003-AY 2017] Penn adjusted the IPA and ERA using the IM cost-of-living tables. |
| | Consistent with CM | [AY 2003-AY 2018] Yes. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2003-AY 2018] Penn used the IM optional treatment of elementary and secondary school tuition expenses. |
| | Consistent with CM | [AY 2003-AY 2018] Yes. |
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2003-AY 2018] Penn assessed student assets at 5% except in "'special cases,' e.g., gift, inheritance, specifically for educational use, and/or when student has particularly large amount of assets compared to family parent contribution." In these cases, Penn assessed up to 20%. |
| | Consistent with CM | [AY 2003-AY 2018] No; Penn used different rules to determine which assets to assess as student assets and which assets to assess as parent assets. |

**Appendix Table D.14**
**Comparison of CM Guidelines and Penn Methodology**
**(AY 2003-AY 2018)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy[1] | [AY 2003] Penn capped home equity at 2.4 times income.<br><br>[AY 2004] Penn capped home equity at 2.5 times income.<br><br>[AY 2005] Penn capped home equity at 1.1 times income.<br><br>[AY 2006-AY 2012, AY 2015-AY 2018] Penn capped home equity at 1.2 times income.<br><br>[AY 2013] Penn capped home equity at 1.2 times income for families with income less than $180,000. Penn capped home equity at 1.7 times income for families with income greater than $180,000. |
| | Consistent with CM | [AY 2003-AY 2005] No; Penn used a different home equity cap.<br><br>[AY 2006-AY 2012, AY 2015-AY 2018] Yes.<br><br>[AY 2013] No; Penn used a different home equity cap for families with income > $180,000. |
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2004, AY 2008, AY 2012] Penn imputed assets based on an assumed 4% rate of return. Penn imputed assets based on interest and dividend income. |
| | Consistent with CM | [AY 2004, AY 2008, AY 2012] Yes. |

**Appendix Table D.14**
**Comparison of CM Guidelines and Penn Methodology**
**(AY 2003-AY 2018)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2003, AY 2005-AY 2006, AY 2008] Penn used the income threshold determined by the College Board to make an allowance for unreimbursed medical expenses above that threshold.<br><br>[AY 2004] Penn made an allowance for unreimbursed medical expenses that exceeded 3.4% of income.<br><br>[AY 2012] Penn made an allowance for unreimbursed medical expenses that exceeded 3.5% of income. |
| | Consistent with CM | [AY 2003, AY 2005-AY 2006, AY 2008] Yes.<br><br>[AY 2004, AY 2012] No; Penn used a different threshold. |

**Appendix Table D.14**
**Comparison of CM Guidelines and Penn Methodology**
**(AY 2003-AY 2018)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy[2] | [AY 2003-AY 2004] Penn multiplied the total parent contribution by 55% for one sibling in college, 40% for two siblings in college, and 32.5% for three or more siblings in college.<br><br>[AY 2005-AY 2018] Penn used the IM formula to split the parent contribution for multiple siblings in college. In AY 2012, Penn reduced the allowance for siblings enrolled at a community college or other low-cost college and for siblings receiving non-need based scholarships. |
| | Consistent with CM | [AY 2003-AY 2004] No; Penn used different percentages to split the parent contribution.<br><br>[AY 2012] No; Penn treated siblings enrolled in community colleges or other low-cost schools, and siblings receiving non-need-based scholarships, differently.<br><br>[AY 2005-AY 2011, AY 2013-AY 2018] Yes, based on components for which information is available. |

**Appendix Table D.14**
**Comparison of CM Guidelines and Penn Methodology**
**(AY 2003-AY 2018)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2003] Penn adds back rental income and depreciation.<br><br>[AY 2004-AY 2012] Penn added back rental and other real estate depreciation to income. Penn did not add back rental losses to income. Penn imputed the value of rental properties using the Federal Housing Multiplier.<br><br>[AY 2013] Penn added back rental and other real estate depreciation to income. Penn did not add back rental losses to income. Penn imputed the value of rental properties using an unspecified housing multiplier.<br><br>[AY 2014-AY 2018] Penn added back rental and other real estate depreciation to income. Penn did not add back rental losses to income. Penn used Zillow to estimate the value of rental properties. |
| | Consistent with CM | [AY 2003] Yes based on the components for which information is available.<br><br>[AY 2004-AY 2018] No; Penn did not add back rental losses and in some years used Zillow to determine the value of rental property. |

**Notes:**

[1] Although Penn in some years applied a home equity cap that was consistent with the CM's home equity cap, throughout the entire time period Penn used a variation of the FM's methodology to assess parent assets in its own need analysis, which lowered the effect of home equity and other considered assets on Penn's calculation of EFC for some families (PENN568-LIT-00055002 at 002). Specifically, Penn added a portion of discretionary net worth to available income and then calculated a single parent contribution from that, rather than separately calculating a parent contribution from income and a parent contribution from assets per the IM's methodology.

[2] I note that in AY 2019, while it was still a member of the 568 Group, Penn changed its treatment of siblings in college by reducing the share of the parent contribution Penn expected a family to contribute (from 60% to 50% for a single sibling in school) and stopped reducing the allowance for siblings enrolled at a community college or other low-cost college and for siblings receiving non-need based scholarships (Varas 30(b)(6) Deposition, 88:3-22).

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.15**
**Comparison of CM Guidelines and Rice Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living table. |
| | Institutional Policy | [AY 2003-AY 2022] Rice adjusted the IPA and ERA using the IM cost-of-living tables. |
| | Consistent with CM | [AY 2003-AY 2022] Yes. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2009-AY 2015] Rice did not make an allowance for elementary and secondary school tuition expenses.<br><br>[AY 2016-AY 2022] Contradiction between deposition testimony and produced documents:<br>• According to deposition testimony, Rice made an allowance for elementary and secondary school tuition expenses beginning in 2016.<br>• According to software settings, Rice did not make an allowance for elementary and secondary school tuition expenses from AY 2016-AY 2022, except for AY 2018 when Rice made an allowance of $8,000. |
| | Consistent with CM | [AY 2009-AY 2015, AY 2018] No; Rice did not provide an allowance for elementary and secondary school tuition or provided an allowance that differed from the IM's.<br><br>[AY 2016-AY 2017, AY 2019-AY 2022] Contradiction between deposition testimony and produced documents. |
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2022] Rice treated prepaid tuition and savings plans as parent assets. Rice used professional judgment to determine how to treat assets where the source is someone other than the parent, such as the grandparent or the student. |
| | Consistent with CM | [AY 2022] No; Rice used a different rule to decide which assets to treat as student assets and which assets to treat as parent assets. |

**Appendix Table D.15**
**Comparison of CM Guidelines and Rice Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [AY 2009-AY 2011] Rice capped home equity at 1.2 times income.<br><br>[AY 2012-AY 2014, AY 2017-AY 2018] Rice capped home equity at 2 times income.<br><br>[AY 2015-AY 2016] Rice capped home equity at 2.2 times income.<br><br>[AY 2017-AY 2018] Rice capped home equity at 2 times income.<br><br>[AY 2020-AY 2021] Rice capped home equity at 0.1 times income.<br><br>[AY 2022] Contradiction between deposition testimony and produced documents:<br>• According to deposition testimony, Rice capped home equity at 1.2 times income.<br>• According to software settings, Rice capped home equity at 0.1 times income. |
| | Consistent with CM | [AY 2009-AY 2011] Yes.<br><br>[AY 2012-AY 2018, AY 2020-AY 2021] No; Rice used a different home equity cap.<br><br>[AY 2022] Contradiction between deposition testimony and produced documents. |
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2009-2011] Rice did not impute assets.<br><br>[AY 2012] Rice imputed assets using dividend and interest income based on an assumed 37% rate of return.<br><br>[AY 2013] Rice imputed assets using dividend and interest income based on an assumed 40% rate of return.<br><br>[AY 2014-AY 2020] Rice imputed assets using dividend and interest income based on an assumed 30% rate of return.<br><br>[AY 2021] Rice imputed assets using dividend and interest income based on an assumed 20% rate of return.<br><br>[AY 2022] Rice imputed assets using dividend and interest income based on an assumed 3% rate of return. |
| | Consistent with CM | [AY 2009-AY 2011] No; Rice did not impute the value of liquid assets.<br><br>[AY 2022] No; Rice assumed a different rate of return to impute the value of liquid assets. |

**Appendix Table D.15**
**Comparison of CM Guidelines and Rice Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2009-AY 2022] Rice used the income threshold determined by the College Board to make an allowance for unreimbursed medical expenses above that threshold. |
| | Consistent with CM | [AY 2009-AY 2022] Yes. |
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [AY 2009-AY 2021] Rice used the IM formula to split the parent contribution for multiple siblings in college.<br><br>[AY 2022] Rice used the IM formula to split the parent contribution for multiple siblings in college. Rice did not count siblings in graduate or professional school as siblings in college unless the family provided documentation that the sibling was dependent for aid purposes. Rice did not allow parents in college to count towards the number of siblings in college. Rice counted siblings in community college and siblings receiving non-need-based aid as siblings in college. |
| | Consistent with CM | [AY 2009-AY 2021] Yes; based on the elements for which information is available.<br><br>[AY 2022] No; Rice did not reduce the allowance for siblings in community college or sibilings receiving non-need-based aid. |

**Appendix Table D.15**
**Comparison of CM Guidelines and Rice Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2022] Rice added back rental losses and depreciation to income. Rice used Zillow to estimate the value of rental properties. Rice treated rental properties as real estate assets, not as business assets, even if they were a family's primary source of income. Rice considered the equity in the non-owner-occupied portion of a multifamily property on a case-by-case basis. |
| | Consistent with CM | [AY 2022] No; Rice used Zillow to impute rental property value and did not treat rental property as a business even if it was the primary source of income. |

**Note:**
[1] I note that Ms. Walker retired from Rice in November 2022 and therefore assumed that her testimony described Rice's need analysis methodology as of AY 2022.

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.16**

[redacted]

**Appendix Table D.16**

[redacted]

ATTORNEYS' EYES ONLY - SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

**Appendix Table D.16**

[redacted]

**Appendix Table D.16**

[redacted]

**Appendix Table D.17**
**Comparison of CM Guidelines and Yale Methodology**
**(AY 2003-AY 2006, AY 2018-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living table. |
| | Institutional Policy | [AY 2003-AY 2006] According to its response in the GAO survey and deposition testimony, Yale's treatment of cost of living variances was consistent with the CM Guidelines.<br><br>[AY 2018-AY 2022] Yale adjusted the IPA and ERA using the IM cost-of-living tables. |
| | Consistent with CM | [AY 2003-AY 2006, AY 2018-AY 2022] Yes. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2003-AY 2006] According to its response to the GAO survey and deposition testimony, Yale's treatment of elementary and secondary school tuition expenses was consistent with the CM Guidelines.<br><br>[AY 2018-AY 2022] Yale did not make an allowance for elementary and secondary school tuition expenses. |
| | Consistent with CM | [AY 2003-AY 2006] Yes.<br><br>[AY 2018-AY 2022] No; Yale did not provide an allowance for elementary and secondary school tuition. |

**Appendix Table D.17**
**Comparison of CM Guidelines and Yale Methodology**
**(AY 2003-AY 2006, AY 2018-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2003-AY 2006] According to its response to the GAO survey and deposition testimony, Yale's treatment of family and student assets was consistent with the CM Guidelines.<br><br>[AY 2018- AY 2020] According to its software settings, Yale treated student assets as student assets.<br><br>[AY 2021] According to its software settings, Yale treated student assets, except trust funds, as parent assets.<br><br>[AY 2022] Yale treated student assets up to an unspecified threshold as parent assets. Yale treated student assets above that threshold as student assets. |
| | Consistent with CM[1] | [AY 2003-AY 2006] Yes.<br><br>[AY 2018-AY 2021] Insufficient information.<br><br>[AY 2022] No; Yale used a different rule to determine which assets to treat as student assets and which assets to treat as parent assets. |



A503

**Appendix Table D.17**
**Comparison of CM Guidelines and Yale Methodology**
**(AY 2003-AY 2006, AY 2018-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [AY 2003-AY 2006] According to its response to the GAO survey and deposition testimony, Yale's treatment of home equity was consistent with the CM Guidelines.<br><br>[AY 2018-AY 2022] Yale capped home equity at 3 times income. |
| | Consistent with CM | [AY 2003-AY 2006] Yes.<br><br>[AY 2018-AY 2022] No; Yale used a different home equity cap. |
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2003-AY 2006] According to its response to the GAO survey and deposition testimony, Yale's treatment of the imputation of the value of liquid assets was consistent with the CM Guidelines.<br><br>[AY 2018-AY 2022] Yale imputed assets based on an unspecified rate of return. |
| | Consistent with CM[2] | [AY 2003-AY 2006] Yes.<br><br>[AY 2018-AY 2022] Insufficient information. |
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2003-AY 2006] According to its response to the GAO survey and deposition testimony, Yale's treatment of unreimbursed medical expenses was consistent with the CM Guidelines.<br><br>[AY 2022] Yale "followed the spirit" of the CM Guidelines. |
| | Consistent with CM[3] | [AY 2003-AY 2006] Yes.<br><br>[AY 2022] Insufficient information. |

**Appendix Table D.17**
**Comparison of CM Guidelines and Yale Methodology**
**(AY 2003-AY 2006, AY 2018-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [AY 2003-AY 2005] According to its response in the GAO survey, Yale's treatment of the number of siblings in college was consistent with the CM Guidelines.<br><br>[AY 2022] Yale used the FM percentages to split the parent contribution for multiple siblings in college. Yale did not count siblings in graduate or professional school as siblings in college unless the graduate school "require[d] parental information." Yale capped the allowance for siblings enrolled in community college at the total cost of attendance. Yale reduced the parent contribution for siblings receiving non-need based aid. |
| | Consistent with CM | [AY 2003-AY 2005] Yes.<br><br>[AY 2022] No; Yale used FM percentages to split the parent contribution. |

**Appendix Table D.17**
**Comparison of CM Guidelines and Yale Methodology**
**(AY 2003-AY 2006, AY 2018-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2003-AY 2006] According to its response to the GAO survey and deposition testimony, Yale's treatment of business and real estate was consistent with the CM Guidelines.<br><br>[AY 2018-AY 2022] Yale added back rental losses to income. Yale did not always impute the value of rental properties using the housing multiplier. Yale would treat rental property as a family's primary home when the family did not have a primary home. |
| | Consistent with CM | [AY 2003-AY 2006] Yes.<br><br>[AY 2018-AY 2022] No; Yale did not consistently use a housing multiplier to determine rental property value. |

**Notes:**

[1] I did not consider software settings to contain sufficient information to compare Yale's treatment of family and student assets to the CM Guidelines' recommendation from AY 2018 to AY 2021.

[2] From AY 2018 to AY 2022, produced documents state that Yale imputed the value of liquid assets but do not specify the rate of return. Therefore, I did not have sufficient information to determine whether Yale's policy was consistent with the CM Guidelines' recommendation.

[3] In AY 2022, deposition testimony states that Yale "followed the spirit" of the CM Guidelines but does not provide sufficient information to determine whether Yale's policy was consistent with the CM Guidelines' recommendation.

**Sources:** Backup materials to this report (Appendix D).

# EXCERPTS FROM TRANSCRIPT OF HAL J. SINGER DEPOSITION (NOV. 27, 2024), DKT. 789-2

## Pages 315-316

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
\- - -

ANDREW CORTZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL AMAERLANDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER and CAMERON WILLIAMS, individually and on behalf of all others similarly situated,
Plaintiff

v.

BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,
Defendants.

:CIVIL ACTION
:CASE NO.
:1:22-cv-00125

\- - -
November 27, 2024
\- - -
C O N F I D E N T I A L
\- - -
Videotaped deposition of
HAL J. SINGER, Ph.D.
\- - -
ESQUIRE DEPOSITION SOLUTIONS
\- - -

FINAL TRANSCRIPT WITHOUT CONFIDENTIALITY DESIGNATIONS

answer. We can go through all of these. I don't think that sitting here certainly I can't give you a specific change to the formula that CalTech or any defendant made upon joining. I get to see the offers of EFC. I don't get go see the actual formula itself.

Q. Your -- we were talking a moment ago about your common shock analysis.

By itself, that's not enough to show common impact; correct?

MR. CRAMER: Objection to form.

THE WITNESS: I think that whether it's in sample -- remember, there's two parts of the proof. Okay?

You have to first show a generalized effect and in my case I'm doing it with my regression model.

And then at part two, you can go in different directions. You could go the price structure direction, you can go in sample prediction and you can go horizontal and vertical equity.

The common shock was meant to corroborate the price structure path. I'm

No. 26-2759

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

ANDREW CORZO, ET AL.,

*Plaintiffs-Appellees*,

*v.*

CORNELL UNIVERSITY, ET AL.,

*Defendants-Appellants*.

Interlocutory Appeal Pursuant to Federal Rule of Civil Procedure 23(f) from the United States District Court for the Northern District of Illinois, No. 1:22-cv-00125-MFK Before the Honorable Matthew F. Kennelly

**APPENDIX FOR DEFENDANTS-APPELLANTS BRIEF**
**VOLUME 2, PARTS 4 & 5**
**(A509 – A667)**

DAVID GRINGER
ALAN SCHOENFELD
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 Word Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
david.gringer@wilmerhale.com
alan.schoenfeld@wilmerhale.com

SETH P. WAXMAN
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
seth.waxman@wilmerhale.com

*Attorneys for Defendant-Appellant the Trustees of the University of Pennsylvania*

October 5, 2026

Additional Counsel on Inside Cover

NORMAN ARMSTRONG
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800
norman.armstrong@cooley.com

*Attorney for Defendant-Appellant Cornell University*

BRITT M. MILLER
DANIEL T. FENSKE
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
dfenske@mayerbrown.com

*Attorneys for Defendant-Appellant Georgetown University*

ERIC MAHR
JAN RYBNICEK
FRESHFIELDS US LLP
700 13th Street NW
Washington, DC 20005
(202) 777-4500
eric.mahr@freshfields.com
jan.rybnicek@freshfields.com

*Attorneys for Defendant-Appellant Massachusetts Institute of Technology*

ZAKI ANWAR
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
zaki.anwar@wilmerhale.com

EDWARD W. FELDMAN
MILLER SHAKMAN LEVINE &
FELDMAN LLP
30 W. Monroe Street
Suite 1900
Chicago, IL 60603
(312) 759-7213
efeldman@millershakman.com

*Attorneys for Defendant-Appellant the Trustees of the University of Pennsylvania*

ROBERT A. VAN KIRK
SARAH F. KIRKPATRICK
MATTHEW D. HEINS
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000
rvankirk@wc.com
skirkpatrick@wc.com
mheins@wc.com

*Attorneys for Defendant-Appellant University of Notre Dame*

# APPENDIX TABLE OF CONTENTS

Page

## VOLUME 1
## (BOUND WITH BRIEF)


Order on Motion for Class Certification (June 1, 2026), Dkt. 1275 .......... A1

Memorandum Opinion and Order on Motion for Class Certification (Mar. 31, 2026), Dkt. 1241 .......... A12

Memorandum Opinion and Order on Motions to Exclude Expert Testimony (Sept. 29, 2025), Dkt. 1160 .......... A74


## VOLUME 2
## (SEPARATELY BOUND)


District Court Docket, No. 1:22-cv-00125 (N.D. Ill.) .......... A128

Complaint (Jan. 9, 2022), Dkt. 1 .......... A139

Amended Complaint (Feb. 15, 2022), Dkt. 106 .......... A200

Memorandum Opinion and Order on Motion to Dismiss (Aug. 15, 2022), Dkt. 185 .......... A207

Second Amended Complaint (Feb. 6, 2023), Dkt. 308 .......... A211

Plaintiffs' Motion for Class Certification Exhibit 17: Email from Patricia McWade to Ted Bracken (dated Apr. 15, 2014), Dkt. 753-17 (Redacted) .......... A222

Plaintiffs' Motion for Class Certification Exhibit 18: Email from Cynthia Barnhart to Elizabeth Hicks (dated Aug. 27, 2014), Dkt. 753-18 (Excerpts) .......... A223

Plaintiffs' Motion for Class Certification Exhibit 24: Email from Donald Bishop to Lou Nanni, Joseph Gelchion, and Robert Mundy (dated Mar. 6, 2012), Dkt. 753-24 .......... A224

Rebuttal Expert Report of Nicholas Hill, dated Aug. 7, 2024 (filed Dec. 16, 2024), Dkt. 755-4 (Excerpts) ............................... A226

Deposition of Hal J. Singer, dated Nov. 27, 2024 (filed Dec. 16, 2024), Dkt. 755-11 (Excerpts) ........................................................A233

Amended Expert Report of Hal J. Singer, dated May 28, 2024 (filed Dec. 16, 2024), Dkt. 755-12 (Excerpts) ............................. A272

Rebuttal Expert Report of Hal J. Singer, dated Oct 7, 2024 (filed Dec. 16, 2024), Dkt. 755-18 (Excerpts) ............................. A279

Defendants' Motion to Exclude Expert Testimony, Exhibit 20: *Peer School Financial Aid Initiatives Timeline* (filed Dec. 16, 2024), Dkt. 755-22 ...........................................................................A310

Surrebuttal Expert Report of Lauren J. Stiroh, dated Nov. 1, 2024 (filed Dec. 16, 2024), Dkt. 755-27 (Excerpts) .................................A314

Rebuttal Expert Report of Lauren J. Stiroh, Appendix 1, dated Aug. 7, 2024 (filed Dec. 16, 2024), Dkt. 755-29 (Excerpts) ............................................................... A324

Rebuttal Expert Report of Hal J. Singer, dated Oct. 7, 2024 (filed Dec. 17, 2024), Dkt. 756-34 (Excerpts) ............................. A331

Expert Report of George Bulman, dated May 14, 2024 (filed Dec. 17, 2024), Dkt. 756-36 (Excerpts) ...............................A336

Supplemental Rebuttal Expert Report of Hal J. Singer, dated Nov. 8, 2024 (filed Dec. 17, 2024), Dkt. 756-38 (Excerpts) ............................................................... A338

Rebuttal Expert Report of Bridget Terry Long, dated Aug. 7, 2024 (filed Dec. 17, 2024), Dkt. 756-39 (Excerpts) (Redacted) ..............A342

Rebuttal Expert Report of Bridget Terry Long, Appendix D, dated Aug. 7, 2024 (filed Dec. 20, 2024), Dkt. 765-1 (Excerpts) (Redacted)............................................... A426

Deposition of Hal J. Singer, dated Nov. 27, 2024 (filed Feb. 1, 2025), Dkt. 789-2 (Excerpts) .......... A507

Rebuttal Expert Report of Bridget Terry Long, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 789-3 (Excerpts) (Redacted) .......... A510

Rebuttal Expert Report of Nicholas Hill, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 789-4 (Excerpts) .......... A598

Rebuttal Expert Report of Lauren J. Stiroh, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 789-16 (Excerpts) (Redacted) .......... A625

Plaintiffs' Motion for Class Certification, Exhibit 19: *The 568 Group Consensus Methodology Policy Guidelines* (Dec. 2016) (filed Feb. 1, 2025), Dkt. 789-20 .......... A655

Second Amended Expert Report of Hal J. Singer, dated June 10, 2024 (filed Feb. 1, 2025), Dkt. 789-25 (Excerpts) .......... A673

Surrebuttal Expert Report of Nicholas Hill, dated Nov. 1, 2024 (filed Feb. 1, 2025), Dkt. 789-32 (Excerpts) .......... A687

Plaintiffs' Motion for Class Certification, Exhibit 41*:* *Report of Common Standard Subcommittee to 568 Presidents' Working Group* (filed Feb. 1, 2025), Dkt. 789-42 (Excerpts) .......... A689

Deposition of James Tilton, dated May 15, 2023 (filed Feb. 1, 2025), Dkt. 789-49 (Excerpts) .......... A691

Surrebuttal Expert Report of Lauren J. Stiroh, dated Nov. 1, 2024 (filed Feb. 1, 2025), Dkt. 789-51 (Excerpts) .......... A694

Rebuttal Expert Report of Nicholas Hill, dated Aug. 7, 2024 (filed Feb. 27, 2025), Dkt. 802-7 (Excerpts) .......... A699

Second Amended Expert Report of Hal J. Singer, dated June 10, 2024 (filed Feb. 28, 2025), Dkt. 805-2 (Excerpts) .......... A702

Minute Docket Entry for Hearing on Motions to Exclude Expert Testimony (Apr. 3, 2025), Dkt. 835 ............................... A705

Defendants' Motion for Summary Judgment, Exhibit 85: *Penn Undergraduate Student Accessibility and Affordability*, dated Feb. 27, 2020, (filed May 7, 2020), Dkt. 864-4 (Excerpts) ............................................................ A707

Defendants' Motion for Summary Judgment, Exhibit 90: *House Judiciary Committee Report on Need-Based Educational Aid Act of 2001*, H.R. Rep. No. 107-32, 1st Sess. (2001), Dkt. 864-9 (Excerpts)..................................... A710

Defendants' Motion for Summary Judgment, Exhibit 120: Email from Caesar Storlazzi to J. Lloyd Suttle and Rhakti Nagella, dated Oct. 2, 2012 (filed May 7, 2025), Dkt. 864-39 ....................................................................... A714

Deposition of Hal J. Singer, dated Nov. 27, 2024 (filed May 8, 2025), Dkt. 865-30 (Excerpts) .............................. A715

Deposition of Caesar Storlazzi, dated July 27, 2023 (filed May 8, 2025), Dkt. 865-31 (Excerpts) .............................. A726

Deposition of Hal J. Singer, dated Nov. 27, 2024 (filed May 29, 2025), Dkt. 874-5 (Excerpts) .............................. A728

Errata to Expert Report of Bridget Terry Long, updated Aug. 12, 2024 (filed June 27, 2025), Dkt. 889-3 (Excerpts)...... A735

Second Amended Expert Report of Hal J. Singer, dated June 10, 2024 (filed June 27, 2025), Dkt. 889-17 (Excerpts) ........................................................... A739

Plaintiffs' Opposition to Summary Judgment, Exhibit 107: *Memorandum of Understanding the 568 Presidents' Group*, dated Jan. 5, 2004 (filed Sept. 12, 2025, Dkt. 1025-6 ....................................................................... A744

Memorandum Opinion and Order on Cross-Motions for Summary Judgment (Jan. 12, 2026), Dkt. 1210 (Excerpts) ...................... A747

Transcript of Proceedings of Status Conference (Mar. 20, 2025), Dkt. 1261 (Excerpts)................................................................... A784

Transcript of Proceedings on Motions to Exclude Expert Testimony (Apr. 14, 2025), Dkt. 1263 (Excerpts) ..................... A788

Hearing on Motions to Exclude Expert Testimony (Apr. 14, 2025): Defendants' Hearing Presentation ................ A833

Order Granting Plaintiffs' Motion to Provide Agreed Forms of Notice to the Certified Litigation Class (June 12, 2026), Dkt. 1282 (Excerpts)................................................................... A835

Transcript of Proceedings on Class Counsel Approval (May 26, 2026, 2:30pm) (Excerpts)........................................... A837

**VOLUME 3**
**SEALED**
**(SEPARATELY BOUND)**

Rebuttal Expert Report of Bridget Terry Long, Appendix D, dated Aug. 7, 2024 (filed Dec. 16, 2024) Dkt. 754-3 (Excerpts) [unredacted version of A426-506] ............................ A839

Plaintiffs' Motion for Class Certification Exhibit 17: Email from Patricia McWade to Ted Bracken (dated Apr. 15, 2014), Dkt. 757-12 [unredacted version of A222] ......................................................................... A920

Rebuttal Expert Report of Bridget Terry Long, dated Aug. 7, 2024 (filed Dec. 17, 2024), Dkt. 757-52 (Excerpts) [unredacted version of A342-425] ..................................................................A921

Declaration of Hal J. Singer (Jan. 25, 2025), Dkt. 785-2................. A1005

Rebuttal Expert Report of Bridget Terry Long, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 788-3 (Excerpts) [unredacted version of A510-597]........................................................................A1009

Rebuttal Expert Report of Lauren J. Stiroh, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 788-16 (Excerpts) [unredacted version of A625-654] ....................................................................A1088

Second Amended Expert Report of Hal J. Singer (May 7, 2025), Dkt. 854-7 (Excerpts)....................................................................A1118

Transcript of Proceedings on Settlement Approval (July 28, 2025, 2:50pm), Dkt. 1345 (Excerpts)...........................A1121

## Index of Excerpted Transcript Pages Included in Appendix



| Proceeding | Excerpted Transcript Pages | Appendix Page |
|---|---|---|
| Transcript of Proceedings of Status Conference (Mar. 20, 2025), Dkt. 1261 | pp.9-11 | A785-787 |
| Transcript of Proceedings on Motions to Exclude Expert Testimony (May 15, 2026), Dkt. 1263 | pp.7-31, 47-48, 69-73, 75-76, 87, 98-100, 113-115, 130-131, 150 | A789-832 |
| Transcript of Proceedings on Settlement Approval (July 28, 2025, 2:50pm), Dkt. 1345 (SEALED) | p.7 | A1122 |
| Transcript of Proceedings on Class Counsel Approval (May 26, 2026, 2:30pm) | p.9 | A838 |

## Index of Excerpted Deposition Transcript Pages Included in Appendix


| Depositions | Excerpted Transcript Pages | Appendix Page |
|---|---|---|
| Hal J. Singer Deposition (Nov. 27, 2024), Dkt. 755-11 | pp.29, 31-34, 48-49, 127-132, 184, 189-190, 201, 252-254, 261-262, 270-274, 281-283, 288-293, 295-296 | A234-271 |
| Hal J. Singer Deposition (Nov. 27, 2024), Dkt. 789-2 | pp.315-316 | A508-509 |
| Hal J. Singer Deposition (Nov. 27, 2024), Dkt. 865-30 | pp.19-21, 27, 59, 82, 92-93, 95, 117 | A716-725 |
| Hal J. Singer Deposition (Nov. 27, 2024), Dkt. 874-5 | ECF pp.3-8 | A729-734 |
| Caesar Storlazzi Deposition (July 27, 2023), Dkt. 865-31 | p.38 | A727 |
| James Tilton Deposition (May 15, 2023), Dkt. 789-49 | pp.121-122 | A692-693 |

going to agree, it was a great question -- she should write more of them -- that by itself, that would not constitute a proof of common impact. Just like in sample by itself.

These are all, it's a two-step process. You have to pair part two, whether it's the pricing structure, in sample prediction or horizontal vertical equity you have to pair that with a finding of the generalized effect. If you don't have a generalized effect, you don't get -- you don't get passing. You're over. That's the first box. Only if you get to the second. The question kind of presumes that some of these ancillary or second stage techniques could by themselves count as a sufficient proof of common impact. I just want to make sure we're all on the same page. None of them by themselves can do it.

They have to be married up with the first stage regression.

BY MR. GRINGER:

Q. Are you aware that many potential class members received financial

ATTORNEYS' EYES ONLY - SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,<br><br>Defendants. | **Case No. 1:22-cv-00125**<br><br>**Hon. Matthew F. Kennelly** |

**EXPERT REPORT OF BRIDGET TERRY LONG, PH.D.**
**AUGUST 7, 2024**

94. In response to the growing literature on debt aversion, as shown in **Figure 6** below, since 2008, many of the Defendants have introduced no-loan policies for all undergraduate students, which eliminate loans from financial aid packages and replace them with scholarships, grants, or work-study. These blanket policies aim to increase applications from low-income students concerned about loan debt, particularly since they are simple and easy to communicate.

**Figure 6**
**Defendants' No-Loan Policies as of 2023**[188]

| Institution | Year |
|---|---|
| Columbia | 2008 |
| Yale | 2008 |
| Penn | 2009 |
| Vanderbilt | 2009 |
| Chicago | 2015 |
| Northwestern | 2016 |
| MIT | 2017 |
| Brown | 2018 |
| Johns Hopkins | 2019 |
| Dartmouth | 2022 |
| Emory | 2022 |
| Rice | 2022 |

**Notes:**
[1] As of 2023, Caltech, Cornell, Duke, Georgetown, and Notre Dame do not have no-loan policies.
[2] Penn phased in their no-loan policy beginning September 2008 restricted to undergraduates with calculated family incomes under $100,000 and extended the policy to all undergraduate students eligible for financial aid in 2009.
[3] Chicago and Northwestern implemented their policy for incoming first-year and future undergraduate students.
[4] MIT previously established a no-loan policy for all undergraduate students before 2011 but ended their policy as of the 2011-2012 academic year. MIT reinstated their no-loan policy as of the 2017-2018 academic year.

95. Similarly, some of the Defendants have instituted income threshold policies whereby prospective students with family incomes under a certain amount (and with typical amounts of assets) will not have loans in their financial aid packages or will not have a required

188 Backup to this report (No-Loan Timeline); **Appendix C** (No-Loan Timeline).

increasingly using formal retirement savings accounts, which were already protected from need analysis methodologies.[291]

143. These discussions benefited students in multiple ways and enhanced equity in need analysis processes. For example, the 2001 refinement of the IM led to schools reporting fewer appeals in the first year following implementation, suggesting that these updates led to a more equitable and efficient allocation of institutional aid that aligned with families' expectations.[292]

144. The 568 Group thus represented an institution-led effort by Defendants and some of their peers to reaffirm their existing commitments to the principles of need-based aid, as well as to refine common need analysis guidelines to improve transparency and equity among families.

### D. The 568 Group Developed Recommended Best Practices for Need Analysis that Benefited Students

145. The 568 Group focused its efforts on developing best practices for need analysis, focusing on specific elements that needed "to be addressed if fairness and equity across institutions [were] to be recognized."[293] The 568 Group's recommendations and discussions were documented in the CM Guidelines, which were circulated to members and updated over time to reflect additional discussion and information as it became available. By December 2016, the latest date for which finalized CM Guidelines were produced in this matter, the

---

[291] Baum, "A Primer on Economics for Financial Aid Professionals," CollegeBoard, 2004, available at https://professionals.collegeboard.org/pdf/primer-economics-financial-aid-professionals.pdf, accessed September 14, 2023, pp. 83–85.

[292] CBD000001 ("2003-2004 School Year IM Users' Guide," The College Board, 2003) at 031.

[293] COFHE-02-00009085 ("Materials for the Next Meeting on September 13," 568 Presidents' Working Group, September 3, 1999) at 093.

CM Guidelines discussed the treatment of 17 elements used in need analysis for domestic students.[294]

146. Often, the CM Guidelines highlighted financial burdens faced by families that were not adequately accounted for by the IM. In these cases, the CM Guidelines recommended modifications to better estimate the needs of students, which acknowledged the need for more aid than what the IM suggested. As described in the CM Guidelines, "[i]n developing its policy guidelines, the 568 Group has focused on arriving at the 'right' approach to determining parental ability to pay without regard to potential cost implications. For many families, especially middle-income families, the methodology has the effect of reducing the expected family contribution."[295] The 568 Group therefore anticipated that the CM Guidelines would "reduce expected parent contributions in the aggregate."[296] Although the effect of the CM Guidelines' recommendations on a student's EFC depended on the student's and their family's individualized financial circumstances, there were several

---

[294] NULIT-0000000348 ("568 Presidents' Group: Consensus Methodology Policy Guidelines," 568 Presidents' Group, 2016). In addition to the CM Guidelines dated December 2016, I have also identified three final drafts dated June 2001, 2004-2005, November 2015; *see* UCHICAGO_0000183661 ("Report of The Common Standards Subcommittee to The 568 Presidents' Working Group," 568 Presidents' Working Group, June 1, 2001); NULIT-0000161662 ("Consensus Methodology Policy Guidelines Manual," The 568 Presidents' Group, 2004); DARTMOUTH_0000152041 ("The 568 Presidents' Group Consensus Methodology Policy Guidelines," The 568 Presidents' Group, November 2015); DARTMOUTH_0000091786 ("The 568 Presidents' Group Consensus Methodology Policy Guidelines," The 568 Presidents' Group, December 2016); as well as drafts dated November 2010, November 2012, January 2013, October 2014, and March 2019; *see* Emory_568Lit_0000224 ("The 568 Presidents' Group Consensus Methodology Policy Guidelines," The 568 Presidents' Group, November 2010); MIDDLEBURY003665 ("The 568 Presidents' Group Consensus Methodology Policy Guidelines," The 568 Presidents' Group, November 2012); GTWNU_0000006237 ("The 568 Presidents' Group Consensus Methodology Policy Guidelines," The 568 Presidents' Group, January 2013); GTWNU_0000141656 ("The 568 Presidents' Group Consensus Methodology Policy Guidelines," The 568 Presidents' Group, October 2014); MITLIT-000006825 ("The 568 Presidents' Group Consensus Methodology Policy Guidelines," The 568 Presidents' Group, December 2016); *see also* **Appendix D**.

[295] NULIT-0000000348 ("568 Presidents' Group: Consensus Methodology Policy Guidelines," 568 Presidents' Group, 2016) at 351.

[296] NULIT-0000000348 ("568 Presidents' Group: Consensus Methodology Policy Guidelines," 568 Presidents' Group, 2016) at 352.

148. As of 2001, the 568 Group and the College Board brought together economic expertise and institutional experiences to develop cost-of-living tables that would address these concerns, while providing families in high cost-of-living areas with additional allowances against their income and assets.[300] In an example referenced in the financial aid community, the cost of living in Manhattan, New York is substantially higher than in Manhattan, Kansas.[301] Therefore, a family in Manhattan, New York would likely receive a higher IPA and ERA from schools using the cost-of-living tables developed by the 568 Group and the College Board, resulting in a lower EFC, higher eligibility for need-based aid, and a more equitable aid determination.

149. By 2003, the College Board had incorporated these tables into the options available for the IM, giving any school that used the IM the ability to more accurately and equitably calculate need for students and families living in high-cost areas by increasing the IPA and ERA.[302] Indeed, many schools chose to use the tables: according to a 2019 survey, of the

---

300 UCHICAGO_0000183661 ("Report of The Common Standards Subcommittee to The 568 Presidents' Working Group," 568 Presidents' Working Group, June 1, 2001) at 670, 682-684 ("We believe that this issue requires collaboration with CSS's Financial Aid Standards and Services Advisory Committee. That group has begun work on the cost-of-living issue and we look forward to lending out support to their on-going efforts in this regard. Given the complexity of the issue and the amount of time that it will take to come to resolution, it is appropriate to expand the number working on the problem." Additionally, the Common Standards Subcommittee discussed the careful economic analysis and iteration needed to evaluate the cost-of-living issue: "Our initial concern with the CES data was based on the fact that it gives information on expenditures and not the cost of a fixed market basket of goods. […] A subsequent review of the CES data focused on the component that describes the cost of housing. […] In addition to developing a cost of living table based on differential housing costs, we examined its impact when applied against the entire Income Protection Allowance (IPA) and against only the housing component of the IPA.").

301 UCHICAGO_0000183661 ("Report of The Common Standards Subcommittee to The 568 Presidents' Working Group," 568 Presidents' Working Group, June 1, 2001) at 670; Baum, "A Primer on Economics for Financial Aid Professionals," CollegeBoard, 2004, available at https://professionals.collegeboard.org/pdf/primer-economics-financial-aid-professionals.pdf, accessed September 14, 2023, p. 52.

302 CBD000001 ("2003-2004 School Year IM Users' Guide," The College Board, 2003) at 190. For the 568 Group's recommended cost-of-living adjustments made in 2001, see UCHICAGO_0000183661 ("Report of The Common Standards Subcommittee to The 568 Presidents' Working Group," 568 Presidents' Working Group, June 1, 2001) at 684.

114 schools using the CSS PROFILE for their domestic undergraduate students, 61 (54 percent) respondents used the cost-of-living adjustment factor.[303] The College Board estimated that adjusting the IPA and ERA for cost-of-living differences across regions would decrease the expected parent contribution for 55 percent of families that filed the CSS PROFILE for 2022-2023 with a parent contribution of $95,000 for less, with a median decrease of $720.[304] Students at both Defendant schools and non-Defendant schools thus benefited from the 568 Group's work to develop a better and more equitable way to account for the expenses families face and increase their eligibility for need-based financial aid.

*2. The Treatment of Home Equity*

150. While the College Board had incorporated the option for schools to include home equity into its IM before the development of the CM Guidelines, the debate over the treatment of home equity was still ongoing. The College Board continued to update the treatment of home equity in the IM over time, reflecting broader concerns in the financial aid community related to this element. Consistent with these ongoing adjustments, the 568 Group identified home equity as a priority area for discussion prior to developing the initial CM Guidelines. Materials circulated ahead of a 568 Group meeting in September 1999 noted that "[h]ow to treat the non-liquid asset of the family home present[ed] special problems."[305]

---

303 CBD008556 ("Setting Your CSS Profile & IDOC Service Options: What's New and Trending," CollegeBoard, August 8, 2019) at 566, 579.

304 NULIT-0000181680 ("Institutional Methodology User Guide," CollegeBoard, July 15, 2022) at 722, 737.

305 COFHE-02-00009085 ("Materials for the Next Meeting on September 13," 568 Presidents' Working Group, September 3, 1999) at 093.

### A. The CM Guidelines Did Not Limit Each Defendant's Ability to Separately Determine Its Own EFC Estimates

166. As Dr. Singer recognizes in his report, without "agreement […] on at least many components of an IM […] the schools could [...] appl[y] different methodologies generating different results."[333] Indeed, my analysis of the CM Guidelines finds that they discussed only 17 specific elements used in need analysis and provided actionable recommendations for only some of these elements. Therefore, even if Defendants' need analysis methodologies were consistent with the recommendations in the CM Guidelines for the actionable elements—which, as I discuss in **Section IV.B**, is not the case—there would necessarily be substantial independent judgment underlying Defendants' individualized need analysis methodologies and resulting EFC calculations.

167. As discussed in **Section III.D**, the 568 Group focused its attention on 17 specific elements used in need analysis that it had determined were "most often subject to local interpretation or professional judgment," suggesting that schools were dissatisfied with the then-current treatment (if any) of these nuanced elements in common need analysis methodologies, such as the IM.[334] However, recommendations on these 17 elements could not be used by themselves to calculate an EFC because need analysis requires "the examination of many dozens of elements to measure a family's ability to pay."[335] Therefore, the CM Guidelines could only be used in conjunction with a broader need analysis methodology, such as a

---

333 Singer Report, ¶ 128.

334 NULIT-0000000348 ("568 Presidents' Group: Consensus Methodology Policy Guidelines," 568 Presidents' Group, 2016) at 352; DARTMOUTH_0000082053 ("A Response to the Draft Report on the Activities of the 568 Report," 568 Presidents' Group, September 5, 2006) at 059.

335 NULIT-0000000348 ("568 Presidents' Group: Consensus Methodology Policy Guidelines," 568 Presidents' Group, 2016) at 350.

179. As can be seen in **Figure 8** above, I find that Defendants had divergent need analysis methodologies throughout their time as 568 Group members and regularly employed need analysis methodologies that were inconsistent with the recommendations in the CM Guidelines for the eight elements I analyzed. Specifically, no Defendant was consistent with the CM Guidelines' recommended treatment for all eight elements I analyzed for all years with available information. Defendants ranged from being consistent on one element (Emory, Notre Dame, Vanderbilt) to being consistent on a maximum of five elements (Columbia). Further, Defendants were not uniformly consistent with the CM Guidelines' recommended treatment for any of the eight elements I analyzed. On one end of the spectrum, thirteen Defendants were consistent with the CM Guidelines' recommendation to use the IM cost-of-living table, more than any other element I analyzed. On the other end of the spectrum, only one Defendant (Duke) was consistent with the CM Guidelines' recommendations regarding the treatment of family and student assets.

180. Note that marking a Defendant's need analysis methodology as consistent with the CM Guidelines for a particular element (identified with a checkmark in **Figure 8)** does not mean that it never deviated from the CM Guidelines' recommended treatment of that element for any student. In particular, my assessment does not incorporate professional judgment adjustments, which Defendants may have used to adjust the treatment of *any* element based on a specific student's needs or circumstances.

181. Dr. Singer alleges that surveys conducted by the 568 Group made clear that Defendants were "each applying most of the components of the CM."[363] However, Dr. Singer does not

---

[363] Singer Report, ¶ 201.

### C. Defendants' Need Analysis Methodologies Deviated from the CM Guidelines' Recommended Treatment in a Variety of Ways, Including Choices that Further Decrease EFC

183. Dr. Singer asserts that the CM Guidelines "establish a floor for EFCs," and that a school "would be allowed to deviate from the [CM] and make global changes to its financial aid awarding policies that systematically deviated from the methodology so long as any such changes increased family contributions."[367] To the contrary, my analysis finds not only that Defendants routinely deviated from the CM Guidelines, but also that individual Defendants' need analysis methodologies differed from the CM Guidelines in a variety of ways, including at times by lowering EFCs further than the recommendations in the CM Guidelines would suggest. Below, I describe the wide range of approaches Defendants adopted for three of the eight elements I analyzed in detail. I similarly found variation among the remaining five elements, described in more detail in **Appendix D**. Specifically:

- *Medical Expenses.* The CM Guidelines recommended that schools use the IM's default allowance for unreimbursed medical expenses above a certain threshold, yet individual Defendants differed on the percent of income above which medical expenses were allowed.[368]
- *Elementary and Secondary School Tuition Expenses.* The CM Guidelines recommended that schools use the IM's optional allowance for elementary and secondary school tuition expenses up to a certain maximum, yet some individual Defendants did not make an allowance for such expenses at all, while those that did make an allowance differed on the maximum amount of the allowance.[369]

---

367 Singer Report, ¶¶ 126, 147.

368 For example, in AY 2004, Chicago made an allowance for unreimbursed medical expenses exceeding 7.5 percent of income, while Cornell made an allowance for expenses exceeding 4 percent of income and Penn made an allowance for expenses exceeding 3.4 percent of income. (**Appendix Tables D.3, D.5, D.14**.)

369 For example, in AY 2015, Rice did not make an allowance for elementary and secondary school tuition expenses. [redacted] and Dartmouth [redacted]

- *Imputing Liquid Assets.* The CM Guidelines recommended that schools impute the value of liquid assets that could have generated reported interest and dividend income assuming a four percent rate of return, yet individual Defendants differed on whether they imputed liquid assets based on interest income, dividend income, or the CM Guidelines' recommendation of both interest and dividend income, as well as on the rate of return they assumed to perform the imputation.[370]

- *Cost-of-Living Adjustments.* The CM Guidelines recommended that schools adjust certain allowances against income and assets to account for cost-of-living differences using tables provided by the College Board, yet individual Defendants differed on whether they made cost-of-living adjustments at all, or only made such adjustments using professional judgment.[371]

- *Assessment of Rental Property and Other Real Estate.* The CM Guidelines' recommendation for the assessment of rental property and other real estate included multiple components. While most Defendants added back rental losses and depreciation, individual Defendants varied in the way they determined the value of rental properties, with some Defendants relying on Zillow or tax assessor websites rather than the CM Guidelines' recommendation to use purchase price and a multiplier based on the year of purchase.[372]

### *1. Home Equity*

184. As discussed in **Section III.D.2**, the CM Guidelines included a specific recommendation for the treatment of home equity as an asset. Before 2005, the CM Guidelines recommended that schools cap home value at 2.4 times total parent income, or equivalently

[redacted] while Dartmouth's cap took into account the student's expected parent contribution. (**Appendix Tables D.15, [redacted] D.6**.)

370 For example, in AY 2009, Rice did not impute assets at all while Emory assumed different interest rates to impute assets using interest income (two percent) and dividend income (three percent). (**Appendix Tables D.15, D.8.**)

371 For example, in AY 2007, Brown did not make cost-of-living adjustments, while Dartmouth made cost-of-living adjustments for students living in Alaska, Hawaii, or Puerto Rico but only on appeal. (**Appendix Tables D.1, D.6**.)

372 For example, in AY 2012, Duke used Zillow to estimate the value of rental properties while Cornell used tax assessor websites or Zillow to estimate the value of rental properties. (**Appendix Tables D.7, D.5**.)

ATTORNEYS' EYES ONLY - SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

cap home equity at 2.4 times total parent income less mortgage debt. Beginning in 2005, the 568 Group instead recommended that schools directly cap home equity at 1.2 times total parent income.[373]

185. My review of each Defendant's need analysis methodology shows that only four Defendants applied a home equity cap at the level recommended in the CM Guidelines for all years they were included in Dr. Singer's Class Period and for which information on their baseline need analysis methodologies was available.[374] Other Defendants' approaches have varied over time.

186. Some Defendants' baseline methodologies treated home equity in a way that would decrease a student's EFC compared to the CM Guidelines' recommended treatment:

- Some Defendants did not include home equity in their need analysis at all in some years during Dr. Singer's Class Period, including Caltech (since 2019) and MIT (since 2016).[375]

- Before MIT removed home equity from its need analysis for all families in 2016, it removed home equity from its need analysis for families with less than $100,000 in income beginning in 2008. It expanded the set of families for which it did not consider home equity to all families with less than $150,000 in income beginning in 2014.[376]

---

373 DARTMOUTH_0000359371 ("Membership Dues in Support of The 568 Presidents' Group for FY 2006 and 2007," 568 Presidents' Group, November 28, 2005) at 375; COFHE-02-00002603 ("Report of the Common Standards Subcommittee to the 568 Presidents' Working Group," Consortium on Financing Higher Education, June 2001) at 612-613.

374 The Defendants my analysis identified as acting consistent with the CM Guidelines are Columbia, Duke, Georgetown, and Johns Hopkins. See **Figure 8**.

375 **Appendix Tables D.2, D.11**.

376 **Appendix Table D.11**.

- In 2005, Penn capped the amount of home equity used in its need analysis at 1.1 times income. This cap would result in lower parent contributions than the CM Guidelines' recommended cap.[377]

187. Other Defendants' baseline methodologies treated home equity in a way that would tend to increase a student's EFC compared to the CM Guidelines' recommended treatment:

- Some Defendants did not cap home equity in various years during Dr. Singer's proposed Class Period, including Notre Dame and Northwestern.[378]

- Some Defendants used higher caps on home equity, ranging from 2-3 times income in various years during Dr. Singer's proposed Class Period, including [redacted] Rice, Brown, and Emory. Using a higher cap on home equity would result in higher parent contributions than the CM Guidelines' recommended cap.[379]

- Some Defendants used a higher cap on home equity for families with higher income. For example, during the 2013-2014 academic year, Penn capped home equity at 1.2 times income for families with incomes below $180,000, but capped home equity at 1.7 times income for families with higher incomes.[380]

188. Most Defendants' need analysis methodologies reflected the thinking of the 568 Group, which recognized the benefit to students of limiting the extent to which home equity is considered in need analysis. Still, individual Defendants rarely defaulted to the CM Guidelines' recommendation. These choices resulted in some Defendants' need analysis

---

377 **Appendix Table D.14**. Throughout the entire time period, Penn used a variation of the FM's methodology to assess parent assets in its own need analysis, which lowered the effect of home equity and other considered assets on Penn's calculation of EFC for some families relative to the IM. PENN568-LIT-00055002 ("Email with subject line 'Penn IM Tool update'," May 10, 2021) at 002. Specifically, Penn added a portion of discretionary net worth to available income and then calculated a single parent contribution from that, rather than separately calculating a parent contribution from income and a parent contribution from assets per the IM's methodology. *See also* **Section V.C**.

378 **Appendix Tables D.13, D.12**.

379 **Appendix Tables** [redacted] **D.15, D.1, D.8**.

380 **Appendix Table D.14**.

methodologies resulting in lower EFCs than would be expected from the CM Guidelines' recommendation, and others resulting in higher EFCs.

*2. Number of Siblings in College*

189. As of December 2016, the CM Guidelines included the following five specific recommendations for how to adjust parent contributions for students with siblings in college at the same time: (1) employ the IM's default approach for multiple siblings in college, which expects 60 percent of the parent contribution if the student has one sibling in college, 45 percent if the student has two siblings in college, and 35 percent if the student has three or more siblings in college; (2) do not count siblings in graduate or professional school towards the number of siblings enrolled in college (unless they are dependents with documented parent contributions for their own education); (3) do not allow the reduction in the parent contribution for a sibling in college to exceed the sum of tuition and fees if the sibling is enrolled in community college or another low-cost school; (4) do not allow the reduction in the parent contribution for a sibling in college to exceed the sum of tuition, fees, and room and board net of non-need-based scholarship if the sibling received non-need-based scholarships; and (5) do not count parents towards the number of family members in college.[381]

190. My review of each Defendant's need analysis methodology shows that only two Defendants treated siblings in college in a manner consistent with all components of the CM Guidelines' recommendation for all years they were included in Dr. Singer's Class

[381] NULIT-0000072193 ("Draft Professional Judgment Guidelines Manual," 568 Presidents' Group, August 26, 2015), at 215 (detailing IM treatment of multiple siblings); NULIT-0000038124 ("Consensus Methodology Policy Guidelines," 568 Presidents Group, November 2015), at 135-136.

Period for which information on their baseline need-analysis methodologies were available.[382]

191. Some Defendants' baseline methodologies treated the number of siblings in college in a way that would decrease a student's EFC relative to the CM Guidelines' recommended treatment:

- Some Defendants expected a lower percentage of the parent contribution for multiple siblings in college at the Defendant school or other similarly priced school in various years during Dr. Singer's proposed Class Period. For example, Emory expected 50 percent of the parent contribution if the student had one sibling in college and 35 percent if the student had two siblings in college if the siblings attended Emory or another similarly priced school. Similarly, MIT expected 50 percent of the parent contribution if the student and sibling both attended MIT.[383]
- Some Defendants allowed siblings in graduate or professional school to count towards the number of siblings in college in various years during Dr. Singer's proposed Class Period, including, for example, Cornell.[384]

192. Other Defendants' baseline methodologies treated the number of siblings in college in a way that would increase a student's EFC relative to the CM Guidelines' recommended treatment. Some Defendants did not allow for all siblings enrolled in college to reduce the expected parent contribution in various years during Dr. Singer's proposed Class Period. For example, [redacted]

[382] The Defendants my analysis identified as acting consistent with the CM Guidelines are Columbia and Dartmouth. See **Figure 8**.

[383] **Appendix Tables D.8, D.11**.

[384] **Appendix Table D.5.**

[385] **Appendix Table** [redacted]

school with the same EFC could be offered different amounts of need-based institutional grant aid.

206. While a student's EFC affects the calculation of their demonstrated financial need, whether and to what extent a change in EFC affects the amount of need-based institutional grant aid they are offered depends critically on each institution's individual packaging policies.

207. Depending on the school's packaging policy, even if a student's EFC would have been lower absent the 568 Group—which Dr. Singer has not demonstrated would have occurred—they would not necessarily have received additional need-based institutional grant aid if the school met that increased need by increasing the amount of student loans or work-study included in their financial aid package instead. For example, Georgetown met students' demonstrated financial needs first with Pell Grants, then with federal Stafford loans, then with federal work-study or student employment. Only after awarding these types of aid did Georgetown award need-based institutional grant aid.[404] Therefore, even if a particular student's EFC would have been lower absent the 568 Group, the incremental need may have been met with not yet allocated federal aid. Other Defendants, including

2020) (In the 2019-2020 academic year, Columbia reported that their Scholar Program removed loan and job expectations for selected students); GTWNU_0000195239 ("COFHE Yellowbook for 2016-2017," Consortium on Financing Higher Education, 2016-2017) (In the 2016-2017 academic year, Georgetown reported that their Georgetown Scholars Program (GSP) and John Carroll program removed loan requirements for selected students); CORNELL_LIT0000213959 ("COFHE Yellowbook for 2019-2020," Consortium on Financing Higher Education, 2019-2020) (In the 2019-2020 academic year, Cornell removed loan requirements for students with family income less than or equal to $60,000); DARTMOUTH_0000177144 ("COFHE Yellowbook for 2019-2020," Consortium on Financing Higher Education, 2019-2020) (In the 2019-2020 academic year, Dartmouth removed loan requirements for students with family income less than $100,000).

[404] GTWNU_0000186083 ("Policies and Procedures Manual," Georgetown University, 2013-2014) at 157-158.

Cornell and Brown, similarly had policies of packaging institutional need-based grant aid only after packaging all other available types of aid such as federal grants and loans.[405]

208. Notably, Plaintiffs do not allege that Defendants agreed on how to package financial aid, even though the packaging process ultimately determines what portion of a student's demonstrated need is met through need-based institutional grant aid. In fact, Dr. Singer acknowledges that "[t]he question of the 'packaging of aid' was a separate matter," and record evidence—including evidence cited by Dr. Singer—shows that the 568 Group *expected* members to apply different packaging policies.[406] For example, the CM Guidelines consistently referred to "individual institutional 'packaging' decisions" and noted that schools may wish to adjust their packaging policies to help manage any budgetary pressures they faced as a result of deciding to adopt some of the 568 Group's recommendations that would tend to lower EFCs for students.[407] Similarly, a 2018 presentation by the 568 Technical Committee to the 568 Group specifically noted that the "CM does NOT address packaging policies nor does it address non-need-based financial aid such as often called merit-based aid related to academics or athletics" [emphasis in original].[408]

209. Consistent with the 568 Group's expectation, record evidence shows that Defendants adopted a wide range of packaging policies, and in fact changed these policies throughout

---

405 CORNELL_LIT0000213572 ("2022-2023 Undergraduate Need Analysis and Packaging Policies," Cornell University, 2022-2023) at 578-579; BROWN_0000050379 ("Financial Aid Office: Undergraduate Overview," Brown University, 2014) at 381.

406 Singer Report, ¶ 146.

407 *See, for example*, NULIT-0000161662 ("Consensus Methodology Policy Guidelines Manual," The 568 Presidents' Group, 2004) at 665-666; NULIT-0000000348 ("568 Presidents' Group: Consensus Methodology Policy Guidelines," 568 Presidents' Group, 2016) at 351-352.

408 DARTMOUTH_0000154245 ("Greater Good vs Institutional Needs," 568 Technical Committee, 2018) at 248.

the Class Period. For example, COFHE Yellowbook data produced in this case report the "typical" amount of self-help aid, broken down into loans and work-study, included in a student's financial aid package by school and year for COFHE members. COFHE defines "typical self-help" as "the starting or base package offered to students who are not affected by differential or preferential packaging[;] who are in the default category for differential or preferential packaging"; or who are in the "clear modal group" of a school's differential or preferential packaging policy.[409] These data show that Defendants differed in the amount they expected students to contribute through work-study, with the typical work study expectation ranging between $1,350 and $3,600.[410] Further, analysis of these data for first-year students in **Figure 9** below shows that Defendants included varying amounts of loans in their "typical" financial aid packages, with each Defendant decreasing its reliance on loans between 2010 and 2023. Because Defendants all meet the full demonstrated need of their admitted students,[411] including less loans or work-study in their typical financial aid packages means, by definition, that they therefore include *higher* amounts of need-based institutional grant aid to make up the difference. This behavior is inconsistent with Dr.

---

409 *See, for example*, BROWN_0000331819 ("COFHE Yellowbook for 2014-2015," Consortium on Financing Higher Education 2014-2015). COFHE defines preferential packaging as policies that lower self-help expectations based in part on admissions ratings while it defines differential packaging as policies that lower self-help expectations for lower-income students.

410 Backup materials to this report (COFHE); **Appendix C** (COFHE).

411 The backup materials to this report contain information on the Defendants' full-need policies. Backup materials to this report (Full-Need Policies); JHULIT_0000122562 ("COFHE Yellowbook for 2023-2024," Consortium on Financing Higher Education, 2023-2024) (provides information on the full-need policies for Brown, Columbia, Cornell, Dartmouth, Emory, Georgetown, Johns Hopkins, MIT, Northwestern, Rice, Chicago, Penn, Vanderbilt, and Yale); DUKE568_0033960 ("Meeting of the Resources Committee of the Board of Trustees," Duke University, February 26, 2021) (provides information on Duke's full-need policy); Chang Deposition, 94:9-94:14 (describing Caltech's full-need policy); Affleck-Graves Deposition, 220:20-221:18 (describing Notre Dame's full-need policy).

Singer's allegation that Defendants had the "goal of suppressing [need-based] institutional grant aid."[412]

**Figure 9**
**Defendants Continued to Decrease Loans in Students' Typical Financial Aid Packages[413]**




**Notes:**
[1] The loan share is calculated as the typical self-help loan amount for freshmen divided by the combined tuition, fees, room, and board for a given school and year, from data in COFHE Yellowbooks. COFHE defines typical self-help as the starting or base package offered to students who are not affected by differential or preferential packaging or who are in the default category for differential or preferential packaging. COFHE specifies that the total tuition, mandatory fees paid by all students, and room and board costs are the announced, official numbers reported by the given school.
[2] Columbia, Penn, Vanderbilt, and Yale are not pictured because they had no-loan policies for the entire time period pictured and therefore their loan share is zero percent. Brown, Dartmouth, Emory, and Notre Dame are not pictured due to data limitations. Notre Dame is not a COFHE member, and Brown, Dartmouth, and Emory do not have continuous COFHE Yellowbook data from 2010-2023. Caltech is not pictured prior to 2017 due to data limitations.
[3] Chicago, Northwestern, MIT, Johns Hopkins, and Rice implemented no-loan policies during the time period pictured. Chicago announced its no-loan policy for the 2015-2016 academic year. However, the COFHE data show

---

[412] Singer Report, ¶¶ 3, 126.

[413] Backup materials to this report (COFHE); **Appendix C** (COFHE).

## Appendix D
## Methodology for Analyzing Consistency of Defendants' Need Analysis Methodologies with CM Guidelines

1. This appendix summarizes the methodology I used to analyze Defendants' need analysis methodologies and the extent to which they were consistent with the recommendations in the CM Guidelines.

### A. ANALYSIS OF CM GUIDELINES

2. I identified four sets of CM Guidelines that appeared to be finalized, dated June 2001, 2004-05, November 2015, and December 2016. I identified several other versions of CM Guidelines; however, each appeared to be a draft due to the inclusion of track changes in the documents and/or based on the content of the emails to which they were attached. See **Figure D.i**, below, for a summary of the CM Guidelines documents I identified.

**Figure D.i**

| Date of Document | Example Bates Stamp | Draft/Final | Notes |
|---|---|---|---|
| June 2001 | UCHICAGO_0000183661 | Final | The cover email dated 7/3/2001 (UCHICAGO_0000183658) says "A copy of the final report of the subcommittee on a new 'Consensus Approach to Need Analysis' is also attached for your information and files " |
| 2004-05 (Members Only Version) | NULIT-0000161662 | Final | No cover emails or other documentation were found to suggest that this version is a draft |
| November 2010 | Emory_568Lit_0000224 | Draft | The cover email dated 11/18/2010 (Emory_568Lit_0000223) refers to this document as "Ted's draft rewrite of the manual " |
| November 2012 | MIDDLEBURY003665 | Draft | The cover email dated 10/20/2014 (MIDDLEBURY003632) notes that this version was circulated ahead of the 568 Group meeting in October 2013 and includes "possible/proposed changes to income, asset and business equity adjustments " |
| January 2013 | GTWNU_0000006237 | Draft | The cover email dated 12/28/2012 (GTWNU_0000006234) says "I am attaching a revised draft of the 568 CM Manual that was prepared by Bill Schilling in anticipation of our upcoming Workshop " |
| October 2014 | GTWNU_0000141656 | Draft | The cover email dated 8/12/2014 (GTWNU_0000141655) says "In anticipation of our conf call on Friday, I am attaching my redrafts of the Consensus Methodology Manual[ ]" |
| November 2015 | DARTMOUTH_0000152041, RICE_LIT0000007065 | Final | The cover email dated 2/10/2016 (DARTMOUTH_0000152040) says "I have attached (above) the 568 Manual with some of the technical corrections […] We have not yet posted the manual to the site (members only), as we are still looking into the password issue " The file name of the attachment indicates this version was "approved " |
| December 2016 | DARTMOUTH_0000091786, NULIT-0000000348, PENN568-LIT-00162887 | Final | The cover email (DARTMOUTH_0000091785) says "Please see attached the final versions of the Professional Judgment and Consensus Methodology Manuals " |
| April 2019 | MITLIT-000006825 | Draft | The cover email (MITLIT-000006823) says "I have done some work on the PJ and CM Manuals based on the document […] that Bernie sent us " |

3. For each of the four finalized CM Guidelines, I identified the recommended treatment (if any) for the 17 elements of need analysis discussed in the CM Guidelines. I assumed that

the recommended treatment of an element in any finalized set of CM Guidelines did not change unless a new, finalized set of CM Guidelines was published with an updated recommendation, with the exception of home equity, for which a document in the record confirmed that the recommendation changed in 2005.[1]

4. The CM Guidelines' [redacted]. **Figure D.ii** below shows these values in each academic year from 2003 to 2022.

**Figure D.ii: Institutional Methodology Option Values**

| Academic Year | [redacted] | [redacted] | Source |
|---|---|---|---|
| AY 2003 | [redacted] | [redacted] | CBD004281 at 281. |
| AY 2004 | [redacted] | [redacted] | CBD004286 at 286. |
| AY 2005 | [redacted] | [redacted] | CBD004291 at 292. |
| AY 2006 | [redacted] | [redacted] | CBD004296 at 297. |
| AY 2007 | [redacted] | [redacted] | CBD004301 at 302. |
| AY 2008 | [redacted] | [redacted] | CBD004306 at 307. |
| AY 2009 | [redacted] | [redacted] | CBD004311 at 312. |
| AY 2010 | [redacted] | [redacted] | CBD004316 at 317. |
| AY 2011 | [redacted] | [redacted] | CBD004321 at 322. |
| AY 2012 | [redacted] | [redacted] | CBD004326 at 327. |
| AY 2013 | [redacted] | [redacted] | CBD004331 at 334. |
| AY 2014 | [redacted] | [redacted] | CBD004345 at 348. |
| AY 2015 | [redacted] | [redacted] | CBD004359 at 362. |
| AY 2016 | [redacted] | [redacted] | CBD004373 at 376. |
| AY 2017 | [redacted] | [redacted] | NULIT-0000111384 at 387. |
| AY 2018 | [redacted] | [redacted] | NULIT-0000166453 at 457. |
| AY 2019 | [redacted] | [redacted] | NULIT-0000000649 at 655 |
| AY 2020 | [redacted] | [redacted] | NULIT-0000000540 at 545. |
| AY 2021 | [redacted] | [redacted] | NULIT-0000000094 at 099. |
| AY 2022 | [redacted] | [redacted] | NULIT-0000000665 at 670. |

[1] DARTMOUTH_0000359371 at 375.

### B. ANALYSIS OF DEFENDANTS' NEED ANALYSIS METHODOLOGIES

5. For each Defendant, I reviewed all documentation I could identify with respect to that Defendant's baseline need analysis methodology during the Class Period defined by Dr. Singer for information on their treatment of the 17 elements discussed by the CM Guidelines.[2] The materials I identified and reviewed included policy manuals, financial aid software settings, responses to a questionnaire from the United States Government Accountability Office, other produced documents, and deposition testimony.

6. Documentation was not always precise about the exact timing of a methodological approach. To the extent available, I included either the academic year or the most specific date (at the monthly level) available in the underlying documentation. For depositions, if no timeframe was specified, I assumed the testimony described the approach taken in the closest academic year to the date of the deposition.

7. Software settings reflect the value of the global options set by Defendants for the purpose of calculating EFCs within a particular software system (e.g., PowerFAIDS, Banner). However, I note that each school might change options locally for individual students, or might make global changes across groups of students outside of the software settings. In the absence of additional information, I have treated software settings as reflecting the Defendant's treatment of each element for the purpose of my analysis. In addition, I note that some software settings are not sufficiently precise to be informative about whether a Defendant was consistent with the CM Guidelines. For example, the produced software settings related to the treatment of family and student assets only allow two options: to treat

---

2 *See* Singer Report, ¶ 9. I understand that there is a dispute as to when individual Defendants entered or exited the 568 Group. In my analysis, I use the Class Period as presented by Dr. Singer, but I am not opining on the correct conduct dates. To the extent that the Class Period is updated, I may be asked to update my analysis.

all reported student assets as student assets or to treat all reported student assets as parent assets (except for trust funds).[3] Because neither option is consistent with the nuances of the CM Guidelines' recommended treatment of this element, financial aid officers would always have to make adjustments not captured by the software settings to be consistent with the recommendation in the CM Guidelines. Therefore, for this element, I did not consider software settings sufficiently informative as to whether a Defendant's approach was consistent with the CM Guidelines.

### C. ANALYSIS OF DEFENDANTS' CONSISTENCY WITH CM GUIDELINE RECOMMENDATIONS

8. As discussed in **Section IV.B**, I excluded nine elements of need analysis from my analysis because the CM Guidelines did not provide actionable recommendations for the treatment of the element, or because sufficient information was not available across Defendants to consistently analyze the treatment of the element. Specifically, I found that the CM Guidelines discussed but did not provide actionable recommendations on the following elements: divorced, separated, and single parents; parental unemployment; retirement allowances; IM taxation bands; family loan debt; one-time income adjustments; special expense adjustments; and parent businesses. In addition, although the CM Guidelines provided actionable recommendations for the definition of income, for the majority of Defendants, produced documents and deposition testimony about their need analysis methodologies did not provide sufficient information for me to analyze whether they were consistent with the CM Guidelines' recommendations. I have included the information I gathered for each Defendant related to its treatment of these elements in the backup

3 *See, for example*, NULIT-0000000240 at 249; NULIT-0000181680 at 747.

ATTORNEYS' EYES ONLY - SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

materials to this Appendix, but I have not analyzed each Defendant's consistency with the CM Guidelines for these elements.

9. For the remaining eight elements, I compared each Defendant's treatment with the recommendation in the CM Guidelines. If the CM Guidelines' recommendation had multiple components, I considered the Defendant's consistency with each component.

10. For each element and year with available data, I classified each Defendant's need analysis methodology as follows:

- **Consistent:** A Defendant's need analysis methodology was classified as consistent with the CM Guideline recommendation if its treatment of the element was consistent with the CM Guideline for all components of the recommendation for which information was available.

- **Inconsistent:** A Defendant's need analysis methodology was classified as inconsistent with the CM Guideline recommendation if its treatment of the element was inconsistent with the CM Guideline for any component of the recommendation for which information was available. If a Defendant's treatment was consistent with some, but not all, components of the CM Guideline, it was marked as inconsistent.

- **Insufficient information:** A Defendant's need analysis methodology was classified as having insufficient information if there was not sufficient information to determine whether the Defendant was consistent with the CM Guideline recommendation for any component of the recommendation for that element. This includes cases where the information was missing and cases where multiple sources of information appeared to be contradictory.

**Appendix Table D.1**
**Comparison of CM Guidelines and Brown Methodology**
**(AY 2004-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living table. |
| | Institutional Policy | [Jan 2007] Brown did not adjust the IPA and ERA using the IM cost-of-living tables. |
| | Consistent with CM | [Jan 2007] No; Brown did not account for differences in cost of living between areas. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [Jan 2007] Brown used IM optional treatment of elementary and secondary school tuition expenses.<br><br>[AY 2014-AY 2015] Brown made an allowance for private school tuition expenses covering "all or a portion of a sibling's private school education costs." |
| | Consistent with CM | [Jan 2007] Yes.<br><br>[AY 2014-AY 2015] Insufficient information. |
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2004 -AY 2007] Brown assessed student assets at the FM student asset assessment rate of 35%.<br><br>[Jan 2007, AY 2014-AY 2015] Brown treated assets reported in the student's name as student assets and assessed them at 20%. |
| | Consistent with CM | [AY 2004-AY 2007, AY 2014-AY 2015] No; assets reported in students name are treated as student assets. |

**Appendix Table D.1**
**Comparison of CM Guidelines and Brown Methodology**
**(AY 2004-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [Jan 2007, AY 2010-AY 2011] Brown capped home equity at 3 times income minus mortgage debt.<br><br>[AY 2015-AY 2017] Brown capped home value at 3 times income.<br><br>[AY 2022] Brown did not consider home equity in its need analysis. |
| | Consistent with CM | [Jan 2007, AY 2010-AY 2011] No; home equity capped at 3 times income.<br><br>[AY 2015-AY 2017] No; home value capped at 3 times income.<br><br>[AY 2022] No; home equity not considered. |
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [Jan 2007] Brown imputed assets based on an assumed 3% rate of return. Brown imputed assets based only on interest and not on dividend income. |
| | Consistent with CM | [Jan 2007] No; Brown imputed assets at a 3% interest rate based only on interest, not on dividend income. |

**Appendix Table D.1**
**Comparison of CM Guidelines and Brown Methodology**
**(AY 2004-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [Jan 2007] Brown made an allowance for unreimbursed medical expenses exceeding 11% of the IPA.<br><br>[AY 2010-AY 2011, AY 2016-AY 2017] Brown made an allowance for unreimbursed medical expenses exceeding 99.9% of income.<br><br>[AY 2014] Brown made an allowance for unreimbursed medical expenses exceeding the standard FM allowance.<br><br>[AY 2015] Contradiction between produced documents:<br>• According to software settings, Brown made an allowance for unreimbursed medical expenses exceeding 99.9% of income.<br>• According to other produced documents, Brown made an allowance for unreimbursed medical expenses exceeding the standard FM allowance. |
| | Consistent with CM | [Jan 2007, AY 2010-AY 2011, AY 2014-2017] No; Brown used alternative income thresholds to determine the allowance. |
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [Jan 2007, AY 2014] Brown used the FM percentages to split the parent contribution for multiple siblings in college. Brown lowered the allowance if the sibling attended a low cost school. Brown did not count siblings in graduate or professional school as siblings in college except if the family provided documentation that the sibling was a dependent for aid purposes in AY 2006. Brown did not include parents for the number in college.<br><br>[AY 2010, AY 2011, 2015-2017, AY 2022] Brown used the FM percentages to split the parent contribution for multiple siblings in college. |
| | Consistent with CM | [Jan 2007, AY 2010, AY 2011, AY 2014, 2015-2017, AY 2022] No; Brown uses FM percentages to split the parent contribution. |

**Appendix Table D.1**
**Comparison of CM Guidelines and Brown Methodology**
**(AY 2004-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [Jan 2007, AY 2014, AY 2015, AY 2022] Brown added back rental depreciation and losses to income. |
| | Consistent with CM | [Jan 2007, AY 2014, AY 2015, AY 2022] Yes; based on components for which information is available. |

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.2**
**Comparison of CM Guidelines and Caltech Methodology**
**(AY 2020-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living table. |
| | Institutional Policy | [AY 2020-AY 2022] Caltech adjusted the IPA and ERA using the IM cost-of-living tables. |
| | Consistent with CM | [AY 2020-AY 2022] Yes. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2020-AY 2022] Caltech did not make an allowance for elementary and secondary school tuition expenses. |
| | Consistent with CM | [AY 2020-AY 2022] No; Caltech did not make an allowance for elementary and secondary school tuition expenses. |
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2020-AY 2021] Contradiction between deposition and produced documents:<br>• According to deposition testimony, Caltech treated all student assets as parents assets.<br>• According to software settings, Caltech did not treat student assets as family assets.<br><br>[AY 2022] Caltech treated all student assets as parents assets. |
| | Consistent with CM | [AY 2020-AY 2021] Contradiction between deposition and produced documents.<br><br>[AY 2022] No; Caltech does not treat student trust funds and assets from sources other than the parent as student assets. |
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [AY 2020-AY 2022] Caltech did not consider home equity in its need analysis. |
| | Consistent with CM | [AY 2020-AY 2022] No; Caltech did not include home equity. |

**Appendix Table D.2**
**Comparison of CM Guidelines and Caltech Methodology**
**(AY 2020-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2020] Caltech did not impute assets.<br><br>[AY 2021] Contradiction between produced documents:<br>• According to software settings, Caltech did not impute assets.<br>• According to its Needs Analysis Manual, Caltech imputed assets assuming either a 1.3% or a 2.7% rate of return, depending on the total amount of interest income, tax exempt interest, and dividend income.<br><br>[AY 2022] Caltech did not impute assets. |
| | Consistent with CM | [AY 2020-AY 2022] No; Caltech either did not impute assets or imputed assets assuming a different rate of return. |
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2020, AY 2022] Caltech used the income threshold determined by the College Board to make an allowance for unreimbursed medical expenses above that threshold.<br><br>[AY 2021] Caltech made an allowance for unreimbursed medical expenses that exceeded 5% of income. |
| | Consistent with CM | [AY 2020, AY 2022] Yes.<br><br>[AY 2021] No; Caltech made a different allowance for unreimbursed medical expenses than recommended by the College Board. |

**Appendix Table D.2**
**Comparison of CM Guidelines and Caltech Methodology**
**(AY 2020-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [AY 2020-AY 2022] Caltech used the FM percentages to split the parent contribution for multiple siblings in college. Caltech capped the allowance for siblings enrolled in community college at the total cost of attendance. |
| | Consistent with CM | [AY 2020-AY 2022] No; Caltech used the FM percentages to split the parent contribution by the number of siblings in college. |

**Appendix Table D.2**
**Comparison of CM Guidelines and Caltech Methodology**
**(AY 2020-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2020] Caltech added back rental and other real estate depreciation to income.<br><br>[AY 2021] Caltech added back rental and other real estate depreciation to income unless the amount of depreciation was less than or equal to $1,500. Caltech imputed the value of rental properties based on either the amount of depreciation or mortgage interest paid. |
| | Consistent with CM | [AY 2020-AY 2021] Yes; based on components for which information is available. |

**Note:**

[1] From AY 2020 to AY 2022, Caltech used both the FM and the IM as the starting point for its need analysis methodology for different students. I analyzed whether Caltech's need analysis methodology was consistent with the CM Guidelines when it used the IM as the starting point rather than the FM.

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.3**
**Comparison of CM Guidelines and Chicago Methodology**
**(AY 2003-AY 2013)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living table. |
| | Institutional Policy | [AY 2003-AY 2005] Chicago reported that it was not consistent with the CM Guidelines on cost-of-living variances. |
| | Consistent with CM | [AY 2003-AY 2005] No; Chicago reported that it was not consistent with the CM Guidelines. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2003-AY 2005] Contradiction between produced documents:<br>• According to its response to the GAO survey, Chicago's treatment of elementary and secondary school tuition expenses was consistent with the CM Guidelines.<br>• According to produced documents, Chicago used the IM optional treatment of elementary and secondary tuition expenses only if the parent contribution "seem[ed] excessive given a family's income."<br><br>[AY 2006-AY 2013] Chicago made an allowance for elementary and secondary school tuition expenses only if the parent contribution "seem[ed] excessive given a family's income." Chicago capped the allowance for elementary and secondary school tuition expenses at $7,900. |
| | Consistent with CM | [AY 2003-AY 2005] Contradiction between produced documents.<br><br>[AY 2006-AY 2013] No; Chicago only included an allowance for elementary and secondary tuition expenses for some families and in some years used a different cap for the allowance. |

**Appendix Table D.3**
**Comparison of CM Guidelines and Chicago Methodology**
**(AY 2003-AY 2013)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2003-AY 2005] Contradiction between produced documents:<br>• According to its response to the GAO survey, Chicago's treatment of family and student assets was consistent with the CM Guidelines.<br>• According to another produced document, Chicago treated student assets, including student trust funds, assets given to the student by their parents under $10,000, assets given to the student by other parties, pre-paid tuition plans, among others, as student assets.<br><br>[AY 2006-AY 2013] Chicago treated student assets, including student trust funds, assets given to the student by their parents under $10,000, assets given to the student by other parties, pre-paid tuition plans, among others, as student assets. Beginning AY 2009, Chicago noted that it disregarded student assets if the total value of those assets was less than $100. |
| | Consistent with CM | [AY 2003-AY 2005] Contradiction between produced documents.<br><br>[AY 2006-AY 2013] No; Chicago treated most student assets as student assets. |
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [AY 2003-AY 2004] Contradiction between produced documents:<br>• According to its response to the GAO survey, Chicago's treatment of home equity was not consistent with the CM Guidelines.<br>• According to another produced document, Chicago capped home equity at 2.4 times parent income minus mortgage debt.<br><br>[AY 2005] Chicago capped home equity at 3.0 times parent income minus mortgage debt.<br><br>[AY 2006] Chicago capped home equity at 2 times parent income.<br><br>[AY 2007-AY 2013] Chicago capped home equity at 1.2 times parent income. |
| | Consistent with CM | [AY 2003-AY 2004] Contradiction between produced documents.<br><br>[AY 2005-AY 2006] No; Chicago used a different home equity cap.<br><br>[AY 2007-AY 2013] Yes. |

**Appendix Table D.3**
**Comparison of CM Guidelines and Chicago Methodology**
**(AY 2003-AY 2013)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2003-AY 2013] Chicago imputed assets based on an assumed 4% rate of return. Chicago imputed assets based on interest and dividend income. |
| | Consistent with CM | [AY 2003-AY 2013] Yes. |
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2003-AY 2013] Chicago made an allowance for medical expenses exceeding 7.5% of total income. In AY 2012-AY 2013, Chicago did not include this allowance for students admitted under early action. |
| | Consistent with CM | [AY 2003-AY 2013] No; Chicago used a different threshold and, in some years, did not include any allowance for students admitted under early action. |

**Appendix Table D.3**
**Comparison of CM Guidelines and Chicago Methodology**
**(AY 2003-AY 2013)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [AY 2003-AY 2005] Contradiction between produced documents:<br>• According to its response in the GAO survey, Chicago's treatment of the number of siblings in college was consistent with the CM Guidelines.<br>• According to produced documents, Chicago used the IM formula to split the parent contribution for multiple siblings in college when the costs of all schools were equivalent or when taking the siblings' costs directly from the parent contribution would yield a lower contribution for the sibling attending Chicago. Chicago did not count siblings in graduate school as siblings in college.<br><br>[AY 2006-AY 2013] Chicago used the IM formula to split the parent contribution for multiple siblings in college when the costs of all schools were equivalent or when taking the siblings' costs directly from the parent contribution would yield a lower contribution for the sibling attending Chicago. Chicago did not count siblings in graduate school as siblings in college. |
| | Consistent with CM | [AY 2003-AY 2005] Contradiction between produced documents.<br><br>[AY 2006-AY 2013] No; Chicago used a different method to adjust for siblings in college when school costs were not equivalent or when taking sibling costs directly from the parent contribution would lead to a higher EFC for the sibling enrolled at Chicago. |

**Appendix Table D.3**
**Comparison of CM Guidelines and Chicago Methodology**
**(AY 2003-AY 2013)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2003-AY 2005] According to its response to the GAO survey, Chicago's treatment of business and real estate was consistent with the CM Guidelines. |
| | Consistent with CM | [AY 2003-AY 2005] Yes. |

**Note:**
[1] When possible, I relied on manuals outlining Chicago's need analysis methodology for the regular decision admissions cycle. In the absence of such manuals, I instead relied on manuals outlining Chicago's need analysis methodology for the early action admissions cycle.

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.4**
**Comparison of CM Guidelines and Columbia Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living table. |
| | Institutional Policy | [AY 2021] Columbia adjusted the IPA and ERA using the IM cost-of-living tables. |
| | Consistent with CM | [AY 2021] Yes. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2021] Columbia made an unspecified allowance for elementary and secondary school tuition expenses. |
| | Consistent with CM | No information. |
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2013] Columbia treated student assets as student assets except for assets given to the student by the parent.<br><br>[AY 2014-AY 2022] Columbia treated the first $10,000 of student assets as parent assets. Columbia treated any additional student assets as student assets. |
| | Consistent with CM | [AY 2013-AY 2022] No; Columbia applied different rules to determine which student assets to assess as student assets vs. parent assets. |
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [AY 2021] Columbia capped home equity at 1.2 times income. |
| | Consistent with CM | [AY 2021] Yes. |
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2021] Columbia imputed assets based on an assumed 4% rate of return. |
| | Consistent with CM | [AY 2021] Yes. |
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | No information. |
| | Consistent with CM | No information. |

**Appendix Table D.4**
**Comparison of CM Guidelines and Columbia Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [AY 2021] Columbia used the IM percentages to split the parent contribution for multiple siblings in college. Columbia multiplied the parent contribution by 50% for each enrolled sibling if both siblings attended Columbia. |
| | Consistent with CM | [AY 2021] Yes; based on components for which information is available. |
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2021] Columbia added back rental and other real estate depreciation and rental losses to income. |
| | Consistent with CM | [AY 2021] Yes; based on components for which information is available. |

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.5**
**Comparison of CM Guidelines and Cornell Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living-table. |
| | Institutional Policy | [AY 2004-AY 2006] Cornell adjusted for cost-of-living for families living in areas with high cost-of-living.<br><br>[AY 2021-AY 2022] Cornell adjusted the IPA and ERA using the IM cost-of-living tables. |
| | Consistent with CM[1] | [AY 2004-AY 2006] Insufficient information.<br><br>[AY 2021-AY 2022] Yes. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2004-AY 2006, AY 2012, AY 2014-AY 2020] Cornell considered private school tuition in its need analysis methodology.<br><br>[AY 2021-AY 2022] Cornell used the IM optional treatment of elementary and secondary school tuition expenses. |
| | Consistent with CM[2] | [AY 2004-AY 2006, AY 2012, AY 2014-AY 2020] Insufficient information.<br><br>[AY 2021-AY 2022] Yes. |

**Appendix Table D.5**
**Comparison of CM Guidelines and Cornell Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2004-AY 2006] Cornell treated student assets given to the student from their parents or saved from the student's own employment as parent assets. It treated assets given to the student from a third party (grandparents, godparents, or other relatives) as student assets and assessed them at 25%. In AY 2005-AY 2006, Cornell specified that it would not treat student assets as parent assets if doing so resulted in an EFC lower than the FM EFC.<br><br>[AY 2012, AY 2014-AY 2020] Cornell treated student assets where the source is either the parent or the student (including 529 plans set up by the parent or student and, in AY 2016-AY 2020, student trust funds set up by the parent) as parent assets and all other student assets (including IRAs and Keoghs) as student assets. Cornell disregarded student assets if the total value of those assets was less than a specified threshold and, in AY 2014-AY 2015, disregarded 529 plans set up by third parties.<br><br>[AY 2021-AY 2022] Contradiction between produced documents:<br>• According to one source, Cornell treated student assets where parents were the source of the asset and pre-paid tuition or savings plans as parent assets and treated student assets provided by third parties or the student, including trusts, as student assets.<br>• According to another source, Cornell treated student assets where the source is either the parent or the student and pre-paid tuition or savings plans as parent assets and treated student assets provided by third parties as student assets. |
| | Consistent with CM | [AY 2004-AY 2006, AY 2012, AY 2014-2020] No; Cornell used different rules to determine which students assets to treat as student assets and which to treat as parent assets.<br><br>[AY 2021-AY 2022] Contradiction between produced documents. |

**Appendix Table D.5**
**Comparison of CM Guidelines and Cornell Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [AY 2004-AY 2006] Cornell capped home equity at 2.4 times total income minus mortgage debt.<br><br>[Mar 2008, Oct 2008, AY 2012, AY 2014-AY 2022] Cornell capped home equity at 1.2 times income. |
| | Consistent with CM | [AY 2004, Mar 2008, Oct 2008, AY 2012, AY 2014-AY 2022] Yes.<br><br>[AY 2005-AY 2006] No; Cornell capped home equity at 2.4 times income minus mortgage debt. |

**Appendix Table D.5**
**Comparison of CM Guidelines and Cornell Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2004-AY 2006] Cornell imputed assets based on an assumed 4% rate of return. Cornell imputed assets based on interest and dividend income.<br><br>[AY 2012] Cornell imputed assets based on an assumed 3% rate of return. Cornell imputed assets based on interest and dividend income.<br><br>[AY 2014-AY 2018] Cornell imputed cash assets using interest income based on an assumed 2% rate of return. Cornell imputed the value of investments using dividend income based on an assumed 4% rate of return.<br><br>[AY 2019-AY 2022] Cornell imputed assets based on an assumed 3% rate of return. Cornell imputed assets based on interest and dividend income. |
| | Consistent with CM | [AY 2004-AY 2006] Yes.<br><br>[AY 2012, AY 2014-2022] No; Cornell assumed a different rate of return to impute parent assets. |
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2004-AY 2006] Cornell made an allowance for unreimbursed medical expenses exceeding 4% of income.<br><br>[AY 2012, AY 2014-AY 2020] Cornell considered unreimbursed medical expenses in its need analysis methodology.<br><br>[AY 2021-AY 2022] Cornell used the income threshold determined by the College Board to make an allowance for unreimbursed medical expenses above that threshold. |
| | Consistent with CM[3] | [AY 2004-AY 2006] No; Cornell used a different income threshold.<br><br>[AY 2012, AY 2014-AY 2020] Insufficient information.<br><br>[AY 2021-AY 2022] Yes. |

**Appendix Table D.5**
**Comparison of CM Guidelines and Cornell Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship |
| | Institutional Policy | [AY 2004-AY 2006] Cornell used the IM formula to split the parent contribution for multiple siblings in college. Cornell did not count siblings enrolled in graduate school as siblings in college except if the parents provided more than half of the sibling's financial support during the academic year. Cornell used a different method to adjust the parent contribution for siblings with low parent contributions.<br><br>[AY 2012, AY 2014-AY 2016] Cornell did not count siblings enrolled in graduate school as siblings in college except if the parents provided documentation of a required parent contribution. Cornell used a different method to adjust the parent contribution for siblings with low parent contributions.<br><br>[AY 2017-2020] Cornell used the IM formula to split the parent contribution for multiple siblings in college. Cornell did not count siblings enrolled in graduate school as siblings in college except if the parents provided documentation of a required parent contribution. Cornell used a different method to adjust the parent contribution for siblings with low parent contributions.<br><br>[AY 2021] Cornell used the IM formula to split the parent contribution for multiple siblings in college. Cornell counted siblings in graduate and professional school as siblings in college. It counted siblings in graduate and professional school towards the number of siblings in college. Cornell used a different method to adjust the parent contribution for siblings with low parent contributions.<br><br>[AY 2022] Cornell used the IM formula to split the parent contribution for multiple siblings in college. Cornell counted siblings in graduate and professional school and siblings with low parent contributions or attending low-cost colleges as siblings in college. |
| | Consistent with CM | [AY 2004-AY 2006, AY 2012, AY 2014-AY 2022] No; Cornell at various times used a different method to adjust the parent contribution for siblings with low parent contribution (rather than siblings attending low-cost schools) and adjusted the parent contribution for siblings in graduate and professional school regardless of whether a parent contribution was required for those students. |

**Appendix Table D.5**
**Comparison of CM Guidelines and Cornell Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2004-AY 2006] Cornell added back depreciation and rental losses to income.<br><br>[AY 2012, AY 2014-AY 2018] Cornell added back rental losses to income. Cornell used tax assessor websites or Zillow to assess the value of rental properties. If the family occupied one unit in a multifamily property they owned, Cornell treated the equity in the non-owner-occupied portion of the property as other real estate. Cornell would move real estate assets to other real estate if a family reported rental income as a business.<br><br>[AY 2019-AY 2022] Cornell added back rental losses to income. If the family occupied one unit in a multifamily property they owned, Cornell treated the equity in the non-owner-occupied portion of the property as other real estate. In AY 2021-AY 2022, Cornell would move real estate assets to other real estate if a family reported it as a business. |
| | Consistent with CM | [AY 2004-AY 2006] Yes, based on components for which information is available.<br><br>[AY 2012, AY 2014-AY 2022] No; in various years Cornell used tax assessor websites or Zillow to assess the market value of the home and did not treat rental properties as businesses even when they were the primary source of income. |

**Notes:**

[1] From AY 2004 to AY 2006, produced documents state that Cornell made cost of living adjustments but do not describe how those adjustments were made. Therefore, I did not have sufficient information to determine whether Cornell's policy was consistent with the CM Guidelines' recommendation.

[2] From AY 2004 to AY 2006, in AY 2012, and from AY 2014 to AY 2020, produced documents state that Cornell considered private school tuition in its need analysis methodology but do not describe how it was considered. Therefore, I did not have sufficient information to determine whether Cornell's policy was consistent with the CM Guidelines' recommendation.

[3] In AY 2012, and from AY 2014 to AY 2020, produced documents state that Cornell considered unreimbursed medical expenses in its need analysis methodology but do not describe how it was considered. Therefore, I did not have sufficient information to determine whether Cornell's policy was consistent with the CM Guidelines' recommendation.

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.6**
**Comparison of CM Guidelines and Dartmouth Methodology**
**(AY 2004-AY 2022)**

| Element | Summary of Baseline Treatment | |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living table. |
| | Institutional Policy | [AY 2006-AY 2007, AY 2010-AY 2012] Dartmouth used professional judgment to adjust for cost-of-living in Alaska, Hawaii, and Puerto Rico on appeal. Dartmouth approved other cost-of-living adjustments only by committee.<br><br>[AY 2013-AY 2016] Dartmouth approved cost-of-living adjustments by committee.<br><br>[AY 2017-AY 2022] Dartmouth adjusted the IPA and ERA using the IM cost-of-living table. |
| | Consistent with CM | [AY 2006-AY 2007, AY 2010-AY 2017] No; Dartmouth used professional judgment to make cost-of-living adjustments on appeal or only if approved by committee.<br><br>[AY 2017-AY 2021] Yes. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2006-AY 2007, AY 2010-AY 2014] Dartmouth used IM optional treatment of elementary and secondary school tuition expenses.<br><br>[AY 2015-AY 2021] Dartmouth used IM optional treatment of elementary and secondary school tuition expenses unless the expected parent contribution for the student was lower than the maximum allowance, in which case it capped the allowance at the expected parent contribution instead. |
| | Consistent with CM | [AY 2006-AY 2007, AY 2010-AY 2014] Yes.<br><br>[AY 2015-AY 2021] No; Dartmouth used a lower cap for some students. |

**Appendix Table D.6**
**Comparison of CM Guidelines and Dartmouth Methodology**
**(AY 2004-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2004] Dartmouth treated all student assets as student assets.<br><br>[AY 2006] Dartmouth assessed reported student assets at the IM student asset assessment rate of 25% unless the IM student contribution was less than the FM student contribution. Dartmouth treated college savings plans and prepaid tuition plans owned by the parent as parent assets if the beneficiary was a sibling. Dartmouth treated prepaid tuition plans owned by the parent as a resource that reduced self help if the beneficiary was the student.<br><br>[AY 2007] Dartmouth assessed reported student assets at the FM student asset assessment rate of 20% unless the IM student contribution was less than the FM student contribution. Dartmouth treated college savings plans and prepaid tuition plans owned by the parent as parent assets.<br><br>[AY 2010-AY 2013] Dartmouth assessed reported student assets at the FM student asset assessment rate of 20%. Dartmouth treated college savings plans owned by either the parent or the student as parent assets. Dartmouth treated prepaid tuition plans owned by the parent as parent assets.<br><br>[AY 2014-AY 2021] Dartmouth assessed reported student assets at the FM student asset assessment rate of 20%. Dartmouth treated qualified tuition programs owned by either the parent or the student as parent assets. Dartmouth treated UGMAs and UTMAs as student assets. |
| | Consistent with CM | [AY 2004, AY 2006-AY 2007, AY2010-AY 2021] No; Dartmouth at various times did not treat student assets as parent assets; treated college savings plans and prepaid tuition plans as student assets in some circumstances; and treated UGMAs and UTMAs as student assets regardless of the source of the gift. |

**Appendix Table D.6**
**Comparison of CM Guidelines and Dartmouth Methodology**
**(AY 2004-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [AY 2006-AY 2009] Dartmouth capped home equity at 2.4 times income minus mortgage debt.<br><br>[AY 2010-AY 2021] Dartmouth capped home equity at 1.2 times income. |
| | Consistent with CM | [AY 2006-AY 2009] No; Dartmouth capped home value at 2.4 times income.<br><br>[AY 2010-AY 2021] Yes. |
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2006-AY 2007, AY 2010-AY 2021] Dartmouth imputed assets using interest and dividend income based on an assumed 4% rate of return. |
| | Consistent with CM | [AY 2006-AY 2007, AY 2010-AY 2021] Yes. |
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2006-AY 2007, AY 2010-AY 2011, AY 2013-AY 2021] Dartmouth used the income threshold determined by the College Board to make an allowance for unreimbursed medical expenses above that threshold.<br><br>[AY 2012] Dartmouth made an allowance for unreimbursed medical expenses that exceeded 3.5% of income. |
| | Consistent with CM | [AY 2006-AY 2007, AY 2010-AY 2011, AY 2013-AY 2021] Yes.<br><br>[AY 2012] No; Dartmouth used a different income threshold. |

**Appendix Table D.6**
**Comparison of CM Guidelines and Dartmouth Methodology**
**(AY 2004-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [AY 2006-AY 2007, AY 2010-AY 2015] Dartmouth used the IM percentages to split the parent contribution for multiple siblings in college. Dartmouth did not count siblings in graduate school as siblings in college without additional documentation.<br><br>[AY 2016-AY 2021] Dartmouth used the IM percentages to split the parent contribution for multiple siblings in college. Dartmouth did not count siblings in graduate school as siblings in college. |
| | Consistent with CM | [AY 2006-AY 2007, AY 2010-AY 2021] Yes; based on components for which information is available. |

**Appendix Table D.6**
**Comparison of CM Guidelines and Dartmouth Methodology**
**(AY 2004-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2006-AY 2007, AY 2010-AY 2012] Dartmouth added back the higher of rental depreciation or losses to income. Dartmouth added back real estate losses separately for individual entities.<br><br>[AY 2013-AY 2021] Dartmouth added back the higher of rental depreciation or losses to income. Dartmouth added back real estate losses separately for individual entities. Dartmouth did not impute the value of rental properties. |
| | Consistent with CM | [AY 2006-AY 2007, AY 2010-AY 2012] Yes, based on components for which there is information.<br><br>[AY 2013-AY 2021] No; Dartmouth did not impute rental property value. |

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.7**
**Comparison of CM Guidelines and Duke Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living table. |
| | Institutional Policy | [AY 2012-AY 2013] Duke adjusted the IPA based on cost-of-living expenses in different parts of the country.<br><br>[AY 2022] Duke adjusted the IPA and ERA using the IM cost-of-living tables. |
| | Consistent with CM[1] | [AY 2012-AY 2013] Insufficient information.<br><br>[AY 2022] Yes. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2012-AY 2013, AY 2021] Duke used IM optional treatment of elementary and secondary school tuition expenses.<br><br>[AY 2022] Duke made an unspecified allowance for secondary school tuition expenses. |
| | Consistent with CM[2] | [AY 2012-AY 2013, AY 2021] Yes.<br><br>[AY 2022] Insufficient information. |
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2010] Duke treated assets saved under the student's name as parent assets.<br><br>[AY 2011-AY 2022] Contradiction between deposition testimony and produced documents:<br>• According to testimony from Janice Coleman, Duke treated assets saved under the student's name as parent assets.<br>• According to testimony from Miranda McCall, Duke treated all student assets as parent assets except for student trust funds, which it treated as student assets. Duke did not consider gifts from third parties (e.g., grandparents) in its need analysis.<br>• According to produced documents, Duke treated all student assets as parent assets except for student trust funds, which it treated as student assets. Duke treated college savings plans as parent assets. Duke treated gifts from third parties (e.g., grandparents) as trust funds. |
| | Consistent with CM | [AY 2010] Yes.<br><br>[AY 2011-AY 2022] Contradiction between deposition testimony and produced documents. |

**Appendix Table D.7**
**Comparison of CM Guidelines and Duke Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [AY 2012-AY 2013, AY 2021-AY 2022] Duke capped home equity at 1.2 times income. |
| | Consistent with CM | [AY 2012-AY 2013, AY 2021-AY 2022] Yes. |
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2012-AY 2013] Duke imputed assets using interest and dividend income based on an assumed 2.5% rate of return.<br><br>[AY 2021] Duke imputed assets using interest and/or dividend income based on an unspecified rate of return.<br><br>[AY 2022] Duke imputed assets based on an assumed rate of return that varied annually and ranged between 2% and 3.5%. |
| | Consistent with CM[3] | [AY 2012-AY 2013, AY 2022] No; Duke used a different rate of return to impute assets.<br><br>[AY 2021] Insufficient information. |
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2012-AY 2013] Duke made an allowance for unreimbursed medical expenses that exceeded 3.6% of income.<br><br>[AY 2022] Duke used the income threshold determined by the College Board to make an allowance for unreimbursed medical expenses above that threshold. |
| | Consistent with CM | [AY 2012-AY 2013] No; Duke used a different threshold.<br><br>[AY 2022] Yes. |

**Appendix Table D.7**
**Comparison of CM Guidelines and Duke Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [AY 2012-2013] Duke used the IM formula to split the parent contribution for multiple siblings in college. Duke did not count siblings enrolled in graduate or professional school, siblings receiving full merit or athletic scholarships, or siblings enrolled at military academies as siblings in college. Produced documents contain a contradiction as to whether Duke did not count any siblings in community college as siblings in college or whether it only counted siblings in community college if their COA exceeded $15,000.<br><br>[AY 2022] Duke used the IM formula to split the parent contribution for multiple siblings in college. |
| | Consistent with CM | [AY 2012-2013] No; Duke used different rules to determine which students it counted as in college.<br><br>[AY 2022] Yes, based on components for which information is available. |

**Appendix Table D.7**
**Comparison of CM Guidelines and Duke Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2012 - AY 2013] Duke added back rental losses and depreciation to income. Duke used Zillow to estimate the value of rental properties.<br><br>[Date unknown] Duke added back rental losses separately for individual entities.<br><br>[AY 2021] Duke added back rental depreciation to income. Duke treated rental properties as business assets. Duke used real estate websites to estimate the value of rental properties and other real estate.<br><br>[AY 2022] Duke did not use the purchase price and the date of purchase to impute rental property value. Duke treated all rental and real estate assets as business assets. Duke did not have a standard approach to the treatment of multi-family property. Duke did not add back real estate losses separately for individual entities. |
| | Consistent with CM | [AY 2012-AY 2013, AY 2021-AY 2022] No; Duke used a different method to assess rental property value and, at various times, Duke treated all rental properties as businesses, did not have a standard approach for treating multifamily properties, and did not zero out losses on each rental property separately. |

**Notes:**

[1] From AY 2012 to AY 2013, produced documents state that Duke made cost of living adjustments but do not describe how those adjustments were made. Therefore, I did not have sufficient information to determine whether Duke's policy was consistent with the CM Guidelines' recommendation.

[2] In AY 2022, deposition testimony states that Duke made an allowance for secondary school tuition in its need analysis methodology but does not provide sufficient information for me to determine whether Duke's policy was consistent with the CM Guidelines' recommendation.

[3] In AY 2021, produced documents state that Duke imputed the value of liquid assets but do not specify the rate of return. Therefore, I did not have sufficient information to determine whether Duke's policy was consistent with the CM Guidelines' recommendation.

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.8**

**Comparison of CM Guidelines and Emory Methodology**

**(AY 2004-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| **Cost of Living Variances** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living table. |
| | Institutional Policy | [AY 2009] Emory adjusted the IPA and ERA for high cost-of-living areas.<br><br>[AY 2015] Emory adjusted the IPA based on cost-of-living expenses in different parts of the country. |
| | Consistent with CM[1] | [AY 2009] Yes.<br><br>[AY 2015] Insufficient information. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2009, AY 2015] Emory made an allowance for private school tuition expenses capped at $6,500 for each eligible student. |
| | Consistent with CM | [AY 2009] No; Emory used a different cap. |
| **Family and Student Assets** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2009, AY 2015] Emory treated student assets as student assets. |
| | Consistent with CM[2] | [AY 2009] No; Emory did not treat student assets as parent assets.<br><br>[AY 2015] Insufficient information. |
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [2007] Emory sometimes capped home equity at 2.4 times income minus mortgage debt.<br><br>[AY 2009, AY 2015] Emory capped home equity at 2 times income if the home was purchased at least 10 years ago. |
| | Consistent with CM | [AY 2007, AY 2009, AY 2015] No; Emory used a different home equity cap and did not cap home equity for all students. |

**Appendix Table D.8**
**Comparison of CM Guidelines and Emory Methodology**
**(AY 2004-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| **Imputing the Value of Liquid Assets** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2009, AY 2015] Emory imputed assets using interest income based on an assumed 2% rate of return. Emory imputed assets using dividend income based on an assume 3% rate of return. |
| | Consistent with CM | [AY 2009, AY 2015] No; Emory assumed a different rate of return to impute assets. |
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2009] Emory used the income threshold determined by the College Board to make an allowance for unreimbursed medical expenses above that threshold.<br><br>[AY 2015] Emory made an allowance for unreimbursed medical expenses that exceeded 3.8% of income. |
| | Consistent with CM | [AY 2009] Yes.<br><br>[AY 2015] No; Emory used a different income threshold. |

**Appendix Table D.8**
**Comparison of CM Guidelines and Emory Methodology**
**(AY 2004-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| **Number of Siblings in College** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [AY 2009] Emory used the IM formula to split the parent contribution for multiple siblings in college.<br><br>[AY 2015] Emory used the IM formula to split the parent contribution for mulitple siblings in college. Emory multiplied the total parent contribution by 50% for one sibling in college and 35% for two siblings in college if the sibling attended Emory or another similarly priced institution. |
| | Consistent with CM | [AY 2009] Yes, based on components for which there is information.<br><br>[AY 2015] No; Emory used different percentages to split the parent contribution when siblings also attended Emory or similar priced schools. |

**Appendix Table D.8**
**Comparison of CM Guidelines and Emory Methodology**
**(AY 2004-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2009] Emory added back rental depreciation and losses to income. Emory imputed the value of rental properties using an unspecified multiplier.<br><br>[AY 2015] Emory added back rental depreciation to income. Emory did not add back rental losses. |
| | Consistent with CM | [AY 2009] Yes, based on components for which there is information.<br><br>[AY 2015] No; Emory did not add back rental losses. |

**Notes:**
[1] In AY 2015, produced documents state that Emory made cost of living adjustments but do not describe how those adjustments were made. Therefore, I did not have sufficient information to determine whether Emory's policy was consistent with the CM Guidelines' recommendation.
[2] I did not consider software settings to contain sufficient information to compare Emory's treatment of family and student assets to the CM Guidelines' recommendation for AY 2015.

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.9**
**Comparison of CM Guidelines and Georgetown Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living table. |
| | Institutional Policy | [AY 2016, AY 2018-AY 2022] Georgetown adjusted the IPA and EPA using the IM cost-of-living tables. |
| | Consistent with CM | [AY 2016, AY 2018-AY 2022] Yes. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2004-AY 2009] Georgetown made an allowance for tuition expenses up to $6,900 for each eligible student.<br><br>[AY 2019] Georgetown made an allowance for tuition expenses up to $11,970 for each eligible student.<br><br>[AY 2022] Georgetown made an allowance for tuition expenses up to $12,640 for each eligible student.<br><br>[AY 2011-AY 2015, AY 2017-AY 2018, AY 2020-AY 2021] Contradiction between produced documents:<br>• According to an internal contradiction in its Policy and Procedure manuals, Georgetown made a maximum allowance of either $6,900 or $8,870 from AY 2011-AY 2015, either $6,900 or $8,870 in AY 2017, and either $11,970 or $12,220 in AY 2020.<br>• According to software settings, Georgetown made an allowance for tuition expenses up to $11,750 in AY 2018, $12,220 in AY 2020, and $12,540 in AY 2021.<br>• According to its Policy and Procedure Manuals, Georgetown made an allowance for tuition expenses up to $11,970 in AY 2018 and AY 2020 and $12,640 in AY 2021. |
| | Consistent with CM | [AY 2004-AY 2009, AY 2012-AY 2015, AY 2017] No; Georgetown used a different cap for elementary and secondary school tuition expenses.<br><br>[AY 2011, AY 2018, AY 2020-AY 2021] Contradiction between produced documents.<br><br>[AY 2019, AY 2022] Yes. |

**Appendix Table D.9**
**Comparison of CM Guidelines and Georgetown Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2016] Georgetown treated student assets as family assets unless the calculated IM EFC is less than FM EFC, in which case Georgetown treated student assets as student assets.<br><br>[AY 2018-AY 2022] According to its software settings, Georgetown treated student assets as parent assets except for student trust funds, which it treated as student assets. |
| | Consistent with CM[1] | [AY 2016] No; Georgetown either treated all student assets as family assets (including trust funds) or treated all student assets as student assets, depending on whether the calculated IM EFC was less than the FM EFC.<br><br>[AY 2018-AY 2022] Insufficient information. |
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [AY 2016, AY 2018-AY 2022] Georgetown capped home equity at 1.2 times income. |
| | Consistent with CM | [AY 2016, AY 2018-AY 2022] Yes. |

**Appendix Table D.9**
**Comparison of CM Guidelines and Georgetown Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2004-AY 2009, AY 2011-AY 2015, AY 2017-AY 2018, AY 2020-AY 2022] Georgetown imputed cash assets using interest income based on an assumed 4% rate of return. Georgetown imputed the value of investments using dividend income based on an assumed 5% rate of return.<br><br>[AY 2019] According to its software settings, Georgetown imputed cash assets using interest income based on an assumed 4% rate of return. Georgetown imputed the value of investments using dividend income based on an assumed 40% rate of return.<br><br>[AY 2018, AY 2020] Contradiction between produced documents:<br>• According to its software settings, Georgetown imputed cash assets using interest income based on an assumed 4% rate of return. Georgetown imputed the value of investments using dividend income based on an assumed 40% rate of return.<br>• According to its Policy and Procedure manuals, Georgetown imputed cash assets using interest income based on an assumed 4% rate of return. Georgetown imputed the value of investments using dividend income based on an assumed 5% rate of return.<br><br>[AY 2021-AY 2022] Contradiction between produced documents:<br>• According to its software settings, Georgetown imputed cash assets using interest income based on an assumed 4% rate of return. Georgetown imputed the value of investments using dividend income based on an assumed 4% rate of return.<br>• According to its Policy and Procedure Manuals, Georgetown imputed cash assets using interest income based on an assumed 4% rate of return. Georgetown imputed the value of investments using dividend income based on an assumed 5% rate of return. |
| | Consistent with CM | [AY 2004-AY 2009, AY 2011-AY 2015, AY 2017, AY 2019] No; Georgetown assumed a different rate of return to impute the value of investments.<br><br>[AY 2018, AY 2020-AY 2022] Contradiction between produced documents. |

**Appendix Table D.9**
**Comparison of CM Guidelines and Georgetown Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2004-AY 2009] Georgetown made an allowance for unreimbursed medical expenses that exceeded 5% of income.<br><br>[AY 2011, AY 2018-AY 2019] Georgetown used the income threshold determined by the College Board to make an allowance for unreimbursed medical expenses above that threshold.<br><br>[AY 2012-AY 2015, AY 2017] Georgetown made an allowance for unreimbursed medical expenses that exceeded 3.5% of income.<br><br>[AY 2020-AY 2022] Contradiction between produced documents:<br>• According to its software settings, Georgetown used the income threshold determined by the College Board to make an allowance for unreimbursed medical expenses above that threshold. ([AY 2020] 5.0%, [AY 2021-2022] 4.3%).<br>• According to other produced documents, Georgetown made an allowance for unreimbursed medical expenses that exceeded 4.9% of income. |
| | Consistent with CM | [AY 2004-AY 2009, AY 2012-AY 2015, AY 2017] No; Georgetown used a different income threshold.<br><br>[AY 2011, AY 2018-AY 2019] Yes.<br><br>[AY 2020-AY 2022] Contradiction between produced documents. |

**Appendix Table D.9**
**Comparison of CM Guidelines and Georgetown Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [AY 2004-AY 2009, AY 2011-AY 2015, AY 2017-AY 2018, AY 2020-AY 2022] Georgetown used the IM formula to split the parent contribution for multiple siblings in college. Georgetown counted siblings enrolled in professional school (e.g., law, medicine) as siblings in college. Georgetown did not count siblings in ROTC, siblings in miliatry academies, siblings with full scholarships, siblings in community college, or siblings in graduate school as siblings in college.<br><br>[AY 2018-AY 2022] Georgetown used the IM formula to split the parent contribution for multiple siblings in college.<br><br>[AY 2004-AY 2009, AY 2011-AY 2015, AY 2017] Georgetown counted siblings enrolled in professional school (e.g., law, medicine) as siblings in college.<br><br>[AY 2018, AY 2020- AY 2022] Georgetown did not count siblings enrolled in professional school (e.g., law, medicine) as siblings in college. |
| | Consistent with CM | [AY 2004-AY 2009, AY 2011-AY 2015, AY 2017-AY 2018, AY 2020-AY 2022] No; at various times, Georgetown treated siblings in professional school (e.g., law and medicine) as siblings in college and did not treat siblings in community college as siblings in college. |

**Appendix Table D.9**
**Comparison of CM Guidelines and Georgetown Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2004-AY 2009, AY 2011-AY 2015, AY 2017-AY 2018, AY 2020-AY 2022] Georgetown added back rental losses to income.<br><br>[AY 2016] Georgetown added back rental losses and rental and real estate depreciation, net of losses, to income.<br><br>[AY 2018-AY 2022] Georgetown added back rental losses to income. |
| | Consistent with CM | [AY 2004-AY 2009, AY 2011-AY 2022] Yes, based on components for which information is available. |

**Notes:**

[1] I did not consider software settings to contain sufficient information to compare Georgetown's treatment of family and student assets to the CM Guidelines' recommendation from AY 2018 to AY 2022.

[2] I infer the academic year associated with Georgetown's software settings based on their file names.

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.10**
**Comparison of CM Guidelines and Johns Hopkins Methodology**
**(AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living table. |
| | Institutional Policy | [AY 2022] Johns Hopkins adjusted the IPA and EPA using the IM cost-of-living tables. |
| | Consistent with CM | [AY 2022] Yes. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2022] Johns Hopkins used IM optional treatment of elementary and secondary school tuition expenses. |
| | Consistent with CM | [AY 2022] Yes. |
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2022] According to produced documents, Johns Hopkins treated all student assets as parent assets except for trust funds, which it treated as student assets. |
| | Consistent with CM[1] | [AY 2022] Insufficient information. |
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [AY 2022] Johns Hopkins capped home equity at 1.2 times income. |
| | Consistent with CM | [AY 2022] Yes. |
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2022] Johns Hopkins imputed assets based on an assumed 4% rate of return. |
| | Consistent with CM | [AY 2022] Yes. |

**Appendix Table D.10**
**Comparison of CM Guidelines and Johns Hopkins Methodology**
**(AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2022] Contradiction between deposition testimony and produced documents:<br>• According to deposition testimony, Johns Hopkins used the income threshold determined by the College Board to make an allowance for unreimbursed medical expenses above that threshold (4.3%).<br>• According to produced documents, Johns Hopkins made an allowance for unreimbursed medical expenses that exceeded 5% of income. |
| | Consistent with CM | [AY 2022] Contradiction between deposition testimony and produced documents. |
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [AY 2022] Johns Hopkins used the IM formula to split the parent contribution for multiple siblings in college. Johns Hopkins did not count siblings older than 23, siblings in graduate school, siblings attending military or service academies, or siblings attending community college as siblings in college, but did count parents towards the number of family members in college. Deposition testimony and produced documents contain a contradiction on the treatment of siblings in community college:<br>• According to deposition testimony, Johns Hopkins considered the cost of attendance for siblings attending community college in the calculation of the parent contribution.<br>• According to produced documents, Johns Hopkins made a standard allowance of $3,000 for siblings attending community college. |
| | Consistent with CM | [AY 2022] Contradiction between deposition testimony and produced documents. |

**Appendix Table D.10**

**Comparison of CM Guidelines and Johns Hopkins Methodology**

**(AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2022] Johns Hopkins added back rental and real estate losses and depreciation to income. Johns Hopkins added back rental losses separately for individual entities. Johns Hopkins treated real estate value and debt as business value and debt if a family reported rental income on Schedule E, even if rental income was not the family's primary source of income. |
| | Consistent with CM | [AY 2022] No; Johns Hopkins treated real estate value and debt as business value and debt if there is rental income on Schedule E, even if it was not the primary source of income. |

**Note:**

[1] I did not consider software settings to contain sufficient information to compare Johns Hopkins' treatment of family and student assets to the CM Guidelines' recommendation for AY 2022.

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.11**
**Comparison of CM Guidelines and MIT Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living table. |
| | Institutional Policy | [AY 2003-AY 2022] MIT adjusted the IPA and ERA using the IM cost-of-living tables. |
| | Consistent with CM | [AY 2003-AY 2022] Yes. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2003-AY 2017, AY 2021-AY 2022] MIT used the IM optional treatment of elementary and secondary school tuition expenses.<br><br>[AY 2018-AY 2020] MIT made an allowance for elementary and secondary school tuition expenses capped at $11,450. |
| | Consistent with CM | [AY 2003-AY 2011, AY 2014-AY 2017, AY 2021-AY 2022] Yes.<br><br>[AY 2012-AY 2013, AY 2018-AY 2020] No; MIT applied a different cap. |
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2003-AY 2010] MIT treated all student assets where the parent was the source of the asset, including pre-paid tuition plans, college savings plans, and parent-originated trusts, as parent assets. MIT treated student assets given by a third party as student assets.<br><br>[AY 2011-AY 2020] MIT treated student assets, except trusts, as parent assets, including any pre-paid tuition and savings plans where the parent is the owner.<br><br>[AY 2021-AY 2022] MIT treated all student assets as parent assets. |
| | Consistent with CM | [AY 2003-AY 2022] No; MIT applied different rules to determine which student assets to assess as student assets vs parent assets. |

**Appendix Table D.11**
**Comparison of CM Guidelines and MIT Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [AY 2003-AY 2006] MIT capped home equity at 2.4 times income minus mortgage debt.<br><br>[AY 2007] MIT capped home equity at 1.2 times income.<br><br>[AY 2008-AY 2013] MIT capped home equity at 1.2 times income for families with income greater than $100,000. MIT did not consider home equity in its need analysis for families with income less than $100,000.<br><br>[AY 2014-AY 2015] MIT capped home equity at 1.2 times income for families with income greater than $150,000. MIT did not consider home equity in its need analysis for families with income less than $150,000.<br><br>[AY 2016-AY 2022] MIT did not consider home equity in its need analysis. |
| | Consistent with CM | [AY 2003-AY 2004, AY 2007] Yes.<br><br>[AY 2005-AY 2006] No; MIT applied a different home equity cap.<br><br>[AY 2008-AY 2022] No; MIT excluded home equity for families with income below certain thresholds and then excluded home equity altogether. |
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2003-AY 2013] MIT imputed assets based on an assumed 4% rate of return. MIT imputed assets based on interest and dividend income.<br><br>[AY 2014- AY 2022] MIT imputed assets based on an assumed 3% rate of return. MIT imputed assets based on interest and dividend income. |
| | Consistent with CM | [AY 2003-AY 2013] Yes.<br><br>[AY 2014-AY 2022] No; MIT assumed a different rate of return to impute the value of liquid assets. |

**Appendix Table D.11**
**Comparison of CM Guidelines and MIT Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2003, AY 2009-AY 2011, AY 2014, AY 2021-AY 2022] MIT used the income threshold determined by the College Board to make an allowance for unreimbursed medical expenses above that threshold.<br><br>[AY 2004-AY 2008] MIT made an allowance for unreimbursed medical expenses that exceeded 3.4% of income.<br><br>[AY 2012-AY 2013] MIT made an allowance for unreimbursed medical expenses that exceeded 3.5% of income.<br><br>[AY 2015-AY 2020] MIT made an allowance for unreimbursed medical expenses that exceeded 3.8% of income. |
| | Consistent with CM | [AY 2003, AY 2009-AY 2011, AY 2014, AY 2021-AY 2022] Yes.<br><br>[AY 2004-AY 2008, AY 2012-AY 2013, AY 2015-AY 2020] No; MIT applied a different income threshold. |

**Appendix Table D.11**
**Comparison of CM Guidelines and MIT Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [AY 2003-AY 2022] MIT used the IM formula to split the parent contribution for multiple siblings in college. MIT did not count siblings enrolled in graduate or professional school as siblings in college unless they provided documentation of expected parent contributions. MIT used professional judgment for siblings attending low cost schools to proportionally divide the parent contribution according to the cost of each sibling's college.<br><br>[AY 2004-AY 2005] MIT used professional judgment to multiply the parent contribution by 50% for each enrolled sibling on appeal if two siblings attended MIT.<br><br>[AY 2006-AY 2009] MIT multiplied the parent contribution by 50% for each enrolled sibling if two siblings attended MIT.<br><br>[AY 2010-AY 2022] MIT multiplied the parent contribution by 50% for each enrolled sibling on appeal if two siblings attended MIT or a similarly priced private school. |
| | Consistent with CM | [AY 2003, AY 2010-AY 2014] Yes.<br><br>[AY 2004-AY 2009] No; MIT used different percentages to split the parent contribution when multiple siblings attended MIT.<br><br>[AY 2015-AY 2022] No; MIT did not cap the allowance for siblings enrolled at community colleges or low-cost schools as part of its standard treatment. |

**Appendix Table D.11**
**Comparison of CM Guidelines and MIT Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2003-AY 2008] MIT added back rental losses and rental and other real estate depreciation to income. MIT imputed the value of rental properties based on the purchase price and the date of purchase, applying the College Board's Federal Commercial Property Multiplier table.<br><br>[AY 2009] MIT added back rental losses and rental and other real estate depreciation to income. MIT added back rental losses separately for individual entities. MIT imputed the value of rental properties based on the purchase price and the date of purchase, using the College Board's Federal Commercial Property Multiplier table. If the family occupied one unit in a multifamily property they owned, MIT treated the full amount of equity under home equity.<br><br>[AY 2010-AY 2022] MIT added back rental losses and rental and other real estate depreciation to income. MIT added back rental losses separately for individual entities. MIT used purchase price and date of purchase to impute rental property value, applying different multipliers over the years. If the family occupied one unit in a multifamily property they owned, MIT treated the equity in the non-owner-occupied portion of the property as other real estate. MIT considered treating real estate as a business if rental real estate was being used as income. |
| | Consistent with CM | [AY 2003-AY 2022] Yes, based on components for which information is available. |

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.12**
**Comparison of CM Guidelines and Northwestern Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living-table. |
| | Institutional Policy | [AY 2016-AY 2017] Northwestern adjusted the IPA and ERA for parents who lived in metropolitan areas where the cost of living was higher than the national average.<br><br>[AY 2018-AY 2022] Northwestern adjusted the IPA and ERA using the IM cost-of-living tables. |
| | Consistent with CM | [AY 2016-AY 2022] Yes. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2016-AY 2022] Northwestern made an unspecified allowance for elementary and secondary school tuition expenses. |
| | Consistent with CM[1] | [AY 2016-AY 2022] Insufficient information. |
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2018-AY 2022] According to its software settings, Northwestern treated student assets as student assets. |
| | Consistent with CM[2] | [AY 2018-AY 2022] Insufficient information. |
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [AY 2018-AY 2022] Northwestern did not cap home equity. |
| | Consistent with CM | [AY 2018-AY 2022] No; Northwestern did not cap home equity. |

**Appendix Table D.12**
**Comparison of CM Guidelines and Northwestern Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2016-AY 2022] Northwestern imputed assets based on an unspecified rate of return. |
| | Consistent with CM[3] | [AY 2016-AY 2022] Insufficient information. |
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | No information. |
| | Consistent with CM | No information. |
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [AY 2022] Northwestern reduced the parent contribution by 40% for two siblings in college. Northwestern used professional judgment to protect a certain amount of parent income to pay college costs rather than applying a percent multiplier to unequal parent contribution amounts across families. |
| | Consistent with CM | No information. |

**Appendix Table D.12**
**Comparison of CM Guidelines and Northwestern Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2018-AY 2022] Northwestern added back rental losses to income. |
| | Consistent with CM | [AY 2018-AY 2022] Yes, based on components for which information is available. |

**Notes:**

[1] From AY 2016 to AY 2022, produced documents state that Northwestern made an allowance for elementary and secondary school tuition in its need analysis methodology but do not provide sufficient information for me to determine whether Northwestern's policy was consistent with the CM Guidelines' recommendation.

[2] I did not consider software settings to contain sufficient information to compare Northwestern's treatment of family and student assets to the CM Guidelines' recommendation from AY 2018 to AY 2022.

[3] From AY 2016 to AY 2022, produced documents indicate that Northwestern imputed the value of liquid assets but do not specify the rate of return. Therefore, I did not have sufficient information to determine whether Northwestern's policy was consistent with the CM Guidelines' recommendation.

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.13**
**Comparison of CM Guidelines and Notre Dame Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living-table. |
| | Institutional Policy | [AY 2003-AY 2011] Notre Dame used professional judgment to adjust the IPA and ERA using the IM cost-of-living tables.<br><br>[AY 2012-AY 2016, AY 2018-AY 2022] Notre Dame adjusted the IPA and ERA using the IM cost-of-living tables. |
| | Consistent with CM | [AY 2003-AY 2011] No; Notre Dame did not apply a cost-of-living adjustment.<br><br>[AY 2012-AY 2016, AY 2018-AY 2022] Yes. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2003-May 2005] Notre Dame used IM optional treatment of elementary and secondary school tuition expenses.<br><br>[Mar 2006, Jan 2007, AY 2008-AY 2022] Notre Dame used professional judgment to make an allowance for elementary and secondary school tuition expenses. |
| | Consistent with CM | [AY 2003-May 2005] Yes.<br><br>[March 2006, Jan 2007, AY 2008-AY 2022] No; Notre Dame did not provide an allowance for elementary and secondary school tuition expenses as part of its baseline need analysis methodology. |
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2003] Notre Dame used professional judgment to determine the treatment of student assets.<br><br>[Feb 2004-AY 2011] Notre Dame treated student assets greater than $100 as parent assets if the parents were the source of the assets.<br><br>[AY 2012-AY 2022] Notre Dame treated student assets as student assets except for trust funds established by the parent, which it treated as parent assets. |
| | Consistent with CM | [AY 2003-AY 2022] No; Notre Dame used different rules to determine which assets to treat as student assets and which to treat as parent assets. |

**Appendix Table D.13**
**Comparison of CM Guidelines and Notre Dame Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [Feb 2004-AY 2020] Notre Dame did not cap home equity in its need analysis.<br><br>[AY 2021-AY 2022] Notre Dame capped home equity at 1.2 times income. |
| | Consistent with CM | [Feb 2004-AY 2020] No; home equity not capped.<br><br>[AY 2021- AY 2022] Yes. |
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2003-Feb 2005] Notre Dame reviewed interest and dividend income relative to assets and used professional judgment in the case of discrepancies.<br><br>[AY 2006-Jan 2008] Notre Dame imputed assets based on an assumed 5% rate of return. Notre Dame imputed assets based on interest and dividend income.<br><br>[Jan 2009-AY 2011, AY 2014-AY 2016] Notre Dame imputed assets based on an assumed 4% rate of return. Notre Dame imputed assets based on interest and dividend income.<br><br>[AY 2012-AY 2013, AY 2021-AY 2022] Notre Dame imputed assets based on an assumed 3% rate of return. Notre Dame imputed assets based on interest and dividend income.<br><br>[AY 2017-AY 2020] Notre Dame did not impute assets. |
| | Consistent with CM | [AY 2006-AY 2008, AY 2012-AY 2013, AY 2018-AY 2022] No; Notre Dame either assumed a different rate of return to impute assets or did not impute assets.<br><br>[Jan 2009-AY 2011, AY 2014-AY 2016] Yes. |

**Appendix Table D.13**
**Comparison of CM Guidelines and Notre Dame Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [Jan 2004, Feb 2005, Apr 2006, Jan 2007, Jan 2008, Jan 2009, May 2010] Notre Dame made an allowance for all unreimbursed medical expenses.<br><br>[AY 2011-AY 2013, AY 2015, AY 2018, AY 2020-AY 2022] Notre Dame used the income threshold determined by the College Board to make an allowance for unreimbursed medical expenses above that threshold.<br><br>[Feb 2003, AY 2014, AY 2016-AY 2017] Notre Dame made an allowance for unreimbursed medical expenses that exceeded 4% of income (AY 2003), 3.7% of income (AY 2014), or 3.9% of income (AY 2016-AY 2017).<br><br>[AY 2019] Notre Dame made an allowance for unreimbursed medical expenses that exceeded an unknown percent of income. |
| | Consistent with CM[1] | [Feb 2003, Jan 2004, Feb 2005, Apr 2006, Jan 2007, Jan 2008, Jan 2009, May 2010, AY 2014, AY 2016-AY 2017] No; Notre Dame used a different income threshold or no income threshold at all.<br><br>[AY 2011-AY 2013, AY 2015, AY 2018, AY 2020-AY 2022] Yes.<br><br>[AY 2019] Insufficient information. |

**Appendix Table D.13**
**Comparison of CM Guidelines and Notre Dame Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [AY 2003, Feb 2004, Feb 2005, Apr 2006, Jan 2007, Jan 2008, Jan 2009, May 2010] Notre Dame did not count siblings in graduate school as siblings in college.<br><br>[AY 2011-AY 2022] Notre Dame did not count siblings in graduate school or siblings in low-cost schools as siblings in college. |
| | Consistent with CM | [AY 2003, Feb 2004, Feb 2005, Apr 2006, Jan 2007, Jan 2008, Jan 2009, May 2010, AY 2011- AY 2014] Yes, based on components for which information is available.<br><br>[AY 2015-AY 2022] No; Notre Dame treated siblings enrolled in low-cost schools differently. |

**Appendix Table D.13**
**Comparison of CM Guidelines and Notre Dame Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2003, May 2005] Notre Dame added back rental losses and depreciation to income.<br><br>[AY 2006] Notre Dame added back rental losses and depreciation to income. Notre Dame treated real estate assets as business assets if they were a family's primary source of income.<br><br>[Jan 2007-AY 2022] Notre Dame added back rental losses and depreciation to income. Notre Dame treated real estate assets as business assets if they were a family's primary source of income. Notre Dame used the College Board multipliers to impute rental property value. It used a multiplier to impute rental property value. |
| | Consistent with CM | [AY 2003, May 2005, AY 2006-AY 2022] Yes, based on components for which information is available. |

**Note:**
[1] In AY 2019, produced documents indicate that Notre Dame made an allowance for some amount of unreimbursed medical expenses; however, due to the way the document was printed, the threshold used to make that allowance is not visible. Because I am unable to confirm whether Notre Dame's threshold was consistent with the threshold determined by College Board in this year, I do not have sufficient information to determine whether Notre Dame's policy was consistent with the CM Guidelines.

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.14**
**Comparison of CM Guidelines and Penn Methodology**
**(AY 2003-AY 2018)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living-table. |
| | Institutional Policy | [AY 2003-AY 2017] Penn adjusted the IPA and ERA using the IM cost-of-living tables. |
| | Consistent with CM | [AY 2003-AY 2018] Yes. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2003-AY 2018] Penn used the IM optional treatment of elementary and secondary school tuition expenses. |
| | Consistent with CM | [AY 2003-AY 2018] Yes. |
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2003-AY 2018] Penn assessed student assets at 5% except in "'special cases,' e.g., gift, inheritance, specifically for educational use, and/or when student has particularly large amount of assets compared to family parent contribution." In these cases, Penn assessed up to 20%. |
| | Consistent with CM | [AY 2003-AY 2018] No; Penn used different rules to determine which assets to assess as student assets and which assets to assess as parent assets. |

**Appendix Table D.14**
**Comparison of CM Guidelines and Penn Methodology**
**(AY 2003-AY 2018)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy[1] | [AY 2003] Penn capped home equity at 2.4 times income.<br><br>[AY 2004] Penn capped home equity at 2.5 times income.<br><br>[AY 2005] Penn capped home equity at 1.1 times income.<br><br>[AY 2006-AY 2012, AY 2015-AY 2018] Penn capped home equity at 1.2 times income.<br><br>[AY 2013] Penn capped home equity at 1.2 times income for families with income less than $180,000. Penn capped home equity at 1.7 times income for families with income greater than $180,000. |
| | Consistent with CM | [AY 2003-AY 2005] No; Penn used a different home equity cap.<br><br>[AY 2006-AY 2012, AY 2015-AY 2018] Yes.<br><br>[AY 2013] No; Penn used a different home equity cap for families with income > $180,000. |
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2004, AY 2008, AY 2012] Penn imputed assets based on an assumed 4% rate of return. Penn imputed assets based on interest and dividend income. |
| | Consistent with CM | [AY 2004, AY 2008, AY 2012] Yes. |

**Appendix Table D.14**
**Comparison of CM Guidelines and Penn Methodology**
**(AY 2003-AY 2018)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2003, AY 2005-AY 2006, AY 2008] Penn used the income threshold determined by the College Board to make an allowance for unreimbursed medical expenses above that threshold.<br><br>[AY 2004] Penn made an allowance for unreimbursed medical expenses that exceeded 3.4% of income.<br><br>[AY 2012] Penn made an allowance for unreimbursed medical expenses that exceeded 3.5% of income. |
| | Consistent with CM | [AY 2003, AY 2005-AY 2006, AY 2008] Yes.<br><br>[AY 2004, AY 2012] No; Penn used a different threshold. |

**Appendix Table D.14**
**Comparison of CM Guidelines and Penn Methodology**
**(AY 2003-AY 2018)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy[2] | [AY 2003-AY 2004] Penn multiplied the total parent contribution by 55% for one sibling in college, 40% for two siblings in college, and 32.5% for three or more siblings in college.<br><br>[AY 2005-AY 2018] Penn used the IM formula to split the parent contribution for multiple siblings in college. In AY 2012, Penn reduced the allowance for siblings enrolled at a community college or other low-cost college and for siblings receiving non-need based scholarships. |
| | Consistent with CM | [AY 2003-AY 2004] No; Penn used different percentages to split the parent contribution.<br><br>[AY 2012] No; Penn treated siblings enrolled in community colleges or other low-cost schools, and siblings receiving non-need-based scholarships, differently.<br><br>[AY 2005-AY 2011, AY 2013-AY 2018] Yes, based on components for which information is available. |

**Appendix Table D.14**
**Comparison of CM Guidelines and Penn Methodology**
**(AY 2003-AY 2018)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2003] Penn adds back rental income and depreciation.<br><br>[AY 2004-AY 2012] Penn added back rental and other real estate depreciation to income. Penn did not add back rental losses to income. Penn imputed the value of rental properties using the Federal Housing Multiplier.<br><br>[AY 2013] Penn added back rental and other real estate depreciation to income. Penn did not add back rental losses to income. Penn imputed the value of rental properties using an unspecified housing multiplier.<br><br>[AY 2014-AY 2018] Penn added back rental and other real estate depreciation to income. Penn did not add back rental losses to income. Penn used Zillow to estimate the value of rental properties. |
| | Consistent with CM | [AY 2003] Yes based on the components for which information is available.<br><br>[AY 2004-AY 2018] No; Penn did not add back rental losses and in some years used Zillow to determine the value of rental property. |

**Notes:**

[1] Although Penn in some years applied a home equity cap that was consistent with the CM's home equity cap, throughout the entire time period Penn used a variation of the FM's methodology to assess parent assets in its own need analysis, which lowered the effect of home equity and other considered assets on Penn's calculation of EFC for some families (PENN568-LIT-00055002 at 002). Specifically, Penn added a portion of discretionary net worth to available income and then calculated a single parent contribution from that, rather than separately calculating a parent contribution from income and a parent contribution from assets per the IM's methodology.

[2] I note that in AY 2019, while it was still a member of the 568 Group, Penn changed its treatment of siblings in college by reducing the share of the parent contribution Penn expected a family to contribute (from 60% to 50% for a single sibling in school) and stopped reducing the allowance for siblings enrolled at a community college or other low-cost college and for siblings receiving non-need based scholarships (Varas 30(b)(6) Deposition, 88:3-22).

**Sources:** Backup materials to this report (Appendix D).

**Appendix Table D.15**
**Comparison of CM Guidelines and Rice Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Cost of Living Variances*** | CM Guidelines | [2001] Adjust IPA and ERA using the cost-of-living table developed by the 568 Group.<br><br>[2004, 2015, 2016] Adjust IPA and ERA using the IM cost-of-living table. |
| | Institutional Policy | [AY 2003-AY 2022] Rice adjusted the IPA and ERA using the IM cost-of-living tables. |
| | Consistent with CM | [AY 2003-AY 2022] Yes. |
| ***Elementary and Secondary School Tuition Expenses*** | CM Guidelines | Use the IM optional treatment of elementary and secondary school tuition expenses, which includes an allowance against income for these expenses up to a certain amount. This cap is set by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2009-AY 2015] Rice did not make an allowance for elementary and secondary school tuition expenses.<br><br>[AY 2016-AY 2022] Contradiction between deposition testimony and produced documents:<br>• According to deposition testimony, Rice made an allowance for elementary and secondary school tuition expenses beginning in 2016.<br>• According to software settings, Rice did not make an allowance for elementary and secondary school tuition expenses from AY 2016-AY 2022, except for AY 2018 when Rice made an allowance of $8,000. |
| | Consistent with CM | [AY 2009-AY 2015, AY 2018] No; Rice did not provide an allowance for elementary and secondary school tuition or provided an allowance that differed from the IM's.<br><br>[AY 2016-AY 2017, AY 2019-AY 2022] Contradiction between deposition testimony and produced documents. |
| ***Family and Student Assets*** | CM Guidelines | [2001, 2004] Assess all student assets as parent assets.<br><br>[2015, 2016] Assess assets in prepaid tuition and savings plans as parent assets. Assess assets where the student is the source of the asset, assets from grandparents and other outside benefactors, and student trust funds as student assets. |
| | Institutional Policy | [AY 2022] Rice treated prepaid tuition and savings plans as parent assets. Rice used professional judgment to determine how to treat assets where the source is someone other than the parent, such as the grandparent or the student. |
| | Consistent with CM | [AY 2022] No; Rice used a different rule to decide which assets to treat as student assets and which assets to treat as parent assets. |

**Appendix Table D.15**
**Comparison of CM Guidelines and Rice Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Home Equity*** | CM Guidelines | [2001, 2004] Cap home equity at 2.4 times income minus mortgage debt.<br><br>[2005, 2015, 2016] Cap home equity at 1.2 times income. |
| | Institutional Policy | [AY 2009-AY 2011] Rice capped home equity at 1.2 times income.<br><br>[AY 2012-AY 2014, AY 2017-AY 2018] Rice capped home equity at 2 times income.<br><br>[AY 2015-AY 2016] Rice capped home equity at 2.2 times income.<br><br>[AY 2017-AY 2018] Rice capped home equity at 2 times income.<br><br>[AY 2020-AY 2021] Rice capped home equity at 0.1 times income.<br><br>[AY 2022] Contradiction between deposition testimony and produced documents:<br>• According to deposition testimony, Rice capped home equity at 1.2 times income.<br>• According to software settings, Rice capped home equity at 0.1 times income. |
| | Consistent with CM | [AY 2009-AY 2011] Yes.<br><br>[AY 2012-AY 2018, AY 2020-AY 2021] No; Rice used a different home equity cap.<br><br>[AY 2022] Contradiction between deposition testimony and produced documents. |
| ***Imputing the Value of Liquid Assets*** | CM Guidelines | Use a multiplier set by the 568 Group (equal to 25 in all available CM Guidelines, based on an assumed 4 percent rate of return) to impute the principal value of assets that could have generated reported interest and dividend income.<br><br>The CM Guidelines do not provide a recommendation on how to resolve any discrepancy between reported and imputed assets. |
| | Institutional Policy | [AY 2009-2011] Rice did not impute assets.<br><br>[AY 2012] Rice imputed assets using dividend and interest income based on an assumed 37% rate of return.<br><br>[AY 2013] Rice imputed assets using dividend and interest income based on an assumed 40% rate of return.<br><br>[AY 2014-AY 2020] Rice imputed assets using dividend and interest income based on an assumed 30% rate of return.<br><br>[AY 2021] Rice imputed assets using dividend and interest income based on an assumed 20% rate of return.<br><br>[AY 2022] Rice imputed assets using dividend and interest income based on an assumed 3% rate of return. |
| | Consistent with CM | [AY 2009-AY 2011] No; Rice did not impute the value of liquid assets.<br><br>[AY 2022] No; Rice assumed a different rate of return to impute the value of liquid assets. |

**Appendix Table D.15**
**Comparison of CM Guidelines and Rice Methodology**
**(AY 2003-AY 2022)**

| Element | | Summary of Baseline Treatment |
|---|---|---|
| ***Medical Expenses*** | CM Guidelines | Use the IM treatment of unreimbursed medical expenses, which includes an allowance against income for these expenses that exceed a certain percentage of income. This percentage is determined by the College Board and varies from year to year. |
| | Institutional Policy | [AY 2009-AY 2022] Rice used the income threshold determined by the College Board to make an allowance for unreimbursed medical expenses above that threshold. |
| | Consistent with CM | [AY 2009-AY 2022] Yes. |
| ***Number of Siblings in College*** | CM Guidelines | • Use the IM formula to account for siblings in college, which multiplies the total parent contribution by 60 percent for one sibling in college, 45 percent for two siblings in college, and 35 percent for three or more siblings in college;<br>• Do not count siblings enrolled in graduate or professional school as siblings in college, unless that sibling is considered a dependent for the purpose of receiving financial aid; and<br>• Do not count parents towards the number of family members in college.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• If a sibling is attending community college or another low-cost school, do not reduce the total parent contribution by more than the amount of their tuition and fees; and<br>• If a sibling is receiving non-need-based scholarships, do not reduce the total parent contribution by more than the amount of their tuition, fees, room and board net of the scholarship. |
| | Institutional Policy | [AY 2009-AY 2021] Rice used the IM formula to split the parent contribution for multiple siblings in college.<br><br>[AY 2022] Rice used the IM formula to split the parent contribution for multiple siblings in college. Rice did not count siblings in graduate or professional school as siblings in college unless the family provided documentation that the sibling was dependent for aid purposes. Rice did not allow parents in college to count towards the number of siblings in college. Rice counted siblings in community college and siblings receiving non-need-based aid as siblings in college. |
| | Consistent with CM | [AY 2009-AY 2021] Yes; based on the elements for which information is available.<br><br>[AY 2022] No; Rice did not reduce the allowance for siblings in community college or sibilings receiving non-need-based aid. |

**Appendix Table D.15**
**Comparison of CM Guidelines and Rice Methodology**
**(AY 2003-AY 2022)**

| **Element** | | **Summary of Baseline Treatment** |
|---|---|---|
| ***Rental Property/ Other Real Estate (formerly Assessment of Business and Real Estate)*** | CM Guidelines | • Add back rental/real estate depreciation to income;<br>• Add back any remaining rental loss to income; and<br>• Impute rental property value from rental income and/or purchase price and year of purchase.<br><br>In 2015 and 2016, the CM Guidelines included the following additional recommendations:<br>• Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family;<br>• If the family occupies one unit in a multifamily property they own, determine the percentage associated with the family's residence and include the appropriate value/debt under home equity; include remaining value/debt under other real estate; and<br>• Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties. |
| | Institutional Policy | [AY 2022] Rice added back rental losses and depreciation to income. Rice used Zillow to estimate the value of rental properties. Rice treated rental properties as real estate assets, not as business assets, even if they were a family's primary source of income. Rice considered the equity in the non-owner-occupied portion of a multifamily property on a case-by-case basis. |
| | Consistent with CM | [AY 2022] No; Rice used Zillow to impute rental property value and did not treat rental property as a business even if it was the primary source of income. |

**Note:**
[1] I note that Ms. Walker retired from Rice in November 2022 and therefore assumed that her testimony described Rice's need analysis methodology as of AY 2022.

**Sources:** Backup materials to this report (Appendix D).

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLANDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERONE WILLIAMS, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHN HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,<br><br>*Defendants.* | Case No. 22-cv-00125 |

**EXPERT REPORT OF NICHOLAS HILL**

**7 August 2024**

**Figure 4: The Defendants' exits from the 568 Group**

| School name[81] | Date of final exit | Final exit prior to disbanding of the 568 Group? | First academic year potentially affected by final exit from the 568 Group |
|---|---|---|---|
| Brown[82] | May 2012 | Yes | 2013–2014 |
| Caltech | 2022 | No | 2023–2024 |
| Columbia | 2022 | No | 2023–2024 |
| Cornell | 2022 | No | 2023–2024 |
| Dartmouth | 2022 | No | 2023–2024 |
| Duke[83] | May 2021 | Yes | 2022–2023[84] |
| Emory[85] | Apr. 2012 | Yes | 2013–2014 |
| Georgetown | 2022 | No | 2023–2024 |
| Johns Hopkins | 2022 | No | 2023–2024 |
| MIT | 2022 | No | 2023–2024 |
| Northwestern | 2022 | No | 2023–2024 |
| Notre Dame | 2022 | No | 2023–2024 |
| Penn[86] | Jan. 2020 | Yes | 2020–2021[87] |
| Rice (see notes)[88] | Nov. 2021 | Yes | 2022–2023[89] |
| U-Chicago[90] | Sept. 2014 | Yes | 2015–2016 |
| Vanderbilt[91] | Apr. 2020 | Yes | 2021–2022 |
| Yale (see notes) | 2022 | No | 2023–2024 |

Notes: Rice and Yale exited and re-entered the 568 Group. I discuss this in greater detail below. This table focuses on their final exits.

---

81 As noted in the preceding paragraphs, unless otherwise noted, many of the Defendants exited the 568 Group when it disbanded on 4 November 2022.

82 BROWN_0000000439 (May 23, 2012, Letter informing of Brown's withdrawal from the 568 Group).

83 Defendant Duke University's Answer to Amended Complaint, *Henry, et al. v. Brown University, et al.*, 22-cv-00125 (N.D. Ill. January 25, 2023), p. 26.

84 Dr. Singer does not account for Duke's exit prior to the disbanding of the 568 Group in his analyses. I have included this exit based on the evidence and at the request of counsel. *See* Singer Report, Appendix 3 Table 1.

85 Emory University's Answer to Second Amended and Supplemental Class Action Complaint, *Henry, et al. v. Brown University, et al.*, 22-cv-00125 (N.D. Ill. January 25, 2023), p. 3.

86 PENN568-LIT-00000002 (2020 memo documenting Penn's exit from 568 Group).

87 Although the first academic year potentially affected could possibly be 2021–2022, I analyze 2020–2021 because Penn's financial aid offers would not yet have been made to first-year students as of their exit in January 2020. PENN568-LIT-00000002 (2020 memo documenting Penn's exit from 568 Group). My assumption of these years is also consistent with Dr. Singer's assumptions for Penn. *See* Singer Report, Appendix 3 Table 1.

88 RICE_LIT0000132590 (November 2021 emails documenting Rice's exit from the 568 group).

89 Dr. Singer does not account for Rice's exit prior to the disbanding of the 568 Group in his analyses. I have included this exit based on the evidence and at the request of counsel. *See* Singer Report, Appendix 3 Table 1.

90 University of Chicago's Answer to Second Amended and Supplemental Class Action Complaint, *Henry, et al. v. Brown University, et al.*, 22-cv-00125 (N.D. Ill. January 25, 2023), p. 4.

91 Vanderbilt University's Answer to Plaintiffs' Second Amended and Supplemental Class Action Complaint and Demand for Jury Trial, *Henry, et al. v. Brown University, et al.*, 22-cv-00125 (N.D. Ill. January 25, 2023), p. 3.

(76) Two of the Defendants exited and re-entered the 568 Group. Rice exited the 568 Group "in or about 2011, and rejoined the [568 Group] in 2014 or 2015."[92] Yale did not participate in the 568 Group "from 2008 until 2018."[93] Their dates of exit and re-entry are summarized in Figure 5. Similar to the above, I also include the academic years following their exit and re-entry where aid packages may have potentially been affected by their participation (or lack thereof) in the 568 Group.

**Figure 5: The Defendants' exits from and re-entries into the 568 Group**

| School name | Date of first exit | First potentially impacted academic year following exit from the 568 Group | Date of re-entry | First potentially impacted academic year following re-entry into the 568 Group |
|---|---|---|---|---|
| Rice[94] | 2011 | 2012–2013 | 2014 | 2015–2016 |
| Yale[95] | Early 2008[96] | 2008–2009 | 2018 | 2018–2019[97] |

(77) The Defendants were not the only members of the 568 Group. Other member schools include Amherst College, Boston College, Claremont McKenna College, College of the Holy Cross, Davidson College, Grinnell College, Haverford College, Wake Forest University, Wellesley College,

[92] Defendant William Marsh Rice University's Answer and Affirmative Defenses to Plaintiffs' Second Amended and Supplemental Class Action Complaint, *Henry, et al. v. Brown University, et al.*, 22-cv-00125 (N.D. Ill. January 25, 2023), at 26. In an email in November 2010, Anne Walker, Former Assistant Vice President and Executive Director of University Financial Aid Services at Rice, wrote "Rice will be dropping out of 568." RICE_LIT0000033891 (November 2011 email documenting Rice's exit from 568 Group).

[93] Yale's Answer to Plaintiffs' Second Amended and Supplemental Class Action Complaint and Demand for Jury Trial, *Henry, et al. v. Brown University, et al.*, 22-cv-00125 (N.D. Ill. January 25, 2023), p. 36. In an email from December 13, 2017, Scott Wallace-Juedes the Director of Undergraduate Financial Aid at Yale at the time wrote, "we have officially been welcomed to the 568 Group and membership approved," YALE_LIT_0000074539 at -4540 (2017 Yale internal email regarding the 568 Group).

[94] Rice University Answer to Amended Class Action Complaint, September 9, 2022, p. 24; Defendant William Marsh Rice University's Answer and Affirmative Defenses to Plaintiffs' Second Amended and Supplemental Class Action Complaint, *Henry, et al. v. Brown University, et al.*, 22-cv-00125 (N.D. Ill. January 25, 2023), p. 26. Dr. Singer does not account for Rice's first exit and re-entry in his analyses. According to his backup materials, Dr. Singer excluded Rice's first exit and re-entry because "while Rice withdrew from the 568 Group in 2011, this was merely a technicality as result of a lapse in dues, and does not correspond to any change in how Rice approached financial aid." *See* Singer Report, Appendix 3 Table 1. However, based on the evidence that suggest Rice exited the group and at the request of counsel, I analyze the effects of Rice's exit and re-entry.

[95] Defendant Yale University's Answer and Affirmative Defenses to Amended Class Action Complaint, *Henry, et al. v. Brown University, et al.*, 22-cv-00125 (N.D. Ill. January 25, 2023), p. 30. Deposition of Caesar Storlazzi (Former University Director of Student Financial Services at Yale, July 27, 2023) 50:1–2.

[96] Deposition of Caesar Storlazzi (Former University Director of Student Financial Services at Yale), July 27, 2023, 102:21–23.

[97] Although the first academic year potentially impacted may be 2019–2020 given a 2018 entry, there is some evidence that Yale re-entered in 2017, which would imply the first academic year potentially impacted by the re-entry would be 2018–2019. *See* Deposition of Caesar Storlazzi (Former University Director of Student Financial Services at Yale) July 27, 2023, 50:1–2 ("And the Yale College office and dean of admissions and financial aid decided to rejoin 568 in 2017."). Due to the uncertainty here, I assume that the first academic year impacted by the re-entry to be 2018–2019, which is consistent with Dr. Singer's assumption for Yale.

Wesleyan University, and Williams College.[98] These schools also entered and exited the 568 Group at different times.[99]

## 3.3. Glossary of terms

(78) Below is a summary of key terms used throughout my report.

**Figure 6: Glossary of terms**

| Term | Definition |
|---|---|
| Academic year | The period, typically fall to spring, during which students attend school. |
| Cost of attendance | Cost of attendance is an estimate of students' education expenses for a specified period of enrollment.[100] Cost of attendance has multiple components, including tuition and fees, room and board, books and supplies, transportation, and other miscellaneous expenses.[101] |
| Effective institutional price | Dr. Singer's effective institutional price is calculated as the difference between the cost of attendance and institutional, need-based grants. Dr. Singer calculates a version of the effective institutional price that accounts for all institutional grants, both need-based and non-need-based, such as merit and athletic grants. When I refer to the effective institutional price, I am referring to the version that accounts only for institutional, need-based grants, unless otherwise stated. |
| Expected family contribution | The estimated amount a student and family can afford to pay for a year of college.[102] The expected family contribution is made up of a parent contribution and a student contribution. |
| Federal aid | Financial aid provided by the federal government. From this point on, "federal aid" refers to grants and scholarships provided by the federal government, unless otherwise specified. |

98 "568 Presidents Group Member Institutions," 568 Presidents Group, accessed via web archive February 13, 2024, last archived July 24, 2011, https://web.archive.org/web/20110724210442/http://568group.org/membership/index.html; "568 Presidents Group Member Institutions," 568 Presidents Group, accessed via web archive July 30, 2024, last archived June 26, 2008, https://web.archive.org/web/20080626203756/http://568group.org/membership/members.html; "568 Presidents Group Member Institutions," 568 Presidents Group, accessed via web archive August 2, 2024, last archived January 24, 2022, https://web.archive.org/web/20220124014615/http:/www.568group.org/home/?q=node/24. *See* Long Report, § III.C for further details on the formation and mission of the 568 Group.

99 For example, Haverford College, which was one of the founding members of the 568 Group was no longer listed as a member school by November 2017. *See* CORNELL_LIT0000002461, at -2464 (July 6, 2001 article about the 568 Group); "568 Presidents Group Member Institutions," 568 Presidents Group, accessed via web archive July 30, 2024, last archived November 8, 2017, https://web.archive.org/web/20171108001643/http://www.568group.org:80/home/?q=node/24. As another example, College of the Holy Cross was not listed as a member school in July 2008, but did appear as one by January 2009. *See* "568 Presidents Group Member Institutions," 568 Presidents Group, accessed via web archive July 30, 2024, last archived July 6, 2008, https://web.archive.org/web/20080706133340/http://568group.org/membership/members.html; "568 Presidents Group Member Institutions," 568 Presidents Group, accessed via web archive July 30, 2024, last archived January 6, 2009, https://web.archive.org/web/20090106203613/http://568group.org/membership/members.html.

100 The standard period for a full-time undergraduate is a 9-month academic year. U.S. Department of Education, Cost of Attendance (Budget), September 2017, https://fsapartners.ed.gov/sites/default/files/2021-02/2017-2018%20Chapter%202%20-%20Cost%20of%20Attendance%20%28Budget%29.pdf.

101 IPEDS cost of attendance is defined as "the sum of published tuition and required fees (lower of in-district or in-state for public institutions), books and supplies, and the weighted average for room and board and other expenses." IPEDS cost of attendance does not include student-specific expenses such as transportation. "Average Institutional Net Price FAQs," IPEDS, updated February 2019, https://nces.ed.gov/ipeds/report-your-data/faq-average-net-price.

102 "What is the Expected Family Contribution (EFC)?" Mark Kantrowitz, Saving for College, March 20, 2024, https://www.savingforcollege.com/article/what-is-the-expected-family-contribution-efc.

# 4. The Defendants increased their financial aid after the introduction of the consensus methodology guidelines

(79) Dr. Singer claims that the Defendants suppressed institutional grant aid and artificially inflated prices for students.[103] In this section I analyze whether the Defendants reduced their financial aid during the conduct period. I do so in several ways. First, I examine whether the Defendants reduced their financial aid awards after the consensus methodology guidelines were introduced. Contrary to Dr. Singer's claims, I find that the Defendants increased their financial aid awards. Second, I examine whether the Defendants reduced their financial aid awards compared to peer schools. If the Defendants had agreed to reduce financial aid, their financial aid awards ought to have decreased relative to peer schools. Instead, I find no evidence that Defendants changed their financial aid awards compared to peer schools. Both of these results are inconsistent with Dr. Singer's claims that the Defendants suppressed institutional grant aid and artificially inflated prices for students.

## 4.1. The Defendants increased the amount of financial aid awarded after the introduction of the consensus methodology guidelines

(80) One way to quantify a school's financial aid spending is to calculate its total financial aid spending per year. Figure 7 summarizes the progression of average total institutional aid awarded by Defendants over time and illustrates how it relates to the introduction of the consensus methodology guidelines (depicted by the gray vertical line).[104] The blue line in the figure depicts total institutional aid awarded per Defendant over time after adjusting for inflation. Figure 7 shows that the Defendants significantly increased their inflation-adjusted institutional aid awarded both over time and since the introduction of the consensus methodology guidelines.[105]

[103] Dr. Singer claims "the record evidence cited herein, when viewed through the criteria economists use to assess cartels, is consistent with Plaintiffs' allegation that Defendants engaged in the alleged conspiracy to suppress the institutional grant aid and to artificially inflate Effective Institutional Prices" (Singer Report, ¶ 124) and claims that his "results are consistent with Defendants' having engaged in the alleged Overarching Conspiracy to suppress institutional grant aid" (Singer Report, ¶ 192).

[104] Figure 7—and the remaining figures in this section—were created using IPEDS data. These data exist for all Defendants beginning as far back as the 1999–2000 academic year, which allows me to compare aggregate statistics for time periods before and after the introduction of the consensus methodology guidelines. The Defendants' structured data does not uniformly cover the period from the 1999–2000 academic year to the 2021–2022 academic year, and hence cannot be used for this purpose.

[105] The figure includes all the Defendants in all years, which includes periods when a Defendant was not part of the 568 Group. In Appendix C.1, I show the same chart limiting the chart to those six Defendants that were continuously part of the 568 Group (until its dissolution) since before the consensus methodology guidelines were introduced (Columbia, Cornell, Georgetown, MIT, Northwestern, and Notre Dame). That chart looks very similar and also shows that average institutional aid, adjusted for inflation, awarded by those Defendants per undergraduate student has risen both over time and since the introduction of the consensus methodology guidelines.

**Figure 7: Average total institutional grant aid awarded per Defendant over time (dollars in 2024 prices)**




Sources: IPEDS; Federal Reserve Bank of St. Louis CPI data (as produced by Dr. Singer).
Notes:
[1] Institutional grant aid awarded per Defendant calculated as the average amount of institutional grant aid awarded to full-time, first-time degree-seeking undergraduates per Defendant (total institutional aid awarded to full-time, first-time, degree-seeking undergraduates / 17 Defendants).
[2] Aid awarded refers to grant or scholarship aid awarded to the student. Aid awarded may differ from aid dispersed to a student. For example, aid awarded may differ if a student leaves a school mid-year before the entire award amount is dispersed. "IPEDS 2023–2024 Student Financial aid survey instructions," Integrated Postsecondary Education Data System, accessed June 30, 2024, https://surveys.nces.ed.gov/ipeds/public/survey-materials/instructions?instructionid=30016.
[3] As previously discussed, the 2003–2004 academic year is the first academic year the consensus methodology guidelines could have potentially affected aid packages.

(81) Another way to quantify the amount of institutional aid awarded by a school is to calculate the average amount of institutional aid received per full-time, first-time, degree-seeking undergraduate student. I use the average institutional aid per student, as opposed to the average institutional aid per student who received aid, as a more complete measure for the total amount of institutional aid provided.[106] Figure 8 summarizes the average amount of aid received per full-time, first-time, degree-

[106] To see this, consider two otherwise identical schools A and B with a cost of attendance of $10,000. School A provides institutional aid for 50 percent of the cost of attendance for 50 percent of students. School B provides institutional aid for 50 percent of the cost of attendance for 50 percent of students and institutional aid for 10 percent of the cost of attendance for the rest of 50 percent of students. In this case, School B provides more financial aid to students overall. The average institutional aid per student is calculated at $2,500 for School A and $3,000 for School B, whereas the average institutional aid per student who received an award is calculated at $5,000 for School A and $3,000 for School B, which is inconsistent with the fact that School B provides more institutional aid. Such a situation may occur for a school like MIT, which "provided a $5,000 Covid-era grant to all enrolled undergraduate students" during the pandemic. Office of the Vice Chancellor, "MIT keeps a firm commitment to undergraduate student support for 2021–2022," MIT News, March 26, 2021, https://news.mit.edu/2021/mit-keeps-firm-commitment-undergraduate-student-support-0326.

seeking undergraduate student by year at the Defendants. The figure shows that inflation-adjusted average institutional aid awarded by the Defendants per undergraduate student has risen both over time and since the introduction of the consensus methodology guidelines.[107]

**Figure 8: Average institutional grant aid awarded to full-time, first-time, degree-seeking undergraduates by the Defendants (dollars in 2024 prices)**




Sources: IPEDS; Federal Reserve Bank of St. Louis CPI data (as produced by Dr. Singer).
Notes:
[1] Average institutional grant aid calculated as the average amount of institutional grant aid awarded per full-time, first-time, degree-seeking undergraduate (total institutional grant aid awarded to full-time, first-time, degree-seeking undergraduates / total full-time, first-time degree-seeking undergraduates).
[2] The 2003–2004 academic year is the first academic year the consensus methodology guidelines could have potentially affected aid packages.

(82) A third way to quantify the amount of financial aid awarded by the Defendants is to measure the proportion of students awarded aid. Figure 9 depicts the percentage of full-time, first-time, degree-seeking undergraduates who received aid at the Defendants over time. It shows that while this percentage varies significantly from year to year, it has increased overall since the introduction of the

[107] The figure includes all the Defendants in all years, which includes periods when a Defendant was not part of the 568 Group. In Appendix C.1, I show the same chart limiting the chart to those six Defendants that were continuously part of the 568 Group (until its disbandment) since before the consensus methodology guidelines were introduced (Columbia, Cornell, Georgetown, MIT, Northwestern, Notre Dame). That chart looks very similar and also shows that average institutional aid, adjusted for inflation, awarded by those Defendants per undergraduate student has risen both over time and since the introduction of the consensus methodology guidelines.

**Figure 11: Institutional grant aid awarded to students by the Defendants**




Sources: IPEDS; Dr. Singer's combined Defendant data.
Note: Following Dr. Singer's definition, full ride students are defined as students with total grant aid values (as reported in Defendant data) equal to or greater than the school's cost of attendance as reported by IPEDS.

(86) My analyses show that the broad patterns in the data do not support Dr. Singer's claim that the challenged conduct reduced financial aid awards. If the 568 Group or the introduction of the consensus methodology guidelines had been intended to reduce financial aid awards, the observed pattern of increasing financial aid is not the pattern that one would expect to see. Instead, one would expect to see stagnation or a decrease in financial aid awarded over time because of coordination among the Defendants to reduce financial aid.

## 4.2. The Defendants increased financial aid at the same pace as peer schools after the introduction of the consensus methodology guidelines

(87) The previous section shows that Defendant financial aid awards have been rising over time. In this section, I compare the Defendants' financial aid awards over time to financial aid awards over time at the other schools in Dr. Singer's proposed market (henceforth, "non-Defendants").[116] I do so using a

[116] The non-Defendant schools in Dr. Singer's proposed market are Carnegie Mellon, Harvard, Princeton, Stanford, and WashU.

widely accepted econometric approach known as "difference-in-differences."[117] I find no evidence that Defendants and non-Defendants changed their overall financial aid awards differently during the alleged conduct period.

(88) Difference-in-differences works by comparing the Defendants' financial aid to that of the non-Defendants before and after the alleged conduct (i.e., the introduction of the consensus methodology guidelines and each Defendants' membership in the 568 Group). The intuition of this methodology is that non-Defendants serve as a control group for Defendants—non-Defendants should be affected by the same supply and demand factors that affect Defendants, so comparing to them implicitly controls for many factors that affect financial aid.

(89) Defendants entered and exited the 568 Group at various times, and some schools entered or exited multiple times. This variation in entry and exit dates poses a problem for a standard difference-in-differences model, which is predicated upon a single event that occurs at a single point in time.[118] To handle this econometric problem, I use the staggered difference-in-differences model developed by Callaway and Sant'Anna (2021) rather than a difference-in-differences model with a single dummy variable for the alleged conduct.[119] This approach has some limitations, but with staggered entries and exits, it is important to use it because the standard difference-in-differences approach is flawed.[120]

(90) Since my analysis relies on a comparison between the Defendants and non-Defendants over time, I estimate my difference-in-differences model using IPEDS data, which provide aggregate information on financial aid for a larger number of non-Defendants over a longer period of time than the school-specific financial aid data produced in discovery. This has advantages over the Defendant student-

---

117 *See*, *e.g*., Joshua D. Angrist and Jörn-Steffen Pischke, *Mostly Harmless Econometrics: An Empiricist's Companion* (Princeton University Press, 2009), pp. 227–33; Alberto Abadie and Matias D. Cattaneo, "Econometric Methods for Program Evaluation," *Annual Review of Economics* 10 (2018): pp. 482–484.

118 A single conduct dummy variable can result in estimated effects with limited interpretability. In particular, schools' conduct period academic years can be the basis of comparison for other conduct period school-academic years. This means a school could counterfactually increase their grant aid during the conduct period, and the estimated effect on grant aid could decrease. *See*, for example, Borusyak, Kirill, Xavier Jaravel, and Jann Spiess. "Revisiting Event-Study Designs: Robust and Efficient Estimation." *Review of Economic Studies* (2024); Goodman-Bacon, Andrew. "Difference-in-Differences with Variation in Treatment Timing." *Journal of Econometrics* 225, no. 2 (2021): 254–277; Jonathan Roth, Pedro HC Sant'Anna, Alyssa Bilinski, and John Poe, "What's trending in difference-in-differences? A synthesis of the recent econometrics literature," *Journal of Econometrics* 235, no. 2 (2023): 2218–2244; Abraham, Sarah, and Sun, Liyang, "Estimating dynamic treatment effects in event studies with heterogeneous treatment effects," *Journal of Econometrics* 225, no. 2 (2021): 175–199; de Chaisemartin, Clément, and Xavier D'Haultfœuille. "Two-Way Fixed Effects Estimators with Heterogeneous Treatment Effects." *American Economic Review*, 110 (9) (2020): 2964–96.

119 Brantly Callaway and Pedro HC Sant'Anna, "Difference-in-Differences with Multiple Time Periods," *Journal of Econometrics* 225, no. 2 (2021).

120 In order to implement the methodology of Callaway and Sant'Anna (2001) I need to exclude any early exit periods from the control groups, imposing the additional assumption that there is no selection into these exits. This approach uses the "not-yet-treated" as a baseline for comparison, i.e., the control group is composed of schools who, until a given academic-year, had never been part of the alleged conduct. I, therefore, drop the early exit periods from this analysis. Additionally, this analysis bases pre-conduct comparisons on the single year prior to conduct in contrast to the single dummy variable model, which uses all available pre-conduct years.

level data in that the IPEDS data are available from the 1999–2000 academic year to the 2021–2022 academic year for all schools in the Plaintiffs' alleged market, whereas the student-level data have an unbalanced panel with relatively fewer years of data.[121]

(91) Figure 12 summarizes the estimated effect of the alleged conduct and the associated significance levels for three outcome variables: (1) average institutional grant aid awarded to full-time, first-time, degree-seeking students, (2) total institutional grant aid per school for full-time, first-time, degree-seeking students, and (3) percentage of full-time, first-time, degree-seeking students receiving institutional grant aid.[122] The results in Figure 12 show that there was no statistically significant change in the Defendants' financial aid relative to the non-Defendants' during the alleged conduct period.[123] In other words, my model finds no statistically significant evidence that the conduct had an effect on average institutional grant aid awarded, total institutional grant aid awarded, or percentage of students receiving institutional grant aid. This evidence is inconsistent with Dr. Singer's claim that the alleged conduct decreased financial aid.

[121] IPEDS data are aggregated at the school-year level for all schools and years needed for the analysis, while school-specific data contain information at the student-year-school level but are not available for all necessary schools and years. Student-level data produced by the Defendants do not contain information on the non-Defendants. Even among the Defendants, the produced student-level data are not available over consistent time periods. School-specific data are available for some Defendants (Johns Hopkins, Caltech) only starting in the 2015–2016 academic year. *See* Appendix J for additional detail on Defendants' student-level data. *See also* Figure 102. When using IPEDS data, I default to using Dr. Singer and Dr. Bulman's provided data. In cases where data are not provided by either of them, I rely on my own processed IPEDS data. *See* Appendix J for more details.

[122] Average institutional grant aid is calculated as the average amount of institutional grant aid awarded per full-time, first-time, degree-seeking undergraduate (total institutional grant aid awarded to full-time, first-time, degree-seeking undergraduates / total full-time, first-time degree-seeking undergraduates). Institutional grant aid awarded per Defendant is calculated as the average amount of institutional grant aid awarded to full-time, first-time degree, seeking undergraduates per Defendant (total institutional aid awarded to full-time, first-time, degree-seeking undergraduates / 17 Defendants). Percentage receiving institutional grant aid is calculated as the percentage of full-time, first-time, degree-seeking undergraduates who were awarded institutional grants (number of full-time, first-time, degree-seeking undergraduates receiving institutional grants / all full-time, first-time, degree-seeking undergraduates).

[123] The point estimates in Figure 21 are not statistically significant. The signs of the estimated impact of the alleged conduct are opposite of what one would expect if Dr. Singer's analyses on the impact of the alleged conduct were true.

**Figure 12: Estimated effect of the alleged conduct on the Defendants' institutional grant aid, and percentage of students receiving institutional grant aid, based on the staggered difference-in-differences model**

| Effect of alleged conduct on | Estimated effect of alleged conduct | Standard error | p-value | Significance level | | |
|---|---|---|---|---|---|---|
| | | | | 10% | 5% | 1% |
| Institutional grant aid per full-time, first-time, degree-seeking student | + $1,255 | $1,702 | 0.46 | No | No | No |
| Total institutional grant aid for full-time, first-time, degree-seeking student | + $3,832,458 | $3,178,153 | 0.23 | No | No | No |
| Percentage of full-time, first-time, degree-seeking students receiving institutional grant aid | + 3% | 3% | 0.26 | No | No | No |

Sources: IPEDS; Federal Reserve Bank of St. Louis CPI data (as produced by Dr. Singer).
Notes:
[1] The estimation is based on the staggered difference-in-differences model in Brantly Callaway and Pedro HC Sant'Anna, "Difference-in-Differences with Multiple Time Periods," *Journal of Econometrics* 225, no. 2 (2021).
[2] The standard errors are clustered at the level of the school.
[3] A positive sign indicates the alleged conduct increased financial aid.
[4] Grant aid is deflated using the CPI to 2024 prices.

(92) I conduct robustness checks by changing my model specifications and sample data, including (1) using the difference-in-differences model with a single dummy variable for the alleged conduct (as opposed to the methodology of Figure 12) and (2) estimating the effect of the alleged conduct on net price as opposed to institutional aid. I find that the results do not change materially, and I continue to find that the conduct did not have a statistically significant effect on the Defendants' average institutional grant aid awarded, total grant aid awarded, or the percentage of students receiving aid. I also find that my results are robust to limiting the model to those seven Defendants that were part of the 568 Group during the entire conduct period within the IPEDS data.[124] I similarly do not find evidence of an effect on net price. *See* Appendix C.2 for the results of my robustness checks.

[124] Those seven schools are Columbia, Cornell, Duke, Georgetown, MIT, Northwestern, and Notre Dame. Limiting the data in this way has the advantage of eliminating staggered entry (and exits) and hence the resulting model can be estimated using a standard difference-in-differences model with a single dummy. This is because I have eliminated the need to implement an approach that accounts for staggered entry and exit, as I only consider the set of schools where such a staggering does not occur.

#### 5.1.1. The Defendants calculated different expected family contributions for the same student

(98) To assess whether the Defendants standardized expected family contribution calculations, I first analyze how expected family contributions differed across the Defendants for first-time applicants who were admitted to more than one Defendant in the same academic year. For each such applicant with expected family contribution data from more than one Defendant in the same academic year, I analyze the differences in the expected family contributions calculated by the Defendants. If the Defendants were using the consensus methodology guidelines (or some other tool) to coordinate their expected family contribution calculations, differences in schools' expected family contributions would be negligible. Instead, I find large differences in calculated expected family contributions across schools.

(99) Figure 13 illustrates my methodology by displaying the expected family contributions calculated by the four Defendants to which one particular student was admitted in the 2018–2019 academic year.[131] It shows significant variation in the expected family contributions calculated for this student by the four Defendants that admitted this student. The size of the spread between the largest and smallest calculated expected family contributions is greater than $25,000.

[131] I understand that the student's identity is masked and replaced by a unique anonymized identifier ("UID") to preserve the student's anonymity. *See* Declaration of R. Garrison Harvey, March 7, 2023. *See also* Appendix E.1 for some additional student-level examples.

**Figure 13: School-specific expected family contributions from the Defendants for UID_0000894185215, 2018–2019 academic year (dollars in 2024 prices)**




Sources: Corrected combined Defendant data; Federal Reserve Bank of St. Louis CPI data (as produced by Dr. Singer).
Note: Data are limited to Defendants where student UID_0000894185215 was admitted in the 2018–2019 academic year with an available school-specific expected family contribution.

(100) I next analyze whether my findings with respect to the expected family contribution calculations for this specific student hold true when analyzing other students who were cross-admitted to more than one Defendant. I find that the variation in expected family contribution calculations depicted in Figure 13 is not an outlier. Most students have materially different expected family contributions across Defendants when cross-admitted to multiple Defendants.

(101) Figure 14 depicts the percentage of students who were cross-admitted by two or more Defendants that received different expected family contributions using various tolerances. For example, the first bar shows that the Defendants calculated different expected family contributions for 99 percent of cross-admitted students.[132] The figure shows that the Defendants calculated expected family contributions with a difference greater than 5 percent for 86 percent of cross-admitted students and a difference greater than 20 percent for 56 percent of cross-admitted students. These results are not consistent with

[132] For this analysis and others that follow in Section 5.1, I use the absolute value of the pairwise difference in schools' expected family contribution calculations. This means that if a student was admitted to two Defendants, there is one comparison. If the student was admitted to three Defendants, there are three comparisons (*e.g.,* school A to school B, school B to school C, and school C to school A). If the student was admitted to four Defendants, there are six pairwise comparisons, and so on.

Defendants agreeing to a common financial aid methodology or the challenged conduct standardizing expected family contributions.

**Figure 14: Percentage of cross-admitted students who received different expected family contributions from the Defendants, 1998–1999 to 2022–2023 academic years**




Sources: Corrected combined Defendant data; IPEDS; Cornell cost of attendance data; Federal Reserve Bank of St. Louis CPI data (as produced by Dr. Singer).
Notes:
[1] Data are limited to students who were admitted to two or more Defendants with non-missing and non-zero school-specific expected family contributions.
[2] Data are restricted to the academic years during the conduct period for which each Defendant was a member of the 568 Group.
[3] Applicants for whom all expected family contributions exceed the cost of attendance are excluded from the analysis. I rely on IPEDS cost of attendance data to make this restriction, with the exception of Cornell. For Cornell, I rely on produced average cost of attendance data (CORNELL_LIT0000436889) that distinguishes between Cornell's endowed and contract colleges for New York residents.[133] *See* Section 3.3 for how cost of attendance is defined.

(102) Figure 15 depicts the average spread in expected family contribution for students who were admitted to two, three, four, and five or more Defendants. It shows that students who were admitted to two

[133] Some Cornell students pay lower tuition rates (*e.g.,* New York State residents matriculating at Cornell's contract colleges who pay in-state rates) that are not captured by IPEDS, which only reports the highest tuition rates (i.e., the tuition rates applicable to all students matriculating at Cornell's endowed colleges and students who are not New York State residents but matriculate at Cornell's New York State statutory colleges, or contract colleges). Before 2003, Cornell reported for purposes of IPEDS data separate metrics for its tuition (and thereby, cost of attendance) for its contract colleges. After 2003, a single metric is reported which overestimates the cost of attendance for New York State residents matriculating at Cornell's contract colleges, *see* my backup materials for a comparison of these metrics.

Defendants had an average spread between those expected family contribution calculations of $15,399. This spread increases to $21,773 for students admitted to three Defendants, $26,566 for students admitted to four Defendants, and $24,466 for students admitted to five or more Defendants.[134] These results are consistent with the Defendants using different methodologies for calculating expected family contribution—they are inconsistent with Plaintiffs' allegations that the consensus methodology guidelines led to standardized expected family contribution calculations.

[134] Students for whom only one Defendant calculated an expected family contribution have no spread since there is only one offer.

**Figure 15: Average expected family contribution spread across the Defendants to which students were admitted from 2003–2022 (dollars in 2024 prices)**




Sources: Corrected combined Defendant data; IPEDS; Cornell cost of attendance data; Federal Reserve Bank of St. Louis CPI data (as produced by Dr. Singer).
Notes:
[1] Expected family contribution spread is calculated as the difference of the maximum school-specific expected family contribution minus the minimum school-specific expected family contribution for an individual applicant. The expected family contribution is deflated using the CPI to 2024 prices.
[2] Data are limited to first-year applicants who were admitted to two or more Defendants with non-missing expected family contributions.
[3] Data are limited to academic years in which a Defendant was a member of the 568 Group, beginning with the introduction of the consensus methodology guidelines, which would potentially affect students matriculating in the 2003–2004 academic year.
[4] Applicants for whom all expected family contributions exceed the cost of attendance are excluded from the analysis. I rely on IPEDS cost of attendance data to make this restriction, with the exception of Cornell. For Cornell, I rely on produced average cost of attendance data that distinguish between Cornell's endowed and contract colleges for New York residents. *See* Section 3.3 for how cost of attendance is defined.
[5] Within the Defendant data from 2003–2022, 33,683 students with non-missing school-specific expected family contributions were admitted to two Defendants, 7,875 students were admitted to three Defendants, 1,996 students were admitted to four Defendants, and 656 students were admitted to five or more Defendants.

### 5.1.2. The introduction of the consensus methodology guidelines did not change the variation in the Defendants' expected family contribution calculations

(103) As discussed in Section 3.2.2, the 568 Group's consensus methodology guidelines could have first affected students matriculating in the 2003–2004 academic year.[135] If the Defendants standardized

[135] *See* Section 3.2.2.

(113) The 568 Group's consensus methodology guidelines state that they "should be viewed as the basis of an ongoing process to construct a need analysis system that will assure fair and equitable access to educational opportunity."[146] The guidelines were focused on numerous elements used to determine a student's family's ability to pay.[147] Nothing in the consensus methodology guidelines required schools to use these elements in a particular way or prohibited them from using other elements.[148] Member schools were free to adopt any suggested improvements to expected family contribution calculations reflected in the consensus methodology guidelines that they found useful and to ignore any that they did not, as well as to adopt other changes or modifications to their need analysis methodologies in areas unaddressed by the consensus methodology guidelines.[149]

(114) Ordinary-course documents and testimony are consistent with the 568 Group members using different methodologies to calculate applicants' expected family contributions. For example, an Emory document compares recommendations from the consensus methodology guidelines and highlights differences between the 568 need analysis recommendations and Emory's policies.[150] In a 2015 survey, schools were asked about their approach to various elements of the consensus methodology guidelines. For most questions, at least some of the responding schools reported deviating from the consensus methodology guidelines.[151] This is consistent with analyses performed by Dr. Long,[152] as well as testimony from the Defendants, including:

- James Tilton, Former Dean of Financial Aid, Brown University: "We did not use the consensus methodology when calculating [Brown's] institutional methodology."[153]

---

146 NULIT-0000000348 at -0350 (December 2016 568 Presidents Group Consensus Methodology Policy Guidelines).

147 An earlier version of the consensus methodology guidelines notes, "In developing its recommendations, the Subcommittee has focused on arriving at the 'right' approach to determining parental ability to pay, without regard to potential cost implications." "[I]t is important to note that the Subcommittee views its efforts as the beginning of a long-term process. Some of the issues identified in our paper require further exploration and analysis." "[T]his report to the Presidents should be viewed as an 'organic' document. While containing a number of quite specific recommendations for the implementation of a Consensus Approach, it is only the first step in an ongoing process to develop a need analysis system that seeks to assure fair and equitable access to educational opportunity." COFHE-02-00002603 at -2605–2608 (2001 document highlighting background and principles of 568 Group).

148 *See* Section 3.2.2. Furthermore, as discussed by Dr. Long, Dr. Singer fails to present compelling evidence that the Defendants were bound by the consensus methodology guidelines. Long Report, § IV.B.

149 *See* Section 3.2.2. As described by Dr. Long, the consensus methodology guidelines were incomplete or left many decisions to the professional judgment of financial aid officers at 568 Group schools. As an example, the 568 Group did not come to consensus on how to treat retirement allowances, how to assess the income of non-custodial parents, and other aspects of need analysis. Long Report, §§ III.D and IV.A.

150 Emory_568Lit_0004292 (Comparison of 568 need analysis recommendations and Emory policies).

151 CORNELL_LIT0000252669 at -2678–2696 (January 2015 presentation titled "Results of Consensus Methodology Questionnaire").

152 Long Report, § IV.B.

153 Deposition of James Tilton, May 15, 2023, 59:13–19. In a 2006 Memorandum of Understanding, Brown also states that by participating in the Presidents Group, it "is not committing or binding itself to use any common principles of analysis for determining need based aid for its students; shall be free to use or not use common principles of analysis/methodologies; and may at its discretion use, adopt and/or administer other principles, polices and methodologies in determining need based aid for its students." BROWN_0000078665 at -8665 (Brown 2006 memorandum of understanding, 568 Group).

- Malina Chang, Director of Student Financial Aid, Caltech: "Q: Do you know whether Caltech changed any of the components of its IM approach after joining the 568 Group? A: It did not. Q: And can you recall whether anyone at Caltech ever compared how its IM formula compared to the consensus methodology that the 568 Group had identified? A: It did not. Q: Meaning, you don't know if anyone at Caltech ever did such a comparison? A: I was the only one around. . . . When we joined 568, I was, basically, the one around in the financial office, and I did not do any comparisons with the needs analysis of Caltech and CM. I knew very little of CM, in fact."[154]
- Michael Hall, Executive Director of Financial Aid, Columbia: "Q: And so the idea was to arrive at some sort of consensus methodology for determining the financial needs of families whose children were applying for admission to schools? . . . . A: That was -- while I was on the Committee, that never seemed to be the goal. It seemed to certainly be around best practices, but, even at Columbia, we weren't always following what the consensus methodology said to the letter, anyway."[155]
- Diane Corbett, Former Executive Director of Financial Aid, Cornell: "Q: Okay. What if we ask it like this: From the interaction you had with 568, do you agree that they work toward consistent treatment of families and the elimination of divergent results? A: I cannot speak to what 568 was working toward. My understanding was there were best practices that we at Cornell could choose to adopt or not as we developed our own methodology for need analysis to meet the needs of our students."[156]
- Karl Furstenberg, Dean of Admissions and Financial Aid, Dartmouth College: "Q: Did Dartmouth adopt any part of the [consensus methodology]? A: Not that I'm aware of. No."[157]
- Miranda McCall, Director of Financial Aid, Duke: "Q: And prior to the last year, you would have had no idea how the consensus methodology compared to the Duke [institutional methodology]? A: Correct."[158]
- Tom McDermott, Associate Vice President of Financial Aid, Johns Hopkins University: "I recall of one of the meetings that I attended as a guest, someone, and I can't even recall who, who was convening the discussion, asked for a show of hands of how many institutions were, in fact, using consensus methodology as it was defined. And my recollection was that no one raised their hand."[159]

---

[154] Deposition of Malina Chang, September 13, 2023, 65:12–66:8.
[155] Deposition of Michael Hall, September 13, 2023, 54:12–24.
[156] Deposition of Diane Corbett, January 8, 2024, 110:16–111:3 (objection omitted).
[157] Deposition of Karl Furstenberg, July 14, 2023, 97:15–16.
[158] Deposition of Miranda McCall, August 29, 2023, 76:13–16.
[159] Deposition of Thomas McDermott, August 18, 2023, 90:23–91:14.

- Leslie Bridson, Director of Student Financial Services, Massachusetts Institute of Technology: "[T]here was no agreement to use anything. We could use what we wanted and not use what we did not want to use."[160]
- Mary Nucciarone, Dean of Financial Aid, Notre Dame: "Q: To the extent there were similarities between Notre Dame's institutional methodology and the suggestions reflected in the 568 consensus methodology guidelines, were any of those similarities, in your view, a result of any obligation that Notre Dame had to follow or adhere to the 568 suggestions? . . . . A. I personally . . . . did not interpret anything about those 568 guidelines as mandatory . . . . [E]ach school decided which of the tools that were in that manual were appropriate to our institution, and how would we apply those to the methodology that we were using on our campus."[161]
- Elaine Varas, Director of Financial Aid, Penn: "While we were in 568, from the point that I had participate -- that I had begun to participate, we were not following all of the consensus methodology components. And we were, in fact, using our own Penn institutional methodology in many cases."[162]
- Anne Walker, Former Assistant Vice President and Executive Director of University Financial Aid Services, Rice: "We did not follow all of the consensus methodology. I was told by my predecessor that Rice would not support every element of the consensus methodology. And, for example, the home equity was one example that I used."[163]
- Brent Tener, Executive Director of Financial Aid, Vanderbilt University: "I would classify the information put together as an examination of best practices. You know, what are things that schools can review? And, again, Vanderbilt always -- you know, with regard to, you know, the professional judgment section, you know, and elements of the consensus methodology, we would develop our own procedures that we ultimately followed."[164]
- Scott Wallace-Juedes, Former Director of Undergraduate Financial Aid, Yale University, "Q: And my question is, why does that make it more fair if – why is it important for all the – for institutions or group of institutions to do it the same way? Why can't Yale do it its way, Cornell do it its way, and MIT do it its way? A: I think that each of those schools do do it their own way. There are some common principles that can be shared. The group has a lot of expertise in terms of working with students, with families, with creating a space where students that haven't typically been represented on our campuses because of finance are able to do so. That includes everything from low-income students to middle-income students and however you want to parse

[160] Deposition of Leslie Bridson, July 13, 2023, 49:9–15.
[161] Deposition of Mary Nucciarone, November 1, 2023, 325:17–326:14.
[162] Deposition of Elaine Varas, August 2, 2023, 138:3–11.
[163] Deposition of Anne Walker, September 8, 2023, 147:12–17.
[164] Deposition of Brent Tener, July 12, 2023, 76:9–23.

that. So it's not – from my experience, it was not about doing it the exact same way. It's about learning how and agreeing on factors in the need analysis that can best support students."[165]

## 5.2. The Defendants' net price offers did not become more similar upon joining the 568 Group and the variation in net price did not change upon exiting the 568 Group

(115) In this section I analyze the net prices that the Defendants offered to prospective students.[166] First, in Section 5.2.1, I examine the net prices the Defendants offered students who were admitted to multiple Defendants. I find that the Defendants frequently offered significantly different net prices to the same students. Further, I find that the Defendants often offered significantly different average net prices to students with very similar expected family contribution calculations. I conclude that the large variation in offered net prices (for the same student) is driven by both differences in expected family contribution calculations and other factors such as financial aid packaging.

(116) Second, in Section 5.2.2, I test whether the variation across the Defendants in offered net prices (for the same student) decreased after the introduction of the consensus methodology guidelines. I find that it did not. Third, I show in Section 5.2.3 that exiting the 568 Group did not change the variation in offered net prices. Finally, as detailed in Section 5.2.4, I find that the qualitative evidence is consistent with my empirical findings and inconsistent with the Defendants colluding to standardize their methodologies for calculating net prices.

(117) Collectively, this evidence is consistent with the Defendants independently setting the net prices that they offer to students. It is inconsistent with a claim that the Defendants adopted a methodology for determining student financial aid that resulted in more standardized net prices.[167]

### 5.2.1. The Defendants offered different net prices to the same students

(118) In this section, I present evidence that the Defendants typically offered the same students significantly different net prices. This evidence is inconsistent with a cartel in which cartel members offer the

[165] Deposition of Scott Wallace-Juedes, July 7, 2023, 152:21–153:17.

[166] As discussed in Section 3.1 above, net prices are the standard way to calculate the price students pay for higher education. Further, as I previously noted, examining net prices can be informative as to whether the challenged conduct occurred: if net prices did not become more standardized over time, it implies either that there was no attempt to standardize expected family contributions or that any attempt to standardize expected family contributions was not successful.

[167] As noted in Section 3.3, Dr. Singer performs analyses using the effective institutional price. This differs from the net price analyzed in this section in that effective institutional price does not include non-need-based institutional grants, nor grants that a student receives from government and outside sources. In Appendix E.3, I present versions of the analyses in this section analyzing effective institutional price. The appendix figures show that the conclusions from my analyses do not change when analyzing effective institutional price.

(120) The variation in net prices offered to the student in the previous figure is not an isolated incident. Figure 20 depicts the percentage of students who were cross-admitted by at least two Defendants and received different offered net prices using various tolerances.[170] For example, the first bar shows that the Defendants offered different net prices for all cross-admitted students. The figure also shows that the Defendants offered net prices with a difference greater than 5 percent for 86 percent of cross-admitted students, a difference greater than 10 percent for 77 percent of cross-admitted students, and a difference greater than 20 percent for 64 percent of cross-admitted students. These differences are not consistent with the Defendants using the 568 Group consensus methodology guidelines to standardize offered net prices.

**Figure 20: Percentage of cross-admitted students who received different offered net prices from the Defendants, 1998–1999 to 2022–2023 academic years (dollars in 2024 prices)**




Sources: Corrected combined Defendant data; IPEDS; Cornell cost of attendance data; Federal Reserve Bank of St. Louis CPI data (as produced by Dr. Singer).
Notes:
[1] Data are limited to students who were admitted to two or more Defendants with non-missing and non-zero net price offers.
[2] Data are restricted to the academic years during the conduct period for which each Defendant was a member of the 568 Group. Net prices are deflated using the CPI to 2024 prices.
[3] Applicants for whom all expected family contributions exceed the cost of attendance are excluded from the analysis. I rely on IPEDS cost of attendance data to make this restriction, with the exception of Cornell. For Cornell, I rely on produced average cost of attendance data that distinguish between Cornell's endowed and contract colleges for New York residents. *See* Section 3.3 for how cost of attendance is defined.

170 As in the previous section, I compare variance in net prices by making pairwise comparisons across Defendants.

**Figure 21: Average net price spread across the Defendants to which students were admitted, 2003–2022 (dollars in 2024 prices)**




Sources: Corrected combined Defendant data; IPEDS; Cornell cost of attendance data; Federal Reserve Bank of St. Louis CPI data (as produced by Dr. Singer).
Notes:
[1] Net price is calculated as the average cost of attendance minus all grants and scholarships received. IPEDS cost of attendance data are used for the net price calculation, with the exception of Cornell. For Cornell, I rely on produced average cost of attendance data that distinguish between Cornell's endowed and contract colleges for New York residents.
[2] Spread is calculated as the maximum net price minus the minimum net price for an individual applicant. Net prices are deflated using the CPI to 2024 prices.
[3] Data are limited to first-year applicants who were admitted to two or more Defendants with non-missing grant and scholarship information.
[4] Data are limited to academic years in which a Defendant was a member of the 568 Group, beginning with the introduction of the consensus methodology guidelines, which would potentially affect students matriculating in the 2003–2004 academic year.
[5] Applicants for whom all expected family contributions exceed the cost of attendance are excluded from the analysis. I rely on IPEDS cost of attendance data to make this restriction, with the exception of Cornell. *See* Section 3.3 for how cost of attendance is defined.
[6] Within the Defendant data from 2003–2022, 32,082 students with non-missing net price offers admitted to two Defendants, 7,461 students were admitted to three Defendants, 1,849 students were admitted to four Defendants, and 612 students were admitted to five or more Defendants.

(122) Conceptually, there are two potential reasons why one might observe considerable variation in net prices offered to the same students: (1) variation in expected family contribution calculations and (2) different financial aid packaging policies. To disentangle these explanations, Figure 22 examines whether the Defendants offered substantially the same net price to groups of students with the same expected family contribution in a given year. Groups of students are defined as having the same

expected family contribution in a year if their expected family contributions are in the same $100 bucket in that year.[171]

(123) Figure 22 summarizes for each Defendant, for each year it was a member of the 568 Group, the average difference in its net price offers from the average net price offers of other Defendants for students with the same expected family contribution.[172] The figure only compares the Defendants to the other Defendants that were in the 568 Group in the year in question. The dark blue bars depict the average variation in net price offers between each Defendant and all other Defendants for students with the same expected family contribution in the same year, and the light blue bar on the far left-hand side of the figure shows the average difference across all Defendants.

(124) The results demonstrate that the Defendants made substantially different offers to students with the same expected family contribution. Net prices, on average, differ by approximately $7,000 across the Defendants for students with the same expected family contribution. Each school's net price for students with the same expected family contribution, on average, is at least $5,500 different from other schools. These results show that the variation in net prices is not just due to the variation in expected family contribution calculations (which I show in Section 5.1) but also due to variation in packaging policies across the Defendants.

[171] I assign students to groups based on $100 expected family contribution increments. For example, students with expected family contributions in the range of $9,901 and $10,000 are analyzed as a group.

[172] I also perform a version of this analysis in which I only compare net price offers made to students who received net price offers from and had similar expected family contributions (within $100) at multiple Defendants. While the analysis described in the text compares average net prices for *all* students that had similar expected family contributions, this robustness check compares net price offers made to individual students who were cross-admitted to different Defendants with the same expected family contributions at those Defendants. This allows me to control for potential differences among individual students' circumstances. The sample size for this analysis is significantly lower, but the aggregate findings are the same as those reported in Appendix 9.3.E.2.

**Figure 22: Average net price spread at the Defendants among students with the same calculated expected family contribution, 1998–2023 (dollars in 2024 prices)**




Sources: Corrected combined Defendant data; IPEDS; Cornell cost of attendance data; Federal Reserve Bank of St. Louis CPI data (as produced by Dr. Singer).
Notes:
[1] Net price is calculated as the average cost of attendance minus all grants and scholarships received. Net prices are deflated using the CPI to 2024 prices.
[2] IPEDS cost of attendance data are used for the net price calculation. The exception is Cornell, for which I rely on produced average cost of attendance data that distinguish between Cornell's endowed and contract colleges for New York residents. *See* Section 3.3 for how cost of attendance is defined.
[3] For each Defendant, average net price relative to other Defendant 568 Group members is calculated as the average difference between the net price offered to students by that Defendant and the net price offered to students with the same expected family contribution by all other Defendants that were members of the 568 Group in that same year.
[4] This analysis excludes students whose expected family contribution or net price of attendance exceeds cost of attendance, students for whom expected family contribution or cost of attendance is equal to zero, and students for whom net price is less than $1,000 or greater than $100,000.

### 5.2.2. The introduction of the consensus methodology guidelines did not reduce the variation in the Defendants' net prices

(125) In this section, I analyze the impact of 568 Group entry on variation in offered net prices for the same student across the Defendants for whom data are available.[173] For Brown, Columbia, Dartmouth, Duke, Northwestern, Penn, U-Chicago, and Yale, I analyze the impact of the introduction of the consensus methodology guidelines on variation in offered net price. I also analyze the impact of late

[173] The schools with available data are Brown, Caltech, Columbia, Dartmouth, Duke, Northwestern, Penn, Rice, U-Chicago, and Yale.

**Figure 25: Average variation in school-specific offered net price estimates, 568 Group exit (dollars in 2024 prices)**




Sources: Corrected combined Defendant data; IPEDS; Cornell cost of attendance data; Federal Reserve Bank of St. Louis CPI data (as produced by Dr. Singer).
Notes:
[1] This figure is limited to the six Defendants that exited the 568 Group and produced three years of post-exit data (Brown, Emory, Penn, Rice, U-Chicago, and Yale's first exit). Vanderbilt's exit is excluded, as its 2023–2024 data are incomplete, resulting in less than three years of post-exit data to analyze. Duke's exit is not included, as there are not three years of post-exit data to analyze. *See* Section 3.2.3 for a full list of Defendant exit dates.
[2] Net price is calculated as the cost of attendance minus all grants and scholarships received in the school-specific aid package. IPEDS cost of attendance data are used for the net price calculation, with the exception of Cornell. For Cornell, I rely on produced average cost of attendance data that distinguish between Cornell's endowed and contract colleges for New York residents. Net prices are deflated using the CPI to 2024 prices.
[3] For each entrant, I limit the set of Defendants for which I compare expected family contributions to those for whom data are available for the entire seven-year period being analyzed.
[4] Data are limited to first-year applicants who were admitted to two or more Defendants with available grant and scholarship information.
[5] Applicants for whom all expected family contributions exceed cost of attendance are excluded from the analysis. I rely on IPEDS cost of attendance data to make this restriction, with the exception of Cornell. *See* Section 3.3 for how cost of attendance is defined.

### 5.2.4. Qualitative evidence is consistent with the Defendants calculating net prices differently

(131) Ordinary course documents produced by the Defendants are consistent with my empirical analyses that the Defendants offered different net prices. The Defendants compete with other Defendants and peer schools to attract students. One major source of competition is in their use of financial aid

packages to facilitate enrollment.[181] For example, a 2021 email from MIT's Director of Student Financial Services states, "Protected discussions within the [568] group is limited to only using common principles of need analysis. Prospective discussions on how to meet that need (packaging, such as loans vs. grants) . . . . should not be allowed."[182]

(132) Documents from other Defendants also highlight that they compete for students and that financial aid is one mechanism for doing so:

- Georgetown: A 2015 Briefing Book from Georgetown's Office of Student Financial Services describes the creation of the Georgetown Scholarship Program in 2004, which was a response to Georgetown "losing students . . . . to those schools who were offering reduced or no loans, or offering a more competitive aid package."[183] The Georgetown Scholarship Program raises millions of dollars a year to fund financial aid and other programming initiatives for lower-income students.[184]
- MIT: In a 2015 presentation by MIT's Admissions and Student Financial Services group, the slides note that differences in net prices "effects [MIT's] competitive position," and that "[e]nhancing our competitive position will require a multifaceted approach, including financial aid enhancements." Subsequent slides identify three such enhancements.[185]
- Notre Dame: In a 2013 email chain about student enrollment, Notre Dame's Director of Admissions states that setting "enrollment goals without some effort to enhance financial aid seems to seek different results without changing our behavior." He discusses "competitors who are offering no-loan packages," reassessing the family contribution percentage ("our family contribution is 17% of income, while many of our peers have a 10% cap"), and moving up financial aid notification dates to allow "for more time for [Notre Dame] to engage those families who have significant questions."[186]
- Penn: In a 2013 presentation named "Competitor Profiles 4.4.13," the slides contain descriptions of Penn's competitors' financial aid policies, comparisons of net prices between Penn and those schools, as well as win-loss percentages.[187]

---

[181] The 568 Group actually expected members to apply different packaging policies, and members adopted a wide range of packaging policies. Long Report, § IV.E.

[182] MITLIT-000002121 at -2122 (2021 MIT email exchange).

[183] GTWNU_0000107168 at -7219 (Georgetown Office of Student Financial Services, 2015, describes program implemented to replace loans with grants).

[184] GTWNU_0000107168 at -7219–7227 (Georgetown Office of Student Financial Services, 2015, describes program implemented to replace loans with grants).

[185] MITLIT-000180316, at -0317 and -0338 (2015 Presentation to Deans Group).

[186] ND_0158341 at -8343 (2013 email chain about Notre Dame student enrollment).

[187] PENN568-LIT-00167414 (2013 Penn presentation named "Competitor Profiles 4.4.13").

- Emory: A document prepared by Emory's Dean of Admissions states, "It is the case that the more we offer in financial aid (whether need- or merit-based) the higher our yield will be on admitted students . . . . Emory clearly does need to revisit its pricing structure (i.e. financial aid resources and aid packaging methodology), so that it competes better."[188]
- Dartmouth: A 2014 "Financial Aid Office Self-Study" states, "Competitive financial aid programs and attractive financial aid packages play major roles in determining where students will attend college. Over the years Dartmouth has launched several financial aid initiatives to ensure that the College remains competitive."[189]

---

[188] Emory_568Lit_0058886 (Sept. 2014 Emory internal memo on "Financial Aid and Undergraduate Admissions Competitiveness").

[189] DARTMOUTH_0000003665 at -3676 (2014 Dartmouth "Financial Aid Office Self-Study").

**ATTORNEYS' EYES ONLY – SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS individually and on behalf of all others similarly situated,

*Plaintiffs*,

v.

BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,

*Defendants.*

Case No. 22-cv-00125

# EXPERT REPORT OF LAUREN J. STIROH, PH.D.

**August 7, 2024**

information and/or request further review of financial aid awards and virtually all successful appeals resulted in the requesting students receiving larger aid awards.

### 2. Financial Aid Packages

50. A financial aid package includes the total amount of financial aid that a student is offered from federal and non-federal (*i.e.*, state, private, and institutional) sources.[156] A financial aid package may consist of grants, loans, and/or work-study.[157]

51. Grants are categories of aid that do not need to be paid back by the student and are often referred to as "gift aid."[158] Grants are generally awarded based on financial need, but gift aid can also be awarded based on merit.[159] Gift aid can be funded by the federal and state governments and other private organizations but, in the case of Defendants, is mainly distributed by the schools themselves. For example, federal grants include Pell Grants, which are awarded to students with "exceptional financial need."[160] State grants are often provided for residents that attend college in their state.[161] All Defendants offer institutional need-based gift aid and certain Defendants also offer merit-based gift aid, which can be based on academics, athletics, or other talents and activities.[162]

52. The other broad category of financial aid is referred to as "self-help aid," which encompasses both student loans and work-study awards.[163] Loans are a category of financial aid that the student and/or their family must pay back upon finishing school.[164]

---

Student Financial Services, "Financial Aid Appeals," available at https://sfs mit.edu/undergraduate-students/our-approach-to-aid/financial-aid-appeals; University of Notre Dame Office of Financial Aid, "Change in Circumstances," available at https://financialaid nd.edu/policies/change-in-circumstances; University of Pennsylvania Student Registration & Financial Services, "Application for Reevaluation," available at https://srfs.upenn.edu/sites/default/files/publisher/Reevaluation-Application-2024-2025.pdf.

156 U.S. Department of Education, "What Is a Financial Aid Package?," available at https://studentaid.gov/help-center/answers/article/what-is-financial-aid-package.

157 SoFi, "Gift Aid vs Self Help Aid for College," August 1, 2023, available at https://www.sofi.com/learn/content/gift-aid-vs-self-help-aid.

158 The College Board, "Parents Guide to Getting Financial Aid," updated June 12, 2023, available at https://blog.collegeboard.org/parents-guide-getting-financial-aid; SoFi, "Gift Aid vs Self Help Aid for College," August 1, 2023, available at https://www.sofi.com/learn/content/gift-aid-vs-self-help-aid.

159 Varonika Ware, Scholarships360, "Merit-Based vs. Need-Based Aid: Everything You Need to Know," April 16, 2024, available at https://scholarships360.org/financial-aid/merit-based-scholarships-meaning.

160 U.S. Department of Education, "Federal Pell Grants," available at https://studentaid.gov/understand-aid/types/grants/pell.

161 *See*, *e.g.*, College for All Texans, "Toward EXcellence, Access, and Success Grant Program (TEXAS Grant)," available at http://www.collegeforalltexans.com/apps/financialaid/tofa2.cfm?ID=458; California Student Aid Commission, "Cal Grant Programs," available at https://www.csac.ca.gov/cal-grants.

162 *See* **Exhibit 3**. Varonika Ware, Scholarships360, "Merit-Based vs. Need-Based Aid: Everything You Need to Know," April 16, 2024, available at https://scholarships360.org/financial-aid/merit-based-scholarships-meaning.

163 SoFi, "Gift Aid vs Self Help Aid for College," August 1, 2023, available at https://www.sofi.com/learn/content/gift-aid-vs-self-help-aid.

164 SoFi, "Gift Aid vs Self Help Aid for College," August 1, 2023, available at https://www.sofi.com/learn/content/gift-aid-vs-self-help-aid.

Students can access federal student loans from the U.S. Department of Education.[165] As discussed below, certain Defendants are committed to offering financial aid packages that do not include loans, and these "no-loan" policies have been adopted heterogeneously by Defendants over the relevant time period.[166] Work-study is another form of self-help aid that is often included in student financial aid packages.[167] Work-study awards offer students employment in exchange for funds that go towards the student's cost of attendance.[168]

53. Aid packages vary by school and student, and as a result, identical EFCs do not necessarily lead to identical aid packages and net prices. For instance, some Defendants currently do not offer loans in their financial aid packages while others do, resulting in different net prices even for students with the same EFC.

### 3. Net Price of Attendance

54. The net price of attendance is typically calculated as the cost of attendance less gift aid.[169] Loans and work-study are typically not subtracted from the cost of attendance when calculating net price, as these are types of self-help aid that are paid back by the student or their family through loan payments or through employment efforts.[170] The gift aid used in net price calculations typically includes institutional gift aid as well as federal, state, and other gift aid, but Dr. Singer chooses to use exclusively institutional gift aid in his calculation of Effective Institutional Price, as shown in **Figure 3.1** below.

---

165 Students can also receive loans from private lenders, but these often come with higher interest rates. U.S. Department of Education, "Loans," available at https://studentaid.gov/understand-aid/types/loans; Finaid, "Private Student Loans," available at https://finaid.org/loans/privatestudentloans.

166 Jill A. Chafin and Andrew Pentis, Lending Tree, "56 'No Loan Colleges' to Help You Avoid Student Debt," January 11, 2023, available at https://www.lendingtree.com/student/colleges-no-student-loans-policy.

167 SoFi, "Gift Aid vs Self Help Aid for College," August 1, 2023, available at https://www.sofi.com/learn/content/gift-aid-vs-self-help-aid.

168 *See*, *e.g.*, University of Pennsylvania Student Registration & Financial Services, "Work-Study," available at https://srfs.upenn.edu/financial-aid/work-study; Georgetown University Office of Student Financial Services, "Student Employment & Work-Study," available at https://finaid.georgetown.edu/financial-resources/student-employment.

169 U.S. Department of Education, "What Is Net Price or Out-of-Pocket Cost?," available at https://studentaid.gov/help-center/answers/article/what-is-out-of-pocket-cost; The College Board, "9 Things You Need to Know about Net Price," available at https://bigfuture.collegeboard.org/pay-for-college/calculate-your-cost/net-price/9-things-you-need-to-know-about-net-price; Taylor Freitas, Bankrate, "What Is Net Price for College?," February 10, 2023, available at https://www.bankrate.com/loans/student-loans/net-price-college.

170 The College Board, "9 Things You Need to Know About Net Price," available at https://bigfuture.collegeboard.org/pay-for-college/calculate-your-cost/net-price/9-things-you-need-to-know-about-net-price.

members to pay higher net prices than they otherwise would have. There is no economic basis from which to assert what principles would have been adopted absent the alleged agreement, much less that any alternative principles would result in more favorable outcomes for all or substantially all members of the proposed Class. Dr. Singer provides no economic link between this set of Core Principles and his assertions of common impact.

85. It is instructive to consider the economic implications of the Core Principles, and, more specifically, whether an absence of agreement on these principles would be expected to result in changes to financial aid approaches which would benefit all or substantially all proposed Class members:

1) The first principle states that "parents and students have the primary responsibility to contribute to educational expenses before an institution awards financial aid."[218] This principle was observed by Defendant schools prior to their entry into the alleged agreement and is also held among 568 Group member- and non-member-schools alike.[219] Thus, it is likely that schools would independently adopt this philosophy, and there would be no economic impact of the alleged agreement. Plaintiffs do not provide a theory or explanation for what principle would prevail absent this first principle, what changes to financial aid systems might stem from any hypothesized alternative principle or the absence of this principle entirely, and why such changes would benefit all or substantially all proposed Class members. Defendant schools already cover the majority of the cost of attendance for many proposed Class members.[220]

2) The second principle relates to horizontal equity, or the idea that families with similar financial circumstances should receive similar financial aid awards from a given school.[221] This principle was observed by Defendant schools and others well before the 568 Group came into existence, so there is no reason to believe Defendants would have abandoned it absent the Challenged

---

218 Singer Amended Report, ¶ 149.

219 *See, e.g.*, Cooper (Stanford) Deposition, 197:21-198:12, 201:15-202:5, 205:22-206:3; Donahue (Harvard) Deposition, 235:11-236:5; Meade (College Board) Deposition, 48:12-49:6, 280:15-282:12; Caltech Financial Aid, "Principles of Needs Analysis," archived February 25, 2019, at the Wayback Machine, available at https://web.archive.org/web/20190225181139/https://www finaid.caltech.edu/howitworks/principles; Defendant California Institute of Technology's Responses and Objections to Plaintiffs' Second Set of Interrogatories on All Defendants, *Henry, et al. v. Brown University, et al.*, Case No. 1:22-cv-00125, United States District Court, Northern District of Illinois, Eastern Division, November 6, 2023, p. 23; Meade (College Board) Deposition, Exhibit 34 (Allan M. Cartter, "New Approaches to Student Financial Aid: Report of the Panel on Student Financial Need Analysis," College Entrance Examination Board (1971)), pp. 20-22 (stating the financial aid community's "common assumptions" as far back as the 1950s included that "[f]amilies were expected to be the first source of support for their children in college," and that parents and students "are expected to contribute according to their means [and] from their own assets and earnings.")

220 *See* **Figure 7.1.**

221 Singer Amended Report, ¶¶ 149-150. Caltech Financial Aid, "Principles of Need Analysis," available at https://www finaid.caltech.edu/howitworks/principles.

Conduct.[222] Even assuming the absence of the Challenged Conduct would have led Defendants not to adhere to this principle, Plaintiffs offer no theory by which all or substantially all members of the proposed Class would benefit. Without such a principle, a school's but-for financial aid approach would not prioritize awarding the same or similar financial aid to two students with similar financial profiles. An obvious corollary is that removing this principle would have inconsistent impact on financial aid packages across the proposed Class—some members might benefit, but others would be worse off, and still others would be unaffected.

3) The third principle puts forth that income and assets should both be "part of the assessment of parents' and applicants' ability to pay."[223] Again, I understand that this principle has been widely held throughout the industry generally and among Defendants specifically since well before the advent of the 568 Group, so there is no reason to believe Defendants would not have adhered to it in the absence of the Challenged Conduct.[224] And even if they did not, in a but-for world in which Defendants did not use students' and their families' income and assets together to assess need and award financial aid, it does not follow that all students would benefit from whatever principle was instead followed by Defendant schools. For instance, if only income were assessed, this would favor students whose families had low income relative to their assets; conversely, if only assets were assessed, this would favor students whose families were less asset-rich relative to their income. If neither income nor assets were evaluated at all (*e.g.*, if merit-based aid became the primary form of aid, or some other proxy for financial need were used), then, for the reasons discussed below, this change would not be expected to benefit all or substantially all members of the proposed Class. Moreover, the assessment of both income and assets would not necessarily lead to schools evaluating those

222 *See, e.g.*, Meade (College Board) Deposition, 184:11-185:22, 284:4-19; The College Board CSS Financial Aid Profile Users' Guide, 2003–2004 School Year, CBD000001-279 at 011 (endorsing the principle that "[t]o ensure equity, a recognized standard need analysis formula should be applied consistently across the institution's full population of student financial aid applicants," and the principle that "[a]n equitable need analysis system expects families in similar circumstances to make similar contributions. An equitable need analysis system expects families with different circumstances to contribute appropriately different amounts"); Meade (College Board) Deposition, Exhibit 34 (Allan M. Cartter, "New Approaches to Student Financial Aid: Report of the Panel on Student Financial Need Analysis," College Entrance Examination Board (1971)), p. 62 (stating in 1971 that the Panel on Student Financial Need Analysis's "concern has been with improving the fairness of the present CSS system by achieving greater equity in the required contribution from families who have equal resources, and with providing a better basis for applying the widely accepted principle of ability-to-pay in determining the relative contribution expected from families of unequal resources.").

223 Singer Amended Report, ¶ 149.

224 *See, e.g.*, Meade (College Board) Deposition, 167:8-168:21; Meade (College Board) Deposition, Exhibit 34 (Allan M. Cartter, "New Approaches to Student Financial Aid: Report of the Panel on Student Financial Need Analysis," College Entrance Examination Board (1971)), pp. 20, 22 ("Family assets and income, as well as any unusual problems, were taken into account." … "Parents are expected to contribute according to their means, taking into account their income, assets, number of dependents and other relevant information."); The College Board CSS Financial Aid Profile Users' Guide, 2003–2004 School Year, CBD000001-279 at 011 ("A need analysis system should provide a comprehensive measurement of family financial strength. Both income and assets contribute to the family's financial strength and both should be considered when measuring any family's ability to pay.").

parameters in a consistent manner that affects all students in the same direction.

4) The fourth principle relates to informing applicants about the EFC calculation process and the awarding of need-based aid and carrying out policies consistently across all years that the student attends the school.[225] Again, I understand that this principle of honesty and transparency in the administration of need-based financial aid has long been widely held both by Defendants and by the broader financial aid community, so it is not plausible that absent the Challenged Conduct, Defendants would not have adopted it.[226] In any event, there is simply no economic logic to support a conclusion that adoption of such a principle would harm students, much less all or substantially all students in the proposed Class. To the contrary, emphasizing transparency and consistency may benefit many students, including by ensuring generous policies continue even at times of fiscal hardship. For example, I am not aware of any Defendant that changed its financial aid policies in ways harmful to students during the COVID-19 pandemic and many changed their policies in favorable ways.[227] In a but-for world in which Defendants did not adopt this principle, such benefits could evaporate, and it is therefore reasonable to infer that some students would be worse off.

5) The fifth principle relates to clearly communicating information about how non-need-based aid is awarded, if at all.[228] As with the previous principle, there is no economic theory that supports the notion that clearly communicating information to students would lead to anticompetitive harm. To the extent that this principle is alleged to be an important, underlying component of the alleged agreement on the primacy of need-based aid, an agreement to prioritize need-based aid would not have resulted in common impact, as explained below in **Section V.A.2**.

6) The sixth principle relates to the use of professional judgment in assessing EFCs.[229] I discuss professional judgment in **Section V.A.3** and explain why the supposed agreement to limit the use of professional judgment would not cause harm to all or substantially all proposed Class members.

---

225 Singer Amended Report, ¶ 149.

226 *See, e.g.*, The College Board CSS Financial Aid Profile Users' Guide, 2003–2004 School Year, CBD000001-279 at 010, 012 ("The institution has an obligation to provide high quality consumer information to students and their families, fully disclosing realistic educational costs and aid renewal policies at the time of the initial offer of assistance." … "Each institution has a responsibility to disclose information about the policies and practices it applies in measuring family ability to pay.").

227 Emory News Center, "EmoryTogether Fund Provides Financial Support for Students Affected by COVID-19," March 25, 2020, available at https://news.emory.edu/stories/2020/03/coronavirus_emorytogether_fund/index html; Duke Office of the President, "Announcing Three New COVID-19 Relief Funds," available at https://president.duke.edu/announcing-three-new-covid-19-relief-funds.

228 Singer Amended Report, ¶ 149.

229 Singer Amended Report, ¶ 149.

90. Merit-based aid is aid awarded based on a student's talents and abilities.[232] No economic logic supports an inference that all or substantially all proposed Class members—students who received need-based financial aid from Defendant schools because of their financial circumstances—would benefit from a change in emphasis to more merit-based aid being awarded based on individual talents and abilities. Indeed, economic logic suggests that some proposed Class members would have been worse off in a but-for world in which Defendants did not prioritize need-based aid over merit aid.

91. For a purported agreement to prioritize need-based aid over merit-based aid to have common impact, it must be that in a but-for world without such an agreement: (1) all Defendants would have offered more merit-based aid than they actually did, (2) this additional merit-based aid would have gone to all or substantially all members of the proposed Class, and (3) there would be no offsetting changes in the amount of need-based aid offered that would leave any proposed Class members with less aid overall. There is no economic basis to think that any of these necessary outcomes would have occurred but for the conduct at issue.

92. First, the primacy of need-based aid was a foundational principle of financial aid long before the advent of the 568 Group;[233] many of the Defendant schools did not offer merit aid before, during, or after their involvement with the 568 Group.[234] Plaintiffs offer no reason to suppose that Defendants would not have followed the principle on the primacy of need-based aid absent the Challenged Conduct. Second, had any Defendants made merit-based aid the primary form of financial aid or increased the proportion of financial aid awarded on the basis of merit, there would be variation in the impact of such a change across the proposed Class. By definition, awarding merit-based aid requires schools to select certain students over their peers on the basis of academic merit, athletic merit, or other qualities valued by schools.[235] It stands to reason that many proposed Class members would not have received merit aid in the but-for world and thus are not adversely affected by this aspect of the Challenged Conduct There is no way to identify, with information and methods common to the proposed Class, which supposed Class

---

232 The Princeton Review, "Need-Based Aid vs. Merit-Based Aid," available at https://www.princetonreview.com/college-advice/need-based-merit-based. Dr. Singer opines that "[a]warding merit aid is not in line" with the first and second principles. Singer Amended Report, ¶¶ 151-152.

233 *See, e.g.*, Meade (College Board) Deposition, Exhibit 34 (Allan M. Cartter, "New Approaches to Student Financial Aid: Report of the Panel on Student Financial Need Analysis," College Entrance Examination Board (1971)), pp. 21-22 (observing that in 1970, the Board of Trustees for the College Board (then known as CEEB) approved principles of financial aid, the first of which was that "The purpose of any financial aid program—institutional, governmental or private—should be to provide monetary assistance to students who can benefit from further education but who cannot do so without such assistance. The primary purpose of a collegiate financial aid program should be to provide financial assistance to accepted students who, without such aid, would be unable to attend that college," while another principle was "Financial aid should be offered only after determination that the resources of the family are insufficient to meet the student's educational expenses. The amount of aid offered should not exceed the amount needed to meet the difference between the student's total educational expenses and the family's resources.").

234 These Defendants include Brown, Caltech (after 2008), Columbia, Cornell, Dartmouth, MIT, Penn, and Yale. *See* **Exhibit 3**.

235 Dr. Singer himself notes that "[i]nstitutions can define 'merit' however they see fit. Institutions thus provide merit aid for academic performance or for achievement in a sport, music, drama, debate, or another activity a school deems worthy of a discount to encourage the student to enroll at that institution." Singer Amended Report, ¶ 30.

members would have received more merit-based aid in the absence of the Challenged Conduct. Some proposed Class members were towards the bottom of their admitted classes academically, and thus also would have been unlikely to have received additional merit aid. And many proposed Class members already did receive merit aid in addition to their need-based aid.[236] There is no reason provided or reason to believe that all or nearly all of these proposed Class members would have received even more merit aid.

93. Third, to the extent that some schools increased the availability of merit-based aid, it is possible that that an increase in merit aid would be met with a decline in need-based financial aid, thereby potentially harming some members of the proposed Class. Regardless of the type of institutional grant aid offered, schools must figure out a way to fund grant aid. If a Defendant school devoted additional funds to merit aid, there might be a corresponding drop in need-based aid. The same is true for the use of discretionary funds. Schools could divert some of the discretionary funds used for need-based aid in the real world to merit aid in the but-for world. Dr. Singer cites to a document discussing the benefits of the 568 Group, stating that "the 568 Group believed that the CM was the way to spread out 'limited [financial aid] dollars among [the] greatest number of worthy applicants.'"[237] To the extent this is right, the economic inference is that but for the Challenged Conduct, these limited financial aid dollars would be spread across fewer "worthy" applicants. This suggests a but-for world where fewer proposed Class members receive financial aid, or all receive smaller amounts of aid. Thus, it is likely that some members of the proposed Class would have been monetarily worse off in a but-for world that shifts the focus to merit-based aid. For example, a move towards merit-based aid would not be expected to benefit a proposed Class member from a disadvantaged background with average academic qualifications to the same degree that it may benefit a proposed Class member with strong academic credentials from a middle-class (less disadvantaged) family. In this plausible scenario, aid would be shifted from a family with more need to a family with less need. Moreover, determining which proposed Class members would be winners or losers in a but-for world with more merit-based aid would require individualized inquiry.

94. There is no class-wide method, and Plaintiffs' experts have proposed none, that can determine which Defendants would have switched to offering more merit-based aid relative to need-based aid absent a purported agreement to prioritize need-based aid, to what extent any school would have shifted its aid toward merit-based awards, and which students would have benefited or been harmed by the shifting focus of individual schools' financial aid practices.

---

[236] *See, e.g.*, Singer Amended Report, Appendix 3 Table 2.

[237] Singer Amended Report, ¶ 186 (referring to CALTECH000001723).

### 3. *There Is No Economic Basis to Conclude That All or Substantially All Proposed Class Members Would Benefit from the Absence of an Agreement on Professional Judgment*

95. Another element of the Challenged Conduct according to Dr. Singer was a supposed agreement to use a "common manual" for applying professional judgment and to limit the extent to which professional judgment was applied.[238] Professional judgment refers to situations in which financial aid officers manually modify financial inputs to the need analysis calculation or the cost of attendance for a student to compensate for individual circumstances.[239] Professional judgment can be used to respond to a wide range of scenarios including, but not limited to, changing family situations, such as unusually high medical expenses and temporary or unexpected changes in employment, and natural disasters.[240]

96. Dr. Singer does not provide any economic reasoning or evidence that absent the purported use of a "common manual," professional judgment would have been used more often and in more cases than it was actually employed, nor that such additional use of professional judgment would benefit any members of the proposed Class, much less all or substantially all of them. He also fails to analyze whether there was any change in the use of professional judgment after the 568 Group was formed and the alleged agreement was made. That is, he fails to establish that the purported use of a "common manual" for professional judgment constrained the choices or decisions of any Defendant in a way that adversely affected any, much less substantially all, proposed Class members—particularly given that professional judgment, by definition, is exercised at the discretion of financial aid officers based on particularized financial circumstances of the individual applicant in front of them.[241]

97. Even if the use of professional judgment would have differed but for the alleged agreement, there is no class-wide method to establish in which additional or different cases schools would have opted to exercise professional judgment that they did not exercise in the actual world, or whether such additional uses of professional judgment would have benefited certain students if indeed it benefited them at all. Indeed, professional judgment can be exercised in ways both helpful and harmful to the

---

238 Singer Amended Report, ¶ 4.

239 Finaid, "Professional Judgement," available at https://finaid.org/educators/pj; College Selection Strategy, "What Is the Foundation for Your Financial Aid Appeal?," available at https://collegeselectionstrategy.com/financial-aid-appeal-professional-judgment.

240 *See, e.g.*, PENN568-STRUCTURED-00000154 xlsx, sheet "Sheet1," rows 1478, 5515, 7115, 17059.

241 *See, e.g.*, Meade (College Board) Deposition, Exhibit 34 (Allan M. Cartter, "New Approaches to Student Financial Aid: Report of the Panel on Student Financial Need Analysis," College Entrance Examination Board (1971)), pp. 20-21 ("From the beginning it was a fundamental precept that the computation procedures were designed as an aid to, not as a substitute for, the aid officer's considered judgment."); The College Board CSS Financial Aid Profile Users' Guide, 2003–2004 School Year, CBD000001-279 at 012 ("The financial aid administrator must always make the final assessment of family ability to pay, guided by these principles and considering the particular circumstances of the individual student and family.").

individual student.[242] Since professional judgment relates to unsystematic deviations from standard practices due to "unique or extenuating financial circumstances in individual cases," it does not follow that more professional judgment in the but-for world would uniformly benefit all or even any proposed Class members as not all or even most proposed Class members would fall into such categories.[243] There is no reason to believe—and none is provided by Dr. Singer—that professional judgment would have been applied widely throughout, and exclusively to the benefit of all or substantially all members of, the proposed Class absent the Challenged Conduct.

### 4. *There Is No Economic Basis to Conclude That All or Substantially All Proposed Class Members Would Benefit from the Absence of an Agreement on Data Sharing*

98. The sixth piece of Challenged Conduct as enumerated by Dr. Singer is the sharing of financial aid information across schools.[244] Dr. Singer asserts that this information was shared "most prominently" through COFHE, an organization consisting of thirty-nine schools, including many that are neither Defendants nor members of the 568 Group.[245]

99. COFHE produces admissions and financial aid data on member schools in its "Colorbooks." The COFHE Redbook contains admissions statistics, the Bluebook contains financial aid statistics, the Brownbook tracks sources of undergraduate grant aid, and the Yellowbook tracks tuition, student charges, and self-help policies.[246] These Colorbooks contain information averaged at the school level, information averaged across all participating schools, or information averaged across four broad groups: Coed Colleges, Ivy League Universities, Non-Ivy Universities, and Women's Colleges.[247]

100. Dr. Singer notes that these Colorbooks date back to the 1970s.[248] Dr. Singer opines that the Colorbooks allowed Defendants to benchmark themselves to other COFHE members

---

242 Nucciarone (Notre Dame) Deposition, 60:4-20 (noting that professional judgment may "mean[] an increase or a decrease in a contribution").

243 Singer Amended Report, ¶ 149.

244 Singer Amended Report, ¶ 4.

245 Singer Amended Report, ¶ 165 (citing COFHE, "Consortium on Financing Higher Education," available at https://web mit.edu/cofhe).

246 *See, e.g.*, COFHE Admissions Statistics, Class Entering 2021 (Redbook XLVI), June 2022, COFHE-02-00022277-377 at 281; First-Year Financial Aid/Admissions Survey, Class of 2025 – Entering Fall 2021 (Bluebook XXXVII), October 2022, COFHE-02-00022378-428 at 382; Sources of Undergraduate Grant Aid at the COFHE Institutions, 2020-2021 Academic Year (Brownbook), January 2023, COFHE-02-00022429-467 at 433; Tuition, Student Budgets, and Self-Help at the Consortium Institutions for Academic Year 2022-23 (Yellowbook), March 2023, COFHE-02-00022468-526 at 470; Singer Amended Report, ¶ 166

247 Presidents Book, November 2022, COFHE-02-00018026-058; COFHE Admissions Statistics, Class Entering 2021 (Redbook XLVI), June 2022, COFHE-02-00022277-377; First-Year Financial Aid/Admissions Survey, Class of 2025 – Entering Fall 2021 (Bluebook XXXVII), October 2022, COFHE-02-00022378-428; Sources of Undergraduate Grant Aid at the COFHE Institutions, 2020-2021 Academic Year (Brownbook), January 2023, COFHE-02-00022429-467; Tuition, Student Budgets, and Self-Help at the Consortium Institutions for Academic Year 2022-23 (Yellowbook), March 2023, COFHE-02-00022468-526.

248 Singer Amended Report, ¶ 168.

Plaintiffs and Dr. Singer claim that one purpose of the Challenged Conduct was to set an inflated floor for EFC calculations, even among proposed Class members who presented financial circumstances addressed by elements of the CM guidelines, it is not the case that the application of the approach recommended in the CM guidelines as to those elements uniformly increased EFC calculations (or, by extension, net price).[270] In other words, a student merely having a characteristic discussed by the CM guidelines does not imply that the student was harmed.

116. For instance, the College Board determined that, in the Base IM, retirement allowances were not necessary, while the CM guidelines recommended that for families without formal retirement plans or assets, schools should use professional judgment to apply additional allowances in order to allow the family to protect more of their assets from being counted in financial aid calculations.[271] All else equal, students whose families did not have formal retirement accounts such as IRAs or 401(k)s would have lower EFC calculations to the extent Defendants implemented the CM guidelines' recommendations, relative to if the Defendants used the approach of the Base IM. In other words, these students would be better off under the CM guidelines than under the Base IM.

117. In a similar way, the Base IM assesses student assets at a rate of 25 percent and treats parental assets separately and at a lower rate, whereas the CM guidelines suggested that pre-paid tuition and savings plans for students be treated as parent assets, which would result in those assets being assessed at rates between three and five percent.[272] In effect, the CM guidelines suggested that "[m]ost student assets should be considered parental assets in assessing the EFC," and thus, all else equal, for students who have many assets or large amounts of pre-paid tuition, the adoption of the CM guidelines' recommendation would result in lower EFC calculations than the Base IM.[273] In other words, these students would be better off under the CM guidelines than under the Base IM.

---

270 Dr. Singer fails to explain why, if Defendants developed the CM guidelines as part of an overall effort to depress financial aid awards, the 568 Group would have recommended alterations to the Base IM methodology that would result in higher financial aid offers, on average. Dr. Singer does not include any analyses of the impact of the Challenged Conduct on EFCs themselves, if any. In fact, his turned over databuild does not include the EFC information produced by Defendants as part of their structured data.

271 This has been in place since the first version of the CM guidelines. *See* The 568 Presidents' Group Consensus Methodology Policy Guidelines, 2004–2005 (Members Only Version), NULIT-0000161662-718 at 671; The 568 Presidents' Group Consensus Methodology Policy Guidelines, November 2015, VANDERBILT-00000813-831 at 823; The 568 Presidents' Group Consensus Methodology Policy Guidelines, December 2016, DARTMOUTH_0000091786-803 at 796 ("The 568 Group recognizes that many families are not covered by formal retirement programs and that it may be appropriate to provide retirement protection for those without such support. Such an allowance should be created in consultation with CSS and other experts in the field of retirement planning."); 568 Presidents' Group Professional Judgment Guidelines Manual, December 2016, COFHE-02-00007049-068 at 056-057 ("The 568 Group believes that it is appropriate, as a professional judgment option, to provide retirement protection to those for whom Social Security is the only significant source of retirement income. . . . Institutions may use professional judgment in identifying cases where these non-social security assets are insufficient to support the parent's reasonable retirement needs.").

272 These CM guidelines have been in place since 2015. The 568 Presidents' Group Consensus Methodology Policy Guidelines, December 2016, DARTMOUTH_0000091786-803 at 794; The 568 Presidents' Group Consensus Methodology Policy Guidelines, November 2015, VANDERBILT-00000813-831 at 821.

273 568 Presidents' Group Professional Judgment Guidelines Manual, December 2016, COFHE-02-00007049-068 at 057; The 568 Presidents' Group Consensus Methodology Policy Guidelines, December 2016, DARTMOUTH_0000091786-803 at 794-795.

"UID_0000022314340" both received Base IM EFC calculations of $3,350.[279] These students applied from New York, NY (10038), and Vallejo, CA (94591), respectively.[280] Under the CSS Profile's tables, each of these ZIP codes are assigned a different cost of living adjustment factor. For instance, in the 2015–2016 academic year, New York had a COLA factor of 1.10, and "San Francisco – Oakland – Fremont, CA," which includes ZIP code 94591, had a COLA factor of 1.18.[281] As such, despite these students having an EFC calculation of $3,350 under the Base IM, under Cornell's need analysis, which included following the CM guidelines' recommendation of using the COLA tables, these students had different, lower EFCs. In particular, the student from New York had an EFC of $1,975, and the student from Northern California had an EFC of $1,850.[282] Thus, the students from New York and California benefited from the CM-recommended adjustments that Cornell made to its EFC calculations relative to the Base IM.

121. The CM guidelines also differ from the Base IM with respect to the treatment of home equity. The CM guidelines recommended that home equity should be considered in need analyses, and, since 2005, should be capped at 1.2 times family income.[283] This differs from the Base IM practice of not capping home equity at all, or the IM recommendation in 2022 of capping home equity at a multiple of two times total income.[284] Students whose families' home equity exceeds 1.2 times family income would therefore benefit from the implementation of this suggestion from the CM guidelines relative to the Base IM or the 2022 IM recommendation.

122. Yale's treatment of home equity over time provides an example in which adoption of the CM recommendation on home equity resulted in benefits to students. Prior to joining the 568 Group in 2003, Yale had a policy of capping home equity at three times family income; while a member of the 568 Group, it adopted the CM guidelines of 2.4- and then 1.2-times income.[285] After leaving the 568 Group, Yale returned to its previous policy of

---

279 Needs Analysis Compare – Institutional Methodology, CORNELL_LIT0000335803-808 at 803; Stiroh turnover materials (Defendants' Structured Data).

280 USPS, "Cities by ZIP Code," available at https://tools.usps.com/zip-code-lookup.htm?citybyzipcode; Stiroh turnover materials (Defendants' Structured Data).

281 College Board Institutional Methodology Tables and Worksheets 2015-16 School Year, July 22, 2014, DARTMOUTH 0000388645-926 at 653.

282 Stiroh turnover materials (Defendants' Structured Data).

283 The 568 Presidents' Group Consensus Methodology Policy Guidelines, 2004–2005 (Members Only Version), NULIT-0000161662-718 at 670-671; The 568 Presidents' Group Consensus Methodology Policy Guidelines, November 2015, VANDERBILT-00000813-831 at 822; The 568 Presidents' Group Consensus Methodology Policy Guidelines, December 2016, DARTMOUTH_0000091786-803 at 795.

284 College Board CSS Profile Institutional Methodology User Guide, July 15, 2022, NULIT-0000181680-802 at 696 ("Base IM uses the value minus the debt to calculate the home equity used in the methodology."), 731 ("[I]f capping is used, that equity be capped rather than value . . . The recommended home equity cap is 2 times the total income, though institutions can define the value"); Needs Analysis Compare – Institutional Methodology, CORNELL_LIT0000335803-808 at 804.

285 Storlazzi (Yale) Deposition, 88:5-12; The 568 Presidents' Group Consensus Methodology Policy Guidelines, 2004–2005 (Members Only Version), NULIT-0000161662-718 at 670-671; 568 Presidents' Group Invoice, November 28, 2005, DARTMOUTH_0000359371-571 at 375; The 568 Presidents' Group Consensus Methodology Policy Guidelines, November 2015, VANDERBILT-00000813-831 at 822; The 568 Presidents' Group Consensus Methodology Policy Guidelines, December 2016, DARTMOUTH_0000091786-803 at 795.

using a cap of three times income for the 2013–2014 academic year.[286] For students whose parents' home equity was greater than 2.4-times or 1.2-times to 3-times their income, the CM guidelines' recommendation on how to treat home equity resulted in a lower EFC calculation than the approach taken by Yale when it was not a member of the 568 Group.[287] This example illustrates the fact that the application of the CM guidelines did not uniformly increase EFC calculations, and for some proposed Class members, even decreased them relative to a plausible but-for world.

#### b. CM Adjustments Are for Special Circumstances Not Affecting All Proposed Class Members

123. As discussed above, the CM guidelines did not provide a comprehensive methodology for calculating a student's family's ability to contribute to the expenses associated with a college education, but instead offered recommendations for specific financial aid situations, such as how to handle non-custodial parents and what to do with high home equity. To the extent that the CM guidelines recommended particular approaches in certain financial aid situations, these situations did not affect all or substantially all members of the proposed Class and thus would not be expected to result in common impact.

124. For instance, the CM guidelines offered a series of recommendations in 2016 related to rental property and other real estate owned by students' families, yet, for comparison, in 2018 only 6.7 percent of individual tax filers reported owning rental properties to the IRS.[288] Not every family of every student who received need-based financial aid owned rental property. Another parameter on which the 2016 CM guidelines offered recommendations for special circumstances was "Special Expense Adjustments," which by definition concerned "an expense that most families don't incur."[289] Thus, even if there were an agreement on these elements that resulted in less financial aid than any school might have offered absent the agreement, the agreement would not adversely impact all or substantially all proposed Class members.

125. **Figure 5.1** below gives the percentage of proposed Class members by Defendant for whom various components of the CM are relevant, to the extent that they can be observed in the structured financial aid data produced by Defendants. For example, one component of the CM guidelines previously discussed concerns the treatment of home

---

[286] Storlazzi (Yale) Deposition, 88:5-12, Exhibit 13, Email from Caesar Storlazzi (Yale) to J Lloyd Suttle (Yale) et al, Subject: RE: Meeting to Discuss YC Financial Aid model and projections, YALE_LIT_0000005427-435 at 427.

[287] Data show that 29 percent of students admitted to Yale between 2003 and 2005 and between 2005 and 2022 had home equities greater than the CM recommended cap of 2.4- or 1.2-times income, respectively. Stiroh turnover materials (Defendants' Structured Data).

[288] The 568 Presidents' Group Consensus Methodology Policy Guidelines, December 2016, DARTMOUTH_0000091786-803 at 792; Drew DeSilver, Pew Research Center, "As National Eviction Ban Expires, a Look at Who Rents and Who Owns in the U.S.," August 2, 2021, available at https://www.pewresearch.org/short-reads/2021/08/02/as-national-eviction-ban-expires-a-look-at-who-rents-and-who-owns-in-the-u-s.

[289] "These expenses can include costs associated with parental care, funeral expenses, uninsured natural disasters, and extraordinary home repair costs," among others. The 568 Presidents' Group Consensus Methodology Policy Guidelines, December 2016, DARTMOUTH_0000091786-803 at 799.

equity, which the CM guidelines recommended capping at a certain multiple of family's income. Column (e) of the table below shows the percentage of proposed Class members at each Defendant whose parents' home equity was greater than 1.2 times their income for academic years 2005–2006 and onward and 2.4 times their income for years prior. For most Defendants for which data are available, fewer than half of students who reported home equity information meet this criterion. Thus, even to the extent that Defendants did agree to implement the recommendation in the CM guidelines for home equity caps, doing so would not directly affect over half of their financial aid recipients. Because these circumstances do not apply to all—or in many cases, even most—students attending Defendant schools, the manner and extent to which Defendants implemented the various recommendations of the CM guidelines impacted different students in different ways (if at all).

## Figure 5.1: Summary of Proposed Class Members Reporting Information Discussed by the CM Guidelines During Dr. Singer's Class Period[290]

| | Percentage of Matriculating Students with Financial Aid Information Reporting | | | |
|---|---|---|---|---|
| Defendant | Divorced Parents | Siblings in College | Primary or Secondary Education Expenses | Home Equity to Income Ratios Greater than the CM Recommended Cap |
| | -------(Percent)------- | ---------(Percent)--------- | ----------(Percent)---------- | ---------------------(Percent)--------------------- |
| (a) | (b) | (c) | (d) | (e) |
| Brown | 15.3 % | 36.0 % | -- % | 30.6 % |
| Caltech | 11.5 | 33.3 | -- | -- |
| Chicago | 10.6 | 23.1 | -- | 36.5 |
| Columbia | 11.0 | 25.8 | -- | 48.8 |
| Cornell | 14.6 | 31.6 | -- | 40.3 |
| Dartmouth | 13.2 | 32.0 | -- | 31.2 |
| Duke | 12.1 | 30.6 | 1.6 | 38.0 |
| Emory | 14.7 | 30.1 | -- | -- |
| Georgetown | 1.6 | 36.0 | -- | 61.1 |
| Johns Hopkins | 10.8 | 30.4 | -- | 36.4 |
| MIT | 11.5 | 21.6 | -- | 11.8 |
| Northwestern | 3.8 | 38.0 | -- | 40.7 |
| Notre Dame | -- | 41.0 | -- | 66.9 |
| Penn | 13.4 | 36.1 | 14.3 | 31.7 |
| Rice | 8.6 | 26.4 | -- | 34.7 |
| Vanderbilt | 15.4 | 33 2 | 17.1 | 17.0 |
| Yale | 13.4 | 30.8 | -- | 30.8 |

126. Even if Defendants had uniformly adopted the recommendations of the CM guidelines, there would not be class-wide impact, nor would the impact on any individual student necessarily be to that student's detriment.

127. Moreover, some of the CM guidelines' recommended approaches, when adopted, resulted in lower EFC calculations than would result from other methodologies like the Base IM, which further undermines any notion of common impact. Determining the impact of a Defendant's use of one or more aspects of the CM guidelines on any particular proposed Class member would require individual inquiry into whether that

290 "--" indicates not available. This figure reports available data for the first year a proposed Class member appears in a school's financial aid data. Students with missing information for the reported criteria are included in the total count of students for each category used to calculate the percentages shown. Stiroh turnover materials (Defendants' Structured Data); Singer Amended Report, ¶ 9.

proposed Class member's financial and demographic profile presented issues addressed by the CM guidelines, and whether the approaches to each of those issues outlined in the CM guidelines had the effect of raising, lowering, or keeping constant the EFC calculation relative to alternative methodologies. Without such individualized inquiry, it would not be possible to know whether in the but-for world a proposed Class member would have been impacted positively, negatively, or not at all by the absence of the Challenged Conduct.

### 2. Observable Alternative Methodologies or Approaches That Are Not Challenged by Plaintiffs Do Not Result in Uniformly Lower EFC Calculations for All Members of the Proposed Class

128. While neither Dr. Singer nor Plaintiffs explain what methodologies Defendant schools would have used to calculate EFCs but for the Challenged Conduct, it must be that these methodologies would have resulted in lower EFC calculations for all proposed Class members for there to be common adverse impact from an alleged agreement to standardize EFC calculations.

129. The ability-to-pay calculations conducted by schools are complex—schools collect dozens of pieces of personal and financial information from students and use this information to calculate EFCs. The structured data produced by Defendants and third parties in this matter allow me to compare EFC calculations performed for the same student across different schools and methodologies to evaluate whether it is plausible to conclude that alternative methodologies would have resulted in uniformly more favorable calculations for all students.

130. In the following subsections, I compare EFCs calculated for individual students by Defendants and (1) the other schools in Dr. Singer's proposed relevant market who Dr. Singer suggests were more "generous" than Defendants;[291] (2) Defendant schools outside of the 568 Group in a given year (*i.e.*, the benchmark periods Dr. Singer uses in his regression analysis);[292] and (3) the Base IM approach. I find that the various methodologies do not uniformly result in higher or lower EFC calculations relative to the EFCs calculated by the Defendants during the purported Challenged Conduct periods. My analyses, described below, demonstrate that proposed Class members would not all benefit from the absence of the Challenged Conduct in the but-for world.

#### *a. Comparison of EFCs Calculated by Defendants and EFCs Calculated by Third-Party Schools in the Proposed Relevant Market*

131. Data produced by COFHE containing student-level financial aid and admissions information allow me to compare, at the individual student level, EFC calculations by

[291] Singer Amended Report, ¶¶ 379-381.

[292] Singer Amended Report, ¶¶ 192-193, 228.

loans, and work-study awards, and Defendants have changed their policies on the components of packaging over the Class Period.

140. Plaintiffs do not allege that the Challenged Conduct included agreement on whether and to what extent schools would include loans in financial aid packaging—in fact, throughout the Class Period, policies regarding loans have differed over time and across Defendants. For instance, some Defendants have adopted no-loan policies at different times during the Class Period.[305] Columbia, Dartmouth, Penn, Vanderbilt, and Yale have all had policies in place since at least 2009 wherein loans have not been a part of the financial aid package offered by the school.[306] Other Defendants adopted no-loan policies more recently. Northwestern introduced a no-loan policy for incoming students in 2016, which it expanded to all students in 2019.[307] Brown and MIT introduced no-loan policies in the 2017–2018 and/or 2018–2019 academic year and Johns Hopkins followed suit in the 2019–2020 academic year.[308] Emory and Rice changed packaging policies to no longer include institutional loans in 2022.[309] Other Defendants have

[305] A "no-loan" policy means that loans are not part of the aid package offered to students by the institutions, but loans may still be available to the student if that is the student's preferred way to pay for their cost of attendance.

[306] Columbia Undergraduate Admissions, "Affordability & Aid," available at https://undergrad.admissions.columbia.edu/affordability; New York Times, "Columbia University to Offer Financial Aid to More Students," March 11, 2008, available at https://www.nytimes.com/2008/03/11/education/11columbia html; Dartmouth Financial Aid, "Introduction to Financial Aid," available at https://financialaid.dartmouth.edu/how-aid-works/introduction-financial-aid; Peer School Financial Aid: Initiatives, Columbia_00015333-336 at 335; Sessa (Penn) Deposition, 223:23-224:22; Julie McWilliams, Penn Today, "Penn Expands Financial Aid Program to Eliminate Loans: Fact Sheet," December 17, 2007, available at https://penntoday.upenn.edu/news/penn-expands-financial-aid-program-eliminate-loans-fact-sheet; Vanderbilt University, "Financial Aid," available at https://www.vanderbilt.edu/financialaid; Tener (Vanderbilt) Deposition, 146:2-146:6; Yale University Financial Aid, "Affordability," available at https://finaid.yale.edu/costs-affordability/affordability; Wallace-Juedes (Yale) Deposition, 183:17-184:19.

[307] Christine Farolan, The Daily Northwestern, "Northwestern Eliminates Loans as Part of Financial Aid Packages," March 4, 2016, available at https://dailynorthwestern.com/2016/03/03/campus/northwestern-eliminates-loans-as-part-of-financial-aid-packages; Josiah Bonifant and Allie Goulding, The Daily Northwestern, "No-Loan Policy to Be Fully Implemented in 2019–2020, but Students Still Grapple with Financial Aid Options," February 5, 2019, available at https://dailynorthwestern.com/2019/02/05/lateststories/no-loan-policy-to-be-fully-implemented-in-2019-2020-but-students-still-grapple-with-financial-aid-options; Northwestern University Undergraduate Admissions, "Affordability and Aid," available at https://admissions northwestern.edu/tuition-aid.

[308] Tilton (Brown) Deposition, 120:21-122:10; Brown University Undergraduate Financial Aid, "Undergraduate Financial Aid," available at https://finaid.brown.edu; Defendant Brown University's Responses and Objections to Plaintiffs' First Set of Interrogatories on All Defendants, *Henry, et al. v. Brown University, et al.*, Case No. 1:22-cv-00125, United States District Court, Northern District of Illinois, Eastern Division, April 5, 2023, p. 28; MIT Student Financial Services, "Making MIT Affordable," available at https://sfs.mit.edu/undergraduate-students/the-cost-of-attendance/making-mit-affordable; 30(b)(6) Deposition of Leslie Bridson, Director of Student Financial Services, MIT, *Henry, et al. v. Brown University, et al.*, Case No. 1:22-cv-00125, United States District Court, Northern District of Illinois, Eastern Division, April 23, 2024, 49:13-18; McDermott (Johns Hopkins) Deposition, 124:15-125:5; Johns Hopkins Undergraduate Admissions, "Financial Aid Glossary," available at https://apply.jhu.edu/tuition-aid/financial-aid-glossary; Scott Jaschik, Inside Higher Ed, "$1.8 Billion to Make Johns Hopkins Need-Blind," November 18, 2018, available at https://www.insidehighered.com/admissions/article/2018/11/19/largest-gift-ever-higher-education-will-make-johns-hopkins-need-blind.

[309] Laura Diamond, Emory News Center, "Emory Expands Financial Aid to Allow More Students to Graduate Debt-Free," January 31, 2022, available at https://news.emory.edu/stories/2022/01/upress_emory_advantage_expansion_31-01-2022/story html; Emory University Office of Financial Aid, "Loans," available at https://studentaid.emory.edu/undergraduate/types/loans html; Doug Miller, Rice University News & Media Relations, "Rice Strengthening Its Commitment to Loan-Free Financial Aid," December 16, 2021, available at https://news rice.edu/news/2021/rice-strengthening-its-commitment-loan-free-financial-aid; Rice University Office of Financial Aid, "The Rice Investment," available at https://financialaid.rice.edu/rice-investment.

adopted policies related to packaging and loans that factor in certain financial circumstances of the student's family. Cornell currently has a policy that includes no student loans for students whose families have a total annual income of less than $75,000, and "low" loan offers for all other students.[310] Cornell first adopted a zero student loans policy in 2008 for families whose total annual income was $60,000 or less—a threshold that has oscillated between $60,000 and $75,000 in the interim years.[311] Duke similarly includes no loans for students whose families have a total income below a threshold, in this instance $40,000 annually, which has been their policy since 2007.[312] For students above that threshold, the amount of loans is capped based on the family's income.[313] At Caltech, students whose families make less than $90,000 annually have no loans as part of their financial aid packages, while other incoming and returning students are packaged loans of $4,500 and $5,500, respectively.[314] Other Defendants, such as Georgetown and Notre Dame, have not adopted no-loan policies.[315] That each Defendant school implements different packaging policies with respect to loans—which would in turn impact the net prices for students in different manners—undermines the notion of common impact. Even if the Challenged Conduct inflated EFCs (a factor that Dr. Singer has not shown), competitive forces would still discipline net prices through the other components of net price (*e.g.*, packaging).

141. In a similar manner, throughout the alleged Class Period, Defendants have employed differing policies regarding the presence of work-study aid as a part of financial aid packages. For instance, prior to the 2013–2014 academic year Cornell's work

---

310 In particular, for 2024–2025, the maximum loan offer for students whose total family income is greater than $75,000 is either $2,000, $4,000, or $6,000, depending on if the student's total family income is between $75,001 and $125,000 annually, between $125,001 and $175,000 annually, or greater than $175,000 annually, respectively. Cornell University Office of Financial Aid, "Affordability," available at https://finaid.cornell.edu/cost-to-attend/affordability.

311 Cornell Chronicle, "Cornell Drops Need-Based Loans for Students from Families Earning under $75,000," January 31, 2008, available at https://news.cornell.edu/stories/2008/01/cornell-announces-sweeping-new-financial-aid-program; Cornell Chronicle, "CU Recommits to Need-Based Financial Aid for Undergrads," November 13, 2008, available at https://news.cornell.edu/stories/2008/11/cornell-enhances-financial-aid-undergraduates; Cornell Chronicle, "Cornell Affirms Commitment to Need-Blind Admissions and Robust Need-Based Aid," July 3, 2012, available at https://news.cornell.edu/stories/2012/07/cornell-affirms-need-blind-admissions-aid-policies.

312 Duke Karsh Office of Undergraduate Financial Support, "Awarding and Policy," available at https://financialaid.duke.edu/forms-resources/awarding-policy; Deposition of Miranda McCall, Associate Vice Provost and Director of Financial Aid, Duke, *Henry, et al. v. Brown University, et al.*, Case No. 1:22-cv-001245, United States District Court, Northern District of Illinois, Eastern Division, August 29, 2023 ("McCall (Duke) Deposition"), 25:8-26:1; You Can Afford Duke, DUKE568_0000428-429 at 429.

313 In particular, for 2023–2024, the amount of loan in each student's financial aid package is either $2,000, $3,000, $4,000, or $5,000, depending on if the student's family has an income between $40,001 and $55,000 per year, between $55,001 and $70,000 per year, between $70,001 and $85,000 per year, or greater than $85,000 per year. Duke Karsh Office of Undergraduate Financial Support, "Awarding and Policy," available at https://financialaid.duke.edu/forms-resources/awarding-policy; McCall (Duke) Deposition, 25:8-26:1.

314 This policy has been in place since 2018. Previously, Caltech has also used a no-loan threshold of $60,000 and $65,000. Chang (Caltech) Deposition, 127:20-128:11, 130:23-133:1, 134:5-15; Caltech Undergraduate Admissions, "Afford," available at https://www.admissions.caltech.edu/afford.

315 Georgetown views loans as a "vital component of the financial aid package." Georgetown University Office of Student Financial Services, "Federal Loans," available at https://finaid.georgetown.edu/financial-resources/federal-loans; Georgetown Undergraduate Bulletin, "Financial Assistance to Meet College Expenses," 2023–2024, available at https://bulletin.georgetown.edu/expenses-and-financialassistances/studentfinancialservices; Russo (Notre Dame) Deposition, 114:10-23.

expectation was $2,000.[316] It increased to $2,500 in 2013 and $2,600 in 2017.[317] Since the 2023 spring semester, the work contribution has been $2,700 for first-year students and $3,300 for all others.[318] At Duke, the "self-help portion included in each financial aid package always includes a job award through the Federal or Duke University Work Study program," equal to at most $2,200.[319] At Caltech, incoming students receive up to $1,350 of work study, while returning students receive $2,500.[320] Students at Brown are told to expect earnings of approximately $2,950 for the academic year work component of their financial aid package.[321] Chicago has included self-help work expectations in students' financial aid packages of up to $5,000 their first year since at least the 2017–2018 academic year, and currently includes self-help expectations of $5,500 for their second year, $6,500 for their third year, and $7,000 for their fourth year.[322] Northwestern's packaging for a "Standard" student in the 2019–2020 academic year included $2,000 in summer work and $3,300 of federal work-study.[323] MIT's self-help component was set at $6,000 for all students in the 2012–2013 academic year and was reduced to $5,500 in the 2015–2016 academic year and $3,400 in the 2017–2018 academic year.[324] As with loans, that each Defendant school implements different packaging policies with respect to work-study aid would in turn impact the net prices of students in different manners and undermine the notion of common impact.

142. Because of differences among Defendants in factors such as cost of attendance and packaging, the net prices paid by proposed Class members vary substantially even among

---

316 Cornell Chronicle, "Cornell Affirms Commitment to Need-Blind Admissions and Robust Need-Based Aid," July 3, 2012, available at https://news.cornell.edu/stories/2012/07/cornell-affirms-need-blind-admissions-aid-policies.

317 Cornell Chronicle, "Cornell Affirms Commitment to Need-Blind Admissions and Robust Need-Based Aid," July 3, 2012, available at https://news.cornell.edu/stories/2012/07/cornell-affirms-need-blind-admissions-aid-policies; Kotlikoff (Cornell) 30(b)(6) Deposition, Exhibit 2, Timeline of Financial Aid Initiatives, p. 4.

318 Kotlikoff (Cornell) 30(b)(6) Deposition, Exhibit 2, Timeline of Financial Aid Initiatives, p. 4.

319 This policy has been in place for as long as Miranda McCall can remember. She joined Duke in August of 2011. McCall (Duke) Deposition, 25:8-26:9 ("A. $2,200 is . . . the maximum we would issue in work study. . . . Q. And the policy you just described, do you know how long that's been in place at Duke? A. I do not. Q. As long as you can remember? A. That's correct."); Duke Karsh Office of Undergraduate Financial Support, "Awarding and Policy," available at https://financialaid.duke.edu/forms-resources/awarding-policy.

320 This policy has been in place "for a long time," according to Malina Chang. Chang (Caltech) Deposition, 127:13-134:15 ("Q. And how does the school decide, if you know, from year to year, how it will approach packaging for that given year? A. It's been pretty consistent during my time in the financial aid office. . . . Q. And what level has the work-study been at? A. For incoming students, it's $1,350. . . . Q. And do you recall what . . . the $1,350 was before it was $1,350? A. No, I do not. It's been $1,350 for a long time. . . . Q. And can you tell me what the breakdown in the standard package is? A. So $1,350 for work-study . . . for incoming students. Upperclass, $2,500 work-study[.]").

321 Brown University Undergraduate Financial Aid, "Student Employment in Financial Aid Packages," available at https://finaid.brown.edu/aid-types/student-employment.

322 These values reflect the amounts listed for the 2023–2024 academic year. The University of Chicago Financial Aid, "Federal Work Study and Employment," available at https://financialaid.uchicago.edu/undergraduate/how-aid-works/types-of-aid/federal-work-study-and-employment; Frosh Packaging Philosophy 2017–2018, UCHICAGO_0000009857-860 at 857.

323 Packaging Policies – 2019–20, NULIT-0000002304-305 at 304.

324 Timeline of Select MIT Financial Aid Policy Changes, MITLIT-000659580-582 at 581; MIT News, "Financial Aid Gains to Offset Tuition Increase for 2017-2018," December 21, 2006, available at https://news mit.edu/2016/financial-aid-gains-offset-tuition-increase-1221.

students with the same or similar EFC calculations. As an illustration of this point, I examine proposed Class members with EFC calculations within 2.5 percent of the median EFC in 2018–2019 ($18,690)—this includes proposed Class members with EFC calculations ranging from $18,228 to $19,157.[325] I then examine the distribution of net prices for these students. I find that, for these students, mean net price is $23,610 and ranges from $5,330 to $61,462.[326] **Figure 5.6** below gives the distribution of net prices for these students. The spread of net prices is much wider than the spread of EFC calculations.

**Figure 5.6: Distribution of Net Prices for Proposed Class Members with EFCs within 2.5 Percent of Median in 2018 – 2019[327]**




143. Even if Dr. Singer could show that Defendants coordinated EFC calculations, differences in other factors influencing net prices, including packaging policies across the Defendant schools, would lead to divergences in the net prices ultimately paid by proposed Class members. I demonstrate above that students with similar or the same EFCs did not pay the same net prices. The disconnect between the calculation of EFCs and the net price undermines any notion of common impact that Dr. Singer attempts to establish through his interpretation of qualitative materials.

---

325 This includes 552 proposed Class members in this year. Stiroh turnover materials (Defendants' Structured Data).

326 Stiroh turnover materials (Defendants' Structured Data).

327 The median EFC for proposed Class members in academic year 2018–2019 is $18,690. This figure includes net prices for those proposed Class members with EFCs in a ± 2.5 percent range around this value ($18,228 to $19,157). The fifth to 95th percentiles of net prices for these proposed Class members are charted. This analysis only includes schools who were members of the 568 Group in 2018–2019. **Exhibits 7.A** through **7.T** present an equivalent analysis for other academic years in the Class Period and yield similar distributions. Stiroh turnover materials (Defendants' Structured Data).

**ATTORNEYS' EYES ONLY – SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)**

[redacted]

146. While the Named Plaintiffs' experiences with appeals and individualized financial aid serve as examples, information in the record suggests that appeals and individualized price determination are widespread across the proposed Class. For instance, during the academic years that Penn was a member of the 568 Group, an average of 746 individual students submitted an appeal each year, with a total of 12,690 appeals submitted between 2003 and 2019.[337] Of these 12,690 appeals, 9,498 or 75 percent were approved by Penn, resulting in an increase to some part of the student's financial aid package.[338] Similarly, Georgetown saw an average of 429 students submit an appeal between the 2004–2005 and 2022–2023 academic years, totaling 8,156 appeals.[339] Of those 8,156 appeals, 6,734, or 83 percent, were approved by Georgetown, leading to higher financial aid awards for all of those students.[340] Caesar Storlazzi, Yale's former Director of Financial Aid, testified that around 10 percent of financial aid awards were appealed and that close to 90 percent of these resulted in some change to award amounts.[341] This type of individualized pricing is inconsistent with a uniform overcharge theory.

147. Professional judgment can be exercised in a wide range of scenarios. For example, in 2008 a family with a student at Penn qualified for the no-loan initiative after a re-evaluation due to a hostile divorce, a second mortgage, and the loss of a grandmother's financial support.[342] In another situation, a family with a large income was struggling to rebuild their home after "devastating flooding."[343] Professional judgment was used to decrease the amount of income used in this family's financial aid calculations and eliminate the cash and savings that they needed to use for rebuilding.[344]

148. Re-evaluations can also be used when families are on the margin for certain policies. For example, one reviewer used professional judgment to have a family qualify for Penn's

---

[redacted]

337 PENN568-STRUCTURED-00000207 xlsx, sheet "Sheet1."

338 PENN568-STRUCTURED-00000207 xlsx, sheet "Sheet1."

339 Defendant Georgetown University's Amended Responses and Objections to Plaintiffs' Second Set of Interrogatories, *Henry, et al. v. Brown University, et al.*, Case No. 1:22-cv-00125, United States District Court, Northern District of Illinois, October 31, 2023 ("Georgetown Responses to Plaintiffs' 2nd Set of ROGs"), pp. 33-34.

340 Georgetown Responses to Plaintiffs' 2nd Set of ROGs, pp. 33-34; Gall (Georgetown) Deposition, 227:2-9.

341 Storlazzi (Yale) Deposition, 38:1-7.

342 PENN568-STRUCTURED-00000154 xlsx, sheet "Sheet1," row 1478.

343 PENN568-STRUCTURED-00000154 xlsx, sheet "Sheet1," row 7115.

344 PENN568-STRUCTURED-00000154 xlsx, sheet "Sheet1," row 7115.

no-loan policy due to how "close to 50k" they were.[345] These professional judgment adjustments can also happen when a family's situation changes throughout the year, such as those struggling with medical expenses or unemployment. As an example, a student at Penn became "highly aided" after their father was terminated from his job and the family incurred a $1,538 medical expense.[346]

# VI. Observed Economic Outcomes Are Inconsistent with There Being Class-Wide Common Impact

149. The alleged agreement to adopt common principles and approaches to financial aid does not mean that the actual results of EFC calculations will be uniform across Defendant schools. Nor does it necessarily lead to higher EFC calculations relative to other approaches, as discussed above.[347] In this section, I use both quantitative and qualitative information to evaluate whether EFC calculations across Defendants were standardized. If purported adherence to the agreement did not lead to uniform or higher EFCs, undoing the agreement would not lead to common changes in EFCs, much less common changes by a uniformly lower amount. In fact, under Plaintiffs' theory, a purported goal of the agreement was to reduce variation in approaches across Defendants. To the extent that Plaintiffs' theory is correct, undoing the agreement would increase variation in outcomes, and such an increase in variation would lead to variation in impact, including some students being worse off.

150. Defendants' documents and deposition testimony demonstrate that schools did not use the same methodology for calculating EFCs. The CM guidelines developed by the 568 Group specifically, and the Challenged Conduct more generally, consisted of both general principles as well as, in certain instances, specific recommendations for handling various financial aid scenarios. Testimony and documents show that Defendants did not view following each specific CM guideline as a requirement of their membership in the 568 Group. In addition, testimony and documents show that, in those instances in which the CM guidelines provided a specific recommendation, Defendants who adopted those recommendations did not do so uniformly.

151. In **Exhibit 4**, I list testimony by Defendant representatives related to whether the CM guidelines provided a specific methodology for calculating financial aid, whether Defendants viewed following the CM guidelines as a requirement of participating in the 568 Group, and whether Defendants did in fact follow the CM guidelines. For example, Cornell's Deputy Director for Compliance and Policy, Becky Maxson, testified that Cornell viewed the CM guidelines as "best practice[s]" and that Cornell would "make an independent decision on whether or not" to implement them as part of their institutional

345 PENN568-STRUCTURED-00000154 xlsx, sheet "Sheet1," row 8185.

346 PENN568-STRUCTURED-00000154 xlsx, sheet "Sheet1," row 17059.

347 *See* **Section V.B.2**.

methodology.[348] Similarly, Georgetown's Assistant Dean for Research and Planning in the Office of Student Financial Services, Matthew Lewis, explained that he has "always understood consensus methodology to be more of just … a framework, like a set of guidelines for how to evaluate [need]" and that "each individual school might have its own interpretation or variation on how they themselves actually integrate that."[349] Mary Nucciarone, Notre Dame's Director of Financial Aid, likewise testified that she "did not interpret anything about those 568 guidelines as mandatory," and explained that "[e]ach of us, each school decided which of the tools that were in that manual were appropriate to our institution, and how would we apply those to the methodology that we were using on our campus."[350] As another example, James Tilton, Brown's former Dean of Financial Aid, explained that "many of us did not adhere to consensus methodology. Instead, we … agreed to the principles related to the needs analysis."[351] Furthermore, Michael Hall, Columbia's Executive Director of Financial Aid who served on the 568 Technical Committee – the group responsible for setting meeting agendas and leading presentations – testified that the goal of the 568 Technical Committee was related to "best practices" and that, "even at Columbia, we weren't always following what the consensus methodology said to the letter."[352] This testimony suggests that inconsistent implementation of financial aid practices among Defendants could lead to variation in impact across members of the proposed Class who attended different Defendant institutions at different times throughout the proposed Class Period. Dr. Singer himself acknowledges that such a situation in which Defendants agreed to general principles but not the same methodologies would generate different financial aid results across schools.[353]

152. Documents and testimony demonstrate that Defendants did not uniformly follow the CM guidelines in instances where the CM guidelines recommended a specific approach to handling a financial aid question.[354] For example, while the CM guidelines throughout the Class Period suggested that schools cap home equity at particular amounts of family income, at least Brown, Caltech, MIT, Notre Dame, Penn, and Yale did not use the recommended home equity caps for at least some portion of their time in the 568 Group, and the CM guidelines were not a "floor" on ability-to-pay calculations either, as Penn for example set a lower cap on home equity than called for by the CM guidelines.[355]

---

348 Deposition of Becky Maxson, Deputy Director for Compliance and Policy, Cornell, *Henry, et al. v. Brown University, et al.*, Case No. 1:22-cv-00125, United States District Court, Northern District of Illinois, Eastern Division, November 17, 2023, 58:11-59:19, 263:12-24.

349 Lewis (Georgetown) Deposition, 130:8-131:5.

350 Nucciarone (Notre Dame) Deposition, 325:17-326:14.

351 Tilton (Brown) Deposition, 45:18-46:19.

352 Hall (Columbia) Deposition, 38:8-23, 54:12-24.

353 Singer Amended Report, ¶ 128.

354 I understand that Dr. Bridget Long, another one of Defendants' experts in this case, catalogs differences in the implementation of CM guidelines across Defendants.

355 Singer Amended Report, ¶ 126 ("The CM was to establish a floor for EFCs[.]"); The 568 Presidents' Group Consensus Methodology Policy Guidelines Manual, 2004–2005 (Members Only Version), NULIT-0000161662-718 at 670-671; The 568 Presidents' Group Consensus Methodology Policy Guidelines, November 2015, VANDERBILT-00000813-831 at 822-

Another example relates to the adjustment of EFC calculations for students who had siblings also attending college contemporaneously. While some Defendants followed the recommendation of the CM guidelines (which was to use the adjustment multipliers present in the Base IM), others used the adjustments found in the FM.[356] These documents and testimony are consistent with the finding that EFC calculations varied across Defendants during the Class Period.

153. Individual students admitted to more than one Defendant school often received different EFC calculations from each school to which they were admitted. This variation demonstrates that there was no commonly implemented methodology used by Defendant schools to determine financial aid offered to students and, therefore, no economic basis to suggest that the impact, if any, of the Challenged Conduct was common to the proposed Class or was always to the detriment of admitted students.

154. To evaluate whether Defendants' need calculations were standardized, I examine Defendants' structured financial aid data, and, in particular, EFC calculations for students who were cross-admitted to multiple Defendant schools. Without consistency in observed EFCs, it is incorrect as a matter of economics to presume that, in the but-for world, Defendants would calculate uniformly lower EFCs for all proposed Class members.[357] Moreover, to the extent that consistent implementation of the CM guidelines and uniformity in calculating EFCs is central to Dr. Singer's theory of common impact, my analysis demonstrates that that supposed pillar of his reasoning is without basis.[358]

155. To evaluate Plaintiffs' allegation and Dr. Singer's assertion that Defendants implemented a common approach to measuring financial need and that this resulted in common impact across the proposed Class, I compare EFCs of students who applied to multiple Defendant schools during the same aid year. An applicant has the same underlying financial information and circumstances during the same year, regardless of the school to

---

823; The 568 Presidents' Group Consensus Methodology Policy Guidelines, December 2016, DARTMOUTH_0000091786-803 at 795; Massachusetts Institute of Technology Need Analysis Manual 2022–2023, November 12, 2021, MITLIT-000001005-101 at 012, 076; Chang (Caltech) Deposition, 188:6-13; Storlazzi (Yale) Deposition, 151:24-152:15, 195:20-196:7; Comparison of 568 Group, Brown, and Federal Methodology, January 24, 2007, BROWN_0000000154-157 at 155-156; Institutional Methodology, April 3, 2006, ND_0191421-427 at 425-426; Undergraduate Need Analysis Applicable Calcs and Tables by Version, February 10, 2003, PENN568-LIT-00168774-776 at 776.

356 The 568 Presidents' Group Consensus Methodology Policy Guidelines Manual, 2004–2005 (Members Only Version), NULIT-0000161662-718 at 672-673; The 568 Presidents' Group Consensus Methodology Policy Guidelines, November 2015, VANDERBILT-00000813-831 at 824-825; The 568 Presidents' Group Consensus Methodology Policy Guidelines, December 2016, DARTMOUTH_0000091786-803 at 797; McCall (Duke) Deposition, 234:17-235:2; Walker (Rice) 30(b)(6) Deposition, 190:12-191:11; Tilton (Brown) Deposition, 53:18-54:11; Chang (Caltech) Deposition, 160:24-161:12; Wallace-Juedes (Yale) Deposition, 142:1-143:17.

357 This is because, as discussed **Section IV**, there is no economic incentive that would drive all schools to make changes to their principles or guidelines that would necessarily benefit all students, if the school were to make any changes at all to their approaches to need determination. Moreover, as discussed in **Section V.B**, observable EFC calculations from alternative methodologies are not uniformly higher or lower than the EFCs calculated by Defendants during the Class Period.

358 Dr. Singer states that "[i]t would have been important, as an economic matter, for Defendants to have agreement not just on the Core Principles, but also on at least many components of an IM, because otherwise the schools could all apply the principles while applying different methodologies generating different results." Singer Amended Report, ¶ 128.

substantially affect Dr. Singer's results and opinions.[376] For illustrative purposes, in **Exhibits 13** through **16**, I show the results of running Dr. Singer's model, after correcting certain of these errors, and demonstrate the impact of my sensitivity analyses after those corrections.[377] As shown, adjusting for certain of the errors in Dr. Singer's dataset substantially reduces the magnitude of Dr. Singer's damage estimate and overturns many of his purported findings of adverse impact.

## A. A Single, Unvarying Common Overcharge Estimate Is Economically Implausible

164. Dr. Singer bases his purported finding of common impact in large part on the fact that the regression model he designed yields a single "overcharge" on EIPs that he says was paid by all or virtually all proposed Class members. However, by construction, Dr. Singer's regression model is designed to only estimate a single, uniform overcharge on EIP across all proposed Class members at all Defendant schools throughout all 20 years of the relevant period.[378] This means that, as constructed by Dr. Singer, the model is incapable of estimating different overcharges for proposed Class Members at different Defendant schools or of estimating different overcharges for proposed Class members that attended Defendant schools at different time periods. And, by extension, the model is incapable of identifying unharmed proposed Class Members such that they could be excluded from the proposed Class and damages calculations. As such, Dr. Singer's model imposes common impact, rather than tests whether any adverse impact from the Challenged Conduct was, in fact, common to the proposed Class.

165. A single, uniform overcharge estimate across all years, Defendants, and proposed Class members is inconsistent with the Challenged Conduct.[379] Thus, a model that imposes a single average class-wide overcharge is inappropriate to use in this context.[380] A

[376] For example, Dr. Singer miscoded the years recorded in certain Defendants' data, and therefore misclassifies data for some students as part of the Conduct period, when those data should have instead been included as part of the benchmark data.

[377] I am not opining that the limited corrections in this sensitivity analysis are the only corrections that need to be made. To perform the sensitivity analysis, I use certain corrected data items from a dataset compiled by Dr. Nicholas Hill. I understand that Dr. Hill has offered opinions as to the full scope of errors contained in Dr. Singer's data and statistical work.

[378] Dr. Singer estimates the effect of the Challenged Conduct on proposed Class members' EIPs. This creates a disconnect between the Challenged Conduct, which allegedly increased proposed Class members EFCs. As noted, Dr. Singer does not establish that the conduct at issue increased all proposed Class members' EFCs, and as I showed above, such an outcome is economically implausible and not supported by analysis of available data. Moreover, as noted, Dr. Singer does not present a chain of reasoning whereby the Challenged Conduct, which allegedly affected only one factor that affects EIPs, would have logically resulted in a price increase for all proposed Class members. Without such a chain of reasoning, Dr. Singer's regression results are indistinguishable from a statistical anomaly and cannot establish a causal connection to the Challenged Conduct.

[379] As I explained in **Section V**, there is no economic basis to expect that the conduct at issue affected all members of the proposed Class. As explained, not all proposed Class members fit into categories that were implicated by the CM guidelines and not all proposed class members would have benefited from a switch to more merit-based aid being offered. Because economic theory and logic tell us that not all proposed Class members would benefit from alternatives to the current methodologies for needs assessment, it is methodologically improper to design a regression model that imposes common impact.

[380] At minimum, the but-for world implied by Dr. Singer's single overcharge model is inconsistent with Plaintiffs' allegations and theory of harm. For example, Plaintiffs challenge the purported agreement to prioritize need-based aid over merit-based

regression model purporting to measure the impact of an alleged conspiracy on a proposed Class must be tailored to the industry and conduct at issue.[381]

166. Dr. Singer's model imposes the following restrictions on the purported effect of the Challenged Conduct:

i. The alleged impact is forced to be constant over time (*i.e.*, the model imposes that proposed Class members who attended Defendant schools during different years of the alleged conduct were harmed uniformly).

ii. The alleged impact is forced to be constant across Defendant schools (*i.e.*, the model imposes that proposed Class members who attended different Defendant schools during the alleged Conduct period were harmed uniformly).

167. As shown in prior sections, my analysis refutes the presumption that there is common adverse impact resulting from the Challenged Conduct. Plausible financial aid methodologies in a but-for world could share many, if not all, of the Core Principles that are alleged to be part of the Challenged Conduct. If there are no changes in Core Principles between the actual and but-for world financial aid methodologies, then there can be no economic impact from this aspect of the Challenged Conduct, common or otherwise.

168. Neither can common impact be presumed from the alleged development and implementation of the CM guidelines. Defendants did not implement the CM guidelines uniformly and, even if they had, many of the CM guidelines only applied to certain groups of students or resulted in lower EFC calculations for certain groups of students.[382] Students for whom the CM guidelines did not apply or who would have received higher

aid. Awarding merit-based aid necessarily involves assessing the relative quality or attributes of different students and selecting certain students to receive such aid over others. A but-for world in which more merit-aid is awarded is not one in which students uniformly receive higher offers; therefore, it is not consistent with the but-for world implied by Dr. Singer's model. As another example, Plaintiffs and Dr. Singer suggest that the Challenged Conduct resulted in some consistency in financial aid calculations across Defendant schools which would otherwise not persist absent the agreement. For example, Dr. Singer discusses that without the 568 Group there would be more variance in aid and needs analyses, that "merit aid would proliferate," and that schools may be forced into "bidding wars" for students (*see* Singer Amended Report, ¶¶ 130, 132, 187, 221, 362). If outcomes in the but-for world exhibited more variation than outcomes in the actual world, then the differences between but-for outcomes and actual outcomes would necessarily exhibit similar variation. Increased variance in but-for outcomes is inconsistent with a model that yields a uniform, common increase in financial aid offers to all members of the proposed Class, which is what Dr. Singer's model imposes. Dr. Singer provides no method to analyze the extent and impact of additional need analysis variation in the but-for world that would plausibly need to emerge if Plaintiffs and Dr. Singer's theory on the role of the Challenged Conduct in leading to more consistency were correct. To the contrary, in the but-for world implied by Dr. Singer's supposed common impact analysis, there is no change along this dimension.

Dr. Singer purports to be able to transform his single overcharge model into a methodology to determine overcharge for individual proposed Class members. I explain in **Section VII.C** why Dr. Singer's methodology is fundamentally flawed.

381 "*Behrend* may ultimately stand for the relatively uncontroversial proposition that an expert's opinion must be premised on the theory of liability advanced by the plaintiffs (and accepted by the court) . . . This approach requires an understanding of industry structure, price patterns, and other factual issues that may also bear on the merits of the case." ABA (2014) "Applying Econometrics," pp. 349, 356-357.

382 *See* **Section V.B.1** and **Section VI**.

EFC calculations but for the CM guidelines cannot be presumed to be harmed in the same way as other proposed Class members.

169. Furthermore, the alleged agreement to develop and implement the CM guidelines did not result in standardized EFC calculations nor did it result in uniformly lower EFC calculations relative to alternatives.[383] Without standardization of EFCs, and specifically standardization toward higher EFCs, it is not plausible to assume that EFCs would be uniformly lower in a but-for world and therefore cannot be assumed to have caused common injury. Even if one were to (erroneously) conclude that the Challenged Conduct did in fact lead to common impact, as I described above, there is no basis to assume that all proposed Class members would be impacted uniformly, and it is methodologically incorrect to design a model that imposes uniform outcomes on all proposed Class members.

170. One component of the Challenged Conduct is the supposed development and implementation of the CM guidelines. As discussed above, the CM guidelines, even if implemented uniformly, would not be expected to affect the financial aid awards of all proposed Class members. Furthermore, there is no basis to assume that any supposed implementation of the CM guidelines would uniformly impact students from 2003 through 2022 nor has Dr. Singer provided any such basis.

171. The CM guidelines were updated, revised, and expanded numerous times throughout the relevant period.[384] For example, the CM guidelines recommended that schools include allowances for documented educational debt, including debt from both siblings and parents, starting with the 2004–2005 version, and continuing through the November 2015 version.[385] In the December 2016 update of the CM guidelines, however, the recommendation was changed to include only educational debt of parents and exclude that of siblings.[386] The CM guidelines regarding how to define income also changed over time. In the November 2015 CM guidelines the recommendation was to "[a]dd back all losses (Schedule C, Schedule E, Capital and other losses) to income," but in the

---

383 *See* **Section VI**.

384 *See, e.g.*, The 568 Presidents' Group Consensus Methodology Policy Guidelines Manual 2004-2005 (Members Only Version), NULIT-0000161662-718; The 568 Presidents' Group Consensus Methodology Policy Guidelines, November 2015, VANDERBILT-00000813-831; The 568 Presidents' Group Consensus Methodology Policy Guidelines, December 2016, DARTMOUTH_0000091786-803. Another component of the Challenged Conduct is the supposed agreement to use Base IM as a starting point for EFC calculations. The College Board updated the Base IM numerous times throughout the relevant period and so the harm, if any, of using Base IM as a starting point is similarly unlikely to be uniform and unvarying across the entire 20-year period for which Dr. Singer purports to measure harm. For example, during academic years 2021–2022 and 2022–2023, the College Board updated the Available Income tables used in Base IM to better differentiate families based on their income. Employment Allowance was also eliminated from the Base IM in the 2021–2022 academic year. IM Changes & Consensus Methodology, October 2020, YALE_LIT_0000012686-726 at 688, 693-694.

385 The 568 Presidents' Group Consensus Methodology Policy Guidelines, 2004–2005 (Members Only Version), NULIT-0000161662-718 at 675, 686; The 568 Presidents' Group Consensus Methodology Policy Guidelines, November 2015, VANDERBILT-00000813-831 at 826-827.

386 The 568 Presidents' Group Consensus Methodology Policy Guidelines, December 2016, DARTMOUTH_0000091786-803 at 799-800.

December 2016 CM guidelines the recommendation changed to "[z]ero out all losses . . . to income."[387]

172. Moreover, not all components of the CM guidelines were uniformly implemented by Defendants, so it is economically reasonable to infer that impact, if any, would not be uniform across schools. Even if, hypothetically, the implementation of the CM guidelines resulted in inflated average EFCs, this inconsistency of implementation across schools demonstrates the possibility that the impact on EFCs would vary by school, including the possibility that there was no impact at some schools. Dr. Singer fails to test for this possibility.

173. In addition to variation over time and between schools, there is wide variation in the net price paid by proposed Class members. For example, even among proposed Class members as identified by Dr. Singer, which excludes students who received financial aid covering at least 95 percent of their entire cost of attendance or who received no financial aid at all, students show a wide dispersion in the percentage of their cost of attendance that they were responsible for paying. **Figure 7.1** shows the distribution of the percentage of cost of attendance covered by gift aid across proposed Class members in the 2015–2016 academic year.[388] The figure illustrates the wide dispersion of the share of cost of attendance paid by members of the proposed Class. In addition, it demonstrates that a large portion of proposed Class members paid only a small portion of the cost of attendance after accounting for gift aid. Across academic years within the Class Period, more than 75,000 alleged Class member-year observations, out of nearly 600,000, paid a net price of less than $10,000 per year.[389]

387 The 568 Presidents' Group Consensus Methodology Policy Guidelines, November 2015, VANDERBILT-00000813-831 at 827; The 568 Presidents' Group Consensus Methodology Policy Guidelines, December 2016, DARTMOUTH_0000091786-803 at 800.

388 A similar chart showing the distribution of Dr. Singer's EIP variable is presented as **Exhibit 17.U**.

389 Net price is calculated by subtracting Dr. Singer's inst_grant_aid_std and all_other_grant_aid_std variables from his coa variable. Singer turnover materials (Defendants FA Regression Data).

**ATTORNEYS' EYES ONLY – SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)**

**Figure 7.1: Distribution of the Percentage of Cost of Attendance Covered by Gift Aid across Proposed Class Members in Academic Year 2015 – 2016**[390]




174. Dr. Singer could have designed his model to allow the effect of the Challenged Conduct to vary over time, or by Defendant. If, in fact, the Challenged Conduct had the effect of raising all Class member's EIP by the same amount, then a model that allows for the effects of the conduct to vary would yield similar results for different groups of proposed Class members and time periods. That is, a properly specified model could reveal common impact rather than impose it as the only allowed-for outcome. I have conducted these tests of Dr. Singer's model and demonstrate that his model does not yield common impact. I modify Dr. Singer's regression model to allow for the effect of the conduct to vary: (1) by Defendant school, and (2) over time. Allowing the effect of the Challenged Conduct to vary by Defendant, or over time, shows wide variation in the estimated effect of the Challenged Conduct across proposed Class members and does not show any statistically significant impact for substantial shares of the proposed Class.

---

[390] This analysis reflects the distribution of the percentage of cost of attendance covered by gift aid for proposed Class members in the 2015–2016 academic year. Dr. Singer limits his proposed Class to those whose gift aid does not exceed 95 percent of their cost of attendance. **Exhibits 17.A** through **17.T** present an equivalent analysis for other academic years in the Class Period and yield similar distributions. Singer turnover materials (Defendants FA Regression Data).

204. Correlation analysis is insufficient to establish that impact, if any, must be class-wide. A simple example establishes the flaw of Dr. Singer's opinion. Suppose market factors cause prices in an industry to increase by two percent over time. If the prices for all customers increased by two percent over time, but some customers paid a price with an embedded 10 percent "overcharge," then the prices for the customers being overcharged would still move in unison with the prices paid by the rest of the customers. Prices for the two groups of customers would still exhibit a high degree of correlation, even if the "overcharge" were embedded in prices for the affected group of customers. Thus, the mere fact of allegedly high price correlation says nothing about whether the prices paid by all customers necessarily include an overcharge if there is one found for any customer.

205. Dr. Singer purports to test whether changes in price transmit uniformly throughout the proposed Class by finding instances in which average EIP at a Defendant school falls by five percent or more from one year to the next and then observing whether average EIP of different income deciles at that school also fell.[428] As an initial point, this kind of averaging across proposed Class members will necessarily obfuscate individual differences. In addition, Dr. Singer's exercise is not pertinent to the economic analysis of whether, in a but-for world absent the Challenged Conduct, all proposed Class members would pay lower prices. This is because its starting point is random "common shocks," unexplained by Dr. Singer, that lowered average prices throughout the relevant period.[429] But not all factors that could cause average price to change would necessarily impact students uniformly across even income deciles. As a simple example, a decision to lower the cap on home equity considered in need analysis would benefit students whose families own houses but have no effect on the prices paid by students whose families rent. In such a situation, average price at each income decile will still fall and the fact that many students' prices will not change will not be apparent by looking at averages. Looking into random incidents in which prices changed is a misguided approach to evaluating whether a world without the Challenged Conduct would uniformly benefit all members of the proposed Class.

Signed this 7th day of August, 2024:

Lauren J. Stiroh

[428] Singer Amended Report, ¶¶ 264-265.

[429] Singer Amended Report, ¶ 264.

**ATTORNEYS' EYES ONLY – SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)**

$$\widehat{EIP_{ist}} = \hat{\alpha} + \hat{\beta}Conduct_{ist} + \Sigma_X \widehat{Controls_{ist}^X} \quad (fitted\ EIP)$$

4. By subtracting the fitted value of EIP ($\widehat{EIP_{ist}}$) from the actual, observed EIP for each particular student-school-year observation ($EIP_{ist}$), you obtain the regression residual ($r_{ist}$).[6] This residual informs how far off the actual value for a particular observation is from the value predicted by the estimated regression model. While multiple regression models are constructed so that these residuals are, on average, equal to zero, this does not mean that the residual is zero for all observations.[7]

$$EIP_{ist} - \widehat{EIP_{ist}} = r_{ist} \quad (residual)$$

5. Dr. Singer's in-sample methodology relies upon comparing actual, observed EIPs with EIPs he asserts would have prevailed in the but-for world absent the Challenged Conduct. To obtain these predicted but-for EIPs (represented as $\widehat{EIP_{ist}^{bf}}$), Dr. Singer uses all of the estimated coefficients from his model except the conduct coefficient to predict a price for each student-school-year observation. These estimated coefficients represent the average estimated relationship between the control variables and prices across all observations in the regression model (*i.e.*, not the effect of the control variables on EIPs at the individual level).[8]

$$\widehat{EIP_{ist}^{bf}} = \hat{\alpha} + \Sigma_X \widehat{Controls_{ist}^X} \quad (predicted\ but-for\ EIP)$$

6. Dr. Singer then takes the difference between actual prices and what his model predicts would be but-for prices for each observation (this difference is depicted in the expression below). He concludes by claiming that any positive difference between these two values is evidence that a particular student-school-year observation was impacted by the alleged conspiracy.[9]

$$EIP_{ist} - \widehat{EIP_{ist}^{bf}}$$

7. The fundamental flaw of Dr. Singer's approach is that, even assuming his regression is well-specified and that he has estimated properly the average effect of the conduct and all of the additional control variables included in his model, the student-school-year level differences he examines to "identify" common impact conflate both the residual values of his regression ($r_{ist}$) and the average effect, if any, of the conduct ($\hat{\beta}$). Through simple algebra and by the definitions of the regression components used in Dr. Singer's methodology, I show that the difference Dr. Singer analyzes ($EIP_{ist} - \widehat{EIP_{ist}^{bf}}$) can

6 Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach* (7th Edition) (Boston: Cengage, 2020) ("Wooldridge (2020)"), pp. 27-28, 32-33, 74.

7 Wooldridge (2020), p. 74 ("Normally, the actual value for $y_i$ for any observation *i* will not equal the predicted value, $\hat{y}_i$: OLS minimizes the *average* squared prediction error, which says nothing about the prediction error for any particular observation.").

8 Wooldridge (2020), p. 72.

9 Singer Amended Report, ¶ 258.

# THE 568 PRESIDENTS' GROUP CONSENSUS METHODOLOGY POLICY GUIDELINES

December 2016

## Background

On April 18, 2000, the 568 Presidents Group met and appointed eight senior financial aid professionals from participating 568 institutions to serve on a Common Standards Subcommittee and to report back to them concerning:

> *whether it is possible to reach agreement on common standards for determining financial need at the institutional level consistent with the Statement of Principles for need based financial aid and as permitted by Section 568.*

The charge to the Subcommittee further requested that, in the pursuit of these goals, the panel:

- *address the principal issues that give rise to divergent need calculations;*
- *arrive at reasonable compromises in the areas where the principles may conflict;*
- *strive for recommendations supportive of a system that many schools could adopt while still being able to manage their individual aid resources;*
- *seek solutions that aspire to simplicity and consistency, that discourage manipulation of the system, and are realistic regarding the capacity of families to contribute to educational expenses;*
- *explore avenues to maintain a system supportive of a Consensus Approach to Need Analysis, if one is adopted.*

The work of the Subcommittee was in turn guided by a statement of Need Analysis Principles adopted by the 568 Presidents at that meeting. These Principles are as follows:

### Financial Aid Principles

1. To the extent they are able, parents and students have the primary responsibility to contribute to educational expenses before an institution awards financial aid.
2. Families should contribute to educational expenses according to their ability. Those with similar financial profiles should contribute similar amounts.
3. Institutions should evaluate both income and assets as part of the assessment of the parents' and applicants' ability to pay.
4. Each institution should inform applicants about the policies and practices it applies when measuring a family's ability to pay, carry out its policies consistently throughout a student's eligibility, and support the awarding of need-based aid.
5. An institution that allocates any financial assistance that is not based exclusively on need should inform all prospective applicants of the standards it applies in allocating that aid.
6. The exercise of "professional judgment" by financial aid officers in assessing a family's ability to pay should recognize unique or extenuating financial circumstances in individual cases; such professional judgment is not the proper mechanism for systematically treating 568 Groups of students differently in order to advance institutional objectives.

The revised policy guidelines contained in this Manual represent the best efforts of the 568 Presidents' Group to develop and maintain a Consensus Methodology that is both consistent with the Need Analysis Principles adopted by the Presidents of the participating institutions and compatible with the values that underlie the 568 Presidents' Statement of Principles.

The Consensus Methodology contains certain key components, including: 1) common elements of need analysis as described below; 2) a common calendar for the collection of data from families; 3) a means of training aid professionals in the application of the Methodology; and 4) an oversight 568 Group to review and modify the methodology as needed over time.

Where possible, the professional expertise and program services of the College Scholarship Service (CSS) of the College Board shall be used as resources to advance the implementation of this Consensus Methodology. In addition to their long-standing role as the primary data collection agency, the College Board is invited, when appropriate, to assist with the modeling of various recommendations in order to assess their impact on both families and institutions.

Finally, because need analysis is a complex and detailed process requiring the examination of many dozens of elements to measure a family's ability to pay, many policy guidelines require regular exploration and analysis. In this sense this Manual continues to be an "organic" document. While containing a number of quite specific guidelines for the implementation of the Consensus Methodology, the Manual should be viewed as the basis of an ongoing process to construct a need analysis system that will continue to assure fair and equitable access to educational opportunity.

**Policy Guidelines for the Maintenance of the Consensus Approach Methodology**

The 568 Group believes that the Consensus Approach to Need Analysis, referred to as the Consensus Methodology, when properly implemented and maintained, eliminates much of the variance in the need analysis results that was experienced in the past. The 568 Group does not view the Consensus Methodology as a panacea, however. Need analysis procedures have traditionally depended on professional judgment applied locally. Although the Consensus Methodology would standardize many policies now subject to professional judgment, it is important to recognize that no system will completely eliminate disparate results or the effects of individual institutional packaging decisions, in which the institution determines the mix of grant, loan, and work components in students' awards.

In developing its policy guidelines, the 568 Group has focused on arriving at the "right" approach to determining parental ability to pay without regard to potential cost implications. For many families, especially middle-income families, the methodology has the effect of reducing the expected family contribution. The impact of these policy guidelines is likely to vary from institution to institution depending on the school's applicant profile and the extent to which similar adjustments are already included in its need analysis procedures.

Although the 568 Group fully supports the Consensus Methodology outlined in this manual, it is important to note that these guidelines can be expected to heighten the differences associated with the Federal Methodology (FM), and the College Board's Institutional Methodology (IM), as well as certain institutional changes that have been implemented in recent years. Specifically, both the IM and certain need analysis modifications adopted unilaterally by individual schools have led to cases in which the institution's family contribution is less than that derived from Federal Methodology, resulting in an over-award which limits or eliminates eligibility for federal funding. In an effort to deal with this problem, the 568 Group's Professional Judgment Guidelines Manual includes a section on the various methods that schools may wish to adopt in order to reconcile differences in results between institutional and federal need analysis.

The 568 Group is concerned about restrictions that federal regulations place on the expenditure of need-based institutional aid funds. The 568 Group believes that the Consensus Methodology results in fair parent contribution levels and that participating institutions should not be forced to disadvantage students by reducing the amount of institutional aid they may receive or excluding them from subsidized federal loans or work-study. The 568 Presidents Group, singularly or in concert with other groups, will support petitions to Congress for relief in this critical area of institutional prerogative.

The 568 Group believes strongly that matters of need analysis, including professional judgment, should be independent of the qualifications or desirability of a particular applicant for an institution. That is, rules should not be interpreted more leniently because an applicant will bring strong academic or athletic ability or other desirable qualities to the campus.

Finally, it is important to note that the 568 Group views its ongoing efforts as a long-term process. Many of the policy issues identified in this manual will continue to require further exploration and analysis. Moreover, we have found that the use of the Consensus Methodology continues to present new and unexpected issues and concerns over time. Likewise, technological advances may also provide opportunities for improving and updating the policy guidelines outlined in this manual. Responding to these concerns will require the regular attention of the Group's Need Analysis Council and ongoing training efforts for participants.

## Introduction - The Consensus Approach to Need Analysis

The 568 Presidents Group institutions have agreed on a series of common need analysis standards designed to be included in a Consensus Methodology. The participating institutions believe that this approach, when applied in a consistent manner, serves to diminish or eliminate the divergent results that continue to threaten the long-standing tradition of awarding aid on the basis of need. It is important to note that the efforts of the 568 Group are restricted to policies that affect first-year awards only. The issue of school-to-school inconsistencies applies primarily to first-year students and the 568 Group believes that it is necessary for financial aid officers to retain as much flexibility as possible in dealing with their already-enrolled students.

The Consensus Methodology begins with the understanding that the College Board's Institutional Methodology (IM) is an appropriate base for institutional need analysis and provides an appropriate platform for further work. Consequently, the 568 Group has focused on those aspects of the existing IM that are most often subject to local interpretation or professional judgment. The desire to serve the "greater good" rather than individual institutional needs and capabilities requires compromise in some areas, but the 568 Group believes that the resulting methodology remains true to both the institutional and professional principles that undergird its cooperative efforts. By developing policy guidelines that attempt to set the "right" policy without regard to the cost implications, the 568 Group's guidelines serve to reduce expected parent contributions in the aggregate. All 568 Group schools are free to deal with institutional resource issues through their packaging policies.

Although the 568 Group has sought, where possible, to err on the side of simplicity, many need analysis issues do not lend themselves to a simplified process. Matters relating to divorced and separated parents and the analysis of small business enterprises are two such examples. The 568 Group believes, however, that its collective interest in achieving a fair and equitable result requires the added complexity associated with the policy guidelines in these and other particularly complicated areas. Additionally, the 568 Group believes that IM, as amended by the Consensus Methodology, encourages savings for college and recognizes that a family's ability to pay is largely a function of: a) its financial strength and b) the number of children to be educated. In the area of discouraging asset manipulation, our policy guidelines seek to address this problem, but more work must be done in this difficult area.

## Part I – Need Analysis and Professional Judgment Issues

**A. Divorced/Separated/Single Parent**

**Consensus Agreement:** Analysis begins with the custodial family unit. In most cases, additional information is sought concerning the non-custodial family unit. In the case of re-marriage of either or both natural Parents, the standard approach would be to request the cooperation of and information from all parents and spouses. Generally, a contribution from the income and assets of no more than two parents will be expected. Institutions may exercise professional judgment to use information from more than two parents.

**The Non-Custodial Waiver Process**—Information may be waived using the Consensus Approach **Non-custodial Waiver Petition** or other appropriate documentation from the non-custodial parent in any of the following circumstances:

- physical or emotional abuse documented by, for example, a police report, restraining order, or supervised visitation in the divorce decree;
- receiving public assistance or is disabled and receiving benefits;
- incarceration;
- step-parent has legally adopted the student;
- when the divorce occurred over ten years ago and there is no contact, no child support, or parent involvement. In most cases, a third party confirmation letter is advised;
- when the divorce is more recent and the student provides adequate information to support a claim of "abandonment;" (excluding financial or emotional) or
- no known second parent.

NOTE: How and when the non-custodial parent is given information about accessing the **Non-Custodial Waiver Petition** is an institutional decision.

**Background:** Until the development of the 568 Group approach to the analysis of Divorced/Separated parents, there was no consistent way of evaluating the financial need of students whose parents are not married to each other but who remain the primary source of the student's financial, physical, and emotional support. In response to the process introduced by the 568 Group, the College Board developed an online Non-Custodial Profile form and a corresponding non-custodial parent need analysis. The process presumes that institutions will attempt to secure data from both natural parents (Parent A, the custodial parent; and Parent B the non-custodial parent) in order to determine what is a reasonable contribution from each; recognizing, of course, that this effort may not always be successful. The process is often made more complex because of the re-marriage of one or both parents. In addition, Federal Methodology (FM) completely excludes all non-custodial data.

**Rationale:**

- A consensus approach on policy and procedure for calculating parental support will reduce significant variances in measuring need among institutions.
- As with students whose parents are married to one another, **ability** to pay, not **willingness** should be used to determine the expected parent contribution.

• Parents' divorce one another, not their child.

***[NOTE: See Appendix for supplemental language that will be included in the Professional Judgment Manual]***

**B. Assessment of Rental Property/Other Real Estate**

**Prior Treatment**: Federal Methodology (FM) has no special provisions for rental income. Base Institutional Methodology (IM) eliminates Schedule E losses. Many institutions make professional judgment changes, e.g., adding back rental/real estate depreciation, or falling back on a bottom-line adjustment to the parent contribution (PC) to better reflect what they think the family can afford.

**Consensus Agreement**:

- Add back any rental loss to income.
- Add back rental/real estate depreciation (net of loss) to income and include any positive income to overall family income.
- Use Housing multiplier to determine rental property value from purchase price and year of purchase.
- Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family, especially in cases where the business is as a developer.
- Multi-family real estate – Determine the percentage of the family's residence and include appropriate value/debt under the home. The remaining value/debt will be included under other real estate.

**Rationale**: Rental property depreciation, while allowable for income tax purposes, is a paper loss that distorts a family's real income. To the extent that other components of the methodology (e.g., a cap on home equity) are linked to income, the methodology should use as realistic an income as possible. There should be objective measures to assess rental property value, just as there are with home value, rather than relying solely on family-reported data.

**Issues**: Increased document/data collection may be required, although many schools collect much of it already.

**Implementation/Resolution of Issues:** Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties.

**C. Cost of Living Variances**

**Prior Treatment**: Institutional Methodology has traditionally used a uniform, basic living expense allowance. Although it is generally recognized that living expenses vary significantly in different geographic areas, the standard calculation does not consider these variations. The current methodology now includes an option developed initially by the 568 Group that allows institutions to adjust the living allowance for applicants from virtually all metropolitan areas.

**Consensus Agreement**: The 568 Group believes that the number of locales needs to be expanded and appreciates College Board's cooperation in developing a new and expanded Cost of Living Table that incorporates all major metropolitan areas. The 568 Group recognizes that the complexity of gauging the ever-changing costs of living in the various metropolitan areas will require an ongoing research effort. The 568 Group looks forward to further collaboration with CSS to finesse the current tables.

**Rationale**: While everyone recognizes that living in Manhattan, Kansas requires less non-discretionary income than living in Manhattan, New York, it is very difficult to draw exact lines for the purpose of defining cost-of-living areas. Where does consideration of the high cost of living in NYC end? Which suburbs should be included? While there would be a desire to develop a table that defined cost-of-living areas at the micro level, the 568 Group is aware that, even within a zip code, housing values can differ significantly. Gathering detailed information to define a micro-level table would be extremely difficult and would have questionable long-term reliability.

It is also difficult to deal with the variety of choices that families make. One family might choose to live in an upscale suburb while another family with the same income might choose a lower-cost area. Giving one family a higher allowance to account for their decision to enjoy a higher standard of living would be unfair and inappropriate. It is also virtually impossible to distinguish between true cost-of-living issues and standard-of-living differences within metropolitan areas. Again, the common metropolitan area Cost-of-Living Table developed with CSS resolves this problem.

**Issues:**

- Identification of the boundaries of major metropolitan areas within which there is a reasonably uniform cost of living.
- Identification of the appropriate market basket of goods and services to be used to define cost-of-living indices. In particular, state and local taxes, which are allowed separately in both IM and FM, should be excluded.

**Resolution of Issues**: The question of how to adjust the need analysis formula to account for geographical differences in the cost of living is complex and the solutions are likely to change over time. Consequently, the 568 Group believes that cost-of-living standards should be reviewed and updated annually. The cost-of-living tables offered by CSS as a PROFILE option shall be used in the Consensus Approach. These tables are based on the Bureau of Labor Statistics Consumer Expenditure Survey (CES), a data source that is used throughout the current IM formula. The tables include metropolitan areas from throughout the country, but do not include the impact of local and state taxes, thereby avoiding an issue that taints other cost-of-

living studies.[1] The table shall be used only to increase IPA, not decrease it. Using the table to decrease the IPA and ERA would be unfair to students from cities with lower housing costs because the methodology does not lower the IPA or ERA for students from rural areas or cities not covered by the table.

The 568 Group agrees that this issue requires ongoing collaboration with CSS's Financial Aid Standards and Services Advisory Committee. The 568 Group is continuing its work on the cost-of-living issue and the 568 Group looks forward to lending its support to FASSAC on-going efforts in this regard. Given the complexity of the issue and the amount of time that it will take to come to resolution, it is appropriate to expand the number working on the problem.

**Consensus Agreement**: Adjust the IPA and ERA allowances, using CSS tables. Continue to consider whether there is a better approach to the COLA tables.

**D. Family and Student Assets**

**Prior Treatment**: Student assets are treated separately from parental assets in the current institutional and federal analyses. They are assessed at 25% in Institutional Methodology (IM) and 20% in Federal Methodology (FM). In IM, sibling assets are added to parental assets; the assessment rates range from 3% to 5% of family assets. Assets in pre-paid tuition and savings plans are treated in Federal Methodology as untaxed income.

**Consensus Agreement**: If the student is the source of the asset, then the consensus agreement is to treat them as student assets. Assets in pre-paid tuition and savings plans are to be treated as parent assets. Assets from grandparents (and other outside benefactors) and Trusts are generally to be treated as student assets.

**Rationale**: This treatment of assets has several advantages over both the IM and FM methodologies. It is consistent with the treatment of sibling assets since they are already added to parental assets in IM. It is also consistent with public policy initiatives that encourage families to participate in plans offering pre-paid tuition and/or savings plans.

**Issues**: Several issues need to be resolved:

- The cost of treating student assets at a lower rate of assessment (3 to 5% versus 25%) will be significant for many institutions.

---

[1] The 568 Group's initial concern with the CES data was based on the fact that it gives information on expenditures and not the cost of a fixed market basket of goods. Therefore, the CES data presents information on standards of living rather than cost of living. A subsequent review of the CES data focused on the component that describes the cost of housing. This was done because it is clear that housing costs represent the most significant driving force in differential costs of living and because it eliminates the effect of discretionary choices that families make in the purchase of discretionary items such as entertainment, dining out, etc. In addition to developing a cost of living table based on differential housing costs, the 568 Group examined its impact when applied against the entire Income Protection Allowance (IPA) and against only the housing component of the IPA. As one would expect, the differences are quite significant

- Professional judgment will need to be exercised in cases where this treatment might not be appropriate. An example is the case in which large assets are given to the student by third parties, such as grandparents.
- Since the federal system still assesses student assets at 20%, the 568 Group's agreement may result in federal overawards.

**Implementation/Resolution of Issues**: A broad examination of family assets might result in somewhat higher assessment rates on parental assets. The 568 membership institutions will need to formulate standards of professional judgment to cover those cases in which assets held in the student's name are to be treated as student resources. Due to the federal issues involved, the 568 Group agrees that the proposal should be placed on future legislative agendas.

### E. Home Equity

**Consensus Agreement**: Home equity can be an important indicator of a family's financial strength and it should be given consideration in need analysis. In many cases a cap based on a family's income should be used to limit the amount of equity to be assessed. The consensus view is that the standard cap should be 1.2 times total income (as defined by CM), with professional judgment adjustments in individual cases, including where it may be necessary to impute a value other than what is reported.

**Background**: The Congressional decision to remove home equity from the federal formula has been a major factor in the confusion now surrounding need-based aid awards nationally and particularly at the 568 Group institutions. The absence of home equity in the federal formula has meant that for many families contributions based on the Federal Methodology have often been considerably lower than those calculated via IM. For reasons relating to both fairness and competition, institutions have begun to vary the manner in which home equity is considered. At some institutions, these policy changes have been applied across the board. At others the treatment of home equity has been applied selectively based on the applicant's circumstances or the institutional admissions rating.

The prior IM option of capping home equity at 3 times income does not sufficiently recognize the fact that home equity is an asset that is less liquid than other forms of assets and is therefore less readily available for financing education expenses. The 568 Group is aware that the family home is both an investment good and consumption good. While other assets are held strictly for the appreciation of wealth (an investment good), one's home is also a good from which housing services and other non-pecuniary factors are important considerations (a consumption good). The IM methodology ignores the consumption value of the home and treats it strictly as an investment good like any other asset. Furthermore, housing values have appreciated over time at very different rates in different parts of the country. In these and other cases, the use of the full reported home value may result in an expected PC significantly out of line with the family's income. For these reasons, and to narrow the divide between the treatment of home equity in the FM and the Consensus Approach the equity of the home should be capped at 1.2 times income as defined in CM. Because many 568 institutions already adjust home equity in some fashion, this policy encourages greater consistency in the treatment of this significant asset.

### F. Retirement Allowance

**Consensus Agreement**: Because the world of retirement planning continues to change, an allowance for retirement needs to be viewed from a broader perspective than in the past, incorporating an overview of family assets that may exist outside of traditional IRAs, Keoghs, defined-benefit, and defined-contribution plans. Need Analysis must recognize that part of a family's financial planning necessarily must include saving for retirement. The 568 Group agrees to create a Task Force on Retirement, and perhaps collaborating with CSS, to bring about a comprehensive review of the treatment of assets in Need Analysis as they relate to retirement planning.

**Background**: Until its recent revision, the Base IM treatment of assets included a retirement allowance provision for all families. This provision was created at a time when most families expected that Social Security would serve as the principal source of retirement income. The IM retirement allowance was designed to supplement the family's Social Security income during retirement. Because most families are now covered by formal, privately owned retirement plans not considered in need analysis, CSS determined that the IM retirement allowance was no longer necessary. It was eliminated and formal educational savings and family emergency savings allowances were added.

The 568 Group recognizes that many families are not covered by formal retirement programs and that it may be appropriate to provide retirement protection for those without such support. Such an allowance should be created in consultation with CSS and other experts in the field of retirement planning. Recognizing that this will involve research and would ultimately require CSS to add questions to PROFILE, in the interim the current Federal Methodology (FM) asset protection (retirement allowance) tables should be used on a case-by-case basis.

CSS plans a long-term project in which they will review retirement assets currently held by applicant families. The planning for this project was delayed given a negative response from the IM User group to some preliminary data, the Reimagined PROFILE and Prior PriorYear projects. Although the 568 Group does not necessarily agree with the inclusion of such assets in the need analysis formula, members of the 568 Group are interested in supporting and participating in this project. (Fall of 2016) A subcommittee of 568 is currently in conversation with CSS regarding how retirement asset information is currently being asked for on the PROFILE and how we (568) might be able to use collected information to test models for an income or asset protection allowance for retirement.

**G. Institutional Methodology Taxation Bands**

**Consensus Agreement**: No change until further study assesses their impact.

**Background**: Institutional Methodology is a highly progressive formula designed to determine the family's ability to pay through a careful review of its overall financial circumstances. An Income Protection Allowance (IPA) does not, as is commonly understood, define the amount of money required by individual families to cover their living expenses. Instead, it represents the income level below which a family has no discretion about how its income is spent. Parents with

incomes at or below the IPA are not asked to make contributions from income to their children's educational costs. Those with higher incomes have more choices about how they spend their income and are expected to use some fraction of their income to pay for their children's education. Because of concerns about the progressivity of the IPA, the new IM recalibrated the lower-income taxation bands and reduced the highest band by one percent. In addition, CSS published new, more liberal, optional assessment rate tables in 2009. The 568 Group endorses the use of these new tables.

After a great deal of consideration, the 568 Group concludes that a better understanding of the impact these changes have on the new IM is needed. Given this uncertainty and the additional methodological changes described elsewhere in this Manual, it is important to review over time the impact of the revised tables as part of the process of improving the Consensus Approach. Consequently, no additional adjustments are recommended at this time, subject to further study over the next several years.

### H. Number of Siblings in College

**Consensus Agreement:** Continue the Institutional Methodology formula for multiple siblings in college.

**Background**: Federal Methodology divides the total parent contribution by the number of siblings enrolled in college to derive an expected parent contribution for each sibling.

The 568 Group agrees that the current IM treatment of the number of siblings in college shall be included in the Consensus Approach. Additionally, the Consensus Approach shall include the following policy clarifications:

1. Siblings enrolled in graduate or professional school shall not be counted as in college (but will be included in household size) unless the family can document that the enrolling institution has determined that the student is dependent for aid purposes and that the parents are paying the assigned parent contribution.
2. The allowance for siblings enrolled at community colleges and other similar low-cost schools should be capped at the amount of their tuition and mandatory fees. (Schools may also want to cap the allowance for siblings at four-year public colleges at their tuition, mandatory fees, room, and board, but there is not consensus on this issue.)
3. If the sibling is receiving a non-need-based scholarship, the allowance should be capped at tuition, fees, room and board, net of the scholarship.
4. Parents shall not be counted as family members in college. If, however, the parent's current job requires course work or they need to be retrained after losing a job, the institution may include as an allowance against income the amount of such unreimbursed tuition.

A related issue is the consideration of previous educational debt the parents may have accumulated when educating other children. This issue is addressed in Paragraph N below.

**I. Elementary and Secondary School Tuition Expenses**

**Consensus Agreement**: Employ the Institutional Methodology optional treatment of such expenses.

**Background**: Unlike the Federal Methodology (FM), the IM formula offers the option of counting elementary and secondary school expenses. In each case the tuition allowance cap for each sibling is based on a national average of the annual cost of elementary/secondary school tuition. This IM formula option has been made a standard part of the Consensus Approach. Tuition expenses in excess of the cap would generally not be considered, unless perhaps through professional judgement.

Although the Federal Methodology ignores elementary and secondary school expenses, most 568 Group-like schools already use the IM formula.

**J. Imputing Assets**

**Consensus Agreement:** Use reported interest and dividend income to extrapolate the value of the principal that generates this income.

**Background**: Cash and investment assets reported by both parents and students often fail to correlate with interest and dividend income as reported on federal tax forms. Historically, institutions have used a variety of formulas to impute the asset holdings implied by the reported income. The Consensus Approach will use reported interest and dividend income to impute the principal value that would be expected to generate this income. Each year, the 568 Technical Committee will establish a multiplier, based on market results, to be used for this purpose. The multiplier has been 25, based on an assumed 4% return. The 568 Group has discussed that, in the current interest rate climate, this may be overly generous, but no decision has been made to modify it. Also, the Group has discussed the possible use of different multipliers for interest and dividends, but, again, no specific agreement has been made.

**K. Medical Expenses**

**Consensus Agreement**: Employ the Institutional Methodology treatment of such expenses.

**Background**: Unlike the Federal Methodology, which ignores medical expenses, current IM allows unreimbursed medical expenses that exceed 4.6% of IM income. The current IM treatment of medical expenses shall be included in the Consensus Approach. In cases of extreme medical expenses, professional judgment guidelines should be applied locally. If reported medical expenses are higher in 2016 than 2015 (itemized on Schedule A), a special adjustment can be made to include 2016.

**L. One-time Income Adjustments**

**Consensus Agreement**: Exclude certain non-recurring income. Treatment of non-recurring income is to be handled on a case-by-case basis.

**No. 26-2759**

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

ANDREW CORZO, ET AL.,

*Plaintiffs-Appellees*,

*v.*

CORNELL UNIVERSITY, ET AL.,

*Defendants-Appellants*.

Interlocutory Appeal Pursuant to Federal Rule of Civil Procedure 23(f) from the United States District Court for the Northern District of Illinois, No. 1:22-cv-00125-MFK Before the Honorable Matthew F. Kennelly

**APPENDIX FOR DEFENDANTS-APPELLANTS BRIEF**
**VOLUME 2, PARTS 6 & 7**
**(A668 – A838)**

DAVID GRINGER
ALAN SCHOENFELD
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 Word Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
david.gringer@wilmerhale.com
alan.schoenfeld@wilmerhale.com

SETH P. WAXMAN
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
seth.waxman@wilmerhale.com

*Attorneys for Defendant-Appellant the Trustees of the University of Pennsylvania*

October 5, 2026

Additional Counsel on Inside Cover

NORMAN ARMSTRONG
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800
norman.armstrong@cooley.com

*Attorney for Defendant-Appellant Cornell University*

BRITT M. MILLER
DANIEL T. FENSKE
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
dfenske@mayerbrown.com

*Attorneys for Defendant-Appellant Georgetown University*

ERIC MAHR
JAN RYBNICEK
FRESHFIELDS US LLP
700 13th Street NW
Washington, DC 20005
(202) 777-4500
eric.mahr@freshfields.com
jan.rybnicek@freshfields.com

*Attorneys for Defendant-Appellant Massachusetts Institute of Technology*

ZAKI ANWAR
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
zaki.anwar@wilmerhale.com

EDWARD W. FELDMAN
MILLER SHAKMAN LEVINE &
FELDMAN LLP
30 W. Monroe Street
Suite 1900
Chicago, IL 60603
(312) 759-7213
efeldman@millershakman.com

*Attorneys for Defendant-Appellant the Trustees of the University of Pennsylvania*

ROBERT A. VAN KIRK
SARAH F. KIRKPATRICK
MATTHEW D. HEINS
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000
rvankirk@wc.com
skirkpatrick@wc.com
mheins@wc.com

*Attorneys for Defendant-Appellant University of Notre Dame*

## APPENDIX TABLE OF CONTENTS

Page

### VOLUME 1
### (BOUND WITH BRIEF)


Order on Motion for Class Certification (June 1, 2026), Dkt. 1275 .......... A1

Memorandum Opinion and Order on Motion for Class Certification (Mar. 31, 2026), Dkt. 1241 .......... A12

Memorandum Opinion and Order on Motions to Exclude Expert Testimony (Sept. 29, 2025), Dkt. 1160 .......... A74


### VOLUME 2
### (SEPARATELY BOUND)


District Court Docket, No. 1:22-cv-00125 (N.D. Ill.) .......... A128

Complaint (Jan. 9, 2022), Dkt. 1 .......... A139

Amended Complaint (Feb. 15, 2022), Dkt. 106 .......... A200

Memorandum Opinion and Order on Motion to Dismiss (Aug. 15, 2022), Dkt. 185 .......... A207

Second Amended Complaint (Feb. 6, 2023), Dkt. 308 .......... A211

Plaintiffs' Motion for Class Certification Exhibit 17: Email from Patricia McWade to Ted Bracken (dated Apr. 15, 2014), Dkt. 753-17 (Redacted) .......... A222

Plaintiffs' Motion for Class Certification Exhibit 18: Email from Cynthia Barnhart to Elizabeth Hicks (dated Aug. 27, 2014), Dkt. 753-18 (Excerpts) .......... A223

Plaintiffs' Motion for Class Certification Exhibit 24: Email from Donald Bishop to Lou Nanni, Joseph Gelchion, and Robert Mundy (dated Mar. 6, 2012), Dkt. 753-24 .......... A224

Rebuttal Expert Report of Nicholas Hill, dated Aug. 7, 2024 (filed Dec. 16, 2024), Dkt. 755-4 (Excerpts) .............................. A226

Deposition of Hal J. Singer, dated Nov. 27, 2024 (filed Dec. 16, 2024), Dkt. 755-11 (Excerpts) .............................................. A233

Amended Expert Report of Hal J. Singer, dated May 28, 2024 (filed Dec. 16, 2024), Dkt. 755-12 (Excerpts) ............................ A272

Rebuttal Expert Report of Hal J. Singer, dated Oct 7, 2024 (filed Dec. 16, 2024), Dkt. 755-18 (Excerpts) ............................ A279

Defendants' Motion to Exclude Expert Testimony, Exhibit 20: *Peer School Financial Aid Initiatives Timeline* (filed Dec. 16, 2024), Dkt. 755-22 ........................................................ A310

Surrebuttal Expert Report of Lauren J. Stiroh, dated Nov. 1, 2024 (filed Dec. 16, 2024), Dkt. 755-27 (Excerpts) ................................ A314

Rebuttal Expert Report of Lauren J. Stiroh, Appendix 1, dated Aug. 7, 2024 (filed Dec. 16, 2024), Dkt. 755-29 (Excerpts) ................................................... A324

Rebuttal Expert Report of Hal J. Singer, dated Oct. 7, 2024 (filed Dec. 17, 2024), Dkt. 756-34 (Excerpts) ............................ A331

Expert Report of George Bulman, dated May 14, 2024 (filed Dec. 17, 2024), Dkt. 756-36 (Excerpts) .............................. A336

Supplemental Rebuttal Expert Report of Hal J. Singer, dated Nov. 8, 2024 (filed Dec. 17, 2024), Dkt. 756-38 (Excerpts) ................................................... A338

Rebuttal Expert Report of Bridget Terry Long, dated Aug. 7, 2024 (filed Dec. 17, 2024), Dkt. 756-39 (Excerpts) (Redacted) ............. A342

Rebuttal Expert Report of Bridget Terry Long, Appendix D, dated Aug. 7, 2024 (filed Dec. 20, 2024), Dkt. 765-1 (Excerpts) (Redacted)............................................. A426

Deposition of Hal J. Singer, dated Nov. 27, 2024 (filed Feb. 1, 2025), Dkt. 789-2 (Excerpts) .......... A507

Rebuttal Expert Report of Bridget Terry Long, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 789-3 (Excerpts) (Redacted) .......... A510

Rebuttal Expert Report of Nicholas Hill, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 789-4 (Excerpts) .......... A598

Rebuttal Expert Report of Lauren J. Stiroh, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 789-16 (Excerpts) (Redacted) .......... A625

Plaintiffs' Motion for Class Certification, Exhibit 19: *The 568 Group Consensus Methodology Policy Guidelines* (Dec. 2016) (filed Feb. 1, 2025), Dkt. 789-20 .......... A655

Second Amended Expert Report of Hal J. Singer, dated June 10, 2024 (filed Feb. 1, 2025), Dkt. 789-25 (Excerpts) .......... A673

Surrebuttal Expert Report of Nicholas Hill, dated Nov. 1, 2024 (filed Feb. 1, 2025), Dkt. 789-32 (Excerpts) .......... A687

Plaintiffs' Motion for Class Certification, Exhibit 41: *Report of Common Standard Subcommittee to 568 Presidents' Working Group* (filed Feb. 1, 2025), Dkt. 789-42 (Excerpts) .......... A689

Deposition of James Tilton, dated May 15, 2023 (filed Feb. 1, 2025), Dkt. 789-49 (Excerpts) .......... A691

Surrebuttal Expert Report of Lauren J. Stiroh, dated Nov. 1, 2024 (filed Feb. 1, 2025), Dkt. 789-51 (Excerpts) .......... A694

Rebuttal Expert Report of Nicholas Hill, dated Aug. 7, 2024 (filed Feb. 27, 2025), Dkt. 802-7 (Excerpts) .......... A699

Second Amended Expert Report of Hal J. Singer, dated June 10, 2024 (filed Feb. 28, 2025), Dkt. 805-2 (Excerpts) .......... A702

Minute Docket Entry for Hearing on Motions to Exclude
Expert Testimony (Apr. 3, 2025), Dkt. 835 ................................ A705

Defendants' Motion for Summary Judgment, Exhibit 85:
*Penn Undergraduate Student Accessibility and Affordability*, dated Feb. 27, 2020, (filed May 7, 2020),
Dkt. 864-4 (Excerpts) ................................................................ A707

Defendants' Motion for Summary Judgment, Exhibit 90:
*House Judiciary Committee Report on Need-Based Educational Aid Act of 2001*, H.R. Rep. No. 107-32,
1st Sess. (2001), Dkt. 864-9 (Excerpts)...................................... A710

Defendants' Motion for Summary Judgment, Exhibit 120:
Email from Caesar Storlazzi to J. Lloyd Suttle and Rhakti Nagella, dated Oct. 2, 2012 (filed May 7, 2025),
Dkt. 864-39 ................................................................................ A714

Deposition of Hal J. Singer, dated Nov. 27, 2024
(filed May 8, 2025), Dkt. 865-30 (Excerpts) .............................. A715

Deposition of Caesar Storlazzi, dated July 27, 2023
(filed May 8, 2025), Dkt. 865-31 (Excerpts) .............................. A726

Deposition of Hal J. Singer, dated Nov. 27, 2024
(filed May 29, 2025), Dkt. 874-5 (Excerpts) .............................. A728

Errata to Expert Report of Bridget Terry Long, updated
Aug. 12, 2024 (filed June 27, 2025), Dkt. 889-3 (Excerpts)...... A735

Second Amended Expert Report of Hal J. Singer,
dated June 10, 2024 (filed June 27, 2025),
Dkt. 889-17 (Excerpts) .............................................................. A739

Plaintiffs' Opposition to Summary Judgment, Exhibit 107:
*Memorandum of Understanding the 568 Presidents' Group*, dated Jan. 5, 2004 (filed Sept. 12, 2025,
Dkt. 1025-6 ................................................................................ A744

Memorandum Opinion and Order on Cross-Motions for Summary Judgment (Jan. 12, 2026), Dkt. 1210 (Excerpts) ...................... A747

Transcript of Proceedings of Status Conference (Mar. 20, 2025), Dkt. 1261 (Excerpts)................................................................. A784

Transcript of Proceedings on Motions to Exclude Expert Testimony (Apr. 14, 2025), Dkt. 1263 (Excerpts) ..................... A788

Hearing on Motions to Exclude Expert Testimony (Apr. 14, 2025): Defendants' Hearing Presentation ................ A833

Order Granting Plaintiffs' Motion to Provide Agreed Forms of Notice to the Certified Litigation Class (June 12, 2026), Dkt. 1282 (Excerpts)................................................................. A835

Transcript of Proceedings on Class Counsel Approval (May 26, 2026, 2:30pm) (Excerpts)........................................... A837

**VOLUME 3**
**SEALED**
**(SEPARATELY BOUND)**

Rebuttal Expert Report of Bridget Terry Long, Appendix D, dated Aug. 7, 2024 (filed Dec. 16, 2024) Dkt. 754-3 (Excerpts) [unredacted version of A426-506] ............................ A839

Plaintiffs' Motion for Class Certification Exhibit 17: Email from Patricia McWade to Ted Bracken (dated Apr. 15, 2014), Dkt. 757-12 [unredacted version of A222] ........................................................................ A920

Rebuttal Expert Report of Bridget Terry Long, dated Aug. 7, 2024 (filed Dec. 17, 2024), Dkt. 757-52 (Excerpts) [unredacted version of A342-425] ..................................................................A921

Declaration of Hal J. Singer (Jan. 25, 2025), Dkt. 785-2................. A1005

Rebuttal Expert Report of Bridget Terry Long, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 788-3 (Excerpts) [unredacted version of A510-597]........................................................................A1009

Rebuttal Expert Report of Lauren J. Stiroh, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 788-16 (Excerpts) [unredacted version of A625-654] ....................A1088

Second Amended Expert Report of Hal J. Singer (May 7, 2025), Dkt. 854-7 (Excerpts) ....................A1118

Transcript of Proceedings on Settlement Approval (July 28, 2025, 2:50pm), Dkt. 1345 (Excerpts) ....................A1121

## Index of Excerpted Transcript Pages Included in Appendix


| Proceeding | Excerpted Transcript Pages | Appendix Page |
|---|---|---|
| Transcript of Proceedings of Status Conference (Mar. 20, 2025), Dkt. 1261 | pp.9-11 | A785-787 |
| Transcript of Proceedings on Motions to Exclude Expert Testimony (May 15, 2026), Dkt. 1263 | pp.7-31, 47-48, 69-73, 75-76, 87, 98-100, 113-115, 130-131, 150 | A789-832 |
| Transcript of Proceedings on Settlement Approval (July 28, 2025, 2:50pm), Dkt. 1345 (SEALED) | p.7 | A1122 |
| Transcript of Proceedings on Class Counsel Approval (May 26, 2026, 2:30pm) | p.9 | A838 |

**Index of Excerpted Deposition Transcript Pages Included in Appendix**

| Depositions | Excerpted Transcript Pages | Appendix Page |
|---|---|---|
| Hal J. Singer Deposition (Nov. 27, 2024), Dkt. 755-11 | pp.29, 31-34, 48-49, 127-132, 184, 189-190, 201, 252-254, 261-262, 270-274, 281-283, 288-293, 295-296 | A234-271 |
| Hal J. Singer Deposition (Nov. 27, 2024), Dkt. 789-2 | pp.315-316 | A508-509 |
| Hal J. Singer Deposition (Nov. 27, 2024), Dkt. 865-30 | pp.19-21, 27, 59, 82, 92-93, 95, 117 | A716-725 |
| Hal J. Singer Deposition (Nov. 27, 2024), Dkt. 874-5 | ECF pp.3-8 | A729-734 |
| Caesar Storlazzi Deposition (July 27, 2023), Dkt. 865-31 | p.38 | A727 |
| James Tilton Deposition (May 15, 2023), Dkt. 789-49 | pp.121-122 | A692-693 |

**Background**: Because the Consensus Approach uses base year income to estimate a parent's ongoing income, it may be appropriate to exclude certain non-recurring income, such as capital gains (and losses), early withdrawals from pension plans and IRA's, and. rollovers. Most 568-type schools already reduce need analysis income by documenting one-time-only income and this practice shall be incorporated into the Consensus Approach, with appropriate adjustments to tax allowances. Specifically not included would be overtime and bonus income unless the parent's employer can document a related change in company policy. You may wish to perform a mid-year review with documentation in such instances.

**M. Special Expense Adjustments**

**Consensus Agreement**: Consider the impact of certain non-reoccurring, non-discretionary expenses

**Background**: Families often incur one-time-only, non-reoccurring expenses that can significantly affect their ability to support educational costs. These expenses can include costs associated with parental care, funeral expenses, uninsured natural disasters, and extraordinary home repair costs. As a general rule, for an allowance to be made for an expense, the expense must be both extraordinary (i.e. an expense that most families don't incur) and non-discretionary. In the case of one-time expenses such as weddings and funerals, schools may want to spread the allowance over the student's remaining years, to smooth the impact on PC and to recognize that families often spread these expenses by borrowing. Treatment of such costs varies from campus to campus and contributes to the variability in need analysis results. The Professional Judgment Guidelines Manual includes specific guidelines on how institutions can respond to these expenses. If reported elder care expenses are higher in 2016 than 2015, a special adjustment can be made to include 2016.

**N. Family Loan Debt**

**Consensus Agreement**: The Consensus Approach recognizes that it is reasonable to make an allowance for parents' personal education debt within the methodology. Allowances for such debt would be made against parental income and/or assets but is left to the discretion of individual schools and is addressed in the Professional Judgment Handbook. It is agreed that an educational debt allowance would not include debt incurred for the higher education expenses of an applicant's sibling(s). In addition, no allowance would be made for debt incurred for the applicant, or for the sibling in a program in which he or she is currently enrolled (and whose expenses are therefore considered in the adjustment for multiple siblings in college).

**Rationale**: A parent's personal educational debt affects current financial strength. Recognizing a parent's educational debt further addresses previous and legitimate commitments to education by broadening the perspective from a "snap shot" view to a wider one that includes consideration of certain financing expenses incurred by the parent(s). In fairness, consideration should be given

to parents who have incurred their own personal educational debt which they are required to repay while supporting the educational costs of the applicant.

**Implementation/Resolution of Issues**:
Skip logic will be included in the Re-Imagine PROFILE that distinguishes debt for parent, currently enrolled sibling and not currently enrolled sibling. The 568 Group will continue to work with CSS to craft language and assist in articulating what information and data would be most useful to implement this policy guideline into central processing.

### O. Definition of Income

**Consensus Agreement**: Zero out all losses (Schedule C, Schedule E, Capital and other losses) to income. If Schedule C, E or F income represents multiple entities, one or more of which has a positive income and one or more of which has a loss, add back the individual losses to income.

### P. Parent Businesses

**Background**: It is the sense of most financial aid professionals that self-employed families generally have greater financial strength than wage-earning families with the same AGI, and that adding back Schedule C, E and F losses is not generally sufficient to achieve horizontal equity among these families. While no consensus approach has been attempted to address this concern, the PJ Manual provides extensive suggestions for reviewing tax returns for Corporations/Partnerships and Schedule C, E and F enterprises.

### Q. Parental Unemployment

**Consensus Agreement**: – In cases where it is appropriate to use anticipated year income, it is agreed that there should be a mid-year review follow-up process. Anticipated year income can be used when there has been an interruption or change in employment that has caused a significant reduction in household income. For the parent who is unemployed or where there is a significant reduction to income, it should be assumed that the parent will be reemployed at a reduced rate from his or her previous salary. (Of course the parents' anticipated earnings could be used, if higher than the base or recent year earnings.) Appropriate unemployment benefits should be built in for the assumed period of unemployment. Other income elements (e.g. the other parent's wages) should be built in at the base year level unless the parents' projection indicates a significant (and explained) change. Appropriate adjustments should be made to tax allowances (US, state/local, FICA).

**Background**: The standard IM and CM is to use base year data in constructing the parental contribution. This raises the issue of how to construct income and otherwise deal with cases where a parent has become unemployed, or otherwise projects a significant decline in income from the base year level, since base-year income is not a reflection of the parents' ability to contribute in these cases. Most schools follow up for additional information, including the parents' projection of income for the following year. However, it was apparent to the 568 Group

that there was inconsistency in how income was constructed once the additional information was received. In order to attempt to bring about greater consistency among the 568 schools in these cases, the Technical Committee developed a prototype Appeal/Projected Year Income follow-up document, and recommended a standard approach (included in the appendix). We recognize that parents who are unemployed are likely to present the worst-case scenario when projecting income, and feel that a floor is needed to recognize this fact.

**R. International Students-**
**Background**: While most of the 568 schools used the College Board's Certification of Finances to collect information about the financial circumstances of international aid applicants, there was very little rationale or consistency in how family contributions were determined. It was clear that simply plugging the data for these students into the standard IM/CA calculation was inappropriate, since infrastructural allowances and tables did not reflect the very different levels of income required for maintenance in the various foreign countries, and therefore did not accurately reflect how much of the family income and assets could be reasonably considered discretionary and available toward educational expenses. Some schools attempted to determine a PC by subtracting reported expenses from reported income. Parent offers were frequently used. A Global Spreadsheet was developed using CIA data for individual countries' GNPs to serve as a reasonable basis for adjusting IM tables. The 568 Group adopted the Global Spreadsheet, and the College Board thereafter incorporated it into their processing. A CSS group is expected to be reviewing this in the near future.

## Part II – Management and Process Issues

The maintenance and management of a new common standard of need analysis requires a number of specific agreements related to processing.

**A. Tax Form Collection**

**Consensus Agreement**: Collect all of the base tax and W-2 forms from all applicants.

**Background**: Application requirements for first-year students can vary considerably from institution to institution. Most 568 Group institutions require families to submit their base tax forms (all pages and all schedules) before releasing financial aid resources for account payments. As a general policy, the 568 Group calls for participating institutions to require families to submit their base tax forms (personal and, where appropriate, corporate and partnership) and all W-2 forms before first-year aid awards are prepared.

**B. Professional Judgment Guidelines Manual**

**Consensus Agreement**: Maintain a Professional Judgment Guidelines Manual that borrows heavily from the current CSS manual with modifications as appropriate.

**Background**: the 568 Group recognizes that locally applied professional judgment is a critical component of need analysis. The PJ Manual standardizes both those issues that should be treated locally and, to the extent possible, the manner in which such issues are handled.

Rather than reinvent the proverbial wheel, the tried-and-true professional judgment advisories prepared by the CSS and others should be used where appropriate. These are subject to modification where appropriate and others will be added as needed.

Finally, the issue of training is critical to the success of the Consensus Approach. Staff members, especially new hires, must be trained in the use of the Consensus Approach to determining the family's ability to pay. Time and resources should be devoted to both in-house and 568 Group activities.

**CERTIFICATE**
**OF**
**SIBLING ENROLLMENT**

| A. ***YOUR COLLEGE*** **STUDENT INFORMATION** |
| --- |

Name________________________________________ ID#__________________________
My sibling,______________________________ will ( ) will not ( ) be attending a post-secondary institution during the 2000-2001 academic year.
Continue to Section B if sibling will be attending a post-secondary institution; return form to the above address if sibling will not be attending a post-secondary institution.

**B. TO BE COMPLETED BY SIBLING OF YOUR COLLEGE STUDENT**

In order to verify information on my sibling's financial aid application, I authorize the institution at which I am enrolled to release the information requested to *Your College*.

__________________________________________________
Name of Institution

________________________/______________________ ______________________ ___________
Sibling's Name Signature S.S. # Date

**C. TO BE COMPLETED BY INSTITUTION REFERENCED IN SECTION B**

The *Your College* student referenced in Section A has indicated on her/his financial aid application that s/he has a sibling, referenced in Section B, who will be attending your institution during the 2000-2001 academic year. Please complete the following information regarding the student enrolled at your institution to assist us in our certification.

EXPECTED DATE OF GRADUATION
1. ____________/_________
(Month/ Year)

2000-2001 ENROLLMENT STATUS
2. ( ) Undergraduate ( ) Graduate
3. ( ) Full-time ( ) Less than 1/2 ( ) Half-time ( ) Not enrolled
4. ( ) Degree ( ) Certificate ( ) Non-degree

DEPENDENCY STATUS
5. ( ) Dependent ( ) Independent

RESIDENCY STATUS
6. ( ) Resident ( ) Commuter ( ) Off-Campus

COSTS FOR THE ACADEMIC YEAR
7. _________ Tuition & Fees _________ Rm & Bd____________ Total Cost of Attendance

FINANCIAL AID INFORMATION
8. Is the student a financial aid applicant? ( ) Yes ( ) No
9. PC for 2000-01: FM _________ IM _________
10. Is the student receiving non-need based aid? ( ) Yes ( ) No
11. If yes, please indicate sources and amounts:

I CERTIFY THAT THE ABOVE INFORMATION IS ACCURATE TO THE BEST OF MY KNOWLEDGE.

______________________________________________________________________
Name/Signature of College Official Date

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ANDREW CORZO, SIA HENRY, MICHAEL MAERLANDER, ALEXANDER LEO-GUERRA, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated,

*Plaintiffs*,

v.

BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,

*Defendants*.

Case No. 1:22-cv-00125

*Class Action*

**EXPERT REPORT OF HAL J. SINGER, PH.D. (ERRATA II UPDATED)**

June 10, 2024

This report cites and quotes material that Defendants designated as Confidential or AEO under the Second Amended Confidentiality Order (ECF No. 608)

## II. THE CHALLENGED CONDUCT

123. In Part II.D below, through an economic lens, I analyze record evidence concerning the extent to which the Challenged Conduct is consistent with the allegations of conspiracy and inconsistent with unilateral conduct and unfettered competition in setting Effective Institutional Prices. This approach is common among economists, who frequently bring their expertise to bear in analyzing evidence of communications among alleged cartel members and other qualitative aspects of collusive behavior. I offer no opinion regarding whether the Challenged Conduct violated antitrust law.

124. In my opinion, the record evidence cited herein, when viewed through the criteria economists use to assess cartels, is consistent with Plaintiffs' allegation that Defendants engaged in the alleged conspiracy to suppress the institutional grant aid and to artificially inflate Effective Institutional Prices, and inconsistent with unfettered competition and unilateral conduct.

### A. The Alleged Overarching Agreement

125. The Challenged Conduct comprised two main elements. The first element concerned how to award institutional grant aid, and the second element concerned the sharing of competitively sensitive information to further the agreement on how to award institutional grant aid.

126. The first element comprised both the CM and the Core Principles. Defendants' purpose in establishing the CM was to achieve "a consistent formula of need analysis."[126] The CM was to establish a floor for EFCs: "What we are trying to eliminate is the downside adjustments that lead to real confusion."[127] Accordingly, if a 568 Group member did not implement the CM in full,

126. VANDERBILT-00000528 at -529 (statement from 568 Group Technical Committee Chair to 568 Group Members about renewing the 568 exemption).

127. UCHICAGO_0000183734 (statement from Chair of the Common Standards Subcommittee of the 568 Presidents Group); *see also* GTWNU_0000009794.

members were expected to commit that the CM would be the "lowest" contribution expected of a family.[128] According to documents, Defendants did not want "competitive pressure"[129] and wanted to "avoid bidding wars."[130] The objective was to "reduce the variance in need analysis results across institutions through consistent application of these common standards."[131]

127. The second element, relating to the sharing of competitively sensitive information, concerned the 568 Group's effort to understand how they were approaching and awarding institutional grant aid from year to year. This is consistent with, as a practical matter, an enforcement mechanism—if Defendants saw that some of them were not applying the CM and Core Principles so as to result in similar practices and policies, as reflected in the shared data, then they would see there was no point or utility in adhering to the Challenged Conduct.

128. It would have been important, as an economic matter, for Defendants to have agreement not just on the Core Principles, but also on at least many components of an IM, because otherwise the schools could all apply the principles while applying different methodologies generating different results. This was true because, as Dr. Baum acknowledges, at least most of the "precise number[s]" in the Base IM, with respect to percentages, "could be modified to some extent

128. DARTMOUTH_000035937 (an internal Dartmouth June 2004 memorandum summarizing a recent 568 Group meeting and explaining that to participate in the 568 Group, you did not have to agree to use the Consensus Methodology entirely, but institutions had to commit that the CA would be the "**lowest**" contribution that would be expected of a family) (emphasis in original); *see also* MIDDLEBURY01293 (document entitled "Summary of Presidents' Section 568 Group Meetings" authored by a former Chair of the Technical Committee stating "[i]t has been understood that some 568 member institutions, for budgetary or other reasons, might decide not to fully implement all of the specific agreements, but not so as to result in lower expected contributions than the agreements."); Emory_568Lit_0000577 (568 Technical Committee making changes to income bands optional, "consistent with [its] policy of making across-the-board revisions only if PCs are increased").

129. MITLIT-000078586 at -78591.

130. DARTMOUTH_0000359527.

131. GTWNU_0000012456.

discussion among the members of the 568 Group Technical Committee, a key architect of the 568 Group explained that the CM "established a 'floor' approach that could be breeched only in cases involving locally applied individual case based professional judgment."[172] An internal email by MIT's head of Student Financial Services in 2014 explained her understanding that "[a]n institution can be part of the 568 Group and be more stringent in how it defines financial need, but not more generous."[173]

148. The first element of the Challenged Conduct, noted above, comprised agreement on (1) six Core Principles of awarding institutional grant aid; (2) making need-based aid the primary form of institutional grant aid; (3) using the Base IM as the starting point for setting awards of institutional grant aid; (4) developing and implementing the CM as a variation for the IM for purposes of need analysis; (5) using a common manual for applying Professional Judgment, with it to be the exception, rather than the rule; and (6) sharing competitively sensitive information relating to institutional grant aid. I address these in turn below.

**2. Consensus on Six Core Principles**

149. The 568 Group created "Consensus Methodology Policy Guidelines" setting forth the following agreed-upon Core Principles for awarding institutional grant aid:

> 1. To the extent they are able, parents and students have the primary responsibility to contribute to educational expenses before an institution awards financial aid.
>
> 2. Families should contribute to educational expenses according to their ability. Those with similar financial profiles should contribute similar amounts.
>
> 3. Institutions should evaluate both income and assets as part of the assessment of parents' and applicants' ability to pay.
>
> 4. Each institution should inform applicants about the policies and practices it applies when measuring a family's ability to pay, carry out its policies consistently throughout a student's eligibility, and support the awarding of need-based aid.

172. BROWN_0000015617.
173. MITLIT-000074274.

> 5. An institution that allocates any financial assistance that is not based exclusively on need should inform all prospective applicants of the standards it applies in allocating that aid.
>
> 6. The exercise of "professional judgment" by financial aid officers in assessing a family's ability to pay should recognize unique or extenuating financial circumstances in individual cases; such professional judgment is not the proper mechanism for systematically treating 568 Groups of students differently in order to advance institutional objectives.[174]

150. Principles one through four and principle six are based on the ability to pay. The second principle is also based on horizontal equity. Horizontal equity is the principle that families of similar socioeconomic backgrounds should pay similar prices, while vertical equity is the principle that families with greater ability to pay should pay higher prices. The fourth principle is also based on the primacy of need-based aid. These six Core Principles thus collectively reflect what I call, for ease of reference, the "affordability principle." Georgetown President John DeGioia, and former chair of the 568 Group, captured the affordability principle in explaining how the 568 exemption permits the 568 Group to use the CM: "What it enables us to do is develop a common formula by which we would assess the need of the student. We ask the family to contribute the *maximum* that they are capable of, according to that formula."[175]

***a. Consensus on the Primacy of Need-Based Aid***

151. As to the first principle, to say that parents and students have the "primary responsibility" to pay what they can afford to pay is to say that schools should be awarding aid in line with that premise. Awarding merit aid is not in line with the first principle, as "extensive reliance on merit aid would be inconsistent with families paying the amount that they can afford to pay."[176]

---

174. Penn-LIT-00162887 ("The Presidents' Group Consensus Methodology Policy Guidelines December 2016").

175. Connor Jones, *On the Record with President DeGioia,* THE GEORGETOWN VOICE (Mar. 6, 2014), https://georgetownvoice.com/2014/03/06/record-president-degioia/ (emphasis added).

176. Baum 215:7-13; Baum Ex. 15 at 2.

College Board, a school did not "agree" to use the CSS Profile or Base IM, and the College Board was imposing no requirement that the school do so.[180]

### *d. Consensus on Development and Implementation of the CM*

156. Defendants developed the CM by periodically modifying its components from the Base IM. That is, as one Defendant explained, "CA is not a different methodology (than IM), it's just an enhanced version**.** CA is basically IM with tweaks."[181] The 568 Group's Technical Committee was responsible for proposing and implementing changes, reflected in the "Consensus Methodology Policy Guidelines" regularly distributed—at least every other year—to the Defendants.[182]

157. Defendants regularly described themselves as following the CA and CM. In response to inquiries from Congress, for example, Cornell explained that it was applying the CM.[183] The internal documents of other Defendants further reflect their efforts to hew to the CM. Duke used what it called the "568 rule set" in its "global options" in its IM software.[184] In June 2011, Penn acknowledged "the agreement to use the consensus approach" and "the agreement to abide by the CA."[185] Penn later hired a prestigious consulting firm to assess their financial aid practices, and the firm concluded as part of its analysis that the school was applying the CM.[186] In a February 2017

---

180. Meade 12:10-19.
181. GTWNU_0000292229.
182. Columbia_00184489 at -510. ("In support of this effort, the Need Analysis Council shall appoint a Technical Committee responsible for managing and, where appropriate, updating the Consensus Approach."); *see also, e.g.*, CORNELL_LIT0000273249 (Cornell's Director of Financial Aid being asked by technical committee to approve updated manual).
183. CORNELL_LIT0000100841 (In 2008, Cornell told Congress it determines a "family's contribution toward educational costs . . . by using the 568 Presidents' Group Consensus Approach methodology").
184. DUKE568_0000902 at -919; DUKE568_0152811; DUKE568_0026368; DUKE_00255500.
185. BROWN_0000017721.
186. Varas 150:14-20.

hard to define what is 568 vs what is IM. In some cases the 568 recommendation is to use IM, in other cases the 568 recommendation became IM."[191]

### *e. Consensus on Guidelines for Professional Judgment*

160. The 568 Group's alleged agreement to use professional judgment where appropriate was part of the Challenged Conduct. The 568 Group regularly updated and distributed the Professional Judgment Guidelines, or Manual, to Defendants. One of the points of the Guidelines was to permit the schools to exercise discretion in unusual cases without varying substantially from the "floor" calculations under the CM.[192] One founding member explained that "variations from CA, beyond those detailed in the guidelines, should be the exception, rather than the rule."[193]

161. Such limits on the exercise of professional judgment were evidently part of the Core Principle that "professional judgment is not the proper mechanism for *systematically* treating 568 Group students differently in order to advance institutional objectives."[194] A further point of the Guidelines was to maximize the extent to which the exercise of discretion occurred with some range of judgment that the Guidelines deemed reasonable. Notre Dame's Director of Financial Aid, for example, was not aware of any differences between the Notre Dame manual for Professional Judgment and the 568 Manual for Professional Judgment.[195]

162. Concurrent with early drafts of the CM, the 568 Group published a 32-page "Professional Judgment Guidelines Manual."[196] The "Rationale" for the document was that "having a consensus on policy and procedure for calculating parental support will reduce significant

---

191. CORNELL_LIT0000112401.

192. DUKE568_0000027 (2016 Professional Judgment Guidelines Manual); MITLIT-000073811 (2015 Professional Judgment Guidelines Manual); AMHE-00004085 (2014 Professional Judgment Guidelines Manual); COFHE-02-00003131 (2004-05 Professional Judgment Guidelines Manual).

193. GTWNU_0000347907 at -914.

194. *See* PENN568-LIT-00162887 at -888.

195. Nucciarone 112:5-113:24.

196. BROWN_0000000386.

### 2. Quantitative Evidence Demonstrates that the Challenged Conduct Resulted in Artificially Inflated Effective Institutional Prices at All Defendants to a Statistically Significant Degree

227. I measure the effect of the Challenged Conduct by contrasting Effective Institutional Prices that Class Members paid during the Class Period, which is characterized by each individual Defendant's membership in the 568 Group against a benchmark that involved pricing during periods where Defendants were not formally part of the 568 Group. Such "clean" periods inform a conservative "but-for" world that would have prevailed absent the Challenged Conduct. Known as the "before-after" methodology, this standard empirical approach enjoys frequent application in both research and litigation.[306] To apply the before-after model, economists, researchers, and other practitioners typically use multiple regression analysis, which I do in this report.

228. The benchmark I use is a conservative approach in that it likely understates the effect of the Challenged Conduct for at least two reasons. First, I include in the benchmark periods in which Defendants claim to have left the 568 Group, but during which the 568 Group continued to exist. It is certainly possible and indeed likely that due to the economic concept known as the "umbrella effect" the relevant prices charged by Defendants who were in the Group but left, or who had not yet joined the Group, had their prices inflated by the Challenged Conduct. In other words, the but-for world is a counterfactual world during which the Challenged Conduct did not occur at all, whereas my benchmark includes periods during which the Challenged Conduct exists, but individual Defendants either left or had yet to join. Because of the umbrella effect, the prices of schools who

306. Theon van Dijk & Frank Verboven, *Quantification of Damages*, in 3 ISSUES IN COMPETITION LAW AND POLICY 2331, 2332 (2008) ("The concept underlying most economic damages assessments is that of the "but-for" world."). Note that while this methodology is termed the "before-after" model, it does not depend on the ordering of when the anticompetitive conduct occurred. Rather, it merely requires there be a clean period and a "conduct period" in order to make a comparison between the two. For instance, in Appendix 3 Table 1, I show that Yale had entered and exited the 568 Group on multiple occasions. Therefore, the model compares the average Effective Institutional Price across all of the periods for which Yale participated in the Challenged Conduct to the average Effective Institutional Price across all of the periods for which Yale did not participate in the Challenged Conduct.

these data ceased in 2015, I supplemented these data with relevant IPEDS files for the remaining years until the most recent data available.

236. I include investment return data from Defendants' institutional annual endowment reports and the National Association of College and University Business Officers (NACUBO). I also include endowment level data from NACUBO and IPEDS.

237. Lastly, I include data on the unemployment rate and real gross domestic product (GDP) which come from the Federal Reserve Bank of St. Louis FRED database. I also include the Consumer Price Index for all urban consumers (CPI-U), which I use to adjust all financial data to 2024 inflation adjusted dollars.

***b. My Econometric Model***

238. The general framework I employ estimates Effective Institutional Price as a function of the Challenged Conduct and various control variables. In choosing such control variables, I have relied on both economic theory and documentary evidence that informs the factors that Defendants and the literature consider important when evaluating the Effective Institutional Price charged to individual students. I specify the following multivariate regression model:

$$Price_{ist} = \alpha + \beta Conduct_{st} + \sum_x STUD_{ist}^x + \sum_y UNI_{st}^y + \sum_z MACRO_t^z + \varepsilon_{ist}$$

The dependent variable, $Price_{ist}$, is the Effective Institutional Price for student $i$ at institution $s$ in academic year $t$. The independent variable, $Conduct_{st}$, measures whether the student's Effective Institutional Price was subject to the Challenged Conduct (conservatively crediting all Defendants for their claims of withdrawal) at institution $s$ during academic year $t$. The coefficient on $Conduct_{st}$ can be interpreted as the change in Effective Institutional Price associated with the conduct variable flipping from zero to one. I also include three sets of control variables—$STUD_{ist}^x$, $UNI_{st}^y$, and

$MACRO_t^z$—which control for other relevant factors that explain variation in Effective Institutional Price.

239. The control variables that I use generally are based on those found in the economics literature on financial aid in higher education, such as adjusted gross income,[319] endowments,[320] and unemployment,[321] for instance. The error term, $\varepsilon_{ist}$, captures idiosyncratic variation in Effective Institutional Prices that is not explained by the model. It is standard practice in econometrics to include control variables that help explain variation in the dependent variable, and to increase precision of the model.[322] I describe each of these control variable sets below.

240. The control variables contained in $STUD_{ist}^x$ include student and family level characteristics that explain variation in Effective Institutional Prices across students, universities, and academic years. These variables all are included in the Defendants' structured financial aid data. I include control variables for the family's adjusted gross income and net worth.[323] I include these control variables because the record evidence suggests that these variables factor into Defendants'

---

319. C.M. Hoxby, *Benevolent Colluders? the Effects of Antitrust Action on College Financial Aid and Tuition*, IO: REGULATION (2000) [hereafter Hoxby (2000)]. Hoxby (2000) includes parents' earned income as an explanatory variable in financial aid package regressions. Castleman & Long (2016) include parents' adjusted gross income as a control variable in regressions of college attendance. B. L. Castleman, & B. T. Long, *Looking beyond enrollment: The causal effect of need-based grants on college access, persistence, and graduation*, JOURNAL OF LABOR ECONOMICS, 34(4), 1023-1073 (2016).

320. Hoxby (2000) includes both endowment per student and the percentage growth in endowment over the prior three years as explanatory variables in financial aid package regressions.

321. Hoxby (2000) includes financial market indicators as explanatory variables in financial aid package regressions.

322. JEFFREY WOOLDRIDGE, INTRODUCTORY ECONOMETRICS: A MODERN APPROACH, 1 (Thompson 4th ed. 2009) [hereafter WOOLDRIDGE] at 97 ("[E]conomists often include many control variables in order to isolate the causal effect of a particular variable."); *id.* 86 ("With multiple regression analysis, we are able to include many factors among the explanatory variables, and omitted variables are less likely to be a problem in multiple regression analysis than in simple regression analysis.").

323. For each of financial variables, I use the sum of both the student's and parents' values. Generally, the student values are either significantly lower than the parents' values or are equal to zero since students are unlikely to have accumulated significant wealth or income at the age of entering college.

the 27 years of Defendants' data analyzed in this instance.[334] Lastly, I include real gross domestic product (GDP), which controls for business cycle fluctuations such as the great recession.[335]

245. In addition to the numerous control variables described above, I also include both institution and student fixed effects.[336] A fixed effect is a variable that controls for time-invariant individual-specific characteristics; economics literature commonly makes use of such variables to account for unobserved, individual-specific factors that do not vary over time.[337] In this instance, institution fixed effects control for time invariant differences across Defendants. Likewise, student fixed effects control for time invariant differences across students, which may arise from differences in inherent academic ability and achievement that likely do not vary across time, and which may correlate with greater institutional grant aid for those Defendant universities that award merit-based aid.[338] Higher institutional grant aid would result in a lower Effective Institutional Price. Similarly, Effective Institutional Price may differ as a result of unobserved socioeconomic and demographic factors, such as race, first-generation status, or citizenship, all of which are controlled for via student-level fixed effects.

246. My primary dependent variable is Effective Institutional Price, which is the difference between cost of attendance and institutional grant aid. For cost of attendance, I use IPEDS

---

334. WOOLDRIDGE at 366 ("[W]e must be careful to allow for the fact that unobserved, trending factors that affect yt might also be correlated with the explanatory variables. If we ignore this possibility, we may find a spurious relationship between yt and one or more explanatory variables. Fortunately, adding a time trend eliminates this problem.").

335. GDP is commonly used to control for fluctuations in aggregate income that may correlate with a variety of economic factors, such as university enrollment. *See*, *e.g.*, Kevin L. Pennington, Dixie McGinty, and Mitchell R. Williams, *Community college enrollment as a function of economic indicators,* COMMUNITY COLLEGE JOURNAL OF RESEARCH AND PRACTICE 26, no. 5 431-437 (2002). ("In other words, a high Gross Domestic Product and high Personal Consumption Expenditure both tended to be very strongly associated with low enrollment in community colleges.").

336. In my regressions tables that follow, I show results both with institution fixed effects, and with interacted institution-student fixed effects.

337. *See, e.g.,* WOOLDRIDGE, Chapter 14.1.

338. More specifically, student fixed effects will control for a student's *average* increase in institutional grant aid resulting from their greater academic achievement, but they will not control for whether a student's academic achievement changes over time.

information into constant 2024 dollars. In total, there are approximately 780 thousand student-academic years in the data. The average Effective Institutional Price for Class Members in the data is $41,476, and the average institutional grant aid is $39,131.

TABLE 10: REGRESSION DATA SUMMARY STATISTICS

| Variable | Mean | SD | Min | Max | Obs. |
|---|---|---|---|---|---|
| Real Effective Institutional Price | $41,476 | $20,288 | $3,357 | $95,875 | 780,157 |
| Real Effective Institutional Price (Need-Based plus Merit-Based) | $41,000 | $20,181 | $3,357 | $95,875 | 780,157 |
| Real Institutional Grant Aid | $39,131 | $21,472 | $1 | $91,150 | 780,157 |
| Real Institutional Grant Aid (Need-Based plus Merit-Based) | $39,607 | $21,352 | $1 | $91,150 | 780,157 |
| Real Adj. Gross Income ($ thousands) | $130 | $98 | $0 | $13,088 | 780,157 |
| Real Net Worth ($ thousands) | $219 | $1,223 | -$188,181 | $79,079 | 780,157 |
| Number in College | 1.4 | 0.6 | 0.0 | 9.0 | 780,157 |
| Real Other Gift Aid | $2,707 | $5,016 | $0 | $86,700 | 780,157 |
| Year in College | 2.4 | 1.2 | 1.0 | 4.0 | 780,157 |
| Cumulative Three-Year Lagged Excess Returns | 43.6% | 48.9% | -49.5% | 199.0% | 780,157 |
| % First Years Receiving Financial Aid | 63.4% | 8.4% | 40.0% | 100.0% | 780,157 |
| Real Tuition Revenue Per FTE Undergrad (1-year Lag) | $77,107 | $34,040 | $31,977 | $193,741 | 780,157 |
| Unemployment Rate | 5.7 | 1.9 | 3.6 | 9.6 | 780,157 |
| Real GDP ($ billions) | $18,069 | $2,247 | $12,643 | $22,585 | 780,157 |
| Tuition CPI | 716.1 | 169.3 | 312.5 | 940.0 | 780,157 |

*Sources*: Defendants' structured financial aid data; IPEDS; FRED; NACUBO; BLS. Observation counts are for the full dataset. Data limited to Class Members.

#### c. *Effective Institutional Price Regression Results Using Defendants' Structured Data*

248. In this section, I report results from applying the regression model described above to Defendants' structured data. To assess the effect of the Challenged Conduct on Effective Institutional Prices, I define a "conduct" variable using the record evidence of when each Defendant participated in the Challenged Conduct, while conservatively crediting those Defendants who left the 568 Group's claims of withdrawal. I provide a timeline of each Defendant's participation (with the caveat just discussed) in Appendix 3 Table 1. For each regression, I regress Effective Institutional Price on the conduct variable and control variables, all of which enter the model in levels, meaning that their coefficients can be interpreted as unit changes. A positive conduct coefficient implies that the Effective Institutional Prices Class Members paid were artificially inflated as a result of the Challenged Conduct.

and "vertical equity" in their determination of financial aid. Horizontal equity is the principle that families of similar socioeconomic backgrounds should pay similar prices, while vertical equity is the principle that families with greater ability to pay should pay higher prices.[351] (In order to achieve either horizontal or vertical equity, a school must start by assessing what students can afford to pay, rather than what the school can afford to pay.) These principles are consistent with a common pricing structure.

**1. In-Sample Prediction Based on Effective Institutional Price Regressions**

255. In-sample prediction, as described below, represents a standard method of demonstrating common impact in antitrust cases. This econometric method uses the output of my regression analyses to compare the Effective Institutional Price that students paid to what they would have paid "but-for" the Challenged Conduct.[352] I perform this test using the Defendants' structured data regression model shown in Table 11, column 6. Under this method, a Class Member suffers antitrust injury whenever the Effective Institutional Price he or she paid for at least one academic year during the Class Period is greater than what he or she would have paid absent the Challenged Conduct. In other words, this approach uses the standard definition of harm as the difference between the actual and counterfactual ("but-for") conditions.

256. This standard form of in-sample econometric analysis allows me to compute the proportion of Class Members that sustained antitrust injury as a result of the Challenged Conduct.

---

351. Caltech explains: "There should be horizontal equity (also referred to as equity across the board) in the distribution of limited financial aid resources. That is, families in similar circumstances with similar resources should be expected to make similar contributions. Families in different circumstances should be expected to make contributions appropriate to their financial resources. This is known as vertical equity, and is sometimes referred to as leveling the playing field." https://www.finaid.caltech.edu/howitworks/principles.

352. Theon van Dijk & Frank Verboven, *Quantification of Damages*, 3 ISSUES IN COMPETITION LAW AND POLICY 2331-2348, 2332 ABA Section of Antitrust Law (2008) [hereafter Dijk & Verboven (2008)] ("The concept underlying most economic damages assessments is that of the "but-for" world. In the case of a price-fixing agreement, the but-for world represents the economic outcome that would have occurred without the agreement. The difference between this counterfactual world and the actual world provides the measurement of damages.").

The approach I use enjoys widespread acceptance. Courts have certified several antitrust class action cases where I, as well as other Plaintiffs' economists, have reliably used this method to demonstrate common impact.[353]

257. The introductory chapter of the Federal Judicial Center's *Reference Manual on Multiple Regression*, describes the logic supporting this approach, illustrating how multiple regression analysis inform whether individual Class Members suffered injury as a result of employment discrimination.[354] Here, I apply the same framework to determine whether Class Members suffered injury in the form of artificially inflated Effective Institutional Price as a result of the Challenged Conduct. The method begins by using the econometric model developed in Part III.A above, which control for factors (other than the Challenged Conduct) that may affect Effective Institutional Price.[355] In other words, the point of the regression is to isolate the role played by the Challenged Conduct on variances in the dependent variable, *i.e.*, Effective Institutional Prices charged by the Defendants. Next, the econometric model computes the Effective Institutional Price that Class Members would have received *in the but-for world*, and this assessment is compared to the Effective Institutional Price that Class Members were actually awarded.[356] If the actual Effective Institutional Price paid by a Class Member in a given academic year is greater than what the model

---

353. *See* n. 350, *supra*.

354. REFERENCE MANUAL at n.4 ("The first step in such a regression analysis is to specify all of the possible 'legitimate' (*i.e.*, nondiscriminatory) factors that are likely to significantly affect the dependent variable and which could account for disparities in the treatment of male and female employees. By identifying those legitimate criteria that affect the decision-making process, *individual plaintiffs* can make predictions about what job or job benefits similarly situated employees should ideally receive, and then can measure the difference between the predicted treatment and the actual treatment of those employees. If there is a disparity between the predicted and actual outcomes for female employees, plaintiffs in a disparate treatment case can argue that the net 'residual' difference represents the unlawful effect of discriminatory animus on the allocation of jobs or job benefits.").

355. *Id.* ("The first step in such a regression analysis is to specify all of the possible 'legitimate' (*i.e.*, nondiscriminatory) factors that are likely to significantly affect the dependent variable and which could account for disparities in the treatment of male and female employees.").

356. *Id.* ("By identifying those legitimate criteria that affect the decision-making process, *individual plaintiffs* can make predictions about what job or job benefits similarly situated employees should ideally receive, and then can measure the difference between the predicted treatment and the actual treatment of those employees.").

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLANDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERONE WILLIAMS, individually and on behalf of all others similarly situated,

*Plaintiffs,*

v.

BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHN HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,

*Defendants.*

Case No. 22-cv-00125

**SURREBUTTAL EXPERT REPORT OF NICHOLAS HILL, PHD**

**1 November 2024**

# 5. Dr. Singer's new overcharge estimates change materially in response to sensitivity tests from my rebuttal report

(44) Dr. Singer presents his new overcharge estimates in Table 6 of his rebuttal report.[48] The underlying model Dr. Singer uses is unchanged from his initial report (all that has changed is his data) and hence is conceptually flawed for the reasons I discussed in my rebuttal report.[49] In this section, I set aside these conceptual flaws and apply to Dr. Singer's new overcharge estimates the same quantitative sensitivity tests that I applied to his initial overcharge estimates.[50,51]

(45) Specifically, I analyze how his overcharge estimates change in response to three separate small and reasonable changes. First, I replace the linear time trend in his baseline model with a flexible time trend.[52] Second, I modify his baseline model to estimate the effect of the COVID-19 pandemic on financial aid more flexibly.[53] Third, I estimate his baseline model after dropping flawed data from after the end of the 568 Group in 2022.[54] I discussed the motivation for each of these sensitivity tests in detail in Section 8.3 of my rebuttal report.[55]

(46) I apply my sensitivity tests to Dr. Singer's estimated overcharges in two ways. First, I apply them when using the Singer amended data. I find that Dr. Singer's estimated overcharges change materially in response to my sensitivity tests. Second, I apply my sensitivity tests when using my amended data. I find that Dr. Singer's estimated overcharges change materially in response to using my amended

48 Singer Rebuttal Report, ¶ 150, Table 6.

49 Hill Rebuttal Report, §§ 8.4, 8.5. For example, in my rebuttal report I demonstrated conceptually that Dr. Singer's methodology for dropping students who received a full ride introduces selection bias into his results. Hill Rebuttal Report, ¶ 236. My critique applies to Dr. Singer's new overcharge estimates as well. For example, 182 Yale students received full rides in 2018—the first year Yale re-entered the 568 Group—after not receiving full rides in 2017. The average effective institutional price for these students was $9,432 in 2018, materially lower than their average expected institutional price of $17,891 in 2017. Dr. Singer drops these students in 2018 but includes them in 2017. By excluding these students from his data during the conduct period but including them in the year before the conduct period, Dr. Singer's approach could overestimate the average effective institutional price during the conduct period for Yale.

50 Hill Rebuttal Report, § 8.3.

51 I also apply both my sensitivity tests and Dr. Singer's sensitivity tests to Dr. Singer's baseline model. I find that his overcharge estimates change materially in response to these combined sensitivity tests. I present the results of running Dr. Singer's models with both his sensitivity tests and my sensitivity tests applied in Appendix B.3.

52 *See* Hill Rebuttal Report, § 8.3.1; *see also* Hill Rebuttal Report, ¶ 216 ("My more flexible approach is a more general version of Dr. Singer's linear time trend. If the time trend is truly linear, my more flexible specification will identify that. If it is not, my more flexible specifications will be better positioned to control for trends over time accurately.").

53 *See* Hill Rebuttal Report, § 8.3.2; *see also* Hill Rebuttal Report, ¶ 220 ("[T]he standard economic method for flexibly controlling for the impact of discrete events, such as the COVID-19 pandemic and subsequent upheaval in the higher education industry and high inflation rates, is to include dummy variables for each affected year. Hence, I make Dr. Singer's approach more flexible by adding to Dr. Singer's model a separate control for each year starting in the 2020–2021 academic year. This approach allows the effect of COVID-19 (during the actual pandemic and the subsequent period of high inflation) to be present and distinct for each academic year from 2020–2021 onwards.").

54 *See* Hill Rebuttal Report, ¶ 8.3.3; *see also* Hill Rebuttal Report, ¶ 227 ("Dr. Singer's purported findings of adverse effects depends heavily upon including data from academic years 2023–2024 and 2024–2025. These data are flawed and should not be included when estimating Dr. Singer's overcharge regressions (or other empirical projects).").

55 Hill Rebuttal Report, § 8.3.

# REPORT OF
# THE COMMON STANDARDS
# SUBCOMMITTEE
# TO
# THE 568 PRESIDENTS'
# WORKING GROUP

that the use of the Professional Judgment Guidelines Manual by participating institutions will lead to reasonably consistent parent contributions. Our Subcommittee's recommendations in this critical area are outlined in Appendix A.

**B. Assessment of Business and Real Estate**

**Recommendation:** Continue to exclude business and rental losses from the calculation of income in central processing; add back rental depreciation; impute rental property value; redesign Business/Farm Supplement Form to improve quality of data; seek expert advice on various adjustments; and ask CSS to keep us informed of and involved in their work in this area.

**Discussion**: An increasing number of our applicant families present complex business and real estate profiles for our review and this complexity makes central processing of this information impossible. Consequently, financial aid professionals have attempted to make sense of this information with varying levels of experience, expertise, and applicant-provided information. More experienced aid officers have learned to apply a "sixth sense" to these cases, while those with little experience and limited staff resources are often forced to deal with these applicants as if they were salaried employees rather than as self-employed business persons or entrepreneurs. Understandably, the self-employed family's calculated ability to pay often varies significantly from campus to campus. Because business and real estate issues may not always lend themselves to central processing, we propose to standardize local treatment of these matters. The details of our recommendations can be found in Appendix B.

**C. Cost of Living Variances**

**Recommendation:** Monitor new developments and refine procedures on this issue over time.

**Discussion**: It is widely understood that cost of living in Manhattan, Kansas, is substantially different than it is in Manhattan, New York. Although the current Institutional Methodology offers a local option that provides cost-of-living adjustments in a few metropolitan areas, the central calculation does not. This failure reduces the "face validity"[2] of current parent contributions and must be corrected. Although we considered a series of options ranging from zip code to regional adjustments, we have determined that the expanded metropolitan cost-of-living structure previewed in Appendix C and provided to users electronically. As new technologies and pricing models are developed we would expect to refine our approach further.

**D. Family and Student Assets**

[2] A formula is said to have face validity if the average person believes that the formula's results are fair---that the results are, on their face, valid.

# EXCERPTS FROM TRANSCRIPT OF JAMES TILTON DEPOSITION (MAY 15, 2023), DKT. 789-49

## Pages 121-122

**In the Matter Of:**

*Carbone vs*

*Brown University*

---

*JAMES TILTON*

*May 15, 2023*

---

LEXITAS™

J. TILTON - CONFIDENTIAL

mathematic equation is you determine a student's cost of attendance, you determine a student contribution, you determine a parent contribution, which is then the EFC, you subtract that from the cost of attendance.

The rest is called "demonstrated need," and for those institutions, like Brown, that packaged need, you meet the need of the student with financial aid awards.

Q So the packaging is some combination of loans and grants, is that correct?

A For some. Not for Brown, not since 2019.

Q Since 2019, Brown has not been using loans, is that correct?

A We -- I should be correct.

In 2008-2009, Brown made significant changes to their needs analysis and their packaging formulas to help our students and our families. For example, families that made less than $60,000 and

J. TILTON - CONFIDENTIAL

had income less than $100,000 had zero loans in their financial aid packages.

Families who had incomes higher than $100,000, had a specific amount of a loan in their package each year, 100 to 125, 125 to 150 and greater than 150.

In 2018-19, the Brown promise eliminated all loans to students receiving need-based aid.

Q Okay. When you said, "made significant changes in 2008-2009," this would have been shortly after Yale left the 568 Presidents' Group, is that right?

A It could have been. That period of time was when many institutions were making announcements about changes -- significant changes in their aid packages.

And so we at Brown thought it was very important for us to discuss what kinds of changes we might make to our needs analysis and aid packages to assist awarding more to students, awarding more aid, making Brown more accessible to students and being more competitive.

**ATTORNEYS' EYES ONLY – SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)**

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS individually and on behalf of all others similarly situated,

*Plaintiffs*,

v.

BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,

*Defendants.*

Case No. 22-cv-00125

# SURREBUTTAL EXPERT REPORT OF LAUREN J. STIROH, PH.D.

**November 1, 2024**

have benefitted. Moreover, even if EFC calculations were closer together, the data Dr. Singer uses for this regression show that, on average, EFCs still differed by an average of $14,476 when both Defendant schools were in the 568 Group.[32]

## B. Dr. Singer's New "Harmed on Net" Analysis Reveals That His In-Sample Prediction Methodology Is Fatally Flawed

15. Dr. Singer presents a new result using what he describes as a "harmed on net" methodology to purportedly demonstrate common impact.[33] This methodology is tied to Dr. Singer's in-sample prediction analysis, in which he purports to be able to measure a specific overcharge for each individual proposed Class member – academic year observation.[34] In Dr. Singer's "harmed on net" analysis, he sums these purported individual overcharges for each proposed Class member across all of their academic years in the Class Period to purportedly obtain a measure of "net harm" for each proposed Class member.[35] He claims that the results of this analysis demonstrate common impact and that his results are not mechanical, *i.e.*, are not the result of his model being mathematically rigged to deliver only one possible outcome.[36] However, Dr. Singer's new analysis only demonstrates that his methodology is fundamentally incapable of assessing whether individual proposed Class members were harmed by the Challenged Conduct.

16. Dr. Singer's new analysis does not address the fundamental flaw with his approach that I pointed out in the Stiroh Initial Report – that the statistical analysis employed by Dr. Singer imposes, rather than tests for, common impact.[37] His new methodology is inextricably linked to his flawed overcharge regression and thus suffers from the same flaws. For instance, as I demonstrate below, Dr. Singer's methodology cannot identify unharmed proposed Class members. Dr. Singer's new "harmed on net" analysis and the results he obtains from it confirm this.

17. That Dr. Singer imposes, rather than tests for, common impact is illustrated by the fact that his methodology mechanically returns a finding that *every* proposed Class member who only attended a Defendant school during the period when their school was a member of the 568 Group was "harmed on net" by exactly his generalized overcharge estimate of

---

32 For context, the average yearly real EFC for each Defendant during its Conduct Period ranges from $23,637 at Yale to $34,452 at Rice. Similarly, EIPs differed by $17,939 on average when both Defendant schools were in the 568 Group. Hill turnover materials (Student school-pairs dataset); Singer reply turnover materials (EFC Regression Data); Singer Reply Report, Table 2.

33 Singer Reply Report, ¶¶ 234-235.

34 Expert Report of Hal J. Singer, Ph.D. (Errata II Updated), *Henry, et al. v. Brown University, et al.*, Case No. 1:22-cv-00125, United States District Court, Northern District of Illinois, Eastern Division, June 10, 2024 ("Singer Amended Report"), ¶ 255; Singer Reply Report, ¶¶ 224-225.

35 Singer Reply Report, ¶ 234.

36 Singer Reply Report, ¶ 235.

37 Stiroh Initial Report, ¶ 164.

$1,202 multiplied by the number of years of data for the proposed Class member.[38] For example, there are 921 proposed Class members who attended Cornell from 2010 through 2013, all years in which Cornell was a member of the 568 Group.[39] Dr. Singer's methodology mechanically returns a finding that all 921 of these students were "harmed on net" by exactly $1,202 (his generalized overcharge estimate) times four.[40] Thus, Dr. Singer's analysis of "harmed on net" is not a finding of class-wide harm but rather a mechanical outcome of his model.[41] All students are assigned an identical overcharge regardless of individual characteristics. This is wholly implausible given that actual total need-based aid varied for these students from $8,615 to $285,398.[42]

18. Almost 85 percent of all proposed Class member/school combinations have been assigned an identical overcharge of $1,202 per year of attendance by Dr. Singer's methodology.[43] That is because that same 85 percent of the proposed Class member/school combinations only have observations at Defendant schools while those schools were in the 568 Group and no observations in Dr. Singer's benchmark periods.[44] This result is completely disconnected from the economics of the situation. For these 85 percent of student/school combinations to be injured by exactly the same amount, Defendants would have all had to make the same modifications to their needs analyses and packaging decisions, and these modifications, regardless of each student's idiosyncratic financial and personal circumstances, must have affected EFC calculations, aid packaging, and EIPs completely identically. As discussed in Sections IV and V of the Stiroh Initial Report, this is implausible.

19. As demonstrated in **Figure S3.4** below, for every single one of these proposed Class members that Dr. Singer says is "impacted," Dr. Singer's "harmed on net" methodology finds that the proposed Class member was overcharged on net by exactly $1,202 times the number of years they appear in the data.[45] To the extent that any individual proposed Class members were not impacted by the Challenged Conduct, Dr. Singer's methodology is mathematically incapable of identifying them, as I detail below.

---

[38] Such students do not have data observations that fall into the periods Dr. Singer defines as the benchmark periods for his overcharge analysis. While the results of Dr. Singer's analysis for such students clearly illustrate an issue with Dr. Singer's methodology, it remains that this methodology does not return meaningful results for proposed Class members with benchmark observations, either, for the reasons I explain in the Stiroh Initial Report. Singer Amended Report, ¶¶ 217, 281; Singer Reply Report, ¶¶ 57, 71, 211, 227, Table 6; Stiroh Initial Report, ¶¶ 197-202, Appendix 1.

[39] These are students who began at Cornell in 2010 and left in 2013 and have no other observations outside of those four years. Singer reply turnover materials (Singer Updated Regression Data).

[40] *See* Singer reply turnover materials (Singer Updated Regression Data).

[41] *See* **Figure 3.6**.

[42] Singer reply turnover materials (Singer Updated Regression Data).

[43] Singer reply turnover materials (Singer Updated Regression Data).

[44] Singer reply turnover materials (Singer Updated Regression Data).

[45] There are 35 proposed Class members for whom Dr. Singer predicts would have paid negative EIPs in the but-for world in at least one year. Dr. Singer drops these observations from his "harmed on net" analysis. Other than these 35 proposed Class members, every proposed Class member without benchmark observations is flagged by Dr. Singer as "impacted" according to both his "impacted at least once" criteria and his "harmed on net" criteria. Singer reply turnover materials (Singer Updated Regression Data).

**Figure S3.4: "Net Overcharges" for Proposed Class Members Without Benchmark Observations According to Dr. Singer's New "Harmed on Net" Methodology[46]**

| Years Attended School | Class Members | Class Members "Impacted" | Class Members "Impacted" by Exactly $1,202 times Years Attended School |
|---|---|---|---|
| | (Count) | | |
| (a) | (b) | (c) | (d) |
| 1 | 45,030 | 45,030 | 45,030 |
| 2 | 24,568 | 24,561 | 24,561 |
| 3 | 27,486 | 27,468 | 27,468 |
| 4 | 71,136 | 71,126 | 71,126 |

20. The fundamental shortcomings of Dr. Singer's methodology for demonstrating common impact are also illustrated by his purported findings for proposed Class members at Dartmouth and Emory. Dartmouth and Emory only produced data that cover each student's first academic year. For proposed Class members at Dartmouth and Emory with one observation in the data, Dr. Singer's methodology "finds" that every single one of these proposed Class members was impacted by the Challenged Conduct and, moreover, that all were "harmed on net" by exactly the same amount as his generalized overcharge estimate.[47] Dr. Singer's methodology is incapable of identifying any proposed Class members at Dartmouth and Emory who were not impacted by the Challenged Conduct.

**Figure S3.5: Results of Dr. Singer's "Harmed on Net" Methodology for Proposed Class Members With One Observation at Dartmouth or Emory[48]**

| Defendant | Class Members | Class Members "Impacted" | Class Members "Impacted" by Exactly $1,202 | Percent "Impacted" | Percent "Impacted" by Exactly $1,202 |
|---|---|---|---|---|---|
| | | (Count) | | (Percent) | |
| (a) | (b) | (c) | (d) | (e) | (f) |
| Dartmouth | 7,724 | 7,724 | 7,724 | 100 % | 100 % |
| Emory | 5,550 | 5,550 | 5,550 | 100 | 100 |

21. In fact, the findings presented above are not surprising given that they are a mathematical result of Dr. Singer's methodology and model. As I discussed in Appendix 1 of the Stiroh Initial Report, Dr. Singer's purported "overcharge" for each observation is equal to the sum of the residual from his regression model and the generalized overcharge estimate.[49] Through the inclusion of student-school fixed effects and the mathematics of

46 In this figure, "Years Attended School" refers to the number of years for which there are data for each proposed Class member/school combination. Singer reply turnover materials (Singer Updated Regression Data).

47 There are two proposed Class members at Dartmouth and three proposed Class members at Emory who appear in multiple years in the data. Dr. Singer's methodology flags all five as impacted and finds that all five were "harmed on net" by exactly $2,404. *See* Singer reply turnover materials (Singer Updated Regression Data).

48 Singer reply turnover materials (Singer Updated Regression Data).

49 Stiroh Initial Report, Appendix 1.

fixed effects in a linear regression, Dr. Singer's model imposes that the sum of residuals for each student's observations is equal to zero.[50] This has two implications.

i. Every proposed Class member for whom there are only observations in the Conduct Period is mathematically guaranteed to have at least one observation flagged as "impacted" because for the residuals to sum to zero, at least one individual residual must be positive and at least one must be negative. Over 85 percent of proposed Class member/school combinations fall into this category.[51] By construction, if any of these proposed Class members were not impacted by the Challenged Conduct, Dr. Singer's model is mathematically incapable of identifying these proposed Class members.

ii. For all of these proposed Class members, Dr. Singer purports to find that they are "harmed on net" by exactly his overcharge coefficient estimate times the number of years the proposed Class member appears in the data.

22. **Figure S3.6** presents an example from the data that demonstrates how Dr. Singer's model and methodology mathematically guarantees his conclusion (*i.e.*, it is mechanical). The figure presents findings from Dr. Singer's methodology for a student who attended Cornell from 2018 through 2021, all years in which Cornell was a member of the 568 Group. Column (d) presents the actual EIPs paid by the student in each year while column (f) presents Dr. Singer's predictions of what the student would have paid but for the Challenged Conduct. Column (g) presents the estimated residual for each observation from Dr. Singer's main regression specification, which is the difference between the actual EIP paid by the student and the fitted value that comes from Dr. Singer's full regression model, including his conduct coefficient.[52] Column (i) presents Dr. Singer's estimate of overcharge for each individual observation for this student, which is simply equal to the sum of the estimated residual from column (g) and his generalized overcharge estimate recorded in column (h).

23. In his "harmed on net" analysis, Dr. Singer sums the four values in column (i) to obtain a "net harm" estimate of $4,808, which is equal to four times $1,202. Because the observation-specific overcharge estimates in column (i) are themselves obtained by summing up the values from column (g) and column (h), the sum of the values from column (i) will be mathematically identical to the sum of all the values in columns (g) and (h). By construction, the estimated residuals in column (g) will sum to zero.[53] As such, Dr. Singer's methodology imposes that such a proposed Class member (*i.e.* one

---

[50] William H. Greene, *Econometric Analysis* (8th Edition) (New York: Pearson, 2018) ("Greene (2018)"), p. 33.

[51] Singer reply turnover materials (Singer Updated Regression Data).

[52] The fitted value for each observation from Dr. Singer's regression model can be expressed as the but-for EIP plus his generalized overcharge estimate. Jeffrey M. Wooldridge, Introductory Econometrics: A Modern Approach (7th Edition) (Boston: Cengage, 2020), pp. 27-28.

[53] This is a consequence of the model Dr. Singer has chosen to employ in this context, which includes student and school fixed effects. Greene (2018), p. 33. Note that when applying Dr. Singer's "harmed on net" analysis to his EIP specification that uses only school fixed effects, rather than school and student fixed effects (*i.e.*, specification (3) instead of specification (6)), only 50 percent of proposed Class members are flagged as "harmed". Singer reply turnover materials (Singer Updated Regression Data); Singer Reply Report, Table 6.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLANDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERONE WILLIAMS, individually and on behalf of all others similarly situated,

*Plaintiffs,*

v.

BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHN HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,

*Defendants.*

Case No. 22-cv-00125

**EXPERT REPORT OF NICHOLAS HILL**

**7 August 2024**

**Figure 10: Count of Penn students who received a loan in their financial aid package**

| Academic year | Count of Penn student loan recipients |
|---|---|
| 2002–2003 | 4,108 |
| 2003–2004 | 4,123 |
| 2004–2005 | 4,072 |
| 2005–2006 | 4,055 |
| 2006–2007 | 1,856 |
| 2007–2008 | 1,762 |
| 2008–2009 | 1,418 |
| 2009–2010 | 497 |
| 2010–2011 | 425 |
| 2011–2012 | 463 |
| 2012–2013 | 511 |

Source: Corrected combined Defendant data.
Note: Counts include all students who received a loan (institutional, federal, state, and outside) as part of their financial aid package, regardless of need.

(85) In addition to increases in financial aid resulting from no-loan policies, the Defendants increasingly awarded "full ride" financial aid packages to students over time. The green bar in the figure below shows the total institutional need-based grant aid awarded to full ride students by the Defendants over time. The blue bar shows institutional need-based grant aid awarded to non-full ride students. The orange line, which represents the percent of aid being awarded to full ride students, has increased from nearly no aid in 1998–1999 to nearly 40 percent of aid awarded in 2023–2024. Dr. Singer excludes all full ride students, and their awarded aid, when he estimates purported damages.[115]

[115] Singer Report, ¶ 246 ("I drop any observations where a student was awarded a "full-ride" (i.e., where a student's total gift aid exceeded the cost of attendance).").

**Figure 11: Institutional grant aid awarded to students by the Defendants**




Sources: IPEDS; Dr. Singer's combined Defendant data.
Note: Following Dr. Singer's definition, full ride students are defined as students with total grant aid values (as reported in Defendant data) equal to or greater than the school's cost of attendance as reported by IPEDS.

(86) My analyses show that the broad patterns in the data do not support Dr. Singer's claim that the challenged conduct reduced financial aid awards. If the 568 Group or the introduction of the consensus methodology guidelines had been intended to reduce financial aid awards, the observed pattern of increasing financial aid is not the pattern that one would expect to see. Instead, one would expect to see stagnation or a decrease in financial aid awarded over time because of coordination among the Defendants to reduce financial aid.

## 4.2. The Defendants increased financial aid at the same pace as peer schools after the introduction of the consensus methodology guidelines

(87) The previous section shows that Defendant financial aid awards have been rising over time. In this section, I compare the Defendants' financial aid awards over time to financial aid awards over time at the other schools in Dr. Singer's proposed market (henceforth, "non-Defendants").[116] I do so using a

[116] The non-Defendant schools in Dr. Singer's proposed market are Carnegie Mellon, Harvard, Princeton, Stanford, and WashU.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ANDREW CORZO, SIA HENRY, MICHAEL MAERLANDER, ALEXANDER LEO-GUERRA, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated,

*Plaintiffs*,

v.

BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,

*Defendants*.

Case No. 1:22-cv-00125

*Class Action*

**EXPERT REPORT OF HAL J. SINGER, PH.D. (ERRATA II UPDATED)**

June 10, 2024

This report cites and quotes material that Defendants designated as Confidential or AEO under the Second Amended Confidentiality Order (ECF No. 608)

the 27 years of Defendants' data analyzed in this instance.[334] Lastly, I include real gross domestic product (GDP), which controls for business cycle fluctuations such as the great recession.[335]

245. In addition to the numerous control variables described above, I also include both institution and student fixed effects.[336] A fixed effect is a variable that controls for time-invariant individual-specific characteristics; economics literature commonly makes use of such variables to account for unobserved, individual-specific factors that do not vary over time.[337] In this instance, institution fixed effects control for time invariant differences across Defendants. Likewise, student fixed effects control for time invariant differences across students, which may arise from differences in inherent academic ability and achievement that likely do not vary across time, and which may correlate with greater institutional grant aid for those Defendant universities that award merit-based aid.[338] Higher institutional grant aid would result in a lower Effective Institutional Price. Similarly, Effective Institutional Price may differ as a result of unobserved socioeconomic and demographic factors, such as race, first-generation status, or citizenship, all of which are controlled for via student-level fixed effects.

246. My primary dependent variable is Effective Institutional Price, which is the difference between cost of attendance and institutional grant aid. For cost of attendance, I use IPEDS

334. WOOLDRIDGE at 366 ("[W]e must be careful to allow for the fact that unobserved, trending factors that affect yt might also be correlated with the explanatory variables. If we ignore this possibility, we may find a spurious relationship between yt and one or more explanatory variables. Fortunately, adding a time trend eliminates this problem.").

335. GDP is commonly used to control for fluctuations in aggregate income that may correlate with a variety of economic factors, such as university enrollment. *See, e.g.*, Kevin L. Pennington, Dixie McGinty, and Mitchell R. Williams, *Community college enrollment as a function of economic indicators*, COMMUNITY COLLEGE JOURNAL OF RESEARCH AND PRACTICE 26, no. 5 431-437 (2002). ("In other words, a high Gross Domestic Product and high Personal Consumption Expenditure both tended to be very strongly associated with low enrollment in community colleges.").

336. In my regressions tables that follow, I show results both with institution fixed effects, and with interacted institution-student fixed effects.

337. *See, e.g.*, WOOLDRIDGE, Chapter 14.1.

338. More specifically, student fixed effects will control for a student's *average* increase in institutional grant aid resulting from their greater academic achievement, but they will not control for whether a student's academic achievement changes over time.

data providing the sum of tuition, room, board, and fees.[339] For institutional grant aid, I filter Defendants' financial aid awards data to only include institutional grant aid awards.[340] I then limited these awards to include need based institutional grant aid only, and then summed up each student's need based institutional grant aid per each academic year.[341] I subtract each student's institutional grant aid from the average cost of attendance of their Defendant institution per academic year to generate Effective Institutional Price. I then limited the data to only include Class Members. To do this, I filter the data to only include observations where a student was awarded a positive institutional grant aid amount, and I drop any observations where a student was awarded a "full-ride" (i.e., where a student's total gift aid exceeded the cost of attendance).[342]

247. In Table 10, I present summary statistics for the variables I rely on from Defendants' structured data, IPEDS, and other publicly available data sources. For all dollar denominated variables, I use the Consumer Price Index for all urban consumers (CPI-U) to convert financial

339. Because on-campus room and board is generally higher than off-campus room and board, I conservatively use on-campus room and board for purposes of my calculations. *See* Kat Tretina, *Tuition & Room and Board: On-Campus vs. Off-Campus Costs*, CREDIBLE (Mar. 14, 2024), https://www.credible.com/student-loans/on-campus-vs-off-campus-costs. IPEDS cost of attendance data is available from 1998-2022. Because of this, I extrapolate cost of attendance for the 2023-2024 academic years using linear extrapolation.

340. Defendants generally provided variables specifying the source and type of award, which allows me to filter down to institutional gift aid awards only. Yale only provided offer data, so I use offers instead of awards for Yale.

341. In Appendix 3 Table 2, I provide an average percentage of undergraduate institutional gift aid that is merit based by Defendant using data from the Common Dataset. Generally, the Ivy League institutions do not award any merit based institutional gift aid. *See*, *e.g.*, Anika Arora Seth & Nicole Rodriguez, *Following antitrust expiration, merit and athletic scholarships become an option for the Ivy League*, YALE DAILY NEWS (Dec. 8, 2022), https://yaledailynews.com/blog/2022/12/08/following-antitrust-expiration-merit-and-athletic-scholarships-become-an-option-for-the-ivy-league/. For the other, non-Ivy League Defendants, I categorize gift aid into merit based and need based subtypes using either: (a) some form of a "merit" variable that differentiates merit based from need based gift aid, or (b) inferring whether an award is merit based or need based using the award description. If there was no practicable way to differentiate need based from merit based institutional gift aid using the data produced, I defaulted to using total institutional gift aid. *E.g.*, I cannot reliably separate Rice's institutional merit based gift aid from their institutional need based gift aid, so I treat all institutional gift aid as being institutional need based grant aid. *See* my workpapers. I run sensitivity analyses using all institutional gift aid (including need based and merit based) as the dependent variable in my regressions in Appendix 4. The distinction makes no meaningful difference to my results.

342. Because cost of attendance may differ based on where a student lives, I filter the data to observations where the institutional grant aid was no larger than 95 percent of the cost of attendance. Student-academic years with total gift aid greater than 95 percent of the cost of attendance comprise 7.5 percent of the data.

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois − CM/ECF NextGen 1.8 (rev. 1.8.3)**
**Eastern Division**

Sia Henry, et al.

Plaintiff,

v.

Case No.: 1:22−cv−00125
Honorable Matthew F. Kennelly

Brown University, et al.

Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Thursday, April 3, 2025:

MINUTE entry before the Honorable Matthew F. Kennelly: Docket entry 834 included a date error and is corrected to read as follows (change shown in **bold type**). The Court has reviewed the parties' proposals regarding the Daubert hearing on the motion to exclude opinions of plaintiffs' expert Dr. Singer. The purpose of the hearing is to determine whether, and the extent to which, Dr. Singer's challenged opinions meet the requirements of Daubert and Federal Rule of Evidence 702 and are therefore admissible. The hearing is not the equivalent of a trial on the merits or a mini−trial regarding the degree of persuasiveness of Dr. Singer's challenged opinions vis−a−vis the opinions of the defendants' experts. In addition, the parties should assume that the Court has read and studied the pertinent written materials that have been submitted, which of course include the defendants' examination of Dr. Singer during his deposition and their rebuttal experts 9; reports and related materials. The hearing will begin promptly at 12:45 PM on **4/14/2025** as previously ordered and will continue to approximately 4:45−5:00 PM. (a) Because plaintiffs bear the burden of establishing admissibility, they will go first and last in questioning Dr. Singer, and they will have the opportunity to recall Dr. Singer briefly after defendants' rebuttal expert testifies. (b) Each side is allocated 50 minutes of time for Dr. Singer's opening examination. Plaintiffs may divide their time as they wish between direct and redirect examination. (c) If defendants wish to call a rebuttal expert, they will go first and last in questioning that expert. Each side is allocated 25 minutes of time with the defendants' rebuttal expert. Defendants may divide this time as they wish between direct and redirect examination. (d) If plaintiffs wish to recall Dr. Singer for further testimony after the defendants' rebuttal expert has testified, the Court will allocate 10 minutes per side for that. (e) Each side is allocated no more than 15 minutes for argument at the conclusion of the testimony. (f) The Court reserves the right to reduce these time limits either collectively or individually before or during the hearing. (mk)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was

generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

Penn
University of Pennsylvania

Office of the Vice President for
Finance and Treasurer

# Undergraduate Students Access & Affordability

## Trustee Committee on Budget and Finance

February 27, 2020

# Net Cost of Attendance

First-time, Full-time Traditional Undergraduate




- Cost of Attendance has grown at an AAGR of 4.2% since FY05.
- Net cost has remained virtually flat over this timeframe.
- In constant 2005 dollars, average net cost to aided freshmen has decreased 23.2% from $18,837 in FY05 to $14,459 in FY20.

# Undergraduate student accessibility has never been higher.

- **Record high** financial aid budget
- UG **financial aid endowment passed $1B** at June 30, 2018
- Students who apply for financial aid **at all income levels** have demonstrated need covered with grant-based aid
- In constant 2005 dollars, average net cost to aided freshmen has **decreased 23.2% from $18,837 in FY05 to $14,459 in FY20**
- Student loan takers among need-based grant aid recipients is **1/3 of the FY04 level**

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO


107TH CONGRESS 1st Session } HOUSE OF REPRESENTATIVES { REPORT 107–32

# NEED-BASED EDUCATIONAL AID ACT OF 2001

APRIL 3, 2001.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. SENSENBRENNER, from the Committee on the Judiciary, submitted the following

# R E P O R T

[To accompany H.R. 768]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill (H.R. 768) to amend the Improving America's Schools Act of 1994 to make permanent the favorable treatment of need-based educational aid under the antitrust laws, having considered the same, reports favorably thereon without amendment and recommends that the bill do pass.

TABLE OF CONTENTS

| | Page |
|---|---|
| Purpose and Summary | 1 |
| Background and Need for the Legislation | 2 |
| Hearings | 3 |
| Committee Consideration | 4 |
| Vote of the Committee | 4 |
| Committee Oversight Findings | 4 |
| Performance Goals and Objectives | 4 |
| New Budget Authority and Tax Expenditures | 4 |
| Congressional Budget Office Cost Estimate | 4 |
| Constitutional Authority Statement | 5 |
| Section-by-Section Analysis and Discussion | 5 |
| Changes in Existing Law Made by the Bill, as Reported | 5 |

## PURPOSE AND SUMMARY

H.R. 768 makes permanent an existing temporary antitrust exemption that allows colleges and universities that admit students on a need-blind basis to agree on common standards for assessing need for purposes of awarding institutional financial aid. The current temporary exemption is set to expire on September 30, 2001.

89–006

## Background and Need for the Legislation

Beginning in the mid-1950's, a number of prestigious private colleges and universities agreed to award institutional financial aid (i.e. aid from the school's own funds) solely on the basis of demonstrated financial need. Last year, institutional grant aid at all colleges and universities amounted to about $12.2 billion as compared to Federal grant aid of about $8.9 billion. These schools also agreed to use common principles to assess each student's financial need and to give essentially the same financial aid award to students admitted to more than one member of the group. Among the schools engaging in this practice were the Ivy Overlap Group (Brown, Columbia, Cornell, Dartmouth, Harvard, Princeton, Penn, Yale, and MIT) and the Pentagonal/Sisters Overlap Group (Amherst, Williams, Wesleyan, Bowdoin, Dartmouth, Barnard, Bryn Mawr, Mount Holyoke, Radcliffe, Smith, Vassar, Wellesley, Colby, Middlebury, Trinity, and Tufts).

From the 1950's through the late 1980's, the practice continued undisturbed. In 1989, the Antitrust Division of the Department of Justice brought suit against the nine members of the Ivy Overlap Group to enjoin these practices. In 1991, the eight Ivy League schools (i.e. all of the Ivy Overlap Group except for MIT) agreed to a consent decree that for all practical purposes ended the practices of the Overlap Group. See *United States* v. *Brown University*, 1991 U.S. Dist. Lexis 21168, 1993-2 Trade Cases ¶70,391 (E.D. Pa. 1991).

In 1992, Congress passed a temporary antitrust exemption to allow the schools to agree to award financial aid on a need-blind basis and to use common principles of needs analysis. Higher Education Amendments of 1992, § 1544, Pub. L. No. 102–325, 106 Stat. 448, 837 (1992). This temporary exemption specifically prohibited any agreement as to the terms of a financial aid award to any specific student. By its terms, it expired on September 30, 1994.

In the mean time, MIT continued to contest the lawsuit. After a non-jury trial, the district court ruled that the practices of the Overlap Group violated the antitrust laws, but specifically invited a legislative solution. *United States* v. *Brown University*, 805 F.Supp. 288 (E.D. Pa. 1992). On appeal, MIT won a reversal of the district court's decision. *United States* v. *Brown University*, 5 F.3d 658 (3d Cir. 1993). The appeals court held that the district court had not engaged in a sufficiently thorough antitrust analysis and remanded for further consideration. After that decision, the parties reached a final settlement.

In 1994, Congress passed another temporary exemption from the antitrust laws. Improving America's Schools Act of 1994, § 568, Pub. L. No. 103–382, 108 Stat. 3518, 4060 (1994). This exemption resembled the one passed in 1992 in that it allowed agreements to provide aid on the basis of need only and to use common principles of needs analysis. It also prohibited agreements on awards to specific students. However, unlike the 1992 exemption, it also allows agreement on the use of a common aid application form and the exchange of the student's financial information through a third party. This exemption roughly mirrors the settlement reached in 1993. It was to expire on September 30, 1997.

Under that exemption, financial aid officers from some of the affected schools in 1997 proposed a set of guidelines to determine eligibility for institutional aid. These guidelines address issues like expected contributions from non-custodial parents, treatment of depreciation expenses which may reduce apparent income, valuation of rental properties, and unusually high medical expenses. However, a number of schools were reluctant to join the discussions because of fears about the expiration of the exemption.

In 1997, Congress extended the exemption again through September 30, 2001. The 1997 extension passed the Committee and the full House by voice vote. It passed the Senate by unanimous consent.

Since that extension, the affected schools have made further progress. Seventeen prestigious colleges that were not part of the original overlap groups have joined the discussions. Thus, the exemption has encouraged these schools to adhere to need-blind admissions and need-based aid. That is particularly important when the cost of elite universities is increasingly beyond the reach of the middle class. See, *e.g.*, Stuart Rojstaczer, *Colleges Where the Middle Class Need Not Apply*, *The Washington Post*, at A27, March 9, 2001. The presidents of the universities have tentatively agreed to a common set of principles affirming the primacy of need-based aid. In addition, they are discussing and testing guidelines based on the 1997 proposals of the financial aid officers. The presidents expect to announce agreement on the principles and guidelines in the next several months. In the past 2 months, Harvard, Princeton, and MIT have announced major new efforts to reduce the amount of loans that students must take out by substantially increasing their institutional grant aid. These efforts demonstrate that nothing in the exemption limits the ability of schools to respond to demonstrated need on an individual basis. As this progress shows, common treatment of these types of issues makes sense. The existing exemption has worked well so far. Progress is being made, and more schools are moving to need-blind admissions and need-based aid.

The need-based financial aid system serves social goals that the antitrust laws do not adequately address—namely, making financial aid available to the broadest number of students solely on the basis of demonstrated need. Without it, the schools would be required to compete, through financial aid awards, for the very top students. Those very top students would get all of the aid available which would be more than their demonstrated need. The rest would get less than their demonstrated need or none at all. Ultimately, such a system would serve to undermine the principles of need-based aid and need-blind admissions. No student who is otherwise qualified ought to be denied the opportunity to go to one of the nation's most prestigious schools because of the financial situation of his or her family. H.R. 768 will help protect need-based aid and need-blind admissions and preserve that opportunity.

## Hearings

Because H.R.768 only makes permanent an already existing temporary and noncontroversial antitrust exemption, the Committee held no hearings on it.

COMMITTEE CONSIDERATION

After its referral to the Committee on the Judiciary, H.R. 768 was held at the full Committee. Thus, it received no subcommittee consideration. On March 28, 2001, the full Committee met in open session and ordered favorably reported the bill H.R. 768, by a voice vote, a quorum being present.

VOTE OF THE COMMITTEE

During its consideration of H.R. 768, the Committee took no rollcall votes.

COMMITTEE OVERSIGHT FINDINGS

In compliance with clause 3(c)(1) of Rule XIII of the Rules of the House of Representatives, the Committee reports that the findings and recommendations of the Committee, based on oversight activities under clause 2(b)(1) of Rule X of the Rules of the House of Representatives, are incorporated in the descriptive portions of this report.

PERFORMANCE GOALS AND OBJECTIVES

H.R. 768 does not authorize funding. Therefore, clause 3(c) of Rule XIII of the Rules of the House is inapplicable.

NEW BUDGET AUTHORITY AND TAX EXPENDITURES

Clause 3(c)(2) of Rule XIII of the Rules of the House of Representatives is inapplicable because this legislation does not provide new budgetary authority or increased tax expenditures.

CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

In compliance with clause 3(c)(3) of Rule XIII of the Rules of the House of Representatives, the Committee sets forth, with respect to the bill, H.R. 768, the following estimate and comparison prepared by the Director of the Congressional Budget Office under section 402 of the Congressional Budget Act of 1974:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, March 30, 2001.*

Hon. F. JAMES SENSENBRENNER, Jr., *Chairman,*
*Committee on the Judiciary,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has prepared the enclosed cost estimate for H.R. 768, the Need-Based Educational Aid Act of 2001.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contact is Lanette J. Walker, who can be reached at 226–2860.

Sincerely,

DAN L. CRIPPEN, *Director.*

Enclosure.

cc: Honorable John Conyers Jr.
Ranking Member

**Date:** Tuesday, October 2 2012 02:55 PM
**Subject:** RE: Meeting to discuss YC Financial Aid model and projections
**From:** Storlazzi, Caesar
**To:** Suttle, J Lloyd <j.suttle@yale.edu>; Nagalla, Bhakti <bhakti.nagalla@yale.edu>;
**Attachments:** job2 - Spring 2012 - finaid adjustments and projections - four alternatives w 165K attenuation.pdf

Dear Lloyd and Bhakti,

I want to confirm that, for the Class of 2017 (entering Yale College in the fall of 2013) we have instituted the second "reset" of our needs analysis methodology. We are already performing needs analyses using the reset parameters listed below for our athletic prereads.

On page 7 of the attached PDF, you will find the matrix of results for the set of parameters we have instituted, showing the savings of just under $3 million for one class. (The rest of the PDF showed the savings if only some of the parameters were put in place.) The parameters of the changes that we have adopted are as follows:

- Zero parent contributions for families under $65k
- Use full College Scholarship Service assessment of parent contribution from available income
- Attenuate the parent contribution calculation from income between the incomes of $65k and $165k
- Use a 6% contribution from assets, including the families under $65k (the under $65k folks always have a zero Parent Contribution from income, but may have an asset contribution if they have assets greater than the asset allowance).
- The Yale asset allowance is reduced from $200k to $150k (the 98-99 level when we first introduced this concept of an across-the-board Yale asset allowance).
- Home equity is now capped at 3 times total income (it was previously capped at 1.2 times total income).
- We are assuming that once this second reset is fully in place for all four classes that the decrease in aid the scholarship budget will be just under $12 million.

Let me know if you have any questions in advance of our meeting.

Best regards,

Caesar

**From:** Suttle, J Lloyd
**Sent:** Tuesday, October 02, 2012 12:40 PM
**To:** Storlazzi, Caesar; Nagalla, Bhakti
**Cc:** Haynes, Lourdes
**Subject:** Meeting to discuss YC Financial Aid model and projections

Bhakti and Caesar,
As I've discussed with each of you this morning, I would like to find time for the three of us to meet either late next week or (more likely) early in the week of Oct. 15 to discuss a new undergraduate financial aid model that Bhakti is developing, and to update our projections about aid costs in FY13 and beyond. By copy of this message, I'm asking Lourdes to schedule that meeting. Thanks.

# EXCERPTS FROM TRANSCRIPT OF HAL J. SINGER DEPOSITION (NOV. 27, 2024), DKT. 865-30

## Pages 19-21, 27, 59, 82, 92-93, 95, 117

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
\- - -

ANDREW CORTZO, SIA HENRY, :CIVIL ACTION
ALEXANDER LEO-GUERRA, MICHAEL :
AMAERLANDER, BRANDON PIYEVSKY,:
BENJAMIN SHUMATE, BRITTANY :
TATIANA WEAVER and CAMERON :
WILLIAMS, individually and on :
behalf of all others similarly:
situated, :
Plaintiff :
:
V. :
:
BROWN UNIVERSITY, CALIFORNIA :
INSTITUTE OF TECHNOLOGY, :
UNIVERSITY OF CHICAGO, THE :
TRUSTEES OF COLUMBIA :
UNIVERSITY IN THE CITY OF NEW :
YORK, CORNELL UNIVERSITY, :
TRUSTEES OF DARTMOUTH :
COLLEGE, DUKE UNIVERSITY, :
EMORY UNIVERSITY, GEORGETOWN :
UNIVERSITY, MASSACHUSETTS :
INSTITUTE OF TECHNOLOGY, :
NORTHWESTERN UNIVERSITY, :
UNIVERSITY OF NOTRE DAME DU :
LAC, THE TRUSTEES OF THE :
UNIVERSITY OF PENNSYLVANIA, :
WILLIAM MARSH RICE UNIVERSITY,:
VANDERBILT UNIVERSITY, and :
YALE UNIVERSITY, :CASE NO.
Defendants. :1:22-cv-00125

\- - -
November 27, 2024
\- - -
C O N F I D E N T I A L
\- - -
Videotaped deposition of
HAL J. SINGER, Ph.D.
\- - -
ESQUIRE DEPOSITION SOLUTIONS
\- - -

FINAL TRANSCRIPT WITHOUT CONFIDENTIALITY
DESIGNATIONS

BY MR. GRINGER:
Q. Why didn't you offer your EFC regression until your second report?
A. Right. That's a good question.
I think that the -- as I said in my report, what the families ultimately care about from a -- and what economists ultimately care about from a consumer welfare perspective would be what the family ended up paying on that.
So, my focus on the first report, as you know, was on the effective institutional price. I'm going to avoid ever saying that verbal thing again by just using the acronym EIP. If you bear with me, I'll try not to have a complete acronym soup today. EFC and IEP are going to come up a few times.
Q. Is it your understanding that by applying the consensus methodology, a school can directly calculate an EFC?
A. My understanding is that applying the consensus methodology would not give you a crisp formula to use. Instead, it was a set of principals that would guide how

EFC would be calculated in broad strokes.

Q. What do you mean by crisp formula?

A. I don't think that the 568 Group ever presented an Excel spread sheet and said here's the formula that you should use. I don't think it was that concrete. And I do acknowledge that there was scope for amendments. We know about the exceptions under the professional guidance principal.

So, I think that, you know, what I've said, they've agreed to broad principals. And that's what the consensus methodology was aimed at.

And, you know, we can tick through the various principals, but, you know, they were able to meet in person and confer, but the major theme that I take away from all the citations, all the depositions, that it appears as if they were trying to establish a floor. They wanted to dampen competition in the sense that, you know, I think Vanderbilt, one Vanderbilt document talked about, you know, competition breaking loose or Georgetown document talked about

moving to the wild, wild west what would happen if we didn't establish the floor and people could just do whatever they wanted to.

So, there was a floor and based on certain principals and you could, of course, go over the floor and you wouldn't be in violation of the agreement. But you couldn't go under the floor.

Q. So, what was the floor?

A. The floor, it's hard for me to define it in real-time here.

But I think that we have documents that discuss the floor.

Q. Uh-huh.

A. Right. And so I think that there was a -- the group got together. They began with the IM, made certain modifications and, you know, they could arrive at what they -- what they thought the group should be paying -- should be asking of the family and nothing less.

Q. I understand these people are not in the potential class, but you're aware that at every defendant school there were students who did not have to pay anything

is now the third time. I don't know if I can write down the formula.

We can see what the EFC was. We can see by looking at the documents -- you know, in the data we can see what the EFC was for each student. We can look to the documents to see what they were trying to achieve, what the principals were, how they refined the formula over time.

But sitting here, on the third time I can't -- I can't tell you that the formula was take the family's, you know, income, multiply by point two plus point three plus a family's assets. I can't give you a formula in real-time.

BY MR. GRINGER:

Q. In any of your three reports did you write down the complicated formula that you say was agreed to by the defendants?

A. No.

Q. You do acknowledge, Dr. Singer, that the defendants calculated different EFCs for the same students; correct?

A. Oh, yes, I do. In fact, you recall that I have an analysis of cross

would tend to cause my regression to understate the effect of the conduct.
BY MR. GRINGER:
Q. Is that something you've looked at, whether there are changes in the results between the benchmark period and the class period at the school level?
MR. CRAMER: Objection to form.
THE WITNESS: I don't run models of course for individual schools. But I am -- when I code a school as being zero in a given year, I'm assuming, I'm telling the computer to assume that the conduct is off; right?
That they are now setting prices no longer pursuant to the strictures of the 568. And so to the extent that they don't immediately change, now I'm repeating myself, that would tend to bias these coefficients towards zero.
That would cause my methodology to understate the effect of the conduct.
BY MR. GRINGER:
Q. So, I take it your understanding is that one of the strictures of 568 was that

I'm sure we could find that, while defendants were inside of the cartel.

Q. We've talked a little bit about EFCs. What is your understanding of what cost of attendance means?

A. I think that if you were to explain this to the -- a layperson, you could think of the list price for the tuition, cost of attendance.

Q. Anything else?

A. I think that's how I understand it. I've defined it of course in my report. You have the work papers as well.

Q. Do you understand anything other than tuition to be a component of cost of attendance?

A. It could also include fees, but I've, you know, I used the cost of attendance data, you know, as defendants produced it to me.

So, I don't think that I'm, you know, coming up with my own definition of COA.

Q. Do you have a definition of COA?

MR. CRAMER: Asked and answered.

six components, in your view, is an agreement regarding packaging?

A. I have a section that discusses how the affordability principal applies to packaging. Let me see if I can see -- I think this could be element number two, but also it could be one of the six core principles if we dive in. But you asked me about an agreement? An agreement with respect to packaging?

Q. Uh-huh.

A. So, you know, I have -- I provide record evidence that suggests that packaging is included under the 568 agreement, under the alleged agreement; right? And we can go to that section and I also, I'm recalling a section about how the affordability principle applies.

I'm also in agreement, speaking of agreements with Dr. Stiroh here that if you're going to go through the hassle of conspiring over the EFC, it could be defeated if you didn't also control the participants' behavior with respect to loans; right?

So, I think there's an important

area of agreement there, which is important to point out for the fact finder that when we do, we do have agreements.

So, it would make sense as an economic matter if you were trying to organize a cartel, to make sure that if, you know, we can conspire to raise the EFC by $1,000, it would be foolish if our members could cheat by increasing drawing down the loans and increasing their grant aid and in just such a way as to, you know, offset that thousand dollar increase.

Q. You've used the phrase now a couple of times affordability principle. What does that mean?

A. I define in my report, but I, you know, the best I can do in real-time is that the -- the family's contribution, how much the family is going to contribute is going to be based on what they can afford to pay.

Q. And in all of the potential class members in this case received need based financial aid; is that correct?

A. That's definitional. To get

THE WITNESS: I've never as an exercise yet just removed one pillar of the challenged conduct.

I've been instructed to assume that this is one overarching conspiracy and that I was asked to model a world in which the entire agreement, all of it's six elements were removed.

So, the way that I'm hearing the question is, you know, have I modeled a world yet in which one element of the challenged conduct is removed.

I haven't been asked to do that and I also don't understand that, you know, that's being alleged here. There's not six independent elements. It's all one overarching conspiracy.

BY MR. GRINGER:

Q. Do you agree that all potential class members benefited to at least some extent from the rest of need-based aid?

MR. CRAMER: Objection. Form.

THE WITNESS: The question is relative to what? Relative to the world in which they didn't get any need-based aid? Of

that the defendants agreed with each other to follow these six principles or is that an assumption you're making?

A. Well, it's my understanding that they reached a consensus on these principles. This is part of the overarching agreement that they would abide by these principles.

Q. Are you offering the opinion that the defendants agreed with one another to adhere to these principles or are you assuming it?

A. I think that I assume. I've said this in other parts of my report that I have to assume that the challenged conduct occurred. The only thing I was asked to do with respect to the qualitative evidence was to assess whether the conduct was consistent with the existence of agreement.

Q. Do you know of any universities in America where to the extent they are able, parents and students do not have the primary responsibility to contribute to educational expenses before an institution awards financial aid?

MR. CRAMER: Objection to form.

# EXCERPTS FROM TRANSCRIPT OF CAESAR STORLAZZI DEPOSITION (JULY 27, 2023), DKT. 865-31

## Page 38

CONFIDENTIAL

VOLUME 1
PAGES: 1-201
EXHIBITS: See Index

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
Case No. 1:22-cv-00125

SIA HENRY, MICHAEL MAERLANDER, BRANDON PIYEVSKY, KARA SAFFRIN, and BRITTANY TATIANA WEAVER, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,

Defendants.

VIDEOTAPED DEPOSITION of CAESAR STORLAZZI
Thursday, July 27, 2023
9:30 a.m.
Wiggin and Dana LLP
One Century Tower, 265 Church Street
New Haven, Connecticut

Michelle Keegan, RMR, CRR, CSR
Lexitas

Final transcript without Confidentiality Designations

Q. What percentage would you estimate of the financial aid awards were appealed in some manner?

A. I would say somewhere around 10 percent.

Q. And of those appeals, do you have an estimation of what percentage resulted in a change in the financial aid award?

A. Close to 90 percent.

Q. 90 percent of the 10 percent?

A. 90 percent of the 10 percent. Yes.

Q. And were there certain schools that you would typically see being provided as examples of, I guess, lower parent contribution amounts that the parents hoped Yale would match?

A. Yes.

Q. And what were those schools?

A. Often Harvard, Princeton, Stanford.

Q. And do you have a sense of why those schools were typically the ones being shown to the financial aid officers as part of the appeals process?

A. Yes.

Q. And why is that?

A. For example, Princeton used a different algorithm to determine their parent contributions.

# EXCERPTS FROM TRANSCRIPT OF HAL J. SINGER DEPOSITION (NOV. 27, 2024), DKT. 874-5

## ECF Pages 3-8

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

\- - -

ANDREW CORTZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL AMAERLANDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER and CAMERON WILLIAMS, individually and on behalf of all others similarly situated,
Plaintiff

v.

BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,
Defendants.

:CIVIL ACTION
:CASE NO.
:1:22-cv-00125

\- - -

November 27, 2024

\- - -

C O N F I D E N T I A L

\- - -

Videotaped deposition of
HAL J. SINGER, Ph.D.

\- - -

ESQUIRE DEPOSITION SOLUTIONS

\- - -

FINAL TRANSCRIPT WITHOUT CONFIDENTIALITY DESIGNATIONS

Q. Yeah. For home equity.
A. Oh, for home -- oh, oh, for home equity. I don't think I have that clear of an understanding as to the income threshold as it intersected with home equity. I don't think I have that in my head.
Q. You would agree with this: Just because Caesar Storlazzi says in a school newspaper blog we're leaving 568 to be more generous doesn't mean Yale, in fact, became more generous?
MR. CRAMER: Objection to form.
THE WITNESS: I think I'm with you that we wouldn't want to base as an economist, we wouldn't want to base our conclusions entirely on the qualitative evidence.
As you know, I like to look at both the qualitative and quantitative. With respect to Yale, the regression I had in mind you might recall is in the third report we did one analysis that was Yale specific where we only looked at the leavers, the students who had some time in and some time out. Around that 2008 experiment. We saw, in

fact, that if we got to, you know, 81 percent of those transactions, you know, suffered impact and of course it's even higher when you consider at least once it would go into the 90s if you considered, you know, the students at Yale who lived through that experience would have suffered impact, I think it's 93 percent.

So, that was the regression analysis that I had in mind.

Q. Is it your understanding that Penn was the only school to adopt a no-loan policy while it was a member of the 568 Group?

A. No. There was one other -- there was one other one, at least one other one who did it concurrent with Penn. And I think both of those were done in reaction to Yale.

It starts with a C and I think it may have been Cornell.

Q. Columbia?

A. Oh, you know, you try -- there's so many facts here and I just -- I'm trying to remember. For some reason my brain is

the challenged conduct?
A. That's a great question.
I have to -- I have to treat the leavers as zeros in my regression because that is my approach to uncovering the effect.
But I explain that I believe this is an extremely conservative approach that is going to vastly understate what would have happened in a but-for world where you have the removal of 20 years of an alleged price fixing cartel.
I have to -- I have to exploit that. That's the best evidence that I can -- that I can uncover. But I recognize that because of umbrella effects, which is even if you're out and everyone else is still part of the cartel, that's going to affect how you price and what are called, economists call lingering effects.
After you've been with a cartel for ten years, you're going to have learned the technique, you're going to have learned how to keep prices high and so the idea that, you know, that you're going to unlearn that because you're going to come out, is a big

ask of the data despite all of these limitations, we're still finding economically and statistically significant effects of the cartel.

Q. When you use the phrase the cartel, what are you referring to?

A. The challenged conduct here, the 568 cartel.

Q. Why do you refer to it as a cartel?

A. Oh, because the, you know, it is my opinion -- first of all, that's an allegation of the case. This is a price fixing case.

Q. Uh-huh.

A. Right. I hope that the word cartel isn't inflammatory or pejorative. It's just the challenged conduct here; right?

So we're talking about does the qualitative evidence, does the qualitative evidence consistent with the formation of a cartel and of the adverse competitive effects of a cartel? Does the quantitative evidence suggest that this alleged cartel produced harmful effects for the students?

that to me is the biggest downside of doing the staggered DID.

Q. Okay. So, I appreciate that narrative. It will save us quite a bit of time, somewhat ironically.

But just so I'm clear, did you account for, in your work, for the staggered entry and exit of defendants into the group?

A. Well, the way that I account for it is that I'm going to treat Yale as being free and clear from the conduct in 2008, I think is the year that they left despite the fact that Yale might still make appearances at certain meetings and be participating in some less constrained way, right.

So in that sense, by treating it as the clean period, again, I go back to this word, I'm being extremely conservative. To the extent that there are any lingering effects, right, that would push the conduct towards zero, right, my estimate is understating what the true effect is, moreover, to the extent that there are any umbrella effects. We talked about Yale is out, but all of its partners are still in it.

That could be affecting Yale as well. If your partners are going soft through alleged conspiracy, then your incentive is to go soft on the competition as well. That's how I dealt with it.

Q. You said a moment ago that the post 2008 Yale experience is probably one of the most important experiences we can investigate in the entirety of the data set.

Why do you believe that?

A. Because Yale, you remember in the Singer-3, I went to the Yale experiment of 2008. Yale is the singular defendant who said I'm leaving and I'm leaving because I want to be more generous. I feel constrained by the conduct. And, you know, if we can't find an effect there, that out to be where we find the effect.

So, Dr. Hill staggered DID treatment is going to eliminate that experience, the post 2008 experience for Yale. Right? And that to me is a fatal flaw of the staggered DID.

Q. So, when you say Yale said we're leaving and we're leaving because we want to

ATTORNEYS' EYES ONLY - SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,

Defendants.

**Case No. 1:22-cv-00125**

**Hon. Matthew F. Kennelly**

**ERRATA TO THE EXPERT REPORT OF BRIDGET TERRY LONG, PH.D. DATED AUGUST 7, 2024**

**UPDATED AUGUST 12, 2024**

ATTORNEYS' EYES ONLY - SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

## I. CORRECTED FIGURE 8 OF THE LONG REBUTTAL REPORT

1. I submitted an expert report in this matter on August 7, 2024. Subsequent to submitting my report, I identified arithmetical errors in the counts depicted in the "Number of Schools—Inconsistent with CM" and "Number of Schools—Contradiction/Insufficient Information" lines in **Figure 8**, which I have corrected below. These corrections do not change any of the numbers presented elsewhere in my report nor do they affect any of my opinions expressed therein.

ATTORNEYS' EYES ONLY - SUBJECT TO SECOND AMENDED CONFIDENTIALITY ORDER (DKT. 608)

**Corrected Figure 8**
**Each Defendant Separately Determined How Its Need Analysis Methodology Treated Elements for Which the CM Guidelines Provided Actionable Recommendations[1]**

| | CM Guidelines' Elements | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Defendant** | **Cost of Living Variances** | **Family and Student Assets** | **Home Equity** | **Imputing the Value of Liquid Assets** | **K-12 Tuition Expenses** | **Medical Expenses** | **Number of Siblings in College** | **Rental Property/Other Real Estate** |
| Brown | | | | | ✓ | | | ✓ |
| Caltech | ✓ | | | | | | | ✓ |
| Chicago | | | | ✓ | | | | ✓ |
| Columbia | ✓ | | ✓ | ✓ | * | * | ✓ | ✓ |
| Cornell | ✓ | | | | ✓ | | | |
| Dartmouth | | | | ✓ | | | ✓ | |
| Duke | ✓ | ✓ | ✓ | | ✓ | | | |
| Emory | ✓ | | | | | | | |
| Georgetown | ✓ | | ✓ | | | | | ✓ |
| Johns Hopkins | ✓ | * | ✓ | ✓ | ✓ | * | * | |
| MIT | ✓ | | | | | | | ✓ |
| Northwestern | ✓ | * | | * | * | * | * | ✓ |
| Notre Dame | | | | | | | | ✓ |
| Penn | ✓ | | | ✓ | ✓ | | | |
| Rice | ✓ | | | | | ✓ | | |
| Vanderbilt | ✓ | | | | | | | * |
| Yale | ✓ | | | ✓ | | ✓ | | |
| **Number of Schools** | | | | | | | | |
| Consistent with CM | 13 | 1 | 4 | 6 | 5 | 2 | 2 | 8 |
| Inconsistent with CM | 4 | 14 | 13 | 10 | 10 | 12 | 13 | 8 |
| Contradiction/ Insufficient Information | 0 | 2 | 0 | 1 | 2 | 3 | 2 | 1 |

**Notes:**
[1] ✓ indicates that the Defendant's treatment of a specific need analysis element was consistent with all components of the CM Guidelines' recommended treatment in all years for that Defendant's respective Class Period, to the extent this information is available.
[2] * indicates that either: (1) there was insufficient information available about the Defendant's treatment of the specific need analysis element to determine whether it was consistent with the CM Guidelines' recommended treatment for any year I analyzed; or (2) the available information about the Defendant's treatment of the specific need analysis element was conflicting for all years for that Defendant's respective Class Period, such that it was not possible to determine whether it was consistent with the CM Guidelines' recommended treatment in any year.
[3] A blank indicates that the Defendant's treatment of a specific need analysis element was demonstrably inconsistent with at least one component of the CM Guidelines' recommended treatment in at least one year for that Defendant's respective Class Period.

1 **Appendix Tables D.1-D.17**.

Bridget Terry Long, Ph.D.
August 12, 2024

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ANDREW CORZO, SIA HENRY, MICHAEL MAERLANDER, ALEXANDER LEO-GUERRA, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated,

*Plaintiffs*,

v.

BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,

*Defendants*.

Case No. 1:22-cv-00125

*Class Action*

**EXPERT REPORT OF HAL J. SINGER, PH.D. (ERRATA II UPDATED)**

June 10, 2024

This report cites and quotes material that Defendants designated as Confidential or AEO under the Second Amended Confidentiality Order (ECF No. 608)

officers at such Institutions in their exercising independent professional judgment with respect to individual applicants for such financial aid; or

(3) to use a common aid application form for need-based financial aid for such students if the agreement to use such form does not restrict such Institutions in their requesting from such students, or in their using, data in addition to the data requested on such form.[4]

3. Plaintiffs allege that none of the Defendants qualified for the 568 exemption because, during each year of the Class Period (defined below), at least one Defendant did not admit all of its undergraduate students who were U.S. citizens or domestic U.S. residents on a need-blind basis.[5] Plaintiffs further allege that Defendants entered into a conspiracy (that is, formed a cartel) by joining or associating with the 568 Group with the goal of suppressing institutional grant aid and artificially inflating the difference between (a) the cost of attendance (the sum of tuition, fees, room and board paid by students to attend an institution) and (b) the institutional grant aid provided.[6] "Institutional grant aid" refers to any need-based financial grant or scholarship aid that an institution awards its students and that students need not repay. The "Effective Institutional Price" equals the cost of attendance remaining after subtracting any institutional grant aid. I refer to this alleged conspiracy and all of its constituent components (as discussed further below) hereafter in this report as the "Challenged Conduct" or "Overarching Agreement."

4. I understand that, under Plaintiffs' theory of the case, the Challenged Conduct occurred over the Class Period (defined below).[7] I understand further that the Challenged Conduct

---

4. Section 568(a).
5. Second Amended and Supplemental Class Action Complaint ("Compl."), ECF No. 308, ¶¶ 3-4.
6. Cost of attendance is not the same as tuition. Tuition is the cost to register as a student and attend classes at an institution. Cost of attendance includes additional relevant costs, such as room, board, and various fees. Institutions provide a cost-of-attendance estimation on their websites, but the cost of attendance estimates for previous years are not consistently publicly available. The most comprehensive source is the Department of Education's Integrated Postsecondary Education Data System ("IPEDS"), which retains the cost of attendance for institutions as reported to the Department of Education. I use the IPEDS values for all years prior to 2023. *See* my workpapers for details.
7. Most Defendants joined the 568 Group in connection with its formation in January 1998, but as my analyses below show, the 568 Group did not all implement the Challenged Conduct until September 2003. Some Defendants, as my analyses below also show, joined in later years.

included an agreement among Defendants to apply a "consensus approach" to financial aid, which involved reaching agreement on (1) six core principles of awarding financial aid (which principles I review further below); (2) making need-based aid the primary form of financial aid; (3) using the Institutional Methodology (defined below), or "IM", as the "base" method for need analysis and as the starting point for calculating financial aid; (4) developing and implementing the Consensus Methodology (defined below), or "CM", as a variation of the IM for purposes of need analysis; (5) using a common manual for applying "professional judgment" to determinations of need, and treating professional judgment as the exception, rather than the rule; and (6) reciprocally sharing competitively sensitive information relating to principles, practices, amounts, and methods regarding the provision of financial aid.[8]

5. I use the term "financial aid" (or "aid") in this report to refer to any form of assistance to support undergraduate studies received from any source.[9] Financial aid includes grants and scholarships from various sources (including institutional grants) as well as loans or work-study programs. Loans and work-study are forms of "self-help," because loans are to be repaid and the student earns funds by working.[10] The cost of attendance reflects the gross price to attend an institution (before accounting for all forms of financial aid). The Effective Institutional Price, as

---

8. Some 568 Group members and documents also refer to a "Consensus Approach," which appears to be a general description of the CM in combination with the core principles and common approach to professional judgment.

9. The College Cost Initiative, of which Defendants are partners, states: "A financial aid offer is a document sent by a postsecondary institution to a student that outlines the amounts and details of the financial aid being offered to the student, which may include scholarships, grants, loans, employment, or other forms of financial assistance to pay for college expenses. Sometimes schools refer to these as financial aid 'awards', although this term is outdated. Schools should refer to these as financial aid offers." *Glossary*, COLLEGE COST TRANSPARENCY INITIATIVE, https://www.collegeprice.org/glossary (last visited May 2024). The most common forms of financial aid are grants, loans, and work study. The most common sources of financial aid are federal, state, institutional, and outside sources.

10. The College Cost Initiative explains: "Federal Work-Study provides funding for part-time jobs for undergraduate and graduate students with financial need. Unlike grants and loans, FWS is paid to students as they earn the funds by working." *Glossary*, COLLEGE COST TRANSPARENCY INITIATIVE, https://www.collegeprice.org/glossary (last visited May 2024).

noted, equals the cost of attendance minus the institutional grant aid. It follows that, holding cost of attendance constant, lowering institutional grant aid increases Effective Institutional Price.

6. I distinguish Effective Institutional Price from the term "net price" in higher education. I understand that this is the statutory definition of "net price":

> The term "net price" means the average yearly price actually charged to first-time, full-time undergraduate students receiving student aid at an institution of higher education after deducting such aid, which shall be determined by calculating the difference between—
>
> (A) the institution's cost of attendance for the year for which the determination is made; and
>
> (B) the quotient of—
>
> (i) the total amount of need-based grant aid and merit-based grant aid, from Federal, State, and institutional sources, provided to such students enrolled in the institution for such year; and
>
> (ii) the total number of such students receiving such need-based grant aid or merit-based grant aid for such year.[11]

7. This definition refers to the net price that first-time, full-time ("FTFT") undergraduate students pay. My econometric analyses in this report rely on student-level data per academic year. I use the term "academic year" to refer to a fall term through summer term. The 2010 academic year, for instance, means the fall 2010 term, spring 2011 term, and summer 2011 term. The Department of Education defines net price, for a single student in a given academic year, as "the amount that a student pays to attend an institution in a single academic year after subtracting scholarships and grants the student receives. Scholarships and grants are forms of financial aid that a student does not have to pay back."[12] Accordingly, in this report, Effective Institutional Price is cost of attendance minus institutional need-based grants and scholarships. Subtracting third-party

11. 20 U.S.C. § 1015a. This definition thus refers to "merit aid." I refer to "merit aid" in this report as institutional aid other than need-based institutional aid.

12. *Net Price Calculator Center*, U.S. DEPARTMENT OF EDUCATION, https://collegecost.ed.gov/net-price (last visited May 2024).

grants and scholarships from the Effective Institutional Price would yield the net price defined above. I concentrate in the body of this report on the effects of the Challenged Conduct on the Effective Institutional Price, because it is the effective price that Defendants charge, after deducting the institutional aid they provide (but without considering grant aid that federal and state governments, and other third-party sources, may provide).

8. I understand that the Class does not include those for whom the total cost of attendance, including tuition, fees, room, and board for each undergraduate academic year, was covered by any form of financial or merit aid (not including loans) from one or more Defendants. Plaintiffs define the "Class" as follows:

> All persons who have during the Class Period (a) enrolled in one or more of Defendants' full-time undergraduate programs, (b) received at least some need-based financial aid from one or more Defendants, and (c) whose tuition, fees, room, or board to attend one or more of Defendants' full-time undergraduate programs was not fully covered by the combination of any types of grant or merit aid in any undergraduate year.[13]

Under this definition, because a single student could experience one year or a series of years as part of her undergraduate education in which a combination of institutional grant or merit aid covered that student's cost of attendance, but other years in which that student's institutional grant or merit aid did not cover the student's full cost of attendance, that student would be in the Class but only, for impact or damages purposes, those years in which the institutional aid did not cover the full cost of attendance.

9. The Class Period is defined as follows:

(a) For Brown, Dartmouth, and Emory—from fall term 2004 through June 30, 2023.

(b) For Chicago—from fall term 2003 through June 30, 2014.

---

13. Compl. ¶ 200.

**Memorandum of Understanding**
**The 568 Presidents' Group**

The undersigned institution agrees to participate in the collaborative work of the 568 Presidents' Group under the following guidelines:

**Purposes** -- The purposes of the Group are to:

1. Maintain financial aid policies and procedures that are designed to bring greater clarity, simplicity, and fairness to the process of assessing each family's ability to pay for college.
2. Discuss and agree upon common principles of analysis for determining the financial need of undergraduate financial aid applicants.
3. Build, maintain, and revise, as appropriate, a Consensus Approach need analysis methodology that is consistent with these principles.
4. Explore ways of developing a data exchange program as permitted by the MIT Settlement Standards of Conduct.[1]

**Participation** -- Participation in the Group is limited by federal law to colleges and universities that practice need-blind admissions.[2] Participating institutions shall recertify their compliance with Section 568 annually. If, at any time, an institution fails to meet the need-blind requirement, its participation shall terminate immediately.

**Organization** -- The presidents of the participating institutions shall appoint a Steering Committee consisting of at least three presidents, one of whom shall serve as Chairperson. Each participating institution shall also designate an individual to represent the institution on a Need Analysis Council and members of that Council shall in turn elect a Chairperson from amongst its members to serve as Chairperson of the Technical Committee and to preside at meetings of the Council. The Technical Committee will serve as the coordinating and policy review body of the Need Analysis Council, reporting on behalf of the Council to the presidents of the 568 Group.

Members of the Technical Committee shall be drawn from the Need Analysis Council. Working subcommittees may be appointed, as needed, from time to time.

**Term and Assessment** -- A review and assessment of the activities of the Group shall be conducted periodically to determine whether continuation of the Group is recommended. The Group's continuation is also contingent on the renewal of Section 568 by Congress.[3] An eligible institution may voluntarily resign from the Group by giving written notice to the Chairperson of the Steering Committee.

**Funding** -- Dues shall be collected to pay for various costs associated with meetings, conferences, and other expenses. Each institution will be assessed an initial fee of $1,000 and a participating institution shall serve as the administrator of such funds. The collection of additional funds from member institutions may be authorized by the participants from time to time to pay for expenses not covered by the initial fee.

**Staffing and Counsel** -- To the extent that the Group may require clerical and logistical support to advance its agenda, the Group may designate a representative of a member institution or an independent third party to provide such support. Reimbursement for such support shall be made from dues collected from the participants. The Group shall retain counsel to provide legal advice to the Group.

**Work Plan** -- The Need Analysis Council shall prepare an annual Work Plan for discussion and approval by the participating institutions. The Work Plan shall describe the activities to be carried out and provide a timetable for their implementation. At the conclusion of each year, the Need Analysis Council shall submit to the presidents of the participating institutions a report of the Group's activities and a financial statement of expenses incurred.

**Effective Date** -- This Agreement shall be effective December 1, 2003.

Agreed to this 5th day of January, ~~2003~~ 2004

Cornell University
Institution

Jeffrey S. Lehman
Senior Officer's Name and Title

[signature]
Senior Officer's Signature

Please return to:
President Morton O. Schapiro
Chairperson, 568 Presidents' Group
Williams College
P.O. Box 687
Williamstown, MA 01267
Fax 413-597-4015

[1] See Paragraphs 4 and 5 of the "MIT Standards of Conduct."
[2] As defined in Section 568 of the Improving America's Schools Act, the term "need-blind" means admitting U.S. nationals or resident aliens during both regular and wait list admissions without regard to the financial circumstances of the student or the student's family.
[3] The current exemption expires on September 30, 2008.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLANDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated,** | ) | |
| **Plaintiffs,** | ) | |
| **vs.** | ) | **Case No. 22 C 125** |
| **BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,** | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Former undergraduate students have brought this putative class action against various private universities, alleging that they violated section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to suppress competition on financial aid. The universities

have moved for summary judgment on the merits and on the statute of limitations. The students have moved for partial summary judgment on the University of Pennsylvania's (UPenn) withdrawal defense. For the reasons below, the Court denies both motions.

**Background**

This case is the second of its kind. In 1958, the eight Ivy League schools[1] and the Massachusetts Institute of Technology (MIT) formed the "Ivy Overlap Group." *United States v. Brown Univ.*, 5 F.3d 658, 662 (3d Cir. 1993). That group agreed not to award merit-based financial aid, instead committing to awarding financial aid solely based on demonstrated financial need. *Id.* The Ivy Overlap Group members also agreed to share financial aid information with one another and to jointly develop and apply a common method for assessing expected family contribution (EFC)—the amount a school assumes that a student's family can contribute and a core determinant in calculating financial need. *Id.* Lastly, to mitigate discrepancies in financial aid calculation, the Ivy Overlap Group agreed to meet once a year to jointly determine EFCs for commonly admitted students. *Id.* at 663.

In 1991, the Department of Justice Antitrust Division brought a civil antitrust enforcement action against the Ivy Overlap Group, alleging that the schools' agreement violated section 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1, by suppressing competition among the schools in the prices offered to students receiving financial aid. Verified Compl. ¶ 25, *United States v. Brown Univ.*, 805 F. Supp. 288 (E.D. Pa. 1992) (No. 91 C 3274). That lawsuit ultimately ended in a consent decree that limited

[1] The Ivy League comprises the following schools: Brown University, Columbia University, Cornell University, Dartmouth College, Harvard University, the University of Pennsylvania, Princeton University, and Yale University.

collusion on financial aid.

In 1994, Congress enacted a temporary antitrust exemption—the 568 Exemption—that permitted some agreements regarding financial aid between "2 or more institutions of higher education at which all students admitted are admitted on a need-blind basis." Improving America's Schools Act of 1994, Pub. L. No. 103-382, § 568(a), 108 Stat. 3518, 4060 (1994). Specifically, the 568 Exemption permitted agreements:

> (1) to award such students financial aid only on the basis of demonstrated financial need for such aid; (2) to use common principles of analysis for determining the need of such students for financial aid [subject to independent professional judgment]; (3) to use a common aid application form for need-based financial aid . . . ; and (4) to exchange through an independent third party, before awarding need-based financial aid . . . , [information about students' financial need].

*Id.*

In 1998, a group of colleges and universities, including the defendant universities in this case, formed the 568 Presidents Group, named after the 568 Exemption. This lawsuit centers around that group's activities.

In 2000, the 568 Group created a "Common Standards Subcommittee" to consider "whether it is possible to reach agreement on common standards for determining financial need at the institutional level consistent with the Statement of Principles for need-based financial aid and as permitted by Section 568." Defs.' Mot. for Summ. J., Ex. 377 (Subcommittee Report) at 5.[2] The 568 Group specifically asked the Common Standards Subcommittee to "address the principal issues that give rise to

[2] Pincites for exhibits are based on ECF pagination. Pincites for briefs are based on the page numbers in the briefs.

divergent need calculations" and "arrive at reasonable compromises in the areas where [six agreed-upon financial aid] principles may conflict." *Id.* Those agreed-upon principles, which the Court will refer to as the Core Principles, were:

1. To the extent they are able, parents and students have the primary responsibility to contribute to educational expenses before an institution awards financial aid.
2. Families should contribute to educational expenses according to their ability. Those with similar financial profiles should contribute similar amounts.
3. Institutions should evaluate both income and assets as part of the assessment of the parents' and applicants' ability to pay.
4. Each institution should inform applicants about the policies and practices it applies when measuring a family's ability to pay, carry out its policies consistently throughout a student's eligibility, and support the awarding of need-based aid.
5. An institution that allocates any financial assistance that is not based exclusively on need should inform all prospective applicants of the standards it applies in allocating that aid.
6. The exercise of "professional judgment" by financial aid officers in assessing a family's ability to pay should recognize unique or extenuating financial circumstances in individual cases; such professional judgment is not the proper mechanism for systematically treating groups of students differently in order to advance institutional objectives.

*Id.*

In 2001, the Common Standards Subcommittee published a report proposing a "Consensus Approach to Need Analysis" that the subcommittee believed would "eliminate much of the [recent] variance in need analysis." *Id.* at 3–4. According to the report, the Common Standards Subcommittee took the College Board's Institutional Methodology (IM) as its "starting point" and "focused on those aspects of the current IM that are most often subject to local interpretation or professional judgment." *Id.* at 6. The result was a set of common standards for "fifteen specific and important areas" in "determining a family's ability to pay," the Consensus Methodology (CM). *Id.* at 6–10.

Some recommendations simply adopted the IM. *See id.* at 9 (recommending that

the 568 Group use the IM's treatment for extrapolating assets and accounting for medical expenses). But others provided additional or different guidance. Of those, some recommendations were relatively straightforward. For example, the report recommended that "student assets and assets held in college savings programs and pre-payment tuition plans [should generally] be treated as family assets." *Id.* at 7. Some were virtually formulaic, subject to limited exceptions. *Id.* ("Count home equity capped at 2.4 times income minus mortgage debt with professional judgement [sic] adjustments in individual cases."). Others were open-ended or more complex. *See id.* at 9 ("Consider the impact of certain non-reoccurring, non-discretionary expenses. . . . Recognize educational debt under certain circumstances."); *see also id.* at 6 (providing more complex recommendations regarding divorced families and business and real estate).

The report also proposed future tasks for the 568 Group. One proposal was to appoint a "Need Analysis Committee to review and revise [the CM] as appropriate." *Id.* at 10. Another was to create a "Professional Judgment Guidelines Manual." *Id.* Regarding that suggestion, the report recognized that "locally applied professional judgment is a critical component of need analysis" that the manual should not "eliminate or restrict." *Id.* Instead, the manual would "standardize both those issues that should be treated locally and, to the extent possible, the manner in which such issues are handled." *Id.* Lastly, the report proposed testing a "data exchange program as permitted by the MIT Settlement Standards of Conduct." *Id.*

The 568 Group followed through on many of the report's recommendations. It adopted a revised version of the CM, developed Professional Judgment Guidelines, and

created a "Technical Committee" to review and revise both sets of standards. Defs.' Resp. to Pls.' Stat. of Facts ¶ 7.[3] As for information sharing, some 568 Group members—and all but one of the defendant universities—were also members of the Consortium on Financing Higher Education (COFHE), a separate organization that predated the 568 Group and shared admissions and financial aid data from its member schools in the form of "colorbooks." Pls.' Resp. to Defs.' Stat. of Facts ¶¶ 112–15.

In a letter to financial aid directors, the chairman of the 568 Group Common Standards Subcommittee stated:

> Each of the 568 Group institutions has made a commitment to the [six] financial aid principles adopted by the 568 Presidents' Group . . . and to the implementation of the need analysis policies and procedures first published [in the 2001 report] and revised with your help in the ensuing months.

Pls.' Resp. to Defs.' Mot. for Summ. J., Ex. 117 (Implementation Letter) at 2. The letter summarized nineteen policies for "determining financial need" that "participating institutions agree[d] to." *Id.* at 2–3. The letter also said that the aid directors were "responsible for . . . implementing the currently agreed upon Consensus Approach need analysis methodology," starting with "the cohort of students applying to enter college in the fall of 2003." *Id.* at 2–3. It further cautioned that although professional judgment was "a critical element" of the Consensus Approach, "the goal of consistent results requires that variations . . . beyond those detailed in the[] guidelines[] should be the exception[] rather than the rule." *Id.* at 2.

An attached document clarified that the agreement was "limited to following the formula for parent and student contribution results." *Id.* at 4. Financial aid packaging—

[3] Unless otherwise specified, citations to the parties' statements of facts refer to those submitted in response to the universities' motion for summary judgment.

eventual effects of the consensus approach may not be captured." *Id.* at 13.

Over the next sixteen years, the 568 Group continued to collaborate on common financial aid principles and practices, with Congress renewing the 568 Exemption several times during that period. The 568 Group's composition changed over the years, with its members—including some of the defendant universities—periodically leaving and joining the group. Pls.' Resp. to Defs.' Stat. of Facts ¶ 66. The 568 Group publicly disclosed its membership, the Core Principles, and at least part of the CM. *See id.* ¶¶ 72, 94. Much of that information was available on the 568 Group's website, where the group asserted that it "work[ed] together in an effort to maintain a need-based financial aid system that is understandable and fair and will bring greater clarity, simplicity, and equity to the process of assessing each family's ability to pay for college." Defs.' Mot. for Summ. J., Ex. 419 at 3.

On January 9, 2022, the students initiated this lawsuit, alleging that the 568 Group violated section 1 of the Sherman Act by engaging in a "price-fixing cartel that is designed to reduce or eliminate financial aid as a locus of competition, and that in fact has artificially inflated the net price of attendance for students receiving financial aid." Compl. ¶¶ 1, 4.

On October 1, 2022, Congress declined to renew the 568 Exemption. Just over a month later, the 568 Group formally dissolved.

**Discussion**

Summary judgment is appropriate if there is "no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (quoting Fed. R. Civ. P. 56(c)). In other words,

Section 4 of the Clayton Act provides a private cause of action to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a). Thus in a private suit like this one, the plaintiffs "must show more than a conspiracy in violation of the antitrust laws; they must show an injury to them resulting from the illegal conduct." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Putting these principles together, the students must show: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade . . . ; and (3) an accompanying injury." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012) (quoting *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993)).

**1. Agreement**

"The meaning of the term 'contract, combination . . . or conspiracy' is informed by the basic distinction in the Sherman Act between concerted and independent action . . . ." *Am. Needle*, 560 U.S. at 190 (cleaned up). "Section 1 applies only to *concerted action* that restrains trade." *Id.* (emphasis added). Put differently, section 1 does not reach unilateral action; it requires an agreement. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984).

The universities devote much of their briefing to arguing that the students "cannot prove the 'agreement' element." Defs.' Mem. in Supp. of Mot. for Summ. J. at 2. They do not dispute that they were part of the 568 Group and collaborated on common financial aid practices, including the Core Principles, the CM, and the Professional Judgment Guidelines. They instead contend that the students cannot show the

agreement alleged in the complaint: an overarching conspiracy to artificially inflate the net price of attendance.

The problem with this argument is that it shifts the goalposts away from what the agreement element requires. An agreement that suppresses competition violates section 1, regardless of its form or purpose. *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946). In other words, section 1 does not require any particular kind of agreement to trigger antitrust scrutiny; it distinguishes only between agreements that harm competition and those that do not. And importantly, the existence of an agreement is "different from and antecedent to the question whether it unreasonably restrains trade." *See Am. Needle*, 560 U.S. at 186; *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1400b (5th ed. 2025) ("In the antitrust universe, the existence of an agreement must always be considered separately from the question of legality."). As a result, the students do not need to prove an overarching price-fixing conspiracy to satisfy the agreement element, they simply need to show that there was an agreement. *Cf. Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 704 (7th Cir. 2021) (holding that the existence of a contract established agreement but not a resulting unreasonable restraint of trade).

Of course, there are conceptual boundaries to what constitutes an agreement. But as a leading antitrust treatise observes, section 1 can reach "even a vague understanding between competitors on a common course of action" or "[c]ollective decision making without . . . implementation." Areeda, *supra*, ¶ 1404. And even a mutual understanding to exchange information may constitute a section 1 violation if it has an anticompetitive effect. *See United States v. Container Corp. of Am.*, 393 U.S.

333, 335 (1969).

Viewed in that light, a jury reasonably could find that the agreement element is satisfied. At a minimum, it is undisputed that all the universities were members of the 568 Group and collaborated on devising common financial aid practices, which they all at least partially implemented. Defs.' Resp. to Pls.' Stat. of Facts ¶ 2; Defs.' Mot. for Summ. J., Ex. 2.1 at Fig. 8. That alone is enough concerted action to trigger further antitrust scrutiny.

Moreover, there is enough evidence in the record for a jury reasonably to find that the 568 Group agreed on the Consensus Approach to avoid bidding wars and then adhered to it. The 2001 subcommittee report stated that the Consensus Approach would "eliminate much of the [recent] variance in need analysis." Subcommittee Report at 3–4. Similarly, a November 2000 memorandum from Dartmouth's then-Director of Financial Aid said that one purpose of the Consensus Methodology was to "[a]void bidding wars," and it expressed concerns about other competitors not "sign[ing] on." *See* Pls.' Resp. to Defs.' Mot. for Summ. J., Ex. 158 at 3–4.

Those same concerns show up in Vanderbilt's internal communications in 2014 regarding the 568 Exemption. Vanderbilt's Vice Provost for Enrollment at the time recommended pushing for the 568 Exemption's renewal "to avoid bidding wars between schools" and warned that its expiration "would cause instability in the marketplace" and "could . . . force[] [schools] into a bidding war for students, using need-based aid as a major tool." *Id.*, Ex. 369 at 4. The Chancellor agreed. *Id.* at 3.

The record also contains evidence that the 568 Group members felt obligated to follow the Consensus Approach, at least to some degree. The letter from the chairman

of the 568 Group Common Standards Subcommittee told aid directors that they were responsible for implementing the Consensus Approach. The 2006 GAO Report shows that the universities followed through on that message, finding that twenty-five of the twenty-eight schools in the group used the Consensus Approach the following year. GAO Report at 3.

There are also several statements by 568 Group institutions indicating that they believed the Consensus Approach restricted their financial aid analysis and that following the approach was a condition of remaining in the 568 Group. In 2014, one 568 Group member stated:

> I think it was made clear to those wanting to participate in 568 that they could NOT use an EFC that was lower than what is calculated using the [Consensus Approach], unless they had documented the case using "professional judgment." That was why HYP felt the need to leave the group; they wanted to offer more "need-based" scholarship aid. Maybe this is not the document to explain that nuance but it is a reality.

Pls.' Resp. to Defs.' Mot for Summ. J., Ex. 88 at 2. Similarly, in 2016, MIT's Dean of Admissions wrote, "When Harvard, Princeton, Yale, and Stanford started making their more serious financial aid enhancements, they had to leave the group . . . . We may or may not be asked to leave if we adopt some similar enhancements." *Id.*, Ex. 205 at 3; *see also id.*, Ex. 41 at 2 ("I thought at Georgetown we could say such an endowment would allow us to be more generous in our aid calculation (no more 568 Group!) . . . ."); *id.*, Ex. 57 at 7 ("[Penn should] [w]eigh the tradeoffs of 568 Group membership[,] *e.g.*, Harvard, Yale and Princeton are not members and therefore can adopt different methods to calculate parental contribution[.]"); *id.*, Ex. 58 at 5 (noting that "Harvard and Princeton never joined" the 568 Group "because they did not want to limit the usage of their funds").

Some statements further allude to a price floor. For example, in an email chain from 2002, one 568 Group member asked, "Presumably, as are [sic] using CA as the 'floor' . . . , we are still in compliance with the agreement, at least in theory. Do I have this right?" *Id.*, Ex. 60 at 3. The response confirmed that understanding, stating, "What we are trying to eliminate is the downside adjustments that lead to real confusion." *Id.* at 2. Another letter echoed that belief in 2008, asserting that "the core Consensus Approach agreement established a 'floor' approach that could be breeched [sic] only in cases involving locally applied individual case based professional judgment." *Id.*, Ex. 62 at 2. The letter also expressed concern that the 568 Group "must have a common methodology that serves as [its] base line" for it to "have meaning and a viable future." *Id.* at 3.

In sum, a jury reasonably could find that the 568 Group created the Consensus Approach at least in part to avoid bidding wars, that members were expected or required to adhere to the approach, and that they did in fact partially implement it. This would be sufficient to satisfy the agreement element.

**2. Unreasonable restraint of trade**

As discussed above, section 1 prohibits an agreement only if it unreasonably restrains trade. That inquiry "is confined to a consideration of impact on competitive conditions." *Pro. Eng'rs*, 435 U.S. at 690. In other words, "[t]he true test of legality is whether the restraint . . . promotes competition or . . . may suppress or even destroy competition." *Id.* at 691.

**i. Mode of analysis**

The default test for assessing whether an agreement is anticompetitive is the rule

*Sys., Inc.*, 441 U.S. 1, 23 (1979). And "even price fixing by agreement between competitors . . . [is] governed by the rule of reason . . . if the challenged practice when adopted could reasonably have been believed to promote 'enterprise and productivity.'" *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1011 (7th Cir. 2012).

Acknowledging those limits takes this agreement out of the purview of *per se* analysis. The challenged agreement does not fix prices or components of pricing. Nor does it set a pricing formula. The students argue that the agreement ultimately has the effect of fixing a component of pricing, but that is not obvious from the face of the agreement. *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 340 n.10 (2d Cir. 2008) (Sotomayor, J., concurring) ("When empirical analysis is required to determine a challenged restraint's net competitive effect, neither a *per se* nor a quick-look approach is appropriate."). To the contrary, three aspects of the agreement caution against condemning it without an investigation into its actual effects.

First, it is not obvious whether or how the agreed-upon principles and practices affected competition. Some aspects of the agreement may have even promoted competition. For example, the 2016 version of the Consensus Approach deviated from the Institutional Methodology—the standard methodology in the industry for assessing financial need—by encouraging cost of living variances. That adds another variable which the 568 Group members could use to compete with one another and which, as a practical reality, likely would not otherwise exist.

Second, a jury reasonably could find that the 568 Group did not agree on other aspects of pricing, such as packaging or list prices, or enforce any other aspects of the agreement. If so, the 568 Group's members could easily circumvent any price-fixing

effects from the challenged agreement. That further undermines the *per se* rule's assumption that the agreement's inherent "anticompetitive potential" means that a full-blown rule of reason analysis will likely be "wholly fruitless." *See Maricopa*, 457 U.S. at 351.

Third, the universities could have adopted the Consensus Approach for purposes other than suppressing competition in the higher-education market. For example, as the Third Circuit recognized in the Overlap Group case, a commitment to need-based aid might enable universities to more evenly allocate financial aid to those students who otherwise would be unable to afford the cost of attendance. The universities also suggest that the 568 Group created efficiencies in financial aid that fostered competition. To be clear, the students have sufficient evidence to support a reasonable inference that the universities adopted the agreement at least in part to suppress competition. *See supra*, Part 1; *cf. Matsushita*, 475 U.S. at 596 (requiring a showing that the inference of an illegal agreement is reasonable in light of competing inferences). But a reasonable inference is not a certainty. To the extent that the agreement may have been motivated by purposes other than fixing prices, that possibility further cautions against reflexively condemning an already ambiguous agreement without analyzing its actual effect on competition. *See Broad. Music*, 441 U.S. at 19 (noting that purpose is relevant for whether to apply *per se* analysis because "it tends to show effect"). *See generally* Areeda, *supra*, ¶ 1506 (cautioning that intent is not a substitute for analyzing effects on competition).

In sum, the agreement in this case is distinguishable from obviously anticompetitive price-fixing arrangements. The agreement here is one on general

standards—short of a formula—that arguably but do not obviously narrow decisionmaking on a single aspect of pricing that can be undone by decisions regarding other aspects of pricing. To the best of the Court's knowledge, no court has applied the *per se* rule to another agreement with a similarly attenuated relationship to price fixing. Mindful of the Supreme Court's repeated warnings that the *per se* rule must be based on real experience with a type of restraint, the Court concludes that the *per se* rule is inappropriate in this case.

With that established, the Court need not resolve whether the students or the universities bear the initial burden of showing how the agreement affects competition and instead goes on to assess the question of anticompetitive effect directly.

**ii. Anticompetitive effect**

Discerning how an agreement affects competition is no easy task. Harm to competition usually manifests as a detrimental effect on the market, such as a "reduction of output, . . . increase in price, or deterioration in quality of goods or services." *Brown*, 5 F.3d at 668. But because the market is subject to a plethora of confounding variables, it takes more to infer that those effects are a product of the challenged agreement rather than some other market force. *See id.*; Areeda, *supra*, ¶ 1503a.

As a result, an antitrust plaintiff must show as a threshold matter that the defendants have enough market power to ignore competitive pressures, *e.g.*, by profitably raising prices above the competitive level. *See Agnew*, 683 F.3d at 335; Areeda, *supra*, ¶ 501. That in turn requires a plaintiff to define at least the rough contours of a relevant market—that is, to identify which other products are "reasonably

interchangeable by consumers for the same purposes" and therefore exert meaningful competitive constraints on the defendants. *Sharif Pharm., Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916 (7th Cir. 2020) (quoting *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)). A properly defined market identifies which products are similar enough (the product market) and close enough (the geographic market) to compete with one another. *See id.* at 917. If the market is properly defined, then showing that the defendants control a substantial portion of that market supports an inference of market power. *See generally* Areeda, *supra*, ¶ 532.

A plaintiff may meet its burden without evidence of detrimental effects if it can produce strong proof of market power by precisely defining a relevant market and showing that the defendants have a monopoly market share. *See Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004); *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) (stating that market power is a surrogate for detrimental effects). Put differently, a plaintiff armed with evidence of actual detrimental effects on the market has more leeway in defining the market and showing market power.

To summarize, a plaintiff has two ways to meet its initial burden to show that an agreement harms competition. One is to provide evidence of the rough contours of a relevant market, the defendant's market power, and the detrimental effects of the assertion of that power. The other is to provide a precise market definition and enough market power to presume harm to the market.

In this case, the students choose the first method and rely on their expert, Dr. Singer, to define the relevant market, calculate the defendants' market shares, and

provide evidence of anticompetitive effects. The universities challenge Singer's findings at each step, arguing that they are unreliable or fail to satisfy the students' burden. The universities advanced similar arguments in their motion to exclude Singer's testimony as inadmissible under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The Court has denied that motion, and much of the reasoning in that opinion applies equally here.

That said, an expert's opinion may be admissible under *Daubert* but still not enough to create a genuine dispute of material fact. Thus the Court addresses the universities' challenges to Singer's findings to the extent necessary to determine whether the students have met their burden at summary judgment.

The students define the relevant market as twenty-two "elite, private universities whose average rankings in the *U.S. News & World Report* [USNWR] put them in the top 25 for universities during the Class Period." Pls.' Resp. to Defs.' Mot. for Summ. J. at 29. The parties seem to agree that the geographic market is nationwide. They instead dispute whether the relevant market extends beyond the elite, private universities identified by the students to, for example, highly ranked public universities or liberal arts colleges.

To support their market definition, the students rely on two main kinds of evidence. First, they rely on Singer's regression analyzing the effect of 568 Group membership on the universities' "effective institutional prices" (EIPs), which Singer defines as the "cost of attendance minus institutional need-based grants and scholarships." Pls.' Resp. to Defs.' Mot. for Summ. J., Ex. 14 (Singer Report) ¶ 7. That regression model analyzed data from "clean" periods when the universities were not

formally part of the 568 Group and treated them as benchmark prices. Based on those benchmarks, the model predicted what the prevailing prices would have been without the challenged agreement. It then compared that prediction to the actual prices charged while the universities were formally 568 Group members. To isolate the effect of 568 Group membership, the model accounted for confounding variables that might affect price, including expressly accounting for macroeconomic trends; the COVID-19 pandemic; and characteristics of students, universities, and academic years.

After accounting for some adjustments proposed by the universities' rebuttal experts, Singer observed that the universities charged, on average, $1,202 more per student per year when they were members of the 568 Group than they otherwise would have. The students characterize Singer's regression as a modified version of the "Hypothetical Monopolist test" (HMT), which the Seventh Circuit has endorsed as a method to define a relevant geographic market in the healthcare context. The universities argue that Singer's regression is not an adequate substitute for a standard HMT and is "incapable of defining the relevant market." Defs.' Reply in Supp. of Mot. for Summ. J. at 19.

The HMT test asks whether a hypothetical monopolist in a candidate market could maximize its profits by raising prices above competitive levels. *See FTC v. Advoc. Health Care Network*, 841 F.3d 460, 468 (7th Cir. 2016); Areeda, *supra*, ¶ 536. If it could, then the candidate market is a relevant market; the hypothetical monopolist's success implies that there are not enough reasonably interchangeable products outside the market for consumers to switch to. *Advoc. Health Care*, 841 F.3d at 468. "But if customers would defeat the attempted price increase by buying from outside the

[candidate market], it is not a relevant market; the test should be rerun using a larger candidate [market]." *Id.* Though the Seventh Circuit has only expressly endorsed the use of HMTs regarding geographic markets in the healthcare industry, the same concept applies to product markets and other contexts. *See* Areeda, *supra*, ¶ 536.

The universities argue that Singer's regression does not serve the same functions as an HMT because it neither "analyze[s] how students would react if [the universities] raised prices" nor performs any "statistical test of cross-elasticity of demand," *i.e.*, product interchangeability. Defs.' Mem. in Supp. of Mot. for Summ. J. at 36.

For purposes of summary judgment, the Court disagrees. Singer's regression observes that the universities in fact inflated their prices while in the 568 Group over a two-decade period. According to Singer, his regressions show "that a not-so hypothetical collection of universities exercised market power . . . in the form of significant artificial price inflation." Singer Report ¶ 80. The universities do not elaborate on why that interpretation is unreasonable. A jury reasonably could infer from that evidence that the students could not defeat the price increase because products outside the candidate market were not sufficiently interchangeable.

To be sure, there are other possible explanations for the observed price increase that complicate whether it can be used to help define the market. For example, the price increase might have gone unchecked simply because it did not hit the point at which competitive pressures would have kicked in. Or perhaps the price increase was not price maximizing but nonetheless continued because the universities did not realize that it was unprofitable or did not seek to maximize their profits.

On the other hand, if one assumes that the universities charged close to the prevailing price when they were not in the 568 Group, then the inflated price during their membership likely was supracompetitive. And if one assumes that the universities aimed to maximize profits and were reasonably competent at doing so, then the fact that they maintained an average overcharge over two decades suggests that the overcharge was in fact price-maximizing.

These assumptions are not inherently unreasonable. In fact, such assumptions are often part of standard HMTs too. Standard HMTs often treat prices predating the challenged conduct as benchmark, prevailing prices. *See* U.S. Dep't of Just. & Fed. Trade Comm'n, Merger Guidelines, 42 (2023), https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf. And in doing so, they assume that the firms in the market are profit maximizing—charging the most profitable prices under the competitive conditions at the time.

Recognizing the risk that a price increase might occur for reasons besides anticompetitive conduct, standard HMTs require that the hypothetical price increase be a "small but significant and nontransitory increase in price" (SSNIP). Areeda, *supra*, ¶ 536; *see Advoc. Health Care*, 841 F.3d at 465. An insignificant or transitory price increase is more likely to reflect a competitive market moving toward equilibrium. Areeda, *supra*, ¶ 537. In contrast, a significant and lasting increase in price is more likely to be truly supracompetitive and indicative of market power. *Id.* In other words, the more significant and lasting the price increase, the more reliably it suggests a relevant market and market power. With this function in mind, significance is a matter of degree. *Id.* A standard HMT typically looks for a 5% increase in total price, but different

market characteristics might justify different significance thresholds. *Id.* For example, in an industry with low profit margins, a substantially smaller significance level might be appropriate. *Id.*

Singer does not say how significant the observed price inflation was in terms of a percentage of total price. He instead states that the price inflation was "economically and statistically significant, meaning [it was] non-trivial in magnitude and highly unlikely due to random chance." Singer Report ¶ 286. He further quantifies the statistical significance, stating that "there is less than a one percent probability that the Challenged Conduct had no effect on Effective Institutional Price given such large conduct coefficients." *Id.* ¶ 249. But Singer conspicuously does not do the same with economic significance, despite stating in his rebuttal report that in this case "economic significance is equally if not more important than statistical significance." Pls.' Resp. to Defs. Mot. for Summ. J., Ex. 32 (Singer Rebuttal), ¶ 88. *See generally* ABA, Proving Antitrust Damages: Legal and Economic Issues, § II.6.C.5.c (3rd ed. 2017) ("[H]ypothesis tests . . . represent statistical statements about both the estimated coefficient *and* the precision with which it is estimated, not purely economic statements about the size of the measured effect."). Singer does, however, note in a later footnote that the average predicted EIP was $39,728. That means that the observed increase of $1,202 was roughly 3%.

That is lower than the presumptive 5% benchmark, but the universities have not challenged Singer's regression on this basis. Additionally, three factors suggest that the 3% number understates the proposed market's power. First, Singer's regression analyzes a smaller market—just the seventeen defendant universities—than the market

the students ultimately proposed. The larger proposed market of twenty-two elite, private universities, if united, likely would be able to impose a larger price increase.

Second, Singer's regression assumes that the universities' prices are not affected by the 568 Group's existence when they are not formal members of the group. In other words, it treats those prices as the prices that would have prevailed if the 568 Group did not exist at all. But as Singer points out, those prices too might be artificially inflated under the umbrella effect—which observes that a price-fixing cartel's existence can distort the market, causing even non-members to set higher prices than what would have otherwise prevailed—or lingering effects of 568 Group membership on a former member's pricing.

Third, the universities' profit margins are low. In fact, one of the universities' own experts, Terry Long, finds that each defendant university operates its undergraduate program at a deficit. That is a double-edged sword. On the one hand, it might suggest that the universities do not aim to maximize their profits or charge competitive prices, undermining the assumptions necessary to infer the existence of a relevant market from an observed price increase. On the other hand, if one accepts the premise that the universities are profit maximizing—a reasonable explanation for why they would increase prices—the lower profit margins suggest that even a 3% increase in price can imply the existence of a relevant market. And because the students have produced evidence suggesting that the universities did compete with one another on price and sought to avoid competition, a jury reasonably could choose the latter inference.

Moreover, the students do not rest their market definition solely on Singer's regression. They also provide his analysis of the so-called *Brown Shoe* factors—

practical indicia that help define the relevant market. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Singer claims that four factors support the students' market definition.

First, Singer points to industry recognition, asserting that USNWR "is considered the premier ranking institution for U.S. schools." Singer Report ¶ 82. According to Singer, the fact that the twenty-two elite, private universities have been ranked consistently in the top 25 suggests that they are a separate market, "perceived to be the best route to achieving social status and promoting one's employment prospects." *Id.* Second, Singer points out that the elite, private universities "charge significantly higher prices for their product relative to all public universities and to many other private universities." *Id.* ¶ 83.

Third, Singer argues that the elite, private universities recognize one another as their primary competitors. He supports this claim in part through record evidence. For example, he cites an internal document from Dartmouth comparing Dartmouth to a list of twenty-seven "peer institutions." Pls.' Resp. to Defs.' Mot. for Summ. J., Ex. 34 at 2. That document states that the list "is based on the top 20 National Universities in the US News and World Report ranking" and "should be updated based on the most recent top 20 institutions." *Id.* The document describes the additional seven institutions as "Comparable Institutions" which "should be reviewed regularly to make sure they are still comparable." *Id.* A Vanderbilt internal document similarly compares Vanderbilt's undergraduate tuition to the rest of the "Private USN&WR Top 25." *Id.*, Ex. 40 at 5.

Singer also performed a peer analysis to show empirically that the elite, private universities consider themselves as a separate market. He surveyed two sets of data

where 373 universities self-reported whom they considered as peers. Based on that data, he analyzed the universities' peer / reverse-peer ratio—how many peers a university listed as compared to how often that university was listed by another as a peer. Singer asserts that the lower peer / reverse-peer ratio is a proxy for quality, noting that Harvard's ratio was 0.11.

Singer found that the elite, private universities had, on average, a peer / reverse-peer ratio of 0.52. By contrast, the ten highest USNWR-ranked universities outside of the elite, private universities had an average ratio of 0.77, and the top ten liberal arts colleges had an average of 0.62. Adding either other group, or both groups, to the proposed market of elite, private universities, increased the peer / reverse-peer ratio. According to Singer, this "reinforce[s] the conclusion that the different groups of institutions are viewed as belonging to separate markets." Singer Report ¶ 90.

Singer also analyzed a market / non-market odds ratio—how often a group of schools listed one another as peers versus listing out-of-group schools as peers—as a measurement for how "self-contained a market is in terms of peer recognition." *Id.* ¶ 91. Singer found that the elite, private universities had significantly higher odds ratios than a grouping that added the other ten highest ranked universities, the top ten liberal arts colleges, or both.

Fourth, Singer analyzed student preferences with two tests: a comparison of how far each school's student body traveled to attend and a "revealed preferences" test analyzing how students chose between multiple schools they were admitted to. His geographic test calculated how far students traveled on average to attend schools and, to account for the fact that some schools are closer to more densely populated areas,

compared that average to a hypothetical average if the school had a perfectly nationwide reach. A ratio of those averages closer to 1 indicated a nationwide student body, whereas a lower ratio indicated a more regional student body. That test showed that students traveled much farther, on average, for the elite, private universities (actual average distance of 757, ratio of 0.72) than for the other ten highest ranked universities (actual average distance of 352, ratio of 0.30). But the top ten liberal arts colleges (actual average distance of 814, ratio of 0.67) more closely resembled the elite, private universities.

Singer's revealed preferences analysis found that within the group of elite, private universities, a university's win rate roughly correlated with its USNWR average. He also compiled a revealed preferences ranking that added the other ten highest ranked universities, the top ten liberal arts colleges, or both. In general, the elite, private universities had stronger win rates. And proportionally, expanding the market did not significantly change the overall distribution of win rates. For example, the top eighteen schools were still elite, private universities even after adding the top ten liberal arts colleges. According to Singer, his geographic and revealed preferences analyses demonstrate that the elite, private universities have distinct characteristics and customers, two other *Brown Shoe* factors.

The universities raise a host of objections to Singer's *Brown Shoe* analysis, but none are persuasive enough to prevent a jury from reasonably accepting his conclusion. Their arguments fall into three main buckets. First, the universities argue that the cutoff USNWR ranking of top 25, as opposed to some other number, "is wholly arbitrary." Defs.' Mem. in Supp. of Mot. for Summ. J. at 38–39. In the abstract, that might be true

(though unhelpful, since the law requires that *some* line be drawn). But the whole point of Singer's analysis is to show that the market definition is not arbitrary. The universities cannot rebut his showing without explaining why his analysis is wrong.

Second, the universities point out that schools compete in multiple dimensions that are not captured by the USNWR or the elite, private university market. For example, students interested in performing arts might prioritize different schools than students interested in engineering. Or students in California might prioritize different schools than students in Georgia or Texas. For those students, the area of effective competition is not the elite, private university market but instead the top performing arts or engineering schools, or the top schools in California, Georgia, or Texas.

This argument suggests the existence of smaller markets, but it does not disprove the existence of the elite, private university market as a relevant market. To show that there is not an elite, private university market, the universities cannot merely point out that individual consumers, or sets of consumers, view their options differently. That is true of most if not all markets. The antitrust laws, however, are concerned with aggregates. The universities must therefore show that consumers, as an aggregate population, do not view the elite, private universities as a separate market.

In that light, the students' proposed market is supported by a few intuitive propositions. The first is that prestige matters. The most prestigious schools compete primarily against one another, not with less prestigious schools. Next, liberal arts colleges differ from universities. Ranking authorities often place them in different categories entirely. Liberal arts colleges do not have the same focus on research—an important consideration for many students—and often focus relatively narrowly on

liberal arts. Lastly, public universities differ from private universities. Some public universities may be just as prestigious as the elite, private universities, but they compete primarily within a smaller, more regional, market by subsidizing tuition for in-state residents. Additionally, public universities often offer different experiences from private universities, with larger class sizes and less tightly knit alumni networks.

The universities' third set of arguments challenges Singer's interpretations of several of his findings, contending that they in fact contradict his proposed market. For example, they argue that Singer's revealed preferences analysis "shows that cross-admitted students preferred many schools outside his proposed product market." *Id.* at 37. Specifically, the universities point to three public universities—UCLA, UC Berkeley, and University of Michigan—that had a higher win-rate than thirteen elite, private universities, and five liberal arts colleges—Pomona, Williams, Swarthmore, Bowdoin, and Amherst—that had a higher win-rate than two elite, private universities. Similarly, the universities point out that some highly ranked public universities and/or liberal arts colleges had similar costs of attendance and public endowments to the elite, private universities.

To be sure, some of Singer's studies, viewed in isolation, raise some questions about his market definition. For example, Singer's peer analysis assumes that the elite, private universities are a distinct group and that if the market is any bigger, it must encompass all ten of the other highest-ranked universities or all ten of the top liberal arts colleges. But if the data were disaggregated and listed purely in order of the peer / reverse-peer ratio, the result would be a very mixed distribution of elite, private universities and the other schools. UC Berkeley and Amherst, for example, have a ratio

much closer to most of the elite, private universities than Notre Dame does. Similarly, the revealed preference rankings show that UCLA, UC Berkeley, and the University of Michigan have similar win-rates to a majority of elite, private universities, whereas Emory and Carnegie—considered as part of the market—are relative outliers. Additionally, some metrics show that the elite, private universities are similar to their out-of-market counterparts. The geographic test shows that liberal arts colleges command a similarly nationwide reach.

Considering all of the metrics together, however, shows that schools that appear to be in the market for one reason may be excluded for another reason. For example, the geographic test suggests that liberal arts colleges are similar to elite, private universities, but those colleges are almost universally lower by Singer's prestige metrics. On the flip side, Singer's prestige metrics leave only a few reasonable contenders for schools that should be included in the market. The ones with the best claims are UCLA, UC Berkeley, the University of Virginia, the University of Michigan, and USC, all of which have some combination of meeting the USNWR top-25 cutoff, strong peer / reverse-peer ratios, and relatively high win-rates. The geographic test, however, indicates that these schools have less nationwide reach.[4]

As a result, a jury reasonably could conclude that the students' proposed market is off only slightly, if at all. A jury might reasonably find that a few additional schools

---

[4] That test did not list individual school data, so this difference might merely be an artifact of comparing averages. But the perceived difference in reach aligns with the fact that public schools, like UCLA, UC Berkeley, UVA, and Michigan, subsidize tuition for in-state students but not for out-of-state students. Because USC is a private school, its geographic reach is more likely to resemble that of the elite, private universities, but a one-school difference is not material.

belong in the market and/or that a few schools in the market do not belong, but the overall picture would be largely the same. Put differently, the students have sufficiently proven the rough contours of the market. And because the students offer Singer's regression as direct evidence of anticompetitive effects, that is enough.

The rest of the analysis is easier. After defining the relevant market, the students must show that the defendant universities had enough market power to have caused the anticompetitive effects that they proffer. To do so, they rely on Singer's calculation of the universities' market shares—how much of the market the universities controlled.

Singer used three calculations, one where the universities have equal weight, one where each university is weighted by its number of undergraduate students, and one where each university is weighted by its undergraduate tuition. All three showed that the universities controlled roughly 77–79% of the market. For good measure, Singer also recalculated market shares based on a larger market that included the three other universities consistently ranked in the USNWR top 25—UC Berkeley, UCLA, and UVA. Based on that market, Singer calculated the defendant universities' market share to range from 51–72%.

Because market shares are merely a proxy for market power, there is no exact point at which the percentage of the market is enough. *See* Areeda, *supra*, ¶ 532. One complexity is that market shares only convey a sense of market power as the market currently exists. But if the market might easily expand with the entry of new competitors, then market shares might overestimate market power. As the Areeda treatise explains, a defendant with 100% of the market obviously controls output and price in the market entirely. *Id.* But if demand is highly reactive to price changes, or

new entry is so easy that even a small increase in price would entice new competitors, then that control does not translate to meaningful market power. *Id.* As a result, the requisite percentage of the market might depend in part on other characteristics of the market.

Singer addresses this point by showing that the elite, private universities are protected from new competition by their well-established research and post-graduate programs, large endowments, and higher quality faculty. Any prospective entrant would have a hard time clearing these barriers to entry. As a result, the market is relatively stable, and market share is a relatively good indication of market power.

The Court concludes that Singer's market share calculations in the 70% range are sufficient to permit a reasonable inference of market power. *See Valley Liquors, Inc. v. Renfield Imps., Ltd.*, 822 F.2d 656, 666 (7th Cir. 1987). Singer's lowest calculation of 51% is likely too low. *See id.* at 667; Areeda, *supra*, ¶ 532c. But given the high barriers to entry, and the fact that the universities do not challenge Singer's market share analysis beyond objecting to the market definition used, the Court does not believe that in this case it is too low as a matter of law.

As the final component of their proof of anticompetitive effects, the students use Singer's regression to show an artificial price increase. The universities raise two sets of responses. The universities first raised several methodological challenges in their *Daubert* motion largely focused on Singer's choice of data, control variables, and standard errors. Considering those criticisms for purposes of summary judgment, the Court concludes that none of them preclude a jury from reasonably finding that Singer's regression means what he says it to mean.

The universities also argue that the Court should grant summary judgment on discrete parts of the challenged agreement that they claim could not have possibly harmed competition. In doing so, they implicitly accept that Singer's regression might reflect competitive harms caused by other aspects of the agreement. Since the students need not show any particular agreement to prevail, this line of argument is not a basis for summary judgment. As for the request to grant partial summary judgment on certain aspects of the agreement, the Court declines to do so. As the students point out, it would not be appropriate to prevent the jury from viewing the alleged conspiracy in its entirety. *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698–99 (1962) ("[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.").

To summarize, the students have presented evidence supporting the rough contours of a relevant market, high enough market shares to infer market power, and the proposed effects of that market power in the form of an artificial price increase. That evidence is all consistent with the type of agreement that the students allege. Despite the universities' challenges, a jury reasonably could find that the challenged agreement harmed competition.

**3. Antitrust standing / injury**

The doctrine of antitrust standing and the "subsidiary doctrine" of antitrust injury impose additional restrictions on when a private plaintiff can sue for a violation of the antitrust laws. *See Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 715 (7th Cir. 2006). The universities invoke these doctrines by arguing that "[e]ven if [section] 1 somehow applied to defendants' conduct, numerous plaintiffs lack a right to

sue because others paid for their college educations." Defs.' Mem. in Supp. of Mot. for Summ. J. at 47. Specifically, the universities contend that the students who had their college expenses paid for by parents or other third parties have not suffered any injury.

The universities frame their arguments primarily in terms of antitrust standing. They do not claim that the students lack Article III standing, which limits the federal courts' jurisdiction to cases involving an injury in fact traceable to the defendant and likely to be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). But because their arguments implicate Article III standing and therefore the Court's jurisdiction, the Court briefly addresses that issue first. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998).

Article III requires that the plaintiff suffered an injury in fact. *Lujan*, 504 U.S. at 560. Monetary harm, like paying an artificially inflated tuition cost, readily qualifies. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021). But as the universities point out, some students—the plaintiffs in this case—did not pay tuition themselves. Instead, their tuition costs came out of someone else's pocket, like a parent, as a gift that the students had no obligation to pay back. In that case, it seems like the parent has suffered an Article III injury but not the student.

That problem is illusory. When the students in this case were admitted to the defendant universities, they alone incurred the legal obligation to pay tuition. The parents, in contrast, had no contract or agreement with the universities. As far as the law is concerned, the parents must have gifted or loaned the money to the students. *See Rynasko v. N.Y. Univ.*, 63 F.4th 186, 195 & n.9 (2d Cir. 2023). The students then paid their tuition with that money and suffered an injury when they paid too much.

The district court's decision in *In re iPhone Antitrust Litigation*, 4:11-cv-6714-YGR, 2025 WL 3124160 (N.D. Cal. Oct. 27, 2025), which the universities cite as supplemental authority, does not persuade this Court otherwise. The district court there rejected an argument that children who paid for iPhone apps with their parents' money had Article III and antitrust standing because they "directed the payment" by clicking the purchase button. *Id.* at *13. As an initial matter, that decision by another district court outside of this circuit is not binding on this Court. Additionally, courts in more analogous cases have generally held that parents do not have standing to sue colleges and universities merely because they paid tuition on behalf of their children. *See, e.g.*, *Rynasko*, 63 F.4th at 195; *Gociman v. Loyola Univ. of Chi.*, 515 F. Supp. 3d 861, 866 (N.D. Ill. 2021) (citing cases). Though the parents' lack of standing does not necessarily imply that the students have standing, the logic in those cases supports treating this case as analogous to one where the parent gives the money to the student to then pay tuition themselves. *See Rynasko*, 63 F.4th at 195 n.9. In that situation, the student would have standing, and so too here.

With the jurisdictional issue out of the way, the Court turns to the question of antitrust standing. The universities primarily invoke one strand of antitrust standing, the *Illinois Brick* doctrine, "a bright-line rule that authorizes suits by *direct* purchasers but bars suits by *indirect* purchasers." *Apple, Inc. v. Pepper*, 587 U.S. 273, 279 (2019) (citing *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 746 (1977)). According to the universities, students who had their parents pay are not direct purchasers; they are gift recipients. The universities further warn that permitting the students to sue would run the risk of imposing double liability because the people who actually paid the tuition could also

sue.

As with the Article III issue, the Court sees this problem as illusory. The students are the ones paying because they are the only ones with a legal obligation to the universities. The fact that the parents are the effective source of the money does not change that fact. *See In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, 05-MD-1720 (MKB), 2024 WL 1014159, at *12 (E.D.N.Y. Mar. 8, 2024) ("Defendants' 'who pays' rule 'would require [the Court] to rewrite the rationale of *Illinois Brick* and to gut the longstanding bright-line rule.'" (quoting *Apple*, 587 U.S. at 282)). Nor does it matter that the parents mailed cash or provided their card information directly, rather than giving it to the students first. Thus the students have standing to sue the universities, not the parents. Otherwise, antitrust standing would turn on factual differences that have no relation to any legitimate purpose of the doctrine.

The Court therefore concludes that the students have met their burden of proof to establish a prima facie antitrust case.

**B. Affirmative defenses**

Having addressed the core arguments on the merits, the Court turns to the parties' disputes regarding the universities' affirmative defenses. The universities first argue that they are immune from antitrust liability under the 568 Exemption. They have also asked the Court to bar all claims based on tuition charges prior to 2018, contending that they fall outside the Sherman Act's four-year statute of limitations. The students have moved for summary judgment on UPenn's defense that it withdrew from the alleged conspiracy in 2020.

The Court denies the universities' motion for summary judgment on the basis of

the 568 Exemption. It also denies the parties' requests for summary judgment on the statute of limitations and withdrawal defenses because genuine disputes of material fact exist regarding both issues.

**1. 568 exemption**

The 568 Exemption provides that "[i]t shall not be unlawful under the antitrust laws for 2 or more institutions of higher education at which all students admitted are admitted on a need-blind basis, to agree or attempt to agree" to four enumerated types of agreements. Cornell, Georgetown, MIT, and UPenn argue that they are immune from liability by virtue of this exemption. § 568(a). Although they acknowledge that other schools involved in the agreement were not need blind, they argue that they were individually need blind and therefore are protected "regardless of the practices of other 568 Group members." Defs.' Mem. in Supp. of Mot. for Summ. J. at 46–47.

The Court has already rejected this argument in its opinion denying the universities' motion to dismiss. *Carbone v. Brown Univ.*, 621 F.Supp.3d 878, 887–89 (N.D. Ill. 2022). Antitrust exemptions are to be strictly construed. *See Fed. Mar. Comm'n v. Seatrain Lines, Inc.,* 411 U.S. 726, 733 (1973). By its text, the exemption protects agreements, not individual universities. And it only protects certain agreements—those between "2 or more institutions of higher education at which all students admitted are admitted on a need-blind basis." § 568(a). That requires all of the "2 or more institutions" to admit all students on a need-blind basis.

The universities interpret this language to instead protect an institution that is individually need-blind, regardless of whether other participants in the agreement were also need-blind. But under that reading, Congress's decision to include the phrase "2 or

more" makes no sense. If Congress wanted to protect individual need-blind institutions without considering the admissions practices of other participants to the agreement, it could have instead said, "It shall not be unlawful under the antitrust laws for *an institution* at which all students admitted are admitted on a need-blind basis, to agree or attempt to agree . . . ."[5] That is not what Congress did.

Accordingly, for the 568 Exemption to apply, every institution in the agreement must admit all students on a need-blind basis. Because it is undisputed that some of the 568 Group members did not do so, none of the universities may benefit from the 568 Exemption's protections in this case.

Even if the universities' interpretation were correct, they still would not be entitled to summary judgment on their exemption defense. The students have produced sufficient evidence for a jury reasonably to find that each of the universities claiming the exemption favored wealthier applicants and therefore did not admit all students "on a need-blind basis." The universities resist this conclusion by arguing that a school is still need-blind even if it engages in wealth favoritism. In their view, "need-blind" merely means that the school does not disadvantage applicants "because of their decision to seek financial aid or information in their financial aid application." Defs.' Reply in Supp. of Mot. for Summ. J. at 23.

The universities' argument is contrary to the statutory text. The exemption expressly defines "on a need-blind basis" to mean "without regard to the financial

[5] The only other possible reading is that Congress wanted to protect agreements where at least two participants were need-blind institutions, regardless of the other members' admissions practices. There is no reason to think Congress intended such an arbitrary result.

circumstances of the student involved or the student's family." § 568(c)(6). A school that provides preferential treatment to an applicant with a wealthy background is plainly not admitting all students "without regard to the financial circumstances of the student involved or the student's family." *Id.*

The universities try to circumvent the statutory definition by appealing to legislative history and other parts of the statute that use the term "need-based" information, which they argue supports their narrower definition. Even assuming these arguments could overcome the plain text of the exemption, neither is persuasive. The legislative history the universities cite expressly states that it is not "elaborating on the need-blind admissions standard in the statutory text." H.R. Conf. Rep. 103-761 (1994). And though it does suggest that schools should not consider information derived from a financial application form, it does so only as one example of a non-need-blind practice, not as the exhaustive definition that the universities propose. The universities argue that "need-based" uses the term "need" to mean "demonstrated financial need," but the statute never connects those terms. "Need-based" and "demonstrated financial need" instead appear in two separate provisions which list two different types of exempt agreements. *See* § 568(a)(1), (3). There is no basis in the text for stitching those terms together as the universities suggest, let alone using them to rewrite the statutory definition of "need-blind."

In summary, the universities are not entitled to summary judgment based on the 568 Exemption.

**2. Statute of limitations**

The timeliness of antitrust claims is governed by the Clayton Act's limitations

# EXCERPTS FROM TRANSCRIPT OF PROCEEDINGS OF STATUS CONFERENCE (MAR. 20, 2025), DKT. 1261

## Pages 9-11

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SIA HENRY, et al., | ) | Case No. 22 C 125 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| BROWN UNIVERSITY, et al., | ) | Chicago, Illinois |
| | ) | March 20, 2025 |
| Defendants. | ) | 2:00 p.m. |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MATTHEW F. KENNELLY

APPEARANCES:

For the Plaintiffs: ROCHE FREEDMAN LLP
BY: MR. EDWARD J. NORMAND
99 Park Avenue, Suite 1910
New York, NY 10016
(646) 970-7513

GILBERT LITIGATORS & COUNSELORS
BY: MR. ROBERT DEWITT GILBERT
MR. DAVID STUART COPELAND
11 Broadway, Suite 615
New York, NY 10004
(646) 448-5269

Court Reporter: MS. CAROLYN R. COX, RPR, CRR, FCRR
Official Court Reporter
219 S. Dearborn Street, Suite 2102
Chicago, Illinois 60604
(312) 435-5639

THE COURT: I'm going to make a suggestion. I'm going to make a suggestion. I'll wait. Sign off, go out and come back in.

MR. GRINGER: Thank you, your Honor.

(Brief pause.)

MR. GRINGER: Better?

THE COURT: Much better. Go ahead.

MR. GRINGER: Thank you, your Honor, for doing that.

I know the Court wanted us to consider, to talk amongst ourselves what the hearing should look like. I assume one of the possibilities would be that the defendants could call one or more of their experts as part of the hearing.

THE COURT: Agnostic means what it says. I don't have any preexisting view on it. I'll just tell you. And as I said, I was going to come back to this. I've been a judge for 25 years, 25 and a half, and Daubert's been there that entire time. My view is most of the things can be handled on papers, and sometimes with argument.

I think I've done one or maybe two hearings with testimony in those 25 and a half years. And the second one is only because I'm not sure. I'm sure of the one. So I don't have any preexisting views on what it should look like. I know enough to know that there's not one right answer to this. There's a decent amount of flexibility. So if that's what you're going to propose, then, you know, find out if the other

side will agree to it. If you don't come to an agreement on what the hearing should look like, then each side give me your status report, your pitch for why it should be done your way.

MR. GRINGER: Thank you.

THE COURT: Okay.

MR. CRAMER: Your Honor, this is Eric Cramer.

THE COURT: Go ahead, Mr. Cramer.

MR. CRAMER: Yeah. Eric Cramer for the plaintiffs. I just had one follow-up question.

Does your Honor -- I know you said your Honor was agnostic. Does your Honor have any particular issues --

THE COURT: Yeah, I knew you were going to ask me that.

MR. CRAMER: -- on the Daubert motion?

THE COURT: Just assume it's everything.

MR. CRAMER: Okay.

MR. VAN KIRK: Your Honor, Bob Van Krik again for defendants.

Your proposal touches one issue that we were going to raise, which is we were going to propose two days, one on Daubert and one on -- I'm agreeing with you, which is we're very happy to have the hearing. And I think in terms of the class, (unintelligible) to have that afterwards, the class cert argument, if we were to have it, would be very beneficial in terms of hearing those two in context. They are -- the

resolution of Dr. Singer is potentially dispositive on the class cert issue, but the converse is not true. There are remaining issues, and I think it's an important issue for them. And they'd love to be heard if you have the time and inclination.

THE COURT: Without being flip about it, being heard includes the 75 pages or whatever it is that's already been filed, just to be clear about it.

MR. VAN KIRK: Understood.

THE COURT: Reading and watching is the equivalent of hearing. I get what you're saying, and I haven't made up my mind about that yet.

MR. VAN KIRK: I appreciate your consideration.

THE COURT: Okay. So here's what I'm going to say -- anybody else before we go to the breakout room?

Okay. So here's the deal. If you, A, need to be in the breakout room to discuss the Penn sealing issue and, B, are authorized to be in that, you need to have your camera turned on so I can see you. And those are the people I'm going to move to the room, nobody else. And if the crowd gets too big, then I reserve the right to change my mind. I'm going to give it about 15 seconds to give people a chance to do whatever clicks they have to do. Right now I have six people other than me.

MR. GILBERT: I am having trouble seeing my own video.

# EXCERPTS FROM TRANSCRIPT OF PROCEEDINGS ON MOTIONS TO EXCLUDE EXPERT TESTIMONY (MAY 15, 2026), DKT. 1263

**Pages 7-31, 47-48, 69-73, 75-76, 87, 98-100, 113-115, 130-131, 150**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SIA HENRY, et al., | ) | Case No. 22 C 125 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| BROWN UNIVERSITY, et al., | ) | Chicago, Illinois |
| | ) | April 14, 2025 |
| Defendants. | ) | 12:45 p.m. |

TRANSCRIPT OF PROCEEDINGS - MOTION
BEFORE THE HONORABLE MATTHEW F. KENNELLY

APPEARANCES:

For the Plaintiffs: FREEDMAN NORMAND FRIEDLAND LLP
BY: MR. EDWARD J. NORMAND
10 Grand Central
155 E. 44th Street, Suite 915
New York, New York 10016

FREEDMAN NORMAND FRIEDLAND LLP
MR. RICHARD CIPOLLA
225 Franklin Street, 26th Floor
Boston, Massachusetts 09110

Court Reporter: CAROLYN R. COX, RPR, CRR, FCRR
Official Court Reporter
219 S. Dearborn Street, Suite 2102
Chicago, Illinois 60604
(312) 435-5639
C.Cox.courtreporter@gmail.com

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

you reviewed guided your analysis of step one.
A. Sure. So on this slide, I put a few examples of qualitative evidence that indicated that defendants were attempting to establish a floor, a price floor for what a school could design as the family's expected family contribution.

So these documents are suggesting that it was permissible to be less generous than what the floor was established by the group, but you couldn't be any more generous. And so this would have the effect of raising the prices and doing so in a systemic and generalized way. So it supports the hypothesis that's going to be tested in step one.
Q. How did you go about implementing your before and after regression here?
A. So here I gathered data from all the 17 defendants, and we got very granular data. We had basically every offer that was ever made to a student who applied, and we had all the attributes of the student that the school was conditioning their offers on. Like I said before, we got to see the family's income, the assets.

And so we constructed a model that tried to assess in broad strokes what the prices that students paid net of any institutional grant aid from the university when their school was a member of the 568 Group compared to when their school was no longer a member of the 568 Group.

Q. Your models focus on effective institutional price or EIP. What does EIP represent?
A. Yes. So IEP is very simple. It's just the difference between the cost of attendance and the institutional grant aid.
Q. And how is EIP calculated?
A. So the cost of attendance here is just the sum of tuition, room and board, fees, and any other expenses. You can think of it, your Honor, as a list price which we have in many of our cases.
And the second part of the equation is just the institutional grant aid. These are need-based grants that are made from the institution to the student, and it's distinguished from, for example, merit-based aid or aid from third parties.
Q. Why did you focus your regression on EIP?
A. I focused the regression on EIP for two reasons. The first is that EIP is something that is under the domain, under the control of the defendant. We can actually have the power to set it; and, two, these are the two ingredients that most plausibly could have been affected by the challenged conduct. So those are the two reasons.
Q. Defendants' *Daubert* motion criticizes your use of EIP here. Do any of the defendants' experts themselves criticize or critique EIP in their reports?
A. No.

Q. What is defendants' criticism of EIP?
A. They have two broad criticisms. They think that I should have modeled instead the net price which would be net of other flows including loans, work study, merit-based aid, and third-party aid.
Q. Why did you choose not to subtract loans or work study in computing EIP?
A. Well, because loans and work study are ultimately paid for by the student as a form of self-help. It should not be understood as a discount.
THE COURT: That part I get. Why did you exclude merit aid?
THE WITNESS: That's a good question.
Merit aid. When you go into the record evidence, your Honor, it seems like that the intent at least was to effect need-based aid. In fact, need-based aid was made primary, it was a primacy, it was given primacy in their discussion. But as an alternative model, I do also include merit-based aid just as a sensitivity test, and we continue to find statistically and economically significant effects of the challenged conduct.
THE COURT: Okay. So you basically told me that even if you include merit-based aid, it doesn't -- you still have an effect, but why did you not include it?
THE WITNESS: Oh, the reason why I didn't, again, is the criteria that I'm using for it to formulate my dependent

variable. I want two things. I want it to be under the control of the defendants. Of course, that is, merit-based aid is. But the second thing is that when you look at the record evidence, your Honor, I'm trying to find things that could plausibly have been affected by participation in the 568.

THE COURT: Okay.

THE WITNESS: When you look at the documents, they're elevating need-based aid over merit-based aid, right, and they're coming up with a formula.

So this is where I targeted my investigation. But as a backstop, I still have an alternative model that includes, subtracts off merit-based aid, and we continue to find economically and statistically significant effects.

THE COURT: Go ahead, Mr. Cramer.

MR. CRAMER: Thank you.

BY MR. CRAMER:

Q. Is merit-based aid a large portion of the overall institutional plus merit aid?

A. No. In fact, some of these schools don't even offer merit-based aid.

Q. Why didn't you subtract out third-party grants?

A. Well, there is no plausible connection or nexus between the conduct, the conspiracy, and third-party aid. And, in fact, the defendants don't control third-party aid. There's just no reason why, say, a federal grant ought to go up or down based

on the university's participation in the 568 Group.
Q. Are defendants correct that EIP is a, quote/unquote, invented metric that nobody pays?
A. No. They're not correct that it's an invented metric. In fact, Dennis Carlson, an economics professor who served as the expert for MIT in the proceeding litigation, I think it was called the overlap litigation, ultimately published a paper in 1995 in which he used EIP as his dependent variable.
Q. What is this slide depicting, Dr. Singer?
A. So this is the regression model that I ultimately ran. And it shows how we're hypothesizing a relationship between the conduct, that is, the participation in the 568 Group in a given year, with the EIP that's offered to the student.
Q. So EIP is on the left-hand side of the equation there. What does that mean?
A. Well, we refer to this as the dependent variable or the outcome variable. It's the variable that we want to predict.
Q. And I see the variable conduct on the right-hand side of the equation. Can you explain what that measures?
A. Conduct is very simple. It takes on a value of 0 and 1, and the value is 1 if when I'm looking at an observation in the spreadsheet, I'm looking at what a student paid, if that student's university was a member of the 568 Group in that year, the conduct variable takes on the value of 1. If it stepped out of the 568 Group, the conduct variable is 0.

Q. Does your regression assume an effect or does it test an effect?

A. Oh, it tests an effect, right. So if there is no association between being a member of 568 and the offers that you make to your student, the prices that you charge to your student, then that conduct coefficient, that beta one will come back as 0. That is precisely the test that we are conducting.

Q. Another variable on the right-hand side is X theta. What does that represent?

A. Right, so this is my shorthand for all the other control variables that are in the model. We want to make sure that if the EIP is bouncing around for a given student in a given year, we want to make sure that we're controlling for all the other things that are moving around at the same time that could also explain movements in the EIP. That allows us to isolate what the effect of the conduct is on the EIP.

Q. Very briefly, Dr. Singer, could you please describe to the Court some of the control variables that you used in your regression?

A. Right. I made a slide that summarizes them. And it's long. We won't go through all of them. But there's three big categories, your Honor. There's student-specific control variables that are in the model, institutional-specific control variables, and macroeconomic control variables. Again, we saw documents that say these are the variables that the school was

conditioning on, the students, the family's gross income, the net worth. We want to make sure that those are included in the model so that we can do the best job possible in predicting what a given student's EIP is in any given year.

Q. Dr. Singer, does defendants' *Daubert* motion criticize any of your control variables?

A. They do not.

Q. What is the period free of the challenged conduct called?

A. We call this the benchmark period or the clean period.

Q. How did you define the benchmark for your model in this case?

A. So we want to include the prices that student paid in years when the universities, the defendants, were not participants in the 568 Group. So this would be -- for some schools, we've got before data, we've got data on offers that were made prior to 2003. We also have data of offers and prices that were charged when a school stepped out of the 568 Group, as Yale did in 2008. And, finally, we have a post period which is we have data for some schools after 2022 that allow us to see how offers changed, if any, when the 568 Group was ultimately unwound.

Q. So how does the model then test for the effect of the challenged conduct, if there is one?

A. So the model is going to bring all these data together and try to understand how the various variables in the model move

around in predicting a student's EIP in a given year. And what it ultimately will allow us to do is to isolate the effect and say, controlling for all the other right-hand side or independent variables in the model, what was the incremental effect of a school's participation in 568 on the price that it charged for a student.

Q. Dr. Singer, could you please summarize the results of your primary impact regression model in this case?

A. Sure. I have a slide that does it. There's a lot on this slide, but I just want to call your attention, your Honor, to three things.

At the very top, you'll see associated with the conduct variable, which is the key independent variable, really the only variable that we ultimately care about making a causal inference of.

The regression in my best specification comes out to $1201, 1202, roughly. What this tells us is controlling for all the other things in the model, that a school's association with the 568 Group is associated with inflation in the EIP that's paid by the student of $1202 a year. And put another way, if -- that means that if a student matriculated for four years in the university, their overcharges per this model would be roughly $4800.

The only other things I'm going to quickly call your attention to is the number of observations. It had 701,000

observations. Imagine a spreadsheet with 700,000 rows in it. This is a very rich, detailed, granular structured database.

THE COURT: Observation is student in a year?

THE WITNESS: Exactly. Exactly. So a lot of times you'll see the same student four years.

We'll talk about the importance of why having 701,000 observations is so critical and distinguishes my model from defendants' model.

The next thing I want to talk about is the R squared. The R squared, your Honor, it says .87, that's a measure of what's called the goodness of fit. And that tells you what percentage of the variation in the dependent variable, the variable you're trying to predict, here EIP, can be explained by the variables that are included in your model.

Now, what this means is that this model can explain almost 90 percent of the variation in EIP in the data. Now, there are other variables that could be out there that could also be contributing to EIP that aren't accounted for, but this R squared is a very high percentage. It suggests that it would be difficult to find other variables.

And then finally, at the bottom, we have 257,000 unique students in the model, and I've got controls for student-fixed effects. These are effects that we can't measure but are innate fixed qualities of a student that are potentially correlated with the offers that they get.

THE COURT: Give me an example because that was one place where I got lost in all of this.

THE WITNESS: Yeah. So we might not get to see, for example, the offers that a student gets from a rival school. And so there are innate characteristics that we just don't have in the database. Right? We know a lot about the student, income, net worth, right, but there are innate characteristics that the school could be conditioning on and we just don't get that data. Right?

We want to include the student identification. And what a fixed effect does is it says, so long as that characterization is fixed over time, we can include it in the model to see if it's helpful in predicting in this case prices, and it turns out it's very helpful.

BY MR. CRAMER:

Q. Is using fixed effects a standard method in econometrics?

A. Very standard.

Q. And do defendants criticize or in their *Daubert* motion your use of fixed effects?

A. No.

Q. All right. You mentioned a number of observations in your model. Why is that important?

A. It's important because we're ultimately trying to uncover this mapping. We're trying to uncover a formula that would map a student's characteristics into the offer that they get, into

the price that they pay. And when you fit a model to this granular student data, you know, we have literally for every student at the university all the offers that they were made. We get to see so much about that student. And this data is so helpful in explaining variations in the EIP.

And I just want to contrast this with the model that Dr. Hill is going to be presenting today as well puts forward. His has 500 observations by contrast. He's looking at aggregated data, that is, data that's aggregated up to the university level. And when he does that, he's not able to exploit this rich variation in the characteristics of each student that my model is able to do by being aimed at the student level.

Q. Dr. Singer, do you use this model standing alone to demonstrate that all class members paid higher EIPs due to the challenged conduct?

A. I don't. I do not. This model is step one of a two-step process, but this model does give us a sense of a generalized effect across all students.

Q. Okay. Given that your model measures a single common overcharge, does that mean that your model can provide no evidence about how widespread the effect is across the class?

A. No, it can provide evidence. In fact, when you go to an econometric journal, this is typically where economists would stop. They would only stop and make a causal inference based

on a regression model.

The step two process that I undertake is largely done for the purpose of proving common impact; that is, we're looking at a very specific question, you know, can this generalized effect be expected to touch all or almost all members of the class.

Q. And we'll get to that, your step two methods, in a moment.

Before we do, you described your models as pooled. Can you explain what that means?

A. Yeah. The pooled just means that we're going to estimate one singular model across all students. We're going to pool the data from multiple defendants, multiple students all into one singular model.

Q. And what did you use a pooled model in step one -- why did you use a pooled model in step one of your analysis instead of breaking it down defendant by defendant like one of defendants' experts did?

A. Yes. I think there's two good reasons here. The first is that when you look at the qualitative evidence, the seeking of the antitrust exemption, the information sharing among rivals, the setting of the price floor for the family's expected family contribution, these are the types of conduct that an economist would expect would have an overarching systemic effect on pricing for all the participants. And, in fact, the plaintiffs are alleging just a single overarching conspiracy. They're not

alleging a series of multiple conspiracies that start and stop at different points in time.

The second reason why I did a pooled model as opposed to separate models for each defendant is we have some gaps in the data, and the gaps are very discrete for certain defendants -- and we'll get into those gaps in a bit -- but given these gaps in the data, I found that a pooled model allows us to take advantage of all these experiences across all these schools and using different defendants as benchmarks for other defendants. That was the best way in my mind to go forward.

I'll also just note very quickly that Dr. Hill, when he estimates his model in the aggregate data, also uses a pooled model.

Q. What are the notable gaps or data limitations you were faced with in constructing your model?

A. Yeah, I made a slide for this. And very quickly, your Honor, nine of 17 defendants provided no pre-conspiracy data.

THE COURT: That's pre-2003?

THE WITNESS: Exactly. And this is -- it is unfortunate in that we would have liked to have seen, for all 17, we would have liked to have seen prices before the 568 Group was formed. You know, this would have been for the other, I guess, my math, I guess, eight universities, we are getting to see the pre. But the pre is the most pristine, you know, the cleanest version of a benchmark of what life would

look like absent the cartel. For nine of 17, we don't get any of that. Right?

The second data gap is four of 17 defendants only provided us a single clean year, and I think that year was 2003. Again, this is not ideal because we like to have data for all 17 defendants in the after period after the 568 Group disbanded. We're only getting that for the residual.

So these are some challenges that we have in the data.

BY MR. CRAMER:

Q. Does the fact that the data were incomplete, Dr. Singer, mean that your model is unreliable?

A. No. It's not -- it doesn't make it unreliable. I think that what it does is it makes the model conservative in the following sense that if we had more information, if we had more of the clean period, the before period for more defendants, if we had more data for the after period, we'd just have more opportunities to measure the effect of the conduct. So I would submit that the coefficient, that 1202 that's coming out of my regression, it's likely understating the true effect of the challenged conduct.

Q. Now, defendants claim that your pooled model assumes common impact by calculating a single common overcharge across the class. Are they correct that you are assuming common impact?

A. No, they are not correct. I think what they're doing here is they are conflating step one of my two-part proof with step

two.

Step one is just asking is there a generalized effect. But I'm not making my conclusion about common impact based solely on step one. I'm, instead, running a whole new series of tests in step two to determine whether a general shock to the system could be expected to be felt widespread across the class.

Q. Does your model assume that each defendant overcharged students by the same amount?

A. No, it does not.

And just to highlight that, I have an exhibit here, your Honor, I think from my first report. But here what I did was I used my step two method, which we'll get into very shortly, in which I make predictions of what each student would have paid absent the challenged conduct. I compare that to the actual price they were charged and I computed an overcharge for each student. And then I aggregated that up across students in the same university.

And you'll see that I found that Brown, on average, overcharged each student per my model at 4.4 percent; Cal Tech, 2.4 percent.

So, no, I reject the notion that my model is somehow set up to generate identical price effects for each university.

Q. So once you found generalized artificial overcharge with your step one model, what did you do to determine whether that

effect was spread broadly across the class?

A. Right. So when I move into step two, I have two distinct and separate analyses, your Honor, for making this determination.

The first analysis is called the price structure analysis. And that involves qualitative and quantitative assessments of whether there exists a price structure that would transmit a general shock to all or almost all members of the class.

The second and completely independent analysis that I performed for step two is called in-sample prediction or in-sample modeling. And here, I alluded to it a second ago, we're going to use the model from step one to make a prediction of what each student would have paid absent the challenged conduct.

Q. Do defendants critique any of your price structure analyses in their *Daubert* motion?

A. They do not.

Q. In your opinion, would your price structure analyses alone, along with your step one, be sufficient to demonstrate common impact?

A. Yes.

Q. Okay. Let's talk about in-sample, your second means of determining that the challenged conduct had a class-wide effect.

What does in-sample analysis involve?
A. So in-sample is we take the results from step one, all right, and that is our best prediction model, and we move into a more granular analysis of predicting for every single one of these students while their school was in the 568 Group, let's predict, let's predict what they would have been charged absent that school's participation and the conduct in that year. Right? And so we can do that with the tools that are developed in step one. All right?
And then we have a prediction for each student. Some students are predicted to have done better than what they got in the actual world. Some students are predicted to be no better than what they got in the actual world. And so we're going to determine for any student whose actual EIP sits above the actual price they paid, sits above their predicted, we're going to consider them to be impacted or injured on that transaction.
Q. Did you conduct more than one in-sample analysis in this case?
A. Yes, I did three in-sample analyses.
Q. Can you describe those for the Court, please.
A. Sure. The harmed at least once, as the name suggests, is we look at your entire tenure at a university, and if there's a single observation in which the predicted price is below the actual price, we will consider that class member to have

suffered antitrust injury, right, regardless of what happened in their other years.

In the second approach, we used a different standard which is we allow for the possibility that a student had overcharges in some years and undercharges in other years, and we sum those across the four years in their experience. And we asked the question whether on net the student was worse off as a result of the conduct, and if they are, that's a harder standard, of course, to satisfy that. That's the second measure of common impact.

Q. And what's the third measure, the Yale model?

A. The Yale model is going to exploit a very specific experience. And this is in 2008, Yale left the group, the 568 Group, and announced upon its leaving that it was doing so to be more generous by its students.

And in this example, we're going to really focus on that period between 2007 and 2008 because we think that this is the best approximation, given the data that we have and the limitations that we have, this is the best approximation of what the world would have looked like absent the challenged conduct.

Q. Now, you stated that defendants' critiqued models one and two in their *Daubert* motion. Did they critique the Yale model in their *Daubert* motion?

A. They did not critique the Yale model. Defendants only

critiqued the first two models.
Q. All right. Can you explain the Yale model in more detail.
A. Yeah. So the Yale model is going to be comprised of students that I refer to as straddlers. And so a straddler is someone who matriculated at a university when his or her university was both inside the 568 Group and outside the 568 Group. So I really want to focus in on just those students who experienced the world under both circumstances.
Now, students are going to show up in the data more than one academic year, that was another restriction. So I want them to be at least one clean year in -- sorry -- 2007 is when Yale was a member. 2008 was when they were not. So I want to make sure that they have at least 2007 in that data.
And then finally, as you know, the defendants don't critique this model in their *Daubert* anyway.
Q. What was defendants' critique of models one and two?
A. Model -- the critique of models one and two, your Honor, was that for non-straddlers -- I realize it's a lot of jargon -- it's those students who only matriculated while their school was a member of the 568, that my best prediction reverts to the mean overcharge. Right?
And so they asserted that because that's the case that -- this statistic that I'm generating, was bound to give a high percentage. Right?
Now, I want to note that I've used in-sample in

several cases that have been certified, the U of C case, chicken growers, pork antitrust, there's many more, but those are recent. This has always been the approach that I've taken is that we make an estimate and we compare it to the actual, make an estimate of the predicted and compare it to the actual.

I still think that that model is the best prediction that we can do with econometrics. We can't make a better prediction than what we have. But I hear that critique. And so to address that critique, I wanted to rerun the tests but this time on a set of students who were only straddlers, right? Because, at that point, defendants' criticism melts away, right? Their criticism is only related to the non-straddlers. They have no criticism for the straddlers.

Q. In your view -- or is it your view that the Yale model can be extrapolated to the class as a whole even though it only focuses on Yale students?

A. It is. I think this is the best experiment to possibly exploit. We have a school who is announcing they want to leave the 568 Group because they feel constrained in their ability to do good by students. They leave. And I want to test, I want to exploit that experiment and see if, in fact, students were better off. That, to me, is the closest we can ever get.

You know, we have a 20 -- an alleged 20-year conspiracy, right, and we're trying to find examples and experiments that will reveal to us what the effect would be. I

think the Yale experiment is the best one.
Q. And what did the Yale experiment show?
A. So the Yale experiment showed that 93 percent of these straddlers suffered antitrust injury.
Q. Is there a reason you believe, Dr. Singer, that the Yale model is conservative and understates common impact?
A. I do.
Q. Why?
A. So there's three reasons, and I'll go through them quickly. But I think that in-sample, your Honor, is inherently conservative as is my model one, model two, including Yale for the following reason.

We sometimes observe in the data of someone who got a really, really low price, and the model just can't explain why, that is, the predicted, even in the absence of the conspiracy is coming in above, and we say that the in-sample, that person escaped injury. Right? But what it's doing in a sense is it's assuming that whatever shock allowed that person to get a really, really low price that year somehow goes away in the but-for world.

But to the extent that the same discount would have been achieved by the student in the but-for world, that student is likely injured by the conduct, but these models are going to say, no, he escaped injury. Okay. That's the first reason.

The second reason is that it's limited to straddlers,

right, that is, someone who had a foot in the outside. And the problem there, it's not a problem, it's just making it conservative, is that these students are going to have fewer opportunities to have suffered injury. Right? You're going to have at least some years free of the conduct, and of course you can't be injured in those years.

Now, compare that to one of the non-straddlers. The non-straddler has to go through four years of the university being a member, so four opportunities to suffer injury. These guys sometimes only have one year. So in that sense, it's conservative.

Finally, I think that -- remember, Yale broke out in 2008 which is not very far from the inception of the 568 Group. So to the extent there were any kind of ramp-up effects, that is, to the extent it took a few years for the conduct to start producing price effects, that is, pushing up prices for students, then the Yale experiment, as I have conducted it, wouldn't be capturing at least the full extent of the effect.

Q. Is it your opinion --

THE COURT: Can we just pause? I want to ask about one aspect of this. Part of the problem when you're dealing with a non-expert like me is my explanation of what I read may not be quite on the money, so to speak.

But one of the criticisms I think I saw of the in-sample prediction analysis is this whole thing about how --

that it might be inconsistent for a particular student. They pull out an example where somebody had supposedly overcharged three years and undercharged one year, and basically the criticism is that means the model is reliable, you can't explain it.

THE WITNESS: I remember that. You know, I think there are 701,000 experiences, your Honor, right, with 259,000 students, unique students. If you're just going through the data and you're trying to find someone who exhibits a weird pattern, I don't think that is that hard to do. All right?

So I don't think the fact that they could find someone who is predicted to be overcharged in one period and undercharged in the next period is all that impressive. Remember, we're --

THE COURT: What would explain the undercharge?

THE WITNESS: I think that the best -- remember, it's an inherent reason that makes in-sample conservative. Remember, someone gets a shock that is not incorporated, the model can't see it. The model cannot figure out why that student got as low of a price as they did in that year, despite the fact that we've got 89 percent or whatever it is, 89 percent R squared and controlling, the model just can't -- the student experiences a shock, you know, perhaps she had a great outside offer and the university was forced to drop their price. It happens. Right?

But this model says, you know what, I can't account for why they did so well, I'm just going to consider them to be uninjured in that year. Okay?

THE COURT: Okay. Thanks.

BY MR. CRAMER:

Q. And you're considering them uninjured even though they might have done that well in the but-for world absent the conspiracy, right?

A. Correct.

Q. Now, the examples that his Honor mentioned about undercharges, those were from model one and model two, correct? In other words, those examples weren't pulled from the Yale model, right?

A. Yeah. Defendants don't address the Yale model in the *Daubert*.

Q. Is it your opinion that any class members were uninjured by the challenged conduct?

A. No. I don't think that any student would have escaped injury. Remember, the pricing structure analysis which defendants also don't bring up in their *Daubert* would indicate that prices are set in this market with internal -- with vertical and horizontal equity in mind in such a way that all the prices would be interconnected so that if there was a general shock to the average price, as what is being found in my step one regression, that you would expect that everyone

would be tethered together.

Q. All right. I'd like now to briefly cover some of defendants' critiques of your use of data.

A. Yes.

Q. Did the definition of the class exclude certain students?

A. Yes, the class definition, your Honor, excluded full riders, those who didn't pay anything, and it also included students who didn't get any institutional grant aid.

Q. Do you have an understanding as to why the full riders or full rides were excluded from the class?

A. I think I have an understanding. I think that if someone paid zero, that they couldn't possibly have been injured by the challenged conduct. You can't do better than zero.

Q. And you excluded data reflecting students who got full rides from your model in the years they got the full rides, right?

A. Correct.

Q. And defendants say that excluding the full rides biases your results because you exclude students they say to whom the defendants were most generous. Are they right?

A. They are not right.

Q. Why not?

A. Well, so defendants and their expert, Dr. Hill, like to focus on one stylized example. I call this example A in the spreadsheet, your Honor.

THE COURT: Sorry.

(Proceedings heard in closed court:)

MR. GRINGER: You won't miss that much.

THE COURT: Tab 55 of what?

MR. GRINGER: That's just our --

THE COURT: Just your internal thing. Okay. Sorry. I figured there was some place I should go look for it.

MR. GRINGER: And we'll bring it up on the screen. Like the plaintiffs, we'll show you the binder, your Honor.

BY MR. GRINGER:

Q. So this student, as you can see, Dr. Singer, is taken, UID 234787, taken from your data. They attended Duke in the 2006 school year, and the cost of attendance there was $69,482. Now, that student got $41,170 from Duke.

Are you with me so far?

A. As a need-based institutional grade -- grant aid, yes. Yes.

Q. Okay. And so your EIP very simply subtracts the need-based institutional aid from the cost of attendance to get an EIP of $28,312, correct?

A. Correct.

Q. Okay. But that student also got $17,357 in non-institutional financial aid. And so the price that student paid Duke is $10,955 or $17,357 less than the EIP, correct?

A. Yes.

Q. Okay. So let's go to slide 3. Here's another student attending college right here in Chicago, 2004.

Cost of attendance, $68,938. They got $39,256 in need-based aid from Chicago. They also got, however, $14,539 in merit-based aid from Chicago. And then another $9,807 in aid from outside of Chicago.

With me so far?

A. Yes, I can follow these. It has no import, but I follow it.

Q. That's what you think. That's your opinion, sir.

The price that student actually paid is $5,336, correct?

A. Yes, that is a measure -- that is another net price variable that you could use, yes.

Q. But you have them paying an effective price of $29,683?

A. I would say that in my primary model, that is what I use is the EIP. But, you know, I have a variant that subtracts also the merit-based aid, and it has no effect on the findings.

Q. Your variant that you talked about a few times, it doesn't account for federal grants like Pell grants, correct?

A. It does account for it. And I know you don't want me to say this, but I would like to say it. It accounts for on the right-hand side as a variable, as a model as a control variable because it is not under the control of this university and cannot plausibly have been affected by the challenged conduct.

is what's happening to list price in that year, for example. You're not showing me how the other right-hand side variables in the model are moving around that would alter the prediction.

So I don't know. And you probably chose the most implausible -- you had 700,000 observations to choose from. I've never seen this before.

BY MR. GRINGER:

Q. Well, so -- and that $17,000 was exactly the amount needed for that student's harmed on net to be equal to 1202 multiplied by 4, correct?

A. No. If 16,000 is the underprediction, this would be an overcharge.

THE COURT: Let me just get at what he's -- basically what he's saying is that isn't it strange that the under -- that the overcharge in the fourth year is exactly the amount it needs to end up with the total being 1202 times 4? Isn't that strange?

That's your point, right?

THE WITNESS: I think -- okay, maybe what he's getting at and I granted this --

THE COURT: This is a point that actually I was going to ask about, and I won't count what I'm about to ask you against your time here.

So this is an example, I don't know if it's the same one that's discussed in the briefs, where it's presented as

like this odd coincidence although really not a coincidence that the model somehow seems to always converge on $1202 a year no matter how you calculate it, and doesn't that suggest that the model is kind of gerrymandered?

THE WITNESS: Okay. And I acknowledge that for the non-straddlers, right, for the non-straddlers, those who only matriculated while the school was in, the prediction will default to the average effect. I grant you that. And that's why I did the Yale model because I said, okay, if he thinks that the score is as high as it is, I still think that 1202 is the best prediction for the non-straddler. You can't do a better prediction than that, in my opinion. Right? But I said, okay, if you think that this high score in the 90s is being artificially inflated because of the non-straddlers, let's run in-sample on a group that is comprised solely of straddlers. That will answer your question. Right? And it turns out, when you run it on the Yale group, you continue to score in the 90s.

BY MR. GRINGER:

Q. Importantly, Dr. Singer, that Yale model you keep talking about, it still uses your in-sample methodology, correct?

A. Yes, it's the same in-sample methodology I use in every case.

Q. And you didn't do any work to ensure that that population of Yale students was representative of the population of

students as a whole, correct?
A. I didn't run a separate analysis of representativeness. They are class members.
I do want to point out that what we're looking for and the reason why Yale was chosen is, one, we want to just have non-straddlers; but, number two, we want to give -- we want to find the one experiment that we think we were given, as I said, where you'd have some plausible prospect of quantifying impact. Right? Yale announces it wants to leave in order to be more generous by the student. So we think that this is the place to measure the impact.
Q. Okay. I want to show -- last example on your in-sample methodology. If we go to slide 14 here.
This is a student who attended Notre Dame between 2015 and 2018. Okay? And you can see from year one, tier 4, the amount of grant aid actually increases by $13,000 and their EFC declines. Now, in the first two years of the model, your prediction overcharges negative 30,000 and negative 25,000.
Are you with me so far?
A. Yes, I see that.
Q. And then in the third and fourth year where the student is getting more grant aid, almost more than $10,000 more, you actually have their overcharge at 28,000 and 32,000.
I'll take a hint, isn't that strange, Dr. Singer?
A. It's not strange to me because if you go through a database

of 700,000 students, you are going to find what look to be anomalous results. It's not that impressive that you could find a handful of anomalous predictions.

Q. I only have 15 minutes, Dr. Singer.

A. I congratulate you. Well, but -- this isn't a scientific proof that it's generally making bad predictions.

THE COURT: Stop. Ask another question.

BY MR. GRINGER:

Q. Okay. I take it you believe the reason that explains these wide variations from going from negative $30,000 undercharge to $30,000 overcharge while the student is getting more money and aid is because of how you use EIP, correct?

A. No, I'm just suggesting that other things could be moving around including the list price from year to year. Remember, the EIP, which you're not plotting here, is the difference between the list price, cost of attendance, rent, other things that could have gone up that is affecting the EIP from one year to the next.

Q. Okay. Well, let's try and do that a little bit. Let's go to slide 15 since you've made this point.

What I want to show here is we're now same student, same years, same prediction overcharges. I want to show you what changes in the student's need-based grant aid and their merit aid, both money from the school, from Notre Dame itself. And you can see your model is predicting the undercharge in the

first two years because the student is receiving all of that money as need-based aid. And then in the final two years, it's where the student now receives the same amount of merit aid as it previously did need-based aid, you're showing them as overcharged.

Do you see that?

A. I see it. And if this anomaly that you've highlighted is endemic in the data that when I recast my left-hand side variable to subtract out merit-based aid, right, then I should lose my results, but I don't.

Q. You did that for your in-sample methodology?

A. I've included merit-based aid in one of my step one regressions, and it doesn't move the needle considerably.

Q. But not step two?

A. I don't think I did it for step two, right.

Q. That's right.

A. But you wouldn't see the same picture, of course, if you did it for that.

Q. So merely by Notre Dame changing the name of what it calls its financial aid, a student goes from being undercharged to being overcharged in your in-sample methodology, correct?

A. If this variant of the model is only looking at list price, cost of admission minus institutional aid, right, then you can have wild swings in that measure because that's the measure that we're focused on.

A. I don't have it memorized, but it's not a model that I'm offering.

Q. Now, on these other techniques, you have a common shock price structure analysis, correct?

A. Yeah. As you go down the pricing structure pathway, which I don't think was raised in the *Daubert* brief, I do have a common shock analysis, that's true.

Q. And that's not a stand-alone method of showing common impact, right?

A. Well, I don't think you would get to step two unless you demonstrated generalized price effects in step one. So if you're asking me would I present to the fact-finder proof of common impact based solely on a pricing structure analysis, the answer is no. The pricing structure analysis is something that is used in conjunction with the step one finding of a generalized overcharged.

Q. And that can't say the percentage of class members who are overcharged, correct?

A. I think that it can inform the percentage of the class members who are overcharged.

Q. Maybe it can inform, but it doesn't allow you to specify that percentage, correct?

A. It won't give you a precise percentage, but if you know that everyone's prices move together and you have record evidence indicating that schools concerned about vertical and

horizontal equity and binding all the students according to a common formula, and if you know that there was a general shock to the EIPs caused by the challenged conduct, that would allow you to infer that all or almost all class members were injured. In fact, I've done that in other cases where the price structure analysis was the only element of common impact.

Q. Did you ever run your regression on full-ride student year observations only?

A. No. I only brought the full rides in, you know, to address this alleged deficiency.

Q. If we bring up slide 19, when you run your regression only on full-ride students, there is your model 6, you get an overcharge of $1,007. Very close to the overcharge you get when including -- when excluding overrides and including everyone else.

So your model is predicting that students who cannot be harmed are overcharged in almost the exact same amount as students who paid for college?

A. So first of all, I never ran this model. I think we have an agreement on that. So you say Singer's backup, I don't think I even provided code for this. This seems like a new analysis.

Q. You provided the data, right?

A. I provided the data. But I don't want you to suggest that this could be generated through my backup. Someone had to run

considered when calculating a student's EFC. That's not being more generous either, is it?
A. I don't know. I haven't studied whether Yale is more or less generous for the class of 2017. It's not something I've studied.
MR. GRINGER: Thank you, Dr. Singer.
THE WITNESS: Thanks.
THE COURT: Two minutes which means 120 seconds which doesn't mean 121 seconds.
MR. CRAMER: I'll be quick.
HAL SINGER, Ph.D. PLAINTIFFS' WITNESS, SWORN
REDIRECT EXAMINATION
BY MR. CRAMER:
Q. Does the defendants' *Daubert* motion mention the Yale model at all?
A. No.
THE COURT: I do recall it.
BY MR. CRAMER:
Q. You were asked some questions about the results of the in-sample modeling with respect to Vanderbilt, Duke, Penn, and Notre Dame students. One commonality between them is for all of the periods in which the student examples were mentioned is they were all non-straddlers. Does that tell you anything about the criticism and your response to that criticism?
A. Yeah, it tells me that it pertains to models 1 and 2 from

Is the Yale example the only instance in which Dr. Singer excludes full-ride students?

A. No, there are other examples in the data. I think it's between 7 and 8 percent of the data are full-ride students.

Q. And did Dr. Singer ever correct for the problems created by excluding full-ride students in his analysis?

A. Yes. So there was some discussion of this earlier, and if we advance one more slide, I think we have an example that's helpful to this.

So here in the first row of the table, we're looking at Dr. Singer's baseline model. And you can see he said his overcharge is $1202. And then below it in Dr. Singer's declaration, he said, I understand I've been criticized on the full-ride students, I re-added those observations into the data and I reran it and I got an overcharge of $1179, no significant change, so that must mean there isn't a problem in the model. But that's not true.

So if you look at the third column here, that's giving the number of in-sample conduct period observations. And you can see the last line here, your Honor, is summarizing the difference. When we add back in the full-ride observations, it goes up by about 58,000 observations.

And then the fourth column says, well, what were the total damages to the in-sample observations. So here we're taking the overcharge multiplied by the number of in-sample

observations, and that gives us total damages. And you can see total damages went up by $57 million.

And then the final column is showing us the key point. When Dr. Singer added in full-ride observations, those full-ride observations, according to his model, had $966 of overcharge. But these students were getting a full ride. So either the model is biased and it's estimating significant overcharges to students who couldn't have been harmed or it's telling us you shouldn't be using EIP as your measure because it's leading to the systematic problem.

Q. Just to be clear, is this just simple math based on Dr. Singer's back-up data?

A. Correct.

Q. But did you also run Dr. Singer's regression against just full-ride students?

A. Yes. That was referred to in Dr. Singer's testimony. And when I did that, I just took the full-ride observations, I ran the model on it, and it estimated an overcharge to full-ride students of I think it was $1007. So very similar to the number that Dr. Singer himself finds.

Q. Thank you, Dr. Hill.

Does Dr. Singer exclude any other types of students from his analysis?

A. Yes. If we advance one more slide, please.

Dr. Singer mentioned he also excludes no-aid students,

so these are what I call no-aid students, students who didn't receive any aid. And this, too, introduces selection bias into the model.

So, again, on the left-hand side, we have these data. So if we look at student C, in year one prior to the school joining the 568 Group, they paid $10,000. Year two, they also paid $10,000 after the school enters the 568 Group.

And then in this example, the cost of attendance is $50,000. So student D in year one is getting no aid. Student D pays the full price. Year two, after the school joins the 568 Group, that drops by $20,000.

And we can do the same exercise looking at the average. So if you look at year one, the average is going to be 10,000 plus 50,000, that gives us 30,000. In year two, the average is 10,000 plus 30,000 for an average of 20,000. So you can see on the right-hand side, that's a decrease in the average price of $10,000.

Dr. Singer is going to drop that observation for student D in year one. So he calculates the average price in year one as just the price paid by student C. So that's $10,000. Year two, he calculates $20,000, so his model will say a $10,000 increase.

So, again, here in the model is predicting the exact opposite of what happened. And, again, as Dr. Singer said, this could go the other way. His model could predict a $10,000

point, correct?
A. Well, the IPEDS data has more years, but, yes, there was one year when they were in the 568 Group, correct.
Q. And the defendants in this case produced student-specific data, correct?
A. Correct.
Q. But you didn't use that data in your own model, correct?
A. I didn't use it in that model, but I used it in other models. The model I was talking about earlier with all the schools who were always in versus the schools who were never in, I did use the student level data.
Q. In one of your regression models, you pulled together data for all of the defendants and five non-defendant 568 members in a single model, correct?
A. I'm sorry. Could you repeat that?
Q. Yeah. In one of your models, you pooled together data for all of the defendants and five non-defendant members of the 568 Group in a single model -- I'm sorry -- non-568 -- non-defendant --
THE COURT: You're probably going to want to start that question over again.
MR. CRAMER: Yes, I will start it over.
BY MR. CRAMER:
Q. If one of your models, you pooled together data for all of the defendants and five other members of Dr. Singer's relevant

market, correct?
A. When up say "pooled together," do you mean used?
Q. Yes, in one model?
A. Yes.
Q. You did not conduct any regression analyses on a defendant-by-defendant basis, correct?
A. No, that's not true because I took versions of Dr. Singer's model in my appendix.
Q. For your own models, you did not do it on a defendant-by-defendant basis, correct?
A. I think that's true of 4.2, but I did robustness checks that did use Dr. Singer's model and used -- controlled properly for the entry and exit.
Q. But you did models in your report including all of the defendants together, right?
A. Just to be clear, they're separated out in the regression. Each school is separated in section 4.2. But, yes, it's all of those schools and then the five control schools.
Q. So it aggregates across defendants and across all students, correct, your modeling, or some of it?
A. No. I don't think that's correct.
Q. For one of the models you specify, you include the seven defendants that were in the 568 Group for the entire conduct period, correct?
A. Correct.

Q. And for that model, you used a single dummy variable for the seven defendants for the entire 20-year conduct period, correct?
A. That's correct.
Q. This is sometimes called a pooled model, correct?
A. I don't -- if you say so, yes.
Q. Okay. And you believe that your pooled model with a single conduct variable for all defendants for the entire period is a reliable approach for attempting to estimate the effect, if any, of 568 Group participation on the amount of institutional aid offered, correct?
A. Well, it's not my preferred model, but it's what Dr. Singer did. So I'm just using his same model.
Q. Is your -- you believe that your method was reliable?
A. I think it's -- because it controls -- it controls for the problem with entry and exit which bedevils his model, so I think it's more reliable, yes.
Q. Let's talk about the Chicago post-2015 data. Please turn to tab 5 in the cross-examination binder in front of you.
A. Sure.
Q. This was figure 45, C6 from your surrebuttal report. And look at the column entitled Dr. Singer's Model 6 in the middle square. That's where you report the effect of two changes to Dr. Singer's model. You changed Dr. Singer's standard errors method, which is not mentioned in the *Daubert*; and, two, you

The Seventh Circuit used as an example, if the expert had extrapolated based on one data point, that would have been a problem. Or if the expert had extrapolated and it literally used these words, "the population of white rhinos in Africa." Right?

That was the kind of out-of-bounds data input problem that the Seventh Circuit said would rise to the level or potentially rise to the level of *Daubert*. Nothing here comes close to that.

And the *Dealer Management* case from this court in 2022 says, "Rule 702 does not condition admissibility on a complete and flaw-free set of data."

And the *Allstate Securities* case from this circuit -- from this Court in 2022 said, "time periods, waiting, inputs to a model are not the appropriate subject of *Daubert*."

That's true for control variables. So you heard some attacks on control variables, COVID control variable, how Dr. Singer deals with the time and changes over time. Those are all attacks on variables. And the Supreme Court said in *Bazemore* and the Seventh Circuit said in *Manpower* that attacks on the variables in a model, that's not *Daubert*. That's for cross-examination at trial.

The next point I'll make is about everything that the *Daubert* motion does not challenge. It does not challenge the control variables in its regression. It does not challenge his

price model. It does not challenge his Yale in-sample model. Now, recall, your Honor, that all of the attacks that defendants' motion raised about in-sample, which is a standard method used in the broiler chicken case and the turkey case and dozens of other cases, all of the criticisms of the in-sample model went to the non-straddlers in the models one and two. None of it applied to Yale. He ran the Yale model because it didn't -- the attacks did not apply to the straddlers. And, in fact, and what did -- in Dr. Singer's result, what was his result in the Yale model? 93 percent impact, which is conservative because, as he testified today and is in his report: A, in-sample is a very conservative method; B, it only refers to straddlers which means they only have one or two or three years to be impacted whereas most students have four; and, finally, there's that ramp-up or lingering effect.

So the Yale model is conservative and yet it finds 93 percent of students impacted. And none of their attacks apply to the Yale model.

And the broiler chicken case said that an in-sample model almost exactly the way Dr. Singer ran it that found 93.4 percent of the class members injured was sufficient to establish common impact.

And so that is what I would say about in-sample.

A lot of their attacks in their *Daubert* motion go to attacks on the pooled model, the step one, and confuse it with

that you just kind of singled that one out because it looks good for you and the others ones might not?

MR. CRAMER: Well, number one, we picked it because it was a prototypical example of a school announcing it's leaving to be more generous and so we're going to look and see if that's true.

Number two, they don't attack, there's no attack from any of their experts nor in their motion saying it is cherry-picked. They don't say that until today.

THE COURT: Right.

MR. CRAMER: We say that it's representative. In fact, it's conservative. It's very conservative for the reasons that we identified.

If I can just talk about EIP. The reason why we focused on that, as Dr. Singer testified, is because those are the levers under the defendants' control that are most likely affected by the challenged conduct, institutional aid and net price. But as to merit aid, we control for it. He controls for it. He runs a separate model with merit aid. It doesn't have a significant effect.

As to net price, that's in our complaint, paragraph 7, we refer to net price.

THE COURT: What about this change of theory thing that Mr. Van Kirk was talking about?

MR. CRAMER: That's what I'm saying. In the

# *Corzo, et al. v. Brown University, et al.*

## Defendants' Motion to Exclude Expert Testimony and Opinions of Hal Singer

April 14, 2025

# In-Sample Prediction Analysis

STUDENT EXAMPLE: **NOTRE DAME**




UID NUMBER:
0000648195221

A75

INSTITUTIONAL GRANT AID IN EACH YEAR:




EFC EACH YEAR:




IN-SAMPLE PREDICTION OVERCHARGE IN EACH YEAR:




Total In-Sample Prediction Overcharge **$4,808**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,<br><br>Defendants. | Case No. 1:22-cv-00125<br><br><br>Hon. Matthew F. Kennelly |

**ORDER GRANTING PLAINTIFFS' MOTION TO PROVIDE AGREED FORMS OF NOTICE TO THE CERTIFIED LITIGATION CLASS**

Before the Court is Plaintiffs' Motion to Provide Agreed Forms of Notice to the Certified Litigation Class (the "Motion"). On June 1, 2026, the Court certified the following Class (or "Litigation Class"):

> All persons who have during the Class Period (a) enrolled in one or more of Defendants' full-time undergraduate programs, (b) received at least some need-based financial aid from one or more Defendants,[1] and (c) whose tuition, fees, room, or board to attend one or more of Defendants' full-time undergraduate programs was not fully covered by the combination of any types of grant or merit aid in any undergraduate year.[2] The Class Period is defined as follows:
>
> - For Brown, Dartmouth, Emory—from Fall Term 2004 through June 30, 2023.
> - For Chicago—from Fall Term 2003 through June 30, 2014.
> - For Columbia, Cornell, Duke, Georgetown, MIT, Northwestern, Notre Dame, and Rice—from Fall Term 2003 through June 30, 2023.
> - For Penn—from Fall Term 2003 through June 30, 2019.
> - For Vanderbilt—from Fall Term 2003 through June 30, 2020.
> - For Yale—from Fall Term 2003 through June 30, 2007, and from Fall Term 2018 through June 30, 2023.
> - For Caltech—from Fall Term 2020 through June 30, 2023.
> - For Johns Hopkins—from Fall Term 2022 through June 30, 2023.
>
> Excluded from the Litigation Class are:
>
> - Any Officers[3] and/or Trustees of Defendants, or any current or former employees holding any of the following positions: Assistant or Associate Vice Presidents or Vice Provosts, Executive Directors, or Directors of Defendants' Financial Aid and Admissions offices, or any Deans or Vice Deans, or any employees in Defendants' in-house legal offices;

---

[1] The Defendants are Brown University ("Brown"), California Institute of Technology "Caltech"), University of Chicago ("Chicago"), Trustees of Columbia University in the City of New York ("Columbia"), Cornell University ("Cornell"), Trustees of Dartmouth College ("Dartmouth"), Duke University ("Duke"), Emory University ("Emory"), Georgetown University ("Georgetown"), Johns Hopkins University ("Johns Hopkins"), Massachusetts Institute of Technology ("MIT"), Northwestern University ("Northwestern"), University of Notre Dame du Lac ("Notre Dame"), Trustees of the University of Pennsylvania ("Penn"), William Marsh Rice University ("Rice"), Vanderbilt University ("Vanderbilt"), and Yale University ("Yale").

[2] For avoidance of doubt, the Litigation Class does not include those for whom the total cost of attendance, including tuition, fees, room, and board for each undergraduate academic year, was covered by any form of financial aid or merit aid (not including loans) from one or more Defendants.

[3] For the avoidance of doubt, the Columbia University "Officers" excluded from the Litigation Class are members of the Senior Administration of Columbia University, and do not include exempt employees of Columbia University who are referred to as officers.

# EXCERPTS FROM TRANSCRIPT OF PROCEEDINGS ON CLASS COUNSEL APPROVAL (MAY 26, 2026, 2:30pm)

**Page 9**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SIA HENRY, et al., | ) | Case No. 22 C 125 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| BROWN UNIVERSITY, et al., | ) | Chicago, Illinois |
| | ) | May 26, 2026 |
| Defendants. | ) | 2:30 p.m. |

TRANSCRIPT OF PROCEEDINGS - MOTION
BEFORE THE HONORABLE MATTHEW F. KENNELLY

APPEARANCES:

For the Plaintiffs: FREEDMAN NORMAND FRIEDLAND LLP
BY: MR. EDWARD J. NORMAND
10 Grand Central
155 E. 44th Street, Suite 915
New York, New York 10016

MOLO LAMKEN LLP
BY: MR. STEVEN F. MOLO
430 Park Avenue
New York, New York 10022

Court Reporter: CAROLYN R. COX, RPR, CRR, FCRR
Official Court Reporter
219 S. Dearborn Street, Suite 2102
Chicago, Illinois 60604
(312) 435-5639
C.Cox.courtreporter@gmail.com

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

class representatives and the most sophisticated class ever. These are graduates of the top universities in the country.

The class reps have two lawyers -- one went to Harvard; one went to NYU -- a doctor, and other accomplished professionals. They can participate in this process and protect the class by being involved. Instead, what they said is, I didn't know -- some of them said they read the opinion, but they didn't know that you had found a lack of candor on the part of FNF and Berger Montague. And yet they said, I trusted them to make the recommendation. And when they said Molo Lamken, we said okay.

Now, I want to be clear about one thing, which is Molo Lamken is a very fine firm. They say, oh, well, we don't say anything about that. That's because there is nothing to say derogatory about Steve Molo. We'd love to try a case against him. He's got an excellent representation. That's not the issue.

The issue is should we have gotten to that point, and should they have been in charge of that process? And we think the answer is no to both of those questions. We think the evidence that we obtained from the class reps concerning their lack of participation, their figurehead status, the fact that they turned this over entirely, with these kind of allegations floating around, one, that plaintiffs' counsel didn't tell them about it --

## CIRCUIT RULE 30(d) CERTIFICATE

All materials required by Circuit Rule 30(a)-(b) are included in Defendant-Appellant's required Appendix.

Dated: October 5, 2026

/s/ *Seth P. Waxman*
SETH P. WAXMAN

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of October, 2026, I filed the foregoing using the CM/ECF system, which effected service on all registered counsel.

/s/ *Seth P. Waxman*
SETH P. WAXMAN