No. 26-2759

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

ANDREW CORZO, ET AL.,

*Plaintiffs-Appellees*,

*v.*

CORNELL UNIVERSITY, ET AL.,

*Defendants-Appellants*.

Interlocutory Appeal Pursuant to Federal Rule of Civil Procedure 23(f) from the United States District Court for the Northern District of Illinois, No. 1:22-cv-00125-MFK Before the Honorable Matthew F. Kennelly

**APPENDIX FOR DEFENDANTS-APPELLANTS BRIEF**
**VOLUME 2, PARTS 1 & 2**
**(A128 – A266)**

DAVID GRINGER
ALAN SCHOENFELD
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 Word Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
david.gringer@wilmerhale.com
alan.schoenfeld@wilmerhale.com

SETH P. WAXMAN
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
seth.waxman@wilmerhale.com

*Attorneys for Defendant-Appellant the Trustees of the University of Pennsylvania*

October 5, 2026

Additional Counsel on Inside Cover

NORMAN ARMSTRONG
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800
norman.armstrong@cooley.com

*Attorney for Defendant-Appellant Cornell University*

BRITT M. MILLER
DANIEL T. FENSKE
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
dfenske@mayerbrown.com

*Attorneys for Defendant-Appellant Georgetown University*

ERIC MAHR
JAN RYBNICEK
FRESHFIELDS US LLP
700 13th Street NW
Washington, DC 20005
(202) 777-4500
eric.mahr@freshfields.com
jan.rybnicek@freshfields.com

*Attorneys for Defendant-Appellant Massachusetts Institute of Technology*

ZAKI ANWAR
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
zaki.anwar@wilmerhale.com

EDWARD W. FELDMAN
MILLER SHAKMAN LEVINE & FELDMAN LLP
30 W. Monroe Street
Suite 1900
Chicago, IL 60603
(312) 759-7213
efeldman@millershakman.com

*Attorneys for Defendant-Appellant the Trustees of the University of Pennsylvania*

ROBERT A. VAN KIRK
SARAH F. KIRKPATRICK
MATTHEW D. HEINS
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000
rvankirk@wc.com
skirkpatrick@wc.com
mheins@wc.com

*Attorneys for Defendant-Appellant University of Notre Dame*

## APPENDIX TABLE OF CONTENTS

Page

### VOLUME 1
### (BOUND WITH BRIEF)

Order on Motion for Class Certification (June 1, 2026), Dkt. 1275 ........ A1

Memorandum Opinion and Order on Motion for Class Certification (Mar. 31, 2026), Dkt. 1241 ........ A12

Memorandum Opinion and Order on Motions to Exclude Expert Testimony (Sept. 29, 2025), Dkt. 1160 ........ A74

### VOLUME 2
### (SEPARATELY BOUND)

District Court Docket, No. 1:22-cv-00125 (N.D. Ill.) ........ A128

Complaint (Jan. 9, 2022), Dkt. 1 ........ A139

Amended Complaint (Feb. 15, 2022), Dkt. 106 ........ A200

Memorandum Opinion and Order on Motion to Dismiss (Aug. 15, 2022), Dkt. 185 ........ A207

Second Amended Complaint (Feb. 6, 2023), Dkt. 308 ........ A211

Plaintiffs' Motion for Class Certification Exhibit 17: Email from Patricia McWade to Ted Bracken (dated Apr. 15, 2014), Dkt. 753-17 (Redacted) ........ A222

Plaintiffs' Motion for Class Certification Exhibit 18: Email from Cynthia Barnhart to Elizabeth Hicks (dated Aug. 27, 2014), Dkt. 753-18 (Excerpts) ........ A223

Plaintiffs' Motion for Class Certification Exhibit 24: Email from Donald Bishop to Lou Nanni, Joseph Gelchion, and Robert Mundy (dated Mar. 6, 2012), Dkt. 753-24 ........ A224

Rebuttal Expert Report of Nicholas Hill, dated Aug. 7, 2024 (filed Dec. 16, 2024), Dkt. 755-4 (Excerpts) .............................. A226

Deposition of Hal J. Singer, dated Nov. 27, 2024 (filed Dec. 16, 2024), Dkt. 755-11 (Excerpts) ....................................................A233

Amended Expert Report of Hal J. Singer, dated May 28, 2024 (filed Dec. 16, 2024), Dkt. 755-12 (Excerpts) ............................ A272

Rebuttal Expert Report of Hal J. Singer, dated Oct 7, 2024 (filed Dec. 16, 2024), Dkt. 755-18 (Excerpts) ............................ A279

Defendants' Motion to Exclude Expert Testimony, Exhibit 20: *Peer School Financial Aid Initiatives Timeline* (filed Dec. 16, 2024), Dkt. 755-22 ........................................................................A310

Surrebuttal Expert Report of Lauren J. Stiroh, dated Nov. 1, 2024 (filed Dec. 16, 2024), Dkt. 755-27 (Excerpts) ................................A314

Rebuttal Expert Report of Lauren J. Stiroh, Appendix 1, dated Aug. 7, 2024 (filed Dec. 16, 2024), Dkt. 755-29 (Excerpts) .............................................................. A324

Rebuttal Expert Report of Hal J. Singer, dated Oct. 7, 2024 (filed Dec. 17, 2024), Dkt. 756-34 (Excerpts) ............................ A331

Expert Report of George Bulman, dated May 14, 2024 (filed Dec. 17, 2024), Dkt. 756-36 (Excerpts) ...............................A336

Supplemental Rebuttal Expert Report of Hal J. Singer, dated Nov. 8, 2024 (filed Dec. 17, 2024), Dkt. 756-38 (Excerpts) .............................................................. A338

Rebuttal Expert Report of Bridget Terry Long, dated Aug. 7, 2024 (filed Dec. 17, 2024), Dkt. 756-39 (Excerpts) (Redacted) ..............A342

Rebuttal Expert Report of Bridget Terry Long, Appendix D, dated Aug. 7, 2024 (filed Dec. 20, 2024), Dkt. 765-1 (Excerpts) (Redacted).............................................. A426

Deposition of Hal J. Singer, dated Nov. 27, 2024 (filed Feb. 1, 2025), Dkt. 789-2 (Excerpts) ........ A507

Rebuttal Expert Report of Bridget Terry Long, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 789-3 (Excerpts) (Redacted) ........ A510

Rebuttal Expert Report of Nicholas Hill, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 789-4 (Excerpts) ........ A598

Rebuttal Expert Report of Lauren J. Stiroh, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 789-16 (Excerpts) (Redacted) ........ A625

Plaintiffs' Motion for Class Certification, Exhibit 19: *The 568 Group Consensus Methodology Policy Guidelines* (Dec. 2016) (filed Feb. 1, 2025), Dkt. 789-20 ........ A655

Second Amended Expert Report of Hal J. Singer, dated June 10, 2024 (filed Feb. 1, 2025), Dkt. 789-25 (Excerpts) ........ A673

Surrebuttal Expert Report of Nicholas Hill, dated Nov. 1, 2024 (filed Feb. 1, 2025), Dkt. 789-32 (Excerpts) ........ A687

Plaintiffs' Motion for Class Certification, Exhibit 41: *Report of Common Standard Subcommittee to 568 Presidents' Working Group* (filed Feb. 1, 2025), Dkt. 789-42 (Excerpts) ........ A689

Deposition of James Tilton, dated May 15, 2023 (filed Feb. 1, 2025), Dkt. 789-49 (Excerpts) ........ A691

Surrebuttal Expert Report of Lauren J. Stiroh, dated Nov. 1, 2024 (filed Feb. 1, 2025), Dkt. 789-51 (Excerpts) ........ A694

Rebuttal Expert Report of Nicholas Hill, dated Aug. 7, 2024 (filed Feb. 27, 2025), Dkt. 802-7 (Excerpts) ........ A699

Second Amended Expert Report of Hal J. Singer, dated June 10, 2024 (filed Feb. 28, 2025), Dkt. 805-2 (Excerpts) ........ A702

Minute Docket Entry for Hearing on Motions to Exclude Expert Testimony (Apr. 3, 2025), Dkt. 835 ............................... A705

Defendants' Motion for Summary Judgment, Exhibit 85: *Penn Undergraduate Student Accessibility and Affordability*, dated Feb. 27, 2020, (filed May 7, 2020), Dkt. 864-4 (Excerpts) ............................................................ A707

Defendants' Motion for Summary Judgment, Exhibit 90: *House Judiciary Committee Report on Need-Based Educational Aid Act of 2001*, H.R. Rep. No. 107-32, 1st Sess. (2001), Dkt. 864-9 (Excerpts)...................................... A710

Defendants' Motion for Summary Judgment, Exhibit 120: Email from Caesar Storlazzi to J. Lloyd Suttle and Rhakti Nagella, dated Oct. 2, 2012 (filed May 7, 2025), Dkt. 864-39 ...................................................................... A714

Deposition of Hal J. Singer, dated Nov. 27, 2024 (filed May 8, 2025), Dkt. 865-30 (Excerpts) .............................. A715

Deposition of Caesar Storlazzi, dated July 27, 2023 (filed May 8, 2025), Dkt. 865-31 (Excerpts) .............................. A726

Deposition of Hal J. Singer, dated Nov. 27, 2024 (filed May 29, 2025), Dkt. 874-5 (Excerpts) .............................. A728

Errata to Expert Report of Bridget Terry Long, updated Aug. 12, 2024 (filed June 27, 2025), Dkt. 889-3 (Excerpts)...... A735

Second Amended Expert Report of Hal J. Singer, dated June 10, 2024 (filed June 27, 2025), Dkt. 889-17 (Excerpts) ........................................................... A739

Plaintiffs' Opposition to Summary Judgment, Exhibit 107: *Memorandum of Understanding the 568 Presidents' Group*, dated Jan. 5, 2004 (filed Sept. 12, 2025, Dkt. 1025-6 ...................................................................... A744

Memorandum Opinion and Order on Cross-Motions for Summary Judgment (Jan. 12, 2026), Dkt. 1210 (Excerpts) ...................... A747

Transcript of Proceedings of Status Conference (Mar. 20, 2025), Dkt. 1261 (Excerpts)................................................................ A784

Transcript of Proceedings on Motions to Exclude Expert Testimony (Apr. 14, 2025), Dkt. 1263 (Excerpts) ..................... A788

Hearing on Motions to Exclude Expert Testimony (Apr. 14, 2025): Defendants' Hearing Presentation ................ A833

Order Granting Plaintiffs' Motion to Provide Agreed Forms of Notice to the Certified Litigation Class (June 12, 2026), Dkt. 1282 (Excerpts)................................................................ A835

Transcript of Proceedings on Class Counsel Approval (May 26, 2026, 2:30pm) (Excerpts) .......................................... A837

**VOLUME 3**
**SEALED**
**(SEPARATELY BOUND)**

Rebuttal Expert Report of Bridget Terry Long, Appendix D, dated Aug. 7, 2024 (filed Dec. 16, 2024) Dkt. 754-3 (Excerpts) [unredacted version of A426-506] ............................ A839

Plaintiffs' Motion for Class Certification Exhibit 17: Email from Patricia McWade to Ted Bracken (dated Apr. 15, 2014), Dkt. 757-12 [unredacted version of A222] ........................................................................ A920

Rebuttal Expert Report of Bridget Terry Long, dated Aug. 7, 2024 (filed Dec. 17, 2024), Dkt. 757-52 (Excerpts) [unredacted version of A342-425] .........................................................A921

Declaration of Hal J. Singer (Jan. 25, 2025), Dkt. 785-2................. A1005

Rebuttal Expert Report of Bridget Terry Long, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 788-3 (Excerpts) [unredacted version of A510-597]..........................................................................A1009

Rebuttal Expert Report of Lauren J. Stiroh, dated Aug. 7, 2024 (filed Feb. 1, 2025), Dkt. 788-16 (Excerpts) [unredacted version of A625-654] ........ A1088

Second Amended Expert Report of Hal J. Singer (May 7, 2025), Dkt. 854-7 (Excerpts) ........ A1118

Transcript of Proceedings on Settlement Approval (July 28, 2025, 2:50pm), Dkt. 1345 (Excerpts) ........ A1121

## Index of Excerpted Transcript Pages Included in Appendix

| Proceeding | Excerpted Transcript Pages | Appendix Page |
|---|---|---|
| Transcript of Proceedings of Status Conference (Mar. 20, 2025), Dkt. 1261 | pp.9-11 | A785-787 |
| Transcript of Proceedings on Motions to Exclude Expert Testimony (May 15, 2026), Dkt. 1263 | pp.7-31, 47-48, 69-73, 75-76, 87, 98-100, 113-115, 130-131, 150 | A789-832 |
| Transcript of Proceedings on Settlement Approval (July 28, 2025, 2:50pm), Dkt. 1345 (SEALED) | p.7 | A1122 |
| Transcript of Proceedings on Class Counsel Approval (May 26, 2026, 2:30pm) | p.9 | A838 |

## Index of Excerpted Deposition Transcript Pages Included in Appendix

| Depositions | Excerpted Transcript Pages | Appendix Page |
|---|---|---|
| Hal J. Singer Deposition (Nov. 27, 2024), Dkt. 755-11 | pp.29, 31-34, 48-49, 127-132, 184, 189-190, 201, 252-254, 261-262, 270-274, 281-283, 288-293, 295-296 | A234-271 |
| Hal J. Singer Deposition (Nov. 27, 2024), Dkt. 789-2 | pp.315-316 | A508-509 |
| Hal J. Singer Deposition (Nov. 27, 2024), Dkt. 865-30 | pp.19-21, 27, 59, 82, 92-93, 95, 117 | A716-725 |
| Hal J. Singer Deposition (Nov. 27, 2024), Dkt. 874-5 | ECF pp.3-8 | A729-734 |
| Caesar Storlazzi Deposition (July 27, 2023), Dkt. 865-31 | p.38 | A727 |
| James Tilton Deposition (May 15, 2023), Dkt. 789-49 | pp.121-122 | A692-693 |

**United States District Court**
**Northern District of Illinois (Chicago)**
**CIVIL DOCKET FOR CASE #: 1:22-cv-00125**

Henry et al v. Brown University et al
Assigned to: Honorable Matthew F. Kennelly
Case in other court: 26-01275
Cause: 15:1 Antitrust Litigation

Date Filed: 01/09/2022
Jury Demand: Both
Nature of Suit: 410 Anti-Trust
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 01/09/2022 | 1 | COMPLAINT filed by Michael Maerlander, Sia Henry, Brandon Piyevsky, Kara Saffrin, Brittany Tatiana Weaver; Jury Demand. Filing fee $ 402, receipt number 0752-19036663.(Roche, Kyle) (Entered: 01/09/2022) |
| 02/15/2022 | 106 | AMENDED complaint by Michael Maerlander, Sia Henry, Brandon Piyevsky, Kara Saffrin, Brittany Tatiana Weaver, Alexander Leo-Guerra, Savannah Rose Eklund, Frank Carbone, Andrew Corzo against Brown University, California Institute of Technology, Cornell University, Duke University, Emory University, Georgetown University, Massachusetts Institute of Technology, Northwestern University, The Trustees of Columbia University in the City of New York, The Trustees of the University of Pennsylvania, Trustees of Dartmouth College, University of Chicago, University of Notre Dame du Lac, Vanderbilt University, William Marsh Rice University, Yale University, The Johns Hopkins University (Roche, Kyle) (Entered: 02/15/2022) |
| 08/15/2022 | 185 | MEMORANDUM OPINION AND ORDER signed by the Honorable Matthew F. Kennelly on 8/15/2022: For the reasons stated in the accompanying Memorandum Opinion and Order, the Court denies the defendants' motions to dismiss [dkt. nos. 145, 146 & 148]. The defendants are directed to answer the amended complaint by no later than September 9, 2022. The parties are directed to promptly confer regarding a discovery and pretrial schedule, and they are to file by August 26, 2022 a joint status report with an agreed proposal, or alternative proposals if they cannot agree. The case is set for a telephonic status hearing on September 2, 2022 at 9:10 a.m., using call-in number 888-684-8852, access code 746-1053. The Court reserves the right to vacate the hearing if it determines a hearing is not needed. (mk) (Entered: 08/15/2022) |
| 02/06/2023 | 308 | *SECOND* AMENDED complaint by Cameron Williams, Alexander Leo-Guerra, Michael Maerlander, Sia Henry, Benjamin Shumate, |

| | | |
|---|---|---|
| | | Brandon Piyevsky, Andrew Corzo, Brittany Tatiana Weaver against Brown University, California Institute of Technology, Cornell University, Duke University, Emory University, Georgetown University, Massachusetts Institute of Technology, Northwestern University, The Johns Hopkins University, The Trustees of Columbia University in the City of New York, The Trustees of the University of Pennsylvania, Trustees of Dartmouth College, University of Chicago, University of Notre Dame du Lac, Vanderbilt University, William Marsh Rice University, Yale University (Normand, Edward) (Entered: 02/06/2023) |
| 12/16/2024 | 753 | DECLARATION of Edward Normand regarding motion for miscellaneous relief, 751 , motion for miscellaneous relief, 750 , motion for miscellaneous relief, 752 (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45, # 46 Exhibit 46, # 47 Exhibit 47, # 48 Exhibit 48, # 49 Exhibit 49, # 50 Exhibit 50, # 51 Exhibit 51, # 52 Exhibit 52, # 53 Exhibit 53, # 54 Exhibit 54, # 55 Exhibit 55, # 56 Exhibit 56, # 57 Exhibit 57, # 58 Exhibit 58, # 59 Exhibit 59, # 60 Exhibit 60, # 61 Sealed Exhibit 61, # 62 Exhibit 62, # 63 Sealed Exhibit 63, # 64 Exhibit 64, # 65 Exhibit 65, # 66 Exhibit 66, # 67 Exhibit 67, # 68 Exhibit 68, # 69 Exhibit 69, # 70 Exhibit 70, # 71 Sealed Exhibit 71, # 72 Exhibit 72, # 73 Exhibit 73, # 74 Exhibit 74, # 75 Exhibit 75)(Normand, Edward) Docket Text Modified by Clerk's Office. (Entered: 12/16/2024) |
| 12/16/2024 | 754 | SEALED DOCUMENT by Defendant The Trustees of the University of Pennsylvania *Defendants' Motion to Exclude Expert Testimony and Opinions of Hal Singer, George Bulman, and Elizabeth Mora* (Attachments: # 1 Appendix, # 2 Declaration of David Gringer in Support, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13, # 16 Exhibit 14, # 17 Exhibit 15, # 18 Exhibit 16, # 19 Exhibit 17, # 20 Exhibit 18, # 21 Exhibit 19, # 22 Exhibit 20, # 23 Exhibit 21, # 24 Exhibit 22, # 25 Exhibit 23, # 26 Exhibit 24, # 27 Exhibit 25, # 28 Exhibit 26, # 29 Exhibit 27, # 30 Exhibit 28, # 31 Exhibit 29, # 32 Exhibit 30, # 33 Exhibit 31, # 34 Exhibit 32, # 35 Exhibit 33, # 36 |

| | | |
|---|---|---|
| | | Exhibit 34, # 37 Exhibit 35, # 38 Exhibit 36, # 39 Exhibit 37, # 40 Exhibit 38, # 41 Exhibit 39, # 42 Exhibit 40, # 43 Exhibit 41, # 44 Exhibit 42)(Gringer, David) (Entered: 12/16/2024) |
| 12/16/2024 | 755 | MOTION by Defendant The Trustees of the University of Pennsylvania Defendants' Motion to Exclude Expert Testimony and Opinions of Hal Singer, George Bulman, and Elizabeth Mora<br><br>(Attachments: # 1 Appendix, # 2 Declaration of David Gringer in Support, # 3 Sealed Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13, # 16 Exhibit 14, # 17 Exhibit 15, # 18 Exhibit 16, # 19 Exhibit 17, # 20 Exhibit 18, # 21 Exhibit 19, # 22 Exhibit 20, # 23 Exhibit 21, # 24 Exhibit 22, # 25 Exhibit 23, # 26 Exhibit 24, # 27 Exhibit 25, # 28 Exhibit 26, # 29 Exhibit 27, # 30 Exhibit 28, # 31 Exhibit 29, # 32 Exhibit 30, # 33 Exhibit 31, # 34 Exhibit 32, # 35 Exhibit 33, # 36 Exhibit 34, # 37 Exhibit 35, # 38 Exhibit 36, # 39 Exhibit 37, # 40 Exhibit 38, # 41 Exhibit 39, # 42 Exhibit 40, # 43 Exhibit 41, # 44 Exhibit 42)(Gringer, David) Docket Text Modified by Clerk's Office. (Entered: 12/17/2024) |
| 12/17/2024 | 756 | EXHIBIT by Plaintiffs Sia Henry, Michael Maerlander, Alexander Leo-Guerra, Andrew Corzo, Brittany Tatiana Weaver, Benjamin Shumate, Cameron Williams regarding declaration,,,,,, 753 (Attachments: # 1 Exhibit 77, # 2 Exhibit 78, # 3 Exhibit 79, # 4 Exhibit 80, # 5 Exhibit 81, # 6 Exhibit 82, # 7 Exhibit 83, # 8 Exhibit 84, # 9 Exhibit 85, # 10 Exhibit 86, # 11 Exhibit 87, # 12 Exhibit 88, # 13 Exhibit 89, # 14 Exhibit 90, # 15 Exhibit 91, # 16 Exhibit 92, # 17 Exhibit 93, # 18 Exhibit 94, # 19 Exhibit 95, # 20 Exhibit 96, # 21 Exhibit 97, # 22 Exhibit 98, # 23 Exhibit 99, # 24 Exhibit 100, # 25 Exhibit 101, # 26 Exhibit 102, # 27 Exhibit 103, # 28 Exhibit 104, # 29 Exhibit 105, # 30 Exhibit 106, # 31 Exhibit 107, # 32 Sealed Exhibit 108, # 33 Exhibit 109, # 34 Exhibit 110, # 35 Exhibit 111, # 36 Exhibit 112, # 37 Exhibit 113, # 38 Exhibit 114, # 39 Exhibit 115, # 40 Exhibit 116, # 41 Exhibit 117, # 42 Exhibit 118, # 43 Exhibit 119, # 44 Exhibit 120, # 45 Exhibit 122, # 46 Exhibit 123)(Normand, Edward) Docket Text Modified by Clerk's Office. (Entered: 12/17/2024) |
| 12/17/2024 | 757 | SEALED MOTION by Plaintiffs Sia Henry, Michael Maerlander, Alexander Leo-Guerra, Andrew Corzo, Brandon Piyevsky, Brittany Tatiana Weaver, Benjamin Shumate, Cameron Williams FOR CLASS CERTIFICATION (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 6, # 6 Exhibit 8, # 7 Exhibit 9, # 8 Exhibit 11, # 9 Exhibit 12, # 10 Exhibit 13, # 11 Exhibit 14, # 12 Exhibit 17, # 13 Exhibit 19, # 14 Exhibit 22, # 15 Exhibit 23, # 16 Exhibit 28, # 17 Exhibit 29, # 18 Exhibit 30, # 19 Exhibit 31, # 20 |

| | | |
|---|---|---|
| | | Exhibit 32, # 21 Exhibit 36, # 22 Exhibit 37, # 23 Exhibit 47, # 24 Exhibit 49, # 25 Exhibit 50, # 26 Exhibit 51, # 27 Exhibit 53, # 28 Exhibit 54, # 29 Exhibit 55, # 30 Exhibit 56, # 31 Exhibit 59, # 32 Exhibit 60, # 33 Exhibit 61, # 34 Exhibit 64, # 35 Exhibit 65, # 36 Exhibit 67, # 37 Exhibit 69, # 38 Exhibit 71, # 39 Exhibit 74, # 40 Exhibit 85, # 41 Exhibit 86, # 42 Exhibit 87, # 43 Exhibit 88, # 44 Exhibit 94, # 45 Exhibit 97, # 46 Exhibit 100, # 47 Exhibit 101, # 48 Exhibit 108, # 49 Exhibit 110, # 50 Exhibit 111, # 51 Exhibit 114, # 52 Exhibit 115, # 53 Exhibit 119, # 54 Exhibit 120, # 55 Exhibit 121)(Normand, Edward) (Entered: 12/17/2024) |
| 12/20/2024 | 765 | MOTION by Defendant The Trustees of the University of Pennsylvania to seal *Portions of Exhibit 1 to Their Daubert Motion* 755<br><br>(Attachments: # 1 Exhibit 1)(Gringer, David) (Entered: 12/20/2024) |
| 01/24/2025 | 785 | SEALED MEMORANDUM by Plaintiffs Sia Henry, Michael Maerlander, Alexander Leo-Guerra, Andrew Corzo, Brandon Piyevsky, Brittany Tatiana Weaver, Cameron Williams (Attachments: # 1 Declaration of Eric Cramer, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12)(Cramer, Eric) Modified on 1/27/2025 (td, ). (Entered: 01/24/2025) |
| 01/31/2025 | 788 | SEALED RESPONSE by The Trustees of the University of Pennsylvania to SEALED MOTION by Plaintiffs Sia Henry, Michael Maerlander, Alexander Leo-Guerra, Andrew Corzo, Brandon Piyevsky, Brittany Tatiana Weaver, Benjamin Shumate, Cameron Williams *FOR CLASS CERTIFICATION* 757 (Attachments: # 1 Declaration of David Gringer in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28, # 30 Exhibit 29, # 31 Exhibit 30, # 32 Exhibit 31, # 33 Exhibit 32, # 34 Exhibit 33, # 35 Exhibit 34, # 36 Exhibit 35, # 37 Exhibit 36, # 38 Exhibit 37, # 39 Exhibit 38, # 40 Exhibit 39, # 41 Exhibit 40, # 42 Exhibit 41, # 43 Exhibit 42, # 44 Exhibit 43, # 45 Exhibit 44, # 46 Exhibit 45, # 47 Exhibit 46, # 48 Exhibit 47, # 49 Exhibit 48, # 50 Exhibit 49, # 51 Exhibit 50, # 52 Exhibit 51, # 53 Exhibit 52, # 54 Exhibit 53, # 55 Exhibit 54, # 56 Exhibit 55, # 57 Exhibit 56, # 58 Exhibit 57, # 59 Exhibit 58, # 60 Exhibit 59, # 61 Exhibit 60, # 62 Exhibit 61, # 63 Exhibit 62, # 64 Exhibit 63, # 65 Exhibit 64, # 66 |

| | | |
|---|---|---|
| | | Exhibit 65, # 67 Exhibit 66, # 68 Exhibit 67, # 69 Exhibit 68)(Gringer, David) (Entered: 01/31/2025) |
| 02/01/2025 | 789 | RESPONSE by The Trustees of the University of Pennsylvania in Opposition to SEALED MOTION by Plaintiffs Sia Henry, Michael Maerlander, Alexander Leo-Guerra, Andrew Corzo, Brandon Piyevsky, Brittany Tatiana Weaver, Benjamin Shumate, Cameron Williams FOR CLASS CERTIFICATION 757 (Attachments: # 1 Declaration of David Gringer in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28, # 30 Exhibit 29, # 31 Exhibit 30, # 32 Exhibit 31, # 33 Exhibit 32, # 34 Exhibit 33, # 35 Exhibit 34, # 36 Exhibit 35, # 37 Exhibit 36, # 38 Exhibit 37, # 39 Exhibit 38, # 40 Exhibit 39, # 41 Exhibit 40, # 42 Exhibit 41, # 43 Exhibit 42, # 44 Exhibit 43, # 45 Exhibit 44, # 46 Exhibit 45, # 47 Exhibit 46, # 48 Exhibit 47, # 49 Exhibit 48, # 50 Exhibit 49, # 51 Exhibit 50, # 52 Exhibit 51, # 53 Exhibit 52, # 54 Exhibit 53, # 55 Exhibit 54, # 56 Exhibit 55, # 57 Exhibit 56, # 58 Exhibit 57, # 59 Exhibit 58, # 60 Exhibit 59, # 61 Exhibit 60, # 62 Exhibit 61, # 63 Exhibit 62, # 64 Exhibit 63, # 65 Exhibit 64, # 66 Exhibit 65, # 67 Exhibit 66, # 68 Exhibit 67, # 69 Exhibit 68)(Gringer, David) (Entered: 02/01/2025) |
| 02/27/2025 | 802 | MOTION by Defendants Cornell University, Georgetown University, Massachusetts Institute of Technology, The Trustees of the University of Pennsylvania, University of Notre Dame du Lac for leave to file Amended Reply in Support of Defendants' Motion to Exclude Expert Testimony and Opinions of Hal Singer, George Bulman, and Elizabeth Mora<br><br>(Attachments: # 1 Exhibit A - Amended Reply in Support of Defendants' Motion to Exclude Expert Testimony and Opinions of Hal Singer, George Bulman, and Elizabeth Mora, # 2 Declaration of David Gringer in Support, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13, # 16 Exhibit 14, # 17 Exhibit 15, # 18 Exhibit 16, # 19 Exhibit 17, # 20 Exhibit 18, # 21 Exhibit 19, # 22 Exhibit 20)(Miller, Britt) (Entered: 02/27/2025) |
| 02/28/2025 | 805 | REPLY by Defendants Cornell University, Georgetown University, Massachusetts Institute of Technology, The Trustees of the University of Pennsylvania, University of Notre Dame du Lac to motion for |

| | | |
|---|---|---|
| | | miscellaneous relief,,,, 755 *(Amended Reply in Support of Defendants' Motion to Exclude Expert Testimony and Opinions of Hal Singer, George Bulman, and Elizabeth Mora)* (Attachments: # 1 Declaration of David Gringer in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20)(Miller, Britt) (Entered: 02/28/2025) |
| 02/28/2025 | 806 | SEALED REPLY by Cornell University, Georgetown University, Massachusetts Institute of Technology, The Trustees of the University of Pennsylvania, University of Notre Dame du Lac to MOTION by Defendant The Trustees of the University of Pennsylvania Defendants' Motion to Exclude Expert Testimony and Opinions of Hal Singer, George Bulman, and Elizabeth Mora<br><br>755 *(Amended Reply in Support of Defendants' Motion to Exclude Expert Testimony and Opinions of Hal Singer, George Bulman, and Elizabeth Mora)* (Attachments: # 1 Declaration of David Gringer in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20)(Miller, Britt) (Entered: 02/28/2025) |
| 04/03/2025 | 835 | MINUTE entry before the Honorable Matthew F. Kennelly: Docket entry 834 included a date error and is corrected to read as follows (change shown in **bold type**). The Court has reviewed the parties' proposals regarding the Daubert hearing on the motion to exclude opinions of plaintiffs' expert Dr. Singer. The purpose of the hearing is to determine whether, and the extent to which, Dr. Singer's challenged opinions meet the requirements of Daubert and Federal Rule of Evidence 702 and are therefore admissible. The hearing is not the equivalent of a trial on the merits or a mini-trial regarding the degree of persuasiveness of Dr. Singer's challenged opinions vis-a-vis the opinions of the defendants' experts. In addition, the parties should assume that the Court has read and studied the pertinent written materials that have been submitted, which of course include the defendants' examination of Dr. Singer during his deposition and their rebuttal experts' reports and related materials. The hearing will begin promptly at 12:45 PM on **4/14/2025** as previously ordered and will continue to approximately 4:45-5:00 PM. (a) Because plaintiffs bear the burden of establishing admissibility, they will go first and last in questioning Dr. Singer, and they will have the opportunity to recall Dr. Singer briefly after defendants' rebuttal expert testifies. (b) Each side is |

| | | |
|---|---|---|
| | | allocated 50 minutes of time for Dr. Singer's opening examination. Plaintiffs may divide their time as they wish between direct and redirect examination. (c) If defendants wish to call a rebuttal expert, they will go first and last in questioning that expert. Each side is allocated 25 minutes of time with the defendants' rebuttal expert. Defendants may divide this time as they wish between direct and redirect examination. (d) If plaintiffs wish to recall Dr. Singer for further testimony after the defendants' rebuttal expert has testified, the Court will allocate 10 minutes per side for that. (e) Each side is allocated no more than 15 minutes for argument at the conclusion of the testimony. (f) The Court reserves the right to reduce these time limits either collectively or individually before or during the hearing. (mk) (Entered: 04/03/2025) |
| 05/07/2025 | 854 | SEALED DOCUMENT by Defendants Cornell University, Georgetown University, Massachusetts Institute of Technology, The Trustees of the University of Pennsylvania, University of Notre Dame du Lac (Declaration of Daniel T. Fenske in Support of Motion for Summary Judgment and Exhibits 1-80) (Attachments: # 1 Exhibit 1, # 2 Exhibit 1.1, # 3 Exhibit 2, # 4 Exhibit 2.1, # 5 Exhibit 3, # 6 Exhibit 3.1, # 7 Exhibit 4, # 8 Exhibit 5, # 9 Exhibit 6, # 10 Exhibit 7, # 11 Exhibit 8, # 12 Exhibit 9, # 13 Exhibit 10, # 14 Exhibit 11, # 15 Exhibit 12, # 16 Exhibit 13, # 17 Exhibit 14, # 18 Exhibit 15, # 19 Exhibit 16, # 20 Exhibit 17, # 21 Exhibit 18, # 22 Exhibit 19, # 23 Exhibit 20, # 24 Exhibit 21, # 25 Exhibit 22, # 26 Exhibit 23, # 27 Exhibit 24, # 28 Exhibit 25, # 29 Exhibit 26, # 30 Exhibit 27, # 31 Exhibit 28, # 32 Exhibit 29, # 33 Exhibit 30, # 34 Exhibit 31, # 35 Exhibit 32, # 36 Exhibit 33, # 37 Exhibit 34, # 38 Exhibit 35, # 39 Exhibit 36, # 40 Exhibit 37, # 41 Exhibit 38, # 42 Exhibit 39, # 43 Exhibit 40, # 44 Exhibit 41, # 45 Exhibit 42, # 46 Exhibit 43, # 47 Exhibit 44, # 48 Exhibit 45, # 49 Exhibit 46, # 50 Exhibit 47, # 51 Exhibit 48, # 52 Exhibit 49, # 53 Exhibit 50, # 54 Exhibit 51, # 55 Exhibit 52, # 56 Exhibit 53, # 57 Exhibit 54, # 58 Exhibit 55, # 59 Exhibit 56, # 60 Exhibit 57, # 61 Exhibit 58, # 62 Exhibit 59, # 63 Exhibit 60, # 64 Exhibit 61, # 65 Exhibit 62, # 66 Exhibit 63, # 67 Exhibit 64, # 68 Exhibit 65, # 69 Exhibit 66, # 70 Exhibit 67, # 71 Exhibit 68, # 72 Exhibit 69, # 73 Exhibit 70, # 74 Exhibit 71, # 75 Exhibit 72, # 76 Exhibit 73, # 77 Exhibit 74, # 78 Exhibit 75, # 79 Exhibit 76, # 80 Exhibit 77, # 81 Exhibit 78, # 82 Exhibit 79, # 83 Exhibit 80)(Fenske, Daniel) (Entered: 05/07/2025) |
| 05/07/2025 | 864 | EXHIBIT by Defendants Cornell University, Georgetown University, Massachusetts Institute of Technology, The Trustees of the University of Pennsylvania, University of Notre Dame du Lac *(Redacted Exhibits 81-160 to Declaration of Daniel T. Fenske)* regarding declaration,,,,,, 863 (Attachments: # 1 Exhibit 82, # 2 Exhibit 83, # 3 Exhibit 84, # 4 Exhibit 85, # 5 Exhibit 86, # 6 Exhibit 87, # 7 Exhibit 88, # 8 Exhibit 89, # 9 Exhibit 90, # 10 Exhibit 91, # 11 Exhibit 92, # 12 Exhibit 93, # |

| | | |
|---|---|---|
| | | 13 Exhibit 94, # 14 Exhibit 95, # 15 Exhibit 96, # 16 Exhibit 97, # 17 Exhibit 98, # 18 Exhibit 99, # 19 Exhibit 100, # 20 Exhibit 101, # 21 Exhibit 102, # 22 Exhibit 103, # 23 Exhibit 104, # 24 Exhibit 105, # 25 Exhibit 106, # 26 Exhibit 107, # 27 Exhibit 108, # 28 Exhibit 109, # 29 Exhibit 110, # 30 Exhibit 111, # 31 Exhibit 112, # 32 Exhibit 113, # 33 Exhibit 114, # 34 Exhibit 115, # 35 Exhibit 116, # 36 Exhibit 117, # 37 Exhibit 118, # 38 Exhibit 119, # 39 Exhibit 120, # 40 Exhibit 121, # 41 Exhibit 122, # 42 Exhibit 123, # 43 Exhibit 124, # 44 Exhibit 125, # 45 Exhibit 126, # 46 Exhibit 127, # 47 Exhibit 128, # 48 Exhibit 129, # 49 Exhibit 130, # 50 Exhibit 131, # 51 Exhibit 132, # 52 Exhibit 133, # 53 Exhibit 134, # 54 Exhibit 135, # 55 Exhibit 136, # 56 Exhibit 137, # 57 Exhibit 138, # 58 Exhibit 139, # 59 Exhibit 140, # 60 Exhibit 141, # 61 Exhibit 142, # 62 Exhibit 143, # 63 Exhibit 144, # 64 Exhibit 145, # 65 Exhibit 146, # 66 Exhibit 147, # 67 Exhibit 148, # 68 Exhibit 149, # 69 Exhibit 150, # 70 Exhibit 151, # 71 Exhibit 152, # 72 Exhibit 153, # 73 Exhibit 154, # 74 Exhibit 155, # 75 Exhibit 156, # 76 Exhibit 157, # 77 Exhibit 158, # 78 Exhibit 159, # 79 Exhibit 160)(Fenske, Daniel) (Entered: 05/08/2025) |
| 05/08/2025 | 865 | EXHIBIT by Defendants Cornell University, Georgetown University, Massachusetts Institute of Technology, The Trustees of the University of Pennsylvania, University of Notre Dame du Lac *(Redacted Exhibits 161-240 to Declaration of Daniel T. Fenske)* regarding declaration,,,,,, 863 (Attachments: # 1 Exhibit 162, # 2 Exhibit 163, # 3 Exhibit 164, # 4 Exhibit 165, # 5 Exhibit 166, # 6 Exhibit 167, # 7 Exhibit 168, # 8 Exhibit 169, # 9 Exhibit 170, # 10 Exhibit 171, # 11 Exhibit 172, # 12 Exhibit 173, # 13 Exhibit 174, # 14 Exhibit 175, # 15 Exhibit 176, # 16 Exhibit 177, # 17 Exhibit 178, # 18 Exhibit 179, # 19 Exhibit 180, # 20 Exhibit 181, # 21 Exhibit 182, # 22 Exhibit 183, # 23 Exhibit 184, # 24 Exhibit 185, # 25 Exhibit 186, # 26 Exhibit 187, # 27 Exhibit 188, # 28 Exhibit 189, # 29 Exhibit 190, # 30 Exhibit 191, # 31 Exhibit 192, # 32 Exhibit 193, # 33 Exhibit 194, # 34 Exhibit 195, # 35 Exhibit 196, # 36 Exhibit 197, # 37 Exhibit 198, # 38 Exhibit 199, # 39 Exhibit 200, # 40 Exhibit 201, # 41 Exhibit 202, # 42 Exhibit 203, # 43 Exhibit 204, # 44 Exhibit 205, # 45 Exhibit 206, # 46 Exhibit 207, # 47 Exhibit 208, # 48 Exhibit 209, # 49 Exhibit 210, # 50 Exhibit 211, # 51 Exhibit 212, # 52 Exhibit 213, # 53 Exhibit 214, # 54 Exhibit 215, # 55 Exhibit 216, # 56 Exhibit 217, # 57 Exhibit 218, # 58 Exhibit 219, # 59 Exhibit 220, # 60 Exhibit 221, # 61 Exhibit 222, # 62 Exhibit 223, # 63 Exhibit 224, # 64 Exhibit 225, # 65 Exhibit 226, # 66 Exhibit 227, # 67 Exhibit 228, # 68 Exhibit 229, # 69 Exhibit 230, # 70 Exhibit 231, # 71 Exhibit 232, # 72 Exhibit 233, # 73 Exhibit 234, # 74 Exhibit 235, # 75 Exhibit 236, # 76 Exhibit 237, # 77 Exhibit 238, # 78 Exhibit 239, # 79 Exhibit 240)(Fenske, Daniel) (Entered: 05/08/2025) |
| 05/29/2025 | 874 | NOTICE OF FILING PUBLIC VERSIONS OF DOCUMENTS PREVIOUSLY FILED UNDER SEAL by Andrew Corzo, Sia Henry, |

| | | |
|---|---|---|
| | | Alexander Leo-Guerra, Michael Maerlander, Brandon Piyevsky, Benjamin Shumate, Brittany Tatiana Weaver, Cameron Williams (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26)(Normand, Edward) (Entered: 05/29/2025) |
| 06/27/2025 | 889 | DECLARATION of David Gringer regarding Response 887 , response in opposition to motion, 886 , Rule 56 statement 888 (Attachments: # 1 Exhibit 1, # 2 Exhibit 1.1, # 3 Exhibit 1.2, # 4 Exhibit 2, # 5 Exhibit 2.1, # 6 Exhibit 3, # 7 Exhibit 4, # 8 Exhibit 5, # 9 Exhibit 6, # 10 Exhibit 7, # 11 Exhibit 8, # 12 Exhibit 9, # 13 Exhibit 10, # 14 Exhibit 11, # 15 Exhibit 12, # 16 Exhibit 13, # 17 Exhibit 14, # 18 Exhibit 15, # 19 Exhibit 16, # 20 Exhibit 17, # 21 Exhibit 18, # 22 Exhibit 19, # 23 Exhibit 20, # 24 Exhibit 21, # 25 Exhibit 22, # 26 Exhibit 23, # 27 Exhibit 24, # 28 Exhibit 25, # 29 Exhibit 26)(Gringer, David) (Entered: 06/27/2025) |
| 08/12/2025 | 945 | PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY by Andrew Corzo, Sia Henry, Alexander Leo-Guerra, Michael Maerlander, Brandon Piyevsky, Benjamin Shumate, Brittany Tatiana Weaver, Cameron Williams (Attachments: # 1 Exhibit A)(Normand, Edward) (Entered: 08/12/2025) |
| 08/25/2025 | 949 | RESPONSE by Defendant The Trustees of the University of Pennsylvania to other, 945 *Notice of Supplemental Authority* (Gringer, David) (Entered: 08/25/2025) |
| 09/12/2025 | 1025 | NOTICE by Andrew Corzo, Sia Henry, Alexander Leo-Guerra, Michael Maerlander, Brandon Piyevsky, Benjamin Shumate, Brittany Tatiana Weaver, Cameron Williams re Response 896 *OF FILING CORRECTED AND PUBLIC COPIES OF DOCUMENTS* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 17, # 4 Exhibit 40, # 5 Exhibit 46, # 6 Exhibit 107, # 7 Exhibit 117, # 8 Exhibit 122, # 9 Exhibit 129, # 10 Exhibit 203, # 11 Exhibit 204, # 12 Exhibit 206, # 13 Exhibit 237, # 14 Exhibit 271, # 15 Exhibit 275, # 16 Exhibit 282, # 17 Exhibit 314, # 18 Exhibit 367, # 19 Exhibit 369, # 20 Exhibit 377)(Normand, Edward) (Entered: 09/12/2025) |
| 09/29/2025 | 1160 | MEMORANDUM OPINION AND ORDER signed by the Honorable Matthew F. Kennelly on 9/29/2025: For the reasons stated in the accompanying Memorandum Opinion and Order, the Court denies plaintiffs' motions to exclude Dr. Long and Mr. Ammon [dkt. nos. 750, |

| | | |
|---|---|---|
| | | 751] and also denies defendants' motion to exclude Dr. Singer, Dr. Bulman, and Ms. Mora [dkt. 755]. (mk) (Entered: 09/29/2025) |
| 01/12/2026 | 1210 | MEMORANDUM OPINION AND ORDER signed by the Honorable Matthew F. Kennelly on 1/12/2026: For the reasons stated above, the Court denies the universities' motion for summary judgment in its entirety [dkt. 848] and the students' motion for partial summary judgment on UPenn's withdrawal defense [dkt. 850]. (mk) (Entered: 01/12/2026) |
| 03/31/2026 | 1241 | MEMORANDUM OPINION AND ORDER signed by the Honorable Matthew F. Kennelly on 3/31/2026: For the reasons stated in the accompanying Memorandum Opinion and Order, the Court grants plaintiffs' motion to amend their motion for class certification and withdraws from consideration as class counsel the attorneys associated with Gilbert Litigators and Counselors [dkt. 1236, 1237]. The Court enters and continues plaintiffs' motion for class certification [dkt. 757] and gives plaintiffs 21 days, to April 21, 2026, to file a motion proposing new lead class counsel. The case is set for an in-person status hearing on April 28, 2026 at 9:30 a.m. (mk) (Entered: 03/31/2026) |
| 05/15/2026 | 1261 | TRANSCRIPT OF PROCEEDINGS held on March 20, 2025 before the Honorable Matthew F. Kennelly. Order Number: 51430, 51433, 51434, 51440. Court Reporter Contact Information: Carolyn Cox, carolyn_cox@ilnd.uscourts.gov.<br><br>IMPORTANT: The transcript may be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through the Court Reporter/Transcriber or PACER. For further information on the redaction process, see the Court's web site at www.ilnd.uscourts.gov under Quick Links select Policy Regarding the Availability of Transcripts of Court Proceedings.<br><br>Redaction Request due 6/5/2026. Redacted Transcript Deadline set for 6/15/2026. Release of Transcript Restriction set for 8/13/2026. (Cox, Carolyn) (Entered: 05/15/2026) |
| 05/15/2026 | 1263 | TRANSCRIPT OF PROCEEDINGS held on April 14, 2025 before the Honorable Matthew F. Kennelly. Order Number: 48951, 48948, 48945, 48935, 51648. Court Reporter Contact Information: Carolyn Cox, carolyn_cox@ilnd.uscourts.gov.<br><br>IMPORTANT: The transcript may be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may |

| | | |
|---|---|---|
| | | be obtained through the Court Reporter/Transcriber or PACER. For further information on the redaction process, see the Court's web site at www.ilnd.uscourts.gov under Quick Links select Policy Regarding the Availability of Transcripts of Court Proceedings.<br><br>Redaction Request due 6/5/2026. Redacted Transcript Deadline set for 6/15/2026. Release of Transcript Restriction set for 8/13/2026. (Cox, Carolyn) (Entered: 05/15/2026) |
| 06/01/2026 | 1275 | ORDER ON MOTION FOR CLASS CERTIFICATION, signed by the Honorable Matthew F. Kennelly on 6/1/2026: For the reasons stated in the Court's March 31, 2026 Memorandum Opinion and Order and in the present Order, the Court grants plaintiffs' motion for class certification. The Court certifies a class consisting of all persons who have during the "class period" (a) enrolled in one or more of defendants' full-time undergraduate programs, (b) received at least some need-based financial aid from one or more defendants, and (c) whose tuition, fees, room, or board to attend one or more of defendants' full-time undergraduate programs was not fully covered by the combination of any types of grant or merit aid in any undergraduate year. (The term "class period" is defined with particularity in various submissions, see, e.g., dkt. 755-12 par. 9 (Hal Singer amended report), and should of course be included in the class notice.) The remaining named plaintiffs are appointed as class representatives and should be identified in the class notice. Steven Molo and MoloLamken LLC are appointed as lead counsel for the class, and Freedman Norman Friedland LLP and Berger Montague PC are appointed as co-counsel for the class. The parties are directed to confer regarding an appropriate form of notice and are to submit an agreed notice, or competing proposals if they cannot agree in good faith, by June 10, 2026. A telephonic status hearing is set for June 12, 2026 at 9:15 a.m., using call-in number 650-479-3207, access code 2305-915-8729. (mk) (Entered: 06/01/2026) |
| 06/12/2026 | 1282 | ORDER Granting Plaintiff's Motion to Provide Agreed Forms of Notice to the Certified Litigation Class: Signed by the Honorable Matthew F. Kennelly on 6/12/2026. Mailed notice. (mma, ) (Entered: 06/12/2026) |
| 09/30/2026 | 1345 | SEALED TRANSCRIPT OF PROCEEDINGS held on July 28, 2025 before the Honorable Matthew F. Kennelly. UNDER SEAL MOTION. Court Reporter Contact Information: Carolyn Cox, carolyn_cox@ilnd.uscourts.gov. (Cox, Carolyn) (Entered: 09/30/2026) |

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SIA HENRY, MICHAEL MAERLANDER, BRANDON PIYEVSKY, KARA SAFFRIN, and BRITTANY TATIANA WEAVER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,<br><br>Defendants. | Case No.:<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiffs, Sia Henry, Michael Maerlander, Brandon Piyevsky, Kara Saffrin, and Brittany Tatiana Weaver, individually and on behalf of all others similarly situated, bring this class action under Section 1 of the Sherman Act against Brown University ("Brown"), California Institute of Technology ("CalTech"), University of Chicago ("Chicago"), The Trustees of Columbia University in the City of New York ("Columbia"), Cornell University ("Cornell"), Trustees of Dartmouth College ("Dartmouth"), Duke University ("Duke"), Emory University ("Emory"), Georgetown University ("Georgetown"), Massachusetts Institute of Technology ("MIT"), Northwestern University ("Northwestern"), University of Notre Dame du Lac ("Notre Dame"), The Trustees of the University of Pennsylvania ("Penn"), William Marsh Rice University ("Rice"), Vanderbilt University ("Vanderbilt"), and Yale University ("Yale") (collectively, "Defendants").

**I.**

**INTRODUCTION**

1. Defendants are private, national universities that have long been in the top 25 of the *U.S. News & World Report* rankings for such schools. These elite institutions occupy a place of privilege and importance in American society. And yet these same Defendants, by their own admission, have participated in a price-fixing cartel that is designed to reduce or eliminate financial aid as a locus of competition, and that in fact has artificially inflated the net price of attendance for students receiving financial aid. Defendants participate in the cartel claiming the protection of Section 568 of the Improving America's Schools Act of 1994 (the "568 Exemption"). This exemption from the antitrust laws, which otherwise prohibit conspiracies among competitors, applies to two or more institutions of higher education at which "*all* students admitted are admitted on a need-blind basis." Section 568 defines "on a need-blind basis" to mean "without regard to the financial circumstances of the student involved or the student's family." 15 U.S.C. § 1 Note.

2. Defendants have not been entitled to the 568 Exemption. Under a true need-blind admissions system, all students would be admitted without regard to the financial circumstances of the student or student's family. Far from following this practice, at least nine Defendants for many years have favored wealthy applicants in the admissions process. These nine Defendants have thus made admissions decisions *with regard to* the financial circumstances of students and their families, thereby disfavoring students who need financial aid. All Defendants, in turn, have conspired to reduce the amount of financial aid they provide to admitted students. This conspiracy, which has existed (with slightly varying membership) for many years, thus falls outside the exemption from the antitrust laws.

3. Defendants are members of the so-called "568 Presidents Group," in which the members have agreed on "a set of common standards for determining the family's ability to pay for college," which the members describe as the "Consensus Approach." Based on the Consensus Approach, in approximately 2003 the 568 Presidents Group (the "568 Cartel") devised the Consensus Methodology, which is a common formula for determining an applicant's ability to pay. Under the Consensus Methodology, an applicant's ability to pay is a substantial determinant of the net price, which is the institution's gross tuition plus fees for room and board, less institutional grant aid, charged to the applicant for attendance.

4. In collectively adopting this methodology, and regularly meeting to implement it jointly, the 568 Cartel has explicitly aimed to reduce or eliminate price competition among its members. As a result of this conspiracy, the net price of attendance for financial-aid recipients at Defendants' schools has been artificially inflated. In short, due to the conduct challenged herein, over almost two decades, Defendants have overcharged over 170,000 financial-aid recipients by at least hundreds of millions of dollars, in violation of Section 1 of the Sherman Act.

5. Defendants' longstanding conspiracy would be immune from the antitrust laws only if they have all been complying with the 568 Exemption. In fact, however, at least nine Defendants (Columbia, Dartmouth, Duke, Georgetown, MIT, Northwestern, Notre Dame, Penn, and Vanderbilt) have been members of the 568 Cartel and have not qualified for the 568 Exemption throughout the Class Periods (defined below).

6. Instead, these nine Defendants have considered the financial circumstances of students and their families in admissions—for example, by maintaining admissions systems that favor the children of wealthy past or potential future donors. At least some of these nine Defendants also take into account applicants' financial circumstances through a largely secretive practice known as "enrollment management." And at least some of these nine Defendants have also considered applicants' need for financial aid by preferencing students who will not need financial aid in deciding on waitlist admissions.

7. The other seven Defendants (Brown, CalTech, Chicago, Cornell, Emory, Rice, and Yale) have been members of the 568 Cartel during at least parts of the last two decades. These seven Defendants may or may not have adhered to need-blind admissions policies, but they nonetheless conspired with the other Defendants. The 568 Exemption thus does not apply to them either. In addition, although such knowledge is unnecessary to show their liability, these seven Defendants knew or should have known that the other nine Defendants were not following need-blind admissions policies.

8. In critical respects, elite, private universities like Defendants are gatekeepers to the American Dream. Defendants' misconduct is therefore particularly egregious because it has narrowed a critical pathway to upward mobility that admission to their institutions represents. The burden of the 568 Cartel's overcharges falls in particular on low- and middle-income families

struggling to afford the cost of a university education and to achieve success for their children. In addition, unlike prior admissions scandals, such as Varsity Blues,[1] the 568 Cartel's systematic suppression of financial aid is the official policy of its participants.

9. The 568 Cartel has thus caused substantial injury damages to Plaintiffs and the other members of the proposed Class (defined below). Plaintiffs bring this lawsuit to end Defendants' conspiratorial conduct and to prevent future students from suffering the injury the ongoing conspiracy has inflicted. In addition, Plaintiffs do so under circumstances in which a reasonable person, like each of the Plaintiffs, would have been unaware of the harm resulting from Defendants' use of the Consensus Methodology.

10. Plaintiffs also seek to compensate the proposed Class of all U.S. citizens or permanent residents, and purchasers of tuition, room, or board on their behalf, who have (a) enrolled in one or more of the Defendants' full-time undergraduate programs, (b) received need-based financial aid from one or more Defendants, (c) paid to one of more Defendants tuition, room, or board not fully covered by such financial aid, and (d) first enrolled in one of the Defendants' full-time undergraduate programs during the relevant times (defined below) since 2003.

11. Parents, legal guardians, and other family members commonly pay or help to pay the cost of a student's tuition, room, and board. The proposed Class therefore includes both students and those who pay or commit to pay on behalf of students.

---

[1] "Varsity Blues" is law enforcement's code name for the investigation and prosecution of the college admissions bribery scandal, which involved allegations that certain universities gave admissions preference to the children of wealthy parents in exchange for bribes.

## II.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331, 1332(d)(2), and 1337.

13. This Court has personal jurisdiction over each Defendant on multiple bases, including that each Defendant has (1) transacted business in the United States and in this District, including by recruiting, and advertising for, students residing in this District; (2) transacted business with Class Members throughout the United States, including those residing in this District; and (3) committed substantial acts in furtherance of an unlawful scheme in the United States, including in this District. Each Defendant has recruited, accepted, enrolled, and charged artificially high net prices of attendance to, and thus injured, individuals residing within this District. In addition, Defendants have held at least one meeting of the 568 Cartel in Rosemont, Illinois, which is within this District.

14. Venue is proper in this District under 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b), (c), and (d), because each Defendant transacted business, was found, had agents, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

15. During the Class Periods, Defendants' conduct has had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States and in this District. Defendants' conduct affects admitted students around the country, including through transactions with parties residing in different states. Defendants do business across state lines.

## III.

## THE PARTIES

### A. Plaintiffs

16. Plaintiff Sia Henry attended Duke as a full-time undergraduate student from the fall of 2007 until she graduated in the spring of 2011. For each of these four years, she paid to Duke some of the costs of tuition, room, and board. She received need-based financial aid from Duke in at least two of her four years of attendance. Since graduating from Duke, and subsequently from Harvard Law School, Ms. Henry has dedicated her career to advocacy on behalf of prisoners, most recently as a Senior Program Specialist at Impact Justice. She resides in Atlanta, Georgia.

17. Plaintiff Michael Maerlander attended Vanderbilt as a full-time undergraduate student from the fall of 2015 until he graduated in the spring of 2019. For each of these four years, he received need-based financial aid from Vanderbilt and paid for some of the costs of tuition, room, and board. He resides in New York, New York.

18. Plaintiff Brandon Piyevsky attended Northwestern as a full-time undergraduate student from the fall of 2013 until he graduated in the spring of 2017. For each of these four years, he received need-based financial aid from Northwestern and paid for some of the costs of tuition, room, and board. He resides in Toledo, Ohio.

19. Plaintiff Kara Saffrin attended Northwestern as a full-time undergraduate student from the fall of 2014 until she graduated in the spring of 2018. For each of these four years, she received need-based financial aid from Northwestern and paid for some of the costs of tuition, room, and board. She resides in Chicago, Illinois.

20. Plaintiff Brittany Tatiana Weaver attended Vanderbilt as a full-time undergraduate student from 2003 until she graduated in 2007. For each of these four years, she received need-

based financial aid from Vanderbilt and paid for some of the costs of tuition, room, and board. She resides in Farmington Hills, Michigan.

**B. Defendants**

21. Defendants are private, national universities that have been members of the 568 Cartel (most since 2003, and some not continuously) sand have been continuously ranked in the top 25 of the *U.S. News & World Report* rankings for national universities since 2003.

22. Each Defendant acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein. All Defendants are jointly and severally liable for the acts of all members of the 568 Cartel.

23. At least nine Defendants were continuously members of the 568 Cartel from 1998, implemented the Consensus Methodology from 2003 (or 2004, in the case of Dartmouth) through at least 2019, and practiced admissions policies that were not need-blind and thus were not covered by the 568 Exemption.

24. The remaining Defendants were official members of the 568 Cartel for different time periods and may or may not have followed a need-blind admissions policy, but nonetheless conspired with the other Defendants (and knew or should have known that the other Defendants were not following need-blind admissions policies).

**Brown**

25. Defendant Brown University is a private, non-profit institution with its principal place of business in Providence, Rhode Island.

26. Brown was established by a charter, approved by the Rhode Island legislature, as "College of Rhode Island" in 1764. The school was the third college in New England and seventh in America. The school's name was changed to Brown in 1804. Brown is a member of the Ivy League, a consortium of eight elite universities.

27. Brown's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $204,200; 19% of undergraduates come from the top 1% of the country's income distribution, and 70% come from the top 20%; and only 4.1% come from the bottom 20% of the income distribution.[2]

28. Brown has an endowment of approximately $6.9 billion.[3]

**California Institute of Technology**

29. Defendant California Institute of Technology is a private, non-profit institution with its principal place of business in Pasadena, California.

30. CalTech is one of the nation's leading research universities.

31. CalTech's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $146,300; 3% of undergraduates come from the top 1% of the country's income distribution, and 69% come from the top 20%; and only 2.9% come from the bottom 20% of the income distribution.[4]

32. CalTech has an endowment of approximately $3 billion.

**Chicago**

33. Defendant University of Chicago is a private, non-profit institution with its principal place of business in Chicago, Illinois.

---

[2] *Economic Diversity and Student Outcomes at Brown University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/brown-university.

[3] Michael Nitezel, *Elite University Endowments Soar as Higher Ed Divide Grows*, FORBES (Oct. 15, 2021), https://www.forbes.com/sites/michaeltnietzel/2021/10/15/elite-university-endowments-soar-to-record-highs/?sh=724aa8932d5f.

[4] *Economic Diversity and Student Outcomes at the University of California Institute of Technology*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/california-institute-of-technology.

34. Chicago was founded in 1890 by the American Baptist Education Society and oil magnate John D. Rockefeller, who later described the school as "the best investment I ever made."

35. Chicago's undergraduate study body is generally wealthy and privileged. The median family income of undergraduates is $134,500; 10% of undergraduates come from the top 1% of the country's income distribution, and 58% come from the top 20%; and only 5.5% come from the bottom 20% of the income distribution.[5]

36. Chicago has an endowment of almost $12 billion.

**Columbia**

37. Defendant Trustees of Columbia University in the City of New York is a private, non-profit institution with its principal place of business in New York, New York.

38. Columbia was established as King's College by royal charter of King George II of Great Britain in 1754. It was renamed Columbia College in 1784. In 1896, the campus was moved to its current location in Morningside Heights and renamed Columbia University. According to its website, "Columbia University is one of the world's most important centers of research." Columbia is a member of the Ivy League.

39. Columbia's undergraduate student body, with the exception of its School of General Studies, discussed below, is generally wealthy and privileged. The median family income of undergraduates is $150,900; 13% of undergraduates come from the top 1% of the country's income distribution, and 62% come from the top 20%; and only 5.1% come from the bottom 20% of the income distribution.[6]

---

[5] *Economic Diversity and Student Outcomes at the University of Chicago*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/university-of-chicago.

[6] *Economic Diversity and Student Outcomes at Columbia University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/columbia-university.

40. Columbia has an endowment of approximately $14 billion.

**Cornell**

41. Defendant Cornell is a private, non-profit institution with its principal place of business in Ithaca, New York.

42. Cornell was founded in 1865, as a private though land-grant institution of New York State. According to its website, Cornell has been described as "the first *truly* American university because of its founders' revolutionary egalitarian and practical vision of higher education." (Emphasis in original.) Cornell is a member of the Ivy League.

43. Cornell's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $151,600; 10% of undergraduates come from the top 1% of the country's income distribution, and 64% come from the top 20%; and only 3.8% come from the bottom 20% of the income distribution.[7]

44. Cornell's endowment is approximately $10 billion.

**Dartmouth**

45. Defendant Trustees of Dartmouth College is a private, non-profit institution with its principal place of business in Hanover, New Hampshire.

46. According to Dartmouth's website: "Founded in 1769, Dartmouth is a member of the Ivy League and consistently ranks among the world's greatest academic institutions." Dartmouth's website also claims that "Dartmouth College educates the most promising students."

47. Dartmouth's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $200,400; 21% of undergraduates come from the top

[7] *Economic Diversity and Student Outcomes at Cornell University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/cornell-university.

1% of the country's income distribution, and 69% come from the top 20%; and only 2.6% come from the bottom 20% of the income distribution.[8]

48. Dartmouth has an endowment of approximately $8.5 billion.

**Duke**

49. Defendant Duke University is a private, non-profit institution with its principal place of business in Durham, North Carolina.

50. Duke's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $186,700; 19% of undergraduates come from the top 1% of the country's income distribution, and 69% come from the top 20%; and only 3.9% come from the bottom 20% of the income distribution.[9]

51. Duke has an endowment of approximately $12.7 billion.

**Emory**

52. Defendant Emory University is a private, non-profit institution with its principal place of business in Atlanta, Georgia.

53. Emory was established by charter of the Georgia legislature in 1836.

54. Emory's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $139,800; 15% of undergraduates come from the top 1% of the country's income distribution, and 58% come from the top 20%; and only 6% come from the bottom 20% of the income distribution.[10]

---

[8] *Economic Diversity and Student Outcomes at Dartmouth College*, N.Y. TIMES https://www.nytimes.com/interactive/projects/college-mobility/dartmouth-college.

[9] *Economic Diversity and Student Outcomes at Duke University* N.Y. TIMES https://www.nytimes.com/interactive/projects/college-mobility/duke-university.

[10] *Economic Diversity and Student Outcomes at Emory University* N.Y. TIMES https://www.nytimes.com/interactive/projects/college-mobility/emory-university.

55. Emory has an endowment of approximately $9 billion.

**Georgetown**

56. Defendant Georgetown University is a private, non-profit institution with its principal place of business in Washington, District of Columbia.

57. According to its website: "Georgetown University is the oldest Catholic and Jesuit institution of higher learning in the United States."

58. Georgetown's undergraduate student body is generally wealthy and privileged. The median family income of undergraduate students is $229,100; 21% of undergraduates come from the top 1% of the country's income distribution, and 74% come from the top 20%; and only 3.1% come from the bottom 20% of the income distribution.[11]

59. Georgetown has an endowment of approximately $2.6 billion.

**Massachusetts Institute of Technology**

60. Defendant Massachusetts Institute of Technology is a private, non-profit institution with its principal place of business in Cambridge, Massachusetts.

61. MIT is regularly ranked in the top five in international rankings of the world's best research universities.

62. MIT's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $137,400; 5.7% of undergraduates come from the top 1% of the income distribution, and 61% come from the top 20%; and only 6.2% come from the bottom 20% of the income distribution.[12]

---

[11] *Economic Diversity and Students Outcomes at Georgetown University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/georgetown-university.

[12] *Economic Diversity and Student Outcomes at Massachusetts Institute of Technology*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/massachusetts-institute-of-technology.

63. MIT has an endowment of approximately $27.4 billion.

**Northwestern**

64. Defendant Northwestern University is a private, non-profit institution with its principal place of business in Evanston, Illinois. Northwestern was founded in 1853.

65. Northwestern's undergraduate student body is generally wealthy and privileged. The median family income of Northwestern's undergraduates is $171,200; 14% of undergraduates come from the top 1% of the income distribution, and 66% come from the top 20%; and only 3.7% come from the bottom 20% of the income distribution.[13]

66. Northwestern has an endowment of approximately $11 billion.

**University of Notre Dame du Lac**

67. Defendant University of Notre Dame du Lac is a private, non-profit institution with its principal place of business in South Bend, Indiana.

68. Notre Dame was founded in 1842. According to its website, Notre Dame is "[o]ne of America's leading undergraduate teaching institutions."

69. Notre Dame's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $191,400; 15% of undergraduates come from the top 1% of the income distribution, and 75% come from the top 20%; and only 1.6% come from the bottom 20% of the income distribution.[14]

70. Notre Dame has an endowment of approximately $12 billion.

---

[13] *Economic Diversity and Student Outcomes at Northwestern University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/northwestern-university.

[14] *Economic Diversity and Student Outcomes at Notre Dame*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/notre-dame.

**University of Pennsylvania**

71. Defendant Trustees of the University of Pennsylvania is a private, non-profit institution with its principal place of business in Philadelphia, Pennsylvania.

72. Penn was founded in 1740 by Benjamin Franklin. As of 2014, Penn had 25 undergraduate alumni that were billionaires, more than any other university in the world.[15] Penn is a member of the Ivy League.

73. Penn's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $195,500; 19% of undergraduates come from the top 1% of the income distribution, and 71% come from the top 20%; and only 3.3% come from the bottom 20% of the income distribution.[16]

74. Penn has an endowment of approximately $20.5 billion.

**Rice**

75. Defendant William Marsh Rice University is a private, non-profit institution with its principal place of business in Houston, Texas.

76. Rice was founded in 1891 by Houston businessman William Marsh Rice.

77. Rice's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $160,800; 9.8% of undergraduates come from the top 1% of the income distribution, and 64% come from the top 20%; and only 4.9% come from the bottom 20% of the income distribution.[17]

---

[15] Emily Jane Fox, *Top 20 Colleges with Most Billionaire Alumni*, CNN (Sept. 17, 2014), https://money.cnn.com/2014/09/16/luxury/top-colleges-with-billionaire-undergraduates/.

[16] *Economic Diversity and Student Outcomes at the University of Pennsylvania*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/university-of-pennsylvania.

[17] *Economic Diversity and Student Outcomes at Rice University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/rice-university.

78. Rice's total endowment is approximately $8 billion.

**Vanderbilt**

79. Defendant Vanderbilt University is a private, non-profit institution with its principal place of business in Nashville, Tennessee.

80. Vanderbilt was founded in 1873 and named in honor of Cornelius Vanderbilt, who donated a founding gift. According to Vanderbilt's website, "the university's prominent alumni base includes Nobel Prize winners, members of Congress, governors, ambassadors, judges, admirals, CEOs, university presidents, physicians and attorneys, as well as professional sports figures playing in the NFL, NBA, Major League Baseball, the PGA and LPGA."

81. Vanderbilt's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $204,500; 23% of undergraduates come from the top 1% of the income distribution, and 70% come from the top 20%; and only 1.9% come from the bottom 20% of the income distribution.[18]

82. Vanderbilt has an endowment of approximately $10 billion.

**Yale**

83. Defendant Yale University is a private, non-profit institution with its principal place of business in New Haven, Connecticut.

84. Originally chartered by the legislature of Connecticut as the Collegiate School in 1701 in multiple locations, the school was moved to New Haven in 1716 and renamed Yale in 1718, after a wealthy British merchant and philanthropist, Elihu Yale. It is the third-oldest university in the United States. Yale is a member of the Ivy League.

[18] *Economic Diversity and Student Outcomes at Vanderbilt University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/vanderbilt-university.

85. Yale's undergraduate study body is generally wealthy and privileged. The median family income of undergraduates is $192,600; 19% of undergraduates come from the top 1% of the income distribution, and 69% come from the top 20%; and only 2.1% come from the bottom 20% of the income distribution.[19]

86. Yale's endowment of approximately $42 billion is the second highest of any university in the United States.

## IV.

## MEMBERSHIP IN THE 568 CARTEL

87. The 568 Cartel was formed in 1998. Columbia, Cornell, Duke, Georgetown, MIT, Northwestern, and Notre Dame have been members of the 568 Cartel since 1998 and first implemented the Consensus Methodology in 2003.

88. Dartmouth joined the 568 Cartel in 1998 and implemented the Consensus Methodology in 2004.

89. Penn and Vanderbilt joined the 568 Cartel in 1998, implemented the Consensus Methodology in 2003, and evidently withdrew from the Cartel in 2020.

90. Yale joined the 568 Cartel in 1998, implemented the Consensus Methodology in 2003, and evidently withdrew from the Cartel at the end of 2007. Yale has been a member of the 568 Cartel from 2018 to the present.

91. Rice joined the 568 Cartel in 1998, implemented the Consensus Methodology in 2003, and evidently withdrew from the Cartel in 2009. Rice has been a member of the 568 Cartel from 2017 to the present.

---

[19] *Economic Diversity and Student Outcomes at Yale University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/yale-university.

92. Brown joined the 568 Cartel in 1998, implemented the Consensus Methodology in 2004, and evidently withdrew from the Cartel in 2012.

93. Emory joined the 568 Cartel in 1998, implemented the Consensus Methodology in 2003, and evidently withdrew from the Cartel in 2012.

94. Chicago joined the 568 Cartel in 1998, implemented the Consensus Methodology in 2003, and evidently withdrew from the Cartel in 2014.

95. CalTech joined the 568 Cartel in 2019 and implemented the Consensus Methodology the same year.

## V.

## DEFENDANTS' VIOLATION OF THE FEDERAL ANTITRUST LAWS

### A. Defendants Have Colluded on Their Financial-Aid Practices

96. Defendants are competitors in enrolling highly selective undergraduate student bodies and providing an undergraduate education. People throughout the United States (and the world) apply for admission to Defendants' undergraduate programs.

97. Each Defendant annually sends out thousands of solicitations and mailings and receives thousands of admission applications that cross state lines, including thousands of applications from Class Members. Out-of-state students, including thousands of Class Members, make up a substantial percentage of each Defendant's undergraduate population.

98. Each Defendant annually receives millions of dollars that flow across state lines in tuition payments, grants, donations, and athletic ticket sales and sponsorships. Each Defendant markets its undergraduate programs and tickets for athletic events to the public across state lines.

99. The Defendants have engaged, throughout the Class Periods, in a continuing conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act. This violation is likely to continue unless the relief sought herein is granted.

100. This conspiracy consists of an agreement, understanding, and concert of action among Defendants, the substantial terms of which are to restrain price competition relating to their provision of financial aid for students, and thereby to increase the net price of attending these institutions ("the net price of attendance").

101. The 568 Cartel generally meets in person as a group at least twice each year. In October 2017, for example, the 568 Cartel held one of its official biannual meetings at the Hilton Rosemont, in Rosemont, Illinois, near O'Hare International Airport. On information and belief, 568 Cartel members communicate with each other about matters related to the conspiracy through other means as well, such as telephone calls, video calls, emails, and messaging.

102. Defendants maintain a website for purpose of representing the 568 Cartel and its purposes to the public. The website of the 568 Presidents Group states: "This site serves as a resource . . . for visitors seeking to learn more about the Group."[20] The website explains that the "568 Presidents Group is an affiliation of colleges and universities, all of which must admit students on a need-blind basis." An FAQ section on the website adds: "It is referred to as a 'Presidents' group because it was formed by a group of 28 college and university presidents from need-blind schools in 1998." The website also contains the form of a certificate of compliance whereby a member of the group can certify that "its admission and financial aid practices currently comply with the rules of Section 568 regarding 'need-blind admission practices.'" These statements on the website mislead the public by representing that the 568 Cartel members' practices are compliant with Section 568. The truth, as alleged further below, is the opposite.

103. The 568 Cartel fixes prices through a formula that is based on a "set of common standards for determining the family's ability to pay for college." The 568 Cartel calls this formula

---

[20] 568 PRESIDENTS GROUP, http://www.568group.org/home/.

the "Consensus Methodology." This methodology assesses the income and assets of a given financial-aid applicant and their family to determine the applicant's ability to pay and thus the financial contribution that the applicant and their family is expected to make. The applicant's assessed ability to pay therefore is a key determinant in the net price of attendance. To the extent the 568 Cartel uses these standards and methodology to set a formula for setting prices only for a student's freshman year, these prices substantially determine the prices for that student's subsequent years at the same institution.

104. Members of the 568 Cartel began meeting sometime after the enactment of Section 568 in 1994. The 568 Cartel was officially formed in 1998.

105. Penn and Vanderbilt evidently withdrew from the 568 Cartel around June 2020; since then, their names have not been included in the list of member institutions on the Cartel website. But the determinants of the net price of attending Penn and Vanderbilt, during the Class Periods and for all currently enrolled students (other than incoming freshmen in 2021), were established while those institutions were participating in the conspiracy alleged here.

106. The net price of attendance for all currently enrolled students (other than incoming freshman in 2021) were fixed between the institution and the student while Penn and Vanderbilt were in the 568 Cartel.

107. As of July 2001, Dartmouth had not joined the 568 Cartel. According to Dartmouth's then-Dean of Admissions and Financial Aid, Karl Furstenberg, as of 2001 Dartmouth had a "need analysis methodology that [was] perhaps more enlightened, more generous and more flexible than" that of the 568 Cartel, and Dartmouth was "actually doing more than this new

methodology would allow."[21] Not long after Mr. Furstenberg made these statements, however, Dartmouth decided to join the 568 Cartel and implemented the Consensus Methodology soon after the 2003-04 academic year.

108. The 568 Cartel monitors and enforces its combination and conspiracy in several ways, according to the Cartel's website, including (but not limited to) such steps as (a) requiring each participating institution to submit a "Certificate of Compliance," (b) requiring university professionals at each institution to receive "training . . . in the application of the Methodology," (c) imposing a "common calendar for the collection of data from families," and (d) conducting an annual or biannual meeting every year since 2007.

## VI.

## DEFENDANTS' ANTICOMPETITIVE CONDUCT HAS RAISED NET PRICES

109. As higher-education insiders—including employees and officers of the institutions in the 568 Cartel—have acknowledged, the Cartel limits competition in financial-aid offers from supposedly competing schools, driving down aid packages and thereby driving up the net price of attendance for aid-eligible students.

110. Yale evidently withdrew from the 568 Cartel in 2008, for example, and did so because it determined that membership in the Cartel had restricted the amount of financial aid that Yale could provide to students. That is, Yale's decision to increase financial-aid awards to eligible students prompted it to withdraw. In withdrawing, Yale stated that its "new, more generous aid

---

[21] Shevani Jaisingh, *28 Colleges Alter Financial Aid Packages*, THE DARTMOUTH (July 17, 2001), https://www.thedartmouth.com/article/2001/07/28-colleges-alter-fin-aid-packages.

policy in [to become effective in] January [2009] means the University can no longer follow the consensus methodology."[22]

111. Yale's then-Director of Student Financial Services, Caesar Storlazzi, concluded: "By leaving the 568 Group, Yale is now free to give families more aid than they would have gotten under the consensus methodology."[23] Storlazzi stated that what is "not good" about the Cartel's approach is that it has "one needs-analysis formula that everyone has to sign on to."[24] The connection between Yale's withdrawal and the effect on net prices was explicit: "In other words, the percentage of a family's income and assets that Yale takes as a parental contribution is now lower than the percentage taken by 568 schools."[25] (Yale evidently rejoined the Cartel in 2018, without fanfare.)

112. Other universities have similarly declined to participate in the 568 Cartel because it would limit the financial aid they could provide. Harvard's then-Director of Financial Aid, Sally Donahue, said in 2008 that Harvard never joined the 568 Cartel because its financial-aid formula would have yielded financial-aid packages that were smaller than what Harvard wanted to award.[26] In 2015, one anonymous university president who refused to participate in the 568 Cartel described it as "an insider's game" that belonged to a "bygone era." Observing that some schools had left the 568 Cartel to offer more financial aid, this anonymous president opined that "the notion of a collective that would constrain money is counter to public policy."[27]

---

[22] Caitlin Roman, *University Leaves Financial Aid Group*, YALE DAILY NEWS (Sept. 26, 2008), https://yaledailynews.com/blog/2008/09/26/university-leaves-financial-aid-group/.

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] The Education Conservancy, *Financial Aid: Examining the Thinking Behind the Policy* (June 2015), https://www.educationconservancy.org/PresidentialThinking.pdf.

113. Indeed, the website of the 568 Presidents Group states in relevant part: "The Consensus Approach . . . seeks to reduce much of the variance in need analysis results that has been experienced in recent years." The website goes on to state that the "participating institutions believe that the Consensus Approach, when applied in a consistent manner, serves to diminish or eliminate . . . divergent results."

114. The phrases "reduce much of the variance," "consistent manner," and "diminish or eliminate divergent results," in the opaque world of higher-education pricing, are code words meaning that the purpose of the 568 Cartel is to reduce or eliminate competition between Cartel members over offers of financial aid to prospective students. And elimination of competition over financial-aid offers is simply a means of coalescing around a uniform *and lower* level of aid to all prospective students. The result of the 568 Cartel is thus not only to reduce the amount of total aid offered by each school, but also to reduce the total amount of aid offered to each prospective student at each Defendant school.

115. In addition, under antitrust principles, the fact that members of the 568 Cartel must agree on a common methodology for determining financial aid is itself evidence that the Cartel reduced such aid. Competitors would not reach such agreement, because they would be incentivized to increase aid and reduce net prices of attendance to attract students. In this case, that would mean the awarding of more financial aid and reduction of net prices of attendance for all students in the proposed Class.

116. The 568 Exemption allowed the 568 Cartel members to eliminate incentives to compete if all of the members admitted all students on a need-blind basis. Plaintiffs show herein, however, that by their own actions, Defendants did not satisfy this provision and thus were not

entitled to the exemption. Accordingly, Defendants are liable for the reduced aid and artificially high net prices of attendance for Class Members that resulted from their agreement.

117. Absent collusion, Defendants would compete on price for the students that they have decided to admit because these are the students that the admissions department has decided would satisfy the goals of the admissions process—among other things, to generate a diverse student body of high academic performers and student-athletes. Defendants view enrolling such students as critical to maintaining their prestige and influence and continuing to attract donations.

118. Given that a large percentage of families cannot afford an elite university education for their children without financial assistance, the 568 Cartel has enabled Defendants to maintain artificially inflated net prices of attendance, through artificially reduced financial aid, without losing admitted students to competitor schools.

119. In short, Defendants' anticompetitive activities have produced overcharges in the net prices of attendance for all Class Members.

## VII.

## ALLEGATIONS RELATED TO DEFENDANTS' AFFIRMATIVE DEFENSES

### A. Most and Possibly All Defendants Do Not Employ "Need-Blind" Admissions Policies

120. During the Class Periods, at least nine Defendants—Columbia, Dartmouth, Duke, Georgetown, MIT, Northwestern, Notre Dame, Penn, and Vanderbilt—have failed to conduct their admissions practices on a need-blind basis because all of them made admissions decisions taking into account the financial circumstances of applicants and their families, through policies and practices that favored the wealthy, including but not limited to those described below.

121. The other seven Defendants (Brown, CalTech, Chicago, Cornell, Emory, Rice, and Yale) may or may not have followed a need-blind admissions policy throughout the Class Periods,

but during at least some portion of the Class Periods, they conspired with the other Defendants to reduce financial aid and increase the net price of attendance for their students.

122. Section 568 defines "on a need-blind basis" to mean "without regard to the financial circumstances of the student involved or the student's family."

123. An admissions practice can be described as "need-aware," as some admissions offices have used the phrase, if the institution considers an applicant's inability to afford the full price of tuition, room, and board as a factor weighing against acceptance in at least some admissions decisions.

124. The language of Section 568, as well as its legislative history, makes clear that to qualify for the exemption, a school must follow need-blind admissions with respect to all applicants, including those on the waitlist. Section 568 is modeled on the settlement reached between MIT and the Department of Justice in a case against the predecessor to the 568 Cartel, which operated for decades until the early 1990s. It was known as the Overlap Group. The MIT settlement defined "need-blind admissions" to mean "admit[ting] all United States citizens to its undergraduate programs without regard to family financial circumstances, *other than admitted from a wait list.*" (Emphasis added.) In enacting Section 568, Congress generally followed the terms of MIT's settlement, but it *omitted* the exception for waitlisted students.

125. Penn and Vanderbilt have considered the financial need of waitlisted applicants, despite Section 568's requirement that "all students admitted" be admitted on a need-blind basis.

126. A former Penn admissions officer, Karen Crowley, conceded in 2009 that although it is "not an official practice," admissions officers give preference to "full-paying student[s]" on the waitlist over those who need financial aid, especially when "endowments are down and cost-cutting is essential." "If a full-paying student says he'll definitely come, letting him in can be a

relief."[28] On information and belief, Crowley's concession was reflective of Penn's own admissions practices.

127. In May 2021, college admissions consultant and former Associate Dean of Admissions at Penn until June 2008, Sara Harberson, acknowledged: "When I worked as the associate dean of admissions at the University of Pennsylvania, a need-blind institution, the office was not forthright about the fact that needing financial aid kept a student from being considered or admitted from the waitlist. Many need-blind universities are not open about their policies when it comes to whom they admit off the waitlist."[29]

128. Vanderbilt has admitted being need-aware with respect to waitlisted applicants through statements by its admissions officers. Vanderbilt has stated on its website, for example, that it "reserve[s] the right to be need aware when admitting waitlisted students."[30] This concession was posted on April 13, 2018, by Kim Struglinski, who joined the Vanderbilt office of undergraduate admissions in 2015 and thus was a Vanderbilt employee at the time of the statement.

129. Vanderbilt has conceded it is need-aware for waitlisted applicants on other occasions. In 2013, a Vanderbilt employee named Carolyn Pippen stated that "we do reserve the right to be need-aware when admitting waitlisted students."[31] And in 2014, a Vanderbilt employee

---

[28] Kathleen Kingsbury, *Dirty Secrets of College Waitlists*, THE DAILY BEAST (Mar. 30, 2009, updated July 14, 2017), https://www.thedailybeast.com/dirty-secrets-of-college-waitlists.

[29] Sara Harberson, *How Colleges Play the Waitlist Game*, COURIER TIMES (May 17, 2021), https://www.buckscountycouriertimes.com/story/opinion/2021/05/17/op-ed-how-colleges-play-waitlist-game-students-detriment/5071470001/.

[30] Kim Struglinski, *Waitlist FAQ 2018*, VANDERBILT UNIVERSITY UNDERGRADUATE ADMISSIONS (Apr. 13, 2018), https://admissions.vanderbilt.edu/vandybloggers/2018/04/waitlist-faqs-2018/.

[31] Carolyn Pippen, *I'm On the Wait List – Now What*, VANDERBILT UNIVERSITY UNDERGRADUATE ADMISSIONS (Apr. 12, 2013), https://admissions.vanderbilt.edu/vandybloggers/2013/04/im-on-the-wait-list-now-what-2/.

named Jay Watson addressed whether Vanderbilt would be need-aware for waitlisted students that year: "We do reserve the right to be need aware when admitting students from the wait list."[32]

130. Accordingly, in failing to conduct need-blind admissions as to waitlisted applicants, Penn and Vanderbilt do not qualify for the 568 Exemption.

131. Columbia engages in need-aware admissions practices that relate to applicants to its School of General Studies, which is an undergraduate program of Columbia. The School of General Studies is under the governance of Columbia's President, Provost, Trustees, and Faculty of Arts and Sciences, just like Columbia College and equivalent to the School of Engineering and Applied Science.[33] This governance structure contrasts with Barnard College, which is independent of, but affiliated with, Columbia.[34]

132. Columbia's School of General Studies offers an undergraduate degree program for "nontraditional students" who have had a break of one or more year in their studies and for dual- or joint-degree students, who split their time as students between Columbia and other institutions, such as Sciences Po in Paris and Trinity College Dublin.[35] Students in the School of General Studies take the same courses with the same faculty and undertake the same majors as other undergraduates at Columbia. They receive a diploma from Columbia like other undergraduates.

---

32 Jay Watson, *Vanderbilt Admissions AMA*, VANDERBILT UNIVERSITY UNDERGRADUATE ADMISSIONS (Mar. 31, 2014), https://admissions.vanderbilt.edu/vandybloggers/2014/03/vanderbilt-admissions-ama/.

33 *Compare* COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CHARTERS AND STATUTES (2017), art. XXII (Faculty of General Studies), *with* art. XI (Columbia College), art. XIV (Faculty of Engineering and Applied Science).

34 *See id.*, art. XXIII.

35 Columbia School of General Studies, *Dual and Joint Degree Programs*, https://gs.columbia.edu/content/dual-and-joint-degree-programs.

133. According to Columbia's website, the School of General Studies comprises more than 2,500 undergraduate students, which is approximately 30% of Columbia's undergraduate student population.[36] In addition, 68% of undergraduates enrolled in the School of General Studies take classes on a full-time basis.[37]

134. Columbia concedes that "General Studies admissions are not need-blind."[38] In fact, Columbia has used General Studies to generate revenue that supports other university initiatives, like campus expansions and new scientific research centers. Columbia's Faculty of Arts & Sciences pays a nine-figure "common-cost tax" to the university.[39] But General Studies recruits and enrolls a less wealthy, more socioeconomically diverse student body than Columbia's other undergraduate programs.[40] The burden of supporting Columbia's preservation of prestige and financial accumulation therefore falls on those who can least afford it.

135. Accordingly, in failing to conduct need-blind admissions as to applicants for the School of General Studies, Columbia does not qualify for the 568 Exemption.

136. In sum, throughout the relevant Class Periods, Penn and Vanderbilt have considered the financial need of waitlisted students, and Columbia has considered the financial need of

---

[36] Columbia University, *Fall Headcount Enrollment by School, 2010-2019* (Jan. 13, 2020), https://opir.columbia.edu/sites/default/files/content/Statistical%20Abstract/opir_enrollment_history.pdf.

[37] Columbia School of General Studies, *Statistics and Facts*, https://gs.columbia.edu/content/statistics-and-facts.

[38] Eli Lee, *Public Health Professor Lisa Rosen-Metsch Appointed Dean of General Studies*, COLUMBIA SPECTATOR (Nov. 14, 2017), https://www.columbiaspectator.com/news/2017/11/14/public-health-professor-lisa-rosen-metsch-appointed-dean-of-general-studies/.

[39] Michael Ouimette, *Unfunded Mandate: Columbia College, Arts and Sciences, and the Bollinger Era*, COLUMBIA SPECTATOR (May 5, 2016), https://www.columbiaspectator.com/lead/2016/05/05/unfunded-mandate-columbia-college-arts-and-sciences-and-bollinger-era/.

[40] Jessica Spitz, *At a crossroads; The future of GS*, COLUMBIA SPECTATOR (Apr. 20, 2017), https://www.columbiaspectator.com/news/2017/04/20/at-a-crossroads-the-future-of-gs/ ("[T]he population skews older and many are juggling jobs, raising families, and often do not have parents to rely on for tuition money.").

students applying to the School of General Studies, in deciding whether to admit such students to attend their undergraduate programs on a full-time basis. The presence of these institutions in the 568 Cartel therefore extinguishes the 568 Exemption for all its members.

**B. Certain Defendants' Enrollment Management Practices Are Not "Need-Blind"**

137. Dartmouth and Notre Dame engage in need-aware admissions through "enrollment management." This is "the systematic integration of the functions of admissions, the relationship between tuition and fees (pricing) and financial aid, and student retention, along with the use of research to inform institutional policies and practices."[41] It is a "managerial paradigm" that brings together admissions and other institutional functions "into a comprehensive institutional approach designed to enable college and university administrators to exert greater influence over the factors that shape their enrollments."[42]

138. One of the key purposes of enrollment management is to limit the number of financial-aid-eligible applicants who are admitted to the institution to achieve financial and budgetary objectives. The effect of these practices is to disadvantage applicants based on their need for institutional financial aid.

139. Econometric modeling is central to enrollment management. As explained by Stephen Brooks, a higher-education consultant whose client list includes Columbia and Penn,[43] models draw on standard elements of college applications—academic ability, geography, demographics, interests, whether the student has requested aid, and more—to assess an applicant's

---

41 Don Hossler, *Origins of Strategic Enrollment Management*, in HANDBOOK OF STRATEGIC ENROLLMENT MANAGEMENT 5 (Don Hossler and Bob Bontrager, eds., 2014).

42 *Id*. at 4, 7-8.

43 *Our Clients*, SHBrooks, https://www.shbrooks.com/clients.

likelihood of enrolling if offered admission.[44] These yield models, in turn, permit schools to forecast the revenue and cost implications of their admissions and financial-aid decisions.[45]

140. One anonymous enrollment manager has said: "Good luck getting any institution to tell you exactly how they handle ability to pay as a driver in their admit decision. . . . What they will say is 'We're need blind.' That's bullshit. They would never tell you exactly how they do it, but they do it all the time."[46]

141. Indeed, these institutions know their practices are legally problematic, and thus they maintain a shroud of secrecy over them. For instance, author Jeff Selingo asked two dozen colleges or universities for access to their admissions practices. Nearly all refused, some because they were "worried about exposing how they shaped their class based on the financial need of applicants."[47] Selingo also wrote: "Even at need-blind schools, admission eventually can come down to money. Those colleges control how much they spend on financial aid by recruiting heavily in rich high schools and admitting in early decision a significant proportion of students who tend to be wealthier. And even when schools are need-blind, admissions officers still see the zip codes and the occupations of parents when reviewing applications."[48]

---

[44] Stephen H. Brooks, *Using Campus-Based Financial Aid Strategically*, in HANDBOOK OF STRATEGIC ENROLLMENT MANAGEMENT 223-26 (Don Hossler and Bob Bontrager, eds., 2014); Stephen H. Brooks, *Econometric Modeling of Enrollment Behavior*, 26 J. Student Fin. Aid 7, 9-10 (1996).

[45] Brooks, *Using Campus-Based Financial Aid Strategically*, at 226; Brooks, *Econometric Modeling of Enrollment Behavior*, at 16-17.

[46] Matthew Quirk, *The Best Class Money Can Buy*, THE ATLANTIC (Nov. 2005) https://www.theatlantic.com/magazine/archive/2005/11/the-best-class-money-can-buy/304307/.

[47] Jeffrey Selingo, WHO GETS IN AND WHY: A YEAR INSIDE COLLEGE ADMISSIONS 13 (2020).

[48] *Id*. at 212.

142. Notre Dame also employs an "enrollment management model."[49] Announcing in 2010 the hire of its associate vice-president for undergraduate enrollment, Don Bishop, Notre Dame praised his "innovative marketing and financial aid strategies" in prior enrollment-management jobs.[50] Announcing a new dean of admissions in 2019, Notre Dame touted her status as "a featured presenter at national enrollment management conferences and events."[51] In addition, Notre Dame has a partnership with a software company that develops data-visualization tools, touting "improved scenario analyses on all data associated with an applicant or prospective enrollee."[52] Notre Dame is thus using data analysis to shape need-aware admissions decisions.

143. In 2015, Dartmouth created the position of Vice Provost for Enrollment Management, announcing that it would permit the university "to use a wealth of newly available data to identify and recruit prospective students."[53] In 2016, Dartmouth announced its hiring of Lee Coffin from Tufts University, a need-aware school.[54] At Tufts, Coffin operated under strict

---

[49] Jordan Cockrum and Natalie Weber, *Notre Dame, SMC communities evaluate opportunities, efforts for low socioeconomic students*, THE OBSERVER (Apr. 30, 2018), https://ndsmcobserver.com /2018/04/efforts-low-socioeconomic-students/.

[50] Dennis Brown, *Notre Dame alumnus Bishop appointed associate VP for undergraduate enrollment*, NOTRE DAME NEWS (Sept. 15, 2010), https://news.nd.edu/news/notre-dame-alumnus-bishop-appointed-associate-vp-for-undergraduate-enrollment/.

[51] Joyce Lance, *Christy Pratt appointed director of admissions*, NOTRE DAME NEWS (July 1, 2019), https://news.nd.edu/news/christy-pratt-appointed-director-of-admissions/.

[52] Leila Meyer, *U Notre Dame, SynGlyphX Partner on Enrollment Data Visualization Tool*, CAMPUS TECH. (Jan. 13, 2016), https://campustechnology.com/articles/2016/01/13/u-notre-dame-synglyphx-partner-on-enrollment-data-visualization-tool.aspx?admgarea=news.

[53] Dartmouth University, Office of Communication, *Search Has Begun for Undergraduate Admissions Leader* (Oct. 29, 2015), https://news.dartmouth.edu/news/2015/10/search-has-begun-undergraduate-admissions-leader.

[54] Bill Platt, *Lee Coffin to Lead Enrollment, Admissions, and Financial Aid*, DARTMOUTH NEWS (Feb. 4, 2016), https://news.dartmouth.edu/news/2016/02/lee-coffin-lead-enrollment-admissions-and-financial-aid.

budgetary limits.[55] He shaped the cohort of admitted students to bring revenues and costs in line. His admissions office sent tentative acceptances to the financial-aid office, which modeled the revenue and cost implications so that the admissions office would meet the university's budgetary goals. As Coffin has acknowledged, "Shifting things at the end . . . happens every year."[56]

144. Dartmouth's and Notre Dame's use of enrollment management thus involves the resolution of admissions decisions *with* regard to the financial circumstances of the applicant or their family, in that such management (i) identifies relatively wealthy students, for the benefits (direct and indirect) that the school expects from their admission, and (ii) identifies relatively less wealthy students in order to limit the total amount of financial aid—and then acts upon that information to meet budgetary goals.

### C. Many Defendants Consider Family Financial Circumstances in Giving Preference to the Children of Wealthy Past or Potential Donors, and Thus Do Not Adhere to a Need-Blind Admissions Policy

145. Many Defendants consider applicants' "financial circumstances" through admissions preferences given to the children of wealthy past or potential donors, such that their chances of admission increase significantly. Such Defendants understand that these applicants—commonly known as "development cases" or "development admits"—have no need for financial aid and that their admission could generate a substantial financial return for the university.

146. Consequently, the development offices of such Defendants analyze and monitor these applicants and coordinate with the university presidents or admissions offices during the

---

55 Carly Olson, *Crunching the Numbers*, TUFTS OBSERVER (Apr. 25, 2016), https://tuftsobserver.org /crunching-the-numbers/("My responsibility as Dean is that I can't spend more dollars than Tufts has. They give me a checkbook every year and they say spend all of it, but don't spend more than that."); *see also id.* ("This year, Coffin said admissions had $19.7 million and 1,325 spots to consider when making their decisions.").

56 *Id.*

admissions cycle. In short, awarding special treatment to the children of wealthy prior and potential donors necessarily means some less privileged applicants are not admitted on account of their financial circumstances to make room for the wealthy.

147. Many Defendants also consider large donations, and even financial capacity in the absence of any donation history, as plus factors for admission. Assessing potential donations of an applicant's family necessarily involves considering the income, assets, and other financial circumstances of that family. Similarly, considering a family's past donations, pursuant to the agreement of the 568 Cartel, constitutes the consideration of family financial circumstances.

148. In considering the wealth and donation history of certain students and their families, moreover, such Defendants implicitly consider less privileged applicants' lack thereof. Because of the limited number of spots available in any given class, the advantage given to one group entails a disadvantage imposed on the other. Privileging the wealthy and disadvantaging the financially needy are inextricably linked; they are two sides of the same coin.

149. In addition, such Defendants are committed to maintaining admissions as a zero-sum game, by limiting growth in the number of undergraduate seats to maximize perceptions of exclusivity and prestige. Defendants' presidents and senior admissions and development officers know that the other Defendants routinely favor children from wealthy families and thereby fail to admit all students without regard to their financial circumstances or that of their families.

150. Dartmouth's former dean of admissions, Maria Laskaris, said in 2019: "The ultra-rich have an additional advantage in their ability to donate large sums of money to universities, which can boost their kids' chances of acceptance." According to Laskaris, admissions officers are

"made aware of" this factor because "colleges are always in fundraising mode."[57] At Dartmouth, development officers meet with admissions staff to review a list created by the development office. Each year, up to 50 applicants may be considered through this special process, most of whom are admitted, accounting for 4-5% of Dartmouth's student body.[58]

151. An email exchange exposed by the Sony hack in 2014 illustrates Dartmouth's efforts to evaluate and court wealthy potential donors.[59] Michael Lynton, CEO of Sony Pictures Entertainment, intended to visit Dartmouth with his daughter, a prospective student. Michael Lynton is not an alumnus of Dartmouth, and public records have not shown that Lynton had previously donated to Dartmouth. On the eve of his visit, Lynton received a solicitous email from Jeff Sassorossi, a 1975 Dartmouth graduate and then Dartmouth's "Director, Special Projects & Reporting." Sassorossi explained that his role at Dartmouth was "to serve as the liaison between the Advancement (Alumni Relations and Development) and Admissions. As such, I work with families as they go through the admissions process at Dartmouth." Sassorossi offered Lynton and his daughter a personal tour of the campus. Sassorossi's email also indicated that Lynton was being recruited to Dartmouth by Leon Black, a billionaire private equity investor, major Dartmouth benefactor, and former trustee.[60]

---

[57] Jill Tucker, *In the College Admissions Game, Even the Legal Kind, Money Has Always Mattered*, SAN FRANCISCO CHRON. (Mar. 12, 2019), https://www.sfchronicle.com/bayarea/article/In-the-college-admissions-game-even-the-legal-13683518.php.

[58] Joseph Asch, *Donor Admissions: How It Works Now*, DARTBLOG (Sept. 29, 2014), http://www.dartblog.com/data/2014/09/011686.php.

[59] *See* Joseph Asch, *VIP Donor Preferences Cont'd*, DARTBLOG (Feb. 4, 2016), http://www.dartblog.com/data/2016/02/012467.php; Email from Jeff T. Sassorossi to Michael Lynton, Re: Dartmouth College Visit (Mar. 28. 2014), https://wikileaks.org/sony/emails/emailid/132718.

[60] *See* Peter Lattman, *Apollo's Leon Black Donates $48 Million to Dartmouth*, N.Y. TIMES DEALBOOK (Mar. 29, 2012), https://dealbook.nytimes.com/2012/03/29/apollos-leon-black-donates-48-million-to-dartmouth; Office of Communications, Dartmouth University, *Dartmouth Board Elects Three New Charter Trustees*, DARTMOUTH NEWS (June 13, 2011) (announcing Black was stepping down after

152. Despite these entreaties, Lynton's daughter enrolled at Brown, which got the $1 million donation from Lynton instead of Dartmouth.[61] The opinion editor for the *Brown Daily Herald* described Lynton's gift to Brown as "a $1 million check to Brown with more strings attached than the Los Angeles Philharmonic. Anyone with a pulse can trace the probable outcome of this 'philanthropy'—a prospective student connected to Lynton gets accepted to Brown!"[62]

153. According to journalist Daniel Golden's book, *The Price of Admission*, Duke "enrolled thousands of privileged but underqualified applicants with no prior ties to the university in the expectation of parental payback."[63] According to Golden, Duke "accepted at least one hundred nonalumni children each year due to family wealth."[64] In some years, between 3-5% of Duke's student body consists of students "who would have been turned away without pressure from the development office."[65]

154. While serving as president of Duke, Richard Brodhead admitted that "it would be naïve to say that any university should pay no attention to a family's ability to help the university," explaining that a family's ability to donate to Duke was a "plus factor" in admissions."[66] Jean Scott, a former director of undergraduate admissions at Duke, estimated that "a couple of hundred" applicants a year received special attention as children of prospective donors. Scott admitted that

---

two terms as trustee), https://news.dartmouth.edu/news/2011/06/dartmouth-board-elects-three-new-charter-trustees.

[61] Chad Simon, *Simon '16: Pimp My University*, BROWN DAILY HERALD (Oct. 21, 2015), https://www.browndailyherald.com/2015/10/21/simon-16-pimp-my-university/.

[62] *Id*.

[63] Daniel Golden, THE PRICE OF ADMISSION 54 (2006).

[64] *Id*.

[65] *Id*. at 57.

[66] Geoffrey Mock, *Brodhead Discusses Early Admissions, Developmental Admits*, DUKE TODAY (Sept. 22, 2006), https://today.duke.edu/2006/09/admit.html.

there "were certainly students who got in because they were a high priority" for fundraising. Scott also said that there "was more of this [fundraising-related] input at Duke than at any other institution I ever worked for."[67]

155. The longstanding dean of admissions for Georgetown, Charles Deacon, was asked by a reporter: "What about children of alumni and *potential* donors?" (Emphasis added.) In response, Dean Deacon candidly admitted: "On the fundraising side, we also have a small number of 'development *potential'* candidates. If Bill Gates wants his kid to come to Georgetown, we'd be more than happy to have him come and talk to us." (Emphasis added.) Dean Deacon continued to point out that "not all those special cases end up being people who give a lot of money. We have children of Supreme Court justices, senators, and so on apply. We may give extra consideration to them because of the opportunities that may bring."[68]

156. In short, Georgetown admits a range of students based on their families' wealth, prestige, and influence. Some of these students are given "extra consideration" based on their parents' influence or political power, without any expectation of a financial contribution. On the other hand, some *are* given "extra consideration" on the basis of their "development potential"—namely, the ability of the family to make a financial contribution to the institution, and the likelihood that it will do so.

157. Indeed, Dean Deacon has also candidly admitted that Georgetown favors past donors, as well as potential donors, and has even admitted that Georgetown calibrates the extent of the admissions advantage to the size of the donation: "If you were very close to the edge and

---

67 Daniel Golden, *How Lowering the Bar Helps Colleges Prosper*, WALL ST. J. (Sept. 9, 2006), https://www.wsj.com/articles/SB115774251817757837.

68 Alvin P. Sanoff, *Getting In To Top Schools*, WASHINGTONIAN (Oct. 1, 2007), https://www.washingtonian.com/2007/10/01/getting-in-to-top-schools/.

the family's given to the annual fund every year or something, that might be enough of a tip to get you in. If you're a little farther from the edge, but the family has built Regents Hall, that might tip a little farther."[69]

158. The former director of selection at MIT, McGreggor Crowley, admitted in March 2019: "In truth, for every office of admissions there is a development office that builds a university's endowment through donations from alumni and wealthy individuals. And every year, regardless of what a college or university says publicly, a number of children of wealthy donors and alumni get a nod in their direction while other applicants are rejected."[70] In an interview with NBC News, Crowley admitted that "as for the children of prominent campus donors, . . . a college's development office might reach out to the dean of admissions to say, 'Hey, just so you know, Lisa's dad has been very generous to us in the past, or something.'" NBC News reported that according to Crowley: "Usually, that kind of information [about a family's financial contribution] is relayed to the most senior officials in an admissions office."[71]

159. At Northwestern, a separate admissions process exists for the wealthy and well connected. On April 24, 2019, *The Daily Northwestern* published an article with the headline: "Northwestern President Schapiro Says He Reads Applications of Some Legacy, Donor Students." As revealed in the article, in the 2018-19 admissions cycle, Schapiro personally reviewed the applications of about 550 students, including applications associated with wealthy donors. A

---

69 Suzanne Monyak, *Legacy Status Tips Admission*, THE HOYA (Mar. 20, 2015), https://thehoya.com/legacy-status-tips-admission-scales/.

70 McGreggor Crowley, *Confessions of a Former MIT Admissions Director*, BOSTON GLOBE (Mar. 13, 2019), https://www.bostonglobe.com/opinion/editorials/2019/03/13/confessions-former-admissions-director/qPQppf0AhpJIbIJ8mZ6q9L/story.html.

71 Daniel Arkin, *The College Admissions Scandal is Just the Extreme Version of a System that Already Favors the Wealthy*, NBC, https://www.nbcnews.com/news/us-news/college-cheating-scandal-two-ex-admissions-officers-explain-behind-scenes-n983796.

Northwestern spokeswoman has further admitted that President Schapiro was "frequently involved in dealing with principal donors to the University."[72]

160. One of the student reporters who broke the story about Northwestern's two-track admissions system later stated in a podcast interview: "[President Schapiro] also told us that he tries to work with the Dean of Admissions Christopher Watson, as much as he can. He brought up an example that if they both disagreed on an applicant that they try to work it out."[73] President Schapiro is the boss at Northwestern, and the Dean of Admissions reports to him. The head of the university is using his discretion to make or influence numerous admissions decisions. Schapiro's involvement in admissions decisions for applicants associated with wealthy donors was not public until revealed by reporting in 2019.

161. Penn also tracks past and potential donors, rewarding past donors and enticing potential donors by admitting their children. A former Associate Dean of Admissions, Sara Harberson, has described the university's use of "tags" to track applicants that are "a high priority for the institution." Penn tags the applications of "children of donors or potential donors," among others, giving those applicants "the proverbial golden ticket."[74] The university has "spots reserved"

---

[72] Alan Perez and Gabby Birenbaum, *Northwestern President Schapiro Says He Reads Applications of Some Legacy, Donor Students*, THE DAILY NORTHWESTERN (Apr. 24, 2019), https://dailynorthwestern.com/2019/04/24/campus/northwestern-president-schapiro-says-he-reads-applications-of-some-legacy-donor-students/?print=true.

[73] Cassidy Jackson and Heena Srivastava, *The Weekly: University President Morton Schapiro Reveals Role in Admissions Process*, THE DAILY NORTHWESTERN (May 3, 2019), https://dailynorthwestern.com/2019/05/03/multimedia/audio/the-weekly-university-president-morton-schapiro-reveals-role-in-admissions-process/.

[74] Sarah Harberson, *The Truth about 'Holistic" College Admissions*, LOS ANGELES TIMES (June 9, 2015), https://www.latimes.com/opinion/op-ed/la-oe-harberson-asian-american-admission-rates-20150609-story.html.

for these "development cases," whose "parents have already given significant money to the institution, or plan to."[75]

162. The director of admissions at Notre Dame for 36 years until his retirement in July 2019, Bob Mundy, made appearances at alumni gatherings during his tenure in office. Mundy's biography at these appearances stated: "In his current position as Director of Admissions Operations, he oversees the 35 members of staff, and recruitment efforts that have included as many as 40,000 annual inquiries and a record-setting 16,500 applications for the 2011 class. Ultimately, the office is responsible for 'delivering' a freshmen class of approximately 2,000 students, while also satisfying the needs of various constituencies: i.e. alumni, athletics, *the Development Office*, etc." (Emphasis added.)

163. The associate vice provost for undergraduate enrollment at Notre Dame, Don Bishop, acknowledged the significant influence that donations play in the Notre Dame admissions process. Indeed, he admitted that if someone gave $15 million, then their children would be given "some special interest" during the Notre Dame admissions process.[76]

164. A past president of Vanderbilt, E. Gordon Gee, stated in 2019 that any president under "truth serum" would concede that donor connections make a difference in admissions.[77]

165. Defendants may independently choose to favor the children of the wealthy if they like, thereby disfavoring every other applicant. But if they make that choice, they cannot lawfully

---

[75] Vice News, *How Broken the College Admissions Process Is*, YOUTUBE (Mar. 13, 2019) (Harberson quoted at 5:20), https://www.youtube.com/watch?v=0v5yHnWCiLE&feature=emb_logo.

[76] Daniel Golden, *How Wealthy Families Manipulate Admissions at Elite Universities*, TOWN & COUNTRY (Nov. 21, 2016), https://www.townandcountrymag.com/society/money-and-power/news/a8718/daniel-golden-college-admission/.

[77] Jack Stripling, *It's an Aristocracy: What the Admissions-Bribery Scandal Has Exposed About Class on Campus*, THE CHRONICLE OF HIGHER EDUCATION (Apr. 17, 2019), https://www.chronicle.com/article/its-an-aristocracy-what-the-admissions-bribery-scandal-has-exposed-about-class-on-campus/?cid2=gen_login_refresh&cid=gen_sign_in.

conspire on financial-aid policies. The law does not allow them to do both. Defendants must choose between continuing their wealth favoritism and need-aware admissions practices, on the one hand, and participation in the lucrative 568 Cartel, on the other.

**D. The Section 568 Exemption Applies Only to a Group of Schools That All Employ "Need-Blind" Admissions Policies Within the Term's Statutory Meaning**

166. The 568 Exemption, as noted, precludes any school invoking it from taking account of "the financial circumstances" of a student or their family in making admissions decisions. Under the well-established rules of statutory construction, any contrary interpretation of the text of the 568 Exemption would be impermissible speculation as to Congress's intent—in particular where any antitrust exemption is construed narrowly (with what courts have described as "beady eyes and green eyeshades"). Just as fundamental, the evidence of the purpose and overarching goal of the 568 Exemption, as reflected in its legislative history, compels this interpretation of the plain meaning of "need-blind" as defined in the statute.

167. The 568 Exemption replaced what had been a general temporary antitrust exemption. The 1994 legislative history of the enactment of Section 568 explains in relevant part: "This provision extends for an additional three years the temporary antitrust exemption for certain collegiate financial aid award analysis, which was originally enacted with the Higher Education Amendments of 1992 as a two-year exemption." H.R. Conf. Rep. 103-761, 911-12, 1994 U.S.C.C.A.N. 2901, 3242-43. This report explained that, as noted above, Section 568 is modeled on the MIT-DOJ settlement: "The temporary exemption has also been revised in light of the 'standards of conduct' adopted as part of the settlement of the antitrust action between the Department of Justice and Massachusetts Institute of Technology in the case of *United States v. Brown University, et al.*, Civ. Action No. 91-3274 (E.D. Pa.), on December 22, 1993." *Id.*

168. The referenced "standards of conduct" provided in relevant part: "Non-profit institutions of higher education may participate in the cooperative financial aid arrangements set forth below ('Participating Schools'), provided that they practice need-blind admissions; that is, admit all United States citizens to its undergraduate programs without regard to family financial circumstances, other than admitted from a wait list." *Letter from MIT lawyer Thane D. Scott about Overlap settlement*, http://tech.mit.edu/Bulletins/overlp-ts.html. This legislative history thus makes clear that Section 568's language tracks the language in the "standards of conduct" precluding admissions *with* regard to "family financial circumstances."

169. This legislative history further states that the 568 Exemption "applies only to institutions of higher education that admit students on a need-blind basis. The definition of 'on a need-blind basis' in subsection (c)(6) is based on language in the 'standards of conduct' adopted in the MIT settlement. However, there is one conspicuous difference between the statutory language and the MIT standards of conduct: the statute deletes the phrase 'other than admitted from a wait list.' *See also United States v. Brown University*, 5 F.3d 658 (1993)." H.R. Conf. Rep. 103-761, 911-12, 1994 U.S.C.C.A.N. 2901, 3242-43. This conference report further states:

> The managers have decided against elaborating on the need-blind admissions standard in the statutory text. As should be obvious, however, evidence of a practice among admissions personnel at an institution of higher education of examining, discussing, or otherwise considering information relating to a student's financial circumstances that is derived from such student's financial aid application form, *or from any other document or record obtained for the purpose of ascertaining such financial circumstances*, before the decision is made regarding the student's admission will substantially increase the institution's burden of demonstrating that the school's admissions policy is truly need-blind.

*Id*. (emphasis added). The report then specifies: "Prudence would counsel that schools wishing to make use of this provision *insulate their admissions, process and admissions personnel as*

*completely as possible from such student financial aid information, until after the admissions process is complete*." *Id*. (emphasis added). Consistent with the statute, no exception is made for applicants on the institution's waitlists.

170. This aspect of the legislative history thus reflects Congress's intent that a "truly need-blind" admissions policy would not permit a school invoking the 568 Exemption to use the information that the 568 Cartel has used and continues to use to consider the financial circumstances of an applicant's family for admissions purposes—including (i) the common application (which asks questions about the parents' occupation for the purpose, at least in part, of ascertaining the financial circumstances of the applicant and their family); (ii) emails between development and admissions, as well as any "tags" that admissions uses to flag development prospects, obtained for the purpose of ascertaining the financial circumstances of the applicant and their family; (iii) any documents that admissions receives identifying one or both parents as donors, or regarding donation history, or identifying one or both parents as alumni; and (iv) the information integral to enrollment management.

171. The 2001 legislative history to the renewal of the 568 Exemption further confirms the following congressional goal and purpose: "No student who is otherwise qualified ought to be denied the opportunity to go to one of the nation's most prestigious schools because of the financial situation of his or her family." Report to Accompany H.R. 768, House of the Judiciary, *Need-Based Educational Aid Act of 2001* (Apr. 3, 2001). An admissions policy that admits certain students based on their wealth, in a zero-sum admissions arrangement, necessarily denies admission to at least some students "because of the financial situation of his or her family."

172. In a separate part of the 2001 legislative history, Senator Barney Frank, one of the sponsors of the legislation, referenced that it arose out of litigation regarding the Overlap Group

(discussed above), and a practice in which "these schools strive to achieve what they call a needs-based admission policy," and "what it meant was that they strove to admit young men and women *based on their ability to do the work of that school*." Statement of Barnie Frank, Need-Based Educational Aid Act of 2001, 147 Cong. Rec. H1360-02, 2001 WL 321629 (Apr. 3, 2001) (emphasis added). An admissions policy that admits certain students based on their wealth as a relevant factor does not admit those students "based on their ability to do the work of that school."

173. In sum, the scope of the 568 Exemption is rooted in the plain language of the statutory text, and in the statute's legislative history, which shows that the statute's plain text furthers the statute's purposes.

## VIII.

## PLAINTIFFS' DELAYED DISCOVERY OF THEIR INJURIES UNDER, AND DEFENDANTS' CONTINUING VIOLATIONS OF, THE ANTITRUST LAWS

174. Defendants' violations of the Sherman Act occurred each time Defendants engaged in conduct, further to the 568 Cartel, that harmed Plaintiffs and other Class Members. In the context of Defendants' price-fixing conspiracy, such conduct and violations occurred each time Defendants have met to fine-tune their Cartel agreement and upon each transaction with any Class Member at an artificially inflated net price of attendance.

175. Defendants have engaged in continuing violations of the Sherman Act. The 568 Cartel has met at least annually since 2003 to discuss and fine-tune their Cartel agreement, and the Class Members have paid artificially high net prices to attend Defendants' schools since that time as a result of the conduct alleged herein.[78]

---

[78] In terms of formal membership, as noted above, Brown and Emory evidently left the 568 Cartel permanently in 2012; Chicago evidently left it in 2014; and Penn and Vanderbilt evidently left it in 2020. Some institutions have attended meetings of the 568 Cartel and exchanged information with the Cartel without being formal members, including certain institutions that never formally joined. (Plaintiffs reserve the right to name such institutions as defendants based on discovery in this case.)

176. The Class Members' claims accrued when they discovered they had been injured and who caused their injury. Plaintiffs discovered these facts only within the last two years.

177. Until that time, a person exercising reasonable diligence could not have discovered (a) the extent to which Defendants had failed to admit all successful applicants without regard to the financial circumstances of the student or the student's family, in violation of the 568 Exemption, or (b) that Defendants' use of the Consensus Methodology has disadvantaged and in fact caused financial injury to the Class Members.

178. A person exercising reasonable diligence could not have discovered the violations and injury at issue in part because Defendants have made incomplete and misleading statements that impeded discovery of those violations and the resulting injury.

179. Defendant have publicly stated and advertised, incompletely and misleadingly, that they admit students on a need-blind basis; and Defendants have claimed to be need-blind on hundreds of internet, marketing, and admissions materials and brochures.

180. Defendants and the other members of the 568 Cartel have maintained a website for the Cartel. The first words printed on the homepage of this website have been: "What is the 568 Presidents Group? 568 Presidents Group is an affiliation of colleges and universities, all of which must admit students on a need-blind basis." Under an FAQ on the same website, the 568 Cartel has made the following misleading claim: "It is referred to as a 'Presidents' group because it was formed by a group of 28 college and university presidents from need-blind schools in 1998."

181. Defendants that have not followed a need-blind admissions policy have made similarly incomplete and misleading statements, including on websites, during the Class Periods. Such Defendants have further misrepresented, as shown below, that they are "need-blind," within the meaning of that term under Section 568.

182. The website for Columbia has stated and continues to state: "Admission to Columbia is need-blind for US Citizens and Eligible Noncitizens, meaning the Office of Undergraduate Admissions considers your application without regard to your financial need." Whether or not Columbia considers each application without regard to the student's financial need, this notion of need-blindness is not consistent with the statutory definition that prohibits Columbia (so long as it participates in the 568 Cartel) from considering either financial need or financial wealth. Columbia's redefinition of "need-blind" is not consistent with the statute. A university's promise to disregard financial need is meaningless if the institution privileges wealth.

183. Other Defendants that have not followed a need-blind admissions policy have also engaged in definitional contortions. Dartmouth's website, for example, has contained and continues to contain a glossary of admissions-related terms. As redefined by Dartmouth, an admissions decision is "need-blind" so long as it is not made with "knowledge of an applicant's financial need." If Dartmouth does make admissions decisions without knowledge of an applicant's financial need, this is nevertheless insufficient for compliance with Section 568, which requires that *all* students be admitted without regard to the financial circumstances of the students or their families. Under Section 568, Dartmouth is not allowed to make admissions decisions with knowledge and on the basis that, an applicant has financial need, or does not have financial need, or is rich, or any other financial circumstance.

184. Duke's website has also employed and continues to employ its own definitions, claiming that its "admissions policy is 'need-blind,' which means that applicants are accepted based on their merit, regardless of their ability to pay for college." Duke's redefinition does not mention whether *all* students "are accepted based on their merit, regardless of" their ability to donate money to Duke. In reality, not all students are admitted to Duke on the basis of merit at all.

185. MIT's website also has provided and continues to provide a glossary of admissions-related terms. As redefined by MIT, "need-blind" means that "[p]rospective students are not disadvantaged in the undergraduate admissions process because of their financial need." MIT's redefinition is contrary to the statutory meaning of "need-blind basis" and constitutes an admission that MIT considers the financial circumstances of certain applicants.

186. Northwestern's website has claimed and continues to claim that it "has a need-blind admissions policy for U.S. citizens and permanent residents; this means that financial aid is not a factor in determining admission. Applicants are encouraged to apply for financial aid." Northwestern's redefinition of "need-blind basis" is also contrary to the statutory definition and constitutes a further admission that Northwestern fails to conduct admissions without regard to the financial circumstances of all applicants and their families.

187. Penn's website has claimed and continues to claim another misleading definition of "need-blind": "Our need-blind policy means that your ability to pay is not considered in your admission decision." This is misleading because under Section 568, exempt institutions are prohibited from considering the financial circumstances of any applicant or any applicant's family, not just an applicant's "ability to pay."

188. The foregoing redefinitions of "need-blind" for purposes of Section 568 obfuscate that Defendants failing to follow need-blind admissions policies have made admissions decisions with regard to the financial circumstances of all applicants and their families.

189. In reality, the 568 Cartel was not, and has never been, composed of "need-blind schools" as that term is defined by the statute. The 568 Cartel's inaccurate public claim to being composed of "need-blind schools" had the effect of misleading a reasonably diligent person investigating whether the 568 Cartel's conduct gave rise to a cause of action.

190. The website for the 568 Cartel has contained and continues to contain the form of a certificate of compliance whereby a member of the Cartel can certify that "its admission and financial aid practices currently comply with the rules of Section 568 regarding 'need-blind admission practices.'" Publicly posting this form of certification misleads any reasonably diligent person who inquires into whether members of the 568 Cartel are need-blind.

191. The website for the 568 Cartel has stated and continues to state: "This site serves as a resource both for the 568 Presidents Group member institutions wanting to keep up to date on the Group's activities, *as well as for visitors seeking to learn more about the Group*." (Emphasis added.) The 568 Cartel thus continues inaccurately to advertise on its website that all Cartel members are "need-blind" within the meaning of Section 568.

192. The 568 Cartel has publicly asserted that its activities were carried out for altruistic purposes. The website for the 568 Cartel, for example, has stated and continues to state that the purpose of the conspiracy is to agree on a financial-aid system that is "fair" and that the Consensus Methodology was adopted after consideration of ways to "improve the financial aid system so as to better serve the needs of families in their efforts to pay for college."

193. Such assertions are false but would be viewed as credible by a reasonably diligent person investigating the 568 Cartel's conduct. Actors sympathetic to the 568 Cartel have likewise published statements and conclusions that would have persuaded a reasonably diligent person investigating the Cartel's conduct that they had not suffered financial harm.

194. Defendants further engaged in conduct that hindered a reasonably diligent person's ability to discover the violations and injury at issue by consistently omitting, in public statements purporting to describe the reasons for net tuition price increases, any reference to price fixing or the use of the Consensus Methodology as bearing on increased net prices of attendance. Whether

or not such statements have accurately described *some* of the reasons for net tuition price increases, these statements have not acknowledged the effects of the use of the Consensus Methodology.

195. In targeting Class Members through the institution's alumni magazine, for example, Dartmouth claimed in 2015 that rising tuition prices could be explained because "[j]ust as lattes cost more these days, so do markers and whiteboards and keeping the lights on. Healthcare costs and salaries are rising too—and hiring at the College has shot up more than enrollment."[79] The feature article also listed "[l]ess sizeable but still significant drivers of cost includ[ing] compliance with a range of government regulations imposed to address issues such as crime, gender equity and accessibility, which have totaled millions of dollars." The article quoted Dartmouth's president Phil Hanlon as saying that these factors, although supposedly "not as much as financial aid" have "'been a driver for the last eight to 10 years.'"[80]

196. A Georgetown spokesperson explained away the institution's substantial tuition increases by suggesting that "the growing cost 'reflects the reality that many of our operating expenses continue to increase at rates higher than inflation.'"[81]

197. In 2008, an MIT news release incorrectly claimed: "During the past decade, the net tuition for undergraduates--what students and families pay after financial aid--has, on average, dropped by more than 15 percent when adjusted for inflation."[82] Such statements suggest to a reasonable person that MIT had lowered net prices of attendance over time. If MIT's statement

---

79 C.J. Hughes, *Why is Dartmouth So Expensive*, DARTMOUTH ALUMNI MAGAZINE, May-June 2015, https://dartmouthalumnimagazine.com/articles/why-dartmouth-so-expensive.

80 *Id*.

81 Connie Parham, *GU Hikes Undergraduate Tuition 5.5 Percent*, THE HOYA (Feb. 22, 2008), https://thehoya.com/gu-hikes-undergraduate-tuition-5-5-percent/.

82 *MIT to be Tuition-Free for Families Earning less than $75,000 a Year*, MIT NEWS (Mar. 7, 2008), https://news.mit.edu/2008/tuition-0307.

were true, moreover, the net price of attendance would have "dropped" even more if MIT had not participated in the 568 Cartel.

198. In 2009, John Affleck-Graves, then-executive vice president of Notre Dame, identified only food costs when asked to explain the institution's 4.4 percent increase in tuition: "We are aware of the pressure families are under, and we wanted to be as conservative as we could be, . . . the difficultly for us this year is that we have seen an increase in a lot of our costs, like food . . . . And then we are faced with a difficult choice because we don't want to decrease the opportunities we provide for the students, like study abroad and research opportunities."[83]

199. In 2017, Amy Gutmann, President of Penn, told *The Daily Pennsylvanian* that "as tuition goes up financial aid goes up even more."[84] If this statement is true, it is also true that but for Penn's participation in the 568 Cartel, financial aid would have gone up even more—and that President Gutmann did not speak to that fact.

## IX.

## CLASS ACTION ALLEGATIONS

200. The proposed Class, under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), comprises all U.S. citizens or permanent residents, and purchasers of tuition, room, or board on their behalf, who have (a) enrolled in one or more of the Defendants' full-time undergraduate programs, (b) received need-based financial aid from one or more Defendants, (c) paid to one of more Defendants tuition, room, or board not fully covered by such financial aid,

[83] Madeline Buckley, *University Increases Tuition for 2009*, THE OBSERVER (Mar. 4, 2009), https://ndsmcobserver.com/2009/03/university-increases-tuition-for-2009/.

[84] *Amy Gutmann's Interview with The Daily Pennsylvanian*, THE DAILY PENNSYLVANIAN (Mar. 2, 2017), https://www.thedp.com/article/2017/03/amy-gutmann-penn-transcript-interview.

and (d) first enrolled in one of the Defendants' full-time undergraduate programs during these time periods (the "Class Periods"):

- Brown—from 2004 through 2012.
- CalTech—from 2019 to the present.
- Chicago—from 2003 through 2014.
- Columbia—from 2003 to the present.
- Cornell—from 2003 to the present.
- Duke—from 2003 to the present.
- Dartmouth—from 2004 to the present.
- Emory—from 2004 through 2012.
- Georgetown—from 2003 to the present.
- MIT—from 2003 to the present.
- Northwestern—from 2003 to the present.
- Notre Dame—from 2003 to the present.
- Penn—from 2003 to the present.
- Rice—from 2003 through 2009, and from 2017 to the present.
- Vanderbilt—from 2003 through 2019.
- Yale—from 2003 through 2007, and from 2018 to the present.

201. The Class excludes purchasers of tuition, room, and board the full cost of which was covered with institutional aid provided by such Defendant(s). Class Members also exclude Defendants and their officers, directors, management, employees, subsidiaries, or affiliates; and the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

202. Plaintiffs reserve the right to amend the Class definition, including with respect to the relevant time periods of membership in the 568 Cartel, based on discovery in this action.

203. The Class Members are readily ascertainable and identifiable because records of the relevant transactions should exist, because the Class Members' identities are known to Defendants, and because the members may be notified of the pendency of this action by forms of notice customarily used in class actions.

204. The Class Members are so numerous that joinder of all of them is impracticable; the number is unknown to Plaintiffs but, on information and belief, is over 170,000.

205. There are questions of law and fact common to the Class Members, including, but not limited to, the following:

a. The scope and operation of the 568 Exemption;

b. Whether Defendants' admissions practices fall under the 568 Exemption;

c. Whether Defendants conspired as alleged herein;

d. Whether the conspiracy harmed competition as alleged herein;

e. Whether the conspiracy caused antitrust injury as alleged herein;

f. The appropriate Class-wide measure of damages; and

g. The common method for determining the damages of individual Class Members.

206. All or substantially all Class Members were injured by Defendants' unlawful conduct. A common formula exists that allows for determination of damages of individual Class Members and for excluding from recovery any individuals who may not have been damaged.

207. Plaintiffs' claims are typical of the claims of the Class Members. Plaintiffs and the other Class Members were damaged by the same common course of conduct by Defendants.

208. Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs' interests are aligned with, and not adverse to, those of the other Class Members.

209. Plaintiffs will continue to fully and adequately protect the interests of the Class Members. Plaintiffs have retained counsel competent and experienced in the prosecution of antitrust class action litigation, and with the necessary financial resources, to represent themselves and the Class.

210. Defendants have acted on grounds that apply generally to the Class, so that final injunctive relief is appropriate respecting the Class as a whole.

211. Questions of law or fact that are common to the Class Members predominate over any questions affecting only individual Class Members.

212. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual Class Members would impose heavy burdens on the Court and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. In contrast, a class action would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the vast majority of the Class Members to seek redress for the violations of law alleged herein.

## X.

## ANTITRUST INJURY

213. Plaintiffs and the other Class Members have suffered antitrust injury due to Defendants' illegal conduct. They have suffered injury of the type that the antitrust laws were intended to prevent and that flows from that which makes Defendants' acts unlawful.

214. Defendants have conspired to reduce or eliminate price competition among 568 Cartel members on provision of financial-aid packages to Class Members, thereby depriving Plaintiffs and the other Class Members of a competitive marketplace.

215. As a result of Defendants' conspiracy to fix prices, Plaintiffs and the other Class Members were injured in the form of receiving artificially suppressed financial aid and paying artificially inflated net prices of attendance.

216. Plaintiffs and the other Class Members are naturally motivated to enforce the antitrust laws because they paid artificially inflated prices. There are no other persons who were more directly injured from, or more motivated to seek redress for, Defendants' misconduct than Plaintiffs and the other Class Members.

217. Absent Defendants' conspiracy, Defendants would have competed more aggressively to attract Plaintiffs and the other Class Members to their undergraduate programs, by offering all Class Members more generous financial aid and charging lower net prices of attendance than under Defendants' conspiracy.

218. If Defendants had competed with respect to financial aid, Plaintiffs and the other Class Members would have received more money in financial aid and paid lower net prices of attendance, as opposed to the artificially inflated net prices that Plaintiffs and the other Class Members paid due to Defendants' conspiracy.

219. Defendants' conspiracy is an illegal horizontal agreement to fix prices. By setting prices, through agreed-upon formulas, Defendants' price fixing directly and proximately caused antitrust injury to Plaintiffs and the other Class Members, who received less money in financial aid, and paid higher net prices of attendance, than they would have if Defendants had competed rather than conspired to fix prices.

## XI.

## THE RELEVANT MARKET

220. Defendants' price fixing is *per se* anticompetitive, obviating any market definition, including based on the direct evidence of anticompetitive effects. Defendants' conduct is also illegal under any rule of reasons or "quick look" analysis that may apply.

221. Plaintiffs thus further allege a relevant market, for undergraduate education at private national universities with an average ranking of 25 or higher in the *U.S. News & World Report* rankings from 2003 through 2021 (the most recent year in which Class Members applied to any of the Defendants). This is the Market for Elite, Private Universities.

222. This market does not include liberal arts colleges, which offer distinct products and are generally more like each other than elite, private universities. Reflecting industry recognition of these discrete classifications, both *U.S. News & World Report* and the *Carnegie Classifications* classify national universities and liberal arts colleges separately, given that liberal arts colleges are generally regarded as having different characteristics and services, including a smaller student body, smaller and less competitive athletic programs, fewer graduate programs, and less emphasis on research. In contrast, private, national universities tout themselves as offering such distinct services that the liberal arts colleges do not.

223. The Market for Elite, Private Universities has a rational relation to the interchangeability of use or cross-elasticity of demand with respect to the universities in the market. That is, within this market, sufficient cross-elasticity of demand exists such that a sufficient number of admitted students to two or more of these universities would respond to a small but significant increase in the net price by one university in the market by choosing to attend a lower-priced university in the same market that would make the price increase unremunerative.

224. The Market for Elite, Private Universities also has a rational relation to the cross-elasticity of demand with respect to elite, private liberal arts colleges. That is, the cross-elasticity between elite, private universities and elite liberal arts colleges in the United States is low, such that a hypothetical monopolist in the Market for Elite, Private Universities could impose a small but significant non-transitory increase in price ("SSNIP") without losing so many students to elite liberal arts colleges as to render the SSNIP unremunerative.

225. Admission to elite, private liberal arts colleges is generally less selective than admission to elite, private, national universities. According to *U.S. News & World Report,* the average admission rate of the top 10 national universities is approximately 7%, whereas the average admission rate of the top 10 liberal arts colleges is approximately 14%.

226. A further factor differentiating private universities and liberal arts colleges is the yield rate—that is, the rate at which admissions offers are accepted. Among the private universities ranked in the top 25 by *U.S. News & World Report*, there is a strong correlation between the institution's rank and yield rate. Among the liberal arts colleges, this correlation is much weaker (if it exists at all). The yield rate of both Harvard and Stanford, for example, is usually greater than 80%, whereas the yield rate for the most highly rated private liberal arts colleges—Williams, Amherst, and Swarthmore—is usually approximately 40%.

227. The Market for Elite, Private Universities does not include public universities. A handful of public universities have national rankings and selectivity comparable to that of the elite, private universities. Competition between public universities and elite, private institutions, however, is limited in the national market for students seeking financial aid, including the Class Members. The University of California-Los Angeles ("UCLA") and the University of California-Berkeley ("UC Berkeley"), for example, do not provide need-based financial assistance to out-of-

state applicants. The University of Michigan-Ann Arbor ("Michigan") has an official policy of prioritizing financial aid for residents. The University of Virginia ("UVA") is required by law to matriculate at least two-thirds of its undergraduate student body from its pool of in-state applicants and charges a high average net price to out-of-state students to cross-subsidize in-state students, a pricing policy that is driven by political pressure that private institutions do not face.

228. Indeed, public universities and private universities make pricing decisions based on very different factors, with public institutions being subject to political pressures, state laws, and dependence on expropriations from state treasuries. Compared to elite, private universities, public universities such as UCLA, UC Berkeley, UVA, and Michigan have different pricing models and largely compete for different students. (Cornell includes four contract colleges, whose students comprise less than half of the university's undergraduates, that charge lower tuition on in-state residents. Plaintiffs expect discovery to confirm that this fact does not exclude Cornell from the relevant market, including because Cornell does not largely compete for different students than the other universities in the relevant market.)

229. Schools in the Market for Elite, Private Universities compete with each other. Defendants are tightly packed in their average *U.S. News & World Report* rankings over the last 19 years (3.1, 5.1, 5.9, 6.4, 7.3, 8.0, 8.0, 10.7, 11.5, 14.8, 14.8, 16.7, 16.7, 18.1, 19.7, and 22.3).

230. Defendants have considerable market power, which they have exercised to increase the net price of attendance and to injure Plaintiffs and the other Class Members through the conduct alleged herein. Since 2003, Defendants have controlled, on average, approximately 74% of the number of undergraduate slots in the Market for Elite, Private Universities.

231. Competition in the Market for Elite, Private Universities is constrained by extremely strong brand preferences among consumers and high barriers to entry. Competition is

further constrained by the fact that such institutions limit the supply of available seats, which has the effect of generating scarcity and enhancing their prestige. Competition in the Market for Elite, Private Universities is further constrained by the fact that applicants cannot readily substitute one institution for another because an applicant's choice is limited to those universities to which he or she is admitted in a highly selective process.

232. The 568 Cartel does not have any pro-competitive impacts. Accordingly, if the rule of reason were to apply, it is not necessary to demonstrate reasonable and less restrictive alternatives are available. Unlike the Overlap Group, the 568 Cartel does not agree to allocate aid solely based on demonstrated financial need. Indeed, unlike the Overlap Group, several members of the 568 Cartel offer athletic scholarships and compete to have nationally ranked athletic teams every year.

233. Defendants have substantial endowments and the proven capacity to earn rates of return on those endowments that well exceed the minimum 5% distribution requirement of the tax laws. Defendants thus have ample resources to meet the financial needs of their students without reducing their endowments (if that were even imperative) and without colluding on a formula that results in artificially reduced financial aid, and that would in fact provide substantially more financial aid, and charge lower net prices of attendance, but for the 568 Cartel.

234. In addition, a reasonable and less restrictive alternative is for each member of the 568 Cartel to implement a fair formula unilaterally, as other elite, private universities have done, without entering into a conspiracy that overcharges students. In addition, no pro-competitive impact that Defendants may proffer justifies the significant overcharge caused by the conspiracy. If even relevant to any analysis under the rule of reason, moreover, there is no legitimate or significant procompetitive justification in Defendants' non-compliance with Section 568 or in

combining such non-compliance with the collective application of the Consensus Methodology to artificially reduce financial aid.

235. Colluding on common aid methodology under the 568 Cartel is not reasonably necessary to achieve the objective of awarding financial aid to admitted students. Instead, there are substantially less restrictive alternatives for helping to fund need-based financial aid—namely, and as noted, using a portion of the annual investment gains on Defendants' endowments.

## XII.

## CLAIM FOR RELIEF

### FIRST CAUSE OF ACTION
### Sherman Act Section 1

236. Plaintiffs incorporate the preceding paragraphs.

237. At a time currently unknown to Plaintiffs, but at least as early as 2003, and continuing through the present, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize and reduce the amount of financial aid paid to Class Members, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

238. In formulating and carrying out their agreement and conspiracy, Defendants did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others: Using an agreed upon formula or method for fixing, lowering, and stabilizing the amount of financial aid they offered and fixing, increasing, and stabilizing the net price of attendance.

239. The 568 Cartel has monitored and enforced its combination and conspiracy in several ways, according to the Cartel's website, including (but not limited to) such steps as (a) requiring each participation institution to submit a "Certificate of Compliance," (b) requiring university professionals at each institution to receive "training . . . in the application of the

Methodology," (c) imposing a "common calendar for the collection of data from families," and (d) conducting an annual or biannual meeting every year since 2007.

240. This conspiracy has had the following effects, among others: The net price of attendance has been fixed, increased, maintained, and stabilized at artificially high, non-competitive levels for all Class Members.

241. Plaintiffs and the other Class Members have been injured and will continue to be injured in their businesses and property by paying more for attendance at Defendants than they would have paid and will pay but for the combination and conspiracy.

242. Defendants are not entitled to the affirmative defense that they are exempt from the antitrust laws, because they do not satisfy the requirement that all students are admitted on a need-blind basis, for the reasons set forth above.

243. Defendants' price-fixing is a *per se* violation of the Sherman Act; or, in the alternative, is a violation of the Sherman Act under the Rule of Reason or "quick look" analysis.

244. Defendants' conduct has directly and proximately caused antitrust injury to Plaintiffs and the other Class Members. The artificially inflated net price of attendance that Plaintiffs and the other Class Members have paid to Defendants flows directly from Defendants' price fixing and is the type of damage that the antitrust laws were designed to prevent.

245. Plaintiffs and the other Class Members are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

## XIII.

## REQUESTED RELIEF

Plaintiffs request the following relief:

(a) That the Court determine that this action may be maintained as a class action under Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and direct that notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to Class Members;

(b) That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the law;

(c) That the Court hold Defendants jointly and severally liable for the injuries caused by each one of them and award Plaintiffs and the other Class Members actual damages and/or restitution in an amount to be determined at trial, such amount to be trebled as permitted by law;

(d) That the Court award Plaintiffs and the other Class Members pre- and post-judgment interest on any recovery;

(e) That the Court award Plaintiffs their costs of suit, including reasonable attorneys' fees and expenses;

(f) That the Court award Plaintiffs a permanent injunction, under Section 16 of the Clayton Act, enjoining Defendants from continuing to illegally conspire regarding their pricing and financial-aid policies; and

(g) That the Court award such other relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury of all claims so triable in this lawsuit.

/s/ Robert D. Gilbert
Robert D. Gilbert
Elpidio Villarreal
**GILBERT LITIGATORS & COUNSELORS, P.C.**
11 Broadway, Suite 615
New York, NY 10004
Telephone: 646-448-5269
rgilbert@gilbertlitigators.com
pdvillarreal@gilbertlitigators.com

/s/ Kyle W. Roche
Kyle W. Roche
Edward Normand
Eric Rosen
Peter Bach-y-Rita
**ROCHE FREEDMAN LLP**
99 Park Avenue, 19th Floor
New York, NY 10016
Tel: (646) 350-0527
kyle@rochefreedman.com
tnormand@rochefreedman.com
erosen@rochefreedman.com
pbachyrita@rochefreedman.com

/s/ Eric L. Cramer
Eric L. Cramer*
Caitlin Coslett*
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Phone: (215) 875-3000
ecramer@bm.net
ccoslett@bm.net

/s/ Elizabeth A. Fegan
Elizabeth A. Fegan
**FEGAN SCOTT LLC**
150 S. Wacker Dr., 24th floor
Chicago, IL 60606
Tel: (312) 741-1019
beth@feganscott.com

Robert E. Litan*
Daniel J. Walker*
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20006
Phone: (202) 559-9745
rlitan@bm.net
dwalker@bm.net

**Pro hac vice* to be filed

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| FRANK CARBONE, ANDREW CORZO, SAVANNAH ROSE EKLUND, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, KARA SAFFRIN, and BRITTANY TATIANA WEAVER, individually and on behalf of all others similarly situated, | **Case No. 1:22-cv-00125** |
| Plaintiffs, | **Hon. Matthew F. Kennelly** |
| v. | |
| BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY, | **JURY TRIAL DEMANDED** |
| Defendants. | |

**AMENDED CLASS ACTION COMPLAINT**

Plaintiffs, Frank Carbone, Andrew Corzo, Savannah Rose Eklund, Sia Henry, Alexander Leo-Guerra, Michael Maerlender, Brandon Piyevsky, Kara Saffrin, and Brittany Tatiana Weaver, individually and on behalf of all others similarly situated, bring this class action under Section 1 of the Sherman Act against Brown University ("Brown"), California Institute of Technology ("CalTech"), University of Chicago ("Chicago"), The Trustees of Columbia University in the City of New York ("Columbia"), Cornell University ("Cornell"), Trustees of Dartmouth College ("Dartmouth"), Duke University ("Duke"), Emory University ("Emory"), The Johns Hopkins University ("Johns Hopkins"), Georgetown University ("Georgetown"), Massachusetts Institute of Technology ("MIT"), Northwestern University ("Northwestern"), University of Notre Dame du Lac ("Notre Dame"), The Trustees of the University of Pennsylvania ("Penn"), William Marsh Rice University ("Rice"), Vanderbilt University ("Vanderbilt"), and Yale University ("Yale") (collectively, "Defendants").

**I.**

**INTRODUCTION**

1. Defendants are private, national universities that have long been in the top 25 of the *U.S. News & World Report* rankings for such schools. These elite institutions occupy a place of privilege and importance in American society. And yet these same Defendants, by their own admission, have participated and are participating in a price-fixing cartel that is designed to reduce or eliminate financial aid as a locus of competition, and that in fact has artificially inflated the net price of attendance for students receiving financial aid.

2. Defendants have participated in this cartel while claiming the protection of Section 568 of the Improving America's Schools Act of 1994 (the "568 Exemption"). This exemption from the antitrust laws, laws which otherwise prohibit conspiracies among competitors relating to price, offers antitrust immunity only to two or more institutions of higher education at which "*all* students

admitted are admitted on a need-blind basis." (Emphasis added.) Section 568 defines "on a need-blind basis" to mean "without regard to the financial circumstances of the student involved or the student's family." 15 U.S.C. § 1 note.

3. Defendants are not entitled to the 568 Exemption. Under a legally compliant need-blind admissions system, all students must be admitted without regard to their or their families' financial circumstances. Far from adhering to this statutory requirement, all Defendants have considered the financial circumstances of students or their families in deciding whether to admit students.

4. Defendants have thus made admissions decisions *with regard to* the financial circumstances of students and their families, thereby disfavoring students who need financial aid. All Defendants, in turn, have conspired to reduce the amount of financial aid they provide to admitted students. This conspiracy, which has existed (with only slightly varying membership) for many years, thus falls outside any potentially applicable antitrust exemption.

5. Defendants are and have been members of the so-called "568 Presidents Group," in which the members have agreed on "a set of common standards for determining the family's ability to pay for college," which the members describe as the "Consensus Approach." Based on the Consensus Approach, in approximately 2003, the 568 Presidents Group (the "568 Cartel") devised the Consensus Methodology, which is a common formula for determining an applicant's ability to pay. Under the Consensus Methodology, an applicant's ability to pay is a substantial determinant of the net price, which is the institution's gross tuition plus fees for room and board, less institutional grant aid, charged to the applicant for attendance.

6. Since its inception, the goal of the 568 Cartel has been, in the words of the Cartel members, to determine "whether it is possible to reach agreement on common standards for

determining financial need at the institutional level." Defendants in fact so determined and so agreed. Defendants have met—and continue to meet—to devise, agree upon, and collectively implement common principles and a uniform method for analyzing, offering, and providing financial aid to admitted students.

7. In collectively sharing confidential data and information about admissions and financial aid, adopting this methodology, and regularly meeting to implement this methodology jointly, the 568 Cartel has intended to reduce or eliminate, and in fact succeeded in reducing or eliminating, price competition among its members. As a result, the net price of attendance for financial-aid recipients at Defendants' schools—included among the members of the proposed Class here—has been artificially inflated. In short, due to the conduct challenged herein, over almost two decades, Defendants have overcharged over 200,000 financial-aid recipients by at least hundreds of millions of dollars collectively, in violation of Section 1 of the Sherman Act.

8. This longstanding conspiracy would be immune from the antitrust laws only if all the conspirators have been complying with the 568 Exemption. In fact, all Defendants have been members of the 568 Cartel, and none has qualified for the 568 Exemption. Instead, all Defendants have considered the financial circumstances of students and their families in deciding whether to admit waitlisted and transfer students; at least several Defendants maintain admissions systems that favor the children of wealthy past or potential future donors; at least several Defendants preference wealthy applicants through the largely secretive process known as "enrollment management"; and Columbia considers the financial circumstances of students and families in making admission decisions for its School of General Studies.

9. In critical respects, elite, private universities like Defendants are gatekeepers to the American Dream. Defendants' misconduct is particularly egregious because it has narrowed a

critical pathway to upward mobility that admission to their institutions represents. The burden of the 568 Cartel's overcharges falls especially on low- and middle-income families struggling to afford the cost of a university education and to achieve success for their children. In addition, unlike prior admissions scandals, such as Varsity Blues,[1] the 568 Cartel's systematic suppression of financial aid, resulting in the artificial inflation of the net price of attendance, is the official policy of its participants. As Defendants have succinctly admitted, the purpose of their Cartel has been—in these specific terms—to "discuss *and agree upon* common principles of analysis for determining the financial need of undergraduate financial aid applicants."

10. The 568 Cartel has thus caused substantial injury to Plaintiffs and the other members of the proposed Class (defined below). Plaintiffs bring this lawsuit to end Defendants' conspiratorial conduct and to prevent future students from suffering the injury the ongoing conspiracy has inflicted. Plaintiffs do so without having known until recently that they had been injured in violation of the 568 Exemption, and under circumstances in which a reasonable person would have been unaware of the harm resulting from Defendants' use of the Consensus Methodology in violation of the 568 Exemption.

11. Plaintiffs also seek compensation for themselves and a proposed Class of all U.S. citizens or permanent residents, and purchasers of tuition, room, or board on their behalf, who have (a) enrolled in one or more of Defendants' full-time undergraduate programs, (b) received need-based financial aid from one or more Defendants, (c) paid to one of more Defendants tuition, room, or board not fully covered by such financial aid, and (d) first enrolled in one of Defendants' full-time undergraduate programs during the relevant times (defined below) from January 1, 2003 until

[1] "Varsity Blues" is law enforcement's code name for the investigation and prosecution of the college admissions bribery scandal, which involved allegations that certain universities gave admissions preference to the children of wealthy parents in exchange for bribes.

the effects of Defendants' continuing conduct ceases. Members of this "Class" shall be called "Class Members."

12. Parents, legal guardians, and other family members commonly pay or help to pay the cost of a student's tuition, room, and board. The proposed Class therefore includes both students and those who pay or commit to pay on behalf of students.

## II.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331, 1332(d)(2), and 1337.

14. This Court has personal jurisdiction over each Defendant on multiple bases, including that each Defendant has: (1) transacted business in the United States and in this District, including by recruiting, and advertising for, students residing in this District; (2) transacted business with Class Members throughout the United States, including those residing in this District; and (3) committed substantial acts in furtherance of an unlawful scheme in the United States, including in this District. Each Defendant has recruited, accepted, enrolled, and charged artificially high net prices of attendance to, and thus injured, individuals residing within this District. In addition, Defendants have held at least one meeting of the 568 Cartel in Rosemont, Illinois, which is within this District.

15. Venue is proper in this District under 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b), (c), and (d), because each Defendant transacted business, was found, had agents, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

formed by a group of 28 college and university presidents from need-blind schools in 1998." The website also contains the form of a certificate of compliance whereby a member of the group can certify that "its admission and financial aid practices currently comply with the rules of Section 568 regarding 'need-blind admission practices.'" These statements on the website mislead the public by representing that the 568 Cartel members' practices are compliant with Section 568. The truth, as alleged further below, is the opposite.

115. The 568 Cartel fixes prices through a formula that is based on a "set of common standards for determining the family's ability to pay for college." The 568 Cartel calls this formula the "Consensus Methodology." Defendants admit on their own website that the "purposes" of the 568 Cartel include, collectively, to "Discuss and agree upon common principles of analysis for determining the financial need of undergraduate financial aid applicants"; to "Build, maintain, and revise, as appropriate, a Consensus Approach need analysis methodology that is consistent with these principles"; and to "Explore ways of developing a data exchange program."

116. Defendants further concede that the "Consensus Methodology" would, in their own words, contain "certain key components, including: 1) common elements of need analysis . . .; 2) a common calendar for the collection of data from families; 3) a means of training aid professionals in the application of the Methodology; and 4) an oversight 568 Group to review and modify the methodology as needed over time."

117. Critical components of the 568 Cartel have therefore been the development of a "data exchange program" and the agreement to share information about admissions and financial-aid methodology, and then to meet regularly to discuss this data and information, to enable the Cartel members to agree to use a common methodology for determining financial-aid awards for the purposes of coordinating financial-aid awards among Cartel members. The common

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **FRANK CARBONE, ANDREW CORZO, SAVANNAH ROSE EKLUND, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLANDER, BRANDON PIYEVSKY, KARA SAFFRIN, and BRITTANY TATIANA WEAVER, individually and on behalf of all others similarly situated,** | ) | |
| **Plaintiffs,** | ) | |
| **vs.** | ) | **Case No. 22 C 125** |
| **BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,** | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Frank Carbone, Andrew Corzo, Savannah Rose Eklund, Sia Henry, Alexander Leo-Guerra, Michael Maerlander, Brandon Piyevsky, Kara Saffrin, and Brittany Tatiana

Weaver, on behalf of themselves and all others similarly situated, have sued seventeen private universities for antitrust violations under section 1 of the Sherman Act. The defendants include Brown University (Brown), California Institute of Technology (CalTech), University of Chicago (Chicago), the Trustees of Columbia University in the City of New York (Columbia), Cornell University (Cornell), Trustees of Dartmouth College (Dartmouth), Duke University (Duke), Emory University (Emory), Georgetown University (Georgetown), the Johns Hopkins University (Johns Hopkins), Massachusetts Institute of Technology (MIT), Northwestern University (Northwestern), University of Notre Dame Du Lac (Notre Dame), the Trustees of the University of Pennsylvania (Penn), William Marsh Rice University (Rice), Vanderbilt University (Vanderbilt), and Yale University (Yale).

This opinion concerns three motions to dismiss filed by the defendants: (1) a motion joined by all of the defendants; (2) a motion by Brown, Chicago, Emory, and Johns Hopkins; and (3) a motion by Yale. For the reasons below, the Court denies the defendants' motions.

**Background**

The defendants are private universities that have been consistently ranked by the *U.S. News & World Report* as among the top twenty-five of such schools in the nation. On January 9, 2022, the plaintiffs filed suit against the defendants, who they allege have "participated and are participating in a price-fixing cartel that is designed to reduce or eliminate financial aid as a locus of competition, and that in fact has artificially inflated the net price of attendance for students receiving financial aid." Am. Compl. ¶ 1. The plaintiffs seek class certification under Federal Rules of Civil Procedure 23(a),

### C. Yale's motion

Yale has also filed a separate motion to dismiss, contending that the claims against it should be dismissed because the plaintiffs concede that Yale does not use the disputed Consensus Methodology in determining a student's need for financial aid. The Court disagrees. The amended complaint alleges that "Yale claims not to have participated in the 568 Cartel from 2008 until 2018" and that it implemented a new financial aid policy in early 2009. Am. Compl. ¶ 123. Contrary to Yale's contentions, these allegations do not amount to a concession that Yale does not use the CM. In fact, the plaintiffs allege that Yale is currently a member of the 568 Group and that all members of the 568 Group are required to adopt the CM. *See id.* ¶ 124 (alleging that "Yale understood that active members of the 568 Cartel were required to agree to and impose the Consensus Methodology").

In addition, even if the amended complaint was understood to allege that Yale stopped using the CM in 2008, it can still be held liable for the acts of its alleged coconspirators. *Marion Healthcare*, 952 F.3d at 839. The amended complaint alleges that Yale joined the 568 Group in 1998. Yale contends that the plaintiffs concede that Yale withdrew from the conspiracy in 2008, but this is inaccurate. As with Brown, Chicago, and Emory, the amended complaint states that Yale *claims* to have withdrawn from the conspiracy, but it does not concede that Yale actually withdrew. The Court thus denies Yale's motion to dismiss.

## Conclusion

For the foregoing reasons, the Court denies the defendants' motions to dismiss [dkt. nos. 145, 146 & 148]. The defendants are directed to answer the amended

complaint by no later than September 9, 2022. The parties are directed to promptly confer regarding a discovery and pretrial schedule, and they are to file by August 26, 2022 a joint status report with an agreed proposal, or alternative proposals if they cannot agree. The case is set for a telephonic status hearing on September 2, 2022 at 9:10 a.m., using call-in number 888-684-8852, access code 746-1053. The Court reserves the right to vacate the hearing if it determines a hearing is not needed.

MATTHEW F. KENNELLY
United States District Judge

Date: August 15, 2022

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated, | **Case No. 1:22-cv-00125** |
| Plaintiffs, | |
| v. | **Hon. Matthew F. Kennelly** |
| BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY, | **JURY TRIAL DEMANDED** |
| Defendants. | |

**SECOND AMENDED AND SUPPLEMENTAL**
**<u>CLASS ACTION COMPLAINT</u>**

Plaintiffs, Andrew Corzo, Sia Henry, Alexander Leo-Guerra, Michael Maerlender, Brandon Piyevsky, Benjamin Shumate, Brittany Tatiana Weaver, and Cameron Williams, individually and on behalf of all others similarly situated, bring this class action under Section 1 of the Sherman Act against Brown University ("Brown"), California Institute of Technology ("CalTech"), University of Chicago ("Chicago"), The Trustees of Columbia University in the City of New York ("Columbia"), Cornell University ("Cornell"), Trustees of Dartmouth College ("Dartmouth"), Duke University ("Duke"), Emory University ("Emory"), The Johns Hopkins University ("Johns Hopkins"), Georgetown University ("Georgetown"), Massachusetts Institute of Technology ("MIT"), Northwestern University ("Northwestern"), University of Notre Dame du Lac ("Notre Dame"), The Trustees of the University of Pennsylvania ("Penn"), William Marsh Rice University ("Rice"), Vanderbilt University ("Vanderbilt"), and Yale University ("Yale") (collectively, "Defendants").

## I.

## INTRODUCTION

1. Defendants are private, national universities that have long been in the top 25 of the *U.S. News & World Report* rankings for such schools. These elite institutions occupy a place of privilege and importance in American society. And yet these same Defendants, by their own admission, have participated and are participating in a price-fixing cartel that is designed to reduce or eliminate financial aid as a locus of competition, and that in fact has artificially inflated the net price of attendance for students receiving financial aid.

2. Defendants have participated in this cartel while claiming the protection of Section 568 of the Improving America's Schools Act of 1994 (the "568 Exemption"). This exemption from the antitrust laws, laws which otherwise prohibit conspiracies among competitors relating to price, offered antitrust immunity only to two or more institutions of higher education at which "*all*

students admitted are admitted on a need-blind basis." (Emphasis added.) Section 568 defines "on a need-blind basis" to mean "without regard to the financial circumstances of the student involved or the student's family." 15 U.S.C. § 1 note. The 568 Exemption expired at midnight on September 30, 2022.

3. Defendants were not entitled to the 568 Exemption. Under a legally compliant need-blind admissions system, all students must be admitted without regard to their or their families' financial circumstances. Far from adhering to this statutory requirement when the 568 Exemption existed, all Defendants have considered the financial circumstances of students or their families in deciding whether to admit students.

4. Defendants have thus made admissions decisions *with regard to* the financial circumstances of students and their families, thereby disfavoring students who need financial aid. All Defendants, in turn, have conspired to reduce the amount of financial aid they provide to admitted students. This conspiracy, which has existed (with only slightly varying membership) for many years, thus falls outside any potentially applicable antitrust exemption.

5. Defendants are and have been members of the so-called "568 Presidents Group," in which the members have agreed on "a set of common standards for determining the family's ability to pay for college," which the members describe as the "Consensus Approach." Based on the Consensus Approach, in approximately 2003, the 568 Presidents Group (the "568 Cartel") devised the Consensus Methodology, which is a common formula for determining an applicant's ability to pay. Under the Consensus Methodology, an applicant's ability to pay is a substantial determinant of the net price, which is the institution's gross tuition plus fees for room and board, less institutional grant aid, charged to the applicant for attendance.

6. Since its inception, the goal of the 568 Cartel has been, in the words of the Cartel members, to determine "whether it is possible to reach agreement on common standards for determining financial need at the institutional level." Defendants in fact so determined and so agreed. Defendants have met—and may continue to meet—to devise, agree upon, and collectively implement common principles and a uniform method for analyzing, offering, and providing financial aid to admitted students.

7. In collectively sharing confidential data and information about admissions and financial aid, adopting this methodology, and regularly meeting to implement this methodology jointly, the 568 Cartel has intended to reduce or eliminate, and in fact succeeded in reducing or eliminating, price competition among its members. As a result, the net price of attendance for financial-aid recipients at Defendants' schools—included among the members of the proposed Class here—has been artificially inflated. In short, due to the conduct challenged herein, over almost two decades, Defendants have overcharged over 200,000 financial-aid recipients by billions of dollars collectively, in violation of Section 1 of the Sherman Act.

8. This longstanding conspiracy would have been immune from the antitrust laws when the 568 Exemption existed only if all the conspirators had been complying with the Exemption. In fact, all Defendants have been members of the 568 Cartel, and thus conspirators, and none qualified for the 568 Exemption. Instead, all Defendants have considered the financial circumstances of students and their families in deciding whether to admit waitlisted and transfer students; Defendants have maintained admissions systems that favor the children of wealthy past or potential future donors; at least several Defendants have given preference to wealthy applicants through the largely secretive process known as "enrollment management"; and Columbia has

considered the financial circumstances of students and families in making admission decisions for its School of General Studies.

9. In critical respects, elite, private universities like Defendants are gatekeepers to the American Dream. Defendants' misconduct is particularly egregious because it has narrowed a critical pathway to upward mobility that admission to their institutions represents. The burden of the 568 Cartel's overcharges falls especially on low- and middle-income families struggling to afford the cost of a university education and to achieve success for their children. In addition, unlike prior admissions scandals, such as Varsity Blues,[1] the 568 Cartel's systematic suppression of financial aid, resulting in the artificial inflation of the net price of attendance, has been the official policy of its participants. As Defendants have succinctly admitted, the purpose of their Cartel has been—in these specific terms—to "discuss *and agree upon* common principles of analysis for determining the financial need of undergraduate financial aid applicants."

10. The 568 Cartel has thus caused substantial injury to Plaintiffs and the other members of the proposed Class (defined below). Plaintiffs bring this lawsuit to prevent Defendants' conspiratorial conduct and to prevent future students from suffering the injury the ongoing conspiracy has inflicted. Plaintiffs do so without having known until recently that they had been injured in violation of the 568 Exemption, and under circumstances in which a reasonable person would have been unaware of the harm resulting from Defendants' use of the Consensus Methodology in violation of the 568 Exemption.

11. Plaintiffs also seek compensation for themselves and a proposed Class of all U.S. citizens or permanent residents, who have (a) enrolled in one or more of Defendants' full-time

---

[1] "Varsity Blues" is law enforcement's code name for the investigation and prosecution of the college admissions bribery scandal, which involved allegations that certain universities gave admissions preference to the children of wealthy parents in exchange for bribes.

undergraduate programs, (b) received need-based financial aid from one or more Defendants, (c) directly purchased from one of more Defendants education, room, or board not fully covered by such financial aid, and (d) first enrolled in one of Defendants' full-time undergraduate programs during the relevant times (defined below) from January 1, 2003 until the effects of Defendants' continuing conduct ceases. Members of this "Class" shall be called "Class Members."

## II.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331, 1332(d)(2), and 1337.

13. This Court has personal jurisdiction over each Defendant on multiple bases, including that each Defendant has (1) transacted business in the United States and in this District, including by recruiting, and advertising for, students residing in this District; (2) transacted business with Class Members throughout the United States, including those residing in this District; and (3) committed substantial acts in furtherance of an unlawful scheme in the United States, including in this District. Each Defendant has recruited, accepted, enrolled, and charged artificially high net prices of attendance to, and thus injured, individuals residing within this District. In addition, Defendants have held at least one meeting of the 568 Cartel in Rosemont, Illinois, which is within this District.

14. Venue is proper in this District under 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b), (c), and (d), because each Defendant transacted business, was found, had agents, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

102. Johns Hopkins joined the 568 Cartel in 2021, has taken overt steps in furtherance of the conspiracy alleged herein (including meeting with Defendants and discussing the Consensus Methodology with them), and first implemented the Consensus Methodology with respect to Early Decision applicants in 2021.

103. Rice joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

104. Penn joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

105. Vanderbilt joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

106. Yale joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

107. Certain Defendants claim to have stopped participating in the 568 Cartel at various points in time since 2003, but Plaintiffs are unaware of any evidence that any Defendant disavowed and repudiated the conspiracy and its goals. Accordingly, no Defendant withdrew from the conspiracy. Accordingly, since 2003 and through the present, the determinants of the net price of attending Defendants' schools have been established through the conspiracy.

## V.

## DEFENDANTS' VIOLATION OF THE FEDERAL ANTITRUST LAWS

### A. Defendants Have Colluded on Their Financial-Aid Practices

108. Defendants are purported competitors in enrolling highly selective undergraduate student bodies and providing an undergraduate education. People throughout the United States apply for admission to Defendants' undergraduate programs.

109. Each Defendant annually sends out thousands of solicitations and mailings and receives thousands of admission applications that cross state lines, including thousands of applications from Class Members. Out-of-state students, including thousands of Class Members, make up a substantial percentage of each Defendant's undergraduate population.

110. Each Defendant annually receives millions of dollars that flow across state lines in tuition payments, grants, donations, and athletic ticket sales and sponsorships. Each Defendant markets its undergraduate programs and tickets for athletic events to the public across state lines.

111. Defendants have engaged in a continuing conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act. This conspiracy, to the extent it continues, is likely to continue unless the relief sought herein is granted.

112. This conspiracy has consisted of an agreement, understanding, and concert of action among Defendants, and each of them, the substantial terms of which are to restrain price competition relating to their provision of financial aid for students, and thereby to increase the net price of attending these institutions ("the net price of attendance").

113. The 568 Cartel generally meets in person as a group at least twice each year. In October 2017, for example, the 568 Cartel held one of its official biannual meetings at the Hilton Rosemont, in Rosemont, Illinois, near O'Hare International Airport. On information and belief, 568 Cartel members communicate with each other about matters related to the conspiracy through other means as well, such as telephone calls, video calls, emails, and messaging.

114. Until the fall of 2022, Defendants maintained a public-facing website for purpose of representing the 568 Cartel and its purposes to the public. The website stated: "This site serves as a resource . . . for visitors seeking to learn more about the Group."[22] The website explained that

[22] 568 PRESIDENTS GROUP, http://www.568group.org/home/.

the "568 Presidents Group is an affiliation of colleges and universities, all of which must admit students on a need-blind basis." An FAQ section on the website added: "It is referred to as a 'Presidents' group because it was formed by a group of 28 college and university presidents from need-blind schools in 1998." The website also contained the form of a certificate of compliance whereby a member of the group could certify that "its admission and financial aid practices currently comply with the rules of Section 568 regarding 'need-blind admission practices.'" These statements on the website misled the public by representing that the 568 Cartel members' practices were compliant with Section 568. The truth, as alleged further below, is the opposite.

115. The 568 Cartel has fixed prices through a formula that is based on a "set of common standards for determining the family's ability to pay for college." The 568 Cartel calls this formula the "Consensus Methodology." Defendants admitted on their own website that the "purposes" of the 568 Cartel include, collectively, to "Discuss and agree upon common principles of analysis for determining the financial need of undergraduate financial aid applicants"; to "Build, maintain, and revise, as appropriate, a Consensus Approach need analysis methodology that is consistent with these principles"; and to "Explore ways of developing a data exchange program."

116. Defendants further conceded that the "Consensus Methodology" would, in their own words, contain "certain key components, including: 1) common elements of need analysis . . .; 2) a common calendar for the collection of data from families; 3) a means of training aid professionals in the application of the Methodology; and 4) an oversight 568 Group to review and modify the methodology as needed over time."

117. Critical components of the 568 Cartel have therefore been the development of a "data exchange program" and the agreement to share information about admissions and financial-aid methodology, and then to meet regularly to discuss this data and information, to enable the

Cartel members to agree to use a common methodology for determining financial-aid awards for the purposes of coordinating financial-aid awards among Cartel members. The common methodology assesses the income and assets of given financial-aid applicants and their families to determine the applicants' ability to pay and thus the financial contribution that the applicant is expected to make.

118. The applicants' assessed ability to pay therefore is a key determinant in the net price of attendance. The 568 Cartel has used the shared, competitively sensitive information about enrollment, costs, and other data relating to Defendants' available resources for financial aid to arrive at a common and agreed formula for setting ability to pay, which results in artificially inflated net prices of attendance.

119. Members of the 568 Cartel began meeting sometime after the enactment of Section 568 in 1994. The 568 Cartel was officially formed in 1998.

120. As of July 2001, Dartmouth had not joined the 568 Cartel. According to Dartmouth's then-Dean of Admissions and Financial Aid, Karl Furstenberg, as of 2001 Dartmouth had a "need analysis methodology that [was] perhaps more enlightened, more generous and more flexible than" that of the 568 Cartel, and Dartmouth was "actually doing more than this new methodology would allow."[23] Not long after Mr. Furstenberg made these statements, however, Dartmouth decided to join the 568 Cartel, implemented the Consensus Methodology, and took other steps in furtherance of the conspiracy as alleged herein.

121. The 568 Cartel has monitored and enforced its combination and conspiracy in several ways, according to the Cartel's website, including (but not limited to) such steps as (a)

---

[23] Shevani Jaisingh, *28 Colleges Alter Financial Aid Packages*, THE DARTMOUTH (July 17, 2001), https://www.thedartmouth.com/article/2001/07/28-colleges-alter-fin-aid-packages.

requiring each participating institution to submit a "Certificate of Compliance," (b) requiring university professionals at each institution to receive "training . . . in the application of the Methodology," (c) imposing a "common calendar for the collection of data from families," and (d) conducting an annual or biannual meeting every year since 2007.

122. At midnight on September 30, 2022, the 568 Exemption expired. The 568 Cartel website is now blank except for the following message: "The 568 Presidents Group (and all of its Committees) has been formally dissolved, effective November 4, 2022. Thank you."

## VI.

## DEFENDANTS' ANTICOMPETITIVE CONDUCT HAS RAISED NET PRICES

123. As higher-education insiders—including employees and officers of the institutions in the 568 Cartel—have acknowledged, the Cartel has limited competition in financial-aid offers from supposedly competing schools, driving down aid packages and thereby driving up the net price of attendance for aid-eligible students.

124. Yale claims not to have participated in the 568 Cartel from 2008 until 2018. Yale claims it left the Cartel because it determined that membership in the Cartel had restricted the amount of financial aid that Yale could provide to students. That is, Yale's decision to increase financial-aid awards to eligible students prompted it to want to no longer participate. In so doing, referring to a new policy to be implemented in early 2009, Yale stated that its "new, more generous aid policy in January means the University can no longer follow the consensus methodology."[24]

125. Yale's then-Director of Student Financial Services, Caesar Storlazzi, concluded: "By leaving the 568 Group, Yale is now free to give families more aid than they would have gotten

[24] Caitlin Roman, *University Leaves Financial Aid Group*, YALE DAILY NEWS (Sept. 26, 2008), https://yaledailynews.com/blog/2008/09/26/university-leaves-financial-aid-group/.

EXHIBIT
McWade-11 12.8.23 mlg
exhibitsticker.com

**Date:** Tuesday, April 15 2014 01:09 PM
**Subject:** Re: 568 Talking points paper
**From:** Patricia McWade <mcwadep@georgetown.edu>
**To:** Ted Bracken <ted.bracken@yahoo.com>;

---

I think it was made clear to those wanting to participate in 568 that they could NOT use an EFC that was lower than what is calculated using the CA, unless they had documented the case using "professional judgment". That was why HYP felt the need to leave the group; they wanted to offer more "need-based" scholarship aid. Maybe this is not the document to explain that nuance but it is a reality.

On Tue, Apr 15, 2014 at 12:57 PM, Ted Bracken <ted.bracken@yahoo.com> wrote:

> I think this is a improvement on what were were trying to say, Pat.
>
> Begin forwarded message:
>
> **From:** Kristine E Dillon <[redacted]@MIT.EDU>
> **Subject: RE: 568 Talking points paper**
> **Date:** April 15, 2014 at 12:51:29 PM EDT
> **To:** Ted Bracken <ted.bracken@yahoo.com>
> **Cc:** Megan Arleth <marleth@mit.edu>
>
> Ted--
>
> Sorry to be slow with my comments. I was traveling last week and editing documents was not possible.
>
> -----Original Message-----
> From: Ted Bracken [mailto:ted.bracken@yahoo.com]
> Sent: Tuesday, April 15, 2014 12:31 PM
> To: Bruce C Layton; Megan Arleth; Scott Fleming; Patricia McWade; Chris Simmons; [redacted]
> Cc: Kristine E Dillon
> Subject: 568 Talking points paper
>
> All,
>
> Attached is the latest draft of the 'talking points' piece that has now had the benefit of several improvements suggested by the group.
>
> Let me know how I can be of further help.
>
> Ted

EXHIBIT
Exhibit 2 ID 4/23/24 LF
exhibitsticker.com

**Date:** Wednesday, August 27 2014 09:19 AM
**Subject:** Re: 568 Presidents' Group Exemption Renewal Efforts
**From:** Cynthia Barnhart
**To:** Elizabeth M Hicks <emhicks@mit.edu>;
**CC:** Dennis M Freeman <freeman@mit.edu>; Philip H. Lippel <phlippel@mit.edu>; Leslie C Bridson <lbridson@mit.edu>;
**Attachments:** smime.p7m

Thanks Betsy! Could you respond directly to the email below and let Karla know?

Thanks again,
Cindy

CYNTHIA BARNHART
Chancellor
Ford Professor of Engineering
MIT, Room 10-200, 77 Massachusetts Avenue
Cambridge, MA 02139
barnhart@mit.edu
617 253-3815

On Aug 26, 2014, at 11:21 AM, Elizabeth M Hicks <emhicks@mit.edu> wrote:

Dear Cindy,

After talking to Philip Lippel as well as the MIT financial aid staff, I recommend that we support the renewal of Section 568. However, we may want to make it clear that we believe that the 568 Group is entering its final transition stage and will have served its purpose after this next 5-7 year extension.

Currently, there are twenty-four 568 member institutions, of which four are Ivy's (Columbia Cornell, Dartmouth and Penn) and nine others COFHE institutions (Amherst, Duke, Georgetown, MIT, Northwestern, Swarthmore, University of Chicago, Wellesley and Williams) and eleven other non-COFHE institutions. Leslie Bridson, our Director of Financial Aid, serves on the Technical Committee. The Group provides MIT financial aid staff with professional development opportunities for jointly discussing and agreeing on principles of need analysis. I do worry that the eleven non-COFHE institutions have institutional resource issues that can lead the group away from establishing sound need analysis principles. An institution can be a part of the 568 Group and be more stringent in how it defines financial need, but not more generous. Harvard, Princeton, Stanford and Yale departed from the 568 Group when they decided not only to be more generous but to be more transparent about the financial aid a family would receive.

I expect that in the future there will be other professional development opportunities for MIT financial aid staff, but we are not there yet. As part of the transition, a cost of $10,000 to fund this renewal, along with our annual 568 Group dues, are reasonable costs to assume for the benefit we derive.

If you have any other questions about the 568 Group, please let me know.

Best,

Betsy

**Date:** Tuesday, March 6 2012 03:10 PM
**Subject:** outcomes of our sessions last week
**From:** Donald Bishop <Donald.C.Bishop.40@nd.edu>
**To:** Lou Nanni <lnanni@nd.edu>; Joseph Gelchion <Joseph.Gelchion.2@nd.edu>; Robert Mundy <Robert.M.Mundy.1@nd.edu>;
**CC:** Donald Bishop <Donald.C.Bishop.40@nd.edu>;

Exhibit 12
Witness: Rev. Edward A. Malloy, C.S.C.
9/7/2023
Michelle Keegan, RMR, CRR, CSR

I have now reviewed the data.

Clearly we had more higher ranked applicants this year. Most of the increase is in the AP area.

We have the following outcomes of admits by UR rating:

| | 2012 | 2011 | |
|---|---|---|---|
| A | 43 | 34 | +9 |
| AP | 32 | 20 | +12 |
| B | 42 | 52 | -10 |
| BM | 46 | 70 | -24 |
| | 163 | 176 | -13 |
| SAT-one-test | 1388 | 1398 | |

(the decline of 10 points on the SAT for UR admits means our enrolled class profile will be one-point lower this year due to the lower profile of these students—compared to the decisions we made last year)

Admits at the academic rating of:

| Academic Rating | 2012 | 2011 | |
|---|---|---|---|
| 1-8 | 69 | 99 | -30 |
| 9-12 | 56 | 57 | -1 |
| 13-18 | 38 | 20 | +18 |

Most of our non-special interest admits have an academic rating of 1-6. If you add alumni status to the mix many alumni children with a 7 or 8 academic rating gain admission (about 90%).

Students with a 13-18 rating are massive allowances to the power of the family connections and funding history. The gain of 21 A and AP admits and the gain of 18 very low ranked admits (13-18 academic ratings) means we allowed their high gifting or potential gifting to influence our choices more this year than last year—because they simply were more higher ranked and larger donors.

In one respect we can congratulate university relations on these added donors. However, many of them are AP's so it will be important this summer and each summer to review the actual history of giving by these AP's as their relationship with Notre dame matures.

Overall I feel the decisions we made were in reasonable accordance with what we did last year.

The lower number of B Minus and B's were due to our elevation of the giving to reach these ratings.

The sad part of the year is the drop of 30 UR kids in the academic rating of 1-8. That was a big decline.

Sure hope the wealthy next year raise a few more smart kids!

Don

Don Bishop
Associate Vice President for Undergraduate Enrollment
University of Notre Dame

574-631-7505

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLANDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERONE WILLIAMS, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHN HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,<br><br>*Defendants.* | Case No. 22-cv-00125 |

**EXPERT REPORT OF NICHOLAS HILL**

**7 August 2024**

**Figure 7: Average total institutional grant aid awarded per Defendant over time (dollars in 2024 prices)**




Sources: IPEDS; Federal Reserve Bank of St. Louis CPI data (as produced by Dr. Singer).
Notes:
[1] Institutional grant aid awarded per Defendant calculated as the average amount of institutional grant aid awarded to full-time, first-time degree-seeking undergraduates per Defendant (total institutional aid awarded to full-time, first-time, degree-seeking undergraduates / 17 Defendants).
[2] Aid awarded refers to grant or scholarship aid awarded to the student. Aid awarded may differ from aid dispersed to a student. For example, aid awarded may differ if a student leaves a school mid-year before the entire award amount is dispersed. "IPEDS 2023–2024 Student Financial aid survey instructions," Integrated Postsecondary Education Data System, accessed June 30, 2024, https://surveys.nces.ed.gov/ipeds/public/survey-materials/instructions?instructionid=30016.
[3] As previously discussed, the 2003–2004 academic year is the first academic year the consensus methodology guidelines could have potentially affected aid packages.

(81) Another way to quantify the amount of institutional aid awarded by a school is to calculate the average amount of institutional aid received per full-time, first-time, degree-seeking undergraduate student. I use the average institutional aid per student, as opposed to the average institutional aid per student who received aid, as a more complete measure for the total amount of institutional aid provided.[106] Figure 8 summarizes the average amount of aid received per full-time, first-time, degree-

[106] To see this, consider two otherwise identical schools A and B with a cost of attendance of $10,000. School A provides institutional aid for 50 percent of the cost of attendance for 50 percent of students. School B provides institutional aid for 50 percent of the cost of attendance for 50 percent of students and institutional aid for 10 percent of the cost of attendance for the rest of 50 percent of students. In this case, School B provides more financial aid to students overall. The average institutional aid per student is calculated at $2,500 for School A and $3,000 for School B, whereas the average institutional aid per student who received an award is calculated at $5,000 for School A and $3,000 for School B, which is inconsistent with the fact that School B provides more institutional aid. Such a situation may occur for a school like MIT, which "provided a $5,000 Covid-era grant to all enrolled undergraduate students" during the pandemic. Office of the Vice Chancellor, "MIT keeps a firm commitment to undergraduate student support for 2021–2022," MIT News, March 26, 2021, https://news.mit.edu/2021/mit-keeps-firm-commitment-undergraduate-student-support-0326.

seeking undergraduate student by year at the Defendants. The figure shows that inflation-adjusted average institutional aid awarded by the Defendants per undergraduate student has risen both over time and since the introduction of the consensus methodology guidelines.[107]

**Figure 8: Average institutional grant aid awarded to full-time, first-time, degree-seeking undergraduates by the Defendants (dollars in 2024 prices)**




Sources: IPEDS, Federal Reserve Bank of St. Louis CPI data (as produced by Dr. Singer).
Notes:
[1] Average institutional grant aid calculated as the average amount of institutional grant aid awarded per full-time, first-time, degree-seeking undergraduate (total institutional grant aid awarded to full-time, first-time, degree-seeking undergraduates / total full-time, first-time degree-seeking undergraduates).
[2] The 2003–2004 academic year is the first academic year the consensus methodology guidelines could have potentially affected aid packages.

(82) A third way to quantify the amount of financial aid awarded by the Defendants is to measure the proportion of students awarded aid. Figure 9 depicts the percentage of full-time, first-time, degree-seeking undergraduates who received aid at the Defendants over time. It shows that while this percentage varies significantly from year to year, it has increased overall since the introduction of the

107 The figure includes all the Defendants in all years, which includes periods when a Defendant was not part of the 568 Group. In Appendix C.1, I show the same chart limiting the chart to those six Defendants that were continuously part of the 568 Group (until its disbandment) since before the consensus methodology guidelines were introduced (Columbia, Cornell, Georgetown, MIT, Northwestern, Notre Dame). That chart looks very similar and also shows that average institutional aid, adjusted for inflation, awarded by those Defendants per undergraduate student has risen both over time and since the introduction of the consensus methodology guidelines.

Defendants agreeing to a common financial aid methodology or the challenged conduct standardizing expected family contributions.

**Figure 14: Percentage of cross-admitted students who received different expected family contributions from the Defendants, 1998–1999 to 2022–2023 academic years**




Sources: Corrected combined Defendant data; IPEDS; Cornell cost of attendance data; Federal Reserve Bank of St. Louis CPI data (as produced by Dr. Singer).
Notes:
[1] Data are limited to students who were admitted to two or more Defendants with non-missing and non-zero school-specific expected family contr butions.
[2] Data are restricted to the academic years during the conduct period for which each Defendant was a member of the 568 Group.
[3] Applicants for whom all expected family contributions exceed the cost of attendance are excluded from the analysis. I rely on IPEDS cost of attendance data to make this restriction, with the exception of Cornell. For Cornell, I rely on produced average cost of attendance data (CORNELL_LIT0000436889) that distinguishes between Cornell's endowed and contract colleges for New York residents.[133] *See* Section 3.3 for how cost of attendance is defined.

(102) Figure 15 depicts the average spread in expected family contribution for students who were admitted to two, three, four, and five or more Defendants. It shows that students who were admitted to two

[133] Some Cornell students pay lower tuition rates (*e.g.,* New York State residents matriculating at Cornell's contract colleges who pay in-state rates) that are not captured by IPEDS, which only reports the highest tuition rates (i.e., the tuition rates applicable to all students matriculating at Cornell's endowed colleges and students who are not New York State residents but matriculate at Cornell's New York State statutory colleges, or contract colleges). Before 2003, Cornell reported for purposes of IPEDS data separate metrics for its tuition (and thereby, cost of attendance) for its contract colleges. After 2003, a single metric is reported which overestimates the cost of attendance for New York State residents matriculating at Cornell's contract colleges, *see* my backup materials for a comparison of these metrics.

damages) holds for 29 percent of school-academic year combinations during the alleged conduct period.[366]

(233) These problems arise due to an econometric issue with Dr. Singer's model. The problem results from the combination of several factors, including the facts that (1) Dr. Singer's models 4–6 use a single dummy variable to identify the effect of the challenged conduct and (2) schools enter and exit the challenged conduct at different times.[367] This results in affected students serving as a control for other affected students.[368]

## 8.5. Dr. Singer has failed to account for selection bias introduced by the fact that the alleged conduct is associated with a changing fraction of students on full rides

(234) Dr. Singer's overcharge modeling is plagued by multiple forms of bias in the selection of his sample. Specifically, before estimating his regression model Dr. Singer limits his sample to students (1) whose grant aid covered less than 95 percent of the school-academic year specific cost of attendance and (2) who received a positive amount of institutional need-based grant aid.[369] Both sources of selection bias can result in an estimate of positive overcharges due to the alleged conduct when every individual class member was either unharmed or benefitted from the actions of 568 Group.[370]

(235) To illustrate this issue, I present two examples. The first demonstrates the issue with Dr. Singer excluding students whose grant aid covered more than 95 percent of the cost of attendance. The second demonstrates the issue with Dr. Singer excluding students who do not receive any form of grant aid. I will abstract from Dr. Singer's exact overcharge models for the sake of simplicity and consider the general form of Dr. Singer's "before-after" modeling.

(236) My first example is illustrated in Figure 42. Suppose there are two students, Student A and Student B, both of whom attend the same School S, for two years. School S is not a member of the 568 Group in the first year but joins prior to the second year. Now suppose that Student A has an effective

---

[366] *See* my backup materials. I calculate analogous percentages for all regressions in Dr. Singer's Table 11 regressions.

[367] In my analysis in Section 4.2, I mitigate the econometric difficulties highlighted in this section. I do so by using a methodology designed to overcome them.

[368] Recall that Dr. Singer's models 4–6 identify the effect of the challenged conduct by comparing the financial aid granted to students whose schools changed 568 Group membership status to the financial aid granted to students whose schools did not change 568 Group membership status. This control group includes both students whose schools were in (and remained in) the 568 Group and students whose schools were not in (and remained out of) the 568 Group. It also compares students in different time periods to one another. These comparisons lead to counter-intuitive findings such as the ones described above.

[369] Singer Report, ¶ 246.

[370] *See, e.g.*, Joshua D. Angrist and Jörn-Steffen Pischke, *Mostly Harmless Econometrics: An Empiricist's Companion* (Princeton University Press, 2009), § 2.1.

institutional price of $30,000 in both years. Student B has an effective institutional price of $10,000 for the first year, and $0 for the second (i.e., student B receives a full ride the second year). Dr. Singer's "before-after" modeling would calculate an average effective institutional price of $20,000 for the "before" period (the average of Student A's $30,000 effective institutional price and Student B's $10,000 effective institutional price in the first year). Dr. Singer's approach would calculate an average effective institutional price of $30,000 for the conduct period (Student A's effective institutional price is $30,000 and Student B's price is excluded from the Dr. Singer's "before-after" as Student B received a full ride). As a result, Dr. Singer's approach would estimate an *increase* in the effective institutional price by $10,000 ($20,000 during the "before" period vs. $30,000 during the conduct period) due to the alleged conduct when neither Student A nor Student B's effective institutional price increased due to the alleged conduct—indeed, Student B's price decreased. This is an obvious modeling error, since Student A pays the same amount each year, while Student B pays less the second year.

**Figure 42: Example illustrating sample selection issues from full ride students in Dr. Singer's overcharge modeling**

| | Year 1 price (pre-conduct period) | In Dr. Singer's calculation? | Year 2 price (conduct period) | In Dr. Singer's calculation? | Difference |
|---|---|---|---|---|---|
| Student A | $30,000 | Yes | $30,000 | Yes | $0 |
| Student B | $10,000 | Yes | $0 | No | -$10,000 |
| **True average** | $20,000 | | $15,000 | | **-$5,000** |
| **Dr. Singer's average** | $20,000 | | $30,000 | | **$10,000** |

Note: Details of this example can be found in the text above.

(237) My second example is illustrated in Figure 43. Suppose there are two other students (Student C and Student D) who attended the same School S in the same two-year period as my previous example. In this example, the effective institutional price faced by Student C is $10,000 for both the first and second year (the "before" year and the conduct year). Suppose further that Student D received no aid in the first year and therefore paid the full cost of attendance of $50,000. Additionally, Student D received some aid in the second year and had an effective institutional price of $30,000. Dr. Singer's before-after model would compute an average effective institutional price of $10,000 in the first year (Student D's first year price is dropped from the analysis, as they did not receive any grant aid and the only price used in the first year is Student C's effective institutional price). Dr. Singer's model would compute an average effective institutional price of $20,000 in the conduct year (the average of Student C and Student D's prices of $10,000 and $30,000 in the second year, respectively). Dr. Singer's before-after approach would find a $10,000 increase in the effective institutional price for class members due to the conduct—the average effective institutional price increased from $10,000 in the "before" period to $20,000 in the conduct period. However, neither Student C nor Student D's effective institutional price increased from before the conduct to the conduct period, and Dr. Singer would erroneously conclude that the alleged conduct increased the effective institutional price of class members.

**Figure 43: Example illustrating sample selection issues from students receiving any aid in Dr. Singer's overcharge modeling**

| | Year 1 price (pre-conduct period) | In Dr. Singer's calculation? | Year 2 price (conduct period) | In Dr. Singer's calculation? | Difference |
|---|---|---|---|---|---|
| Student C | $10,000 | Yes | $10,000 | Yes | $0 |
| Student D | $50,000 | No | $30,000 | Yes | -$20,000 |
| True average | $30,000 | | $20,000 | | -$10,000 |
| Dr. Singer's average | $10,000 | | $20,000 | | $10,000 |

Note: Details of this example can be found in the text above.

(238) The previous two examples illustrate the selection issues in Dr. Singer's general "before-after" model that prevent one from interpreting his model estimates as reflective of the effect of the alleged conduct on the prices class members paid to the Defendants.

## 8.6. Damages

(239) After correcting for errors in Dr. Singer's model and corresponding damages calculations, there is no credible evidence that the class members were harmed by the alleged conduct. Hence, I conclude that Dr. Singer's report provides no credible evidence of anticompetitive harm as a result of the alleged conduct.

# EXCERPTS FROM TRANSCRIPT OF HAL J. SINGER DEPOSITION (NOV. 27, 2024), DKT. 755-11

**Pages 29, 31-34, 48-49, 127-132, 184, 189-190, 201, 252-254, 261-262, 270-274, 281-283, 288-293, 295-296**

**In the Matter Of:**

CORTZO V. BROWN UNIVERSITY

1:22-cv-00125

**HAL J. SINGER, PH.D.**

*November 27, 2024*

*Confidential*

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

allegedly run afoul of the criteria for
getting the exemption.
Under which they would come up
with common formula, a common set of
principals for arriving at student aid
packages.
Q. Do you know if there were
members of the 568 Group who are not
defendants in this case?
A. I can't think of any members. I
mean it's possible, but I can't think of
members sitting here that aren't also
defendants.
Q. You ran regression models in
this case?
A. Yes.
Q. None of your regression models
analyzed data from any school that was a
member of the 568 Group that is not a
defendant in this case; correct?
MR. CRAMER: Objection to form.
THE WITNESS: I think that's
correct. The only way that I could get data
is if granular student level data, was if the
school was a defendant in this case.

there's data out there for someone who never belonged, then they would always be coded a zero, in which case it would be hard, at least for the technique that I applied to assess the impact of the cartel.

Q. Well, I think I was asking you something slightly different than you answered, but maybe not.

But I'll just -- I want to be clear. If you wanted to assess whether the challenged conduct had an impact on EIPs or EFCs, do you think it's important to analyze the data for all the members of the alleged cartel?

MR. CRAMER: Objection to form. Asked and answered. Incomplete hypothetical.

THE WITNESS: I believe that I have assessed all the members in the sense those who are actively participating during the scope of this class period. I don't think that we've omitted anyone.

If you're asking me to assume that there's a hypothetical member out there who's data I didn't get, I'm just not aware that there was a member who's data I didn't

get.
BY MR. GRINGER:
Q. I'm asking you for then to just assume that there are members of the 568 Group whose data is not included in your regression.
Given that, so assume there is that data out there, in assessing whether the challenged conduct had an impact on EIPs and/or EFCs, isn't it important to consider the data from all the group members, not just a subset?
MR. CRAMER: Incomplete hypothetical. Objection to form. Asked and answered.
THE WITNESS: I don't think that it's critical. If you're asking me as an economist, would I like to see more data, I think economists are never going to turn down that invitation. But I don't think it's critical.
If I thought I was missing some important component of the activity of the members of the cartel here, but I don't think I am. I think I've seen all the important

members.

BY MR. GRINGER:

Q. So, you analyzed that data from Swarthmore College in your regressions?

A. No.

Q. Do you know Swarthmore College was a member of the 568 Group?

A. Sitting here, I can't tell you if they were, but I don't think that they would have, you know, made certain criteria that plaintiffs have required to be a defendant in the case.

Q. Do you know if Wesleyan was a member of the 568 Group?

A. They may have attended a meeting, but I don't know if they were a member.

Q. Do you know if Pomona College was a member of the 568 Group?

A. I haven't seen any documents or evidence on Pomona College.

Pomona did you say?

Q. Yeah, Pomona.

A. Yeah.

Q. You don't know one way or the

other if they were a member?
A. If I don't get to see their documents or data, it's hard for me to say.
If the plaintiffs haven't named them as a defendant, my strong surmise is there's something different about Pomona.
Q. Is it your strong surmise that maybe it would be inconvenient for the proposed market definition to look at Pomona College?
MR. CRAMER: Objection to form.
THE WITNESS: Would it -- I mean are you asking me is that the reason why be they didn't name Pomona as a defendant?
BY MR. GRINGER:
Q. You said you surmised asking. Is that the reason?
MR. CRAMER: Objection form. Asked and answered.
THE WITNESS: I don't have an opinion on that.
BY MR. GRINGER:
Q. You don't know whether Pomona college was a member of the 568 Group; correct?

fact, that if we got to, you know, 81 percent of those transactions, you know, suffered impact and of course it's even higher when you consider at least once it would go into the 90s if you considered, you know, the students at Yale who lived through that experience would have suffered impact, I think it's 93 percent.

So, that was the regression analysis that I had in mind.

Q. Is it your understanding that Penn was the only school to adopt a no-loan policy while it was a member of the 568 Group?

A. No. There was one other -- there was one other one, at least one other one who did it concurrent with Penn. And I think both of those were done in reaction to Yale.

It starts with a C and I think it may have been Cornell.

Q. Columbia?

A. Oh, you know, you try -- there's so many facts here and I just -- I'm trying to remember. For some reason my brain is

telling me it was Penn plus someone who started with a C. It could be Columbia, yes.

Q. And just tell me the schools you believe adopted a no-loan policy after leaving the 568 Group?

MR. CRAMER: Asked and answered.

THE WITNESS: Okay. Yeah, let's see how good my memory is compared to seven minutes ago.

I think I answered Yale, Emory, Chicago, Rice, Brown went to no loan. Those are the ones that I'm just doing by memory. But I would -- I would probably rather go with what I put in my reports than memory, but that's the best my memory can do.

BY MR. GRINGER:

Q. When Yale rejoined the 568 Group, it continued to have a no-loan policy; correct?

A. I don't have that concrete. I think that's consistent with my understanding, but I don't have the histories of each school completely memorized.

Q. In your view, is leaving the 568 Group the same thing as no longer engaging in

$10,000 jump in the EIPs in the first year and that's a bigger jump than we had ever seen leading up to that. And then we see another jump that I think is on the order of $20,000.

And so, we are very skeptical about what's going on with the post 2016 data.

I have all other sorts of thoughts on it, too, but I don't want to keep talking. You go ahead.

Q. I appreciate that. Thank you.

You're making the assumption that the data until 2016 when the database changed is accurate; correct?

A. I am making an assumption that it is accurate and I am -- but most importantly, and I think this is I'm going to tee up this dispute, we have variation in the conduct, in the pre '16 period; right?

So, whatever infirmities that pre '16 data might have, what's nice is that we can -- we can see how it changes with respect to a change in the conduct.

The problem, you know, Dr. Hill

proposed during his deposition, that we should instead only include 2016 post 2016.

And the problem with that, I don't know if he's aware or not, but it's just a run of zeros. There's no variation in the conduct during that period.

So, if you limit the data that way, you're, by design or by accident, depriving the model of being able to ascertain any effect of the challenged conduct.

And if that one was done in isolation, I would say okay, maybe it was an oversight.

But there's a theme that emerges in Dr. Hill's criticisms, in that they are almost all appear to be motivated as a way to deprive the regression of the data that it would need to find an effect.

We can go through the Chicago example where he chooses post 2016, the killing 2023, which is one of the only years that we have for many of these schools that they weren't in the conduct. He wants it gone from the regression. You know, the

staggered DID deprives it of the Yale experience after they leave. The cluster standard errors we talked about, depriving the classification of errors. Putting in the COVID period through 2024, which of course coincides with the very few clean period observations we have as away to conflate the model and to inject confusion as to what is causing it, between COVID and the conduct.

Finally the year fixed effects as opposed to my time is another way to inject collinearity with the conduct and therefore make it harder for the regression to find an effect.

I feel like the theme that's emerging from Dr. Hill is that not how to design the best model, but how can I derive the model? How can I, Dr. Hill, deprive the model by making these choices to ever find an effect.

I realize it's very convenient for the defendants to not find an effect, but that can't be the load star. The load star can't be let me suggest changes that deprive the model. We have to give the model the

data. We have to give it a chance to find these effects.

Q. I appreciate all that context. My question was really just are you making the assumption that the data until 2016 when the database changed is accurate? You answered that and then went on, I think, you know, and I don't want to fight with you too hard on this. You're an expert. I understand this. But am going to move to strike everything after the word accurate in this answer.

MR. CRAMER: We'll oppose that motion.

MR. GRINGER: It was a little lengthy, I think all things considered.

BY MR. GRINGER:

Q. You don't actually know which data set with regard to Chicago is the accurate data set; correct?

MR. CRAMER: Objection to form.

THE WITNESS: I know that the two can't be put side by side; right?

What I -- and also, when you say accurate, we don't want to hold up the data.

There's no such thing as a pristine database. Every database is going to have a certain amount of infirmities.

What I think is more attractive about the pre 2016 is that you at least have variation in the conduct. You at least have the opportunity to see, do prices change when the conduct goes in and out; right?

So, if we're forced to chose between pre 2016 and post 2016, to me it's a very easy choice. One gives the model an opportunity to find an effect. It doesn't guarantee an effect but it gives the model an opportunity to find one, if one exists.

Dr. Hill's choice precludes the model from finding an effect.

If you just have a run of zeros, we can't find an effect. You've basically eliminated Chicago's contribution, right, to informing the conduct variable.

Q. How is that any less outcome determinative than what you just criticized Dr. Hill for doing?

A. Because there's no guarantee of an outcome. There's no guarantee of an

outcome just because you have zeros and ones.

We could run the regression and find that there was no effect; right?

But at least you have some period of zeros and some period of ones to test. You have data that you're feeding the model; right?

If we take Dr. Hill's approach, which is throw out 2023, you know, just look at Chicago post 2016; right? We're taking away some of the very small sources of variation in the database where you have clean periods, right, or where you have a change in the conduct.

If my methodology is let's exploit the changes, and his fixes are just remove the possibility of studying changes, right, then the likelihood of finding an effect is going to vanish.

Q. You're the one who removed the 2016 to 2022 Chicago data; correct?

A. I removed the 2016 because it can't be compared. When you see the $10,000 jump when they change databases and then you see another jump of $20,000, something is

not to adopt a policy like a higher minimum wage policy in which each state is making independent decisions.

This is whether or not to be a member of a cartel and the cartel formed in 2002 and it ran to 2023.

So the exposure to the treatment, exposure to the cartel, the cartel was a constant. It didn't vary across schools and didn't vary across years.

Q. Did the consensus methodology vary across years?

A. I think that there were refinements to the CM over time.

But that doesn't change how I would design the zero one decision to just one conspiracy. There's not a series of independent serially stacked up conspiracies here.

Q. Okay. And if we go to your rebuttal report, Singer-2 at Footnote 218, really starting at 216 through 218 which is on Page 62.

And you also quote in the text.

A. Yes. I'm here.

The treatment is the exposure to the conduct, which is a 20-year long price fixing conspiracy; right?

And within a year, within a given year, again, these firms aren't making, you know, decisions about whether or not the conduct -- the cartel exists. The cartel exists regardless of whether or not one person defects in a given year. The cartel is the cartel.

Q. How does your model adjust for staggered entry and exit into the 568 Group?

A. My model, so, I don't do a staggered diff and diff or DID the way that Dr. Hill does.

So my model treats you as a one or a zero, depending on whether or not you were alleged to have participated in the cartel in that year; right?

In contrast, for the staggered different difference, as Dr. Hill acknowledges in his report, if you have someone like Yale, who starts off say outside of the conduct, comes in and then leaves, right, he has to eliminate Yale's post 2008

experience from his model, right. Under staggered treatment you use the post 2008 Yale experience, which I got to tell you is probably one of the most important experiences we can investigate in the entirety of the data set.

Dr. Hill's technique eviscerates it. It eliminates Yale post 2008.

So, if I -- if you understand kind of the hand that you're dealt, where you can find variation in the data and you recognize the downside of the staggered DID, you would hopefully quickly come to the conclusion that this is too important. This data that he's eliminating from the regression is just too important to get rid of.

And yet he does. So for me, I, you know, we considered it and we decided to treat, you know, in and out of the conduct as one in zero regardless of whether or not you had been there. If you were there and you left, you know, you get -- you continue to stay in the database and you continue to inform the conduct coefficient.

financial aid. We didn't want to include those who had free rides.

Q. Because those are not in the class?

A. Correct.

Q. Weren't students who received a full ride subject to the same challenged conduct as the potential class members?

A. Sure.

Q. So, why should the definition of the class determine whether or not -- let me ask you this: You would agree with me that the people, the students who got 95 percent or more of the cost of attendance are the individuals for whom defendants were most generous towards with their financial aid; correct?

A. Sure.

Q. So, in your regression models, you exclude observations from the very individuals from whom defendants were most generous to; correct?

A. Yes. Because they are not members of the class.

So, what we want to do is build

THE WITNESS: I wouldn't put it that way. It's not requiring it. Because it could find no effect.

The way that you put the question, it almost sounds as if there has to be an effect.

BY MR. GRINGER:

Q. No.

A. It's just testing for a single uniform effect.

Q. So, just so -- because I'm screwing up.

Your EIP regression model is testing for a single uniform effect. Is that correct?

A. It's testing for a single uniform effect because one of the nature of the challenged conduct which you and I don't get to write, but two, we don't have an a priori basis in the record for why the effect would vary from one year to the next.

The mere fact that one of 17 schools peeled out, you know, in the middle of a period would not materially alter the efficacy of the alleged cartel. I mean

either the cartel is inflating prices or it's not. And when one of 17 goes out or two of 17 goes out in a given year, that doesn't give you an a priori reason in economics to believe that the cartel would all of a sudden unravel and the effects would go to zero. Right?

You would need substantial defection in order to achieve an unraveling of the cartel. We never get anywhere close to that.

That's the quibble that I'm having with Dr. Stiroh. You need an a priori reason to test for break. If you don't have an a priori reason, you have one conduct coefficient. It's just that simple.

Q. And in your EIP regression model tests for the alleged impact of the challenged conduct to be constant across the individual schools; right?

MR. CRAMER: Objection. Form.

THE WITNESS: Well, it's estimating the effect of one uniform coefficient across all schools across all time periods.

Again, I said that when we go and use our in-sample prediction techniques, we generate differential effects, right, by defendant in that table. We get differential effects.

Q. What are institution fixed effects?

A. An institution fixed effect is a dummy variable that will control for the identity of the institution when making the prediction of what the EIP or the EFC was in any given year.

Q. Do you use institution fixed effects in your regression models?

A. I think that we have some combination of institution student fixed effects. We can go back and look in the summary tables where we show the regression coefficients. We define how we've constructed the student fixed effects.

Q. I will concede you do that.

A. Okay.

Q. My question was just a stand-alone institution fixed effect.

A. I think that if you added those

can be vastly different, in fact, it could even be zero in a given year.

The prediction for a given year is not constrained in any way.

Q. Not only that, the prediction can be and often is negative; correct?

A. You could have -- you could have a, when you say negative, I want to make sure that the predicted price comes in above the actual price. That could happen; right?

Even with, we should give a name for these people, the never -- we should come up with a name, this is different than the singletons. These are people who only purchase while their school is a member of the cartel. The -- I don't know what you want to call it.

Q. If you think of something, get back to us.

So, would it be and what we just -- that average effect across the number of years is true regardless of the individual characteristics of the student; correct?

A. The average across the four years will be the same, right.

And so, you know, you know my response to this. I think I these -- these class members, the ones that are unfortunate enough to have actually matriculated four years under the cartel, that is, their school was a member of the cartel, each of the four years I think these are the most vulnerable students, the most likely to be injured given the generalized effect that we already know.

So, we're faced with this issue of should we remove them from the test, which Dr. Stiroh never does, but that's her implication, but I strongly would reject taking them out because my inclination is to give the fact finder my best estimate of the share of the class members who are injured under a given standard.

But having said that, we said fine, if you want to do a test purely on students who don't fall under the singleton category or about the only cartel, we'll come up with a name for them, they are only purchasing while they are sellers in the cartel. I've got another test, that's the Yale test and that's in Singer-3.

(Whereupon, Deposition Exhibit Singer-9, Surrebuttal Expert Report of Lauren J. Stiroh, Ph.D., was marked for identification.)

\- - -

BY MR. GRINGER:

Q. If you could turn to Page 14, Singer-9, 3.86.

This is an actual Cornell student in your data, Dr. Singer.

And this student ostensively is overcharged by $1,282 in year one, $4,030 in year two, undercharged by $9,487 in year three and was harmed by $8,983 in year four.

What could explain the switch from a $4,030 overcharge in year two to a $9,487 undercharge in year three?

A. Yeah. It's easy. He got -- this student, I don't know if it's a man or a woman, but if you look at the actual EIP in Column D, they got a remarkably low EIP. And it's so low that I priced the regression. The regression can't explain why it was so low.

So, when I go to predict what

this person would have paid, my prediction is above the actual EIP in that third year. My prediction, the best prediction I can make, given all the characteristics of that student, is that that student's EIP in year three would have been 17,226.

But in fact, they got this remarkably low EIP of 7,739.

So, I cannot show injury under this method in year three.

Q. What could explain the switch from the $4,030 overcharge in year two to the $9,487 undercharge in year three?

MR. CRAMER: Asked and answered. He just answered that question.

THE WITNESS: I mean I can do it again.

I think maybe you're asking now why didn't that happen in the previous year?

MR. GRINGER: Okay.

THE WITNESS: I can answer it -- let me just say it. It's okay.

Look at the price in the previous year. I mean you're going to see a pattern.

Here the price shot up from their initial EIP, their initial EIP was 14,000. Do you see that?

It goes up to 19,000 in year two. And the regression predicts, the prediction model, right, my best-fitting model, model six, right, is that this student would have paid in year two an EIP of 15,501; right?

And, therefore, they suffered an overcharge of $4,000; right?

But I don't want you to look at the 4,000 and the minus 9,000 and think there's some infirmity with the prediction.

The model just could not have predicted that this student would have gone from 14 to 19 to 7,000 in an EIP.

These are the examples I'm talking about before where these very large discounts manifest. The model could not have predicted them and the model will consider the student to be uninjured in those years.

Despite the fact that whatever shock gave that low price, likely that same shock would have occurred in the but-for

world, but we're not crediting the student for that. We're just going to assume that that shock was associated entirely with the conduct; right?

We're going to take that out and the model, the model can't predict it; right?

BY MR. GRINGER:

Q. Do you have any idea what Cornell did in year three for this student that was better for the student?

A. We'd have to go into the individual database to look to see what happened.

But I have to accept that those are the actual EIPs according to the data.

Q. Even with these data swings from 14 to 19 to 7 to 25, this student's total overcharge just happened to equal exactly $4,808. That doesn't strike you as a coincidence?

A. It is not a coincidence. It is happening because of the student fixed effects that we're using. This would not happen had we not used student fixed effects.

This is a -- this is an artifact

of two things, I'm telling you. The use of the student fixed effects, which I think is the best model that we can use.

When you look at the R squared, among other factors, but if you look at the R squares as we move across the bottom of the row, we get much, much better predictive power with the student fixed effects than we do without, right.

I want to come up with the best prediction model possible.

This is entirely an artifact of the use of fixed effects, student fixed effects combined with students who were unfortunate to have just matriculated while their school was part of the cartel.

Q. Do you dispute that 26 percent of proposed class members were, according to your methodology, overcharged by more than $5,000 in at least one year and undercharged by more than $5,000 in at least one other year?

MR. CRAMER: Objection to form.

THE WITNESS: I've never seen or heard that stat before. You're asking me to

the best model.

And method, you know, specification six is my preferred model.

I continue to use student fixed effects even when I do the Yale regression. I continue to do student fixed effects. But just for those students who experience the switch by Yale in the 2008 period.

Q. Okay. Do you still have Singer-9 in front of you?

A. Yes.

Q. Page earlier, footnote 53. Do you dispute Dr. Stiroh's finding that when you apply your harmed-on-net analysis to your EIP specification, that uses only school fixed effects rather than school and student fixed effects that only half of proposed class members are flagged as harmed?

A. Do I dispute it? I don't know what the answer is. I can't dispute it.

Q. Is the only difference between model three and model six in your EIP regression analysis the inclusion of student fixed effects?

A. I believe so.

Q. Okay.
A. And I could -- I just happen to have the page here.
Q. Please.
A. Let me just confirm.
Q. Please confirm.
A. Yes. That's the only difference.
Q. Now we've been talking all about EIPs. And you've built a regression model to analyze the challenged conducts impact on EIPs; correct?
A. Correct.
Q. And you define EIP as the cost of attendance minus institutional grant aid; correct?
A. Correct.
Q. EIP is a measure you came up with; correct?
A. It is a measure I came up with, but it's based off of a much more commonly known net price measure.
The reason, as I explained in my report, I didn't want to use net price is that net price subtracts out aid from other

sources.

And I felt like including that into the dependent variable would create a source of confusion and would confound what we're looking for.

And I'm fairly confident that Dr. Hill uses the same measure of pricing that I do as well.

Q. Your EIP metric does not include work study awards; correct?

A. I don't think the base version of my EIP model uses work study. It's subtracting out institutional grant aid.

Q. Why does your definition of EIP not include work study awards?

A. Because the theory of harm here is that the defendants coordinated in their decisions of how much to offer in terms of grant aid.

So, if we included other measures of aid that were outside of what I think the scope of the challenged conduct is, I don't think there's a theory of harm that says that this inflated work study or deflated work study. Now they may have gone

MR. CRAMER: There are a lot of class members in here.

MR. GRINGER: Could you stop it?

MR. CRAMER: It was a joke.

MR. GRINGER: First of all, i did receive financial aid from Penn which is more than certain people and their children can say. Okay?

BY MR. GRINGER:

Q. So, you don't know, and we can come back to that, Dr. Singer.

But just so the record is clear, if a student received $50,000 in grant aid and the $2,000 work study award and the cost of attendance was $80,000, the student would pay to the school $28,000; correct?

MR. CRAMER: Asked and answered.

THE WITNESS: That sounds right.

BY MR. GRINGER:

Q. But you would treat the EIP as $30,000; correct?

A. Correct.

Q. So you're personally inflating your measure of the EIP inflates what every single potential class member actually paid

to their institution; correct?
MR. CRAMER: Objection to form.
THE WITNESS: No. That's way too much of a stretch. Did you mean to say every single? Maybe -- I think maybe what you meant to say was for those who got work study assistance.
BY MR. GRINGER:
Q. That's fair. Your measure of EIP inflates for every student who received work study assistance what they actually paid to a defendant?
A. It -- I'm going to push back gently on that it inflates.
I'm trying to capture out of pocket no strings attached. I think that I've come up with the best measure of that.
You know, I note that none of your experts have said that Dr. Singer should include work study as -- in his EIP. This is the first time I'm hearing this critique. But having heard it now for the first time, I think that my measure is still superior. I like mine better.
Q. EIP also does not include

subsidized loans; correct?
A. It does not include subsidized loans.
Q. You don't think the opportunity to obtain a subsidized loan is a benefit offered to students?
A. Oh, no, not if it's coming in lieu of an unconditional grant. You'd always prefer a grant over a loan. My goodness. These students, I know you think they should be thankful, but they don't like coming out of college in debt up to their eyeballs.
Q. Let me ask you: You're assuming that the choice is between a subsidized loan and more grant money. If the choice is between a subsidized loan and nothing, a student prefers a subsidized loan; correct?
A. If that's the choice, I don't think that that -- I don't think that that is the outcome, though, in the but-for world. I think that what's happening is that the defendants were able to drive a harder bargain and push more loans than they otherwise would have been able to.
Q. Okay. And what percentage of