No. 26-2759

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

| | | |
|---|---|---|
| ANDREW CORZO, et al., | ) | On Appeal from a Class |
| | ) | Certification Order of the United |
| *Plaintiffs-Appellees*, | ) | States District Court for the |
| | ) | Northern District of Illinois, |
| v. | ) | Eastern Division |
| | ) | |
| CORNELL UNIVERSITY, et al., | ) | No. 1:22-cv-00125-MFK |
| | ) | |
| *Defendants-Appellants*. | ) | Hon. Matthew F. Kennelly, |
| | ) | District Court Judge |
| | ) | |
| | ) | |

# BRIEF OF *AMICUS CURIAE* ASSOCIATION OF AMERICAN UNIVERSITIES IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL

Lindsay C. Harrison
*Counsel of Record*
Elizabeth Henthorne
Gavan W. Duffy Gideon
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000
lharrison@jenner.com
*Counsel for Amicus Curiae*

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No. 26-2759

Short Caption: Andrew Corzo et al. v. Cornell University et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Association of American Universities as amicus curiae

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the District Court or before an administrative agency) or are expected to appear for the party in this court:

Jenner & Block LLP for Amicus Curiae

(3) If the party or amicus is a corporation:

i) Identify all of its parent corporations, if any; and

None

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

None

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases: N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2: N/A

---

Attorney's Signature /s/ Lindsay C. Harrison Date: October 20, 2026

Attorney's Printed Name: Lindsay C. Harrison

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** X **No** ____

Address: 1099 New York Avenue NW, Suite 900, Washington, DC 20001

Phone Number: (202) 639-6865 Fax Number: (202) 639-6066

E-Mail Address: lharrison@jenner.com

rev. 12/19 AK

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No. 26-2759

Short Caption: Andrew Corzo et al. v. Cornell University et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Association of American Universities as amicus curiae

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the District Court or before an administrative agency) or are expected to appear for the party in this court:

Jenner & Block LLP for Amicus Curiae

(3) If the party or amicus is a corporation:

i) Identify all of its parent corporations, if any; and

None

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

None

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases: N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2: N/A

---

Attorney's Signature /s/ Elizabeth Henthorne Date: October 20, 2026

Attorney's Printed Name: Elizabeth Henthorne

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ____ **No** X

Address: 1099 New York Avenue NW, Suite 900, Washington, DC 20001

Phone Number: (202) 637-6367 Fax Number: (202) 639-6066

E-Mail Address: bhenthorne@jenner.com

rev. 12/19 AK

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No. 26-2759

Short Caption: Andrew Corzo et al. v. Cornell University et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Association of American Universities as amicus curiae

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the District Court or before an administrative agency) or are expected to appear for the party in this court:

Jenner & Block LLP for Amicus Curiae

(3) If the party or amicus is a corporation:

i) Identify all of its parent corporations, if any; and

None

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

None

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases: N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2: N/A

---

Attorney's Signature /s/ Gavan W. Duffy Gideon Date: October 20, 2026

Attorney's Printed Name: Gavan W. Duffy Gideon

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule **3(d)** Yes No X

Address: 1099 New York Avenue NW, Suite 900, Washington, DC 20001

Phone Number: (202) 639-3849 Fax Number: (202) 639-6066

E-Mail Address: gavan.gideon@jenner.com

rev. 12/19 AK

## TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT .......... i

TABLE OF AUTHORITIES .......... v

IDENTITY AND INTEREST OF *AMICUS CURIAE* .......... 1

INTRODUCTION .......... 2

ARGUMENT .......... 4

I. Need-Based Financial Aid Expands Access to Higher Education for Students Who Otherwise Could Not Afford to Attend .......... 4

II. Shared Principles of Need-Based Financial Aid Are Common Across Institutions of Higher Education .......... 7

III. AAU's Members Pursue Their Commitment to Need-Based Financial Aid Through Varying, and Ever-Evolving, Policies and Practices .......... 10

IV. Improperly Certified Classes Pose Unique Risks and Harms to Institutions of Higher Education and Their Students, Faculty, and Broader Communities .......... 13

CONCLUSION .......... 14

# TABLE OF AUTHORITIES

## Cases

*Arandell Corp. v. Xcel Energy Inc.*, 149 F.4th 883 (7th Cir. 2025) ........................... 13

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) .......................................... 13

*Corzo v. Brown University*, No. 22-cv-125, 2026 WL 91424 (N.D. Ill. Jan. 12, 2026), *appeal dismissed sub nom. Corzo v. Cornell University*, No. 26-1275, 2026 WL 2352963 (7th Cir. Mar. 16, 2026) .............................................. 6

*Corzo v. Cornell University*, 835 F. Supp. 3d 890 (N.D. Ill. 2026) ............................. 7

*Microsoft Corp. v. Baker*, 582 U.S. 23 (2017) ........................................................... 13

*United States v. Brown University in Providence in Rhode Island*, 5 F.3d 658 (3d Cir. 1993) ................................................................................................ 6

## Other Authorities

Kritika Agarwal, *AAU Institutions Expand Free-Tuition Programs for Low- and Middle-Income Americans*, Association of American Universities (Feb. 27, 2026), https://www.aau.edu/newsroom/aau-institutions-expand-free-tuition-programs-low-and ............................................ 11

Allan M. Cartter, *New Approaches to Student Financial Aid: Report of the Panel on Student Financial Need Analysis* (1971).................................. 5, 8, 9

Benjamin L. Castleman & Bridget Terry Long, *Looking Beyond Enrollment: The Causal Effect of Need-Based Grants on College Access, Persistence, and Graduation*, 34 J. Lab. Econ. 1023 (2016) ....................... 5

College Board, *Institutional Methodology Get the Full Picture* (2014), https://secure-media.collegeboard.org/digitalServices/pdf/professionals/institutional-methodology.pdf ......................................................... 8

David Deming & Susan Dynarski, *Into College, Out of Poverty? Policies to Increase the Postsecondary Attainment of the Poor* (Nat'l Bureau of Econ. Rsch., Working Paper No. 15387, 2009) ....................................................... 5

*Financial Aid*, Association of American Universities, https://www.aau.edu/federal-policy-advocacy/financial-aid (last visited Oct. 20, 2026) ............... 4, 5

Melanie Lefkowitz, *Board of Trustees Approves 2026-27 Budget Parameters*, Cornell Chronicle (Mar. 23, 2026), https://news.cornell.edu/stories/2026/03/board-trustees-approves-2026-27-budget-parameters ........ 12

Lumina Foundation and the Institute for Higher Education Policy, *Form & Formula: How the Federal Government Distributes Aid to Students* (2015), https://www.luminafoundation.org/files/resources/form-and-formula-viewing-guide.pdf ........ 8

*Making MIT Affordable*, Massachusetts Institute of Technology Student Financial Services, https://sfs.mit.edu/undergraduate-students/the-cost-of-attendance/making-mit-affordable/ (last visited Oct. 20, 2026) ........ 12

National Ass'n of Student Financial Aid Administrators, *Reimagining Financial Aid to Improve Student Access and Outcomes* (2013), https://www.nasfaa.org/uploads/documents/ektron/67439aeb-419d-4e9c-9035-4278d0bbed61/d19119911e864c39abb555e99f130 d122.pdf ........ 6

*Pathways to Notre Dame*, University of Notre Dame Office of Financial Aid, https://financialaid.nd.edu/contact/frequently-asked-questions/ pathways-to-notre-dame/#faq_2025 (last visited Oct. 20, 2026) ........ 12

*The Quaker Commitment*, University of Pennsylvania Student Registration & Financial Services, https://srfs.upenn.edu/quaker-commitment (last visited Oct. 20, 2026) ........ 12

Barbara R. Snyder, *Leading Research Universities Are Making College Costs More Affordable and Transparent*, Association of American Universities (May 26, 2026), https://www.aau.edu/newsroom/ barbaras-blog/leading-research-universities-are-making-college-costs-more-affordable-and ........ 12

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* Association of American Universities ("AAU") was founded in 1900 and is composed of America's leading research universities. AAU's member universities earn the majority of competitively awarded federal funding for research that improves public health, seeks to address national challenges, and contributes significantly to the country's economic strength, while educating and training tomorrow's visionary leaders and innovators. Its members include 69 public and private research universities in the United States, including Cornell University, Massachusetts Institute of Technology, the University of Notre Dame, and the University of Pennsylvania.

AAU has a strong interest in the continued strength and viability of financial aid in higher education. Indeed, AAU's members are at the forefront of making high-quality education more affordable and accessible. AAU member institutions are more affordable on average than other four-year institutions when it comes to out-of-pocket costs, and students at AAU schools have far lower loan default rates than the national average. AAU is accordingly well positioned to assess financial aid principles and practices like those challenged here and to identify differences between the

[1] The Court granted AAU leave to file an *amicus* brief on or before October 20, 2026. Dkt. No. 34. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), AAU states that no party's counsel authored this brief in whole or in part and no entity or person, aside from AAU or its counsel, contributed money that was intended to fund the preparation or submission of this brief. In the interest of full disclosure, at an earlier stage of this litigation, Jenner & Block LLP represented one of the defendants that has since been dismissed from the case.

approaches taken by leading U.S. institutions of higher education in their efforts to make such education more affordable.

AAU also has a strong interest in ensuring the proper interpretation and application of Rule 23's requirements, as improperly certified class actions threaten substantial harm to its member institutions and their students, faculty, and staff. AAU's members are non-profit institutions at the leading edge of innovation, scholarship, and solutions that contribute to scientific progress, economic development, public health, and national security. Money spent on a financial judgment or settlement extracted through class action pressure inevitably comes at the expense of work critical to members' educational and research-focused missions. A judgment or settlement arising from an improperly certified class thus not only harms universities, but threatens their ability to carry out their missions and serve their students, present and future, as increasing litigation costs threaten to pull resources from existing research, instruction, and financial aid budgets.

## INTRODUCTION

AAU and its members are committed to making high-quality higher education more affordable and accessible to students regardless of their financial circumstances. One of the most important tools in furthering that mission is need-based financial aid. For decades, institutions of higher education have built and refined systems for assessing a family's ability to pay and distributing aid dollars based on financial need—opening the door to college and university experiences for countless students who otherwise could not afford to attend. Through their

experience administering financial aid, schools across the country have arrived at a shared understanding of the importance of prioritizing need-based aid and the best practices for delivering aid to students equitably. Those fundamental principles are the foundations of modern financial aid—not the hallmarks of a conspiracy.

Plaintiffs nonetheless persuaded the district court to certify a class consisting of more than 220,000 students across a twenty-year period, based on a finding that questions of law or fact common to the class predominated over individualized ones. That finding rested on an analysis by Plaintiffs' expert that assumed uniform conduct by Defendants with respect to relevant financial aid practices and policies. That assumption does not withstand scrutiny. As AAU knows from experience, financial aid programs at major research universities are anything but uniform. While AAU's members are all deeply committed to expanding access to higher education through financial aid, they pursue that shared commitment through widely varying and ever-evolving approaches, shaped by differences in institutional missions, student demographics, and available resources. In other words, any assumption that Defendants acted in lockstep with respect to relevant financial aid principles and practices, producing common harm across the class, is at odds with how leading research universities actually operate.

The consequences of the district court's error are not abstract. Universities are nonprofit institutions whose resources are committed to teaching, research, and financial aid. They are not well positioned to withstand the threat of potentially massive aggregate liability that accompanies a class certification order like the one

here. And they could not absorb exposure in the billions without severe consequences for their educational missions—consequences that would fall on the very students whose interests Plaintiffs claim to represent. This Court should reverse.

## ARGUMENT

### I. Need-Based Financial Aid Expands Access to Higher Education for Students Who Otherwise Could Not Afford to Attend.

For decades, AAU's members have worked to make high-quality higher education more affordable and accessible to students regardless of their financial circumstances. Core to those efforts is a commitment to need-based financial aid—financial packages of grants and loans that help students cover tuition and other education-related expenses based on individualized calculations of their financial need. AAU member universities have long been at the vanguard of expanding need-based aid. Today, many members admit students without regard to their need for financial assistance and meet the full demonstrated need of the students whom they ultimately enroll through student-specific aid packages. As just one example of the commitment of AAU members to generous financial aid, "[s]tudents at AAU universities receive 258% more grant aid from their institutions than all grants and student loans combined from the federal government."[2]

---

[2] *Financial Aid*, Association of American Universities, https://www.aau.edu/federal-policy-advocacy/financial-aid (last visited Oct. 20, 2026).

Need-based aid has long been "a foundational principle of financial aid." A631.[3] The purpose of need-based financial aid is to increase access to higher education for students who otherwise could not afford to attend.[4] Need-based financial aid helps "increas[e] low- and middle-income students' access to higher education, consistent with the goals of educational equity, access, and excellence." A348. Indeed, studies have shown that need-based financial aid increases both access to higher education—*i.e.*, the likelihood that students attend college or university in the first place—and persistence—*i.e.*, the likelihood those students complete a degree.[5]

While AAU members offer students other forms of financial assistance as well, including merit-based aid, they generally "prioritize[] need-based financial aid" in furtherance of their "missions of increasing access for admitted students, especially low- and middle-income students, through the use of institutional resources." A371.

---

[3] Citations to "Opening Br." refer to the Brief for Defendants-Appellants, Dkt. No. 29, and citations to "A__" refer to the Appendix for Defendants-Appellants Brief, Dkt. No. 49.

[4] *See, e.g.*, *Financial Aid*, *supra* note 2; Allan M. Cartter, *New Approaches to Student Financial Aid: Report of the Panel on Student Financial Need Analysis* at 22 (1971) [hereinafter *Cartter Report*] ("The primary purpose of a collegiate financial aid program should be to provide financial assistance to accepted students who, without such aid, would be unable to attend that college.").

[5] *See, e.g.*, David Deming & Susan Dynarski, *Into College, Out of Poverty? Policies to Increase the Postsecondary Attainment of the Poor*, at 11 (Nat'l Bureau of Econ. Rsch., Working Paper No. 15387, 2009) ("The best estimates suggest that eligibility for $1,000 of subsidy increases college attendance rates by roughly four percentage points."); Benjamin L. Castleman & Bridget Terry Long, *Looking Beyond Enrollment: The Causal Effect of Need-Based Grants on College Access, Persistence, and Graduation*, 34 J. Lab. Econ. 1023, 1060 (2016) ("[N]eed-based grant eligibility has a positive and substantial effect not only on whether students enroll in college but also on the number of credits they accumulate and on whether they earn a bachelor's degree.").

In the experience of AAU's members, and consistent with expert testimony in this case, relying too heavily on merit-based aid can result in "limited financial aid dollars" being allocated away from students with greater need and thus potentially leaving students from more disadvantaged backgrounds without the financial support they would require to attend a college or university at all. A632. Prioritizing need-based aid, on the other hand, allows institutions to distribute financial support "equitably among students according to their need." A371; *cf. Corzo v. Brown Univ.*, No. 22-cv-125, 2026 WL 91424, at *8 (N.D. Ill. Jan. 12, 2026) (recognizing that "a commitment to need-based aid might enable universities to more evenly allocate financial aid to those students who otherwise would be unable to afford the cost of attendance"), *appeal dismissed sub nom. Corzo v. Cornell Univ.*, No. 26-1275, 2026 WL 2352963 (7th Cir. Mar. 16, 2026).[6] The National Association of Student Financial Aid Administrators has advocated for prioritizing need-based aid in the context of federal financial aid for the same reason—*i.e.*, "valuable student aid dollars are best spent serving students with need, who may not otherwise have the opportunity to attend college."[7]

---

[6] *See also, e.g.*, *United States v. Brown Univ. in Providence in R.I.*, 5 F.3d 658, 677 (3d Cir. 1993) (Because "financial aid resources are limited," "[a] trade-off may need to be made between providing some financial aid to a large number of the most needy students or allowing the free market to bestow the limited financial aid on the very few most talented who may not need financial aid to attain their academic goals.").

[7] The National Association of Student Financial Aid Administrators, *Reimagining Financial Aid to Improve Student Access and Outcomes* at 17 (2013), https://www.nasfaa.org/uploads/documents/ektron/67439aeb-419d-4e9c-9035-4278d0bbed61/d19119911e864c39abb555e99f130d122.pdf.

For students with the greatest financial need, institutions' aid dollars go a long way toward making a university education possible—in many cases covering all or nearly all of a student's education-related expenses. Plaintiffs' expert excluded from his analysis students who received institutional grant aid that covered more than 95% of the cost of attendance. Opening Br. 20-21. Yet those are precisely the students for whom the commitment to need-based aid by institutions like AAU's members matters most, opening doors to high-quality higher education that may otherwise be out of reach. A374 (observing that "[f]or low-income students … lack of financial aid can mean not attending any post-secondary school").

## II. Shared Principles of Need-Based Financial Aid Are Common Across Institutions of Higher Education.

Central to Plaintiffs' antitrust claims in this case is an alleged agreement by Defendants and other universities "to apply several core principles in awarding aid." *Corzo v. Cornell Univ.*, 835 F. Supp. 3d 890, 899 (N.D. Ill. 2026). But Defendants correctly observe that the general principles Plaintiffs point to reflect longstanding tenets of need-based financial aid applied widely across institutions of higher education, not only the schools targeted by Plaintiffs in this lawsuit. Opening Br. 11-12. Indeed, the "core principles" at issue are largely a reflection of the baseline approach to financial aid discussed above—*i.e.*, "to make need-based aid the primary form of financial aid and to base it on student and family 'ability to pay.'" *Corzo*, 835 F. Supp. 3d at 899 (quoting Pls.' Mem. in Supp. of Mot. for Class Certification at 7).

The system of financial aid administration that exists across U.S. universities today has been developed over the past seven-plus decades. In 1954, the College

Board established need analysis as an organized practice with the creation of the College Scholarship Service ("CSS")—a standardized system to collect financial data from students and parents that was then used to calculate financial need.[8] The system was created to enable institutions of higher education "to allocate their student aid funds more rationally, to increase opportunity, and to serve students more effectively."[9] Two decades later, a National Task Force on Student Aid Problems comprised of various financial aid stakeholders recommended the adoption of a single national need-analysis formula known as the Uniform Methodology, used to calculate a family's ability to pay for higher education.[10] After the federal government consolidated its need-analysis rules into a single, simpler formula (the "Federal Methodology") in the 1990s, the College Board introduced the Institutional Methodology ("IM"), which was designed to "provide schools with a more complete understanding of a family's financial situation." A389-391. Hundreds of institutions continue to use the IM—which can be customized to account for an institution's particular preferences and practices—as a starting point for need analysis today.[11]

---

[8] *See Cartter Report*, *supra* note 4, at 1; Lumina Foundation and the Institute for Higher Education Policy, *Form & Formula: How the Federal Government Distributes Aid to Students* at 4, 12, 14 (2015) https://www.luminafoundation.org/files/resources/form-and-formula-viewing-guide.pdf [hereinafter *Lumina Report*].

[9] *Cartter Report*, *supra* note 4, at 20.

[10] *See Lumina Report*, *supra* note 8, at 6, 12.

[11] *See* College Board, *Institutional Methodology Get the Full Picture* at 1 (2014), https://secure-media.collegeboard.org/digitalServices/pdf/professionals/institutional-methodology.pdf ("Over 350 institutions and scholarship programs use IM in conjunction with the CSS/Financial Aid PROFILE® to target their need-based funds equitably to students who need it the most.").

Through decades of experience administering need-based aid, institutions of higher education have coalesced around foundational tenets similar to the "core principles" that Plaintiffs claim are evidence of an antitrust conspiracy. For instance, among institutions that practice need-based aid, it has long been established that "parents and students have the primary responsibility to contribute to educational expenses before an institution awards financial aid." A676; *see* A628.[12] The principle that "[f]amilies should contribute to educational expenses according to their ability" and that "[t]hose with similar financial profiles should contribute similar amounts" reflects a foundational premise of need-based aid since its inception. A676; *see* A348-349; A628-629.[13] And the idea that "[i]nstitutions should evaluate both income and assets" in calculating need has been accepted for many decades across institutions. A676; *see* A629.[14]

Other "core principles" Plaintiffs cast as part of a conspiracy similarly reflect what are widely recognized as best practices in the world of need-based financial

---

[12] *See, e.g.*, *Cartter Report*, *supra* note 4, at 20 (noting "acceptance of common assumption[]" following establishment of CSS in 1954 that "[f]amilies were expected to be the first source of support for their children in college"); *id.* at 22 (quoting 1970 College Board revised statement of "Principles of Student Financial Aid Administration": "Financial aid should be offered only after determination that the resources of the family are insufficient to meet the student's educational expenses.").

[13] *See also, e.g.*, *id.* at 22 (quoting 1970 College Board revised statement of "Principles of Student Financial Aid Administration": "The amount and type of self-help expected from students should be related to the circumstances of the individual. In the assignment of funds to those students designated to receive financial aid, the largest amounts of total grant assistance should go to students with the least ability to pay.").

[14] *See also, e.g.*, *id.* at 20 ("Family assets and income … were taken into account."); *id.* at 22 (same in 1970 "Principles of Student Financial Aid Administration").

aid—*e.g.*, that institutions should be transparent about their financial aid policies and carry them out consistently when calculating and awarding aid; that they should inform applicants of the standards the institutions apply when they allocate financial aid on bases other than need; and that they should not "systematically treat[] … [g]roups of students differently in order to advance institutional objectives." A676-677. While Plaintiffs may argue that principles like these constitute the foundation of an overarching conspiracy, they in fact reflect fundamental principles and practices underlying the modern financial aid system. *See* A351.

## III. AAU's Members Pursue Their Commitment to Need-Based Financial Aid Through Varying, and Ever-Evolving, Policies and Practices.

While the financial aid systems of AAU members rest on similar foundational principles, as outlined above, those principles do not lead to anything like the uniform conduct assumed by Plaintiffs' expert in this case. To the contrary, although institutions share a general commitment to need-based aid, their particular policies and practices for calculating and distributing such aid vary widely. Those differences are not incidental, but instead reflect genuine variation in institutional priorities, student demographics, and available resources. Institution-specific policies and practices are also ever-evolving, often in the direction of more expansive and generous need-based aid, in service of institutions' efforts to increase affordability and access.

One key area in which AAU members' financial need policies and practices differ is in how they package need-based aid—*i.e.*, the mix of grants, loans, and other financial assistance included in a student's aid award. Opening Br. 44-46 (similarly

observing that "Defendants diverged widely in their approaches to financial aid packaging"). For instance, while some institutions rely heavily on loans to meet the demonstrated need of admitted students, others aim to meet the demonstrated need of admitted students chiefly through grants—financial support that does not need to be paid back. As Defendants observe, these differences in packaging "significantly affect[] the prices students actually pa[y]." *Id.* at 44-45; *see also* A419-420 ("As a result of [different packaging] policies, two students admitted to the same school with the same [Expected Family Contribution] could be offered different amounts of need-based institutional grant aid.").

AAU members' financial aid policies and practices are also continually evolving. For instance, in recent years, many AAU members have expanded free-tuition programs for low- and middle-income students, shifting a large proportion of their aid from loans to grants.[15] *Cf.* A381-382 ("[S]ince 2008, many of the Defendants have introduced no-loan policies for all undergraduate students, which eliminate loans from financial aid packages and replace them with scholarships, grants, or work-study."). The goal of such policies and programs is to "increase applications from low-income students concerned about loan debt, particularly since they are simple and easy to communicate." A381. Even with this general trend shared across schools, though, the particulars of institutions' free-tuition programs vary

[15] *See, e.g.*, Kritika Agarwal, *AAU Institutions Expand Free-Tuition Programs for Low- and Middle-Income Americans*, Association of American Universities (Feb. 27, 2026), https://www.aau.edu/newsroom/aau-institutions-expand-free-tuition-programs-low-and.

substantially, with schools setting different income thresholds for free-tuition guarantees. For example, Defendants and AAU members Cornell University, Massachusetts Institute of Technology, the University of Notre Dame, and the University of Pennsylvania have all adopted full-tuition guarantees, but the relevant family income thresholds range from $125,000 to $200,000.[16] Other AAU member institutions have adopted similar guarantees, with the relevant thresholds falling within an even broader range—from about $75,000 up to $250,000.[17] And universities have additionally adopted varying policies regarding the extent to which they provide grant aid to cover non-tuition expenses such as housing, books, and fees.[18]

A model like the one Plaintiffs employed here that assumes lockstep conduct across institutions throughout a twenty-year timeframe is thus at odds not only with the record evidence in this case, Opening Br. 36-46, but with how universities operate in practice. Such a model does not merely oversimplify financial aid policies that are

---

[16] *See* Melanie Lefkowitz, *Board of Trustees Approves 2026-27 Budget Parameters*, Cornell Chronicle (Mar. 23, 2026), https://news.cornell.edu/stories/2026/03/board-trustees-approves-2026-27-budget-parameters; *Making MIT Affordable*, Massachusetts Institute of Technology Student Financial Services, https://sfs.mit.edu/undergraduate-students/the-cost-of-attendance/making-mit-affordable/ (last visited Oct. 20, 2026); *Pathways to Notre Dame*, University of Notre Dame Office of Financial Aid, https://financialaid.nd.edu/contact/frequently-asked-questions/pathways-to-notre-dame/#faq_2025 (last visited Oct. 20, 2026); *The Quaker Commitment*, University of Pennsylvania Student Registration & Financial Services, https://srfs.upenn.edu/quaker-commitment (last visited Oct. 20, 2026).

[17] *See, e.g.*, Barbara R. Snyder, *Leading Research Universities Are Making College Costs More Affordable and Transparent*, Association of American Universities (May 26, 2026), https://www.aau.edu/newsroom/barbaras-blog/leading-research-universities-are-making-college-costs-more-affordable-and.

[18] *Id.*

nuanced and institution-specific; it generates the appearance of common impact where none exists. A finding of predominance resting on such an expert model is inconsistent with the "rigorous analysis" that Rule 23 requires. *Arandell Corp. v. Xcel Energy Inc.*, 149 F.4th 883, 894 (7th Cir. 2025).

## IV. Improperly Certified Classes Pose Unique Risks and Harms to Institutions of Higher Education and Their Students, Faculty, and Broader Communities.

Courts, including the Supreme Court, have long recognized that "[c]ertification of a large class may so increase the defendant's potential damages liability and litigation costs that he may find it economically prudent to settle and to abandon a meritorious defense." *Microsoft Corp. v. Baker*, 582 U.S. 23, 29 (2017) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 476 (1978)). To put an even finer point on it: "[W]hen damages allegedly owed to tens of thousands of potential claimants are aggregated and decided at once, the risk of an error will often become unacceptable." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2011). The decision to certify is thus often the decisive event in a case—particularly in the antitrust context, given the possibility of treble damages.

The threat of potentially massive aggregate liability takes on special force in the higher education arena. Universities are non-profit institutions whose resources are dedicated to teaching, research, and financial aid—not held in reserve to absorb litigation risk. While endowments are sometimes assumed to be a source of liquidity, such funds are restricted by legal requirements, fiduciary obligations, and donor intent to specific purposes, meaning endowment funds cannot easily (if at all) be

redirected to satisfy a judgment or finance a costly settlement. *Cf.* A352 (Defendants' expert explaining that endowments are "subject to complex rules and restrictions regarding how funds can be managed and how returns can be spent."). Universities thus may have to divert resources from their core educational missions to satisfy a financial judgment. In such cases, money paid out to compensate former students may come at the direct expense of current and future students.

This case illustrates the stakes: The district court certified a class that includes more than 220,000 students, resulting in potential treble-damages exposure upwards of $1.7 billion. Opening Br. 1; Opp'n to Pet. for Permission to Appeal Under Fed. R. Civ. P. 23(f) at 18 n.8, *Corzo v. Cornell University*, No. 26-8014 (7th Cir. June 25, 2026), Dkt. No. 19. However that exposure is ultimately allocated, it is an amount that few universities could absorb without severe consequences for their research, teaching work, and even their financial aid programs—consequences that would fall on the very students whose interests Plaintiffs claim to represent. For nonprofit universities, the pressures that accompany certification of a class like the one here are thus not merely a matter of litigation strategy; they bear directly on the institutions' ability to carry out their educational missions.

## CONCLUSION

For the foregoing reasons, AAU respectfully urges this Court to reverse the district court's grant of class certification with instructions that class certification be denied.

Date: October 20, 2026

Respectfully submitted,

/s/ Lindsay C. Harrison

Lindsay C. Harrison
*Counsel of Record*
Elizabeth Henthorne
Gavan W. Duffy Gideon
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000
lharrison@jenner.com
bhenthorne@jenner.com
gavan.gideon@jenner.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the word limit of Circuit Rule 29, because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 3,717 words. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32(b), and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Century Schoolbook font for the main text and 11-point Century Schoolbook font for the footnotes.

Date: October 20, 2026

/s/ Lindsay C. Harrison
Lindsay C. Harrison
*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I, Lindsay C. Harrison, an attorney, hereby certify that on October 20, 2026, I caused the **Brief of *Amicus Curiae* Association of American Universities in Support of Defendants-Appellants and Reversal** to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Pursuant to ECF procedure (a)(4) and Circuit Rule 31(b), and upon notice of this Court's acceptance of the electronic brief for filing, I certify that I will cause ten copies of the above cited brief to be transmitted to the Court via UPS overnight delivery, delivery fee prepaid within five days of that date.

Date: October 20, 2026

/s/ Lindsay C. Harrison
Lindsay C. Harrison
*Counsel for Amicus Curiae*